**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
**Viktoria Safarian**, OSB No. 175487
Email: viktoria@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241

**Juan C. Chavez**, OSB No. 136428
Email: jchavez@ojrc.info
**Brittney Plesser**, OSB No. 154030
Email: bplesser@ojrc.info
**Alex Meggitt**, OSB No. 174131
Email: ameggitt@ojrc.info
**Franz H. Bruggemeier**, OSB No. 163533
Email: fbruggemeier@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503 944-2270

**J. Ashlee Albies**, OSB No. 051846
Email: ashlee@albiesstark.com
**Whitney B. Stark**, OSB No. 090350
Email: whitney@albiesstark.com
**Maya Rinta**, OSB No. 195058
Email: maya@albiesstark.com
Albies & Stark LLC
1 SW Columbia St. Suite 1850
Portland, Oregon 97204
Telephone: (503) 308-4770

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DON'T SHOOT PORTLAND, a nonprofit corporation, in its individual capacity, and NICHOLAS J. ROBERTS, in an individual capacity and on behalf of themselves and all others similarly situated, and  MICHELLE "MISHA" BELDEN, in an individual capacity and on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs<br><br>        v.<br><br>CITY OF PORTLAND, a municipal corporation,<br><br>        Defendant. | Case No.<br><br>MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUCTION |

## **MOTION FOR TEMPORARY RESTRAINING ORDER**

Pursuant to Fed. R. Civ. Pro. 65(a) and (b)(1), Plaintiffs request issuance of a Temporary Restraining Order and Preliminary Injunction. The application shows that "immediate and irreparable injury, loss, or damage will result to the movant[s] before the adverse party can be heard in opposition." Fed. R. Civ. Pro. 65(b)(1)(A). Plaintiffs support this application for relief with the below Memorandum of Law, the Declarations of Andy Green, Nicholas J. Roberts, Misha Belden, Hari Khalsa, Kevin Wilbanks, Brittany Bezdek, Allyxandra Theus, Daniel Rushton, and others in the process of being collected and signed at the time of filing of this motion.

If the Court elects to grant Plaintiffs' Temporary Restraining Order, Plaintiffs request an expedited hearing in accordance with Fed. R. Civ. Pro. 65(b)(3).

MEMORANDUM IN SUPPORT OF ENTRY OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
Page 2

Plaintiffs have a Constitutional right under the Fourth Amendment against the use of unreasonable force by the state and under the First Amendment to be allowed to engage in protest as protected speech. Plaintiffs request this court to issue a temporary restraining order and preliminary injunction to ensure that their constitutional rights are not violated by Defendants' unreasonable actions in employing tear gas against crowds indiscriminately.  The use of tear gas against crowds of protesters does not only harm plaintiffs directly and unreasonably, it also increases the risk that plaintiffs and the people around them will contract COVID-19. Plaintiffs seek issuance of a temporary restraining order to enjoin Defendants from using tear gas and smoke as crowd control tactics at protests.  Plaintiffs further ask the Court to require Defendants to immediately implement new procedures and policies for the use of crowd control munitions that will bring Portland Police Bureau ("PPB") in compliance with the standards of the Fourth Amendment.  For the reasons argued in Plaintiffs' Memorandum of Law, *infra*, the Court should enter that order.

# Table of Contents

I. INTRODUCTION .................................................................................................... 8

II. PROCEDURAL HISTORY .................................................................................... 8

III. STANDARD OF LAW.......................................................................................... 8

IV. FACTUAL ALLEGATIONS ................................................................................ 9

    A. Massive groups of demonstrators in Portland have taken to the streets demanding justice for George Floyd and condemning a racist and oppressive police system.............. 9

    B. The Portland Police Bureau has used tear gas indiscriminately against crowds of protesters. ............................................................................................................... 11

    C. The Portland Police Bureau's indiscriminate use of tear gas against crowds of protesters injured them and deterred them from engaging in further First Amendment activities. .............................................................................................................. 12

        1. Tear gas is a dangerous chemical weapon designed to harm and disorient people. .............................................................................................................. 13

        2. The novel coronavirus COVID-19 is a highly contagious, deadly respiratory virus.................................................................................................................. 16

        3. The Portland Police Bureau's use of tear gas helps spread COVID-19 infections and exacerbates its harmful, deadly nature. ......................................................... 17

V. ARGUMENT ...................................................................................................... 19

    A. Plaintiffs Are Likely to Prevail on the Merits of Their Fourth Amendment Claim..... 19

        1. Plaintiffs Roberts and Belden were "seized" because their freedom of movement was restrained by the Portland Police Bureau's use of tear gas against them. .............. 20

        2. The Portland Police Bureau's use of tear gas was a significant and dangerous level of force. ..................................................................................................... 21

        3. Plaintiffs Roberts and Belden did not commit any crimes and was not a threat to the officers or anyone else. ...................................................................................... 22

        4. Plaintiffs were at most passively resisting, if they heard any orders to disperse, and passive resistance does not justify the use of significant force as here. ............... 24

    B. Plaintiffs Are Likely to Prevail on the Merits of Their First Amendment Claim. ....... 26

    C. Plaintiffs are likely to prevail on their Monell claims against the City of Portland both on the First and Fourth Amendment violations. ............................................................ 28

        1. Plaintiffs will likely succeed on the theory that PPB and the City has an official policy of using indiscriminate and thus excessive force against protests declared "civil disturbance." ............................................................................................. 29

        2. Plaintiffs will likely succeed on the theory that PPB and the City has a custom and practice of using indiscriminate chemical gas agents against crowds of protestors.................................................................................................................. 30

3. Plaintiffs will likely succeed on the theory that official policymakers of the City of Portland ordered and ratified the uses of tear gas against crowds of protesters. .................................................................................................................... 31

**D. Without This Court's Intervention, Plaintiffs are Likely to Suffer Irreparable Harm.** ................................................................................................................ 32

**E. The Public Interest Weighs in Favor of Granting this Temporary Restraining Order and the Balance of Equities Is in Plaintiffs' Favor because the Safeguarding of Plaintiffs' and the Public's Constitutional Rights and Promotion of Public Health Outweigh Defendant's Interest in Using Chemical Weapons Against People.** ......... 34

**VI. CONCLUSION** .............................................................................................. 36

**Cases**

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ........................ 8

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858 (9th Cir. 2016) ............... 26

*Associated Press v. Otter*, 682 F.3d 821 (9th Cir. 2012) ................................................. 32

*Davis v. City of Las Vegas*, 478 F.3d 1048 (9th Cir. 2007) ............................................ 22

*Dougherty v. City of Covina*, 654 F.3d 892 (9th Cir. 2011) ........................................... 28

*Estate of Osuna v. Cty. of Stanislaus*, 392 F. Supp. 3d 1162 (E.D. Cal. 2019) ........... 30

*Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008) ..................................................... 25

*Gillette v. Delmore*, 979 F.2d 1342 (9th Cir. 1992) ......................................................... 28

*Goldstein v. City of Long Beach*, 715 F.3d 750 (9th Cir. 2013) ..................................... 32

*Graham v. Connor*, 490 U.S. 386 (1989). ................................................................. 19, 22

*Hartman* v. *Moore*, 547 U. S. 250, 256 (2006).............................................................. 26

*Headwaters Forest Def. v. Cnty. of Humboldt ("Headwaters I")*, 240 F.3d 1185 (9th Cir. 2000)21

*Headwaters Forest Def. v. Cty. of Humboldt*, 276 F.3d 1125 (9th Cir. 2002) ..................... 25, 35

*Id.* ...................................................................................................................... 21, 22, 23

*In re Excel Innovations, Inc.*, 502 F.3d 1086 (9th Cir. 2007) .......................................... 33

*Johnson v. City of Berkeley*, 2016 WL 928723 (N.D. California, 2016)................... 27, 31

*Keating v. City of Miami*, 598 10 F.3d 753,767 (11th Cir. 2010) ................................... 27

*LaLonde v. County of Riverside*, 204 F.3d 947 (9th Cir. 2000)....................................... 25

*Logan v. City of Pullman*, 392 F. Supp. 2d 1246 (E.D.Wash. 2005)............................... 21

*Louis v. Praprotnik*, 485 U.S. 112 (1988)..................................................................... 32

*Marbet v. City of Portland*, No. CV 02-1448-HA, 2003 U.S. Dist. LEXIS 25685 (D. Or. Sep. 8, 2003)......................................................................................................................... 20

*Marbet v. City of Portland*, No. CV 02-1448-HA, 2003 WL 23540258 (D. Or. Sept. 8, 2003).. 25

*Martin v. City of Portland*, No. 3:19-CV-1647-SI, 2020 WL 363391(D. Or. Jan. 21, 2020) ...... 31

*McCarthy v. Barrett*, 804 F. Supp. 2d 1126 (W.D. Wash. 2011) ................................... 27

*McCarthy v. Barrett*, 804 F.Supp.2d 1126 (W. D. Washington, 2011)........................... 31

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ........................................................ 34

*Melendres v. Arpaio*, 695 F.3rd 990 (9th Cir. 2012) ....................................................... 33

*Multi-Ethnic Immigrant Workers Org. Network v. City of L.A.*, 246 F.R.D. 621 (C.D. Cal. 2007) ................................................................................................................................... 27

*Natural Res. Def. Council, Inc.  v. Winter*, 518 F.3d 658 (9th Cir. 2008)..................... 8

*Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012). .................................................. 19

*NRDC v. Winter*, 518 F.3d 658 (9th Cir. 2008) ............................................................. 32

*Sammartano v. First Judicial Dist. Court*, 303 F.3d 959 (9th Cir. 2002)....................... 34

*Ulrich v. City & Cty. of S.F.*, 308 F.3d 968 (9th Cir. 2002) ........................................... 26

*Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir.2005)................................................... 32

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) ................................................ 8

**Other Authorities**

Amy Harmon, *Why We Don't Know the True Death Rate for Covid-19*, The New York Times (Apr. 17, 2020) ................................................................................................. 17

CENTERS FOR DISEASE CONTROL AND PREVENTION, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*............................... 17

CENTERS FOR DISEASE CONTROL AND PREVENTION; *Facts About Riot Control Agents Interim* .. 15

CENTERS FOR DISEASE CONTROL AND PREVENTION; *Facts About Riot Control Agents Interim Document*, ................................................................................................ 14, 15

MEMORANDUM IN SUPPORT OF ENTRY OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Charlotte West, *Pepper Spray is Toxic, Experts Say. So Why Is it Being Used on Children?* The Appeal (Sep. 10, 2019) ............................................................................................. 16

CONVENTION ON THE PROHIBITION OF THE DEVELOPMENT, PRODUCTION, STOCKPILING, AND USE OF CHEMICAL WEAPONS AND ON THEIR DESTRUCTION ............................................. 15

DEFENSE TECHNOLOGY, *Sell Sheet* (Skat Shell 40mm Multiple Projectile Round, OC)*, available at* https://www.defense-technology.com/on/demandware.static/-/Sites-DefenseTech-Library/default/dw3feef745 /resources/def-tech-pdfs/OCPyrotechnicSellSheet08.15.pdf ....... 14

DEFENSE TECHNOLOGY, *Skat Shell 40mm Multiple Projectile Round OC* .................................... 14

Holly Secon and Hilary Brueck, *Police Departments' Use of Tear Gas Could Exacerbate Coronavirus Outbreak, Experts Say*, BUSINESS INSIDER (June 2, 2020) ........................... 15, 18

Lisa Song, *Tear Gas is Way More Dangerous Than Police Let On – Especially During the Coronavirus Pandemic*, PROPUBLICA (June 4, 2020) ..................................................... 14, 15, 16

Lois Parshley, *The Emerging Long-Term Complications of Covid-19, Explained*, VOX (May 8, 2020) ...................................................................................................................................... 19

Maxine Bernstein, *Amid Calls for Ban on Tear Gas, Portland Police Deputy Chief Stands By Its Use*, THE OREGONIAN (June 4, 2020) ........................................................................................ 13

Michelle Goldberg, *Tear Gas is An Abortifacient. Why Won't the Anti-Abortion Movement Oppose It?,* THE NATION (Aug. 14, 2014) .............................................................................. 15

*Open Letter Advocating for an Anti-Racist Public Health Response to Demonstrations Against Systemic Injustice occurring During the COVID-19 Pandemic* .............................................. 17

Panagis Galiatsatos, *What Cornavirus Does to the Lungs,* JOHNS HOPKINS MEDICINE .............. 19

Rong-Going Lin II, *Using Tear Gas to Subdue Protesters May Further Spread the Cornavirus, Experts Warn*, Los Angeles Times (June 4, 2020) .................................................................. 18

THE NEW YORK TIMES, *An Incalculable Loss* (May 27, 2020) .................................................. 19

Twitter, "#DefendPdx" @defendpdx (June 2, 2020), ................................................................ 13

Zeynep Tufekci, *I Can't Breathe: Braving Tear Gas in a Pandemic*, The Atlantic (June 4, 2020) ...................................................................................................................................... 15

**Rules**

Fed. R. Civ. Pro. 65(a) ................................................................................................................ 2

**Constitutional Provisions**

First Amendment ......................................................................................................................... 3

Fourth Amendment ...................................................................................................................... 3

# I. INTRODUCTION

In the wake of the police killing of George Floyd, for the past seven days, plaintiffs, along with tens of thousands of their fellow community members and millions of other people around the world, have taken to the streets to protest white supremacy and police violence in the United States generally and in Portland specifically. The Portland Police Bureau, like police departments all over the country, have responded with indiscriminate, unchecked, and unconstitutional violence against protesters in order to suppress their right to free speech. Plaintiffs bring a civil rights action and seek a Court order to stop the City of Portland from using chemical weapons against them.

# II. PROCEDURAL HISTORY

Plaintiffs filed their Complaint on June 5, 2020. Dkt. 1. In their Complaint, Plaintiffs announced that they represent a putative class of similarly situated persons, Comp. ¶¶ 21-29, and that they seek an order enjoining Defendants' unconstitutional conduct, *See generally id*. Plaintiffs file this Motion for a Temporary Restraining Order in conjunction with the Complaint.

# III. STANDARD OF LAW

The court may grant a temporary restraining order or preliminary injunction by finding one of two sets of criteria are satisfied. *Natural Res. Def. Council, Inc. v. Winter*, 518 F.3d 658, 677 (9th Cir. 2008). The "traditional" criteria consider four factors: (1) the likelihood of success on the merits, (2) the likelihood of irreparable harm in the absence of preliminary relief, (3) the balance of equities, and in some cases, (4) the public interest. *Id*.; *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008); and *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1135-38 (9th Cir. 2011).

In the Ninth Circuit, among others, courts use a "sliding scale" to evaluate these equitable factors. A strong showing on one of the factors may offset a weak showing on another. *Cottrell*, 632 F.3d at 1131-32.  Thus, for example, "a preliminary injunction is appropriate when plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."[1] *Id*. at 1134-35 (internal quotations and citations omitted).

Alternatively, a court may grant the request for a Temporary Restraining Order if the plaintiff demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised, and the balance of hardships tips sharply in the plaintiff's favor. *Natural Res*. *Def*. *Council, Inc*., 518 F.3d 658 at 677 (9th Cir. 2008). To succeed under the "serious question" test, plaintiffs must show that they are likely to suffer irreparable injury and that an injunction is in the public's interest. *Cottrell*, 632 F.3d at 1132. As described below, Plaintiffs satisfy both sets of criteria, and this court should issue a Temporary Restraining Order for Plaintiffs' Putative Class.

## IV. FACTUAL ALLEGATIONS

### A. Massive groups of demonstrators in Portland have taken to the streets demanding justice for George Floyd and condemning a racist and oppressive police system.

On May 25, 2020, in Minneapolis, Minnesota, a Black man named George Floyd was murdered on video by Officer Derek Chauvin of the Minneapolis Police Department while three of his fellow officers watched and did nothing to intervene. Officer Chauvin knelt on Mr. Floyd's neck for nearly nine minutes while Mr. Floyd pleaded for his life, repeatedly telling Chauvin that he could not breathe. Bystander video of the murder quickly went viral, sparking

---

[1] The Supreme Court held in *Winter* that a preliminary injunction should not issue if a plaintiff shows only a possibility of harm rather than a likelihood of harm. *Winter*, 555 U.S. at 21; *see also* 632 F.3d at 1135.  However, it did not reject the sliding scale or "serious question" frameworks.  632 F.3d at 1132-34.

MEMORANDUM IN SUPPORT OF ENTRY OF A TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
Page 9

outrage throughout the country. For many Americans, and particularly Black Americans, the murder of George Floyd, in broad daylight while being openly filmed and decried by witnesses, was the proverbial straw that broke the camel's back. Fed up with the empty platitudes and the endless yet ineffective "reforms" of their political and law enforcement leaders, millions of Americans took to the streets in protest, demanding an end to police violence and white supremacy, and refusing to leave those streets unless and until meaningful change is made.

Beginning on May 29, 2020, and every night since then, Portlanders have been demonstrating in the streets demanding justice for George Floyd, Breonna Taylor, Tony McDade, and other Black people killed by the police; to take a stand in opposition against the brutalities of policing which operates to oppress Black people; and to stand in solidarity with Black, Indigenous, and other people of color ("BIPOC") in our community and amplify BIPOC voices and demands. *See e.g.* Declaration of Hari Khalsa ("Khalsa Decl.") at ¶¶ 5, 8; Declaration of Mara Kruzewski ("Kruszewski Decl.") at ¶ 3; Declaration of Nicholas J. Roberts ("Roberts Decl.") at ¶ 11; Declaration of Kevin Wilbanks ("Wilbanks Decl.") at ¶ 3; Declaration of Daniel Rushton ("Rushton Decl.") at ¶ 3; Declaration of Allyxandra Theus ("Theus Decl.") at ¶¶ 4. 7; Declaration of Brittany Bezdek ("Bezdek Decl.") at ¶ 3.

A focal point of conflict between the City of Portland Police Bureau and the protesters has been the "Justice Center" in downtown Portland, which is, as of the date of this filing, completely surrounded by fencing. The building houses PPB's central precinct, which includes command staff offices, a jail where hundreds of humans—disproportionately Black—are kept in cages, and a small number of courtrooms which perpetuate racial inequalities every working day. The "Justice Center" is thus seen as a symbolic target for demonstrators. Khalsa Decl. at ¶ 9; Bezdek Decl. at ¶ 3.

Notably, a vast majority of demonstrators wore masks or other face coverings, as advised by the Centers for Disease Control and Prevention ("CDC") and other public health officials to help prevent against the spread of COVID-19.[2] Khalsa Decl. at ¶ 11.

**B. The Portland Police Bureau has used tear gas indiscriminately against crowds of protesters.**

The Portland Police Bureau has met demonstrator's demands with violence. PPB's response to the mass demonstrations includes indiscriminate use of chemical agents against crowds of protesters. For example, on May 29, 2020 at around 2:00 am, without warning or provocation, PPB members threw cannisters of tear gas behind a group of protesters, trapping them between clouds of tear gas and a fence. Roberts Decl. at ¶ 15. The next day, on May 30, at around 5:00 pm, without warning or provocation, PPB members again threw tear gas cannisters into a large crowd of demonstrators. *Id*. at ¶ 22-23. As a people ran to escape the chemical agent, police continued to throw tear gas cannisters from various positions, effectively trapping protesters in disorienting, painful plumes of tear gas. *Id*. On May 31, at around 11:30 pm, PPB members again indiscriminately fired tear gas, flash bang grenades, and rubber bullets onto an entire crowd of protesters outside of the "Justice Center" apparently in response to a few people spray painting property and throwing fireworks and empty water bottles. Wilibanks Decl. at ¶ 8, 9; Kruszewski Decl. at ¶ 9. On June 1, 2020, without warning or provocation, on multiple occasions around 4:00 pm and from around 11:00 pm through 1:00 pm, PPB launched tear gas into the crowd—sometimes while laughing. Bezdek Decl. at ¶¶ 6, 11, 18, 19, 22, 25. On June 2, 2020, without warning or provocation, PPB members again indiscriminately fired tear gas upon hundreds of protesters. Theus Decl. at ¶¶ 3, 9

---

[2] *See, supra*, Section D.

MEMORANDUM IN SUPPORT OF ENTRY OF A TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
Page 11

Over these days of protests, on multiple occasions, as people tried to escape the tear gas and leave the area, Portland police continued to fire tear gas cannisters, blocking their exits. Kruszewski Decl. at ¶ 9; Theus Decl. at ¶ 11; Bezdek Decl. at ¶ 23. At times, when demonstrators were attempting to leave the area, police officers followed and continued to shoot tear gas. Bezdek Decl. at ¶ 23

**C. The Portland Police Bureau's indiscriminate use of tear gas against crowds of protesters injured them and deterred them from engaging in further First Amendment activities.**

PPB's indiscriminate use of tear gas as already inflicted severe injuries to protesters and has chilled their desire to participate in further demonstrations. For example, people experienced:

- burning of their eyes, nose, and lungs;
- physical injuries as a result of being hit by exploding metal cannisters;
- uncontrollable snot and mucus which poured into their face masks;
- uncontrollable coughing and spitting;
- temporary blindness;
- disorientation;
- confusion;
- difficulty breathing;
- choking
- wheezing;
- nausea;
- panic; and
- terror.

Khalsa Decl. at ¶¶ 20, 21; Kruszewski Decl. at ¶ 10, Roberts Decl. at ¶¶ 16, 18; Wilbanks Decl. at ¶¶ 14, 15; Rushton Decl. at ¶ 13; Bezdek Decl. at ¶ 12. Some people who were injured were not even taking part in the demonstrations. Wilibanks Decl. at ¶ 12. PPB subjected protesters to potent doses and prolonged exposure to the chemical agents. For example, protesters attempting to escape clouds of tear gas were met with PPB firing even more cannisters of the chemical agent. Khalsa Decl. at ¶ 16; Kruszewski Decl. at ¶ 9; Roberts Decl. at ¶ 23. Children and

pregnant protesters were indiscriminately gassed to the point of vomiting uncontrollably. Green Decl. at ¶ 10-11.

As a result of PPB's above-described conduct, demonstrators have experienced trauma symptoms, fear of exposure to COVID-19, fear for their safety if they demonstrate again, refrained from attending any other protests, and are hesitant to attend future demonstrations. Khalsa Decl. at ¶¶ 22, 24; Kruszewski Decl. at ¶ 12, Roberts Decl. at ¶¶ 34; Wilbanks Decl. at ¶¶ 14, 15; Theus Decl. at ¶¶ 15, 16; Rushton Decl. at ¶19; Bezdek Decl. at ¶ 27.

Despite this, as of June 4, 2020, PPB announced it had no plans to stop using tear gas in the future.[3]

**D. The Portland Police Bureau's use of tear gas against crowds during the COVID-19 pandemic puts the public at heightened risk of contracting the respiratory virus.**

**1. Tear gas is a dangerous chemical weapon designed to harm and disorient people.**

The Portland Police Bureau deploys dangerous chemical agents against protesters. Among its so-called "crowd control" arsenal of tools and weapons, PPB uses at least two types of chemical agents against protesters: oleoresin capsicum ("OC") and orthochlorobenzalmalonitrile ("CS"). On the evening of June 3, 2020, PPB subjected Portland demonstrators to both OC and CS agents, all apparently Defense Technology brand manufactured by Safariland, including "Triple-Chaser OC," "Skat Shell OC," "Triple-Chaser CS," and "Skat Shell CS."[4]

---

[3] Maxine Bernstein, *Amid Calls for Ban on Tear Gas, Portland Police Deputy Chief Stands By Its Use*, THE OREGONIAN (June 4, 2020) available at https://www.oregonlive.com/crime/2020/06/amid-calls-for-ban-on-tear-gas-portland-police-deputy-chief-stands-by-its-use.html

[4] *See* Twitter, "#DefendPdx" @defendpdx (June 2, 2020), https://twitter.com/defendpdx/status/1268220101490335745

For clarity, the term "tear gas" includes both OC and CS chemical agents and these terms "tear gas" and "chemical agents" are used interchangeably throughout this motion. OC is derived from capsaicin and designed to be an irritant and inflammatory "primarily affect[ing] the respiratory tract."[5] CS is a nerve gas designed to inflict pain, and degrades the mucous membranes in a person's eyes, nose, mouth, and lungs.[6] The Defense Technology brand used by PPB includes a warning that its product can also expose people to lead salts and hexavalent chromium, which can cause cancer, birth defects, or other reproductive harm.[7] In addition, "triple-chaser" cannisters break into multiple distinct sub-munitions that disperse approximately 20 feet apart, allowing tear gas to cover a much larger area in a shorter period of time.[8] That is, PPB's means of tear gas dispersal are designed to be widespread and broadly applied.

Tear gas inflicts acute and serious injuries. The immediate impacts of tear gas exposure include chest tightness, coughing, a choking sensation or feeling of asphyxia, wheezing, shortness of breath, vomiting, excessive tearing and burning of the eyes, a runny nose, burning and swelling of the nose, sneezing, difficulty swallowing, drooling, among other things.[9] The

---

[5] *See, e.g.,* DEFENSE TECHNOLOGY, *Sell Sheet* (Skat Shell 40mm Multiple Projectile Round, OC)*, available at* https://www.defense-technology.com/on/demandware.static/-/Sites-DefenseTech-Library/default/dw3feef745/resources/def-tech-pdfs/OCPyrotechnicSellSheet08.15.pdf

[6] *See* Lisa Song, *Tear Gas is Way More Dangerous Than Police Let On – Especially During the Coronavirus Pandemic*, PROPUBLICA (June 4, 2020) available at https://www.propublica.org/article/tear-gas-is-way-more-dangerous-than-police-let-on-especially-during-the-coronavirus-pandemic

[7] *See* DEFENSE TECHNOLOGY, *Skat Shell 40mm Multiple Projectile Round OC, available at* https://www.defense-technology.com/products/chemical-agent-devices/chemical-projectiles/pyrotechnic/40-mm-projectiles/skat-shell-40mm-multiple-projectile-round-oc-1176043.html#q=skat+shell&start=1%20/; DEFENSE TECHNOLOGY, *Skat Shell 37mm Multiple Projectile Round CS*, available at https://www.defense-technology.com/products/chemical-agent-devices/chemical-projectiles/pyrotechnic/37-mm-projectiles/skat-shell-37-mm-multiple-projectile-round--cs-1012243.html

[8] DEFENSE TECHNOLOGY, *Triple-Chaser Separating Canister, CS – Technical Specifications, available at* https://www.defense-technology.com/on/demandware.static/-/Sites-DefenseTech-Library/default/dwc919152e/product-pdfs/less-lethal/Triple-Chaser_Grenade.pdf

[9] CENTERS FOR DISEASE CONTROL AND PREVENTION; *Facts About Riot Control Agents Interim Document*, available at https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp; Mike Baker, *Corrosive Effects of Tear Gas Could Intensify Coronavirus Pandemic*, THE NEW YORK TIMES (June 3, 2020), available at https://www.nytimes.com/2020/06/03/us/tear-gas-risks-protests-coronavirus.html

MEMORANDUM IN SUPPORT OF ENTRY OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Page 14

Centers for Disease Control and Prevention ("CDC") also warns that immediate exposure to a large dose or long-lasting exposure can cause blindness, glaucoma, respiratory failure, and even death as a result of chemical burns or respiratory failure.[10] Further, the 1993 International Chemical Weapons Convention bans tear gas under Article I, Section 5.[11]

Long-term health effects as a result to tear gas exposure are also dire. The CDC provides long-term health effects can include eye scarring, glaucoma, and possible breathing problems including asthma.[12] Studies conducted by the U.S. military and studies of civilians in Turkey have found exposure to tear gas creates a greater risk of contracting influenza, pneumonia, chronic bronchitis, and other respiratory illnesses, as well as chronic chest pains and coughing that can last for weeks.[13] In addition, many subjects of the Turkey study also reported ongoing dyspnea—"the medical term for 'I can't breathe.'"[14] Evidence also shows tear gas may induce abortions, causing miscarriages and fetal harm.[15]

---

[10] CENTERS FOR DISEASE CONTROL AND PREVENTION; *Facts About Riot Control Agents Interim Document*, available at https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp

[11] CONVENTION ON THE PROHIBITION OF THE DEVELOPMENT, PRODUCTION, STOCKPILING, AND USE OF CHEMICAL WEAPONS AND ON THEIR DESTRUCTION, available at https://www.opcw.org/sites/default/files/documents/CWC/CWC_en.pdf ("Each State Party undertakes not to use riot control agents as a method of warfare.")

[12] CENTERS FOR DISEASE CONTROL AND PREVENTION; *Facts About Riot Control Agents Interim Document*, available at https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp

[13] Lisa Song, *Tear Gas is Way More Dangerous Than Police Let On – Especially During the Coronavirus Pandemic*, PROPUBLICA (June 4, 2020) available at https://www.propublica.org/article/tear-gas-is-way-more-dangerous-than-police-let-on-especially-during-the-coronavirus-pandemic; Holly Secon and Hilary Brueck, *Police Departments' Use of Tear Gas Could Exacerbate Coronavirus Outbreak, Experts Say*, BUSINESS INSIDER (June 2, 2020) available at https://www.businessinsider.com/police-use-of-tear-gas-could-worsen-coronavirus-outbreaks-2020-6

[14] Zeynep Tufekci, *I Can't Breathe: Braving Tear Gas in a Pandemic*, The Atlantic (June 4, 2020) available at https://www.theatlantic.com/health/archive/2020/06/i-cant-breathe-using-tear-gas-during-pandemic/612673/

[15] Michelle Goldberg, *Tear Gas is An Abortifacient. Why Won't the Anti-Abortion Movement Oppose It?*, THE NATION (Aug. 14, 2014) available at https://www.thenation.com/article/archive/tear-gas-abortifacient-why-wont-anti-abortion-movement-oppose-it/.

The impact of tear gas on children is particularly severe. Some experts are concerned about neurological problems and permanent skin or eye damage.[16] Notably, the use of OC spray on incarcerated children and young people is banned in 35 states.[17]

While the above-described harmful effects of tear gas are known, it should be noted that the development and evolution of these chemical agents have far outstripped scientists' ability to understand the full scope of their impact on human health.[18]

**2. The novel coronavirus COVID-19 is a highly contagious, deadly respiratory virus.**

COVID-19 is a novel respiratory virus spread primarily through droplets when an infected persons coughs or sneezes, or through droplets of saliva or discharge from the nose. Declaration of Marc F. Stern ("Stern Decl.") at ¶ 7. For all these reasons, the CDC recommends people wear face coverings over the nose and mouth to help prevent the spread of COVID-19.[19] There is no vaccine nor cure for COVID-19, and no one has prior immunity. *Id*. As such, the virus has spread across the globe, and has been designated a global pandemic.

Those infected with COVID-19 can experience no symptoms, mild symptoms, or severe symptoms. *Id*. at ¶ 8. As such, and due to limited COVID-19 testing, the true rate of COVID-19 infections is unknown, although health officials and epidemiologists have estimated that there are five to 10 people with undetected infections for every confirmed case in some communities,

---

[16] Lisa Song, *Tear Gas is Way More Dangerous Than Police Let On – Especially During the Coronavirus Pandemic*, PROPUBLICA (June 4, 2020) available at https://www.propublica.org/article/tear-gas-is-way-more-dangerous-than-police-let-on-especially-during-the-coronavirus-pandemic
[17] Charlotte West, *Pepper Spray is Toxic, Experts Say. So Why Is it Being Used on Children?* The Appeal (Sep. 10, 2019) available at https://theappeal.org/pepper-spray-is-toxic-experts-say-so-why-is-it-being-used-on-children/
[18] Lisa Song, *Tear Gas is Way More Dangerous Than Police Let On – Especially During the Coronavirus Pandemic*, PROPUBLICA (June 4, 2020) available at https://www.propublica.org/article/tear-gas-is-way-more-dangerous-than-police-let-on-especially-during-the-coronavirus-pandemic
[19] CENTERS FOR DISEASE CONTROL AND PREVENTION; *Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission*, available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html

and others estimate there are far more.[20] The CDC estimates the incubation period for COVID-19 is thought to extend to fourteen days, with a median of four to five days from exposure to symptoms onset.[21] In short, the true number of people are infected with COVID-19 is unknown, and those who are infected may not have symptoms but can still transmit the respiratory virus to others.

### 3. The Portland Police Bureau's use of tear gas helps spread COVID-19 infections and exacerbates its harmful, deadly nature.

The novel coronavirus COVID-19 is just that—novel—and the scope of the COVID-19-related harm as exacerbated by tear gas is yet to be completely determined. However, emerging research and evidence shows that when police use tear gas against a crowd of people, they help spread COVID-19 and render people less capable of fighting the virus. As an example: to date, hundreds of public health experts and infectious disease experts have signed on to an open letter opposing any use of tear gas, smoke, or other respiratory irritants "which could increase risk for COVID-19 by making the respiratory tract more susceptible to infection, exacerbating existing inflammation, and inducing coughing."[22] Notably, the public health experts additionally highlight the fact that Black people are more likely to be killed by the police and are more likely to develop and suffer from COVID-19 than their white counterparts.[23]

---

[20] Amy Harmon, *Why We Don't Know the True Death Rate for Covid-19*, The New York Times (Apr. 17, 2020) available at https://www.nytimes.com/2020/04/17/us/coronavirus-death-rate.html

[21] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, (Updated June 2, 2020) available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management patients.html#:~:text=The%20incubation%20period%20for%20COVID,CoV%2D2%20infection.

[22] *Open Letter Advocating for an Anti-Racist Public Health Response to Demonstrations Against Systemic Injustice occurring During the COVID-19 Pandemic*, available at https://drive.google.com/file/d/1Jyfn4Wd2i6bRi12ePghMHtX3ys1b7K1A/view

[23] *Id.*

MEMORANDUM IN SUPPORT OF ENTRY OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Use of tear gas against a crowd of demonstrators is directly adverse to all best known practices to reduce the infections spread of COVID-19. As described above, tear gas immediately impacts our eyes, nose, mouth, and lungs, inflicting a burning sensation and simulating the feeling of asphyxiation. The chemical agents increase mucus production, resulting in watering of the eyes, a runny nose, and coughing. As people exposed to tear gas immediately begin coughing and gasping for air, sneezing, blowing their nose, and vomiting, they are likely to remove any face coverings—and indeed, per proper decontamination procedures, people exposed to tear gas should remove impacted clothing.[24] As a crowd of people secrete mucus and attempt to wipe their faces while coughing and sneezing, it creates a perfect storm for COVID-19 transmission: people not wearing masks are in close proximity, coughing, sneezing, and secreting mucous and droplets that carry the virus. Some professionals highlight the added concern that a person's nose is "known to be a reservoir for the virus."[25]

In addition to thwarting best known practices to reduce COVID-19 spread, police use of tear gas also makes people more susceptible to succumbing to the virus's harmful effects. Respiratory irritants like tear gas inflame the inside of the nose and mouth, as well as the lining of lung tissues, which make the body more susceptible to respiratory infection.[26] Tear gas is

---

[24] Lisa Song, *Tear Gas is Way More Dangerous Than Police Let On – Especially During the Coronavirus Pandemic*, PROPUBLICA (June 4, 2020) available at https://www.propublica.org/article/tear-gas-is-way-more-dangerous-than-police-let-on-especially-during-the-coronavirus-pandemic; Rong-Going Lin II, *Using Tear Gas to Subdue Protesters May Further Spread the Cornavirus, Experts Warn*, Los Angeles Times (June 4, 2020) available at https://www.latimes.com/california/story/2020-06-04/using-tear-gas-to-subdue-protesters-may-help-spread-the-coronavirus-experts-warn; CENTERS FOR DISEASE CONTROL AND PREVENTION; *Facts About Riot Control Agents Interim Document*, available at https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp
[25] Holly Secon and Hilary Brueck, *Police Departments' Use of Tear Gas Could Exacerbate Coronavirus Outbreak, Experts Say*, BUSINESS INSIDER (June 2, 2020) available at https://www.businessinsider.com/police-use-of-tear-gas-could-worsen-coronavirus-outbreaks-2020-6
[26] Rong-Going Lin II, *Using Tear Gas to Subdue Protesters May Further Spread the Cornavirus, Experts Warn*, Los Angeles Times (June 4, 2020) available at https://www.latimes.com/california/story/2020-06-04/using-tear-gas-to-subdue-protesters-may-help-spread-the-coronavirus-experts-warn; Mike Baker, *Corrosive Effects of Tear Gas Could Intensify Coronavirus Pandemic*, THE NEW YORK TIMES (June 3, 2020), available at https://www.nytimes.com/2020/06/03/us/tear-gas-risks-protests-coronavirus.html

designed to be an irritant and inflammatory agent which can cause a person's lungs to fill with mucus, limiting their ability to breathe or even triggering an asthma attack.[27] The body's response to tear gas can also weaken a person's ability to fight viruses—a particularly devastating result given that COVID-19 is itself a respiratory virus with no vaccine or cure.

Even without these exacerbating effects, the global COVID-19 pandemic is a serious matter with devastating consequences. As of May 27, 2020—weeks before the mass, nationwide protests in response to the police killing of George Floyd—at least 100,000 Americans have died from the virus.[28] Survivors of COVID-19 likely face permanent lung damage.[29] The true devastation of COVID-19 has yet to be revealed, but even those who survive from the virus may continue to suffer long-term effects including stroke, embolisms, heart damage, cognitive impairments, adverse mental health impacts, and infertility.[30]

## V. ARGUMENT

### A. Plaintiffs Are Likely to Prevail on the Merits of Their Fourth Amendment Claim.

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer by means of physical force or show of authority terminates or restrains his freedom of movement through means intentionally applied." *Nelson v. City of Davis*, 685 F.3d 867, 875 (9th Cir. 2012). A seizure results in a constitutional violation if it is unreasonable. *Graham v. Connor*, 490 U.S. 386 (1989). To resolve the question of whether

---

[27] Lisa Song, *Tear Gas is Way More Dangerous Than Police Let On – Especially During the Coronavirus Pandemic*, PROPUBLICA (June 4, 2020) available at https://www.propublica.org/article/tear-gas-is-way-more-dangerous-than-police-let-on-especially-during-the-coronavirus-pandemic

[28] THE NEW YORK TIMES, *An Incalculable Loss* (May 27, 2020) available at https://www.nytimes.com/interactive/2020/05/24/us/us-coronavirus-deaths-100000.html

[29] Panagis Galiatsatos, *What Cornavirus Does to the Lungs,* JOHNS HOPKINS MEDICINE, available at https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/what-coronavirus-does-to-the-lungs

[30] *See* Lois Parshley, *The Emerging Long-Term Complications of Covid-19, Explained*, VOX (May 8, 2020) available at https://www.vox.com/2020/5/8/21251899/coronavirus-long-term-effects-symptoms

MEMORANDUM IN SUPPORT OF ENTRY OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

the use of force was "unreasonable," the court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Nelson*, 685 F.3d at 878 (internal citations and quotation marks omitted). PPB's use of tear gas chemical agents against plaintiff and the class was clearly unreasonable under the totality of the circumstances.

### 1. Plaintiffs Roberts and Belden were "seized" because their freedom of movement was restrained by the Portland Police Bureau's use of tear gas against them.

Plaintiffs, Nicholas Roberts and Misha Belden, representatives of all putative class-members in the tear-gassed crowd, was "seized" within the meaning of the Fourth Amendment when he was subjected to OC and CS spray ("tear gas"). Defendant's use of tear gas against plaintiff and the class of protesters was an intentional use of force which terminated plaintiff's and the whole crowd's freedom of movement. Once PPB deploys tear gas against crowds of protesters standing in the vicinity the people in the crowd run away. Plaintiff and the rest of the crowd could no longer stay to exercise their First Amendment rights and instead were forced to try to remove themselves from the area due to being gassed. The officers acted volitionally in deploying "crowd control munitions," including but not limited to OC and CS gas. This was an intentional use of force. *Nelson,* 685 F.3d at 875 (explaining that a volitional use of force is an intentional use of force against plaintiff, regardless of whether he was the intended recipient of the use of force.); *Marbet v. City of Portland*, No. CV 02-1448-HA, 2003 U.S. Dist. LEXIS 25685, at *26-27 (D. Or. Sep. 8, 2003) (denying Defendant City of Portland's Motion to Dismiss the Fourth Amendment claim because intentionally pepper spraying and shooting rubber bullets is a "seizure.")

It is of no significance if PPB's goal was to disperse what they called an "unlawful assembly" or a "civil disturbance." In *Nelson*, the defendants also made the argument that their intent was to disperse the crowd. The court emphasized that the Fourth Amendment standard is not a subjective one, so the defendants' intent was irrelevant to the question of whether a "seizure" occurred. *Id*. at 877-78. Because his freedom of movement was restrained by the use of OC and CS spray, plaintiff was subject to a "seizure" under the Fourth Amendment.

### 2. The Portland Police Bureau's use of tear gas was a significant and dangerous level of force.

The use of tear gas is a significant and dangerous use of force. In *Nelson*, the Ninth Circuit again rejected the contention that the use of pepper spray (OC spray) is a "minimal" intrusion, due to the immediacy and "uncontrollable nature" of the pain involved. *Nelson*, 685 F.3d at 878 (citing *Headwaters Forest Def*. *v*. *Cnty*. *of Humboldt ("Headwaters I")*, 240 F.3d 1185, 1199 (9th Cir. 2000), *vacated and remanded on other grounds*, 534 U.S. 801, 122 (2001); *see also Logan v*. *City of Pullman*, 392 F. Supp. 2d 1246, 1261 (E.D.Wash. 2005) (noting that pepper spray "is a 'dangerous weapon' under the criminal sentencing guidelines because it is 'capable of inflicting death or serious bodily injury.'")). Both the risk of harm and the actual harm suffered by plaintiff is relevant to the relative weights of interests involved. *Nelson*, 685 F.3d at 879. Officers deployed CS and OC gas into the crowd and continued to deploy these chemical agents as the crowd started running away. The agents were fired into the fleeing crowd, posing great risks to everyone.[31] Plaintiff Roberts experienced intense pain, coughing, difficulty breathing and seeing, confusion, disorientation and panic. Roberts Decl. at ¶¶ 16; 18-19; 22. As a result of being gassed repeatedly, plaintiff Roberts "could barely talk and it was painful to

---

[31] *Supra,* Section I.C.

MEMORANDUM IN SUPPORT OF ENTRY OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
Page 21

move." Roberts Decl. at ¶¶ 33. The risks associated with contact with OC/CS spray are great, and even greater given the respiratory effects and the heightened risks of contracting COVID-19. *See Supra Section D*. Plaintiff Belden also felt intense pain, and noticed that others were in pain as well. Belden Decl. at ¶¶ 13, 15, 16. Given the circumstance, Plaintiff Belden believed that the police were trying to kill her. *Id*. at 16.

### 3. Plaintiffs Roberts and Belden did not commit any crimes and was not a threat to the officers or anyone else.

The reasonableness of force inquiry is essentially a balancing test between the seriousness of force and the need for force against the threat posed by plaintiff. *"*To evaluate the need for the government's use of force against Nelson we consider a number of factors, including "the severity of the crime at issue, whether . . .[Nelson] pose[d] an immediate threat to the safety of the officers or others, and whether he . . . actively resist[ed] arrest or attempt[ed] to evade arrest by flight." *Nelson*, 685 F.3d at 879 (*quoting Graham*, 490 U.S. at 396.).

The first two factors – the severity of the crime at issue and the threat posed by plaintiff to the safety of PPB officers or others – weighs heavily in favor of plaintiff. Plaintiff Roberts was peacefully standing on public streets, exercising his constitutional rights to protest police violence. Roberts Decl. at ¶¶ 14-16; 21-23; 28-32.  He did not commit any crimes at all. Plaintiff He was not posing any threat to the officers or anyone else. Belden also was standing by peacefully. Belden Decl. at ¶¶ 11,12. Even if they were "trespassing" after an order to disperse, a fact that plaintiffs do not concede because he was peacefully and lawfully exercising their First Amendment rights on public streets in downtown Portland, trespass "is a minor infraction that justifies, at most, only a minimal use of force." *Nelson*, 685 F.3d at 880; *Davis v*. *City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007).

In considering "degree of threat posed by the suspect," *Nelson*, 685 F.3d at 880, it is important to note that the relevant question is whether the plaintiff himself posed a threat to officers or the public prior to the use of force. In *Nelson v. City of Davis*, police fired pepperballs (OC) on plaintiff who was a partygoer at a party at UC Davis. In *Nelson* the court gave due weight to the "the tumultuous circumstances in which the use of force took place" and yet still found this factor to weigh heavily against the defendants because defendants did not observe *specifically* Nelson and his friends throwing objects, acting violently, or engaging in any threatening behavior. *Nelson*, 685 F.3d at 880-81 (9th Cir. 2012). The court noted:

> "Although the officers encountered individuals at various points during their sweeps who threw bottles or other debris at them, or haphazardly threw such items throughout the complex, the defendants admit that they never saw Nelson throw anything — in their direction or in any other direction. . . Even affording due weight to the tumultuous circumstances in which the use of force took place, there was no indication that Nelson or his colleagues — college students taking cover in the breezeway — represented a threat to anyone's safety. These individuals were observed prior to the officers' use of force and were seen not to be engaged in any violent conduct. Nonetheless, the projectiles were launched towards them. Under these circumstances, the general disorder of the complex cannot be used to legitimize the use of pepperball projectiles against non-threatening individuals."

*Id*.

The City will undoubtfully claim that the officers faced an exigency to disperse the crowds downtown due to some protesters throwing objects at them or engaging in other concerning behaviors. This argument must fail as it did in *Nelson*. One or several people throwing objects at numerous heavily armed officers does not justify an indiscriminate use of gas agents against a peaceful group of bystanders, including plaintiff. Even if officers observed some individuals throwing objects, this observation justifies at most a targeted and directed use of force against those individuals, not a wide-spread, indiscriminate use of force against the entire crowd, including plaintiff. *Nelson* stands clearly for this proposition. *Nelson v. City of Davis*, 685 F.3d 867, 883 (9th Cir. 2012). The *Nelson* court was clear:

MEMORANDUM IN SUPPORT OF ENTRY OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
Page 23

"The officers' general interest in clearing the complex does not provide a legitimate governmental interest sufficient to justify the use of the force at issue. While it is undisputed that there were individuals hurling both bottles and expletives at officers, it is also undisputed that Nelson and his companions were not among them, and the individuals causing the problems were not so numerous that the two categories of partygoers were indistinguishable. The application of force to Nelson's group therefore could not have been justified by the government's interest in stopping any and all disorderly behavior."

*Id*.

### 4. Plaintiffs were at most passively resisting, if they heard any orders to disperse, and passive resistance does not justify the use of significant force as here.

Lastly under the *Graham* analysis is the question of whether plaintiff was actively resisting or attempting to evade arrest. Undoubtedly, PPB will claim that plaintiff and the class of plaintiffs comprising the crowd of protesters did not comply with orders to disperse immediately. According to the declarations supporting this motion, peaceful protesters were trapped and unable to leave safely due to the continuous tear gas deployment as they tried to escape. *See e.g.* Roberts Decl. at ¶¶ 15; 23; Green Decl. at ¶¶ 10.

Even if the court finds that plaintiffs heard the orders and engaged in passive resistance, this does not justify PPB's use of force against plaintiffs. The Ninth Circuit has held that "failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force. We have so held even when the extent of the resistance was substantially greater than Nelson and his friends' simple failure to disperse. *Nelson*, 685 F.3d at 881 (citing collection of cases on various levels of resistance). Where, as here, the only resistance is a peaceful failure to immediately disappear from an area, the "resistance was [not] particularly bellicose . . . we have held that various applications of force, including the use of pepper spray. . . and bean bag projectiles . . . were not reasonable." *Nelson*, 685 F.3d at 882 (internal citations omitted). Even if plaintiff heard and did

not immediately comply with orders to disperse, that single act of non-compliance, without any attempts to threaten the officers or put them at risk, does not constitute "active resistance" and therefore this factor should also weigh heavily in favor of plaintiff.

In conclusion, the plaintiff is likely to prevail on the merits that the use of tear gas against him was an unreasonable application of force under the Fourth Amendment. Precedent supporting plaintiff's probability of success is abundant. *LaLonde v. County of Riverside*, 204 F.3d 947 (9th Cir. 2000) (the use of pepper spray, and a failure to alleviate its effects, was an unreasonable application of force against an individual who was suspected of only minor criminal activity, offered only passive resistance, and posed little to no threat of harm to others.); *Headwaters Forest Def. v. Cty. of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002)(denying qualified immunity for the second time and stating that "using pepper spray against the protesters was excessive under the circumstances" when officers applied pepper spray directly into the eyes of protesters who were refusing to leave.); *Nelson v. City of Davis*, 685 F.3d 867, 885 (9th Cir. 2012)("Under these precedents, any reasonable officer therefore would have been on notice prior to April 2004 that the application of pepper spray to individuals such as Nelson and his associates, whose only transgression was the failure to disperse as quickly as the officers desired, would violate the Fourth Amendment."); *Marbet v. City of Portland*, No. CV 02-1448-HA, 2003 WL 23540258, at *10 (D. Or. Sept. 8, 2003) (denying motion to dismiss Fourth Amendment claim because the plaintiffs' allegations that the "defendants intentionally applied pepper spray and shot rubber bullets at plaintiffs who were engaged in lawful protest activities" were facts, if proven, that "would establish that [the] defendants intentionally restrained [the] plaintiffs' freedom of movement"); *Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008)(holding that the

use of tear gas against nonviolent anti-war  who at most committed the misdemeanor of

disorderly conduct, did not flee or actively resist arrest, constituted unreasonable force).

///

///

### B. Plaintiffs Are Likely to Prevail on the Merits of Their First Amendment Claim.

"[A]s a general matter the First Amendment prohibits government officials from

subjecting an individual to retaliatory actions" for engaging in protected

speech. *Hartman* v. *Moore*, 547 U. S. 250, 256 (2006). In order to show a First Amendment

violation, Plaintiffs must provide evidence that that their "protected activity was a substantial

motivating factor in . . . [D]efendant[s'] conduct," that is, "there was a nexus between

[Defendants'] actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,

824 F.3d 858, 867 (9th Cir. 2016). "As with proof of motive in other contexts, this element of a

First Amendment retaliation suit may be met with either direct or circumstantial evidence[.]"

*Ulrich v. City & Cty. of S.F.*, 308 F.3d 968, 979 (9th Cir. 2002).

Plaintiffs are likely to prevail on the elements of a First Amendment violation. Plaintiffs

will show that Defendant declared their protected protest an "unlawful assembly" and unleashed

repeated, wide-spread, indiscriminate uses of force against crowds of peaceful protesters

engaged in speech criticizing Defendant's rampant use of force against Black people. As

evidenced in the declarations filed in support of this motion, the plaintiff and declarants were

members of crowds of peaceful protesters. The crowds of people were engaged in speech

condemning Defendant for its use of force: shouting "Fuck the Police" and "Abolish Police"

among other slogans. Defendant may justify its uses of force by claiming that "projectiles were

thrown" at officers. This reason is pretextual and shifts blame on the victims of police violence.

As the declarations supporting this motion show, if water bottles or fireworks were thrown, they were thrown by one, two, or a few individuals within a large crowd of peaceful demonstrators. Khalsa Decl. at ¶ 13. Such actions do not justify the indiscriminate teargassing of a large crowd. The deployment of tear gas has had its intended effect of chilling speech. Once tear gas is deployed, protesters have scattered – coughing, injured, silenced. Countless protesters have been traumatized and intimidated against returning to protest again and afraid to stay after dark. Don't Shoot PDX has suffered as an organization with the mission to end police violence through civic engagement because people's protest activities have been chilled.

Courts within this jurisdiction and in other circuits have sided with Plaintiffs on First Amendment issues in similar protest contexts. *McCarthy v. Barrett*, 804 F. Supp. 2d 1126, 1137-38 (W.D. Wash. 2011) (holding that, despite police claims that tear gas was used to disperse a violent crowd, a reasonable juror could conclude that officers who used tear gas against a crowd at the Milwaukee Way Antiwar Protest "intended to deter protesters' protected speech based on their association with certain student political organizations."); *Johnson v. City of Berkeley*, 2016 WL 928723 (N.D. California, 2016) (holding that protest plaintiffs who were arrested and tear gassed by the police "have alleged sufficient facts to infer that plaintiffs' association with the protest was a substantial or motivating factor for defendants' actions."); *Keating v. City of Miami*, 598 10 F.3d 753,767 (11th Cir. 2010) (upholding the denial of qualified immunity because supervisors, including the Chief of Miami Police Department violated clearly established law when they directed their subordinate officers to use less-than-lethal weapons, including batons, tear gas, pepper spray (balls and direct spray), to disperse a crowd at a large public demonstration and consequently failed to stop such conduct.); *Multi-Ethnic Immigrant Workers Org. Network v. City of L.A.*, 246 F.R.D. 621, 634 (C.D. Cal. 2007) (ruling on a motion

to certify a class in a protest case where LAPD declared an unlawful assembly and dispersed a

protest using "less-lethal force" after a group of protesters threw objects at officers, stating "[a]s

to the First Amendment claim, Plaintiffs are correct that the only material fact is that the LAPD

decided to declare an unlawful assembly and disperse the crowd" because plaintiffs' protected

speech rights were curtailed by Defendants' act of declaring an unlawful assembly.)

### C. Plaintiffs are likely to prevail on their *Monell* claims against the City of Portland both on the First and Fourth Amendment violations.

Plaintiffs have alleged *Monell* liability flowing from various *Monell* theories pled jointly and

in the alternative. To establish that the City of Portland itself is liable, Plaintiffs must allege that:

(1) they were deprived of a constitutional right; (2) the municipality had a policy, custom, or

practice; (3) the policy, custom, or practice amounted to deliberate indifference of the plaintiffs'

constitutional rights; and (4) the policy, custom, or practice was the "moving force" behind the

constitutional violation. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

Plaintiffs can prove that the policy, custom, or practice was the cause of injury in three ways: (1)

"a city employee committed the alleged constitutional violation pursuant to [either] a formal

governmental policy or a longstanding practice or custom which constitutes the standard

operating procedure of the local governmental entity"; (2) "the individual who committed the

constitutional tort was an official with final policy-making authority and that the challenged

action itself thus constituted an act of official governmental policy"; or (3) "an official with final

policy-making authority ratified a subordinate's unconstitutional decision or action and the basis

for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992). Arguments about

Defendants' liability on the elements of First and Fourth Amendment violations are hereby

incorporated from sections above. *See Supra Sections A and B*.

**1. Plaintiffs will likely succeed on the theory that PPB and the City has an official policy of using indiscriminate and thus excessive force against protests declared "civil disturbance."**

The City of Portland has an official policy allowing the use tear gas against crowd of protestors whenever it determines that the crowd creates a "civil disturbance." This policy has no relationship with the *Graham v. Connor* Fourth Amendment standard regulating the use of force against individuals. It expressly allows for the indiscriminate use of force against a crowd of people, in violation of the Fourth Amendment. The relevant Directive of PPB reads "6.4.6. Riot Control Agents (RCAs) or Area Impact Munitions. 6.4.6.1. Authorized Uses in Crowd Control. 6.4.6.1.1. Under the direction of the Crowd Management Incident Commander (CMIC), to disperse a crowd, when a demonstration or event becomes a civil disturbance, as defined in Directive 635.10, Crowd Management/Crowd Control." A civil disturbance is in turn defined in PPB Directive 0635.10 as "An unlawful assembly that constitutes a clear and present danger of riot, disorder, interference with traffic upon the public streets or when another immediate threat to public safety, peace or order appears."

This is a formal, written policy promulgated by the Portland Police Bureau. This policy does not comport with the "reasonableness" of force analysis under the Fourth Amendment because it does not require an individualized inquiry into whether individuals against whom force is used are actually a threat to law enforcement or anyone else, have committed any crimes, or are fleeing or resisting arrest. *See Supra Section A.*

In this case, Defendants have used this policy to violate the class of plaintiffs' Fourth and First Amendment rights. What is and what is not an "unlawful assembly" or a "civil disturbance" is itself a highly discretionary decision made by the City or Portland Police at the scene of a protest. In this case, the decisions to declare the protests against police violence "civil

disturbance[s]" and therefore allow the deployment of tear gas against largely peaceful crowds of protesters was a decision made to silence protestors, infringing each class member's First Amendment rights. The non-violent, peaceful protesters in the crowds were thus subjected to indiscriminate police violence through the use of chemical agents in violation of their Fourth Amendment rights.

### 2. Plaintiffs will likely succeed on the theory that PPB and the City has a custom and practice of using indiscriminate chemical gas agents against crowds of protestors.

At least on May 29, 30, 31 and June 2 and 3, 2020, the PPB deployed tear gas and other crowd control munitions on a large crowd of peaceful protestors and continued to deploy tear gas at people running away. Videos documenting the indiscriminate nature of this force deployment are rampant.[32] The City has tacitly and explicitly authorized the use of indiscriminate crowd control weapons on crowds of protestors by justifying uses of similar tactics, including tear gas shot indiscriminately into crowds of protestors, at protests on these dates. This custom of using indiscriminate force against crowds of protestors has violated the class of plaintiffs' Fourth and First Amendment rights, as explained above.

Plaintiffs have pled sufficient facts and filed declarations of facts about the nights of May 29, 30, 31, June 2 and 3, 2020 to show that the use of chemical agents against crowds of anti-police violence protestors was not an isolated incident, and instead constituted a practice or custom constituting city policy. *See e.g.* Roberts Decl.; *see Estate of Osuna v. Cty. of Stanislaus*, 392 F. Supp. 3d 1162, 1175 (E.D. Cal. 2019) (denying motion to dismiss *Monell* claim because the

---

[32] E.g. https://twitter.com/mrolmos/status/1268072714926878720?s=21; https://twitter.com/matcha_chai/status/1268043556913987584?s=21

complaint "identified multiple prior instances of alleged misconduct."); *see also Martin v. City of Portland*, No. 3:19-CV-1647-SI, 2020 WL 363391, at \*5-6 (D. Or. Jan. 21, 2020)(denying the City's motion to dismiss *Monell* claim because the plaintiff adequately alleged "that the City ha[d] a history of using unconstitutional force on people experiencing mental health crises sufficient to constitute a custom or practice" where the complaint alleged that the City had such a custom or practice, that PPB had a history of employing unconstitutional excessive force in confrontations with mentally ill people, that PPB did not adequately remedy the problem, and that an officer used excessive force when he killed the plaintiff); *McCarthy v. Barrett*, 804 F.Supp.2d 1126 (W. D. Washington, 2011)(denying summary judgment to defendants on Fourth and First Amendment *Monell* claims against the City of Tacoma stemming from the use of tear gas and other uses of force to disperse a protest); *Johnson v. City of Berkeley*, 2016 WL 928723, at ¶ 7 (N.D. California, 2016) ("This unlawful use of force is part of a 'repeated course of conduct by members of the [Berkeley] Police Department tantamount to a custom, policy, pattern or repeated practice of condoning, ratifying and/or tacitly encouraging the abuse of police authority, and disregard for the constitutional rights of citizens.").

### 3. Plaintiffs will likely succeed on the theory that official policymakers of the City of Portland ordered and ratified the uses of tear gas against crowds of protesters.

The decision to use chemical agents against the class of plaintiffs was made by incident commanders at the scene of the protests. Chief of PPB Jamie Resch has repeatedly defended and ratified this decision in news conferences. Mayor of Portland, Ted Wheeler, has stated that he has received minute-by-minute updates from PPB on the protests.

"To hold a local government body liable for an official's conduct, a plaintiff must first establish that the official (1) had final policymaking authority concerning the action . . . at issue;

and (2) was the policymaker for the local governing body for the purposes of the particular act.'" *Goldstein v. City of Long Beach*, 715 F.3d 750, 753 (9th Cir. 2013). Plaintiff can also establish the liability of municipal defendants by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate. *Louis v. Praprotnik*, 485 U.S. 112, 126-127 (1988).

In this case plaintiffs have pled both theories in the alternative. Incident commanders at the scene likely had "final policymaking authority concerning the action . . . at issue," namely the decisions to declare the protests "civil disturbance" and unleash chemical agents on the crowds. On information and belief, Chief Jamie Resch was likely involved in those decisions herself. Even if it is found that incident commanders are not final policy makers and if Chief Jamie Resch did not make the decision to repeatedly gas crowds of protestors herself, she certainly ratified it in news conferences.

### D. Without This Court's Intervention, Plaintiffs are Likely to Suffer Irreparable Harm.

Plaintiffs require immediate injunctive relief from this court to prevent ongoing and likely future harm to members of the proposed Plaintiff class.  Plaintiffs seeking a TRO or preliminary injunction must establish that they are "likely to suffer irreparable harm in the absence of preliminary relief."  *NRDC v. Winter*, 518 F.3d 658, 677 (9th Cir. 2008).

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (quotation marks omitted). A colorable First Amendment claim, as described above, "is irreparable injury sufficient to merit the grant of relief." *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir.2005). Here, where

Plaintiffs have alleged infringement of their constitutional rights, they have shown irreparable harm. *Melendres v. Arpaio*, 695 F.3rd 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury.") (quotation marks and citation omitted).

PPB tear gassing crowds of demonstrators constitutes excessive force and chills all people's freedom of speech and assembly. People who would otherwise participate in protests and protesters now fear doing so due to unwarranted and indiscriminate police violence against them. Further, as described above, police use of tear gas against a crowd of protesters additionally results in further exacerbation of COVID-19, where many people are in close proximity to one another, coughing, sneezing, vomiting, and otherwise secreting saliva and snot without masks or face coverings. Those who are wearing masks to prevent COVID-19 are thus faced with an impossible decision, as proper decontamination procedures require them to remove clothing contaminated with the chemical agent. Thus, in addition to the immediate injuries inflicted by tear gas—the most severe of which may cause death—demonstrators doused with tear gas thus face increased risk of contracting and suffering from COVID-19, which may result in permanent damage to almost all of their organs or death.

Plaintiffs face likely and concrete future harm. *See, c.f., In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007) ("Speculative injury cannot be the basis for a finding of irreparable harm."). Plaintiffs' possibility of future harm is not speculative: as of June 4, 2020, PPB announced it would not cease use of tear gas against future demonstrators.[33] As evidenced by the declarations accompanying this motion, the use of tear gas against crowds of protesters has happened nearly daily since the murder of George Floyd.  Harm caused by immediate as well

---

[33] *Supra,* section B.

as prolonged exposure to tear gas are well-known, as described above. PPB's use of tear gas is likely to exacerbate the spread COVID-19 and the suffering that comes along with the respiratory disease. The only speculative harm is the breathtaking scope of COVID-19's destruction: how many more people will die of COVID-19, how many survivors will suffer permanent bodily injury, and if humankind will ever see a vaccine or cure. PPB has certainly demonstrated its continued enthusiasm and readiness to keep using tear gas against crowds of protesters.

### E. The Public Interest Weighs in Favor of Granting this Temporary Restraining Order and the Balance of Equities Is in Plaintiffs' Favor because the Safeguarding of Plaintiffs' and the Public's Constitutional Rights and Promotion of Public Health Outweigh Defendant's Interest in Using Chemical Weapons Against People.

The balance of equities falls overwhelmingly in favor of granting a temporary restraining order in this case. Plaintiffs have demonstrated that their constitutional rights have been violated and that they face the high likelihood of irreparable harm. The Ninth Circuit has "consistently recognized the significant public interest in upholding First Amendment principles." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002). Furthermore, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (granting an injunction on a Fourth Amendment basis). The public has no interest in Defendants continuing to place members of the proposed Plaintiff class at risk of serious harm and continuing to infringe upon their constitutional rights.

It is alarming that the use of chemical agents against groups of largely peaceful protesters is posited by PPB as a valid crowd control tactic that the public must accept as a legitimate use of government force. Police forces around the nation have been deploying OC and CS chemical

agents against crowds of protesters. Historically, this shows an escalation in the tactics that are used by law enforcement agencies around the nation.

Tens of thousands of Portlanders have been protesting the very police violence at stake in this case. According to the Ninth Circuit, writing in 2002, addressing the use of pepper spray into the eyes of protesters who had clamped themselves together to protest the logging of ancient forests, "the use of pepper spray under these circumstances was entirely unprecedented: in California, its use was limited to controlling hostile or violent subjects and it had never been used in Humboldt County, the State of California, or anywhere in the country against nonviolent protesters." *Headwaters Forest Def. v. Cty. of Humboldt*, 276 F.3d 1125, 1128 (9th Cir. 2002). In 2002 this statement was true. Nowadays, the use of tear gas against crowds of protesters has become common place. This escalation and militarization of policing is the very reason for the current national and local protests. The use of chemical agents against peaceful demonstrations must cease immediately.

The balance of equities overwhelmingly weighs in favor of Plaintiffs. Plaintiffs' interest in protection of their constitutional rights and bodily health far outweigh any potential damage to Defendants. Plaintiffs' constitutional rights deserve to be protected; they are entitled to engage in free expression and assembly without risk of being indiscriminately subjected to excessive force. Plaintiffs deserve to be safe while doing so, and during this current global pandemic, governments should be encouraging people to follow best practices to take preventative measures to protect against COVID-1, not actively thwarting those very efforts with chemical weapons and other police violence.

Defendants' interests weigh very little in comparison. The Portland Police Bureau may lose one single weapon in its vast arsenal of so-called "crowd control" tactics. The government

may have to endure the administrative burden of the Portland Police Chief having to call a meeting and direct officers to cease use of tear gas against demonstrators. As mass demonstrations against police brutality and the violence inherent to the criminal legal system show no sign of slowing down or diminishing, such a burden is a very small price to pay to safeguard people's constitutional rights as well as the health of each individual and the general public.

## VI. CONCLUSION

Plaintiffs humbly pray that the Defendant and all persons acting on its behalf be enjoined and prevented from using tear gas on protesters, pending entry by the Court of a final judgment in this action. Plaintiffs' abilities to safely, without risk of harm or death, express their dissent with police and state actions, dependent on this Court's recognition of their constitutional rights, hang in the balance unless this Court intervenes.

DATED: June 5, 2020.

_s/ J. Ashlee Albies_
J. ASHLEE ALBIES, OSB 051846
ashlee@albiesstark.com
Whitney B. Stark, OSB No. 090350
Maya Rinta, OSB No.195058
Albies & Stark LLC

Jesse Merrithew, OSB No. 074564
Viktoria Safarian, OSB No. 175487
Levi Merrithew Horst PC

Juan C. Chavez, OSB No. 136428
Brittney Plesser, OSB No. 154030
Alex Meggitt, OSB No. 174131
Franz H Bruggemeier, OSB No.163533
Oregon Justice Resource Center

Of Attorneys for Plaintiffs

**LR 7-1 CERTIFICATION**

The parties have not conferred regarding this motion, as it is not required under LR 7-1(a).

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b).