J. SCOTT MOEDE, OSB 934816
Chief Deputy City Attorney
scott.moede@portlandoregon.gov
NAOMI SHEFFIELD, OSB 170601
Deputy City Attorney
naomi.sheffield@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendant City of Portland*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| DON'T SHOOT PORTLAND, a nonprofit corporation, in its individual capacity, NICHOLAS J. ROBERTS, in an individual capacity and on behalf of themselves and all others similarly situated, MICHELLE "MISHA" BELDEN, in an individual capacity and on behalf of themselves and all others similarly situated,<br><br>      **PLAINTIFFS,**<br><br>    v.<br><br>CITY OF PORTLAND, a municipal corporation**,**<br><br>      **DEFENDANT.** | Case No. 3:20-cv-00917-HZ<br><br>DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |

Page i –   DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

## Table of Contents

I.     INTRODUCTION ................................................................1

II.    FACTUAL BACKGROUND ...............................................1

       A.    Riot Control Agents and COVID-19 ......................1

       B.    Protests from May 29, 2020 to Present ...................3

       C.    PPB's Policy Regarding Use of Riot Control Agents............7

       D.    Ratification of Officers' Use of Riot Control Agents ............9

III.   PLAINTIFFS CANNOT MEET THE TEST FOR A TEMPORARY RESTRAINING ORDER IN THIS CASE ...............9

       A.    Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits. ...............11

             1.    Defendants' Policies and Procedures Do Not violate Plaintiffs' First Amendment Rights. ...............12

             2.    Defendants' Policies and Procedures Do Not Violate Plaintiffs' Fourth Amendment Rights. ...............15

       B.    Plaintiffs Cannot Show Irreparable Harm if No TRO Issues. ...............18

       C.    Plaintiffs Have Not Established and Cannot Establish that the Balance of Equities Weighs in Their Favor or that a TRO is in the Public Interest. ...............22

IV.    CONCLUSION ...............24

Page i –   DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

# Table of Authorities

Page(s)

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ........................................................ 10

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
  824 F.3d 858 (9th Cir. 2016) .......................................................... 12

*Armstrong v. Davis*,
  275 F.3d 849 (9th Cir. 2001) .......................................................... 19

*Arpin v. Santa Clara Transp. Agency*,
  261 F3d. 912 (9th Cir. 2001) .......................................................... 16

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011) ...................................................................... 15

*Barnett v. BAC Home Loan Servicing, L.P.*,
  772 F. Supp. 2d 1328 (D. Or. 2011) ............................................... 10

*Boyd v. Benton*,
  374 F.3d 773 (9th Cir. 2004) .......................................................... 17

*Buck v. City of Albuquerque*,
  2007 WL 9734037 (D.N.M. Apr. 11, 2007) ..................................... 17

*Campbell v. City of Oakland*,
  2011 WL 5576921 (N.D. Cal. Nov. 16, 2011) ............................ 11, 24

*Caribbean Marine Servs. Co. v. Baldridge*,
  844 F.2d 668 (9th Cir. 1998) ..................................................... 10, 19

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ................................................................... 19, 20

*Cohen v. California*,
  403 U.S. 15 (1971) ........................................................................ 12

*DeShaney v. Winnebago Cty. Dept. of Social Servs.*,
  489 U.S. 189 (1989) ...................................................................... 16

*Dougherty v. City of Covina*,
  654 F.3d 892 (9th Cir. 2011) .......................................................... 11

*Ellsworth v. City of Lansing*,
  205 F.3d 1340 (6th Cir. 2000) ........................................................ 14

*Forrester v. City of San Diego*,
  25 F.3d 804 (9th Cir. 1994) ............................................................ 16

*Friends of the Wild Swan v. Weber*,
  955 F. Supp. 2d 1191 (D. Mont. 2013) ............................................ 23

*Gish v. Newsom*,
  2020 WL 1979970 (C.D. Cal. Apr. 23, 2020) .................................. 19

*Gomez v. Vernon*,
  255 F.3d 1118 (9th Cir.2001) ......................................................... 19

*Graham v. Connor*,
  490 U.S. 386 (1989) ................................................................. 15, 16

Page ii –       DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
                ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

*Granny Goose Foods, Inc. v. Teamsters,*
  415 U.S. 423 (1974)..................................................................................9

*Hadley v. City of Beaverton,*
  2010 WL 1257609 ................................................................................16

*Headwaters Forest Def. v. Cty. of Humboldt,*
  276 F.3d 1125 (9th Cir. 2002) ................................................15, 17, 18

*Hodgers-Durgin v. Gustavo De La Vino,*
  199 F.3d 1037 (9th Cir. 1999) ..............................................................18

*Jackson v. City of Bremerton,*
  268 F.3d 646 (9th Cir. 2001) ..........................................................16, 17

*Johnson v. California,*
  543 U.S. 499 (2005)..............................................................................19

*Johnson v. City of Berkeley,*
  2016 WL 928723 (N.D. Cal. Mar. 11, 2016)........................................13

*Jurkowski v. City of Seattle,*
  2017 WL 4472859 (W.D. Wash. 2017) .................................................17

*Keating v. City of Miami,*
  598 F.3d 753 (11th Cir. 2010) ..............................................................13

*Klein v. City of San Clemente,*
  584 F.3d 1196 (9th Cir. 2009) ..............................................................10

*LaDuke v. Nelson,*
  762 F.2d 1318 (9th Cir.1985) ........................................................19, 20

*LaLonde v. County of Riverside,*
  204 F.3d 947 (9th Cir. 2000) ................................................................17

*Lewis v. Casey,*
  518 U.S. 343 (1996)..............................................................................12

*Logan v. City of Pullman,*
  392 F. Supp. 2d 1246 (E.D. Wash. 2005) .............................................17

*Los Angeles Unified Sch. Dist. v. United States Dist. Court for the Cent. Dist. of Cal.,*
  650 F.2d 1004 (9th Cir. 1981) ..............................................................10

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997)...........................................................................9, 10

*McCarthy v. Barrett,*
  804 F. Supp. 2d 1126 (W.D. Wash. 2011).............................................13

*Mendocino Envtl. Ctr. v. Mendocino Cty.,*
  192 F.3d 1283 (9th Cir. 1999) ..............................................................12

*Multi-Ethnic Immigrant Workers Org. Network v. City of L.A.,*
  246 F.R.D. 621 (C.D. Cal. 2007) ....................................................13, 20

*Nelson v. City of Davis,*
  685 F.3d 867 (9th Cir. 2012) ................................................15, 17, 18

*Pohlman v. Hormann,*
  2014 WL 5425502 ................................................................................10

*Puente v. City of Phoenix,*
  2019 WL 4849613 (D. Ariz. Sept. 30, 2019)........................................21

Page iii –    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
                ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

*Secot v. City of Sterling Heights,*
   985 F. Supp. 715 (E.D. Mich. 1997)........................................................................ 14
*Simula, Inc. v. Autoliy, Inc.,*
   175 F.3d 716 (9th Cir. 1999) .................................................................................... 19
*Sternberg v. Town of Danville,*
   2015 WL 9024340 (N.D. Cal. Dec. 16, 2015) .......................................................... 11
*Tennessee v. Garner,*
   471 U.S. 1 (1985).................................................................................................... 15
*Terry v. Ohio,*
   392 U.S. 1 (1968).................................................................................................... 15
*Webb v. Sloan,*
   330 F.3d 1158 (9th Cir. 2003) .................................................................................. 11
*Winter v. Natural Res. Def. Council,*
   555 U.S. 7 (2008)........................................................................................... 10, 11, 22

Page iv –    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

## I.  INTRODUCTION

Thousands of Portlanders have joined with millions around the country to protest the injustices of police brutality and racism, highlighted by the murder of George Floyd, an African American man, by a white Minneapolis police officer. These protests are protected First Amendment expression. In fact, the City agrees with plaintiffs that these protests are essential to advancing a long overdue need for meaningful reform and restorative justice.

The undeniably important message of these protests is not in dispute. This case does not relate to those thousands of people who have powerfully expressed these important values. This case relates to Portland Police Bureau's response to a small number of people who have not peaceably assembled, but have instead engaged in violent, destructive, criminal activity that poses an immediate risk to the life and safety of officers, other protesters, and individuals detained in the Multnomah County Detention Center. It is in only these limited instances that police are authorized to use hand tossed or launched CS gas and other similar riot control agents to disperse crowds. And only after orders are given to disperse and adequate time is provided for participants to do so. In these very limited circumstances, the use of these gases is a reasonable and constitutional use of force.

Plaintiffs have not met their burden of demonstrating a likelihood of success on the merits, irreparable harm, that the balance of hardships weighs in their favor, or that an injunction would be in the public interest. For these reasons, the Court should deny the plaintiffs' request for a temporary restraining order and preliminary injunction.

## II.  FACTUAL BACKGROUND

### A.  Riot Control Agents and COVID-19

Each rapid response team squad has three grenadiers who are trained in the use of less lethal weapons. These less lethal weapons include the following riot control agents: smoke (obscurant), 2-chlorobenzalmalononitrile "CS gas," Oleoresin Capsicum Pyrotechnic "OC

Page 1 –    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

pyrotechnic," and OC vapor. (Declaration of Franz Schoenig ("Schoening Decl."), ¶¶ 4-5). Tear gas colloquially refers to chloroacetophenone (CN gas), which Portland Police Bureau ("PPB") does not utilize, and CS gas. For the purpose of its response, the City uses "CS gas" to refer to the munitions that deploy CS gas, and "riot control agents" to generally refer to all of the aforementioned munitions (but not including other less lethal impact munitions, such as 40mm or FN303 or rubber ball distraction devices).

The City does not dispute that in some cases riot control agents can have significant health impacts. However, in most cases, the effects of riot control agents are short-lived after a person has been removed from the source.[1] "Tear gas and pepper spray classify as nonlethal agents and therefore usually have an excellent prognosis. In most cases after removal from the exposure, resolution of symptoms will occur within 10 to 20 minutes. In some cases of prolonged exposures, patients can have more serious injuries and respiratory complications. In most of these cases, patients typically improve relatively quickly."[2] The Center for Disease Control ("CDC"), as plaintiffs note, has outlined the symptoms of immediate exposure to riot control agents, which include excessive tearing, running nose, burning in the mouth and nose, irritation, chest tightness, coughing, choking sensation, noisy breathing, and shortness of breath. The CDC has also outlined the more severe effects that may arise from "[l]ong-lasting exposure or exposure to a large dose of riot control agent, especially in a closed setting."[3]

The City also does not dispute plaintiffs' assertions that COVID-19 is a highly contagious and deadly respiratory virus, which is spread from person to person and can be spread by infected persons who may be asymptomatic and unaware that they are infected. (Dkt. 2, Pl's

---

[1] Centers for Disease Control and Prevention, *Facts About Riot Control Agents*, available at https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp.

[2] Rohini J. Haar, et al., *Health impacts of chemical irritants used for crowd control: a systematic review of injuries and deaths caused by tear gas and pepper spray* (Oct. 19, 2017), available at https://www.ncbi.nlm.nih.gov/books/NBK544263/.

[3] Centers for Disease Control and Prevention, *Facts About Riot Control Agents*, available at https://emergency.cdc.gov/agent/riotcontrol/factsheet.asp.

Page 2 –    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
            ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

Motion for Temporary Restraining Order and Preliminary Injunction ("Dkt. 2") at 16-17). The City would clarify, however, that the CDC explains that COVID-19 spreads from person-to-person: "Between people who are in close contact with one another (within about 6 feet). Through respiratory droplets produced when an infected person coughs, sneezes or talks. These droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs."[4]

Plaintiffs have pointed to newspaper articles that quote public health officials, as well as an open letter from some public health officials relating to potential connections between riot control agents and COVID-19. The City is not aware of any epidemiological or other scientific studies that have addressed whether the use of riot control agents increases either the risk of infection by COVID-19 or the spread of COVID-19.

PPB has always identified the use of riot control agents as a significant use of force, which is why they are subject to specific limitations in PPB's directives, even when there is no worldwide respiratory pandemic. Moreover, the City recognizes the concerns expressed by some public health officials and others that riot control agents may create a more significant risk in light of COVID-19. It was, at least partially, in recognition of these concerns, that Mayor Wheeler, the police commissioner, further limited the use of CS gas. (Declaration of Craig Dobson ("Dobson Decl."), ¶ 13).

B.    Protests from May 29, 2020 to Present

Beginning on May 28, 2020 and continuing every night since, thousands of Portlanders have come together to protest and "demand[] an end to police violence and white supremacy." (Dkt. 01, Complaint ("Compl.") at ¶ 10). Thousands of these protesters have marched and joined rallies for hours each night without any intervention by the police. (Dobson Decl., ¶¶ 20-22). In

---

[4] Coronavirus Disease 2019 (COVID-19) How It Spreads, available at
https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html

Page 3 –    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
             ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

fact, PPB has repeatedly expressed appreciation and support of these peaceful protests, and tens of thousands of demonstrators have freely exercised their First Amendment rights with zero police involvement. (Dobson Decl., ¶¶ 20-22). For example, over the last several nights thousands of demonstrators have gathered at Revolution Hall and the adjacent park. (Dobson Decl., ¶¶ 20-22). These demonstrators marched from Revolution Hall and across the bridge to Waterfront Park. (Dobson Decl., ¶¶ 20-22). Police did not intervene during these gatherings or marches in any way—there were no dispersal orders, nor was there any use or threatened use of riot control agents. (Dobson Decl., ¶¶ 20-22). The same is true for multiple other locations throughout Portland. (Dobson Decl., ¶¶ 20).

Yet Plaintiffs allege PPB deploys riot control agents indiscriminately and inappropriately against these peaceful protests. Evidence does not support these allegations. While PPB officers have deployed riot control agents in limited instances, they have done so only when necessary to prevent injury to life or significant damage to property and in response to violent illegal activity by a comparatively small subset of people.

In particular, beginning late in the evening on May 29, 2020 through the early morning on May 30, 2020, following the first night of large peaceful protests, a limited group of persons engaged in rioting and looting. In downtown, windows were broken, fires were started, cars were burned, and buildings were graffitied. (Dobson Decl., ¶¶ 21; Schoening Decl., ¶ 13). Plaintiffs concede that "[a] focal point of conflict between the City of Portland Police Bureau and the protesters [was] the 'Justice Center' in downtown Portland." (Dkt. No. 2 at 10). The Justice Center houses the Multnomah County Detention Center. The Multnomah County Detention Center serves as the initial booking facility for all arrestees in Multnomah County and houses adults in custody for the County, as well as state and federal inmates involved in court matters. (Declaration of Michael Reese ("Reese Decl."), ¶ 4). It is a maximum-security facility. (Reese Decl., ¶ 4). As of May 29th, the Justice Center held approximately 250 adults in custody. (Reese

Page 4 –     DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
             ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

Decl., ¶ 5). At around 11:00 p.m. on May 29th, persons began smashing windows and security doors at the Justice Center and ultimately entered a ground-level office used by corrections staff. (Reese Decl. ¶ 5; Schoening Decl., ¶ 13; Declaration of Naomi Sheffield ("Sheffield Decl.")[5], ¶ 1). Once inside the building, these persons spray-painted graffiti, overturned office equipment, and destroyed property. (Reese Decl., ¶ 6; Schoening Decl., ¶ 13) These persons threw flares and other incendiary devices into the office, causing fires. (Reese Decl., ¶ 6; Schoening Decl., ¶ 13) The building's fire alarm system and ceiling sprinklers activated, which very fortunately helped control and extinguish the fires. (Reese Decl., ¶ 6). At the time of the fire, in addition to the approximately 250 prisoners housed at the facility, there were approximately 70 Multnomah County Department of Corrections' employees present. (Reese Decl., ¶ 5). Those employees had to be evacuated to a secure area inside the building to avoid the violent and dangerous trespassers. (Reese Decl., ¶ 6).

The actions of the persons trespassing and lighting fires inside the Justice Center put corrections staff, adults in custody, and the public at extreme risk. (Reese Decl., ¶ 8). The trespass and arson could have had tragic consequences had it gone unchecked. (Reese Decl., ¶ 8). In response, PPB gave the group engaging in this illegal activity multiple warnings that if they did not disperse, they would be subject to the use of riot control agents or impact munitions. (Schoening Decl., ¶ 14). Warnings were given through the PPB sound truck. (Schoening Decl., ¶ 14). PPB also used its Twitter account to warn demonstrators to leave the area. (Sheffield Decl., ¶ 2). When the group failed to disperse or stop their illegal and dangerous activity at the Justice Center, pursuant to Directives 635.10 and 1010.00, the Incident Commander ("IC") declared the demonstration at the Justice Center an unlawful assembly and ordered riot control officers to deploy non-lethal measures to disperse the group in front and inside the facility. (Schoening

---

[5] Links to video footage and other online media, including tweets from PPB's Twitter account are included in the Declaration of Naomi Sheffield.

Page 5 –    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

Decl., ¶ 14). The measures employed included the use of CS gas. (Schoening Decl., ¶ 14).

The persons trespassing, destroying property, throwing flares and other devices inside the Justice Center were effectively removed from the premises by the use of CS gas. (Schoening Decl., pp. 14-15; Reese Decl., ¶ 7). It is notable, and appropriate, that, even under the extreme circumstances of fires being set inside an occupied maximum-security detention facility, the trespassers were first ordered to leave, and warnings were given that force would be used, prior to the use of CS gas or other riot control measures. (Schoening Decl. ¶¶ 13-14; Reese Decl. ¶¶ 6-8). Additionally, PPB tweeted warnings prior to the use of CS gas at 11:03 p.m. and made announcements over the loudspeaker for the group to disperse. (Sheffield Decl., ¶ 2). In short, the decision to use riot control agents was not made lightly and riot control agents were not used indiscriminately.

Following the events of the night of May 29 and early morning of May 30, a fence and other barricades were erected around the Justice Center and other critical infrastructure in the downtown area. PPB riot control teams have been deployed to the Justice Center nightly to maintain order and to protect against similar threats to public safety. (Schoening Decl., ¶¶ 15-16). The area surrounding the Justice Center has continued to see protests, most of them peaceful. Unfortunately, however, a small subset of violent agitators has continued to attack property and law enforcement officers stationed there. (Schoening Decl., ¶¶ 15-16).

Property has continued to be damaged and law enforcement officers have been subjected to projectiles thrown and launched towards them. (Schoening Decl., ¶¶ 15-16). These projectiles have included bricks, full cans of soup, frozen water bottles, full water bottles, rocks, steel slingshot balls launched from powerful slingshots, commercial fireworks, bottles, beer cans, flares and many other items. (Schoening Decl., ¶¶ 15-16; Sheffield Decl., ¶¶ 13-19). At least three Sheriff's deputies and thirty PPB members have been injured. (Schoening Decl., ¶ 16; Reese Decl., ¶¶ 9-10; Sheffield Decl., ¶ 4). In response, PPB has predominantly given warnings

Page 6 –    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

and asked the crowd to cease criminal activity. However, PPB has deployed riot control agents in some instances. In keeping with PPB directives, riot control agents have only been deployed after the Incident Commander declared the demonstration, at the specific location, an unlawful assembly and the demonstrators there are given multiple warning to leave the area and warned that failure to do so would result in the use of riot control agents and impact munitions against them. (Schoening Decl., ¶¶ 15-17). PPB has also used twitter to provide such warnings and to make demonstrators aware of the exact location impacted. (Sheffield Decl., ¶ 5). Again, the tactics required in the vicinity of the Justice Center in response to violent criminal behavior are in stark contrast to the entirely peaceful protests at many other locations in the City which have not required any police intervention at all.

Riot control agents, such as CS gas, provide law enforcement with a valuable non-lethal and minimally injurious area denial tool that can be deployed from a distance. (Schoening Decl., ¶18). This minimizes the risk of injury to both demonstrators and PPB members. (Schoening Decl., ¶18). Without riot control agents, including CS gas, law enforcement's ability to disburse an unlawful assembly would likely require physical force, including person-to-person contact, which carries much higher risks for all involved. (Schoening Decl., ¶18).

C.    PPB's Policy Regarding Use of Riot Control Agents

The Portland Police Bureau has directives that specify the requirements for the use of riot control agents, including CS gas, during crowd control and crowd management. As relevant to plaintiffs' allegations, Directive 1010.00, PPB's directive on Use of Force, provides that riot control agents may be used in crowd control: "Under the direction of the Crowd Management Incident Commander (CMIC), to disperse a crowd, when a demonstration or event becomes a civil disturbance, as defined in Directive 635.10, Crowd Management/Crowd Control." (Directive 1010.00, ¶ 6.4.6.1.1). Directive 635.10, PPB's directive on Crowd Management and Crowd Control, does define a civil disturbance, as plaintiffs assert. (Dkt. 2 at 29). But it further

Page 7 –    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

provides, as relevant to plaintiffs' allegations, "When the crowd has been ordered to disperse and does not heed repeated warnings, and no reasonable alternative is apparent, riot control agents (RCAs) and/or special impact munitions may be deployed to prevent violence, injury or property damage and to avoid a greater application of force." (Directive 635.10, ¶ 9.2). Moreover, "These weapons [RCAs] shall only be used at the direction of the CMIC and when avenues of escape (i.e., clear path or route) are available to the crowd. Pursuant to this policy and Directive 1010.00, Use of Force, members must issue warnings prior to deployment." (*Id*. at ¶ 9.2.1). Directive 635.10 also prohibits officers from "deploy[ing] specialty impact munitions or aerosol restraints indiscriminately into a crowd." (*Id*. at ¶ 10.2).

In short, PPB's policies require that the use of riot control agents for dispersal be authorized by an incident commander. They require that officers give the crowd repeated warnings to disperse with adequate path or route of egress. They require that no alternative be apparent. And they require that they be deployed to prevent violence, injury or property damage or to prevent greater force.

Mayor Ted Wheeler, the commissioner of the Portland Police Bureau, has imposed even greater limitations on the use of CS gas, directing PPB that "gas should not be used unless there is a serious and immediate threat to life safety, and there is no other viable alternative for dispersal." (Dobson Decl., ¶ 16). Mayor Wheeler has instructed that "gas should not be used to disperse crowds of non-violent protestors or for general crowd management purposes. It should only be used in response to violence that threatens life safety." (*Id*.). The limitations in PPB's directives, as further limited by the direction of the City's police commissioner, are in place because uses of riot control agents, including CS gas, are serious uses of force and should occur only in limited instances and not against peaceful demonstrators.

///

///

Page 8 –    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

    D.    <u>Ratification of Officers' Use of Riot Control Agents</u>

Plaintiffs contend, without evidence, that the officers' uses of riot control agents were either made or ratified by a policy maker. The Chief of Police and the Commissioner of Police are final policy makers for PPB. In this capacity, neither have authorized, evaluated, or ratified any particular use of force from the protests of the last week and a half. In fact, as discussed above, the police commissioner has directed PPB to further limit instances when riot control agents can be used to disperse persons who pose a threat to life safety.

PPB's directives outline a detailed process for the reporting different categories of force, as well as review by supervisors and others through the chain of command. (Directive 1010.00, ¶ 13). Pursuant to Directive 635.10, ¶ 13.1.1, the Incident Commander or his or her designee will write an after action, in accordance with Directive 1010.00 for each use of force used during the protests. At this point, individual uses of force, including riot control agents have not been processed through the standard use of force review process. However, each use of force used during the protests will be subject to the standard process set forth in the directives, and officers will be subject to discipline for any use of force that is inconsistent with PPB's directives. This includes any use of force that is unreasonable, in violation of the Fourth Amendment or retaliatory in response to protestors' exercise of First Amendment Rights. (Directive 1010.00, ¶ 5; Directive 310.20).

**III.    PLAINTIFFS CANNOT MEET THE TEST FOR A TEMPORARY RESTRAINING ORDER IN THIS CASE**

A temporary restraining order is an "extraordinary and drastic remedy." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). A TRO "should be restricted to serving [its] underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438-39 (1974).

"[T]he standards for issuance of a temporary restraining order are at least as exacting as

Page 9 –    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

those for a preliminary injunction." *Pohlman v. Hormann*, 2014 WL 5425502 *1 n. 1 (D. Or. Oct. 20, 2014) (citing *Los Angeles Unified Sch. Dist. v. United States Dist. Court for the Cent. Dist. of Cal.*, 650 F.2d 1004, 1008 (9th Cir. 1981)). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Barnett v. BAC Home Loan Servicing, L.P.*, 772 F. Supp. 2d 1328, 1333 (D. Or. 2011) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008)). The Supreme Court established in *Winter* that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." 555 U.S. at 20. Alternatively, a preliminary injunction is available where there are "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff[s]," but only if plaintiff also "shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

In each case, Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal citations omitted). Plaintiffs bear the burden of proving each of the elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1998) ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief."). The requirement for a plaintiff, on a motion for preliminary injunctive relief "for substantial proof is much higher" than even what is required in connection with summary judgment. *Mazurek*, 520 U.S. at 972.

///

///

Page 10 –    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

A.    Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits.

"To prevail, plaintiffs must first show that they likely will succeed on the merits of their constitutional claims." *Campbell v. City of Oakland*, 2011 WL 5576921, at *3 (N.D. Cal. Nov. 16, 2011) (citing *Winter*, 555 U.S. at 20). Plaintiffs' TRO Motion includes declarations alleging injury from previous uses of riot control agents by PPB officers. Plaintiffs and declarants describe alleged injuries arising from five instances in which PPB allegedly deployed riot control agents. Success on these claims of individual injury "would entitle plaintiffs to money damages only, *not* injunctive relief." *Id.* But plaintiffs seek an injunction against the City, not damages against individual officers.

"To state a *Monell* claim, a plaintiff must establish: (1) that the plaintiff possessed a constitutional right of which he was deprived; (2) that the municipality had a policy, custom, or practice; (3) that the policy, custom, or practice amounted to deliberate indifference to the plaintiff's constitutional rights; and (4) that the policy, custom, or practice was the moving force behind the constitutional violation." *Sternberg v. Town of Danville*, 2015 WL 9024340, at *3 (N.D. Cal. Dec. 16, 2015) (citing *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)). A plaintiff may also establish a *Monell* claim where the employee engaged in the allegedly unconstitutional act was a final policymaker. *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003).

Here, decisions to deploy riot control agents during the protests were not made by a final policymaker. The use of this level of force was authorized by the IC, and the decision whether to use force was made by each individual officer. Moreover, plaintiffs cannot show that the City has either an official policy or a custom or practice regarding the use of riot control agents that amounts to deliberate indifference to either plaintiffs' First or Fourth Amendment rights.[6]

Plaintiffs here request system-wide relief "prohibiting the City of Portland from using

---

[6] There is inadequate evidence at this time for the court to address whether any particular use of tear gas violated a plaintiff's constitutional rights.

Page 11 –    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
             ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

tear gas as a crowd control measure" (Compl. at 16). But such systemwide relief is only available if there has been systemwide violations. *Lewis v. Casey*, 518 U.S. 343, 359 (1996). That has not occurred here. Even consistent with plaintiffs' own allegations and evidence, there have been widespread peaceful protests throughout the City of Portland, including rallies and marches all over the City. These have occurred without the use of riot control agents; in fact, largely without police intervention at all. There is not a system-wide use of riot control agents. Rather, PPB's uses of riot control agents have been used on some, but not all nights, against a limited group of protesters engaged in violent activity and refusing to follow lawful commands to disperse. The uses of riot control agents has not been system-wide, but rather have been isolated and those isolated instances can be adequately addressed without injunctive relief.

      1.     **Defendants' Policies and Procedures Do Not violate Plaintiffs' First Amendment Rights.**

The First Amendment protects the rights of persons to express their opinions and beliefs in the manner they see fit. *See Cohen v. California*, 403 U.S. 15, 24-26 (1971). To succeed on a claim of First Amendment retaliation, plaintiffs must show that (1) they "engaged in constitutionally protected activity; (2) [the City's] actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the [City's] conduct—i.e., that there was a nexus between the [City's] actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). Assuming without conceding that plaintiffs have shown the first two elements, there is no evidence of the third. While the intent by the City to inhibit plaintiffs' speech can be demonstrated either through direct or circumstantial evidence, *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1301 (9th Cir. 1999); here, plaintiffs present no evidence to support that element. Rather, all evidence is to the contrary.

Plaintiffs cite a string of cases where courts "have sided with Plaintiffs on First

Page 12 –     DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

Amendment issues in similar protest contexts." (Dkt. 2 at 28). But each of these examples is distinguishable either in the facts alleged or the posture of the case. *McCarthy v. Barrett*, 804 F. Supp. 2d 1126, 1137 (W.D. Wash. 2011) (evidence showed that police focused their attention on particular groups, assuming they were anarchists, although there was no indication beyond generalized internet threats that the groups planned criminal activity); *Johnson v. City of Berkeley*, 2016 WL 928723, *4-5 (N.D. Cal. Mar. 11, 2016) (on a motion to dismiss, plaintiffs' allegations of being struck by batons and doused in tear gas for simply being present at a demonstration were sufficient); *Keating v. City of Miami*, 598 F.3d 753, 767 (11th Cir. 2010) (supervisors who allegedly directed "subordinates to use less-than-lethal weapons to disperse a crowd of peaceful demonstrators" violated those demonstrators' First Amendment Rights); *Multi-Ethnic Immigrant Workers Org. Network v. City of L.A.*, 246 F.R.D. 621, 634 (C.D. Cal. 2007) (noting for the purpose of considering predominance for a class action, that the decision to declare an unlawful assembly and disperse the crowd was the only material fact where "[e]ven the LAPD Report states that the First Amendment rights of peaceful individuals and members of media were curtailed.").

Notably, thousands of people over the last week have peacefully protested while, as plaintiffs describe it, "criticizing Defendant's rampant use of force against Black people." (Dkt. 2 at 26). These crowds also advocated for abolishing or dismantling the police. And these crowds similarly shouted slogans condemning the police. (Sheffield Decl., ¶¶ 5-7). But the Portland Police Bureau has facilitated these thousands of people gathering to exercise their fundamental right to criticize the police and advocate for change. PPB has asked cars to be conscientious when these individuals march on unclosed streets, including on the interstate. (Sheffield Decl., ¶¶ 8-11). PPB has minimized their presence at these events, in recognition that their presence is not necessary. (Dobson Decl., ¶ 18). PPB has coordinated, where possible, with event organizers on the events themselves and has reached out to open dialogue regarding the substance of the

Page 13 –    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

protesters' concerns.

The limited uses of riot control agents by PPB officers was not motivated by ill-will or malice toward the protesters' message. In fact, as plaintiffs' declarants assert, their message was the same as thousands of peaceful protesters that have had minimal to no interaction with PPB during these protests. Rather, the use of riot control agents was in response to the violent criminal activity that a much smaller group engaged in. Where officers facilitated the free speech of thousands, for hours each day, over numerous days, and responded with force only to a very limited group of people who engaged in violent criminal behavior, the Court cannot infer that riot control agents were used in retaliation for plaintiffs' speech. *See Ellsworth v. City of Lansing*, 205 F.3d 1340, *3 (6th Cir. 2000) (unpublished) (noting in connection with First Amendment retaliation claim that the officers let a rally continue for hours, and "that although the First Amendment protects against retaliation for exercising the right of free speech . . . it does not speak to retaliation for shoving or striking a police officer."); *Secot v. City of Sterling Heights*, 985 F. Supp. 715, 721 (E.D. Mich. 1997) (for a First Amendment retaliation claim, it is not enough that plaintiff was engaged in speech activity when he was struck by the officer).

Plaintiffs are not asking this court to determine if any particular use of riot control agents by PPB officers over the past ten days violated a plaintiff's First Amendment Rights. Instead, plaintiffs are seeking the extraordinary remedy of a temporary restraining order against the City—placing prohibitions on the City's future actions. For this, the Court must conclude not that there have been past violations, but rather that the City's custom, practice or policy regarding the use of riot control agents is an ongoing violation of plaintiffs' First Amendment Rights. Even if the former were true—it is not—the latter certainly is not.

PPB's written policies prohibit officers from "engag[ing] in adverse conduct in response to action taken or perceived to be taken by any individual." (Directive 310.20, ¶ 4.1). More specifically, officers cannot "engage in any form of explicit or implicit retaliation against a

Page 14 –    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
             ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

community member," including taking any action against a community member for "exercising their legal rights." (*Id*. at 4.3). In the context of protests, PPB's policy is explicitly to promote First Amendment activity. (Directive 635.10). PPB's use of riot control agents is limited to instances where it is necessary to prevent injury, protect property, or avoid a higher level of force. In short, PPB officers' uses of riot control agents at protests over the past week and a half were not motivated by protestors expression, but by the need to stop criminal activity. And PPB's existing policies expressly prohibit any retaliatory use of force in response to protestors' exercise of First Amendment rights.

2. Defendants' Policies and Procedures Do Not Violate Plaintiffs' Fourth Amendment Rights.

Under the Fourth Amendment, a seizure results in a constitutional violation only if it is unreasonable. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The determination of reasonableness requires an examination of "whether the totality of the circumstances justified [the] seizure." *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). "When the governmental interests at stake are substantial, a greater intrusion upon the Fourth Amendment rights of the person may be justified." *Nelson v. City of Davis*, 685 F.3d 867, 878 (9th Cir. 2012). The Court has emphasized that "the need for force" is the crux of the analysis, but that the analysis is not a subjective one. *Id.* at 877-78 (quoting *Headwaters Forest Def. v. Cty. of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002)). In other words, "the Fourth Amendment regulates conduct rather than thoughts." *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011).

The analysis of use of force is a fact-specific inquiry which looks at (1) the severity of the crime, (2) the immediacy of the threat to the safety of officers or others, and (3) whether the suspect was resisting arrest or attempting to evade arrest. *Graham*, 490 U.S. at 396. Further, the "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *See Terry v. Ohio,* 392 U.S.

Page 15 –    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
             ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

1, 20–22 (1968). "The reasonableness analysis must make 'allowance for the fact that police officers are forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Hadley v. City of Beaverton*, 2010 WL 1257609 at *12 (quoting *Graham*, 490 U.S. at 396). Plaintiffs bear the burden of proving that the force used was unreasonable. *Arpin v. Santa Clara Transp. Agency*, 261 F3d. 912, 922 (9th Cir. 2001).

In the present case, the analysis of facts for the individual uses of riot control agents would necessarily involve an examination of plaintiffs' conduct vis-a-vis the officers' conduct. In each instance alleged by plaintiffs, officers were guarding a jail, which held individuals for whom the County had a constitutional duty to protect from harm. *DeShaney v. Winnebago Cty. Dept. of Social Servs.*, 489 U.S. 189, 199-200 (1989). The reasonableness inquiry must also take into account the fact that the jail had been broken into and subject to arson on May 29, 2020. Lastly, the Court's inquiry would require consideration of when riot control agents were deployed—only after the crowd threw projectiles at the officers and ignored commands to disperse. But this analysis, of whether a particular PPB officer's use of force over the last week and a half was objectively reasonable, is not at issue in this case. Rather, plaintiffs seek injunctive relief against the City, which requires the Court to consider the policy and practices of the City moving forward.

It is well settled law that the City has a "legitimate interest in quickly dispersing and removing lawbreakers with the least risk of injury to police and others." *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994). More specifically, the government has a safety interest in controlling a group of people, and force can be justified when protestors substantially outnumber officers and refuse to obey commands to disperse. *See Jackson v. City of Bremerton*, 268 F.3d 646, 652-53 (9th Cir. 2001). Even if the potential for criminal activity involves only low-level misdemeanors, the government has a significant interest when the occurrence is

Page 16 –    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

widespread. *See Forrester*, 25 F.3d at 807.

Additionally, officers are permitted to use "less-than-lethal" alternatives in order to avoid unnecessary fatalities. *See Boyd v. Benton*, 374 F.3d 773, 779 (9th Cir. 2004). In determining whether less than lethal force is excessive, the "context of the officers' actions must be considered[.]" *Nelson*, 685 F.3d at 886. There are many different types of less than lethal force, including dogs, tasers, flash bangs, rubber bullets and pepper spray; and one may be appropriate in certain circumstances, while another is not.

Looking at the use of pepper spray, the Ninth Circuit has held that it does not constitute excessive force when used on an arrestee who was interfering with an officer's arrest of a third party. *Jackson*, 268 F.3d at 651-53. The Court has also compared the use of pepper spray to police dogs, saying "the use of such weapons (e.g., pepper sprays; police dogs) may be reasonable as a general policy to bring an arrestee under control[.]" *LaLonde v. County of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000).

Plaintiffs do not cite to any cases that hold pepper spray necessarily constitutes excessive force, and indeed there are cases in which the Court has found that exposure to pepper spray does not even amount to a seizure. *See Logan v. City of Pullman*, 392 F. Supp. 2d 1246, 1259-60 (E.D. Wash. 2005) (plaintiffs who suffered secondary exposure to pepper spray were not seized within the meaning of the Fourth Amendment because the officer's act was not willful); *Buck v. City of Albuquerque*, 2007 WL 9734037 at *29-31 (D.N.M. Apr. 11, 2007) (finding plaintiffs were not seized when exposed to tear gas at a protest because plaintiffs were free to leave and did indeed leave); *See also Jurkowski v. City of Seattle*, 2017 WL 4472859 at *9 (W.D. Wash. 2017) (finding question of fact existed as to whether protestor was seized when blast ball grenade deployed as she was able to retreat).

In the context of pepper spray and crowds of protestors, plaintiffs rely on *Nelson*, 685 F.3d 867, and *Headwaters*, 276 F.3d 1125, both of which are distinguishable from plaintiffs'

Page 17 –     DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

evidence in their declarations, as well as from potential future cases. In *Nelson*, the crowd was a

party, and the party posed no threat, nor showed any unwillingness to comply with police

orders.[7] 685 F.3d at 879-81. The facts in *Headwaters* are similarly distinguishable, as the

protestors in that case were noted to be "sitting peacefully" while officers applied pepper spray

with Q-tips to the protestors' eyes. *Headwaters*, 276 F.3d at 1130.

Plaintiffs contend that the use of riot control agents can result in significant harm, and

they assert that this harm may be increased in light of COVID-19. Recognizing the risk of harm

that riot control agents present, PPB's directives limit the use of riot control agents to situations

where the government interest is great (when necessary to prevent violence, injury or property

damage and to avoid a greater application of force). Riot control agents cannot be used

indiscriminately or against crowds of peaceful protestors. The directives further require the use

of riot control agents in a way that reduces harm to impacted individuals—by requiring

directions to disperse, warnings, and adequate time for people to leave. These restrictions and

requirements appropriately balance the risk of harm caused by riot control agents, as well as any

additional risk that may arise because of COVID-19.

Mayor Wheeler's June 6 direction to PPB limits the use of CS gas even further, requiring

a threat to life safety and no viable alternative. And it prohibits the use of CS gas against

peaceful protestors. No further order by this Court is necessary to ensure that uses of CS gas or

other riot control agents by PPB are consistent with the requirements of the Fourth Amendment.

B.    <u>Plaintiffs Cannot Show Irreparable Harm if No TRO Issues.</u>

To obtain a temporary restraining order, plaintiffs must show that they will suffer

*immediate and irreparable injury* in the absence of the requested relief. *Hodgers-Durgin v.*

---

[7] Plaintiff also relies on *Nelson* for the proposition that trespass is a minor offense, but the
partiers in *Nelson* were not trying to trespass into a secured jail facility, like the persons on May
29, 2020.

Page 18 –    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

*Gustavo De La Vino*, 199 F.3d 1037 (9th Cir. 1999) ("The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff[s] will be wronged again – a 'likelihood of substantial and immediate irreparable injury.'"). "The propriety of a temporary restraining order, in particular, hinges on a significant threat of irreparable injury that must be imminent in nature." *Gish v. Newsom*, 2020 WL 1979970, at *3 (C.D. Cal. Apr. 23, 2020) (citing *Simula, Inc. v. Autoliy, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999); *Baldridge*, 844 F.2d at 674. "[A] federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

The Ninth Circuit has set forth two ways to demonstrate that prospective injury is likely to occur, such that injunctive relief may be warranted:

> First, a plaintiff may show that the defendant had, at the time of the injury, a written policy, and that the injury "stems from" that policy. *Hawkins,* 251 F.3d at 1237. In other words, where the harm alleged is directly traceable to a written policy, *see Gomez v. Vernon,* 255 F.3d 1118, 1127 (9th Cir.2001), there is an implicit likelihood of its repetition in the immediate future. Second, the plaintiff may demonstrate that the harm is part of a "pattern of officially sanctioned ... behavior, violative of the plaintiffs' [federal] rights." *LaDuke v. Nelson,* 762 F.2d 1318, 1323 (9th Cir.1985). Thus, where the defendants have repeatedly engaged in the injurious acts in the past, there is a sufficient possibility that they will engage in them in the near future to satisfy the "realistic repetition" requirement.

*Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001) (abrogated on other grounds by *Johnson v. California*, 543 U.S. 499 (2005)).

The City does not question that First Amendment and Fourth Amendment injuries—injuries to rights protected by the Constitution—are significant. But here, plaintiffs ask the Court to exercise its equitable powers to oversee the City's law enforcement function both by banning

Page 19 –    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
             ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

the City "from using tear gas and smoke as crowd control tactics at protests" and requiring the City to immediately implement new policies and procedures for crowd control and crowd management. (Dkt. 2 at 3). In such instances, with such a request the Court must recognize "[t]he special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." *Lyons*, 461 U.S. at 112.

Here, plaintiffs have inaccurately described PPB's written policies. But when read completely, particularly in connection with the Mayor's direction to PPB, PPB's policy on the use of riot control agents does not constitute an official policy of violating plaintiffs' protected rights. Further, plaintiffs have not evidenced that "defendants engaged in a *standard pattern of officially sanctioned* officer behavior violative of the plaintiffs' constitutional rights." *LaDuke,* 762 F.2d at 1324 (emphasis added, internal citation omitted). In *LaDuke*, the challenged practice was "initiating and executing searches of migrant farm housing [that] violated [migrant workers'] Fourth Amendment rights." *Id*. at 1322. The court explained that "[t]he first difference between *Lyons* and this case lies in the respective district court findings on the likelihood of recurrent injury." *Id*. at 1324. In short, courts should distinguish between a pattern of police misconduct and "isolated event[s] caused by unusual or isolated factors." *Multi-Ethnic Immig. Workers*, 246 F.R.D. at 627.

During the last week, thousands of protesters have freely exercised their First Amendment right to express their views, largely free from any intervention or interaction with PPB. PPB has facilitated and not responded to these crowds blocking streets, temporarily shutting down bridges and freeways, or violating a curfew imposed by the Mayor. In fact, PPB has largely not responded with any force as a small number of persons graffitied buildings, broke windows and set fires. PPB has, however, responded with riot control agents in the very limited circumstances where it was necessary to protect officers from projectiles being thrown at them and to protect the Justice Center, which unlike other properties being damaged, houses hundreds

Page 20 –     DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING
              ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

of incarcerated individuals.

The City's policies limit the use of riot control agents to instances where they are necessary to prevent violence, injury or property damage and to avoid a greater application of force. They also prohibit indiscriminate use. The City further limits CS gas to *only* situations where there is an imminent risk to life safety and no alternative action available. With these strict limits on the use of riot control agents, plaintiffs have not shown that they face any imminent risk that they will be subject to riot control agents while engaged in peaceful, lawful, protest activity. *Cf. Puente v. City of Phoenix*, 2019 WL 4849613, at *9 (D. Ariz. Sept. 30, 2019) (a risk of imminent future harm justifying an injunction where police "had no policy in place at the time of the protest regarding the use of tear gas/chemical agents" and "did not change its procedures or implement corrective actions after the protest").

Notably, one other court has considered and granted a temporary restraining order recently in connection with the current protests nation-wide. As relevant to the deployment of riot control agents, that court enjoined the Denver Police Department "from employing chemical weapons or projectiles of any kind against persons engaging in peaceful protests or demonstrators" and enjoined Denver police officers "from using chemical weapons or projectiles unless an on-scene supervisor at the rank of Captain or above specifically authorizes such use of force in response to specific acts of violence or destruction of property that the command officer has personally witnessed." The court further ordered:

> 5. Chemical agents or irritants (including pepper spray and tear gas) may only be used after an order to disperse is issued.
>
> 6. Any and all order to disperse must be followed with adequate time for the intended audience to comply and officers must leave room for safe egress. If it appears that the intended audience was unable to hear the order, the order must be repeated prior to the use of chemical agents or irritants.

(Sheffield Decl., ¶ 12)

Page 21 –    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

The order from the United States District Court in Colorado is less restrictive than what plaintiffs request in their TRO. But it is also less restrictive than the requirements under which PPB is currently operating, which require both an order to disperse and adequate time and room for safe egress. The City's policies also limit use of riot control agents to instances where they are necessary to prevent violence, injury or property damage and to avoid a greater application of force, and further require "serious and immediate threat to life safety" and "no other viable alternative for dispersal" before using CS gas. The existing restrictions on PPB's use of riot control agents protect plaintiffs against constitutional injuries and eliminate the risk of immediate, irreparable constitutional harm.

C.  <u>Plaintiffs Have Not Established and Cannot Establish that the Balance of Equities Weighs in Their Favor or that a TRO is in the Public Interest.</u>

A plaintiff seeking a preliminary injunction or temporary restraining order must establish not only that he is likely to succeed on the merits and is likely to suffer irreparable harm in the absence of preliminary relief, but also that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter,* 555 U.S. at 20 (2008). "In exercising their sound discretion, courts of equity should pay particular regard for the public . . . consequences in employing the extraordinary remedy of injunction." *Id*. at 24 (internal citations omitted).

Here, the balance of equities tips in favor of the City, and granting a TRO is not in the public interest. As discussed herein, after many hours each day of peaceful protests by thousands of people, PPB utilized riot control agents in very limited circumstances, after warnings were given, to disperse the crowd following a civil disturbance. The circumstances giving rise to these civil disturbances included the breaking of the windows of the Justice Center and other buildings, setting off fireworks, property destruction, looting, setting fires in the Justice Center and other areas of downtown, throwing and launching deadly projectiles at the police, and attempting to dismantle a fence put up to protect the Justice Center. Further, riot control agents

Page 22 –   DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

have only been used on some nights, against smaller groups of protesters engaged in violent activity and refusing to follow lawful commands to disperse. The City's interest is not in "using chemical weapons against people" as alleged by Plaintiffs. (Dkt. 2 at 34.) The City's interest is in dispersing crowds in these circumstances where it is necessary to preserve the lives and the safety of the protesters, officers, and the individuals detained in the Multnomah County Detention Center. This is consistent with how riot control agents will be used moving forward, as required by PPB's directives and Mayor Wheeler's limitation on use of CS gas.

Weighing the hardship of the use of riot control agents against the benefits of protecting all individuals and government buildings in the area, while difficult, tips the equities in favor of the City. *See Friends of the Wild Swan v. Weber*, 955 F. Supp. 2d 1191, 1196 (D. Mont. 2013) (The balance of equities and public interest considerations, including the protection of governmental buildings and facilities, weighed in favor of the defendants.). Plaintiffs mischaracterize the burden on the City by framing it as losing a "single weapon in its vast arsenal of so-called 'crowd control' tactics" and "endur[ing] the administrative burden of the Portland Police Chief having to call a meeting and direct officers to cease use of tear gas against demonstrators." (Dkt. 2 at 35-36). The burden on the City is much more significant and includes officer injuries, injuries to other protesters in the area and individuals inside the Justice Center, and the burning and destruction of public and private buildings and property. Moreover, the use of riot control agents is limited to instances when "there no other viable alternative for dispersal" and may be used to "avoid a greater application of force." The City has no interest in deploying any force against a crowd. But the restrictive policy on the use of riot control agents is designed to ensure the least intrusive application of force necessary to maintain the important goal of protecting life and safety.

Should the Court determine that the balance of equities and public interest of both parties are compelling, then these two factors do not support the issuance of a TRO. In *Campbell*, the

Page 23 –    DEFENDANT'S RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

plaintiffs filed a motion for temporary restraining order alleging excessive force and seeking to enjoin the City of Oakland from using certain crowd control techniques during the "Occupy" protests. 2011 WL 5576921 at *1-2. The Court determined that both parties presented compelling interests:

> Plaintiffs, of course, seek to protect and exercise their First and Fourth Amendment rights in ways that implicate the public interest. The defendants, on the other hand, have indisputably accommodated the majority of the demonstrations, and seek to protect the safety and property of other Oakland residents.

*Id.* at *5. The Court then held, "[a]ccordingly, the final two factors do not weigh in favor of issuing a TRO." *Id.* For the foregoing reasons, the balance of equities and public interest do not favor the granting of an injunction.

## IV.    CONCLUSION

For all these reasons, the Court should deny the Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction.

Dated: June 9, 2020.

Respectfully submitted,

*/s/ Naomi Sheffield*
J. SCOTT MOEDE, OSB 934816
Chief Deputy City Attorney
scott.moede@portlandoregon.gov
NAOMI SHEFFIELD, OSB 170601
Deputy City Attorney
naomi.sheffield@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendant City of Portland*

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047