**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
**Viktoria Safarian**, OSB No. 175487
Email: viktoria@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241

**Juan C. Chavez**, OSB No. 136428
Email: jchavez@ojrc.info
**Brittney Plesser**, OSB No. 154030
Email: bplesser@ojrc.info
**Alex Meggitt**, OSB No. 174131
Email: ameggitt@ojrc.info
**Franz H. Bruggemeier**, OSB No. 163533
Email: fbruggemeier@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503 944-2270

**J. Ashlee Albies**, OSB No. 051846
Email: ashlee@albiesstark.com
**Whitney B. Stark**, OSB No. 090350
Email: whitney@albiesstark.com
**Maya Rinta**, OSB No. 195058
Email: maya@albiesstark.com
Albies & Stark LLC
1 SW Columbia St. Suite 1850
Portland, Oregon 97204
Telephone: (503) 308-4770

**Attorneys for Plaintiffs**

FIRST AMENDED COMPLAINT

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DON'T SHOOT PORTLAND, a nonprofit corporation, in its individual capacity, NICHOLAS J. ROBERTS, in an individual capacity and on behalf of themselves and all others similarly situated, MICHELLE "MISHA" BELDEN,  in an individual capacity and on behalf of themselves and all others similarly situated<br>        Plaintiffs<br><br>        v.<br><br>CITY OF PORTLAND, a municipal corporation,<br>        Defendant. | Case No. 3:20-cv-00917-HZ<br><br>FIRST AMENDED COMPLAINT<br><br>(Violations of Civil Rights: 42 U.S.C. § 1983)<br><br><br>JURY TRIAL DEMANDED |

Plaintiffs, by and through their attorneys, allege:

**NATURE OF ACTION**

1.

This is a civil rights action brought pursuant to 42 U.S.C. § 1983. Plaintiffs bring this civil rights action to stop the City of Portland from using excessive force against them in order to suppress plaintiffs' right to free speech. For the past nineteen days, plaintiffs, along with tens of thousands of their fellow community members, and millions of other people around the world, have taken to the streets to protest white supremacy and police violence in the United States generally and in Portland specifically. The Portland Police Bureau ("PPB"), like police departments all over the country, has responded with indiscriminate, unchecked, and unconstitutional violence against protesters. At first, PPB used chemical agents ("tear gas") against crowds of protesters, including plaintiffs, who had committed no criminal acts, posed no threat of violence to any person, and were merely engaged in protected speech. Plaintiffs were immediately concerned that the use of tear gas is particularly dangerous at the present time

because it is specifically designed to irritate the respiratory system and to cause people to expel mucus and aspirated saliva. In the midst of a global pandemic, the deadly novel COVID-19 virus is known to spread principally through aspirated saliva and mucus. Plaintiffs sought and obtained a temporary restraining order prohibiting PPB from using tear gas except in narrow circumstances. Following that order, PPB changed tactics, and now use a variety of so-called "less lethal" weapons indiscriminately against plaintiffs in its continued effort to silence speech. Plaintiffs are entitled to a temporary restraining order, preliminary injunction, permanent injunction, damages, and an award of attorneys' fees and costs.

## JURISDICTION AND VENUE

2.

This court has subject matter jurisdiction over plaintiffs' claims of violation of federal constitutional rights pursuant to 28 U.S.C. §§ 1331(a) and 1343 because the causes of action arise under 42 U.S.C. § 1983.

3.

Venue is proper in the District of Oregon pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in the District of Oregon and because defendants are subject to personal jurisdiction in the District of Oregon.

## PARTIES

4.

Plaintiff Don't Shoot Portland is a not for profit corporation, incorporated under the laws of the state of Oregon, whose principle place of business is Portland, Multnomah County, Oregon. Don't Shoot Portland is a Black-led organization whose fundamental mission is to advocate for social and racial justice in Portland. Don't Shoot Portland was formed in the wake of the Ferguson uprising stemming from the police killing of Michael Brown and community

outrage at police violence directed at Black people. Don't Shoot Portland provides support for grassroots organizing and education on issues of police brutality, the school to prison pipeline, and combatting white supremacy and racism. Don't Shoot Portland holds ongoing events and trainings related to its mission such as bystander intervention trainings, and advocates for demilitarization of the police. Its programs include a children's art and social justice council, community clothing tree, and community legal clinics. Don't Shoot Portland also advocates for social justice and change though supporting direct action in a safe manner; participating, organizing and supporting protests; providing know your rights trainings and information; and providing jail support to people arrested during demonstrations. Don't Shoot Portland recognizes that mass mobilizations and demonstrations are necessary for politicians and the general public to understand the importance of an issue in order to enact policies responsive to community demands in order to create and foster a more equitable City. Don't Shoot Portland has devoted resources to identifying, counteracting, and addressing the practices alleged in this complaint, and this diversion of resources has frustrated its mission.  As a result of the PPB's unconstitutional policy, practice, and customs, as alleged herein, Don't Shoot Portland must devote additional resources to educating, informing, and protecting protesters from unconstitutional practices, and this diversion of resources has frustrated its mission.

5.

Plaintiff Nicholas J. Roberts (Pronouns: he/him), at the time of filing and all material times, was a resident of Portland, Multnomah County, Oregon.

6.

Plaintiff Michelle "Misha" Belden (Pronouns: They/Them), at the time of filing and all material times, was a resident of Portland, Multnomah County, Oregon.

7.

Defendant City of Portland is a political subdivision of the State of Oregon. The Portland Police Bureau ("PPB") is a department or division of the City. As a local governmental entity, the City of Portland is a suable person under 42 U.S.C. § 1983. Every person who used tear gas and "less lethal" weaponry, including as described below, was an employee or agent of the City of Portland. On information and belief, each and every decision to indiscriminately use tear gas and other "less-lethal" weapons against plaintiffs was made at or ratified by a sufficiently high level as to be policy decision of the City of Portland.

**GENERAL ALLEGATIONS**

8.

Black Lives Matter.

9.

The disproportionate and excessive use of force against African Americans by police officers in the United States is a well-documented, systemic problem. It exists in every police department in this country, including the PPB.

**I.      George Floyd**

10.

On May 25, 2020, in Minneapolis, Minnesota, a Black man named George Floyd was murdered on video by Officer Derek Chauvin of the Minneapolis Police Department while three of his fellow officers watched and did nothing to intervene. Officer Chauvin knelt on Mr. Floyd's neck while Mr. Floyd pleaded for his life, repeatedly telling Chauvin that he could not breath. A bystander video of the murder quickly went viral, sparking outrage throughout the country.

11.

FIRST AMENDED COMPLAINT

For many Americans, and particularly Black Americans, the murder of George Floyd, in broad daylight while being openly filmed by a witness, was the proverbial straw that broke the camel's back. Fed up with the empty platitudes and the endless yet ineffective "reforms" by their political and law enforcement leaders, millions of Americans took to the streets in protest, demanding an end to police violence and white supremacy, and refusing to leave those streets unless and until meaningful change is made.

12.

Protests against police violence have been met with police violence in nearly every city around the country. Videos shared in the press and on social media show the police in this country out of control: attacking journalists, attacking bystanders, threatening children, assaulting people for insulting them, engaging in drive-by attacks with "less lethal" weapons, planting weapons in the hands of people arrested, pulling off demonstrators' CDC-recommended facemasks and macing them, kettling whole groups of protesters only to launch tear gas at them, driving their cars directly through crowds of people, using military helicopters in efforts to terrify civilians, discussing plans to shoot protesters, and above all, using massive amounts of tear gas in a massive systemic effort to stop people from protesting police violence. This violent police response has only strengthened the resolve of protesters.

**II.    Portland**

13.

Beginning on May 29, 2020, and every night since then, Portlanders have been demonstrating in the streets demanding justice for George Floyd and demanding an end to police violence. The PPB, like police departments throughout the country, have met these demands with violence.

14.

A focal point of conflict between PPB and protesters has been the "Justice Center" in downtown Portland, which is, as of the date of this filing, is completely surrounded by fencing. The building houses PPB's central precinct, which includes command staff offices, a jail where hundreds of humans – disproportionately Black – are housed in small cage like cells, and a small number of courtrooms where the "business" of the criminal legal system perpetuating these racial inequalities continues every working day. It is, in short, a perfect symbol of the harms the protesters seek to address.

15.

PPB is determined to keep the protesters away from the Justice Center, closing public streets, erecting fences, and guarded by lines of law enforcement officers wearing armor, helmets, and gas masks, and stocked with weapons. Every night since the protests began has ended with a standoff around the Justice Center between police and protesters, culminating in PPB using a variety of tactics, including indiscriminately spraying demonstrators with tear gas, rubber bullets, pepper balls, blast balls, Long Range Acoustic Device ("LRAD"), flash bangs, and other impact munitions, while launching aerial munitions into the air above their heads. The police then scatter the protesters throughout the streets of downtown Portland, often kettling them and continuing to assault them with more pepper spray, impact munitions, and aerial munitions.

16.

Since this court entered a Temporary Restraining Order on June 9, 2020, limiting the PPB's use of tear gas on protestors, PPB has escalated its use of rubber bullets, pepper balls, blast balls, flash bangs, and other impact munitions on the crowd in an indiscriminate manner.

/ / /

### III.    Tear Gas and COVID 19

17.

Riot control agents (here referred to as "tear gas") are chemical compounds that temporarily make people unable to function by causing irritation to the eyes, mouth, throat, lungs, and skin. Several different compounds are considered to be riot control agents, including chloroacetophenone ("CN"), hlorobenzylidenemalononitrile ("CS"), and oleoresin capsicum ("OC"). OC is derived from capsaicin and designed to be an irritant and inflammatory agent "primarily affect[ing] the respiratory tract." CS is a nerve gas designed to inflict pain, and degrade the mucous membranes in a person's eyes, nose, mouth, and lungs. The PPB uses both CS and OC, and possibly others.

18.

PPB launches tear gas from canisters at protesters which releases the chemical agent in gaseous form, exposing people through skin contact, eye contact, or breathing it in. PPB also discharges chemical agents directly from handheld canisters, and by shooting FN303s with OC payload or 40mm impact munitions with OC payload. These weapons spread their OC payload upon impact with the ground or the body of person. Manufacturer's materials for OC capsules fired from FN303s describe this feature and practice of firing at the ground as "area saturation."

19.

Tear gas causes irritation to the area of contact within seconds of exposure, including eye burning, excessive tearing, blurred vision and redness; runny nose, and nasal burning and swelling; mouth burning, irritation, difficulty swallowing and drooling; chest tightness, coughing, choking sensation, wheezing, shortness of breath; burns and skin rash. Some people experience nausea and vomiting. Studies show that tear gas is linked to miscarriage and fetal

harm. Moreover, the 1993 International Chemical Weapons Convention, Geneva, bans tear gas from use by military forces during war.

20.

COVID-19, or Coronavirus, is a novel and serious respiratory virus which impacts the upper and lower respiratory system. It is spread primarily through droplets when an infected persons coughs or sneezes, or through droplets of saliva or discharge from the nose. For all these reasons, the CDC recommends people wear face coverings over the nose and mouth to help prevent the spread of COVID-19. There is no vaccine nor cure for COVID-19, and no one has prior immunity. As such, the virus has spread across the globe, and has been designated a global pandemic. Those infected with COVID-19 can experience no symptoms, mild symptoms, or severe symptoms. As such, and due to limited COVID-19 testing, the true rate of COVID-19 infections is unknown.

Because of racism and its impact on economic and health disparities, Black people, Indigenous people, and people of color are more likely to develop, suffer, and face complications from COVID-19 than their white counterparts.[1]

21.

Many recent reports link the use of tear gas to exacerbation of spreading of COVID-19. Indeed, Oregon Health and Science University ("OHSU") President Danny Jacobs, M.D., F.A.C.S., released a statement acknowledging that "Protests have long served as a positive agent for social change in the U.S.," and that PPB's "use of tear gas and other chemical means to control crowds has raised great concern among medical professionals as we simultaneously try to manage a global pandemic." The statement further opined:

---

[1] *See* Multnomah County, *New numbers show COVID-19 damage to communities of color; leaders call for better data collection*, (May 1, 2020), available at https://multco.us/novel-coronavirus-covid-19/news/new-numbers-show-covid-19-damage-communities-color-leaders-call

FIRST AMENDED COMPLAINT

While large gatherings in general provide increased opportunities for the transmission of COVID-19, the use of tear gas could significantly exacerbate the spread. Tear gas is a chemical that attacks the mucous membranes of the eyes, nose, throat and lungs and causes severe pain and irritation; exposure to tear gas can result in blindness, bleeding, crying and coughing. The release of airborne droplets through tear gas-induced coughing could accelerate the spread of COVID-19 and lead to a surge in new cases. Damage to the respiratory tract can put individuals at greater risk of adverse outcomes if they become infected with COVID-19.[2]

22.

The use of tear gas is, by its very nature, indiscriminate. Everyone must breathe, and anyone who breathes in the area where police have used tear gas will be harmed by the gas. The City of Portland knew this when it decided to procure the tear gas, arm police with the tear gas, and authorize police to use tear gas in its downtown core on protesters. The City knew that the gas would harm people who were not engaged in any unlawful activity and where PPB had no probable cause that individuals had committed any crimes.

## V.    Impact Munitions

23.

In addition to using chemical weapons, PPB uses a variety of so-called "riot control" weapons, some of which also contain OC as a chemical irritant. PPB uses two different platforms for launching these munitions: an 18 mm, 15-round capacity, shoulder fired weapon called an FN303; and 40 mm, two round capacity, shotgun-style launcher. PPB uses the FN303 to deploy munitions containing OC powder designed to cause chemical irritation to anyone around the impact; munitions containing paint designed to both hurt the person and mark them with paint; and munitions containing sand to both hurt the target and cause non-chemical irritation. PPB uses the 40 mm launcher to fire foam tipped rounds designed to hurt people, foam tipped rounds

---

[2] Danny Jacobs, M.D., M.P.H., FACS, Statement on tear gas and nonviolent protests, Oregon Health & Sciences University (June 4, 2020) available at https://news.ohsu.edu/2020/06/05/statement-on-tear-gas-and-nonviolent-protests?linkId=90165009

with OC inside, and two types of "flash-bang" grenades: one that emits light and sound, and one that, in addition, spreads plastic shot over an area of people in order to hurt them. PPB also uses hand-held grenade-style weapons that accomplish the same purposes of 40 mm launched flash-bangs. The manufacturer's website advertises that one of these hand-thrown grenades will spread plastic projectiles over a 50 foot radius.

24.

Neither the FN303s nor the 40 mm launchers are accurate at long distances, and become inaccurate altogether after several deployments. The use of FN303s and 40 mm launchers in crowd management settings has lead to the death of protesters, like in Boston.[3] This fact has lead to some police departments to cease use of FN303s altogether, like the Boston Police Department, which repurposed these weapons by melting them into sewer caps.[4] During the recent protests following George Floyd's murder, projectiles fired from FN303s have resulted in the serious maiming of individuals.[5]

25.

In the past and during the present protests, PPB has firing these impact munitions, particularly the FN303, indiscriminately into crowds of passively resisting, or other peaceful protesters, both before and after PPB has declared an unlawful assembly/civil disturbance, leaving large welts, bruises, and other similar injuries. Protesters outside of the Multnomah County Justice Center attest to being fired upon and hit by such munitions by officers standing at the top of the stairs across the street despite having not engaged in any behavior that was criminal, let alone threated anyone's life or safety.

---

[3] The New York Times, *Boston Police to Destroy Pepper-Spray Guns* (Feb. 23, 2007), available at https://www.nytimes.com/2007/02/23/us/23pepper.html
[4] *Id.*
[5] Kelli Kennedy, *Protester hit in face by police rubber bullet wants answers*, Houston Chronicle (June 12, 2020), available at  https://www.houstonchronicle.com/news/article/Protester-hit-in-face-by-police-rubber-bullet-15336813.php

FIRST AMENDED COMPLAINT

## IV.    Don't Shoot Portland

26.

Don't Shoot Portland has been participating the local demonstrations and providing assistance and support to protesters. It has participated in, monitored, and amplified calls to end racist policing and the violent police response to nonviolent protesters. It strongly opposes the use of tear gas, "less lethal" weapons, and any force against protesters.

## V.    Nicholas J. Roberts

27.

Nicholas J. Roberts is an Oregonian who lives in downtown Portland. He attended his first protest on May 29, 2020, because he wanted to protest police brutality and the oppression of Black people. He took precautions because of COVID-19, putting on gloves, face masks, and safety glasses, and tried to practice social distancing. Mr. Roberts attended demonstrations on May 29, 30, 31 and June 1, 2, 6, 10, 12 and 13, and saw peaceful protesters. Mr. Roberts was not engaging in any unlawful activity when the PPB began launching tear gas into the largely peaceful crowd protesting police violence in front of the Justice Center. Mr. Roberts attended protests on May 30, May 31, and June 2, 6, and 13, and had a similar experience: PPB launched tear gas and "less lethal" weapons at peaceful protesters demonstrating against police violence at the Justice Center who were not engaged in any unlawful conduct. Mr. Roberts has been attending demonstrations less since being subjected to PPB's weaponry.

28.

Mr. Roberts was physically harmed and frightened by PPB's use of tear gas and "less lethal" weapons.

///

///

## VI. Michelle "Misha" Belden

29.

Mx. Belden had attended the protest in Downtown Portland on June 2, 2020. They were protesting against the brutality the country witnessed when George Floyd of Minneapolis, MN was murdered by a Minneapolis Police Officer. They wished to be with their community as it protested against police violence and racism. They were attending the march from SE Portland to Pioneer Plaza in Downtown Portland. There, they heard a few explosions in the distance. They arrived at the area around SW 3rd and SW Salmon. They found a crowd chanting, and mostly calm. Suddenly, there was a flash bang then tear gas. Everyone started scattering. They were trapped between walls of gas, a fence, and lines of police officers. The air was thick with tear gas. They believed the police were trying to kill them. This continued for several blocks until they reached safety around SW Naito and Harvey MLK.

30.

Mx. Belden attended protests on June 9 and 10, 2020 as well, between the 9 pm-1 am at the Justice Center in Downtown Portland. On June 9, the crowd of approximately 500 was mostly peaceful, and some people rattled the fence erected outside the Justice Center. PPB administered a warning to back away from the fence, and while many protestors backed away, some stayed close to the fence, but stopped rattling the fence. At about midnight, when the crowd had dwindled to by approximately 40%, PPB fired flash bangs and OC munitions to disperse the crowd without any warning. To Mx. Belden and others, it looked and sounded like tear gas, despite the TRO entered in this case, causing Mx. Belden to believe the PPB will never stop using excessive force, and that protesters will all be subject to arrest and excessive force at all times, denying them an opportunity to have a peaceful protest. On June 10, one part of the fence was taken down, away from the Justice Center and where PPB was stationed. Protesters

were simply standing around. Two people, one clothed,and one not, ran behind the fenced off

area. After the first person went into the fenced area, PPB deployed chemical agents, impacting

the nearby protestors. PPB then deployed "less lethal" weapons, including OC blasts, and flash

bang. Mx. Belden left the scene, because they felt PPB was escalating and they did not want to

be caught up in it, and did not want to get gassed again. As a result, Mx. Belden gave up on

protesting for the rest of that week.

31.

Mx. Belden was physically harmed and frightened by PPB's use of tear gas and "less

lethal" weapons.

**CLASS ALLEGATIONS**

32.

Plaintiffs Nicholas J. Roberts and Misha Belden bring this action pursuant to Rules 23(a)

and 23(b)(1) and (2) of the Federal Rules of Civil Procedure on behalf of themselves and a class

of similarly situated individuals.

33.

The proposed class is defined as follows: all individuals who currently or who will in the

future engage in protest activities that follow the death of George Floyd opposing police violence

and white supremacy. This include protesters who engage in passive resistance to the orders of

police, but does not those who engage in conduct beyond passive resistance.

34.

The class period commences on May 25, 2020 and extends to the date on which PPB is

enjoined from, or otherwise ceases, enforcing their unconstitutional policy, practice, and custom

of using indiscriminate excessive force, including but not limited to the use of tear gas and "less

lethal" weapons, irrespective of the individualized conduct of specific protesters. Specifically

excluded from the class are Defendant and any and all of their respective affiliates, legal representatives, heirs, successors, employees, or assignees.

35.

This action has been brought and may properly be maintained as a class action under Federal law and satisfies numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

36.

The Class is so numerous, on information and belief, over 1,000, that joinder is impractical. Maintaining individual actions would create a risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Multiple courts issuing multiple injunctions governing use of force standards for law enforcement would be untenable.

37.

Common questions of law and fact exist as to all members of the class. These legal and factual questions include but are not limited to:

- By engaging in the tactics alleged herein, has Defendant violated the First Amendment?

- By engaging in the tactics alleged herein, has Defendant violated the Fourth Amendment?

- By allowing an unconstitutional pattern, practice, and custom of using indiscriminate excessive force against protesters, has Defendant violated the First and Fourth Amendments?

- Has Defendant exhibited a deliberate indifference to the unconstitutional conduct alleged herein?

- By utilizing indiscriminate force, such as tear gas, pepper spray, and impact munitions, has Defendant unlawfully chilled the speech rights of protesters?

38.

Plaintiffs Robert's and Belden's claims are typical of the claims of the class members. The harms Plaintiffs suffered and will suffer, as a result of Defendant's courses of conduct, are typical of the harms suffered by class members. "[T]he party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory  relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(1)(A). There is no allegation that Plaintiffs have been targeted because of anything unique to them as individuals.

39.

Plaintiffs Roberts and Belden will fairly and adequately protect the interest of the Class. Plaintiffs have no interests adverse to the interests of the class. Plaintiffs retained counsel with experience and success in the prosecution of civil rights litigation. Counsel for Plaintiffs know of no conflicts among class members or between counsel and class members.

40.

Plaintiffs Roberts and Belden seek injunctive and declaratory relief. Any injunction requiring Defendants to address their constitutional violations would prevent other litigants from seeking a different injunction. Plaintiffs Roberts and Belden seek class certification under Fed. R. Civ. P. 23(b)(1).

**FIRST CLAIM FOR RELIEF**
**(Excessive Force – Violation of Fourth Amendment – 42 U.S.C. § 1983 brought on behalf of Plaintiff Don't Shoot Portland Individually and Plaintiffs Roberts and Belden Individually and the Putative Class)**

41.

Plaintiffs restate and incorporate herein all previous paragraphs of this Complaint.

42.

**Count 1: Municipal Liability – Unlawful Practice or Policy Allowing Indiscriminate Use of Force as Tactic to Disperse Crowd.**

The City of Portland has an official policy allowing the use of "riot control" and "less lethal" weapons against a crowd whenever it determines that the crowd creates a "civil disturbance." This policy has no relationship with the *Graham v. Connor* Fourth Amendment standard regulating the use of force against individuals. It expressly allows for the indiscriminate use of force against a crowd of people, including those engaging in passive resistance, in violation of the Fourth Amendment.

Alternatively, even if the policy itself is constitutional, PPB's actual practice and custom is to allow the use of "riot control" and "less lethal" weapons against a crowd both before and after an "unlawful assembly" and/or a "civil disturbance" has been declared, even when a substantial number of people in that crowd, or even the majority of that crowd, are engaged only in the passive resistance to an order.

43.

On May 29, 30, 31 and June 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, and 16, 2020, PPB deployed tear gas and/or other "less lethal" weapons on large crowds of peaceful protesters and continued to deploy tear gas and/or "less lethal" weapons at people running away. Videos documenting the indiscriminate nature of this force deployment are rampant.[6] The City has tacitly and explicitly authorized the use of indiscriminate crowd control munitions on crowds of protesters by justifying uses of similar tactics, including "less lethal" weapons shot indiscriminately into crowds of protesters, at protests on these dates.

---

[6] E.g. https://twitter.com/mrolmos/status/1268072714926878720?s=21;
https://twitter.com/matcha_chai/status/1268043556913987584?s=21

FIRST AMENDED COMPLAINT

The City, acting pursuant to this policy, custom, or practice, unlawfully used tear gas and "less lethal" weapons against plaintiffs as alleged above.

44.

## Count 2: Municipal Liability – Action of Policymaking Officials

The decision to use riot control and "less lethal" weapons against the crowds containing plaintiffs on May 29, 30, 31 and June 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, and 16 made by officials of the PPB who are sufficiently senior that the decision may fairly be said to represent official policy of the City of Portland. Former PPB Chief Jami Resch was, and PPB Chief Chuck Lovell is the highest level of authority within the PPB, and Mayor of Portland Ted Wheeler, also the Police Commissioner, has acknowledged receiving minute-to-minute reports from PPB of events on the ground at the protest. The decision to use riot control and "less lethal" weapons was made by official policy makers the Chief of PPB and the Mayor of Portland.

45.

## Count 3: Municipal Liability -- Ratification

Former PPB Chief Jamie Resch stated in a news conference on June 3 that the decision to use tear gas, other riot control, and "less lethal" weapons against a crowd of protesters the evening prior was made by incident commanders at the scene. As such, the decision to use tear gas and "less lethal" weapons against the crowds containing plaintiffs on May 29, 30, 31 and June 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, and 16 was made by incident commanders on scene. As alleged above, these decisions were ratified by the Chief of PPB and the Mayor of Portland.

46.

The above-described conduct was a proximate cause of harm to Plaintiffs.

///

FIRST AMENDED COMPLAINT

## SECOND CLAIM FOR RELIEF
### (Violation of the First Amendment – 42 U.S.C. § 1983 brought on behalf of Plaintiff Don't Shoot Portland Individually and Plaintiffs Roberts and Belden Individually and the Putative Class)

47.

Plaintiffs restate and incorporate herein all previous paragraphs of this Complaint.

48.

Plaintiffs were engaged in constitutionally protected acts of free speech, including public demonstration opposing racism and police violence against Black people. Plaintiffs will continue to do so in the future.

49.

PPB's use of force against Plaintiffs for engaging in First Amendment protected activity and, in an effort, to deter future similar activity, evidences a pattern and practice of unconstitutional conduct that is certain to continue absent any relief.

50.

Plaintiffs reasonably fear the PPB's continued use of tear gas and "less lethal" weapons on protesters and PPB's acts would, and did, chill a reasonable person from continuing to engage in protected First Amendment Activity.

51.

**Municipal Liability – First Amendment**

The City of Portland has a custom and practice of using militarized force against anti-police protesters, as demonstrated by the use of tear gas and "less lethal" weapons against those protesting outside the Justice Center, a significant symbolic representation of the issues being protested. The defendants' use of force was intended to punish a group of protesters *en masse* for their political speech, and to deter further similar expressions of speech. The supervisory decision to fire tear gas and "less lethal" weapons indiscriminately into a crowd of protesters

FIRST AMENDED COMPLAINT

demonstrating outside the Justice Center was made in retaliation for the protesters' protected

speech condemning the police at the symbolic embodiment of the protest subject matter and to

chill the expression of further similar speech.

52.

The supervisor defendants who authorized, made, and ratified the decision to attack anti-

police demonstrators are sufficiently senior so that their decision can fairly be said to be the

official policy of the City of Portland.

53.

The above-described conduct was a proximate cause of harm to Plaintiffs.

## DAMAGES

As a direct and proximate result of the conduct of the Defendants, Plaintiffs suffered

economic and noneconomic damages, including interference with their First Amendment rights,

a greater distrust in the PPB and police in general, fear of increased exposure to the novel

COVID-19 virus, emotional distress, physical pain, and discomfort and suffering.

## REASONABLE ATTORNEY'S FEES AND COSTS

42 U.S.C. § 1988(b) allows "the prevailing party . . . a reasonable attorney's fee as part of

the costs. . ." in an action brought under 42 U.S.C. § 1983.

Plaintiffs requests that the court grant reasonable attorneys' fees in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs pray for their costs and disbursements incurred herein and for the

following in accordance with the proof at trial:

1.     A temporary restraining order, prohibiting the City of Portland from using tear

gas as a crowd control measure;

2.      A temporary restraining order, prohibiting the City of Portland from using "less lethal" weapons, including but not limited to OC spray or munitions, impact munitions, LRAD, sound cannons, etc., against protestors who are only engaged in passive resistance, including passive resistance to an order to disperse. In any case where PPB uses less lethal weapons, it must insure that no person who is engaged in only passive resistance is impacted or effected by those weapons.

3.      A permanent injunction, prohibiting the City of Portland from using tear gas as a crowd control measure;

4.      A permanent injunction, prohibiting prohibiting the City of Portland from using "less lethal" weapons, including but not limited to OC spray or munitions, impact munitions, LRAD, sound cannons, etc., against protestors who are only engaged in passive resistance, including passive resistance to an order to disperse. In any case where PPB uses less lethal weapons, it must insure that no person who is engaged in only passive resistance is impacted or effected by those weapons;

5.      Compensatory damages to Plaintiffs Roberts and Belden;

6.      Attorney's fees; and

7.      Any other relief the court deems proper.


**DATED** this 18th day of June 2020.

s/J. Ashlee Albies
**J. Ashlee Albies**, OSB No. 051846
**Whitney B. Stark**, OSB No. 090350
**Maya Rinta**, OSB No. 195058
Albies & Stark LLC

**Jesse Merrithew**, OSB No. 074564
**Viktoria Safarian**, OSB No. 175487
Levi Merrithew Horst PC

**Juan C. Chavez**, OSB No. 136428
**Brittney Plesser**, OSB No. 154030

**Alex Meggitt**, OSB No. 174131
**Franz H. Bruggemeier**, OSB No. 163533
Oregon Justice Resource Center
**Attorneys for Plaintiffs**

FIRST AMENDED COMPLAINT