**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
**Viktoria Safarian**, OSB No. 175487
Email: viktoria@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241

**Juan C. Chavez**, OSB No. 136428
Email: jchavez@ojrc.info
**Brittney Plesser**, OSB No. 154030
Email: bplesser@ojrc.info
**Alex Meggitt**, OSB No. 174131
Email: ameggitt@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503 944-2270

**J. Ashlee Albies**, OSB No. 051846
Email: ashlee@albiesstark.com
**Whitney B. Stark**, OSB No. 090350
Email: whitney@albiesstark.com
**Maya Rinta**, OSB No. 195058
Email: maya@albiesstark.com
Albies & Stark LLC
1 SW Columbia St. Suite 1850
Portland, Oregon 97204
Telephone: (503) 308-4770

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | | |
|---|---|---|
| DON'T SHOOT PORTLAND, et al., | ) | Case No. 3:20-cv-00917-HZ |
| Plaintiffs | ) | |
| | ) | PLAINTIFFS' MOTION FOR |
| v. | ) | PRELIMINARY INJUNCTION |
| | ) | |
| CITY OF PORTLAND, a municipal | ) | |
| corporation, and MULTNOMAH COUNTY, | ) | **Oral Argument Requested** |
| a political subdivision of the State, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Motions that this Court enter a Preliminary Injunction prohibiting the City of
Portland from using "less lethal" weapons, including but not limited to OC spray or munitions,
impact munitions, LRAD, sound cannons, etc., against protestors who are only engaged in
passive resistance, including passive resistance to an order to disperse. In any case where PPB
uses less lethal weapons, it must ensure that no person who is engaged in only passive resistance
is impacted or effected by those weapons.

This Motion is supported by the following Memorandum and the Declarations of Dr.
Anita Randolph ("Randolph Decl."), Donnie Yarn ("Yarn Decl."); Gillian Herrera ("Herrera
Decl."); Thaddeus O'Connell ("O'Connell Decl"); Alexandra Johnson ("Johnson Decl.");
Camilla Ruth Kaplan ("Kaplan Decl."); Frederick Garlick ("Garlick Decl."); Natalie Ann
Norcross ("Norcross Decl."); Zach Reinhardt ("Reinhardt Decl."); and Jacinda Padilla ("Padilla
Decl.").

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................. 6

II. PROCEDURAL HISTORY ................................................................................. 7

III. FACTUAL SUMMARY ..................................................................................... 8

    A. Monday, June 15, 2020 ................................................................................ 8

    B. Thursday, June 25, 2020 .............................................................................. 9

        1. Demonstration at the Justice Center ...................................................... 9

        2. Demonstration at the Portland Police Bureau's North Precinct............... 9

            a. Police Violently Dispersed the Potlatch Ceremony ......................... 12

        3. Friday, June 26, 2020 ........................................................................... 13

IV. LEGAL STANDARDS ..................................................................................... 18

V. ARGUMENT ..................................................................................................... 19

    A. Plaintiffs Are Likely to Prevail on the Merits of Their Fourth Amendment Claim..... 19

        1. The City of Portland has violated the rights of protesters to be free from unlawful use of force while protesting.................................................................... 19

        2. "Less Lethal" weapons create significant injuries ................................. 20

        3. Plaintiffs and Declarants posed no threat............................................. 21

        4. PPB has fired upon compliant, passively resistant, and retreated protesters. ......... 22

    B. Plaintiffs Are Likely to Prevail on the Merits of Their First Amendment Claim. ....... 24

    C. Plaintiffs are likely to prevail on their Monell claims against the City of Portland both on the First and Fourth Amendment violations. .............................................. 26

        2. Plaintiffs will likely succeed on the theory that PPB and the City has a custom and practice of using indiscriminate chemical gas agents against crowds of protestors... 28

    D. Without This Court's Intervention, Plaintiffs are Likely to Suffer Irreparable Harm.  30

    E. The Public Interest Weighs in Favor of Granting this Temporary Restraining Order and the Balance of Equities Is in Plaintiffs' Favor because the Safeguarding of Plaintiffs' and the Public's Constitutional Rights and Promotion of Public Health Outweigh Defendant's Interest in Using Chemical Weapons Against People................................ 32

CONCLUSION....................................................................................................... 34

## TABLE OF AUTHORITIES

**Cases**

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1135-38 (9th Cir. 2011) .......... 18

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016) ...................... 24

*Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) ...................................................... 31

*Boyd v. Benton County*, 374 F.3d 773, 779 (9th Cir. 2004) .......................................................... 21

*Cantu, et. al. v. City of Portland*, USDC of D. Or. Case. 3:19-cv-01606-SB, Dkt. 43 (D. Or., June 3, 2020) ........................................................................................................................................ 28

*Deorle v. Rutherford*, 272 F.3d 1272, 1276, 1281–1282 (9th Cir. 2001) .................................... 20

*Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) ................................................. 26

*Estate of Osuna v. Cty. of Stanislaus*, 392 F. Supp. 3d 1162, 1175 (E.D. Cal. 2019) ................. 29

*Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008) .................................................................. 23

*Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) ..................................................... 26

*Goldstein v. City of Long Beach*, 715 F.3d 750, 753 (9th Cir. 2013) ........................................... 30

*Graham v. Connor*, 490 U.S. 386 (1989) ..................................................................................... 19

*Hamilton v. City of Olympia*, 687 F.Supp.2d 1231, 1242-3 (W.D. Wash. 2009) ......................... 20

*Hartman* v. *Moore*, 547 U. S. 250, 256 (2006) ............................................................................ 24

*Headwaters Forest Def. v. Cty. of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) ............. 23, 33

*In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007) ............................................ 31

*Johnson v. City of Berkeley*, 2016 WL 928723 (N.D. California, 2016) ................................. 25, 29

*Keating v. City of Miami*, 598 10 F.3d 753,767 (11th Cir. 2010) ................................................ 25

*LaLonde v. County of Riverside*, 204 F.3d 947 (9th Cir. 2000) .................................................... 23

*Louis v. Praprotnik*, 485 U.S. 112, 126-127 (1988) .................................................................... 30

*Marbet v. City of Portland*, No. CV 02-1448-HA, 2003 WL 23540258, at *10 (D. Or. Sept. 8, 2003) .......................................................................................................................................... 23

*Martin v. City of Portland*, No. 3:19-CV-1647-SI, 2020 WL 363391, at *5-6 (D. Or. Jan. 21, 2020) .......................................................................................................................................... 29

*McCarthy v. Barrett*, 804 F. Supp. 2d 1126, 1137-38 (W.D. Wash. 2011) ................................. 25

*McCarthy v. Barrett*, 804 F.Supp.2d 1126 (W. D. Washington, 2011) ........................................ 29

*Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) .......................................................... 33

*Melendres v. Arpaio*, 695 F.3rd 990, 1002 (9th Cir. 2012) ......................................................... 31

*Multi-Ethnic Immigrant Workers Org. Network v. City of L.A.*, 246 F.R.D. 621, 634 (C.D. Cal. 2007) .......................................................................................................................................... 26

*Natural Res. Def. Council, Inc.  v. Winter*, 518 F.3d 658, 677 (9th Cir. 2008) ........................... 18

*Nelson v. City of Davis*, 685 F.3d 867, 875 (9th Cir. 2012) ..................................... 19, 20, 21, 23

*NRDC v. Winter*, 518 F.3d 658, 677 (9th Cir. 2008) .................................................................... 30

*Patel v. Dennett*, 389 F.Supp.3d 888, 898 (D. Nev. 2018) .......................................................... 22

*Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002) ........................... 33

*Ulrich v. City & Cty. of S.F.*, 308 F.3d 968, 979 (9th Cir. 2002) ................................................ 24

*United States v. Jones*, 214 F.3d 836, 837–38 (7th Cir.2000) ..................................................... 21

*Warsolider v. Woodford*, 418 F.3d 989, 1001 (9th Cir.2005) ...................................................... 31

*Washington v. City of Los Angeles*, 2018 WL 6131603, at *6 (C.D. Cal. 2018) ......................... 20

*Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008) ....................................................... 18

**Statutes**

ORS 164.255 ................................................................................................................................... 21

ORS 166.025 ................................................................................................................................... 21

**Other Authorities**

Jules Boykoff, *'We Can't Be Duped by Petty Reforms': A Q&A With a Black Panther*, The
     Nation (June 25, 2020),.................................................................................................. 22
Keaton Thomas, *PPB spent thousands on chemical munitions shortly after George Floyd
     protests began*, KATU News (June 29, 2020),......................................................................... 6
Mason Lake, *June 26th Portland Police Assault*, YouTube (June 26, 2020),.............................. 13
United States Congress's Oversight Committee, *CRCL Sbcmte Briefing: Government Violence
     Against Peaceful Civil Rights Protesters / Journalists*, YouTube at 23:50 (June 29, 2020),... 32

# I. INTRODUCTION

Plaintiffs initiated their lawsuit stating their intent to move for a temporary restraining order to enjoin Defendant from their continued indiscriminate use of tear gas against peaceful and/or passively resistant protesters. Following the grant of Plaintiffs' Motion for Temporary Restraining, Plaintiffs now move to enjoin Defendant's continued indiscriminate use of all riot control munitions against peaceful and/or passively resistant protesters.

As happened after entry of this Court's Temporary Restraining Order, the use of tear gas on peaceful or passively resistant protesters was greatly curtailed. The City used tear gas on one day, in the early morning hours of June 26, 2020, which we will discuss *infra* § III.B. The efficacy of the Temporary Restraining Order demonstrates its necessity. Because of the manner in which the City then used its other munitions—pepper balls, flash bangs, and impact munitions—further restraint was needed. The parties came to an agreement on the future use of these weapons on June 26, 2020. This agreement needs to be perpetuated beyond the expiration date of July 24, 2020, and augmented to prevent further harm against Portlanders.

The Portland Police have demonstrated that they cannot be trusted to utilize these riot control munitions without court intervention. The Portland Police recently described their philosophy on using chemical weapons like the ones Plaintiffs seek to enjoin thusly: "Sometimes, some simple pain compliance in terms of using riot control agent will accomplish the goal of changing the behavior, changing the dangerous behavior that's happening without having to use other physical force that has a higher risk of injury."[1] What the declarants have

---

[1] Quote attributed to Lt. Franz Schoening of the Portland Police Bureau. Keaton Thomas, *PPB spent thousands on chemical munitions shortly after George Floyd protests began*, KATU News (June 29, 2020), available at https://katu.com/news/following-the-money/portland-police-bureau-spent-thousands-on-chemical-munitions-shortly-after-george-floyd-protests-began.

seen, experienced, and now testify to speaks to the first half of this statement—about pain compliance and changed behavior—but nothing can corroborate the latter half. Any alleged dangerous behavior cannot justify the use of these riot control agents against the peaceful and passive; And as the medical expert declarants have attested to, the use of these agents already gives rise to a "higher risk of injury." This "changing of behavior" is an unconstitutional chilling of speech through unlawful use of force.

As we see a growing count of injured Portlanders, a preliminary injunction is justifiable under the law, and needed to prevent further injury. Additionally, Plaintiffs wish to notify the Court as to its intent to file a Motion to Show Cause regarding violations of the Temporary Restraining Order, and will file its Motion imminently.

## II. PROCEDURAL HISTORY

Plaintiffs initiated their lawsuit against the City of Portland on June 5, 2020. *Comp.*, Dkt. 1. In their Complaint, they allege that the then sole Defendant City of Portland violated both the Fourth and First Amendments through their use of "tear gas" against peaceful or passively resistant protesters. *Id.* Plaintiffs filed a Motion for Temporary Restraining Order concurrently with its Complaint. *Mot. for TRO*, Dkt. 2. Plaintiffs supported their Motion with the Declarations of nine individuals—protesters, witnesses, and doctors. The Court held a hearing on this Motion on June 9, 2020, Dkt. 28, and issued its ruling the same day. *Order on TRO*, Dkt. 29. The Court's order restricted the use of tear gas to be "limited to situations in which the lives or safety of the public or the police are at risk… Tear gas shall not be used to disperse crowds where there is no or little risk of injury." *Id.*

Subsequently, on June 26, 2020, the Parties agreed to amend the Temporary Restraining Order to also include weapons such as FN303s and 40MM less lethal launchers (weapons that

carry payloads colloquially known as and referred to *infra* as "foam tipped projectiles," "rubber bullets," and "pepper balls"), Rubber Ball Distraction Devices (colloquially known as and referred to *infra* as "flash bangs"), Aerosol restraints (such as OC Spray, or "pepper spray"), and Long Range Acoustical Devices ("LRAD"). Dkt. 42.

### III. FACTUAL SUMMARY

Plaintiffs supplement the factual record provided in their previous filings, Dkts. 3-13, with these additional facts.

**A. Monday, June 15, 2020**

As had been the case for the previous nights, demonstrators assembled outside the Justice Center in Downtown Portland to sing songs, chant, listen to speeches, and protest the police presence. Declarant Reinhardt was present at the Justice Center, in the park. He had heard that a garbage can had been set on fire a few blocks away, which gave the pretense for Defendant City of Portland to close the park. Reinhardt Decl. ¶ 6. There was no indication that members of the crowd in front of the Justice Center were involved with the fire three blocks away, many were not even aware that a fire had even occurred. *Id.* After hearing the warning from police to disperse, which is actually quite difficult to hear when standing in a crowd of hundreds of chanting people, Mr. Reinhardt and his friend decided it was best to go unlock their bikes in anticipation for the incoming flood of police through the park. *Id.*

By the time they had returned, around 11:00 pm, the Police had already declared Downtown "closed" and demarcated SW Broadway as a border in the "closure" area. *Id.* at ¶ 8. Mr. Reinhardt and his friend decided to travel that way with a group of about 40 other protesters. *Id.* After crossing SW Broadway, Mr. Reinhardt and a group of 40 protesters took a break to reassess what to do. *Id.* at ¶ 10.

Suddenly, 20-25 PPB riot police arrived at SW Broadway, pointing their weapons, including what looked like FN 303s, at the retreated group. *Id.* at ¶ 11. The group pleaded with the officers to just let them be. *Id.* at ¶ 12. The officers then began to retreat, to the relief of the group. *Id.* at ¶ 13. As the officers piled onto their riot van, one of Defendant City's officers kept their weapon trained on the crowd, and fired at the crowd at a range of about15 feet. *Id.* at ¶ 14. No one had thrown anything at the officers, or threatened the officers in any way. *Id.* at ¶ 13. The officer who fired into the crowd jumped on the riot van and sped away. *Id.* at ¶ 15.

Mr. Reinhardt saw that a man had been hit in the face. *Id.* at ¶ 15. He called for medics in the area to assist the man with his injuries and then looked for his friend. *Id.* His friend had been struck in the face (inches from his eye) with a shard of hard plastic ball that had broken off of the plastic bullets with pepper powder in them. *Id.*

**B. Thursday, June 25, 2020**

    <u>1. Demonstration at the Justice Center</u>

On Thursday, June 25, 2020, protesters held a candlelight vigil at the Justice Center for all those who have been killed by police. Declaration of Aubrey Danner ("Danner Decl.") at ¶ 2. That evening, law enforcement officers jumped out of the plywood doors covering the Justice Center, and indiscriminately shot whoever happened to be standing near by, and then immediately retreated back inside the doors. Declaration of Princess Blair Unicorn ("Unicorn Decl.") at ¶ 10.

    <u>2. Demonstration at the Portland Police Bureau's North Precinct</u>

On Thursday, June 25, 2020, at around 9:00pm, a group of demonstrators marched from Fernhill Park arrived at the Portland Police Bureau's North Precinct ("North Precinct" or "the precinct"). Herrera Decl. at ¶ 2. The protesters chose to gather near the precinct to directly

express their grievances about police brutality toward Black people and to be heard by police officers patrolling historically Black and African American neighborhoods. Herrera Decl. at ¶ 2. A crowd of protesters peacefully assembled on NE Martin Luther King, Jr. Boulevard ("MLK"), chanting, giving speeches, playing music, and expressing themselves. Herrera Decl. at ¶ 3; O'Connell Decl. at ¶ 3.

At the parking lot on the corner of MLK and NE Emerson, some people held a Potlach ceremony. O'Connell Decl. at ¶ 4; Herrera Decl. at ¶ 3. A Potlatch is a traditional Indigenous ceremony practiced by Indigenous groups in the Pacific Northwest. Herrera Decl. at ¶ 3. It involves the sharing and giving of wealth. O'Connell Decl. at ¶ 4; Herrera Decl. at ¶ 3. One of the hosts of the Potlatch set up their grill, prayer cards, tables, and chairs, and started grilling salmon, corn, zucchini, and other vegetables, and gave food out to people. O'Connell Decl. at ¶ 4. There were signs all around the parking lot explaining the purpose and status of the ceremony, including that it was a protected ceremony under the American Indian Religious Freedom Act. O'Connell Decl. at ¶ 4; Herrera Decl. at ¶ 3. It was obvious that the Potlatch ceremony was separate and apart from the main crowd of people at MLK. Herrera Decl. at ¶ 3.

After a couple hours, without provocation, law enforcement officers charged at the protesters on MLK with batons. Herrera Decl. at ¶ 4; Unicorn Decl. at ¶ 6, 8. Officers also fired munitions and flash bang grenades into the crowd, and released cannisters of OC pepper spray into the crowd. Herrera Decl. at ¶ 4; Unicorn Decl. at ¶ 6, 8. Prior to this use of force, no one had thrown anything at the officers and no one had set any fires. Herrera Decl. at ¶ 5. People were simply standing on MLK when officers charged, shot, and OC sprayed the crowd. Herrera Decl. at ¶ 5.

After police engaged in the above-described conduct, protesters announced to the crowd that a dumpster and a boarded-up window of Mid-K Beaty store, a Black-owned business, were on fire, and the protesters called for the fires to be put out. Herrera Decl. at ¶ 7. At least one person heard an explosion like a flashbang grenade come from the dumpster, which then caught fire. Unicorn Decl. at ¶ 9. That dumpster was adjacent to a boarded up window of the Mid-K Beauty store. Unicorn Decl. at ¶ 9. Almost immediately, protesters pulled the dumpster away from the building and tried to put out the dumpster fire. Unicorn Decl. at ¶ 9. Protesters also put out the fire of the Mid-K Beauty store board. Danner Decl. at ¶ 4.

At the time the dumpster was on fire, protesters were not throwing or breaking anything, and were not setting anything on fire. Declaration of Maggie Sisco ("Sisco Decl.") at ¶ 4. Police announced that the crowd should "go the other way," but did not tell people where to go, and the crowd was confused trying to figure out how to leave. Sisco Decl. at ¶ 4.

Either while protesters were trying to put the fire out, or after the fires were already out, officers launched tear gas, rubber bullets, pepper balls, and flash bang grenades into the crowd. Unicorn Decl. at ¶ 10; Herrera Decl. at ¶ 8; Sisco Decl. at ¶ 4; Danner Decl. at ¶ 5. Protesters began running away and moving back. Danner Decl. at ¶ 5. As a result of the chemical agent and munitions, protesters felt they could not breathe, and started gagging, coughing, and sneezing. Unicorn Decl. at ¶ 11; Sisco Decl. at ¶ 4. Multiple people were actively bleeding from their police-inflicted wounds. Unicorn Decl. at ¶ 11. Street medics treated protesters' injuries, and smoke and gas continued to fill the air. Danner Decl. at ¶ 7.

On June 25, 2020 and into the morning hours of June 26, 2020, officers used tear gas, flash bang grenades, and pepper balls to scatter protesters who were not engaged in any acts of

violence or property damage. Herrera Decl. at ¶ 12; Danner Decl. at ¶ 5. Officers shot protesters

with pepper balls even as they walked away from officers with their hands in the air, inflicting

pain and bruises. Herrera Decl. at ¶ 9; Danner Decl. at ¶ 6. Police officers sprinted towards

retreating protesters and charged at them. Danner Decl. at ¶ 7.

### a. Police Violently Dispersed the Potlatch Ceremony

That same evening and into the morning hours, Portland police also violently dispersed

the Potlatch ceremony that was being conducted separate and apart from the protesters. At

around 12:40am, Portland police officers fired from the top of the roof onto the crowd below,

including those who had been peacefully partaking in the Potlatch ceremony. O'Connell Decl. at

¶ 4.  At around 1:15am, when police ordered people to disburse, the host of the Potlach started

packing up their food, grill, table, chairs, and other equipment. About 10 minutes later, police

rushed out of the precinct, firing rubber bullets and flash bang grenades, and shoving peoples

with batons and destroyed the Potlatch equipment and materials. O'Connell Decl. at ¶ 7.

As people were retreating and running away, officers launched tear gas into crowd.

O'Connell Decl. at ¶ 8; Herrera Decl. at ¶ 13. At no point had any of the people engaging in the

peaceful religious ceremony do anything to provoke or threaten the officers. O'Connell Decl. at ¶

4; Herrera Decl. at ¶ 14.

Throughout the evening, police officers appeared  to target people's heads and vital

organs with their weapons. Herrera Decl. at ¶ 14; O'Connell Decl. at ¶ 9. Officers pushed,

tackled, and beat protesters with fists and batons—including those people who had fallen on the

ground. O'Connell Decl. at ¶ 9. On at least one occasion, a police officer punched a protester in

the face point-blank. O'Connell Decl. at ¶ 9.

As a result of police use of tear gas that evening, some protesters suffered respiratory distress and exacerbated asthma symptoms. Sisco Decl. at ¶ 5. Others were traumatized by the police use of force—particularly against people who had done nothing wrong, who were attempting to comply with police commands, and who had done nothing but peacefully attend an Indigenous ceremony and exercise their religious freedom. O'Connell Decl. at ¶ 10.

 Law enforcement's above-described conduct had a chilling effect on people's First Amendment rights: people fear for life and safety at the hands of the police, and worry that they will be injured—or injured again—at a subsequent demonstration. Herrera Decl. at ¶ 16. Others have not attended another demonstration: after June 26, O'Connell planned to attend another event, but after they were stopped by the police, they were so frightened that they turned around and went home. O'Connell Decl. at ¶ 11.

### 3. Friday, June 26, 2020

On the evening of Friday, June 26, 2020, as it got dark, a large crowd of protesters—perhaps up to 200 people—gathered in the street on SW 3rd Avenue in front of the Justice Center and chanted. Garlick Decl. at ¶ 8; Lake Decl. at ¶ 3. The Justice Center was covered with plywood boards. Declaration of Mason Lake ("Lake Decl.") at ¶ 3. Law enforcement officers occasionally looked at protesters from the inside of the Justice Center through holes in the plywood which covered the building. Garlick Decl. at ¶ 7; Lake Decl. at ¶ 3.[2]

At around 11:00pm, without provocation, law enforcement officers starting shooting at protesters from the south side of the Justice Center. Garlick Decl. at ¶ 10. About a dozen or so protesters were standing there with hands up. Garlick Decl. at ¶ 11. Yet law enforcement officers

---

[2] Mason Lake, *June 26th Portland Police Assault*, YouTube (June 26, 2020), available at https://youtu.be/v2XWwopy2MI

shot impact munitions through the holes in the plywood at a crowd of protesters from about three to 10 feet away. Lake Decl. at ¶ 4. Later, officers ordered people to move away from the corner of the building, only to come out of the Justice Center and fire pepper balls and impact rounds/rubber bullets at the crowd five minutes later. Garlick Decl. at ¶ 11; Lake Decl. at ¶ 4.

Throughout the evening, law enforcement officers continued to point their weapons and shoot at groups of protesters who were doing nothing more than standing near the building. For example, In response to a group of protesters chanting on SW 3rd Avenue and Main Street, law enforcement officers yelled and pointed their weapons and protesters through the plywood holes. Garlick Decl. at ¶ 12. When some protesters who knocked on the door, officers would open the door to fire rubber bullets at the crowd. *Id*. Officers shot pepper balls and impact munitions at children, including a 12-year-old child, who was injured; officers' impact munitions split the child's leg open and it bled profusely. *Id*.

Without warning, officers dropped a flash bang grenade into the crowd from a second-story window of the Justice Center and fired rubber bullets into the crowd. Garlick Decl. at ¶ 13; Lake Decl. at ¶ 4. At least one person collapsed and was unresponsive after the flash bang grenade; another person fell from rubber bullet injuries. Garlick Decl. at ¶ 14; Danner Decl. at ¶ 9; Lake Decl. at ¶ 4.

Law enforcement's above-described conduct had a chilling effect on people's First Amendment rights: people worry that if they go out to protest, or if they film the police, they will be injured or killed. Lake Decl. at ¶ 7.

///

///

**4. Saturday, June 27, 2020**

On Saturday, June 27, 2020, there was another large demonstration at the Justice Center. Some protesters, aware of the temporary restraining order, relied on that order to protect them from law enforcement's use of chemical agents and munitions. Norcross Decl. at ¶ 1; Kaplan Decl. at ¶ 3. As such, some of the people were attending a protest for the first time. Norcross Decl. at ¶ 1.

That evening, there were hundreds of people protesting, including children and people of many different races. Yarn Decl. at ¶ 4; Kaplan Decl. at ¶ 4. At or around 10:00pm, a large group of protesters stood in the intersection of SW 3rd Avenue and Main Street. Norcross Decl. at ¶ 4. Protesters chanted, and saying the names of George Floyd and Breonna Taylor, and supported one another by handing out snacks and cups of coffee. Norcross Decl. at ¶ 4; Yarn Decl. at ¶ 5; Kaplan Decl. at ¶ 4. Some protesters had placed barriers at SW 3rd Avenue as a safety precaution in the face of threats of violence and attacks by vehicles driving through the crowd. Unicorn Decl. at ¶ 13; Yarn Decl. at ¶ 5.

At around 10:30pm, two vans of law enforcement officers in riot gear arrived at SW 3rd Avenue and Salmon Street. Garlick Decl. at ¶ 21; Kaplan Decl. at ¶. Another group of officers came toward the crowd at SW 3rd Avenue from the south. Norcross Decl. at ¶ 4. In response to the police presence, some protesters tried to leave the area to the west but law enforcement launched a cannister of chemical agents and obstructed their path out. Norcross Decl. at ¶ 6. The area was covered in thick smoke which caused a painful burning sensation in people's lungs, coughing, and caused people's eyes to water. Norcross Decl. at ¶ 6, 7. Prior to officers' use of

the chemical agent, protesters had not thrown any items, set any fires, or otherwise threatened the life or safety of officers or others. Norcross Decl. at ¶ 12.

As law enforcement officers in riot gear lined up on SW 3rd Avenue and Salmon Street, the crowd of demonstrators at SW Main Street yelled and chanted at them. The crowd put their hands up and saying, "Don't Shoot!," "We're just talking to you!", "We have First Amendment Rights!", and "I don't see no riot here, take off your riot gear!" Some people in the crowd then started chanting, "All cops are bastards!" Shortly after, and without warning, the line of law enforcement officers charged at a crowd of protesters. Kaplan Decl. at ¶ 6; Garlick Decl. at ¶ 22; Sisco Decl. at ¶ 6. Prior to the police charge, protesters had not thrown anything at officers, started fires, or otherwise acted aggressively or threateningly. Garlick Decl. at ¶ 22; Sisco Decl. at ¶ 8; Yarn Decl. at ¶ 8; Kaplan Decl. at ¶ 7.

Officers continued to charge the protesters, ripping away protesters' umbrellas, signs, and shields so that officers could intentionally spray protesters in the face with OC. Garlick Decl. at ¶ 24; Unicorn Decl. at ¶ 15; Yarn Decl. at ¶ 8; Kaplan Decl. at ¶ 8; Trumbly Decl. at ¶ 10. Officers acted with the intent to injure and inflict terror: for example, officers shoved protesters to the ground, grabbed the goggles from their faces, and sprayed OC directly into their uncovered faces. Trumbly Decl. at ¶ 11. Officers also indiscriminately sprayed OC into the crowd of people. *Id*.

As the crowd retreated, officers continued to shove people and engage in excessive, aggressive and unprofessional conduct. Kaplan Decl. at ¶ 8. For example, at least one officer yelled, "get the fuck out of here!" Garlick Decl. at ¶ 24. In at least one case, as a protester walked backward and recorded the officers, another officer pushed that person down and kicked their

cell phone away. Sisco Decl. at ¶ 6. In another case, an officer used their baton to hit a protester in the back and in the knee as that person was retreating. Unicorn Decl. at ¶ 18. Despite the fact that protesters yelled that they could not back up because there was no where to go, law enforcement officers continued to continued to push, shove, and deploy OC spray upon protesters—at times spraying the back of people's heads—even as the crowd complied and were in retreat. Garlick Decl. at ¶ 25; Unicorn Decl. at ¶ 15; Kaplan Decl. at ¶ 9.

As the crowd retreated, officers also launched pepper ball munitions and flash bang grenades that exploded in the middle of the crowd. Garlick Decl. at ¶ 27; Kaplan Decl. at ¶ 10; Trumbly Decl. at ¶ 12, 13. Shrapnel from the grenades injured at least one protester and added to their disorientation and confusion. Kaplan Decl. at ¶ 10. In addition, officers also launched smoke bombs into the crowd, including into a crowd of people near Main Street who were just standing there. Unicorn Decl. at ¶ 15; Yarn Decl. at ¶ 9; Kaplan Decl. at ¶ 10. The toxic smell and taste of the chemical caused a burning sensation in protesters' eyes, nose, mouth, throat and lungs; coughing; and wheezing as some people felt like they could not breathe. Yarn Decl. at ¶ 10; Kaplan Decl. at ¶ 12.

Law enforcement officers' indiscriminate use of chemical agents and munitions against the crowd was unprovoked: no one had thrown anything at the officers, no one had started a fire, or otherwise posed a threat. Kaplan Decl. at ¶ 11.

Later into the evening and early hours of June 28, officers continued to engage in excessive acts of violence. For example, at least one officer pushed a shopping cart back at an apparently unhoused person, hitting them in the stomach and knocking them down, even though that person appeared to be neurodiverse and was not part of the protests nor interfering with the

police. Sisco Decl. at ¶ 7. As another example, another officer pointed a flashlight on the end of his gun at people's faces, inches away, while smiling and laughing. Unicorn Decl. at ¶ 16.

Law enforcement officers' conduct on the evening of June 27, 2020 in the morning of June 28, 2020 was frightening and dangerous. Norcross Decl. at ¶ 9, 10 11; Sisco Decl. at ¶ 8; Kaplan Decl. at ¶ 14. Throughout the evening, law enforcement used physical force, chemical agents, and impact munitions against people who were already complying and retreating. Kaplan Decl. at ¶ 14. Protesters witnessed officers purposely pepper spraying people's faces and heads even as the crowd retreated. Garlick Decl. at ¶ 25; Unicorn Decl. at ¶ 15; Kaplan Decl. at ¶ 14. Law enforcement's objectives were unclear—their conduct suggested their primary purpose was to attack and harm protesters. Kaplan Decl. at ¶ 14.

Law enforcement's conduct had a chilling effect on people's First Amendment rights: people worry that if they go out to protest, they will face an increased risk of contracting COVID-19, and people fear that that continued participation in demonstrations will result in law enforcement officers continuing to attack, injure, and possibly kill them. Norcross Decl. at ¶ 13, 14; Sisco Decl. at ¶ 9; Yarn Decl. at ¶ 13.; Kaplan Decl. at ¶ 15.

## IV. LEGAL STANDARDS

The court may grant a temporary restraining order or preliminary injunction by finding one of two sets of criteria are satisfied. *Natural Res. Def. Council, Inc.  v. Winter*, 518 F.3d 658, 677 (9th Cir. 2008). The "traditional" criteria consider four factors: (1) the likelihood of success on the merits, (2) the likelihood of irreparable harm in the absence of preliminary relief, (3) the balance of equities, and in some cases, (4) the public interest.  *Id.*; *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008); and *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131, 1135-38 (9th Cir. 2011).

In the Ninth Circuit, among others, courts use a "sliding scale" to evaluate these equitable factors. A strong showing on one of the factors may offset a weak showing on another. *Cottrell*, 632 F.3d at 1131-32. Thus, for example, "a preliminary injunction is appropriate when plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."[3] *Id.* at 1134-35 (internal quotations and citations omitted).

## V. ARGUMENT

As with the Plaintiffs' Motion for Temporary Restraining Order, Plaintiffs seek an injunction under both the First and Fourth Amendments of the United States Constitution.

### A. Plaintiffs Are Likely to Prevail on the Merits of Their Fourth Amendment Claim

<u>1. The City of Portland has violated the rights of protesters to be free from unlawful use of force while protesting.</u>

Use of force in the protest context runs through *Graham v. Connor*, 490 U.S. 386 (1989) and *Nelson v. City of Davis*, 685 F.3d 867, 875 (9th Cir. 2012). When the government restrains persons, as they do when they deploy impact munitions and riot control agents, they are "seized" for the purposes of the Fourth Amendment. *Nelson*, 685 F.3d at 875. When a seizure occurs, we next turn to the reasonableness of that seizure to determine whether a right was violated. *Graham v. Connor*, 490 U.S. 386 (1989). Whether the use of force was "unreasonable" can be determined by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Nelson*, 685 F.3d at 878 (internal citations and quotation marks omitted).

Here, a seizure is evident, if not from the declarants' testimony then from the very name the Police have given these weapons: "crowd control munitions." Police fire these weapons into

---

[3] The Supreme Court held in *Winter* that a preliminary injunction should not issue if a plaintiff shows only a possibility of harm rather than a likelihood of harm. *Winter*, 555 U.S. at 21; *see also* 632 F.3d at 1135. However, it did not reject the sliding scale or "serious question" frameworks. 632 F.3d at 1132-34.

crowds to change their behavior, restrict their movement, and punish through use of force. When a person is subjected to these weapons they experience fear, shock, disorientation, and extreme pain. *Johnson* ¶¶ 22, 27.

2. "Less Lethal" weapons create significant injuries

Courts have viewed these "less lethal" weapons as "significant uses of force" in protest and non-protest contexts alike. *Washington v. City of Los Angeles*, 2018 WL 6131603, at *6 (C.D. Cal. 2018) (Regarding a 40 mm foam tipped projectile launched from 43 feet away and striking an individual in the face, blinding them). For instance, the Ninth Circuit has deemed OC Spray as "substantially more than a minimal intrusion" in the use of force context. *Nelson*, 685 F.3d at 883. It has also stated that deploying pepper balls on persons "not suspected of violating a crime" is a violation of that person's constitutional rights. *Hamilton v. City of Olympia*, 687 F.Supp.2d 1231, 1242-3 (W.D. Wash. 2009) ("[R]easonable officers in the Defendants position would have known that using batons and pepper balls on an individual calmly attempting to use a cross walk to cross a city street would be a violation of his constitutional rights.")

Weapons like bean bags and 40 mm foam tipped projectiles have been found to be significant uses of forces that would violate persons' Fourth Amendment rights if used against compliant or otherwise non-threatening persons. *Deorle v. Rutherford*, 272 F.3d 1272, 1276, 1281–1282 (9th Cir. 2001) (a police officer who shot an unarmed man in the face, without warning, even though the officer had a clear line of retreat; there were no bystanders nearby; the man had been "physically compliant and generally followed all the officers' instructions"; and he had been under police observation for roughly 40 minutes); *Washington*, 2018 WL 6131603, at *6 (C.D. Cal. 2018). While the payload of the weapon can differ, the result is the same: grievous wounds. Reinhardt Decl. ¶ 15; *Johnson* ¶¶ 22, 27.

The Ninth Circuit has found "flash bangs" to be "inherently dangerous," and their usage should raise concern. *Boyd v. Benton County*, 374 F.3d 773, 779 (9th Cir. 2004), *citing United States v. Jones*, 214 F.3d 836, 837–38 (7th Cir.2000) ("police cannot automatically throw bombs into drug dealers' houses, even if the bomb goes by the euphemism 'flash bang device'").

3. Plaintiffs and Declarants posed no threat.

As with Plaintiffs' Motion for Temporary Restraining Order, the declarants describe conduct that could at the very worst be described as "passively resistant." Consistently, night after night, Defendant City of Portland has used the acts of individuals—few of whom are arrested—to mete out mass punishment against all present. Persons attempting to leave the scene were punished. Persons shielding themselves from the unlawful use of force were punished. Persons being mere bystanders were punished by having their limbs shot. Per *Nelson*, each of these uses of force violated the rights of the individuals affected in part because the degree of the threat these individuals posed was so low.

In considering "degree of threat posed by the suspect," *Nelson*, 685 F.3d at 880, it is important to note that the relevant question is whether the plaintiff himself posed a threat to officers or the public prior to the use of force. In *Nelson v. City of Davis*, police fired pepper balls (OC) on plaintiff who was a partygoer at a party at UC Davis. In *Nelson* the court gave due weight to the "the tumultuous circumstances in which the use of force took place" and yet still found this factor to weigh heavily against the defendants because defendants did not observe *specifically* Nelson and his friends throwing objects, acting violently, or engaging in any threatening behavior. *Nelson*, 685 F.3d at 880-81 (9th Cir. 2012).

The common crimes charged after demonstrations are Criminal Trespass, ORS 164.255, and Disorderly Conduct, ORS 166.025. The crime of trespassing would not warrant such a use of

force. *Nelson*, 685 F.3d at 880. Nor would the crime of Disorderly Conduct necessarily warrant this level of force. *Patel v. Dennett*, 389 F.Supp.3d 888, 898 (D. Nev. 2018) (After plaintiff yelled obscenities at an officer, the officer exerted enough pressure to break the plaintiff's arm, which the Court concluded could be unreasonable.)

Defendant City of Portland cannot justify their use of force on the vast majority of persons whom have been subjected to them over the past month. Attempts to pit the actions of "bad" protesters versus "good" protesters is a tactic with some history in Portland, OR.[4] It is unavailing given the facts presented in this case. Undoubtably, Defendant City of Portland will cite the fires lit in the Justice Center as justification for thirty days of police violence and terror on the streets of Portland. The City had their chance to arrest the individuals culpable for those fires, failed, and now seek to cast the entire Portland activist movement in the same light. That is constitutionally untenable.

Defendant City of Portland cannot be allowed to continue to subvert the constitutional order of sentencing and punishment through harsh and severe violence.

### 4. PPB has fired upon compliant, passively resistant, and retreated protesters.

As described above, and as argued in Plaintiffs' Motion for Temporary Restraining Order, passive resistance neither constitutes active flight nor justifies a high-level use of force. To the contrary, Declarants have testified that officers were shooting at crowds of passive individuals *who had already retreated* as they themselves retreated onto their riot vehicles. Reinhardt Decl. ¶ 15.

---

[4] Kent Ford, a noted Black Portland activist who has been active in City politics since the 1960s, said in an interview recently: "I know better than to fall for [building a divide between 'good' and 'bad' protesters]. Back in the day, we were the 'bad protesters' in the local newspapers. We are all out there for the same thing: to fight against police brutality and the harassment of people of color, of black folks." Jules Boykoff, *'We Can't Be Duped by Petty Reforms': A Q&A With a Black Panther*, The Nation (June 25, 2020), available at https://www.thenation.com/article/society/kent-ford-interview-black-panther-party/.

The Ninth Circuit has held that "failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force… even when the extent of the resistance was substantially greater than Nelson and his friends' simple failure to disperse. *Nelson*, 685 F.3d at 881 (citing collection of cases on various levels of resistance); *see LaLonde v. County of Riverside*, 204 F.3d 947 (9th Cir. 2000) (the use of pepper spray, and a failure to alleviate its effects, was an unreasonable application of force against an individual who was suspected of only minor criminal activity, offered only passive resistance, and posed little to no threat of harm to others.); *Headwaters Forest Def. v. Cty. of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) (denying qualified immunity for the second time and stating that "using pepper spray against the protesters was excessive under the circumstances" when officers applied pepper spray directly into the eyes of protesters who were refusing to leave.); *Nelson v. City of Davis*, 685 F.3d 867, 885 (9th Cir. 2012)("Under these precedents, any reasonable officer therefore would have been on notice prior to April 2004 that the application of pepper spray to individuals such as Nelson and his associates, whose only transgression was the failure to disperse as quickly as the officers desired, would violate the Fourth Amendment."); *Marbet v. City of Portland*, No. CV 02-1448-HA, 2003 WL 23540258, at *10 (D. Or. Sept. 8, 2003) (denying motion to dismiss Fourth Amendment claim because the plaintiffs' allegations that the "defendants intentionally applied pepper spray and shot rubber bullets at plaintiffs who were engaged in lawful protest activities" were facts, if proven, that "would establish that [the] defendants intentionally restrained [the] plaintiffs' freedom of movement"); *Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008)(holding that the use of tear gas against nonviolent anti-war  who at most committed the misdemeanor of disorderly conduct, did not flee or actively resist arrest, constituted unreasonable force).

**B. Plaintiffs Are Likely to Prevail on the Merits of Their First Amendment Claim.**

"[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech. *Hartman* v. *Moore*, 547 U. S. 250, 256 (2006). In order to show a First Amendment violation, Plaintiffs must provide evidence that that their "protected activity was a substantial motivating factor in . . . [D]efendant[s'] conduct," that is, "there was a nexus between [Defendants'] actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). "As with proof of motive in other contexts, this element of a First Amendment retaliation suit may be met with either direct or circumstantial evidence[.]" *Ulrich v. City & Cty. of S.F.*, 308 F.3d 968, 979 (9th Cir. 2002).

Plaintiffs are likely to prevail on the elements of a First Amendment violation. Plaintiffs will show that Defendant declared their protected protest an "unlawful assembly" and unleashed repeated, wide-spread, indiscriminate uses of force against crowds of peaceful protesters engaged in speech criticizing Defendant's rampant use of force against Black people. As evidenced in the declarations filed in support of this motion, the plaintiff and declarants were members of crowds of peaceful protesters. The crowds of people were engaged in speech condemning Defendant for its use of force: shouting "Fuck the Police" and "Abolish Police" among other slogans. Defendant may justify its uses of force by claiming that "projectiles were thrown" at officers. This reason is pretextual and shifts blame on the victims of police violence. As the declarations supporting this motion show, if water bottles or fireworks were thrown, they were thrown by one, two, or a few individuals within a large crowd of peaceful demonstrators. Khalsa Decl. at ¶ 13. Such actions do not justify the indiscriminate teargassing of a large crowd. The deployment of tear gas has had its intended effect of chilling speech. Once tear gas is

deployed, protesters have scattered – coughing, injured, silenced. Countless protesters have been traumatized and intimidated against returning to protest again and afraid to stay after dark. Don't Shoot PDX has suffered as an organization with the mission to end police violence through civic engagement because people's protest activities have been chilled.

Declarants also speak to the Police's apparent intent for using this indiscriminate force: intimidation, pleasure, and revenge. One declarant writes: "There is one particular officer who is present who appears giddy whenever the police are about to start using force. Because of this, people have made signs that say, 'stop smiling when you gas us.' It is truly upsetting to see officers excited with anticipation of attacking us." Reinhardt Dec., ¶ 16. Another declarant writes about the expletive laden orders to disperse. Garlick Dec., ¶ 24.

Courts within this jurisdiction and in other circuits have sided with Plaintiffs on First Amendment issues in similar protest contexts. *McCarthy v. Barrett*, 804 F. Supp. 2d 1126, 1137-38 (W.D. Wash. 2011) (holding that, despite police claims that tear gas was used to disperse a violent crowd, a reasonable juror could conclude that officers who used tear gas against a crowd at the Milwaukee Way Antiwar Protest "intended to deter protesters' protected speech based on their association with certain student political organizations."); *Johnson v. City of Berkeley*, 2016 WL 928723 (N.D. California, 2016) (holding that protest plaintiffs who were arrested and tear gassed by the police "have alleged sufficient facts to infer that plaintiffs' association with the protest was a substantial or motivating factor for defendants' actions."); *Keating v. City of Miami*, 598 10 F.3d 753,767 (11th Cir. 2010) (upholding the denial of qualified immunity because supervisors, including the Chief of Miami Police Department violated clearly established law when they directed their subordinate officers to use less-than-lethal weapons, including batons, tear gas, pepper spray (balls and direct spray), to disperse a crowd at a large

public demonstration and consequently failed to stop such conduct.); *Multi-Ethnic Immigrant Workers Org. Network v. City of L.A.*, 246 F.R.D. 621, 634 (C.D. Cal. 2007) (ruling on a motion to certify a class in a protest case where LAPD declared an unlawful assembly and dispersed a protest using "less-lethal force" after a group of protesters threw objects at officers, stating "[a]s to the First Amendment claim, Plaintiffs are correct that the only material fact is that the LAPD decided to declare an unlawful assembly and disperse the crowd" because plaintiffs' protected speech rights were curtailed by Defendants' act of declaring an unlawful assembly.)

**C. Plaintiffs are likely to prevail on their *Monell* claims against the City of Portland both on the First and Fourth Amendment violations.**

Plaintiffs have alleged *Monell* liability flowing from various *Monell* theories pled jointly and in the alternative. To establish that the City of Portland itself is liable, Plaintiffs must allege that: (1) they were deprived of a constitutional right; (2) the municipality had a policy, custom, or practice; (3) the policy, custom, or practice amounted to deliberate indifference of the plaintiffs' constitutional rights; and (4) the policy, custom, or practice was the "moving force" behind the constitutional violation. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). Plaintiffs can prove that the policy, custom, or practice was the cause of injury in three ways: (1) "a city employee committed the alleged constitutional violation pursuant to [either] a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity"; (2) "the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy"; or (3) "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992). Arguments about

Defendants' liability on the elements of First and Fourth Amendment violations are hereby incorporated from sections above. *See Supra Sections A and B.*

> 1. Plaintiffs will likely succeed on the theory that PPB and the City has an official policy of using indiscriminate and thus excessive force against protests declared "civil disturbance."

The City of Portland has an official policy allowing the use tear gas against crowd of protestors whenever it determines that the crowd creates a "civil disturbance." This policy has no relationship with the *Graham v. Connor* Fourth Amendment standard regulating the use of force against individuals. It expressly allows for the indiscriminate use of force against a crowd of people, in violation of the Fourth Amendment. The relevant Directive of PPB reads "6.4.6. Riot Control Agents (RCAs) or Area Impact Munitions. 6.4.6.1. Authorized Uses in Crowd Control. 6.4.6.1.1. Under the direction of the Crowd Management Incident Commander (CMIC), to disperse a crowd, when a demonstration or event becomes a civil disturbance, as defined in Directive 635.10, Crowd Management/Crowd Control." A civil disturbance is in turn defined in PPB Directive 0635.10 as "An unlawful assembly that constitutes a clear and present danger of riot, disorder, interference with traffic upon the public streets or when another immediate threat to public safety, peace or order appears."

This is a formal, written policy promulgated by the Portland Police Bureau. This policy does not comport with the "reasonableness" of force analysis under the Fourth Amendment because it does not require an individualized inquiry into whether individuals against whom force is used are actually a threat to law enforcement or anyone else, have committed any crimes, or are fleeing or resisting arrest. *See Supra Section A.*

In this case, Defendants have used this policy to violate the class of plaintiffs' Fourth and First Amendment rights. What is and what is not an "unlawful assembly" or a "civil disturbance"

is itself a highly discretionary decision made by the City or Portland Police at the scene of a

protest. In this case, the decisions to declare the protests against police violence "civil

disturbance[s]" and therefore allow the deployment of tear gas against largely peaceful crowds of

protesters was a decision made to silence protestors, infringing each class member's First

Amendment rights. The non-violent, peaceful protesters in the crowds were thus subjected to

indiscriminate police violence through the use of chemical agents in violation of their Fourth

Amendment rights.

> ### 2. Plaintiffs will likely succeed on the theory that PPB and the City has a custom and practice of using indiscriminate chemical gas agents against crowds of protestors.

On most nights for the previous month, PPB has deployed tear gas and other crowd

control munitions on a large crowd of peaceful protestors and continued to deploy tear gas at

people running away. Videos documenting the indiscriminate nature of this force deployment are

rampant.[5] The City has tacitly and explicitly authorized the use of indiscriminate crowd control

weapons on crowds of protestors by justifying uses of similar tactics, including tear gas shot

indiscriminately into crowds of protestors, at protests on these dates. This custom of using

indiscriminate force against crowds of protestors has violated the class of plaintiffs' Fourth and

First Amendment rights, as explained above.

Plaintiffs have pled sufficient facts and filed declarations of facts to show that the use of

chemical agents against crowds of anti-police violence protestors was not an isolated incident,

and instead constituted a practice or custom constituting city policy. *See Cantu, et. al. v. City of*

*Portland*, USDC of D. Or. Case. 3:19-cv-01606-SB, Dkt. 43 (D. Or., June 3, 2020) (denying

---

[5] E.g., Sergio Olmos (@MrOlmos), Twitter (June 2, 2020), available at
https://twitter.com/mrolmos/status/1268072714926878720?s=21; Matcha Thai (@Matcha_chai), Twitter (June 2, 2020), available at https://twitter.com/matcha_chai/status/1268043556913987584?s=21

motion to dismiss *Monell* claims on both Fourth and First Amendment claims owing to an

adequate pleading of City command structures during protests);  *Estate of Osuna v. Cty. of*

*Stanislaus*, 392 F. Supp. 3d 1162, 1175 (E.D. Cal. 2019) (denying motion to dismiss *Monell*

claim because the complaint "identified multiple prior instances of alleged misconduct."); *see*

*also Martin v. City of Portland*, No. 3:19-CV-1647-SI, 2020 WL 363391, at *5-6 (D. Or. Jan. 21,

2020)(denying the City's motion to dismiss *Monell* claim because the plaintiff adequately

alleged "that the City ha[d] a history of using unconstitutional force on people experiencing

mental health crises sufficient to constitute a custom or practice" where the complaint alleged

that the City had such a custom or practice, that PPB had a history of employing unconstitutional

excessive force in confrontations with mentally ill people, that PPB did not adequately remedy

the problem, and that an officer used excessive force when he killed the plaintiff); *McCarthy v.*

*Barrett*, 804 F.Supp.2d 1126 (W. D. Washington, 2011)(denying summary judgment to

defendants on Fourth and First Amendment *Monell* claims against the City of Tacoma stemming

from the use of tear gas and other uses of force to disperse a protest); *Johnson v. City of*

*Berkeley*, 2016 WL 928723, at ¶ 7 (N.D. California, 2016) ("This unlawful use of force is part of

a 'repeated course of conduct by members of the [Berkeley] Police Department tantamount to a

custom, policy, pattern or repeated practice of condoning, ratifying and/or tacitly encouraging

the abuse of police authority, and disregard for the constitutional rights of citizens.").

       3. Plaintiffs will likely succeed on the theory that official policymakers of the City of
       Portland ordered and ratified the uses of tear gas against crowds of protesters.

       The decision to use chemical agents against the class of plaintiffs was made by incident

commanders at the scene of the protests. Former Chief of PPB Jamie Resch and current Chief of

PPB Chuck Lovell has repeatedly defended and ratified this decision in news conferences.

Mayor of Portland, Ted Wheeler, has stated that he has received minute-by-minute updates from PPB on the protests.

"To hold a local government body liable for an official's conduct, a plaintiff must first establish that the official (1) had final policymaking authority concerning the action . . . at issue; and (2) was the policymaker for the local governing body for the purposes of the particular act.'" *Goldstein v. City of Long Beach*, 715 F.3d 750, 753 (9th Cir. 2013). Plaintiff can also establish the liability of municipal defendants by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate. *Louis v. Praprotnik*, 485 U.S. 112, 126-127 (1988).

In this case plaintiffs have pled both theories in the alternative. Incident commanders at the scene likely had "final policymaking authority concerning the action . . . at issue," namely the decisions to declare the protests "civil disturbance" and unleash chemical agents on the crowds. On information and belief, former Chief of PPB Jamie Resch and current Chief of PPB Chuck Lovell was likely involved in those decisions herself. Even if it is found that incident commanders are not final policy makers and if former Chief of PPB Jamie Resch and current Chief of PPB Chuck Lovell did not make the decision to repeatedly gas crowds of protestors herself, she certainly ratified it in news conferences.

**D. Without This Court's Intervention, Plaintiffs are Likely to Suffer Irreparable Harm.**

Plaintiffs require immediate injunctive relief from this court to prevent ongoing and likely future harm to members of the proposed Plaintiff class. Plaintiffs seeking a TRO or preliminary injunction must establish that they are "likely to suffer irreparable harm in the absence of preliminary relief." *NRDC v. Winter*, 518 F.3d 658, 677 (9th Cir. 2008).

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (quotation marks omitted). A colorable First Amendment claim, as described above, "is irreparable injury sufficient to merit the grant of relief." *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir.2005). Here, where Plaintiffs have alleged infringement of their constitutional rights, they have shown irreparable harm. *Melendres v. Arpaio*, 695 F.3rd 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury.") (quotation marks and citation omitted).

PPB tear gassing crowds of demonstrators constitutes excessive force and chills all people's freedom of speech and assembly. People who would otherwise participate in protests and protesters now fear doing so due to unwarranted and indiscriminate police violence against them. Further, as described above, police use of tear gas against a crowd of protesters additionally results in further exacerbation of COVID-19, where many people are in close proximity to one another, coughing, sneezing, vomiting, and otherwise secreting saliva and snot without masks or face coverings. Those who are wearing masks to prevent COVID-19 are thus faced with an impossible decision, as proper decontamination procedures require them to remove clothing contaminated with the chemical agent. Thus, in addition to the immediate injuries inflicted by tear gas—the most severe of which may cause death—demonstrators doused with tear gas thus face increased risk of contracting and suffering from COVID-19, which may result in permanent damage to almost all of their organs or death.

Plaintiffs face likely and concrete future harm. *See, c.f., In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007) ("Speculative injury cannot be the basis for a finding of

irreparable harm."). Plaintiffs' possibility of future harm is not speculative: as of June 4, 2020, PPB announced it would not cease use of tear gas against future demonstrators.[6] As evidenced by the declarations accompanying this motion, the use of tear gas against crowds of protesters happened nearly daily since the murder of George Floyd and until entry of the Court's order. Use of impact and chemical munitions have not ceased, and have frequently been deployed on peaceful crowds.

Harm caused by immediate as well as prolonged exposure to tear gas are well-known, as described above. PPB's use of tear gas is likely to exacerbate the spread COVID-19 and the suffering that comes along with the respiratory disease. The only speculative harm is the breathtaking scope of COVID-19's destruction: how many more people will die of COVID-19, how many survivors will suffer permanent bodily injury, and if humankind will ever see a vaccine or cure. PPB has certainly demonstrated its continued enthusiasm and readiness to keep using tear gas against crowds of protesters.

Protesters in Portland and around the country have similarly been severely harmed by chemical munitions and impact weapons fired wantonly into peaceful crowds. On June 29, 2020, a reporter testified before Congress about the loss of her eye to a police impact munition.[7] This is a national crisis, and one that demands Federal Court intervention to abate.

**E. The Public Interest Weighs in Favor of Granting this Temporary Restraining Order and the Balance of Equities Is in Plaintiffs' Favor because the Safeguarding of Plaintiffs' and the Public's Constitutional Rights and Promotion of Public Health Outweigh Defendant's Interest in Using Chemical Weapons Against People.**

---

[6] *Supra,* section B.
[7] United States Congress's Oversight Committee, *CRCL Sbcmte Briefing: Government Violence Against Peaceful Civil Rights Protesters / Journalists*, YouTube at 23:50 (June 29, 2020), available at https://youtu.be/QXXGCcM8E9Q.

The balance of equities falls overwhelmingly in favor of granting a temporary restraining order in this case. Plaintiffs have demonstrated that their constitutional rights have been violated and that they face the high likelihood of irreparable harm. The Ninth Circuit has "consistently recognized the significant public interest in upholding First Amendment principles." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002). Furthermore, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (granting an injunction on a Fourth Amendment basis). The public has no interest in Defendants continuing to place members of the proposed Plaintiff class at risk of serious harm and continuing to infringe upon their constitutional rights.

It is alarming that the use of chemical agents and impact munitions against groups of largely peaceful protesters is posited by PPB as a valid crowd control tactic that the public must accept as a legitimate use of government force. Police forces around the nation have been deploying OC and CS chemical agents against crowds of protesters. Historically, this shows an escalation in the tactics that are used by law enforcement agencies around the nation.

Tens of thousands of Portlanders have been protesting the very police violence at stake in this case. According to the Ninth Circuit, writing in 2002, addressing the use of pepper spray into the eyes of protesters who had clamped themselves together to protest the logging of ancient forests, "the use of pepper spray under these circumstances was entirely unprecedented: in California, its use was limited to controlling hostile or violent subjects and it had never been used in Humboldt County, the State of California, or anywhere in the country against nonviolent protesters." *Headwaters Forest Def. v. Cty. of Humboldt*, 276 F.3d 1125, 1128 (9th Cir. 2002). In 2002 this statement was true. Nowadays, the use of tear gas against crowds of protesters has become common place. The additional proliferation of FN 303 and 40 mm launchers, flash bang

grenades, and LRADs has created the conditions of a constitutional tinderbox. And indeed, this escalation and militarization of policing is the very reason for the current national and local protests. The use of these weapons against peaceful demonstrations must cease immediately.

The balance of equities overwhelmingly weighs in favor of Plaintiffs. Plaintiffs' interest in protection of their constitutional rights and bodily health far outweigh any potential damage to Defendants. Plaintiffs' constitutional rights deserve to be protected; they are entitled to engage in free expression and assembly without risk of being indiscriminately subjected to excessive force. Plaintiffs deserve to be safe while doing so, and during this current global pandemic, governments should be encouraging people to follow best practices to take preventative measures to protect against COVID-19, not actively thwarting those very efforts with chemical weapons and other police violence.

Defendants' interests weigh very little in comparison. The Portland Police Bureau has no interest in violating the constitution by firing into passively resistant crowds.

## CONCLUSION

Plaintiffs humbly pray that the Defendant and all persons acting on its behalf be enjoined and prevented from using crowd control munitions on protesters, pending entry by the Court of a final judgment in this action. Plaintiffs' abilities to safely, without risk of harm or death, express their dissent with police and state actions, dependent on this Court's recognition of their constitutional rights, hang in the balance unless this Court intervenes.

DATED:  June 30, 2020.

/s/ *Juan C. Chavez*

Juan C. Chavez
Of Attorneys for Plaintiffs