**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
**Viktoria Safarian**, OSB No. 175487
Email: viktoria@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241

**Juan C. Chavez**, OSB No. 136428
Email: jchavez@ojrc.info
**Brittney Plesser**, OSB No. 154030
Email: bplesser@ojrc.info
**Alex Meggitt**, OSB No. 174131
Email: ameggitt@ojrc.info
**Franz H. Bruggemeier**, OSB No. 163533
Email: fbruggemeier@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503 944-2270

**J. Ashlee Albies**, OSB No. 051846
Email: ashlee@albiesstark.com
**Whitney B. Stark**, OSB No. 090350
Email: whitney@albiesstark.com
**Maya Rinta**, OSB No. 195058
Email: maya@albiesstark.com
Albies & Stark LLC
1 SW Columbia St. Suite 1850
Portland, Oregon 97204
Telephone: (503) 308-4770

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DON'T SHOOT PORTLAND, et al., <br><br> Plaintiffs <br><br> v. <br><br> CITY OF PORTLAND, a municipal corporation, and MULTNOMAH COUNTY, a political subdivision of the State, <br><br> Defendants. | Case No. 3:20-cv-00917-HZ <br><br> PLAINTIFFS' MOTION FOR FINDING OF CONTEMPT AND FOR SANCTIONS AGAINST DEFENDANT CITY OF PORTLAND <br><br> **Oral Argument Requested** |

**LR 7-1 CERTIFICATION**

Counsel for plaintiffs hereby certify that they contacted counsel for defendants and attempted to resolve this dispute but were unable to do so.

**MOTION**

Plaintiffs move this Court for an order finding the Defendant City of Portland ("City") in contempt and imposing remedial sanctions. In particular, on June 27, 2020, and into the morning hours of June 28, 2020, Portland Police Bureau members used "less lethal weapons" in violation of this Court's order entered on June 26, 2020. Plaintiffs ask this Court to impose sanctions that are reasonably calculated to prevent future contemptuous conduct by the City. This Court has wide discretion in determining the appropriate sanction. Plaintiffs suggest that the following options should be considered by the Court:

1. A complete ban on the use of certain "less lethal weapons" in any crowd control situation.

2. A requirement that any use of "less lethal weapons" must be specifically authorized by a politically accountable leader, such as Mayor Ted Wheeler, the commissioner of the Portland Police Bureau.

3. Prohibiting the individual members who violated this Court's order from participating in any future crowd control operations.

4. Compensatory fines of sufficient size to compensate the individual class members for their injuries and deter future violations.

**FACTS**

The protests sparked by the May 25, 2020, police killing of George Floyd have continued across the globe and in Portland. For over a month, people have attended demonstrations in Portland to express concerns about ongoing racial inequality; to protest police brutality; to support the message of defunding the police; to express disapproval of systemic racism and state brutality inflicted on Black people, Indigenous people, and other people of color ("BIPOC"); to stop the continued police killings of Black people; to protest the Portland Police; to stand up for our rights; and because Black Lives Matter. Declaration of Donnie Yarn ("Yarn Decl.") at ¶ 3; Declaration of Gillian Herrera ("Herrera Decl.") at ¶ 16; Declaration of Thaddeus O'Connell ("O'Connell Decl.") at ¶ 2; Declaration of Alexandra Johnson ("Johnson Decl.") at ¶ 10, 11; Declaration of Camilla Ruth Kaplan ("Kaplan Decl.") at ¶ 15; Declaration of Frederick Garlick ("Garlick Decl.") at ¶ 3; Declaration of Natalie Ann Norcross ("Norcross Decl.") at ¶ 13. This Court has entered two restraining orders governing the City's use of force at these protests. *See* Dkt. No. 29, 43. Plaintiffs now seek enforcement of those orders.

**I.      Thursday, June 25, 2020**

      a.    Demonstration at the Justice Center

On Thursday, June 25, 2020, protesters held a candlelight vigil at the Justice Center for all those who have been killed by police. Declaration of Aubrey Danner ("Danner Decl.") at ¶ 2. That evening, law enforcement officers jumped out of the plywood doors covering the Justice Center, and indiscriminately shot whoever happened to be standing near by, and then immediately retreated back inside the doors. Declaration of Princess Blair Unicorn ("Unicorn Decl.") at ¶ 10.

      b.    Demonstration at the Portland Police Bureau's North Precinct

On Thursday, June 25, 2020, at around 9:00pm, a group of demonstrators marched from Fernhill Park and arrived at the Portland Police Bureau's North Precinct ("North Precinct" or "the precinct"). Herrera Decl. at ¶ 2. The protesters chose to gather near the precinct to directly express their grievances about police brutality toward Black people and to be heard by police officers patrolling historically Black and African American neighborhoods. Herrera Decl. at ¶ 2. A crowd of protesters peacefully assembled on NE Martin Luther King, Jr. Boulevard ("MLK"), chanting, giving speeches, playing music, and expressing themselves. Herrera Decl. at ¶ 3; O'Connell Decl. at ¶ 3.

At the parking lot on the corner of MLK and NE Emerson, some people held a Potlach ceremony. O'Connell Decl. at ¶ 4; Herrera Decl. at ¶ 3. A Potlatch is a traditional Indigenous ceremony practiced by Indigenous groups in the Pacific Northwest. Herrera Decl. at ¶ 3. It involves the sharing and giving of wealth. O'Connell Decl. at ¶ 4; Herrera Decl. at ¶ 3. One of the hosts of the Potlatch set up their grill, prayer cards, tables, and chairs, and started grilling salmon, corn, zucchini, and other vegetables, and gave food out to people. O'Connell Decl. at ¶

4. There were signs all around the parking lot explaining the purpose and status of the ceremony, including that it was a protected ceremony under the American Indian Religious Freedom Act. O'Connell Decl. at ¶ 4; Herrera Decl. at ¶ 3. It was obvious that the Potlatch ceremony was separate and apart from the main crowd of people at MLK. Herrera Decl. at ¶ 3.

After a couple hours, without provocation, law enforcement officers charged at the protesters on MLK with batons. Herrera Decl. at ¶ 4; Unicorn Decl. at ¶ 6, 8. Officers also fired munitions and flash bang grenades into the crowd, and released cannisters of OC pepper spray into the crowd. Herrera Decl. at ¶ 4; Unicorn Decl. at ¶ 6, 8. Prior to this use of force, no one had thrown anything at the officers and no one had set any fires. Herrera Decl. at ¶ 5. People were simply standing on MLK when officers charged, shot, and OC sprayed the crowd. Herrera Decl. at ¶ 5.

After police engaged in the above-described conduct, protesters announced to the crowd that a dumpster and a boarded-up window of Mid-K Beauty store, a Black-owned business, were on fire, and the protesters called for the fires to be put out. Herrera Decl. at ¶ 7. At least one person heard an explosion like a flashbang grenade come from the dumpster, which then caught fire. Unicorn Decl. at ¶ 9. That dumpster was adjacent to a boarded up window of the Mid-K Beauty store. Unicorn Decl. at ¶ 9. Almost immediately, protesters pulled the dumpster away from the building and tried to put out the dumpster fire. Unicorn Decl. at ¶ 9. Protesters also put out the fire of the Mid-K Beauty store board. Danner Decl. at ¶ 4.

At the time the dumpster was on fire, protesters were not throwing or breaking anything, and were not setting anything on fire. Declaration of Maggie Sisco ("Sisco Decl.") at ¶ 4. Police

announced that the crowd should "go the other way," but did not tell people where to go, and the crowd was confused trying to figure out how to leave. Sisco Decl. at ¶ 4.

Either while protesters were trying to put the fire out, or after the fires were already out, officers launched tear gas, rubber bullets, pepper balls, and flash bang grenades into the crowd. Unicorn Decl. at ¶ 10; Herrera Decl. at ¶ 8; Sisco Decl. at ¶ 4; Danner Decl. at ¶ 5. Protesters began running away and moving back. Danner Decl. at ¶ 5. As a result of the chemical agent and munitions, protesters felt they could not breathe, and started gagging, coughing, and sneezing. Unicorn Decl. at ¶ 11; Sisco Decl. at ¶ 4. Multiple people were actively bleeding from their police-inflicted wounds. Unicorn Decl. at ¶ 11. Street medics treated protesters' injuries as smoke and gas continued to fill the air. Danner Decl. at ¶ 7.

On June 25, 2020, and into the morning hours of June 26, 2020, officers used tear gas, flash bang grenades, and pepper balls to scatter protesters who were not engaged in any acts of violence or property damage. Herrera Decl. at ¶ 12; Danner Decl. at ¶ 5. Officers shot protesters with pepper balls even as they walked away from officers with their hands in the air, inflicting pain and bruises. Herrera Decl. at ¶ 9; Danner Decl. at ¶ 6. Police officers sprinted towards retreating protesters and charged at them. Danner Decl. at ¶ 7.

      c.   <u>Police Violently Dispersed the Potlatch Ceremony</u>

That same evening and into the morning hours, Portland police also violently dispersed the Potlatch ceremony that was being conducted separate and apart from the protesters. At around 12:40am, Portland police officers fired from the top of the roof onto the crowd below, including those who had been peacefully partaking in the Potlatch ceremony. O'Connell Decl. at ¶ 4. At around 1:15am, when police ordered people to disperse, the host of the Potlach started packing up their food, grill, table, chairs, and other equipment. About 10 minutes later, police

rushed out of the precinct, firing rubber bullets and flash bang grenades, shoving people with batons, and destroying the Potlatch equipment and materials. O'Connell Decl. at ¶ 7.

As people were retreating and running away, officers launched tear gas into the crowd. O'Connell Decl. at ¶ 8; Herrera Decl. at ¶ 13. At no point had any of the people engaging in the peaceful religious ceremony done anything to provoke or threaten the officers. O'Connell Decl. at ¶ 4; Herrera Decl. at ¶ 14.

Throughout the evening, police officers appeared to target people's heads and vital organs with their weapons. Herrera Decl. at ¶ 14; O'Connell Decl. at ¶ 9. Officers pushed, tackled, and beat protesters with fists and batons—including those people who had fallen on the ground. O'Connell Decl. at ¶ 9. On at least one occasion, a police officer punched a protester in the face point-blank. O'Connell Decl. at ¶ 9.

As a result of police use of tear gas that evening, some protesters suffered respiratory distress and exacerbated asthma symptoms. Sisco Decl. at ¶ 5. Others were traumatized by the police use of force—particularly against people who had done nothing wrong, who were attempting to comply with police commands, and who had done nothing but peacefully attend an Indigenous ceremony and exercise their religious freedom. O'Connell Decl. at ¶ 10.

Law enforcement's above-described conduct had a chilling effect on people's First Amendment rights: people now fear for their life and safety at the hands of the police, and worry that they will be injured—or injured again—at a subsequent demonstration. Herrera Decl. at ¶ 16. Others have not attended another demonstration: after June 26, O'Connell planned to attend another event, but after they were stopped by the police, they were so frightened that they turned around and went home. O'Connell Decl. at ¶ 11.

**II.     Friday, June 26, 2020**

On the evening of Friday, June 26, 2020, as it got dark, a large crowd of protesters—perhaps up to 200 people—gathered in the street on SW 3rd Avenue in front of the Justice Center and chanted. Garlick Decl. at ¶ 8; Lake Decl. at ¶ 3. The Justice Center was covered with plywood boards. Lake Decl. at ¶ 3. Law enforcement officers occasionally looked at protesters from the inside of the Justice Center through holes in the plywood which covered the building. Garlick Decl. at ¶ 7; Lake Decl. at ¶ 3, video available at:

https://www.youtube.com/watch?v=v2XWwopy2MI.

At around 11:00pm, without provocation, law enforcement officers started shooting at protesters from the south side of the Justice Center. Garlick Decl. at ¶ 10. About a dozen or so protesters were standing there with their hands up. Garlick Decl. at ¶ 11. Yet law enforcement officers shot impact munitions through the holes in the plywood at the crowd of protesters from about three to ten feet away. Lake Decl. at ¶ 4. Later, officers ordered people to move away from the corner of the building, only to come out of the Justice Center and fire pepper balls and impact rounds/rubber bullets at the crowd five minutes later. Garlick Decl. at ¶ 11; Lake Decl. at ¶ 4.

Throughout the evening, law enforcement officers continued to point their weapons and shoot at groups of protesters who were doing nothing more than standing near the building. For example, in response to a group of protesters chanting on SW 3rd Avenue and Main Street, law enforcement officers yelled and pointed their weapons at protesters through the plywood holes. Garlick Decl. at ¶ 12. When some protesters knocked on the door, officers would open the door to fire rubber bullets at the crowd. *Id*. Officers shot pepper balls and impact munitions at children, including a 12-year-old child, who was injured; officers' impact munitions split the child's leg open and it bled profusely. *Id.*

Without warning, officers dropped a flash bang grenade into the crowd from a second-story window of the Justice Center and fired rubber bullets into the crowd. Garlick Decl. at ¶ 13; Lake Decl. at ¶ 4. At least one person collapsed and was unresponsive after the flash bang grenade; another person fell from rubber bullet injuries. Garlick Decl. at ¶ 14; Danner Decl. at ¶ 9; Lake Decl. at ¶ 4.

Law enforcement's above-described conduct had a chilling effect on people's First Amendment rights: people now worry that if they go out to protest, or if they film the police, they will be injured or killed. Lake Decl. at ¶ 7.

### III.    Saturday, June 27, 2020

On Saturday, June 27, 2020, there was another large demonstration at the Justice Center. Some protesters, aware of this Court's temporary restraining order, relied on that order to protect them from law enforcement's use of chemical agents and munitions. Norcross Decl. at ¶ 1; Kaplan Decl. at ¶ 3. As such, some of the people were attending a protest for the first time. Norcross Decl. at ¶ 1.

That evening, there were hundreds of people protesting, including children and people of many different races. Yarn Decl. at ¶ 4; Kaplan Decl. at ¶ 4. At or around 10:00pm, a large group of protesters stood in the intersection of SW 3rd Avenue and Main Street. Norcross Decl. at ¶ 4. Protesters chanted, saying the names of George Floyd and Breonna Taylor, and supported one another by handing out snacks and cups of coffee. Norcross Decl. at ¶ 4; Yarn Decl. at ¶ 5; Kaplan Decl. at ¶ 4. Some protesters had placed barriers at SW 3rd Avenue as a safety precaution in the face of threats of violence and attacks by vehicles driving through the crowd. Unicorn Decl. at ¶ 13; Yarn Decl. at ¶ 5.

At around 10:30pm, two vans of law enforcement officers in riot gear arrived at SW 3rd Avenue and Salmon Street. Garlick Decl. at ¶ 21; Kaplan Decl. at ¶ 5. Another group of officers came toward the crowd at SW 3rd Avenue from the south. Norcross Decl. at ¶ 4. Around this time, Portland police told protesters to leave SW 3rd. Declaration of Hilary Jepsen ("Jepsen Decl.") ¶ 2. Some protesters tried to leave the area to the west but law enforcement launched a cannister of chemical agents and obstructed their path out. Norcross Decl. at ¶ 6; Jepsen Decl. at ¶ 4, 5, 6. The area was covered in thick smoke-like substance which caused a painful burning sensation in people's lungs, choking, fits of severe coughing, shortness of breath, and caused people's eyes to water. Norcross Decl. at ¶ 6, 7; Jepsen Decl. at ¶ 6, 8, 9. That is, whether or not the smoke-like substance was composed of CS, its actual effects were identical to tear gas. Jepsen Decl. at ¶ 7, 8, 14. Prior to officers' use of the chemical agent, protesters had not thrown any items, set any fires, or otherwise threatened the life or safety of officers or others. Norcross Decl. at ¶ 12. To the contrary, protesters were following orders to leave or else engaged in passive resistance when law enforcement officers subjected them to chemical weapons. Jepsen Decl. at ¶¶ 10, 11, 12, 14.

As law enforcement officers in riot gear lined up on SW 3rd Avenue and Salmon Street, the crowd of demonstrators at SW Main Street yelled and chanted at them. The crowd put their hands up and saying, "Don't Shoot!," "We're just talking to you!," "We have First Amendment Rights!," and "I don't see no riot here, take off your riot gear!" Shortly after, and without warning, the line of law enforcement officers charged at a crowd of protesters. Kaplan Decl. at ¶ 6; Garlick Decl. at ¶ 22; Sisco Decl. at ¶ 6. Prior to the police charge, protesters had not thrown

anything at officers, started fires, or otherwise acted aggressively or threateningly. Garlick Decl. at ¶ 22; Sisco Decl. at ¶ 8; Yarn Decl. at ¶ 8; Kaplan Decl. at ¶ 7.

Officers continued to charge the protesters, ripping away protesters' umbrellas, signs, and shields so that officers could intentionally spray protesters in the face with OC. Garlick Decl. at ¶ 24; Unicorn Decl. at ¶ 15; Yarn Decl. at ¶ 8; Kaplan Decl. at ¶ 8; Trumbly Decl. at ¶ 10. Officers acted with the intent to injure and inflict terror: for example, officers shoved protesters to the ground, grabbed the goggles from their faces, and sprayed OC directly into their uncovered faces. Trumbly Decl. at ¶ 11. Officers also indiscriminately sprayed OC into the crowd of people. *Id*.

As the crowd retreated, officers continued to shove people and engage in excessive, aggressive and unprofessional conduct. Kaplan Decl. at ¶ 8. For example, at least one officer yelled, "get the fuck out of here!" Garlick Decl. at ¶ 24. In at least one case, as a protester walked backward and recorded the officers, another officer pushed that person down and kicked their cell phone away. Sisco Decl. at ¶ 6. In another case, an officer used their baton to hit a protester in the back and in the knee as that person was retreating. Unicorn Decl. at ¶ 18. Despite the fact that protesters yelled that they could not back up because there was no where to go, law enforcement officers continued to continued to push, shove, and deploy OC spray upon protesters—at times spraying the back of people's heads—even as the crowd complied and were in retreat. Garlick Decl. at ¶ 25; Unicorn Decl. at ¶ 15; Kaplan Decl. at ¶ 9.

As the crowd retreated, officers also launched pepper ball munitions and flash bang grenades that exploded in the middle of the crowd. Garlick Decl. at ¶ 27; Kaplan Decl. at ¶ 10; Trumbly Decl. at ¶ 12, 13; Jepsen Decl. at ¶ 5. Shrapnel from the grenades injured at least one

Page 11  PLAINTIFFS' MOTION FOR FINDING OF CONTEMPT AND FOR
      SANCTIONS AGAINST DEFENDANT CITY OF PORTLAND

protester and added to their disorientation and confusion. Kaplan Decl. at ¶ 10. In addition, officers also launched smoke bombs into the crowd, including into a crowd of people near Main Street who were just standing there or trying to walk away. Unicorn Decl. at ¶ 15; Yarn Decl. at ¶ 9; Kaplan Decl. at ¶ 10; Jepsen Decl. at ¶ 3, 4, 5. The toxic smell and taste of the chemical caused a burning sensation in protesters' eyes, nose, mouth, throat and lungs; coughing; and wheezing as some people felt like they could not breathe. Yarn Decl. at ¶ 10; Kaplan Decl. at ¶ 12; Jepsen Decl. at ¶ 6, 7, 8, 9.

Law enforcement officers' indiscriminate use of chemical agents and munitions against the crowd was unprovoked: no one had thrown anything at the officers, no one had started a fire, or otherwise posed a threat. Kaplan Decl. at ¶ 11.

Later into the evening and early hours of June 28, officers continued to engage in excessive acts of violence. For example, at least one officer pushed a shopping cart back at an apparently unhoused person, hitting them in the stomach and knocking them down, even though that person appeared to be neurodiverse and was not part of the protests nor interfering with the police. Sisco Decl. at ¶ 7. As another example, another officer pointed a flashlight on the end of his gun at people's faces, inches away, while smiling and laughing. Unicorn Decl. at ¶ 16.

Law enforcement officers' conduct on the evening of June 27, 2020, into the morning of June 28, 2020, was frightening and dangerous. Norcross Decl. at ¶ 9, 10 11; Sisco Decl. at ¶ 8; Kaplan Decl. at ¶ 14. Throughout the evening, law enforcement used physical force, chemical agents, and impact munitions against people who were already complying and retreating. Kaplan Decl. at ¶ 14; Jepsen Decl. at ¶ 12, 13, 14, 15. Protesters witnessed officers purposely pepper spraying people's faces and heads even as the crowd retreated. Garlick Decl. at ¶ 25; Unicorn

Decl. at ¶ 15; Kaplan Decl. at ¶ 14. Law enforcement's objectives were unclear—their conduct suggested their primary purpose was to attack and harm protesters. Kaplan Decl. at ¶ 14; Jepsen Decl. at ¶ 12.

Law enforcement's conduct had a chilling effect on people's First Amendment rights: people now worry that, if they go out to protest, they will face an increased risk of contracting COVID-19, and people fear that that continued participation in demonstrations will result in law enforcement officers continuing to attack, injure, and possibly kill them. Norcross Decl. at ¶ 13, 14; Sisco Decl. at ¶ 9; Yarn Decl. at ¶ 13.; Kaplan Decl. at ¶ 15; Jepsen Decl. at ¶ 18.

## ARGUMENT

This Court has broad inherent authority to enforce its orders. *Spallone v. United States*, 493 U.S. 265, 276 (1990). In addition, this Court has explicit statutory authority to enforce its orders through contempt, including the imposition of fines and confinement. *See* 18 U.S.C. § 401(3). Neither willfulness nor intent is required, and good faith is not a defense to a civil contempt finding. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).

Procedurally, plaintiff bears the initial burden of showing by clear and convincing evidence that defendant violated a specific and definite order of this Court. *See Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir. 1983). Once that burden is met, the burden shifts to defendant to show that they have taken all reasonable steps to avoid violating that order. *Id*. Only where a defendant has been in substantial compliance with a court order is the defense of "all reasonable steps" even available. *In re Dual-Deck*, 10 F.3d at 695.

As demonstrated by the above facts, the City has violated this Court's order by:

    a) Using tear gas on June 25 when there was no risk to the lives and safety of the police or community, and for the purpose of dispering the crowd; and,

    b) Using FN303 and 40MM less lethal launchers, rubber ball distraction devices, and aerosol restraints against people who were both attempting to follow orders or engaged in only passive resistance on June 26 and June 27.[1]

### A.    Violation on June 25

On June 25, 2020, and into the morning hours of June 26, 2020: after firing on a peaceful crowd partaking in an Indigenous religious ceremony, as people were retreating and running away, officers launched tear gas into crowd. O'Connell Decl. at ¶ 4, 8; Herrera Decl. at ¶ 13, 14. Officers also used tear gas, flash bang grenades, and pepper balls to scatter protesters who were not engaged in any acts of violence or property damage. Herrera Decl. at ¶ 12; Danner Decl. at ¶ 5. This Court's order prohibits the use of tear gas except in "situations in which the lives or safety of the public or the police are at risk." Dkt. No. 29, at 9-10. In addition, the Court ordered that "Tear gas shall not be used to disperse crowds where there is no or little risk of injury." *Id*. at 10. As the evidence submitted shows, this clear, definite order was violated on June 25.

### B.    Violations on June 26 and June 27

The evidence from June 26 and June 27 show repeated, systemic violations of the order. Rubber bullets and other impact munitions have been used, more often than not, against people who are engaged only in passive resistance, if any resistance at all. Garlick Decl. at ¶ 11, 27; Lake Decl. at ¶ 4; Kaplan Decl. at ¶ 10; Trumbly Decl. at ¶ 12, 13. A child was struck with an impact muntion. Garlick Decl. at ¶ 12; *see* PPB Directive 1010.6.2.1 (prohibiting the use of any

---

[1] The stipulated order from June 26 incorporates PPB Use of Force Directive 1010. That directive is included in full in the appendix to this motion.

less lethal weapons against children under the age of 15). Rubber ball distraction devices have been used where no lives or safety are at risk, and indeed seem to serve no legitimate law enforcement purpose whatsoever. Kaplan Decl. at ¶ 10. There does not appear to be any effort to avoid exposing entire crowds of people to pepper spray; indeed, officers appear at times to be acting in open defiance of that prohibition. Garlick Decl. at ¶ 25; Unicorn Decl. at ¶ 15; Kaplan Decl. at ¶ 14; Jepsen Decl. at ¶ 3, 4, 5, 12, 13, 14, 15.

However, the invidual violations pale in comparison to the overall theme: the City is using force as a means of dispersing protests, in clear violation of the United States Constitution and this Court's orders. Individual law breakers in the crowd of protesters are merely the excuse used for imposing group punishment. There is little or no effort to arrest people. The intent of the officers is clear from the overall practice, as well as the words of the officers themselves in video recordings from the ground. The officers repeatedly tell people that if they do not leave an area, the officers will use force against them to make them leave an area. The officers have no intention of arresting anyone and allowing a court of law to figure out whether the person broke the law. People who do not leave when told to do so are simply beaten until they leave. People who are prevented from moving any faster by the crowd behind them are beaten, people who cannot move quickly enough away from the police line are beaten, and people who stumble because of a police shove or tripping over another person are beaten as they fall to the ground. This theme is directly in opposition to the overall purpose of both of this Court's orders: that people engaged in passive resistance should not be subjected to these high levels of force. This Court must act to remedy the contempt.

### C.     No Defense to Contempt

Regardless of what steps the City took to comply with the Court's order, this Court should find that the defense of "all reasonable steps" is unavailable to them because they have

never been in substantial compliance with the order. The ink was barely dry on the order before the City violated it. In such a situation, there can be no claim of substantial compliance. *In Re Dual-Deck*, 10 F.3d at 695.

### D.  Remedy and Sanction

Federal courts have broad remedial powers to address noncompliance. *Stone v. City and County of San Francisco*, 968 F.2d 850, 861-62 (9th Cir. 1992) (affirming court's power to authorize sheriff to override state law); *See also, e.g.*, *Brown v. Plata*, 563 U.S. 493 (2011) (imposing prison population limit); *Nat'l Org. for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536 (9th Cir. 1987) (affirming appointment of a Special Master). When the least intrusive measures fail to rectify the problems, more intrusive measures are justifiable. *Stone*, 968 F.2d at 861 (citing *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978)). Here, the Court has a valid basis to use its broad powers to compel Defendant to comply with the Court's orders.

**DATED** this 30th day of June 2020

        *s/Jesse Merrithew*

        **Jesse Merrithew**, OSB No. 074564
        **Viktoria Safarian**, OSB No. 175487
        Levi Merrithew Horst PC

        **J. Ashlee Albies**, OSB No. 051846
        **Whitney B. Stark**, OSB No. 090350
        **Maya Rinta**, OSB No. 195058
        Albies & Stark LLC

        **Juan C. Chavez**, OSB No. 36428
        **Brittney Plesser**, OSB No. 154030
        **Alex Meggitt**, OSB No. 174131
        **Franz H. Bruggemeier**, OSB No. 163533
        Oregon Justice Resource Center

        **Attorneys for Plaintiffs**