**1010.00, Use of Force**
**Refer:**

- *Graham* v. *Connor*, 490 U.S. 386 (1989)
- ORS § 161.015, General Definitions
- DIR 315.30, Satisfactory Performance
- DIR 330.00, Internal Affairs, Complaint Intake and Processing
- DIR 333.00, Criminal Investigations of Police Bureau Employees
- DIR 345.00, Employee Information System
- DIR 416.00, Critical Incident - Temporary Altered Duty
- DIR 630.05, Vehicle Interventions and Pursuits
- DIR 630.45, Emergency Medical Custody Transports
- DIR 630.50, Emergency Medical Aid
- DIR 631.70, Investigation of Animal Problems
- DIR 635.10, Crowd Management/Crowd Control
- DIR 640.02, Photography and Digital Imaging
- DIR 850.20, Mental Health Crisis Response
- DIR 900.00, General Reporting Guidelines
- DIR 1010.10, Deadly Force and In-Custody Death Reporting and Investigation Procedures
- DIR 1020.00, Weapons Administration
- DIR 1021.00, Weapons Qualifications
- PPB Canine Unit Standard Operating Procedures

**Definitions:**

- Active Aggression:  A threat or overt act of an assault (through physical or verbal means), coupled with the present ability to carry out the threat or assault, which reasonably indicates that an assault or injury to any person is about to happen, unless intervention occurs.
- Administrative Review:  A written determination that requires the gathering and evaluating of information to develop a course of action.
- After Action Report:  A written report that describes a police action and assesses its adherence to policy through critique and evaluation using required criteria.
- Arcing:  Activating a conducted electrical weapon (CEW) without discharging the probes or making contact with a subject, to serve as a warning to the subject.
- Boxing In:  A coordinated tactic of making contact between police vehicles and a subject's vehicle to stop or prevent the start of a pursuit.
- Complaint of Improper Force:  A complaint by a subject or person at the scene, or while in police custody, of improper force during a police action.  Complaints of improper force include complaints of inappropriate and/or excessive force.
- Complaint of Physical Injury:  An assertion by a person that a member caused the person physical injury.

- Conducted Electrical Weapon (CEW):  A weapon, including Tasers, designed primarily to discharge electrical charges into a subject that will cause involuntary muscle contractions and overrides the subject's voluntary motor responses.
- CEW Application:  The contact and delivery of an electrical impulse to a subject using a CEW.
- CEW Cycle:  An activation of the CEW for a duration of up to five seconds.
- Constitutional Force Standard:  Under *Graham v. Connor* and subsequent cases, the federal courts have established that government use of force must comply with the "reasonableness" requirement of the Fourth Amendment.  Under this standard, members must choose from the objectively reasonable force options at a scene. See the definition of "objectively reasonable" below.
- Cover Fire:  When a member discharges a firearm in a tactical situation in response to the ongoing threat of the use of deadly physical force by a subject, and direct action against the subject is not feasible.  Cover fire is not intended to strike a subject, but is meant only to prevent a subject from taking further action against the police or others that could result in death or serious physical injury.  Cover fire can be dangerous and must be used with extreme caution.  Cover fire is also intended to allow officers to take actions to resolve the situation, such as effecting a rescue, advancing or retreating, or delivering chemical agents.
- Critical Firearm Discharge:  Each discharge of a firearm by a member.  This term includes discharges at persons where no one is struck.  This term is not intended to include discharges at the range or in training, or negligent discharges not intended as an application of force, which are still subject to administrative investigation.
- Deadly Force, also known as Lethal Force:  Any use of force likely to cause death or serious physical injury, including the use of a firearm, carotid neck hold, or strike to the head, neck or throat with a hard object.
- De-escalation:  A deliberate attempt to prevent or reduce the amount of force necessary to resolve the confrontation.
- Drive Stun:  The process of applying energy to a subject through the terminal on a cartridge or conducted electrical weapon.
- Force:  Physical coercion used to effect, influence or persuade an individual to comply with an officer, to include the intentional pointing of a firearm at an individual.  Control holds and handcuffing without resistance do not constitute force.
- Immediate Cover:  A member who stands ready to deploy additional control if needed (e.g., the CEW is ineffective or it fails to function properly).
- Improper Use of Force:  The application of force where there is insufficient justification for its use, where the use of force is more than is objectively necessary or that violates policy.
- Involved Member:  For the purposes of this directive, 1010.00, Use of Force, an involved member is a Bureau member who is involved in the application of force or directs another to use force.

- Less Lethal Force:  A force application that is not intended or expected to cause death or serious injury and that is commonly understood to have less potential for causing death or serious injury than conventional, more lethal police tactics.  Nonetheless, use of less-lethal force can result in death or serious injury.
- Less Lethal Weapons:  Weapons designed and intended to apply less lethal force.  These weapons include, but are not limited to, CEWs, impact weapons, impact munitions, aerosol restraints.
- Mental Health Crisis:  An incident in which someone with an actual or perceived mental illness experiences intense feelings of personal distress (e.g., anxiety, depression, anger, fear, panic, hopelessness), a thought disorder (e.g., visual or auditory hallucinations, delusions, sensory impairment or cognitive impairment), obvious changes in functioning (e.g., neglect of personal hygiene) and/or catastrophic life events (e.g., disruptions in personal relationships, support systems or living arrangements; loss of autonomy or parental rights; victimization or natural disasters), which may, but not necessarily, result in an upward trajectory of intensity culminating in thoughts or acts that are dangerous to self and/or others.
- Mental Illness:  Health conditions that are characterized by alterations in thinking, mood, or behavior (or some combination thereof) associated with distress and/or impaired functioning.  Alterations in thinking, mood, or behavior contribute to a host of problems-patient distress, impaired functioning, or heightened risk of death, pain, disability, or loss of freedom.
- Misconduct:  Conduct by a member that violates Bureau regulations, orders, directives, or other standards of conduct required of City employees.
- Necessary:  No objectively reasonable effective alternative exists to affect a lawful purpose.
- Non-Disciplinary Corrective Action:  Action other than discipline taken by a PPB supervisor to enable or encourage a member to improve their performance.
- Objectively reasonable:  The reasonableness of a use of force is based on the totality of circumstances known by an officer at the time of action or decision-making.  It shall be judged from the perspective of a reasonable officer on the scene, without the clarity of 20/20 hindsight after the event has concluded.  The measure of reasonableness gives consideration to the reality that officers are often forced to make split-second decisions in circumstances that are tense, uncertain and rapidly evolving.  In the application or evaluation of the use of force, uses of the terms reasonable and reasonably in this policy refer to objective reasonableness.
- Passive Resistance:  A person's non-cooperation with a member that does not involve violence or other active conduct by the individual.
- Physical Injury:  As defined in ORS § 161.015 (7), the impairment of a person's physical condition or causing a person substantial pain.  Substantial pain refers to degree and duration of the pain suffered by the victim; the pain must be considerable and must be more than momentary.

- Physical Resistance: A person's physical attempt to evade a member's control that does not rise to the level of active aggression.
- Probe Cartridge: A device that contains two probes connected to light gauge wire that is propelled and attaches to the subject upon activation of the CEW.
- Pursuit Intervention Techniques (PIT): A driving technique designed to stop a fleeing motorist safely and quickly by making contact with the fleeing car at a specific point on the vehicle, which throws the car into a spin and brings it to a stop.
- Ramming: The use of an emergency (police) vehicle, other than in a pursuit intervention technique or boxing-in maneuver to purposely cause contact with another vehicle in order to disable the vehicle.
- Serious Physical Injury: As defined in ORS § 161.015(8), physical injury which creates a substantial risk of death, or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of function of any bodily organ.
- Serious Use of Force: (1) all uses of force by a member that reasonably appear to create or do create a substantial risk of death, serious disfigurement, disability, or impairment of the functioning of any body part or organ; (2) all critical firearm discharges by a member; (3) all uses of force by a member resulting in a significant injury, including a broken bone, an injury requiring hospitalization, or an injury deemed to be serious by a member's supervisor; (4) all head, neck and throat strikes with an object or carotid neck holds; (5) force used upon juveniles known or reasonably assumed to be under fifteen or individuals known or reasonably assumed to be pregnant; (6) all uses of force by a member resulting in a loss of consciousness; (7) more than two applications of a CEW on an individual during a single interaction, regardless of the mode or duration of the application, regardless of whether the applications are by the same or different officers, and regardless of whether the CEW application is longer than 15 seconds, whether continuous or consecutive; (8) any strike, blow, kick, electronic control weapon system cycle, or similar use of force against a handcuffed, otherwise restrained, under control, or in custody subject, with or without injury; and (9) any use of force referred by a member's supervisor to Professional Standards Division (PSD) which PSD deems serious.
- Takedown: Physical coercion used by a member to affect, direct, or influence a person to go to the ground not under their own control.
- Warning shot: Discharge of a firearm for the purpose of compelling compliance from an individual, but not intended to cause physical injury.
- Witness member: For the purposes of this directive, 1010.00, Use of Force, a witness member is a Bureau member who observes or has firsthand knowledge of the events surrounding the use of force by another member, and other than observing the incident, did not use force themselves. Additionally, a member who observes or has knowledge of the events surrounding a member's direction to another to use force.

**Policy:**

1. The Portland Police Bureau is committed to upholding the civil rights of all individuals, protecting human life and property, and maintaining civil order.  The Bureau's commitment to public safety includes ensuring the welfare of members of the public, its officers and professional staff, with an emphasis on the sanctity of life and policing with respect.

2. The Portland Police Bureau recognizes that this commitment may require members to use force.  The community expects and the Portland Police Bureau requires that members use only the objectively reasonable force necessary to perform their duties and overcome the threat or resistance of the subject under the totality of the circumstances.  Members who violate these values by using objectively unreasonable force erode the confidence of the community and may expose themselves, those present, and the greater population to unnecessary danger; thus, objectively unreasonable uses of force shall result in corrective action and/or discipline, up to and including termination.

3. While the ultimate objective of every law enforcement encounter is to protect the public, nothing in this policy requires a member to retreat or be exposed to possible physical injury before applying reasonable force.

4. Over the course of their careers, the Bureau expects members to develop and use skills and abilities that allow them to regularly resolve confrontations while minimizing the need to use force.  Members are to be aware that this Directive is more restrictive than state or federal laws.

5. The Bureau is dedicated to providing training in all categories of force and de-escalation techniques, as well as providing sufficient resources, to help members safely and effectively resolve confrontations through the application of de-escalation tools and lower levels of force.  When feasible, members are expected to use de-escalation tactics in order to avoid the need for or reduce the amount of force.  However, the Bureau recognizes that each situation is unique and presents its own challenges.  Members are expected to adapt and apply Bureau training principles reasonably in unanticipated situations.

6. Members shall attempt to avoid or minimize the use of force against individuals in perceived behavioral or mental health crisis or those with mental illness and direct such individuals to the appropriate services, where possible.

7. Member accountability is integral to building and maintaining community trust.  The Bureau is committed to institutionalizing systems of accountability and establishing transparent reporting practices.  When force is used, the Bureau is dedicated to reviewing, reporting and investigating member actions to determine if the force used was in accordance with Bureau training and policy.  This policy establishes reporting and investigative guidelines for all use of force.  It includes the specific reporting requirements for all force incidents and the completion of police reports and After Action reports, as defined in this Directive.

8. The Bureau recognizes that the use of force may have an emotional impact on all involved.  Members are encouraged to take proactive steps to mitigate these impacts through positive interactions with subjects and concerned community members following such an event.

**Procedure**:

**1. De-escalation:**

1.1. Members shall use de-escalation techniques, when time and circumstances reasonably permit. De-escalation techniques provide members the opportunity to stabilize the scene or reduce the necessity for or intensity of force so that more time, options and resources are available to resolve the confrontation.  Members shall take proactive steps to eliminate the immediacy of the threat, establish control and minimize the need for force.

1.1.1. De-escalation techniques include, but are not limited to: 1) using verbal techniques to calm an agitated subject and promote rational decision making; 2) allowing the subject appropriate time to respond to direction;  3) communicating with the subject from a safe position using verbal persuasion, advisements, or warnings; 4) decreasing exposure to a potential threat by using distance, cover, or concealment; 5) placing barriers between an uncooperative subject and an officer; 6) ensuring there are an appropriate number of members on scene; 7) containing a threat; 8) moving to a safer position; and 9) avoiding physical confrontation, unless immediately necessary.

1.1.2. When practical and appropriate, members shall consult with and/or call specialized units to respond, including but not limited to those related to behavioral health, tactics and/or negotiation, to assist in de-escalating the situation or devising a disengagement strategy or otherwise assist in safely resolving the incident.

1.1.3. To avoid confusion, members shall establish and maintain one-on-one communication with the subject and avoid giving simultaneous directions or having multiple members verbally engaging the subject.

1.2. Members shall consider whether a subject's lack of compliance is a deliberate attempt to resist or an inability to comply based on factors including, but not limited to: 1) medical conditions; 2) mental impairment; 3) developmental disability; 4) physical limitation; 5) language barrier; 6) drug or alcohol impairment; and 7) mental health crisis.

1.3. Members shall consider a disengagement plan when the benefits to be gained by police intervention are clearly outweighed by the risks associated with the call.

1.4. When responding to and managing scenes involving persons in mental health crisis and when time and circumstances permit, members shall consider using disengagement and de-escalation techniques, as well as devising a response plan through the ROADMAP tool.  Members shall refer to Directive 850.20, Police Response to Mental Health Crisis, for

additional guidance regarding ROADMAP and encounters with individuals with known or perceived mental illnesses or experiencing mental health crisis.

1.4.1. Tactics in ROADMAP can be used as a stand-alone tactic, or they may be overlapped with other tactics to create a plan. Plans may need to be altered several times during an incident as it evolves, and members should be prepared to switch to other tactics as the totality of the circumstances changes.

1.4.1.1. When safe under the totality of circumstances, members shall consider disengagement as a tactic to reduce undue safety risks to the member, the involved person(s) or others.

1.5. When force is used, the amount of force used, including the number of members who use force, shall be reduced as resistance decreases. Only the amount of force reasonably calculated to maintain control shall be used.

1.6. Members shall refrain from using force against individuals who are already under control by officers or who express verbal discontent with officers, but do not otherwise pose a threat to officers or others, or impede a valid law enforcement function. Members must balance the governmental interest to take action in service of the public against the rights of individuals involved.

**2. Authorized Use of Force.**

2.1. Members are authorized to use force when permitted by this policy in order to:

2.1.1. Prevent or terminate the commission or attempted commission of an offense;

2.1.2. Lawfully take a person into custody, make an arrest or prevent an escape;

2.1.3. Prevent a suicide or serious self-inflicted injury;

2.1.4. Defend the member or other person from the use of physical force; or,

2.1.5. Accomplish some official purpose or duty that is authorized by law or judicial decree.

**3. Warning Issuance.**

3.1. Unless it would present a danger to the member(s) or others, members shall issue a clear and intelligible verbal warning or attempt to utilize hand signals where there is a language barrier or the subject is deaf or hard of hearing, prior to using any force.

3.1.1. Members shall provide a description of the warning given in their use of force reports.  If no warning was given, members shall provide a justification for the lack of warning.

3.1.1.1. No written justification is necessary for the lack of a warning for the following:

3.1.1.1.1. Vehicle intervention techniques; and

3.1.1.1.2. Category IV force.

3.2. Prior to using a less lethal weapon, members shall, when feasible, warn or announce to other members their intent to use the tool, in an attempt to avoid sympathetic fire.

**4. Prohibited Use of Force.**

4.1. Members shall not use force against people who engage in passive resistance that does not impede a lawful objective.  Physically moving a subject engaged in passive resistance is permitted when it is necessary and objectively reasonable.

4.2. Members are prohibited from using force for interrogation or torture.

4.3. Under no circumstances will a member use force solely because another member is using force.

*5. Graham* **Standard: Force Performance Requirements.**

5.1. To comply with this Directive and satisfy the constitutional standard, members shall only use force that is objectively reasonable under the totality of circumstances.  When determining to use any force, members must balance the individual's Fourth Amendment rights against the government's interest.  Members shall at least consider the following three criteria in making a decision to use force:

5.1.1. **Threat**.  Whether the individual poses an immediate threat to the safety of the officers or others.  The extent and immediacy of the threat are the most important determining factors when considering the need for and type of force that may be reasonable during an encounter.

5.1.2. **Severity**.  The severity of the crime at issue.

5.1.3. **Active Resistance or Evading**.  Whether the individual is actively resisting control or attempting to evade.  When force is used, the amount of force used, shall be reduced as resistance decreases.  Only the amount of force reasonably calculated to maintain control shall be used.

5.2. Though the above three factors are of primary consideration, a reasonableness inquiry is not limited to these factors and force will be evaluated under the totality of the circumstances.

5.3. **Member Considerations for Use of Force.**

5.3.1. Members should recognize that their approach to confrontations may influence whether force becomes necessary and the amount force that must be used.

5.3.2. Members must not precipitate a use of force by placing themselves or others in jeopardy through actions that are inconsistent with the Bureau's training without a substantial justification for variation from recommended practices.

5.3.3. When feasible, members shall allow individuals time to submit to arrest before force is used.

5.4. **Other Member Responsibilities.**

5.4.1. Members must individually justify each independent application of force.  When feasible, members shall re-evaluate the need for continued force in between independent uses of force.

5.4.2. Members have a duty to reasonably intercede to prevent the use of unlawful force by another member.

5.4.3. Members shall take into account all available information, including observed behavior, reports from other members or witnesses, known mental health history and perceived mental illness or mental health crisis.

5.4.4. During a confrontation with an individual known or perceived to be in mental health crisis, members must recognize and reasonably balance the governmental interest in providing care to the individual with the need for force.  Members shall call in specialized units when practical.

5.4.5. Members shall refer to Directive 850.20, Police Response to Mental Health Crisis, for intervention techniques regarding individuals with known or perceived mental illnesses or experiencing a mental health crisis.

**6. Less Lethal Force.**
6.1. Less lethal force provides members with additional tactics or options for managing encounters with threatening or actively resistive subjects.  However, members shall consider that the use of less lethal force can still result in death or serious injury.
6.2. Members shall not use less lethal weapons on the following persons unless the person is armed with a dangerous or deadly weapon, or is about to commit suicide, or is in the act of causing harm to themselves or others, or the member has probable cause that the subject has committed a Measure 11 crime:
6.2.1. Children who are known to be, or are obviously under the age of fifteen.

6.2.2. An individual who is known to be, or is obviously pregnant.

6.2.3. A person who is known to be, or is obviously medically fragile.

6.3. Members shall not use any less lethal weapons against individuals who are handcuffed or otherwise restrained, and under control.

6.4. Additional rules for Bureau-authorized less lethal weapons are outlined below:

6.4.1. *Impact Weapons.*

6.4.1.1. Authorized Uses.

6.4.1.1.1. In response to active aggression.

6.4.1.1.1.1. When striking, members should only use the Bureau-issued baton. Use of any other impact tool is strongly discouraged and is appropriate only when the member reasonably believes that other authorized physical force responses are not available.

6.4.1.1.1.2. Members shall make reasonable efforts to ensure that impact weapons are used on preferred target areas, including arms and legs.

6.4.1.2. Restricted Uses.

6.4.1.2.1. Members striking or jabbing with a baton shall not deliberately target the head or throat, neck, spine, or groin unless deadly force would be authorized.

6.4.1.2.1.1. Unintentional or inadvertent strikes to these restricted areas require following all other reporting procedures, with the addition of explicitly verbally notifying a supervisor that this has occurred. Reports must specifically address the circumstances and actions that related to striking restricted areas.

6.4.2. *Impact Munitions.*

6.4.2.1. Authorized Uses.

6.4.2.1.1. In response to active aggression;

6.4.2.1.2. To prevent suicide or immediate physical harm when reasonable in light of available options;

6.4.2.1.3. To avoid the use of a higher level of force; or,

6.4.2.1.4. To effect the capture or prevent the escape of a subject when the member reasonably believes that the subject presents an immediate risk of physical injury to the public, members or themselves, or the escape of the subject presents a significant danger to the public, members or themselves.  Mere flight from an officer is not sufficient cause for the use of the impact munitions.

6.4.2.1.5. Members shall make reasonable efforts to ensure that impact munitions are used on preferred target areas.  Under seven yards, members will aim for the legs.  Over seven yards, members will aim anywhere below the waist line except the groin.

6.4.2.1.6. Members may use impact munitions on vicious or aggressive animals when the presence of those animals interferes with the safety of the members or the public, the execution of a police function, or completion of a mission.

6.4.2.2. Restricted Uses.

6.4.2.2.1. Members shall not deliberately target a subject's head, neck, throat, or groin area, unless deadly force is authorized.

6.4.2.2.2. Members are prohibited from using impact munitions against an individual for the purpose of crowd control or crowd management, except at the direction of a supervisor and with the approval of the Incident Commander (IC), unless there are exigent circumstances requiring deployment to prevent the threat of death or serious injury to a person.

6.4.3. *Aerosol Restraints.*

6.4.3.1. Authorized Uses.

6.4.3.1.1. When a person(s) engages in physical resistance or indicates the intent to engage in physical resistance.

6.4.3.1.2. Members may use aerosol restraints on vicious or aggressive animals, when the presence of those animals interferes with the safety of the members or the public, the execution of a police function, or completion of a mission.

6.4.3.2. Restricted Uses.

6.4.3.2.1.  Aerosol restraints shall not be used on the operator of a motor vehicle that is immediately capable of being driven unless there is a substantial justification for doing so and no reasonable alternative is apparent.

6.4.3.2.2.  When deploying aerosol restraints, members shall attempt to minimize exposure to non-targeted persons.

6.4.3.3. Actions Following the Use of Aerosol Restraints.

6.4.3.3.1. Members shall make a reasonable effort to ensure that affected individuals are exposed to fresh air.  Members shall, as soon as practicable, relieve the subject's discomfort by washing aerosol spray from the subject's eyes with water, unless the subject refuses by words or action.

6.4.3.3.2. Members shall notify the receiving agency of aerosol restraint exposure, and the condition of the exposed individual taken into custody shall be continuously monitored.  If the individual's condition appears to worsen, members shall notify medical personnel.

6.4.4. *Conducted Electrical Weapon System (CEW).*

6.4.4.1. Authorized Uses.

6.4.4.1.1.  In response to active aggression;

6.4.4.1.2.  To prevent suicide or immediate physical harm when reasonable in light of available options;

6.4.4.1.3.  To avoid the use of a higher level of force; or,

6.4.4.1.4.  To effect the capture or prevent the escape of a subject when the member reasonably believes that the subject presents an immediate risk of physical injury to the public, members or themselves, or the escape of the subject presents a significant danger to the public, members or themselves.  Mere flight from an officer is not sufficient cause for the use of the CEW.

6.4.4.1.5.  Members may also utilize warning tactics such as arcing or activating the CEW lasers in an attempt to gain compliance.  Members should point the CEW in a safe direction when arcing and never intentionally direct the lasers into the eyes of a person.

6.4.4.1.6.  Members may use a CEW on vicious or aggressive animals when the presence of those animals interferes with the safety of the members or the public, the execution of a police function, or completion of a mission.

6.4.4.2. Restricted Uses.

6.4.4.2.1. Members shall avoid the use of more than three CEW applications against the same individual, unless exigent circumstances (immediate and serious bodily harm to a person or persons is about to occur) warrant use.  Members shall not use a CEW for pain compliance

against those a reasonable officer would believe have an actual or perceived mental illness or are in mental health crisis, except in exigent circumstances and then only to avoid the use of a higher level of force.

6.4.4.2.2. Members shall not use a CEW to threaten or coerce a person except for the purpose of managing a potential or actual physical confrontation.

6.4.4.2.3. Members shall not use a CEW when there is a significantly heightened risk of secondary injury (e.g., uncontrolled fall, drowning) to the subject or others unless the member reasonably believes the threat or danger posed by the subject outweighs the risk of injury that might occur as a result of loss of control.

6.4.4.2.4. Members shall not use a CEW on a handcuffed or otherwise restrained subject, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, and/or to avoid greater application of use of force and no reasonable alternative is apparent.  Where practical and safe to do so, members shall obtain supervisory authorization before deploying a CEW on a handcuffed subject.

6.4.4.2.5. Members shall not draw both a firearm and a CEW at the same time.

6.4.4.2.6. Members shall not use a CEW for crowd control or management purposes.

6.4.4.2.7. Members shall not deliberately target the head, face, or groin.  When tactically feasible and time reasonably permits, members shall target lower-center mass for front shots.

6.4.4.2.8. Members shall not use a CEW on subjects who are known or who the member should have reasonably known to have come in contact with flammables or those in areas where flammables are present.

6.4.4.3. Additional considerations when using a CEW.

6.4.4.3.1. Members shall visually and physically confirm that the weapon they are holding is a CEW and not a firearm.

6.4.4.3.2. Only one member may intentionally deploy a CEW at any given time on a subject, except where lethal force would be permitted.

6.4.4.3.3. Members deploying a CEW operationally, if feasible, should be supported by at least one member capable of providing immediate cover.

6.4.4.3.4. Members shall make every reasonable effort to attempt handcuffing during or between each CEW cycle.

6.4.4.3.5. After one standard CEW cycle, the member shall re-evaluate the situation to determine if subsequent cycles are necessary; members shall issue a warning prior to each additional cycle and wait a reasonable amount of time to allow the subject to comply, unless doing so would present a danger to the member(s) or others.  Members shall describe and explain the reasonableness of each CEW cycle in their use of force reports.

6.4.4.4. Actions following the use of a CEW.

6.4.4.4.1. Involved member responsibilities:

6.4.4.4.1.1. If possible, members shall photograph consistent with Directive 640.02, Photography and Digital Imaging, the areas of probe strikes, whether probes penetrated the person's skin, left visible marks or only penetrated the person's clothing, before and after probe removal, as well as any marks, or lack of marks, left by drive stun.  Consent should be obtained before photographing personally sensitive areas.  All photographs shall be placed into evidence in accordance with Bureau policy.

6.4.4.4.2. Supervisor responsibilities:

6.4.4.4.2.1. Verify evidence of CEW deployment is collected, including photographs of tags, cartridges, and probes.

6.4.4.4.2.2. Verify appropriate medical services are summoned, if necessary.

6.4.5. *Canine Deployment.*

6.4.5.1. Authorized Uses.

6.4.5.1.1. To protect the canine officer, the police canine or members of the community from an immediate threat.

6.4.5.1.2. To apprehend or control subjects reasonably believed to be involved in a crime.

6.4.5.1.3. To apprehend a fleeing criminal subject when the canine officer reasonably believes that probable cause exists to arrest a subject for a crime.

6.4.5.1.4. To apprehend hiding subjects when it would be unsafe for officers to proceed into an area.

6.4.5.1.5. Members shall refer to the Canine Unit SOPs for additional guidance.

6.4.5.2. Restricted Uses.

6.4.5.2.1. Members shall not use canines for crowd control or management purposes.

6.4.6. *Riot Control Agents (RCAs) or Area Impact Munitions*.

6.4.6.1. Authorized Uses in Crowd Control.

6.4.6.1.1. Under the direction of the Crowd Management Incident Commander (CMIC), to disperse a crowd, when a demonstration or event becomes a civil disturbance, as defined in Directive 635.10, Crowd Management/Crowd Control.

6.4.6.1.2. To stop or disrupt a group of individuals committing a crime or about to commit a crime, when other more discriminate methods are not feasible or reasonable, and uninvolved parties are unlikely to be subjected to the use of force.

6.4.6.1.3. When a person(s) engages in physical resistance or indicates the intent to engage in physical resistance.

6.4.6.1.4. In exigent circumstances to defend the member or others from physical injury when other, more discriminate methods of applying force are not feasible and uninvolved parties are unlikely to be subjected to the use of force.

6.4.6.2. Restricted Use.

6.4.6.2.1. Members shall not use RCAs or area impact munitions on a crowd engaged in passive resistance that does not impede a lawful objective.

6.4.6.2.2. Members shall not deploy RCAs or area impact munitions to disperse a crowd when avenues of escape are unavailable to the crowd.

6.5. Restraint Device.

6.5.1. *Hobble Restraint.*

6.5.1.1. Authorized Uses.

6.5.1.1.1. To control a subject beyond the capability of handcuffs.

6.5.1.1.1.1. The hobble restraint may be used to supplement handcuffs.  It shall not be used in lieu of handcuffs.

6.5.1.1.2. If a subject has demonstrated the intent to slip their handcuffs to the front, hobble restraints may be used on the upper arms or legs to prevent such an action.

6.5.1.1.3. Hobble restraints (straight leg restraint) may be used to secure a combative subject's legs together to prevent kicking.

6.5.1.1.4. A hobble may be used to secure an animal.

6.5.1.2. Restricted Uses.

6.5.1.2.1. Members shall not use the maximum restraint technique (i.e., securing a subject's knees or ankles in a straight leg restraint, then fastening the hobble to the handcuffs).

6.5.1.2.2. Once secured, a subject shall not be placed on their stomach for an extended period.  If feasible, the subject should be placed the subject's side or in a seated position.

**7. Police Vehicle Intervention Strategies.**

7.1. Intentional contact between a police vehicle and another occupied vehicle shall constitute a use of force for purposes of this policy.  These techniques include, but are not limited to, Pursuit Intervention Technique maneuver (PIT), boxing  in, and ramming.

7.2. Use of vehicle intervention strategies shall require use of force reporting and After Action review pursuant to the reporting sections in this directive.  Members should refer to the applicable force categories for reporting requirements.

7.3. Members shall refer to Directive 630.05, Vehicle Interventions and Pursuits, for additional guidance on the authorized use of these vehicle intervention strategies.

**8. Deadly Force.**

8.1. Authorized uses of deadly force:

8.1.1. Members may use deadly force to protect themselves or others from what they  reasonably believe to be an immediate threat of death or serious physical injury; or,

8.1.2. If necessary to prevent escape, a member may use deadly force where the member has probable cause to believe that the subject has committed a felony crime involving the infliction or threatened infliction of serious physical harm, and the member reasonably believes the subject poses an immediate threat of death or serious physical injury to the member or others.

8.2. The member shall give a verbal warning to the subject, if time, safety, and circumstances permit.

8.2.1. Members should be mindful of the risks inherent in employing deadly force, which may endanger others.  Reckless or negligent use of deadly force is not justified in this Directive or state statute.

8.2.2. Cover fire shall be investigated as a Category I use of deadly force and is only authorized if the member reasonably believes that an immediate threat of death or serious physical injury exists.

8.3. Restrictions on the use of firearms as deadly force:

8.3.1. Members are prohibited from firing warning shots.

8.4. Additional authorized uses for firearms:

8.4.1. A member is authorized to discharge a firearm to stop an aggressive animal that poses a danger to the member or others or end the suffering of a badly injured animal.  Members shall refer to Directive 631.70, Investigation of Animal Problems, for additional guidance.

8.5. Moving Vehicles.

8.5.1. A moving vehicle does not presumptively constitute a deadly force threat.

8.5.2. Members shall not shoot at a moving or fleeing vehicle unless an immediate risk of death or serious physical injury to the member or others exists.

8.5.3. Members are prohibited from intentionally positioning themselves in the path of a moving vehicle or in a location that is clearly vulnerable to vehicular attack.

8.5.4. When feasible, members shall move out of the path of a vehicle rather than discharging a firearm at the vehicle or its occupants.

8.5.5. Members shall consider whether the threat to the member or other persons (including all vehicle occupants) is increased by incapacitating the vehicle operator.  If the operator is incapacitated, the unguided vehicle may remain a threat to anyone in its path.  Members shall weigh the threat of incapacitating the driver against the threat posed by allowing the driver to maintain control of the vehicle.

8.5.6. Members must be aware that shooting at a moving vehicle presents unique challenges of target and backstop.

8.5.7. Members must be aware that shooting from a moving vehicle creates additional challenges of stability and aiming that must be considered in the decision to employ deadly force.

8.5.8. Members shall not use poor tactics or positioning as justification for shooting at or from a moving vehicle.

8.5.9. Members are prohibited from entering an occupied vehicle that is readily capable of being driven (i.e., engine running or keys in the ignition) without substantial justification.

8.6. Members shall refer to Directives 1020.00, Weapons Administration, and 1021.00, Weapons Qualifications, for additional guidelines regarding the issuance, qualification requirements, and secure storage of Bureau-issued weapons.

## 9. Post-force Medical Requirements.

9.1. Members shall summon medical services at the earliest available opportunity when a subject is injured, complains of injury following any use of force, or is a person in a prohibited category (i.e., children under the age of fifteen; an individual who is known to be, or is obviously pregnant; a person who is known to be, or is obviously medically fragile) who sustains Category I through III force (See Section 10). If an individual refuses medical evaluation, the refusal must be documented in an appropriate report. Members shall refer to Directive 630.45, Emergency Medical Custody Transports, for additional guidance.

9.2. When safe to do so, members shall render emergency first aid within the limits of their individual skills, training and available equipment until professional medical care providers arrive on the scene.

9.3. The member shall continually monitor the person for changes in skin or lip color, breathing and levels of consciousness. If the individual's condition deteriorates, the member shall immediately notify Emergency Medical Services (EMS).

9.4. Members shall provide known and reasonably necessary information to facilitate the injured person's transport to a medical facility for additional treatment if recommended by EMS. Refer to Directive 630.45, Emergency Medical Custody Transports, for additional guidance on transporting injured subjects.

9.5. When transporting a person from hospital treatment to a correctional facility, members shall notify a corrections staff member of the extent of the person's injuries and medical treatment given, and provide the corrections staff with the person's medical release forms from the medical facility.

9.6. If a person complains of or appears to be experiencing respiratory distress (e.g., positional asphyxia), members shall perform the following as soon as practical:

9.6.1. If a member's body weight is impeding a subject's breathing, the member shall remove their body weight.

9.6.2. Summon EMS.

9.6.3. Check and continue to monitor the person's breathing and pulse until EMS arrives.

9.6.4. If medically appropriate, place the person in a seated position or position the person on their side to facilitate breathing.

9.7. Members shall follow protocols developed by the Bureau, in conjunction with medical professionals, on their responsibilities following CEW use.  Conditions requiring medical treatment after deployment:

9.7.1. When a CEW is deployed in probe mode:

9.7.1.1. If the probes are embedded in the skin, Portland Fire and Rescue shall be summoned to remove the probes and provide medical treatment, if necessary.  If the CEW is deployed outside of Portland Fire and Rescue's response area and medical treatment is mandated by this Directive or other injury, the fire department or EMS with jurisdiction shall be summoned.

9.7.1.2. Portland Fire and Rescue shall be the first responder to CEW deployments that require only the removal of probes and no other medical treatment, other than removal and treatment of the wound caused by the CEW probes.  To ensure a response from Portland Fire and Rescue only, members must advise the Bureau of Emergency Communications that Portland Fire and Rescue is needed to remove the CEW probes.

9.7.2. When the CEW is deployed on a person in drive stun mode and no probes are deployed, EMS is not required on the scene, unless medical treatment is otherwise necessary.

9.7.2.1. Members shall summon EMS if the CEW is deployed in drive stun mode on a person in a prohibited category (i.e., children under the age of fifteen; an individual who is known to be, or is obviously pregnant; a person who is known to be, or is obviously medically fragile).

9.8. When any force is used on a person suffering or perceived to be suffering from excited delirium (before, during or after the application of force), members shall summon EMS to the scene.  Members shall ensure the subject is examined at the scene.  If in custody and EMS recommends transport, the subject will be transported to the hospital.  If not in custody, and EMS declares the individual mentally competent, the individual can refuse treatment and transport.

**10. Categories of Review.**

10.1. Reporting and investigating requirements are determined by the type of force deployed, injury sustained, and/or complaint of injury. A supervisor who receives notification of a use of force shall respond to the scene to determine the appropriate level of investigation pursuant to the categories listed below. If the force used does not clearly align with any of the categories, the on-scene Sergeant's immediate supervisor shall determine the degree of the investigation.

10.2. Category I: The application of deadly force, an in-custody death, and death that occurs as a result of member(s)' use of force.
10.2.1. Category I force includes, but is not limited to:

10.2.1.1. All critical firearm discharges by a member, except as authorized to stop an aggressive animal or end the suffering of a badly injured animal.

10.2.1.2. In-custody deaths;

10.2.1.3. Death as a result of member(s)' use of force;

10.2.1.4. Carotid neck holds; and

10.2.1.5. All intentional head, neck, and throat strikes with a hard object or when a member strikes the head of a subject against a hard object.

10.2.2. Category I Review.

10.2.2.1. The level of investigative response for Category I Force is governed by Directive, 1010.10, Deadly Force and In-Custody Death Reporting and Investigation Procedures.

10.3. Category II: Other than deadly force, force resulting in hospital treatment or admission; force that is reasonably likely to cause enduring: pain, physical injury, disability or impairment of any body part, but does not result in death.
10.3.1. Category II force includes, but is not limited to:

10.3.1.1. All uses of force by a member resulting in a significant injury, including a broken bone, an injury requiring hospital treatment, or an injury deemed to be serious by a member's supervisor;

10.3.1.2. Any uses of force by a member on a subject that require hospital admission due to the force applied by a member;

10.3.1.3. More than one simultaneous intentional CEW application on a subject at a time;

10.3.1.4. Three or more CEW applications to the same person;

10.3.1.5. CEW deployments on individuals who have an actual or perceived mental illness, or who are in mental health crisis;

10.3.1.6. All launched impact munitions with contact;

10.3.1.7. Impact weapon, with injury requiring hospital treatment;

10.3.1.8. Firearm discharges to stop an aggressive animal;

10.3.1.9. Canine bites;

10.3.1.10. Takedown that causes injury requiring hospital treatment;

10.3.1.11. Riot control agents and/or area impact munitions;

10.3.1.12. Force used upon restricted persons (i.e., children under the age of fifteen, pregnant individuals, medically fragile);

10.3.1.13. Force resulting in a loss of consciousness;

10.3.1.14. Any strike, blow, kick or similar use of force against a handcuffed, otherwise restrained, under control, or in-custody subject, with or without injury; and

10.3.1.15. Ramming as a vehicle intervention strategy.

10.3.2. Category II Review.
10.3.2.1. For all force resulting in hospital admission, supervisors shall notify the Detective Division of the incident, and a detective shall respond to assist in the investigation of the use of force.  The involved member's supervisor shall complete the use of force After Action report.
10.3.2.2. For all force involving more than one simultaneous intentional CEW application on a subject, supervisors shall notify the Detective Division of the incident, and a detective may respond to assist in the investigation of the use of force.  The involved member's supervisor shall complete the use of force After Action report.
10.3.2.3. The use of force After Action report shall be reviewed through the chain of command, up to and including the Assistant Chief.
10.4. Category III: Force that is reasonably likely to cause non-enduring: pain, disorientation, physical injury, or the complaint of pain.
10.4.1. Category III force includes, but is not limited to:

10.4.1.1. CEW deployment of one (1) or two (2) applications;

10.4.1.2. CEW deployment regardless of successful application or member intent;

10.4.1.3. Use of aerosol restraints;

10.4.1.4. Chemical agents used by SERT;

10.4.1.5. Use of impact weapon, without injury;

10.4.1.6. Physical injury or complaint of injury;

10.4.1.7. Complaint of improper force;

10.4.1.8. Launched impact munitions, without contact;

10.4.1.9. Takedown;

10.4.1.10. Strikes with the hands or feet; and

10.4.1.11. PIT maneuver as a vehicle intervention strategy.

10.4.2. Category III Review.

10.4.2.1. The use of force After Action report shall be reviewed through the chain of command, up to and including the RU Manager.

10.5. Category IV:  Force that is intended to establish control of a resistant subject, though not intended or reasonably likely to cause persistent pain or physical injury.

10.5.1. Category IV force includes, but is not limited to:

10.5.1.1. Non-striking use of baton;

10.5.1.2. Takedown performed in a completely controlled manner where there is minimal resistance and no injury;

10.5.1.3. Handcuffing against resistance or control against resistance;

10.5.1.4. Pointing of a firearm;

10.5.1.5. Use of hobble restraint;

10.5.1.6. Use of a less lethal weapon to stop a vicious or aggressive animal;

10.5.1.7. Firearm discharges to end the suffering of a badly injured animal; and

10.5.1.8. Boxing In maneuver as a vehicle intervention strategy.

10.5.2. Category IV Review.

10.5.2.1. The use of force After Action report shall be reviewed through the chain of command, up to and including the Sergeant's immediate supervisor.

10.6. Additional Considerations.

10.6.1. Supervisors have the discretion to elevate the category of any force investigation.

10.6.2. When multiple force options are used during an incident, the investigation shall be conducted at the highest applicable category.

10.6.3. If the force used does not clearly align with any of the categories, the on-scene Sergeant's immediate supervisor shall determine the degree of the investigation.

10.6.4. An on-scene supervisor who reasonably believes that a use of force involves significant misconduct by a member shall immediately notify their immediate supervisor and PSD.  The on-call PSD Lieutenant shall determine the degree of investigation required.

10.6.5. Force incidents that involve a vehicle may be classified under any category of force; the appropriate category will be determined by a member's supervisor and will depend on the totality of the circumstances.  Refer to Directive 630.05, Vehicle Interventions and Pursuits, for additional guidance.

10.6.6. Specialty units, such as the Special Emergency Response Team (SERT), Rapid Response Team (RRT) or others, are not exempt from use of force reporting procedures, as defined in this directive.

## 11. Reporting

11.1. Member Reporting of Force.

11.1.1. Members shall immediately notify a supervisor regarding any use of force, or any negligent or unintentional discharge of a less lethal weapon.

11.1.2. All members will notify a supervisor as soon as practical when a complaint of improper force, a complaint of physical injury, or actual injury to a subject in custody as defined within this Directive occurs or they become aware of the same.

11.1.3. All members involved in a Category II through IV use of force shall provide a candid and detailed verbal account of the event at the scene.

11.1.4. All members involved in a Category II through IV use of force shall submit use of force reports in a timely manner, which include a candid and detailed account of the event, to facilitate a thorough review of the incident in question by supervisory members.  Involved members shall submit use of force reports prior to the conclusion of the shift, unless incapacitated.  Involved members shall report all uses of force whether or not the subject is struck or affected by any weapon.

11.1.4.1. Members who use force in any police action while off duty shall comply with the reporting requirements of this section.

11.1.5. Members involved in a Category I use of force shall refer to Directive 1010.10, Deadly Force and In-Custody Death Reporting and Investigation Procedures, for reporting and investigation requirements for deadly force incidents.

11.1.6. All members who witness any use of force shall provide a candid and detailed verbal account of the event at the scene.  Members who witness a Category I through III use of force shall also submit appropriate reports in a timely manner, which include a candid and detailed account of the event, to facilitate a thorough review of the incident in question by supervisory members.  Witness members shall submit reports prior to the conclusion of the shift, unless incapacitated.  Witness members shall report all uses of force whether or not the subject is struck or affected by any weapon.

11.1.7. Reports shall demonstrate that the member(s) made diligent efforts to locate witnesses and explain when circumstances prevented them from doing so or obtaining contact information.  Reports shall also include all available identifying information for anyone who refuses to provide a statement.

11.1.8. All reports related to use of force shall follow Directive 900.00, General Reporting Guidelines, regarding formatting, timeliness of completion, and submission.

11.1.9. In addition to those guidelines, regardless of force category or type, involved members shall also include a description of the following in their use of force reports:

11.1.9.1. The reason for the initial police presence.

11.1.9.2. The unique characteristics of the event.

11.1.9.3. Whether the individual or subject was known by the member to be mentally ill or in mental health crisis.  If mental illness was present, members shall describe how they took that into account and how it impacted their decision making.

11.1.9.4. A description of the decision-making at each significant point leading up to and during the event.

11.1.9.5. The force used, to include descriptive information regarding the use of any weapon.

11.1.9.6. Any observable injury to the subject, any complaint of injury or the absence of injury, including information regarding any medical aid or on-scene medical evaluation provided or refused by the subject, when applicable.

11.1.9.7. The level of resistance encountered by each officer that led to each separate use of force and, if applicable, any injuries to the subject(s) or member(s).

11.1.9.8. What, if any, de-escalation techniques were used and whether or not they were effective.  If not used, the member shall provide justification as to how time and circumstances did not reasonably permit the member to utilize de-escalation techniques.

11.1.9.9. Members shall include all relevant considerations found within this, and other appropriate, directives in their reports.

11.1.10. For force Categories I through III, members shall provide a narrative account of the force they observed another member apply.

11.1.10.1. Members shall immediately notify an on-duty supervisor of any use of force by another member that violates the constitutional standard as soon as safe to do so.

11.2. Additional Reporting Guidelines for Less Lethal Weapon & Munition Use.

11.2.1. The member shall complete and submit a use of force report documenting the incident.  The use of force report shall contain:

11.2.1.1. The specific circumstances that led to the discharge of the weapon.

11.2.1.2. The name of the supervisor who was verbally notified, as well as the name of the responding supervisor, if different.

11.2.1.3. A description of the warning given.  If no warning was given, members shall state why.

11.2.2. If the member who discharged the weapon is injured and unable to submit a use of force report, the reporting requirement for involved members can be delayed until the member is capable of completing the report.  The member shall, in a timely manner, provide their supervisor with a Work Status Report which identifies any restrictions or limitations on the member until a specified date.

11.2.3. Reporting of CEW Use.

11.2.3.1. The report shall document:

11.2.3.1.1. The specific circumstances leading to the use of the CEW.

11.2.3.1.2. All warnings given to members and the subject.  If no warnings were given, members shall document their justification for not issuing a warning.

11.2.3.1.3. The distance from which the CEW was used.

11.2.3.1.4. The location on the subject's body of the probe strike and the impact points.

11.2.3.1.5. The serial numbers of all cartridges expended.

11.2.3.1.6. The serial number of the CEW used.

11.2.3.1.7. The name of the member designated as immediate cover, if applicable or present.

11.2.3.1.8. The name of the supervisor who was verbally notified as well as the responding supervisor, if different.

11.2.3.1.9. Whether EMS responded and the results of any medical evaluation, if applicable.  If EMS was not summoned, the member shall provide a justification.

11.2.3.1.10. Any evidence or complaints of injury or illness by the subject.

11.2.4. Reporting of Canine Use.

11.2.4.1. Canine handlers shall also complete a use of force report for all bites.

11.2.4.2. Canine unit supervisors shall complete an After Action report for all directed and unintentional canine bites through channels to the appropriate Assistant Chief.

## 12. Supervisor Reporting and Investigation.

12.1. A supervisor who receives notification of a use of force shall respond to the scene unless extraordinary circumstances exist.  In rare circumstances, safety or other practicality reasons may prevent a supervisor from responding directly to the scene, and instead necessitate that the supervisor respond to a proximate location.

12.2. Where necessary, the supervisor shall ensure that the subject upon whom force was used receives medical attention from an appropriate medical provider.

12.3. The supervisor shall conduct an administrative review and a thorough investigation of the use of force, consistent with this policy, gathering applicable evidence described in Section 13.4. of this policy.

12.3.1. If a supervisor is involved in the use of force, they shall contact another supervisor to conduct the administrative review of the incident.

12.4. Supervisors shall personally speak to the involved member and make an inquiry sufficient to determine the nature of the event and the member's justification for the use of force.

12.5. Supervisors shall personally speak to the witness member(s) and make an inquiry sufficient to describe the nature of the force.

12.6. Supervisors shall interview members and witnesses individually and not in groups.

12.7. Supervisors shall make diligent efforts to document witness observations.

12.8. Supervisors shall immediately notify the shift supervisor and PSD regarding any use of force that could appear, to a reasonable supervisor, to violate the Constitutional Force standard; all members' Serious Use of Force; any use of force against persons who have actual or perceived mental illness; or any suspected significant member misconduct.

12.9. In the event that the supervisor suspects possible criminal conduct, the supervisor shall notify their shift supervisor, the on-call PSD Lieutenant, the branch Assistant Chief, and the Bureau's Detective Division.

## 13. Force After Action Reports.

13.1. For Category II-IV force incidents, the supervisor shall document the findings of the review and investigation in an After Action report, and forward the report through the chain of command.

13.2. The After Action report form serves as a checklist to ensure that supervisors carry out force investigation responsibilities.  The Inspector, or Chief's designee, shall review the form for adequacy and relevance, at least annually, and revise as needed.

13.3. For Category II-IV force incidents, supervisors shall complete an After Action report within 72 hours of the use of force.

13.4. All force After Action reports or, in use of deadly force incidents, the investigator's report shall contain a detailed description and comprehensive account of the force.  The report(s) shall include:

13.4.1. Summary: a short one or two paragraph narrative that describes the significant facts of the event.

13.4.2. Involved Member statement: a narrative that describes the use of force.

13.4.3. Investigation: a description of what actions supervisors took and directions they gave on scene.

13.4.4. Discussion of force: a description of the nature of the force and the member's justification for the use of force.

13.4.5. Injuries: a description and photographs of the presence or absence of injuries to the subject or Bureau member involved in the use of force and if any medical treatment was administered, and by whom.

13.4.6. Subject statement: supervisors shall make an attempt to obtain a statement from the subject detailing the event and any injuries.

13.4.7. Witness Member statement:  supervisors shall obtain a statement from the witness member(s) detailing their observation of the event.

13.4.8. Non-member witness statements: supervisors shall make an attempt to locate witnesses to the event and obtain and document complete statements.  If any information from the witness statements needs to be documented in a criminal report, the supervisor shall ensure that the witness statements are documented in the appropriate report.  Supervisors shall document circumstances that prevent them from identifying witnesses or obtaining contact information.  Reports shall include all available identifying information for anyone who refuses to provide a witness statement.

13.4.9. Physical evidence: supervisors shall ensure that the administrative review includes collecting any physical or photographic/video evidence that may assist other reviewers in the chain of command in understanding the scene and event.

13.4.10. Critique Findings and Recommendations: the critique of findings and recommendations shall contain a thorough analysis of the incident.  It shall address any applicable directives, whether or not members complied with such directives and any recommendations or actions

taken to address issues encountered on-scene or during the reporting process.  Supervisors may also modify findings as appropriate and document modifications.

13.4.10.1. The authoring supervisor shall:

13.4.10.1.1. Review all use of force reports to ensure that they include information required per Bureau policy;

13.4.10.1.2. Evaluate the weight of the evidence;

13.4.10.1.3. Use a decision-point approach to analyze each use of force;

13.4.10.1.4. Determine whether the member's actions appear consistent with Bureau policy;

13.4.10.1.5. Determine whether there was legal justification for the original stop and/or detention;

13.4.10.1.6. Implement corrective action whenever there are material omissions or inaccuracies in the members' use of force reports, and for failing to report a use of force, whether applied or observed; and

13.4.10.1.7. Document any non-disciplinary corrective action, training deficiencies, policy deficiencies or poor tactical decisions and ensure that they discuss poor tactical decisions with the member and that the discussion is documented in the Employee Information System (EIS).

13.4.10.2. Supervisors in the chain of command review shall:

13.4.10.2.1. Ensure the authoring supervisor met all the requirements of 13.4.10.;

13.4.10.2.2. Review after action report findings using a preponderance of the evidence standard;

13.4.10.2.3. Review after action reports to ensure completeness and order additional investigation, when necessary;

13.4.10.2.4. Assess the incident for tactical and training implications, including whether the use of force may have been avoided through the use of de-escalation techniques or less force options;

13.4.10.2.5. Modify findings as appropriate and document modifications;

13.4.10.2.6. Order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings and counsel the investigator;

13.4.10.2.7. Implement corrective action whenever there are material omissions or inaccuracies in the members' use of force reports, and for failing to report a use of force, whether applied or observed;

13.4.10.2.8. Document any non-disciplinary corrective action, training deficiencies, policy deficiencies or poor tactical decisions and ensure that the authoring supervisor discusses poor tactical decisions with the member and that the discussion is documented in EIS;

13.4.10.2.9. Suspend an investigation immediately and notify the branch Assistant Chief, the on-call PSD Lieutenant and the Detectives Division whenever the investigation supervisor, shift commander or Division commander finds evidence of apparent criminal conduct by a member; and

13.4.10.2.10. Report a matter to the on-call PSD Lieutenant for review and investigation whenever an investigating supervisor, shift commander or precinct commander finds evidence of significant misconduct by a member or employee.

13.4.10.3. The use of force After Action report shall be completed through the RU within twenty-one days of the event.

13.5. If a supervisor determines that there were performance deficiencies not rising to the level of misconduct, supervisors shall determine whether additional training or counseling is warranted. The Bureau shall provide such counseling or training, consistent with Bureau policies.

13.6. Supervisors shall ensure that EIS tracks all comments, findings, and corrections related to the After Action Reports. Members shall refer to Directive 345.00, Employee Information System (EIS), for additional guidelines.

13.7. All supervisors in the chain of command shall be held accountable for inadequate reports and analysis. As a result, all supervisors shall be subject to corrective action or discipline for the accuracy and completeness of After Action reports completed by other supervisors under their command. Corrective or disciplinary action may include training, demotion, and/or removal from a supervisory position, based on repeated deficient after action reviews at any level of command.

13.8. When, after investigation, a use of force is found to violate policy, the Bureau shall ensure that investigative findings regarding member misconduct are adequately addressed and that appropriate corrective action is taken fairly and expeditiously to resolve the issue.

13.9. Where the use of force indicates policy, training, tactical or equipment concerns, the immediate supervisor shall notify, through channels, the Inspector and the Chief, who shall ensure that the Bureau timely conducts necessary training and/or resolves the policy, tactical or equipment concern.

13.10. The Chief, or designee, and the PSD have the discretion to reassign a use of force investigation to the Detective Division or any Bureau supervisor, thereby taking it out of the after action chain of command as described.

13.11. The Inspector's Office shall routinely audit force-related After Actions and the associated reports. The Chief, or a designee, shall refer to the Inspector's audits to identify trends related to deficient reporting and investigations or problematic use of force patterns. The Chief, or a designee, shall take appropriate corrective action throughout the chain of command when use of force reports, force investigations conducted by supervisors, force-related After Action reports and Command reviews are not completed in accordance with Bureau policy and practices.

13.12. The RU Manager shall ensure that the narrative section of the use of force After Action report is forwarded to the Multnomah County District Attorney's Office in a timely fashion.

13.13. Additional Supervisor Reporting Responsibilities.

13.13.1. An on-duty supervisor shall respond to the scene of all negligent or unintentional discharges of a firearm and notify the Detective Division, which will assume investigative responsibility, except at Bureau authorized training events, where no injury occurs. At training events, as long as no injury occurs, the Training Division shall have responsibility for investigating and reporting the negligent discharge.

13.13.2. An on-duty supervisor shall investigate all negligent or unintentional discharges of less lethal weapons and document the incident in an after action report.

13.13.2.1. Supervisors shall investigate negligent or unintentional discharges of less lethal weapons that strike another person in the same manner as a use of force.
**History:**
- Originating Directive Date: 01/01/14
- Last Revision Signed: 12/20/19
      - Effective Date: 01/19/20
- Next Review Date: 01/19/21