J. SCOTT MOEDE, OSB 934816
Chief Deputy City Attorney
scott.moede@portlandoregon.gov
NAOMI SHEFFIELD, OSB 170601
Deputy City Attorney
naomi.sheffield@portlandoregon.gov
ROBERT YAMACHIKA, OSB 065560
Senior Deputy City Attorney
rob.yamachika@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR  97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendant City of Portland*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

DON'T SHOOT PORTLAND, a nonprofit corporation, in its individual capacity, NICHOLAS J. ROBERTS, in an individual capacity and on behalf of themselves and all others similarly situated, MICHELLE "MISHA" BELDEN, in an individual capacity and on behalf of themselves and all others similarly situated, ALEXANDRA JOHNSON, in an individual capacity and on behalf of themselves and all others similarly situated,

**PLAINTIFFS,**

v.

CITY OF PORTLAND, a municipal corporation**,** and MULTNOMAH COUNTY, a political subdivision of the State,

**DEFENDANTS.**

Case No. 3:20-cv-00917-HZ

DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Page i –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## Table of Contents

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND .................................................................................1

        A.      Less lethal munitions used by PPB rapid response team. ..........................2

        B.      PPB's Policy Regarding Use of Riot Control Agents and Federal Oversight .........3

                1.      Tear Gas and RBDDs.......................................................................3

                2.      Impact Munitions .............................................................................5

                3.      Aerosol Restraints ...........................................................................6

        C.      Protests Beginning May 29, 2020 to June 20, 2020 .................................7

                1.      May 29, 2020-May 30, 2020............................................................8

                2.      May 30, 2020-May 31, 2020............................................................9

                3.      May 31, 2020-June 1, 2020............................................................11

                4.      June 1, 2020 ...................................................................................14

                5.      June 2, 2020 ...................................................................................14

                6.      June 15, 2020 .................................................................................16

                7.      June 25, 2020-June 26, 2020..........................................................18

                8.      June 26, 2020-June 27, 2020..........................................................19

                9.      June 27, 2020 .................................................................................20

III.    PLAINTIFFS CANNOT MEET THE TEST FOR A PRELIMINARY INJUNCTION...21

        A.      Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits. ...............22

                1.      Defendant does not have a practice or custom of violating protestors'
                        Fourth Amendment Rights...............................................................23

                2.      PPB has acted with the intent to promote, not limit, First Amendment
                        expression. ....................................................................................28

        B.      Plaintiffs Will Not Be Irreparably Harmed Without a Preliminary Injunction. ....31

        C.      Plaintiffs Have Not Established and Cannot Establish that the Balance of
                Equities Weighs in Their Favor or that a TRO is in the Public Interest. ..............32

        D.      If This Court Considers a Preliminary Injunction, Plaintiffs' Proposal is Too
                Restrictive. .............................................................................................34

IV.     CONCLUSION....................................................................................................34

Page i –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
            FOR PRELIMINARY INJUNCTION

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

# Table of Authorities

Page(s)

Federal Cases

*AE ex rel. Hernandez v. Cty. of Tulare*,
   666 F.3d 631 (9th Cir. 2012) ........................................................................................ 22

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ...................................................................................... 21

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
   824 F.3d 858 (9th Cir. 2016) ........................................................................................ 28

*Arpin v. Santa Clara Valley Transp. Agency*,
   261 F3d. 912 (9th Cir. 2001) ........................................................................................ 24

*Barnett v. BAC Home Loan Servicing, L.P.*,
   772 F. Supp. 2d 1328 (D. Or. 2011) ............................................................................ 21

*Barney v. City of Eugene*,
   20 F. App'x 683 (9th Cir. 2001) ................................................................................... 27

*Bernini v. City of St. Paul*,
   665 F.3d 997 (8th Cir. 2012) ........................................................................................ 24

*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993) ...................................................................................................... 25

*Campbell v. City of Oakland*,
   2011 WL 5576921 (N.D. Cal. Nov. 16, 2011) ............................................................ 22

*Cantwell v. Connecticut*,
   310 U.S. 296 (1940) ...................................................................................................... 23

*Caribbean Marine Servs. Co. v. Baldrige*,
   844 F.2d 668 (9th Cir. 1988) ........................................................................................ 22

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ........................................................................................................ 31

*Cohen v. California*,
   403 U.S. 15 (1971) ........................................................................................................ 28

*Dougherty v. City of Covina*,
   654 F.3d 892 (9th Cir. 2011) ........................................................................................ 22

*Felarca v. Birgeneau*,
   891 F.3d 809 (9th Cir. 2018) ............................................................................. 23, 24, 25

*Fogarty v. Gallegos*,
   523 F.3d 1147 (10th Cir. 2008) .................................................................................... 26

*Forrester v. City of San Diego*,
   25 F.3d 804 (9th Cir. 1994) .................................................................................... 24, 26

*Graham v. Connor*,
   490 U.S. 386 (1989) ................................................................................................ 23, 24

*Grayson v. County of Marin*,
   2015 WL 2452808 (N.D. Calif. May 21, 2015) .......................................................... 31

Page ii –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
             FOR PRELIMINARY INJUNCTION

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

*Hadley v. City of Beaverton,*
  2010 WL 1257609 (D. Or. 2010)..........................................................23

*Headwaters Forest Def. v. Cty. of Humboldt,*
  276 F.3d 1125 (9th Cir. 2002) ...........................................................26

*Hodgers-Durgin v. de la Vino,*
  199 F.3d 1037 (9th Cir. 1999) ...........................................................31

*Jackson v. City of Bremerton,*
  268 F.3d 646 (9th Cir. 2001) .............................................................24

*Johnson v. City of Berkeley,*
  2016 WL 928723 (N.D. Cal. Mar. 11, 2016)......................................30

*Jurkowski v. City of Seattle,*
  2017 WL 4472859 (W.D. Wash. 2017)..........................................24, 27

*Keating v. City of Miami,*
  598 F.3d 753 (11th Cir. 2010) ...........................................................30

*Klein v. City of San Clemente,*
  584 F.3d 1196 (9th Cir. 2009) ...........................................................22

*Lalonde v. Cty. of Riverside,*
  204 F.3d 947 (9th Cir. 2000) .............................................................26

*Marbet v. City of Portland,*
  2003 WL 23540258 (D. Or. Sept. 8, 2003) .......................................26

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997).............................................................21, 22, 31

*McCarthy v. Barrett,*
  804 F. Supp. 2d 1126 (W.D. Wash. 2011).........................................30

*Mendocino Envtl. Ctr. v. Mendocino Cty.,*
  192 F.3d 1283 (9th Cir. 1999) ...........................................................28

*Molokai Veterans Caring for Veterans v. Cty. of Maui,*
  2011 WL 1637330 (D. Haw. Apr. 28, 2011).......................................29

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
  429 U.S. 274 (1977)............................................................................29

*Multi-Ethnic Immigrant Workers Org. Network v. City of L.A.,*
  246 F.R.D. 621 (C.D. Cal. 2007)........................................................30

*Nelson v. City of Davis,*
  685 F.3d 867 (9th Cir. 2012) ....................................................23, 26, 27

*Schmidt v. Lessard,*
  414 U.S. 473 (1974)............................................................................34

*Sierra Forest Legacy v. Rey,*
  577 F.3d 1015 (9th Cir. 2009) ...........................................................21

*Soranno's Gasco, Inc. v. Morgan,*
  874 F.2d 1310 (9th Cir. 1989) ...........................................................29

*Sternberg v. Town of Danville,*
  2015 WL 9024340 (N.D. Cal. Dec. 16, 2015).....................................22

*Tennessee v. Garner,*
  471 U.S. 1 (1985)................................................................................23

Page iii –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
              FOR PRELIMINARY INJUNCTION

*Webb v. Sloan*,
    330 F.3d 1158 (9th Cir. 2003) ........................................................... 22

*Winter v. Natural Res. Def. Council*,
    555 U.S. 7 (2008) ........................................................... 21, 22, 32

State Cases

*City of Portland v. Hemstreet*,
    119 Or App 239 (1993) ........................................................... 23

Federal Rules

Fed. R. Civ. P. 65(d)(1) ........................................................... 34
Ninth Circuit Rule 36-3 ........................................................... 27

Other Authorities

HB 4208 ........................................................... 5, 6, 31

Page iv –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
            FOR PRELIMINARY INJUNCTION

## I.    INTRODUCTION

There have been over thirty-five straight days and nights of protests in Portland. Thousands of people have turned up to have their voices heard and ensure that much needed changes are made in policing. The City and the Portland Police Bureau ("PPB") have encouraged and supported these protests. A much smaller number of people have shown up to break windows, spray paint businesses, light fires, throw items at police, barricade police inside buildings, and launch fireworks at police and buildings—they have shown up to riot. PPB officers have the unenviable task of ensuring that peaceful protestors have a full and free opportunity to exercise their constitutional rights, while preventing rioters from injuring people and doing significant damage to property. Over the last month, this obligation has subjected PPB officers have been subjected to a nightly barrage of rocks, fireworks, glass bottles, water bottles, knives, and full cans of food, resulting in head injuries, burns, and cuts.

This case is not about the thousands of people peacefully protesting. It is also not about hateful words or anti-police protests. The City and PPB support protestors' expression; regardless of content. This case is about the ability of PPB to respond to a nightly deluge of dangerous objects thrown and launched at them and at occupied buildings, nightly fires, and widespread criminal activity.

Plaintiffs have not met their burden of demonstrating a likelihood of success on the merits, irreparable harm, that the balance of hardships weighs in their favor, or that an injunction would be in the public interest. For these reasons, the Court should deny the plaintiffs' request for a preliminary injunction.

## II.    FACTUAL BACKGROUND

Plaintiffs allege that "[a]t first, PPB used chemical agents ("tear gas") unchecked against crowds of protestors," but following issuance of the temporary restraining order related to tear gas, "PPB changed tactics . . . and . . . now use a variety of so-called less lethal weapons

Page 1 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

indiscriminately against plaintiffs." (Plaintiff's Second Amended Complaint, Dkt. 38, ¶ 1). The City responds to these allegations, and the contentions of plaintiffs' declarants. The City supplements the factual record set forth in its previous filings. (Dkts. 18-21).

    A.    <u>Less lethal munitions used by PPB rapid response team.</u>

PPB's rapid response team ("RRT") are officers specially trained in responding to large crowd management and crowd control events. Each rapid response team squad has a squad leader, an assistant squad leader, and three additional officers who are trained in the use of less lethal munitions. These less lethal munitions include:

- **Hand-tossed or launched canisters containing CS or OC:** Trained officers may carry 2-chlorobenzalmalononitrile "CS gas," Oleoresin Capsicum Pyrotechnic "OC pyrotechnic," OC vapor, and rubber ball distraction devices ("RBDDs") containing OC. ((Declaration of Franz Schoening ("Schoening Decl."), Dkt. 18, ¶¶ 4-5)).[1] For this brief, these are collectively referred to as "tear gas."

- **Rubber ball distraction devices:** Trained officers may carry three types of rubber ball distraction devices. "Inert" RBDDs deliver a blast of light and sound, but do not project either rubber balls or OC. "Live" RBDDs deliver a blast of light and sound and project approximately 180 rubber balls (approximately .81 cm each) in an approximately 50-foot radius from the location of the explosion. OC RBDDs deliver a blast of light and sound and also project a cloud of OC.

- **Direct impact munitions:** Trained officers may carry an FN303 less lethal launcher and a 40MM less lethal launcher.
  - The 40MM less lethal launcher may be used to launch tear gas. It is more commonly used to launch foam-tipped impact projectiles, marking rounds

---

[1] Tear gas colloquially refers to chloroacetophenone (CN gas), which Portland Police Bureau ("PPB") does not utilize, and CS gas.

Page 2 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

containing paint or powder, or OC rounds.

o  The FN303 less lethal launcher launches a fin stabilized projectile with bismuth (nontoxic) powder in the nose and a payload in the rear, which can be paint, powder marking, training or OC.

- **Handheld OC:** Commonly referred to as pepper spray, this is a hand-held canister that delivers short, target-specific bursts of concentrated OC.

(Schoening Decl., Dkt. 18, ¶¶ 4-5).

Riot control agents and area impact munitions, such as tear gas and RBDDs, are a valuable non-lethal and minimally injurious "area denial" tool that can be deployed from a distance. (*Id*. at ¶ 18). This minimizes the risk of injury to both demonstrators and officers. (*Id*.). Without these tools, law enforcement's ability to disburse an unlawful assembly would require more significant physical force. (*Id*.).

B.    PPB's Policy Regarding Use of Riot Control Agents and Federal Oversight

The Portland Police Bureau has directives that specify the requirements for the use of riot control agents during crowd control and crowd management. The policies relating to use of force in crowd management and crowd control situations are captured in PPB Directive 635.10 ("Crowd Management/Crowd Control Directive") and PPB Directive 1010.00 ("Use of Force Directive"). Both of these policies are subject to review and oversight by the United States Department of Justice in connection with the 2012 Settlement Agreement between the City and the United States. *United States v. City of Portland*, 3:12-cv-02265-SI, Dkt. 4-1 (Dec. 17, 2012).

1.    Tear Gas and RBDDs.

Tear Gas and RBDDs are riot control agents or area impact munitions, both governed by PPB Directive 1010.00, § 6.4.6:

6.4.6.1. Authorized Uses in Crowd Control.

6.4.6.1.1. Under the direction of the Crowd Management Incident Commander (CMIC), to disperse a crowd, when a demonstration

Page 3 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

or event becomes a civil disturbance, as defined in Directive 635.10, Crowd Management/Crowd Control.

6.4.6.1.2. To stop or disrupt a group of individuals committing a crime or about to commit a crime, when other more discriminate methods are not feasible or reasonable, and uninvolved parties are unlikely to be subjected to the use of force.

6.4.6.1.3. When a person(s) engages in physical resistance or indicates the intent to engage in physical resistance.

6.4.6.1.4. In exigent circumstances to defend the member or others from physical injury when other, more discriminate methods of applying force are not feasible and uninvolved parties are unlikely to be subjected to the use of force.

6.4.6.2. Restricted Use.

6.4.6.2.1. Members shall not use RCAs or area impact munitions on a crowd engaged in passive resistance that does not impede a lawful objective.

6.4.6.2.2. Members shall not deploy RCAs or area impact munitions to disperse a crowd when avenues of escape are unavailable to the crowd.

Directive 635.10 similarly contemplates the use of tear gas and RBDDs in very limited circumstances:

9.1. Pursuant to ORS §131.675, the IC may order the crowd dispersed when a demonstration or special event becomes a civil disturbance.

9.1.1. Before giving the order to disperse, the IC must consider whether dispersal unduly endangers the public, police or participants in the crowd.

9.1.2. Prior to taking police action to disperse the crowd, and when tactically feasible and time reasonably permits, members shall issue a minimum of two warnings at reasonable intervals to allow the crowd to comply.

9.2. When the crowd has been ordered to disperse and does not heed repeated warnings, and no reasonable alternative is apparent, riot control agents (RCAs) and/or special impact munitions may be deployed to prevent violence, injury or property damage and to avoid a greater application of force.

9.2.1. These weapons shall only be used at the direction of the

Page 4 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

CMIC and when avenues of escape (i.e., clear path or route) are available to the crowd.  Pursuant to this policy and Directive 1010.00, Use of Force, members must issue warnings prior to deployment.

9.3. Force shall only be used in accordance with Directive 1010.00, Use of Force.

Police Commissioner, Mayor Ted Wheeler, additionally imposed even greater limitations on the use of CS gas, directing PPB that "gas should not be used unless there is a serious and immediate threat to life safety, and there is no other viable alternative for dispersal." (Dobson Decl., Dkt. 19, ¶ 16). Mayor Wheeler instructed that "gas should not be used to disperse crowds of non-violent protestors or for general crowd management purposes. It should only be used in response to violence that threatens life safety." (*Id*.). Further, Oregon House Bill 4208, signed by Governor Brown on June 30, 2020, additionally restricts the use of tear gas ("HB 4208"). HB 4208 limits OC, CS, and "other similar chemicals meant to accomplish the same effect." HB 4208, 80th Leg. Assembly, 2020 Spec. Sess. (Or. 2020). It applies when those chemicals are "administered by any shell, cartridge or bomb capable of being discharged or exploded, when the discharge or explosion will cause or permit the release or emission of the chemicals." (*Id*). HB 4208 prohibits the use of tear gas for crowd control except "in circumstances constituting a riot, as described in ORS 166.015." HB 4208 further requires announcements and an opportunity for individuals to evacuate the area.

2.    Impact Munitions

PPB Directive 1010 constrains the use of FN303s and 40MM less lethal munitions:

6.4.2. Impact Munitions.

6.4.2.1. Authorized Uses.

6.4.2.1.1. In response to active aggression;

6.4.2.1.2. To prevent suicide or immediate physical harm when reasonable in light of available options;

6.4.2.1.3. To avoid the use of a higher level of force; or,

6.4.2.1.4. To effect the capture or prevent the escape of a subject

Page 5 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

when the member reasonably believes that the subject presents an immediate risk of physical injury to the public, members or themselves, or the escape of the subject presents a significant danger to the public, members or themselves.  Mere flight from an officer is not sufficient cause for the use of the impact munitions.

6.4.2.1.5. Members shall make reasonable efforts to ensure that impact munitions are used on preferred target areas.  Under seven yards, members will aim for the legs.  Over seven yards, members will aim anywhere below the waist line except the groin.

6.4.2.1.6. Members may use impact munitions on vicious or aggressive animals when the presence of those animals interferes with the safety of the members or the public, the execution of a police function, or completion of a mission.

6.4.2.2. Restricted Uses.

6.4.2.2.1. Members shall not deliberately target a subject's head, neck, throat, or groin area, unless deadly force is authorized.

6.4.2.2.2. Members are prohibited from using impact munitions against an individual for the purpose of crowd control or crowd management, except at the direction of a supervisor and with the approval of the Incident Commander (IC), unless there are exigent circumstances requiring deployment to prevent the threat of death or serious injury to a person.

Use of impact munitions is further limited for crowd control: "Members shall not deploy specialty impact munitions or aerosol restraints indiscriminately into a crowd." (Directive 635.10, ¶ 10.2). Moreover, the restriction imposed by HB 4208, limiting the use of tear gas, applies to impact munitions with OC payloads.

3.      Aerosol Restraints

PPB Directive 1010 also constrains the use of handheld OC (pepper spray):

6.4.3. Aerosol Restraints.

6.4.3.1. Authorized Uses.

6.4.3.1.1. When a person(s) engages in physical resistance or indicates the intent to engage in physical resistance.

6.4.3.1.2. Members may use aerosol restraints on vicious or aggressive animals, when the presence of those animals interferes with the safety of the members or the public, the execution of a

Page 6 –      DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

police function, or completion of a mission.

6.4.3.2. Restricted Uses.

6.4.3.2.1.  Aerosol restraints shall not be used on the operator of a motor vehicle that is immediately capable of being driven unless there is a substantial justification for doing so and no reasonable alternative is apparent.

6.4.3.2.2.  When deploying aerosol restraints, members shall attempt to minimize exposure to non-targeted persons.

6.4.3.3. Actions Following the Use of Aerosol Restraints.

6.4.3.3.1. Members shall make a reasonable effort to ensure that affected individuals are exposed to fresh air.  Members shall, as soon as practicable, relieve the subject's discomfort by washing aerosol spray from the subject's eyes with water, unless the subject refuses by words or action.

6.4.3.3.2. Members shall notify the receiving agency of aerosol restraint exposure, and the condition of the exposed individual taken into custody shall be continuously monitored.  If the individual's condition appears to worsen, members shall notify medical personnel.

Additionally, like impact munitions, aerosol restraints may not be deployed indiscriminately into a crowd. (Directive 635.10, § 10.2).

C.    Protests Beginning May 29, 2020 to June 20, 2020

Protests in Portland have continued every night since May 28, 2020. These protests were ignited by the tragic death of George Floyd at the hands of Minneapolis police officers. Tens of thousands of protestors in Portland, and millions more around the country and the world have joined together to demand an end to racism and to fight for justice in connection with police violence. In Portland, many of these protests have been the largest that the City has addressed in recent history. Many have successfully occurred without intervention or involvement by law enforcement. (Declaration of Craig Dobson ("Dobson Decl."), ¶ 16-17; Declaration of Chris Davis ("Davis Decl."), ¶ 4). Thousands of people, every night for weeks, marched on the freeways, the streets, and the bridges. There were large gatherings in public parks and vigils

Page 7 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
           FOR PRELIMINARY INJUNCTION

around the City. The vast majority of those protesting did so passionately but peacefully. (*Id*.).

In contrast to these large peaceful protests, nearly nightly some demonstrators have congregated and engaged in criminal activity. These individuals have lit well over 100 fires requiring response by Portland Fire and Rescue. (Declaration of Jason Andersen ("Anderson Decl."), ¶ 2, Ex. 3). They have thrown rocks, fireworks, glass bottles, and other objects that have injured PPB officers and officers from other jurisdictions. (Declaration of Damon Simmons ("Simmons Decl."), ¶ 3); Davis Decl., ¶¶ 5, 6, 9; Declaration of Anthony Passadore ("Passadore Decl."), ¶¶ 44, 45, 51, 53; Declaration of Michael Reese ("Reese Decl."), Dkt. 21, ¶ 10). People attempted to burn down North Precinct after trying to barricade officers inside. (Passadore Decl., ¶¶ 28, 33, 40, 41). People, almost nightly, have sought to damage the Justice Center, barricaded doors, broken windows, lit fires, and spray-painted security cameras. (Passadore Decl., ¶¶ 20-21; Dobson Decl., ¶¶ 21-33). Recently, protestors have launched fireworks at the Justice Center and the Federal Courthouse. On July 2, July 3, and July 4, federal law enforcement[2] officers have deployed tear gas and other munitions to protect the Federal Courthouse and those inside from protestors. (Dobson Decl., ¶¶ 77-114).

Below, the City addresses the events of the specific days set forth in plaintiffs' declarations.

1.    May 29, 2020-May 30, 2020

Protests began peacefully on May 29, 2020 with a large gathering at Peninsula Park. (Dobson Decl., ¶ 34). However, later in the evening of May 29, 2020 and into the early morning of May 30, 2020, many of the individuals began to engage in dangerous criminal activity and rioting. (*Id*. at ¶¶ 34-40). Some protestors graffitied buildings and broke windows as they marched along NE MLK Boulevard to downtown. (Schoening Decl., ¶ 5; Dobson Decl., ¶ 34-

---

[2] On July 4, 2020, following deployment of tear gas by federal law enforcement, PPB also used tear gas while trying to disperse the rioting crowd.

Page 8 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

35). At one point a gun shot was fired following a confrontation after an individual drove his car into the march. (*Id.*).

At approximately 11:00 p.m., the sound truck announced an unlawful assembly and instructed people to disperse. (Dobson Decl., ¶ 35). Demonstrators were warned that force may be used. (Declaration of Naomi Sheffield in Support of Response to Preliminary Injunction ("Sheffield Decl."), ¶ 1). Just minutes after these announcements, flares were thrown into the Justice Center, starting a fire. (Dobson Decl., ¶ 36). Tear gas was used to disperse the group. (Dobson Decl., ¶ 37; Declaration of Brandon Haase ("Haase Decl."), ¶¶ 5-10; Young Decl., ¶¶ 6-11; Elam Decl., ¶¶ 6-8).

After the fire at the Justice Center, groups broke apart, sometimes breaking windows and stealing. (Andersen Decl., ¶ 2, Exhibit 3 ("Fire Spreadsheet"); Schoening Decl., ¶¶ 6-7; Haase Decl., ¶¶ 6-7; Declaration of John Young ("Young Decl."), ¶¶ 7-10; Declaration of Charles Elam ("Elam Decl."), ¶¶ 6-7). Fires were set around downtown. (Sheffield Decl., ¶ 2; Dobson Decl., ¶ 38). Portland Fire and Rescue identified over twenty fires that night. (Andersen Decl., ¶ 2, Ex. 3). In addition to the property damage and fires, some individuals repeatedly sought to harm officers who were urgently responding to the criminal activity. (Young Decl., ¶¶ 7, 9, 10; Haase Decl., ¶¶ 6-7; Elam Decl., ¶ 7).

After midnight, PPB declared a riot, and closed downtown, ordering everyone to disperse. (Sheffield Decl., ¶ 3). Between 12:41 a.m. and 3:30 a.m. on May 30, sound trucks announced that the assembly was unlawful and directed people to return home (Dobson Decl., ¶ 38). PPB tweeted: "All persons in downtown Portland: it is not safe, it is dangerous, there is rioting, leave now." (Sheffield Decl., ¶ 4).

2.    May 30, 2020-May 31, 2020

Following the events of May 29, Mayor Wheeler imposed an 8:00 p.m. curfew for the entire City. (Sheffield Decl., ¶ 5). Early in the evening on May 30, the Incident Commander

Page 9 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
            FOR PRELIMINARY INJUNCTION

staged officers largely out of sight because he did not want officers' presence to cause any problem. (Dobson Decl., ¶ 41).

Shortly after 6:30 p.m., some protestors began climbing the fence that had been erected to protect the critical downtown infrastructure, including the Justice Center. (Dobson Decl., ¶ 42). Officers observed projectiles thrown at them by people in the crowd. (*Id*.). There was a large group at the intersection of SW Taylor and SW 3rd, and some cars had gotten stuck within the group of protestors. (*Id*.). The sound truck instructed protestors to clear the intersection and move to the sidewalks. (*Id*.). These announcements continued for ten minutes. As officers began to move individuals from the intersection, people within the group again threw projectiles at the officers. (*Id*. at ¶ 43). These included cans and glass and plastic bottles. (*Id*.; Declaration of Brent Taylor ("Taylor Decl."), ¶ 5). PPB officers used munitions, including tear gas, while pushing the crowd north from the intersection. The sound truck announced an unlawful assembly and ordered protestors to leave. (Dobson Decl., ¶ 43; Sheffield Decl., ¶ 6). Police eventually pushed protestors north while some protestors threw objects at officers. (Sheffield Decl., ¶ 7). Officers used munitions, including tear gas. (Dobson Decl. ¶ 43).

At 8:00 p.m., PPB announced that the Mayor's curfew was in place and that people needed to go home or be subject to arrest. (Dobson Decl., ¶ 44; Sheffield Decl., ¶ 8). PPB received reports about fights, including protestors and counter-protestors fighting over an American flag. (Dobson Decl., ¶ 44). Officers had rocks thrown at them from protestors. (*Id*.). At approximately 8:25 p.m., officers were authorized to use tear gas if needed. (*Id*.). Officers used tear gas, and the large group began to break up into smaller groups. (Declaration of Erik Kammerer ("Kammerer Decl."), ¶ 11).

After protestors dispersed the area around the Justice Center, many regrouped in different areas downtown and in the Lloyd District. (Dobson Decl., ¶ 45). Portland Fire and Rescue received reports of ten fires the night of May 30, 2020. (Andersen Decl. ¶ 2, Ex. 3). Numerous

Page 10 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

officers had rocks, bottles, and other objects thrown at them. (Dobson Decl., ¶¶ 44-45, Haase Decl., ¶ 12-14; Elam Decl., ¶¶ 10-11). Just before 9:00 p.m., PPB was informed that business owners were armed with rifles prepared to defend their businesses. (Dobson Decl., ¶ 45). At approximately 11:35 p.m., aerial fireworks were launched at the Multnomah County Courthouse. (Dobson Decl., ¶ 46). Officers used tear gas at different locations to disperse groups that had ignored orders to disperse, were violating the curfew, and were engaged in theft, vandalism, and other criminal activity. (Kammerer Decl., ¶¶ 9-12; Haase Decl., ¶¶ 13-15; Elam Decl., ¶¶ 9-10; Schoening Decl., ¶ 8).

3.    May 31, 2020-June 1, 2020

Protests on May 31, 2020 started in the early afternoon. Protestors asked to speak with officers, and PPB believed that there was an agreement that the protestors would remain out of the street on the sidewalk and in the parks to allow traffic through. (Declaration of Mike Krantz, ("Krantz Decl."), ¶ 6(a)). At approximately 2:20 p.m., protestors asked officers to take a knee, which they did. (Sheffield Decl., ¶ 9.) At 3:33 p.m., the sound truck began "Please honor our agreement, move to the sidewalk, and into the park now." (Krantz Decl., ¶ 6(a)). This group appeared to largely comply with that request. (*Id.*).

However, just after 4:00 p.m., individuals began throwing bottles and other projectiles at officers. (*Id.* at 6(c)). The sound truck announced: "If you remain in the roadway and show the intent to engage in physical resistance to removal, or if emergency circumstances require, you may be subject to uses of force, including riot control agents and impact weapons." (*Id.*). Following these announcements, a violent group began to advance on officers, causing them to move backward, and the Incident Commander received reports that officers were taking more projectiles. (*Id.*). He authorized the use of CS gas at approximately 4:18 p.m. (*Id.*).

Officers continued to have projectiles thrown at them, including batteries. (Krantz Decl., ¶ 6(d)). The protest liaison spoke with an individual in the crowd and told them that PPB would

Page 11 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

pull back, if the group would stay out of the streets. (*Id.*). PPB allowed a protestor to use the City's public address system to ask protestors to move into the parks. (*Id.*). At approximately 5:19 p.m., PPB tweeted "Portland Police appreciates demonstrators who have moved out of the street and remained peaceful." (Sheffield Decl., ¶ 10).

Just before 6:30 p.m., a few thousand protestors began marching from Laurelhurst Park. The sound truck announced "We have the roads blocked for your safety. Please continue on your path to the east. We want to facilitate your march. Continue east with the rest of your group. We are here to facilitate your march to the east safely." (Krantz Decl., ¶ 7). At almost 7:00 p.m., PPB tweeted "Significant amount of marchers walking East on SE Burnside Drivers please use cautions." And also tweeted: "Significant number of demonstrators also downtown on SW 3rd between Madison and Main. Drivers use caution." (Sheffield Decl., ¶ 11). When demonstrators sat in the street, PPB again tweeted that drivers should use caution. (Sheffield Decl., ¶ 12).

At 8:00 p.m., PPB announced via Twitter "The Mayor's curfew is now in effect." Just after the curfew announcement, officers began taking multiple glass bottles from the crowd downtown. (Dobson Decl., ¶ 51). At approximately 8:10 p.m., the sound truck announced that the event had become an unlawful assembly and that police would begin efforts to disperse the crowd, warning "if you do not leave now, you may be subject to uses of force, including riot control agents and impact munitions." (Dobson Decl., ¶ 51; Declaration of Brittany Bezdek ("Bezdek Decl."), Dkt. 4, ¶ 18). Shortly thereafter, officers began using tear gas to disperse the crowd. (Declaration of John Oliphant ("Oliphant Decl."), ¶ 4; Taylor Decl., ¶ 10; Declaration of Andrew Kofoed ("Kofoed Decl."), ¶ 4; Declaration of Craig Lehman ("Lehman Decl."), ¶ 9; Elam Decl., ¶ 14; Haase Decl., ¶ 18; Young Decl., ¶ 15). Members of the crowd began throwing cannisters of tear gas back at officers. (Dobson Decl., ¶ 51).

PPB continued to distinguish between the crowd throwing projectiles and the peaceful protestors who continued to march. At 8:41 p.m., PPB tweeted: "Police dispersed the crowd who

Page 12 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

were throwing projectiles at police near the Justice Center. A march is still occurring westbound on SE Burnside. Thank you to all the participants for remaining peaceful." (Sheffield Decl., ¶ 13).

Just after 9:30 p.m., the Incident Commander authorized force to protect the Justice Center, but cautioned officers to only respond to protestors when necessary. (Dobson Decl., ¶ 53). Throughout this time, officers continued to have projectiles, including glass, thrown at them. (*Id*.; Oliphant Decl., ¶¶ 5, 9; Declaration of Heather Martley ("Martley Decl."), ¶ 7; Taylor Decl., ¶ 12; Kofoed Decl., ¶ 4; Lehman Decl., ¶ 11; Elam Decl., ¶ 13). PPB warned the crowd that engaging in criminal behavior and throwing objects could result in the use of impact munitions and chemical agents and requested that the crowd remain calm and peaceful. (Dobson Decl., ¶ 53; Sheffield Decl., ¶ 14).

PPB received reports that glass was being broken at the Federal Courthouse, that individuals entered the building, and that a flare was thrown into the building around 10:45 p.m. (Dobson Decl., ¶ 56). PPB sought to move people away from the Federal Courthouse so federal protection services could investigate and evacuate if necessary. PPB tweeted this information, instructed people to leave the building immediately, and advised the crowd to disperse to the west. (Sheffield Decl., ¶ 15; Declaration of Kevin Wilbanks ("Wilbanks Decl."), Dkt. 12, ¶ 6; Declaration of Hari Khalsa ("Khalsa Decl."), ¶ 14). As officers sought to clear this area, they began taking significant projectiles from the crowd, including glass. (Dobson Decl., ¶ 56; Taylor Decl., ¶ 13; Kofoed Decl., ¶ 4; Elam Decl., ¶ 13; Haase Decl., 19.) At this point, some officers deployed tear gas. (Oliphant Decl., ¶ 6; Taylor Decl., ¶ 13; Kofoed Decl., ¶ 4; Elam Decl., ¶ 13; Haase Decl., ¶ 19).

Shortly thereafter, federal protection services determined that nobody had entered the courthouse. At approximately 11:00 p.m., PPB shared this information with the crowd. The sound truck informed the crowd that they could move back in front of the Justice Center.

Page 13 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
             FOR PRELIMINARY INJUNCTION

(Dobson Decl., ¶ 57; Khalsa Decl., ¶ 15). The group continued to throw bottles, sticks, and other projectiles at officers from approximately 11:15 p.m. to 11:25 p.m. Aerial fireworks were also launched at officers. (Dobson Decl., ¶ 57); Wilbanks Decl., ¶ 8). PPB announced a civil disturbance at 11:30 p.m. and warned the crowd of riot control agents. (Dobson Decl., ¶ 57; Sheffield Decl., ¶ 16); Khalsa Decl., ¶ 15).

Following the unlawful assembly announcements, members of the crowd continued to start fires, throw projectiles at officers, and launch fireworks toward officers. (Dobson Decl., ¶ 58; Martley Decl., ¶ 13; Taylor Decl., ¶ 14; Kofoed Decl., ¶¶ 5-6; Lehman Decl., ¶ 11; Elam Decl., ¶ 14; Young Decl., ¶ 16. Officers deployed tear gas to disperse the crowd that had become violent. (Martley Decl., ¶ 14; Taylor Decl., ¶ 14; Kofoed Decl., ¶¶ 5-6; Lehman Decl., ¶ 11; Elam Decl., ¶ 14; Young Decl., ¶ 16). Smaller groups broke up around downtown for the next several hours. The PPB sound trucks continued to announce that this was an unlawful assembly and instructed people to leave. (Dobson Decl., ¶ 58). Many people broke windows, vandalized buildings and otherwise engaged in criminal activity. (Dobson Decl., ¶ 58; Sheffield Decl., ¶¶ 17-19). Officers traveled around downtown until approximately 2:00 a.m. to address these groups engaged in criminal activity, including with tear gas. (Dobson Decl., ¶ 58; Martley Decl., ¶ 14; Kofoed Decl., ¶¶ 6-7; Lehman Decl., ¶¶ 4-7; Elam Decl., ¶ 14; Young Decl., ¶ 20).

    4.    June 1, 2020

PPB did not deploy tear gas on June 1, 2020. (Dobson Decl., ¶ 60).

    5.    June 2, 2020

Two groups gathered on June 2, 2020 at around approximately 6:00 p.m., one at Pioneer Square and a second at Revolution Hall. (Dobson Decl., ¶ 63). Many thousands marched downtown from Revolution Hall, stopping briefly to lie down across the Burnside bridge. These groups peacefully demonstrated for several hours. (*Id.*).

Several hundred protestors also gathered at the fence that had been erected around the

Page 14 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

critical infrastructure downtown. (Dobson Decl., ¶ 64). Some members of this group attempted to breach the fence and threw projectiles, including fireworks, glass bottles, and baseball bats. (*Id.*). At approximately 9:00 p.m., PPB, through the sound truck and Twitter, admonished protestors not to tamper with the fence and warned that force may be used. (Dobson Decl., ¶ 64; Sheffield Decl., ¶ 20).

At approximately 9:15 p.m., the sound truck announced that the demonstration at the fence had become a civil disturbance and protestors were required to leave. It again warned of the use of riot control agents. (Dobson Decl., ¶ 65). Protestors stayed and some continued to throw projectiles at officers. Following these announcements, officers began to deploy tear gas to disperse the protestors who had not left. (*Id.*).

Knowing that there was a significant group of peaceful protestors at Pioneer Square, the Incident Commander directed officers not to push the group from the fence line into Pioneer Square or to deploy tear gas at Pioneer Square. (Dobson Decl., ¶ 66). At approximately 9:33 p.m., PPB tweeted "We continue to appreciate the thousands who are gathered peacefully in Pioneer Courthouse Square, while another smaller group is causing destruction and throwing projectiles at officers on 4th and Taylor. That has been declared an unlawful assembly." (Sheffield Decl., ¶ 21).

Protestors continued to throw bottles, flares, and other projectiles at officers. They also threw riot control agents back at police. (Dobson Decl., ¶ 67; Elam Decl., ¶¶ 19-20; Haase Decl., ¶ 29; Kofoed Decl., ¶ 8; Declaration of Mark Duarte ("Duarte Decl."), ¶¶ 9, 13; Declaration of Justin Damerville ("Damerville Decl."), ¶ 4; Declaration of Randy Kuykendoll, Jr. ("Kuykendoll Decl."), ¶ 6). The sound trucks continued to announce the unlawful assembly and directed protestors to leave for the next two hours. (Dobson Decl., ¶ 67).

At approximately 11:12 p.m., the crowd returned to the fence line around the Justice Center. (Dobson Decl., ¶ 68). At approximately 11:30 p.m., officers were hit with batteries

Page 15 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
            FOR PRELIMINARY INJUNCTION

thrown from the upper deck of a parking garage. (*Id.*). The sound trucks announced that the event had again become a civil disturbance and directed people to leave to the north, warning of a use of force for failing to leave. (*Id.*). Individuals within the crowd continued to throw objects at officers. (Sheffield Decl., ¶¶ 22, 23). Tear gas was again used to disperse the group. (Dobson Decl., ¶ 68; Elam Decl., ¶ 17; Kofoed Decl., ¶9; Duarte Decl., ¶ 11; Damerville Decl., ¶ 5).

As the larger group broke up, smaller groups formed. Some of these groups lit explosives, fireworks, and some small fires. (Dobson Decl., ¶ 69). Individuals continued to throw objects at police as they tried to direct people to leave. (*Id.*). Two sound trucks drove around directing people to leave. (*Id.*). At approximately 12:35 a.m. on June 3, the Incident Commander directed all units to disengage and ordered all officers back within the fence line. (*Id.*). He hoped that removing officers from the equation would de-escalate the anger. (*Id.*). By approximately 2:00 a.m. the demonstration had largely ended. (*Id.*).

6.    June 15, 2020

Plaintiffs and Plaintiffs' declarants describe incidences of less lethal force at two locations on June 15, 2020. First, Plaintiff Johnson describes force near the Justice Center at SW 3rd and SW Main. She indicates that police were standing "above" her, presumably on the portico of the Justice Center, when they fired impact munitions. (Declaration of Alexandra Johnson ("Johnson Decl."), Dkt. 48, ¶¶ 19-21). She also contends that a "flash bang" exploded feet away from her and her friend. (Johnson Decl., ¶ 24). Declarant Reinhardt heard the dispersal announcements and went to SW Broadway. He asserts that while at SW Broadway, outside of the closed area, a PPB officer indiscriminately fired impact munitions with OC at the crowd for no reason. (Declaration of Zack Reinhardt ("Reinhardt Decl."), ¶ 14).

On the evening of June 15, a crowd gathered on the SW 3rd Avenue side of the Justice Center, near the fence that had been erected. (Declaration of Erica Hurley ("Hurley Decl."), ¶ 7). This crowd launched projectiles at Multnomah County deputies who were guarding the Justice

Page 16 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Center. (Hurley Decl., ¶ 7). A few blocks north of the Justice Center, protestors lit debris on fire, requiring a fire engine to extinguish the blaze to protect life and property. (Hurley Decl., ¶ 9). Multnomah County deputies took a number of projectiles from the crowd after they addressed subjects in the crowd who had lit a fire. (Hurley Decl., ¶ 7).

At approximately 10:30, the Incident Commander declared an unlawful assembly, directing persons to leave downtown. (Hurley Decl., ¶¶ 9-10). When the crowd did not disperse, PPB officers began moving the crowd. Protestors continued to throw projectiles, including glass bottles, rocks, and full cans of beverages, and used shields, barricades and other objects to impede the officers' attempts to disperse the crowd. (Hurley Decl., ¶ 10; Kuykendoll Decl., ¶ 15; Duarte Decl., ¶ 20). A Clark County Sheriff deputy was hit in the back of the head with a softball size rock from behind the line of officers; he was transported to the hospital. (Hurley Decl., ¶ 9).

PPB officers Kuykendoll, Duarte and Wands utilized the types of munitions described by Declarants Johnson and Reinhardt on June 15. (Kuykendoll Decl., ¶ 15; Duarte Decl., ¶ 20). At SW 3rd and SW Main, Officer Kuykendoll deployed an RBDD in response to multiple subjects throwing projectiles in order to deter the group from throwing projectiles and disperse them from the area. (Kuykendoll Decl., ¶ 15). Officer Kuykendoll also deployed 3-4 OC rounds from his FN303 at a female as she attempted to pick up a smoke canister and throw it back at the police. (*Id*.).

Officer Wands deployed three OC round from his FN303 at a known male who was threatening officers. (Declaration of Jason Wands ("Wands Decl."), ¶ 22). These rounds struck the intended person. (*Id*.). The individual was shining a high intensity light in officers' eyes which prevented them from seeing while members of the crowd were throwing objects at them. (*Id*.). He then jabbed Officer Wands with the metal tip of his umbrella, and when Officer Wands tried to arrest him, he began punching at Officer Wands in the head. (*Id*.). The individual hit by Officer Wands' FN303 rounds was taken into custody. (*Id*.).

Page 17 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

Office Duarte deployed two OC rounds from his FN303 toward an individual at SW Salmon and SW 5th Avenue who had thrown a projectile at the police. (Duarte Decl., ¶ 20). In another instance, a group of 15-20 people began to advance in the street toward Officer Duarte and police vans. Officer Duarte was concerned for his safety and the safety of the individuals in the vans. (*Id.*). He deployed a single RBDD in the middle of the street directly behind the vans to stop the group's advance. (*Id.*).

7.    June 25, 2020-June 26, 2020

Early in the evening on June 25, a group of several hundred protestors gathered in Fernhill Park. (Passadore Decl., ¶ 25). These protestors marched to PPB's North Precinct. (*Id.* at ¶ 26). At approximately 10:00 p.m., several hundred protestors gathered around the intersection of NE Emerson and NE MLK. They began building a fence and erecting a barricade. (*Id.* at ¶ 27). While erecting the barricade, some protestors began throwing projectiles, including glass bottles, at police officers. (*Id.*).

At around midnight on June 26, demonstrators had barricaded the doors of North Precinct using drills. (*Id.* at ¶ 31). By 12:30 a.m., demonstrators had obscured the building's security cameras. (*Id.* at ¶ 32). As the Incident Commander waited for more officers, some demonstrators began shining green lasers in officers' eyes[3] and ramming dumpsters into the North Precinct doors. Fireworks were also thrown at officers over the barricade that protestors had erected. (*Id.* at ¶ 33). At approximately 1:00 a.m., PPB declared an unlawful assembly because of concerns for the life and safety of officers and persons in custody within North Precinct. (*Id.* at ¶¶ 34-35). At approximately 1:20 a.m., officers began moving the crowd from the immediate area. (*Id.* at ¶ 36). As this happened, demonstrators threw water bottles, glass bottles, and paint at officers, who were then unable to see from their face shields. (*Id.*). At 1:40 a.m., a firework was launched onto

---

[3] United States Food & Drug Administration, *Frequently Asked Questions About Lasers* (March 7, 2018), available at https://www.fda.gov/radiation-emitting-products/laser-products-and-instruments/frequently-asked-questions-about-lasers.

Page 18 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

the roof of North Precinct. (*Id.* at ¶ 39).

Officers Rethemeier, Taylor, Kammerer, Domka, Whitmore, and Westerlund all deployed impact munitions, including FN303 rounds, 40MM less lethal rounds, and RBDDs at individuals engaged in active aggression. These impact munitions were used to respond to individuals throwing glass bottles, jars of paint, and other projectiles at officers; pushing and shoving police officers and wrapping themselves around an officer's legs; pointing lasers into the eyes of officers; moving dumpsters and other barricades into the street; and throwing gas back at officers. (Schoening Decl., ¶¶ 10-11; Declaration of Taylor Rethemeier ("Rethemeier Decl."), ¶¶ 2-4; Declaration of London Westerlund ("Westerlund Decl."), ¶¶ 2-3; Declaration of Zachary Domka ("Domka Decl."), ¶¶ 19-20; Taylor Decl., ¶¶ 15, 19; Declaration of Anthony Whitmore ("Whitmore Decl."), ¶ 3 ). Officers Billard and Westerlund both deployed bursts of handheld OC at individuals. (Declaration of Susan Billard ("Billard Decl."), ¶ 3; Westerlund Decl., ¶ 3). Officer Billard deployed OC at an individual that was stoking the flames of the dumpster fire that had been lit. (Billard Decl., ¶ 3). Officer Westerlund deployed OC at an individual that had grabbed an officer by the vest and attempting to pull the officer into the crowd. (Westerlund Decl., ¶ 3).

Protestors began to light a large dumpster fire on NE MLK, which PPB monitored, but did not respond to because it remained contained. (Passadore Decl., ¶ 40). By 2:14 a.m., demonstrators had set fire to the north side of the building where North Precinct is located. (*Id.* at ¶ 41). Once the Incident Commander received reports of the fire, he determined that it was necessary to use tear gas to disperse the crowd. (*Id.* at ¶ 42). Officers Schoening and Taylor each deployed tear gas to disperse the crowd. (Schoening Decl., ¶ 11; Taylor Decl., ¶ 21). After the crowd dispersed, Portland Fire and Rescue was brought in to assess the building and put out the dumpster fire. (Passadore Decl., ¶ 44).

        8.     June 26, 2020-June 27, 2020

Page 19 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs' declarants assert that PPB shot projectiles from the Justice Center on June 26, 2020. (Declaration of Frederick Garlick ("Garlick Decl."), Dkt. 50, ¶¶ 13, 14; Declaration of Mason Lake ("Lake Decl."), Dkt. 61, ¶ 4; Declaration of Aubrey Danner ("Danner Decl."), Dkt. 56, ¶ 9). No PPB officers deployed munitions from either inside the Justice Center or from the portico in front of the Justice Center on June 26, 2020. (Dobson Decl., ¶ 71).

9.    June 27, 2020

On June 27, demonstrators came to the Justice Center at around 7:30 p.m. (Dobson Decl., ¶ 72). They immediately began blocking SW 3rd Ave. at SW Main with chained plastic barricades. (*Id.*).

At approximately 10:25 p.m., PPB declared an unlawful assembly in order to re-open SW 3rd and remove the barricades that had been erected. (Dobson Decl., ¶ 73). PPB brought in flatbed tow trucks to carry away the constructed barriers. (*Id.*). Seven minutes after the announcement, very few demonstrators had left the roadway. (*Id.*). PPB officers began to push the crowd up to SW 4th Ave. During this push, demonstrators threw rocks, glass bottles and paint at PPB officers. (*Id.*, Lehman Decl., ¶ 29; Kammerer Decl., ¶ 56). They also shined lasers in officers' eyes. (Kofoed Decl., ¶ 12; Domka Decl., ¶ 24). PPB deployed smoke to distract the crowd so officers could pull back from the area safely once the barricades had been removed. (Taylor Decl., ¶ 25).

During this dispersal, two officers deployed RBDDs, both in the direction of small groups of people who were throwing items at the line of officers. (Kammerer Decl., ¶ 56; Kofoed Decl., ¶ 12). Additionally, two PPB officers used handheld OC spray. (Domka Decl., ¶ 23; Lehman Decl., ¶ 29).

Just before 1:30 a.m., the demonstrators moved to the SW 2nd Avenue side of the Justice Center. (Dobson Decl., ¶ 75). Some individuals attempted to block the door to the precinct, as well as the roll-down gates. A police officer attempted to arrest one individual but was hit in the

Page 20 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

face with a skateboard. (*Id*.). At this point, the PPB Sound truck announced an unlawful

assembly and directed protestors to leave the area. Officers attempted to move the crowd to SW

2nd and SW Main. (*Id*.). The crowd pulled two dumpsters from the corner of SW 2nd and SW

Main into the street. (*Id*.). At that point, the Incident Commander closed the area from SW 1st to

SW 6th from Clay to Morrison and officers began to push back the crowd. (*Id*.).

During this push two officers again deployed RBDDs. One deployed an RBDD to deter

the individuals who were moving large dumpsters toward the police and another deployed an

RBDD in response to persons throwing projectiles at the police. (Kofoed Decl., ¶ 12; Lehman

Decl., ¶ 21). Additional smoke was deployed. (Kofoed Decl., ¶ 15).

## III.   PLAINTIFFS CANNOT MEET THE TEST FOR A PRELIMINARY INJUNCTION

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief." *Barnett v. BAC Home Loan Servicing,*

*L.P.*, 772 F. Supp. 2d 1328, 1333 (D. Or. 2011) (quoting *Winter v. Natural Res. Def. Council*,

555 U.S. 7, 22 (2008) citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). "The sole

purpose of a preliminary injunction is to 'preserve the status quo ante litem pending a

determination of the action on the merits.'" *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023

(9th Cir. 2009) (citations omitted).

The Supreme Court established in *Winter* that "[a] plaintiff seeking a preliminary

injunction must establish that he is likely to succeed on the merits, that he is likely to suffer

irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

and that an injunction is in the public interest." 555 U.S. at 20. Alternatively, a preliminary

injunction is available where there are "serious questions going to the merits' and a hardship

balance that tips sharply toward the plaintiff," but only if plaintiff also "shows that there is a

likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the*

Page 21 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

*Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132, 1135 (9th Cir. 2011).

In each case, Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal citations omitted). Plaintiffs bear the burden of proving each of the elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief.") (Emphasis in original). Plaintiffs burden of "substantial proof" for preliminary injunctive relief "is much higher" than even what is required in connection with summary judgment. *Mazurek*, 520 U.S. at 972.

A.      Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits.

"To prevail, plaintiffs must first show that they likely will succeed on the merits of their constitutional claims." *Campbell v. City of Oakland*, 2011 WL 5576921, at *3 (N.D. Cal. Nov. 16, 2011) (citing *Winter*, 555 U.S. at 20). "To state a *Monell* claim, a plaintiff must establish: (1) that the plaintiff possessed a constitutional right of which he was deprived; (2) that the municipality had a policy, custom, or practice; (3) that the policy, custom, or practice amounted to deliberate indifference to the plaintiff's constitutional rights; and (4) that the policy, custom, or practice was the moving force behind the constitutional violation." *Sternberg v. Town of Danville*, 2015 WL 9024340, at *3 (N.D. Cal. Dec. 16, 2015) (citing *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011); *AE ex rel. Hernandez v. Cty. of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012)). A plaintiff may also establish a *Monell* claim where the employee who engaged in the allegedly unconstitutional act was a final policymaker. *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003).

Plaintiffs must show that they were deprived of a constitutional right and that a custom or practice of the City, amounting to deliberate indifference, caused that constitutional deprivation.

Page 22 –      DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
               FOR PRELIMINARY INJUNCTION

Plaintiffs can show neither. The four plaintiffs in this case, Don't Shoot Portland, Nicholas J. Roberts, Michelle "Misha" Belden and Alexandra Johnson, cannot show that they were subject to less lethal force by PPB officers other than tear gas. Importantly, the evidence does not support the conclusion that PPB has engaged in a pattern or custom of using less lethal force at protests in violation of protestors' Fourth Amendment and First Amendment rights.[4]

      1.    Defendant does not have a practice or custom of violating protestors' Fourth Amendment Rights.

Under the Fourth Amendment, a seizure results in a constitutional violation only if it is unreasonable. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The determination of reasonableness requires an examination of "whether the totality of the circumstances justified [the] seizure." *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). "When the governmental interests at stake are substantial, a greater intrusion upon the Fourth Amendment rights of the person may be justified." *Nelson v. City of Davis*, 685 F.3d 867, 878 (9th Cir. 2012).

The analysis of use of force is a fact-specific inquiry which looks at (1) the severity of the crime, (2) the immediacy of the threat to the safety of officers or others, and (3) whether the suspect was resisting arrest or attempting to evade arrest. *Graham*, 490 U.S. at 396. In the Ninth Circuit, courts "may also consider the availability of less intrusive alternatives to the force employed and whether warnings were given." *Felarca v. Birgeneau*, 891 F.3d 809, 818 (9th Cir. 2018). "The reasonableness analysis must make 'allowance for the fact that police officers are forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Hadley v. City*

---

[4] Plaintiffs contend that PPB Directives 1010.00 and 635.0 are unconstitutional under the Fourth Amendment. (PI at 27-28). But plaintiffs omit relevant portions of both directives that further limit the use of area impact munitions and riot control agents. (Directive 635.10 at §9). They argue that the definition of civil disturbance is unconstitutional. Directive 635.10's definition of a "civil disturbance" meets the constitutional standards, set for in *City of Portland v. Hemstreet*, 119 Or App 239, 242 (1993) (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940)). Plaintiffs also contend that PPB officers' actions were made or ratified by a policy maker. But they offer no evidence in support of these contention.

Page 23 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

*of Beaverton*, 2010 WL 1257609 at *12 (D. Or. 2010) (quoting *Graham*, 490 U.S. at 396).
Plaintiffs bear the burden of proving that the force used was unreasonable. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F3d. 912, 922 (9th Cir. 2001).

        a.      PPB officers' use of tear gas has been reasonable under the totality circumstances.

      "What is reasonable in the context of a [potentially violent large-scale protest]" is different from what is reasonable in other, relatively calm, situations. *See Bernini v. City of St. Paul*, 665 F.3d 997, 1003 (8th Cir. 2012); *see also Jurkowski v. City of Seattle*, 2017 WL 4472859, *9-10 (W.D. Wash. 2017) (citing *Bernini*, 665 F.3d at 1003). In certain circumstances, the City has a "legitimate interest in quickly dispersing and removing lawbreakers with the least risk of injury to police and others." *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994). More specifically, the government has a safety interest in controlling large groups of people, and force can be justified when protestors substantially outnumber officers and refuse to obey commands to disperse. *See Jackson v. City of Bremerton*, 268 F.3d 646, 652-53 (9th Cir. 2001). Even if the potential for criminal activity involves only low-level misdemeanors, the government has a significant interest when the occurrence is widespread. *See Forrester*, 25 F.3d at 807.

      In *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018), the Ninth Circuit considered a case where the government interest "began with an attempt by the police to remove the protestors' tents." The court acknowledged that "the tents themselves posed no threat and the protestors appeared guilty only of misdemeanors," but explained that "the university was not required to permit the 'organized lawlessness' conducted by the protestors." *Id*. at 817-18. In *Felarca*, the protestors substantially outnumbered officers, refused to obey commands to disperse, shouted at the officers, and engaged in verbal and physical altercations. *Id*. The Court found that this justified the officers repeatedly jabbing plaintiffs with their batons, including to

Page 24 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
                FOR PRELIMINARY INJUNCTION

the neck and face. *Id.* The Court further concluded that the use of an overhand baton strike was reasonable under the Fourth Amendment because the actions that plaintiff admitted doing—"throwing leaves and shaking his fist . . . were unequivocally attempts at provocation." *Id.* at 818-19.

Here, each night that PPB deployed tear gas, protestors far outnumbered officers and protestors ignored orders to disperse. Over the first three nights of protests, and on June 2, 2020, PPB's interest was not just in protecting the Justice Center, but in addressing widespread criminal activity occurring throughout the City. Protestors here were not "throwing leaves," like in *Felarca*; they were throwing fireworks, rocks, boards, glass bottles, water bottles, and paint. They were also not erecting tents, but rather lighting fires, breaking windows, graffitiing buildings, and attempting to overcome a barricade set up to keep persons in custody safe. The City's interests were, and are, significant. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 287 (1993) (Kennedy, J., concurring) ("[T]he wholesale commission of common state-law crimes creates dangers that are far from ordinary. Even in the context of political protest, persistent, organized, premeditated lawlessness menaces in a unique way the capacity of a State to maintain order and preserve the rights of its citizens.").

PPB used tear gas on June 25, 2020[5] after protestors surrounded North Precinct, spray painted the security cameras on the outside of the precinct, barricaded multiple doors to the precinct, and set the building on fire. Use of tear gas in this situation was necessary to protect the lives and safety of people inside. It was also reasonable under the totality of the circumstances.

Plaintiffs contend that the government interest is low because most protest arrests are for minor crimes. (PI at 21-22). This argument fails for two reasons. First, the Ninth Circuit has held that the "[C]ity's interest in preventing [the] widespread occurrence [of misdemeanors is]

---

[5] PPB has subsequently used tear gas two other occasions, (Dobson Decl., ¶ 100; Passadore Decl., ¶ 56), but those have not been put at issue by plaintiffs.

Page 25 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
            FOR PRELIMINARY INJUNCTION

significant." *Forrester*, 25 F.3d at 807 (1994). Second, the arrest data from a protest is not entirely representative of the activity that took place. Serious criminal activity, like arson, assault, battery, theft, and criminal mischief may occur without officers successfully arresting the subject.

Plaintiffs cite cases where officers: shot someone in the eye with a pepper ball, *Nelson*, 685 F.3d 867 (2012) (summary judgment); left pepper spray on a person's face for twenty to thirty minutes after he had surrendered, *Lalonde v. Cty. of Riverside*, 204 F.3d 947 (9th Cir. 2000) (summary judgment); applied pepper spray with a q-tip to the corner of the eyes of sitting protestors, *Headwaters Forest Def. v. Cty. of Humboldt*, 276 F.3d 1125 (9th Cir. 2002) (summary judgment); "intentionally applied pepper spray and shot rubber bullets at" persons engaged in lawful protest activities, *Marbet v. City of Portland*, 2003 WL 23540258 at *10 (D. Or. Sept. 8, 2003) (motion to dismiss); and used tear gas to disperse a group whose only crime was being in the street, *Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008) (summary judgment). These cases are distinguishable on their facts because PPB officers deployed tear gas in response to widespread criminal activity and violence.

Conversely, the Ninth Circuit has explained that tear gas in circumstances similar to those faced by PPB did not constitute excessive force:

> The protesters were allowed to conduct their activities peacefully
> for several hours before the crowd refused to move back when
> ordered to do so for their safety. Violence then erupted and the
> protesters were allowed to remain after the situation settled. The
> protesters were warned repeatedly to clear the street
> or tear gas would be deployed, and there is no dispute that a small
> group of the crowd became violent. The tear gas was used in
> response to these conditions. Thus, Barney has provided no basis
> to create a material issue of fact that her exposure to tear gas and
> any effect on her First Amendment activities were anything other
> than the unintended consequence of an otherwise constitutional use
> of force under the circumstances.

Page 26 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
             FOR PRELIMINARY INJUNCTION

*Barney v. City of Eugene*, 20 F. App'x 683, 685 (9th Cir. 2001).[6] Just as the use of tear gas was a constitutional in *Barney*, the use of tear gas by PPB officers to address ongoing violent, criminal activity after warnings and a refusal to disperse, was constitutional.

           b.     PPB officers' use of other less lethal munitions has been reasonable under the totality of the circumstances.

Only Plaintiff Johnson contends that she was impacted by a less lethal munition other than tear gas. She states that officers standing on the portico of the Justice Center shot into the crowd, and one officer "step[ped] out from behind a pillar above me on the JC, about 30 ft away. He aimed directly at me and shot me in the back of my left hand." (Johnson Decl., ¶¶ 19-21). No PPB officers fired munitions from the Justice Center on June 15, 2020. Plaintiff Johnson also contends that police began using flash bangs and one exploded "just feet away from my friend and me as we walked to my car." (Johnson Decl., ¶ 24). However, an RBDD exploding near Ms. Johnson is not a seizure under the Fourth Amendment. *See Jurkowski*, 2017 WL 4472859, at *9.

Plaintiffs also cite Declarant Reinhardt's assertion that officers shot at crowds of passive individuals who had already retreated, as officers themselves retreated. While the City cannot speak to Mr. Reinhardt's recollection of what allegedly happened to his friends, the PPB officers who used force on June 15, 2020 did not do so at the location where Mr. Reinhardt remembers seeing force. The officers who used force on June 15, 2020 directed that force at individuals who were engaged in active aggression, not individuals who were compliant, passively resistant, or retreating.

Plaintiffs rely on *Nelson*, where the court found it significant that the defendants "did not see anyone in Nelson's group throwing bottles or engaging in any other threatening or dangerous behavior." 685 F.3d at 880 (2012). However, the exact opposite is true with respect to PPB's use

---

[6] The City previously chose not to cite *Barney* because of Ninth Circuit Rule 36-3. However, the Court at the hearing on the TRO noted the case, which is directly on point. For this reason, the City has elected to include it, notwithstanding the rule.

Page 27 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
                FOR PRELIMINARY INJUNCTION

of non-tear gas, "less lethal" munitions. The declarations of PPB officers support the conclusion that their uses of impact munitions, handheld OC, and RBDDs were directed at individuals engaged in criminal activity and reasonable under the totality of the circumstances. The use of these weapons is not, as plaintiffs assert, indiscriminate. Rather, these are directed specifically at individuals and small groups engaged in active aggression (impact munitions) and physical resistance (pepper spray). These were used to stop people who had picked up objects or previously deployed munitions to throw at officers and physically fighting or resisting officers.

Plaintiffs condemn the City's "[a]ttempts to pit the actions of 'bad' protestors versus 'good' protestors." (Plaintiff's Motion for Preliminary Injunction ("PI"), Dkt. 45, at 22). But that is exactly what PPB is obligated to do—facilitate the First Amendment rights of persons engaged in peaceful protest and address persons engaged in criminal activity.

> 2.    PPB has acted with the intent to promote, not limit, First Amendment expression.

The First Amendment protects the rights of persons to express their opinions and beliefs in the manner they see fit. *See Cohen v. California*, 403 U.S. 15, 24-26 (1971). To succeed on a claim of First Amendment retaliation, plaintiffs must show that (1) they "engaged in constitutionally protected activity; (2) [the City's] actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the [City's] conduct—i.e., that there was a nexus between the [City's] actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). Assuming without conceding that plaintiffs have shown the first two elements, there is no evidence of the third. While the intent by the City to inhibit plaintiffs' speech can be demonstrated either through direct or circumstantial evidence, *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300-01 (9th Cir. 1999), here, all evidence is to the contrary.

Page 28 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Even if plaintiffs present evidence that defendant's actions were motivated to deter speech, the City then "may rebut Plaintiffs' allegation of a retaliatory motive by showing that Defendants would have engaged in the same conduct even in the absence of [any plaintiffs] protected activities." *Molokai Veterans Caring for Veterans v. Cty. of Maui*, 2011 WL 1637330, at *16 (D. Haw. Apr. 28, 2011) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314-15 (9th Cir. 1989).

Plaintiffs argue that their speech was anti-police in support of their contention that the actions of PPB officers were motivated by an intent to silence them. Plaintiffs contend that it is pretextual to assert that the officers acted because things were thrown. In support of this conclusion, they cite their own declarations that indicate that projectiles were being thrown, but only by "one, two or a few individuals." (PI at 24). The video, officer declarations, and injuries that officers have suffered suggest otherwise. Many nights, individual officers were *hit* multiple times by projectiles. The facts show that when protestors were engaged in violence and significant criminal activity, officers used force. But when these same protestors engaged safely with minimal criminal activity, and when thousands of other protestors did so peacefully, PPB not only did not use force, but facilitated the activity.

Plaintiffs also contend that one unidentified officer, among hundreds, may have smiled prior to someone using force and another used an expletive while trying to get a resistive crowd to disperse. While the use of an expletive may demonstrate an officer's frustration with the crowd's refusal to comply with police orders, it does not demonstrate that his actions were motivated by plaintiffs' speech. There is no indication that this alleged statement was motivated by the content of the protestors' speech or, in fact, protestors' speech at all.

This limited evidence regarding two officers, whom plaintiffs do not contend used force, must be weighed against the significant evidence that PPB sought to facilitate, not disrupt, free

Page 29 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

speech activity nightly for over a month. For example, on May 30, 2020, PPB was concerned that a large group marching around SE Precinct may be intent on causing damage or trying to enter the precinct. But PPB officers nonetheless reached out to organizers, observed the behavior of people marching, and did not intervene. Rather, as the very large group continued their march, PPB facilitated the movement by blocking roads.

Again on June 2, even as officers used tear gas to address a crowd that was throwing projectiles at police and trying to tear down a fence at the Justice Center, PPB messaged publicly that the unlawful assembly declaration did not apply to the large group engaged in a peaceful protest in Pioneer Square. They internally also messaged not to push the crowd that was being dispersed into or use tear gas on that group of peaceful protestors.

PPB's continued attempts to de-escalate further demonstrates that PPB did not intend to inhibit any protestor's speech. A fence was erected around the Justice Center in order to provide protection while minimizing police presence that may create conflict. Officers attempted to move out of sight to not incite the crowd. When the fence itself became a focal point of frustration and conflict, it was removed. The lower windows of the Justice Center were boarded up to prevent the risk that projectiles would break windows. Police tried to remain inside the building, and out of sight. These steps were taken, in part, to eliminate the role PPB's presence may have had in agitating the crowd.

Plaintiffs contend that courts have sided in favor of plaintiffs in similar contexts. But these cases were decided on motions to dismiss or summary judgment, where allegations are assumed true and facts are viewed in the light most favorable to the plaintiff. *McCarthy v. Barrett*, 804 F. Supp. 2d 1126, 1137 (W.D. Wash. 2011) (summary judgment); *Johnson v. City of Berkeley*, 2016 WL 928723, *4-6 (N.D. Cal. Mar. 11, 2016) (motion to dismiss); *Keating v. City of Miami*, 598 F.3d 753, 767 (11th Cir. 2010) (motion to dismiss); *Multi-Ethnic Immigrant Workers Org. Network v. City of L.A.*, 246 F.R.D. 621, 634 (C.D. Cal. 2007) (motion for class

Page 30 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

certification). In contrast, for this preliminary injunction motion, plaintiffs must put forth substantial proof of their claims, a standard that "is much higher" than even summary judgment. *Mazurek*, 520 U.S. at 972. Plaintiffs have not done so with respect to their First Amendment claim.

      B.      <u>Plaintiffs Will Not Be Irreparably Harmed Without a Preliminary Injunction.</u>

      To obtain a temporary restraining order, plaintiffs must show that they will suffer *immediate and irreparable injury* in the absence of the requested relief. *Hodgers-Durgin v. de la Vino*, 199 F.3d 1037, 1042 (9th Cir. 1999). "The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff[s] will be wronged again – a 'likelihood of substantial and immediate irreparable injury.'" *Id.* (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).  "[A] federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *City of Los Angeles v. Lyons*, 461 U.S. at 111. An injunction "is unavailable . . . where there is no showing of any real or immediate threat that the plaintiff will be wronged again." *Id*. In *Lyons*, the Court concluded that it was "surely no more than speculation" for Mr. Lyons to assert that because he had been wronged by police misconduct once, he would be involved in another "unfortunate instance[]" of police misconduct. *Id.* at 108.  *See also Grayson v. County of Marin*, 2015 WL 2452808 (N.D. Calif. May 21, 2015) (dismissing plaintiff's claim for injunctive relief enjoining Marin County from allowing deputies to patrol without reasonably monitoring deputies' psychiatric conditions.  Plaintiff had been shot three times by deputy during police encounter.)

      Since this Court's temporary restraining order regarding tear gas, Oregon has enacted a law that restricts PPB and all other law enforcement in their use of tear gas. (HB 4208). It is in some sense broader and in other ways narrower than this Court's temporary restraining order. But it nonetheless eliminates the likelihood that plaintiffs would be harmed by an

Page 31 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
                FOR PRELIMINARY INJUNCTION

unconstitutional use of tear gas.

With respect to PPB's use of less lethal force other than tear gas, there is no evidence that any plaintiffs were ever harmed by such force, let alone a real or immediate threat that they would be harmed again. And plaintiffs offer no argument to the contrary. (PI at 30-32 (largely discussing tear gas)). Plaintiffs' only passing reference to other less lethal munitions is of a reporter testifying to Congress that she was lost an eye as a result of being hit by an impact munition in Minneapolis. This reporter was purportedly struck in Minneapolis. She was hit in the eye, which is inconsistent with PPB policy and the evidence of PPB's use of impact munitions in the record. (Directive 1010.00, ¶ 6.4.2.2.1).

Any injury caused by their alleged Fourth Amendment violations related to tear gas is not likely to continue given the new State law on the use of tear gas. And there is no evidence that plaintiffs were harmed by alleged Fourth Amendment violations related to the use of impact munitions and other less lethal munitions. Plaintiffs' inability to demonstrate irreparable harm precludes the relief they request.

C.    <u>Plaintiffs Have Not Established and Cannot Establish that the Balance of Equities Weighs in Their Favor or that a TRO is in the Public Interest.</u>

A plaintiff seeking a preliminary injunction must establish not only that he is likely to succeed on the merits and is likely to suffer irreparable harm in the absence of preliminary relief, but also that the balance of equities tips in his favor, and that an injunction is in the public interest. *Winter,* 555 U.S. at 20 (2008). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id*. at 24 (internal citations omitted).

The plaintiffs undeniably have an interest in continuing to protest free from excessive force. And they can do so. Peaceful protests continue without response or intervention by PPB. Moreover, the City must protect, not violate, plaintiffs' Constitutional rights regardless of any

Page 32 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

order from this Court.

However, nearly nightly clashes with a small group of individuals who relentlessly seek to destroy property and endanger the lives and safety of others also continue. Dozens of officers have reported injuries from objects thrown by and interactions with aggressive protestors. (Davis Decl., ¶ 5). Officers from PPB and other law enforcement agencies have sought medical treatment for injuries. (Dobson Decl., ¶ 22; Hurley Decl., ¶ 8). The City has a strong interest in maintaining public safety. This is particularly true as some protestors have escalated their criminal behavior in a manner that could have catastrophic consequences, like barricading people in a building and attempting to light it on fire.

On the three nights leading up to and including July 4, protestors have launched commercial grade fireworks at the Federal Courthouse and Justice Center. Each of these nights federal law enforcement agencies have utilized tear gas in response. In addition to the fireworks, officers had rocks, bottles, flammables, and other projectiles fired at them. PPB declared a riot and continued to warn protestors to leave as they threw fireworks, rocks, and bottles at officers. Later in the night, PPB officers deployed CS gas. During the protest, an individual got out of his car with a gun and pointed it at the Federal Courthouse. A separate individual, who was arrested, was also illegally carrying a loaded handgun. In the early morning hours of July 5, 2020, federal law enforcement arrested someone carrying materials for a pipe bomb. (Dobson Decl., ¶¶ 77-114).

PPB has spent millions in overtime pay responding to these protests. On July 4, PPB limited its responses to calls for service to emergencies City-wide because so many resources were required to address the rioting crowd downtown. (Sheffield Decl., ¶ 25). Every additional limitation that this Court imposes on the tools that officers have to address dangerous, criminal behavior puts them at greater risk, the public at greater risk, and requires more human resources to respond to the same protests. Any restrictions on these tools will be in place for at least one to

Page 33 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
            FOR PRELIMINARY INJUNCTION

two years, impacting PPB's ability to respond not just to these protests, but all protests during this time period. The public interest and balance of equities favors PPB having all of the tools they need to address dangerous, riotous behavior.

     D.    <u>If This Court Considers a Preliminary Injunction, Plaintiffs' Proposal is Too Restrictive.</u>

A preliminary injunction is not warranted. However, if this Court concludes that plaintiffs met the burden for equitable relief, their requested relief is overbroad and unworkable. If this Court issues an injunction, it must "state its terms specifically; and [] describe in reasonable detail—and not by referring to the complaint or other document-- the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). This rule "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

The City's interest has been and remains ensuring that demonstrators are able to peacefully demonstrate while maintaining the safety of all persons in Portland. If this Court believes injunctive relief is necessary, the City has proposed language in Exhibit A that would provide further restraints on PPB's use of less lethal force during crowd control events without creating conflict with existing PPB Directives or state law. (Sheffield Decl., ¶ 26, Ex. 43).

## IV.    CONCLUSION

Plaintiffs argue that the City "seek[s] to cast the entire Portland activist movement in the same light," based on the fire lit at the Justice Center on May 29. Nothing could be further from the truth. Activists in Portland have come out by the thousands night after night. They have peacefully protested. A far smaller group of individuals has also come out every night to set fires, break windows, and throw projectiles at the police. The Portland activist community is vibrant, expressive, and forcing essential changes during this difficult time. PPB seeks to

Page 34 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

facilitate the speech of the community, but must address the individuals who continue to engage in violence and criminal activity.

For all these reasons, the Court should deny the Plaintiffs' Motion for a Preliminary Injunction.

Dated: July 6, 2020.

Respectfully submitted,

*/s/ Naomi Sheffield*
J. SCOTT MOEDE, OSB 934816
Chief Deputy City Attorney
scott.moede@portlandoregon.gov
NAOMI SHEFFIELD, OSB 170601
Deputy City Attorney
naomi.sheffield@portlandoregon.gov
ROBERT YAMACHIKA, OSB 065560
Senior Deputy City Attorney
rob.yamachika@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendant City of Portland*

Page 35 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION