J. SCOTT MOEDE, OSB #934816
Chief Deputy City Attorney
scott.moede@portlandoregon.gov
NAOMI SHEFFIELD, OSB #170601
Deputy City Attorney
naomi.sheffield@portlandoregon.gov
ROBERT YAMACHIKA, OSB #065560
Senior Deputy City Attorney
rob.yamachika@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendant City of Portland*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| DON'T SHOOT PORTLAND, a nonprofit corporation, in its individual capacity, NICHOLAS J. ROBERTS, in an individual capacity and on behalf of themselves and all others similarly situated, MICHELLE "MISHA" BELDEN, in an individual capacity and on behalf of themselves and all others similarly situated, ALEXANDRA JOHNSON, in an individual capacity and on behalf of themselves and all others similarly situated,<br><br>PLAINTIFFS,<br><br>v.<br><br>CITY OF PORTLAND, a municipal corporation, and MULTNOMAH COUNTY, a political subdivision of the State,<br><br>DEFENDANTS. | 3:20-cv-00917-HZ<br><br>**DECLARATION OF RANDY KUYKENDOLL JR.**<br><br>**(In Support of Defendant City of Portland's Response to Motion for Temporary Restraining Order and Preliminary Injunction)** |

I, Randy Kuykendoll Jr., declare as follows:

Page 1 – DECLARATION OF RANDY KUYKENDOLL JR.

1. I am a City of Portland police officer. I was hired by the Portland Police Bureau ("PPB") in March 2015, and sworn in as an officer in May 2015. My current primary assignment is as a patrol officer in Central Precinct, assigned to the Entertainment Detail. The Entertainment Detail primarily responds to calls for police service in the downtown area from bars, taverns and clubs. These calls involve noise disturbances, fights, public intoxication, and other forms of disorderly conduct. My work on the Entertainment Detail can involve aspects of crowd management and control. In a few days, I will be transferring out of the Entertainment Detail, but continue working as a patrol officer assigned to Central Precinct.

2. In January 2017 I began working in a detached, specialty assignment with PPB's Rapid Response Team ("RRT"). RRT has an application and selection process. RRT is PPB's primary specialty group that performs crowd management and crowd control services. Since June 2018 my role on RRT has been as a grenadier. As a member of RRT I have received at least 30 to 40 hours of annual In-Service training. As a grenadier, I have received approximately 10 other hours of annual In-Service training. On June 20, 2020, I resigned from my position on RRT to take a position on another specialty unit, Portland Metro Explosive Disposal Unit (MEDU). I receive approximately 40 or more hours of training per month with internal and external training as a member of MEDU.

3. As a RRT grenadier, I have been trained in the use of less lethal weapons such as a 40 mm launcher and the FN303. The 40mm launcher is a shotgun-like platform that allows a variety of Riot Control Agents ("RCAs") to be fired from it. These RCAs can include impact munitions, such as foam tipped impact rounds, marking rounds that contain paint, or Oleoresin Capsicum ("OC") rounds that contain OC powder that disperse on impact. In addition, the 40mm launcher can be used to launch other RCAs such as smoke (obscurant), 2-chlorobenzalmalononitrile "CS" gas and Oleoresin Capsicum Pyrotechnic ("OC pyrotechnic"). The FN303 is a rifle-like platform that allows small, plastic balls to be fired from it. These balls can contain an active ingredient of 0.5% OC in a powder form and washable paint for marking

Page 2 – DECLARATION OF RANDY KUYKENDOLL JR.

suspects.

4. In addition to launchable RCAs, grenadiers also carry hand-tossed munitions including canisters of CS gas, OC pyrotechnic, or OC vapor. Grenadiers may also carry rubber ball distraction devices ("RBDDs"). RBDD payloads can vary, and some do not have any payloads at all, and are called inert RBDDs. An inert RBDD delivers only a blast of light and sound. A "live" RBDD delivers a blast of light and sound, but also contains small rubber balls (approximately .81 cm each) that are dispersed outward in an explosion. An "OC" RBDD delivers a blast of light and sound, but also projects a cloud of OC in outward in an explosion. The rubber ball dispersion during the explosion of a "live" RBDD or an "OC" RBDD radiates horizontally approximately 50 feet.

5. On Tuesday, June 2, 2020 and Wednesday, June 3, 2020, I was assigned as a grenadier to RRT's Alpha Squad. My shift began at 1700 hours on June 2 and ended approximately 0400 hours on June 3. During part of my shift, on or after 2200 hours, I was working downtown in the area of SW 5th Ave / SW Salmon St. Dispersal announcements and force warnings had been given, but members of the crowd had refused to disperse. I saw multiple subjects throwing projectiles at the police during our dispersal of the area. I deployed an RBDD to deter the crowd from throwing projectiles and to move the crowd away from the police. The RBDD landed and detonated more than 5 feet, the safe standoff distance, away from any subject. Multiple subjects ran away from the area, but some remained. I saw a masked up female run back into the area and begin to use a large traffic cone to defeat a nearby gas-producing munition that had been deployed by the police.

6. During part of this same June 2-3 shift, on or after 2200 hours, I deployed FN303 marking rounds at many subjects, all of whom had refused the dispersal orders and force warnings, and most were throwing objects at the police, or preparing to throw objects at the police, including gas-producing munition canisters deployed by the police. In one case, a subject approached a gas-producing munition deployed by the police, and began smothering it with a

Page 3 – DECLARATION OF RANDY KUYKENDOLL JR.

water. In all cases however, I aimed my FN303 marking rounds just below each subject's belt line. Although my marking rounds appeared to strike the intended target area, many of the subjects did not react and continued either throwing objects at the police, or continued their efforts to immobilize the gas-producing munitions. In another case, however, a masked up subject who was preparing to throw a projectile at the police reacted to my volley of marking rounds by dropping the projectile and running away to the north. In another case, my marking rounds hit the subject, but the subject threw the object back at the police, which was one of our gas-producing munitions. In every case, either where the subject dropped the object and ran away, or had thrown the object and then ran away, I ceased my engagement with that subject and ceased firing my FN303 when the threat of that subject's assaultive behavior no longer existed.

7. During part of this same June 2-3 shift, on or after 2200 hours, after dispersal announcements and force warnings had been given, but members of the crowd had refused to disperse, I deployed a triple chaser CS gas munition to deter persons in a crowd from throwing projectiles at the police and move them away from the area. The munition landed more than 5 feet from any subject. Some members of the crowd left the area; other members, however, remained. On a second occasion on this same shift, I deployed another triple chaser CS munition to deter persons in the crowd from throwing projectiles at the police and to move them away from the area. Like before, the munition landed more than 5 feet away from any subject and caused multiple subjects to run away from the area. When I saw that the subjects were fleeing the area, I immediately ceased my use of the CS gas.

8. During part of this same June 2-3 shift, on or after 2200 hours, Alpha Squad was mounting up on a RRT van to leave the particular area where we were policing. A crowd of people began to converge on our RRT van and persons in the crowd were throwing projectiles at us. I tossed a RBDD towards the crowd to deter their assaultive behavior and to cover our egress from the area. The RBDD landed more than 5 feet away, a safe standoff distance, from any of the persons assaulting the members of Alpha Squad. The crowd stopped their advance, and

Page 4 – DECLARATION OF RANDY KUYKENDOLL JR.

Alpha Squad left the area.

9. On Sunday, June 7, 2020 and Monday, June 8, 2020, I was assigned as a grenadier to RRT's Alpha Squad. My shift began at 1700 hours on June 2 and ended approximately 0400 hours on June 3. During part of my shift, on or after 2355 hours, I was working near the Multnomah County Justice Center. Dispersal announcements and force warnings had been given, but members of the crowd had refused to disperse. I saw multiple subjects throwing projectiles at several county deputies and other county personnel who were standing on the portico of the Justice Center along SW 3rd Avenue. I deployed an RBDD to deter the crowd from throwing projectiles and to move them away from the area. The RBDD landed and detonated more than 5 feet, a safe standoff distance, from any person.

10. During this same June 7-8 shift, on or after 2355 hours, after dispersal announcements and force warnings had been given, RRT was directing the crowd west on SW Main Street. However, many people in the crowd began resisting RRT's efforts to push the crowd by standing their ground, and challenging officers to push them. I saw members of the crowd throw projectiles at the police. I deployed an RBDD to deter the crowd from throwing projectiles and orient them away from the area. The RBDD landed and detonated more than 5 feet, a safe standoff distance, from any person.

11. During this same June 7-8 shift, on or after 2355 hours, I deployed Pava rounds from my FN303 at persons who were throwing projectiles at the police, or when about to throw objects. In one case, I saw a subject rear his arm back and prepare to toss the object at the police. I deployed a volley of 3-4 Pava rounds, aiming just below the subject's beltline. Another subject began using a strobe light to disorient me, the light was so intense it obscured the reticle on the FN303. The subject did not react to the initial volley, I deployed another volley of 3-4 Pava rounds, again aiming for just below the subject's beltline. The subject reacted by dropping the projectile and running away to the west. As a result, I immediately ceased deploying FN303 rounds at this person.

Page 5 – DECLARATION OF RANDY KUYKENDOLL JR.

12. During this same June 7-8 shift, on or after 2355 hours, another subject was throwing projectiles at the police. I was unable to target this subject with my FN303 because the same subject utilizing the strobe light flashed me with it again and kept it focused on me; the strobe light washed out my reticle and disoriented me. I saw the subject successfully throw the object at the police. I reoriented and engaged the subject using the strobe light with a volley of 3-4 Pava rounds from my FN303, aiming just below the subject's beltline. The subject did not appear to react, so I deployed 3-4 more Pava rounds. The subject did not obviously react to the Pava rounds but turned away and temporarily stopped flashing me with the strobe light. I stopped deploying FN303 rounds at the subject once he stopped using the strobe light against me. However, later this same person targeted me with the strobe light again when I was attempting to target my FN303 on another subject who was throwing projectiles at the police. I adjusted my line of sight to this person using the strobe light and deployed a volley of 3-4 Pava rounds, aiming just below the beltline. Like before, the subject did not obviously react, but stopped using the strobe light. As a result, I immediately ceased deploying FN303 rounds at this person.

13. On Friday, June 12, 2020 and Sunday, June 13, 2020, I was assigned as a grenadier to RRT's Alpha Squad. My shift began at 1700 hours on June 12 and ended approximately 0400 hours on June 13. During my shift on June 13, on or after 0040 hours, after dispersal announcements and force warnings had been given, a crowd of people were physically resisting RRT's efforts to push them. Members of the crowd were challenging the police to push them; other multiple members of the crowd were throwing projectiles at the police. I deployed a RBDD, which landed more than 5 feet away from any person. Multiple subjects then ran away from the area.

14. During this same June 12-13 shift, on June 13, on or after 0400 hours, I saw a white male who appeared to be about 30 years old, with long brown hair and a beard, run towards a deployed RBDD, pick it up, and throw it back at the police. I deployed a volley of 3-4

Page 6 – DECLARATION OF RANDY KUYKENDOLL JR.

Pava rounds from my FN303, aiming just below the male's beltline. The male dropped the RBDD and ran away. As a result, I immediately ceased deploying FN303 rounds at this person.

15. On Monday, June 15, 2020 and Tuesday, June 16, 2020, I was assigned as a grenadier to RRT's Alpha Squad. My shift began at 1700 hours on June 15 and ended approximately 0400 hours on June 16. During my shift, on or after 2310 hours, I was working in the area of SW 3rd Ave / SW Main St. Dispersal announcements and force warnings had been given, but members of the crowd refused to disperse. I saw multiple subjects throwing projectiles at the police. I deployed an RBDD to deter this assaultive behavior to the police. In another instance during this same shift, on or after 2310 hours, I saw a white female attempt to pick up a munition and throw it at the police. I launched a volley of 3-4 FN303 rounds at the woman's left leg. The woman ceased trying to pick up the munition and ran away Westbound. As a result, I immediately ceased deploying FN303 rounds at this person.

16. While deployed with Alpha Squad during the recent protests, rioting and public disorder in downtown Portland, I believe all my use of force was objectively reasonable under the totally of the circumstances.

17. I make this declaration in support of Defendant City of Portland's Response to Motion for Temporary Restraining Order and Preliminary Injunction.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED: 7/4/20

Randy Kuykendoll Jr.

Page 7 – DECLARATION OF RANDY KUYKENDOLL JR.

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047