J. SCOTT MOEDE, OSB 934816
Chief Deputy City Attorney
scott.moede@portlandoregon.gov
NAOMI SHEFFIELD, OSB 170601
Deputy City Attorney
naomi.sheffield@portlandoregon.gov
ROBERT YAMACHIKA, OSB 065560
Senior Deputy City Attorney
rob.yamachika@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendant City of Portland*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| DON'T SHOOT PORTLAND, a nonprofit corporation, in its individual capacity, NICHOLAS J. ROBERTS, in an individual capacity and on behalf of themselves and all others similarly situated, MICHELLE "MISHA" BELDEN, in an individual capacity and on behalf of themselves and all others similarly situated, ALEXANDRA JOHNSON, in an individual capacity and on behalf of themselves and all others similarly situated,<br><br>**PLAINTIFFS,**<br><br>v.<br><br>CITY OF PORTLAND, a municipal corporation, and MULTNOMAH COUNTY, a political subdivision of the State,<br><br>**DEFENDANTS.** | 3:20-cv-00917-HZ<br><br>**DECLARATION OF CRAIG LEHMAN** |

I, Craig Lehman, Portland Police officer, declare as follows:

1. On May 31, 2020, I was working as a member of the Rapid Response Team, on Delta squad, and we were tasked with responding to a civil disturbance for multiple days in

Page 1 – DECLARATION OF CRIAG LEHMAN

a row. Protestors were blocking traffic, committing acts of vandalism, and throwing projectiles at officers throughout the incident.

2. This demonstration followed the previous night where a similar demonstration devolved into a riot. At this point, people were blocking the street and preventing vehicular traffic. The protestors were given several verbal warnings over a loudspeaker to exit the street immediately or be subject to arrest and the use of force to include impact munitions.

3. The crowd refused to leave the street and were violating the lawful order to leave the street. At the time I used force, it was also past the Mayor's curfew order of 8:00 pm.

4. As I and my group passed several people who remained in the street in violation of the order to leave and in violation of the curfew, I saw several projectiles launched at us. Protestors had also thrown debris in the street and had lit several debris piles on fire. The attitude of protestors toward police was violent and antagonistic and included threats.

5. At this time, as our van was driving down SW Salmon St near SW 10th Ave., several protesters were throwing projectiles at our vehicle as we were mounted on the side. I saw a group of people, that I believed threw the objects at us, run behind a large dumpster. I believed that they were using the dumpster as cover to avoid capture and give them an opportunity to hurl more projectiles at us.

6. I tossed a Rubber Ball Distraction Device at the corner of the dumpster, which was approximately 5 feet from the edge of the sidewalk where the group was hiding. The RBDD was effective at dispersing the crowd.

7. That same night, as our vehicle was passing in front of the Justice Center, I noticed a group of approximately 50 people in the park across the street, while approximately 10 others waited in front of the building.

Page 2 – DECLARATION OF CRIAG LEHMAN

8. We had previously received complaints from officers in front of the Justice Center being impacted by projectiles.

9. I tossed a can of CS into the street in front of the building for several reasons, including to disperse the group of protesters from further access to throw projectiles at officers.

10. That same night, our squad also responded to SW 3rd Avenue and SW Salmon Street due to information we received that protestors had smashed through the windows at the federal courthouse and were actively vandalizing the structure. As I approached SW 3rd avenue, I tossed an RBDD in the street in front of the courthouse to disperse the crowd and it worked.

11. Also that same night, after the protestors were cleared from the courthouse area, there was a group of protestors throwing projectiles at us from the park near the intersection with SW 3rd and Main. I tossed a can of OC into the corner of the park to disperse the crowd throwing projectiles at us and to prevent protestors from attempting to get close enough to throw projectiles.

12. On June 27, 2020, I was again working as a member of the Rapid Response Team, on Delta Squad, and we were tasked with responding to a civil disturbance at SW 3rd and Main St where a crowd had stolen construction barriers and used them to block streets to obstruct vehicles and commerce.

13. At approximately 2230 hours there were several announcements given over a loudspeaker, directed at the crowd, that they were being ordered to leave the street or be subject to arrest or the use of force. When we arrived at SW 3rd Ave. and SW Salmon St. we faced one of the several barricades that blocked the southbound lanes of SW 3rd Ave. We moved on foot until we approached the crowd that had gathered on SW Main St., and they had set up to more barricades at this intersection blocking any flow of vehicle traffic. The loudspeaker announcements were clearly audible and

gave specific directions to the crowd on what the expectations were and which direction we were encouraging them to go.

14. At approximately 2:00 am we received information from officers at the Central Precinct front doors that they needed immediate help while attempting to make an arrest and prevent protestors from breaching the doors to the building.

15. The large majority of the crowd remained in the intersection facing towards our line formation. The front row of the crowd was armed with shields, umbrellas, and various other types of blunt objects. Numerous people were also wearing gas masks, face shields, and various other forms of eye and face protection. Many in this crowd also appeared to be crouching or hunkering down, as if they were bracing themselves to respond to any type of action they believed we would use to move them from the area.

16. Once we were given the order to move the crowd, I observed one subject attempt to thwart another officer from moving them forward by using his skateboard to push the officer back. Along the line I observed several more incidents of people pushing back or resisting offers with their improvised shields.

17. This crowd was made up of people that were largely hostile towards the police and appeared to come down to this area to engage in a violent confrontation with law enforcement, as they had done so on multiple previous nights. The groups that continuously converged on the Justice Center had previously committed acts of vandalism by spray painting or disabling security cameras that were monitoring the building.

18. Since this group, and other groups, have been given significant leeway regarding minor offenses while protesting, my only belief is that this group had no intention of conveying a message, but rather was intent on violence and destruction.

19. That same night, I observed my RRT squad along with Multnomah County RRT attempting to move the violent crowd westbound towards SW 4th Ave. The crowd was actively pushing back against officers and people from behind the crowd were throwing projectiles at the officers on the line and behind the line.

20. The projectiles being thrown at us included paint filled balloons, glass bottles, and feces. All of these jeopardized the health and safety of the officers around me and myself.

21. To protect myself and other officers I deployed one RBDD approximately 5 feet away from the violent crowd as they were actively pushing back against officers.

22. The RBDD landed in the area I intended, where there did not appear to be anyone who was not participating in violent conduct.

23. Also on June 27, 2020, near the intersection of SW 2nd and SW Main St I observed a suspect throw a glass bottle directed at our officers on the line facing northbound on second. We had responded to this area after we received reports of an officer being assaulted and other protestors attempting to breach the precinct doors.

24. Once the bottle was thrown at officers, I launched one 40mm round targeting the subject's right leg. Due to the distance the round struck the suspect's foot.

25. This force was necessary to defend myself and other officers from a violent subject intent on injuring officers with a blunt object.

26. Also on June 27, 2020, due to the increased, and constant violence from the crowd, the incident commander declared this event to be an unlawful assembly and gave specific direction to the crowd of the area that needed to be vacated.

27. The people were given a reasonable amount of time to comply with the directions, and the people who remained continued to stand in the street facing us while hurling insults and provocations of violence.

Page 5 – DECLARATION OF CRIAG LEHMAN

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

28. As we approached SW 4th Ave the suspect standing directly in front of me was walking backwards and at an intentionally slow pace, as to prevent us from accomplishing our task of clearing the streets from the unlawful assembly order. As I pushed the suspect backward, he attempted to grab my left arm and pull it down.

29. With my right hand I targeted the suspect's face with a burst of pepper spray that lasted approximately 1 second. The pepper spray was effective and I lost sight of this suspect shortly after.

30. While I was pushing the subject from the previous pepper spray deployment, another suspect came to his aid and attempted to prevent me from deploying pepper spray. When the suspect attempted to grab my arm, I delivered a 1 to 2 second burst of pepper spray to his face as well. This subject also disappeared, as the pepper spray appeared to be effective.

31. make this declaration in support of the City of Portland's Response to the Motion for Preliminary Injunction..

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED: 7/3/20

Craig Lehman