J. SCOTT MOEDE, OSB 934816
Chief Deputy City Attorney
scott.moede@portlandoregon.gov
NAOMI SHEFFIELD, OSB 170601
Deputy City Attorney
naomi.sheffield@portlandoregon.gov
ROBERT YAMACHIKA, OSB 065560
Senior Deputy City Attorney
rob.yamachika@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendant City of Portland*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| DON'T SHOOT PORTLAND, a nonprofit corporation, in its individual capacity, NICHOLAS J. ROBERTS, in an individual capacity and on behalf of themselves and all others similarly situated, MICHELLE "MISHA" BELDEN, in an individual capacity and on behalf of themselves and all others similarly situated, ALEXANDRA JOHNSON, in an individual capacity and on behalf of themselves and all others similarly situated, <br><br>**PLAINTIFFS,** <br><br> v. <br><br> CITY OF PORTLAND, a municipal corporation, and MULTNOMAH COUNTY, a political subdivision of the State, <br><br>**DEFENDANTS.** | 3:20-cv-00917-HZ <br><br> **DECLARATION OF SERGEANT JOHN OLIPHANT** <br><br> **(In Support of Defendant City of Portland's Response to Motion for Contempt)** |

I, John Oliphant, declare as follows:

      1.    I have been employed by the Portland Police Bureau since August 2009. My current rank is Sergeant. I have been a Sergeant since February 2020. My current primary assignment is Patrol Sergeant. I also serve on the Police Bureau's Rapid Response Team

Page 1 – DECLARATION OF SERGEANT JOHN OLIPHANT

("RRT"). I have been a member of RRT since approximately April 2018. Prior to joining the Portland Police Bureau, I worked as a Woodburn Police Officer from November 2003 until August 2009, and the United States Coat Guard from 1998 to 2006.

2. My professional training includes the police academy, Portland police advanced academy, as well as Portland Police Bureau in-service trainings. I also receive at least 40 hours of additional RRT training including, but not limited to, small unit tactics, crowd behavior, crowd control, less lethal munitions training, and RRT team training.

3. On the Sunday May 31, 2020, I was assigned to Rapid Response Team Charlie Squad in the area of the Justice Center and Mark O. Hatfield Federal Court House at SW Main between SW 2nd and SW 3rd Streets. We were stationed there to protect the safety of peaceful protesters and property in response to violence and property damage that occurred in the area the previous night. As a member of the Rapid Response Team I carried special less lethal munitions on my person including those described in this declaration. The following paragraphs 3 through 8 describe all uses of force employed by me in carrying out my duties on the night of May 31, 2020 through the morning of June, 1, 2020. Uses of force are described in chronological order.

4. At SW Main between SW 2nd and SW 3rd, Charlie Squad was ordered to push a crowd of people back to SW 3rd Ave. The sound truck had been giving continuous instructions to move back and the crowd was disregarding the lawful order. As we began the push forward, numerous people engaged in active aggression to the front line officers. I watched officers next to me begin to arrest a person who was refusing to comply with Officers' lawful commands to disburse and two people began trying to unarrest the subject by pulling on the suspect and punching the arresting officers. I deployed my spray can containing Oleoresin Capsicum ("OC") on the closest suspect. The use of OC spray was effective at stopping the individuals' conduct.

5. Following the incident described above in paragraph 3, with the sound truck continuing to give orders for the crowd to disperse from the Justice Center, we began moving forward. As we moved forward the crowd began to disburse. About two blocks away at SW

5th/SW Columbia, my squad came upon a large crowd that was acting aggressive and refused to disperse in response to the repeated and ongoing commands. The group began throwing objects at us. I was diagonally across from the largest mass of the crowd and rolled a rubber ball distraction device ("RBDD") toward the crowd. RBDD payloads can vary, and some do not have any payload at all and are called inert RBDDs. An inert RBDD delivers a blast of light and sound but contains nothing else. "Live" RBDDs, deliver a blast of light and sound and contains small rubber balls (approximately .81 cm each) which are dispersed in the explosion. OC RBDDs deliver a blast of light and sound and also project a cloud OC gas. To the best of my recollection, the RRBDs I deployed contained OC. The RBDD had the desired effect – the crowd broke into several different smaller groups and some individuals began to disburse.

6. After the primary crowd was dispersed from the Justice Center, my squad was tasked with finding the smaller groups of individuals that were failing to disperse and abide by the Mayor's curfew order which was then in effect. At SW 2nd/SW Alder, we came upon a group of about 10 people. We repeatedly verbally ordered them to disperse and go home. It was apparent to me that they had heard the orders and at least one individual responded by saying 'fuck you.' Other individuals postured indicating physical resistance to the orders. I deployed a hand-toss munition containing 2-chlorobenzalmalononitrile ("CS") gas. The deployment of CS gas had the intended effect – most of the group began to disburse.

7. My squad was told to move to the NE corner of SW 4th/SW Washington. There we waited for a Mobile Field Force to arrive at the Portland Luggage store to assist with boarding up the business's East windows. The windows had been broken out and it appeared that roughly half of the store's merchandise had been stolen by looters. While we waited for the Mobile Field Force to arrive, a crowd of about 75 people started gathering across the street on the SW and SE corner of this intersection. Other officers and I ordered them multiple times to disperse. It was apparent to me that they heard and understood these commands. They refused and started throwing projectiles, one of which hit the back window of a patrol car. A large block

Page 3 – DECLARATION OF SERGEANT JOHN OLIPHANT

of wood was thrown along with spent hand tossed munitions from an earlier deployment by law enforcement. I deployed two hand-toss CS gas canisters at each corner of the intersection. The deployment of CS gas had the intended effect – some individuals began to disburse, and the groups broke into smaller groups.

8. My squad also encountered a crowd of about 12 people at SW 3rd between SW Washington and SW Stark St. The group was repeatedly ordered to disperse. It was apparent to me that they heard and understood these commands, but refused to do so. After repeated instructions to disburse, I deployed a hand-tossed CS gas canister down the sidewalk in their direction and in front of the group. The deployment had the desired effect – the group began to splinter.

9. During the incidents described above I was hit with a glass bottle which broke on my inner thigh. I was hit with a milk jug that was filled with white paint on my legs and right foot. I also had to dodge several other projectiles that were thrown at me throughout the night. The crowds we interacted with were physically aggressive and repeatedly failed to obey lawful orders. These groups intentionally took physical actions to be antagonistic, and attempted to start physical fights with Officers by using words, phrases, and actions to elicit a response from us. Several techniques were attempted to gain voluntary compliance with our orders and deescalate these individuals. Techniques included using the sound truck to give instructions to the crowd, using time and waiting for compliance, using numerous officers, and we engaged in dialogue with the people who identified themselves as protest organizers. These tactics were at times successful, and at times unsuccessful resulting in the force described above.

10. On Tuesday, June 2, 2020 I was similarly deployed with Rapid Response Team Charlie to the same area around the Justice Center and Mark O. Hatfield Federal Courthouse described above. The following paragraphs 10 through 12 describe the uses of force I employed the night of June 2nd through the morning of June 3rd.

11. At SW 3rd/SW Taylor my squad was tasked with dispersing and funneling northward a

large group of physically aggressive individuals that were attacking another group of officers with projectiles. At this point, a civil disturbance had been declared and the officers were calling for help because they felt they were in danger of being overrun by the crowd. Multiple force warnings and orders to disburse were being given by the sound truck and officers. It was apparent to me that the group had heard these lawful commands and understood them but refused to comply. I deployed one CS gas hand-toss canister towards the intersection in front of the group. The group began to disburse and move.

12.    At this point, my squad was split between two vehicles. I was in the second vehicle, following the first. We began driving South on SW Broadway and I watched the vehicle in front of me turn east onto SW Alder. Our entire squad was riding on the outside rails of both vehicles. As I was watching the vehicle turn, it almost completed the turn when it suddenly stopped. As it stopped, a person appeared and I watched them release something, in a baseball throwing motion, towards the officers. I watched one of the officers engage the subject with an FN303. The FN303 is a compressed air driven less lethal device similar to a paintball gun that shoots a specially designed plastic fin stabilized projectile with a bismuth (nontoxic) powder in the nose and a payload in the rear which can be paint, marking, training or Oleoresin Capsicum. I could see the suspect was actively trying to avoid the rounds from the FN303. I could also see the suspect was trying to get in to position to throw another object at the officers in the first vehicle. I dismounted the rail of my vehicle and fired one less lethal blue foam tip 40mm round at the suspect. It was from a distance of 75 feet. I could not see if it impacted but the suspect did duck behind a pole. We quickly mounted our vehicles again so we were not stationary targets for more projectiles. I kept my focus on the suspect and just as we finished the turn and the building made it so I couldn't see the suspect, another unidentified object appeared flying towards the back of my vehicle. It missed the officers in the back but based on the trajectory of where it came from, I believe it was thrown by the same person. Force warnings and orders for dispersals were continually being given by the sound truck to the crowd at this time. It was apparent that the

group had heard and understood these and prior commands to disburse and leave the area but were refusing to do so.

13. I make this declaration in support of Defendant City of Portland's Response to Motion for Contempt.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED: 7-3-20

Page 6 – DECLARATION OF SERGEANT JOHN OLIPHANT