J. SCOTT MOEDE, OSB 934816
Chief Deputy City Attorney
scott.moede@portlandoregon.gov
NAOMI SHEFFIELD, OSB 170601
Deputy City Attorney
naomi.sheffield@portlandoregon.gov
ROBERT YAMACHIKA, OSB 065560
Senior Deputy City Attorney
rob.yamachika@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR  97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendant City of Portland*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| DON'T SHOOT PORTLAND, a nonprofit corporation, in its individual capacity, NICHOLAS J. ROBERTS, in an individual capacity and on behalf of themselves and all others similarly situated, MICHELLE "MISHA" BELDEN, in an individual capacity and on behalf of themselves and all others similarly situated, ALEXANDRA JOHNSON, in an individual capacity and on behalf of themselves and all others similarly situated,<br><br>**PLAINTIFFS,**<br><br>v.<br><br>CITY OF PORTLAND, a municipal corporation**,** and MULTNOMAH COUNTY, a political subdivision of the State,<br><br>**DEFENDANTS.** | 3:20-cv-00917-HZ<br><br>**DECLARATION OF ANTHONY PASSADORE**<br><br>**(In Support of Defendant City of Portland's Response to Plaintiffs' Motion for Preliminary Injunction and Motion for Contempt)** |

///

///

Page  1  –  DECLARATION OF ANTHONY PASSADORE

I, Captain Anthony Passadore, declare as follows:

1. I am employed by the City of Portland as a Captain in the Portland Police Bureau ("PPB" or "the Bureau"). I have been a police officer since 1997 and with the Portland Police Bureau since 2003. Currently, in addition to my role as Captain, I am also frequently in the role of Incident Commander for crowd management/crowd control occurrences that take place within the City.

2. The City's Crowd Management/Crowd Control policy is numbered 0635.10 ("The Policy"). Directive 0632.10 is available at: https://www.portlandoregon.gov/police/article/649358.

3. The City's Use of Force policy is numbered 1010.00 ("Directive 1010.00"). Directive 1010.00 is available at: https://www.portlandoregon.gov/police/article/751998.

4. On June 6, 2020, Mayor Wheeler as Police Commissioner, issued the following direction regarding PPB's use of chemical irritants in connection with crowd dispersal:

> I stand in solidarity with our non-violent demonstrators, who are sending a strong message that we are long overdue for meaningful reform and restorative justice. Our community has serious concerns about the use of CS gas for crowd management, particularly during a time when we're battling a pandemic. I share those concerns. Today, I directed Portland Police Chief Jami Resch that gas should not be used unless there is a serious and immediate threat to life safety, and there is no other viable alternative for dispersal. I strongly believe that gas should not be used to disperse crowds of non-violent protestors or for general crowd management purposes. It should only be used in response to violence that threatens life safety. My priority and focus are to protect the lives of demonstrators, our first responders, and the people in custody at the Justice Center. I am confident that the Portland Police officers, Multnomah County Sheriff deputies, and Oregon State Police troopers on the ground will continue to acknowledge the voice of protesters and act in a way that reflects the professionalism that is expected and is a core value of our police force, as well as the law enforcement agencies supporting them. Night after night, they are doing what they can to prioritize and protect the public's safety. My colleagues and I are acutely aware of the urgency around these issues and will continue to work together in the coming days to put together a package of actions that address the demands we are hearing loudly from our community.

Page 2 – DECLARATION OF ANTHONY PASSADORE

5. The Portland Police Bureau immediately implemented this directive from Mayor Wheeler and made it part of our operational plan.

6. On June 9, 2020, Judge Hernandez issued a TRO regarding tear gas that states

> The Court therefore orders that PPB be restricted from using tear gas or its equivalent except as provided by its own rules generally. In addition, tear gas shall be limited to situations in which the lives or safety of the public or the police are at risk. This includes the lives and safety of those housed at the Justice Center. Tear gas shall not be used to disperse crowds where there is no or little risk of injury.

7. The Portland Police Bureau immediately implemented this Order from Judge Hernandez and made it part of our operational plan.

8. I understand that the City's attorneys also sought clarification from the Court on the Order so that PPB could comply with all details required by the Court. On June 12, 2020, I learned that the restrictions in the Order did not apply to FN 303s with OC payload or 40mm impact munitions with OC payload used by PPB in crowd management/crowd control events and did not apply to handheld OC (commonly referred to as "pepper spray") directed at individuals, not crowds, but used by PPB during crowd management/crowd control events. And finally that the restrictions did not apply to the use of handheld OC outside of crowd management/crowd control events.

9. With or without the clarification, based upon PPB's own policies and directives and Mayor Wheeler's direction about the use of CS gas for crowd management and Judge Hernandez's Order, I very much understood and still understand the importance of exercising restraint and emphasizing de-escalation in crowd management, even in the face of violence from demonstrators.

10. Incident Commander (IC) is defined in the Policy. The IC is the individual responsible for all incident activities, including the development of strategies and tactics and the ordering and release of resources. The IC has the overall authority and responsibility conducting

Page 3 – DECLARATION OF ANTHONY PASSADORE

incident operations and is responsible for the management of all incident operations at the incident site.

11. By way of background, I attended the State of Oregon's Police Academy in 1997. This was approximately a 10-week program. While I have been employed with the City of Portland, I have attended the Bureau's annual in-service trainings, which typically last about one week. The annual in-service training will cover various law topics.

12. I have received training both from the state police academy and from the Bureau's Training Division at annual in-service training.

13. I have also received training both from the state police academy and from the City of Portland's Police Bureau's Training Division at annual in-service training, regarding the lawful use of physical force or control.

14. I have also received special training in crowd management/crowd control management and have used that training in my role as a crowd management Incident Commander. I have been an Incident Commander since 2020.

15. Beginning on May 27, 2020 to the present, I have been serving as the Incident Commander for portions of each day of the demonstrations in Portland. Below is a description of some of the nights that I served as the Incident Commander.

16. Attached as Exhibit 5 is a photograph I took inside the Incident Command Post on June 2, 2020 of the livestreams being viewed of both the protestors peacefully protesting in Pioneer Square and the protestors at the fence near SW 3rd and SW Taylor.

17. On June 9, 2020, I was the Incident Commander. At this point in the protests, I directed that all officers remove themselves from the portico on the Third Avenue side of the Justice Center or move to a position that they would not be seen. I gave this direction to ensure that uniformed police officers did not cause a continued flash point with the protestors.

18.     On June 16, 2020, I was the Incident Commander. On this night, it was my intent to have as little police presence as possible and had no officers present outside of the Justice Center where the crowd was forming.

19.     Protesters congregated on SW 3rd Avenue in front of the Justice Center.

20.     After a couple of hours of protestors chanting, a group marched around the building and locked the front doors of Central Precinct from the outside by protesters with a u-lock and ropes. The u-lock had to be cut off from the outside so those inside could leave. The ropes were taken by protesters from the flagpole and tried to roll-up doors on the Southeast corner of the building where cars exit the parking garage.

21.     Locking the Justice Center from the outside presented serious life safety concerns for the adults in custody and employees inside the building, as it significantly limited any egress in the event of a fire or other emergency. When officers came to remove the locks and ropes, the demonstrators moved away from the building and the doors were re-opened.

22.     As demonstrators took to the street marching, it was still my intent and goal to keep a very low police presence. Around 1:15 a.m., a car drove through the crowd marching in the street at SE 3rd and SE Alder. PPB officers responded to help with the assistance of a Portland Fire medic. PPB officers and Portland Fire medics assisted two patients who were struck by the vehicle and required transport to the hospital.

23.     PPB deploys Air1 during demonstrations to help monitor the movements of the crowd and look out for potential safety threats for the demonstrators and officers on the ground.

24.     When the car dangerously drove into the crowd of marchers, I immediately directed Air1 do leave the downtown area observing the protest to follow the car for arrest. Air1 was able to follow the car into SE Portland where Officers were able to stop the involved vehicle and make arrests.

25.     Early on the Thursday evening of June 25, 2020, a large group gathered at Fernhill Park and eventually marched towards North Precinct.

Page 5 – DECLARATION OF ANTHONY PASSADORE

26.   There was no pre-designated IMT. I was called in from home and informed that a large crowd had developed at North Precinct, and in fact had circled the perimeter of the precinct. I was further told that the crowd was setting up barricades on NE Emmerson street just off of MLK, and they were continually reinforcing that barricade.

27.   At approximately 10:00 pm, several hundred demonstrators began gathering outside North Precinct near Northeast Emerson Street and Northeast Martin Luther King Boulevard. Some demonstrators arrived with supplies to build a fence and began erecting one which stretched from the south side of North Precinct to the north side of the Boys and Girls Club. While building the fence, demonstrators blocked northbound traffic at Northeast MLK Boulevard. During this time, demonstrators began throwing projectiles at police including glass bottles.

28.   By 11:00 p.m., demonstrators began moving dumpsters and other large barriers around North Precinct. Some demonstrators began ramming the dumpsters into large garage doors located on the west side of the North Precinct in an attempt to breach the building. Demonstrators were not successful at breeching the doors so they turned their attention to barricading exit doors so officers inside the building, as well as people in custody, could not get out. Provided are photos of the barricaded doors at North Precinct as Exhibit 6.

29.   I called in from home Lt. Franz Schoening requesting assistance from our Rapid Response Team (RRT). Members of the RRT are certified in the use of specialty munitions. I requested their assistance in order to increase the capabilities and effectiveness of the patrol officer mobile field force that were on scene.

30.   At approximately 11:15 p.m. I broadcasted the following reminder over the North Tactical Radio[1]:

> We're in a really good posture everybody's doing a great job thanks for your hard work. I want to remind everybody of Judge Hernandez' orders on OC use during a protest. OC is authorized by the IC if used directly on a person for their aggressive behavior as it

---

[1] Attached as Exhibit 7 are the BOEC Recordings of the North Tactical Radio on June 25, 2020.

Page 6 – DECLARATION OF ANTHONY PASSADORE

complies with our policies.  OC is NOT to be used as a crowd dispersing agent broad across a group of people.  Break.  We're gonna hold our current position.  We have a great perimeter around the precinct and every location will soon have a supervisor with a set of instructions for the groups that are securing each side in case we have an attempt of a breach.  Again thanks for the hard work.

31. By 12:00 a.m., demonstrators had built barricades on Emerson and MLK with supplies brought by protesters and multiple knocked over dumpsters.  Several demonstrators in the crowd were wearing masks and yielding shields.  Demonstrators were throwing frozen apples and shining lasers at officers while others were using drills to barricade in the precinct door.

32. At approximately 12:37 a.m. we checked the cameras around the precinct and found that protesters had deliberately obscured the cameras so that we could not see out of them. Security cameras show protesters obscuring the views of South camera at 9:48 pm, the West Exit door at 11:21 pm, and the North camera at 11:32 pm.  See [Exhibit 8](), photographs from the North Precinct security camera, and [Exhibit 9](), Twitter video posted by Danny Peterson (@DannyJPeterson) on June 25, 2020 at 11:19 p.m.

33. As we waited, the crowd became more emboldened and aggressive.  A number of persons began to shine green laser pointers in police officers' eyes, the crowd began to ram dumpsters into North Precinct doors.  I felt these actions were an attempt to breach the doors or to block the doors preventing ingress and egress, and fireworks were thrown at Officers over the barricade they had built on Northeast Emerson Street.

34. Around 1:00 a.m., there were still several hundred demonstrators in the crowd surrounding North Precinct.  Due to life safety issues to both police officers and in custodies inside the North Precinct, the sound truck made an admonishment stating an unlawful assembly had been declared, instructing the crowd they needed to leave the area immediately or they could be subject to use of force or arrest.  I requested that as long as anybody saw people trying to leave to please let me know so that I could make sure we let everybody leave that wanted to.

35. The crowd reacted very strongly to the unlawful assembly announcement. Demonstrators pulled in closer to the barricades and a lot of people with heavy backpacks moved

Page  7  –  DECLARATION OF ANTHONY PASSADORE

to the front and tightened up their group.  Exhibit 10 is a livestream video from Twitch.TV/TweebsGaming titled *Portland North Precinct*.  The following clip from Exhibit 10 depicts the crowd's reaction to the Unlawful Assembly Orders.  Exhibit 10 Clip, 1:56 - 14:26.

36. At approximately 1:21 a.m., officers began dispersing the crowd in an effort to move them from the immediate area. While performing this lawful action, demonstrators fought with officers. Furthermore, demonstrators hit officers with paint, causing officers not to be able to see out of their face shields and threw water bottles and glass bottle at officers.

37. I decided to try and de-escalate the situation by waiting for the crowd energy to subside and to wait for additional resources to arrive.  I began to request additional resources, but the Bureau patrol resources were all assigned to this event or to other emergency calls. Outside agencies stated they could not respond to assist.  Even other City Bureaus like PBOT said they could not assist with resources that we requested for tasks like clearing debris from the streets.

38. As we waited, the crowd became even more emboldened and aggressive.  A number of persons began to shine green laser pointers in police officers' eyes and throwing rocks at officers.

39. Around 1:40 a.m., a mortar was launched on to the roof of North Precinct. During this time, crowd control munitions were deployed.

40. A number of fires were lit including a dumpster fire on NE MLK.  People in the crowd began to yell that they were going to burn the police and burn the precinct to the ground.  Provided as Exhibit 11 are photographs from *Oregonlive – Courtesy James Martin* depicting the fires set by protesters on NE MLK.  These fires were staying contained in the middle of the intersection and not encroaching on any buildings, so officers held their location. Exhibit 10 Clip, 29:37 - 39:00.

41. By 2:14 a.m., demonstrators set the north side of North Precinct on fire. *See* Exhibit 12 and Exhibit 10 Clip, 1:01:03 - 1:05:39.

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

42.    To protect the life and safety of police personnel and community members inside the precinct, I authorized the use of CS gas to disperse the crowd. Several demonstrators picked up the canisters of CS gas and threw it at the police.

43.    Around 2:56 a.m., demonstrators began looting and setting fire to businesses in the area. Several business windows were broken, and fires were set to property. By 3:30 a.m., a majority of the crowd had dispersed. *See* Exhibit 13.

44.    Portland firefighters were brought in to assess the North precinct building and put out any remaining dumpster fires.

45.    Numerous officers sustained minor injuries. One officer was taken to the hospital for a more serious injury. All officers are expected to make a full recovery.

46.    Four (4) arrests were made over the course of the evening, including arrests for assaults or attempted assaults on Police Officers.

47.    The dynamics of the demonstrators during this incident were even more aggressive and violent than those seen in past weeks.

48.    Attached as Exhibit 14 is a photograph of a sling shot, hammer, plyers, ear protection, and other items left behind in the area of the demonstration on June 25, 2020.

49.    I was the Incident Commander on June 30, 2020. I remained aware of the court's temporary restraining order regarding tear gas. I also was aware of the newly issued stipulated temporary restraining order regarding less lethal. I directed all supervisors to make sure that all supervisors informed each individual officer of the requirements of both temporary restraining orders, as well as the new state law regarding tear gas.

50.    On that night, I put police officers in North Precinct, because I believed they would move to that location after the peaceful protests at peninsula park. The protestors then decided to go to the Portland Police Association Union Hall. Daryl Turner called me and told me that I do not want a problem in the neighborhood because of the Union Hall. But there was a bigger fire risk than just the Union Hall because it is located in a residential neighborhood. I

wanted to protect against the risk of fire or serious damage in this area, so I sent officers to the Union Hall.

51. When the group of protestors reached the Union Hall, within minutes officers had projectiles thrown at them. I received updates that officers were taking rocks, glass bottles, water bottles, full cans. Air1 was updating that it could see projectiles being thrown at the officers. Officers reported that the level of projectiles continued to increase.

52. It should be known that at the Union Hall there was no ability to move officers out of view if at any time I thought I would move officers in an attempt to de-escalate the crowd. The crowd was approximately 250 people. At approximately 9:05 p.m., I declared an unlawful assembly with instructions for people to disperse to the east to give them clear direction and a safe route away. At 9:11 p.m. there were additional reports of officers having rocks thrown at them. At that point I authorized smoke and RBDDs due to RRT Commander indicating that the rocks were large and were thrown in a manner that could seriously injure an officer. I weighed the nature of the projectiles and the way that they were being thrown in determining that officers' safety was at risk. Shortly after I authorized the use of RBDDs, officers saw a decrease in projectiles and decided not to utilize RBDDs.

53. At approximately at 9:15 p.m. the officers continued to take rocks, full cans, bottles. Some officers reported using FN303s and pepper spray to address the dangerous criminal conduct of specific individuals. Just after 9:30 p.m. some protesters set garbage cans on fire and they began using green lasers.

54. The sound truck continued to announce an unlawful assembly and instructed demonstrators to leave to the east, through 9:40 p.m. After 35 minutes of announcements, demonstrators have not left. Officers began to take make arrests of individuals who were throwing projectiles.

55. At approximately 10:00 p.m., several cans, rocks, lasers, bottles, were taken by officers. An Oregon State Police trooper reported being hit by a can. Multiple officers were

being taken off-line to receive some medical attention. Officers deployed smoke to encourage demonstrators to disperse. Officers continued to take projectiles and lasers were shown. There was a small dumpster fire. At 10:10 p.m. Due to the number of dangerous projectiles and the numerous injuries, and concern that they would seriously injure officers, I declared a riot. In response to the announcement, dozens of projectiles are thrown at officers. I asked that the Sound Truck announce that we would deploy CS gas, which announcement could be heard on the livestream and members of the crowd appeared to be cheering the announcement. People in multiple locations then began to light roman candles and shot them at officers and many more projectiles were being thrown.

56. The sound truck got a second warning of CS gas just before officers began deploying CS gas. I did not believe there were any other options that could protect officers given the level of violence when I authorized the use of CS gas.

57. The sound truck instructed demonstrators to move east past NE Albina. At 10:48 p.m., I instructed officers to disengage to give people an opportunity to leave voluntarily. As officers disengage, they report receiving additional projectiles. At 11:18 p.m., the crowd of approximately 75-100 people are stopped at NE Lombard and NE Albina. Officers at 11:33 p.m. continue report bottles are thrown at them. Officers try to make selective arrests of persons that are throwing projectiles.

58. At 11:50 p.m., some smaller groups began to move into residential neighborhoods. I decided not to try to disperse groups further within the neighborhoods because I did not want to ensure people into private residential property. By 12:13 a.m. a group of approximately 60 protestors have reorganized and are walking North on NE MLK. The group was marching and blocking traffic on NE MLK, toward North Precinct. Officers were brought back to North Precinct. Approximately 75-80 people arrived at North Precinct, and at approximately 12:47 a.m., the sound truck announced an unlawful assembly. A dumpster fire was set at the fire station across the street as the large group remained in the intersection of NE

Page  11  –  DECLARATION OF ANTHONY PASSADORE

MLK and NE Killingsworth. Officers began a dynamic push to disperse the crowd and make arrests as necessary. Small groups began to leave in different directions.

59. A small group came to the Justice Center and set a small fire at the bathrooms and the Elk statute. Portland Fire and Rescue was called-in to put the fire out.

60. Attached as [Exhibit 15](#) are links to clips from the livestream video that I watched during the event on June 30, 2020.

61. I make this declaration in support of Defendant City of Portland's Response to Plaintiffs' Motion for Preliminary Injunction and response to Motion for Contempt.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED:  July 5, 2020.

      *Due to live link -- See Signature Page Attached*
Anthony V. Passadore

MLK and NE Killingsworth. Officers began a dynamic push to disperse the crowd and make arrests as necessary. Small groups began to leave in different directions.

59. A small group came to the Justice Center and set a small fire at the bathrooms and the Elk statute. Portland Fire and Rescue was called-in to put the fire out.

60. Attached as Exhibit 15 are links to clips from the livestream video that I watched during the event on June 30, 2020.

61. I make this declaration in support of Defendant City of Portland's Response to Plaintiffs' Motion for Preliminary Injunction and response to Motion for Contempt.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED: July 5, 2020.

*/s/ Anthony V. Passadore*
Anthony V. Passadore