J. SCOTT MOEDE, OSB 934816
Chief Deputy City Attorney
scott.moede@portlandoregon.gov
NAOMI SHEFFIELD, OSB 170601
Deputy City Attorney
naomi.sheffield@portlandoregon.gov
ROBERT YAMACHIKA, OSB 065560
Senior Deputy City Attorney
rob.yamachika@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR  97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendant City of Portland*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DON'T SHOOT PORTLAND, a nonprofit corporation, in its individual capacity, NICHOLAS J. ROBERTS, in an individual capacity and on behalf of themselves and all others similarly situated, MICHELLE "MISHA" BELDEN, in an individual capacity and on behalf of themselves and all others similarly situated, ALEXANDRA JOHNSON, in an individual capacity and on behalf of themselves and all others similarly situated,<br><br>PLAINTIFFS,<br><br>v.<br><br>CITY OF PORTLAND, a municipal corporation, and MULTNOMAH COUNTY, a political subdivision of the State,<br><br>DEFENDANTS. | 3:20-cv-00917-HZ<br><br>**DECLARATION OF FRANZ SCHOENING**<br><br>**(In Support of Defendant's Response to Plaintiffs' Motion for Preliminary Injunction)** |

I, Franz Schoening, declare as follows:

1.  I am currently employed as a Lieutenant by the Portland Police Bureau ("PPB"). I have been employed in a sworn capacity by PPB since January 2002. I began my

Page 1 – DECLARATION OF FRANZ SCHOENING

career as a police officer, predominantly in patrol. I was promoted to Sergeant in 2007 and was a patrol sergeant. I have held the rank of Lieutenant since 2018, when I was assigned to the Chief of Police's Office as the executive officer for the Operations Branch. Since April of 2019, I have been assigned to the Tactical Operations Division where I am currently assigned as the Commander of the Rapid Response Team ("RRT") and Canine Unit. I have been a member of the RRT since 2008.

2. Since May 28, 2020, I have been present in my role with RRT most nights. Police Bureau representatives have attempted to engage in dialogue with protest representatives to facilitate peaceful assembly and speech. Some groups have been responsive to Police Bureau overtures but others have not. Following the weekend of May 29th through 31st, protests began diverging into two distinct groups; one group that largely gathered on the east side of the river and engaged in peaceful demonstrations and marches, and another group that gathered near the Justice Center. Some members of the group that gathered at the Justice Center have engaged in criminal conduct many nights. The Police Bureau attempted to use temporary fencing to de-escalate the potential for conflicts with the group that gathered nightly at the Justice Center. The group responded each night by tearing down the fencing and throwing projectiles at police officers. The Bureau moved officers out of sight in a further attempt to de-escalate the conflict. Nonetheless, some members of the group broke down the fence and entered the secure area around the Justice Center. Members of the group continued to throw projectiles at officers they could see and engaged in escalatory behavior such as lighting dumpsters on fire and blocking traffic.

3. After roughly two weeks of increasingly violent behavior by the crowd gathered at the fence line, the Bureau attempted again to de-escalate the conflict further by removing the fence which had become a gathering point and focus for the crowd. Members of the group that continued to gather each night then began vandalizing the Justice Center including breaking windows, spray painting cameras, spray painting walls, and pulling plywood boards off of

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047

windows in order to break them. On multiple nights individuals also blocked or locked the doors to the Justice Center from the outside. Many nights the crowd would escalate their destructive and violent behavior until police were forced to respond to address the criminal activity that was occurring. When the police responded, many nights members of the group would then throw projectiles at police until it became dangerous and necessary to declare an unlawful assembly and disperse the group.

4. On the nights of May 29, 2020, May 30, 2020, June 25, 2020, and June 27, 2020 I utilized certain specialty impact munitions as follows:

5. On May 29, 2020, I was the field command for a demonstration at Peninsula Park. Following the demonstration, the group begin marching southbound on MLK Boulevard. Along the march, some members of the group spray painted buildings and broke windows. There was also a shooting at NE 7th and NE Morris following a confrontation between protestors and a motorist who tried to drive through the march. After the march reached downtown, protestors eventually reached the Multnomah County Detention Center, broke windows, and started a fire inside the building. The event was declared a riot, and orders were given over the sound truck for protestors to disperse. Many protestors did not leave and remained in downtown. During this time, some persons broke windows, lit fires, and looted stores.

6. During the hours following the declaration that the event had become a civil disturbance, the sound truck was continually giving orders for people to disperse and giving warnings that people may be subject to riot control agents and impact munitions. I responded to a report of looting at the CVS store at SW 3rd and SW Alder. When I arrived, there were approximately twenty people standing in front of the CVS and the glass windows of the store were broken out. There was at least one person inside the store. I activated my emergency lights and deployed one hand placed canister of CS riot control agent toward the group at the CVS, which caused them to leave.

7. Later in the evening, I approached an RRT squad that was attempting to disperse a crowd of approximately 25 people who were breaking windows in the area of Pioneer Square. I deployed one canister of CS gas in the area of SW Park and SW Madison as the group moved southbound from Yamhill on Park. This broke up the group and effectively stopped the ongoing property damage. I deployed CS gas and OC gas at other locations late in the evening of May 29 and into the morning of May 30 in response to small groups engaged in criminal activity.

8. On May 30, 2020, the Mayor had put in place an 8:00 p.m. curfew. There was a rally in Chapman and Lownsdale Squares earlier in the evening. Later in the evening, over the course of several hours many individuals began to vandalize and loot stores in downtown Portland. The PPB sound truck issued announcements over this entire explaining that this was an unlawful assembly and directing people to leave the downtown area and obey the curfew. Over the course of approximately six hours, deployed several rubber ball distraction devices ("RBDDs"), and CS and OC gas canisters ad different location in the downtown core. In each instance, I deployed the devices in an attempt to disperse groups engaged in active vandalism or active resistance to dispersal orders.

9. On June 25, 2020, I was not scheduled to work. I received a phone call from the Incident Commander, Captain Passadore, around midnight and responded to North Precinct to assist with responding to a demonstration that was occurring. When I arrived at North Precinct, I observed a large crowd standing behind a fortified barricade on NE Emerson Street. The crowd was tightly packed against the barricade and were using umbrellas and plastic shields to interfere with police efforts to address criminal activity occurring within the crowd or to disperse the crowd. There were smaller groups that walked around the outside of the precinct telling officers that they should give upon on trying to defend North Precinct. The crowd greatly outnumbered the officers.

10. As we waited for more police resources to arrive, the crowd began shining green laser pointers in officers' eyes. Some people in the crowd also began to yell that they would burn

Page 4 – DECLARATION OF FRANZ SCHOENING

North Precinct down. Individuals also began to ram dumpsters into the North Precinct doors in an apparent attempt to break them down. Some members of the crowd began throwing items including fruit and water bottles at officers from NE Emerson street. I also heard reports that other officers observed rocks being thrown, but I did not see any myself. Based on these threats, the Incident Commander directed us to move the people away from the building. The sound truck gave numerous dispersal orders and warnings that force may be used. Approximately ten minutes were given following those announcements for the crowd to move, but many people did not leave, and instead began moving toward police along the barricades they had erected. While North Precinct officers began to push north from NE Roselawn and NE MLK, additional officers came out of North Precinct to engage the crowd from the east. Following these pushes, the crowd moved northwest and regrouped at two locations: NE MLK and NE Killingsworth and NE Emerson and the west side of NE MLK.

11. The crowd stopped at NE MLK and NE Killingsworth began lighting objects on fire, including a large dumpster. The crowd continued to throw projectiles at officers. After a few minutes, I hear a report that someone observed fire being set on the north side of the North Precinct building. Additional officers who were watching a livestream of the event confirmed the fire was lit on the north side of the building. People remained in the building, several doors had been barricaded shut, and it was not safe to bring Portland Fire and Rescue to the area to extinguish the fire. Around the same time, there were also reports that other buildings along NE MLK were being broken into. Because of the significant risks that these fires posed, the Incident Commander ordered us to disperse the crowd and authorized the use of CS gas and OC gas. The sound truck announced the dispersal order and gave warnings that riot control agents would be used. After waiting for a few minutes, RRT began to push north on MLK. Some members of the crowd again began to throw projectiles at officers. As we pushed past NE Killingsworth, I saw several people move aggressively toward the police line on the east side of NE MLK. I deployed OC vapor toward the group to prevent them from assaulting the officers. After securing the

Page 5 – DECLARATION OF FRANZ SCHOENING

intersection of NE Killingsworth and NE MLK, Portland Fire and Rescue were called in and they extinguished the fires.

12. The crowd continued to be aggressive and there were additional reports of buildings being broken into and small fires being set. The Incident Commander ordered us to continue to disperse the crowd but prohibited the further use of CS and OC gas given the life and safety concerns had been reduced.

13. On June 27, 2020, I was assigned to field command for the RRT personnel that responded to the demonstration at the Justice Center. Protestors had created barricades with construction material blocking the roadway. It appeared that this was being done to block traffic and prevent police officers from responding and clearing the street. We were instructed to clear the barricades from the street, which required us to clear the crowd from the intersection of SW Main and SW 3rd Avenue. After removing the barricades officers left the area in an attempt to de-escalate the event. This appeared successful for a short period, but eventually the crowd moved back into the street on the SW 2nd Avenue side of Central Precinct. Some of these individuals began to spray paint the windows on the front of the building and attempted to break the front doors to Central Precinct. When Central Precinct officers attempted to make arrests, one officers was struck in the head with a skateboard and others were hit with projectiles. The Central precinct officers called for additional assistance.

14. I arrived at the SW 2nd Avenue side of Central Precinct with Delta Squad and we began to clear protestors to the north on SW 2nd. The crowd continued to throw bottles, rocks, and paint balloons at officers on the line. The sound truck announced that the event had become an unlawful assembly and ordered the crowd to disperse to the north and west. The IC closed the areas from SW 1st to SW 5th from SW Clay to SW Morrison. As we began to move the crowd some individuals continued to throw items. I was struck by two water bottles, one folding knife and one paint balloon. In the area of SW Main, between SW 3rd and SW 4th, I observed an individual physically resisting officers' efforts to move him. He was intentionally putting his

Page 6 – DECLARATION OF FRANZ SCHOENING

back towards officers and leaning into the line, and he then turned around and would yell at the line. This happened a number of times. Officer Dyk was on the line and struggling to get this individual to move. I applied a 1-2 second burst of OC spray to the individual's face. I attempted to minimize the exposure to uninvolved protestors by keeping the burst short and directed at the individual resisting. The individual then ran off into the crowd.

15. I make this declaration in support of Defendant's Response to Plaintiff's Motion for Preliminary Injunction.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED: July 3rd, 2020

_[signature]_

Page 7 – DECLARATION OF FRANZ SCHOENING