**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
**Viktoria Safarian**, OSB No. 175487
Email: viktoria@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241

**Juan C. Chavez**, OSB No. 136428
Email: jchavez@ojrc.info
**Brittney Plesser**, OSB No. 154030
Email: bplesser@ojrc.info
**Alex Meggitt**, OSB No. 174131
Email: ameggitt@ojrc.info
**Franz H. Bruggemeier**, OSB No. 163533
Email: fbruggemeier@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503 944-2270

**J. Ashlee Albies**, OSB No. 051846
Email: ashlee@albiesstark.com
**Whitney B. Stark**, OSB No. 090350
Email: whitney@albiesstark.com
**Maya Rinta**, OSB No. 195058
Email: maya@albiesstark.com
Albies & Stark LLC
1 SW Columbia St. Suite 1850
Portland, Oregon 97204
Telephone: (503) 308-4770

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DON'T SHOOT PORTLAND, et al., )<br>)<br>  Plaintiffs )<br>)<br>v. )<br>)<br>)<br>CITY OF PORTLAND, a municipal )<br>corporation, and MULTNOMAH COUNTY, )<br>a political subdivision of the State, )<br>)<br>  Defendants. )<br>)<br>) | Case No. 3:20-cv-00917-HZ<br><br>PLAINTIFFS' AMENDED MOTION FOR FINDING OF CONTEMPT AND FOR SANCTIONS AGAINST DEFENDANT CITY OF PORTLAND<br><br>**Oral Argument Requested** |

**LR 7-1 CERTIFICATION**

Counsel for plaintiffs hereby certify that they contacted counsel for Defendant City of Portland and attempted to resolve this dispute but were unable to do so.

**AMENDED MOTION**

Plaintiffs amend their prior Motion for Contempt and for Sanctions Against Defendant City ("Plaintiffs' Motion for Contempt"), Dkt. No. 55, and Supplemental Memo In Support, Dkt. 122, and move this Court for an order finding the Defendant City of Portland ("City") in contempt and imposing remedial sanctions. In particular, Plaintiffs focus this Amended motion on violations occurring on June 30, 2020 and into the morning hours of July 1, 2020, during which Portland Police Bureau members used "less lethal weapons" in violation of this Court's order entered on June 26, 2020. The prior motion and supplemental memo which address other dates are hereby withdrawn. Plaintiffs ask this Court to impose sanctions that are reasonably calculated to prevent future contemptuous conduct by the City. This Court has wide discretion in

determining the appropriate sanction. Plaintiffs suggest that the following options should be considered by the Court:

1. A complete ban on the use of certain "less lethal weapons" in any crowd control situation.

2. A requirement that any use of "less lethal weapons" must be specifically authorized by a politically accountable leader, such as Mayor Ted Wheeler, the commissioner of the Portland Police Bureau.

3. Prohibiting the individual members who violated this Court's order from participating in any future crowd control operations.

4. Compensatory fines of sufficient size to compensate the individual class members for their injuries and deter future violations.

**FACTS**

The protests sparked by the May 25, 2020, police killing of George Floyd have continued across the globe and in Portland. For over two months, people have attended demonstrations in Portland to express concerns about ongoing racial inequality; to protest police brutality; to support the message of defunding the police; to express disapproval of systemic racism and state brutality inflicted on Black people, Indigenous people, and other people of color ("BIPOC"); to stop the continued police killings of Black people; to protest the Portland Police; to stand up for our rights; and because Black Lives Matter. *See* Plaintiffs' Motion For Contempt, at p. 3. Dkt. No. 55. This Court has entered two restraining orders governing the City's use of force at these protests. *See* Dkt. No. 29, 43. Plaintiffs now seek enforcement of the second order pertaining to the use of "less lethal" weapons, which restricts the City's use of impact munitions, Rubber Ball Distraction Devices ("flash bangs"), pepper spray, and LRAD in crowd control situations. Dkt. No. 43.

Page 3        PLAINTIFFS' AMENDED MOTION FOR FINDING OF CONTEMPT AND
              FOR SANCTIONS AGAINST DEFENDANT CITY OF PORTLAND

On June 30, 2020, people gathered in Peninsula Park in Northeast Portland to demonstrate against police violence against Black people in our community. From there, they marched to the site of the Portland Police Association ("PPA") on North Lombard St. Declaration of Matthew Cleinman ("Cleinman Decl.") at ¶ 2 (Dkt. No. 120). The PPA is the public service union for rank and file officers, and has been successful at shielding officers involved in deadly force incidents from accountability. The PPA has also defended police officers who engage in overtly racist behavior.[1] The PPA is the body that negotiates the collective bargaining agreement for PPB members with the City. The CBA has been repeatedly identified by experts as the chief obstacle to police accountability in this city.[2] Their president, Daryl Turner, has in the past opposed police reforms,[3] and has referred to the City of Portland as a "cesspool."[4] As such, protesting outside the PPA hall fit squarely within the goals and aims of people protesting police brutality.

When the protesters arrived at the PPA building, at approximately 9:00 PM, they encountered a skirmish line of about 20 Oregon State Police troopers. Cleinman Decl. at ¶ 2; Declaration of Katarina Haas ("Haas Decl.") at ¶ 6, Dkt. No. 127. The troopers stood in a line outside the building, clad in body army and holding batons. Declaration of Michael Dicks ("Dicks Decl.") at ¶ 5, Ex 1 (Dkt. No. 119).

The persons assembled chanted and sang songs. Cleinman Decl. at ¶ 3. Declarant Cleinman heard some announcement from the police officers assembled but could not discern what was said. *Id*. Declarant Dicks heard commotion outside his apartment and looked out his

---

[1] *See, generally,* Serbula, L. & Gibson, K., *Black and Blue: Police-Community Relations in Portland's Albina District, 1964-1985*, 1 Oregon Historical Quarterly 114 (2013), *available at:* http://archives.pdx.edu/ds/psu/9324
[2] *See* https://www.joincampaignzero.org/contracts (collecting policy papers examining the issue); N. Scheiber, F. Stockman, J.D. Goodman, *How Police Unions Became Such Powerful Opponents to Reform Efforts*, N.Y. Times, Jun. 6, 2020, *available at:* https://www.nytimes.com/2020/06/06/us/police-unions-minneapolis-kroll.html
[3] https://www.kgw.com/article/news/local/protests/portland-protests-police-union-president-responds-reform/
[4] https://www.oregonlive.com/portland/2018/07/portland_police_union_leader_s.html

Page 4     PLAINTIFFS' AMENDED MOTION FOR FINDING OF CONTEMPT AND
            FOR SANCTIONS AGAINST DEFENDANT CITY OF PORTLAND

balcony overlooking North Lombard. Dicks Decl. at ¶ 3. From there, he saw the crowd stopping its march and assembling outside the PPA building in front of and away from the OSP skirmish line. *Id.* at ¶¶ 4, 6; Dicks Ex 1. He observed a couple of plastic bottles being thrown toward the police, but otherwise noticed nothing shocking or riotous; he saw people standing in the street chanting or listening to a speaker. *Id.*; Dicks Ex 1. Despite the lack of any widespread criminal conduct, the police announced an unlawful assembly and threatened to use crowd control munitions and arrest people if they did not disperse to the east. *Id*. at ¶ 6; Cleinman Decl. ¶ 3; Dallas Decl. ¶ 2; Passmore Decl. ¶ 5; Herrera Decl. ¶ 2. The protest had been in front of the building for maybe five or 10 minutes at the most; Dicks was confused about why the police declared it an unlawful assembly and threatened to use weapons and arrest the peaceful protesters. Dicks Decl. ¶ 6. He saw no one attacking the police or the building. *Id.* Likewise, Declarant Gillian Herrera was standing in front of the PPA for about five minutes before the police declared an unlawful assembly, and she did not see anyone throwing things at officers, setting fires, or any criminal activity from the crowd. Herrera Second Decl. ¶ 2. Moreover, almost all of the protesters were standing away from the police and the building. *Id; see* also Corrected Declaration of Passadore, ¶ 60, Ex 15-X, at 00:00 - 07:20 (Dkt. No. 111); Dicks Ex 1; Declaration of James Comstock, Ex. 2, at 00:00 to 12:00.

    A.    **First Push With "Less Lethal" Weapons**

Ten to 15 minutes after the march arrived, at around 9:15 PM, Portland Police emerged from behind the building, in full riot gear. Cleinman Decl. ¶ 4; Dallas Decl. ¶ 8; Haas Decl. ¶7; Dicks Ex 3. Cleinman noticed that the officers were not wearing names on their badges, only

numbers.[5] Cleinman Decl. ¶ 4. PPB again declared an unlawful assembly from their LRAD truck, and PPB officers formed a skirmish line at the end of the block across N. Lombard St. and began to push the protesters backwards and to the east. *Id.* at ¶ 6; Haas Decl. ¶7; Dicks Ex 4; Passadore Ex 15-X, at 07:00.

Cleinman, moving backwards, got pushed back and then hit with a baton multiple times by PPB officers, stunning him and knocking him back. Cleinman Decl. ¶ 6. Immediately after he was hit with batons, and as Cleinman was continuing to back away from the officers in compliance with their orders to move back, another PPB officer approached Cleinman and pepper sprayed him in the face, from about 4-5 feet away, directly into Cleinman's eyes. *Id.*; Cleinman Ex 1, at 00:06-00:12; Dicks Decl ¶ 9; Dicks Ex 9, at 01:54. Dicks was alarmed by the police pepper spraying protestors, as the crowd had been moving backward in compliance with officers' orders. Dicks Decl. ¶ 9. From his height and vantage point from his balcony, it was clear to him that the police were attacking protesters in ways that felt completely wrong and unnecessary. *Id.* at ¶ 10. In reaction to the police using pepper spray on the crowd, some individuals in the crowd began to lob bottles toward the police's skirmish line. *Id.*

A few seconds later, an officer used an overhand strike with his baton to hit the arm of a person who walking backwards carrying a large banner with a few other people. Cleinman Ex 1, at 00:25; Dicks Decl ¶ 9, 10; Dicks Ex 4, last few seconds. Other officers begin destroying the banner and ripping it out of the hands of the other people carrying it. Cleinman Ex 1, at 00:26; Dicks Decl ¶ 9, 10; Dicks Ex 5. At the same time, yet another officer begins shooting the banner-carriers with FN303s at close range. Cleinman Ex 1, at 00:27; Dicks Decl. ¶ 10.  Several officers

---

[5] Subsequent news reports have revealed that the City of Portland will not respond to public records requests if only provided a PPB officer's badge number. https://www.oregonlive.com/portland/2020/07/for-portland-police-to-provide-the-name-of-an-officer-at-protests-you-have-to-give-them-the-officers-names-first.html

continue to destroy and steal the banner from the protesters and an officer again shoots the protesters who had been walking with the banner but who had fallen onto the ground. Dicks Decl. ¶ 10; Dicks Ex 5, at 00:00; Cleinman Ex 1, at 00:35. Police do not appear to make any arrests after they destroy the protesters' banner while beating and shooting them. *See* Dicks Ex 5.

At many other times throughout their initial and subsequent pushes push east, police fired and threw explosive smoke grenades (flashbangs), and shot 40mm (rubber bullets) and FN303 (pepper balls) impact munitions into the crowd of protestors when they were both near and a few hundred feet from the officers, without any provocation, hitting people in the leg, arms, stomach, and chest. VanWeelden Decl. ¶ 3 (Dkt. No. 128); Dicks Decl. Ex. 5; Herrera Decl. ¶ 13, 14. Just seconds after police destroyed the large banner and used force on the carriers, a protester threw what appears to be a plastic water bottle at the ground in front of the police line; an officer then shot at the person with FN303s while the officers nearby continued to stand calmy in the line. Dicks Ex 5, at 00:18-00:23. Less than 30 seconds later, police rolled an explosive smoke grenade into the crowd of retreating protesters. Dicks Decl. ¶11; Dicks Ex 5, at 00:50. Declarant Pedro Anglada Cordero kicked the smoking canister back towards the police line, and an officer on the line shot a 40mm green marker round at him, when he was only 10-15 feet from the officer. Declaration of Pedro Anglada Cordero ¶¶ 12-14, 17-19; Dicks Ex 5, at 00:55-00:58. One of the rounds caused a large bruise on the inside of Mr. Anglada's thigh.



Page 7         PLAINTIFFS' AMENDED MOTION FOR FINDING OF CONTEMPT AND
               FOR SANCTIONS AGAINST DEFENDANT CITY OF PORTLAND

Police then rolled another explosive with smoke into the crowd. Dicks Decl. ¶11; Dicks Ex 5, at 01:02; Passadore Ex 15-X, at 10:22; Comstock Ex 2, at 15:12.  When Declarant Haas went to kick one of them away, the police shot her in the thigh and shin with rubber bullets, leaving a huge bruise the size of a baseball. Haas Decl. ¶ 13.



A person picked up the smoking canister and threw it over the police line, and an officer immediately flies towards the person with his baton in both hands and slams the person to the ground.  Dicks Ex 5, at 01:12.

At one point, a protester walked a few feet toward a police line that was 20-30 feet away, and the officers started firing impact munitionsinto the crowd; Declarant Dallas was closest to the police line, and though she did not get hit, she was closest to the officers and saw them shooting into the crowd behind her. Dallas Decl. ¶ 10.

Throughout the time that the police line moved the crowd east during their initial push, officers hit persons in the crowd who were moving as fast as the crowd in front of them would allow, including a legal observer who was clearly marked as such. *See, e.g.*, Comstock Ex 2, at 13:15-13:40, 14:24, 16:20. At one point, while shoving and hitting people with their batons, the officers also yelled at them to move faster, to "get moving" because they had "been told to disperse," and that the protesters "could move" and they should not "make excuses for yourselves," and, almost immediately after, the police line stopped. Comstock Ex 1. One officer shoved someone in the face. Comstock Ex 2, at 14:02-14:08. The same officer then used his baton to shove a person with a bike multiple times and then took the bike from the person and would not let the person retrieve it from behind the police line; the person with the bike was retreating on the sidewalk when the officer attacked them. *Id.*, at 14:30-14:43.

Dicks continued to watch the police push the protesters back to the east of his apartment before they stopped and returned to the PPA building. Dicks Decl. at ¶ 11. As officers retreated, they **t**hrew explosive smoke grenades indiscriminately into the crowd that was just standing there as the police retreated on the riot trucks. Dicks Decl. ¶ 11, 12; Dicks Ex 6, at 05:15; Passadore Ex 15-X, at 15:58.

B.   **Second Push With "Less Lethal" Weapons**

At about 9:30 PM, the crowd moved back towards the PPA building. Cleinman Decl. ¶ 9; Dicks Decl. ¶13. The protesters stopped well away, at least 100 feet, from the building and the police who were in front of it. Dicks Decl. ¶13; Dicks Ex 7. The protesters were just standing in the street, chanting, and had stayed away from the building. *Id.*, at ¶ 13, 14; Ex 7. A few people threw water bottles towards the police and someone started a fire in one of the garbage cans in the middle of the street; Dicks thought it "just seemed kind of dumb." *Id.*, at ¶ 13, 14. By Dicks'

estimation, from his vantage point above and near to the fire, it did not create any risk to any person or property because it was a small fire in a garbage can in the middle of the road. *Id.*

When declarant VanWeelden arrived at N. Lombard St., he saw a group of protesters in the street who seemed completely peaceful. VanWeelden Decl. ¶3. Despite that, the police were shooting what he thought were rubber bullets at the protesters who were a few hundred feet away from the officers. *Id.*; *see also* Dicks Ex 8, at 3:05; Comstock Ex 2, at 24:12, 32:46; Passadore Ex 15-X, at 27:56. He saw nothing happening that was any threat to the officers and there was a lot of space between the protesters and the police. VanWeelden Decl. ¶3.



Despite being far away from the PPA building and the police skirmish line, the police nevertheless ordered the crowd to move east. *Id.*, at ¶16. The police advanced on the protesters. *Id.*, at ¶ 14, 16. PPB again announced that this was an unlawful assembly, which again confused

Page 10     PLAINTIFFS' AMENDED MOTION FOR FINDING OF CONTEMPT AND
            FOR SANCTIONS AGAINST DEFENDANT CITY OF PORTLAND

Dicks, as nothing had changed from the moment before and the protest had appeared peaceful since they arrived on Lombard. *Id.*, at ¶16, 17. People were still just chanting and keeping far away from the skirmish line. *Id.*, at ¶17.

Suddenly and shockingly, with no provocation, the police charged, sprinting and yelling at the crowd, shoving and hitting people with their batons. *Id.*, at ¶ 18; VanWeelden Decl. ¶ 4; Dicks Ex 9, at 01:25; Passadore Ex 15-X, at 33:01; Greatwood Ex 1, at 14:00; Comstock Ex 2, at 37:45. Dicks could not believe what he saw because it "felt so terribly, overwhelmingly wrong." Dicks Decl. ¶ 18. He could not believe that he had watched the police repeatedly and viciously attack the protest crowd that he believed was simply expressing their First Amendment rights. *Id*. The police arrested a few in the bullrush, but the vast majority of the people who were beaten by the police during their charge at the crowd were not arrested. Dallas Decl. ¶ 3.

Witnesses saw police bull-rush protesters, run after people, and tackle and beat them. *Id.*, at ¶ 11; Herring Decl. ¶ 4, 5. Declarant Dallas saw a woman, who, within seconds of being dragged down on the ground by officers had 4-5 officers tackle her. Dallas Decl., at ¶ 12. The officers did not give people with limited physical abilities time to get away, and officers were targeting people who could not get away fast enough. *Id.*, at ¶13. This targeting of individual protesters who had fallen behind was particularly scary to see: officers pushed people onto the ground, hit them with batons, and then they allowed people to get up only to push them to the ground again. Dallas Decl. ¶ 13. The police conduct strongly suggests that they were punishing people for being there with no intent to even arrest them. *Id.*

After the police line stopped and the crowd retreated about 20 feet from the police skirmish line, the protesters began chanting again. *Id.*, at ¶ 19. PPB ordered the crowd to disperse. Dicks Ex. 9. After the police bull-rushed protesters, they indiscriminately shot

Page 11    PLAINTIFFS' AMENDED MOTION FOR FINDING OF CONTEMPT AND
         FOR SANCTIONS AGAINST DEFENDANT CITY OF PORTLAND

munitions into the crowd from a line of officers 20-30 feet away from the retreating crowd of protesters. Dallas Decl. ¶ 4, 9, 10; Herring Decl. ¶ 8; Haas Decl. ¶ 7, 13.

The police line then charged at the crowd a second time, hitting and shoving people and pushing the crowd further east. Passadore Ex 15-X, at 41:48; Greatwood Ex 1, at 22:53. A few minutes later, when the crowd was away from the police line, police lauched three munitions into the back of the crowd. Greatwood Ex 1, at 31:30-31:47; Passadore Ex 15-X, at 50:26.

The police then used grenades, smoke, and impact munitions near the front of the crowd at the corner of N. Lombard and N. Concord. Greatwood Decl. ¶ 8, 9; Ex 1, at 31:52; Passadore Ex 15-X, at 50:50. A flashbang and smoke grenade was casually tossed by police into front of crowd, followed by second. Greatwood Decl. ¶ 8, 9; Ex 1, at 31:52. It does not appear that anyone who was targeted with the flashbangs was near the police line or doing anything to endanger the officers; the person closest to the line appears to have had both hands on his head and the second exploded under a person with their hands up. Greatwood Ex 1, at 31:52. As Declarant Greatwood bent down to examine an object that came toward him but had not exploded nor had any smoke coming from it, police fired impact munitions at Greatwood's groin, hitting him and injuring him, possibly permanently. Greatwood Decl. ¶ 9-11, Ex 1, at approximately 32:00.

About 10 minutes later, the crowd was still away from the police line when police shot multiple times at a person who was slowly walking just in front of the crowd and who may have been bending down to pick something up from the ground. Passadore Ex 15-X, at 58:54. A few minutes later, police shot more smoke canisters into the crowd dozens of feet away from the police line, and followed with flashbangs, and impact weapons. Greatwood Ex 1, at 42:00-43:00; Passadore Ex 15-X, at 59:24, 1:00:50.

C. **Tear Gas Deployed and Another Violent Push**

At around 10:15 pm, PPB declared a riot and fired dozens of tear gas into and over the crowd. Haas Decl. ¶ 14-5; Herrera Decl. ¶ 20; Greatwood Decl. Ex 1 at 43:20. The police used launchers to shoot the gas east over the crowd to land behind them, then ordered the crowd east and charged at the crowd, forcing them eastward into the gas. Haas Decl. at ¶ 15; Herrera Decl. ¶ 20. The PPB's use of tear gas impacted nonviolent protestors not engaged in any unlawful activity and who had no route for escape, people unaffiliated with the protest who happened to be driving by or waiting for a bus, and nearby residences. VanWeelden Decl. ¶ 7, 10; Dicks Decl. ¶ 20, Ex. 13 at :12, 1:53; Haas Decl. ¶15-17; Herrera Decl. ¶ 20. From Dicks' vantage point, again, protestors had still been nonviolent; nothing had changed to provoke the declaration of a riot or the use of tear gas. *Id.* Peoples' eyes and lungs were burning, and they could not breathe. VanWeelden ¶ 7; Haas Decl. ¶ 16. People were vomiting and doubled over in pain, choking, coughing, and had to take off their COVID-19 protective masks. Herrera Decl. ¶ 22.

The air in the neighborhood around North Lombard was choked with tear gas, rising up into the trees until it occluded Dicks' view from his third story window. Dicks Decl. at ¶ 20.

Declarant Sharma was present when PPB launched tear gas again into the peaceful crowd. Declaration of Akash Sharma ("Sharma Decl."). The crowd had been peaceful the moments before police launched the teargas. *Id.* at ¶ 7, 8, 16. When PPB started shooting the teargas, several people walked up with their hands up to show the officers that they were peaceful. *Id.* at ¶ 17.

After officers fired tear gas behind the crowd of protesters, they rushed at the crowd, forcing the protesters to run through the gas. Declaration of Scarlet Passmore ("Passmore Decl.") at ¶ 11, 12. Declarant Passmore had, to that point, stayed away from the front of the protest,

because she was afraid PPB's chemical munitions would trigger her asthma. *Id.* at ¶ 8, 11. The tear gas triggered an asthma attack in Declarant Passmore; she went temporarily blind and collapsed at a nearby gas station as her throat began to close up. *Id.* at ¶ 14, 15.  As she began to convulse, she managed to communicate the location of her inhaler in her backpack to someone who stopped to help her, and others treated her with water and wipes. *Id.* at ¶ 19, 20. Declarant Passmore believes that if other protesters had not stopped to treat her and carried her away from the tear gas, she would have died from its effects. *Id.* at ¶ 23.

The tear gas wafted for several blocks. People on the side streets began treating protesters hacking and gasping for air on their lawn. Sharma Decl. at ¶12. They could smell the tear gas and were immediately affected, despite being far away from the location of the protests. *Id.*

In the school field east of De la Salle school, police shot a gas canister or other munition into the grass, starting a fire. VanWeelden ¶ 9.



After police had pushed protesters back to the intersection of N. Interstate and N. Lombard, the police kept shooting or thowing smoke bombs into the crowd. VanWeeelden Decl. ¶ 5. Witnesses did not see protesters throw anything except water bottles; the police were not under attack when officers were firing impact munitions at the crowd. VanWeelden Decl. ¶ 12. At about 10:45 pm, police had pushed protestors east of I-5, and fired flash bangs and continued to shoot rounds of impact munitions at the crowd of non violent demonstrators. VanWeelden

Decl. ¶ 11. Police continued to push the crowd east. Decl. of Vince Epker (Epker Decl.) ¶ 5,7. Police continued to use impact weapons even after pushing the crowd east of I-5. Police shot Declarant Epker in the face, taking a chunk of flesh off of his cheek. *Id*., at ¶ 7. He was walking backwards, heading east as he had been instructed by police, holding his hands in the air, when police shot him. *Id*. He had not thrown anything at officers, had not destroyed any property, and had done nothing to place officers' safety, or the safety of anyone, at risk. *Id*., at ¶ 6.

### D.    Targeting of Observers and Journalists

Officers seemed to target people documenting the demonstrations. This is evidence that the police knew they were violating the law and did not want their conduct documented. For example, officers recognized and identified Eric Greatwood, who has been livestreaming many protests, by name, threatening to shove him if he did not get back. Greatwood Decl. ¶ 4, 7. When Gratewood bent down to examine an object launched at the crowd by the police they fired impact munitions at Greatwood's groin. Greatwood Decl. ¶ 9-11. Greatwood believes police intentionally targeted him. *Id.*, at 18. Later that night police arrested Leslie McClain, a journalist, who police seemed to target for the act of filming them, while she was crossing the street at a crosswalk. Dallas Decl. ¶ 16. Officers took her press pass and cuffed her even though she was coughing and vomiting, visibly hurt, and in extreme distress. *Id.*, at ¶ 16. Likewise, Police arrested two journalists and and stole a camera from another journalist without arresting him, and shoved and hit National Lawyers Guild Legal Observers. VanWeelden Decl. ¶ 4; Herrera Decl. ¶ 7.

In addition, during the events of June 30, officers used the LRAD close to the protesters. Herring Decl. ¶ 10. Herring states that the LRAD "hurt a lot" and "felt like an instant headache

between my ears." *Id.* The police use of the LRAD made VanWeelden feel like his eardrum that had recently been surgically repaired was going to blow out again. VanWeelden Decl. ¶ 7.

### D. Impact of PPB's Violations

While protesters and observers believe in the importance of protests, they fear being injured again, and for their safety due to police violence. *See, e.g.*, Dallas Decl. at ¶ 19; Greatwood Decl. ¶19; Herring Decl. at ¶ 11.

## ARGUMENT

This Court has broad inherent authority to enforce its orders. *Spallone v. United States*, 493 U.S. 265, 276 (1990). In addition, this Court has explicit statutory authority to enforce its orders through contempt, including the imposition of fines and confinement. *See* 18 U.S.C. § 401(3). Neither willfulness nor intent is required, and good faith is not a defense to a civil contempt finding. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993).

Procedurally, plaintiff bears the initial burden of showing by clear and convincing evidence that defendant violated a specific and definite order of this Court. *See Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir. 1983). Once that burden is met, the burden shifts to defendant to show that they have taken all reasonable steps to avoid violating that order. *Id*. Only where a defendant has been in substantial compliance with a court order is the defense of "all reasonable steps" even available. *In re Dual-Deck*, 10 F.3d at 695.

As demonstrated by the above facts, the City has violated this Court's order on June 30th by using FN303 and 40MM less lethal launchers, flashbang grenades, smoke, batons, and aerosol

restraints (collectively "less lethal" weapons) against people who were both attempting to follow orders or engaged in only passive resistance.[6]

### A. "Less Lethal" Violations

PPB fired pepper balls, impact muntions, and pepper spray into crowds, impacting people who were not engaged in unlawful activity. For example, police shot Eric Greatwood in the groin with rubber bullets, causing him to bleed and suffer substantially, with a possible permanent permanently. Greatwood Decl. ¶ 9-14. Police pepper sprayed Declarant Cleinman and others in the face, despite the fact that Cleinman was complying with their orders. Cleinman Decl. ¶ 6. Police also destroyed a banner and shot the banner-carriers with FN303s at close range for no discerable reason. Cleinman Ex 1, at 00:27, 00:35; Dicks Decl. ¶ 10; Dicks Ex 5, at 00:00. Police fired smoke grenades, rubber bullets and pepper balls at a group of protestors who were a few hundred feet from the officers, without any provocation, hitting people in the leg, arms, stomach, and chest. VanWeelden Decl. ¶ 3 (Dkt. No. 128); Dicks Ex. 5; Herrera Decl. ¶ 13, 14 ; Dallas Decl. ¶ 9.  Likewise, police threw or rolled several smoke grenades at the crowd moving backwards, and shot Declarants Haas and Anglada in their legs when they were at most passively resisting. Dicks Ex. 5; Haas Decl. ¶13; Anglada Decl..  Police shot Declarant Epker in the face when he had his hands raised and was retreating. Epker Decl. ¶¶ 5, 7.

Police also used LRAD very close to protestors in a manner that caused injury to those present. Herring Decl. ¶ 10; VanWeedlen Decl. ¶ 7.

---

[6] The stipulated order from June 26 incorporates PPB Use of Force Directive 1010. That directive is included in full in the appendix to this motion.

Page 17      PLAINTIFFS' AMENDED MOTION FOR FINDING OF CONTEMPT AND
                    FOR SANCTIONS AGAINST DEFENDANT CITY OF PORTLAND

The evidence from June 30 show repeated, systemic violations of the order. Rubber bullets and other impact munitions have been used, more often than not, against people who are engaged only in passive resistance, if any resistance at all.

However, the invidual violations pale in comparison to the overall theme: the City is using force as a means of dispersing protests, in clear violation of the United States Constitution and this Court's orders. Individual law breakers in the crowd of protesters are merely the excuse used for imposing group punishment. There is little or no effort to arrest people, but there is clear intent to target legal observers, journalists, and people documenting the demonstrations. *See* Greatwood Decl. ¶ 4, 7; Dallas Decl. ¶ 16; VanWeelden Decl. ¶ 4; Herrera Decl. ¶7.

The intent of the officers is clear from the overall practice, as well as the words of the officers themselves in video recordings from the ground. The officers repeatedly tell people that if they do not leave an area, the officers will use force against them to make them leave an area. The officers have no intention of arresting anyone and allowing a court of law to figure out whether the person broke the law. People who do not leave when told to do so are simply beaten until they leave. People who are prevented from moving any faster by the crowd behind them are beaten, people who cannot move quickly enough away from the police line are beaten, and people who stumble because of a police shove or tripping over another person are beaten as they fall to the ground. This theme is directly in opposition to the overall purpose of both of this Court's orders: that people engaged in passive resistance should not be subjected to these high levels of force. This Court must act to remedy the contempt.

**B.     No Defense to Contempt**

Regardless of what steps the City took to comply with the Court's order, this Court should find that the defense of "all reasonable steps" is unavailable to them because they have never been in substantial compliance with the order. The ink was barely dry on the order before

the City violated it. In such a situation, there can be no claim of substantial compliance. *In Re Dual-Deck*, 10 F.3d at 695.

### C. Remedy and Sanction

Federal courts have broad remedial powers to address noncompliance. *Stone v. City and County of San Francisco*, 968 F.2d 850, 861-62 (9th Cir. 1992) (affirming court's power to authorize sheriff to override state law); *See also, e.g.*, *Brown v. Plata*, 563 U.S. 493 (2011) (imposing prison population limit); *Nat'l Org. for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536 (9th Cir. 1987) (affirming appointment of a Special Master). When the least intrusive measures fail to rectify the problems, more intrusive measures are justifiable. *Stone*, 968 F.2d at 861 (citing *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978)). Here, the Court has a valid basis to use its broad powers to compel Defendant to comply with the Court's orders.

**DATED** this 12th day of August 2020,

                                   *s/Jesse Merrithew*

                                   **Jesse Merrithew**, OSB No. 074564
                                   **Viktoria Safarian**, OSB No. 175487
                                   Levi Merrithew Horst PC

                                   **J. Ashlee Albies**, OSB No. 051846
                                   **Whitney B. Stark**, OSB No. 090350
                                   **Maya Rinta**, OSB No. 195058
                                   Albies & Stark LLC

                                   **Juan C. Chavez**, OSB No. 36428
                                   **Brittney Plesser**, OSB No. 154030
                                   **Alex Meggitt**, OSB No. 174131
                                   **Franz H. Bruggemeier**, OSB No. 163533
                                   Oregon Justice Resource Center

                                   **Attorneys for Plaintiffs**