J. SCOTT MOEDE, OSB 934816
Chief Deputy City Attorney
scott.moede@portlandoregon.gov
NAOMI SHEFFIELD, OSB 170601
Deputy City Attorney
naomi.sheffield@portlandoregon.gov
ROBERT YAMACHIKA, OSB 065560
Senior Deputy City Attorney
rob.yamachika@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR  97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendant City of Portland*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

|  |  |
|---|---|
| DON'T SHOOT PORTLAND, a nonprofit corporation, in its individual capacity, NICHOLAS J. ROBERTS, in an individual capacity and on behalf of themselves and all others similarly situated, MICHELLE "MISHA" BELDEN, in an individual capacity and on behalf of themselves and all others similarly situated, ALEXANDRA JOHNSON, in an individual capacity and on behalf of themselves and all others similarly situated, | Case No. 3:20-cv-00917-HZ<br><br>DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' AMENDED MOTION FOR FINDING OF CONTEMPT AND FOR SANCTIONS |
| **PLAINTIFFS,** | |
| v. | |
| CITY OF PORTLAND, a municipal corporation**,** and MULTNOMAH COUNTY, a political subdivision of the State, | |
| **DEFENDANTS.** | |

Page i –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' AMENDED
MOTION FOR FINDING OF CONTEMPT AND FOR SANCTIONS

## I.    INTRODUCTION

Plaintiffs move the Court for an order finding the Defendant City of Portland ("City") in contempt and seek remedial sanctions solely for alleged violations of the Court's order restricting the use of impact munitions, RBDDs, and aerosol restraints ("Less Lethal Order") (Dkt. 43, June 26, 2020). Specifically, plaintiffs argue in their Amended Motion for Finding of Contempt and for Sanctions Against Defendant City of Portland ("Amended Motion") that on June 30, 2020, Portland Police Bureau ("PPB") members used less lethal weapons in violation of the Less Lethal Order.

The City has not violated the Less Lethal Order. Plaintiffs' declarants mostly offer vague descriptions of uses of force such that it is not possible to begin to evaluate whether the uses violate the Less Lethal Order. The limited times when plaintiffs describe specific instances of less lethal force, the force described is consistent with the Less Lethal Order, or, at a minimum, not in clear violation. A motion for contempt is not the forum for plaintiffs to seek redress for alleged Fourth Amendment violations. The City asks the Court to look specifically to whether PPB officers have complied with a reasonable interpretation of the Less Lethal Order—the standard that the Court must apply when considering the Amended Motion. The evidence shows that they have.

## II.    FACTS

Plaintiffs, by filing the Amended Motion, limited the scope to June 30, 2020 and to alleged violations of the Less Lethal Order.[1] The City, therefore generally describes the events of that evening, and the officer uses of force that were subject to the Less Lethal Order. On June 30, 2020, PPB officers' deployed impact munitions (40MM and FN303), OC spray, and a rubber

---

[1] Plaintiffs' prior Motion for Finding of Contempt and for Sanctions Against Defendant City of Portland (Dkt. 55) and Supplemental Memo in Support (Dkt. 122) sought sanctions for alleged violations of both the Less Lethal Order and this Court's temporary restraining order regarding the City's use of tear gas (Dkt. 29) ("Tear Gas Order"). Plaintiffs' Amended Motion no longer requests a finding of contempt nor seeks remedial sanctions with respect to the Tear Gas Order.

Page 1 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' AMENDED MOTION FOR FINDING OF CONTEMPT AND FOR SANCTIONS

ball distraction device ("RBDD").[2]

Prior to the start of the event on June 30, 2020, Captain Anthony Passadore, the PPB Incident Commander responsible for the event, instructed all supervisors to reiterate to all officers the requirements from the Tear Gas Order, the Less Lethal Order, and the new state law regarding the use of tear gas. (Declaration of Anthony Passadore ("Passadore Decl."), Dkt. 111, ¶ 49). The Incident Commander also gave instructions over the radio, prior to the start of the event, instructing officers on the requirements of the orders and state law. (Declaration of Michael Pool ("Pool Decl."), ¶ 13; Declaration of Naomi Sheffield ("Sheffield Decl.") ¶ 2, Ex. I, Activity Log at 2). PPB officers were aware of the temporary restraining orders. (*See* Declaration of Nicholas Bianchini ("Bianchini Decl."), ¶ 1; Declaration of Erik Kammerer ("Kammerer Decl."), ¶ 6; Declaration of Zachary Domka ("Domka Decl."), ¶ 5; Declaration of Charles Elam ("Elam Decl."), ¶ 2; Declaration of Brandon Haase ("Haase Decl."), ¶ 1; Declaration of Derek Harris ("Harris Decl."), ¶ 2; Declaration of Andrew Kofoed ("Kofoed Decl."), ¶ 3; Declaration of John Young ("Young Decl."), ¶ 1; Declaration of Brent Taylor ("Taylor Decl."), ¶ 2; Declaration of Craig Lehman ("Lehman Decl."), ¶ 1).

On that evening, a large group of protesters peacefully gathered at Peninsula Park. (Pool Decl., ¶ 13). After the initial gathering, a large group from Peninsula Park began marching toward the Portland Police Association Union Hall ("Union Hall"). (Passadore Decl., ¶ 50). The Union Hall is located in a residential neighborhood of North Portland. Because of this location, the Incident Commander decided that it was important to deploy officers to the Union Hall to

---

[2] In addition to the use of munitions that are subject to the Less Lethal Order, PPB officers did use CS gas and smoke on June 30, 2020. (Kammerer Decl., ¶¶ 4-5, 7-8; Bianchini Decl., ¶ 1; Domka Decl., ¶ 15; Elam Decl., ¶ 7; Haase Decl., ¶ 20; Kofoed Decl., ¶ 12; Taylor Decl., ¶ 8; Young Decl., ¶ 6). The City does not discuss those uses in detail since neither are subject to the Less Lethal Order. (Dkt. 43). OSP MRT officers also deployed CS gas and smoke, which are described in their police reports (Sheffield Decl., ¶ 1, Ex. H, Oregon State Police Reports ("OSP Reports"), Zepeda Rpt. at 2-5, Thomas Rpt. at 6-8), but are not discussed in the briefing because they are not the type of force that is the subject of Plaintiffs' Amended Motion.

Page 2 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' AMENDED MOTION FOR FINDING OF CONTEMPT AND FOR SANCTIONS

ensure that protesters did not try to light it on fire. (Passadore Decl., ¶¶ 49-50)

Protesters arrived at the Union Hall just after 9:00 p.m. on June 30. (Pool Decl., ¶ 14; Ex. I., Activity Log at 4). Within minutes of protesters arriving, Oregon State Police troopers, who were surrounding the Union Hall, had projectiles thrown at them. (Pool Decl., ¶ 14; Passadore Decl., ¶ 51; Sheffield Decl., ¶ 1, Ex. H, OSP Reports, Zepeda Rpt. at 2, Thomas Rpt. at 7, Denney Rpt. at 15, Gray Rpt. at 20, Marshall Rpt. at 22, Short Rpt. at 25, Low Rpt. at 27, Chaffin Rpt. at 38, Waldrop Rpt. at 40, Wolcott-Petersen Rpt. at 43, Henrick Rpt. at 46; Ex. I, Activity Log at 4). They reported "taking bottles," "taking rocks," and green lasers being shined in their eyes. (Pool Decl., ¶ 14; Kofoed Decl. ¶ 5; Ex. I, Activity Log at 4). Because of these reports, the Incident Commander declared an unlawful assembly, and directed protesters to disperse to the east at approximately 9:05 p.m. (Passadore Decl., ¶ 52). OSP troopers continued to report having rocks thrown at them, and when PPB RRT squads arrived, they similarly saw projectiles were being thrown. (Passadore Decl., ¶ 53-55; Ex. I, Activity Log at 4). At approximately 9:15 p.m., OSP troopers and PPB officers began moving the crowd east. (Pool Decl., ¶ 15; Declaration of Vance Nebling ("Nebling Decl."), ¶ 5).

As officers moved east, individuals threw objects, including large rocks, full beverage cans and frozen water bottles at officers and shined green lasers (Ex. H, OSP Reports; Kofoed Decl., ¶ 6; Kammerer Decl., ¶ 3). After officers moved the crowd east a couple of blocks, they disengaged and returned to the Union Hall. (Kofoed Decl., ¶ 9). The main group of protesters also came back toward the Union Hall. (Kofoed Decl., ¶ 10).

After returning to the Union Hall, some protesters began pushing dumpsters and recycle bins into the street and set them on fire. (Kofoed Decl., ¶ 10; Passadore Decl., ¶¶ 53, 60, Ex. 15-E at 1:12-3:59; Nebling Decl., ¶ 4, Ex. B; Ex. I, Activity Log at 4). Despite the repeated announcements to disperse to the east, the crowd had not left the area in front of the Union Hall. (Passadore Decl., ¶ 54). Officers again began to push the crowd east, past the dumpsters that had

Page 3 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' AMENDED
MOTION FOR FINDING OF CONTEMPT AND FOR SANCTIONS

been lit on fire in the street so that Portland Fire and Rescue could put out the fires. (Kofoed Decl., ¶ 10; Nebling Decl., ¶ 4, Ex. B; Ex. I, Activity Log at 4).

By 10:00 p.m., officers were taking a continuous barrage of projectiles, mostly water bottles, but also glass bottles, rocks, fireworks, and full cans, and individuals in the crowd were shining green lasers in officers' eyes. (Passadore Decl., ¶ 55; Nebling Decl., ¶ 10, Ex. C, Ex. D, Ex. E; Ex. I, Activity Log at 4). Multiple officers had been struck by rocks. (*Id.*). At approximately 10:10 p.m., the Incident Commander declared a riot due to significant concern that the projectiles would result in serious injury to an officer. (Passadore Decl., ¶ 55). In response to the announcement that there was a riot, dozens of additional projectiles were thrown at officers, including bottles, full cans, rock, and fireworks. (*Id.*). A protester began to shoot roman candles at the officers. (*Id.*; Greatwood Decl., Dkt. 148, Ex. 1, 44:59-45:13). After this response, at approximately 10:15 p.m., the Incident Commander directed the sound truck to make announcements for the use of tear gas. (Ex. I, Activity Log at 5). When those announcements were made, the Incident Commander authorized officers to deploy CS gas. (*Id.*; Passadore Decl., ¶ 55). After the sound truck gave the second warning for CS gas, the crowd cheered, and officers deployed CS gas. (Passadore Decl., ¶ 56; Ex. H, OSP Reports; Young Decl., ¶ 6; Bianchini Decl., ¶ 1[3]; Haase Decl., ¶¶ 20-21; Kammerer Decl., ¶¶ 7-8; Domka Decl., ¶ 15; Greatwood Decl., Ex. 1, 45:15-45:35 (audio of protestors cheering the announcement of CS gas being used)).

The PPB sound truck continued to instruct the crowd to disperse and move east. At approximately 10:48 p.m., the Incident Commander instructed officers to disengage, but as they did so, they took more projectiles. (Passadore Decl., ¶ 57; Ex. I, Activity Log at 5). A smaller group remained in the street at NE Lombard and NE Albina. As officers began to make selective

---

[3] The Declaration of Nicholas Bianchini was signed with a numbering error causing there to be duplicate numbers 1-2. This paragraph citation is to the second paragraph numbered "1".

Page 4 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' AMENDED MOTION FOR FINDING OF CONTEMPT AND FOR SANCTIONS

arrests in this area, smaller groups of protesters began to disperse into the residential neighborhood; officers did not follow these groups into the residential neighborhood. (Passadore Decl., ¶ 58). Just after midnight on July 1, a group of approximately 60 protesters had reorganized and walked north on NE MLK toward PPB's North Precinct. (*Id*.). The PPB sound truck continued to announce the unlawful assembly, while some members of the group started a dumpster fire and remained in the middle of the intersection of NE MLK and NE Killingsworth. (*Id*.; Kammerer Decl., ¶ 10; Passadore Decl., ¶ 60, Exs. 15-B and 15-C; Ex. I, Activity Log at 5). As officers pushed the crowd around North Precinct to the west, it broke up into small groups and officers disengaged.

Throughout the interactions with protesters on June 30, seven PPB officers deployed impact munitions. These officers deployed impact munitions in response to individuals throwing projectiles, kicking and throwing munitions back at officers, physically pushing and fighting with officers, and shining green lasers in officers' eyes. (Bianchini Decl., ¶¶ 8, 10, 11, 12, 15, 16 (describing each use of his 40mm marking round targeted at and successfully hitting individuals below the waist or inanimate objects near the individuals who were throwing and kicking items (including smoke canisters) at police and lighting fires); Elam Decl., ¶ 6 (using a 40mm marking round in response to an individual who had just kicked a canister of smoke at the police and was running toward a canister of smoke, apparently to also kick it toward the police); Haase Decl., ¶¶ 6-7 (deploying 40MM less lethal marking rounds at individuals who were attempting to throw canisters of smoke or other deployed munitions back at police); Harris Decl., ¶ 6 (deploying FN303 pava rounds at a large dumpster that three individuals were pushing westbound toward a line of officers); Young Decl., ¶ 8 (deploying a single 40MM marking round at an individual who had picked up a still-ignited smoke canister to throw back at officers); Taylor Decl., ¶¶ 7-12 (deploying FN303 rounds in response to individuals engaging in pulling people out of an arrest (unarrest), throwing munitions, bottles, and other projectiles at police, and shining green lasers

Page 5 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' AMENDED
MOTION FOR FINDING OF CONTEMPT AND FOR SANCTIONS

toward police); Lehman Decl., ¶¶ 11-13 (using a 40MM marking round on an individual who ran up to a smoke cannister to throw it and on an individual winding up to throw a bottle).

Five PPB officers deployed OC spray in response to individuals who were pushing officers, striking officers, grabbing officer batons, and otherwise fighting and resisting officers. (Bianchini Decl., ¶ 9 (describing the use of OC spray at two individuals actively shoving back at the line of officers as officers tried to move them east); Kofoed Decl., ¶¶ 7-8 (deploying single bursts of OC spray at individuals actively pushing against and hitting officers with a skateboard and an umbrella); Kofoed Decl. ¶¶ 15 (deploying two bursts of OC spray against an individual fighting and resisting against an officer who was taking him into custody); Middleton Decl., ¶ 6 (deploying a single burst of OC spray to the faces of two individuals who were attempting to grab and shove two unknown police officers); Lehman Decl., ¶¶ 7-9 (deploying OC spray at an individual that was actively struggling with an officer and pushing against the officer and at an individual who was actively trying to pull a person in custody away from police)).

Officer Domka deployed a single RBDD. (Domka Decl., ¶¶ 17-18). This RBDD was deployed toward a small group of individuals who were separated from the rest of the crowd and throwing projectiles at officers. (*Id*.).

In addition to the impact munitions and OC spray deployed by PPB officers, OSP troopers who responded on June 30 also deployed munitions.[4] OSP troopers deployed Stinger rounds (similar to PPB's RBDDs) and pepper balls. (Ex. H, OSP Reports, Zepeda Rpt. at 2-5, Mac Marshal Rpt. at 22-24 & Lewis Topinka Rpt. at 48-50). OSP troopers, like PPB officers, deployed these munitions at different times and locations during the evening in response to specific incidents of threatening and violent activity by certain protesters. (*Id*.).

---

[4] The Less Lethal Order does not impose any restrictions on the use of force by OSP troopers. This information is included to provide a more complete picture, and to address assertions by plaintiffs' declarants regarding uses of force that may not be identified with a particular PPB officer.

Page 6 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' AMENDED MOTION FOR FINDING OF CONTEMPT AND FOR SANCTIONS

During the protest on June 30, 2020, numerous officers were struck with projectiles thrown from individuals in the crowd. Officer Ariel Livingston was struck in the head with a water bottle during the initial push to move protesters east on N Lombard. (Declaration of Ariel Livingston ("Livingston Decl."), ¶¶ 3-7). Criminalist Vance Nebling was struck in the arm with a fist-sized rock weighing approximately two pounds. (Nebling Decl., ¶¶ 6-7, 12; Ex. B, Ex. F, and Ex. G). Officer Bianchini was hit in the legs with multiple items while he stood on the police line. (Bianchini Decl., ¶ 3). OSP Trooper Zepeda was hit in the shin guard with an unopened can of beer and observed PPB officers getting hit with thrown objects. (Ex. H, OSP Reports at 4). OSP Trooper Thomas was hit in the right bicep with a nearly full beer can, had green lasers shined in his eyes, impacting his vision and causing temporary black spots, and witnessed Trooper Cordes get hit twice by rocks and be taken off the line to receive medical attention. (*Id.* at 7-8). Multiple OSP troopers described witnessing Sergeant Bailey being struck in the head with a large rock, which ultimately resulted in a concussion and him being off duty for a week. (*Id.*, Thomas Rpt. at 8, McIlvenna at 36-37). Trooper Kendoll described being hit in the ribs with a large apple thrown at a high rate of speed, as well as green lasers, causing temporary blindness, pain, headaches, and temporary black spots in his vision. (*Id.* at 11). Trooper Butler was hit in the right thigh by a rock and struck by a water bottle. (*Id.* at 13). Trooper Short was struck in the thumb by a glass bottle that he tried to deflect away from hitting other line officers. (*Id.* at 26).

## III.    ARGUMENT

### A.    Legal Standard

"A Court may hold a party in civil contempt when the party has displayed 'disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply.'" *Calvillo Manriquez v. Devos*, 411 F. Supp. 3d 535, 539 (N.D. Cal. 2019) (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)). Plaintiffs have "the burden of showing by clear and convincing evidence that the [City]

Page 7 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' AMENDED
            MOTION FOR FINDING OF CONTEMPT AND FOR SANCTIONS

violated a specific and definite order of the court." *F.T.C. v. Affordable Media*, 179 F.3d 1228,

1239 (9th Cir. 1999) (quoting *Stone v. City and Cty. of San Francisco*, 968 F.2d 850, 856 n.9

(9th Cir. 1992)). Typically, "civil contempt 'should not be resorted to where there is [a] *fair*

*ground of doubt* as to the wrongfulness of the defendant's conduct." *Taggart v. Lorenzen*, 139 S.

Ct. 1795, 1801-02 (2019) (quoting *Ca. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618

(1885)). The Supreme Court has explained that "[t]his standard reflects the fact that civil

contempt is a 'severe remedy,' and that principles of 'basic fairness requir[e] that those enjoined

receive explicit notice' of 'what conduct is outlawed' before being held in civil contempt." *Id.*

(citations omitted).

Contempt does not require that a party's conduct be willful, and there is no good faith

exception, but "a person should not be held in contempt if his action 'appears to be based on

a good faith and reasonable interpretation of the [court's order]." *Dual-Deck*, 10 F.3d at 695

(quoting *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir.

1982)). Moreover, "'[s]ubstantial compliance' with the court order is a defense to civil contempt,

and is not vitiated by 'a few technical violations' where every reasonable effort has been made to

comply." *Id.*; *Century Indem. Co. v. Marine Group, LLC*, 2013 WL 5838991, * 2 (D. Or. Oct.

29, 2013) ("[S]ubstantial compliance based on a reasonable interpretation of the court order is a

defense to civil contempt.").

B.    June 30, 2020

Numerous declarants, and plaintiffs' Amended Motion, describe the use of tear gas on

June 30, 2020. (*See* Dkt. 145 at 13-15; Cleinman Decl., Dkt. 150, ¶¶ 10-11; Dicks Decl., Dkt.

119, ¶ 20; Dallas Decl., Dkt. 124, ¶¶ 14-15, 17, 19; Passmore Decl., Dkt. 118, ¶¶ 9-14, 16, 23;

Herrera Decl., Dkt. 126, ¶¶ 20-21, 26, 30, 32; VanWeelden Decl., Dkt. 128, ¶¶ 8-10; Sharma

Decl., Dkt. 117, ¶¶ 8-12, 15-17, 19). PPB's use of tear gas is subject to the Tear Gas Order.

However, the Amended Motion seeks contempt only for alleged violations of the Less Lethal

Page 8 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' AMENDED
MOTION FOR FINDING OF CONTEMPT AND FOR SANCTIONS

Order. (Dkt. 145 at 2). The significant number of injuries experienced by officers and the threat presented by the persistent throwing of rocks, glass bottles, fireworks, and other projectiles presented a significant risk to the safety of officers. However, because plaintiffs no longer allege a violation of the Tear Gas Order, the City does not further address the use of tear gas in this Response.

Plaintiffs also draw significant attention to PPB's use of smoke. (Dkt. 145 at 7, 8, 9, 12, 14, 16, 17). The Less Lethal Order addressed PPB's use of specific less lethal munitions. It did not include smoke. In fact, plaintiffs' counsel and the City's counsel discussed smoke prior to agreement on the Less Lethal Order, and plaintiffs agreed to a temporary restraining order that did not include smoke. (Declaration of Scott Moede ("Moede Decl."), Dkt. 132, ¶ 1, Ex. A). The City does not address each use of smoke, and the Court should not hold the City in contempt for use of an item that was knowingly excluded from the temporary restraining order.

Similarly, a significant number of the incidences of force described by plaintiffs' declarants involved pushes and baton strikes, which are not subject to the Less Lethal Order. (Dkt. 145 at 6, 8, 9, 11, 16). In fact, plaintiffs concede that the individual violations they allege "pale in comparison to the overall theme." (Dkt. 145, at 18). Plaintiffs' expressed concerns appear to be captured by the repeated allegations that PPB officers "beat" protesters for no reason. (*Id.*). Any allegations of police misconduct, particularly involving the use of force, are serious. And the City is certainly responsible for evaluating each allegation of misconduct by PPB officers to ensure that the force used was appropriate under both law and PPB Directives. But such alleged uses of force—baton strikes and pushing—are indisputably outside the scope of the Less Lethal Order. A finding of contempt is a wholly unwarranted remedy to address these allegations. *Affordable Media*, 179 F.3d at 1239 (requiring violation of a "specific and definite

Page 9 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' AMENDED
            MOTION FOR FINDING OF CONTEMPT AND FOR SANCTIONS

order of the court").[5]

Ultimately, plaintiffs' declarants describe six instances where they were personally impacted by force that is the subject of the Less Lethal Order. Declarant Cleinman states that he was impacted by OC spray. (Cleinman Decl., ¶ 6). The Less Lethal Order provides that OC spray "shall not be used against persons engaged in passive resistance, and consistent with PPB Use of Force Directive 1010, members shall minimize exposure to non-targeted persons." (Less Lethal Order, Dkt. 43). Passive resistance "means a person's non-cooperation with a member that does not involve violence or other active conduct by the individual." (*Id*.).

Declarant Cleinman states that he was shoved by two officers. (Cleinman Decl., ¶ 6). He then describes another officer aiming OC spray "directly into my eyes" from "about 4-5 feet away." (*Id*.). Declarant Cleinman's own assertion—that the officer aimed directly at him from a short distance—confirms that the officer sought to minimize exposure to non-targeted persons. Declarant Cleinman asserts that prior to being hit with OC spray, he "did nothing to place people or property at risk." (Cleinman Decl., ¶ 8). But that is not the standard set forth in the Less Lethal Order. Rather, it prohibits the use of OC spray against persons who are engaged in non-cooperation "that does not involve violence or other active conduct." It can be seen on the video provided by Declarant Cleinman that he grabs the baton of the first officer who shoved him. (Cleinman Ex. 1, 00:05-00:07 (showing Declarant Cleinman's arms going back and forth as the officer tries to get his baton away)). A second officer pushes him so that he keeps moving, at which point Declarant Cleinman turns back to the police line. (*Id*. at 00:07-00:09). It is at this time that an officer uses OC spray. (*Id*. at 00:10-00:12). Declarant Cleinman was not engaged in passive resistance, but rather in active conduct with the officers on the line immediately prior to the use of OC spray.

_____

[5] Plaintiffs also contend that "officers used the LRAD close to the protesters." (Dkt. 145 at 15, 17). The Less Lethal Order prohibits the use of the LRAD as a warning signal but allows for its continued use for announcements. (Dkt. 43).

Page 10 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' AMENDED MOTION FOR FINDING OF CONTEMPT AND FOR SANCTIONS

Declarant Passmore claims she breathed some OC spray because she was downwind from where it was sprayed. (Passmore Decl., ¶ 8). Although Declarant Passmore contends that officers "indiscriminately sprayed OC spray into the crowd," she does not describe either the time or location of this incident. Moreover, her description that the officer did "not appear to spray at specific people," (*Id.*), is inconsistent with the declarations of each of the City's declarants who deployed OC spray. (Bianchini Decl., ¶ 9; Kofoed Decl. ¶¶ 7-8, 15; Middleton Decl., ¶ 6; Lehman Decl., ¶¶ 7-9). Assuming Declarant Passmore was exposed to residual OC spray, the Less Lethal Order does not require that non-targeted individuals are never impacted. Rather it requires officers to minimize exposure to non-targeted individuals. Based on her description, Declarant Passmore was not incidentally sprayed with OC spray, but rather may have been exposed to some residual chemical that remained in the air. This does not evidence a violation of the Less Lethal Order.

Four of plaintiffs' declarants describe being impacted by impact munitions, which could have been FN303s, 40MMs, RBDDs or pepper balls. Pursuant to the Less Lethal Order, PPB officers must use these impact munitions consistent with Directive 1010.00, and they cannot "be used where people engaged in passive resistance are likely to be subjected to the force." (Dkt. 43). Pursuant to Directive 1010.00, impact munitions are authorized in response to active aggression (Directive 1010.00, ¶ 6.4.2.1.1 (Sheffield Decl., Dkt. 141, Ex. 21)), which is defined as, "A threat or overt act of an assault (through physical or verbal means), coupled with the present ability to carry out the threat or assault, which reasonably indicates that an assault or injury to any person is about to happen, unless intervention occurs."

Declarant Anglada Cordero was struck by an impact munition on his legs as he was running up to kick a smoke canister at the police for the second time. (Anglada Cordero Decl., Dkt. 146, ¶¶ 13-14). Declarant Haas similarly was moving to kick a smoke canister when she was struck in the legs by an impact munition. (Haas Decl., Dkt. 127, ¶ 13). Finally, Declarant

Page 11 –     DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' AMENDED
              MOTION FOR FINDING OF CONTEMPT AND FOR SANCTIONS

Greatwood was struck with an impact munition when he walked toward a deployed munition that had been thrown by the police and bent down to examine it. (Greatwood Decl., ¶ 9). Plaintiffs assert that police shot Declarants Haas and Cordero with impact munitions "when they were at most passively resisting." (Dkt. 145 at 17). But throwing or kicking a live munition at officers is not passive resistance; it is active aggression. The officers that deployed the munitions also appear to have struck their intended targets, suggesting that there was little risk to those individuals engaged in passive resistance. Notwithstanding that the uses of force described are not violations of the Less Lethal Order, with the limited information, it is not possible to determine whether the force described was deployed by PPB. As discussed above, OSP troopers also deployed pepper balls at protesters engaged in similar behavior as that described by these declarants. (Ex. H., OSP Reports at 48 (describing Trooper Topinka's use of pepper balls in response to individuals kicking munitions and throwing objects at officers)).

Declarant Epker asserts that he was struck in the face by an impact munition as he was backing away from officers with his hands in the air. (Epker Decl., Dkt. 149, ¶ 7). He claims that this occurred after officers deployed CS gas and after protesters had been pushed east over I-5. (*Id*.). Declarant Epker did not see the officer who shot him or the munition that hit him. (*Id*.). There were very few uses of force at this point in the protest, although there was some force used by both PPB officers and OSP troopers (Haase Decl., ¶ 17; Domka Decl., ¶¶ 17-19; Bianchini Decl., ¶ 17; Ex. H, OSP Reports at 24, 50). None of the uses of force described around this time, appear consistent with Declarant Epker's description. With this amount of information, the City is not certain whether Mr. Epker was struck by something deployed by an officer or whether he was struck by one of the many objects thrown by protesters.

Plaintiffs and their declarants describe other instances where they witnessed force, but there is insufficient information to conclude that the force violated the Less Lethal Order. For example, plaintiffs note that an officer deployed impact munitions at individuals that appeared to

Page 12 –   DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' AMENDED
MOTION FOR FINDING OF CONTEMPT AND FOR SANCTIONS

throw projectiles or reach for projectiles and munitions. (Dkt. 145 at 7; Dicks Ex. 5 at 00:18-00:23 (deploying impact munitions at an individual who threw a bottle filled with a colored liquid at officers); Passadore Decl., Ex. 15-X at 58:54 (deploying impact munitions at an individual that approached an item in front of the crowd, reaching down to pick it up)). In short, plaintiffs describe an officer using impact munitions against individuals appearing to engage in active aggression, consistent with the Less Lethal Order.

Plaintiffs describe officers deploying impact munitions at individuals holding a large sign, refusing to disperse, blocking the police line from moving, and struggling against the police line. (Dkt. 145 at 6; Cleinman Ex. 1 at 00:27-00:35; Dicks Decl. Ex. 5 at 00:00 (showing an officer deploying an impact munition at individuals who are struggling with officers over a sign that was used to block the movement of the officers' line). Declarant Dallas states that officers fired impact munitions at persons behind her in the crowd. (Dkt. 145 at 8; Dallas Decl., ¶ 10). Declarant Dallas does not appear to know who behind her was hit or what conduct they may have been engaged in when an officer deployed an impact munition.

Plaintiffs also cite to video where officers strike a dumpster with impact munitions that protesters were wheeling toward officers. (Dkt. 145 at 10). There is no reason to believe that these munitions struck any protester, and Officer Harris described deploying the munitions at the dumpster to stop the individuals from rolling the dumpster at the police line. (Harris Decl., ¶ 6); (Dicks Decl., Ex. 8 at 3:05; Comstock Decl., Dkt. 147, Ex. 2 at 24:12, 32:46; Passadore Decl., Ex. 15-X at 27:56) (each video showing impact munitions striking dumpster). During previous protests, protesters had rolled dumpsters toward officers in attempt to hit them with the dumpsters. (Harris Decl., ¶ 6).

Plaintiffs also include non-descript assertions that PPB officers used force inappropriately. (VanWeelden Decl., ¶¶ 5, 12 ("the police kept shooting or throwing smoke bombs into the crowd" and "[officers] were standing there calmly while other officers fired

Page 13 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' AMENDED
             MOTION FOR FINDING OF CONTEMPT AND FOR SANCTIONS

weapons at the protesters"); Herring Decl., Dkt. 123, ¶ 8 (explaining that munitions would likely hit people directly); Herrera Decl., Dkt. 126, ¶¶ 13-15 (describing witnessing officer deploying impact munitions at individuals without specifying whether the individuals were engaged in any activity beyond "using their voices to call out and criticize the officers")). They similarly cite to video that depicts officers deploying smoke and the sound of impact munitions can be heard. It is not possible to see from this video at whom the impact munition is deployed or why. (Greatwood Decl., Ex. 1 at 31:52 (showing officers deploying smoke), 42:00-43:00 (showing smoke and audio that sounds like impact munitions); Passadore Decl., Ex. 15-X at 50:50 (showing smoke).

In short, plaintiffs have not shown a violation of the Less Lethal Order. But even if the Court determines that there were "a few technical violations" of the Less Lethal Order on June 30, it should not find the City in contempt where the City has made "every reasonable effort" to comply with the order. *Dual-Deck*, 10 F.3d at 695. The Incident Commander made repeated efforts to remind all officers of the requirements of the injunctions, including the Less Lethal Order. Notably, at 7:30 p.m., before officers deployed, the Incident Commander provided a detailed reminder of the limitations set forth in the June 26 less lethal order. (Ex. I, Activity Log at 2). And, as discussed above, multiple officers testified to their knowledge of the Less Lethal Order. Plaintiffs' Amended Motion ultimately cites to a handful of instances over the two months since the Less Lethal Order has been in place. While they do not meet their burden of showing any violation of the Less Lethal Order, if the Court nonetheless finds a violation, it should not hold the City in contempt.

In the Amended Motion, plaintiffs argue their themes for the case that "the City is using force as a means of dispersing crowds" and "[t]here is little or no effort to arrest people." (Dkt. 145 at 18). They also contend that the City is targeting journalists, legal observers, and others documenting the protests. (*Id.*). Plaintiffs then ask the Court to rule based on "the overall purpose of both of this Court's orders." (*Id.*). The City does not dispute that force was used on June 30,

2020. And the City agrees that all uses of force must be reviewed and scrutinized. But plaintiffs have brought a motion for contempt of the Less Lethal Order. They have the burden of showing, by clear and convincing evidence, that the City violated *that* order—not the overall purpose of both orders. *Affordable Media*, 179 F.3d at 1239. Plaintiffs have not met their burden. The Court should deny their motion.

      C.    <u>Remedies</u>

A "party's good faith, even where it does not bar civil contempt, may help to determine an appropriate sanction." *Taggart*, 139 S. Ct. at 1802. "[T]he use of the contempt power places an additional limitation on a district court's discretion, for as the Court of Appeals recognized, 'in selecting contempt sanctions, a court is obliged to use the 'least possible power adequate to the end proposed.'" *Spallone v. United States*, 493 U.S. 265 (1990) (citation omitted). Here, PPB has demonstrated good faith compliance with the Less Lethal Order. Moreover, plaintiffs' requested remedies demonstrate the difficulty in both structuring and enforcing an injunction regarding the lawful use of force by police officers.

Plaintiffs' requested remedies do not fit the alleged violations. First, plaintiffs request a "complete ban on the use of certain 'less lethal weapons' in any crowd control situation." (Dkt. 145 at 2). While plaintiffs do not identify which weapons they seek to ban, a complete ban on less lethal tools would leave officers with more limited tools that could result in greater uses of force. (Schoening Decl., Dkt. 18, ¶ 18). This would constrain PPB officers far beyond any limitations of the Fourth Amendment and would severely inhibit their ability to respond to individuals engaged in violent criminal activity.

Plaintiffs next ask that less lethal weapons be "authorized by a politically accountable leader, such as Mayor Ted Wheeler." (Dkt. 145 at 3). This requested remedy would require that the Mayor, who is neither a trained law enforcement officer nor a lawyer, determine when and what level of force is necessary in a given situation. There is undoubtedly a role for policy

Page 15 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' AMENDED
                MOTION FOR FINDING OF CONTEMPT AND FOR SANCTIONS

makers in determining the range of tools available to law enforcement officers. However, placing a particular decision to use force in the hands of an individual who has no background or training that would allow him to make a determination consistent with constitutional requirements is inappropriate.

Plaintiffs ask the Court to prohibit individual members who violated the Court's orders from participating in future crowd control operations. (Dkt. 145 at 3). Plaintiffs have not offered clear and convincing evidence that any individual members violated the Less Lethal Order. Plaintiffs offer general allegations regarding the use of force, but very limited descriptions of particular incidences of force that allegedly violated the temporary restraining orders. Given the limited information, it would be challenging or impossible to identify the officers who engaged in the specific alleged misconduct.

Finally, plaintiffs suggest fines to compensate the individual class members for their injuries and to deter future violations. Notwithstanding that plaintiffs have not applied for class certification and no class has been certified in this case, compensating individuals who are the subject of unconstitutional force is a remedy that exists notwithstanding this Court's temporary restraining orders. Those individuals who are actually the subject of alleged excessive force can seek damages against the individual officer.

Plaintiffs' motion for contempt and requested remedies are demonstrative of why injunctive relief regarding use of force is problematic. To analyze the constitutionality of any particular use of force, this Court must consider the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 396 (1989) (the test for reasonable "requires careful attention to the facts and circumstances of each particular case"). The vast majority of the force plaintiffs' declarants describe was witnessed, but there is no impacted individual asserting a violation. Plaintiffs are using the Less Lethal Order and this motion to ask this Court to act as a monitor of every use of force (including force not covered by the Less Lethal Order). But there are already processes in

Page 16 –    DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' AMENDED
            MOTION FOR FINDING OF CONTEMPT AND FOR SANCTIONS

place for evaluating uses of force. There are also already legal remedies available to individuals who are the subject of unconstitutional force. Coming before the Court to discuss every use of force by any PPB officer at any protest, however, is an untenable outcome.

## IV.    CONCLUSION

Plaintiffs' have failed to present clear and convincing evidence that PPB officers violated the Less Lethal Order. Based on the argument above, the City asks the Court to deny Plaintiffs' Amended Motion for Finding of Contempt and for Sanctions Against Defendant City of Portland.

Dated: September 4, 2020.

Respectfully submitted,

*/s/ Naomi Sheffield*
J. SCOTT MOEDE, OSB 934816
Chief Deputy City Attorney
scott.moede@portlandoregon.gov
NAOMI SHEFFIELD, OSB 170601
Deputy City Attorney
naomi.sheffield@portlandoregon.gov
ROBERT YAMACHIKA, OSB 065560
Senior Deputy City Attorney
rob.yamachika@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendant City of Portland*

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
(503) 823-4047