**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
**Viktoria Safarian**, OSB No. 175487
Email: viktoria@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241

**Juan C. Chavez**, OSB No. 136428
Email: jchavez@ojrc.info
**Brittney Plesser**, OSB No. 154030
Email: bplesser@ojrc.info
**Alex Meggitt**, OSB No. 174131
Email: ameggitt@ojrc.info
**Franz H. Bruggemeier**, OSB No. 163533
Email: fbruggemeier@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503 944-2270

**J. Ashlee Albies**, OSB No. 051846
Email: ashlee@albiesstark.com
**Whitney B. Stark**, OSB No. 090350
Email: whitney@albiesstark.com
**Maya Rinta**, OSB No. 195058
Email: maya@albiesstark.com
Albies & Stark LLC
1 SW Columbia St. Suite 1850
Portland, Oregon 97204
Telephone: (503) 308-4770

**Attorneys for Plaintiffs**

THIRD AMENDED COMPLAINT

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DON'T SHOOT PORTLAND, a nonprofit corporation, in its individual capacity, NICHOLAS J. ROBERTS, in an individual capacity and on behalf of themselves and all others similarly situated, MICHELLE "MISHA" BELDEN,  in an individual capacity and on behalf of themselves and all others similarly situated, ALEXANDRA JOHNSON, in an individual capacity and on behalf of themselves and all others similarly situated, | Case No. 3:20-cv-00917-HZ |
| | THIRD AMENDED COMPLAINT |
| | (Violations of Civil Rights: 42 U.S.C. § 1983) |
| Plaintiffs | |
| v. | JURY TRIAL DEMANDED |
| CITY OF PORTLAND, a municipal corporation, and MULTNOMAH COUNTY, a political subdivision of the State, | |
| Defendant. | |

Plaintiffs, by and through their attorneys, allege:

## NATURE OF ACTION

1.

This is a civil rights action brought pursuant to 42 U.S.C. § 1983. Plaintiffs bring this civil rights action to stop the City of Portland and Multnomah County from using excessive force against them in order to suppress plaintiffs' right to free speech. For the past four months, plaintiffs, along with tens of thousands of their fellow community members, and millions of other people around the world, have taken to the streets to protest white supremacy and police violence in the United States generally and in Portland specifically. The Portland Police Bureau ("PPB"), like police departments all over the country, has responded with indiscriminate, unchecked, and unconstitutional violence against protesters. At first, PPB used chemical agents

("tear gas") against crowds of protesters, including plaintiffs, who had committed no criminal acts, posed no threat of violence to any person, and were merely engaged in protected speech. Plaintiffs were immediately concerned that the use of tear gas is particularly dangerous at the present time because it is specifically designed to irritate the respiratory system and to cause people to expel mucus and aspirated saliva. In the midst of a global pandemic, the deadly novel COVID-19 virus is known to spread principally through aspirated saliva and mucus. Plaintiffs sought and obtained a temporary restraining order prohibiting PPB from using tear gas except in narrow circumstances. Following that order, PPB changed tactics and the Multnomah County Sheriff Office ("MCSO") increased its role, and both now use a variety of so-called "less lethal" weapons indiscriminately against plaintiffs in their continued effort to silence speech. Plaintiffs are entitled to a temporary restraining order, preliminary injunction, permanent injunction, damages, and an award of attorneys' fees and costs.

## JURISDICTION AND VENUE

2.

This court has subject matter jurisdiction over plaintiffs' claims of violation of federal constitutional rights pursuant to 28 U.S.C. §§ 1331(a) and 1343 because the causes of action arise under 42 U.S.C. § 1983.

3.

Venue is proper in the District of Oregon pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in the District of Oregon and because Defendants are subject to personal jurisdiction in the District of Oregon.

/ / /

/ / /

/ / /

**PARTIES**

4.

Plaintiff Don't Shoot Portland is a not for profit corporation, incorporated under the laws of the state of Oregon, whose principle place of business is Portland, Multnomah County, Oregon. Don't Shoot Portland is a Black-led organization whose fundamental mission is to advocate for social and racial justice in Portland. Don't Shoot Portland was formed in the wake of the Ferguson uprising stemming from the police killing of Michael Brown and community outrage at police violence directed at Black people. Don't Shoot Portland provides support for grassroots organizing and education on issues of police brutality, the school to prison pipeline, combatting white supremacy and racism, and provides mutual aid to activists, organizers, and others protesting in Portland against police brutality.  Don't Shoot Portland holds ongoing events and trainings related to its mission such as bystander intervention trainings, and advocates for demilitarization of the police. Its programs include a children's art and social justice council, community clothing tree, and community legal clinics. Don't Shoot Portland also advocates for social justice and change though supporting direct action in a safe manner; participating, organizing and supporting protests; providing know your rights trainings and information; and providing jail support to people arrested during demonstrations. Don't Shoot Portland recognizes that mass mobilizations and demonstrations are necessary for politicians and the general public to understand the importance of an issue in order to enact policies responsive to community demands in order to create and foster a more equitable City. Don't Shoot Portland has devoted resources to identifying, counteracting, and addressing the practices alleged in this complaint, and this diversion of resources has frustrated its mission.  As a result of the PPB's and MCSO's unconstitutional policy, practice, and customs, as alleged herein, Don't Shoot Portland must

devote additional resources to educating, informing, and protecting protesters from unconstitutional practices, and this diversion of resources has frustrated its mission.

5.

Plaintiff Nicholas J. Roberts (Pronouns: he/him), at the time of filing and all material times, was a resident of Portland, Multnomah County, Oregon.

6.

Plaintiff Michelle "Misha" Belden (Pronouns: They/Them), at the time of filing and all material times, was a resident of Portland, Multnomah County, Oregon.

7.

Plaintiff Alexandra Johnson (Pronouns: she/her), at the time of filing and all material times, was a resident of Portland, Multnomah County, Oregon.

8.

Defendant City of Portland is a political subdivision of the State of Oregon. The Portland Police Bureau ("PPB") is a department or division of the City. As a local governmental entity, the City of Portland is a suable person under 42 U.S.C. § 1983. The people who used tear gas and "less lethal" weaponry, including as described below, were employees or agents of the City of Portland. On information and belief, each and every decision to indiscriminately use tear gas and other "less-lethal" weapons against plaintiffs was made at or ratified by a sufficiently high level as to be policy decision of the City of Portland.

9.

Defendant Multnomah County is a political subdivision of the State of Oregon. The Multnomah County Sheriff's Office ("MCSO") is a department or division of the County. As a local governmental entity, the County is a suable person under 42 U.S.C. § 1983. The people who used tear gas and "less lethal" weaponry, including as described below, were employees or

agents of Multnomah County. On information and belief, each and every decision to

indiscriminately use tear gas and other "less-lethal" weapons against plaintiffs was made and or

ratified by a sufficiently high level as to be policy decision of Multnomah County. On

information and belief, the MCSO deputies who used tear gas and other "less-lethal" weapons

against plaintiffs were acting pursuant to the practice or policy of Multnomah County.

## GENERAL ALLEGATIONS

### 10.

Black Lives Matter.

### 11.

The disproportionate and excessive use of force against Black people by police officers in

the United States is a well-documented, systemic problem. It exists in every police department in

this country, including the PPB and MCSO.

### 12.

For many years, advocates and activists have attempted, largely unsuccessfully, to get the

City to address and reduce the Portland Police Bureau's disproportionate use of force, stops,

searches, seizures, and arrests of Black people, Indigenous people, and people of color. Efforts to

address the Portland Police Bureau's racial profiling dates back to the 1990s.[1] And yet, despite

all the recommendations, implemented or more often, not, PPB continues to engage in

disproportionate stops, searches, seizures, and uses of force of Black people.

## I.      George Floyd

### 13.

On May 25, 2020, in Minneapolis, Minnesota, a Black man named George Floyd was

murdered on video by Officer Derek Chauvin of the Minneapolis Police Department while three

---

[1] https://www.portlandoregon.gov/police/article/32381

THIRD AMENDED COMPLAINT

of his fellow officers watched and did nothing to intervene. Officer Chauvin knelt on Mr. Floyd's neck while Mr. Floyd pleaded for his life, repeatedly telling Chauvin that he could not breathe. A bystander video of the murder quickly went viral, sparking outrage throughout the country.

14.

For many Americans, and particularly Black Americans, the murder of George Floyd, in broad daylight while being openly filmed by a witness, was the proverbial straw that broke the camel's back. Fed up with the empty platitudes and the endless yet ineffective "reforms" by their political and law enforcement leaders, millions of Americans took to the streets in protest, demanding an end to police violence and white supremacy, and refusing to leave those streets unless and until meaningful change is made.

15.

Protests against police violence have been met with police violence in nearly every city around the country. Videos shared in the press and on social media show the police in this country out of control: attacking journalists, attacking bystanders, threatening children, assaulting people for insulting them, engaging in drive-by attacks with "less lethal" weapons, planting weapons in the hands of people arrested, pulling off demonstrators' CDC-recommended facemasks and macing them, kettling whole groups of protesters only to launch tear gas at them, driving their cars directly through crowds of people, using military helicopters in efforts to terrify civilians, discussing plans to shoot protesters, and above all, using massive amounts of tear gas in a massive systemic effort to stop people from protesting police violence. This violent police response has only strengthened the resolve of protesters.

/ / /

/ / /

THIRD AMENDED COMPLAINT

## II.    Portland

16.

Beginning on May 29, 2020, and every night since then, Portlanders have been demonstrating in the streets demanding justice for George Floyd and demanding an end to police violence. The PPB, like police departments throughout the country, have met these demands with violence.

17.

A focal point of conflict between PPB and MCSO (collectively "law enforcement") on one hand and protesters on the other has been the "Justice Center" in downtown Portland, which was for many weeks, completely surrounded by fencing. The building houses PPB's central precinct, which includes command staff offices, a jail operated by MCSO where hundreds of humans – disproportionately Black – are housed in small cage like cells, and a small number of courtrooms where the "business" of the criminal legal system perpetuating these racial inequalities continues every working day. It is, in short, a perfect symbol of the harms the protesters seek to address.

18.

PPB and MCSO are determined to keep the protesters away from the Justice Center, closing public streets, erecting fences, and guarding it with lines of law enforcement officers stocked with weapons and wearing armor, helmets, and gas masks. Every night since the protests began has ended with a standoff around the Justice Center between law enforcement and protesters, culminating in law enforcement using a variety of tactics, including indiscriminately spraying demonstrators with tear gas, rubber bullets, pepper balls, blast balls, Long Range Acoustic Device ("LRAD"), flash bangs, and other impact munitions, while launching aerial munitions into the air above their heads. After PPB and MCSO succeed in scattering protesters

THIRD AMENDED COMPLAINT

throughout the streets of downtown Portland, PPB often kettle protesters and continue to assault them with more pepper spray, impact munitions, and aerial munitions.

19.

Since this court entered a Temporary Restraining Order on June 9, 2020, limiting the PPB's use of tear gas on protestors, PPB has escalated its use of rubber bullets, pepper balls, blast balls, flash bangs, and other impact munitions on the crowd in an indiscriminate manner, and MCSO has done the same.

### III.    Tear Gas and COVID-19

20.

Riot control agents (here referred to as "tear gas") are chemical compounds that temporarily make people unable to function by causing irritation to the eyes, mouth, throat, lungs, and skin. Several different compounds are considered to be riot control agents, including chloroacetophenone ("CN"), chlorobenzylidenemalononitrile ("CS"), and oleoresin capsicum ("OC"). OC is derived from capsaicin and designed to be an irritant and inflammatory agent "primarily affect[ing] the respiratory tract." CS is a nerve gas designed to inflict pain, and degrade the mucous membranes in a person's eyes, nose, mouth, and lungs. The PPB and the MCSO uses both CS and OC, and possibly other agents.

21.

PPB launches tear gas from canisters at protesters which releases the chemical agent in gaseous form, exposing people through skin contact, eye contact, or breathing it in. PPB also discharges chemical agents directly from handheld canisters, and by shooting FN303s with OC payload or 40mm impact munitions with OC payload. These weapons spread their OC payload upon impact with the ground or the body of person. Manufacturer's materials for OC capsules fired from FN303s describe this feature and practice of firing at the ground as "area saturation."

22.

Tear gas causes irritation to the area of contact within seconds of exposure, including eye burning, excessive tearing, blurred vision and redness; runny nose, and nasal burning and swelling; mouth burning, irritation, difficulty swallowing and drooling; chest tightness, coughing, choking sensation, wheezing, shortness of breath; burns and skin rash. Some people experience nausea and vomiting. Studies show that tear gas is linked to miscarriage and fetal harm. Moreover, the 1993 International Chemical Weapons Convention, Geneva, bans tear gas from use by military forces during war.

23.

COVID-19, or Coronavirus, is a novel and serious respiratory virus which impacts the upper and lower respiratory system. It is spread primarily through droplets when an infected persons coughs or sneezes, or through droplets of saliva or discharge from the nose. For all these reasons, the CDC recommends people wear face coverings over the nose and mouth to help prevent the spread of COVID-19. There is no vaccine nor cure for COVID-19, and no one has prior immunity. As such, the virus has spread across the globe, and has been designated a global pandemic. Those infected with COVID-19 can experience no symptoms, mild symptoms, or severe symptoms. As such, and due to limited COVID-19 testing, the true rate of COVID-19 infections is unknown.

Because of racism and its impact on economic and health disparities, Black people, Indigenous people, and people of color are more likely to develop, suffer, and face complications from COVID-19 than their white counterparts.[2]

/ / /

---

[2]*See* Multnomah County, *New numbers show COVID-19 damage to communities of color; leaders call for better data collection*, (May 1, 2020), available at https://multco.us/novel-coronavirus-covid-19/news/new-numbers-show-covid-19-damage-communities-color-leaders-call

THIRD AMENDED COMPLAINT

24.

Many recent reports link the use of tear gas to exacerbation of spreading of COVID-19. Indeed, Oregon Health and Science University ("OHSU") President Danny Jacobs, M.D., F.A.C.S., released a statement acknowledging that "Protests have long served as a positive agent for social change in the U.S.," and that law enforcement's "use of tear gas and other chemical means to control crowds has raised great concern among medical professionals as we simultaneously try to manage a global pandemic." The statement further opined:

> While large gatherings in general provide increased opportunities for the transmission of COVID-19, the use of tear gas could significantly exacerbate the spread. Tear gas is a chemical that attacks the mucous membranes of the eyes, nose, throat and lungs and causes severe pain and irritation; exposure to tear gas can result in blindness, bleeding, crying and coughing. The release of airborne droplets through tear gas-induced coughing could accelerate the spread of COVID-19 and lead to a surge in new cases. Damage to the respiratory tract can put individuals at greater risk of adverse outcomes if they become infected with COVID-19.[3]

25.

The use of tear gas is, by its very nature, indiscriminate. Everyone must breathe, and anyone who breathes in the area where police have used tear gas will be harmed by the gas. The Defendants knew this when it decided to procure the tear gas, arm law enforcement with the tear gas, and authorize police to use tear gas in its downtown core on protesters. The Defendants knew that the gas would harm people who were not engaged in any unlawful activity and where law enforcement had no probable cause that individuals had committed any crimes.

/ / /

/ / /

/ / /

---

[3] Danny Jacobs, M.D., M.P.H., FACS, Statement on tear gas and nonviolent protests, Oregon Health & Sciences University (June 4, 2020) available at https://news.ohsu.edu/2020/06/05/statement-on-tear-gas-and-nonviolent-protests?linkId=90165009

IV.    **Impact Munitions**

26.

In addition to using chemical weapons, law enforcement uses a variety of so-called "riot control" weapons, some of which also contain OC as a chemical irritant. PPB uses two different platforms for launching these munitions: an 18 mm, 15-round capacity, shoulder fired weapon called an FN303; and 40 mm, two round capacity, shotgun-style launcher. PPB uses the FN303 to deploy munitions containing OC powder designed to cause chemical irritation to anyone around the impact; munitions containing paint designed to both hurt the person and mark them with paint; and munitions containing sand to both hurt the target and cause non-chemical irritation. PPB uses the 40 mm launcher to fire foam tipped rounds designed to hurt people, foam tipped rounds with OC inside, and two types of "flash-bang" grenades: one that emits light and sound, and one that, in addition, spreads plastic shot over an area of people in order to hurt them. PPB also uses hand-held grenade-style weapons that accomplish the same purposes of 40 mm launched flash-bangs. The manufacturer's website advertises that one of these hand-thrown grenades will spread plastic projectiles over a 50-foot radius. MCSO also uses impact munitions against protestors in an indiscriminate manner.

27.

Neither the FN303s nor the 40 mm launchers are accurate at long distances and become inaccurate altogether after several deployments. The use of FN303s and 40 mm launchers in crowd management settings has led to the death of protesters, like in Boston.[4] This fact has led to some police departments to cease use of FN303s altogether, like the Boston Police Department, which repurposed these weapons by melting them into sewer caps.[5] During the recent protests

---

[4] The New York Times, *Boston Police to Destroy Pepper-Spray Guns* (Feb. 23, 2007), available at https://www.nytimes.com/2007/02/23/us/23pepper.html
[5] *Id.*

following George Floyd's murder, projectiles fired from FN303s have resulted in the serious maiming of individuals.[6]

28.

In the past and during the present protests, from May 31 to the present, law enforcement has fired these impact munitions, particularly the FN303, indiscriminately into crowds of passively resisting, or other peaceful protesters, both before and after PPB has declared an unlawful assembly/civil disturbance, leaving large welts, bruises, and other similar injuries. Protesters outside of the Multnomah County Justice Center attest to being fired upon and hit by such munitions by law enforcement standing at the top of the stairs across the street despite having not engaged in any behavior that was criminal, let alone threated anyone's life or safety.

29.

On several occasions since 2017, demonstrations in support of police and against the Black Lives Matter movement have occurred in Portland. During these demonstrations, Defendants did not use tear gas, impact munitions, nor any force against these protestors. Instead, PPB provided escorts to maintain the safety and security of these protestors, an accommodation not afforded to those protesting police violence. For example, on August 17, 2019, a group of approximately 500 pro-fascist, pro-police, anti-Black activists from across the country held an unpermitted rally in Tom McCall Waterfront Park in downtown Portland. The stated aim of the rally organizers was to waste city funds and resources. PPB made extensive accommodations for the rally, including closing the Hawthorne Bridge to traffic, erecting concrete barriers around the site of the rally, and placing a heavily armed police presence between the fascist rally and counterprotesters. After the far-right rally in Tom McCall

---

[6] Kelli Kennedy, *Protester hit in face by police rubber bullet wants answers*, Houston Chronicle (June 12, 2020), available at https://www.houstonchronicle.com/news/article/Protester-hit-in-face-by-police-rubber-bullet-15336813.php

Waterfront Park, PPB opened the Hawthorne Bridge for the exclusive use of the fascist rally. PPB declared a civil disturbance after the far-right rally dispersed, ultimately arresting 13 counterprotesters. The organizers of the fascist event announced they would return to Portland each month to continue to waste city resources.

Likewise, on August 22, 2020, many anti-Black Lives Matter protestors descended on Portland, armed with paintball guns, metal rods, aluminum bats, fireworks, pepperspray, rifles and handguns in an attempt to intimidate and rally against Black Lives Matter protestors. Defendants did not intervene or arrest these pro-police demonstrators for posing threats to Portland community members. Tusitala "Tiny" Toese, who had an outstanding warrant for his arrest, was present, seen, and identified by Defendants, but not arrested. In contrast, PPB members arrested Demetria Hester, Black Lives Matter leader and volunteer with Don't Shoot Portland less than two weeks prior.

Similarly, on September 26, 2020, a group of approximately 200 pro-fascist, pro-police, anti-Black activists descended on Delta Park for a rally for the express purpose of provoking a violent confrontation with anti-fascist activists. They open-carried firearms within the park, in violation of city code, set up armed check points to control access to the park, and forcibly removed people they decided were not there to support their fascist cause. At least one individual was jumped and given a concussion by the violent mob. At one point, a vehicle arrived and delivered dozens of homemade shields. Despite the presence of dozens of police officers, including PPB "liaison officers" on foot in the park, defendants did not intervene in any way with this criminal activity. On the same day, at the same time, anti-fascist organizers held a rally three miles away in Peninsula Park. That rally was specifically designed to avoid violent confrontations with the fascist rally. No march was planned. Nevertheless, there was a heavy

THIRD AMENDED COMPLAINT

police presence from PPB, and PPB seized homemade shields from participants and arrested individual participants.

## V.      Don't Shoot Portland

30.

Don't Shoot Portland is a Black-led human rights organization advocating and educating on the issue of police violence and accountability. Its work includes educational workshops, free legal referrals, policy advocacy, conducting youth and community based events, it hosts a children's art and social justice counsel, and other such work in support of its community action plan that provides services to the most marginalized community members.

31.

Don't Shoot Portland has been participating the local demonstrations and providing assistance and support to protesters. It has participated in, monitored, and amplified calls to end racist policing and the violent police response to nonviolent protesters. It strongly opposes the use of tear gas, "less lethal" weapons, and any force against protesters. Don't Shoot Portland provides mutual aid to activists, organizers, and others protesting in Portland against police brutality. In the wake of the escalated police response to protestors, Don't Shoot Portland has had to divert resources from other aspects of its mission, such as its community events, in order to distribute protective equipment like facemasks and hand sanitizer, first aid kits, and other resources to provide relief from tear gas and impact munitions, as well as assistance with shelter and food to demonstrators and others supporting the protests. In addition, Don't Shoot Portland's board members and volunteers have been participating in protests in support of Black Lives Matter in downtown Portland, and have been providing support to protestors injured by Defendants' unlawful conduct. While engaging in this activity, Don't Shoot Portland's board members and volunteers have been subjected to Defendants' unlawful use of force.

32.

Don't Shoot Portland has facilitated scientific research demonstrating that tear gas is extraordinarily dangerous during COVID-19, especially to Black people, Indigenous people, and people of color. Even Defendant Multnomah County acknowledges that Black people, Indigenous people, and people of color bear a disproportionate burden of illness and death from COVID-19 than their white counterparts.[7]

33.

Defendants have harmed Don't Shoot Portland's mission by destroying its mutual aid supplies with tear gas and physical destruction. Moreover, Defendants' escalated police response has made it substantially more difficult for Don't Shoot Portland to advance its mission of organizing, facilitating, and supporting First Amendment activity in the form of protests and direct action in support of Black Lives because people are reasonably fearful of engaging in these activities. Don't Shoot Portland has had to divert resources from existing projects to educate its volunteers and members of the public about the ongoing demonstrations, and to address the physical and emotional risks that people face by engaging in protest in light of Defendants' unlawful response, and to provide aid and support to those who have been harmed by the escalating police violence towards protestors.

**VI.     Nicholas J. Roberts**

34.

Nicholas J. Roberts is an Oregonian who lives in downtown Portland. He attended his first protest on May 29, 2020, because he wanted to protest police brutality and the oppression of Black people. He took precautions because of COVID-19, putting on gloves, face masks, and

---

[7] https://multco.us/novel-coronavirus-covid-19/news/new-numbers-show-covid-19-damage-communities-color-leaders-call

THIRD AMENDED COMPLAINT

safety glasses, and tried to practice social distancing. Mr. Roberts attended demonstrations on May 29, 30, 31 and June 1, 2, 6, 10, 12 and 13, and saw peaceful protesters. Mr. Roberts was not engaging in any unlawful activity when the PPB began launching tear gas into the largely peaceful crowd protesting police violence in front of the Justice Center. Mr. Roberts attended protests on May 30, May 31, and June 2, 6, and 13, and had a similar experience: law enforcement launched tear gas and "less lethal" weapons at peaceful protesters demonstrating against police violence at the Justice Center who were not engaged in any unlawful conduct. Mr. Roberts has been attending demonstrations less since being subjected to law enforcement's weaponry.

35.

Mr. Roberts was physically harmed and frightened by law enforcement's use of tear gas and "less lethal" weapons.

**VII.    Michelle "Misha" Belden**

36.

Mx. Belden had attended the protest in Downtown Portland on June 2, 2020. They were protesting against the brutality the country witnessed when George Floyd of Minneapolis, MN was murdered by a Minneapolis Police Officer. They wished to be with their community as it protested against police violence and racism. They were attending the march from SE Portland to Pioneer Plaza in Downtown Portland. There, they heard a few explosions in the distance. They arrived at the area around SW 3rd and SW Salmon. They found a crowd chanting, and mostly calm. Suddenly, there was a flash bang then tear gas. Everyone started scattering. They were trapped between walls of gas, a fence, and lines of police officers. The air was thick with tear gas. They believed the police were trying to kill them. This continued for several blocks until they reached safety around SW Naito and Harvey Milk.

37.

Mx. Belden attended protests on June 9 and 10, 2020 as well, between the 9 pm-1 am at the Justice Center in Downtown Portland. On June 9, the crowd of approximately 500 was mostly peaceful, and some people rattled the fence erected outside the Justice Center. Law enforcement administered a warning to back away from the fence, and while many protestors backed away, some stayed close to the fence, but stopped rattling the fence. At about midnight, when the crowd had dwindled to by approximately 40%, PPB fired flash bangs and OC munitions to disperse the crowd without any warning. To Mx. Belden and others, it looked and sounded like tear gas, despite the TRO entered in this case, causing Mx. Belden to believe the PPB will never stop using excessive force, and that protesters will all be subject to arrest and excessive force at all times, denying them an opportunity to have a peaceful protest. On June 10, one part of the fence was taken down, away from the Justice Center and where law enforcement were stationed. Protesters were simply standing around. Two people, one clothed and one not, ran behind the fenced off area. After the first person went into the fenced area, law enforcement deployed chemical agents, impacting the nearby protestors. Law enforcement then deployed "less lethal" weapons, including OC blasts, and flash bang. Mx. Belden left the scene, because they felt law enforcement was escalating and they did not want to be caught up in it and did not want to get gassed again. As a result, Mx. Belden gave up on protesting for the rest of that week.

38.

Mx. Belden was physically harmed and frightened by law enforcement's use of tear gas and "less lethal" weapons.

/ / /

/ / /

/ / /

THIRD AMENDED COMPLAINT

## VIII.   Alexandra Johnson

39.

Alexandra Johnson has attended the protests in Downtown Portland every day since May 31, 2020, because Black Lives Matter and she wants to make her community safer and more equitable. Ms. Johnson has not witnessed any rioting or looting.

40.

For example, on the night of June 15, 2020, Ms. Johnson was at the Justice Center where a crowd of about 100 to 200 people were gathered. The crowd was chanting, but she did not see anyone touch the fence or throw any projectiles. Although PPB announced that it was unlawful to point a laser at police officers, Ms. Johnson did not have a laser, and was merely chanting with the crowd and livestreaming some of the protest. Ten minutes later, the police began shining two high-powered flashlights directly into the eyes of protesters along the fence. PPB also made an announcement not to throw projectiles over the fence. Minutes later, PPB targeted her with multiple spotlights, including a powerful light pointing at her camera for 30 seconds straight. The light hurt her eyes even though she was more than 50 feet away from the police. When she stopped filming, the police stopped targeting her with their lights. After she moved to the intersection of SW 3rd and SW Main, suddenly and without warning, law enforcement officers stationed above the crowd on an upper floor of the Justice Center began shooting "less lethal" munitions into the crowd. She began filming again and announced to the livestream that police had started firing into the crowd indiscriminately and without warning. A moment later, a law enforcement officer about 30 feet away aimed directly at her and shot at her, ripping open her left hand and causing immediate pain and injury. Medics nearby washed her wound, applied pressure, wrapped it, and helped her calm her breathing. About five minutes later, PPB declared an unlawful assembly and ordered the crowd to disburse or be subject to arrest or force.  As she

tried to leave the area, the police began using flashbang grenades, which exploded just feet away from her. The crowd of protesters was also trying to disperse calmly and safely while the police continued to use explosive grenades and smoke grenades.

41.

She eventually went to the hospital, where she received three stitches. Days later, when she removed the bandage, the swelling continued and her injuries were extensive. An x-ray revealed a broken bone in her hand. She is unable to close her fist and is in significant pain while doing small tasks, like pulling up her own pants or lifting a cup of coffee and must revert to only using her other hand. She also has major bruising on the palm of her hand and inside of her thumb making it difficult to perform her job duties. As a result of the above, she feels fearful of police, and has reduced her involvement in the protests.

42.

Ms. Johnson was physically harmed and frightened by law enforcement's use of tear gas and "less lethal" weapons.

## CLASS ALLEGATIONS

43.

Plaintiffs Nicholas J. Roberts, Misha Belden, and Alexandra Johnson bring this action pursuant to Rules 23(a) and 23(b)(1) and (2) of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated individuals.

44.

The proposed class is defined as follows: all individuals who currently or who will in the future engage in protest activities that follow the death of George Floyd opposing police violence and white supremacy. This include protesters who engage in passive resistance to the orders of police but does not those who engage in conduct beyond passive resistance.

45.

The class period commences on May 25, 2020 and extends to the date on which Defendants are enjoined from, or otherwise ceases, enforcing their unconstitutional policy, practice, and custom of using indiscriminate excessive force, including but not limited to the use of tear gas and "less lethal" weapons, irrespective of the individualized conduct of specific protesters. Specifically excluded from the class are Defendants and any and all of their respective affiliates, legal representatives, heirs, successors, employees, or assignees.

46.

This action has been brought and may properly be maintained as a class action under Federal law and satisfies numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

47.

The Class is so numerous, on information and belief, over 1,000, that joinder is impractical. Maintaining individual actions would create a risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Multiple courts issuing multiple injunctions governing use of force standards for law enforcement would be untenable.

48.

Common questions of law and fact exist as to all members of the class. These legal and factual questions include but are not limited to:

- By engaging in the tactics alleged herein, have Defendants violated the First Amendment?

- By engaging in the tactics alleged herein, have Defendants violated the Fourth Amendment?

- By allowing an unconstitutional pattern, practice, and custom of using indiscriminate excessive force against protesters, have Defendants violated the First and Fourth Amendments?

- Have Defendants exhibited a deliberate indifference to the unconstitutional conduct alleged herein?

- By utilizing indiscriminate force, such as tear gas, pepper spray, and impact munitions, have Defendants unlawfully chilled the speech rights of protesters?

49.

Plaintiffs Robert's, Belden's, and Johnson's claims are typical of the claims of the class members. The harms Plaintiffs suffered and will suffer, as a result of Defendants' courses of conduct, are typical of the harms suffered by class members. "[T]he party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory  relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(1)(A). There is no allegation that Plaintiffs have been targeted because of anything unique to them as individuals.

50.

Plaintiffs Roberts, Belden, and Johnson will fairly and adequately protect the interest of the Class.  Plaintiffs have no interests adverse to the interests of the class. Plaintiffs retained counsel with experience and success in the prosecution of civil rights litigation. Counsel for Plaintiffs know of no conflicts among class members or between counsel and class members.

/ / /

/ / /

THIRD AMENDED COMPLAINT

51.

Plaintiffs Roberts, Belden, and Johnson seek injunctive and declaratory relief. Any injunction requiring Defendants to address their constitutional violations would prevent other litigants from seeking a different injunction. Plaintiffs Roberts, Belden, and Johnson seek class certification under Fed. R. Civ. P. 23(b)(1).

## FIRST CLAIM FOR RELIEF
**(Excessive Force – Violation of Fourth Amendment – 42 U.S.C. § 1983 brought on behalf of Plaintiff Don't Shoot Portland Individually and Plaintiffs Roberts, Belden, and Johnson Individually and the Putative Class)**

52.

Plaintiffs restate and incorporate herein all previous paragraphs of this Complaint.

53.

**Count 1: Municipal Liability – Unlawful Practice or Policy Allowing Indiscriminate Use of Force as Tactic to Disperse Crowd.**

The City of Portland and Multnomah County each have an official policy allowing the use of "riot control" and "less lethal" weapons against a crowd whenever it determines that the crowd creates a "civil disturbance." This policy has no relationship with the *Graham v. Connor* Fourth Amendment standard regulating the use of force against individuals. It expressly allows for the indiscriminate use of force against a crowd of people, including those engaging in passive resistance, in violation of the Fourth Amendment.

Alternatively, even if the policy itself is constitutional, PPB's and MCSO's actual practice and custom is to allow the use of "riot control" and "less lethal" weapons against a crowd both before and after an "unlawful assembly" and/or a "civil disturbance" has been declared, even when a substantial number of people in that crowd, or even the majority of that crowd, are engaged only in the passive resistance to an order.

/ / /

THIRD AMENDED COMPLAINT

54.

On the majority of dates from May 29, 2020 to the present, PPB  and MSCO deployed tear gas and/or other "less lethal" weapons on large crowds of peaceful protesters and continued to deploy tear gas and/or "less lethal" weapons at people running away. Videos documenting the indiscriminate nature of this force deployment are rampant.[8] The City and County have  tacitly and explicitly authorized the use of indiscriminate crowd control munitions on crowds of protesters by justifying uses of similar tactics, including "less lethal" weapons shot indiscriminately into crowds of protesters, at protests on these dates and knew or reasonably should have known this would lead to constitutional violations alleged herein.

The City and County, acting pursuant to this policy, custom, or practice, unlawfully used tear gas and "less lethal" weapons against plaintiffs as alleged above.

55.

**Count 2: Municipal Liability – Action of Policymaking Officials**

The decision to use riot control and "less lethal" weapons against the crowds containing plaintiffs on the majority of dates from May 29 through the present made by officials of the PPB or the County who are sufficiently senior that the decision may fairly be said to represent official policy of the City of Portland or the County. Former PPB Chief Jami Resch was, and PPB Chief Chuck Lovell is the highest level of authority within the PPB, and Mayor of Portland Ted Wheeler, also the Police Commissioner, has acknowledged receiving minute-to-minute reports from PPB of events on the ground at the protest. The decision to use riot control and "less lethal" weapons was made by official policy makers the Chief of PPB and the Mayor of Portland who

---

[8] E.g. https://twitter.com/mrolmos/status/1268072714926878720?s=21;
https://twitter.com/matcha_chai/status/1268043556913987584?s=21

knew or reasonably should have known this would lead to constitutional violations alleged herein..

56.

**Count 3: Municipal Liability -- Ratification**

Former PPB Chief Jamie Resch stated in a news conference on June 3 that the decision to use tear gas, other riot control, and "less lethal" weapons against a crowd of protesters the evening prior was made by incident commanders at the scene. As such, the decision to use tear gas and "less lethal" weapons against the crowds containing plaintiffs on the majority of dates from May 29 through the present was made by incident commanders on scene. As alleged above, these decisions were ratified by the Chief of PPB and the Mayor of Portland who knew or reasonably should have known this would lead to constitutional violations alleged therein.

57.

The above-described conduct was a proximate cause of harm to Plaintiffs.

**SECOND CLAIM FOR RELIEF**
**(Violation of the First Amendment – 42 U.S.C. § 1983 brought on behalf of Plaintiff Don't Shoot Portland Individually and Plaintiffs Roberts, Belden, and Johnson Individually and the Putative Class)**

58.

Plaintiffs restate and incorporate herein all previous paragraphs of this Complaint.

59.

Plaintiffs were engaged in constitutionally protected acts of free speech, including public demonstration opposing racism and police violence against Black people. Plaintiffs will continue to do so in the future.

/ / /

/ / /

/ / /

60.

PPB's and the MCSO's use of force against Plaintiffs for engaging in First Amendment protected activity and, in an effort, to deter future similar activity, evidences a pattern and practice of unconstitutional conduct that is certain to continue absent any relief.

61.

Plaintiffs reasonably fear the PPB's and the MCSO's continued use of tear gas and "less lethal" weapons on protesters, and PPB's the MCSO's acts would, and did, chill a reasonable person from continuing to engage in protected First Amendment Activity.

62.

**Municipal Liability – First Amendment**

The City of Portland and Multnomah County have a custom and practice of using militarized force against anti-police protesters, as demonstrated by the use of tear gas and "less lethal" weapons against those protesting outside the Justice Center, a significant symbolic representation of the issues being protested. The Defendants' use of force was intended to punish a group of protesters *en masse* for their political speech, and to deter further similar expressions of speech. The supervisory decision to fire tear gas and "less lethal" weapons indiscriminately into a crowd of protesters demonstrating outside the Justice Center was made in retaliation for the protesters' protected speech condemning the police at the symbolic embodiment of the protest subject matter and to chill the expression of further similar speech.

63.

The supervisor defendants who authorized, made, and ratified the decision to attack anti-police demonstrators are sufficiently senior so that their decision can fairly be said to be the official policy of the City of Portland, and they knew or reasonably should have known this would lead to the constitutional violations alleged herein.

THIRD AMENDED COMPLAINT

64.

The above-described conduct was a proximate cause of harm to Plaintiffs.

65.

As a result of Defendants' unlawful policy and practice, participating in lawful protests against police violence has become more difficult and dangerous. Defendants conduct has made it substantially more difficult for Don't Shoot Portland to advance and fulfill its mission of organizing, facilitating, and supporting First Amendment activity in support of Black Lives. Moreover, Defendants' unlawful policy and practice has caused damage and destruction to Don't Shoot Portland's property, which then requires a further diversion of resources to replenish the destroyed property. Don't Shoot Portland diverted its resources to provide additional protective equipment like face and gas masks, hand sanitizer, first aid kits, and other resources to provide relief from the impacts of Defendants' use of tear gas and impact munitions, as well as assistance, including shelter and food to demonstrators and others supporting the protests. Such diversion of these resources diminishes Don't Shoot Portland's ability to advance other projects of Don't Shoot Portland, such as their children's art project and mutual aid efforts in response to COVID-19.

## DAMAGES

As a direct and proximate result of the conduct of the Defendants, Plaintiffs suffered economic and noneconomic damages, including interference with their First Amendment rights, a greater distrust in the PPB, MCSO, and law enforcement in general, fear of increased exposure to the novel COVID-19 virus, emotional distress, physical pain, and discomfort and suffering.

## REASONABLE ATTORNEY'S FEES AND COSTS

42 U.S.C. § 1988(b) allows "the prevailing party . . . a reasonable attorney's fee as part of the costs. . ." in an action brought under 42 U.S.C. § 1983.

Plaintiffs requests that the court grant reasonable attorneys' fees in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs pray for their costs and disbursements incurred herein and for the following in accordance with the proof at trial:

1.    A temporary restraining order, prohibiting the City of Portland and Multnomah County from using tear gas as a crowd control measure;

2.    A temporary restraining order, prohibiting the City of Portland and Multnomah County from using "less lethal" weapons, including but not limited to OC spray or munitions, impact munitions, LRAD, sound cannons, etc., against protestors who are only engaged in passive resistance, including passive resistance to an order to disperse. In any case where PPB and MCSO uses less lethal weapons, it must insure that no person who is engaged in only passive resistance is impacted or effected by those weapons.

3.    A permanent injunction, prohibiting the City of Portland and Multnomah County from using tear gas as a crowd control measure;

4.    A permanent injunction, prohibiting the City of Portland and Multnomah County from using "less lethal" weapons, including but not limited to OC spray or munitions, impact munitions, LRAD, sound cannons, etc., against protestors who are only engaged in passive resistance, including passive resistance to an order to disperse. In any case where PPB and MCSO use less lethal weapons, they must insure that no person who is engaged in only passive resistance is impacted or effected by those weapons;

THIRD AMENDED COMPLAINT

5.      A declaration that Portland Police Bureau's Crowd Control Directive, 0635.10, as

written and/or as applied violates the Fourth Amendment to the United States

Constitution;

6.      Compensatory damages to Plaintiffs Roberts, Belden and Johnson;

7.      Attorney's fees; and

8.      Any other relief the court deems proper.


**DATED** this 7th day of October 2020.

*s/J. Ashlee Albies*

**J. Ashlee Albies**, OSB No. 051846
**Whitney B. Stark**, OSB No. 090350
**Maya Rinta**, OSB No. 195058
Albies & Stark LLC

**Jesse Merrithew**, OSB No. 074564
**Viktoria Safarian**, OSB No. 175487
Levi Merrithew Horst PC

**Juan C. Chavez**, OSB No. 136428
**Brittney Plesser**, OSB No. 154030
**Alex Meggitt**, OSB No. 174131
**Franz H. Bruggemeier**, OSB No. 163533
Oregon Justice Resource Center

**Attorneys for Plaintiffs**
