IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DON'T SHOOT PORTLAND, a nonprofit
corporation, in its individual capacity;
NICHOLAS J. ROBERTS, in an individual
capacity and on behalf of themselves and all
others similarly situated; MICHELLE
"MISHA" BELDEN, in an individual capacity
and on behalf of themselves and all others
similarly situated; and ALEXANDRA
JOHNSON, in an individual capacity and on
behalf of themselves and all others similarly
situated,

No. 3:20-cv-00917-HZ

OPINION & ORDER

                      Plaintiffs,

    v.

CITY OF PORTLAND and MULTNOMAH
COUNTY,

                      Defendants.

Jesse Merrithew
Viktoria Safarian
LEVI MERRITHEW HORST PC
610 SW Alder Street, Suite 415
Portland, OR 97205

Juan Chavez
Brittney Plesser
Alexander Meggitt
Franz H. Bruggemeier
OREGON JUSTICE RESOURCE CENTER
PO Box 5248
Portland, OR 97208

Jessica Ashlee Albies
Whitney B. Stark
Maya Rinta
ALBIES & STARK LLC
1 SW Columbia Street, Suite 1850
Portland, OR 97204

        Attorneys for Plaintiffs

J. Scott Moede
Naomi Sheffield
Robert T. Yamachika
PORTLAND CITY ATTORNEY'S OFFICE
1221 SW Fourth Avenue, Room 430
Portland, OR 97204

        Attorneys for Defendant City of Portland

HERNÁNDEZ, District Judge:

Plaintiffs Don't Shoot Portland, Nicholas Roberts, Michelle "Misha" Belden, and

Alexandra Johnson, on behalf of themselves and all others similarly situated, bring this case

against Defendants City of Portland and Multnomah County. Compl., ECF 1; Third Am. Compl.,

ECF 186. Plaintiffs allege that Defendants have violated the First and Fourth Amendments in

their use of less-lethal force during recent and ongoing Portland protests. On June 9, 2020, the

Court issued a Temporary Restraining Order barring the use of tear gas by Defendant City of

Portland except in situations in which the lives or safety of the public or the police are at risk.

Order, ECF 29. Based on the stipulation of the parties, the Court further restrained Defendant

City of Portland's use of less-lethal munitions on June 26, 2020. Stip. Add'tl TRO, ECF 43.

Plaintiffs now move for a finding of contempt and remedial sanctions against Defendant City of Portland ("Defendant"),[1] alleging violations of the June 26, 2020 Stipulated Additional Temporary Restraining Order ("the Order") by police officers on the evening of June 30, 2020. Pls.' Am. Mot. Order Show Cause ("Pls.' Mot."), ECF 145. At the evidentiary hearing on October 21 and 22, 2020, Plaintiffs emphasized nine specific incidents in which they argued officers used less-lethal munitions in violation of the Order. Because Plaintiffs have shown by clear and convincing evidence that Defendant violated the Order three times on June 30, the Court grants in part Plaintiff's Amended Motion for Order to Show Cause and finds Defendant in contempt.

## BACKGROUND

In the wake of the May 2020 killing of George Floyd by a Minneapolis police officer, individuals in Portland have taken to the streets to protest police brutality and racial inequality. These protests have ranged from peaceful gatherings and marches to violent clashes between protestors and the police. On the evening of June 30, 2020, 200 to 250 protestors gathered at Peninsula Park in Northeast Portland. The Peninsula Park gathering was peaceful and did not require any police intervention. Following the gathering, some of the protestors marched to the Portland Police Association ("PPA") building, where they were met by a line of Oregon State Police ("OSP") officers. From this point, things escalated quickly.

**I.     PPB's Initial Response to the June 30 Protest**

That evening—like many others before it—the Portland Police Bureau ("PPB") deployed its Rapid Response Team ("RRT"). The RRT is an "all hazards team" within PPB. One of its

---

[1] Plaintiffs bring this motion solely against Defendant City of Portland. Thus, as used throughout this Opinion, Defendant refers only to Defendant City of Portland.

primary responsibilities is to assist with crowd management and crowd control. The RRT is divided into four squads of twelve to fifteen officers, including a few grenadiers. RRT grenadiers carry two types of less-lethal impact munitions: FN303s with marking or pava rounds and 40mm less-lethal launchers with marking rounds. Pool Decl. ¶ 6, ECF 170. According to PPB Officer Zachary Domka—a lead grenadier trainer who was present on the evening of June 30— grenadiers undergo thirty hours of initial training and refresher trainings twice a year. Because of the COVD-19 pandemic, however, no refresher trainings have been held for RRT grenadiers since the fall of 2019.

PPB also assigns a crowd management incident commander to assist in responding to large planned protest events. Captain Passadore was the crowd management incident commander on June 30. As the incident commander, he was responsible for—among other things—gathering information, setting priorities for the event, providing all assisting organizations with an operational briefing, and coordinating that evening's crowd control activities from the incident command center. Because the Order was new to him on June 30, Captain Passadore testified that he took steps to ensure that all officers were familiar with the Order. Captain Passadore "directed all supervisors to make sure that all supervisors informed each individual officer of the requirements of both temporary restraining orders[.]" Corr. Passadore Decl. ("Passadore Decl.") ¶ 49, ECF 111. Later, after calling for attention over the radio, he read a statement conveying the contents of the Order that was transmitted to all officers and supervisors assigned to the event. *See* Sheffield Decl. Ex. I (Activity Log) at 2, ECF 188-1; Pool Decl. ¶ 13.

The crowd at Peninsula Park remained calm and did not require any police intervention. However, early intelligence reports suggested that protestors were going to march to PPB's North Precinct. This concerned Captain Passadore because protestors had previously set fire to

police buildings in Portland. Accordingly, Captain Passadore preemptively sent officers and other resources to the North Precinct. But the crowd at Peninsula Park redirected its march to the PPA building, which houses the public service union for Portland police officers. In the hope that police presence would deter protestors from gathering outside the PPA, Captain Passadore instructed OSP units assisting PPB that evening to maintain a presence there.

## II.    Protests Outside of the PPA on June 30

After protestors arrived at the PPA around 9:00 PM, the event quickly devolved into chaos. Upon arrival, protestors encountered a line of OSP officers dressed in "riot gear" holding batons and other less-lethal munitions. Video of the protest shows a group of individuals standing outside the PPA chanting and dancing. Passadore Decl. Ex. 15-X at 0:00–4:59. Water bottles thrown from the crowd of protestors can be seen landing near officers' feet. Second Suppl. Sheffield Decl. Ex. M at 0:00–1:35, ECF 198. Radio communications from officers on the street described items being thrown at officers within a minute of the protestors' arrival, including bottles and rocks. Sheffield Decl. Ex I (Activity Log) at 3; Pool Decl. ¶ 14. Captain Passadore recalls a change in the tone of the officers' voices as the situation began to escalate. Because of these projectiles, Captain Passadore declared the protest an unlawful assembly only a few minutes after protestors arrived at the PPA building. *See also* Passadore Decl. Ex. 15-X at 4:59. In doing so, he authorized police to move and disperse the crowd to the east. Using the Long Range Acoustical Device, PPB announced that the event had been declared an unlawful assembly and instructed protestors to move east.

At some point PPB RRT officers joined OSP officers at the PPA building. *See* Sheffield Decl. Ex. I (Activity Log) at 2–3; Taylor Decl. ¶ 3, ECF 172. A video from a bystander shows police with batons and other munitions standing shoulder to shoulder in a line, moving protestors

east down Lombard street and away from the PPA. Dicks Decl. Exs. 3, 4; *see also* Passadore Decl. Ex. 15-X at 7:00. In pushing the crowd of protestors away from the PPA building, officers used physical force and deployed less-lethal munitions. In videos of the protest, officers can be seen shoving protestors with their hands and batons. Suppl. Sheffield Decl. Ex. J at 2:40–4:48, ECF 187. One witness testified that officers indiscriminately fired munitions into the crowd as it moved backward, striking more than ten individuals. *See* Dallas Decl. ¶¶ 10–11, ECF 124.

A.    Incident 1 (Andrew Cleinman)

During the push east, officers deployed oleoresin capsicum ("OC spray") against protestor Andrew Cleinman. Mr. Cleinman—a software engineer—was near the police line. As he was moving backward with the crowd, he noticed an officer without any visible identifying information on his uniform. He pointed at the officer and asked for his identifying number. The officer did not respond, but a different officer stepped forward from the line and pushed Mr. Cleinman with a baton. Cleinman Decl. Ex. 1 at 0:07–0:11, ECF 120. When the officer pushed Mr. Cleinman a second time using a downward motion, Mr. Cleinman felt like he was losing his footing and—without thinking—grabbed the officer's baton to stop himself from falling. He testified that as soon as he realized what he had done, he let go. But seconds later, after Mr. Cleinman was pushed away by another officer, a PPB officer sprayed him in the face with OC spray as he turned his head back towards the police line. *Id.*

B.    Incidents 2 & 3 (Unknown Individuals Carrying a Banner)

Around the same time, PPB Officer and RRT grenadier Brent Taylor deployed fifteen rounds from his FN303 in two incidents involving a struggle over a banner. According to Officers Domka and Taylor, signs and banners at protests can present a security threat to officers. Officer Taylor testified that in his experience banners and signs can be draped across

plywood shields reinforced with nails and PVC pipes containing screws or concrete, which could

be used as weapons to impale an officer. Whether a particular sign is assessed as a threat depends

on the overall crowd dynamic, the behavior of the individuals holding the sign, and the materials

from which the sign is constructed.

      That night, a group of protestors carried a large banner with a PVC-pipe frame. Video

shows the protestors carrying the banner moving slowly backwards with the rest of the crowd, in

compliance with PPB's commands to move east. Cleinman Decl. Ex. 1 at 0:16–0:25. Officer

Taylor testified that as police moved the crowd, he observed other protestors trying to get behind

the banner, suggesting that it might be used as a shield. In addition, he observed that some

individuals that evening were dressed in all black, wore helmets and respirators, and had engaged

in skirmishes with officers along the police line. According to Officers Domka and Taylor, the

protestors carrying the banner were also slowing police efforts to move the crowd and interfering

with the police formation.

      Because of these circumstances, Officer Taylor attempted to take the banner from the

protestors. Cleinman Decl. Ex. 1 at 0:25–0:28. A protestor on the opposite side of the banner

from Officer Taylor refused to let go of the banner even after another officer hit the protestor's

wrist with a baton. *Id.* Officer Taylor testified that at this moment he suspected that the protestor

was trying to retain the banner to use it as a weapon. Accordingly, he deployed five rounds of his

FN303 at the protestor's legs, causing them to release the banner and move back into the crowd.

*Id.*

      Officers continued to pull the banner away from the remaining protestors who were still

holding on. One such protestor was an individual on roller skates wearing a backpack. At some

point in the struggle over the banner, the individual fell to the ground, and officers appear to grab

and shove the individual and pull them away from the sign. Cleinman Decl. Ex. 1 at 0:33–0:35; Suppl. Sheffield Decl. Ex. J at 4:58–5:04. Officer Taylor believed that the officers were attempting to take the individual on roller skates into custody because officers had their hands on the individual and were pulling them toward the police line. *See* Suppl. Sheffield Decl. Ex. J at 4:58–5:04. He also believed two other protesters were simultaneously attempting to "unarrest"— or stop the arrest of—the individual because they were pulling the individual back into the crowd. *See id.* According to Officer Taylor, unarrests are dangerous for both the individual being arrested and the officers involved in the arrest. To overcome the resistance of the protestors, officers may resort to higher levels of force against the arrestee, and officers may be harmed by the protestors seeking to effectuate the unarrest. Thus, to prevent an assault or the use of a higher level of force by the arresting officers, Officer Taylor deployed ten rounds from his FN303 against the legs of the protestors before the protestors succeeded in pulling the individual on roller skates into the crowd. Cleinman Decl. Ex. 1 at 0:35–0:38.

C.    Incident 4 (Unknown Individual Throwing a Bottle)

After moving the protestors a block or so to the east, the crowd stopped moving. But individuals in the crowd continued to throw items at police officers. *See* Sheffield Decl. Ex. I (Activity Log) at 3; Pool Decl. ¶ 16. For example, one individual attempted to throw a bottle at the police line, prompting officers to respond by deploying a few rounds from an FN303. Dicks Decl. Ex. 5 at 0:20–0:23. In an attempt to deescalate the situation and "reset," Captain Passadore ordered his RRT units to return to the PPA building. To pull back safely, officers rolled smoke canisters toward the protest line to create a wall of smoke between officers and the protestors.

///

///

D.    Incident 5 (Pedro Anglada Cordero)

Rather than allow the officers' retreat, the deployment of smoke canisters led to the use of additional less-lethal munitions by the police. Pedro Anglada Cordero—a social worker attending the protest because of the history of white supremacy in Oregon and his own experiences with racism while living in Portland—spontaneously kicked a smoke canister away from himself and his wife when one was tossed in their direction. Anglada Decl. ¶ 5, ECF 146. He testified that he did so to keep himself, his wife, and others safe from exposure to smoke and chemical agents. *Id.* ¶ 12. But in doing so, Mr. Anglada kicked the canister twice in the direction of the police line. *Id.* ¶ 13. Officers responded by firing two 40mm less-lethal rounds at Mr. Anglada, striking him behind the knee and on his inner right thigh. Additional munitions were fired as he was retreating. *See id.* ¶ 14; Dicks Decl. Ex. 5 at 0:46–1:04.

According to Officers Domka and Taylor, the act of kicking or throwing a smoke canister at the police amounts to a threat or act of assault. When thrown, smoke canisters become dangerous projectiles due to their weight and temperature. When kicked, the smoke encompasses officers instead of the protestors, limiting officers' visibility. Officer Taylor testified that in his experience kicking canisters back at police can be part of a coordinated attack on the part of some protestors. By enveloping officers in smoke from their own munitions, protestors have a clear line of sight to throw projectiles at police officers.

E.    Incident 6 (Unknown Individual)

Officers ultimately retreated to the PPA building, and the crowd followed, stopping less than a block away. Dicks Decl. ¶ 13, Ex. 7. After police pulled back, protestors moved recycling bins, trash cans, and dumpsters into the street, one of which was set on fire. Passadore Decl. Ex. 15-X at 26:00; Dicks Decl. Exs. 7, 8. Eventually, an individual lit an item on fire from one of the

garbage bins and walked it to one of the unlit dumpsters. Dicks Decl. Ex. 8 at 2:39–3:11. In response, police fired a 40mm less-lethal green marking round at the individual. Officer Domka testified that the spread of the fire could create a more hazardous condition for officers. The smoke and heat distortion from fire makes it harder to see projectiles, and it was likely that officers would need to move their police line among the burning dumpsters and garbage cans because the crowd was not dispersing. Eventually, PPB officers moved past the dumpsters and pushed protestors further east. Dicks Decl. Ex. 8 at 5:51–6:32; Passadore Decl. Ex. 15-X at 29:06–50:59; Sheffield Decl. Ex. I (Activity Log) at 4; Pool Decl. ¶ 17. Protestors continued to throw rocks, bottles, full cans of beer, and smoke bombs at the police line. Sheffield Decl. Ex. I (Activity Log) at 4; Pool Decl. ¶ 17. Some protestors shined green lasers in the officers' eyes. *Id.*

F.    Incident 7 (Katrina Haas)

After the sun had set, officers once again deployed smoke canisters, and protestors kicked the canisters back at the police line. Passadore Decl. Ex. 15-X at 50:52. Katrina Haas—who was protesting police brutality and documenting the protests for other individuals who could not attend due to their disabilities—moved to kick a smoke munition away after one landed near her feet. Haas Decl. ¶¶ 3, 13, ECF 127. She testified that she wanted to distance herself from the munition in order to prevent injury. In response, officers deployed an impact munition that injured her leg, causing her to leave the crowd and hang back on the sidewalk for the rest of the evening.

G.    Incident 8 (Eric Greatwood)

Around the same time, Eric Greatwood—an air force veteran who had live streamed numerous protests that month—saw an inert smoke canister roll near his position toward the front of the crowd. Mr. Greatwood testified that he wanted to inspect the canister. Because he

was managing bulky camera equipment, his movements were slow. He testified that he took a

few steps forward to pick it up, slowly lunging to grab the munition. Mr. Greatwood testified he

was hit in the groin with a munition before ever making contact with it. He also testified that

another protestor picked up the munition. However, video of the incident shows Mr. Greatwood

walking quickly toward the smoke canister and successfully picking it up. Ex. L at 1:31–1:36;

Passadore Decl. Ex. 15-X at 50:59–51:04. Officer Taylor testified that he engaged Mr.

Greatwood with an FN303 as he was picking up the munition because he was concerned that he

would throw it back at the police line.

>    H.    Incident 9 (Unknown Individual)

About an hour after the protestors arrived, officers and protestors came to a standstill a

couple blocks from the PPA building, with some distance between the police and the crowd.

Passadore Decl. Ex. 15-X at 58:48. An individual walked out of the crowd in front of the line of

protestors, approaching an unknown object in the street. Ex. L at 9:23–9:26; Passadore Decl. Ex.

15-X at 58:48–58:54. As the individual reached for the object, police fired impact munitions at

the individual, and they quickly retreated into the crowd. Ex. L. at 9:26–9:29; Passadore Decl.

Ex. 15-X at 58:54–58:57. Officer Domka testified that the use of force in this moment was

appropriate because the individual—by stepping out in front of the protest and reaching down

toward an object on the pavement—may have indicated that they were about to throw the object

back at officers.

In the minutes that followed, protestors continued to throw dangerous projectiles at the

police line with increasing frequency and velocity. *See* Sheffield Decl. Ex. I (Activity Log) at 4–

5; Pool Decl. ¶ 18. Some officers were hit and required medical attention. *Id.* At around 10:10

that evening, Captain Passadore declared the event a riot due to the number of projectiles thrown

and the danger that they posed to police and protestors. *Id*. PPB deployed CS gas to disperse the crowd, and protestors were pushed further east, into a more commercial neighborhood just east of Interstate 5. *See* Sheffield Decl. Ex. I (Activity Log) at 5. Hours later, the protest ended. *Id*. at 8.

## STANDARDS

The court has the inherent power to enforce compliance with its orders, but its authority to punish contempt is defined by federal statute:

> A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as—
>
> > (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
> >
> > (2) Misbehavior of any of its officers in their official transactions;
> >
> > (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

18 U.S.C. § 401. Section 401 applies to both civil and criminal contempt. *United States v. Powers*, 629 F.2d 619, 624 (9th Cir. 1980). Section 401 "contains no limitation on the power of the district court to impose fine or imprisonment for a violation." *Id*. The trial court's decision is "reviewed for an abuse of discretion in setting punishment." *Id*.

Whether a contempt is civil or criminal depends on the "character and purpose" of the punishment. *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir. 1983). The question is: "what does the court primarily seek to accomplish by imposing [the sanction]?" *Id*. (alteration in original) (quoting *Shillitani v. United States*, 384 U.S. 364, 369 (1966)). Criminal contempt is intended to punish past defiance of the court's authority and vindicate the court. *Id*. Civil contempt is designed to compel obedience or compensate the contemnor's adversary for their injuries. *Id*. Contempt is "plainly civil in nature when the sanction imposed is

wholly remedial, serves only the purpose of the complainant, and is not intended as a deterrent to offenses against the public." *Id*.

## DISCUSSION

The events of this year have brought thousands of Portlanders to the streets demanding change. While many of these protests are peaceful, many also devolve into chaos, especially those that stretch late into the night. Individuals in crowds of otherwise peaceful protestors and activists have lit fires and launched bottles, cans, rocks, and fireworks from great distances at police officers. Officers have responded with significant force in wielding batons against protestors and deploying scores of less-lethal munitions, including CS gas. Both sides have caused significant injuries.

The evening of June 30 was no exception. The evidence put forth by Plaintiffs and Defendant documents hours of violence, including threats to the safety of police and protestors alike. But despite its efforts to live up to the standards of the Order and exercise restraint in the face of such turmoil, PPB failed. In their use of impact munitions on June 30, PPB officers violated the Court's June 26, 2020 Order governing Defendant's use of less-lethal force.[2]

"'Civil contempt . . . consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply.'" *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 945 (9th Cir. 2014) (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)). "The contempt need not be willful, . . . . [b]ut a person should not be held in contempt if his

---

[2] In their briefing, Plaintiffs discuss at length the use of other types of force, including physical force, batons, smoke, and CS gas. However, these are not covered by the Court's June 26 Order, and Plaintiffs have not argued that the use of CS gas that evening violated the Court's June 9, 2020 Order. Thus, at this point in the litigation, the Court offers no opinion as to the propriety of Defendant's use of physical force, batons, smoke, and CS gas on the evening of June 30.

action appears to be based on a good faith and reasonable interpretation of the court's order." *In re Dual-Deck*, 10 F.3d at 695 (internal citations and quotations omitted). The moving party bears the burden of showing that the "alleged contemnor violated the court's order by 'clear and convincing evidence,' not merely a preponderance of the evidence." *Id.* Thus, to succeed on a motion for civil contempt, the movant must show that the alleged contemnor: "(1) violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence." *Labor/Cmty. Strategy Ctr. v. L.A. Cty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009) (quoting *In re Dual-Deck*, 10 F.3d at 695). "'Substantial compliance' with the court order is a defense to civil contempt, and is not vitiated by 'a few technical violations' where every reasonable effort has been made to comply." *In re Dual-Deck*, 10 F.3d at 695 (citing *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 891 (9th Cir. 1982)); *see also Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016) ("A contemnor in violation of a court order may avoid a finding of civil contempt only by showing it took *all* reasonable steps to comply with the order.").

Plaintiffs seek a finding of civil contempt and remedial sanctions against Defendant, arguing that Defendant's officers violated the Order no fewer than nine times on June 30, 2020.[3] Pls.' Mot. 2. In response, Defendant argues each of the identified uses of force complied with the Order and PPB's Use of Force Directive.[4] Def.'s Resp. Pls.' Mot. ("Def.'s Resp.") 14, ECF 158. In the alternative, Defendant argues that it made every reasonable effort to comply with the Order. *Id.* Because Plaintiffs have demonstrated by clear and convincing evidence that PPB

---

[3] As the Court stated at the evidentiary hearing, it is only considering those events that were raised by the parties and pointed out to the Court in their opening statements at the hearing.
[4] A copy of PPB's Use of Force Directive 1010 was included as an appendix to Plaintiffs' motion. *See* Pls.' Mot. App. 1, ECF 145-1.

officers violated the Order three times on June 30, and Defendant has not demonstrated that it took all reasonable steps to ensure its officers' compliance, the Court finds Defendant City of Portland in contempt.

## I.   Violations of the Order

At the evidentiary hearing, Plaintiffs argued that Defendant's officers violated the Order in their use of less-lethal munitions no fewer than nine times on the evening of June 30.[5] Eight of these incidents involved the use of impact munitions, including FN303s and 40mm less-lethal launchers. One incident involved the use of OC Spray, an aerosol restraint. The Order limits the PPB's use of these munitions as follows:

> (1) FN303s and 40MM less lethal launchers with or without OC payload are limited to use as outlined in PPB Use of Force Directive 1010, and in addition shall not be used where people engaged in passive resistance are likely to be subjected to the force.
>
> . . . .
>
> (3) Aerosol restraints (handheld OC or "pepper spray") shall not be used against persons engaged in passive resistance, and consistent with PPB Use of Force Directive 1010, members shall minimize exposure to non-targeted persons.

Stip. Addt'l TRO at 2. The Court addresses each type of munition in turn.

### A.   Incidents Involving Impact Munitions

As described above, FN303s and 40mm less-lethal launchers must be used "as outlined in PPB Use of Force Directive 1010" and "shall not be used where people engaged in passive resistance are likely to be subjected to the use of force." Stip. Addt'l TRO at 2. FN303s and 40mm less-lethal launchers are impact munitions governed by ¶ 6.4.2 of Use of Force Directive

---

[5] In their briefing, the parties disputed whether Defendant could be held liable for the actions of OSP officers. The Court need not resolve this issue. In its closing argument at the evidentiary hearing, Defendant stated that all the incidents in question involved the use of force by PPB officers.

1010.  Paragraph 6.4.2.1 provides, in relevant part, that officers are authorized to use impact munitions: (1) "[i]n response to active aggression" and (2) "[t]o avoid the use of a higher level of force." Use of Force Directive 1010 ¶ 6.4.2.1.1, .3. The Directive defines "active aggression" as "[a] threat or overt act of an assault (through physical or verbal means), coupled with the present ability to carry out the threat or assault, which reasonably indicates that an assault or injury to any person is about to happen, unless intervention occurs." *Id.* (Definitions).

The Court finds that three of the eight incidents involving the use of impact munitions violated the Order. These three incidents include: (1) two deployments of fifteen rounds from an FN303 against individuals carrying a banner (Incidents 2 and 3) and (2) the deployment of a few rounds from an FN303 against an individual picking up an unknown object between the protest line and the police line (Incident 9). The remaining incidents did not violate the Order.

Turning first to Incident 2, the Court finds that Officer Taylor did not use his FN303 in response to active aggression. Officer Taylor testified that he deployed his FN303 against an individual holding onto a banner because he believed the banner would later be used as a weapon. Specifically, he cited the following circumstances in support of his belief that the banner may be dangerous: (1) the atmosphere of the protest that day; (2) the movement of protestors behind the sign as though it was a shield; (3) the slow pace of the protestors holding the banner, causing interference with the police formation; (4) the protestor's refusal to let go of the banner; and (5) the use of PVC pipe as the banner's frame, which he testified can be reinforced with cement or nails. But none of the circumstances cited by Officer Taylor suggested that *this* banner was a weapon or would be imminently used by protestors as a weapon. Police officers had ample opportunity to observe the banner before Officer Taylor deployed his munitions. *See* Suppl. Sheffield Decl. Ex. J at 3:25–4:50. The incident occurred while it was still

light out, and video shows that the long PVC banner was flimsy. *See id*. Further, in the moments before Officer Taylor fired his FN303, the protestors carrying the banner were complying with PPB's directions in moving with the rest of the crowd away from the PPA building. *See id.*; Cleinman Decl. Ex. 1 at 0:16–0:25. And—most importantly—nothing suggested that the individual Officer Taylor targeted was engaged in "[a] threat or overt act of an assault, . . . which reasonably indicate[d] that an assault or injury to any person was about to happen, unless intervention occur[ed]." Use of Force Directive 1010 (Definitions). At most, the record shows that the individual who was refusing to let go of their sign was engaged in passive resistance. Because more is required for the use of impact munitions, the Court finds that Officer Taylor's use of force did not comply with Use of Force Directive 1010 and therefore violated the Order.

As to Incident 3, the Court also finds that Officer Taylor's deployment of ten rounds from his FN303 against protestors trying to pull an individual on roller skates back into the crowd violated the Order. Officer Taylor testified that he deployed his FN303 in order to stop an unarrest and prevent an assault or the use of a higher level of force. He believed that officers were arresting the individual on roller skates because officers had their hands on this individual. He also believed that other protesters were attempting to unarrest the individual by pulling them back into the crowd, a situation that is dangerous for both officers and the arrestee. But video of this chaotic moment does not support Officer Taylor's testimony. In video from the protestor's vantage point, it is clear that no arrest is being made. *See* Cleinman Decl. Ex. 1 at 0:33–0:38. During the struggle over the banner, the individual on roller skates falls to the ground and protestors try to pull the fallen individual back into the crowd. *Id*. In video from the officer's perspective, officers appear to grab and shove the individual. *See* Suppl. Sheffield Decl. Ex. J at 4:58–5:04. Aside from a few brief moments of physical contact, however, there is nothing to

suggest that this individual was under arrest. At no point does an officer declare that the skater is under arrest. And in the moments before the scuffle began, the individual was complying with PPB's orders to move to the east along with the rest of the crowd. None of the protesters are engaged in any physical or verbal acts that could constitute a threat or overt act of an assault. Though undoubtedly a chaotic and difficult moment for an officer in his position, the evidence shows that Officer Taylor did not deploy his FN303 in response to active aggression or to prevent the use of a higher level of force. Thus, Officer Taylor's use of impact munitions during Incident 3 violated the Order.

Similarly, an unknown officer's use of impact munitions against an individual approaching an item in the road (Incident 9) was not in response to active aggression. The individual walked out from the crowd of protestors towards an unknown object between the crowd and police line. Ex. L at 9:23–9:26. As they leaned down to grab the item, an officer deployed multiple rounds from an FN303 at them. *Id.* at 9:26–9:29. After reviewing this video, Officer Domka testified that the behavior of this individual—stepping out of the crowd towards the police line and reaching down to pick up an object from the pavement—may indicate that the protestor is about to throw an object at an officer. But it simply cannot be that any attempt by an individual to pick up an item off the ground at a protest constitutes a threat of assault to officers or others. There was nothing in this moment to suggest that the protestor was grabbing an item with the intent to throw it at the police. The individual moved slowly and was struck by a munition before they even had the object in their hands. Because this protestor was not engaged in active aggression, the officer's use of impact munitions violated the Order.

As to the five remaining incidents involving impact munitions, however, Plaintiffs have not demonstrated that Defendant's officers violated the Order. The deployment of impact

munitions against Mr. Anglada, Ms. Haas, and Mr. Greatwood (Incidents 5, 7, and 8) all complied with Use of Force Directive 1010. Mr. Anglada and Ms. Haas both kicked smoke canisters in the direction of police officers. And Mr. Greatwood moved forward quickly, bent down, and successfully picked up a smoke canister. At the time of each incident, these three individuals were just a few of many protestors who were kicking or throwing smoke canisters and other projectiles at the police line. While Mr. Greatwood, Ms. Haas, and Mr. Anglada may not have subjectively intended to assault or threaten to assault officers that evening, kicking or throwing smoke canisters constitutes a threat or act of assault. As Officers Domka and Taylor both testified, smoke canisters are heavy, hot, and dangerous projectiles when thrown at officers. When kicked, smoke canisters can envelop officers in smoke, eliminating their line of sight and providing an opportunity for individuals to injure officers with projectiles. Thus, under these circumstances, officers reasonably perceived the actions of Mr. Anglada, Ms. Haas, and Mr. Greatwood as active aggression, and their use of impact munitions was appropriate under the Order.

Similarly, the deployment of munitions against an unknown individual who attempted to throw an item at police officers (Incident 4) and another individual who attempted to light a dumpster on fire (Incident 6) complied with PPB's Use of Force Directive. Throwing items at police and starting fires at a protest reasonably constitute a threat or an overt act of assault and create a risk of injury to officers or others without intervention. Thus, in the moments that they deployed impact munitions, officers reasonably perceived that these individuals were engaged in active aggression.

///

///

B.      Incidents Involving Aerosols

Aerosol restraints, including OC spray, are not to be used against persons engaged in passive resistance. Stip. Addt'l TRO at 2. In the Order, "passive resistance" is defined as "a person's non-cooperation with a member that does not involve violence or other active conduct by an individual." *Id*. Use of Force Directive 1010 also restricts PPB's use of OC spray to incidents where "a person(s) engages in physical resistance or indicates the intent to engage in physical resistance." Use of Force Directive 1010 ¶ 6.4.3.1.1. Physical resistance is "[a] person's physical attempt to evade a member's control that does not rise to the level of active aggression." *Id*. (Definitions).

The unknown officer's use of OC spray against Mr. Cleinman (Incident 1) did not violate the Order. Both Mr. Cleinman's testimony and video of the incident show that an officer deployed OC spray against Mr. Cleinman mere seconds after Mr. Cleinman grabbed an officer's baton. Though this action may have been inadvertent and without any aggressive intent, there is no dispute that Mr. Cleinman grabbed an officer's weapon during a physical altercation. As an officer reasonably could have interpreted Mr. Cleinman's actions as more than passive resistance, the use of OC spray complied with the Order.

## II.    Defenses to Contempt

There is no "good faith" defense to contempt. *In re Dual-Deck*, 10 F.3d at 695. As noted above, however, "'[s]ubstantial compliance' with the court order is a defense to civil contempt, and is not vitiated by 'a few technical violations' where every reasonable effort has been made to comply." *Id*. at 695 (citing *Vertex Distrib.*, 689 F.2d at 891). In other words, "[i]f a violating party has taken 'all reasonable steps' to comply with the court order, technical or inadvertent

violations of the order will not support a finding of civil contempt." *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986).

In its briefing, Defendant argues that even if there were "a few technical violations" of the Order, Defendant took all reasonable steps to comply. Def.'s Resp. 14. Specifically, Defendant cites Captain Passadore's "repeated efforts to remind all officers of the requirements of the injunctions," including his radio broadcast that evening reciting the limitations of the Order. *Id*. Defendant also emphasizes that Plaintiffs' motion only "cites to a handful of instances over the two months since [the Order] has been in place." *Id*.

First, Defendant's violations of the Court's order on June 30 were not merely "technical" or "inadvertent" as Defendant suggests. During Incidents 2 and 3, Officer Taylor deployed fifteen rounds from his FN303 against a group of protestors carrying a large banner who were otherwise complying with PPB's order to move away from the PPA building. When another officer fired his FN303 at an individual during Incident 9, nothing objectively indicated that this individual presented a threat to police officers. None of the individuals targeted by police in these incidents were engaged in active aggression, and the use of force did not reasonably prevent the use of a higher level of force. All three individuals appear to have been struck by police munitions. The Court cannot conclude that these three violations over an hour-long period were "merely technical."

Second, Defendant has failed to demonstrate that it took *all* reasonable steps to comply with the Order. The Court acknowledges that Defendant took some steps to ensure compliance on June 30. Captain Passadore, for example, read the requirements of the Order over the radio after calling for attention from all officers involved in crowd control on the evening of June 30. There is also evidence in the record that Captain Passadore directed all supervisors to ensure that

all officers were informed of the requirements of the Order. *See* Passadore Decl. ¶ 49. And the Court is cognizant that PPB has been stretched thin over the past few months with the same RRT officers working endless hours in response to ongoing protests. It is also aware of the effect the pandemic has had on PPB's ability to conduct additional trainings. Nevertheless, the Court cannot conclude that a single radio transmission and a discussion with RRT officers and supervisors on June 30, 2020, constitutes "all reasonable steps" Defendant could have taken to ensure compliance with the Order that evening. *Kelly*, 822 F.3d at 1096 (affirming the district court's contempt finding where the contemnor "emphasized[d] the steps it took to comply with the settlement agreement, but fail[ed] to mention other reasonable steps it could have taken"). Accordingly, the Court finds Defendant City of Portland in contempt.

## CONCLUSION

The Court GRANTS in part Plaintiff's Amended Motion for Order to Show Cause [145]. The Court finds Defendant City of Portland in contempt of its June 26, 2020 Stipulated Additional Temporary Restraining Order [43]. Remedies for the above-described violations of the Order will be determined separately. The parties shall contact the Courtroom Deputy within 3 days of this Order to set a date for a scheduling conference.

IT IS SO ORDERED.

DATED: _November 27, 2020_____.

MARCO A. HERNÁNDEZ
United States District Judge