**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
**Viktoria Lo**, OSB No. 175487
Email: viktoria@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241

**Juan C. Chavez**, OSB No. 136428
Email: jchavez@ojrc.info
**Brittney Plesser**, OSB No. 154030
Email: bplesser@ojrc.info
**Alex Meggitt**, OSB No. 174131
Email: ameggitt@ojrc.info
**Franz H. Bruggemeier**, OSB No. 163533
Email: fbruggemeier@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503 944-2270

**J. Ashlee Albies**, OSB No. 051846
Email: ashlee@albiesstark.com
**Whitney B. Stark**, OSB No. 090350
Email: whitney@albiesstark.com
**Maya Rinta**, OSB No. 195058
Email: maya@albiesstark.com
Albies & Stark LLC
1 SW Columbia St. Suite 1850
Portland, Oregon 97204
Telephone: (503) 308-4770

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DON'T SHOOT PORTLAND, a nonprofit corporation, in its individual capacity, NICHOLAS J. ROBERTS, in an individual capacity and on behalf of themselves and all others similarly situated, MICHELLE "MISHA" BELDEN, in an individual capacity and on behalf of themselves and all others similarly situated, ALEXANDRA JOHNSON, in an individual capacity and on behalf of themselves and all others similarly situated, LESTER WRESCKIE, in an individual capacity and on behalf of themselves and all others similarly situated, and THOMAS DREIER, in an individual capacity and on behalf of themselves and all others similarly situated, | Case No. 3:20-cv-00917-HZ<br><br>FOURTH AMENDED COMPLAINT<br><br>(Violations of Civil Rights: 42 U.S.C. § 1983)<br><br><br>JURY TRIAL DEMANDED |
|      Plaintiffs | |
|     v. | |
| CITY OF PORTLAND, a municipal corporation, | |
|     Defendant. | |

Plaintiffs, by and through their attorneys, allege:

**NATURE OF ACTION**

1.

This is a civil rights action brought pursuant to 42 U.S.C. § 1983. Plaintiffs bring this civil rights action to stop the City of Portland from using excessive force against them in order to suppress plaintiffs' right to free speech. For the past year, plaintiffs, along with tens of thousands of their fellow community members, and millions of other people around the world, have taken to the streets to protest white supremacy and police violence in the United States generally and in Portland specifically. The Portland Police Bureau ("PPB"), like police departments all over the

FOURTH AMENDED COMPLAINT

country, responded with indiscriminate, unchecked, and unconstitutional violence against protesters. At first, PPB used chemical agents ("tear gas") against crowds of protesters, including plaintiffs, who had committed no criminal acts, posed no threat of violence to any person, and were merely engaged in protected speech. Plaintiffs were immediately concerned that the use of tear gas is particularly dangerous at the present time because it is specifically designed to irritate the respiratory system and to cause people to expel mucus and aspirated saliva. In the midst of a global pandemic, the deadly novel COVID-19 virus is known to spread principally through aspirated saliva and mucus. Plaintiffs sought and obtained a temporary restraining order prohibiting PPB from using tear gas except in narrow circumstances. Following that order, PPB changed tactics, now using a variety of so-called "less lethal" weapons and baton strikes indiscriminately against plaintiffs in their continued effort to silence speech.  Plaintiffs are entitled to a temporary restraining order, preliminary injunction, permanent injunction, damages, and an award of attorneys' fees and costs.

## JURISDICTION AND VENUE

2.

This court has subject matter jurisdiction over plaintiffs' claims of violation of federal constitutional rights pursuant to 28 U.S.C. §§ 1331(a) and 1343 because the causes of action arise under 42 U.S.C. § 1983.

3.

Venue is proper in the District of Oregon pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in the District of Oregon and because Defendants are subject to personal jurisdiction in the District of Oregon.

/ / /

/ / /

FOURTH AMENDED COMPLAINT

/ / /

## PARTIES

4.

Plaintiff Don't Shoot Portland is a not for profit corporation, incorporated under the laws of the state of Oregon, whose principal place of business is Portland, Multnomah County, Oregon. Don't Shoot Portland is a Black-led organization whose fundamental mission is to advocate for social and racial justice in Portland. Don't Shoot Portland was formed in the wake of the Ferguson uprising stemming from the police killing of Michael Brown and community outrage at police violence directed at Black people. Don't Shoot Portland provides support for grassroots organizing and education on issues of police brutality, the school to prison pipeline, combatting white supremacy and racism, and provides mutual aid to activists, organizers, and others protesting in Portland against police brutality.  Don't Shoot Portland holds ongoing events and trainings related to its mission such as bystander intervention trainings, and advocates for demilitarization of the police. Its programs include a children's art and social justice council, community clothing tree, and community legal clinics. Don't Shoot Portland also advocates for social justice and change though supporting direct action in a safe manner; participating in, organizing and supporting protests; providing know your rights trainings and information; and providing jail support to people arrested during demonstrations. Don't Shoot Portland recognizes that mass mobilizations and demonstrations are necessary for politicians and the general public to understand the importance of an issue in order to enact policies responsive to community demands in order to create and foster a more equitable City. Don't Shoot Portland has devoted resources to identifying, counteracting, and addressing the practices alleged in this complaint, and this diversion of resources has frustrated its mission.  As a result of the PPB's unconstitutional policy, practice, and customs, as alleged herein, Don't Shoot Portland must

devote additional resources to educating, informing, and protecting protesters from unconstitutional practices, and this diversion of resources has frustrated its mission.

5.

Plaintiff Nicholas J. Roberts (Pronouns: he/him), at the time of filing and all material times, was a resident of Portland, Multnomah County, Oregon.

6.

Plaintiff Michelle "Misha" Belden (Pronouns: They/Them), at the time of filing and all material times, was a resident of Portland, Multnomah County, Oregon.

7.

Plaintiff Alexandra Johnson (Pronouns: she/her), at the time of filing and all material times, was a resident of Portland, Multnomah County, Oregon.

8.

Plaintiff Lester Wresckie (Pronouns: he/him), at the time of filing and all material times, was a resident of Portland, Multnomah County, Oregon.

9.

Plaintiff Thomas Dreier (Pronouns: he/him), at the time of filing and all material times, was a resident of Portland, Multnomah County, Oregon

10.

Defendant City of Portland is a political subdivision of the State of Oregon. The Portland Police Bureau ("PPB") is a department or division of the City. As a local governmental entity, the City of Portland is a suable person under 42 U.S.C. § 1983. The people who used tear gas and "less lethal" weaponry, including as described below, were employees or agents of the City of Portland. On information and belief, each and every decision to indiscriminately use tear gas

and other "less-lethal" weapons against plaintiffs was made at or ratified by a sufficiently high level as to be policy decision of the City of Portland.

## GENERAL ALLEGATIONS

11.

Black Lives Matter.

12.

The disproportionate and excessive use of force against Black people by police officers in the United States is a well-documented, systemic problem. It exists in every police department in this country, including the PPB.

13.

For many years, advocates and activists have attempted, largely unsuccessfully, to get the City to address and reduce the Portland Police Bureau's disproportionate use of force, stops, searches, seizures, and arrests of Black people, Indigenous people, and people of color. Efforts to address the Portland Police Bureau's racial profiling dates back to the 1990s.[1] And yet, despite all the recommendations, implemented or more often, not, PPB continues to engage in disproportionate targeting of Black people in stops, searches, seizures, and uses of force.

## I.      George Floyd

14.

On May 25, 2020, in Minneapolis, Minnesota, a Black man named George Floyd was murdered on video by Officer Derek Chauvin of the Minneapolis Police Department while three of his fellow officers watched and did nothing to intervene. Officer Chauvin knelt on Mr. Floyd's neck while Mr. Floyd pleaded for his life, repeatedly telling Chauvin that he could not

---

[1] https://www.portlandoregon.gov/police/article/32381

FOURTH AMENDED COMPLAINT

breathe. A bystander video of the murder quickly went viral, sparking outrage throughout the country.

15.

For many Americans, and particularly Black Americans, the murder of George Floyd, in broad daylight while being openly filmed by a witness, was the proverbial straw that broke the camel's back. Fed up with the empty platitudes and the endless yet ineffective "reforms" by their political and law enforcement leaders, millions of Americans took to the streets in protest, demanding an end to police violence and white supremacy, and refusing to leave those streets unless and until meaningful change is made.

16.

Protests against police violence have been met with police violence in nearly every city around the country. Videos shared in the press and on social media show the police in this country out of control: attacking journalists, attacking bystanders, threatening children, assaulting people for insulting them, engaging in drive-by attacks with "less lethal" weapons, planting weapons in the hands of people arrested, pulling off demonstrators' CDC-recommended facemasks and macing them, kettling whole groups of protesters only to launch tear gas at them, driving their cars directly through crowds of people, using military helicopters in efforts to terrify civilians, discussing plans to shoot protesters, and above all, using massive amounts of tear gas in a massive systemic effort to stop people from protesting police violence. This violent police response has only strengthened the resolve of protesters.

## II.    Portland

17.

Beginning on May 29, 2020, and continuously since then, Portlanders have been demonstrating in the streets demanding justice for George Floyd and demanding an end to police

violence. The PPB, like police departments throughout the country, have met these demands with violence.

18.

A focal point of conflict between PPB on one hand and protesters on the other has been the "Justice Center" in downtown Portland, which was for many weeks, completely surrounded by fencing. The building houses PPB's central precinct, which includes command staff offices, a jail operated by Multnomah County Sheriff's Office where hundreds of humans – disproportionately Black – are housed in small cage like cells, and a small number of courtrooms where the "business" of the criminal legal system perpetuating these racial inequalities continues every working day. It is, in short, a perfect symbol of the harms the protesters seek to address.

19.

PPB is determined to keep the protesters away from the Justice Center, closing public streets, erecting fences, and guarding it with lines of law enforcement officers stocked with weapons and wearing armor, helmets, and gas masks. Nearly every night in the first several months of the protests ended with a standoff around the Justice Center between law enforcement and protesters, culminating in law enforcement using a variety of tactics, including indiscriminately spraying demonstrators with tear gas, rubber bullets, pepper balls, blast balls, Long Range Acoustic Device ("LRAD"), flash bangs, and other impact munitions, while launching aerial munitions into the air above their heads. After PPB succeeds in scattering protesters throughout the streets of downtown Portland, PPB often kettle protesters and continue to assault them with more pepper spray, impact munitions, and aerial munitions. PPB employs the same tactics when these protesters gather near the Portland Police Association building on North Lombard Street or PPB's North Precinct.

FOURTH AMENDED COMPLAINT

20.

Since this court entered a Temporary Restraining Order on June 9, 2020, limiting the PPB's use of tear gas on protestors, PPB has escalated its use of rubber bullets, pepper balls, blast balls, flash bangs, other impact munitions, and baton strikes on the crowd in an indiscriminate manner.

### III.    Tear Gas, RBDDs, Smoke, and COVID-19

21.

Riot control agents (here referred to as "tear gas") are chemical compounds that temporarily make people unable to function by causing irritation to the eyes, mouth, throat, lungs, and skin. Several different compounds are considered to be riot control agents, including chloroacetophenone ("CN"), chlorobenzylidenemalononitrile ("CS"), and oleoresin capsicum ("OC"). OC is derived from capsaicin and designed to be an irritant and inflammatory agent "primarily affect[ing] the respiratory tract." CS is a nerve gas designed to inflict pain, and degrade the mucous membranes in a person's eyes, nose, mouth, and lungs. The PPB uses both CS and OC, and possibly other agents.

22.

PPB also uses Rubber Ball Distraction Devices ("RBDDs") and smoke cannisters to disperse crowds. RBDDs create a loud and disorienting sound, followed by an explosion of rubber balls, and is intended to cause alarm. PPB's use of smoke cannisters is intended to occlude vision and to cause confusion amongst protesters.

23.

PPB launches tear gas from canisters at protesters which release the chemical agent in gaseous form, exposing people through skin contact, eye contact, or inhalation. PPB also discharges chemical agents directly from handheld canisters, and by shooting FN303s with OC

payload or 40mm impact munitions with OC payload. These weapons spread their OC payload upon impact with the ground or the body of a person. Manufacturer's materials for OC capsules fired from FN303s describe this feature and practice of firing at the ground as "area saturation."

24.

Tear gas causes irritation to the area of contact within seconds of exposure, including eye burning, excessive tearing, blurred vision and redness; runny nose, and nasal burning and swelling; mouth burning, irritation, difficulty swallowing and drooling; chest tightness, coughing, choking sensation, wheezing, shortness of breath; burns and skin rash. Some people experience nausea and vomiting. Studies show that tear gas is linked to miscarriage, fetal harm, and abnormal menstruation. Moreover, the 1993 International Chemical Weapons Convention, Geneva, bans tear gas from use by military forces during war.

25.

COVID-19 is a novel and serious respiratory virus which impacts the upper and lower respiratory system. It is spread primarily through droplets when an infected persons coughs or sneezes, or through droplets of saliva or discharge from the nose. For all these reasons, the CDC recommends people wear face coverings over the nose and mouth to help prevent the spread of COVID-19. The virus has spread across the globe, and has been designated a global pandemic. Those infected with COVID-19 can experience no symptoms, mild symptoms, or severe symptoms.

Because of racism and its impact on economic and health disparities, Black people, Indigenous people, and people of color are more likely to develop, suffer, and face complications from COVID-19 than their white counterparts.[2]

---

[2]*See* Multnomah County, *New numbers show COVID-19 damage to communities of color; leaders call for better data collection*, (May 1, 2020), available at https://multco.us/novel-coronavirus-covid-19/news/new-numbers-show-covid-19-damage-communities-color-leaders-call

26.

Many recent reports link the use of tear gas to exacerbation of spreading of COVID-19.

Indeed, Oregon Health and Science University ("OHSU") President Danny Jacobs, M.D.,

F.A.C.S., released a statement acknowledging that "Protests have long served as a positive agent

for social change in the U.S.," and that law enforcement's "use of tear gas and other chemical

means to control crowds has raised great concern among medical professionals as we

simultaneously try to manage a global pandemic." The statement further opined:

> While large gatherings in general provide increased opportunities for the
> transmission of COVID-19, the use of tear gas could significantly exacerbate
> the spread. Tear gas is a chemical that attacks the mucous membranes of the
> eyes, nose, throat and lungs and causes severe pain and irritation; exposure to
> tear gas can result in blindness, bleeding, crying and coughing. The release of
> airborne droplets through tear gas-induced coughing could accelerate the
> spread of COVID-19 and lead to a surge in new cases. Damage to the
> respiratory tract can put individuals at greater risk of adverse outcomes if they
> become infected with COVID-19.[3]

27.

The use of tear gas, RBDDs, and smoke grenades is, by their very nature, indiscriminate.

Everyone must breathe, and anyone who breathes in the area where police have used tear gas

will be harmed by the gas.  Everyone will get smoke into their lungs and eyes. The Defendant

knew this when it decided to procure the tear gas, arm law enforcement with the tear gas, and

authorize police to use tear gas in its downtown core on protesters. The Defendant knew that the

gas would harm people who were not engaged in any unlawful activity and where law

enforcement had no probable cause that individuals had committed any crimes. Similarly, the

rubber balls that project out of RBDDs are uncontrolled or targeted. Anyone who happens to be

nearby will be hit.

---

[3] Danny Jacobs, M.D., M.P.H., FACS, Statement on tear gas and nonviolent protests, Oregon Health & Sciences University (June 4, 2020) available at https://news.ohsu.edu/2020/06/05/statement-on-tear-gas-and-nonviolent-protests?linkId=90165009

## IV.    "Less Lethal" Weapons

28.

In addition to using chemical weapons, PPB uses a variety of so-called "riot control" weapons, some of which also contain OC as a chemical irritant. PPB uses two different platforms for launching these munitions: an 18 mm, 15-round capacity, shoulder fired weapon called an FN303; and 40 mm, two round capacity, shotgun-style launcher. PPB uses the FN303 to deploy munitions containing OC powder designed to cause chemical irritation to anyone around the impact; munitions containing paint designed to both hurt the person and mark them with paint; and munitions containing sand to both hurt the target and cause non-chemical irritation. PPB uses the 40 mm launcher to fire foam tipped rounds designed to hurt people, foam tipped rounds with OC inside, and two types of "flash-bang" grenades: one that emits light and sound, and one that, in addition, spreads plastic shot over an area of people in order to hurt them. PPB also uses hand-held grenade-style weapons that accomplish the same purposes of 40 mm launched flash-bangs. The manufacturer's website advertises that one of these hand-thrown grenades will spread plastic projectiles over a 50-foot radius.

29.

Neither the FN303s nor the 40 mm launchers are accurate at long distances and become inaccurate altogether after several deployments. The use of FN303s and 40 mm launchers in crowd management settings has led to the death of protesters, like in Boston.[4] This fact has led to some police departments to cease use of FN303s altogether, like the Boston Police Department, which repurposed these weapons by melting them into sewer caps.[5] During the recent protests

---

[4] The New York Times, *Boston Police to Destroy Pepper-Spray Guns* (Feb. 23, 2007), available at
https://www.nytimes.com/2007/02/23/us/23pepper.html
[5] *Id.*

following George Floyd's murder, projectiles fired from FN303s have resulted in the serious maiming of individuals.[6]

30.

In the past and during the present protests, from May 31 to November 15, 2020, law enforcement has fired these impact munitions, particularly the FN303, indiscriminately into crowds of passively resisting, or other peaceful protesters, both before and after PPB has declared an unlawful assembly/civil disturbance, leaving large welts, bruises, and other similar injuries. Protesters outside of the Multnomah County Justice Center attest to being fired upon and hit by such munitions by law enforcement standing at the top of the stairs across the street despite having not engaged in any behavior that was criminal, let alone threated anyone's life or safety.

31.

During this same period of time, the police used batons and OC spray against crowds of protesters when marching in formation to force protesters to move, regardless of whether the individual protesters engaged in any resistance to the police.

**V.    Police Response To Other Protests**

32.

On several occasions since 2017, demonstrations in support of police and against the Black Lives Matter movement have occurred in Portland. During these demonstrations, Defendants did not use tear gas, impact munitions, nor any force against these protestors. Instead, PPB provided escorts to maintain the safety and security of these protestors, an accommodation not afforded to those protesting police violence. For example, on August 17,

---

[6] Kelli Kennedy, *Protester hit in face by police rubber bullet wants answers*, Houston Chronicle (June 12, 2020), available at  https://www.houstonchronicle.com/news/article/Protester-hit-in-face-by-police-rubber-bullet-15336813.php

2019, a group of approximately 500 pro-fascist, pro-police, anti-Black activists from across the country held an unpermitted rally in Tom McCall Waterfront Park in downtown Portland. The stated aim of the rally organizers was to waste city funds and resources. PPB made extensive accommodations for the rally, including closing the Hawthorne Bridge to traffic, erecting concrete barriers around the site of the rally, and placing a heavily armed police presence between the fascist rally and counterprotesters. After the far-right rally in Tom McCall Waterfront Park, PPB opened the Hawthorne Bridge for the exclusive use of the fascist rally. PPB declared a civil disturbance after the far-right rally dispersed, ultimately arresting 13 counterprotesters. The organizers of the fascist event announced they would return to Portland each month to continue to waste city resources.

Likewise, on August 22, 2020, many anti-Black Lives Matter protestors descended on Portland, armed with paintball guns, metal rods, aluminum bats, fireworks, pepper spray, rifles and handguns in an attempt to intimidate and rally against Black Lives Matter protestors. Defendants did not intervene or arrest these pro-police demonstrators for posing threats to Portland community members. Tusitala "Tiny" Toese, who had an outstanding warrant for his arrest, was present, seen, and identified by Defendants, but not arrested. In contrast, PPB members arrested Demetria Hester, Black Lives Matter leader and volunteer with Don't Shoot Portland less than two weeks prior.

Similarly, on September 26, 2020, a group of approximately 200 pro-fascist, pro-police, anti-Black activists descended on Delta Park for a rally for the express purpose of provoking a violent confrontation with anti-fascist activists. They open-carried firearms within the park, in violation of city code, set up armed check points to control access to the park, and forcibly removed people they decided were not there to support their fascist cause. At least one individual was jumped and given a concussion by the violent mob. At one point, a vehicle arrived and

delivered dozens of homemade shields. Despite the presence of dozens of police officers, including PPB "liaison officers" on foot in the park, defendants did not intervene in any way with this criminal activity. On the same day, at the same time, anti-fascist organizers held a rally three miles away in Peninsula Park. That rally was specifically designed to avoid violent confrontations with the fascist rally. No march was planned. Nevertheless, there was a heavy police presence from PPB, and PPB seized homemade shields from participants and arrested individual participants.

## VI.    PPB's pattern and practice of illegal use of force against protesters.

33.

PPB has a policy or practice of using force without individualized justification to disperse protestors.  From May 25, 2020 to November 15, 2020, PPB regularly used force consistent with this policy and practice against plaintiffs and class members, *i.e.* without individualized justification to use force. On information and belief, PPB will continue to use force in this manner.

34.

Former PPB Chief Jamie Resch stated in a news conference on June 3, 2020 that the decision to use tear gas, other riot control, and "less lethal" weapons against a crowd of protesters the evening prior was made by incident commanders at the scene.

35.

Nearly a year after protests began, PPB has failed to accurately document or evaluate its officers' use of force against protesters. PPB has demonstrated that it does not take criticisms of its use of force seriously, and it is unwilling or unable to honestly assess, much less ameliorate, its pattern and practice of unconstitutional use of force against protesters without outside orders or supervision.

36.

In an evaluation of PPB's after-action reports (AARs) and other Bureau documentation reviewing and assessing its response to  protests between May 29 to November 15, 2020, the attorneys in the U.S. Department of Justice Civil Rights Division ("DOJ") stated that "PPB's self-assessment insufficiently analyzes its management of force, its members' justifications for force, and the organization's plan to enforce compliance with policy and training. Instead, PPB focuses primarily on external factors beyond its control while over-relying on training and software to address the few faults it is willing to own."

37.

PPB "broadly portrays all force as justified," and evaluated itself as doing "an *excellent* job handling the nightly protest."

38.

PPB has a "pattern of misusing the phrase 'active aggression' to justify force against individuals who engaged in passive resistance or merely failed to disperse."

39.

PPB did not track an inventory of munitions or make a daily count of the type and amount of force used against individuals.

40.

PPB did not assess whether officers violated PPB policies related to using force, reporting force, and reviewing force reports. In its evaluation of use of force at protests, PPB supervisors focus on the articulation of members' justifications for using force, rather than whether a particular use of force was justified.

41.

FOURTH AMENDED COMPLAINT

PPB has failed to issue use of force warnings to individuals, or confirm that subjects heard use of force warnings, before using force on protesters.

42.

The PPB supervisors assigned to complete AARs had little to no crowd management training.

43.

PPB has failed to hold officers, supervisors, and executives accountable for using or approving force without sufficiently articulating a permissible justification.

44.

PPB scheduled a Rapid Response Team (RRT) training for April, 2021, and only created lesson plans for parts of the training after DOJ requested copies. PPB ended up cancelling this training because the materials and outlines were insufficient to meet the DOJ's required standards.

45.

PPB treated the failure to disperse as sufficient justification, in and of itself, to use force against protesters. PPB did not engage in individualized assessments of the reasonableness of a particular use of force against a particular person, as required by their Directive 1010. Instead, the officers on the ground and their supervising officers believed that a mere failure to disperse, which is only passive resistance, was sufficient to justify the use of indiscriminate force.

46.

Ultimately, almost one year after the death of George Floyd, Defendant has failed to acknowledge "the importance of PPB members complying with constitutional standards, adhering to approved policies, and enforcing policy violations."

Since May 31, 2020, the City has increased its inventory of crowd control weaponry for use against demonstrators.

## VII.    Don't Shoot Portland

47.

Don't Shoot Portland is a Black-led human rights organization advocating and educating on the issue of police violence and accountability. Its work includes educational workshops, free legal referrals, policy advocacy, conducting youth and community based events, hosting a children's art and social justice counsel, and other such work in support of its community action plan that provides services to the most marginalized community members.

48.

Don't Shoot Portland has been participating the local demonstrations and providing assistance and support to protesters. It has participated in, monitored, and amplified calls to end racist policing and the violent police response to nonviolent protesters. It strongly opposes the use of tear gas, "less lethal" weapons, and any force against protesters. Don't Shoot Portland provides mutual aid to activists, organizers, and others protesting in Portland against police brutality. In the wake of the escalated police response to protestors, Don't Shoot Portland has had to divert resources from other aspects of its mission, such as its community events, in order to distribute protective equipment like facemasks and hand sanitizer, first aid kits, and other resources to provide relief from tear gas and impact munitions, as well as assistance with shelter and food to demonstrators and others supporting the protests. In addition, Don't Shoot Portland's board members and volunteers have been participating in protests in support of Black Lives Matter in downtown Portland, and have been providing support to protestors injured by Defendants' unlawful conduct. While engaging in this activity, Don't Shoot Portland's board members and volunteers have been subjected to Defendants' unlawful use of force.

49.

Don't Shoot Portland has facilitated scientific research demonstrating that tear gas is extraordinarily dangerous during COVID-19, especially to Black people, Indigenous people, and people of color. Even Defendant Multnomah County acknowledges that Black people, Indigenous people, and people of color bear a disproportionate burden of illness and death from COVID-19 than their white counterparts.[7]

50.

Defendants have harmed Don't Shoot Portland's mission by destroying its mutual aid supplies with tear gas and physical destruction. Moreover, Defendants' escalated police response has made it substantially more difficult for Don't Shoot Portland to advance its mission of organizing, facilitating, and supporting First Amendment activity in the form of protests and direct action in support of Black Lives because people are reasonably fearful of engaging in these activities. Don't Shoot Portland has had to divert resources from existing projects to educate its volunteers and members of the public about the ongoing demonstrations, and to address the physical and emotional risks that people face by engaging in protest in light of Defendants' unlawful response, and to provide aid and support to those who have been harmed by the escalating police violence towards protestors.

**VIII.   Nicholas J. Roberts**

51.

Nicholas J. Roberts is an Oregonian who lives in downtown Portland. He attended his first protest on May 29, 2020, because he wanted to protest police brutality and the oppression of Black people. He took precautions because of COVID-19, putting on gloves, face masks, and

---

[7] https://multco.us/novel-coronavirus-covid-19/news/new-numbers-show-covid-19-damage-communities-color-leaders-call

safety glasses, and tried to practice social distancing. Mr. Roberts attended demonstrations from May 29, 2020 through approximately July or August 2020, including on May 29, 30, 31 and June 1, 2, 6, 10, 12 and 13. On numerous occasions during that time, Mr. Roberts witnessed and experienced PPB launching tear gas into a crowd protesting police violence in front of the Justice Center and impacting people, like himself, who were not engaging in active aggression. For example, Mr. Roberts attended protests on May 30, May 31, and June 2, 6, and 13, and had a similar experience: law enforcement launched tear gas and "less lethal" weapons at peaceful protesters demonstrating against police violence at the Justice Center who were not engaged in any unlawful conduct or active aggression.

52.

On multiple occasions from May 29, 2020 through approximately July or August 2020, PPB subjected Mr. Roberts to tear gas as well as so-called "less lethal" uses of force when Mr. Roberts was demonstrating in the protests and not engaged in any acts of active aggression. PPB officers shot Mr. Roberts with FN 303 "pepper balls", 40 MM munitions, Rubber Ball Distraction Devices; and subjected him to baton strikes and handheld OC spray. As a result of Defendant's conduct, Mr. Roberts attended demonstrations less due to his concerns of being subjected to law enforcement's weaponry.

53.

Mr. Roberts was physically harmed and frightened by law enforcement's use of tear gas and "less lethal" weapons.

## IX.    Michelle "Misha" Belden

54.

Mx. Belden had attended the protest in Downtown Portland on June 2, 2020. They were protesting against the brutality the country witnessed when George Floyd of Minneapolis, MN

was murdered by a Minneapolis Police Officer. They wished to be with their community as it

protested against police violence and racism. They were attending the march from SE Portland to

Pioneer Plaza in Downtown Portland. There, they heard a few explosions in the distance. They

arrived at the area around SW 3rd and SW Salmon. They found a crowd chanting, and mostly

calm. Suddenly, there was a flash bang then tear gas. Everyone started scattering. They were

trapped between walls of gas, a fence, and lines of police officers. The air was thick with tear

gas. They believed the police were trying to kill them. This continued for several blocks until

they reached safety around SW Naito and Harvey Milk.

55.

Mx. Belden attended protests on June 9 and 10, 2020 as well, between 9 pm and 1 am at

the Justice Center in Downtown Portland. On June 9, the crowd of approximately 500 was

mostly peaceful, and some people rattled the fence erected outside the Justice Center. Law

enforcement administered a warning to back away from the fence, and while many protestors

backed away, some stayed close to the fence, but stopped rattling the fence. At about midnight,

when the crowd had dwindled by approximately 40%, PPB fired flash bangs and OC munitions

to disperse the crowd without any warning. To Mx. Belden and others, it looked and sounded

like tear gas, despite the TRO entered in this case, causing Mx. Belden to believe the PPB will

never stop using excessive force, and that protesters will all be subject to arrest and excessive

force at all times, denying them an opportunity to have a peaceful protest. On June 10, one part

of the fence was taken down, away from the Justice Center and where law enforcement were

stationed. Protesters were simply standing around. Two people, one clothed and one not, ran

behind the fenced off area. After the first person went into the fenced area, law enforcement

deployed chemical agents, impacting the nearby protestors. Law enforcement then deployed

"less lethal" weapons, including OC blasts, and flash bang. Mx. Belden left the scene, because

they felt law enforcement was escalating and they did not want to be caught up in it and did not

want to get gassed again. As a result, Mx. Belden gave up on protesting for the rest of that week.

56.

Mx. Belden had gone out on a weekly basis to police accountability protests in Portland

between May 2020 to October 2020. In that time, Mx. Belden had been tear gassed and affected

by indiscriminate "less lethal" weapons like "flash bangs" and OC spray deployed by PPB.

57.

Mx. Belden lives close to the Penumbra Building in East Portland. This location had

become a locus for protest actions, because it serves as a police station for the Portland Police

Bureau and the Multnomah County Sheriff's Office. Throughout August 2020, PPB on several

occasions used tear gas or other aerosolized weapons in and around the Penumbra Building. Mx.

Belden could smell these munitions from their front door, and was affected by them.

58.

Mx. Belden also attended these protests at or around the Penumbra Building in East

Portland, and was subjected to less lethal weapons despite being no more than passively

resistant.

59.

On or around August 10, 2020, Mx. Belden also attended protests in and around the

North Precinct where PPB used indiscriminate force against all protesters, regardless of Mx.

Belden's conduct.

60.

On or around September 5, 2020, Mx. Belden attended a rally and protest in Ventura Park

in East Portland. Venture Park is located nearby PPB's East Precinct. Not long after the rally

concluded, PPB preemptively declared the rally an unlawful assembly. Mx. Belden did not

engage in unlawful conduct, but they, along with several homes in the neighborhood, were blanketed in tear gas.

61.

Mx. Belden was physically harmed and frightened by law enforcement's use of tear gas and "less lethal" weapons. Their menstrual cycle has been effected, and they have suffered emotionally from the trauma of PPB's unchecked violence.

## X.     Alexandra Johnson

62.

Alexandra Johnson has attended the protests in Downtown Portland for many days since May 31, 2020, because Black Lives Matter and she wants to make her community safer and more equitable. Ms. Johnson has not witnessed any rioting or looting.

63.

Ms. Johnson had been exposed to PPB's indiscriminate violence throughout her time spent advocating for police accountability in the streets.

64.

On or about June 5, 2020, upon information and belief PPB shot a tear gas cannister at Ms. Johnson, which then exploded underneath her feet.

65.

On or about June 13, 2020, Ms. Johnson was hit with batons by PPB around SW Fifth Avenue in Downtown Portland. She had not engaged in active aggression.

66.

On or about June 28, 2020, in and around SW Main St. and SW 6th Ave, PPB struck Ms. Johnson with a projectile consistent with the munitions fired from FN303s, despite being at most passively resistant.

67.

On or about July 4, 2020, in, around, and between SW Main St. and W. Burnside St., PPB again tear gassed Ms. Johnson, despite being at most passively resistant.

68.

On or about August 4, 2020, Ms. Johnson was at a protest near the Portland Police Association building. The City has designated this union hall for Portland Police Officers "critical infrastructure," despite being private property that only services Portland Police Association members and provides no public utility. The Portland Police Bureau again, upon information and belief, used tear gas on Ms. Johnson.

69.

On or about the dates of August 13 and 16, 2020, PPB used indiscriminate force such as aerosolized chemical irritants, flash bangs, and upon information and belief tear gas on protestors engaged in at most, passive resistance.

70.

On or about August 22 or 23, 2020, Ms. Johnson had joined protests outside of the Penumbra Building in East Portland. She did not engage in active aggression. In fact, she was acting as a neutral observer that day and stayed primarily on sidewalks filming. PPB began to disperse the protesters through dark, suburban streets. Despite being on the sidewalk, PPB assailed protesters on the sidewalk. Everyone, Ms. Johnson included, was complying with police directives, but nevertheless PPB pushed, knocked, and bludgeoned anyone in their way with batons or truncheons, including Ms. Johnson, and deployed OC at passive demonstrators. A PPB Officer tried pushing Ms. Johnson into the bushes while also attempting to pull her goggles off so the officer could pepper sprayed her directly in the eyes at close range. Ms. Johnson briefly dropped her phone into a bush after being battered by this officer. As she bent over to pick it up,

a PPB Officer came up from behind and wrenched Ms. Johnson's head back, causing exposure to the OC Spray in the air. Ms. Johnson was disoriented, and physically injured. She tumbled away.

71.

On or around September 5, 2020, Ms. Johnson attended a rally and protest in Ventura Park in East Portland. Venture Park is located nearby PPB's East Precinct. Not long after the rally concluded, PPB preemptively declared the rally an unlawful assembly. Mx. Johnson did not engage in unlawful conduct, but she, along with several homes in the neighborhood, were blanketed in tear gas deployed by PPB.

72.

Each and every one of these caused Ms. Johnson pain and suffering, both physically and emotionally.

## XI.  Lester Wresckie

73.

Lester Wresckie (He/Him) was motivated to protest against the Portland Police Bureau because of his commitment to the Black Lives Matter movement and against police violence against Black people here in Portland, OR and across the country.

74.

On the evening of June 30th, Mr. Wrecksie attended a Black Lives Matter rally/protest at Peninsula Park and a march to the Portland Police Association (PPA) office on N. Lombard St. The City has designated this union hall for the PPA as "critical infrastructure," despite being private property that only services PPA members and provides no public utility.

75.

That evening, PPB officers unlawfully used force against and harmed people in the crowd of protesters by pushing, striking, and shooting with impact weapons and pepper spary, including Mr. Wrecksie.

76.

Shortly after the protesters arrived at the PPA office, PPB announced that the protest was an unlawful assembly. Within about 20 minutes of the protesters arriving, PPB formed a line of officers with riot gear that began moving the crowd east on Lombard. During that initial push, Mr. Wrecksie was on roller skates and ended up between a banner carried by a few protesters and the line of police. He was rolling east along with the police line with his back to the officers. PPB officers, within minutes of the start of the PPB push, began pushing Mr. Wrecksie in his back with their batons while he was on his roller skates and between the banner and the line of officers. PPB officers then shoved Mr. Wrecksie to the ground and PPB Officer Brent Taylor, and possibly other PPB officers, shot Mr. Wrecksie with impact munitions, hitting him multiple times on his body.

77.

Later in the night, after PPB had used massive amounts of teargas on the protesters and the surrounding neighborhood, and while he was still wearing roller skates and complying with police orders, a PPB officer grabbed Mr. Wrecksie. He stood on his skates while being held by the officer and asked the officer why he was being grabbed. Two PPB officers then took hold of his arms while another officer hit him with the end of a baton twice in his side and once in his thigh.

78.

The officers then took him to the ground and multiple officers got on top of him and held

him on the ground. An officer then pulled Mr. Wrecksie's mask off and pepper sprayed him in the face while he was on the ground with officers holding his arms out to the side. The officers threatened to spray him again if he did not put his hands behind his back. He told them that he was trying to comply, but the PPB officers were holding his arms down, preventing him from putting his arms behind his back. PPB officers then arrested Mr. Wrecksie and held him in a police car for about an hour without any decontamination from the pepper spray.

79.

At the precinct, a female presenting PPB officer subjected Mr. Wresckie to an aggressive clothed body search, and other gender-based indignities. PPB also kept him in the central holding room where he was not allowed to lay down or even put his feet up and where he was constantly exposed to officers without masks until his release at 11 in the morning on July 1, 12 hours after his arrest. The charges were dropped.

80.

Each and every one of these incidents caused Mr. Wresckie pain and suffering, both physically and emotionally, and places him in fear of continuing to join demonstrations in support of Black Lives Matter and against police violence.

**XII.    Thomas Dreier**

81.

Thomas Dreier (He/Him) was motivated to protest against the Portland Police Bureau because of his commitment to the Black Lives Matter movement and against police violence against Black people here in Portland, OR and across the country.

82.

On August 15 and into the early hours of August 16, 2020, Mr. Dreier attended a protest outside the Penumbra Kelly Building in East Portland. Like thousands of others in Portland, Mr.

Dreier was shocked and horrified by the murder of George Floyd at the hands of a Minneapolis Police Officer and the ongoing violence by police in Portland and around the country, particularly against Black people. Mr. Dreier believes that Black Lives Matter and wanted to express his displeasure with the institution of policing and his opposition to the ongoing police brutality against people advocating for change to policing. Mr. Dreier never engaged in violence, property destruction, or any non-speech-related unlawful activity while at any protest, including the one on August 15-16, 2020.

83.

On August 15, 2020, at least a hundred individuals assembled outside the Penumbra Kelly Building. Around midnight, PPB Officers, wearing full tactical gear, pushed most of the crowd west. On many nights prior, Mr. Dreier had witnessed the same heavily armored, aggressive police force escalate tensions at protests, then use the escalation as an opportunity to attack and injure protesters.

84.

When PPB used force to push many of the protesters west, Mr. Dreier stood on the sidewalk with his guitar in his hands.  Soon after, Mr. Dreier saw a PPB officer grab a person by the throat and push the person into a wall. Mr. Dreier was disturbed by the officer's brutality and wanted to voice his belief that the violence by the police officer was wrong, so, while playing and singing "All You Fascists Bound to Lose" by Woody Guthrie, he went towards the officer who was brutalizing the person. The PPB officer turned to Mr. Dreier and ripped the guitar from Mr. Dreier's hands.

85.

Mr. Dreier was shocked that the officer had taken his guitar and could not believe what was happening when the officer walked across the street and away from Mr. Dreier with Mr.

Dreier's guitar. Mr. Dreier followed the officer into the street, begging for his guitar back. The officer not give it back, and two other PPB officers began pushing Mr. Dreier back towards the sidewalk.  Mr. Dreier continued to beg the officer to return his guitar as he returned to the sidewalk.  After he was back on the sidewalk, in compliance with the officers' directions, another PPB  officer shot him from 10-15 feet away in both of his upper thighs with one or more rounds from a 40mm launcher.

86.

Each and every one of these incidents caused Mr. Dreier pain and suffering, both physically and emotionally.

**CLASS ALLEGATIONS**

87.

Plaintiffs Nicholas J. Roberts, Misha Belden, Alexandra Johnson, Lester Wresckie, and Thomas Dreier bring this action pursuant to Rules 23(a) and 23(b)(1) and (2) of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated individuals.

88.

Defendant has a pattern, policy, or practice of using force without individualized justification to disperse protestors.  From May 25, 2020 to November 15, 2020, Defendant regularly used force consistent with this policy and practice against plaintiffs and class members, *i.e.* without individualized justification to use force. On information and belief, Defendant will continue to use force in this manner.

89.

Plaintiffs and class members have been harmed by Defendant's policy and officially sanctioned behavior, and face a realistic threat of repetition of these violations.

90.

FOURTH AMENDED COMPLAINT

The proposed class is defined as follows:

A.      First Amendment Class: all people who engaged in protest activities that follow the death of George Floyd opposing police violence and white supremacy between May 25, 2020 and November 15, 2020.

B.      Indiscriminate Weapons Subclass for purposes of the Fourth Amendment claim: This is a subclass of the First Amendment Class that consists of protesters who were subjected to tear gas, "flash bang" grenades, aerial distraction devices, rubber ball distraction devices, smoke grenades, and other similar uses of force by the PPB from May 25, 2020 to November 15, 2020. This subclass includes protesters who engaged in passive resistance to the orders of police and those that attempted to comply with the orders of the police, but does not include those who engaged in conduct beyond passive resistance.

C.      Targeted Weapons Subclass for purposes of the Fourth Amendment claim: This is a subclass of the First Amendment Class that consists of protesters who were subjected to "less lethal weapons" (FN303 launchers, 40 mm launchers, batons, aerosol restraints) while engaged in protest activities from May 25, 2020 to November 15, 2020. This subclass includes protesters who engaged in passive resistance to the orders of police and those that attempted to comply with the orders of the police, but does not include those who engaged in conduct beyond passive resistance.  .

91.

The class period commences on May 25, 2020 and extends to the date on which Defendant is enjoined from, or otherwise ceases, enforcing their unconstitutional policy, practice, and custom of using indiscriminate excessive force, including but not limited to the use of tear gas and "less lethal" weapons, irrespective of the individualized conduct of specific

protesters. Specifically excluded from the class are Defendant and any and all of their respective affiliates, legal representatives, heirs, successors, employees, or assignees.

92.

This action has been brought and may properly be maintained as a class action under Federal law and satisfies numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

93.

The Class is so numerous, on information and belief, over 1,000, that joinder is impractical. Maintaining individual actions would create a risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Multiple courts issuing multiple injunctions governing use of force standards for law enforcement would be untenable.

94.

Common questions of law and fact exist as to all members of the class. These legal and factual questions include but are not limited to:

- By engaging in the tactics alleged herein, has Defendant violated the First Amendment?

- By engaging in the tactics alleged herein, has Defendant violated the Fourth Amendment?

- By engaging an unconstitutional pattern, practice, and custom of using indiscriminate excessive force against protesters, has Defendant violated the First and Fourth Amendments?

- Has Defendant exhibited a deliberate indifference to the unconstitutional conduct alleged herein?

- By utilizing indiscriminate force, such as tear gas, pepper spray, and impact munitions, has Defendant unlawfully chilled the speech rights of protesters?

95.

Plaintiffs Robert's, Belden's, Johnson's, Wresckie's, and Dreier's claims are typical of the claims of the class members. The harms Plaintiffs suffered and will suffer, as a result of Defendant's courses of conduct, are typical of the harms suffered by class members. "[T]he party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(1)(A). There is no allegation that Plaintiffs have been targeted because of anything unique to them as individuals.

96.

Plaintiffs Roberts, Belden, Johnson, Wresckie, and Dreier will fairly and adequately protect the interest of the Class.  Plaintiffs have no interests adverse to the interests of the class. Plaintiffs retained counsel with experience and success in the prosecution of civil rights litigation. Counsel for Plaintiffs know of no conflicts among class members or between counsel and class members.

97.

Plaintiffs Roberts, Belden, and Johnson seek injunctive and declaratory relief. Any injunction requiring Defendant to address their constitutional violations would prevent other litigants from seeking a different injunction. Plaintiffs Roberts, Belden, Johnson, Wresckie, and Dreier seek class certification under Fed. R. Civ. P. 23(b)(1).

**FIRST CLAIM FOR RELIEF**
**(Excessive Force – Violation of Fourth Amendment – 42 U.S.C. § 1983 brought on behalf of Plaintiff Don't Shoot Portland Individually and Plaintiffs Roberts, Belden, and Johnson Individually and the Putative Class)**

98.

Plaintiffs restate and incorporate herein all previous paragraphs of this Complaint.

99.

**Count 1: Municipal Liability – Unlawful Practice or Policy Allowing Indiscriminate Use of Force as Tactic to Disperse Crowd.**

The City of Portland has an official policy allowing the use of "riot control" and "less lethal" weapons against a crowd whenever it determines that the crowd creates a "civil disturbance." This policy has no relationship with the *Graham v. Connor* Fourth Amendment standard regulating the use of force against individuals. It expressly allows for the indiscriminate use of force against a crowd of people, including those engaging in passive resistance, in violation of the Fourth Amendment.

Alternatively, even if the policy itself is constitutional, PPB's actual practice and custom is to allow the use of "riot control" and "less lethal" weapons against a crowd both before and after an "unlawful assembly" and/or a "civil disturbance" has been declared, even when a substantial number of people in that crowd, or even the majority of that crowd, are engaged only in the passive resistance to an order.

100.

On a sustained basis and on the majority of dates from May 29, 2020 to November 15, 2020, PPB deployed tear gas and/or other "less lethal" weapons on large crowds of peaceful protesters and continued to deploy tear gas and/or "less lethal" weapons at people running away. Videos documenting the indiscriminate nature of this force deployment are rampant.[8] The City

---

[8] E.g. https://twitter.com/mrolmos/status/1268072714926878720?s=21;

FOURTH AMENDED COMPLAINT

has tacitly and explicitly authorized the use of indiscriminate crowd control munitions on crowds of protesters by justifying uses of similar tactics, including "less lethal" weapons shot indiscriminately into crowds of protesters, at protests on these dates and knew or reasonably should have known this would lead to constitutional violations alleged herein.

The City, acting pursuant to this policy, custom, or practice, unlawfully used force against plaintiffs as alleged above.

101.

**Count 2: Municipal Liability – Action of Policymaking Officials**

The decision to use riot control and "less lethal" weapons against the crowds containing plaintiffs on the majority of dates from May 29 through November 15, 2020 made by officials of the PPB who are sufficiently senior that the decision may fairly be said to represent official policy of the City of Portland. Former PPB Chief Jami Resch was, and PPB Chief Chuck Lovell is the highest level of authority within the PPB, and Mayor of Portland Ted Wheeler, also the Police Commissioner, has acknowledged receiving minute-to-minute reports from PPB of events on the ground at the protest. The decision to use riot control and "less lethal" weapons was made by official policy makers the Chief of PPB and the Mayor of Portland who knew or reasonably should have known this would lead to constitutional violations alleged herein..

102.

**Count 3: Municipal Liability -- Ratification**

The decisions to use tear gas and "less lethal" weapons against the crowds containing plaintiffs on the majority of dates from May 29 through November 15, 2020 was made by incident commanders on scene. As alleged above, these decisions were ratified by the Chief of

---

https://twitter.com/matcha_chai/status/1268043556913987584?s=21

PPB and the Mayor of Portland who knew or reasonably should have known this would lead to constitutional violations alleged therein.

103.

The above-described conduct was a proximate cause of harm to Plaintiffs.

**SECOND CLAIM FOR RELIEF**
**(Violation of the First Amendment – 42 U.S.C. § 1983 brought on behalf of Plaintiff Don't Shoot Portland Individually and Plaintiffs Roberts, Belden, and Johnson Individually and the Putative Class)**

104.

Plaintiffs restate and incorporate herein all previous paragraphs of this Complaint.

105.

Plaintiffs were engaged in constitutionally protected acts of free speech, including public demonstration opposing racism and police violence against Black people. Plaintiffs will continue to do so in the future.

106.

PPB's use of force against Plaintiffs for engaging in First Amendment protected activity and, in an effort, to deter future similar activity, evidences a pattern and practice of unconstitutional conduct that is certain to continue absent any relief.

107.

Plaintiffs reasonably fear the PPB's continued use of tear gas and "less lethal" weapons on protesters, and PPB's acts would, and did, chill a reasonable person from continuing to engage in protected First Amendment Activity.

108.

**Municipal Liability – First Amendment**

The City of Portland has a custom and practice of using militarized force against anti-police protesters, as demonstrated by the use of tear gas and "less lethal" weapons against those protesting outside the Justice Center, a significant symbolic representation of the issues being protested. The Defendants' use of force was intended to punish a group of protesters *en masse* for their political speech, and to deter further similar expressions of speech. The supervisory decision to fire tear gas and "less lethal" weapons indiscriminately into a crowd of protesters demonstrating outside the Justice Center was made in retaliation for the protesters' protected speech condemning the police at the symbolic embodiment of the protest subject matter and to chill the expression of further similar speech.

109.

The supervisors within Defendant who authorized, made, and ratified the decision to attack anti-police demonstrators are sufficiently senior so that their decision can fairly be said to be the official policy of the City of Portland, and they knew or reasonably should have known this would lead to the constitutional violations alleged herein.

110.

The above-described conduct was a proximate cause of harm to Plaintiffs.

111.

As a result of Defendant's unlawful policy and practice, participating in lawful protests against police violence has become more difficult and dangerous. Defendant's conduct has made it substantially more difficult for Don't Shoot Portland to advance and fulfill its mission of organizing, facilitating, and supporting First Amendment activity in support of Black Lives. Moreover, Defendant's unlawful policy and practice has caused damage and destruction to Don't

Shoot Portland's property, which then requires a further diversion of resources to replenish the destroyed property. Don't Shoot Portland diverted its resources to provide additional protective equipment like face and gas masks, hand sanitizer, first aid kits, and other resources to provide relief from the impacts of Defendant's use of tear gas and impact munitions, as well as assistance, including shelter and food to demonstrators and others supporting the protests. Such diversion of these resources diminishes Don't Shoot Portland's ability to advance other projects of Don't Shoot Portland, such as their children's art project and mutual aid efforts in response to COVID-19.

## DAMAGES

As a direct and proximate result of the conduct of the Defendant, Plaintiffs suffered economic and noneconomic damages, including interference with their First Amendment rights, a greater distrust in the PPB and law enforcement in general, fear of increased exposure to the novel COVID-19 virus, emotional distress, physical pain, and discomfort and suffering.

## REASONABLE ATTORNEY'S FEES AND COSTS

42 U.S.C. § 1988(b) allows "the prevailing party . . . a reasonable attorney's fee as part of the costs. . ." in an action brought under 42 U.S.C. § 1983.

Plaintiffs requests that the court grant reasonable attorneys' fees in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs pray for their costs and disbursements incurred herein and for the following in accordance with the proof at trial:

1.     A temporary restraining order, prohibiting the City of Portland from using tear gas as a crowd control measure;

FOURTH AMENDED COMPLAINT

2.      A temporary restraining order, prohibiting the City of Portland from using "less lethal" weapons, including but not limited to OC spray or munitions, impact munitions, LRAD, sound cannons, etc., against protestors who are only engaged in passive resistance, including passive resistance to an order to disperse. In any case where PPB uses less lethal weapons, it must insure that no person who is engaged in only passive resistance is impacted or effected by those weapons.

3.      A permanent injunction, prohibiting the City of Portland from using tear gas as a crowd control measure;

4.      A permanent injunction, prohibiting the City of Portland from using "less lethal" weapons, including but not limited to OC spray or munitions, impact munitions, LRAD, sound cannons, etc., against protestors who are only engaged in passive resistance, including passive resistance to an order to disperse. In any case where PPB uses less lethal weapons, they must insure that no person who is engaged in only passive resistance is impacted or effected by those weapons;

5.      A declaration that Portland Police Bureau's Crowd Control Directive, 0635.10, as written and/or as applied violates the Fourth Amendment to the United States Constitution;

6.      Compensatory damages to Plaintiffs Roberts, Belden, Johnson, Wresckie, and Dreier;

7.      Attorney's fees; and

8.      Any other relief the court deems proper.

**DATED** this 22nd day of June 2021.

                                     *s/J. Ashlee Albies*
                                     **J. Ashlee Albies**, OSB No. 051846
                                     **Whitney B. Stark**, OSB No. 090350

**Maya Rinta**, OSB No. 195058
Albies & Stark LLC

**Jesse Merrithew**, OSB No. 074564
**Viktoria Lo**, OSB No. 175487
Levi Merrithew Horst PC

**Juan C. Chavez**, OSB No. 136428
**Brittney Plesser**, OSB No. 154030
**Alex Meggitt**, OSB No. 174131
**Franz H. Bruggemeier**, OSB No. 163533
Oregon Justice Resource Center

**Attorneys for Plaintiffs**