**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
**Viktoria Lo**, OSB No. 175487
Email: viktoria@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241

**Juan C. Chavez**, OSB No. 136428
Email: jchavez@ojrc.info
**Brittney Plesser**, OSB No. 154030
Email: bplesser@ojrc.info
**Alex Meggitt**, OSB No. 174131
Email: ameggitt@ojrc.info
**Franz H. Bruggemeier**, OSB No. 163533
Email: fbruggemeier@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503 944-2270

**J. Ashlee Albies**, OSB No. 051846
Email: ashlee@albiesstark.com
**Whitney B. Stark**, OSB No. 090350
Email: whitney@albiesstark.com
**Maya Rinta**, OSB No. 195058
Email: maya@albiesstark.com
Albies & Stark LLC
1 SW Columbia St. Suite 1850
Portland, Oregon 97204
Telephone: (503) 308-4770

**Attorneys for Plaintiffs**

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| DON'T SHOOT PORTLAND, a nonprofit corporation, in its individual capacity, NICHOLAS J. ROBERTS, in an individual capacity and on behalf of themselves and all others similarly situated, MICHELLE "MISHA" BELDEN, in an individual capacity and on behalf of themselves and all others similarly situated, ALEXANDRA JOHNSON, in an individual capacity and on behalf of themselves and all others similarly situated, THOMAS DREIER, in an individual capacity and on behalf of themselves and all others similarly situated and LESTER WRECKSIE, in an individual capacity and on behalf of themselves and all others similarly situated, | Case No. 3:20-cv-00917-HZ  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION  ORAL ARGUMENT REQUESTED |
|     Plaintiffs | |
|     v. | |
| CITY OF PORTLAND, a municipal corporation, and MULTNOMAH COUNTY, a political subdivision of the State, | |
|     Defendant. | |

# TABLE OF CONTENTS

LR 7-1 CERTIFICATION.................................................................................................... 1

MOTION ........................................................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

    I.    Viewpoint Discrimination ................................................................................ 4

    II.   PPB's Use of Indiscriminate Weapons ..........................................................13

        A.  June 2 ............................................................................................... 15

        B.  Other Dates ....................................................................................... 18

    III.  PPB's Use of "Less-Lethal Weapons: ...........................................................22

    IV.  The City's Pattern of Officially Sanctioned Behavior.................................... 30

        A.  Unconstitutional Written Policy ...................................................... 30

        B.  Failure to Properly Train ..................................................................31

        C.  Failure to Correct or Retrain When Failure Was Obvious ...........................................33

            1.  FDCRs were inaccurate, incomplete, and/or demonstrated violations of use of force policy on their face .................................................................. 35

            2.  EIS system fails ................................................................................. 41

        D.  Lack of Any Discipline .....................................................................42

            1.  IPR and IA Process............................................................................42

            2.  Administrative closures leave potential violations of PPB Directives unchecked............................................................................43

            3.  IPR and IA did nothing, including for uses of force this Court has found to violate both Directive 1010 ...............................................................45

            4.  IPR and IA are not going to do anything ............................................46

    V.   Plaintiff Nicholas Roberts ................................................................................46

    VI.  Plaintiff Michelle "Misha" Belden ..................................................................50

VII.  Plaintiff Alexandra Johnson ........................................................... 52

VIII. Plaintiff Lester Wrecksie ............................................................... 56

IX.   Plaintiff Thomas Drier .................................................................. 60

ARGUMENT ............................................................................................ 62

    I.   Plaintiffs Satisfy the Requirement of FRCP 23(a) ..................................... 63

        A.  The Proposed Class is Numerous so Joinder of All Members is
            Impracticable ................................................................................ 64

        B.  The Commonality Standard is Met ................................................. 66

        C.  Plaintiffs' Claims Are Typical ...................................................... 71

        D.  The Class Is Adequately Represented ............................................. 73

    II.  Plaintiffs Satisfy the Requirements of FRCP 23(b)(2) ............................... 74

CONCLUSION ......................................................................................... 75

# TABLE OF AUTHORITES

## Cases

*Abay et al v. City of Denver*, Case 1:20-cv-01616-RBJ (D. Col.) .................................................. 63

*Abdullah v. U.S. Sec. Assoc., Inc.*, 731 F.3d 952 (9th Cir. 2013) ........................................... 66, 71

*Alfus v. Pyramid Technology Corp.*, 764 F. Supp. 598 (N.D. Calif. 1991) ................................. 72

*Ali v. Ashcroft*, 213 F.R.D. 390, 408 (W.D. Wash. 2003) ......................................................... 65

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455 (2013) ....................................... 64

*Anti-Police Terror Project v. City of Oakland*, Case 3:20-cv-03866 (N.D. Calif.) .................... 63

*Ariz. Students' Ass'n v. Ariz. Bd. Of Regents*, 824 F.3d 858 (2016) ........................................... 13

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) ..................................................................... 72

*Ballew v. City of Chicago*, Case 1:20-cv-03422 (N.D. Ill.) ........................................................ 62

*Black Lives Matter v. City of Indianapolis*, Case 1:20-cv-01660 (S.D. Ind.) .............................. 63

*Black Lives Matter Los Angeles v. City of Los Angeles*, Case 2:20-cv-05027
    (C.D. Calif.) ....................................................................................................... 62, 63

*Black Lives Matter Seattle-King County et al v. City of Seattle*, Case 2:20-cv-00887-
    RAJ (W.D. Wash.) ................................................................................................. 62

*Chang v. United States*, 217 F.R.D. 262 (D.D.C. 2003) .............................................................. 64

*Civil Rights Educ. & Enf't Ctr. v. Hosp. Props. Tr.*, 317 F.R.D. 91 (N.D. Cal. 2016) ............... 65

*Cohen v. California*, 403 U.S. 15 (1971) ..................................................................................... 13

*Cooper Co. Inc. Sec. Litig.,* 254 F.R.D. 628 (C.D. Cal. 2009) ..................................................... 64

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ................................................... 72

*Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015 (9th Cir. 2012) ...................................... 71

*Gaffett v. City of Oakland, et al.*, 3:21-cv-02881 (N.D. Calif.) .................................................. 63

*Giles v. St. Charles Health Sys., Inc.*, 294 F.R.D. 585 (D. Or. 2013) .......................................... 66

*Goyette v. City of Minneapolis*, Case 0:20-cv-01302 (D. Minn.) ................................................. 62

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) .................................................... 66, 67

*Hanon v. Dataprods. Corp.*, 976 F.2d 497 (9th Cir. 1992) .................................................... 72

*Hartman v. Duffey*, 19 F.3d 1459 (D.C. Cir. 1994) ................................................... 72

*Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125 (9th Cir. 2002) ....... 25, 31, 32, 33

*Hernandez v. Lynch*, 2016 WL 7116611 (C.D. Cal. Nov. 10, 2016) ........................................... 71

*Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161 (9th Cir. 2014) ....................................... 67

*LaDuke v. Nelson*, 762 F.2d 1318 (9th Cir. 1985) ....................................... 72

*Lerwill v. Inflight Motion Pictures*, 582 F.2d 507 (9th Cir. 1978) ................................................ 73

*Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013) ................................................. 63

*Lynch v. Rank*, 604 F. Supp. 30 (N.D. Cal. 1984), aff'd, 747 F.2d 528 (9th Cir. 1984) .............. 65

*Lyon v. ICE*, 308 F.R.D. 203 (N.D. Cal. 2015) ....................................... 74

*Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997) ....................................... 72

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) ................................................. 66

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ................................................. 13, 33

*Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620 (5th Cir. 1999) ........................................ 72

*Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 246 F.R.D. 621 (C.D. Calif. Dec. 14, 2007) ....................................... 64, 75

*Murphy v. Precision Castparts Corp.*, 2018 U.S. Dist. Lexis 108252 (D. Or. June 6, 2018) ....................................... 67

*Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) ................................................. 25

*Nunez v. City of San Diego*, 114 F.3d 935, 944, 949 (9th Cir. 1997) ........................................... 4

*Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 188 F.R.D. 365 (D. Or. 1998) ....................................... 64

*Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014) ....................................... 66, 67

*Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010) ...................................................................75

*Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992) ...................................................................72

*Rosas v. Baca*, 2012 WL 2061694 (C.D. Cal. June 7, 2012) .......................................................67

*Saravia v. Sessions*, 280 F. Supp. 3d 1168 (N.D. Cal. 2017) ......................................................65

*Smith v. Heckler*, 595 F. Supp. 1173 (E.D. Cal. 1984) ...............................................................65

*Sullivan v. Murphy*, 478 F.2d 938 (D.C. Cir. 1973) ...................................................................64

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .......................................................66, 69, 74

*Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998) ...................................................................71, 74

*Washington Mobilization Committee v. Cullinane*, 400 F. Supp. 186 (D.D.C. 1975) .................64

*Williams v City of Minneapolis*, Case 0:20-cv-01303 (D. Minn.) .................................................62

*Williams et al v. City of Dallas Texas et al*, Case 3:20-cv-01526-L (N.D. Tex.) ........................62

*Yahoo Mail Lit.*, 308 F.R.D. 577 (N.D. Cal. 2015) ...................................................................74

*Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011) .................................................25

**Statutes**

ORS 131.675 ...........................................................................................................................38

**Rules and Regulations**

Fed. R. Civ. R. 23 ...............................................................................................................*passim*

Fed. R. Civ. R. 30 .....................................................................................................................13

**Other**

PPB Directive 635 ...............................................................................................................*passim*

PPB Directive 1010 .............................................................................................................*passim*

## LR 7-1 CERTIFICATION

Undersigned counsel hereby certifies that they conferred with counsel for defendants on many occasions, over the course of months in a good-faith attempt to resolve this issue without filing a motion but were unable to do so. Counsel for defendants contests each and every element of class certification for each and every class and sub-class.

## MOTION

Plaintiffs Don't Shoot Portland, Nicholas Roberts, Michelle "Misha" Belden, Thomas Dreier, Lester Wrecksie, and Alexandra Johnson and a class of similarly situated individuals, hereby move for an order certifying the following class and subclasses:

1. General class for purposes of the First Amendment claim: all people who have engaged and will engage in the future in protest activities that follow the death of George Floyd opposing police violence and white supremacy, and all people who would like to engage in such protests but have not due to fear of being subjected to unlawful force by the Portland Police Bureau.

2. Indiscriminate weapons subclass for purposes of the Fourth Amendment claim: This is a subclass of the general class which only includes protestors who were subjected to tear gas and rubber ball distraction devices by the PPB. This subclass includes protestors who were engaging in passive resistance to the orders of police at the time force was used, and those that attempted to comply with the orders of the police, but does not include those who were engaging in conduct beyond passive resistance at the time force was used.

3. Targeted weapons subclass for purposes of the Fourth Amendment claim: This is a subclass of the general class which only includes protestors who were subjected to "less lethal weapons" (FN303 launchers, 40 mm launchers, batons, and aerosol restraints)

while engaged in protest activities. This subclass includes protestors who were engaging in passive resistance to the orders of police at the time force was used and those that attempted to comply with the orders of the police, but does not include those who were engaging in conduct beyond passive resistance at the time force was used.

Plaintiffs seek to have this case certified as a class action pursuant to Fed. R. Civ. P. 23(b)(2) so that the claims of thousands of class members may be resolved in one fair and efficient proceeding.   Certification is appropriate under Fed. R. Civ. P. 23(b)(2) because the class is so numerous that joinder of all members is impractical, there are questions of law and fact common to the class, the claims of the representative parties are typical of the claims of the class, and the representative parties will fairly and adequately protect the interests of the class. All of Plaintiffs' claims and the claims of the proposed class members arise out of a common nucleus of operative facts: PPB's unlawful response to the protests. PPB's practice of using excessive force against protestors and their unlawful motivation for doing so makes injunctive relief appropriate respecting the class as a whole.

Plaintiffs respectfully request that the Court certify the case as a class action; appoint Plaintiffs Roberts, Belden, Dreier, Wrecksie, and Johnson as the class representatives, and appoint Plaintiffs' counsel as class counsel.

For the reasons discussed below, the Rule 23 prerequisites for class certification have been satisfied, and class certification is appropriate.

## STATEMENT OF FACTS

On May 25, 2020, George Floyd was murdered by Minneapolis Police Officer Derek Chauvin. The murder was video recorded by a bystander and quickly went viral around the world. In Portland, Oregon, like in many other cities around the country and the world, thousands of

people took their demands for radical changes to the nature of policing to the streets. Demanding an end to white supremacy and the police departments that uphold it, people rallied and marched through Portland streets, expressing their anger, their sorrow, and their frustrations.

Beginning on May 29, 2020, the PPB responded to these calls for change—which also included explicit demands to end their jobs and careers—with a campaign of widespread violence. PPB's treatment of these demonstrators protesting white supremacy and police violence was brutal, but well in line with how the agency has historically treated such viewpoints. Over about 100 days of active daily and nightly protest demonstrations, an estimated tens of thousands of these demonstrators were met with more than 300 deployments of "tear gas," a chemical weapon banned for use in warfare. PPB also subjected people to additional indiscriminate weapons, such as flashbang grenades, as well as so called "less lethal" weapons. They did this to thousands of people who, like plaintiffs, were doing nothing more than standing in the street after being ordered to leave.

PPB's unlawful conduct is a result of a multitude of failures within the bureau and the City, many of which were known to the City early on, and either intentionally ignored or glossed-over. For example, despite obvious violations and facially unjustifiable uses of force—including many documented by PPB officers themselves—the City failed to properly train, retrain, or provide discipline in response. The City's alleged self-accountability measures, such as the Employee Information System, also failed, and those failures were ignored even when readily apparent. The Independent Police Review system charged with providing accountability was toothless at best, with the Director admitting that, the way PPB's policies and directives are written, IPR would not be able to sustain officers' violations anyway.

In total, PPB engaged in over 6,000 uses of force over the duration of the protests. Yet the City found almost all uses of force were consistent with policy and training—including two incidents for which the Court found the City in contempt of its Temporary Restraining Order. (Defendant refused to provide any discipline for those incidents, either.) Because the City will not, Plaintiffs seek class certification in order to hold PPB responsible for its violent and unlawful conduct against an estimated tens of thousands of people who in the summer of 2020 declared that Black Lives Matter.

## I.    Viewpoint Discrimination

Ample evidence suggests that the PPB's response to left-wing protests against white supremacy and police violence was motivated by the PPB's strong disagreement with the message of those protests. In particular, many protestors strongly advocated for either the abolition, defunding, or disbandment of the PPB. Many protestors made direct comparisons between individual members of the PPB to nazis, members of the KKK, and other white supremacists. It was these protests exclusively to which PPB responded with violence.

On June 1, 2020, Mayor Ted Wheeler issued a Declaration of Emergency Curfew.[1] Wheeler's curfew gave law enforcement the authority to arrest people outside after curfew, but carved out exceptions for almost all types of activities except participation in protests. Despite clear constitutional law prohibiting curfews that unreasonably burden First Amendment activities, Wheeler's office made it clear that the curfew was explicitly meant as a tool for police to target people engaged in demonstrations. *See Nunez v. City of San Diego*, 114 F.3d 935, 944, 949 (9th Cir. 1997).

---

[1] See Office of Mayor Ted Wheeler, City of Portland, "Declaration of Emergency Curfew" (June, 1, 2020) https://www.portland.gov/sites/default/files/2020-06/signed-emergency-order-curfew-june-1-2.pdf.

PPB responded with emboldened violence against demonstrators voicing opposition to white supremacy and police brutality. PPB's violent response to those demonstrating is consistent with its response to similar protestors prior to 2020. For example, on November 26, 2014, during a Portland demonstration following the grand jury decision not to indict Officer Darren Wilson who shot and killed Black teenager Michael Brown in Ferguson Missouri, PPB clad in riot gear blocked the demonstrators from marching on certain roadways, pushed and shoved them with batons, and subjected demonstrators to pepper spray and arrest.[2] On January 20, 2017 during an anti-Trump demonstration, PPB subjected hundreds of nonviolent demonstrators (and journalists) *en masse* to flash-bang grenades, tear gas, FN303s, and other munitions.[3] On February 20, 2017, during another anti-Trump demonstration, on multiple occasions, PPB rushed groups of nonviolent demonstrators, tackling them, pepper spraying demonstrators in the face, firing FN303s, and also arrested 13 demonstrators accused of standing in the street.[4] Mayor Wheeler later acknowledged PPB's response to the demonstrators that day was a "mistake."[5]

PPB's violent response to those demonstrating against white supremacy and police brutality is starkly contrasted by its different and more favorable treatment of right-wing, neo-

---

[2] KGW STAFF, *Ferguson Protest Turns into Rolling Clashes with Police*, KGW 8 (Nov. 26, 2014) available at https://www.kgw.com/article/news/local/ferguson-protest-turns-into-rolling-clashes-with-police/318091109; Miller Resor, *Photos: Portland Protests Michael Brown's Death*, WILLAMETTE WEEK (Nov. 26, 2014) available at https://www.wweek.com/portland/blog-32517-photos-portland-protests-michael-browns-death.html.

[3] Doug Brown, *Police Blasted and Tear Gassed an Inauguration Day Protest*, PORTLAND MERCURY (Jan. 25, 2017) available at https://www.portlandmercury.com/news/2017/01/25/18814554/police-blasted-and-tear-gassed-an-inauguration-day-protest.

[4] Doug Brown, *Mayor Ted Wheeler: Monday's Police Response to Trump Protest a "Mistake,"* PORTLAND MERCURY (Feb. 21, 2017) available at https://www.portlandmercury.com/blogtown/2017/02/21/18856914/mayor-ted-wheeler-mondays-police-response-to-trump-protest-a-mistake.

[5] *Id.*

fascist, white supremacist demonstrators such as Proud Boys and Patriot Prayer members and supporters. Joey Gibson is a right-wing extremist with a history of organizing "free speech" events in Portland (among other places) meant to spew hate speech, incite violence, and antagonize anti-fascist and anti-racist protestors.[6] Patriot Prayer and Proud Boys members and supporters constitute and have close connections with fascists, known neo-nazis, and white supremacists,[7] and have been open about their purpose and intent to engage in violence during their demonstrations.[8] Despite this, PPB typically targets not the Proud Boys or their supporters, but rather the counter-demonstrators for force and arrest.

On April 29, 2017, Gibson organized a "March for free speech" rally at Montavilla Park.[9] Attendees included Trump supporters, someone who brought a Confederate flag, someone who brought a sign mocking Jewish people, and Jeremy Christian armed with a baseball bat who gave

---

[6] Molly Enking, *Right-Wing Rally, Counter-Protestors Face off in Portland*, PBS NEWS HOUR (Aug. 4, 2018), available at https://www.pbs.org/newshour/nation/portland-police-city-officials-prepare-for-right-wing-rally-and-counter-protest.

[7] *See, e.g.,* SOUTHERN POVERTY LAW CENTER, *Extremist Files - Proud Boys*, available at https://www.splcenter.org/fighting-hate/extremist-files/group/proud-boys (last accessed Jan. 7, 2022); KOIN 6, 'Pinochet Did No Wrong': Who is Pincohet? https://www.koin.com/local/multnomah-county/pinochet-did-no-wrong-who-is-pinochet (Aug. 4, 2018) (Patriot Prayer leader Tusitala "Tiny" Toese wearing a shirt that read "PINOCHET DID NOTHING WRONG")

[8] Molly Enking, *Right-Wing rally, Counter-Protestors Face off in Portland*, PBS NEWS HOUR (Aug. 4, 2018), available at https://www.pbs.org/newshour/nation/portland-police-city-officials-prepare-for-right-wing-rally-and-counter-protest (quoting Gibson's saying on a social media livestream, "We've always had guns at the rally. I cannot think of one rally where we didn't have guns. Everywhere we go, we have guns"); *see also,* David D. Kirkpatrick and Alan Feuer, *Police Shrugged off the Proud Boys, Until They Attacked the Capitol,* The New York Times (published Mar. 14, 2021; updated Aug. 23, 2021) available at https://www.nytimes.com/2021/03/14/us/proud-boys-law-enforcement.html (also referencing Proud Boys leaders Joeseph Biggs' and Enrique Tarrio's Portland rallies).

[9] Doug Brown, *Photos & Video: Saturday's Right Wing march, Left Wing Protest in Montavilla.* PORTLAND MERCURY (Apr. 29, 2017) available at https://www.portlandmercury.com/blogtown/2017/04/29/18983985/photos-and-video-saturdays-right-wing-march-left-wing-protest-in-montavilla

a nazi salute and yelled racist slurs such as "fuck all you [n-word]." [10] The right-wing demonstrators marched for more than two miles down SE 82nd Avenue, after which the City then provided TriMet buses to take them back to Montavilla Park.[11] PPB did not subject the right-wing demonstrators to similar uses of force alleged in this case, and the only arrests made were of three counter-protestors.[12]

On May 26, 2017, Jeremy Christian stabbed three people who had intervened to stop his racist harassment of two Black women on a MAX train, killing two.[13] Nine days later, on June 4, 2017, Gibson and Patriot Prayer held a "Free Speech Rally" in downtown Portland at Terry Shrunk Plaza, which was attended by open white supremacists and for which security was provided by the Oath Keepers, a right-wing private paramilitary organization.[14] Counter-protestors demonstrated against the rally in the surrounding areas, including in Chapman Park.[15] PPB treated the counter-demonstrators differently and worse that day, including providing the alt-right protestors a safe exit out of Terry Shrunk Plaza but conducting a mass detention of approximately 150 counter-demonstrators in Chapman Square.[16] PPB's more favorable treatment of the right-wing protestors

---

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] Meerah Powell, *Women Assaulted Day Prior to MAX Train Killings Testifies in Trial*, OPB (Jan. 31, 2020) available at https://www.opb.org/news/article/portland-oregon-max-train-killings-jeremy-christian-trial-day-4/

[14] OPB Staff, *Dueling Protest rallies Turn Chaotic in Wake of TriMet Stabbings,* OPB (June 4, 2017) available at https://www.opb.org/news/article/rallies-expected-to-draw-huge-crowds-following-max-stabbings/

[15] Karina Brown, *Right-Wing Protestors Assemble in Downtown Portland, Hugely Outnumbered,* Willamette Week (June 4, 2017) available at https://www.wweek.com/news/2017/06/04/right-wing-protestors-assemble-in-downtown-portland-hugely-outnumbered/

[16] AMERICAN CIVIL LIBERTIES UNION OF OREGON, *Report and Recommendations to Independent Police Review Regarding Portland Police Bureau's Response to the June 4, 2017 Protests*, p.8-10, available at https://aclu-

was reflected both in PPB's conduct towards the different groups of demonstrators, but also directly by officers, including one PPB lieutenant who expreseed the belief that right-wing protestors were "much more mainstream" than the left-wing protestors.[17]

On August 4, 2018, Gibson and Patriot Prayer staged another rally in Portland at Tom McCall Waterfront Park.[18] Patriot Prayer attendees included openly armed demonstrators acting as "guards."[19] PPB did not subject Patriot Prayer/Proud Boys demonstrators to force, nor did PPB target them for arrest—even when police found several Patriot Prayer members on top of a downtown Portland building adjacent to counter-demonstrators staging a sniper post with a cache of guns.[20] However, PPB did subject the counter-demonstrators to force, ordering them to disperse and then launching an assault which hospitalized three people, including one counter-demonstrator who suffered a head injury when a flashbang grenade struck the back of his head, lodging into a helmet he was wearing.[21] Then-PPB Chief Danielle Outlaw went on a conservative talk-radio

---

or.org/sites/default/files/field_documents/aclu_or_ipr_report_on_june_4_protests.pdf (also documenting other examples of PPB's "Bias/Selective Enforcement").

[17] Katie Sheperd, *Portland Police Saw Right-Wing Protestors as "much More Mainstram" Than Leftist Ones*, WILLAMETTE WEEK (June 27, 2019) available at https://www.wweek.com/news/courts/2018/06/27/portland-police-saw-right-wing-protestors-as-much-more-mainstream-than-leftist-ones/.

[18] Katie Shepherd, *Protestors Seeking Clash on Portland Waterfront Met by Army of Riot Cops*, Willamette Week (Aug. 4, 2018) available at https://www.wweek.com/news/2018/08/04/protestors-seeking-clash-on-portland-waterfront-met-by-army-of-riot-cops/

[19] *Id.*

[20] Gordon R. Friedman, *Armed Protestors Were on Portland Rooftop in August, Police Now Say*, The Oregonian/OregonLive (published Oct. 15, 2018, updated Jan. 29, 2019) available at https://www.oregonlive.com/portland/2018/10/armed_protestors_were_on_portl.html

[21] Jim Ryan, Shane Dixon Kavanaugh, Sarah Verschoor, *At Least Three Hospitalized After Saturday Protest; Police Chief Defends Tactics*, THE OREGONIAN/OREGONLIVE (published Aug. 6, 2018; updated Jan. 29, 2019) available at https://www.oregonlive.com/portland/2018/08/portland_police_chief_proteste.html

show and disparaged the counter-protestors for "whin[ing] and complain[ing]" after PPB officers had "kicked [their] butt."[22]

On October 13, 2018, Gibson held another demonstration billed as a march for "law and order" in Portland.[23] Gibson and attendees marched to a street memorial that people had set up for Patrick Kimmons, a Black man shot and killed by PPB.[24] That evening, although Patriot Prayers openly beat counter-demonstrators with fists, bear spray, and batons outside of a popular bar in downtown Portland, PPB made no arrests in its continued "hands off" approach to Patriot Prayer and Proud Boys demonstrators.[25]

Throughout this time, the Proud Boys' open threats and calls for violence at their demonstrations continued unabated. For example, in January 2019, a member of Proud Boys openly threatened to "unmask every [antifascist] son of a bitch that [he came] across," and repeated a quote attributed to Gibson that "behind every blade of grass there is a gun."[26] Gibson also continued to advocate for the assault of antifascist demonstrators and opined that Portland's "streets need to be cleaned up."[27] Yet PPB's pattern and practice of differential and more favorable treatment of these right-wing demonstrators continued.

---

[22] Katie Shepherd, Portland Police Chief Says Protestors Went Off to "Whine and Complain" Last Week Because Officers "Kicked Your Butt," WILLAMETTE WEEK (Aug. 15, 2018) available at https://www.wweek.com/news/courts/2018/08/15/portland-police-chief-says-protestors-went-off-to-whine-and-complain-last-week-because-officers-kicked-your-butt/

[23] Shane Dixon Kavanaugh, *Bear Spray, Bloody Brawls at Patriot Prayer 'Law and Order' March in Portland,* The Oregonian/OregonLive (published Oct. 13, 2018; updated Jan. 29, 2019) available at https://www.oregonlive.com/portland/2018/10/patriot_prayer_flash_march_cal.html

[24] *Id.*

[25] *Id.*

[26] Jason Wilson, *Portland: Far-Right Activist Threatens Mayor as Group Change Tactics*, THE GUARDIAN (Jan. 29, 2019), available at https://www.theguardian.com/us-news/2019/jan/29/portland-violent-rightwing-group-targets-mayor-with-threats.

[27] *Id.*

On August 17, 2019, the Proud Boys held another demonstration in downtown Portland, which was also attended by Proud Boys leaders Joe Biggs and Enrique Tarrio, who flew to Portland from Florida for the rally.[28] Counter-demonstrators protested the Proud Boys rally, including a "Be the Spectacle" protest organized by Popular Mobilization and supported by religious and community groups, with the goal of countering the Proud Boys' hate speech and recruiting efforts.[29] That day, PPB allowed the Proud Boys to march on the roadway over the Hawthorne Bridge, which had been closed to pedestrian and vehicular traffic, and provided no similar allowance for the counter-demonstrators.[30] Instead, PPB subjected counter-protestors to arrest for allegedly blocking traffic—including one counter-protestor who twerked in a bike lane to NWA's "Fuck the Police," and another person who spat on the ground in the direction of the police.[31]

On August 22, 2020, pro-Trump and pro-police demonstrators held a rally in front of the Multnomah County Justice Center, in response to and in opposition to the watershed Black Lives

---

[28] Andy Campbell, *Proud Boys Leader Admits Their Rallies Are for Fighting and Wasting Money*, HUFFPOST (Aug. 22, 2019; updated Aug. 24, 2019) available at https://www.huffpost.com/entry/proud-boys-rallies-portland_n_5d5e9882e4b0dfcbd4893ee5.

[29] Julie Sabatier, *Q&A: PobMob Appeals to 'Everyday Anti-Fascists'*, OPB, Think Out Loud (Aug. 26, 2019) available at https://www.opb.org/radio/article/oregon-portland-popmob-anti-fascism-popular-mobilization/,

[30] Alex Zielinksi, *As Protest Spread Along the Waterfront and Across Bridges, Portland Police Mostly Managed to Keep Protestors Apart*, PORTLAND MERCURY (Aug. 17, 2019) available at https://www.portlandmercury.com/blogtown/2019/08/17/26989070/as-protest-spread-along-waterfront-and-across-bridges-portland-police-mostly-managed-to-keep-protestors-apart.

[31] Maxine Bernstein, *Twerking in a Portland Bike Lane During a Protest: Reasonable Arrest or Not?* THE OREGONIAN/OREGONLIVE (Jun. 3, 2021) available at https://www.oregonlive.com/crime/2021/06/twerking-in-a-portland-bike-lane-during-a-protest-reasonable-arrest-or-not.html; Maxine Bernstein, *Woman Accuses Portland Detective of Targeting Her for Arrest After She Spat Toward Riot Police Control Van*, The OREGONIAN/OREGONLIVE (Apr. 14, 2021) available at https://www.oregonlive.com/crime/2021/04/woman-accuses-portland-detective-of-targeting-her-for-arrest-after-she-spat-toward-police-riot-control-van.html.

Matter demonstrations following the police killing of George Floyd.[32] In stark contrast to its conduct toward protestors all summer, PPB stood idly by while the pro-police demonstrators engaged in open acts of violence, including one pro-police demonstrator who pointed a firearm at the counter-protestors.[33] PPB did not intervene to stop the fighting, did not target anyone for use of force or arrest, and did not even declare a riot.[34] Only after counterdemonstrators drove off the pro-police/pro-Trump demonstrators did PPB declare an unlawful assembly.[35]

To be sure, examples of PPB's differential treatment predates 2014. In 1936, when anti-fascist/anti-war protestors attempted to organize a protest against actual Nazis that were set to visit the City of Portland, PPB arrested the organizers of the planned protests and held them in jail until the Nazis were safely back on their warship days later.[36] This attitude toward Nazis apparently extended at least until 2005 when the City defended the conduct of then-Sergeant Mark Kruger, who erected a memorial on City property to Nazi war criminals.[37] Rather than fire or punish Kruger, the City ultimately promoted him to the rank of Captain.[38] Notably, all of this information

---

[32] Ryan Hass, Sergio Olmos, Bradley W. Parks, *Protestors Fight Using Pepper Spray, Baseball Bats in Portland on Saturday*, OPB (Aug. 22, 2020) available at https://www.opb.org/article/2020/08/22/conservative-protestors-plan-rallies-in-downtown-portland/

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] Silvie Andrews, *The (First) Time Nazis Marched in Portland*, Oregon Historical Society (January 22, 2019) available at https://www.ohs.org/blog/the-first-time-nazis-marched-in-portland.cfm

[37] Maxine Bernstein, *Portland Police Panel Finds Capt. Mark Kruger Brought 'Discredit and Disgrace' Upon The City By Erecting A Memorial To Nazi Soldiers,* The Oregonian/OregonLive (Published Oct. 8, 2010, Updated Jan. 10, 2019) available at https://www.oregonlive.com/portland/2010/10/portland_police_panel_finds_ca.html

[38] *Id.* Kruger's defense of his conduct, which was adopted by the City, is patently preposterous. Arguing on the one hand that he is a "history buff" and on the other that he had no idea he was honoring war criminals is directly contradictory. A student of history would surely know the only historically consequential fact about the men he was honoring.

came out in the context of a lawsuit filed on behalf of anti-war protestors who alleged excessive force by Kruger.[39]

Portland has a rich history of protest. It also has a rich history of fascists and white supremacists attempting to gain a foothold here, including through protest activities. Despite this, there are no examples of the PPB violently cracking down on right wing or fascist demonstrators. The examples of PPB violently cracking down on left-wing demonstrators are legion.

Although plaintiffs have not yet been permitted to engage in discovery related to their First Amendment claim, some support for their claims has been disclosed in other materials. In a training presentation given to every new RRT member the presentation closed with a slide glorifying police violence against left wing protestors:



Schoening Dep. 92:21-94:18; Decl. J. Ashlee Albies, at ¶3, Ex. 27.

---

[39] *Id.*

The evidence above strongly suggests that the campaign of police violence that began on May 29, 2020 was motivated by the goal of silencing advocates for police reform, defunding, and abolition. The pervasiveness of the campaign is evidence enough to suggest the existence of an established practice, policy, or custom of the city of Portland. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Advocating for police reform, defunding, and abolition, in support of the movement for Black Lives, is core protected speech. *Cohen v. California*, 403 U.S. 15, 26 (1971). The campaign of violence by PPB would chill a person of ordinary firmness from continuing to engage in the protected activity. *Ariz. Students' Ass'n v. Ariz. Bd. Of Regents*, 824 F.3d 858, 867 (2016).

## II.    PPB's Use of Indiscriminate Weapons

PPB calls what is commonly referred to as "tear gas" "riot control agents." *See* PPB Directive 1010.6.4.6; Schoening Dep. 26:14-25; Dobson Dep. 51:10-25.[40] This includes all forms of tear gas (OC and CS gas or vapors that are distributed either by compressed air or pyrotechnics). *Id*. PPB also uses so-called "rubber ball distraction device" grenades (RBDDs). These devices are also known to protestors as flashbangs, stun grenades, concussion grenades, and other names. Decl. Alexandra Johnson, at ¶13; *see* also Samantha Matsumoto, What You Need To Know About Flash-Bangs, OPB, August 14, 2018, available at https://www.opb.org/radio/programs/think-out-loud/article/what-is-a-flash-bang/ (stating that flash bangs are also known as stun grenades, include aerial distraction devices, and developed from concussion grenades). PPB characterizes these as "area impact munitions," which are a subset of "distraction devices." *See* PPB Directive

---

[40] Every deposition transcript cited in this memorandum is the deposition of the City of Portland taken pursuant to Fed. R. Civ. P. 30(b)(6). The excerpts cited are all attached to the concurrently filed declaration of Jesse Merrithew. To avoid confusion with the other exhibits, they are cited by the name of the designated deponent for the City and the original page and line number from the transcripts.

1010.6.4.6; Schoening Dep. 24:11-25:06. By its own admission, the City knows that, each and every time they use these devices, people who have not engaged in anything beyond passive resistance will be subjected to the force. Dobson Dep. 56:07-57:11. The City restricts the use of riot control agents and area impact munitions in the same ways under their directives. PPB Directive 1010.6.4.6. Therefore, for purposes of this motion, plaintiffs are categorizing these two types of weapons together as indiscriminate weapons.

The deployment of these indiscriminate weapons was conducted at the direction of the incident command for the purpose of dispersing a crowd. Schoening Dep. 65:13-66:02; 67:02-68:15; Dobson Dep. 52:08-16. According to the City, while individual members were required to conduct their own *Graham* analysis before deploying, they were not permitted to deploy in most instances unless and until the deployment was authorized by incident command. Schoening Dep. 66:16-68:15; Dobson Dep. 62:15-63:19; *see also* PPB Directive 1010.6.4.6.1. They were specifically authorized to use tear gas only in order to achieve tactical goals that were outlined by incident command. *Id*. Incident command, in turn, was applying the City's practice and policy when they decided what the tactical goals were and when tear gas would be authorized in order to achieve those tactical goals. *Id*.; Dobson Dep. 55:04-55:06.  Therefore, if the use of tear gas violated the Fourth Amendment, then it was the City itself that violated the Fourth Amendment on each and every occasion because they were following written City policy or establishing a City practice through their unified approach to these incidents night after night.[41]

---

[41] The City's written policy is facially unconstitutional when it comes to tear gas. The written policy authorizes the use of tear gas "to disperse a crowd, when a demonstration or event becomes a civil disturbance, as defined in Directive 635.10… ." 635.10 defines a civil disturbance as "An unlawful assembly that constitutes a clear and present danger of riot, disorder, interference with traffic upon the public streets or when another immediate threat to public safety, peace or order appears."

Researchers at Portland State University (PSU) documented almost 300 deployments of tear gas by PPB from May 29, 2020 through September 5, 2020. *See Tear Gas Deployment by Portland Police in 2020*, available at http://web.pdx.edu/~cb22/Teargas/Teargasmap.html. According to those researchers, PPB deployed tear gas on 20 different days: May 29, 30, 31, June 1, 2, 5, 6, 13, 26, 27, 30, July 4, 18, August 5, 12, 19, 22, 23, 24, and September 5. *Id*. Three hundred deployments is almost certainly an undercount based upon the discovery provided by defendants to date. Citing this Court's order limiting discovery, defendants provided Force Data Collection Reports (FDCRs) for May 29, 30, 31, June 1, 2, 5, 6, and 27.[42] On those eight days alone, there are 64 FDCRs documenting the use of tear gas. The vast majority of those 64 FDCRs document multiple deployments of tear gas. Albies, at ¶¶4-5.

A.    **June 2**

To take June 2, 2020, as one example, PPB deployed tear gas and RBDDs throughout downtown Portland for over two hours. Decl. Franz Bruggemeier, at ¶4, Ex. A. In a single live stream video from that night, dozens of tear gas and RBDD deployments are apparent. *Id*. The video shows dozens of people being gassed while fleeing the police along with many apparently uninvolved motorists being gassed while stuck in their cars.

There are twelve FDCRs provided by the City that document the use of tear gas on June 2. Albies, at ¶6, Ex. 28. Those twelve FDCRs, from twelve different PPB officers, document the use of at least 67 canisters of tear gas. *Id*. "At least" because several officers did not specifically state how many canisters they deployed, using the words "multiple" or "several." *Id*. 67 is a conservative

---

[42] In addition, the City provided emails sent by Incident Commanders summarizing the prior nights' activities for the nights of August 4, 10, 13, 15, 16, 22, 23, and September 5. Those documents confirm that PPB used tear gas on August 22, 23, and September 5, but we have not been provided with any detailed justification for the uses of tear gas on those dates.

estimate. When the officers gave target crowd size estimates for their uses of tear gas, they ranged

from 50 to 500. *Id*. The description given by Officer Haase for the use of four canisters of CS gas

is more detailed than many, but still typical of the justifications given over and over for the use of

tear gas:

> After being deployed to downtown Portland for a group of protestors numbering over 500 strong who were confronting officers at SW 5th and Salmon, Delta Squad took up position at SW 4th and SW Taylor, forming a skirmish line across the street facing west. A plan was made to try and disperse the group of protestors who were now violent and hostile toward the police officers who were manning fences at SW 4th and SW Salmon. The plan (using Delta and other RRT squads) was to try and disperse the group of protestors to the west and not allow them to go back to Pioneer Courthouse Square where the peaceful protest was still occurring. PPB wanted to make sure that the peaceful protest could continue without police interference or the violent protestors returning bent on confrontation.
>
> A/SGT Kammerer asked if I had any 40mm CS that I could launch. I informed him that I had 4 remaining on my vest and then no additional. He instructed me to "send it" when the order was given. He wanted the rounds to land in the intersection of SW 5th and SW Taylor (which was part of the plan made with other teams). Once on the skirmish line and facing west, I observed a large group of protestors in the intersection (5th and Taylor) and observed members of the protest throwing several bottles towards the police. Other people from the protest started to form a line in front of us at SW 4th and SW Taylor using bikes and each other to try and form a blockade.
>
> While waiting, I heard the PPB sound truck give several warnings and commands for the group to leave and move away. After each command or warning, the crowd would roar and throw even more objects at the police. After a few more minutes, the command from the IC was given to disperse the crowd. I launched the four CS rounds in succession into the intersection of SW 5th and Taylor. The large plum of CS gas caused several members of the protest to run away. Delta squad advanced west pushing the group of people on SW Taylor to the west as we moved. Other grenadiers used smoke and hand tossed gas to disperse the crowd as well.

*Id*. at 14. Every justification for the use of tear gas in the FDCRs from June 2 relies upon some

version of the "hostile crowd." Consistent with the City's policy and practice ignoring the number

of passively resisting protestors will be gassed, none of the FDCRs make any attempt to draw

distinctions among members of the "crowd," punishing everyone in the crowd based upon the

actions of a few. *See* Dobson Dep. 55:04-56:06. Declarations from the protestor and neutral

observer witnesses paint a more harrowing picture of the violence perpetrated by PPB that day.

Adrian Butera-Smith describes participating in a large march on June 2 in support of Black

Lives Matter that arrived at the courthouse downtown. Decl. Adrian Salvatore Butera-Smith, Dkt.

5, ¶¶4-5. Butera-Smith describes peacefully chanting by the fence erected outside the courthouse

when the police started gassing the protestors and shooting them with rubber bullets.  Butera-

Smith, at ¶¶7-9. Butera-Smith then describes many protestors running away, while a group of

about 20 peaceful protestors still standing at the fence was gassed with no way to escape:

> 14. Right before the gas hit me, I turned and heard a woman standing a bit further from
> the barricade scream in agony, "I can't see. I can't see." Then the gas hit my eyes
> and throat. I had nowhere to go. I was afraid of going back to the barricade where
> the police were standing, I was afraid of charging through the dense cloud of tear
> gas the opposite direction. I could not get away. I was scared.
> 15. I, along with other protestors, pleaded with the police behind the wire barricade to
> let us through or safely escort us out so we could get away from the gas. I pleaded,
> asking, "what can we do in this situation? We are cornered in." I received no
> response from the police. I was finally able to get the attention of a female officer.
> I pleaded with her, "there are people in pain." The female police officer said, "if
> you want to go, you go that way" pointing to the dense cloud of tear gas across
> from her.

Butera-Smith, at ¶¶14-15. Additionally, declarants Andy Green, Allyxandra Theus, Daniel

Rushton, Melissa Nel, and Elijah Booth all describe being teargassed on June 2nd while engaging

in peaceful protest and passive resistance. *See* Decl. Andy Green, Dkt. 6, at ¶¶3-7, 10-11; Decl.

Allyxandra Theus, Dkt. 11, at ¶¶3, 9-12; Decl. Daniel Rushton, Dkt. 10, at ¶¶10-15; Decl. Melissa

Nel, at ¶¶5-10; Decl. Elijah Booth, at ¶15.

Although the City uses the actions of individuals to justify its indiscriminate attacks on

whole crowds of people, the true goal was explicit—to end the protests. In fact, on June 2nd, PPB

repeatedly made announcements revealing that its members' use of force against people was in

direct response to failure to leave the protest, not any individual conduct. Several video and audio

recordings from June 2 include announcements by PPB stating, "This is the Portland Police Bureau. This is a civil disturbance and we have declared this to be an unlawful assembly. Leave the area now or you will be subject to uses of force including riot control agents and impact munitions. LEAVE NOW."  Bruggemeier, at ¶34, Ex. AH, AJ, AK, AL. Another announcement stated, "This is the Portland Police Bureau. Pioneer Square is closed. You must leave now or you will be subject to use of force." *Id*., at ¶35, Ex. AM. Videos from June 2nd reveal protestors scrambling to run away as they are followed down the streets of downtown by police in riot gear shooting tear gas canisters, flashbangs, and impact munitions. *Id*., at ¶4, Ex. A. Downtown Portland resembles a war zone with only one active army – the PPB – chasing fleeing civilians.

### B.    Other Dates

On other dates as well, PPB subjected numerous people to tear gas indiscriminately, including protestors who were simply standing there and not engaged in any conduct beyond passive resistance. *See* Decl. Brittany Bezdek, Dkt. 4,¶¶ 10, 11 (describing peacefully protesting in Chapman Park when the police launched tear gas into the park without warning); Decl. Hari Khalsa, Dkt. 7 (describing standing peacefully with a crowd of demonstrators where "tear gas spread everywhere around me almost immediately"); Decl. Haley Loring Dallas, Dkt. 124; Decl. Maggie Sisco, Dkt. 60; Decl. Gillian Herrera, Dkt. 58, ¶ 8; Decl. Akash Sharma, Dkt. 117; Decl. Dylan VanWeelden, Dkt. 128, ¶¶ 6, 7, 8; Bruggemeier, at ¶¶ 4, 8, 9, Ex. A, F, G.

On numerous occasions, protestors were tear gassed while they were in retreat or complying with police instructions to leave the area. *See* Decl. Mara Kruzewski, Dkt. 8 (describing being trapped in tear gas as police threw tear gas and flash bangs into the crowd and in the direction police had directed protestors to retreat to); Decl. Bradie Nicole Winders, Dkt. 13, ¶13 (declarant turned from the police to retreat and then, without warning, was shot with tear gas); Decl. Katarina

Haas, Dkt. 127, ¶15 (describing how police shot tear gas over the crowd, forcing declarant and other protestors to run through the tear gas in order to get away from the police); Bezdek, Dkt. 4, ¶12 (describing being forced to run through tear gas to get away from the police); Decl. Gabriel Trumbly, Dkt. 25, ¶¶12, 13 (describing how police shot tear gas over their head, trapping declarant between the police line and the tear gas); *see also* Decl. Kevin Wilbanks, Dkt. 12, ¶15; Butera-Smith, Dkt. 5, ¶13, 15; Decl. Thaddeus O'Connell, Dkt. 63, ¶8; Decl. Scarlett Passmore, Dkt. 118, ¶11; Khalsa, Dkt. 7, ¶16; Decl. Chase Lingelbach, ¶10; Decl. Kathleen Mahoney, ¶15 (ACLU legal observer); Bruggemeier, at ¶¶ 4, 7, 8, 10, Ex. A, D-F, H.

Police also shot tear gas canisters directly into crowds of people, causing physical injury from the canisters. Khalsa, Dkt. 7, ¶¶16-20 (declarant was hit in the shin with a tear gas canister which caused a deep gash that bled for 48 hours). In addition, PPB subjected nonviolent protestors to flash bang grenades, even when protestors were complying with instructions. Wilbanks, Dkt. 12, ¶¶ 9, 14 (indiscriminate use of tear gas, flash bang grenades, and rubber bullets on the crowd; continued police use of tear gas and flash bang grenades when declarant was complying with police directions to move); O'Connell, Dkt. 63, ¶¶6-7 (police fired rubber bullets and flash bangs at declarant and other protestors before giving time to comply with an order to disperse); Decl. Princess Unicorn, Dkt. 62, ¶6; Kruzewski, Dkt. 8; Trumbly, Dkt. 57; Mahoney, ¶11 (ACLU legal observer declarant saw police throw flash bang grenade into a crowd of protestors complying with orders to disperse).

Police use of flash bang grenades directly into the crowd also caused physical injury from the mechanism hitting or exploding on people. *See* Decl. Camila Ruth Kaplan, Dkt. 49 ¶¶9-11 (declarant hit in the leg with a flash bang grenade while backing up in retreat and not engaged in active aggression); Decl. Benjamin Ficklin, ¶¶3-10 (describes trying to leave the protest in

compliance with a dispersal order, walking past a line of officers, one officer making eye contact with declarant before throwing a flashbang directly at the declarant, the flashbang bouncing on the ground and hitting declarant in their chest); Decl. Lester Wrecksie, at ¶16; Bruggemeier, at ¶11, Ex. J (flashbang explodes on or near Wrecksie while he is still or moving slowly as directed by PPB).

The PPB's own FDCRs support the above witnesses' accounts. For example, on May 30, an officer describes deploying OC gas and smoke to the rear of a crowd to prevent them from pushing back towards officers. Albies, Ex. 29, p. 3**.** That same night, an officer describes using RBDDs on "a crowd of individuals (100+) running away in order to disperse them." *Id*., at Ex. 30, p. 3. On May 31, an officer describes protestors wearing "bandanas, gas masks, respirators, goggles, face masks for snorkeling or scuba diving, and other clothing" as indicating the individual wishes to engage in aggressive behavior towards the police, and notes the use of CS gas on the crowd without identifying any individuals conduct with particularity. *Id.*, Ex. 31, p. 4.

On June 6, an officer noted "The impetus of this protest was based in anti-police sentiment. Therefore, the vast majority of individuals within the crowd were hostile to police." *Id*., at Ex. 32, p. 1; *see also* Ex. 33, p.1 (same officer using same description for June 8, 2020 protest). The officer used RBDDs to "motivate the group to break up and leave the area" but articulates no threat by individuals who were facing away from the police. *Id*., at Ex. 32, p. 3;  Ex. 33, p.3 (same officer using RBDDs on a crowd of an estimated 100 individuals on June 8, 2020 with the stated intent "to motivate the crowd to disperse without requiring officers to pursue them on foot"). Later, the officer encounters 150 protestors walking westbound on SW Broadway/SW Washington St., and wrote:

> [I]t was reasonable to believe they had been a part of the gathering near the Justice Center and it was equally reasonable to assume there was no justification for them

> to be marching in the exclusion zone outlined by multiple PPB Sound Truck broadcasts (SW Lincoln to W Burnside and SW Naito Pkwy to SW 13th Ave). We called out loudly to the crowd to leave the area and go home, to parrot the verbiage from the Sound Truck admonishments. The members of the crowd did not acknowledge us and continued at the same walking pace. Sergeant Pool announced we were going to motivate the group to break up and leave the area. He and I both deployed RBDDs alongside the crowd before the squad was ordered off the rails to pursue crowd and take custodies.

*Id.*, at Ex. 32, p.3. Likewise, an officer describes deploying OC vapor near a vehicle allegedly supplying protestors with shields and projectiles to prevent people from approaching the truck. *Id.*, at Ex. 34, p. 4. That same night, officers deployed an RBDD against a crowd of over 300 people. *Id.*, at Ex. 35, pp. 4, 6. Three RBDDs were used against "a large group of protestors" to "help motivate the crowd to disperse." *Id.*, at Ex. 36, p. 2. Another officer noted he had probable cause to arrest all subjects he used force against for crimes ranging from disorderly conduct to interfering with a police officer, so after "[m]ultiple warnings were given telling people to disperse," and force warnings given over the loudspeaker from the sound truck, he "deployed a canister of smoke, and two RBDDs (Rubber Ball Distraction Device) to encourage people to disperse without using further force." *Id.*, at Ex. 37, p. 1-2; *see also* Bruggemeier, ¶¶ 4, 5, 9, 10, 30, Ex. A, B, G, H, AC.

> On June 19, an officer describes

> As we were moving the crowd of agitated protestors westbound I observed that many protestors were attempting to bait us into a force event by deliberately walking as slow as humanly possible while another protestor would attempt to video. This tactic of police baiting has been utilized several times over the last few weeks... In an effort to protect the officers on the line and try to disperse the crowd I placed one rubber ball distraction device (RBDD) about five feet from the crowd of protestors. When the RBDD detonated the crowd began to move westbound and a slightly faster pace.

*Id.*, at Ex. 38, p. 3.

This evidence shows a clear pattern where PPB is using these indiscriminate weapons indiscriminately on crowds of people for the sole purpose of dispersing them. As will be shown in section IV, infra, this pattern of behavior was officially sanctioned by the City.

## III.    PPB's Use of "Less-Lethal Weapons"

On a nearly nightly basis for over 100 days, PPB used four "less lethal" weapons against protestors: the 40 mm launcher,[43] the FN303 launcher,[44] hand-held OC spray canisters,[45] and police batons. These weapons are collectively referred to as "less-lethal weapons" throughout this motion. The sheer scope of the amount of times PPB resorted to these weapons during the 2020 protests is difficult to illustrate. According to the USDOJ and City estimates, PPB used force over 6,000 times during these protests. Albies, at ¶9, Ex. 70, p. 5. Just from the tort claim notices (TCNs) and lawsuits filed regarding PPB use of impact munitions during crowd control exclusively regarding the limited dates subject to discovery in this lawsuit, fifteen individuals allege that PPB used impact munitions against them following passive resistance. Decl. Madeline Kay, ¶¶5, 9-34. Neutral observers witnessed more instances than they can count. *See generally,* Decl. James Comstock; Decl. Anastasia Brownell; Decl. James Mapes; Mahoney.

---

[43] The 40 mm launcher is also the weapon system that is used to launch the pyrotechnic tear gas canisters described above. For purposes of this sub-class, we are only talking about the 40 mm when it was used as an impact weapon to launch so-called "sponge rounds," "rubber bullets," or "marking rounds."

[44] The Court heard testimony on the capabilities of the FN303 and the specific types of munitions that PPB uses in the FN303 during the contempt hearing. For purposes of this motion, the different types of munitions used in the FN303 make no substantive difference. The FN303 is used only as an impact weapon and is considered, both by PPB directive and the Fourth Amendment, to be a similar use of force no matter what munition is loaded.

[45] As is evident from the name, we are referring here only to the individual cans of OC spray that individual PPB members carry, designed to be sprayed in short blasts to the subject's face. OC is sometimes incorporated in various types of tear gas munitions described above, designed to be broadcast over a larger area. We do not categorize that use of OC as a "less-lethal weapon" for purposes of this motion.

In addition, dozens of individuals have come forward revealing that PPB targeted protestors with less lethal weapons following nonviolent protest activity and at most passive resistance to orders to disperse. These witnesses describe clear patterns of unconstitutional conduct by PPB.

PPB subjected nonviolent protestors to 40mm impact munitions for the purpose of crowd dispersal. Decl. Frederick Garlick, Dkt. 50, ¶14 (shot with a rubber bullet while attending to a young woman who had fallen); Rushton, Dkt. 10, ¶17 (shot with a rubber bullet "while walking away from the area with my hands up"); Butera-Smith, Dkt. 5, ¶¶7- 9; O'Connell, Dkt. 63, ¶¶6-7; Decl. Margot Simon, ¶11; Lingelbach, ¶10; Decl. Mitchell Green, ¶6-8 ("I was standing in front of the justice center observing when I got hit with one rubber bullet in the right arm"); Booth, ¶¶ 7-12; Decl. Maddie Nguyen, ¶5; Kay, Ex. 18 (Dominique Brouchard complaint), Ex. 12 (Robert Evans, Bea Lake, Sadie Oliver-Grey complaint), Ex. 15 (Madeline Kay TCN), Ex. 17 (Alexandra Montgomery complaint); Ex. 19 (Rose Mayer TCN), Ex. 20 (Lydia Fuller complaint); Mapes, ¶¶10-11 (ACLU legal observer, James Mapes, describes observing officers fire off impact munitions while leaving on a riot van); Bruggemeier, at ¶¶ 8, 22, 24, Ex. F, U, W.

PPB subjected protestors to baton strikes, even when demonstrators were in retreat or attempting to move away from the police. O'Connell, Dkt. 63, ¶9; Garlick, Dkt. 50, ¶25 (police shoved protestors with batons as protestors backed away); Decl. Bradie Nicole Winders, Dkt. 13. ¶¶11-12 (describing being trapped between police and other protestors while the police used batons to push, shove, and beat protestors); Lingelbach, ¶6 (describing the declarant and his friend being batoned as they tried to run away from police); Green, ¶¶11-12; Decl. April Fox, ¶6; Ng, ¶¶12, 15; Lucas, ¶¶11, 14, 16; Decl. Shion Oudinot, ¶¶3, 5-6; Decl. Daniel Rushton in Support of Class Certification ("Rushton II"), ¶¶6, 14, 15; Decl. John Wilson, ¶7 (describing an officer running at

him at full speed, striking him with a baton on throat, and being thrown against a parked car and on the ground); Decl. Nina Frick, ¶¶12-14 (describing being hit so hard in the back during a bull rush that she flew 4-5 feet before hitting the ground and losing consciousness); Kay, Ex. 24. (Ted Timmons TCN), Ex. 25 (Elijah Warren TCN), Ex. 21 (Damesha Smith TCN), Ex. 22 (Logan Colwell TCN); Brownell, ¶17; Mapes, ¶12; Mahoney, ¶13, 22-24 (ACLU legal observer declarant struck with a baton, observed PPB shove a person on crutches attempting to get away, observed PPB use batons against people who were slowly walking away in compliance, observed officers shove a person over a highway barrier as the person dangled over I-5 and fell to the sidewalk as officers stepped over him in a bullrush); Bruggemeier, at ¶¶ 5, 6, 12, 13, 23, 25-27, Ex. B, C, K, L, V, X-Z.

PPB indiscriminately subjected protestors to OC spray or "pepper spray," including when protestors were in retreat. Trumbly, Dkt. 57, ¶11; Garlick, Dkt. 50, ¶¶24, 25 (describing officers using OC spray "from right to left" on a line of protestors; officers spraying the backs of people's heads); Kaplan, Dkt. 49 ¶8 (officer sprayed a protestor in the face at close range while they were backing up in retreat); Seaver, ¶ 9; Oudinot, ¶¶6-7; Tupper, ¶¶2, 4, 6-10 (describing going on a walk in his neighborhood, getting stuck behind the police line and trying to get out and seek direction from police on how to leave safely, being shoved and tackled and pepper sprayed in the face); Wilson, ¶¶6, 7-8; Kay, Ex. 24. (Ted Timmons TCN), Ex. 26 (Evan Henshaw-Plath TCN); Mahoney, ¶26. The police's use of OC spray included multiple incidents or removing a protestor's mask or goggles in order to spray them directly in the face. Garlick, Dkt. 50, ¶24 (officer pulled down declarant's mask so the officer behind them could spray declarant with OC); Trumbly, Dkt. 57, ¶11 (witnessed police grabbing goggles off protestors' faces and then spraying pepper spray directly in their eyes); Decl. Teri Jacobs, ¶9 ("officer ripped my protective goggles off my face,

and pepper sprayed me directly in the eyes"); Bruggemeier, ¶¶ 5, 6, 12, 14-19, 21, 31-33, Ex. B, C, K, M-R, T, AD-AG. PPB's use of pepper spray was so indiscriminate that on multiple occasions, officers shot spray through the windows of their moving police vehicles. Wilbanks, Dkt. 12, ¶13; Decl. Lester Wrecksie, ¶32.

PPB used FN303s on nonviolent protestors in order to disperse the crowd. Trumbly, Dkt. 57, ¶12; Nel, ¶¶8-9; Decl. Courtney Margolin, ¶11; Wrecksie, ¶¶19, 23, 34; Kay, Ex. 2 (Dustin Brandon Ferreira TCN), Ex. 16 (Kelcie Ulmer TCN); Mahoney, ¶27. This indiscriminate tactic included shooting FN303s against protestors who were in retreat and walking away from the police. Herrera, Dkt. 58, ¶9 (declarant hit with tear gas, RBDDs, and FN303s while walking away from officers with their arms in the air); Decl. Zack Reinhardt, Dkt. 53, ¶¶14-17; Unicorn, Dkt. 62, ¶6; Mahoney, ¶16; Bruggemeier, at ¶¶ 8, 12, 16, 20, 28, Ex. F, K, O, S, AA.

While contextualizing the breadth and scope of the violence may be difficult to do, understanding the legal rule at issue is simple. It is not permissible to use any of these weapons against passively resistant protestors, ever. *See Nelson v. City of Davis*, 685 F.3d 867, 883 (9th Cir. 2012) (holding that use of impact munitions against non-violent party-goers during chaotic attempt to disperse party violated Fourth Amendment); *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) (holding that any reasonable police officer would know that pepper spraying protestors in order to force them to comply with an order violated the Fourth Amendment); *Young v. County of Los Angeles*, 655 F.3d 1156, 1167 (9th Cir. 2011) (holding that any reasonable police officer would know that using a baton against a person who refused an order to return to his car violated the Fourth Amendment).

PPB repeatedly violated these clear rules, described in detail by witnesses and victims. For example, Elijah Booth describes being shot in the ribs with a rubber bullet after an announcement

that "if you come any closer, we will shoot." Booth, ¶¶7-12. "When I was shot, I was not doing anything threatening. I was passively resisting by moving back but staying in the crowd gathered in that area." *Id*. Margot Simon was demonstrating at the Justice Center on July 25 when some protestors started pulling down the fence. Simon, ¶9. Simon was wearing a yellow hard hat and was not participating in pulling down the fence, but instead was trying to leave the crowd. Simon describes being unable to leave because people were packed in tightly and the police were advancing and deploying tear gas and impact munitions. When Simon ducked for cover behind people holding shields in front of them, they were hit with many rounds of rubber bullets (40mm) and pepper bullets (FN303s). *Id*. at ¶9-13.

Maddie Nguyen describes about 20-30 protestors outside the PPB's east precinct being told to disperse on August 7, winding up at Ventura Park. PPB followed the protestors to Ventura Park and formed a line, with protestors forming a line 20-30 feet away. At most, Nguyen describes that the protestors yelled things at the police. Nguyen was dancing in place, not engaged in any sort of threatening behavior when they were shot in the knee with an impact munition. Decl. Maddie Nguyen, ¶¶3-5.

Amanda Seaver describes just standing to the back of a crowd of protestors, who chanted and pressed on squeaky pig toys, when police began approaching the group of protestors on both sides. Seaver describes being pepper sprayed and brutalized after simply standing in the crowd:

> 9. I saw an officer take out a can of mace and spray at us as I instinctively ducked my head--even while wearing a respirator, in the past, it has caused coughing and sneezing. I was then pulled to the ground by at least one of the officers and dragged across the pavement by my helmet. The helmet strap was pressing against my neck, causing difficulty breathing, pain, inarticulable fear, and an intense anxiety.
>
> 10. I was pulled several feet on the ground while on my side, grasping for my helmet strap to try to remove it. I was then flipped onto my back forcefully and

my hands pulled behind my back. One officer detained me by kneeling on my legs while another zip tied my wrists.

11. The degree to which the zip ties were tightened, as well as the way my wrists were positioned by the officer, caused immediate pain and I started to feel the effects of a lack of circulation. While being walked away from the area I asked if the restraints could be loosened as I was in a high level of pain. "We'll take care of that when it's time," the officer said.

Decl. Amanda Seaver, ¶¶9-12. Although Seaver was arrested and booked, they were released later that night and no charges were ever filed against them. *Id*., at ¶14. After this brutal experience, Seaver is too fearful and intimidated to engage in further protests. *Id*., at ¶15 ("This was the last protest I attended because of the fear and intimidation I feel about the possibility of being assaulted again by Portland Police.")

Carly Ng describes a bull rush and PPB use of batons as a tactic clearly intended to terrify and injure the protestors. Ng, ¶¶12, 15. "When the PPB bull rush started, it felt like pure aggression from the police. They shouted "MOVE," ostensibly to clear the area, but they were running after people and shoving them to the ground, and then continuing to shove and strike them after they were already on the ground. I could see other protestors being hit with batons. It seemed clear to me that PPB's tactics were intended to terrify and injure us, not to actually clear the street. It really scared the crowd and scattered them. People started running. There was an atmosphere of fear and panic. … It appeared to me that PPB were shoving and striking everyone indiscriminately." *Id*. ACLU Legal Observer Kathleen Mahoney describes PPB closing streets off to a march without provocation. Mahoney, ¶¶18-22. Mahoney describes protestors passively resisting orders to disperse by sitting down in the roadway, police responding by pepper spraying protestors. *Id*., at ¶26. "Any direction that the main group of protestors went, PPB quickly drove down an adjacent street and blocked their march." *Id*., at ¶20. Mahoney declares that "[t]here was no apparent reason

I could discern that provoked PPB to exercise this type of policing. The policing method seemed to escalate tension." Mahoney, ¶¶18-23.

Muriel Lucas describes attending a small protest on August 21, 2020 outside the PPB's North Precinct. Lucas, ¶2. Lucas describes being aware that there was vandalism of a PPB vehicle but Lucas was not involved in the vandalism or know anyone involved. *Id*., at ¶8. A sudden police announcement with order to disperse was immediately followed by a PPB bull rush. *Id*., at ¶9. Lucas then describes being pushed by PPB down dimly lit residential streets, trying to move as fast as they could, and being hit from behind with a baton apparently for not running fast enough. *Id*., at ¶11 ("I flew forward and landed on my wrists and knees. I was in shock. Another protestor picked me up and carried me over their shoulders as we tried to continue running west."). At this point the protest was dispersed and people were trying to leave the area by walking down side streets. *Id*., at ¶12. Lucas then describes the PPB continuing to brutalize them with batons for no apparent reason whatsoever:

> 13. I was walking with a very small group east toward where my car was parked behind the precinct when I saw lights coming toward us. Other people started yelling that the police were coming again, and I realized that there was another PPB bull rush charging directly at our small group. We ran for a long time toward the vicinity of Williams Ave, at which point the police were still following us.

> 14. I was unable to move quickly enough and was again hit from behind by a PPB officer. Iwas thrown over and through the other protestors before landing on the ground. My knees, arms, and palms were shredded and I was bleeding everywhere. I was eventually able to get up and began hobbling away to the south, the direction we were originally ordered to move in by PPB.

> 15. We encountered more police in front of us to the south.

> 16. A PPB officer stopped and looked directly at me, then hit me with his baton using a hard shoving motion with both arms. He struck me on the chest and shoulder, and I was again pushed to the ground.

*Id.*, at ¶¶13-16. That evening PPB officers broke Lucas' collar bone and inflicted enormous pain and damage in the form of large areas of bruising. *Id.*, at ¶¶20-21. Lucas suffers ongoing trauma and physical injuries from the PPB's use of force. *Id.*, at ¶22.

Daniel Rushton, in his second declaration for this case, describes a night on June 30 when he was acting as a trained emergency medical technician at the protest to provide first aid to anyone who needed it, always wearing a white helmet with a clearly identifiable red cross on it. Rushton II, at ¶3. Rushton describes sitting down in the street as an act of passive resistance to orders to disperse when PPB struck him with a baton in the back of the head. *Id.*, at ¶¶6-7 Rushton also describes a night on June 12 when he was again acting as a medic and standing aside with a group of other medics "so police would see that we ere there to support and aid." *Id.*, at ¶13. Police targeted and kettled the medics, beating them with batons, instead of leaving them alone:

> While we stood there, about six or seven Portland Police officers rushed up and surrounded (kettled) us against a building. They began shouting for us to move on, but we had no ability to move because the police had trapped us against the building. Then the police began hitting us with batons on our heads and shoulders. The taller of us, myself included, were wearing helmets and caught most of the blows. While keeping us kettled the officers continued clubbing us and shouting at us to move. This lasted for about two minutes and then one officer moved to the side allowing us to move away one at a time, in the direction the officers indicated. As we left the kettle, we were all subjected to further baton strikes.

*Id.*, at ¶14. Rushton goes on to describe a friend who was unable to run away from police due to a serious medical condition who was targeted by police, grabbed, and beaten with a baton in the groin. *Id.*, at ¶15.

Declarant Evan Tupper describes going on a short walk in his neighborhood in North Portland on July 14 and walking out onto Lombard where a protest was happening. Tupper, ¶¶2-4. Tupper describes a situation where police were not clear about directions of where they wanted people to go and a failure to communicate clear orders. *Id.*, at ¶6. Tupper decided to leave and go

home but officers would not allow him to cross Lombard to get home, no matter how far he tried to get from the police in order to cross. *Id.*, at ¶¶6-7. Tupper repeatedly asked police officers what they wanted him to do in order to safely cross and get home. Instead of communicating clear orders, police shoved him toward the police line and later pepper sprayed him directly in the face. *Id.*, at ¶¶6-10. After being pepper sprayed in the face, he was tackled to the ground and arrested, yet never charged. *Id.*, at ¶¶11-14.

The evidence, even at this early stage, points to a common explanation for why this happened (aside from the viewpoint discrimination described above). The City, whether through an unconstitutional written policy, a failure to properly train, a failure to correct actions when it was obvious training had been inadequate, or through its complete and utter lack of ability to discipline any officer for excessive force, created a practice of using force against anyone who refused to disperse when ordered to disperse, and often people who were attempting to disperse.

## IV. The City's Pattern of Officially Sanctioned Behavior

The evidence here is sufficient to establish that PPB's conduct during the protests was not an isolated event. It was part of pattern of officially sanctioned behavior such that the proposed class representatives have standing to seek injunctive relief.

### A. Unconstitutional Written Policy

The written directives that PPB members are required to follow do not clearly articulate constitutional limitations on the use of force during crowd control events. While PPB Directive 1010 contains specific limitations on the use of specific weapons, Directive 635 appears to give an alternative justification: "When the crowd has been ordered to disperse and does not heed repeated warnings, and no reasonable alternative is apparent, riot control agents (RCAs) and/or special impact munitions may be deployed to prevent violence, injury or property damage and to

avoid a greater application of force." PPB Directive 635.10.9.2.[46] This exception is not based in any Fourth Amendment caselaw. By authorizing the use of force against a "crowd," particularly when it authorizes force either to prevent property damage or "avoid a greater application of force," the directive authorizes force in violation of the Fourth Amendment. This same problem exists in directive 1010 itself when it authorizes the use of impact munitions "to avoid the use of a higher level of force." PPB Directive 1010.6.4.2.1.3. Similarly, directive 1010 authorizes the use of "aerosol restraints" (OC spray) "When a person(s) engages in physical resistance *or indicates the intent to engage in physical resistance.*" PPB Directive 1010.6.4.3.1.1 (emphasis added). It is evident based on PPB members' use of OC spray during the protests that they interpreted this provision to authorize the use of OC spray on protestors who refused to leave when ordered to disperse and attempted to stand in the street in the face of a police line. The use of OC spray in these situations, apparently authorized by directive, is a clear violation of *Headwaters*, 276 F.3d at 1129-30.[47]

### B. Failure to Properly Train

These uncertainties in the PPB directives could have been cleared up in training, but they were not. Instead, PPB training for crowd control events focused primarily on training members to *articulate* their justification for their uses of force in such a way to comply with directives. In other words, training was aimed at creating better *post hoc* justifications for the use of force rather

---

[46] This problem has been repeatedly pointed out by the USDOJ. *See, e.g.,* Albies, at ¶10, Ex. 71, at 6. "That distinction ignores the possibility that a generalized justification may mask the lack of a specific justification consistent with the Constitution and PPB policy. That possibility is made more acute by PPB's silence on several concerns we have raised, including PPB's pattern of misusing the phrase 'active aggression' to justify force against individuals who engaged in passive resistance or merely failed to disperse, and misapplying Directive 635.10 to justify force that does not comply with Directive 1010.00." *Id.*

[47] This problem was undoubtedly aggravated by the fact that the City trained its RRT officers that *Headwaters* held the opposite of what it actually held, as discussed below.

than avoiding unconstitutional force.  During the City's deposition discussing how it trains RRT members on use of force during crowd control, the members' ability to "articulate" their justification was a constant refrain. *See, e.g.,* Schoening Dep. 44:05-45:20, 54:02-55:02, 67:02-68:07, 69:22-70:09, 72:21-74:02, 76:07-77:24, 79:22-81:01, 81:11-82:02, 82:12-83:11. This focus on the articulation of the justification, rather than whether the use of force is substantively justified was also critiqued by the USDOJ: "PPB does not address whether a particular use of force was justified, focusing instead on *the articulation of* the justifications reported in FDCRs. … That distinction ignores the possibility that a generalized justification may mask the lack of a specific justification consistent with the Constitution and PPB policy." Albies, at ¶10, Ex. 71, p. 6.

In the rare circumstance where the City actually trained its officers on specific substantive rules germane to crowd control, they got it completely wrong. The City trained its RRT genadiers that the district court's holding in *Headwaters*, which was reversed (twice) by the Ninth Circuit, was the controlling legal rule. *See* Schoening Dep. 38:11-41:22; Albies, at ¶11, Ex. 72. It trained these officers that "Use of pepper spray to compel compliance by anti-logging protestors was a reasonable use of force; federal trial judge rules that no reasonable juror could view its use in these circumstances as excessive force." *Id*. In fact, the Ninth Circuit reversed this specific ruling. *Headwaters*, 276 F.3d at 1129-30. While the City acknowledged that it improperly trained its grenadiers on this point, it still endorsed training that was substantively in violation of *Headwaters*. As discussed above, the City's directives authorize the use of OC spray when people indicate an intent to engage in physical resistance. When asked how the City trains its officers to apply this directive in protest situations, the City answered: "Things like locking hands or locking arms, could indicate some intent to resist your efforts to arrest people or disperse them…." Schoening Dep. 74:03-74:24; *see also* Bruggemeier, at ¶29, Ex. AB (officer tells dispersing protestors that

police will "use force on you if you don't get out of here. Everyone holding each other, that's unlawful."). The facts in *Headwaters* were that the protestors had physically locked their arms together using a homemade mechanism called a "black bear". 276 F.3d at 1128-1129. The Ninth Circuit held that this was not enough to justify the use of pepper spray to force the protestors to unlock themselves. *Id*. at 1129-30. Therefore, the City's training that "locking hands or locking arms" in an effort to resist dispersal could justify the use of pepper spray is directly in conflict with existing Ninth Circuit precedent.

The failure to train is particularly inexcusable in these circumstances given the simple fact that protestors engage in common patterns and common tactics. Unlike a criminal suspect on the street, who may be completely unpredictable, protestors use common tactics, some of which have been used for decades. The City's refusal to simply train its members that 'this tactic amounts to passive resistance,' or 'this tactic amounts to active aggression,' is not an oversight. It is a deliberate attempt to allow PPB members to use whatever force they desire and have ample leeway to justify it after the fact by their directives.

### C.    Failure to Correct or Retrain When Failure Was Obvious

Even if the initial training itself was not so inadequate as to lead to liability under *Monell*, the inadequacy of the training should have been obvious, even to the most casual observer, within a week of the start of the protests. However, PPB's own system for tracking uses of force broke down at the same time, compounding the problem.

Following any use of force, PPB officers must file an FDCR. Resch Dep. 20:02-07. FDCRs are to be completed before the end of the officer's shift. Resch Dep. 20:12-16. Officers are to detail the time, location, type of force used and the legal justifications for the use of force. Resch Dep. 20:17-21:03. Officers are also supposed to report their use of force to their supervisor, typically a

sergeant, so that they may initiate an investigation on the scene. Resch Dep. 22:23-23:06. At the scene, the supervisor interviews witnesses and gathers evidence. Resch Dep. 23:10-16. Following submission of the FDCR and the investigation on the scene, the supervisor then writes an After Action Report ("AAR"). These AARs are supposed to be complete within 72 hours of the use of force. PPB Dir. 1010.13.3. That supervisor's supervisors will then review the AARs to determine if the AAR filer followed PPB Dir. 1010.13.

Untimely FDCRs and AARs—i.e., those completed outside the time allotted by PPB directive—are out of policy. Resch Dep. 24:16-24. The FDCR and AAR requirements are not different in the "crowd control" setting. Resch Dep. 24:7-15.[48] Even if the demands of following PPB's FDCR and AAR requirements are straining, the policy still controls and failure to follow the timing and investigation requirements violates City policy. Resch Dep. 24:7-24. Accurate and timely FDCRs and AARs are essential to determining whether or not force was compliant with City policy and training. Resch Dep. 49:14-20, 54:24-55:2; Bell Dep. 161:1-10; Caldwell Dep. 74:9-17. Without accurate data, the City cannot address training and discipline problems. Resch Dep. 55:8-17.

During the months of June and July 2020, the City maintained a backlog of FDCRs and AARs. Simon Dep. 11:19-12:3. PPB claimed that this backlog came to be because following through with FDCR and AAR processes was incompatible with the "volume" of PPB's force and "fatigue" felt by the officers using force. Resch Dep. 31:2-10; Albies, at Ex. 73, p. 15. This breakdown led to supervisors being unable to "catch errors and cross reference uses of force" in

---

[48] The FDCR and AAR requirements are nested in PPB Dir. 1010.13, along with the overall force policy for PPB, not with 635.10, which describes crowd control event directives. PPB Dir. 635.10.13.1.1 directs Incident Commanders to "[w]rite an After Action in accordance with… *1010.00, Use of Force, if force was used*…" (emphasis added).

FDCRs. Resch Dep. 32:1-10; Albies, at Ex. 73, p. 15. PPB identified that this was a problem by the "end of May." Simon Dep. 12:14-18.

In addition, the FDCRs and AARs that were submitted and reviewed by the Office of Inspector General during this period contained "insufficient" data (Simon Dep. 12:19-13:07) and were "problematic." Simon Dep. 13:21-14:13. Missing FDCRs posed the "most important issue" presented in May and June 2020. Simon Dep. 21:01-07; Albies, at Ex. 74, p. 1.

As discussed above, timely and accurate FDCRs are crucial to accountability. Resch Dep. 49:14-20. Sergeants were not investigating force at the scene of the force—either at all or in a timely manner. Resch Dep. 48:02-09, 42:05-10; Simon Dep. 28:12-14. Two of the sergeants tasked with "curing" the PPB backlog by addressing FDCRs going forward had "little to no crowd management training." Resch Dep. 49:21-50:04, 50:18-51:08.

A July 9, 2020 training highlighted some of the findings of a use of force audit done by the Office of Inspector General. Simon Dep. 9:04-09. The training describes an audit of two random samples of squad FDCRs where both had missing reports. Simon Dep. 21:01-07; Albies, at Ex. 74, p. 16. The training highlights that descriptions of force that were "problematically" condensed into one description of force ("30-50 rounds" against "3 to 5 subjects" described as a single use of force). Simon Dep. 24:14-19; Albies, at Ex. 74, p. 3. Regardless of this problematic language, the training goes to length to exonerate the officer who did not follow the FDCR standard by stating that the force was "most likely justified." Albies, at Ex. 74, p. 3. By the time of this training, FDCRs had gone unreviewed for "weeks." Simon Dep. 40:11-18. Some FDCRs were never received. Simon Dep. 40:11-18.

      1.    *FDCRs were inaccurate, incomplete, and/or demonstrated violations of use of force policy on their face.*

The accuracy of the FDCRs is critical to all aspects of review of uses of force. Officers rely on the force data collection report when recalling specific uses of force. Bell Dep. 160:19-25. If the information in the force data collection report is inaccurate or incomplete, that impacts an officer's ability to give an accurate statement regarding the incident, which then impacts the efficacy of any administrative investigation into the particular use of force, making that review less reliable. Bell Dep. 161:01-10, Caldwell Dep. 74:09-17, Resch Dep. 49:14-20, 54:24-55:02.

Here again, the City's attempt to correct this problem focused on procedure rather than substance. Nothing was done to address the fact that many FDCRs reveal on their face unjustified use of force. From a sample of 41 FDCRs, plaintiffs found 45 of uses of force where the reported justification on its face is incomplete or does not meet the *Graham* standard. Albies, at ¶8. Of these, plaintiffs identified 12 incidents where OC spray was used on passive resisters, 8 incidents of unjustified impact munitions, and 25 unjustified baton strikes or pushes. *Id*.

For example, FDCRs describe use of OC spray on people who simply:

- **yelled at police,** Ex. 39, p. 3 (spraying a person who yelled, "don't fucking touch me" speculating that the person would shove the police, despite being 5-7 feet away); Ex. 40, p. 2, 3 (checking "active aggression" for a "tall white male, about 5'10' wearing a dark coat was refusing commands to disperse from Lownsdale Square. He faced me and yelled "this is our city, get the fuck out, this is our park." I sprayed a short burst of OC into his face. He shut his eyes for a moment and then remained standing there yelling profanities at me. I then secured my OC can in the holster" and "[a] white female in her 20s who had been lying in the street stood up as I approached and began yelling something incoherent toward me. I sprayed her with a short burst of OC spray and she then walked off northbound on SW Fourth with the crowd.");

- **peacefully refused to disperse**, Ex. 39, p. 3. ("I pushed him with my hand and not my stick. He did not resist my push but also did not move south or disperse from the area. At this time I raised my right hand, in which I held my large OC can and told the male to move or I would spray him. He did not move and instead yelled at me. I was about 7-10 feet from him and sprayed him once in the left eye with OC. He immediately grabbed his face and fell to the ground. Both myself and the officer next to me told him to get up and leave the area. He did not get up. Due to the evolving nature of push to disperse protestors, and the need for me to stay with my squad for my own safety, I walked past

the protestor and left him where he was. I did not see him again and did not use force on him."); Ex. 41, p. 2 ("Our mission was to keep moving forward and there wasn't a lot of support near that area as resources were spread thin. Because I was concerned the subject was going to continue toward us and physically resist me moving him, I used less than a second of a burst of OC spray to the subject's facial area (the only intended target) and he turned away;

- **"resisted" being pushed by police**, Ex. 43, p. 2 ("I witnessed an unknown Officer pushing a female who was resisting the push. This unidentified female turned in my direction as if to avoid the push and continue resisting. I deployed OC with a one second burst to her head region. The unidentified female began to fall back at this time."); Ex. 44, p. 2 (officers "ordered to conduct a dynamic push against the hostile crowd, as I ran north on 2nd ave, I continuously yelled move and targeted 2 individuals in the crowd that refused to disperse. First subject was a mixed race female who was wearing a face mask. Sound truck gave repeated force warning, informing protestors they needed to leave or force may be used against them." Officer sprayed OC sprayed this person and another in the face with the same exact justification, noting "[m]any other officers on the line alongside me were doing the same as me.");

- **rattled a fence**, Ex. 45, p. 4 ("suspect, who was located on the other side of the fence, came up to the fence, began shaking it, and antagonizing officers by screaming and by not obeying the lawful order to leave the area […] I told suspect to leave the area, he refused […] I continually told the suspect the [sic] leave the area. Fellow officer's [sic] did the same, waiting for him to respond each time, and reassing his level of compliance before again, telling the suspect to leave the area. After exhausting all options, I took aim and deployed my OC spray"); and,

- **approached a police line or police car.** Ex. 32, p. 2-3 (spraying someone who had "approached" the police line from 15 feet away); Ex. 46 , p. 3 (spraying a person "approaching" who was far enough away for the spray to only reach his chest and lower body); Ex. 47, p. 1 (officer sprays person approaching a police car, claiming person "was going to attempt to kick our car").

FDCRs describe use of 40mm and FN303s on people who:

- **allegedly engaged in a host of unspecified activity, including failure to disperse,** Ex. 48, p.4 ("I deployed an additional 40mm round at an unknown individual engaged in one of the following behaviors: active aggression, attempting to throw something at police, attempting to kick, throw, or otherwise interfere with RRT munitions, or failing to disperse despite lawful orders to do so. The deployment of a 40mm round was intended to protect myself and my squad, disperse the crowd, and prevent violence, injury, or property damage while avoiding a greater application of force. This deployment was authorized by PPB Directives 1010.00 as well as 635.10 Crowd Management in

accordance with ORS 131.675 Dispersal of Unlawful or Riotous Assemblies. Numerous loud, clear, force warnings had been given by the sound truck throughout the night stating those involved were subject to arrest and force including riot control agents and impact munitions. After being struck with the 40mm round the suspect did not continue to resist. After being struck the suspect retreated into the crowd or left the area. Therefore I was not able to make an arrest or request medical aid.");

- **yelled, cursed, or taunted the police,** Ex 49, p. 1 ("One individual, who was wearing a yellow/white/black jacket with black pants was yelling "fuck you" to me and was not clearing out of the intersection as I verbally told him several times to move. He was approximately 20 yards away and was continuing to yell "fuck you" at me. He started to turn back towards me and the rest of my MFFs, so I deployed a single 40mm less lethal round, which struck him in the left calf area. The unknown male then started to walk away from us, northbound with the rest of his counterparts. We continued to push the group northbound when an RRT van passed us and began moving the group with flashbangs. […] Members of the protest had already thrown and launched items at officers; due to the aggression of the crowd and previous encounters I deployed my 40mm less lethal to prevent this individual from possibly throwing items towards us, and to encourage him to vacate the area and move in the direction we were ordering them to leave in."); Ex. 30, pp. 2, 3 ("Deployed FN rounds at subject who continued to turn towards police line, displaying active aggression and acting as if he was going to charge our line"; "Deployed FN rounds at subject who continued to turn towards police line, displaying active aggressive and acting as if he was going to charge our line […] yelling "fuck you" and other verbiage as to challenging police, displaying tensed body language and grabbing his crotch"); Ex. 48, p. 3-4 ("I observed a while male aggressively approach the fence line while yelling at officers and his hands up in a fighting stance. It appeared he intended to breach or climb the fencing. I deployed one 40mm round directed at his waistline" from a distance of 25 yards)(characterized as "active aggression"); Ex. 50, p. 2 (describing officers trying to shoot someone with a 40mm who was behind a tree "taunting the officers by jumping out from behind the tree and then ducking back behind it");

- **based on pure speculation that an individual would engage in active aggression.** Ex 49, p. 1 ("The individual as part of a group was not clearing the intersection and was blocking all lanes of travel. The unknown individual did not follow orders and vacate the intersection to the north, but rather started to turn towards my MFF unit. Members of the protest had already thrown and launched items at officers; due to the aggression of the crowd and previous encounters I deployed my 40mm less lethal to prevent this individual

from possibly throwing items towards us, and to encourage him to vacate the area and move in the direction we were ordering them to leave in.").

FDCRs describe use of batons on:

- **people who passively resisted or failed to disperse,** Ex. 52, p. 2 ("I told the subject to move north on SW Fourth Avenue but he did not leave. I shoved his back with my baton. He fell forward on his knees"),("A tall white male, with one hand holding his bike refused commands to disperse. I pushed him with my baton. He looked at me and yelled some obscenities and would not disperse") (characterized as "active aggression"); Ex. 53, p. 3 ("As I approached DOE I instructed him to "move" and he did not appear to be making an effort to leave the area. With one of my hands on each end of the baton, I used the pointed end to make contact with what I believe was DOE's torso while giving the instruction to "move." After making contact with DOE, he appeared to lose his balance and fell onto the sidewalk."), Ex. 54, p. 2 ("I ran into the crowd giving loud continuous verbal commands (as I was trained) for the crowd to "move north". As I moved north on SW 2nd between Salmon and Taylor. I saw a protestor turn around and face me. Using my baton with two hands in a horizontal position I pushed the protestor to the north. The protestor turned and began a slow walk. I gave another verbal command and pushed the protestor again with my baton in the same manner."); Ex. 55, p. 2 ("I used my RRT baton to push the subject back after he planted his feet in an attempt to not be moved. The subject took a few steps back and then planted his feet again. I delivered 4-5 pushes with my baton and 3-4 pushes with one hand before reaching the end of the block and the subject left the area.");  Ex. 56, p. 3 (using baton to "push[]" a protestor standing in the middle of the street "to try to convince him to move out of the area"); Ex. 57, p. 3 ("[A] woman in a light colored shirt walked toward me in direct opposition of what she had been directed to do. She was riling up the group, pumping her fist and saying something to the effect of 'we don't have to do what they say.' I performed a baton shove across her chest moving her back several steps."); Ex. 58, pp. 1, 2 (using baton when "DOE walked slowly backward, stopping occasionally while facing officers and filming. It did not appear that DOE was making any effort to leave the area as instructed"); Ex. 59, p. 4 ("I encountered a thin white male with a brown backpack. He was bouncing around in front of me as if enjoying this time more like a party than a riot that it was. I perceived this purposeful and deliberate action to interfere as active resistance to our movements and determined that I needed to communicate the serious nature of our demands to leave. I pushed him with my hickory stick (mid back/ torso area) horizontally in an attempt to convince him to leave the area");  Ex. 60, p. 1 ("several members of the protest were not moving in the prescribed direction as ordered by the members of the squad and the loud speaker. These protestors were acting antagonistically and in defiance of police orders. I was forced to push several people with the flat portion of my baton."); Ex. 31, p. 3 ("A younger, thin black male, approximately 5'11", wearing a light gray hooded sweatshirt and maroon sweatpant style pants was directly in front of me with his cell phone in front of both his face and my face. Instead of moving with the crowd, he continued to talk

either into his phone and not move. I gave additional orders to move and noted there was space to do so, as citizens in all directions were moving. I used my baton to drive into the subjects waist area with one push. The subject tried to verbally resist the movement, but was pushed backwards and remained on his feet."); Ex. 61, p. 3 ("As we continued our push the majority of the crowd ran west bound on SW Jefferson; however, one white male continued to stand in front of our line and refused to move after I told him several times to move, as we continued I used my baton to push the male one time."); Ex. 62, pp. 3, 4 (describing four different accounts of using a baton against people who "refused to move" or "refused to disperse"); Ex. 63, pp. 3,4 (describing three difference incidents of using a baton against a Black man who "refused to move," a white woman "who was yelling at officers and similarly refusing to move," and a white male "who had his back turned from us, but was also not moving from the area"); Ex. 64, p. 3 (describing using a baton on someone who "was not moving with the crowd and had turned their back and stopped"); and

- **people not moving quickly enough to the officer's liking.** Ex. 65, p. 1 ("Upon giving the subject a lawful command to move north on SW 4th Ave, he was intentionally moving at a slower pace than the rest of the crowd. It was at that point that I decided to push the subject with my PR-24 baton to move him forward with the rest of the crowd."); Ex. 66, p. 2 ("The subject intentionally slowed so that officers would have to push him forward. I used by [sic] RRT baton and performed a two handed push on the subject at least one time"); Ex. 67, p. 2 ("A tall white male, about 6'2" wearing a dark coat, with a black backpack was refusing commands to disperse. He faced me, yelled something inaudible and then turned away. I shoved him with my baton against his backpack"); Ex. 68, p. 2 ("As I approached DOE I instructed him to 'move' and he did not appear to be making an effort to leave the area. With one of my hands on each end of the baton, I used the pointed end to make contact with what I believe was DOE's torso while giving the instruction to 'move.' After making contact with DOE, he appeared to lose his balance and fell onto the sidewalk"); *see also* Ex. 56, p. 1 (describing a protestor who "was not leaving the area with any urgency or purpose. His wandering, as slow as he apparently could move, was an indication that he was trying to provoke an altercation with me and inhibit our objective of clearing the park. I took this to be active physical resistance against police."); Ex. 69, p. 3 ("A female was walking with a black male and a white male with glasses. The female began to purposely walk slow to slow my progression forward. I told the female and the group to move or force would be used against them multiple times. The female began to shield the black male from me and continued to walk slow. I pushed the female with my baton 2-3 times in the back on top of her protective gear" and also noting ""I could have pepper sprayed the individuals I pushed but did not because it would have been difficult and unsafe to stow my baton away and then unholster my pepper spray.").

Each of every one of these FDCRs was approved by a supervisor. *See infra*.

The US Department of Justice and the Compliance Officer ("COCL"), entities engaged in ongoing litigation with the City over PPB's use of force, agree that the FDCRs describe force that is transparently out of policy. In reviewing the PPB's use of force last summer, they found that "[s]ome of this force deviated from force policy, and supervisors frequently validated individual uses of force with little or no discussion of reasonableness of the force used." Albies, at Ex. 70, p. 5. They "found that many of PPB's force reporting and review documents were insufficient to show implementation of policies governing use of force, reporting, and investigation." *Id.* at 16. The DOJ and COCL noted that many FDCRs and After Action Reports revealed frequent lack of investigation and analysis by officers' force supervisors. *Id.*

## 2. *EIS system fails*

The PPB also has an "Employee Information System" ("EIS"), an application that compiles information from data sources, including FDCRs, to enable a comprehensive review of a member's work performance. Snider Dep. 18:17-19:25. The PPB holds EIS out as part of a larger accountability system of the PPB, as it can help supervisors monitor, identify, and course correct any potentially problematic patterns. *Id.*, at 20:07-14, 25:05-11, 53:02-08. EIS tracks the amount of force by a particular member, in numbers, in ratio to their arrests, and in relation to other sworn members; these amounts can trigger either an automatic threshold "break," or a manual "alert" by the EIS administrator once they review the information. *Id.*, at 33:13-24, 39:18-40:04, 40:23-41:10. But, EIS counted only one force event for each FDCR, rather than an accurate accounting of how much force was used on a particular night: so if an officer used 25 or 30 less lethal rounds on a particular date, EIS would count that as one use of force. *Id.*, at 110:01-07.

The force data was gathered from FDCRs, and, as with the other aspects of the PPB's accountability system, is only as good as the information in it. *Id.*, at 40:11-14, 50:19-20. EIS can

track when an officer used more force than their colleagues on the same shift. *Id*., at 36:16-20. Once an alert is made, it is forwarded to the officer's reporting unit manager, who reviews it and either closes it, or sends it to the officer's supervisor. *Id*., at 43:9-20.

Despite compiling all this information on use of force, the City did not use EIS to track whether particular RRT members were using force at a rate greater than other RRT members in the same shift. *Id*., at 75:24-76:13. Eventually RRT members' use of force was compared with their other RRT colleagues, but not until July. *Id*., at 37:20-38:18.

### D.    Lack of Any Discipline

Even among American police departments, PPB is infamous in its complete lack of accountability when it comes to disciplining officers who use excessive force. That lack of accountability was on full display during the 2020 protests. PPB used force over 6,000 times during these protests. Albies, at Ex. 70, p. 5; Bell Dep. 59:07-60:01. The City's oversight agency, the Independent Police Review ("IPR"), received over 4,000 individual items of feedback about policing in general since the beginning of the protests: 107 of those were complaints about use of force. Bell Dep. 61:01-62:01; Albies, at Ex. 71, Ex. 75. The City determined that almost all uses of force were consistent with PPB training, including two instances for which this Court found the City in contempt.

#### 1.    *IPR and IA Process*

IPR is housed in the Auditor's office, and Internal Affairs ("IA") is the administrative investigatory department of the PPB; IPR and IA are the only means by which officers can be held responsible or accountable for violations of PPB's use of force policy. Bell Dep. 32:23-33:05. Investigations are initiated by complaints from community members, news stories, announcements, tort claim notices, and legal actions. *Id*., at 27:09-14. Investigations can also be

initiated by a bureau member. *Id.*, at 29:14-20. None of the closed IA or IPR investigations plaintiffs were given in discovery were triggered by another bureau member. *Id.*, at 29:21-24. IPR then decides whether to send the case to IA for investigation or to conduct it within IPR. *Id.*, at 40:03-15. The Collective Bargaining Agreement with the Portland Police Association prohibits IPR investigators from compelling officers, whether witnesses or subjects, to answer IPR investigator questions. *Id.*, at 46:11-17, 47:07-10.

At the end of either the IPR or IA full investigation, the investigator makes recommended findings, which go up the IPR chain of command, then to the officer's reporting unit manager for approval or review of the recommended findings, and then to the IA captain to make proposed findings. *Id.*, at 50:04-09, 16-51:11. The possible findings of full investigations are "unfounded," "exonerated," "not sustained," or "sustained." *Id.*, at 51:16-20.

Some cases are "administratively closed," which occurs most often after an intake investigation; it does not mean that no misconduct or policy violation occurred, it just means that the IPR could not make a finding based on the initial information it had, which includes inability to identify an involved PPB officer. Caldwell Dep. 22:19-24, 29:12-22, Bell Dep. 151:19-24. Administratively closed cases result in no discipline or accountability. Caldwell Dep. 22:11-15.

The full investigations and administratively closed cases for protest related force complaints that Plaintiffs were given access to were consistent with IPR and IA's practices. Bell Dep. 63:21-64:02, 65:03-08; Caldwell Dep. 21:04-09.

       2.    *Administrative closures leave potential violations of PPB Directives unchecked*

48 cases were administratively closed, 33 of which pertained to use of force during protests. Caldwell Dep. 17:16-18:01. The vast majority of administratively closed cases were because IPR could not identify an officer based on information it had. Caldwell Dep. 22:15-18. According to

IPR, 10 were dismissed for "no misconduct", 9 lacked investigative merit, 6 because the complainant was unavailable, 5 were not PPB officers, 1 was an unidentified employee, 1 for "other judicial remedy" and 1 because there was a third-party complaint. Albies, at Ex. 75.

Some were dismissed as "no misconduct," which means IPR determined there were no policy violation even if the allegations were true. Caldwell Dep. 36:14-17. But, on closer examination, this does not hold up. For example, IPR closed as "no misconduct" a case which alleged PPB officers pointed weapons at the complainant and his young daughter while they were in their car, tossed tear gas at individuals that did not appear to be doing anything, and were racing back and forth not adhering to traffic rules. Caldwell Dep. 41:19-42:08, 43:16-22, 43:09-15. Similarly, IPR closed a complaint as "no misconduct" where a person alleged PPB officers deployed flash bangs (RBDD) at him and others in a crowd who were peacefully protesting, causing eye pain and hearing loss, and for giving confusing and conflicting directions. Caldwell Dep. 58:01-59:23, 60:02-22. IPR found PPB members gave adequate warnings based solely on review of the FDCRs and did not interview any officers. Caldwell Dep. 65:09-25, 66:03-08.

More importantly, IPR cannot hold individual officers accountable for violations of Directive 635 or 1010 for use of tear gas, because the incident commander is responsible for making the determination to use tear gas. Caldwell Dep. 52:07-14. IPR heard many complaints of tear gas impacting children or someone's home, but determined such conduct does not violate directives. Caldwell Dep. 55:04-25. None of the investigations into use of force stemming from the protests that plaintiffs were given access to involved incident command, *i.e.* rank of captain or higher. Bell Dep. 22:04-12.

Likewise, IPR administratively closed for "lack of investigative merit" a complaint that PPB deployed tear gas on a few peacefully protesting individuals in a bunker-like stairwell.

Caldwell Dep. 66:15-69:13, 70:13-16, 77:15-24. IPR's initial investigation found, despite PPB undisputedly deployed tear gas in the area, and despite specific allegations that PPB officers threw the tear gas in the stairwell behind them, that IPR could not identify an individual officer and therefore closed the case. Caldwell Dep. 72:05-73:07; 73:15-22, 75:01-76:24, 78:13-19.

3.    *IPR and IA did nothing, including for uses of force this Court has found to violate Directive 1010*

Cases going through the full investigation process fare no better. The City found **all**[49] uses of force fully investigated by the City on the dates the court granted plaintiffs discovery within policy and consistent with PPB training, including two instances for which the Court found the City in contempt. Bell Dep. 72:05-17, 89:04-10, 91:10-95:09, 22-24; 116:17-117:19, 126:03-22, 128:23, 129:04-25, 142:21-143:07.

The City found the specific uses of force the Court found to be basis of its contempt finding (also subject to the court's order on additional training) to be within policy and consistent with PPB training, despite the standard of review employed by the IA investigator--preponderance of the evidence--being lower than the clear and convincing standard applied by this Court. Bell Dep. 97:13-16, 22-98:21, 100:01-101:19, 102:01-103:08; 111:19-112:13, 114:20-23, 129:04-25, 130:01-09; 133:03-25-134:18, 135:23-136:08. The City had the same evidence as the Court, including testimony that the conduct was consistent with PPB policy and training, testimony of involved officers, and video evidence. Bell Dep. 99:01-24, 129:17-25, 136:14-137:07.

---

[49] For some reason, the City separated out into two separate investigations for the same use of force, one of which is still open. Bell Dep. 126:03-22, 127:08-19, 136:14-25. The City has not disciplined any bureau members for using force in crowd control settings, for violating its policies and training with respect to use of riot control agents and less lethal weapons, or for using or approving force used in crowd control settings without a sufficient articulation of a permissible justification. Caldwell Dep. 63:01-65:02, 17:24-19:02.

The City has little concern about making findings in direct contradiction to a federal court judge. Bell Dep. 130:25-131:05, 137:08-16. In fact, the City affirms that despite additional training ordered by the court clarifying that this incident violated PPB Directive 1010 and the existing temporary restraining order, if the same incident happened today, the City would find the same conduct to be within policy, consistent with Directive 1010. Bell Dep. 114:20-115:07.

4.    *IPR and IA are not going to do anything*

The City tells complainants that "IPR monitors all complaints involving Portland Police Officers. The complaint is stored in a database that we use to analyze patterns of conduct as they emerge over time. These reviews help us to improve the quality of police services to the community in the long-term." Bell Dep. 149:14-150:06. However, despite having authority to look at patterns and trends as they emerge, IPR has not conducted any policy reviews related to the protests. Caldwell Dep. 25:09-36:01, 27:03-07,[50] 28:17-23. IPR initiated a policy review of PPB's use of tear gas on June 30 in a North Portland residential neighborhood, it did not complete it. Caldwell Dep. 27:16-19. According to IPR director Ross Caldwell, the directives make it impossible for the City to hold individual people accountable for use of riot control weapons under 635. Caldwell Dep. 27:24-28:02.

**V.    Plaintiff Nicholas Roberts**

Nick Roberts, grew up in the Portland metro area and attended many protests in Portland from May through August of 2020 in support of Black Lives Matter and against the killing of George Floyd. Decl. Nick Roberts ¶¶5, 9. During these protests, he never threw anything at police,

---

[50] IPR will, however, as a result of agreement with the US DOJ, be conducting an investigation into the PPB's force response to the protests. Caldwell Dep. 27:07-15.

did not light any fires, destroy or damage any property. *Id.* at ¶10. He did not engage in anything beyond passive resistance. *Id.*

On the evening of May 29, Roberts attended a protest in front of the Justice Center because he wanted to support the Black Lives Matter movement and understood that the American policing system was designed and operated to oppress Black people. *Id.* at ¶11. It was a chaotic scene, and he joined a group of protestors in front of a line of police officers with their hands up, peacefully protesting. *Id.* at ¶12. Roberts witnessed the PPB escalate the situation, using tear gas against the crowd. *Id.* It was his first time experiencing tear gas and he was terrified; it was debilitating and painful, blurring his vision and causing him to cough, and he and others were trapped between officers and tear gas, unable to see or find a way out of the area. *Id.* As the crowd was attempting to disperse, Roberts saw police with their backs to him, shooting 40 mm weapons at protestors who were running away, hitting people a number of times in the back, including someone who was stumbling while running away from the police. *Id.*; *see also* Roberts Decl. in Support of Pet. for T.R.O. ("Roberts TRO decl."), Dkt. 9, ¶14-19 (6/5/20).

On May 30, similar to the night before, Roberts attended a protest at Chapman square. Roberts, at ¶13. Even though he was afraid, he recognized that to allow police violence to continue unwitnessed and unchallenged would continue the pattern of police violence against Black people. *Id.* Roberts was peacefully protesting with large crowd in Chapman square, when again PPB attacked the crowd with tear gas. *Id.*; Roberts TRO decl. ¶¶20-23. Roberts helped carry a person who was having trouble walking as they tried to escape tear gas. *Id.* Roberts then regrouped with other protestors, who were checking on and providing aid to each other. Roberts, at ¶13. Roberts believes PPB also used RBDDs against protestors as well, throwing them at his feet -- the RBDDs

are incredibly impactful, producing a booming and rattling physical sensation he could feel in his entire body. *Id.*

On June 2, Roberts attended a protest at Revolution Hall. *Id.* at ¶14. While walking home later that night over the Burnside Bridge, he heard loud bangs and police sirens coming from Pioneer Square. *Id.* He went closer to see if he could help anyone. *Id.* When he got there, he saw a Black man with his hands up in front of a line of police, peacefully and verbally protesting. *Id.* Roberts joined him, and the police began pushing them and other protestors forcefully out of the square with their batons and throwing Roberts to the ground. *Id.* PPB also deployed tear gas that night and used RBDDs to try to clear the area. *Id.* In addition, as Roberts was at most engaging in passive resistance, PPB hit him with what felt like a spray of shrapnel, likely from an RBDD. *Id.* He took a video that night, which documents PPB deploying approximately 15 RBDDs over the course of 15 minutes. *Id., see also* Roberts TRO decl. ¶¶26-32.

On June 5, Roberts attended another protest at Chapman square. Roberts, at ¶15. PPB gave a dispersal order, and Roberts and others continued to passively resist by remaining in the square. *Id.* PPB again deployed tear gas against the crowd, and after helping people who were injured by the tear gas, Roberts returned to the square to continue his peaceful protest of ongoing police violence. *Id.* Similarly, on June 7 and 26, Roberts was met again with RBDDs and tear gas for engaging in passive resistance and peaceful protest. *Id.*

On July 3, Roberts returned to Chapman square to peacefully protest the ongoing police violence. *Id.* at ¶16. PPB again deployed tear gas, RBDDs, rubber bullets, and smoke grenades. *Id.* Roberts later was pushed into the streetcar near Pioneer square when officers charged at the crowd. *Id.* Two people were pushed onto the ground, and when Roberts reached down to help them up, a PPB officer shot him with a rubber bullet twice in the leg from about 10 feet away. *Id.* This

caused substantial pain and his leg became stiff. *Id.* He continued to try to help people get out of the street. *Id.* As he was doing that, PPB launched another flash grenade at him; it bounced at his feet and exploded a few feet way. *Id.* It created a terrible sensation that rattled in his chest and he felt like his head was splitting apart. *Id.* Officers then used tear gas. *Id.* As Roberts was reaching down towards a tear gas canister to throw it away from protestors and from the police, PPB shot him in the hand with rubber bullets. *Id.*

On August 21, Roberts was peacefully protesting at Irving Park, between 6 and 8 pm. *Id.* at ¶18. The crowd marched up to North Precinct. *Id.* PPB again deployed tear gas at the crowd after a dispersal announcement. *Id.* The police then followed protestors into the nearby residential neighborhood, firing more tear gas and bull rushing the crowd with shoves and batons. *Id.* Roberts at one point had his arms around an older woman, trying to keep her from being knocked over by the police rushing the crowd. *Id.* He was at back of the line with people who were unable to run. *Id.* After this, he walked back to the precinct to continue his peaceful protests against ongoing police violence and was again tear gassed. *Id.*

On or about August 22, the Proud Boys held a demonstration against the Black Lives Matter movement in Portland in Lownsdale Park. *Id.* at ¶19. The Proud Boys supporters were aiming guns and weapons at the Black Lives Matter demonstrators, with PPB just standing by. *Id.* After the Proud Boys supporters left, PPB moved Black Lives Matter demonstrators out of the park. *Id.* As protestors were going back towards the Justice Center, PPB began firing FN303s in the trees above the protestors, raining down pepper balls on people. *Id.* Roberts was struck on the back of the arm by a munition, which left a sizable bruise. *Id.* Roberts also protested at North Precinct on the corner of MLK and NE Emerson St. *Id.* PPB again deployed tear gas and rushed

the crowd with baton shoves, shoving people with their large plastic shields while people were scrambling from the tear gas. *Id.*

On August 28, 2020, Roberts again ventured out to peacefully protest against police violence. *Id.* at ¶20. This time, however, he stood a bit back, because he thought police would push and gas people again, and he could be in a better position to help people when that happened. *Id.* Despite being further away, he was still impacted when PPB deployed tear gas that night. *Id.* Roberts was able to hand out water to people impacted. *Id.*

Roberts attended several other protests, with largely the same experience of tear gas, RBDDs, and impact munitions. *Id.* at ¶21. While he thinks it is incredibly important to speak out and protest police violence, the PPB's response to the protests was terrifying. He still thinks about these protests, and it has impacted his mental health, and he is still fearful of protesting and large crowds. He was impacted by watching livestreams of the protests after he stopped attending, because he remembered the fear of being there. Witnessing all this violence has negatively impacted Roberts' ability to protest and exercise his First Amendment rights. *Id.* at ¶23.

## VI.    Plaintiff Michelle "Misha" Belden

Misha Belden has lived in Portland since 2017. Decl. Belden ¶9. Belden works as an event and welcome desk coordinator at a nonprofit. *Id.* Belden attended their first protest on May 29, 2020. *Id.* at ¶5. Belden also attended protests in 2020 on the evening of June 2nd to early morning of June 3, June 9, June 10, on or about June 12, August 10, and September 5. *Id.* at ¶10.

Mx. Belden has personally experienced tear gassing on a number of occasions. *Id.* at ¶11. Generally, Belden experienced asphyxiation, pain in their eyes, nose, and lungs, significant coughing and mucus from their nose, and the feeling of wanting to vomit. *Id.* These symptoms persisted for up to an hour. *Id.* Tear gas has also disrupted their menstrual cycle. *Id.* Belden's

conduct at protests during the applicable class period never rose above "passive resistance," and they carried a medic bag at every protest. *Id.* at ¶12. They were tear gassed nonetheless. *Id.* While the effects were not as severe as being present when the tear gas was deployed, living near the Penumbra Building in East Portland exposed Belden to tear gas from their house. *Id.* Belden experienced tear gas a majority of the nights they protested in Portland. *Id.* Belden felt discouraged by PPB's indiscriminate use of force at protests, and this made them fear attending future protests. *Id.* at ¶¶13-14.

On the evening of June 2, Belden marched to a point near Third and Salmon in Downtown Portland around 7:00 pm. *Id.* at ¶15. The crowd was peaceful. *Id.* They did not confront the police, just a fence*. Id.* PPB announced that people should "clear the fence." *Id.* Then suddenly and without warning, PPB began launching explosives and tear gas into the crowd. *Id.* One went off next to Belden and they ran away. *Id.* While Belden tried to get away from the tear gas, PPB continued to tear gas any crowd it saw "indiscriminately." *Id.* Belden also witnessed "flashbangs" being used indiscriminately. *Id.*

On the night of June 9, Belden arrived downtown by Chapman square on Third and Main by the Justice Center at around 9:00 pm. *Id.* at ¶16. Belden stayed there until around 1:00 am. *Id.* They saw a fence surrounding the parks. *Id.* The crowd outside the Justice Center was peaceful save for a few people rattling the fence. *Id.* At around midnight, the crowd dwindled but remained peaceful, and then without warning PPB fired flashbangs and chemical irritants into the crowd. *Id.* The tear gas formed a thick fog. *Id.* Belden ran away, while PPB continued to fire tear gas and flashbangs. *Id.*

On the night of June 10, Belden arrived downtown at around the same time and location as the night before. *Id.* at ¶17. Once again, the crowd was peaceful. *Id.* Some people did go inside the

fenced in area to streak naked in defiance of the closing of the public area. *Id.* Once again, PPB retaliated with tear gas and flashbangs. *Id.* Belden also experienced a second salvo of OC spray and flashbangs. *Id.*

On the night of June 12, Belden arrived downtown at around 8:00 pm. *Id.* at ¶18. Again, the entire protest crowd peacefully gathered by the fence and got tear gassed after rattling the fence. *Id.* By this time, Belden had decided to keep further away from the fence but felt the effects of tear gas nonetheless. *Id.*

On the night of August 10, Belden arrived in a park near the North Precinct in NE Portland, and marched there at around 10:00 pm. *Id.* at ¶19. PPB's chemical munitions were again deployed, this time by residential neighborhoods. *Id.*

## VII.    Plaintiff Alexandra Johnson

Plaintiff Alexandra Johnson is 29 years old. She has lived in Oregon since she was 5 years old, and in the Portland area since 2010. Decl. Alexandra Johnson, at ¶9.

Johnson attended Portland protests against white supremacy and police violence in the wake of the murder of George Floyd by Minneapolis police because Black Lives Matter and she wants to make her community safer and more equitable. *Id.* at ¶11. She believes that her BIPOC friends should not have to fear for their safety and lives when they leave a summer barbeque at my house and go home or when they are doing any other daily activity. *Id.* She protests because we all deserve something better than our current police structure. *Id.* She estimates she attended 45 to 65 protests between May 31st and November 2020. *Id.* at ¶5.

The first protest she attended in the wake of George Floyd's murder by police was on May 31, 2020. *Id.*, at ¶5. Incidents where she was injured or otherwise exposed to indiscriminate violence and use of chemical agents and impact munitions by PPB include June 5, June 6, June

10, June 13, June 27, June 28, July 4, August 1, August 4, August 5, August 7, August 8, August 9 August 12, August 15, August 22 or 23, and September 5, 2020. *Id.*, at ¶14-32.

    She livestreamed events on Facebook through June 2020, and on Twitch after that. *Id.* at ¶12. She felt it was important to document and share what happened at the protests. *Id.* At no point during any protest did she throw an object at the police. *Id.* at ¶10.

    Throughout the protests, Johnson consistently observed PPB deploy what she calls "flashbangs" at protestors. *Id.* at ¶13.  She understands flashbangs are explosives that cause a loud, bone-rattling explosion that is disorienting and causes minor temporary hearing loss and has a very bright flash, and that RBDDs are a type of flashbang. *Id.* She understands that PPB may refer to these explosives as "aerial distraction devices." *Id.* Throughout the protests, she witnessed PPB officer use over 150 flashbangs. *Id.*

    On June 5, she attended a protest outside the Justice Center, arriving about 11:00 P.M. *Id.* at ¶14. About ten minutes after she arrived, "PPB fired eight tear gas canisters into the area of 3rd and Main, blanketing most of Chapman Square in tear gas." *Id.* PBB fired the canisters from 40 mm launchers and threw some by hand. *Id.* It was the first time Johnson was ever exposed to tear gas; she ran with other protestors away from the gas, and her throat immediately closed up and her nose started running. *Id.* Gas was on her hands, burning her face whenever she touched it *Id.* She saw a woman and her child walking down the sidewalk covering their eyes and mouths *Id.* Protestors panicked because many had never been tear gassed before, and they did not know "which way to exit or which way safety was." *Id.* at ¶15. Protestors regrouped at Third and Main, chanting and singing for ten minutes before PPB fired another six or seven tear gas canisters, pushing protestors towards Pioneer Square. *Id.* Johnson was hit in the thigh by a ball from an RBDD around this time *Id.* About twenty minutes later, and Ms. Johnson and other protestors

walked south on Fourth Avenue, PPB officers on a riot van "unloaded another tear gas canister off of the truck" from "at least 20 to 30 yards away" from protestors *Id*. Protestors later continued to Madison between Third and Fourth Avenues, where they stayed and chanted for ten minutes before PPB threw "tear gas flashbangs" into the group. *Id*. at ¶16. As Johnson backed away from the group, a tear gas canister hit her in the chest then exploded under her feet, releasing the gas into her nose, eyes, skin, and hair. *Id*. The canister hit her with enough force that she believes it came from a 40 mm launcher. *Id*. Protestors panicked and trampled each other. *Id*. PPB launched 54 canisters that night *Id*. Her partner of eight years went to one protest and never came back because of the violence and indiscriminate use of force he saw PPB use on June 5. *Id*. at ¶17.

On June 6, she attended a protest outside the Justice Center. *Id*. at ¶18. She saw PPB officers deploy a flashbang so close to a protestor that it exploded underneath her feet. *Id*. This appeared to trigger a PTSD episode or panic attack in the protestor, who immediately began crying and hyperventilating and lost her hearing. *Id*. Johnson helped her to the side and down the street and stayed with her for a few moments to calm her. *Id*.

On June 10, she attended another protest outside the Justice Center. She witnessed PPB officers shooting FN303s at protestors on the other side of a fence about 50 to 70 feet away, including one munition that exploded against a protestor near her, its fragments hitting her face. *Id*. at ¶19. She was also exposed to several flashbangs that PPB deployed that night. *Id*.

On June 12, Johnson attended another protest outside the Justice Center, arriving between 10:00 and 10:30 PM. *Id*. at ¶20. She brought a shield she made out of "old cabinet wood" to protect herself and others from PPB's "indiscriminate shooting and explosions." *Id*. Around midnight, PPB started deploying flashbangs into a crowd of protestors "chanting, singing, drumming, yelling grievances." *Id*. Fifteen to twenty PPB officers lined up and pushed protestors north on Fourth

Avenue *Id*.  Johnson was 20 to 25 feet away from them when officers yelled, "Move!" *Id*. She turned to move in the direction they were moving. *Id*. Two PPB officers then tackled her to the ground and hit her in the back of the legs twice with a baton. *Id*.

On June 27, Johnson attended another protest outside the Justice Center. *Id.* at ¶21. PPB shot her with an FN303 projectile somewhere north of Sixth and Main. *Id*. The munition hit her in the outside of the left thigh, leaving powder on her pants and an apple-sized bruise that lasted two weeks. *Id*. She also felt ricochets of FN303 projectiles used against other protestors and witnessed protestors hit in the face with batons and OC sprayed. *Id*. That night, she also witnessed a PPB officer wrench a protestor away from a group standing still, spray them directly in the face with OC spray, and tackle them to the ground. *Id.* at ¶22. Shortly after that, a flashbang exploded in the middle of the crowd, beneath her feet. *Id*. Through that night, she saw officers use their batons to knock down protestors, shooting them with impact munitions while they were on the ground, and make no attempt to arrest them. *Id.* at ¶23. At one point, she saw a young Black man walking backward with his hands up when a PPB officer sprayed him directly in the face with OC spray. *Id.* at ¶22. She also saw a PPB officer strike a protestor in the face with a baton. *Id.*

On July 4, Johnson attended another protest at the Justice Center, arriving around 8:30 PM. *Id.* at ¶24. A law enforcement agency shot tear gas into Chapman Square and Lownsdale Square, forcing protestors to Sixth Avenue. *Id.* PPB then used tear gas on protestors. *Id*. PPB chased protestors several blocks and used tear gas again near Second Avenue. *Id*. PPB used 10 to 12 canisters, both hand-tossed and with launchers. *Id*.

On August 1, she attended a protest at the Penumbra Kelly Building. At one point, as PPB officers herded protestors down the street, she saw an officer sprint out of the police line, grab a protestor from behind, turn them around, spray them directly in the face with OC spray, and throw

them to the ground without arresting them. *Id*. at ¶25 . When she went over to help the protestor, another PPB officer shoved her to the ground. *Id.*

Throughout the month of August, Johnson attended many more protests, experiencing and witnessing unprovoked violence at the hands of PPB. *Id*. at ¶¶25-31.

On September 5, Johnson attended a protest near Ventura Park in east Portland, arriving at 6:00 or 7:00 PM. *Id.* at ¶32. The protest inside the park included speeches, food, dancing, singing, and mutual aid activities. *Id*. Protestors marched to a nearby police precinct, and PPB quickly declared an unlawful assembly. *Id*. At that point, she had not seen any violence or objects being thrown at officers. *Id*. Soon after, PPB deployed 20 to 30 tear gas canisters at protestors, both by hand-tossing and with 40 mm launchers. *Id*.

Ms. Johnson believes there are causes that justify putting oneself at risk to create larger social change, and she would consider going to protests in the future. *Id.* at ¶ 34. However, the police violence she has witnessed makes her hesitant to have future interactions with police, and PPB's use of force will be a factor when she determines whether to attend future protests. *Id.*

**VIII.    Plaintiff Lester Wrecksie**

Lester Wrecksie is 45 years old and has been a Portland resident for approximately four years, including during the summer of 2020. Decl. Lester Wrecksie, at ¶5.  He has a Bachelor's Degree in Studio Art, and most recently has been employed as an Operations Lead in a business advertising department for the past nine years. *Id.* at ¶11.

Following the murder of George Floyd on May 25, 2020, Wrecksie attended multiple demonstrations in support of Black Lives Matter and against police brutality. *Id.* at ¶¶6, 12. Wrecksie attended these demonstrations because of his support of the Black Lives Matter

movement and his opposition to the PPB and other police violence against Black people in Portland and across the world. *Id.* at ¶6.

Wrecksie attended numerous protests, including a majority of the nightly protests in June 2020. *Id.* at ¶12. At the beginning of protests in early June, he occasionally carried protest signs expressing: "Black Lives Matter," "Free Palestine," "End Apartheid," "Fuck 12," "Melt ICE" and occasionally carried an umbrella which he had embellished in hot pink and glitter the messages "BLM" and "ACAB." *Id.* at ¶13. He also regularly engaged in protest call-and-responses and chants including, "Black Lives Matter," "say their name" chants about victims of police violence, "fuck 12" and "all cops are bastards." *Id.* At no point at any time at any of the protests did Wrecksie ever throw anything at the police, light any fires, engage in any property destruction, or other otherwise engage in any acts beyond passive resistance. *Id.* at ¶14.

On June 20, around 7:00pm or 8:00pm, Wrecksie attended a protest at the Justice Center. *Id.* at ¶15. He joined other demonstrators who were standing or sitting on Third Avenue in front of the building and brought with him his bicycle, which he had used to get to the area and which was his main form of transportation. *Id.* That evening, Wrecksie heard PPB make an announcement listing city street names and saying words to the effect that downtown was closed, and to leave the area. Wrecksie stood where he was in peaceful protest. *Id.*

Then, uniformed officers, believed to be PPB based on the earlier and continued announcements, came down the street where Wrecksie and other protestors were standing. *Id.* at ¶16. PPB's announcements around that time continued, including, "this is the Portland Police Bureau" and to leave the area "or you [demonstrators] will be subject to arrest and use of force including crowd control munitions." *Id.* at ¶16; Bruggemeier, at ¶ 11, Ex. J. Wrecksie walked his bike with the crowd down Third Avenue as instructed by the police. *Id.* at ¶16. He noticed an older

Black gentleman remained seated on the ground in the middle of street and approached him, leaning over his bicycle to ask the man if he wanted anyone to stay with him, because Wrecksie was concerned for his safety at the hands of police. *Id.* During their conversation, while Wrecksie was facing north and away from the police, police shot a flashbang grenade which hit him and explored on or near him. *Id.*; Bruggemeier, at ¶ 11, Ex. J. Wrecksie suffered a concussion and fell unconscious as a police officer wrenched his bicycle out of his hands. *Id.*

When he regained consciousness, other protestors were dragging Wrecksie on the ground towards Chapman Square in an attempt to get away from the police. *Id.* at ¶18. Police officers blocking off the area from Fourth Avenue, and multiple officers subjected Wrecksie to multiple baton strikes, hitting him and others indiscriminately while yelling, "move, move, move" even though he and other members of the crowd were already moving. *Id.*

On June 30, 2020, around 5:00pm or 6:00pm, Wrecksie attended a protest, first meeting at Peninsula Park in the early evening to listen to speakers and musical performers, and then marching to the Portland Police Association ("PPA") building on N Lombard Street. *Id.* at ¶20. That day, Wrecksie wore roller skates, knee pads, a leopard-print helmet, a backpack, blue jeans, and a blue floral handmade Covid mask. *Id.* at ¶21.

Shortly after Wrecksie arrived on Lombard near the PPA building, PPB announced that the gathering was unlawful, and the protestors were to disperse. *Id.* at ¶22. After the announcement, Wrecksie sat down on the ground in peaceful protest. *Id.* He tried to encourage others to do so as well, but they were terrified and did not join him because the line of police were quickly advancing on the crowd of protestors. *Id.* Fearful of being trampled, Wrecksie stood up and helped his friend and others turn their bicycles around in order to retreat with the crowd. *Id.* Wrecksie moved east

with the crowd, as the police continued to advance and push members of the crowd east on N Lombard St. *Id.*

As members of the crowd continued to move, Wrecksie saw people near the police line holding a banner. *Id.* at ¶23. Those holding the banner walked backwards, and their banner which read "ABOLISH THE P.P.B." faced the PPB officers. *Id.* at ¶23; Dkt. 150 (Decl. Matthew Cleinman, Ex. 1). Wrecksie rolled to them and helped carry a part of the banner while continuing to move east, with his back was facing the police. *Id.* PPB officers yanked Wrecksie's backpack multiple times, and he felt a stinging sensation in his face and eyes as if he had been pepper sprayed. *Id.* Wrecksie lost his balance and fell. *Id.* Officer Taylor shot him multiple times with FN303 munitions. *Id.*

Prior to getting shot by PPB, Wrecksie had been holding the banner, facing east, and moving east in compliance with the police's instructions. *Id.* at ¶24. He was not engaged in any conduct beyond passive resistance. The weapons struck Wrecksie's back hip, around his backpack, and his leg around his ankle, and caused multiple bruises. *Id.* at ¶25. Other demonstrators pulled Wrecksie up off the ground and through the crowd where he was able to continue to move east on Lombard. *Id.* at ¶26. That evening at the protest, Wrecksie was also subjected to PPB's use of flashbang grenades and tear gas. *Id.* at ¶ 28.

On at least two other occasions in June 2020, Wrecksie was subjected to additional use of flashbang grenades. *Id.* at ¶29. One occasion was when Wrecksie was leaving a protest down SW Main Street, he was hit in the ankle by a flashbang grenade which had bounced and exploded while Wrecksie was running away from the area in compliance with police instructions. *Id.* On other occasion, Wrecksie experienced a flashbang grenade bounce off of his helmet. *Id.*

PPB also subjected Wrecksie to baton strikes. *Id.* at ¶31. On one occasion at a protest near the PPA building on N Lombard Street, Wrecksie followed police's instructions to move to the sidewalk. *Id.* But once he complied and was on the sidewalk, police came to the sidewalk and started shoving him and others with batons to forcefully move them down the block. *Id.* He witnessed and experienced numerous similar incidents, where the police hit him and other demonstrators with batons to get them to move, even when the crowd was complying but not able to move as quickly as the police's batons dictated. *Id.*

In addition to the incident on June 30, PPB subjected Wrecksie to tear gas on multiple other occasions. *Id.* at ¶33. One occasion was during the evening when Wrecksie was attending a protest downtown on Salmon Street. *Id.* Wrecksie recalled the street being "fogged completely over" with green smoke in the area. He tried to escape the area but people around him were also choking and "running blind." *Id.* When Wrecksie eventually made it out of the worst of the tear gas, near Fifth Avenue, he was forced to take off his fabric covid face mask and vomited in the street. *Id.* Wrecksie suffered similar experiences during many protests in June and July 2020, including in residential neighborhoods. *Id.*

Witnessing and experiencing PPB's violent response to the demonstrators has made Wrecksie wary of attending another demonstration. *Id.* at ¶37. He now has to weigh exercising his rights with facing additional trauma at the hands of the police. *Id.* PPB's conduct has negatively impacted his ability to protest and exercise his First Amendment rights. *Id.*

## IX.    Plaintiff Thomas Drier

Thomas Dreier is a 34 year old who was born and grew up in Portland. Decl. Thomas Dreier, at ¶9. He is a musician who, during 2020, played acoustic guitar and sang at protests and with a group called the Good Troubles. *Id.* Between May 25, 2020 and November 15, 2020, he

estimates he attended two to three protests per week for a total of at least 15 and up to 48 protests. *Id.* at ¶5. He did not start attending protests until a month or two after George Floyd's death, as he was concerned about potential exposure to COVID-19. *Id*.

On August 6, 2020, Dreier attended a protest that ended at Ventura Park in Southeast Portland. *Id.* at ¶11.  That night, a riot van of PPB officers drove by Dreier and others passively protesting the police and standing on the sidewalk. *Id*. Dreier was on the sidewalk playing his guitar when a PPB officer riding on the side of the riot van shot a 40 mm round at him, hitting the neck of his guitar. *Id*. The officer shot at him just as the van was leaving, in what appeared to be a "parting blow." *Id*. Dreier was not throwing anything at police when they shot at him, and nor did he observe anyone near him throwing objects. *Id*. After police shot his guitar, Dreier "retreated into the park to a safe spot" where he thought police "wouldn't continue shooting at" him, and recorded video of the damage to his guitar and recounted the incident. *Id.* at ¶12. The 40 mm impact round left green chalk on the neck of the guitar. *Id.* at ¶12, 15.

On the evening of August 15, 2020 and into the early morning of August 16, Dreier attended a protest that began at Laurelhurst Park and marched to the Penumbra Kelly Building. *Id.* at ¶13. By his estimation, Dreier stayed with the crowd of protestors in front of the building for at least two hours before Portland Police again shot a 40 mm round at him. *Id*. He does not recall seeing protestors throw objects at the police that night or whether a sound truck gave orders to protestors. *Id*.

That night, Dreier saw a PPB officer approach a protestor standing on the sidewalk and choke the protestor with his hands, pushing him against a wall. *Id.* at ¶14; Bruggemeier, at ¶22, Ex. U (video of full incident). The officer "didn't seem to be going through the motions of arresting the protestor, he seemed to just be brutalizing him." *Id*. To protest that officer's actions, Dreier

"casually strolled" to about six feet from the officer and began to play the Woody Guthrie song, "All You Fascists Bound to Lose." *Id.*  The officer then turned his attention to Dreier and ripped the guitar from his hands. *Id.* The officer walked away with the guitar, and Dreier followed him into the street, asking for the guitar back. *Id.* Two other officers ordered Dreier back onto the sidewalk, and he complied. *Id.* When he got back on the sidewalk, a PPB officer shot him in the upper thigh with a 40 mm round. *Id.* The impact round bounced between his thighs, causing both to bruise. *Id.* at ¶14, 16. Dreier collapsed to the ground. *Id.* at ¶14. The impact round left green chalk where it struck him. *Id.*

Dreier has not thrown any objects, lit fires, or graffitied property during any protest he attended, with the exception of once underhanding a water bottle over a fence in front of the federal courthouse without intending to hit anyone, sometime between July and September 2020. *Id.* at ¶10. While Dreier intends to continue protesting police violence and supporting the Black Lives Matter movement, PPB's use of force has impacted his mental health, and he took days off from protesting to recover and because he could not always face consecutive nights of PPB's violence. *Id.* at ¶19.

## ARGUMENT

Plaintiffs have satisfied their burden to certify the class as requested. The Court is not alone in addressing these issues because plaintiffs are not the only people in the country that responded to the 2020 campaigns of police violence with lawsuits. *See, e.g., Williams v City of Minneapolis*, Case 0:20-cv-01303 (D. Minn.); *Goyette v. City of Minneapolis*, Case 0:20-cv-01302 (D. Minn.); *Williams et al v. City of Dallas Texas et al*, Case 3:20-cv-01526-L (N.D. Tex.); *Ballew v. City of Chicago*, Case 1:20-cv-03422 (N.D. Ill.); *Black Lives Matter Seattle-King County et al v. City of Seattle*, Case 2:20-cv-00887-RAJ (W.D. Wash.); *Black Lives Matter Los Angeles v. City of Los*

*Angeles*, Case  2:20-cv-05027 (C.D. Calif.); *Abay et al v. City of Denver*, Case 1:20-cv-01616-RBJ (D. Col.); *Anti-Police Terror Project v. City of Oakland*, Case 3:20-cv-03866 (N.D. Calif.); *Gaffett v. City of Oakland, et al*., 3:21-cv-02881 (N.D. Calif.); *Black Lives Matter v. City of Indianapolis*, Case 1:20-cv-01660 (S.D. Ind.). Of those, only one has substantively litigated class certification. *See Anti-Police Terror Project*, Dkt. No. 124 (Order Denying Motion for Class Certification Without Prejudice). While Judge Spero denied plaintiffs' motion for class certification in that case, he made clear that if the plaintiffs were to amend their motion to limit the class in precisely the ways that plaintiffs here have limited their class, he would certify the class. *Id*. The parties have since stipulated to class certification. *Id*. at Dkt. No. 139. Judge Spero's order is a useful starting point for analyzing the issues presented here.

I.    **Plaintiffs Satisfy the Requirements of FRCP 23(a)**

A proposed class must meet the four threshold requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation.  Fed. R. Civ. P. 23(a); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013).  Plaintiffs' proposed class satisfies all four Rule 23(a) prerequisites.

In the present case, Plaintiffs seek certification under Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

Although in some cases the court may have to "probe behind the pleadings" to determine whether the plaintiffs have met the requirements of Rule 23, "[m]erits questions may be considered to the extent—but only to the extent— that they are relevant to determining whether the Rule 23

prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013) (citations omitted).

Courts in the Ninth Circuit and elsewhere have certified (b)(2) classes seeking injunctive relief on behalf of protestors injured by police. *See, e.g., Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 246 F.R.D. 621 (C.D. Calif. Dec. 14, 2007) (hereinafter "*MIWON*"); *Chang v. United States*, 217 F.R.D. 262 (D.D.C. 2003); *Washington Mobilization Committee v. Cullinane*, 400 F. Supp. 186 (D.D.C. 1975); *Sullivan v. Murphy*, 478 F.2d 938 (D.C. Cir. 1973). As the *MIWON* court recognized: "As a general matter, less precision is required of class definitions under Rule 23(b)(2) than under Rule 23(b)(3), where mandatory notice is required by due process. Manageability is not as important a concern for injunctive classes as for damages classes." 246 F.R.D. at 630.

### A.    The Proposed Class Is Numerous so Joinder of All Members Is Impracticable

The numerosity requirement is met when "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity has been held presumptively satisfied when a proposed class comprises forty or more members. *See, e.g.*, *Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 188 F.R.D. 365, 372 (D. Or. 1998); *In re Cooper Co. Inc. Sec. Litig.,* 254 F.R.D. 628, 634 (C.D. Cal. 2009). The class here is many orders of magnitude larger. In the months since George Floyd's death and the protests opposing police violence and white supremacy began, thousands of people have engaged in protests. Plaintiffs readily meet this standard.

Plaintiffs here do not need to identify a precise number of class members in order to be granted class certification. "Where a plaintiff seeks 'only injunctive and declaratory relief, the numerosity requirement is relaxed and plaintiffs may rely on reasonable inferences arising from

plaintiffs' other evidence that the number of unknown and future members is sufficient to make joinder impracticable.'" *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1203 (N.D. Cal. 2017) (quoting *Civil Rights Educ. & Enf't Ctr. v. Hosp. Props. Tr.*, 317 F.R.D. 91, 100 (N.D. Cal. 2016)), aff'd, 867 F.3d 1093 (9th Cir. 2017). Similarly, "a court may draw a reasonable inference of class size from the facts before it." *Lynch v. Rank*, 604 F. Supp. 30, 36 (N.D. Cal. 1984), aff'd, 747 F.2d 528 (9th Cir. 1984), opinion amended on reh'g, 763 F.2d 1098 (9th Cir. 1985).

Moreover, given the chaotic environment caused by the COVID-19 pandemic, the protests, and the resulting civil unrest, future class members also exist.  The existence of future class members renders joinder impractical, thereby satisfying the purpose behind the numerosity requirement. *See, e.g., Ali v. Ashcroft*, 213 F.R.D. 390, 408-09 (W.D. Wash. 2003) ("[W]here the class includes unnamed, unknown future members, joinder of such unknown individuals is impracticable and the numerosity requirement is therefore met, regardless of class size." (quotation marks omitted)), aff'd, 346 F.3d 873 (9th Cir. 2003), vacated on other grounds, 421 F.3d 795 (9th Cir. 2005); *Smith v. Heckler*, 595 F. Supp. 1173, 1186 (E.D. Cal. 1984) (noting that in injunctive relief cases, "[j]oinder in the class of persons who may be injured in the future has been held impracticable without regard to the number of persons already injured").  Numerosity is satisfied here.

Based on all of the evidence presented above, thousands of people showed up to protest in the wake of the murder of George Floyd and were subjected to violence by the City. Even if one were to take a single night where PPB used tear gas, June 2, even the PPB members' own estimates of the size of crowds they used tear gas on easily meet the numerosity standard. There can be no serious dispute that the number of people in plaintiffs' proposed indiscriminate weapons sub-class meets the numerosity requirement. With respect to the use of less-lethal weapons, plaintiffs have

provided evidence from a) protestor witnesses actually harmed by these weapons, b) neutral observers estimating the number of people they saw harmed by these weapons, and c) the police reports themselves, describing using these weapons against people engaged in passive resistance. Any one of these categories of evidence standing alone would be sufficient to show that numerosity is met.

### B.    The Commonality Standard is Met

The second threshold to certification requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy this element, the plaintiff must allege a common contention "of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). In other words, "[w]hat matters to class certification is not the raising of common 'questions' — even in droves — but rather, the capacity of a classwide proceeding to generate common <u>answers</u> apt to drive the resolution of the litigation." *Id.* (internal marks and citation omitted; emphasis in original). This commonality requirement "has been construed permissively." *Giles v. St. Charles Health Sys., Inc*., 294 F.R.D. 585, 590 (D. Or. 2013) (quoting *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1019 (9th Cir. 1998)). A plaintiff "need not show . . . that every question in the case, or even a preponderance of questions, is capable of class wide resolution." *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (quotation marks omitted). Rather, a "single *significant* question of law or fact" satisfies the commonality requirement. *Abdullah v. U.S. Sec. Assoc., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (quotation omitted and emphasis in original); *see also, Mazza v. Am. Honda Motor Co*., 666 F.3d 581, 589 (9th Cir. 2012) (noting that "commonality only requires a single significant question of law or fact").

The existence of "shared legal issues with divergent factual predicates" is sufficient to satisfy Rule 23(a)(2). *Hanlon*, 150 F.3d at 1019; *see also Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) (applying this rule post-*Dukes*).

Indeed, in civil rights suits such as this one, "commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members. Under such circumstances, individual factual differences among class members pose no obstacle to commonality." *Parsons,* 754 F.3d at 682 (quoting *Rosas v. Baca*, 2012 WL 2061694, at *3 (C.D. Cal. June 7, 2012)); *Murphy v. Precision Castparts Corp.*, 2018 U.S. Dist. Lexis 108252, at *2, 2018 WL 3151426 at *2 (D. Or. June 6, 2018) (Beckerman, J.) ("class members need not be identical in all respects"), report and recommendation adopted, 2018 U.S. Dist. Lexis 107598, 2018 WL 3150675 (D. Or. June 27, 2018).

The core of all of Plaintiffs' claims is that the PPB has a pattern, practice, and custom of using tactics that chill protected speech because of the content of that speech—criticisms of police generally and the PPB in particular. One significant part of this pattern, practice, and custom is the use of unconstitutional force at civil rights protests since the murder of George Floyd—specifically the use of indiscriminate force against, at best, passively resistant protestors. This practice is, in and of itself, unconstitutional. The Portland Police Bureau has maintained this pattern, practice, and custom for years. Their failure to train and/or discipline officers for violating the constitution, and to cease this pattern, practice, and custom has had the effect of condoning or acquiescing to these unconstitutional practices. As has been demonstrated over the past few years, and during the pendency of this case, the PPB engage in restraint and respect for First Amendment rights when nominally pro-police groups rally in Portland. When groups critical of police rally, PPB engages

in aggressive tactics to prevent the expression of protected speech, often culminating in the use of indiscriminate force against people engaged in protected speech.

Plaintiffs point to a common nucleus of core facts making up their claims, and seek injunctive relief only to cure those claims. This is precisely the framework from which certification under Rule 23(b)(2) is appropriate. From this general framework, many common questions of law and fact emerge. First, with respect to the general class and the First Amendment claims made on behalf of that class:

o Whether the class was engaged in protected speech through its protest activities in support of Black Lives Matter and against police violence;

o Whether the defendants' aggressive tactics in policing of protests in support of Black Lives Matter and against police violence would chill a person of ordinary firmness from continuing to engage in the protected activity;

o Whether the content of the class's message was a substantial motivating factor in the defendants' conduct (the use of aggressive tactics in policing of protests in support of Black Lives Matter and against police violence). To determine this question, the jury will need to assess common questions of fact, including:

▪ Whether the defendants' tactics in response to other types of protests were different;

▪ Whether whatever non-discriminatory rationale the City puts forth for those differences is believable;

o Whether the conduct of the Portland Police Bureau in policing protests in support of Black Lives Matter and against police violence was the policy, custom, or practice of the City of Portland because it was either:

- ▪ a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity. This requires the jury to determine common factual issues, including:

    - Whether PPB's tactics with respect to protests in support of Black Lives Matter and against police violence differed substantially from its tactics with respect to other protests;

    - How long any differences in response have persisted.

- ▪ Or, the individual PPB member who authorized or directed the retaliation was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy;

- ▪ Or, an official with final policy-making authority ratified the retaliation and the basis for it.

o Whether the policy, custom, or practice of the City of Portland amounted to deliberate indifference to the class's constitutional right to free expression;

o Whether the policy, custom, or practice of the City of Portland was the moving force behind the violations of the rights of the class.

These questions could be broken down into many subparts with questions of both law and fact that are common to the determination of the entire class's claim. However, due to the nature of the class claims as claims for injunctive relief, the truly dispositive common question is: if the City of Portland has a practice, policy, or custom of engaging in discrimination against protestors based on the content of their message, what form of injunctive relief is necessary to change that practice, policy, or custom moving forward? *See, Wal-Mart*, 564 U.S. at 350 (noting that the critical question is whether class litigation has the capacity to provide class-wide *answers*).

The two Fourth Amendment sub-classes--the indiscriminate force sub-class and the less-lethal sub-class—similarly raise droves of common questions of law and fact (often mixed questions of law and fact). They include:

- For the tear gas subclass:

    o Whether the use of tear gas, when the police know that individuals who have not engaged in any unlawful conduct will be affected by the gas, amounts to an intentional seizure of those individuals under the Fourth Amendment.

    o What degree of exposure to tear gas is necessary to amount to a seizure under the Fourth Amendment.

    o Whether the circumstances that existed on May 29, 30, 31, June 1, 2, 5, 6, 13, 26, 27, 30, July 4, 18, August 5, 12, 19, 22, 23, 24, and September 5 justify the seizure of all the individuals who were seized by the use of the gas.

- For the less-lethal subclass:

    o Whether the PPB had a custom, practice, or policy of failing to apply their general use of force policies (and therefore failing to apply an individual *Graham* analysis) before using less-lethal force against individual protestors in crowd-control settings;

    o Whether PPB had a custom, practice, or policy of failing to require officers who used force against protestors to follow their own policies with respect to report writing and documentation of the use of force;

    o Whether PPB had a custom, practice, or policy of failing to review uses of force against protestors through the chain of command as their policies require;

Any one of these common legal or factual issues, standing alone, is enough to satisfy Rule 23(a)(2)'s permissive standard. *Abdullah*, 731 F.3d at 957. Here again, however, the truly operative question is whether, if there is a custom, practice, or policy that results in violations of the Fourth Amendment against protestors, what injunctive relief is appropriate to remedy that unlawful policy.

The fact that class members may have different factual circumstances does not render commonality non-existent. Courts recognize that even "[w]here the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists." *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1029 (9th Cir. 2012) (internal quotations omitted); *see also Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998) ("Differences among the class members with respect to the merits of their actual document fraud cases, however, are simply insufficient to defeat the propriety of class certification"). This is especially true here where any factual differences are immaterial to the core, and common, legal questions. *See, e.g., Hernandez v. Lynch*, 2016 WL 7116611, at *19 (C.D. Cal. Nov. 10, 2016) (granting certification in challenge to U.S. immigration officials' policies and practices surrounding bond requirements for detainees even though outcome of individual bond cases would depend on the facts of each case).

Due to the numerous common questions of law and fact among the proposed class, the commonality requirement is satisfied.

## C.    Plaintiffs' Claims Are Typical

Typicality is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of

the class." *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "The test of typicality 'is whether the other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured in the same course of conduct.'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011). The Ninth Circuit does not require "the named plaintiff's injuries to be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries result from the same, injurious course of conduct." *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001); *see also Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

Courts have found typicality where various class members were injured more or less than the class representatives, *see Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999) (variations in degree of respiratory illness does not defeat typicality); *Hartman v. Duffey*, 19 F.3d 1459, 1471-72 (D.C. Cir. 1994) (different job categories and rates of pay do not defeat typicality in workplace discrimination class action), where certain class members claim that they were satisfied, *see Rosario*, 963 F.2d at 1018, or where class members were injured at different times. *See Alfus v. Pyramid Technology Corp.*, 764 F. Supp. 598, 606 (N.D. Calif. 1991).

As with commonality, any factual differences between plaintiffs also does not defeat typicality. *LaDuke v. Nelson*, 762 F.2d 1318, 1332 (9th Cir. 1985) ("The minor differences in the manner in which the representative's Fourth Amendment rights were violated does not render their claims atypical of those of the class."); *cf. Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997) (certifying Rule 23(b)(2) class despite differences in the exact nature of the harm suffered by class members).

In this case, plaintiffs' claims are premised on precisely the same conduct as the claims of proposed class members. Plaintiffs and proposed class members each attended protests in support of Black Lives Matter; they each were subjected to the use of force by the City of Portland; and, at the time they were subjected to that force, none of them were engaged in physical resistance or active aggression. Thus, Plaintiffs' claims arise out of the same course of conduct, are based on the same legal theory, and resulted in similar injuries as the claims of the proposed class. Accordingly, the typicality requirement is satisfied.

### D.    The Class Is Adequately Represented

The final Rule 23(a) prerequisite requires that the representative parties have and will continue to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This factor has two components. First, the named representatives must appear able to prosecute the action vigorously through qualified counsel, and second, the representatives must not have antagonistic or conflicting interests with the unnamed members of the class. *Lerwill v. Inflight Motion Pictures*, 582 F.2d 507, 512 (9th Cir. 1978).

Here, plaintiffs have the same interests as the proposed class members—all have engaged in protests, and all have been exposed to force by the PPB.    Plaintiffs understand the responsibilities of being a class representative and are willing and able to actively participate in the action, and they do not seek unique or additional benefits from this litigation. Roberts Decl. ¶¶2-8; Belden Decl. ¶¶2-8; Johnson Decl. ¶¶2-8; Dreier Decl. ¶¶2-8; Wrecksie Decl. ¶¶2-10. Plaintiffs' objective is to secure injunctive relief that will protect the entire class from the challenged practices. As such, Plaintiffs do not have any interests that are antagonistic to the interests of the proposed class.

Proposed class counsel, Albies & Stark, Levi Merrithew Horst, and Oregon Justice Resource Center, have and will continue to prosecute this matter vigorously and adequately protect absent class members. These firms have committed significant resources to litigating this case, regularly engage in major complex civil rights litigation, and have experience in class action lawsuits involving civil rights. Albies Decl. ¶17-21; Merrithew Decl. ¶¶ 2-5; Chavez Decl. ¶¶ 2-11. Proposed class counsel have been appointed as class counsel in class actions litigating violations of federal and state laws. *Id*. Thus, the adequacy requirement is satisfied.

## II. Plaintiffs Satisfy the Requirements of FRCP 23(b)(2)

In addition to satisfying the four requirements of Rule 23(a), the proposed class also satisfies Rule 23(b)(2). Certification of a class under Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). In the Ninth Circuit, "[i]t is sufficient [that] class members complain of a pattern or practice that is generally applicable to the class as a whole." *Walters*, 145 F.3d at 1032, 1047. "'The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class or as to none of them.'" *Lyon v. ICE*, 308 F.R.D. 203, 213 (N.D. Cal. 2015) (quoting *Wal-Mart*, 564 U.S. at 360).

"[T]he focus [in a Rule 23(b)(2) class] is not on the claims of the individual class members, but rather whether [the Defendants] ha[ve] engaged in a 'common policy.'" *In re Yahoo Mail Lit.*, 308 F.R.D. 577, 599 (N.D. Cal. 2015). Thus, "[t]he fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from

meeting the requirements of Rule 23(b)(2)." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010).

Rule 23(b)(2)'s requirements are met here. Plaintiffs allege and present substantial evidence of a common policy by the City of Portland—using force against BLM protestors for the purpose of dispersing them (and thus silencing their expressive conduct) when protestors have engaged in nothing more than passive resistance. Either it is lawful to gas and use less-lethal force against compliant and passively resisting protestors, or it is not. Either the City treated police accountability protestors differently from fascist sympathizers, or it did not. Undoubtedly, the City will argue that its use of force against protestors was the result of individualized *Graham* determinations that the particular force at the particular time was justified. Plaintiffs intend to prove that these are nothing more than post-hoc justifications; the true purpose of all the force used was to disperse the crowd. The resolution of this question is for the finder of fact at the merits stage. The existence of the dispute is further support for the need of a class.

Because plaintiffs and the proposed class seek injunctive relief only, the class certification requirements are necessarily more relaxed. *MIWON*, 246 F.R.D. at 630. Nonetheless, given the amount and strength of evidence supporting this motion, the Court should have no trouble concluding that the requirements of Rule 23 are met here.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court grant this motion and enter an order certifying the proposed class under Rule 23(b)(2); appoint plaintiffs as class representatives; and appoint the plaintiffs' counsel as class counsel.

**DATED** this 19th day of January, 2022.

                                        *s/J. Ashlee Albies*
                                        **J. Ashlee Albies**, OSB No. 051846
                                        **Whitney B. Stark**, OSB No. 090350
                                        **Maya Rinta**, OSB No. 195058
                                        Albies & Stark LLC

                                        **Jesse Merrithew**, OSB No. 074564
                                        **Viktoria LO** OSB No. 175487
                                        Levi Merrithew Horst PC

                                        **Juan C. Chavez**, OSB No. 136428
                                        **Brittney Plesser**, OSB No. 154030
                                        **Alex Meggitt**, OSB No. 174131
                                        **Franz H. Bruggemeier**, OSB No. 163533
                                        Oregon Justice Resource Center
                                        **Attorneys for Plaintiffs**