```
                                                            1
\         IN THE UNITED STATES DISTRICT COURT

                   DISTRICT OF OREGON

                   PORTLAND DIVISION


DON'T SHOOT PORTLAND, et al. ) Case No. 3:20-cv-00917-HZ
                             )
     Plaintiffs,             )
                             )
     v.                      )
                             )
CITY OF PORTLAND, a municipal)
corporation,                 )
                             )
     Defendant.              )
-----------------------------
```

DEPOSITION OF CRAIG DOBSON

Taken on behalf of the Plaintiffs

December 9, 2021

BE IT REMEMBERED THAT, pursuant to the Federal Rules of Civil Procedure, the deposition of CRAIG DOBSON via Zoom was taken before Julie Purcell, a Certified Shorthand Reporter, on Thursday, December 9, 2021, commencing at the hour of 1:00 p.m.

```
                                                                          2
 1   APPEARANCES:
 2   Levi Merrithew Horst, PC
     By Jesse A. Merrithew
 3   610 SW Alder Street, Suite 415
     Portland, OR  97205
 4   (971) 229-1241
     jesse@lmhlegal.com
 5
     Oregon Justice Resource Center
 6   By Franz H. Bruggemeier
        Juan C. Chavez
 7   PO Box 5248
     Portland, OR  97208
 8   (503) 944-2270
     fbruggemeier@ojrc.info
 9   jchavez@ojrc.info
10   Albies & Stark, LLC
     By J. Ashlee Albies
11   1 SW Columbia Street, Suite 1850
     Portland, OR  97204
12   (503) 308-4770
     ashlee@albiesstark.com
13
              Counsel for Plaintiffs
14
15   J. SCOTT MOEDE
     Chief Deputy City Attorney
16   scott.moede@portlandoregon.gov
     NAOMI SHEFFIELD
17   Senior Deputy City Attorney
     naomi.sheffield@portlandoregon.gov
18   ROBERT YAMACHIKA
     Senior Deputy City Attorney
19   rob.yamachika@portlandoregon.gov
     MICHAEL PORTER
20   mike.porter@portlandoregon.gov
     Portland City Attorney's Office
21   1221 SW 4th Avenue, Rm. 430
     Portland, OR  97204
22
              Counsel for Defendant
23
24   Also Present:   Teressa Raiford, Clair Warnock
25
```

```
                                                                            3

 1                        EXAMINATION INDEX

 2                                                        Page

 3    Examination by Mr. Merrithew                        4-83

 4

 5                         EXHIBIT INDEX

 6    - none marked -

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

DON'T SHOOT PORTLAND, et al. v. CITY OF PORTLAND                3:20-cv-00917-HZ
CRAIG DOBSON                                                        12/9/2021

Aufdermauer Pearce Court Reporting, Inc.
503-545-7365

Dec of Merrithew
Exhibit 3 - Page 3 of 13

                                                                        4

1                        CRAIG DOBSON
2    having been first duly sworn under oath, testified under
3    oath as follows:
4
5                        EXAMINATION
6    BY MR. MERRITHEW:
7         Q.   Is it Lieutenant Dobson?
8         A.   It's Commander Dobson.
9         Q.   Commander Dobson.  Commander, have you ever
10   had your deposition taken before?
11        A.   I've had a couple, yes, sir.
12        Q.   Okay.  So you understand that this is a
13   proceeding that is under oath subject to the penalty of
14   perjury?
15        A.   Yes, yes.
16        Q.   And the primary difference in terms of how
17   it's recorded as opposed to state court is we have a
18   court reporter who is listening to this and trying to
19   take it down.  Do you understand that?
20        A.   Yes.
21        Q.   The Zoom depositions I've found are difficult
22   for many reasons, but one of them is that it's harder
23   not to talk over one another and that's pretty important
24   for the court reporter.  So, if you can agree to do your
25   best to wait until I finish asking a question, I'll do

5

1  my best to wait until you've finished answering the
2  question, and we'll try not to annoy the court reporter.
3  Is that a good plan?
4        A.   I hope to follow that plan, yes.
5        Q.   Okay.  Commander Dobson, the other thing that
6  makes this particular deposition a little bit unusual is
7  I'm not actually here to learn about Commander Dobson's
8  recollections or understanding of anything.  You're here
9  to speak on behalf of the City of Portland.  Do you
10 understand that?
11       A.   Yes.
12       Q.   And the City has designated you -- on my cheat
13 sheet -- to talk about three different topics that we
14 asked for a witness to talk about.  Do you understand
15 that?
16       A.   Correct.
17       Q.   Do you believe that you're as prepared as you
18 can be to speak for the City of Portland on those three
19 topics?
20       A.   Yes.
21       Q.   Okay.  I'd like for you to begin by telling
22 us -- actually, strike that.
23            I'm going to start with the topic that I think
24 is a little bit more discrete, which is topic No. 9,
25 regarding the policies, directives and trainings that

51

1  information with our intelligence unit and providing me
2  that which I needed.
3              MR. MERRITHEW:  Can we take like a 10 or
4  15-minute break?
5              MR. YAMACHIKA:  Yeah.
6              MR. MERRITHEW:  Thanks.
7              (Recess:  2:23 to 2:39 p.m.)
8
9  BY MR. MERRITHEW:  (Continuing)
10      Q.   All right.  Commander Dobson, I'd like to move
11  on to talking about riot control agents with you.
12      A.   Okay.
13      Q.   How does the bureau define riot control
14  agents?  What's in that category of munitions?
15      A.   That would be CS, CN, which we don't use, OC,
16  under the pyro -- it would be pyro, there's different
17  types, are typically the three that we look at.
18      Q.   Okay.  And by "pyro," you mean ammunition that
19  has a pyrotechnic ignition system?
20      A.   It burns.
21      Q.   The handheld OC spray canisters that officers
22  carry, those are not included in that category of
23  weapons --
24      A.   Not usually.  We do not consider -- no, that
25  is correct.

52

1          MR. YAMACHIKA:  Just to make sure we're
2  not missing something, like OC vapor, is that different?
3          THE WITNESS:  So that would be a crowd
4  control munition typically, but it's limited in its
5  effects.
6
7  BY MR. MERRITHEW:  (Continuing)
8      Q.   With respect to riot control agents, does
9  Incident Command need to give a specific direction
10 before members on the ground are authorized to use riot
11 control agents on a crowd?
12     A.   Yes.  Typically, yes.
13     Q.   So, is it then the case that it is in fact the
14 Incident Commander who is deciding when or whether to
15 use riot control agents?
16     A.   Yes.
17     Q.   So, can you tell me what factors the Incident
18 Commander takes into account when deciding whether or
19 not to use riot control agents in response to a
20 gathering of people?
21     A.   So, again, we're looking at a variety of
22 things.  In particular for CS, if we're using CS gas or
23 OC gas, we're looking at a number of factors.  We're
24 looking at location.  We're looking at weather.  We're
25 looking at the topography that's there.  We're looking,

                                                                            55
1    weather gets hot enough and things get dry enough,
2    because we're using a burning device, we would limit it
3    based on its chance of setting something on fire.
4         Q.   All right.  Let's talk more about the aspects
5    of the crowd that would cause Incident Command to either
6    authorize or not authorize the use of tear gas, CS gas
7    or other types of gas.  You said something about whether
8    you have a civil disturbance or an unlawful assembly and
9    how many people in the crowd are engaged in criminal
10   activity.
11             Could you tell us, is there any particular
12   threshold that Incident Command is looking for before
13   authorizing the use of CS gas against the crowd, like,
14   you know, 60 percent of the crowd has to be engaged in
15   criminal activity or 20 percent or anything like that?
16        A.   It's really hard to make that kind of
17   determination.  Again, you're looking at situational
18   awareness of what do you have, understanding your tools.
19   So, CS gas is effective in moving a crowd.  It causes
20   very little damage in -- So, we're looking at -- When
21   we're looking at what tools to use, we're looking at
22   what is going to be safe and effective both for the
23   crowd, for the public, as well as the police.  And so
24   can I use this tool on a crowd that is largely either in
25   riot or in unlawful assembly and does it -- is it a tool

56

1  that gives me the stand-off distance so that it's safer
2  for me to apply this tool as opposed to having to use
3  batons with a crowd.  All of those factors come in when
4  we're making that decision with a crowd.  You know, are
5  they throwing projectiles so it's not safe for us to get
6  into that crowd.  It's those type of things.
7       Q.   From Incident Command's point of view, any
8  time the CS gas is used on a crowd, would you
9  acknowledge that there will be people who will be
10 affected by the gas who have committed no criminal act?
11      A.   So, we recognize that gas, once -- once
12 deployed, is indiscriminate in that we can't -- we don't
13 control where it goes.  What we do because we understand
14 the gravity of using CS gas, we try not to use it unless
15 we feel that it's actually going to be a help.  And
16 then, also, prior to using it, we give enough warnings
17 so that those that are there that -- our hope is those
18 that are there that recognize that there's something
19 going on here, that the police are now going to deploy
20 it on, will now choose to leave, and then give them
21 directions in which way to go.
22      Q.   Under PPB directives, a person who is in a
23 crowd who has been directed to leave by a sound truck or
24 other means, who just stands there and doesn't leave,
25 that person is engaged in passive resistance; is that

Case 3:20-cv-00917-HZ   Document 253-3   Filed 01/19/22   Page 10 of 13
DON'T SHOOT PORTLAND, et al. v. CITY OF PORTLAND                3:20-cv-00917-HZ
CRAIG DOBSON                                                         12/9/2021

57

1   right?
2              MR. YAMACHIKA:  Object to form.
3         Go ahead.
4      A.    Yes.
5      Q.    So, whenever CS gas is used on a crowd, people
6   who are engaged in only passive resistance are affected
7   by the gas; is that right?
8              MR. YAMACHIKA:  Same objection.
9         Go ahead.
10     A.    So, persons that would be in there that have
11  chosen not to leave, yes.
12     Q.    So, what I'm trying to understand is, is there
13  any threshold where, from Incident Command's point of
14  view, we have to have greater than, say, five, ten,
15  twenty percent of the crowd engaged in something more
16  than passive resistance before we're going to use CS gas
17  on this crowd?
18             MR. YAMACHIKA:  Objection.  Asked and
19  answered.
20        Go ahead.
21     A.    So, when -- when we look at using CS gas,
22  we're looking at a situation where we feel that the use
23  of it is going to help us eliminate whatever life safety
24  concerns that we have that we're seeing there.  And
25  typically we only use it when we have a life safety

62

1  behavior of the crowd.  If we suddenly see that the
2  crowd has changed conditions, we would then cease that
3  order on the ground.  As they encounter things or
4  situations, they could make the indepen -- once we've
5  given authorization, they could make that independent
6  decision.  As that push is going on, if they find that
7  they need to use additional amounts of gas to continue
8  the group from moving, they -- they could do that.  But,
9  again, we're monitoring.  We're getting feedback from
10 the ground of what's going on and what the situation is
11 so that we can, again, constantly looking at -- at what
12 point is it time for us to try to de-escalate this and
13 change tactics to -- to bring us -- again, de-escalate
14 and bring us back to normalcy.
15       Q.   Okay.  Do I understand from that answer that
16 once it's authorized, it continues to be authorized
17 until Incident Command says, "No more"?
18       A.   I -- It's a little dry -- cut and dry there.
19 We would -- So, for example, if we are asking them to --
20 our officers to do a push or dispersal, we would
21 typically give them an area to disperse from and they
22 would be authorized to use it within that area as they
23 needed based on the conditions that they saw.  Once the
24 group either got outside of that area or we saw a change
25 in the conditions, we might change or bring that order

1  back to not allowing it.
2       Q.   Okay.  So, the Incident Command is, in that
3  example, deciding that you're going to use the gas to
4  try and clear these three blocks, if that's what the
5  authorization is, then the guys on the ground would not
6  have authority to use gas outside of that area; is that
7  right?
8       A.   Again, you've got exigent circumstances.
9  You've got that clause in there.  So, if there was
10 something like that that popped up, they would be able
11 to explain that.  But, yes, in general, they would do it
12 for what they needed to.
13           Part of our training is understanding our
14 tools and understanding the gravity of each of our
15 tools.  Each of them understands that when we use CS
16 gas, we have to be very careful about how we use it and
17 it's not something that we would use -- We give them the
18 decision, but they understand the consequences of using
19 it.
20      Q.   Okay.  So, when Incident Command is making a
21 decision whether or not to authorize the use of CS gas,
22 what directives from the bureau are implicated in that
23 decision?
24      A.   635 and 1010.
25      Q.   Okay.  What parts of 1010 are implicated in

```
 1                    CERTIFICATE

 2

 3        I, Julie Purcell, Professional Reporter and Oregon

 4   Notary, hereby certify that said witness personally

 5   appeared before me via Zoom at the time and place set

 6   forth in the caption hereof; that at said time and place

 7   I reported in stenotype all testimony adduced and other

 8   oral proceedings had in the foregoing matter; that

 9   thereafter my notes were transcribed through

10   computer-aided transcription, under my direction, and

11   that foregoing pages constitute a full, true and

12   accurate record of all such testimony adduced and oral

13   proceedings had, and of the whole thereof.

14        I further certify review of the transcript was

15   requested.

16        Witness my hand this 13th day of December, 2021.

17

18

19                        _____
                          Julie Purcell, CSR
20                        Certified Shorthand Reporter

21

22

23

24

25
```