


COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS







**(800) 528-3335**

**NAEGELIUSA.COM**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON PORTLAND DIVISION**

DON'T SHOOT PORTLAND, et al.,

       Plaintiffs,

vs.                Case No. 3:20-cv-00917-HZ

CITY OF PORTLAND, a municipal
Corporation,

       Defendant.

_____

**REMOTE DEPOSITION BY VIDEO CONFERENCE OF**

**LIEUTENANT FRANZ SCHOENING**

**TAKEN ON**
**THURSDAY, SEPTEMBER 23, 2021**
**9:05 A.M.**

**111 SOUTHWEST SECOND AVENUE**
**PORTLAND, OREGON 97204**

Dec of Merrithew
Exhibit 4 - Page 1 of 44

```
 1        APPEARANCES BY VIDEOCONFERENCE (OR TELECONFERENCE)

 2

 3    APPEARING ON BEHALF OF THE PLAINTIFF,

 4    DON'T SHOOT PORTLAND, et al:

 5    JESSE MERRITHEW, ESQUIRE

 6    LEVI MERRITHEW HORST PC

 7    610 SOUTHWEST ALDER STREET, SUITE 415

 8    PORTLAND, OR 97205

 9    (971) 229-1241

10    (971) 544-7092 (Fax)

11    jesse@lmhlegal.com

12

13    J. ASHLEE ALBIES, ESQUIRE

14    MAYA RINTA, ESQUIRE

15    ALBIES AND STARK LLC

16    ONE SW COLUMBIA STREET, SUITE 1850

17    PORTLAND, OR  97204

18    (503) 308-4770

19    (503) 427-9292 (Fax)

20    ashlee@albiesstart.com

21    maya@albiesstark.com

22

23

24

25
```

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 2 of 44

1   **APPEARANCES BY VIDEOCONFERENCE (OR TELECONFERENCE)**

2

3   **APPEARING ON BEHALF OF THE DEFENDANT,**

4   **CITY OF PORTLAND:**

5   NAOMI SHEFFIELD, ESQUIRE

6   ROBERT YAMACHIKA, ESQUIRE

7   J. SCOTT MOEDE, ESQUIRE

8   **PORTLAND CITY ATTORNEY'S OFFICE**

9   1221 SOUTHWEST FOURTH AVENUE, SUITE 430

10  PORTLAND, OR 97204

11  (503) 823-4047

12  (503) 823-3089 (Fax)

13  naomi.sheffield@portlandoregon.gov

14  rob.yamachika@portlandoregon.gov

15  scott.moede@portlandoregon.gov

16

17  **ALSO PRESENT:**

18  Clair Warnock, City of Portland Paralegal

19  Vincent Guerrera, Videographer

20

21

22

23

24

25

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 3 of 44

1                            INDEX

2                                                      Page

3

4  EXAMINATION BY MR. MERRITHEW                         7

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            EXHIBITS

 2    Exhibit                                        Page

 3

 4                         (NONE MARKED)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

```
 1            REMOTE DEPOSITION BY VIDEOCONFERENCE OF

 2                LIEUTENANT FRANZ SCHOENING

 3                        TAKEN ON

 4             THURSDAY, SEPTEMBER 23, 2021

 5                        9:05 A.M.

 6

 7            THE VIDEOGRAPHER:  We are on the record.

 8  The time is 9:05 a.m.  The date is September 23rd,

 9  2021.  This is the beginning of the deposition of

10  Lieutenant Franz Schoening.  Will -- the case

11  caption is Don't Shoot Portland versus City of

12  Portland.

13            Will counsel, please introduce yourselves

14  and state who you represent.

15            MR. MERRITHEW:  My name is Jesse

16  Merrithew, counsel for the plaintiffs in this

17  action.

18            Also present remotely are Ashlee Albies

19  and Maya Rinta, who are also counsel for the

20  plaintiff.

21            MS. SHEFFIELD:  My name is Naomi

22  Sheffield.  I'm  attorney for the City of Portland,

23  and also present for the City of Portland is Scott

24  Moede and Robert Yamachika.

25            THE VIDEOGRAPHER:  Our court reporter will
```

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

1  swear in the witness.

2          **THE REPORTER:**  Lieutenant Schoening, will

3  you please raise your right hand.

4          Do you solemnly swear or affirm under the

5  penalty of perjury that the testimony you're about

6  to give will be the truth, the whole truth, and

7  nothing but the truth?

8          **THE DEPONENT:**  I do.

9          **THE VIDEOGRAPHER:**  You may now proceed,

10 counsel.

11          **MR. MERRITHEW:**  Thank you.

12 **FRANZ SCHOENING,** having been first duly sworn, was

13 examined, and testified as follows:

14 **EXAMINATION**

15 **BY MR. MERRITHEW:**

16     **Q.    Lt. Schoening, first of all, I want to**

17 **make sure I'm pronouncing your name correctly.  Is**

18 **Schoening correct?**

19     A.    That is correct.

20     **Q.    I want to try and get an understanding of**

21 **what we're here to do today and make sure that**

22 **understanding is shared between the two of us.**

23          **What is your understanding of the topics**

24 **that you're going to testify about today?**

25     A.    I was provided a list of the topics by the

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 7 of 44

1    city attorney's office.  There are a series of

2    questions.  Mostly I'm going to be answering

3    questions related to the training for crowd control

4    and the use of riot control agents by the Portland

5    Police Bureau.

6        **Q.    Okay.  And do you understand that today's**

7    **deposition is not -- it's not about Lt. Schoening's**

8    **knowledge.  It's -- you're speaking for the City of**

9    **Portland when you give answers here today.**

10        A.    I do.

11        **Q.    And do you believe that you are prepared**

12    **to do that?**

13        A.    I believe so.

14        **Q.    And do you consent to give testimony on**

15    **behalf of the City of Portland today?**

16        A.    I do.

17        **Q.    I'd like to get an understanding of what**

18    **you did to prepare for today's deposition in order**

19    **to gather the necessary knowledge that was within**

20    **the scope of the City of Portland.**

21            **Can you tell us what documents you**

22    **reviewed in preparation for the deposition here**

23    **today?**

24        A.    I have reviewed training materials, Rapid

25    Response Team and crowd control training materials

NAEGELI    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335

DEPOSITION & TRIAL    NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 8 of 44

1    A.    Sure.  So you said a couple of things I

2    want to touch on there.  We do deliver additional

3    training on the long baton, both at the State of

4    Oregon course and potentially during in-service

5    training.  My answer earlier was there is no

6    prohibition against using that tool prior to

7    attending the course.  Just to clarify.

8        Q.    Gotcha.

9        A.    To your next question, can you ask that

10   again, please?

11       Q.    Sure.  My question was:  First, can you

12   define what the bureau means by distraction devices?

13   What's in that category?

14       A.    So there is no written definition of

15   distraction device in our policy under Directive

16   1010.  Generally, industry standards, you know, a

17   distraction device is a device that produces a loud

18   noise, a flash of light.  There are a variety of

19   ways they are constructed or manufactured.

20            The Rapid Response Team uses three types

21   of distraction devices.  They use what's commonly

22   referred to as the rubber ball distraction device.

23   There are two types of rubber ball distraction

24   device.  One carries a payload of small rubber

25   projectiles that serve as an area-impact munition,

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 9 of 44

1  and the other contains no payload other than a small

2  amount of inert powder.

3          We also have a non-bursting, aluminum-body

4  distraction device.  That's a small aluminum body

5  and inside is the charge that delivers the flash and

6  sound, but it does not burst.

7      Q.    Okay.  Is -- would the smoke canisters

8  that are deployed by RRT be in a different category?

9      A.    Yes.

10     Q.    What category would that be?

11     A.    That would be obscurant.

12     Q.    Okay.  All right.  And does -- during the

13  2020 protests, did RRT use any aerial distraction

14  devices?

15     A.    No.

16     Q.    Okay.  So for an RRT member to carry and

17  deploy distraction devices, was it -- is there any

18  additional training necessary before they'd be

19  authorized to do that?

20     A.    They would be required to attend the

21  Grenadier Operator's course.

22     Q.    Okay.  So only the grenadiers are

23  authorized to carry and deploy those with RRT; is

24  that right?

25     A.    Grenadiers and supervisors who both attend

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 10 of 44

1  the Grenadier's Course.

2       Q.   All right.  What about the 40-millimeter

3  launchers?  In order to -- for an RRT member to

4  carry and deploy 40-millimeter launcher, what

5  additional training, if any, are they required to

6  attend?

7       A.   So a grenadier or a supervisor would be

8  authorized to carry the 40-millimeter launcher.

9  Prior to that, they'd be required to attend the

10 Grenadier Certification Course.

11      Q.   Is your answer the same with respect to

12 the FN303 launcher?

13      A.   Yes.

14      Q.   The term that I've seen in some of your

15 training materials is riot control agents.  Is that

16 a term that the City of Portland uses to define a

17 certain -- certain crowd control weapons?

18      A.   Riot control agents is referred to in

19 Directive 1010.  I don't believe there's a

20 definition of riot control agent in Directive 1010,

21 but there are authorized uses of riot control

22 agents.

23           A riot control agent would refer to CS

24 gas, pyrotechnic OC munitions and then also OC or CS

25 vapor munitions.

1  Also, you know, just the practical how you would use

2  the tool, make it function properly, deploy it

3  safely.

4        So you know, I can't answer that question

5  in a straightforward manner.  Training around the

6  use of force is an ongoing body of knowledge and we

7  don't expect an instructor to deliver all of that

8  training material again in a window of time for the

9  FN303 or the 40-millimeter or distraction devices,

10 if that makes sense.

11     Q.    Sure, but what I'm trying to understand

12 is, before arming members with these specific weapon

13 systems, what they were taught with respect to, you

14 know, the appropriate use of those weapon systems

15 under the law.

16        And what I see on the schedule is on Day 1

17 from 0800 to 0845, there's three things listed and

18 one of them is policy and procedure legal Graham

19 Standard.

20        And I'm -- so I assume that sometime

21 between 0800 and 08500, there's specific instruction

22 to those new grenadiers and supervisors with respect

23 to how the Graham Standard applies to these new

24 weapons systems that they're learning about, and I'm

25 wondering beyond that, is there any other specific

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 12 of 44

1  **instruction during this three days on that topic?**

2     A.    You know, the schedule is built out to try

3  and structure the training.  It doesn't mean the

4  conversations around those topics are exclusive to

5  those time slots.  That topic may come up again

6  during other time slots, because a question was

7  asked or training goes in that direction and a

8  member -- an instructor decides that a refresher of

9  that material or a reminder may be appropriate based

10 on what they're observing.

11          So I can't answer and say it's exactly

12 this amount of time.  And again, a lot of that

13 direction and training is, remember this is what

14 Directive 1010 says.  This is the training you've

15 already received on the use of force or the Graham

16 Standard and this is how it may interplay with the

17 use of this tool in these circumstances.

18     **Q.    Would you look at the -- the slide that's**

19 **on 110 982 that is headlined, "Legal 9th Circuit**

20 **Court"?**

21     A.    Yes.

22     **Q.    Okay.  So that looks like it starts about**

23 **three pages specifically discussing cases where**

24 **courts have interpreted whether or not a specific**

25 **use of force was within the Graham Standard or not.**

1    Is that what you're looking at as well?

2         A.    Yes.

3         Q.    On the second page, the second bullet

4    point reads, "Use of pepper spray to compel

5    compliance by anti-logging protestors was a

6    reasonable use of force.  Federal trial judge rules

7    that no reasonable jury could view its use in these

8    circumstances as excessive force," and it gives a

9    cite to this Headwaters Forest Defense case; do you

10   see that?

11        A.    Yes, I do.

12        Q.    So is that part of what the new grenadiers

13   in January of 2019 and the new supervisors in

14   January 2019 were trained was the law that they had

15   to apply?

16        A.    So this series of slides is really

17   designed to, you know, make grenadiers and

18   supervisors aware that some of the tools and weapons

19   that are used during crowd control have been

20   evaluated by courts.

21              It is not meant to be an extensive or

22   comprehensive training on current case law that's

23   delivered by generally our city attorney's office

24   during bureau training and in-service or legal

25   updates.  It's more of an awareness-level training

1 that there is -- there are times where these tools

2 are examined by the court as to the reasonableness

3 --

4        Q.    In this presentation, these officers were

5 told that the use of pepper spray to compel

6 compliance by these protestors was a reasonable use

7 of force, that a court had held that; right?

8        A.    Yes.

9        Q.    Is the City aware that this District Court

10 opinion was overturned by the 9th Circuit?

11        A.    I have become aware of that, yes.

12        Q.    Okay.  Since becoming aware of it, has the

13 city done anything to correct any misapprehension

14 that existed among its members as a result of this

15 training?

16        A.    I became aware of it yesterday, so no.

17 Other than to say that the Rapid Response Team

18 currently no longer exists and any reconstitution of

19 the Rapid Response Team and any training associated

20 with that will go through a new vetting process to

21 make sure it is in compliance with current case law

22 and directives.

23        Q.    What vetting process did -- did this

24 presentation go through?

25        A.    It was put together by our instructors and

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

1          It does not mean that you can use force

2    that would not otherwise be authorized, but the

3    overall reasonableness of that decision has

4    different factors.

5          Q.    And what specific factors do you train new

6    RRT members to consider when they're considering a

7    particular use of force?

8          A.    So again, we don't -- there is no way to

9    capture every, single factor that they should

10   consider.  That's -- what we train them to do is to

11   understand the nuances and the differences of

12   operating in a crowd environment and to be able to

13   articulate those factors or what their

14   considerations are.

15          Some common factors that we see are, you

16   know, limited resources.  So on your typical patrol

17   operations call for service, you're likely to have

18   two or three or potentially, you know, a dozen

19   police officers dealing with one or two subjects who

20   are, you know, who are being arrested, who force may

21   have to be used on.  That allows for different

22   tactics in different ways of resolving that

23   situation or de-escalating it.

24          Compared to a crowd setting where you may

25   have 12 or 15 officers dealing with a crowd of

1   several hundred.  That's just a different dynamic

2   and ultimately the force that they apply to each

3   person must be authorized and Constitutional, but

4   their ability to deploy alternative tactics and de-

5   escalate or disengage in different ways may be

6   different.

7            Things like governmental interest.  You

8   know, the necessity to defend a piece of critical

9   infrastructure or something like that may be

10  different in a crowd setting if we believe that

11  people in that crowd want to damage critical

12  infrastructure.  It may be a different

13  prioritization than, you know, vandalism to an

14  individual business.  So there's different

15  considerations, but we can't -- we can't capture all

16  of the different Graham factors that may be present

17  in someone's decision-making process.  We just try

18  to help them understand the need to consider those

19  things and articulate them when justifying their use

20  of force.

21       Q.   The members that you -- that get selected

22  for RRT, are they likely to have deployed in some

23  sort of protest crowd control setting prior to

24  joining RRT?

25       A.   Not necessarily.

1  aggression.

2        Q.    I think it's -- well, I'll leave out the

3  commentary, but what I want to understand is how the

4  bureau trains to apply those two definitions in

5  crowd control situations, if a person in a crowd is

6  given a directive to move and they don't move, they

7  stand there, is that -- does the bureau train that

8  that is physical resistance that authorizes the use

9  of pepper spray or aerosol restraint?

10       A.    So the short answer is no.  The longer

11  answer is, we train two directives.  Directive 1010

12  defines physical resistance and it talks about the

13  Graham Standard.  It talks about, you know, all the

14  different factors.

15           The authorization is for physical

16  resistance or demonstrating the intent to engage in

17  physical resistance.  A member's subjective belief

18  that a person is going to engage or show the intent

19  to engage in physical resistance, it's subjective,

20  so they're going to articulate that or be required

21  to articulate that, but it's also going to have to

22  be objectively reasonable.

23           So I'm going to have to be able to look at

24  that articulation and believe that it is objectively

25  reasonable that they believed the person intended to

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 18 of 44

1  engage in physical resistance in order for them to

2  have followed Directive 1010.

3      Q.   Let's -- maybe this would be a little more

4  fruitful if we looked at some of the training

5  materials on this subject.  Hang on one second.

6          MS. SHEFFIELD:  Jesse, we're about an hour

7  in.  I was thinking we could take a break, but would

8  it make sense before or after we take a look at

9  these?  I'm not sure how long --

10         MR. MERRITHEW:  Yeah, sure.  This is a

11 good time from my perspective if it works for

12 everybody.

13         THE VIDEOGRAPHER:  Please stand by.  The

14 time is 10:25 a.m., and we are off the record.

15         (WHEREUPON, a recess was taken.)

16         THE VIDEOGRAPHER:  Ms. Court Reporter, are

17 you ready?  Please stand by.  We are on the record.

18 The time is 10:41 a.m.  You may now proceed.

19         MR. MERRITHEW:  Thank you.

20 BY MR. MERRITHEW:

21     Q.   Lt. Schoening, I was about to ask you some

22 questions about the -- the various definitions that

23 the city uses in 1010 and how those apply to crowd

24 control situations, but I realized that I didn't

25 finish asking you about the discretion that various

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3345
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 19 of 44

1    1010 and generally speaking, if a grenadier or

2    supervisor is going to be using a rubber ball

3    distraction device independently without

4    coordination from the incident commander or specific

5    direction from the incident commander, it's going to

6    be an exigent circumstances to defend the member or

7    others from physical injury or as part of that

8    general authorization by the incident commander to

9    disperse a crowd, if they encounter a level of

10   resistance or active aggression that presents some

11   risk of injury or life safety concerns that can't be

12   mitigated some other way.

13        Q.    So if I'm understanding the way that the

14   city trains the meaning of 1010 to its members and

15   what they're required to follow as a result of that,

16   is that the -- when it comes to the purpose being

17   crowd dispersal instead of any other purpose that

18   they might have, they only use rubber ball

19   distraction devices and riot control agents at the

20   direction of incident command?

21        A.    As part of the -- so the dispersal would

22   be directed by the incident commander.  A member's

23   decision to use a rubber ball distraction device as

24   part of the effort to accomplish that dispersal

25   would be the individual grenadier or supervisor's

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 20 of 44

1   decision and they would have to comply with

2   Directive 1010.

3        Q.   All right.  So -- let me try and

4   understand what you're saying, because I'm getting a

5   little lost in there.

6            If -- when incident command gives the

7   direction to disperse a crowd to the RRT members on

8   the ground, is it -- if there's no further

9   authorization from incident command that riot

10  control agents are authorized for their use, do you

11  -- does the city train the RRT members that they

12  cannot use those RRT -- those riot control agents

13  absent some exigent circumstances in the dispersal?

14       A.   They would have to justify the use under

15  Directive 1010.

16       Q.   So -- but 1010 says that the riot control

17  agents can be used in a crowd dispersal if

18  authorized by incident command; am I understanding

19  that correctly?

20       A.   Yes.

21       Q.   Okay.  So what I'm trying to understand

22  is, if incident command doesn't specifically say

23  riot control agents are authorized, then they have

24  to have some other authorization under 1010 in order

25  to use them; is that right?

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 21 of 44

1      A.    Yes.

2      Q.    All right.  Okay.  And with respect to the

3  pyrotechnic riot control agents, how -- how do you

4  train the grenadiers as to when to use those?

5          Let me explain what I mean.  Are they

6  trained that they just use them at the direction of

7  incident command where incident command says, "Okay,

8  I want you to deploy pyrotechnic CS gas in this

9  direction at this time, go."  And they just do what

10  they're told.

11          Or is it, are they trained that they are

12  given an authorization based on the conditions that

13  the incident command is observing, and it's then

14  just at their discretion as to whether and when to

15  deploy pyrotechnics -- pyrotechnic or riot control

16  agents?

17      A.    So the overall authorization would come

18  from the incident commander and the officer, the

19  grenadier or supervisor actually deploying

20  pyrotechnic RCAs or any other type of force, also

21  has to justify the use of that force themselves.

22          So they would have to articulate based on

23  Directive 1010 which covers not only specific

24  authorizations, but you know, the Graham Standard

25  and constitutional force, and in all those factors,

1    they'd have to be able to articulate and justify

2    that deployment of a riot control agent under

3    Directive 1010, if that answers your question.

4              It's authorization from incident

5    commander, but also they still have to justify and

6    articulate it, their individual decision to use the

7    agents.

8         Q.    Okay.  And so in other words, the way that

9    the grenadiers are trained, they -- they need that

10   authorization from incident command, but then they

11   also need to be able to either observe or hear or

12   have information from their own sources that causes

13   them to believe that the use of it is justified

14   before they deploy.  Is that what you're saying?

15        A.    Yes.

16        Q.    And so I guess what that -- if I'm

17   understanding  this correctly, what that means is

18   that the way these grenadiers are trained, they

19   could be authorized by incident command to use riot

20   control agents, particularly pyrotechnic riot

21   control agents, and not deploy them at all, because

22   they don't see the justification themselves.

23        A.    Yes, that's fairly common.

24        Q.    Okay.  I want to go back to the topic that

25   we left off at before the break and try and find out

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 23 of 44

1    how the bureau trains its members on these different

2    definitions within 1010 and how they apply it to

3    crowd control operations.

4             And what I'm looking at, and I'd like to

5    ask you some questions about, is a PowerPoint

6    presentation.  The slide I'm looking at starts at

7    Bates Number 110 257.  It's -- the title of it from

8    the first line that I have is, "Advanced Academy

9    Crowd Control Theory Class 102."  I don't have a

10    date to help you on where that is.  I think it's

11    2019.

12        A.   You said 110 257?

13        Q.   Yeah, that's the specific slide.

14        A.   Yes.  I see that slide.

15        Q.   Okay, great.  Let me get back there.  All

16    right. I assume from the title of this presentation

17    that this is part of the training that all bureau

18    members receive during the Advanced Academy that you

19    described earlier as a two-part class; am I assuming

20    correctly?

21        A.   Yes.

22        Q.   Okay.  And there's a series of slides, I

23    guess that actually begins with 256, and then

24    there's 257, 258, 259, 260, 261, that just have

25    photographs of various protest scenes; some labeled,

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 24 of 44

1    some not.  Can you explain what the use of these

2    photographs is in the training process?

3        A.    So it's designed to discuss in general

4    different levels of behavior you might observe, but

5    also to get members to start thinking about how they

6    can articulate what they're seeing and how that

7    would affect their decision-making process and also

8    article if they are  taking actions, police actions,

9    their rationale for doing so.

10       Q.    Okay.  The first slide there on 256, is a

11   photograph of a barely subdued looking crowd of

12   people that -- that is labeled as compliant; do you

13   see that?

14       A.    I do.

15       Q.    And so with that label as compliant, is

16   the purpose of showing the photograph in that

17   discussion to train members that when they see

18   crowds that appear this way that, that doesn't meet

19   the definition of any of the authorizations for use

20   of force under 1010?

21       A.    It's not just about justifying the use of

22   force.  It's about, you know, recognizing crowd

23   dynamics and understanding a little bit about crowd

24   behavior.

25            We discussed, you know, a number of things

1   around crowd psychology, crowd behavior, and so it's

2   about looking at a crowd and really observing what's

3   going on and then incorporating that in your

4   decision-making process, whatever that decision-

5   making process is leading to, whether it's an

6   arrest, a use of force, you know, decision to

7   communicate with the crowd or to disengage from the

8   area from the crowd.  But ultimately, yes, it can

9   also just cover the use of force.

10      **Q.   The next slide actually has the words**

11   **passive resistance on it, and then what looks to be**

12   **the bureau's definition of passive resistance which**

13   **is a person's non-cooperation that does not involve**

14   **violence or other active conduct by the individual;**

15   **do you see that?**

16      A.   I do.

17      **Q.   And the photograph, it's a bit blurry on**

18   **my copy, but it looks like there's an individual who**

19   **is sitting cross-legged in front of the line of**

20   **police officers who have long batons and helmets and**

21   **face shields and it looks like some level of PPE**

22   **protection.**

23         **So what is the bureau trying to train and**

24   **communicate with this photograph?**

25      A.   So a couple of things.  One is that, you

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 26 of 44

1  know, it does talk about passive resistance, which

2  is the definition in Directive 1010 which discusses

3  the use of force and authorizations for the use of

4  force, but again, it's also on the context of

5  general crowd behavior.

6          It's fairly common to encounter activists

7  or folks in the community who believe civil

8  disobedience or engage in passive resistance or just

9  -- like I said, civil disobedience and it's a fairly

10 common protest tactic, so it also just kind of

11 covers that as well.

12     **Q.   Okay.  And so specific to the individual**

13 **who is sitting cross-legged, appears to be in the**

14 **middle of the street in this photograph, does the**

15 **bureau train its members at least with the**

16 **information that you have in front of you in the**

17 **photograph, this person appears to be engaged in, at**

18 **best, passive resistance and not any type of**

19 **physical resistance or active aggression?**

20     A.   Yes.

21     **Q.   The next slide is not labeled and that's**

22 **at 110 258.  That appears to show a scene where the**

23 **police officers are in a line and similar type of**

24 **equipment as the prior photograph and there's three**

25 **individuals who are sitting cross-legged in the**

1    street, joining hands.  A couple of them have it

2    looks like ear protection available, and at least a

3    couple of them appear to be either yelling or

4    singing or doing something boisterous with their

5    voices.

6              Could you tell us what the bureau trains

7    its members to try and recognize and evaluate in

8    this photograph?

9        A.    So again, it's a type of, you know,

10   activity you may see in a protest or demonstration.

11   They're clearly sitting, it appears, on the street,

12   intentionally on some white rail tracks.  It would

13   be most likely some kind of civil disobedience and

14   as it relates to Directive 1010, you know, they're

15   not engaged in certainly active aggression.

16              They may, depending on what else is

17   happening in the context of this situation, be

18   demonstrating the intent to engage in physical

19   resistance, but you know, it's just a picture and --

20   we use the pictures to try and start the

21   conversation, but it's a conversation that

22   acknowledges.  You can't take a still frame of a

23   picture and necessarily use that in isolation to

24   make a decision.  You're going to have to -- it's an

25   exercise to help them articulate what they're

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 28 of 44

1    seeing, how that would mesh with the decision-making

2    process and steer that decision-making process.

3        Q.    So when you're training with a photograph

4    like this, you know, your testimony was that there's

5    nothing within the photograph itself that overtly

6    indicates an intent to engage in physical

7    resistance, what types of things are you training

8    the members to look for that's not captured in this

9    photograph that might make this a situation where

10   there -- there is an intent to engage in physical

11   resistance?

12       A.    So we would tell members, you know, a lot

13   of it is verbal, what they're saying, what they're

14   telling you. You can't capture that in a photograph.

15   They may be telling you they're going to resist your

16   efforts to disperse them or arrest them.  We're not

17   saying this picture does indicate that.  We're

18   saying, you know, there are other factors besides

19   what you see.  Things like locking hands or locking

20   arms, could indicate some intent to resist your

21   efforts to arrest people or disperse them, but none

22   of those factors can be taken in isolation.  It's

23   the totality of the circumstances in any decision-

24   making process, including the use of force.

25       Q.    So in contrast to the photograph before

1   where there's a single individual who is seated on

2   the street with his arms -- or his legs crossed or

3   their legs crossed, which I think you said fairly

4   unequivocally was not -- was passive resistance,

5   where is the line between passive resistance and

6   physical resistance?

7           How does the -- how does the bureau train

8   its officers where that line is?

9       A.    We define it in Directive 1010.

10      Q.    Okay.

11      A.    And I can read the definitions again.

12  Passive resistance is a person's non-cooperation

13  with a member that does not involve violence or

14  other active conduct by the individual.

15          And then physical resistance is a person's

16  physical attempt to evade a member's control that

17  does not rise to the level of active aggression.

18      Q.    So I assume that the bureau, you know,

19  trains its members as to how to approach individuals

20  like the individuals in this photograph, when

21  they're directed to remove them from the street; is

22  that -- is that a fair assumption?

23      A.    Yes.

24      Q.    Okay.  So if they're directed to remove

25  the individual who is seated in slide 257, the

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 30 of 44

1   passively resisting person cross-legged in the

2   street, is -- does the bureau train that anything

3   beyond say going limp and allowing the officers to

4   move them or put them in handcuffs is physical

5   resistance?

6        A.    I'm sorry.  Ask that again, please?

7        Q.    Yeah, I'm trying to understand.  So the

8   definition that the bureau trains for physical

9   resistance says, "other active conduct."  And I'm

10  trying to get at, you know, how the bureau trains,

11  what that might look like in a crowd control

12  situation.

13            So if you've got a person who is -- you

14  know, apparently non-violent sitting in the street,

15  and an officer or group of officers is tasked with

16  removing them one way or the other, either arresting

17  or simply removing them from the street, what --

18  what actions on behalf of that individual would

19  constitute what the bureau trains as other active

20  conduct, that means physical resistance?  Is it

21  anything that they do with their body?

22        A.    No.

23            MS. SHEFFIELD:  Objection.  It misstates

24  1010.

25            THE REPORTER:  I'm sorry, Ms. Sheffield.

NAEGELI
DEPOSITION & TRIAL

(800)528-3345
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 31 of 44

1    Could you please repeat your objection.

2             MS. SHEFFIELD:   I object to the premise

3    misstates the definition of physical resistance in

4    1010.

5    BY MR. MERRITHEW:

6        Q.    You can go ahead, Lieutenant.   It sounded

7    like you were beginning to say no, that's not

8    enough, but I don't want to put words in your mouth.

9        A.    So I think the definition is pretty

10   clearly capture that for physical resistance there

11   has to be active conduct.   The definition itself

12   talks about a physical attempt to evade a member's

13   control that does not rise to the level of active

14   aggression.

15            So moving their body is not necessarily

16   physical resistance.   If the member articulates that

17   the way they're moving their body, the way they are

18   engaging in active conduct, is attempt to evade a

19   member's control, that would meet the definition of

20   physical resistance.

21            So if you pull away from me, if you flee

22   from me, active attempts or active conduct to evade

23   that control, that's physical resistance and that's

24   what we teach our members.

25       Q.    Okay.   And what about intent to engage in

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 32 of 44

1  **physical resistance?  I mean, when you're looking at**

2  **that next slide and having these trainings and**

3  **discussions about the various factors, you know, if**

4  **these individuals are loudly chanting, "Hell no, we**

5  **won't go," is that something that you train is**

6  **sufficient to conclude that there's an intent to**

7  **engage in physical resistance?**

8      A.   We never train that there is, you know,

9  there's a black and white, here's the line where

10 force is authorized.  There's directives that we

11 train.  There's definitions we train.  There are

12 authorizations to try to capture when it's

13 appropriate and allowed to use force.  Directive

14 1010 talks a whole -- about a whole lot more other

15 things beyond just authorization to use force.  It

16 talks about de-escalation.  It talks about you know,

17 other things to try to avoid the use of force, so

18 you know, individual things that a member observes

19 or hears or perceives may add to that cumulative

20 decision-making process and that may include verbal

21 statements like, "Hell no, we won't go," or

22 profanity, telling a member to F off or whatever it

23 is, but that by itself doesn't trigger the

24 authorization to use force.

25            The definitions and directives outline the

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1   authorizations to use force, and a member is

2   required to explain how what they perceived, what

3   led them to that believe that force was authorized.

4        **Q.   Your answer to that question leads us to**

5   **the next slide, which is in 259, 110-259 which is**

6   **labeled "Active Resistance."  And it says a person's**

7   **physical attempt to evade a member's control that**

8   **does not rise to the level of active aggression**

9   **which -- isn't that the definition of physical**

10  **resistance from the directives?**

11       A.   The definition of physical resistance is

12  -- yes, let me look at it again.  Yes.  That is the

13  definition of physical resistance.

14       **Q.   Okay.  I assume that because that is the**

15  **definition of physical resistance from the**

16  **directives, this slide was meant to -- as a training**

17  **tool to try and help members understand the**

18  **directive definition of physical resistance not**

19  **active resistance as the slide states; is that**

20  **right?**

21       A.   That is correct.

22       **Q.   Okay.  Now what are the things that you're**

23  **training members bureau members to recognize in this**

24  **photograph that might amount to meeting the bureau's**

25  **definition of physical resistance?**

**NAEGELI**
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 34 of 44

1      A.    I'm sorry.  Was that a question?

2      Q.    Yes.

3      A.    So again, the slide is not in isolation

4  meant to say this is an authorization to use force.

5  It's an exercise in observing crowd behavior,

6  individual actions within the crowd, articulating

7  what members are observing and having them explain

8  how that affects the decision-making process,

9  including potentially a decision to make an arrest

10 or use force.

11         The authorization under Directive 1010 for

12 aerosol restraints which is around physical

13 resistance is -- it demonstrates physical resistance

14 or the intent to engage in physical resistance.

15 This slide can help members articulate or explain

16 what they might be seeing, you know, the middle

17 finger, the posturing.

18         It appears to me that she is yelling.  The

19 assumption would be that that is towards police

20 officers, but again, in isolation this picture does

21 not tell members they're authorized to use force, if

22 they see this in front of them.  It's, explain what

23 you're seeing, how you articulate it, how it meshes

24 with directives and your decision to take action or

25 not to take action in response to what you're seeing

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 35 of 44

1    or observing.

2        Q.    So the things that -- you're trying to

3    train the members to recognize from this, or to

4    discuss and help them to understand the definition

5    of physical resistance or things like, the posture

6    of the woman who is front and center, the fact that

7    she's got both of her middle fingers up in either

8    direction and trying to assess what that means; is

9    that right?

10       A.    Yes.

11       Q.    Two slides from there is 110 261 where it

12   has the definition of active aggression and it looks

13   like a person who is probably not a police officer,

14   swinging what appears to be a club or a bat at a

15   police officer who is on the ground, and it looks

16   like he's about to strike the officer who is on the

17   ground with this weapon.

18            What are you trying to train with this

19   slide?

20       A.    Again, just to -- it's an exercise to get

21   members to start articulating or to be able to

22   articulate what they're seeing and how that would

23   line up with their decision-making process.

24            You know, it does appear to show active

25   aggression, but again it's just a photograph.  I

1    mean, you can't rely on that by itself to make any

2    decision.

3        Q.    Okay.  Would you agree that there's a

4    pretty big jump in terms of conduct from the slide

5    teaching physical resistance to the photograph of

6    the active aggression where you know, somebody about

7    to commit a felony, assaulting a public safety

8    officer, potentially seriously injuring that officer

9    and somebody who's got both of her middle fingers up

10    and shouting at somebody?

11        A.    Yes.

12        Q.    So what particular factors are you

13    training members to consider when recognizing the

14    differences between active aggression and physical

15    resistance?

16        A.    So we train them to the directives.  So

17    again, you know, physical resistance and active

18    aggression are defined in Directive 1010, and you

19    know, what we train members to do is to receive the

20    situation, look at things, listen to things,

21    articulate what they're seeing, what they're

22    hearing, what they're feeling, and explain why they

23    made the decision they did and why that decision

24    winds up with directives to cover their conduct as

25    members of the police bureau, and this is -- these

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 37 of 44

1    are just a handful of slides, but you know, you

2    could look at endless slides to have members try to

3    articulate what they're seeing or perceiving in

4    those events.

5            We train a whole lot around the use of

6    force.  The Training Division trains a whole lot

7    around the use of force.  The Rapid Response Team

8    trains around the use of force.  These slides are

9    not the only material we talk about when it comes

10   to, you know, articulating and justifying police

11   actions.

12        Q.    The -- is there anything specific that you

13   train either RRT members or bureau members generally

14   about how a crowd's failure to disperse when there's

15   an order to disperse interacts with these

16   definitions under 1010 of passive resistance,

17   physical resistance, and active aggression?

18        A.    So we train that, you know, there are some

19   types of force that are indiscriminate, and if the

20   -- the incident commander authorizes the use of, for

21   example, a pyrotechnic riot control agent, based on

22   the totality of the circumstances, the declaration

23   of a civil disturbance  or a riot, the grenadiers

24   are still going to have to make the individual

25   evaluation of whether that direction comports with

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 38 of 44

1  you're less likely to be perceived as the out-group

2  and you're more likely to get compliance or to de-

3  escalate and avoid force when, you know, their goals

4  conflict our goals, which are usually to establish

5  -- re-establish order or you know, adjust criminal

6  behavior.

7          So they use their mouth.  They talk.  They

8  communicate and then you know, we also talk about,

9  you know, giving time.  If you have the ability and

10 it's feasible, giving them time to kind of work

11 through the stages of not wanting to comply with the

12 direction of the orders, make sure it's clear, they

13 have time to understand what's being asked of them

14 or what they're being directed to do, if possible.

15         And then again, you know, try to avoid

16 individual actions where possible, because of the

17 potential for miscommunication or perception that

18 what we're doing is illegitimate or inflammatory.

19         So we recognize that and train our members

20 to try to avoid that when possible.

21     Q.    Do you have a PowerPoint slide

22 presentation that begins at 128 521 in any of your

23 binders?

24     A.    Are we in 2019 or --

25     Q.    I don't think so.  I don't know the date.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 39 of 44

1    It's not listed on the presentation.  I -- I think

2    it was produced in a batch later on which were

3    represented to be 2017 or '18.  Let me see if I can

4    figure it out.

5              MS. SHEFFIELD:  It's going to be in 2018,

6    so say the number one more time, Jesse?

7              MR. MERRITHEW:  Yeah, 128 521.

8    BY MR. MERRITHEW:

9        Q.    The first slide is, "Protests and Riots."

10             MR. MOEDE:  It's 2018.  It's Scott Moede

11   for the City of Portland.

12             MS. SHEFFIELD:  Yeah, it's going to be in

13   the state basic.

14   BY MR. MERRITHEW:

15       A.    Yeah, I see a slide.

16       Q.    This looks to be a part of the effort that

17   you're describing in order to help members

18   understand these theories of crowd behavior; is that

19   accurate?

20       A.    Part of it, yes.

21       Q.    When and to whom was this presentation

22   given?

23       A.    This appears to be part of the material

24   provided at the state basic RRT MRT Course.

25       Q.    Okay.  I want to ask you about the very

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 40 of 44

1   last slide in this presentation, which is at 128

2   630?

3        A.    Yes.

4        Q.    Could you explain how that slide is

5   consistent with the theories of crowd management

6   that the rest of the presentation was meant to

7   address?

8        A.    It is inconsistent and it's unacceptable.

9        Q.    Okay.  Do you -- was it a -- do you know

10  how this slide is -- came to be in this

11  presentation?

12       A.    I do not.

13       Q.    Would you agree that this slide undermines

14  a lot of what you just described the city trying to

15  teach members about crowd dynamics and in-crowd out-

16  crowd and building rapport in order to avoid the use

17  of force?

18       A.    Yes, absolutely.

19       Q.    In terms of the training with respect to

20  documentation of uses of force, does the city train

21  that each use of force that a member uses must be

22  documented in a -- I forget what their form is

23  called now.  But some sort of documentation of the

24  use of force -- force data collection report.

25  Sorry.

NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 4 - Page 41 of 44

1  transcript, but that looks like that was already

2  going.

3          **THE REPORTER:**  Mr. Merrithew, you do want

4  to order the original and Ms. Sheffield, would you

5  like to purchase a copy as well?

6          **MS. SHEFFIELD:**  Yes, I would.

7          **THE REPORTER:**  Okay.

8          **THE VIDEOGRAPHER:**  And, counsel, Ms.

9  Albies will be getting today's video deposition

10 included in her fee.  Would any other counsel member

11 like a copy of today's video deposition.

12         **MR. MERRITHEW:**  No.

13         **MS. SHEFFIELD:**  No.

14         **THE VIDEOGRAPHER:**  Okay.  The time is

15 12:33 p.m. and we are off the record.

16         **(WHEREUPON, the deposition of FRANZ**

17 **SCHOENING was concluded at 12:33 p.m.)**

18

19

20

21

22

23

24

25

**NAEGELI**
**DEPOSITION** & **TRIAL**

CELEBRATING 40 YEARS IN BUSINESS

**(800)528-3335**
**NAEGELIUSA.COM**

```
 1                        CERTIFICATE

 2

 3        I, the undersigned, Vincent Guerrera, am a

 4   videographer on behalf of NAEGELI Deposition & Trial. I

 5   do hereby certify that I have accurately made the video

 6   recording of the deposition of Franz Schoening, in the

 7   above captioned matter on the 23rd day of September,

 8   2021, taken at the location of 1111 SW 2nd Ave, Portland,

 9   Oregon 97204.

10

11        No alterations, additions, or deletions were made

12   thereto.

13

14        I further certify that I am not related to any of

15   these parties in the matter and I have no financial

16   interest in the outcome of this matter.

17

18

19   _____

20               Vincent Guerrera

21

22

23

24

25
```

```
 1                          CERTIFICATE

 2

 3        I, Rachael McCarrel, do hereby certify that I

 4   reported all proceedings adduced in the foregoing

 5   matter and that the foregoing transcript pages

 6   constitutes a full, true and accurate record of said

 7   proceedings to the best of my ability.

 8

 9        I further certify that I am neither related

10   to counsel or any party to the proceedings nor have any

11   interest in the outcome of the proceedings.

12

13        IN WITNESS HEREOF, I have hereunto set my hand this

14   22nd day of October, 2021.

15

16

17

18   _____

19                       Rachael McCarrel

20

21

22

23

24

25
```