

COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS



NAEGELI
Expect Excellence

DEPOSITION AND TRIAL

CELEBRATING 35 YEARS IN BUSINESS

(800) 528-3335

NAEGELIUSA.COM

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON PORTLAND DIVISION

DON'T SHOOT PORTLAND, et al.,

      Plaintiffs,

vs.                        Case No. 3:20-cv-00917-HZ

CITY OF PORTLAND, a municipal
Corporation,

      Defendant.

_____

**REMOTE DEPOSITION BY VIDEO CONFERENCE OF**

**COMMANDER JEFFREY BELL**

**TAKEN ON**
**FRIDAY, OCTOBER 29, 2021**
**9:08 A.M.**

**TIGARD, OREGON 97223**

Dec of Merrithew
Exhibit 5 - Page 1 of 72

```
 1          REMOTE DEPOSITION BY VIDEOCONFERENCE OF
```

```
 2                COMMANDER JEFFREY BELL
```

```
 3                      TAKEN ON
```

```
 4            FRIDAY, OCTOBER 29, 2021
```

```
 5                     9:08 A.M.
```

```
 6
```

 7          **THE VIDEOGRAPHER:**  We are on the record.

 8   The time is 9:08 a.m.  The date is October 29, 2021.

 9   This is the beginning of the deposition of Jeffrey

10   Bell.  The case caption is, Don't Shoot Portland

11   versus City of Portland.

12          Will counsel please introduce yourselves

13   and state who you represent.

14          **MS. ALBIES:**  J. Ashlee Albies counsel for

15   plaintiff.  With us today is Maya Rinta, Juan

16   Chavez, Alex Meggitt, Franz Bruggemeier.  I believe

17   that's it.  Also counsel for plaintiff.

18          **MR. MOEDE:**  And Scott Moede for defendant

19   City of Portland, and also with us is Mike Porter,

20   Rob Yamachika, Naomi Sheffield and Clair Warnock,

21   and I think Clair Warnock has identified herself as

22   a paralegal.

23          The other folks are attorneys for the City

24   of Portland.

25          **THE VIDEOGRAPHER:**  Our court reporter will

1 swear in the witness.

2          **THE REPORTER:**  Mr. Bell, would you please

3 raise your right hand.

4          Do you solemnly swear or affirm under

5 penalty of perjury that you are Jeffrey Mark Bell,

6 and the testimony you're about to give will be the

7 truth, the whole truth and nothing but the truth.

8          **THE DEPONENT:**  Yes, I do.

9          **THE REPORTER:**  Counsel, you may proceed.

10 **JEFFREY BELL,** having been first duly sworn, was

11 examined, and testified as follows:

12 **EXAMINATION**

13 **BY MS. ALBIES:**

14     **Q.**   Good morning, Commander -- is it Commander

15 Bell?

16     A.   Yes.

17     **Q.**   We've met previously in other cases.  I'm

18 here today to take your deposition on behalf of the

19 City of Portland.

20          And because I've taken your deposition

21 before, I know you probably remember some of the

22 rules, but I'll go over them very briefly.

23          One of the most important ones is to

24 answer the question audibly, and also, if you don't

25 understand a question that I'm asking, just let me

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 3 of 72

1  know.  I'm happy to rephrase it.  Otherwise, if you

2  answer the question, we'll understand that you

3  understood the question as it was asked.  Does that

4  make sense?

5      A.   Yes.

6      Q.   And because of the lag, we'll do our best

7  to not talk over each other and give it an extra

8  beat, which I know you're doing pretty well at this

9  point.

10          How many times have you testified in a

11 deposition?

12      A.   Several.  Less than ten, but I don't know,

13 five or six perhaps.  I don't remember an exact

14 number.

15      Q.   Okay.  And so you understand that if you

16 testify differently at trial or in a hearing than

17 you do here today, we can show this transcript or

18 show this video and point out those discrepancies;

19 do you understand that?

20      A.   Yes, I do.

21      Q.   And that's why it's important to give

22 complete and total answers today to my questions;

23 does that make sense?

24      A.   Yes, it does.

25      Q.   Okay.  So you are here today designated as

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 4 of 72

1  a representative of the City under FRCP 30(b)(6); do

2  you understand that?

3      A.   Yes.

4      Q.   And what is your understanding of the

5  topics that you're here to testify about today?

6      A.   My understanding is that I am here to

7  testify regarding the City's knowledge of complaints

8  and any sort of corrective action, disciplinary

9  action taken against officers based on use of force

10  during -- and I don't have the dates right off the

11  top of my head, but during certain dates of the

12  protests last year, and specifically regarding

13  impact munitions, chemical agents, and batons.

14      Q.   Okay.  And you understand that you're

15  speaking for the City of Portland with respect to

16  these topics?

17      A.   Yes, I do.

18      Q.   And you believe you're prepared to do that

19  here today?

20      A.   I believe so, yes.

21      Q.   And it's your understanding that you have

22  consent and authorization to speak for the City of

23  Portland on these topics that you've described?

24      A.   Yes, I do.

25      Q.   What did do you to prepare for this

NAEGELI

DEPOSITION AND TRIAL

(800)528-3335

NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 5 of 72

1   **deposition today?**

2        A.   In order to prepare for the deposition, I

3   have reviewed a number of closed Internal Affairs'

4   cases on the dates specified and reviewed the

5   investigation reports and the findings of those

6   investigations.

7             I've also reviewed both City Code and

8   bureau directives regarding Internal Affairs'

9   investigations, Police Review Boards, discipline

10  process, and I've also, obviously, discussed the

11  matter with the City attorneys.

12       **Q.   Did you review the Notice of Deposition**

13  **and the City's Objections and Designations to**

14  **plaintiff's Notice of Deposition?**

15       A.   I reviewed the Notice of Deposition.

16       **Q.   Okay.  And that has been marked as Exhibit**

17  **1.  Is that -- do you believe that that's the Notice**

18  **that you reviewed?**

19       A.   I reviewed an Amended Notice that -- I

20  don't know what Exhibit 1 is, but --

21       **Q.   Okay.  Here, I can show you.  That might**

22  **help.**

23       A.   Okay.

24            **THE REPORTER:**  And Ms. Albies, would you

25  like to mark Exhibit 1 for this transcript?

1          MS. ALBIES:  Sure.

2              (WHEREUPON, a document titled, "Amended

3    Notice of Deposition" was marked as Exhibit 1 for

4    identification.)

5    BY MS. ALBIES:

6        Q.   Do you see -- is this the Amended Notice

7    that you're referring to, Cmdr. Bell?

8        A.   I believe so.  The one I reviewed, I

9    believe, was dated September 21st, of this year.

10       Q.   Okay.  20th, 21st.

11       A.   20th, yeah.  I believe that was the one,

12   yes, that I reviewed.

13       Q.   And I just want to direct your attention

14   to Paragraphs 5, 6 and 12?

15       A.   Okay.

16       Q.   And  just confirm that these are the

17   topics on which you're prepared to testify today?

18       A.   Yes, I am prepared on 5, 6 and 12.

19       Q.   Okay.  Thank you.  And I will show you

20   what has been marked as Exhibit 2, and I'll mark it

21   for this deposition as well.

22          MS. ALBIES:  Jennifer, I'll email those in

23   a moment.

24          THE REPORTER:  Thank you.

25             (WHEREUPON, a document titled,

NAEGELI
DEPOSITION AND TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 7 of 72

1   "Defendant's Objections and Designations" was marked

2   as Exhibit 2 for identification.)

3   BY MS. ALBIES:

4     Q.   So this has been marked as Exhibit 2

5   already.  It's Defendant's Objections and

6   Designations to the Notice of FRCP 30(b)(6)

7   deposition.

8         And I'll direct your -- did you review

9   this in preparation for this deposition?

10     A.   I did not review that document.  No.

11     Q.   But looking at Paragraphs 5, 6 and 12,

12   I'll show you 12 in a moment, the City has

13   designated Chris Gjovick with respect to discipline

14   for Paragraph 5, and that's now you; correct?

15     A.   That is correct.

16     Q.   And same with Paragraph 6 -- excuse me,

17   this was designated Chris Gjovick, but that you are

18   taking Chris Gjovick's place with respect to

19   discipline for the purposes  of Paragraph 6;

20   correct?

21     A.   Yes.

22     Q.   Same question with respect to Paragraph

23   12.  The City designates Chris Gjovick, but you are

24   testifying as the designee instead of Chris Gjovick;

25   correct?

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 8 of 72

1    A.    Yes.

2    Q.    Okay.  Thank you.  So during the course of

3  this deposition, I might ask you questions and use

4  "you" and you understand that as I'm asking those

5  questions, that I really mean that the City of

6  Portland; does that make sense?

7    A.    Yes, that makes sense.

8    Q.    And so if you're giving an opinion that is

9  not on behalf of the City of Portland, what you're

10  designated, just make that distinction.  Otherwise,

11  when I use the term "you" and you're responding to

12  those questions, we'll all understand that those are

13  the -- you're responding on behalf of the City; does

14  that make sense?

15    A.    Yes.

16    Q.    And you understand that your answers to

17  those questions are binding on the City; correct?

18    A.    Yes.

19    Q.    And you described reviewing several PPB

20  directives and part of City Code.  I just want to

21  confirm that we're talking about the same

22  directives: Directive 330 applies to Internal

23  Affairs Complaint Intake and Processing.  Is that

24  one of the directives that you reviewed?

25    A.    Yes, it is.

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 9 of 72

1    control or crowd management complaints,

2    investigations regarding personnel in the bureau in

3    the rank of captain or higher.

4            Were there any of the investigations that

5    you reviewed for the purposes of this deposition

6    where IPR reviewed -- conducted an investigation

7    into any bureau member with a rank of captain or

8    higher?

9        A.   Let me think about that for a minute.  I

10   don't -- I don't believe any of them that I

11   reviewed, no, had any members of the rank of captain

12   or higher.

13       Q.   Okay.  And IPR is authorized to have

14   jurisdiction to conduct investigations into force

15   allegations; correct?

16       A.   Yes.

17       Q.   For Internal Affairs, you described that

18   they were non-sworn officers who were the

19   investigators.  Are the Internal Affairs'

20   investigators formerly sworn PPB members?

21       A.   So they are not unsworn officers.  They're

22   just non-sworn members of the bureau.  Sorry, you

23   said non-sworn officers.

24       Q.   Right.

25       A.   At this point, I'm thinking, three of the,

NAEGELI
DEPOSITION AND TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 10 of 72

1  I believe, eight investigators are former detectives

2  with the police bureau.  The other five had not

3  previously been employed by the police bureau in a

4  sworn capacity.

5      Q.   Had they been employed by other law

6  enforcement agencies in a sworn capacity; if you're

7  aware?

8      A.   Let me think.  Yes, some of them have.

9  Some of them have not.

10     Q.   So you described, I believe I heard you

11 described IPRs investigations are, for the most

12 part, initiated by citizen complaints; is that

13 correct?

14     A.   That is correct, yes.

15     Q.   Are -- what about Internal Affairs'

16 complaints?  Are those mostly initiated by citizen

17 complaints or community complaints?

18     A.   Yes, I would say the vast majority of the

19 complaints that we investigate are citizen or

20 community-member initiated.

21     Q.   Okay.  Are there other initiators of

22 investigations for either IPR or IA that are not

23 community-initiated complaints?

24     A.   Yes.

25     Q.   And what is that?

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 11 of 72

1    That there are -- there's potential misconduct on

2    the behalf of one of our -- one of our members.

3         Q.    Okay.  So fair to say that regardless of

4    how a complaint or an investigation is initiated

5    with either IPR -- IPR or Internal Affairs, that the

6    investigation and the process that follows is

7    consistent?

8         A.    Yes.

9         Q.    And you described community-based, kind of

10    complaints or investigations can come from a variety

11    of sources, including within the bureau, news

12    stories, anonymous, tort claim notice and legal

13    actions; correct?

14         A.    Yes.

15         Q.    Okay.  And with respect to force

16    investigations, regardless of how they are

17    initiated, IPR and IA attempt to or do conduct those

18    investigations in a manner consistent with past

19    practices and consistent with each other; is that

20    fair to say?

21         A.    Yes, that's fair to say.

22         Q.    Were any of the investigations that you

23    reviewed for the purpose of this deposition here

24    today initiated from anonymous sources?

25         A.    I don't believe so.  No.

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 12 of 72

1       Q.    Okay.  Were any of them initiated from

2   news sources or news reports; as far as you know?

3       A.    Of the closed cases, not to my knowledge.

4   No.

5       Q.    And were any of the investigations that

6   you reviewed for today initiated from tort claim

7   notices or legal actions?

8       A.    Yes.

9       Q.    Do you recall which ones?

10      A.    If you ask me about specific ones, I could

11  say.  I don't remember right off the top of my head

12  which ones.

13      Q.    Okay.  But you'd expect that

14  investigations initiated from tort claim notices or

15  legal actions would be conducted consistent with

16  complaints or investigations initiated from

17  community members or bureau members; correct?

18      A.    Yes.

19      Q.    And is there any other ways in which

20  complaints are investigated?  Or excuse me, or

21  investigations are initiated other than what we've

22  discussed already here today?

23      A.    Again, I feel like there have been one

24  offs throughout the years.  I can't think of

25  anything specific off the top of my head but -- and

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 13 of 72

1  the --

2      Q.    And I mean specific to force, uses of

3  force.

4      A.    Specific to uses of force.  They have been

5  generated in the past when -- and I guess I've kind

6  of described this, but when, you know, use of force

7  is reviewed by supervisors and command staff through

8  an After-Action process, if someone believes that

9  the officer's actions are out of policy, they have

10  referred those directly to Internal Affairs to do an

11  investigation.

12          So kind of like what I described about

13  bureau members initiating citizen complaints.

14      Q.    Okay.  So if a supervisor reviews a Force

15  Data Collection Report or reviews a particular

16  situation, determines that a force -- use of force

17  may be out of policy in an After-Action review, they

18  can refer that to Internal Affairs or IPR to conduct

19  an investigation; is that correct?

20      A.    That is correct, yes.

21      Q.    Are any of the investigations that you

22  reviewed for the purpose of this deposition, did

23  that situation occur?

24      A.    No.

25      Q.    Are you aware of whether any After-Action

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 14 of 72

1  guess I'm -- well, I believe that it certainly is

2  possible that an officer could use force in a manner

3  that was outside of policy, and there would be, for

4  whatever reason that was not brought to the bureau's

5  attention.  I'm not sure how we would necessarily

6  know about that if it wasn't somehow brought to our

7  attention.

8      Q.   Okay.  That's what -- I'm trying to get at

9  whether you would agree that sometimes inappropriate

10 uses of force might slip through the cracks, because

11 they don't  get initiated by one of the methods that

12 we've talked about here this morning.

13         MR. MOEDE:  And I'll object to the form.

14 BY MS. ALBIES:

15     A.    And again, what I would say is, if -- if

16 they do, as you say, slip through the cracks, either

17 I wouldn't know about it, or as soon as it became

18 apparent to us that it had passed levels of review

19 and had not been complained about or had not been

20 brought to our attention, as soon as it was brought

21 to our attention, an investigation would be

22 initiated.

23     Q.    And the IPR and the IA process that we've

24 talked about thus far, is that the only way that

25 officers could be held responsible or accountable

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 15 of 72

1    **for violations of use of force policy?**

2        A.    I would say by directive and by collective

3    bargaining agreement, yeah, that's pretty much the

4    only procedure we have to hold folks accountable for

5    violations of use of force directive.

6        **Q.    I want to talk a little bit about the IPR**

7    **process itself.  So in terms of force investigations**

8    **related to the dates that are identified in Exhibit**

9    **1 that are subject to this complaint that you're**

10    **here to testify, in examining the uses of force with**

11    **the allegations of inappropriate use of force in**

12    **those cases, Internal Affairs and IA use Directive**

13    **1010 and Directive 635 to assess whether or not that**

14    **use of force was consistent with PPB policy;**

15    **correct?**

16        A.    Yes.

17        **Q.    Are there any other directives that they**

18    **use to assess, just for the use of force component?**

19        A.    Yeah.  I'm not going to know the number

20    off the top of my head -- 315.30, maybe it is.  It's

21    Satisfactory Performance.

22            There is a section in, I believe it's

23    315.30, the name of the directive is Satisfactory

24    Performance, and it refers to judging an officer's

25    use of force, kind of, and I'll paraphrase, but

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 16 of 72

1  very, very soon, in which case, typically there

2  might be a phone call, but usually within a day or

3  two they're seeing actual, you know, I was going to

4  say paper copies, but it's all digital now, but an

5  actual, written, this is what we're investigating.

6  These are the allegations.

7        And again, IPR has the ability to call

8  them up or say, "Hey, we think you should do this,"

9  or "We think you should change this," or "We think

10 this should be worded this way."  And again, same

11 sort of situation.  If IPR and the bureau don't

12 reach an agreement, IPR's recourse is to simply take

13 the investigation and do it themselves and write the

14 allegations how they want.

15        But IA doesn't conduct any investigations

16 without notifying IPR at the very beginning.

17     Q.    Sure.  How does -- so a complaint

18 regarding force related to crowd control or force

19 that was used at the protest last year, however that

20 gets initiated, whether it comes from within the

21 bureau or it comes from community complaint or

22 whatever, it comes from a legal claim, IPR gets

23 notice -- like, can you explain to me, like how does

24 IPR and IA decide who will conduct the actual

25 investigation?  Whether it's going to be an IPR

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 17 of 72

1  **investigator or whether it's going to be an Internal**

2  **Affairs investigator?**

3      A.   So typically, again, the vast majority of

4  these cases come through IPR anyway.  Even some

5  cases that come to the bureau end up going through

6  IPR.  For instance, if an officer out on the street,

7  someone wants to complain about something someone

8  else did, we encourage our officers to take that

9  information down.  Our directives require that they

10 take complaints from folks.

11           The officer will take that and forward

12 that on, you know, to Internal Affairs, but

13 oftentimes, they will also say, "Look, I'll take

14 this.  I'll forward this on to Internal Affairs.

15 Here's a phone number for the independent police

16 union, contact them," and so we find that sometimes

17 when a complaint comes through the bureau, it's gone

18 through IPR as well.

19           So -- and I apologize.  I totally lost my

20 train of thought.  Could you ask the question?

21      Q.   Where does the -- where does it go to IA?

22 **Where does it go to IPR?  If IPR gets the complaint,**

23 **you know, we're talking about the investigations**

24 **that we're looking at.**

25           **And to be clear, I've seen the Internal**

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 18 of 72

1   Affairs' decision-making process, kind of policy

2   which I'm happy to show you, but I'm really just

3   looking for a summary of like how does the City

4   determine whether something goes to an Internal

5   Affairs investigations versus going to an IPR

6   investigator?

7        A.    So ultimately, IPR makes that decision and

8   it's made in a number of different ways.  Like I

9   said, most of the complaints come through IPR.  An

10  investigator takes the initial call or reads the

11  initial email, does a preliminary investigation,

12  submits that to the director or the assistant

13  director who, typically, they are going to be the

14  decision maker.  They're going to decide what is

15  going to happen with that complaint.

16        Are we, the City going to investigate

17  that?  And then they will typically make a decision,

18  again, based on the criteria that I talked about

19  earlier or sometimes they will just pick a random

20  one say, "No, IPR is taking that."  They will decide

21  that IPR is taking that or they will decide, "No,

22  we're gonna give this one to the bureau to do."

23        And again, that's the typical path.  The

24  slightly or the much less frequent path is that

25  complaint comes through the bureau with no knowledge

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 19 of 72

1  to a bureau file, like an FDCR or an After-Action

2  Report, can they just find it within the system

3  fairly quickly?  Or do they have a similar process

4  to the IPR investigators when seeking that

5  information?

6      A.    No.  They have direct access to the record

7  management system so they can for instance search by

8  case number or search by, you know, a person's name.

9  And if the report is in the system, they have access

10  to it.

11     Q.    Okay.  And so in conducting investigations

12  because the -- in reviewing these and just based on

13  my understanding, IPR investigators cannot compel

14  any officers, whether witnesses or subjects of the

15  complaints to answer IPR investigator questions

16  directly; correct?

17     A.    That is correct.

18     Q.    So they have to have either an Internal

19  Affairs investigator or somebody in the subject or

20  witness officer's chain of command order them to

21  answer the questions truthfully and honestly;

22  correct?

23     A.    It's been done a couple of different ways.

24  Typically, we have one of the Internal Affairs

25  sergeants, so it's not necessarily someone in their

NAEGELI
DEPOSITION AND TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 20 of 72

1  chain of command, but it is you know, a supervisor

2  that, yes, gives them the same basic admonishment

3  and orders them to cooperate with the investigation

4  the same way an investigator would do during an IA

5  investigation.

6      Q.   And why is that?

7      A.   The reason for that is the collective

8  bargaining agreement does not allow for IPR

9  investigators to compel testimony from police

10 officers or sworn members.

11     Q.   Okay.  And so this arrangement where

12 there's a sergeant who is there directing the

13 witness or subject officer to answer the questions,

14 that's by agreement with IPR; correct?

15     A.   That's correct.

16     Q.   During those interviews with either a

17 witness or a subject of a force complaint, that

18 Portland Police Bureau member is entitled to have a

19 union representative with them; correct?

20     A.   Correct.

21     Q.   And what's the role, your understanding of

22 that union representative at the interviews?

23     A.   So my understanding of the role is that

24 union representative is there in an advisory

25 capacity and what I have told investigators, IA

NAEGELI
DEPOSITION AND TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 21 of 72

1  on IPR's determination of who should conduct that

2  interview or the investigation; correct?

3      A.   Yes.

4      Q.   And at the end of the investigation, it

5  goes to -- does it go up the chain of command in --

6  if IPR is conducting the investigation, it goes up

7  the chain of command in IPR before it goes to the

8  reporting unit manager for the approval or review?

9      A.   Yes, that's correct.

10     Q.   Okay.  And once it goes -- so it goes

11  through the IPR kind of review process, completed

12  IPR investigation, and then it goes to the reporting

13  unit; correct?  Manager?

14     A.   It actually goes to IA first.

15     Q.   It goes to IA first, and then -- so what's

16  -- walk me through the process of review once an IPR

17  investigation is completed and goes to the review

18  within IPR.

19     A.   So typically that investigation then will

20  come over to IA and the IA captain will typically

21  review it. Again, the IA captain does not have any

22  ability to force IPR to change anything.

23          However, I think on both sides of the IPR,

24  IA, you know, sides of the administrative or the

25  accountability system, I think, generally, we've

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 22 of 72

1    taken the view that more eyes on it is better.  So

2    the IA captain may make suggestions or say, "Hey,

3    did you think about this?"  Or, "Oh, I got questions

4    about this."  "Did you ask this?"  Those sorts of

5    things.

6                The IA captain has the ability to make his

7    or her case to IPR, but ultimately, that case is

8    then sent out to the RU manager for a review of the

9    investigator's recommended findings and they are

10   essentially tasked with -- with rendering proposed

11   findings, is what we call them.

12               And then I don't know, do you just want me

13   to keep going down the line?

14        Q.   No, that's okay.  I'm just -- I was trying

15   to clarity on the steps in that process.

16               And so the types of findings between

17   whether it's an independent IPR investigation versus

18   -- or an IA investigation are the same, unfounded,

19   exonerated, not sustained or sustained?

20        A.   That's correct.

21        Q.   Okay.  In any -- well, let me ask this: In

22   the City's view is the IPR and Internal Affairs'

23   system that we've been discussing this morning, is

24   that working as it's supposed to?

25        A.   I believe so, yes.

NAEGELI
DEPOSITION AND TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 23 of 72

1      **MR. MOEDE:**  Again, I'll just note the same

2  objections.  That is not part of the Amended Notice

3  of Depositions.  It's not part of either

4  investigation, knowledge or discipline.  It doesn't

5  apply to the relevant dates, but go ahead.

6  **BY MS. ALBIES:**

7      A.  So based on just looking at this and you

8  know, being the footnote, essentially, it does

9  appear, yes, that that is actual applications of

10  force.

11      **Q.   Okay.  So the applications of force that**

12  **the bureau is aware of during the 2020 Floyd**

13  **protests from May to October of 2020, between the**

14  **actual and the estimated is 5,160 and 1,091.  So**

15  **that's over 6,000 uses of force for the protests**

16  **during that time period; correct?**

17      **MR. MOEDE:**  I'm just going to again, note

18  the same objection.  This is going to be the last

19  question I'll let him respond to on this.

20  **BY MS. ALBIES:**

21      A.  And I apologize, because I'm reading the

22  notes, because I'm not entirely clear -- okay.  The

23  way I'm reading it, and again, this is the first

24  time I have seen this particular document, I

25  believe.  The way I'm reading it, yes.  I agree with

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 24 of 72

1  your math there.

2      Q.    And I'd like you to look at the document

3  entitled, "Crowd Control Tables, 4.21.21"?  And

4  we'll mark that Exhibit 14.

5              (WHEREUPON, a document titled, "Crowd

6  Control Tables, 4.2.21" was marked as Exhibit 14 for

7  identification.)

8              THE REPORTER:  So noted.

9  BY MS. ALBIES:

10      Q.    Let me know when you have that up, Cmdr.

11  Bell.

12      A.    I have it up now.

13      Q.    Okay.  So this document is the IPR's -- I

14  don't what to call this, it's their document

15  regarding the number of complaints made regarding

16  the protests.  Have you seen this document before?

17      A.    I don't believe so.

18      Q.    This -- this document explains that this

19  sheet shows what happens -- what happened with

20  protest-related complaints and the allegations

21  involved.  This information was updated on 4/21 --

22  excuse me, 4/21/21 and goes back to the first date

23  IPR received a George Floyd protest-related

24  complaint, 5/29/2020.

25              In addition to complaints of misconduct,

1    IPR has received over 4,000 individual items of

2    feedback about policing in general since the

3    beginning of the protests.

4            So this document says total protest cases,

5    125; force cases, 89.  Is it your understanding that

6    that is consistent with the number of complaints

7    that IPR and IA have received regarding force

8    related to the George Floyd protests?

9            MR. MOEDE:  Hold on.  I'm just going to

10    note an objection.  This is outside the Amended

11    Notice of Deposition for which Cmdr. Bell has been

12    designated, particularly on relevant dates.

13            We've also indicated previously that Ross

14    Caldwell, I think C-a-l-d-w-e-l-l is designated for

15    the IPR matters, and he can answer questions about

16    IPR complaints. Go ahead.

17            MS. ALBIES:  My understanding was Mr.

18    Caldwell was designated for administrative closures.

19            MR. MOEDE:  Yes, and this doesn't have to

20    do with anything related to what Cmdr. Bell is

21    designated to testify about.

22            MS. ALBIES:  Well, there were over 6,000

23    uses of force, and there were 89 complaints about

24    force.  I think that context is important to what

25    Cmdr. Bell is testifying about here today.

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 26 of 72

1          MR. MOEDE:  Well, this is an IPR document,

2   right?  So he hasn't reviewed it in preparation for

3   his deposition, because he wasn't designated as

4   such.

5          MS. ALBIES:  So my question to Cmdr. Bell

6   was whether this is consistent with his

7   understanding generally about how many complaints

8   regarding force related to the George Floyd protests

9   that the City has received.

10          MR. MOEDE:  Okay.  I'll just note the same

11   objections.  Cmdr. Bell, you can answer that.  And

12   I'll also object to the form of the question.  Go

13   ahead.

14   BY MS. ALBIES:

15      A.   Again, this is the first time, I believe,

16   I've seen this.  IA and IPR share the same data

17   base.  I think we're both fairly good about keeping

18   that information up to date.  I would say based on

19   what I'm reading here, that yes, it looks like there

20   were probably 125 total cases and 89 of them were

21   force cases.  I'm just reading off the sheet.

22      Q.   Okay, but that doesn't -- that appears

23   consistent with your understanding?

24      A.   I believe so.  Yes.

25      Q.   Okay.  So in your review and your

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 27 of 72

1  preparation for this deposition today, has the City

2  reprimanded either verbally or written or

3  disciplined any Portland Police Bureau member for

4  the use of excessive force in crowd control settings

5  on the dates relevant to this complaint which are

6  May 29th through June 2nd, June 5th and 6th, June

7  9th and 10th, June 12th, 13th, June 28th, June 30th,

8  July 4th, August 4th, August 10th, August 13th,

9  August 15th and 16th, August 22nd and 23rd and

10  September 5th?

11      A.    So based on the closed cases that I've

12  reviewed on those dates, I am not aware of any

13  Portland Police Bureau member who has been given any

14  discipline for excessive -- specifically for

15  excessive force.

16      Q.    Okay.  Any -- what about counseling?

17      A.    That, I am not aware of.  However, there

18  could have been counseling that was undocumented.

19  Based on what I reviewed, no, I'm not aware of any

20  counseling.

21      Q.    And the investigations that you reviewed

22  these closed cases where no bureau member was

23  disciplined or documented counseling related to the

24  use of excessive force, these investigations and

25  review practices are consistent with IPR and IA's

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 28 of 72

1  practices; correct?

2      A.   Yes.

3          MR. MOEDE:   Objection to the form, but go

4  ahead.

5  BY MS. ALBIES:

6      Q.   And has the City disciplined, reprimanded

7  either verbally or written or counseled any Portland

8  Police Bureau member for violating its policies and

9  trainings with respect to the use of riot control

10  agents and less lethal weapons in crowd control

11  settings on the relevant dates that I just

12  identified?

13      A.   No.

14      Q.   And has the City -- is the City aware of

15  any Portland Police Bureau member violating its

16  policies and trainings with respect to the use of

17  riot control agents and less lethal weapons in crowd

18  control settings on the dates that I just

19  identified?

20      A.   No.

21      Q.   And has the City reprimanded or

22  disciplined or counseled any Portland Police Bureau

23  member for using or approving force used in crowd

24  control settings on the dates that I just identified

25  without sufficiently articulating a permissible

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 29 of 72

1  **justification?**

2      **A.    Again, based on the closed cases, no.**

3      **Q.    And are these investigations in the**

4  **questions that I just asked you on these dates,**

5  **these investigations and review practices are**

6  **consistent with IPR and IA's practices as we've**

7  **described this morning; correct?**

8      **A.    Yes, that's correct.**

9      Q.    Okay.  So I want to direct your attention

10 to what is named "List of Cases."  Let me know when

11 you have that up.

12     A.    I have it up now.

13          MS. ALBIES:  And we'll mark that as

14 Exhibit 15.

15          THE REPORTER:  So noted.

16          (WHEREUPON, a documented titled, "List of

17 Cases," was marked as Exhibit 15 for

18 identification.)

19 BY MS. ALBIES:

20     Q.    And do you recognize this document?

21     A.    I -- I understand what it is.  I don't

22 believe I've seen this specific document.

23     Q.    What is it?

24     A.    It appears to me to be a list of cases on

25 the subject dates involving --

1  investigations that would lead to discipline of any

2  bureau members other than the process that we've

3  been talking about this morning; correct?

4      A.  Yes, that's correct.

5      Q.  And so the City's position is that all of

6  the force that -- all of the uses of force and the

7  conduct that are subject to your answer that were

8  investigated by IPR or IA on this list, that the

9  sound for the cases that have been closed that all

10  of that conduct was within policy and consistent

11  with training; correct?

12      A.  Yes, that's correct.

13      Q.  And the City is confident that Internal

14  Affairs and IPR has the ability to address any

15  conduct that is outside of policy and hold people --

16  bureau members  accountable; correct?

17      A.  Yes.

18      Q.  Okay.

19          MS. ALBIES:  Can we take a -- like a six-

20  or seven-minute break?

21          MR. MOEDE:  Yeah, and I can -- if you

22  want, during the break, we can kind of go through

23  when those other documents that I was objecting to

24  were produced and what it is?  Clair is on and can

25  give an explanation if you're interested.

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 31 of 72

1  hit a protestor in a place other than where he was

2  authorized; correct?

3      A.   Yes.

4      Q.   I want to direct your attention to Exhibit

5  -- let's see.  We're going to turn to IPR File

6  2020C-0335.  This was the other -- this was, I think

7  it was Incident Number 9, where the Court found a

8  violation of 1010 of the TRO; do you recall this

9  incident?

10     A.   Yes, I do.  What was the document again?

11     Q.   So I'd like -- so first we're looking at

12 the Opinion and Order which has already been marked

13 as Exhibit 16.

14     A.   Okay.

15     Q.   Oh, sorry, Exhibit 17 on Page 11,

16 describes -- subsection H describes Incident 9.  Let

17 me know when you get there.

18     A.   I'm there now.

19     Q.   And this is the incident where, about an

20 hour after the protestors arrived, officers and

21 protestors came to a standstill a couple of blocks

22 from the PPA building, was some distance between the

23 police and the crowd.  An individual walked out of

24 the crowd in front of the line of protestors,

25 approaching an unknown object in the street.  As the

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 32 of 72

1  individual reached for the object, police fired

2  impact munitions at the individual, and they quickly

3  retreated into the crowd.

4          Officer Domka testified that the use of

5  force in this moment was appropriate, because the

6  individual by stepping out in front of the protest

7  and reaching down towards an object on the pavement,

8  may have indicated that they were about to throw the

9  object back at officers.

10          In the minutes that followed, protestors

11 continued to throw dangerous projectiles at the

12 police line with increasing frequency and velocity.

13 Some officers were hit and required medical

14 attention.  Around 10:10 that evening, Captain

15 Passadore declared the event a riot, due to the

16 number of projectiles thrown and the danger that

17 they proposed to police and protestors.

18          PPB deployed CS gas to disperse the crowd

19 and protestors were pushed further east into a more

20 commercial neighborhood just east of Interstate 5.

21 Hours later, the protest ended.

22          So I didn't read the citations.  There's

23 citations to the Passadore declaration and exhibits

24 and various declarations, but it's your

25 understanding that the Court's recitation of the

1  facts here is based on the evidence that the Court

2  received during the contempt hearing; correct?

3     A.   Correct.

4     Q.   And that includes testimony here of

5  Officer Domka; is that correct?

6     A.   Yes.

7     Q.   And that also includes video evidence of

8  the incident at issue here; correct?

9     A.   Yes.

10    Q.   And so turning to Page 17 of the Order it

11 states as to Incident 3, the Court also finds that

12 Officer ██████ deployment of ten rounds of his

13 FN303 against protestors -- oh, sorry, that's

14 Incident 3.  My bad.

15         Looking at Page 18, which is Incident 9.

16 An unknown officer's use of impact munitions against

17 an individual approaching an item in the road

18 (Incident 9), which is what we're discussing, was

19 not in response to active aggression.  The

20 individual walked out from the crowd of protestors

21 leaning towards an unknown object between the crowd

22 and police line.  As they leaned down to grab the

23 item, an officer deployed multiple rounds from an

24 FN303 at them.

25         After reviewing this video, Officer Domka

1    testified that the behavior of this individual,

2    stepping out of the crowd towards the police line

3    and reaching down to pick up an object from the

4    pavement may indicate that the protestor is about to

5    throw an object at an officer and the Court writes,

6    but it simply cannot be that any attempt by an

7    individual to pick up an item off the ground at a

8    protest constitutes a threat of assault to officers

9    or others.

10              There was nothing in this moment to

11   suggest that the protestor was grabbing an item with

12   the intent to throw it at the police.  The

13   individual moved slowly and was struck by a munition

14   before they even had the object in their hand.

15   Because this protestor was not engaged in active

16   aggression, the officer's use of impact munitions

17   violated the Order.

18              You had an understanding that that's the

19   Order that Judge Hernandez entered in this case;

20   correct?

21       A.   Yes.

22       Q.   And that's the basis of Complaint 2020-C-

23   0335; is that correct?

24       A.   Yes, that's correct.

25       Q.   So I want to turn to the documents that

1  are titled with, "0335" in the title.  So 0335-IA

2  Closure?

3      A.   Okay.

4           THE REPORTER:  Ms. Albies, is this still

5  Exhibit 17 that you're referring to or are you --

6           MS. ALBIES:  No.  This'll be Exhibit 20.

7           THE REPORTER:  Thank you.

8           (WHEREUPON, a document titled, "Portland

9  Police Bureau Internal Affairs Worksheet" was marked

10 as Exhibit 20 for identification.)

11 BY MS. ALBIES:

12     Q.   And looking at what's been marked as

13 Exhibit 20, the IA Closure, it's titled, "Portland

14 Police Bureau Internal Affairs Worksheet," are you

15 familiar with this document, Cmdr. Bell?

16     A.   Yes.

17     Q.   And so it -- the allegations there say,

18 "Officer            ," it gives -- I assume that's

19 his ID Number, "violated the terms of the temporary

20 restraining order in Don't Shoot Portland, et al

21 versus City of Portland for conduct Directive 315,

22 Laws, Rules and Orders," and the second allegation

23 is, "Officer              inappropriately deployed a

24 less lethal munition and struck an unknown subject,"

25 which is a force allegation under Directive 1010.

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 36 of 72

1          So do you know who created these

2    allegations or framed them in this way for this

3    purpose?

4          A.    I believe IPR, but I don't -- I don't have

5    any way of knowing for sure.  I just see that, based

6    on the information at the top of the sheet that this

7    came from IPR, received by Clithero.  He's an IPR

8    investigator.

9              I would assume that they came from IPR,

10   but I don't know for sure.

11         Q.    Okay.  And the -- this says this is an IA

12   closure information and the date it was closed was

13   on 9/1 of '21,  and by Lt. SW -- is that SWK?

14         A.    Yes.

15         Q.    Okay.  How do you pronounce that?

16         A.    Oh, that's initials.

17         Q.    Okay.

18         A.    Konczal is the name.

19         Q.    Say it one more time, please?

20         A.    The name is Scott, I don't know what is

21   middle -- his middle initial is obviously W., Scott

22   W. Konczal.

23         Q.    Okay, and he is the lieutenant with IA?

24         A.    Correct.

25         Q.    And so what does that indicate to you

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 37 of 72

1   where it's initialed?

2       A.   The captain or lieutenant initials that

3   when the case is to be closed.  They put the

4   information and what the final findings were and

5   that's the closure date of the file.  It just means

6   it all -- all the process has been gone through.

7       Q.   Okay.  And the findings here were not

8   sustained; correct?

9       A.   That is correct.

10      Q.   And the -- is there any meaningful

11  difference between allegation 1 and 2, to your

12  understanding?

13      A.   You know, there's been some talk about,

14  because there were other cases that had this same

15  sort of language.  I suppose there could be a fact

16  situation where one might be sustained and one might

17  not be.

18           I think there's often the attempt to try

19  to parse these out, so that we don't miss some form

20  of misconduct based on, you know, very strictly

21  limiting the language.  Effectively, I don't believe

22  there's that much difference, no.  If he violated

23  1010, that would essentially mean that he violated

24  the temporary restraining order.

25      Q.   Okay.  So I would like to direct your

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 38 of 72

1    A.    Correct.

2    Q.    I'm sorry.  Did you answer that?

3    A.    I did.  I'm sorry.  Correct.

4    Q.    Okay.  And it -- if you look on Page 1, it

5    says, "Applicable directives on date of occurrence,

6    315.00, Laws, Rules, Orders.  1010 Use of Force.

7    635.10 Crowd Management/Crowd Control."

8          Were these -- are these directives the

9    same as they are today that were in effect at the

10   time of this incident?

11   A.    I believe they are the same ones in effect

12   today.

13   Q.    Okay.  So the way that this investigation

14   occurred is that this was initiated because of the

15   Court Order finding contempt in this case; correct?

16   A.    That is correct.

17   Q.    Then there was another companion case

18   related to a different incident for which the Court

19   found ███████████ also in violation of the

20   contempt order and 1010; correct?

21   A.    That's correct.

22   Q.    And it's your understanding that the

23   temporary restraining order that the Court found

24   ███████████'s conduct to be in contempt of, was

25   essentially 1010 and restricting the use of less

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 39 of 72

1   lethal weapons consistent with 1010 and in addition

2   that they couldn't be used in a way that would

3   impact people engaged in passive resistance; is that

4   correct?

5           MR. MOEDE:  Object to the form.

6   BY MS. ALBIES:

7       A.   Yes, that's correct.

8       Q.   Is there anything inaccurate about the way

9   that I've characterized it?

10      A.   I don't believe so, no.

11      Q.   Okay.  And the investigator in this case,

12  John Rhodes, conducted an investigation independent

13  from Judge Hernandez' finding on the contempt order;

14  correct?

15      A.   That's correct, yes.

16      Q.   And Investigator Rhodes was applying a

17  Standard of Review of a preponderance of the

18  evidence which is less than the clear and convincing

19  evidence standard that Judge Hernandez was applying;

20  correct?

21      A.   That's correct.

22      Q.   I'd like to direct your attention to Page

23  10 of Exhibit 21.

24          MR. MOEDE:  Is this the exhibit we're

25  looking at right now, counsel?

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 40 of 72

1          MS. ALBIES:   This is the -- 0335 IA Report

2   which has been marked as Exhibit 21.

3   BY MS. ALBIES:

4       Q.    So at the bottom of Page 10, it says,

5   "Investigator Comments," and it notes that Officer

6   Domka testified about the incident.  In the Opinion

7   that we just read, it was -- the Opinion did not

8   identify ██████████ as the person shooting the

9   FN303; correct?

10      A.    Yes, that's correct.

11      Q.    But in the course of this investigation,

12  it became clear that it was ████████ who did

13  use that force in that situation; correct?

14      A.    Yes, that's correct.

15      Q.    Okay.  And so Officer Domka did testify

16  about -- testified to the Court that this particular

17  incident was consistent with Portland Police Bureau

18  Training and Directive 1010; correct?

19      A.    Yes.

20      Q.    And based on the Opinion that we've read

21  into the record, the Court was aware that there were

22  multiple objects being thrown at officers during the

23  course of this incident; correct?

24      A.    Yes.

25      Q.    Looking at Page 11 of this document?  In,

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 41 of 72

1    "The Findings.  This investigator finds that

2    Allegation 1 was not sustained.  The evidence was

3    insufficient to prove a violation of policy or

4    procedure."

5              And it states that Allegation 1 is

6    apparently based solely on the Opinion and Order

7    document from federal case 320-cv-00917-HZ and

8    recites the Court's conclusion that we've already

9    into the record on Page 18 of that Opinion and Order

10   which has already been marked here as Exhibit 17.

11             And it says that the Opinion does not take

12   into account the actions of the protestors

13   throughout the evening before and after this

14   instance, including multiple instances of protestors

15   throwing a variety of objects at the police, either

16   objects already in their possession or objects they

17   retrieved from the ground, which would have an

18   impact on what an officer might objectively and

19   reasonably believe what was about to happen in a

20   similar circumstance.

21             The videos of the evening's events as well

22   as the reports by the officers are illustrative of

23   such actions and of some members of the protest

24   groups.

25             So as we've already discussed, the Court

NAEGELI
DEPOSITION AND TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 42 of 72

1  did actually have information about protestors

2  throwing objects at the police; correct?

3      A.   Yes.

4      Q.   And did have information about what an

5  officer might objectively and reasonably believe was

6  about to happen in similar circumstance; correct?

7          MR. MOEDE:   Object to the form.

8  BY MS. ALBIES:

9      A.   Yes.

10      Q.   And did have the benefit of Officer

11  Domka's testimony about this particular incident

12  that it was, in his opinion, consistent with policy

13  and training; correct?

14      A.   Yes, that's correct.

15      Q.   So fair to say that this investigator's

16  report and opinion and a finding of not sustained

17  differed from the Court's opinion on the same

18  conduct; correct?

19      A.   Yes, that's correct.

20      Q.   And as part of the analysis of 1010 and

21  the standards set by 1010, it incorporates the

22  totality of the circumstances of the event and the

23  incident at issue; correct?

24      A.   I apologize. I missed the first part of

25  that question.

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 43 of 72

1    Q.    1010 incorporates the Graham Standard of

2    reasonable totality -- reasonableness of force and

3    the totality of the circumstances; correct?

4        A.    Yes, that's correct.

5        Q.    And that includes weighing an interest of

6    -- the interest in protecting people's First

7    Amendment rights to engage in peaceful protest and

8    balancing that against the governmental interest in

9    maintaining order; correct?

10        A.    Yes.

11        Q.    Okay.  So the Internal Affairs

12    investigator who is conducting this investigation is

13    conducting that balancing act; correct?

14        A.    Yes.

15        Q.    And the Court, in reviewing the same

16    conduct, was also conducting that balancing act;

17    correct?

18        A.    Yes.

19        Q.    And the Court in conducting -- in the

20    Opinion that the Court gave, the Court didn't say

21    that any officer had to wait until a subject threw

22    an object at the officer before using force against

23    that person; correct?

24        A.    Yes, I don't recall that statement.

25        Q.    But the Court essentially  said there had

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 44 of 72

1  to be something more than just bending down to pick

2  it up; correct?

3      A.    Yes.

4      Q.    And so this investigation report sets out

5  the reasons and the rationale why this investigator

6  disagreed with the Court; correct?  On the same

7  incident.

8      A.    Yes.

9      Q.    Okay.  And I'd like to direct your

10 attention to Exhibit 0335-IA Report Addendum, which

11 we've marked as Exhibit 22.  And this is dated

12 August 4th of 2020 (sic); is that correct?

13     A.    That's correct, yes.

14     Q.    So this -- the prior exhibit was dated May

15 21st of 2021; correct?

16     A.    I don't have it still pulled up.

17     Q.    I'll represent to you that it was dated

18 May 21st of 2021, and this second addendum was a few

19 months later in August of '21; correct?

20     A.    I do see, yes, the August of 2021 for the

21 addendum.

22     Q.    Okay.  And the addendum incorporates

23 additional information from the Court hearing

24 wherein the Court found that ██████████'s

25 conduct had violated -- or this incident, the

 1  for identification.)

 2  BY MS. ALBIES:

 3      A.   Yes

 4          THE REPORTER:  So noted.

 5  BY MS. ALBIES:

 6      Q.   That's dated June 3rd, so that's based on

 7  the review of this initial investigation; correct?

 8      A.   That's what it appears to be, yes.

 9      Q.   Okay.  Was there another RU memo on the

10  addendum investigation or that doesn't have to

11  happen at that stage?

12      A.   No.  If the investigation is amended,

13  there should have been an additional RU Findings

14  Memo.

15          In the materials that I reviewed, I have

16  one dated August 17th.

17      Q.   Okay.  I'd like to direct your attention

18  to,  let's see -- well, looking at, and based your

19  review of the file, it's your understanding that IPR

20  ultimately agreed with the Internal Affairs

21  investigator in this case that the allegation was

22  not -- both allegations were not sustained; correct?

23      A.   That is correct.

24      Q.   And it's your understanding that Internal

25  Affairs agreed with the investigator's finding that

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 46 of 72

1   this was -- these two allegations were not

2   sustained; correct?

3        A.    Yes.

4        Q.    And it's your understanding that the

5   Chief's Office agreed with the finding that these

6   allegations were not sustained; correct?

7        A.    Yes, that's correct.

8        Q.    Okay.  And those findings are directly

9   contradictory towards -- to the Court's findings

10  that these -- this conduct, the same conduct

11  violated the temporary restraining order and 1010;

12  correct?

13       A.    Yes.

14       Q.    And what is your understanding of why that

15  is?

16       A.    My understanding is there are a couple of

17  reasons.  In terms of the analysis of the video, in

18  the Judge's order, the Judge is specific in saying

19  that the unknown individual simply reaches down to

20  pick up the item and that is an unknown item.

21            In looking at the video evidence, the

22  investigator and then the decision maker is to

23  follow, all believe it is fairly conclusive from the

24  video that that was not an unknown object, that it

25  was a canister from a triple chaser gas canister,

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 47 of 72

1  and that it is also clear from the video and

2  conclusive that the subject did actually pick it up

3  and what is not clear from the video is -- or I

4  apologize.  Strike that.

5          That the -- that the -- so that was the

6  information that the decision makers and the

7  investigator used to come to a different conclusion.

8  They could not prove they believed with a

9  preponderance of the evidence that Officer ▮▮▮▮▮

10  had violated the directive and in addition, felt

11  that given the additional analysis and the

12  conclusions they drew from the video evidence, that

13  this event was very similar to Event Number 8

14  involving Mr. Greatwood.

15      Q.   Well, Event Number 8 involving Mr.

16  **Greatwood, the Court described differently as Mr.**

17  **Greatwood walking very quickly towards an object and**

18  **stooping down to pick it up; correct?**

19      A.   The Court described, yes.  That's how the

20  Court described it.

21      Q.   **And the Court had the benefit of the video**

22  **in examining this incident; correct?**

23      A.   They did, yes.

24      Q.   **And the Court says it's an unidentified**

25  **object, but it doesn't say that it could not have**

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 48 of 72

1  been a canister; correct?

2      A.   That's correct.

3      Q.   So the Court could have acknowledged that

4  it was  canister and that wouldn't necessarily make

5  a difference to the Court's analysis; correct?

6          MR. MOEDE:  Object to the form.

7  BY MS. ALBIES:

8      A.   Yeah, I can't answer that.

9      Q.   So the understanding that this was a

10  canister of triple chaser that had already been

11  spent; correct?

12      A.   I believe so, yes.

13      Q.   Okay.  And that the subject picked it up;

14  correct?

15      A.   Correct.

16      Q.   And those are the kind of primary bases

17  for a difference of opinion about whether Officer

18          conduct was reasonable; is that correct?

19      A.   Yes, that's correct.

20      Q.   There was additional training on the

21  Court's order related to this incident; is that

22  correct?

23      A.   That's correct, yes.

24      Q.   So if the same incident happened today,

25  under the same circumstances, the City would find

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 49 of 72

1   the same conduct of Officer ███ to be within

2   policy; is that correct?

3              MR. MOEDE:   I'm going to object to the

4   form.   Again, this is outside of the amended Notice,

5   but go ahead and answer.

6   BY MR. ALBIES:

7       A.    Yes, I believe so.

8       Q.    I'd like to direct your attention to

9   2020-C-0334.

10             MR. MOEDE:   Ashlee, could I take a quick

11  restroom break just to --

12             MS. ALBIES:   Sure.

13             MR. MOEDE:   I'll be right back.

14             THE VIDEOGRAPHER:  Would you like to go off

15  the record, counsel?

16             MS. ALBIES:   Sure.

17             THE VIDEOGRAPHER:   The time is --

18             MS. ALBIES:   I'm going to -- I'm going to

19  do the same.

20             THE VIDEOGRAPHER:   The time is 11:41 a.m.,

21  and we are off the record.

22             (WHEREUPON, a brief recess was taken.)

23             THE VIDEOGRAPHER:   We are on the record.

24  The time is 11:52 a.m.   You may now proceed.

25  BY MS. ALBIES:

1    Q.    Cmdr. Bell, I'd like to -- to look at the

2   exhibit that I just emailed to counsel. We're going

3   to mark that as Exhibit 25.

4          (WHEREUPON, multiple Proposed Findings

5   Cover Sheets documents were marked as Exhibit 25 for

6   identification.)

7   BY MS. ALBIES:

8    Q.    And this is RU Proposed Findings Cover

9   Sheet, IA Proposed Findings Cover Sheet, IPR

10  Proposed Findings Cover Sheet and Addendum, CHO

11  Proposed Findings Cover Sheet, and as we -- you just

12  testified and as I just asked you, all of the

13  reporting unit, independent of IPR, Independent

14  Police Review, Internal Affairs and CHO stands for

15  the Chief's Office; correct?

16   A.    Yes, that's correct.

17   Q.    All of these entities concur with the

18  findings of the IA investigator that Allegations 1

19  and 2 based on Officer ▨▨▨▨▨ conduct that the

20  Court found in violation of the temporary

21  restraining order and Directive 1010 as being a

22  violation, all of these entities found it not

23  sustained; is that correct?

24   A.    Yes, and it's just a fine point.  They're

25  actually concurring with the RU Manager's proposed

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 51 of 72

1  findings, not -- not the recommended findings.

2  They're weighing in on what the RU Manager said.  In

3  this case it's the same, but --

4      Q.   Okay.  Understood.  Thank you.  That's

5  helpful.  So the RU Manager reviews the Internal

6  Affairs investigation and essentially is the --

7  accepting those findings, the recommended findings

8  and proposing those findings as not sustained, does

9  that adopt the entirety of the investigation by the

10  IA investigator?

11      A.   Not necessarily.  If there are -- if there

12  are details -- if there's additional evidence that

13  they consider it a different way, they might agree

14  with the findings, but they might have a slightly

15  different analysis.  They do have the ability to put

16  that in there, but if all they say is simply that I

17  concur, then yes.  I would say they are adopting,

18  yes, the -- the reasoning of the IA or IPR

19  investigator in making the recommended findings.

20      Q.   Okay.  And so looking at Page 3 of what's

21  been marked as Exhibit 25, Pages 3 and 4, this is an

22  example of what you're talking about where IPR

23  Director Ross Caldwell attaches something and makes

24  a comment on the findings; correct?

25      A.   That's correct.

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 52 of 72

1  couple of ones.

2  **BY MS. ALBIES:**

3      Q.    So I want to direct your attention to what

4  -- Case Number 2020-C-0334.  And this is the Lester

5  Wrecksie as the complainant and it is based on the

6  Judge's contempt finding for Incidents 2 and 3.  Do

7  you have that understanding, Cmdr. Bell?

8      A.    It's not -- yes and no.  It's not quite

9  that simple.

10     Q.    Okay.  Tell me about that.

11     A.    There was, actually an additional case

12  opened.  I am not entirely clear on why this was

13  separated in two cases.  There is actually a

14  separate case that was peeled off of this that deals

15  with the same use of force, but looks at it from the

16  perspective of the folks who may have actually been

17  struck, who are unknown individuals.

18          So there is a second case.  I think you

19  have it in your list of cases, but it's still open.

20  That's 21 -- or 2021-C-0075.  That is also looking

21  at this exact same incident and also evaluating the

22  Judge's order.

23     Q.    Why -- why?

24     A.    I -- the reason why is the cases came in

25  at different times.  For whatever reason, one of the

NAEGELI
DEPOSITION AND TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 53 of 72

1    cases came in originally -- let me see here.  Let me

2    see at chro notice to see if I can explain a little

3    better.

4            It is -- it is -- I'm not finding the

5    document.  There it is.  So again, I can't

6    necessarily explain why.  I can explain what

7    happened.

8            What happened was, again, this was looked

9    at from the point of view of Mr. Wrecksie and I --

10   some of the analysis and I can talk about this one,

11   because this one's closed, is that Mr. Wrecksie did

12   not have force use on him, that there was -- there

13   was essentially Mr. Wrecksie and then other

14   individuals in the crowd who may have used force on

15   them.  It was looked at from Mr. Wrecksie's point of

16   view, and then it was looked at from the other

17   folks' point of view and so again, I can't

18   necessarily explain why but the decision was made to

19   open two separate cases.

20       Q.   Does it matter whether or not Mr. Wrecksie

21   or somebody else had force used on them for the

22   purposes of conducting an investigation?

23       A.   Could you -- could you ask that a

24   different way?  Could you -- I'm not --

25       Q.   Well, what you just described -- what you

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 54 of 72

1  just described is that Mr. Wrecksie did not have the

2  force used on him.  There were two people that the

3  Court found that Officer XXXX had used force on --

4  were not engaged in active aggression, that Officer

5  XXXXXdescribed as trying to unarrest Lester

6  Wrecksie; correct?

7        A.    That's correct, yes.

8        Q.    And the Court did not agree with Officer

9  XXXXX perspective on that.  The Court found that

10  they were not, in fact, engaged in active

11  aggression; correct?

12        A.    That's correct.

13        Q.    And the Court based that upon testimony

14  of Officer ████ ; correct?

15        A.    Yes.

16        Q.    And video; correct?

17        A.    Yes.

18        Q.    Same video that was used in the IPR

19  investigation; is that correct?

20        A.    I don't believe there was an IPR

21  investigation.

22        Q.    Or Internal Affairs investigation?

23        A.    Yes.

24        Q.    And the Internal Affairs investigation

25  found that Officer Taylor's perspective that these

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 55 of 72

1  officers were engaged in active aggression was

2  reasonable under the circumstances; correct?

3      A.    I'm sorry.  Could you repeat that.

4      Q.    That Internal Affairs' investigation found

5  that Officer ████'s use of force against

6  individuals he believed were engaged in active

7  aggression by what he described as trying to

8  unarrest Lester Wrecksie, the Internal Affairs'

9  investigation found that to be within policy;

10  correct?

11      A.    In this investigation, yes.

12      Q.    And that's directly at odds with Judge

13  Hernandez' Order that use of force directed against

14  those two individuals was within policy and

15  consistent with 1010; correct?

16      A.    Yes.

17      Q.    And Judge Hernandez in the contempt

18  finding specifically found that those two

19  individuals were not engaged in active aggression;

20  correct?

21      A.    Yes, that's correct.

22      Q.    So again, Internal Affairs' investigation

23  is directly at odds with the federal court judge

24  ruling in this case; correct?

25      A.    Yes.

1      Q.    And the federal court judge is applying a

2  standard that is higher than that applied by

3  Internal Affairs in this case; correct?

4            MR. MOEDE:   Object to the form.

5  BY MS. ALBIES:

6      A.    Yes, the standard used is a higher

7  standard.

8      Q.    To make the finding of contempt; correct?

9      A.    Yes.

10     Q.    And is there any additional information

11 that -- well, why did Internal Affairs and then

12 approved all the way up the chain of command,

13 believe that Officer ███████'s use of force in that

14 scenario was consistent with 1010?

15     A.    In the case of -- Case 334, the decision

16 was made because there was the belief that it was

17 reasonable for Officer ███████ to have believed that

18 those individuals -- first of all, that Mr. Wrecksie

19 was under arrest, and that it was reasonable to

20 believe from his perspective that those individuals

21 were trying to unarrest him.

22            And that the interpretation of the

23 directive is that trying to unarrest someone  is

24 active aggression.

25     Q.    And that is directly at odds with the

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 57 of 72

1  Court's viewing of the same evidence that found that

2  it was incidental conduct and not an arrest;

3  correct?

4       A.    That is what the Court found.  Yes, that's

5  correct.

6       Q.    I'll show you what we'll mark as Exhibit

7  --

8            MS. ALBIES:  What number are we on,

9  Jennifer?

10            THE REPORTER:  Twenty-six.

11            MS. ALBIES:  Exhibit 26, the document

12  entitled, "0334 Wrecksie IA Investigation."

13            (WHEREUPON, a document titled, "0334

14  Wrecksie IA Investigation," was marked as Exhibit 26

15  for identification.)

16            MR. MOEDE:  Ashlee, I'm looking for that

17  document.  Can you just say again, please, what the

18  description is?  334 Wrecksie?

19            MS. ALBIES:  Investigation -- IA

20  Investigation Report.

21            MR. MOEDE:  Okay, thank you.

22  BY MS. ALBIES:

23       Q.    And so this is the investigation conducted

24  by IA Investigator Luis Perez; is that correct,

25  Cmdr. Bell?

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 58 of 72

1  of incorporated  all the proposed findings cover

2  sheets into one document for efficiency's sake.

3           But this is the CHO Proposed Findings

4  Cover Sheet which concurs with the RU Manager's

5  proposed finding of not sustained for Allegation 1

6  which is that _____ violated the terms of the

7  temporary restraining order in Don't Shoot Portland,

8  et al versus City of Portland, conduct Directive

9  315, and Allegation 2, which is that Officer ____

10 inappropriately deployed a less lethal impact

11 munition --

12           THE REPORTER:  I'm sorry to interrupt you,

13 Ms. Albies.  You said -- did you say Officer _?

14           MS. ALBIES:  Officer ____.

15           THE REPORTER:  ____, thank you.

16 BY MS. ALBIES:

17      Q.     So Allegation 2 is that Officer ____

18 ____ inappropriately deployed a less lethal impact

19 munition causing injury to Lester Wrecksie, which is

20 a force complaint in violation of Directive 1010 Use

21 of Force and 635 Crowd Management/Crowd Control.

22           The proposed findings from the RU Manager

23 are reflected on this document as not sustained.

24 And this is the Chief's Office concurring with those

25 findings; correct?

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 59 of 72

1        A.    Yes, that's correct.

2        Q.    And Page 2 of this is Internal Affairs'

3    Proposed Findings Cover Sheet which also concurs

4    with the same findings of not sustained; is that

5    correct?

6        A.    Yes.

7        Q.    And IPR Proposed Finding Cover Sheets as

8    well, concurs with the findings of not sustained for

9    those two allegations; correct?

10        A.    Yes.

11        Q.    And the last one is the RU Proposed

12    Findings Sheets which articulates the proposed

13    finding of not sustained; correct?

14        A.    Yes, that's correct.

15        Q.    Okay.  And same here, none of these

16    proposed finding cover sheets has any comments or

17    addendums explaining the reasoning; correct?

18        A.    In this document, yes, that's correct.

19        Q.    Is it fair to say then lacking any kind of

20    comments or explanation they adopt the investigator

21    -- Internal Affairs' investigator's report as to the

22    basis of those findings?

23             MR. MOEDE:  Object to the form.

24    BY MS. ALBIES:

25        A.    And I can't say that for certain.  There

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 60 of 72

1  is with the RU Proposed Findings Cover Sheet there

2  is always a findings memo which I think was included

3  with all of that, but I would -- I thought it was in

4  here.

5      **Q.   Yes.  That is 0334 Wrecksie RU Manager**

6  **Findings dated May 24th of 2021.**

7      A.   Yes.

8         **MS. ALBIES:**  We'll go ahead and mark that

9  as Exhibit 28.

10         **THE REPORTER:**  So noted.

11         **(WHEREUPON, a document titled, "0334**

12  **Wrecksie RU Manager Findings" was marked as Exhibit**

13  **28 for identification.)**

14  **BY MS. ALBIES:**

15      **Q.   Okay.  So this is what you're saying is**

16  **the companion to Page 4 of Exhibit 27.**

17      A.   Yes.

18      **Q.   Okay.**

19      A.   And I would say that because the findings

20  say, I agree with the recommended finding from the

21  investigator with no -- no additional information,

22  no caveats, nothing like that, that this is -- this

23  document is the RU Manager Commander Erica Hurley

24  adopting the reasoning from the recommended findings

25  as here proposed findings, and then going back to

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 61 of 72

1  the previous exhibit, the Chief's Office, IA, and

2  IPR are all agreeing with, again, the RU Manager's

3  proposed findings.

4      Q.    Okay.  And those findings that, not

5  sustained findings with regard to Allegation 1 and 2

6  are in direct contravention of the Court Opinion and

7  Order in this case; correct?

8      A.    That's correct.

9      Q.    And that's with regard to both Incident 2

10 and 3; is that accurate?  As articulated in the

11 Court's Order?  I mean, I'm struggling to understand

12 that parsing out when it's the same conduct of

13 Officer ███████ that is at issue.

14     A.    No.  This is -- this is actually, this one

15 just covers Incident 3.  It does not cover Incident

16 2.  Again, the 0075 case that I mentioned before,

17 that covers Incident 2 and also covers Incident 3.

18     Q.    That other case covers two incidents, this

19 one just covers Incident 3.

20     A.    Yes.

21     Q.    And that was where Officer ███████ deployed

22 ten rounds from his FN303 against protestors trying

23 to pull an individual on roller skates back into the

24 crowd; is that correct?

25     A.    For this case, 335 -- or 334, yes.

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 62 of 72

1    Q.    Okay.  And in that -- in making that

2  finding, the Court heard testimony from Office

3  ▉▉▉▉▉ correct?

4    A.    Yes.

5    Q.    And saw a video from the incident;

6  correct?

7    A.    Yes.

8    Q.    Okay.  Does the City have concerns about

9  making findings that are in direct contradiction to

10  a federal court judge?

11        MR. MOEDE:  I'm going to object to the

12  form.  I'm also going to object that this outside of

13  the amended Notice and for what he's been designated

14  but go ahead and answer.

15  BY MS. ALBIES:

16    A.    No.

17    Q.    And why not?

18    A.    Because in the view of the investigator

19  and in the view of the people who have reviewed the

20  findings, the information in the investigation is

21  not exactly the same as the information that was

22  reviewed by Judge Hernandez and their interpretation

23  of the policy and their interpretation of the

24  evidence suggests to the decision makers in this

25  case that the conduct was not in violation of the

NAEGELI
DEPOSITION AND TRIAL

(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 63 of 72

1   policy.

2       Q.    Well, the information and the evidence was

3   the same.  It's the interpretation that you're

4   saying is different; is that correct?

5       A.    No, that's not what I said.  I said the

6   evidence and the interpretation are different.

7   There were additional interviews conducted for this

8   investigation that were not part of the testimony in

9   front of Judge Hernandez.

10      Q.    So additional interviews with witnesses

11  that were on scene?

12      A.    Yes.

13      Q.    And the video that was put into evidence

14  is insufficient for the Court to make that

15  determination; is that what the City's position is?

16          MR. MOEDE:  Object to the form.

17  BY MS. ALBIES:

18      A.    I apologize.  Ask again.  Could you please

19  ask it again?

20      Q.    So I'm looking at the investigation report

21  and you have Officer Ariel Livingston, Officer

22  Nathan Jones, Officer Kyle Green, Officer Trevor

23  Middleton, Detective Harris, and Officer Hristov.

24  Those additional witnesses you're saying is the

25  additional evidence that allows the City to take a

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 64 of 72

1  contrary position to the Court's order in this case;

2  is that correct?

3       A.   That's correct.

4       Q.   The Internal Affairs investigation and the

5  determination of whether an officer's conduct is

6  within policy is based on the information that the

7  officer knew at the time; correct?

8       A.   That's correct, yes.

9       Q.   It's not based on what any witness

10 officers knew at the time; is that correct?

11           MR. MOEDE:  Object to the form.

12 BY MS. ALBIES:

13      A.   Yes, that's correct.

14      Q.   And you would agree with me that video

15 evidence shows clearly what happened in this

16 situation; correct?

17           MR. MOEDE:  Object to the form.

18 BY MS. ALBIES:

19      A.   Yes.

20           MS. ALBIES:  Okay, let's take our lunch

21 break.

22           THE VIDEOGRAPHER:  Okay, please stand by.

23 The time is 12:23 p.m. and we are off the record.

24      (WHEREUPON, a luncheon recess was taken.)

25           THE VIDEOGRAPHER:  We are on the record.

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 65 of 72

1  was not inappropriate.  Like that was within policy.

2          Whether it hit Mr. Wrecksie doesn't seem

3  to impact that first step of the analysis; is that

4  correct?

5      A.   I think -- yes, as I said, I think that is

6  -- that can be a factor or that may have been a

7  factor, but you're right.  That wasn't detailed in

8  the analysis of the findings.

9      Q.   There have been investigations into uses

10  of less  lethal munitions that may or may not have

11  struck a subject and the focus is on whether the use

12  of the less lethal munition was appropriate or not;

13  correct?

14      A.   Yes.

15      Q.   And that is a more general way to address

16  whether the use of force is appropriate or within

17  policy, rather than tying it to the impact on the

18  individual who was struck or not struck; is that

19  correct?

20      A.   Yes.

21      Q.   Why with -- so we just discussed Incident

22  3 in the Court's Order, finding a violation of the

23  temporary restraining order, and that corresponds

24  with Case Number  0334; Incident 9 also was a

25  finding of the Court of contempt, violating the

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 66 of 72

1    temporary restraining order corresponds with Case

2    2020-C-0355; correct?

3        A.    Yes.

4        Q.    And the findings for the two allegations

5    in both of those complaints or investigations was

6    not sustained; correct?

7        A.    That's correct.

8        Q.    Why were they not sustained rather than

9    exonerated?

10        A.    So I believe, and I would take them

11    separately.  So to discuss Incident Number -- I get

12    them mixed up.  Mr. Greatwood is Incident Number 8;

13    correct?

14        Q.    I'm sorry.  Say one more time.

15        A.    I apologize.  Mr. Greatwood is Incident

16    Number 8 and Incident 9 is the 335; correct?

17        Q.    I believe so.

18        A.    Okay.

19        Q.    But I was asking not about Incident 8.  I

20    was asking about Incident 3 with Wrecksie and

21    Incident 9 with the unidentified person.

22        A.    I apologize.  I was asking about Mr.

23    Greatwood cause I get Mr. ███████ mixed up whether

24    that's 8 or 9.

25            So that's 8, and 9 is the unknown

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 67 of 72

 1  the new allegations of misconduct are added to the

 2  existing investigation and investigated as part of

 3  that.

 4      **Q.    In looking at -- I'll direct your**

 5  **attention to one of the documents just emailed to**

 6  **you, 2020-C-0174,** ███████████ **IPR letter.**

 7          MS. ALBIES:  And I want to mark that as

 8  Exhibit 29.

 9          THE REPORTER:  So noted.

10          **(WHEREUPON, a document titled, "** ████

    ████████  **IPR Letter" was marked as Exhibit 29 for**

12  **identification.)**

13  **BY MS. ALBIES:**

14      **Q.**  So this is a letter dated March 12th to

15  ████████████  who is the complainant in IPR Case

16  Number 2020-C-0174, and I want  to direct your

17  attention to the last paragraph.

18      A.    Okay.

19      Q.    It says, in this letter, "IPR monitors all

20  complaints involving Portland Police Officers.  The

21  complaint is stored in a database that leads to

22  analyzed patterns of conduct as they emerge over

23  time.  These reviews help us to improve the quality

24  of police services to the community in the long-

25  term.  Thank you for your contribution to our

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 68 of 72

1   **the officer whose conduct is at issue?**

2       A.   If you can't identify the officer whose

3   conduct is at  issue, you don't have any ability to

4   interview that person and get their version of

5   events.

6          That doesn't necessarily preclude someone

7   from finding the allegations sustained on the basis

8   of the evidence in the record.  Typically, if we're

9   unable to identify an officer, we don't have enough

10  information to be able to sustain or obviously

11  exonerate and usually, typically those will end up

12  being not sustained.  But there is nothing that

13  precludes an RU Manager or an investigator from

14  finding that to be a sustained violation of --

15      Q.   **Again, it's an unidentified officer?**

16      A.   Yeah.

17      Q.   **Has that happened to your knowledge?**

18      A.   To my knowledge, that has not happened.

19      Q.   **So just because an officer whose conduct**

20  **is the subject of the complaint was not**

21  **identifiable, that doesn't mean the conduct as**

22  **alleged was within policy; is that correct?**

23      A.   Yeah, that's correct.

24      Q.   Okay.  I want to direct your attention to

25  -- well, I might not have to show this as an

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 69 of 72

1      Q.    Did you find any controverts in the

2  documents that you reviewed for this deposition?

3      A.    No.

4      Q.    Did you find any -- any of the closed

5  cases that you reviewed on the relevant dates for

6  the purposes of this deposition any disagreement on

7  the interpretation of directives and how RRT members

8  are expected to understand them?

9      A.    No, I didn't.

10         MS. ALBIES:  Okay, let's take a quick

11  break.

12         THE VIDEOGRAPHER: Please stand by.  The

13  time is 2:01 p.m., and we are off the record.

14         (WHEREUPON, a brief recess was taken.)

15         THE VIDEOGRAPHER:  We are on the record.

16  The time is 2:05 p.m.  You may now proceed.

17         MS. ALBIES:  Thank you.

18  BY MS. ALBIES:

19      Q.    So Cmdr. Bell, in these investigations,

20  fair to say that the officers often rely on the

21  force data collection reports when thinking back to

22  an event weeks or months prior, sometimes a year

23  prior?

24      A.    I think it's fair to say that's pretty

25  common.

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM

Dec of Merrithew
Exhibit 5 - Page 70 of 72

1      Q.    And if the information in that force data

2   collection report is in accurate or incomplete, that

3   can impact that officer's ability to give an

4   accurate statement about what happened or what they

5   were thinking at the time of the incident; correct?

6      A.    Yes.

7      Q.    And then that, in turn, can impact

8   efficacy of the administrative investigation; would

9   you agree?

10     A.    Yes.

11     Q.    Okay.

12           MS. ALBIES:  No further questions.

13           MR. MOEDE:  I do have a couple of follow

14  ups.

15  EXAMINATION

16  BY MR. MOEDE:

17     Q.    Cmdr. Bell, counsel asked you a question

18  about 335 and 334, I believe and whether or not the

19  City had any concerns about disagreement with a

20  federal judge.  And I think your response no, as it

21  pertained to those two files in particular; correct?

22     A.    Yes.

23     Q.    Okay.  And so could you clarify what you

24  meant by no concerns?

25     A.    So I -- I obviously gave a yes or no

NAEGELI
DEPOSITION AND TRIAL
(800)528-3335
NAEGELIUSA.COM
Dec of Merrithew
Exhibit 5 - Page 71 of 72

CERTIFICATE

    I, Jennifer Kallmeyer, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

    I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

    IN WITNESS HEREOF, I have hereunto set my hand this 12th day of November, 2021.


_____
Jennifer Kallmeyer