J. SCOTT MOEDE, OSB 934816
Chief Deputy City Attorney
scott.moede@portlandoregon.gov
NAOMI SHEFFIELD, OSB 170601
Senior Deputy City Attorney
naomi.sheffield@portlandoregon.gov
ROBERT YAMACHIKA, OSB 065560
Senior Deputy City Attorney
rob.yamachika@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendant City of Portland*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| DON'T SHOOT PORTLAND, a nonprofit corporation, in its individual capacity, NICHOLAS J. ROBERTS, in an individual capacity and on behalf of themselves and all others similarly situated, MICHELLE "MISHA" BELDEN, in an individual capacity and on behalf of themselves and all others similarly situated, ALEXANDRA JOHNSON, in an individual capacity and on behalf of themselves and all others similarly situated, | Case No. 3:20-cv-00917-HZ |
| **PLAINTIFFS**, | **DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| v. | |
| CITY OF PORTLAND, a municipal corporation, | |
| **DEFENDANT.** | |

Page i. – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

MOTION TO STRIKE............................................................................................................ 1

    I.        The Court should strike inadmissible hearsay.................................................... 1

    II.      The Court should strike evidence of incidents from Non-Relevant dates. ....... 2

    III.     The Court should strike evidence of incidents not identified by Plaintiffs in

    their pleadings or discovery. ................................................................................... 3

    IV.     The Court should strike evidence of incidents where Plaintiffs have video

    documentation of the incident but failed to produce the video. ....................... 4

    V.       The Court should strike evidence that fails to provide adequate information

    to identify the incident in question. ..................................................................... 5

MEMORANDUM IN OPPOSITION ................................................................................... 6

    Background ............................................................................................................... 7

    I.        Protests Beginning May 25, 2020 to November 15, 2020 ................................ 7

        1.    May 29, 2020 ................................................................................................ 8

        2.    May 30, 2020 ................................................................................................ 8

        3.    May 31, 2020 ................................................................................................ 9

        4.    June 1, 2020 ................................................................................................ 10

        5.    June 2, 2020 ................................................................................................ 10

        6.    June 5, 2020 ................................................................................................ 11

        7.    June 6, 2020 ................................................................................................ 12

        8.    June 7, 2020 ................................................................................................ 12

        9.    June 9, 2020 ................................................................................................ 13

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

10.  June 10, 2020 ........................................................................................ 13

11.  June 12, 2020 ........................................................................................ 13

12.  June 13, 2020 ........................................................................................ 14

13.  June 15, 2020 ........................................................................................ 14

14.  June 20, 2020 ........................................................................................ 15

15.  June 26, 2020 ........................................................................................ 15

16.  June 27, 2020 ........................................................................................ 15

17.  June 30, 2020 ........................................................................................ 16

18.  July 3, 2020 .......................................................................................... 17

19.  July 4, 2020 .......................................................................................... 17

20.  July 18, 2020 ........................................................................................ 18

21.  July 23, 2020 ........................................................................................ 19

22.  July 24, 2020 ........................................................................................ 19

23.  August 1, 2020 ...................................................................................... 20

24.  August 4, 2020 ...................................................................................... 20

25.  August 5, 2020 ...................................................................................... 22

26.  August 6, 2020 ...................................................................................... 22

27.  August 7, 2020 ...................................................................................... 23

28.  August 8, 2020 ...................................................................................... 23

29.  August 9, 2020 ...................................................................................... 24

30.  August 10, 2020 .................................................................................... 24

31.  August 12, 2020 .................................................................................... 25

32.  August 15, 2020 .................................................................................... 26

Page iii – TABLE OF CONTENTS

33.    August 19, 2020.................................................................................... 27

34.    August 21, 2020.................................................................................... 28

35.    August 22, 2020.................................................................................... 28

36.    August 23, 2020.................................................................................... 29

37.    August 24, 2020.................................................................................... 30

38.    August 28, 2020.................................................................................... 31

39.    September 5, 2020 ................................................................................ 31

II.    **Portland's policy and practice of using less lethal munitions during crowd control. 32**

1.    PPB Directive 1010.00, 635.10, and additional limitations on use of force. ........ 32

2.    PPB Training ........................................................................................ 35

3.    PPB's force reporting, audit, and review............................................... 35

4.    PPB discipline policies ......................................................................... 36

**Legal Standard** ............................................................................................ **37**

**Discussion** ................................................................................................... **38**

III.    **Inadequate Class Definition**............................................................... **39**

1.    Plaintiffs cannot broaden the class definition at this time. ..................... 39

2.    The First Amendment Class is indefinite and impermissibly broad. .................. 40

3.    Fourth Amendment Subclasses ............................................................. 41

IV.    **Commonality: There are no common questions of law or fact that would drive resolution of the class claims**.................................................... **43**

1.    First Amendment Class ........................................................................ 44

2.    Fourth Amendment Subclasses ............................................................. 48

Page iv – TABLE OF CONTENTS

3.    Indiscriminate Weapons Subclass ........................................................ 49

4.    Targeted Weapons Subclass ................................................................ 53

5.    Asserting a *Monell* claim does not create commonality ....................................... 58

**V.    Typicality: The class cannot certify because the City's unique defenses against Plaintiff would prejudice absent class members. ................................................ 60**

1.    Named Plaintiffs do not experience the same types of alleged injuries as their over-broad First Amendment Class. ................................................ 61

2.    Named Plaintiffs' claims relate to force that PPB did not deploy. ....................... 61

3.    Defenses specific to named Plaintiffs' claims. ....................................... 63

4.    Mr. Dreier admitted to engaging in conduct beyond passive resistance during the protests. ................................................................................ 64

**VI.    Numerosity: The Targeted Weapons Subclass does not meet the numerosity requirement. ................................................................................ 64**

**VII.    Adequacy: The proposed representative parties would not fairly and adequately protect the interests of the class. ................................................ 65**

1.    Plaintiffs' interest in obtaining money damages for their alleged claims creates a conflict with the relief sought for the remainder class. ....................... 66

2.    Plaintiffs do not adequately represent the interests of others who have filed similar lawsuits against the City. ................................................ 66

3.    Named Plaintiffs have insufficient knowledge of their particular claims and the facts giving rise to them. ................................................ 68

4.    Named Plaintiffs do not purport to be representatives of both Fourth Amendment Subclasses. ................................................................ 69

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

5.    As a resident of Utah, Mr. Roberts' prospective claims for relief are moot. ........ 70

6.    Named Plaintiffs fail to define the contours of the classes................................... 70

7.    Don't Shoot Portland is a named Plaintiff that shares a claim with the class, but is

neither a representative nor member of the class.......................................................... 71

VIII.    **The City did not act "on grounds that apply generally to the" First

Amendment Class or either Fourth Amendment Subclass. .......................................... 72**

**CONCLUSION** ..................................................................................................................... 75

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

TABLE OF AUTHORITIES

Federal Cases

105 F. Supp. 3d 1061 (C.D. Cal. 2015) ........................................................ 1

132 F. Supp. 3d 1156 (N.D. Cal. 2015) ...................................................... 67

246 F.R.D. 621 (C.D. Cal. Dec. 14, 2007)................................................... 73

281 F.R.D. 534 (C.D. Cal. 2012).................................................................. 68

*Abdullah v. U.S. Sec. Associates, Inc.*,
   731 F.3d 952 (9th Cir. 2013)................................................................... 58

*Ahmad v. City of St. Louis*,
   995 F.3d 635 (8th Cir. 2021)........................................................... 1, 60, 72

*Alberghetti v. Corbis Corp.*,
   263 F.R.D. 571 (C.D. Cal. 2010) ........................................................... 68

*Algarin v. Maybelline, LLC*,
   300 F.R.D. 444 (S.D. Cal. 2014)............................................................. 66

*Amador v. Baca*,
   2014 WL 10044904 (C.D. Cal. Dec. 18, 2014) ............................... 49, 59

*Amador v. Baca*,
   2016 WL 6804910 (C.D. Cal. July 27, 2016) ....................................... 49

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ............................................................................... 72

*Anti-Police-Terror Project, et al. v. City of Oakland*,
   2021 WL 4846958 (N.D. Cal. Oct. 18, 2021)....................................... 39

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,
   824 F.3d 858 (9th Cir. 2016).................................................................. 45

*Armstrong v. Davis*,
   275 F.3d 849 (9th Cir. 2001).................................................................. 61

*B.K. ex rel. Tinsley v. Snyder*,
   922 F.3d 957 (9th Cir. 2019).................................................................. 44

*B.R. v. Cty. of Orange*,
   2017 WL 10525878 (C.D. Cal. Dec. 11, 2017) ............................... 59, 60

*Black Lives Matter D.C. v. Trump*,
   2021 WL 2530722 (D.C.C. June 21, 2021) .......................................... 50

*Blake v. City of Grants Pass*,
   No. 18-1823, 2019 WL 3717800 (D. Or. Aug. 7, 2019)....................... 72

*Brigham City, Utah v. Stuart*,
   547 U.S. 398 (2006) ............................................................................... 48

*Burchett v. Bromps*,
   466 F. App'x 605 (9th Cir. 2012) ........................................................... 5

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.*,
   141 F.R.D. 144 (N.D. Cal. 1991) ..................................................... 68, 71

*C.F. v. Lashway*,
   2017 WL 2574010 (W.D. Wash. June 14, 2017)................................... 41

*Campbell v. City of Los Angeles*,
   903 F.3d 1090 (9th Cir. 2018)................................................................ 43

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

*Cantu v. City of Portland,*
  2020 WL 2952972 (D. Or. June 3, 2020) .................................................. 58
*Chang v. United States,*
  217 F.R.D. 262 (D.D.C. 2003) ................................................................. 73
*Chua v. City of Los Angeles,*
  2017 WL 10776036 (C.D. Cal. May 25, 2017) ....................................... 52
*Civil Rights Educ. & Enforcement Ctr. v. Hosp. Props. Tr.,*
  317 F.R.D. 91 (N.D. Cal. 2016) .............................................................. 43
*Cooper v. Federal Reserve Bank of Richmond,*
  467 U.S. 867 (1984) ................................................................................. 67
*Coughlin v. Sears Holdings Corp.,*
  2010 WL 4403089 (C.D. Cal. Oct. 26, 2010) ......................................... 40
*Crosby v. Cal. Physicians' Service,*
  498 F. Supp. 3d 1218 (C.D. Cal. 2020) ................................................... 40
*Easyriders Freedom F.I.G.H.T. v. Hannigan,*
  92 F.3d 1486 (9th Cir. 1996) ................................................................... 68
*Ellis v. Costco,*
  657 F.3d 970 (9th Cir. 2011) ................................................................... 70
*F.T.C. v. Noland,*
  2021 WL 3857413 (D. Ariz. Aug. 30, 2021) .......................................... 63
*Felarca v. Birgeneau,*
  891 F.3d 809 (9th Cir. 2018) ................................................................... 54
*Forrester v. City of San Diego,*
  25 F.3d 804 (9th Cir. 1994) ............................................................... 48, 54
*FTC v. Publ'g Clearing House, Inc.,*
  104 F.3d 1168 (9th Cir.1997) .................................................................... 5
*Goyette v. City of Minneapolis,*
  2020 WL 3056705 (D. Minn. June 9, 2020) ........................................... 39
*Graham v. Connor,*
  490 U.S. 386 (1989) ............................................................... 48, 49, 50, 58
*Hanon v. Dataproducts Corp.,*
  976 F.2d 497 (9th Cir. 1992) ............................................................. 61, 63
*Harris v. Vector Mktg. Corp.,*
  753 F. Supp. 2d 996 (N.D. Cal. 2010) .................................................... 69
*Headwaters Forest Def. v. Cty. of Humbolt,*
  276 F.3d 1125 (9th Cir. 2002) ........................................................... 53, 54
*Herzig v. Arkansas Found. for Medical Care, Inc.,*
  2019 WL 2870106 (W.D. Ark. July 3, 2019) ......................................... 63
*In re Paxil Litig.,*
  212 F.R.D. 539 (C.D. Cal. 2003) ............................................................ 64
*In re Premera Blue Cross Customer Data Sec. Breach Litig.,*
  2019 WL 3410382 (D. Or. July 29, 2019) .............................................. 41
*In re Yahoo Mail Litigation,*
  308 F.R.D. 577 (N.D. Cal. 2015) ............................................................ 74
*Index Newspapers LLC v. United States Marshals Serv.,*
  977 F.3d 817 (9th Cir. 2020) ................................................................... 47

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018) ........................................................................... 73, 74
*Kennerly v. United States*,
    721 F.2d 1252 (9th Cir. 1983) ..................................................................... 70
*Lacey v. Maricopa Cty.*,
    693 F.3d 896 (9th Cir. 2012) ........................................................................ 45
*Larez v. City of Los Angeles*,
    946 F.2d 630 (9th Cir. 1991) .......................................................................... 1
*Lucas v. Breg, Inc.*,
    212 F. Supp. 3d 950 (S.D. Cal. 2016) ......................................................... 42
*Lyall v. City of Los Angeles*,
    2010 WL 11549565 (C.D. Cal. May 18, 2010) ....................................... 41, 42
*McKenzie Law Firms, P.A. v. Ruby Receptionists, Inc.*,
    2020 WL 1970812 (D. Or. 2020) ................................................................ 61
*Montoya v. City of San Diego*,
    2021 WL 5746476 (S.D. Cal. Oct. 20, 2021) ............................................. 68
*Mothersell v. City of Syracuse*,
    289 F.R.D. 389 (N.D.N.Y. 2013) ................................................................ 60
*Nelsen v. King Cty.*,
    895 F.2d 1248 (9th Cir. 1990) ..................................................................... 70
*Nelson v. City of Davis*,
    685 F.3d 867 (9th Cir. 2012) ....................................................................... 53
*Northwest Immigrant rights Project v. United States Citizenship and Immigration Services*,
    325 F.R.D. 671  (W.D. Wa. 2016) ............................................................... 74
*Officers for Justice v. Civil Serv. Comm'n of City and Cty. of San Francisco*,
    688 F.2d 615 (9th Cir. 1982) ....................................................................... 38
*Ott v. Mortg. Invs. Corp. of Ohio*,
    65 F. Supp. 3d 1046 (D. Or. 2014) .............................................................. 38
*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ......................................................... 44, 59, 61
*Rice v. Morehouse*,
    989 F.3d 1112 (9th Cir. 2021) ..................................................................... 49
*Rodriguez v. Cty. of Los Angeles*,
    891 F.3d 776 (9th Cir. 2018) ....................................................................... 48
*Rodriguez v. Gates*,
    2002 WL 1162675 (C.D. Cal. May 30, 2002) ........................................ 38, 41
*Rodriguez v. West Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ....................................................................... 65
*Rolex Emps. Ret. Tr. v. Mentor Graphics Corp.*,
    136 F.R.D. 658 (D. Or. 1991) ...................................................................... 69
*Rossi v. Trans World Airlines, Inc.*,
    507 F.2d 404 (9th Cir. 1974) ......................................................................... 2
*Rutledge v. Elec. Hose & Rubber Co.*,
    511 F.2d 668 (9th Cir. 1975) ....................................................................... 38
*Sacramento Cty. Retired Emps. Ass'n v. Cty. of Sacramento*,
    975 F.Supp.2d 1150 (E.D. Cal. 2013) ........................................................... 1

Page ix – TABLE OF AUTHORITIES

*Sarmiento v. Sealy, Inc.,*
2020 WL 4458915 (N.D. Cal. May 27, 2020) ...................................................... 65

*Schwartz v. Upper Deck Co.,*
183 F.R.D. 672 (S.D. Cal. 1999) ......................................................................... 64

*Scott v. United States,*
436 U.S. 128 (1978) ............................................................................................ 48

*Senn v. Multnomah Cty.,*
527 F. Supp. 3d 1255 (D. Or. 2021) ............................................................. 45, 60

*Shields v. Walt Disney Parks & Resorts US, Inc.,*
279 F.R.D. 529 (C.D. Cal. 2011) ........................................................................ 65

*Shuford v. Conway,*
326 F.R.D. 321 (N.D. Ga. 2018) ......................................................................... 41

*Stuart v. Radioshack Corp.,*
2009 WL 281941 (N.D. Cal. Feb. 5, 2009) .......................................................... 70

*Sullivan v. Murphy,*
478 F.2d 938 (D.C. Cir. 1973) ............................................................................ 73

*Tennessee v. Garner,*
471 U.S. 1 (1985) ............................................................................................... 49

*Torres v. City of Madera,*
648 F.3d 1119 (9th Cir. 2011) ............................................................................ 49

*Torres v. Madrid,*
141 S. Ct. 989 (2021) ......................................................................................... 50

*United States v. Shumway,*
199 F.3d 1093 (9th Cir.1999) ............................................................................... 5

*Urena v. Earthgrains Distribution, LLC,*
2017 WL 4786106 n.2 (C.D. Cal. July 19, 2017) ............................................... 40

*Vannatta v. Keisling,*
899 F. Supp. 488 (D. Or. 1995) ........................................................................... 2

*Wal-Mart Stores, Inc. v. Dukes,*
564 U.S. 338 (2011) ..................................................................................... passim

*Walters v. Reno,*
145 F.3d 1032 (9th Cir. 1998) ............................................................................ 74

*Washington Mobilization Committee v. Cullinane,*
400 F. Supp. 186 (D.D.C. 1975) ......................................................................... 73

*Williams v. Town of Greenburgh,*
2006 WL 8461745 (S.D.N.Y. Oct. 11, 2006) ....................................................... 47

*Williamson v. City of National City,*
2022 WL 201071 (9th Cir. Jan. 24, 2022) ..................................................... 49, 54

*Willis v. City of Seattle,*
943 F.3d 882 (9th Cir. 2019) .............................................................................. 74

*Xavier v. Philip Morris USA Inc.,*
787 F. Supp. 2d 1075 (N.D. Cal. 2011) .............................................................. 42

*Young v. Cty. of Los Angeles,*
655 F.3d 1156 (2011) ......................................................................................... 53

*Zachery v. Texaco Expl. & Prod., Inc.,*
185 F.R.D. 230 (W.D. Tex. 1999) ....................................................................... 67

Page x – TABLE OF AUTHORITIES

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ........................................................................ 37, 38

State Statutes

ORS 166.015 ........................................................................................................... 34

Federal Rules

Federal Rule of Civil Procedure 23 ................................................................. 37, 38
Rule 23(a) ..................................................................................................... 37, 38, 39
Rule 23(b) ............................................................................................................ 37, 38
Rule 23(b)(2) ...................................................................................................... 38, 39

Other Authorities

HB 2928 ............................................................................................................. 34, 35
HB 4208 .................................................................................................................. 34
House Bill 2928 ...................................................................................................... 33

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

Plaintiffs' Motion for Class Certification ("Motion") is legally insufficient. Plaintiffs seek to certify a First Amendment Class and two Fourth Amendment Subclasses (ECF 254, Pls.' Motion for Class Cert. ("ECF 252, Mot.") at 1-2). But Plaintiffs do not seek to certify a class of persons for whom the Portland Police Bureau ("PPB") has acted in any unified manner. Rather, Plaintiffs seek to certify a class and subclasses of persons with factually divergent experiences over hundreds of nights during the summer of 2020 and indefinitely into the future. They ask this Court to certify a class of persons that is not defined by common time, location, or experience. And they seek this class even though it is unnecessary for obtaining the relief they request. "Given the individualized inquiries plaintiffs' disparate claims require, 'the massive class action . . . neither promotes the efficiency and economy underlying class actions nor pays sufficient heed to the federalism and separation of powers principles emphasized in *Rizzo v. Goode, Lewis v. Casey*, and other cases.'" *Ahmad v. City of St. Louis*, 995 F.3d 635, 645 (8th Cir. 2021). The Court should not certify Plaintiffs' class or subclasses.

## MOTION TO STRIKE

The Court may only consider admissible evidence when deciding Plaintiffs' Motion. Accordingly, the City moves this Court to strike Plaintiffs' evidence that is inadmissible under the Federal Rules of Evidence, outside the scope of this Court's discovery order, not identified in response to the City's discovery request, and reflective of dates for which Plaintiffs did not produce relevant documents to the City.

### I.  The Court should strike inadmissible hearsay.

Plaintiffs rely on inadmissible hearsay evidence in their Motion, in the form of declarations as well as from various news articles. As stated in *AFMS LLC v. United Parcel Serv. Co*, "It is axiomatic to state that newspaper articles are by their very nature hearsay evidence and are thus inadmissible if offered to prove the truth of the matter asserted[.]" 105 F. Supp. 3d 1061, 1070 (C.D. Cal. 2015); *see also Larez v. City of Los Angeles,* 946 F.2d 630, 642 (9th Cir. 1991); *Sacramento Cty. Retired Emps. Ass'n v. Cty. of Sacramento,* 975 F.Supp.2d 1150, 1154

Page 1 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

(E.D. Cal. 2013); *See Vannatta v. Keisling,* 899 F. Supp. 488, 491 (D. Or. 1995) *aff'd,* 151 F.3d

1215 (9th Cir.1998) (striking newspaper articles as inadmissible hearsay and refusing to consider

them on a motion for summary judgment where "[t]he articles discuss the amounts and effects of

special interest contributions, and were offered by Defendants to show that out-of-district donors

in fact pose a real threat to the campaign system.").

This hearsay evidence should be stricken from the record and not considered in the

Court's evaluation of Plaintiffs' Motion. *Rossi v. Trans World Airlines, Inc*., 507 F.2d 404, 406

(9th Cir. 1974) (court should not consider hearsay statements on summary judgment).

Below is a summary of the inadmissible hearsay that Plaintiffs rely upon and this Court

should strike:

- All evidence in the Motion from the top of page five through the first third of page twelve. Plaintiffs rely exclusively on inadmissible hearsay evidence from various online news outlets including KGW, the Portland Mercury, PBS, KOIN 6, The New York Times, OPB, ACLU-OR website, Willamette Week, The Oregonian / OregonLive, The Guardian, Huffpost, and the Oregon Historical Society website. (ECF 252, fns. 2-39).
- The following declarations contain inadmissible hearsay evidence:
  - **Madeline Kay Decl. (ECF 254)**: the statements in the Kay declaration at paragraphs 4-34, as well as the Tort Claim Notices and lawsuit exhibits (Ex. 1-26) are hearsay and should be stricken.
  - **Ashlee Albies Decl. (ECF 257)**: paragraphs 4-5 are a description of Ms. Albies' analysis of FDCRs based on coding and e-discovery. It does not include any of the underlying FDCRs.

## II.    The Court should strike evidence of incidents from Non-Relevant dates.

On July 14, 2021, the parties had a discovery conference with the Court regarding the

scope of class certification discovery. In particular, the parties discussed which nights of protests,

between May and November 2020, Plaintiffs should be entitled to discovery. (Declaration of J.

Scott Moede ("Moede Decl."), ¶ 1, Ex. 1, July 14, 2021 Discovery Conference Transcript ("Ex.

1, Hearing") at 3:21-25). The Court found that with respect to Plaintiffs' class discovery, it

should be limited to the 11 nights in the Fourth Amended Complaint ("Complaint"). Specially,

the Court stated: "I am ordering that the temporal scope of discovery be limited to the 11 nights

that were set forth in the pleadings, and if a class gets certified, we can revisit whether or not

Page 2 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION

additional discovery needs to take place." (Ex. 1, Hearing at 13:14-17).

      After the discovery conference, the parties conferred by email and, based on the Court's order about the nights set forth in the Complaint, agreed on discovery for the following dates of protests in 2020: May 29, 30, 31, June 1, 2, 5-6, 9-10, 12-13, 28, 30, July 4, August 4, 10, 13, 15-16, 22-23, and September 5. A total of 22 days are referred to as the "Relevant Dates". (Moede Decl. ¶ 2, Ex. 2, July 15, 2021 Discovery Conferral Email). Despite agreeing on the Relevant Dates, Plaintiffs have attempted to introduce evidence of incidents that are outside of those dates. The City moves to strike the following evidence that is outside of the Relevant Dates:

- **Benjamin Ficklin Decl. (ECF 258); Evan Tupper Decl. (ECF 260); Maddie Nguyen Decl. (ECF 261); Amanda Seaver Decl. (ECF 265); Shioan Oudinot Decl. (ECF 271); John Wilson Decl. (ECF 274); Muriel Lucas Decl. (ECF 275); Teri Jacobs Decl. Decl. (ECF 278); James Mapes Decl. (ECF 280); Gillian Herrera Decl. (ECF 58); Maggie Sisco Decl. (ECF 60); Haley Loring Dallas Decl. (ECF 124):** each wholly address incidents outside of the Relevant Dates.

- **Melissa Nel Decl. (ECF 262); Carly Ng Decl. (ECF 273); Kathleen Mahoney Decl. (ECF 281); Anastasia Brownell Decl. (ECF 279):** each partially address incidents outside of the Relevant Dates.

- **James Comstock Decl. (ECF 272)**: addresses June 11, 2020, and August 3, 2020, (ECF 272, ¶¶ 12,15), which are not Relevant Dates.

- **Alexandra Johnson Decl. (ECF 276)**: addresses June 27, August 1,7, 8, 9, 12 which are not Relevant Dates. (ECF 276, ¶¶ 21-23, 25-29),

- **Nicholas Roberts Decl. (ECF 277)**: addresses June 5, 7, 26, July 3, 23, August 21, 28, 2020 (ECF 277, ¶¶ 15, 16, 17, 18, 20) which are not Relevant Dates.

- **Lester Wrecksie Decl. (ECF 282)**: addresses June 20, 2020, which is not a Relevant Date. (ECF 282, ¶¶ 15-19).

## III.    The Court should strike evidence of incidents not identified by Plaintiffs in their pleadings or discovery.

      Plaintiffs seek to introduce in their Motion evidence of incidents that have never been disclosed to the City—not in any of their five Complaints, not in their responses to interrogatories (which requested that Plaintiffs "[i]dentify by date, time, and description, the events giving rise to each of your claims against the City.") (Moede Decl. ¶¶ 3-7; Ex. 3, Belden Interrogatory Responses ("Ex. 3, Belden Rog.") # 3; Ex. 4, Dreier Interrogatory Responses ("Ex. 4, Dreier Rog.") # 3; Ex. 5, Johnson Interrogatory Responses ("Ex. 5, Johnson Rog.") # 3; Ex. 6,

Page 3 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
      CLASS CERTIFICATION

Roberts Amended Interrogatory Responses ("Ex. 6, Roberts Rog.") # 3; Ex. 7, Wrecksie

Interrogatory Responses ("Ex. 7, Wrecksie Rog.") # 3), and not at depositions when asked to

identify the same. The City is entitled to be on notice as to what incidents it must be prepared to

respond. Plaintiffs have attempted to expand what incidents are at issue, despite having the

opportunity to amend their Complaint four times. Below is a list of evidence that should be

stricken because it depicts incidents not identified to the City:

- **Franz Bruggemeier Decl. (ECF 257):** Plaintiffs attach thirty-seven video and audio files (Exhibits A-AM)[1] to the declaration of Franz Bruggemeier. With the exception of **Exhibit U** (video produced by Plaintiffs as PLAINTIFFS_000722 and filmed on August 15, 2020); **Exhibits AH, AJ, AK, and AL** (audio files of LRAD announcements recorded June 2-3, 2020, and produced by Defendant) and **Exhibit AM** (video produced by the City recorded on June 2-3, 2020, that includes another LRAD announcement) these exhibits are introduced to show incidents that were not identified in any of their five Complaints, in their responses to interrogatories, or at depositions.

- **Elijah Booth Decl. (ECF 259); April Fox Decl. (ECF 264); Dan Rushton Decl. (ECF 268); Nina Frick Decl. (ECF 270); Benjamin Ficklin Decl. (ECF 258); Evan Tupper Decl. (ECF 260); Maddie Nguyen Decl. (ECF 261); Amanda Seaver Decl. (ECF 265); Shioan Oudinot Decl. (ECF 271); John Wilson Decl. (ECF 274); Muriel Lucas Decl. (ECF 275); Teri Jacobs Decl. (ECF 278); James Mapes Decl. (ECF 280); Melissa Nel Decl. (ECF 262); Carly Ng Decl. (ECF 273); Kathleen Mahoney Decl. (ECF 281); Anastasia Brownell Decl. (ECF 279)** each address incidents that were never identified by Plaintiffs in the Complaint or in response to discovery.

- **Alexandra Johnson Decl. (ECF 276)**: Ms. Johnson's testimony in her declaration related June 6, 10, 27, (ECF 276, ¶¶ 18-23), August 1, 7, 8, 9, 12, and 15 (ECF 276, ¶¶ 25-29) was not identified in Ms. Johnson's interrogatory responses regarding incidents giving rise to the claims.

- **Lester Wrecksie Decl. (ECF 282)**: Mr. Wrecksie's testimony related to June 20, 2020, (ECF 282, ¶¶ 15-19) was not identified in his response to interrogatories as giving rise to a claim against the City (instead he cited to the dates in ¶¶ 73-80 of the Complaint). Paragraphs 29, 31, 33-35 were also not identified in the Complaint or responses to interrogatories.

## IV.    The Court should strike evidence of incidents where Plaintiffs have video documentation of the incident but failed to produce the video.

---

[1] The City acknowledges that Exhibit J was produced by the City to Plaintiffs. However, it is submitted here to produce evidence of an incident not previously identified by Plaintiffs.

Page 4 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
        CLASS CERTIFICATION

Ms. Johnson alleged incidents on June 5, 13, 28, July 4, August 4, 13, 16, 22, 23, and

September 5 in the Complaint (ECF 233, Fourth Amended Complaint ("Compl."), ¶¶ 62-72).

She subsequently added incidents on June 12, 15, and 30 dates. (Ex. 5, Johnson Rog. # 3). In her

deposition, Ms. Johnson added June 6, 10, 20, 27, August 1, 5, 7, 8, 9, 12, 15, and 23. Ms.

Johnson recorded video most nights that she attended the protests. (Moede Decl. ¶ 10, Ex. 10,

Deposition of Alexandra Johnson ("Ex. 10, Johnson Depo") at 28:16-30:03). Plaintiffs agreed to

produce Ms. Johnson's video for nights that she identified. (*Id.*, ¶ 13, Ex. 13, Decl. 17, 2021

Discovery). Plaintiffs have not produced any additional video from Ms. Johnson. (*Id.*). The City

has been able to identify some videos that appear to be of the 2020 protests on Ms. Johnson's

Facebook account. (*Id.*, ¶ 14). The City has been unable to find any videos on Ms. Johnson's

Twitch account that appear to reflect the 2020 protests. (*Id.*, ¶ 15).

## V.  The Court should strike evidence that fails to provide adequate information to identify the incident in question.

"[S]elf-serving affidavits may be cognizable on motions for summary judgment if they

go beyond conclusions and include facts that would be admissible in evidence." *United States v.*

*Shumway,* 199 F.3d 1093, 1103–04 (9th Cir.1999). However, "'a conclusory, self-

serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a

genuine issue of material fact,'" *FTC v. Publ'g Clearing House, Inc.,* 104 F.3d 1168, 1171 (9th

Cir.1997); *see also Burchett v. Bromps*, 466 F. App'x 605, 607 (9th Cir. 2012). The following

declarations provide conclusions without enough detail for the City or the Court to evaluate the

statements and therefore should be stricken:

- **James Comstock Decl. (ECF 272):** Mr. Comstock makes generalized statements such as "beginning from the first nights that I was observing the protests in June, I noted that PPB officers would frequently use force against protesters who were passively resisting. . ." without providing any specific dates or incidents. (ECF 272, ¶ 11).
- **Mitchell Green Decl. (ECF 263); Chase Lingelbach Decl. (ECF 266): Courtney Margolin Decl. (ECF 267)**: each provide generalized statements regarding the protests in 2020, but fail to provide sufficient detail to identify any particular incident.
- **Lester Wrecksie Decl. (ECF 282)**: paragraphs 31 and 33-35 make generalized statements sometimes about "police" and other times specifically PPB but do not

Page 5 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
    CLASS CERTIFICATION

provide any specific dates, times or incidents.

## MEMORANDUM IN OPPOSITION

Plaintiffs define a class and two subclasses:

1. <u>General class for purposes of the First Amendment claim:</u> all people who have engaged and will engage in the future in protest activities that follow the death of George Floyd opposing police violence and white supremacy, and all people who would like to engage in such protests but have not due to fear of being subjected to unlawful force by the Portland Police Bureau (the "First Amendment Class").

2. <u>Indiscriminate weapons subclass for purposes of the Fourth Amendment claim:</u> This is a subclass of the general class which only includes protestors who were subjected to tear gas and rubber ball distraction devices by the PPB. This subclass includes protestors who were engaging in passive resistance to the orders of the police at the time force was used and those that attempted to comply with the orders of the police, but does not include those who were engaging in conduct beyond passive resistance at the time force was used (the "Indiscriminate Weapons Subclass").

3. <u>Targeted weapons subclass for purposes of the Fourth Amendment claim:</u> this is a subclass of the general class which only includes protestors who were subjected to "less lethal weapons" (FN303 launchers, 40 mm launchers, batons, and aerosol restraints) while engaged in protest activities. This subclass includes protestors who were engaging in passive resistance to the orders of police at the time force was used and those that attempted to comply with the orders of the police, but does not include those who were engaging in conduct beyond passive resistance at the time force was used (the "Targeted Weapons Subclass," and together with the Indiscriminate Weapons Class, the "Fourth Amendment Subclasses").

(ECF 252, Mot. at 1-2).

This class definition and proposed subclass definitions are new definitions, not included in the Complaint and not disclosed to the City prior to class discovery. (*See* Compl., ¶ 90; Moede

Decl. ¶ 16).

<b>Background</b>

**I.**     **Protests Beginning May 25, 2020 to November 15, 2020[2]**

Plaintiffs present a varied and inconsistent list of nights that they allege PPB officers used unlawful force against them. In Plaintiffs' Complaint, Plaintiffs identified PPB's use of force on: May 29, 30, 31; June 2, 5, 6, 9, 10, 12, 13[3], 26, 30; July 4; August 4, 10, 13, 16; September 5 (Compl., ¶ 51-86).

Through interrogatory responses, Plaintiffs asserted the following new dates that PPB allegedly used tear gas and other less lethal weapons on June 7, 15, 28; July 23, 24; August 1, 6, 15, 22, and 28. (Ex. 4, Dreier Rog. # 14; Ex. 5, Johnson Rog. # 3; Ex. 6, Roberts Rog. # 12). During depositions, the named Plaintiffs testified that they were subjected to or witnessed force by PPB on the following additional dates: June 20, June 27, July 3, August 5, August 7, August 8, August 9, and August 12. (Moede Decl. ¶¶ 10-12; Ex. 10, Johnson Depo, 174:13-22; 178:06-19; 179:20-180:11; 180:18-181:06; 181:18-24; 117:03-118:05; Ex. 11, Deposition of Nicholas Roberts ("Ex. 11, Roberts Depo"), 79:02-11; Ex. 12, Deposition of Lester Wrecksie ("Ex. 12, Wrecksie Depo") 106:21-110:15).[4] In the Motion, Plaintiffs assert that PPB used tear gas on the following additional dates: July 18, August 19, 23, and 24. (ECF 252, Mot. at 15, 70).

The City will address Plaintiffs' allegations regarding force from 39 dates: May 29, 30,

---

[2] Many protests during 2020 began on one evening and continued into the early morning hours of the following day. The dates in this Response reference the evening that a given protest began. For example, if a protest started on May 31, 2020 and continued into the early hours of June 1, 2020, any tear gas deployed during that protest is identified on May 31, 2020.

[3] Plaintiffs withdrew or were unable to provide any information regarding their claims from May 31, June 1, June 13, August 13, and August 16 in subsequent discovery. (Ex. 11, Roberts Depo, 66:06-16; 111:08-112:18; Ex. 10, Johnson Depo, 79:13-19; 44:24-45:23). However, in their Motion, Plaintiffs again assert that PPB used tear gas on May 31, June 1, and June 13.

[4] In filing their Motion, Plaintiffs raised additional dates in declarations from individuals attending or observing the protests. As discussed in the City's motion to strike, these new incidents and dates were never disclosed and were not within the scope of discovery.

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

31; June 1, 2, 5, 6, 7, 9, 10, 12, 13, 15, 20, 26, 27, 30; July 3, 4, 18, 23, 24; August 1, 4, 5, 6, 7, 8, 9, 10, 12, 15, 19, 21, 22, 23, 24, 28; September 5.[5]

## 1.    May 29, 2020

Mr. Roberts asserted that he was subjected to tear gas on May 29, 2020. (*Id.*, Ex. 6, Roberts Rog. # 12; Ex. 11, Roberts' Depo, 13:15-15:22; 29:13-22). He explained that he joined protesters south of Pioneer Courthouse Square on the night of May 29 into the early morning hours of May 30, 2020. (*Id.*, Ex. 11, Roberts' Depo, 13:15-15:22; 29:13-22).

Protests began peacefully on May 29, 2020, with a large gathering at Peninsula Park. (ECF 113, Declaration of Craig Dobson in Support of Response to Preliminary Injunction, ("ECF 113, Dobson PI Decl.") ¶ 34). However, later in the evening, many individuals engaged in dangerous criminal activity and rioting. (*Id.* at ¶¶ 34-35). At one point, a gun was fired after an individual drove his car into the march. (*Id.*).

At approximately 11:00 p.m., the sound truck announced an unlawful assembly and instructed people to disperse. (*Id.* at ¶ 35). Demonstrators were warned that force may be used. (ECF 115, Declaration of Naomi Sheffield in Support of Response to Preliminary Injunction ("ECF 115, Sheffield Decl.") ¶ 1, Ex. 52). Just minutes after these announcements, flares were thrown into the Justice Center, starting a fire. (ECF 113, Dobson PI Decl. ¶ 36). In addition to the fire at the Justice Center, over twenty fires were set around Portland. (ECF 115, Sheffield Decl. ¶ 2, Ex. 53; ECF 113, Dobson PI Decl. ¶¶ 38-39, 41; ECF 109, Declaration of Jason Andersen in Support of Response to Preliminary Injunction ("ECF 109, Andersen Decl.") ¶ 2, Ex. 3,). Tear gas was used on May 29, 2020, in response to this dangerous activity. (ECF 113, Dobson PI Decl. ¶ 37).

## 2.    May 30, 2020

Mr. Roberts asserted that he was subjected to tear gas on May 30, 2020. (Compl., ¶ 51;

---

[5] The City does not waive its argument that Plaintiffs' reliance on evidence outside of the Relevant Dates should be excluded.

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

Ex. 6, Roberts Rog. # 12; Ex. 11, Roberts Depo, 20:19-21:06). Mr. Roberts testified that he was

subjected to tear gas near the corner of SW Third Avenue and SW Main Street, at approximately

9 p.m. and again at SW Fifth Avenue and SW Main Street. (Ex. 11, Roberts' Depo, 21:07-22:01;

23:10-15). In addition to tear gas, Mr. Roberts also asserted he was impacted by the loud noise

from "flash grenades" on May 30, 2020. (*Id*. at 25:13-26:06).

On May 30, 2020, the Incident Commander staged officers out of sight because he did

not want their presence to cause a problem. (ECF 113, Dobson PI Decl. ¶ 41). A fence was

erected to protect critical infrastructure downtown, including the Justice Center. (*Id*. at ¶¶ 40,

42). Protesters tried to scale this fence, threw projectiles over the fence, and surrounded cars

trying to drive down open City streets. (*Id*. at ¶¶ 42-43). PPB officers used tear gas, while

pushing the crowd north from the fence. While trying to disperse protesters from downtown,

protesters threw rocks, bottles, and other objects at them. (*Id*. at ¶ 43). PPB was informed that

downtown business owners were armed and prepared to defend their buildings. (*Id*. at ¶ 45).

Portland Fire and Rescue ("PF&R") received reports of ten fires the night of May 30,

2020. (ECF 109, Andersen Decl. ¶ 2, Ex. 3). Officers used tear gas to disperse protesters

who violated the curfew and engaged in criminal and dangerous activity. (*Id*. at ¶¶ 44, 46).

## 3.    May 31, 2020

Mr. Roberts indicated that he was subjected to tear gas on May 31, 2020. (Compl., ¶51;

Ex. 6, Roberts Rog. # 12). During his deposition, he had no specific memory related to tear gas

on May 31, 2020. (Ex. 11, Roberts Depo, 66:6-16).

Protests began early on May 31, 2020, and initially remained peaceful. Just after 4:00

p.m., individuals began throwing bottles and other projectiles at officers. (ECF 113, Dobson PI

Decl. ¶ 48b). After warnings from the PPB sound truck, a violent group began to advance on

officers, causing them to move backward, and the Incident Commander received reports that

officers were taking more projectiles. (*Id*.). The Incident Commander authorized the use of CS

gas at approximately 4:18 p.m., but it was not deployed. (*Id*.).

Page 9 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
           CLASS CERTIFICATION

PPB worked to facilitate and block traffic for a large march that began at Laurelhurst Park. (*Id.* at ¶¶ 48-50). PPB did not respond to this march. (*Id.*)

Following the curfew, protesters threw objects at officers. (*Id.* at ¶ 51). PPB used tear gas to disperse the crowd that was throwing objects at officers, and protesters threw canisters of tear gas back at the police. (*Id.* at ¶ 51). PPB distinguished between the crowd throwing projectiles and the peaceful protestors who continued to march. (ECF 115, Sheffield Decl. ¶ 13).

**4.    June 1, 2020**

Plaintiffs assert in their Motion that PPB used tear gas on June 1, 2020. (ECF 252, Mot. at 15, 70)[6].

Thousands of people marched and peacefully protested in Portland on June 1, 2020. (Declaration of Craig Dobson in Support of City's Response to Plaintiffs' Motion for Class Certification ("Dobson Decl.") ¶ 9). PPB monitored the protests, at times communicating with protesters through protest liaisons. (*Id.*). PPB tweeted information to protesters. (*Id.*). PPB made some arrests and responded with less lethal force to individuals who threw glass bottles and rocks. (*Id.*). PPB did not deploy tear gas. (*Id.*).

**5.    June 2, 2020**

Two named Plaintiffs identified being subjected to tear gas on June 2, 2020. Mr. Roberts testified that he initially joined a march from Revolution Hall to Pioneer Square. (Ex. 11, Roberts Depo, 31:07-15). Mr. Roberts remained with the group at Pioneer Square and eventually marched back to Revolution Hall. (*Id.* at 31:12-32:02). During this portion of the evening, Mr. Roberts had no interaction with PPB officers. (*Id.* at 35:16-36:05).

Mr. Roberts later returned downtown. (*Id.* at 32:01-32:10). He went toward some noises, ultimately ending up in Pioneer Square. (*Id.* at 32:03-32:12). Mr. Roberts testified that he was

---

[6] Plaintiffs also assert that FDCRs from June 1, 2020 documented PPB's use of tear gas. (ECF 252, Mot. at 15). But the FDCRs do not indicate that tear gas was used at protests beginning the evening of June 1, 2020.

Page 10 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
            CLASS CERTIFICATION

subjected to tear gas, was pushed with a baton, and was "hit by maybe little rubber balls or the concussion grenades." (*Id.* at 32:13-32:23; 33:11-16). Mr. Roberts also testified that he witnessed an individual get struck with "rubber bullets." (*Id.* at 51:19-52:06).

Mx. Belden asserted that they were subjected to tear gas on June 2, 2020. (Compl., ¶ 54; Moede Decl. ¶ 9, Ex. 9, Deposition of Michelle Belden ("Ex. 9, Belden Depo")56:25-57:09). Mx. Belden testified that they were in Chapman Square when there were loud noises and the air started filling with gas. (*Id.* at 67:15-68:16). Mx. Belden also testified that flash bangs were used on June 2 just before tear gas was deployed. (*Id.* at 75:15-24).

Two groups gathered on June 2, 2020. (ECF 113, Dobson PI Decl. ¶ 63). Many thousands marched downtown from Revolution Hall, stopping briefly to lie down across the Burnside Bridge. This group peacefully demonstrated for several hours. (*Id.*). Several hundred protestors also gathered at the fence near the Justice Center. (*Id.* at ¶ 64-65). Some members of this group attempted to breach the fence and threw projectiles, including fireworks, glass bottles, and baseball bats. (*Id.*). PPB announced an unlawful assembly and directed protesters to leave. Protesters did not leave, and many people continued to throw objects. PPB officers deployed tear gas near the fence to disperse the crowd that had been throwing objects. (*Id.* at ¶ 65). PPB officers also deployed rubber ball distraction devices ("RBDDs"). Knowing that there was a significant group of peaceful protestors at Pioneer Square, the Incident Commander directed officers not to push the group from the fence into Pioneer Square or to deploy tear gas at Pioneer Square. (*Id.* at ¶ 66).

**6.    June 5, 2020**

Ms. Johnson testified that she was subjected to tear gas on June 5, 2020. (Ex. 10, Johnson Depo, 57:20-21, 58:24-59:04, 61:11-17; 62:04-11; 69:22-70:07). Mr. Roberts also testified that he was also subjected to tear gas on June 5, 2020, in Chapman Square. (Ex. 11, Roberts Depo, 66:20-25).

On June 5, 2020, a large peaceful protest marched from Revolution Hall over the

Page 11 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
        CLASS CERTIFICATION

Hawthorne Bridge to Waterfront Park. (Dobson Decl. ¶ 11). There was a large rally at Waterfront Park. (*Id.*). PPB did not need to respond to this protest. (*Id.*).

Another large group gathered in Chapman Square. (*Id.* at ¶ 12). This group was generally non-violent for many hours. (*Id.*). Later in the evening, protesters used sling shots to direct items at a higher speed toward officers. Bricks, glass bottles, fireworks, frozen water bottles, sharp blades, ball bearings, mortars, batteries, and other projectiles were thrown at officers. (*Id.* at ¶ 13). Lasers were also directed at officers' eyes. (*Id.*). Protesters shook the fence, and eventually knocked it down. (*Id.*). Multnomah County Sheriff's Office ("MCSO") deputies responded to certain protesters using crowd control munitions. PPB officers used tear gas to disperse the crowd that had become violent. (*Id.*).

**7.     June 6, 2020**

Mr. Roberts alleged in the Complaint that he experienced PPB use tear gas and less lethal munitions on June 6 (Compl., ¶ 51). He did not subsequently identify any uses of force by PPB on June 6, 2020. (Ex. 6, Roberts Rog. #12; Ex. 11, Roberts Depo, 111:23-112:14). Plaintiffs identify June 6, 2020, as a date that PPB used tear gas. (ECF 252, Mot. at 15, 70).

On June 6, 2020, several thousand individuals marched from Revolution Hall to Irving Park. (Dobson Decl. ¶ 14). PPB generally did not respond to this protest. (*Id.*).

Another group gathered at the Justice Center. (*Id.* at ¶ 15). Some protesters shined lasers at officers, threw paint and full beverage containers over the fence at officers, attempted to cut and push over the fence, and launched a firework at officers. (*Id.*). PPB announced an unlawful assembly and dispersed the crowd with assistance from mutual aid partners. (*Id.*). A commercial grade firework was launched over the fence injuring two MCSO deputies. PPB officers deployed OC Vapor on June 6, 2020. (*Id.*).

**8.     June 7, 2020**

Mr. Roberts testified that he was subjected to tear gas and flash grenades on June 7, 2020, in Chapman Square. (Ex. 6, Roberts Rog. #12; Ex. 11, Roberts Depo, 72:23-73:05).

Page 12 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
          CLASS CERTIFICATION

PPB Officers used less lethal force, but did not deploy tear gas on June 7, 2020. (Dobson Decl. ¶ 17).

**9.      June 9, 2020**

Mx. Belden testified to being chased from Chapman Square by PPB officers deploying tear gas and flash bangs on June 9, 2020. (Ex. 9, Belden Depo, 20:17-32:01).

PPB officers did not deploy tear gas or flash bangs on June 9, 2020. (Dobson Decl. ¶ 18). PPB did not deploy any munitions on June 9, 2020. (*Id.*).

**10.     June 10, 2020**

Mx. Belden testified that they were again subjected to tear gas and flash bangs on June 10, 2020. (Ex. 9, Belden Depo, 32:02-33:24; 35:13-37:19; 37:25-38:18; 39:20-40:04). Ms. Johnson testified to witnessing PPB officers deploying FN303 impact munitions at an individual near the fence on June 10, 2020. (Ex. 10, Johnson Depo, 171:07-14).

PPB officers did not deploy tear gas or flash bangs on June 10, 2020. (Dobson Decl. ¶ 19). A PPB officer deployed an FN303 in response to protesters breaching the fence. (*Id.*).

**11.     June 12, 2020**

Mx. Belden testified that they were subjected to tear gas on June 12, 2020, in Chapman Square. (Ex. 9, Belden Depo, 52:11-53:06; 54:03-55:06).

Ms. Johnson also testified to her experience on June 12, 2020. (Ex. 10, Johnson Depo, 79:13-80:04; 83:17-84:05). Ms. Johnson testified that she witnessed flash bangs and was struck in the back of the legs with a baton. (*Id*. at 83:17-84:05, 85:24-86:11; 87:11-88:07; 92:15-93:03).

Like previous nights, on June 12, 2020, hundreds of protesters marched from Revolution Hall. (Dobson Decl. ¶ 20). This protest occurred without police response. (*Id*.).

Another group gathered near the fence around the Justice Center. Protesters shook the fence, climbed the fence, cut holes in the fence, and ultimately tore down parts of the fence. Many protesters also threw objects over the fence, including road flares, glass bottles, marbles (*shot* from sling shot devices), and metal pipes. (*Id*. at ¶ 21).

Page 13 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
            CLASS CERTIFICATION

PPB declared a civil disturbance and ordered the crowd to disperse. (*Id.*). PPB officers moved to disperse those who would not leave. PPB officers deployed RBDDs on June 12, 2020. (*Id.*). PPB officers did not deploy tear gas on June 12, 2020. (*Id.*).

**12.    June 13, 2020**

Plaintiffs' Motion cites June 13, 2020, as a day that PPB used tear gas. (ECF 252, Mot. at 15, 70).

Again, on June 13, 2020, several thousand people marched from Revolution Hall. (Dobson Decl. ¶ 22). Although there was a small altercation with a motorist, the protest occurred without intervention from PPB. (*Id.*).

A second demonstration occurred at the Justice Center fence. (*Id.* at ¶ 23). Some protesters shook and climbed the fence, while others threw projectiles over the fence, including glass bottles, full beverage containers, rocks, and other projectiles. PPB declared a civil disturbance and ultimately moved to disperse the crowd that refused to leave. (*Id.*). PPB officers did not deploy tear gas on June 13, 2020. (*Id.*).

**13.    June 15, 2020**

Ms. Johnson stated that she was subjected to tear gas at the Multnomah County Detention Center on June 15, 2020. (Ex. 5, Johnson Rog. #3).

On June 15, 2020, like many other nights in June, there were several demonstrations throughout the City. The majority occurred without PPB response. (Dobson Decl. ¶ 24). One group gathered near the fence at the Justice Center. Some individuals threw projectiles over the fence. (*Id.*). PF&R personnel responded to a fire lit near a building. PPB officers provided security for this response. (*Id.*).

PPB declared a civil disturbance and advised the crowd to leave. The majority of the protesters remained, and projectiles were thrown at officers while they tried to disperse the crowd. A law enforcement officer was struck by a rock from behind and transported to the hospital. (*Id.*). Some protesters smashed windows and stole items from buildings downtown and

Page 14 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

in the Pearl District. PPB did not deploy tear gas on June 15, 2020. (*Id.*).

14.     **June 20, 2020**

Mr. Wrecksie testified that he was impacted by a flash bang, struck by batons, and struck by FN303 munitions on June 20, 2020, on SW Third Avenue between SW Madison and SW Main Street. (Ex. 12, Wrecksie Depo, 108:04-109:02).

On June 20, 2020, a demonstration occurred on Southwest Third Avenue between SW Madison and SW Main Streets. (Dobson Decl. ¶26). While the demonstration was initially peaceful, later in the night, demonstrators threw projectiles at officers. (*Id.*). The PPB sound truck announced an unlawful assembly at the request of MCSO. (*Id.*). MCSO deputies deployed to disperse the group that remained. (*Id.*). PPB officers assisted the MCSO deputies. (*Id.*). PPB officers did deploy RBDDs on June 20, 2020, as did MCSO deputies. (*Id.*).

15.     **June 26, 2020**

Mr. Roberts asserted that he was subjected to tear gas and concussion grenades on June 26, 2020 at Chapman Park. (Ex. 11, Roberts Depo, 76:09-14). Plaintiffs, in the Motion, also identify June 26 as a date when tear gas was deployed. (ECF 252, Mot. at 15, 70).

On June 26, 2020, protesters gathered near the Justice Center on SW Third Avenue. The group blocked the street and chanted for several hours without incident. (Dobson Decl. ¶ 27). Later, some demonstrators attempted to barricade doors to the Justice Center from the outside and spray-painted security cameras. (*Id.*). PPB declared an unlawful assembly. PPB officers disperse the crowd that did not leave. (*Id.*). MCSO personnel also participated. (*Id.*). PPB officers did not deploy tear gas or RBDDs on June 26, 2020. (*Id.*).

16.     **June 27, 2020**

Ms. Johnson alleged that she was struck "with a projectile consistent with the munitions fired from FN303s" on June 28, 2020, at SW Sixth Avenue and SW Main Street. (Compl., ¶ 66). In her deposition testimony, she indicates that this allegation actually referred to June 27, 2020, and she was actually struck at SW Sixth closer to SW Broadway. (Ex. 10, Johnson Depo, 99:16-

Page 15 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

22; 100:08-21).[7] She also testified that officers struck a protester in the face with batons and maced protesters. (*Id*. at 105:23-106:05).

Ms. Johnson's video from June 27, 2020, depicts her moving up towards a smoking smoke cannister. (Moede Decl. ¶ 17, Ex. 15, Johnson FB Video). PPB Forensic & Evidence Division video from behind the police line shows an officer's deployment of munitions at individuals moving towards smoke cannisters, kicking and throwing them towards officers. (*Id*. at ¶ 18, Ex. 16, FED Video, 00:37-01:02).

On June 27, 2020, demonstrators blocked SW Third Avenue at SW Main Street, using plastic barriers held together by cable. (Dobson Decl. ¶28). Protesters were asked to remove the barricades, but they remained. (*Id.*). PPB declared an unlawful assembly. (*Id.*). PPB officers responded to remove the barricades from the street. (*Id.*). Protesters threw rocks, glass bottles, and paint at officers. (*Id.*).

Later protesters blocked the door and vehicle gates to Central Precinct. (*Id.*). PPB announced another unlawful assembly and ordered the crowd to disperse. (*Id.*). When PPB officers responded, objects were thrown at them and some garbage cans were set on fire. (*Id.*). PPB officers deployed impact munitions and OC spray in response to individual protesters. (*Id.*). PPB did not deploy tear gas on June 27, 2020.[8] (*Id.*).

## 17.    June 30, 2020

Mr. Wrecksie alleged and testified that he was shoved to the ground and struck by an FN303 multiple times on June 30, 2020. (Compl., ¶ 76). He further alleged that "after PPB had used massive amounts of teargas on the protesters and the surrounding neighborhood," Mr.

---

[7] In Ms. Johnson's interrogatory responses, she does not indicate that she was struck by an FN303 munition or otherwise subject to force on either June 27 or June 28, 2020. (Ex. 5, Johnson Rog. #3).

[8] Plaintiffs also assert that FDCRs from June 27, 2020 documented PPB's use of tear gas. (ECF 252, Mot. at 15). But the referenced FDCRs do not indicate that tear gas was used on June 27, 2020.

Page 16 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
        CLASS CERTIFICATION

Wrecksie was grabbed by PPB officers, hit twice in the side and once in the thigh by the end of a baton, and pepper sprayed. (Compl., 77-78).

Ms. Johnson, indicated in interrogatory responses that she was subjected to tear gas on June 30, 2020. (Ex. 5, Johnson Rog. # 3). She testified during her deposition that she "was mistaken in naming that date as a use-of-force date." (Ex. 10, Johnson Depo, 108:23-109:2).

The record of the events from June 30, 2020, is well-developed in this case in connection with the allegations of contempt. (ECF 158-173).

**18.    July 3, 2020**

Mr. Roberts clarified[9] in deposition testimony that he was protesting in Chapman Square and other locations in downtown Portland on July 3, 2020, when he was impacted by tear gas, concussion or flash grenades and rubber bullets. (Ex. 11, Roberts' Depo, 78:14-79:05). Mr. Roberts stated that he was struck by rubber bullets twice when reaching down to help individuals who had fallen. (*Id.* at 80:11-21). He testified he was struck by a third rubber bullet, while he reached down to pick up a tear gas canister and throw it. (*Id.* at 81:03-82:07). He also testified that he was subjected to tear gas and a concussion grenade. (*Id* at 80:22-81:02; 81:03-12).

On July 3, 2020, protesters gathered near the Justice Center. (Dobson Decl. ¶ 30). Some protesters set off commercial grade fireworks. (*Id.*). Later in the evening, some protesters threw rocks at the Federal Courthouse, breaking windows. (*Id.*). Protesters also launched fireworks toward the federal courthouse and the Justice Center. Several small fires and some dumpster fires were lit. (*Id.*). PPB officers generally stayed out of sight to avoid conflict, and did not use munitions or tear gas or less lethal munitions on July 3, 2020. (*Id.*). Federal law enforcement declared a riot and deployed tear gas and other munitions. (*Id.*).

**19.    July 4, 2020**

---

[9] Mr. Roberts identified July 4, 2020 in his interrogatory responses as a date that he had been subjected to tear gas. (Ex. 6, Roberts Rog. #12). He clarified this date in his deposition testimony. (Ex. 11, Roberts Depo, 78:14-20; 84:09-15).

Page 17 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
        CLASS CERTIFICATION

Ms. Johnson asserted that she was subjected to tear gas deployed by PPB on July 4, 2020. (Compl., ¶ 67; Ex. 10, Johnson Depo, 110:12-19).

On July 4, 2020, protestors fired projectiles, including lit objects, at the Federal Courthouse, breaking windows. (ECF 113, Dobson PI Decl. ¶ 99; Dobson Decl. ¶ 31). Protesters also shot fireworks and mortars at the Justice center. PPB officers had rocks, bottles, flammables, mortars, and other projectiles fired at them. (*Id.*) Federal officers deployed tear gas numerous times in response to these protester actions. (*Id.*)

PPB declared a riot. Following the riot declaration, PPB began assisting federal officers to push protesters away from the area. (*Id.*) Protesters threw heavy projectiles, mortar shells and flaming objects at them. (ECF 113, Dobson PI Decl. ¶ 100; Dobson Decl. ¶ 31). Three PPB officers were injured after being struck by objects. (*Id.*) Windows were broken in many buildings and several fires were set. (*Id.*) PPB took custody of an individual with a handgun who fought to avoid arrest. (*Id.*). Federal officers took an individual into custody with a possible pipe bomb or homemade explosive device. (*Id.*). PPB officers deployed tear gas on July 4, 2020. (*Id.*)

**20.    July 18, 2020**

Plaintiffs assert in the Motion that PPB used tear gas on July 18, 2020. (ECF 252, Mot. at 15, 70).

There were multiple protest events on July 18, 2020. (Dobson Decl. ¶ 32). These included protests at Holiday Park, Lents Park, Salmon Street Springs, and outside the Justice Center. (*Id.*). These protests proceeded without PPB response. (*Id.*). There was also a group of protesters that marched from Peninsula Park to North Precinct. (*Id.*). Protesters vandalized a police car and fence, cut down the flag, and disabled the gate at the entrance to the secure parking lot. (*Id.*).

The protestors left North Precinct and marched to the Portland Police Association ("PPA") building. (*Id.*). Protesters dragged multiple dumpsters into the road and lit them on fire. One person climbed on the roof. (*Id.*). The front door to the PPA building was broken into and multiple people entered and lit a fire. (*Id.*). PPB declared a riot and PPB officers pushed back the

Page 18 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
        CLASS CERTIFICATION

people who did not leave. (*Id.*). PF&R personnel put out the fire in the PPA building and the dumpster fire. (*Id.*). Protestors threw rocks, paint and fireworks at officers. PPB did not deploy tear gas. (*Id.*). PPB officers did, however, report that protesters deployed "gopher gassers," which caused vision impairment. (*Id.*).

A separate group downtown threw objects at the Federal Courthouse, and some protesters breached the fencing around the Federal Courthouse. (*Id.* at ¶ 33). It appeared to PPB that federal officers exited the Federal Courthouse and may have deployed tear gas. PPB did not respond to this protest. (*Id.*).

**21.    July 23, 2020**

Mr. Roberts testified that he was subjected to "tear gas; the pepper balls, or the FN303s . . . and the concussion grenades" on July 23, 2020, in or near Chapman Square. (Ex. 11, Roberts Depo, 85:06-22; 87:07-11; 87:16-88:02).

On July 23, 2020, the NAACP held an event without any police intervention. (Dobson Decl. ¶ 35). After that, a large group marched first to the Justice Center and then to the Federal Courthouse. (*Id.*). At the Federal Courthouse, protesters threw mortars over the fence and shot roman candles at the open doors. (*Id.*). Federal officers deployed impact munitions towards individuals throwing items and shaking the fence. (*Id.*). PPB received a medical call for a protester that was assaulted by another protester. (*Id.*). Protesters breached the fence around the Federal Courthouse and federal officers responded. (*Id.*). A fire started on the portico around the Federal Courthouse. Federal officers deployed tear gas. (*Id.*). PPB announced an unlawful assembly, but did not engage. (*Id.*). PPB officers did not use force on July 23, 2020. (*Id.*).

**22.    July 24, 2020**

Mr. Roberts asserted in his interrogatory response and deposition testimony that he was subjected to tear gas from PPB on July 24, 2020, in Chapman and Lownsdale Squares. (Ex. 6, Roberts Rog. # 12; Ex. 11, Roberts Depo, 89:20-90:18).

On July 24, 2020, two groups merged in front of the Justice Center. (Dobson Decl. ¶ 36).

Page 19 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
       CLASS CERTIFICATION

The group was initially peaceful. Later in the evening, protesters began shaking the fence around the Federal Courthouse. (*Id.*). Protesters threw mortar shells, smoke grenades, and other projectiles over the fence. (*Id.*). Federal officers appeared to deploy impact munitions and smoke or tear gas in response to protesters throwing items. (*Id.*).

The group began to separate, with the group south of SW Main Street—near the Justice Center—engaging peacefully. (*Id.*). Some protesters north of SW Main Street launched items at federal officers and federal officers appeared to deploy tear gas. (*Id.*). A group at SW Third Avenue and SW Salmon started a large fire in the street. (*Id.*). PPB declared an unlawful assembly based on the fire and the significant number of projectiles. (*Id.*).

Before PPB officers arrived to move the group and extinguish the fire, but federal officers had already engaged the group. (*Id.*). PPB officers eventually escorted PF&R personnel into the area to put out the fire. Protesters threw a mortar at PPB officers. (*Id.*). PPB did not deploy tear gas on July 24, 2020. (*Id.*).

**23.    August 1, 2020**

Ms. Johnson testified that she witnessed a PPB officer grab a protester, turn them around, pepper spray them, and then throw them to the ground on August 1, 2020. She also testified that when she went to help, a PPB officer shoved her to the ground. (Ex. 10, Johnson Depo, 176:23-177:20).

Protesters gathered at the Kelly Building on August 1, 2020. (Dobson Decl. ¶ 37). Some protesters threw glass bottles and shined lasers at officers. (*Id.*). One officer was struck in the head. (*Id.*). After many warnings, which resulted in more projectiles thrown, PPB declared an unlawful assembly. (*Id.*). PPB officers moved to disperse the protesters that did not leave. (*Id.*). Some officers used OC spray and batons during the dispersal. PPB did not deploy tear gas. (*Id.*).

**24.    August 4, 2020**

Ms. Johnson alleged in the Complaint and asserted in her interrogatory responses that she was impacted by tear gas near the PPA building on August 4, 2020. (Compl., ¶ 64; Ex. 5,

Page 20 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Johnson Rog. # 3). Ms. Johnson could not recall in her deposition what occurred on August 4, 2020. (Ex. 10, Johnson Depo, 114:04-116:12).

On August 4, 2020, there were two protests. (Dobson Decl. ¶ 38). A group at the Justice Center gave speeches and chanted. PPB did not respond to this protest. (*Id.*).

A crowd also marched to the PPA building. (*Id.*). At the PPA building, protesters lit a large dumpster on fire in the middle of N Lombard Street. (*Id.*). It did not present a danger to structures, so PPB did not intervene. (*Id.*). The crowd chanted that they wanted to burn the building down. PPB received reports that protesters were trying to pry plywood off the building and that someone had lit a torch next to the building. (*Id.*). The building's alarm company reported hearing people trying to break in through the front door. PPB had the sound truck make announcements regarding the attempted break-in. (*Id.*). The crowd self-corrected. (*Id.*).

Later, a pickup truck drove into the crowd of protesters, and seemed to hit a motor bike, dragging it and causing sparks to fly. (*Id.*, ¶ 39). PPB officers arrested the driver of the car. (*Id.*). Protesters made a second attempt to break into the PPA building. (*Id.*). They disabled security cameras, removed plywood, and broke the glass on the back of the building. (*Id.*). The sound truck again made announcements to see if the crowd would self-correct. It did not. (*Id.*). PPB received information that a Molotov cocktail had been thrown in the building and people had entered. (*Id.*). PPB declared an unlawful assembly and PPB officers were sent to move the crowd back and secure the building. (*Id.*). Protesters threw bottles, rocks, and unknown liquids at officers. (*Id.*). While officers secured the building there were reports of gunshots two blocks away. (*Id.* at ¶ 40). Responding officers found evidence that both a car and house were struck with bullets. (*Id.*).

After PPB officers withdrew from the area, a large crowd gathered at the 7-11 next to the PPA building. (*Id.*). PPB observed through livestreams a fist fight occurring and an individual shooting a firearm. (*Id.*). PPB officers arrived at the area, and the crowd chanted "we don't need you." (*Id.*). Once officers confirmed that there was no shooting victim on scene and that no

Page 21 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION

witnesses would speak to the police, they left. (*Id.*).

PPB officers did not deploy tear gas on August 4, 2020. (*Id.*).

**25.    August 5, 2020**

Ms. Johnson testified that she witnessed flash bangs and batons used against protesters on August 5, 2020. (Ex. 10, Johnson Depo, 178:06-179:01).

On August 5, 2020, a small, peaceful protest occurred at the Justice Center. Some cars blocked SW Third Avenue, but there was otherwise no criminal activity and PPB did not respond to this protest. (Dobson Decl. ¶ 41).

Another group of protesters marched to East Precinct. Protesters destroyed the security cameras and began pulling the plywood off the doors and windows. (*Id.*). Protesters tried to open the front doors, and tried to use the wood to break the glass of the front doors. (*Id.*). PPB declared an unlawful assembly and ordered the crowd to disperse. (*Id.*). Protesters stayed. (*Id.*). Protesters broke windows, placed a 2x4 through the handles of the front doors, effectively locking personnel inside, and placed cars in front of the exit to the parking garage. (*Id.*). After disabling exits, protesters started a fire in a garbage can and placed it against the front of the building. PPB declared a riot. (*Id.*).

When PPB officers arrived, they had rocks, bottles, and mortars thrown at them. PPB officers deployed tear gas to disperse the crowd, in response to the dangerous, criminal activity. While dispersing the crowd, PPB officers did deploy RBDDs and used batons. (*Id.*).

**26.    August 6, 2020**

Mr. Dreier testified that his guitar was struck by a 40mm less lethal munition on August 6, 2020. (Moede Decl. ¶ 8, Ex. 8, Deposition of Thomas Dreier ("Ex. 8, Dreier Depo"), 50:11-51:20).

Protesters gathered at both the Kelly Building and the Justice Center on August 6, 2020. Both groups remained peaceful, and PPB did not respond to these protests. (Dobson Decl. ¶ 42).

A third group marched to East Precinct. After arriving, protesters spray painted the walls,

Page 22 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION

disabled security cameras, and tossed paint on an elderly woman who was seeking to stop the property damage. (*Id.*). PPB declared an unlawful assembly. (*Id.*). Protesters lit a trash can on fire outside the precinct, which was put out by an elderly woman who had been discouraging property damage. (*Id.*). Shortly thereafter, someone on the north side of the building sprayed accelerant onto the plywood covering the building, and lit it on fire. (*Id.*). PPB officers were instructed to disperse the crowd so PF&R could put out the fire. (*Id.*).

Individuals in the crowd threw rocks, bottles, fireworks, and paint at officers. (*Id.*). One officer was hit by a large rock. PPB officers did deploy impact munitions. (*Id.*).

### 27.    August 7, 2020

Ms. Johnson testified that she witnessed a protester pepper sprayed August 7, 2020. (Ex. 10, Johnson Depo, 179:20-180:11).

On August 7, 2020, a group of protesters marched from Laurelhurst Park to the Kelly Building. Protesters immediately began throwing rocks at police officers, hitting several. (Dobson Decl. ¶ 43). PPB declared an unlawful assembly but did not immediately disperse the crowd. (*Id.*). The crowd engaged sporadically for several hours, at times throwing a significant number of projectiles, including rocks, bottles, concrete, and other objects. (*Id.*). Later in the evening PPB officers observed a large explosion, which it appeared a protester had attempted to throw toward police. (*Id.*). At that point, PPB officers began to disperse the crowd. As they tried to disperse the crowd, more projectiles were thrown. (*Id.*). PPB officers did deploy OC spray on August 7, 2020. (*Id.*)

### 28.    August 8, 2020

Ms. Johnson testified that PPB officers threw flash bangs from a van on August 8, 2020, and one of them exploded underneath her feet. (Ex. 10, Johnson Depo, 180:18-181:06).

On August 8, 2020 groups gathered peacefully at East Precinct and Central Precinct. Neither group engaged in violent behavior, and PPB did not respond to these protests. (Dobson Decl. ¶ 44).

Page 23 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

A third group marched to the PPA building. Once at the PPA building, members of the crowd used dumpsters and fencing to block vehicle traffic on Lombard in both directions. (*Id.*). Fires were lit in the dumpsters. (*Id.*). Protesters disabled the security cameras. (*Id.*). The security company for the building reported glass breaking inside the building. (*Id.*). PPB declared an unlawful assembly, and began dispersing the protesters. (*Id.*). Protesters entered the PPA building and started a fire inside the doorway, lighting broken plywood on fire. (*Id.*). PPB declared a riot, and PF&R personnel arrived to put out the fire. (*Id.*).

PPB officers worked with Oregon State Police ("OSP") troopers to disperse the crowd. (*Id.*). Officers were struck with rocks, full cans of beer, bricks, and glass bottles. (*Id.*). OSP troopers and PPB officers deployed less lethal force.

**29.     August 9, 2020**

On August 9, 2020, Ms. Johnson testified that "several flashbangs . . . were deployed . . . beneath my feet . . . at the, ah, Portland Police Association." (Ex. 10, Johnson Depo, 181:18-24).

PPB responded to a protest at the PPA building on August 9, 2020. Protesters blocked the streets around the PPA building, preventing vehicle access for PF&R and AMR, who were responding to a medical call. Protesters started a fire on the ground on the south side of the PPA building. (Dobson Decl. ¶ 45).

PPB declared an unlawful assembly and PPB and OSP troopers deployed to disperse the crowd. Law enforcement personnel were struck with projectiles while trying to disperse the crowd, including one member struck by a large mortar. (*Id.*). PPB declared a riot. PPB officers did not deploy any RBDDs on August 9, 2020. (*Id.*).

**30.     August 10, 2020**

Plaintiff Belden testified that she was subjected to tear gas on August 10, 2020 near North Precinct. (Ex. 9, Belden Depo, 86:5-90:16).

On August 10, 2020, protesters gathered at Alberta Park and marched to North Precinct. (Dobson Decl. ¶ 46). Some protesters threw projectiles and shined lights into officers' eyes. (*Id.*).

Page 24 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
         CLASS CERTIFICATION

PPB declared an unlawful assembly, and PPB officers and OSP troopers sought to move protesters who refused to disperse. (*Id.*). PPB did not deploy tear gas. (*Id.*).

31.    **August 12, 2020**

In the Complaint, Plaintiff Johnson alleged that on August 13 "PPB used indiscriminate force such as aerosol chemical irritants, flashbangs, and, upon information and belief, tear gas on protesters engaged in, at most passive resistance." (Compl., ¶ 69). Ms. Johnson testified in her deposition that her allegations in the Complaint regarding August 13, 2020, were related to force used on the night of August 12, 2020. (Ex. 10, Johnson Depo, 44:24-45:23).

Ms. Johnson testified that she witnessed officers deploy OC spray against people while they were already on the ground. (*Id.* at 117:16-118:05). Ms. Johnson also testified that flashbangs were deployed close to other officers and she was subjected to tear gas. (*Id.* at 119:04-20; 122:07-19).

On August 12, 2020, dozens of people gathered at the Justice Center, with speakers relaying frustrations with police and the lack of police reform. (Dobson Del., ¶ 47). This group was peaceful. PPB did not respond to this protest. (*Id.*).

Later in the evening many speakers spoke against "peace-police" in the crowd. (*Id.*). Protesters threw a foul substance at the front door of Central Precinct. (*Id.*). Protesters shook the rolling doors to the garage at Central Precinct so hard they damaged them. (*Id.*). Members of the crowd began lighting fires on federal property and setting off large mortars. (*Id.*). Flares were also tossed over the federal fence. (*Id.*). The PPB sound truck admonished the crowd to stop starting fires and throwing fireworks. (*Id.*).

A group began marching to the Justice Center during an MCSO shift change. The group blocked traffic and entered the private parking lot where county employees were attempting to leave. (*Id.*). PPB declared a civil disturbance. (*Id.*). MCSO requested assistance to allow their employees to leave. (*Id.*). PPB ordered the crowd to disperse, and officers began to disperse the crowd. (*Id.*). PPB officers were sprayed with pepper spray and mortars were thrown at officers.

Page 25 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

PPB declared a riot. (*Id.*). While PPB officers were dispersing the crowd, a protester swung a metal pipe, striking one officer. (*Id.*). PPB officers pulled back to Central Precinct and the crowd advanced on the officers, throwing projectiles. (*Id.*).

PPB officers deployed tear gas to disperse the crowd. (*Id.*). As PPB officers disengaged back to Central Precinct, the crowd again advanced on officers, throwing projectiles. (*Id.*). The Incident Commander authorized officers to use tear gas again, but officers did not deploy tear gas. (*Id.*). For two more hours, members of the crowd blocked the jail exit, assaulted other members of the crowd, and threw projectiles at passing police cars. Members of the crowd also set numerous fires. (*Id.*). An OSP trooper was struck in the head by a rock thrown by a protester. Some officers did use less lethal force, including OC spray on August 12, 2020. (*Id.*).

## 32.    August 15, 2020

Ms. Johnson testified that on August 15, 2020, there was smoke and flash bangs, and that a PPB officer thew her to the ground and "stabbed me with the end of his baton while I was on the ground[.]" (Ex. 10, Johnson Depo, 126:21-127:25).

Mr. Dreier described being struck by a 40mm less lethal munition on August 15, 2020. (Ex. 8, Dreier Depo, 72:19-73:24; 76:14-18; 77:16-79:05).

On August 15, 2020, a group gathered at Laurelhurst Park and marched to the Kelly Building. (Dobson Decl. ¶ 48). Early in the night, there were occasional projectiles thrown toward police. (*Id.*). But later, protesters began to vandalize the building and attempted to knock out the security cameras. (*Id.*). Projectiles, including rocks and glass bottles, also became more regular.

In response to announcements warning protesters regarding their behavior, protesters threw a barrage of rocks, glass bottles, and frozen eggs. (*Id.*). PPB declared a riot and ordered the crowd to disperse. (*Id.*). PPB officers pushed individuals who did not disperse. (*Id.*). During the dispersal, protesters continued to throw rocks. (*Id.*). One officer was struck by a rock in the back and was taken to the hospital. (*Id.*). Protesters continued to throw projectiles, one of which broke

Page 26 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
         CLASS CERTIFICATION

the window of the sound truck, and officers witnessed another thrown rock break the window of another car. (*Id.*). An officer had his face shield broken by another rock that struck his face; he broke his arm as he fell to the ground. (*Id.*)

PPB officers did use impact munitions, batons, RBDDs, and smoke. (*Id.*). PPB has a pending internal affairs investigation regarding the use of the 40mm less lethal weapon that struck Mr. Dreier. (Declaration of Jeffrey Bell ("Bell Decl.") ¶ 2).

**33.    August 19, 2020**

Plaintiffs assert in their Motion that PPB used tear gas on August 19, 2020. (ECF 252, Mot. at 70).

Protesters gathered at the ICE facility in SW Portland on August 19, 2020. (Dobson Decl. ¶ 49). Members of the protest graffitied the ICE building and hit and kicked windows and doors. (*Id.*). A protestor broke the window of the guard shack, allowing them to open the gates to the building. (*Id.*). Federal protective service ("FPS") responded by pushing the crowd of protestors north. (*Id.*). Some protesters threw rocks and other projectiles at the federal protective service officers. (*Id.*).

PPB announced that there was an unlawful assembly, and directed the crowd north, but FPS officers pushed the crowd. (*Id.*). As members of the crowd continued to throw objects at FPS officers, PPB officers pushed the group north. (*Id.*). Some protesters refocused their attention, throwing objects at PPB officers and the sound truck. When officers left, the crowd returned to the ICE building and broke additional windows. (*Id.*). FPS pushed the crowd from the building. PPB declared a riot and FPS deployed tear gas to disperse protesters throwing large rocks. Protesters continued to throw rocks. (*Id.*).

PPB received a call from a neighbor who was assaulted by a protester at their apartment. Protesters threw a hammer and fireworks at officers. (*Id.*). PPB's incident commander authorized the use of tear gas, but it was not deployed. (*Id.*).

Protesters started a large fire with a mattress and picnic bench. (*Id.*). They then returned

Page 27 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

to the ICE building, again striking and breaking windows. (*Id.*). PPB again declared a riot. FPS officers deployed tear gas. PPB officers again assisted FPS officers in pushing protesters north, away from the building. (*Id.*). During that push, protesters threw water bottles and rocks (and slung rocks from a sling shot) at PPB officers. (*Id.*). PPB officers deployed tear gas during this attempt to move the crowd north. (*Id.*).

**34.    August 21, 2020**

Mr. Roberts asserted that he was subjected to tear gas on August 21 near PPB's North Precinct. (Ex. 6, Roberts Rog. #12; Ex. 11, Roberts Depo, 96:13-97:04).

On August 21, 2020, protesters gathered at North Precinct. (Dobson Decl. ¶ 50). Projectiles were thrown, and PPB vehicles were damaged. (*Id.*). PPB officers did not respond to the property damage. Later, protesters lit a recycle box on fire and began throwing rocks, golf balls, and ball bearings toward officers. (*Id.*). The Incident Commander again instructed PPB officers not to respond, because some property damage was worth maintaining the status quo. (*Id.*).

As the fire in the street grew and protesters began approaching the precinct, throwing more projectiles, PPB declared a civil disturbance. (*Id.*). PPB officers deployed to move the group back. (*Id.*). The crowd responded very violently, and PPB declared a riot. PPB officers sustained numerous injuries from projectiles. (*Id.*). PPB did not deploy tear gas on August 21, 2020. (*Id.*).

**35.    August 22, 2020**

Mr. Roberts testified that he was impacted by both tear gas and shields deployed by PPB on August 22, 2020, at North Precinct. Ex. 6, Roberts Rog. #12; Ex. 11, Roberts Depo, 102:23-104:23). Mr. Roberts also testified that earlier in the day in the afternoon ,he was impacted by an FN303 deployed downtown following a right-wing protest. (Ex. 11, Roberts Depo, 116:24-119:13; 120:12-15; 161:11-19).

Ms. Johnson testified that she protested at the Penumbra Kelly Building on August 22,

Page 28 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
        CLASS CERTIFICATION

2020, and was pushed in the back with a baton, causing her to fall into a bush. After falling, she said that an officer grabbed her head, peeled back her goggles, and sprayed her with OC spray. (Ex. 10, Johnson Depo, 134:24-135:10).

In the afternoon of August 22, 2020, there was a right-wing protest and counterprotest in downtown Portland. (Dobson Decl. ¶ 51). The sound truck made announcements admonishing both groups to engage peacefully. After the protest, Federal officers became surrounded by counter-protesters in Terry Schrunk Plaza and requested that PPB announce an unlawful assembly. (*Id.*). PPB provided announcements on their behalf. (*Id.*). Federal officers deployed force. (*Id.*). PPB did not deploy force during the protests in the afternoon downtown on August 22, 2020. (*Id.*).

Later in the evening on August 22, 2020, protesters gathered at the Kelly Building. Individuals brought a guillotine and set it on fire. (*Id.* at ¶ 52). After lighting the fire, protesters began throwing rocks and bottles at officers. (*Id.*). Someone shot a paintball gun at cars and structures. PPB declared an unlawful assembly as the number of projectiles increased. (*Id.*). When protesters did not disperse, PPB officers began to disperse the crowd, and they took additional rocks and other projectiles. (*Id.*). PPB ultimately declared a riot due to the number of projectiles thrown. PPB did use munitions, including OC spray and OC vapor during the dispersal near the Kelly Building. (*Id.*). Some PPB officers also used batons. (*Id.*).

PPB did not deploy tear gas at North Precinct on August 22, 2020. (*Id.* at ¶ 53). PPB did not deploy with shields during any of the protests in the summer of 2020. (*Id.*).

**36.    August 23, 2020**

Plaintiffs assert in their Motion that PPB used tear gas on August 23, 2020. (ECF 252, Mot. at 70).

Protesters gathered in Woodlawn Park on August 23, 2020, and marched to North Precinct. (Dobson Decl. ¶ 54). Protesters set two dumpsters on fire in the street near North Precinct. (*Id.*). They also flipped over a small U-haul trailer to use as cover. (*Id.*). Some

Page 29 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
        CLASS CERTIFICATION

protesters threw rocks, bottles and other projectiles toward police, cars, and the building. PPB declared an unlawful assembly, which resulted in more projectiles, including the use of a "wrist-rocket" to fire marbles over the building and at the sound truck. Protesters rolled the burning dumpsters closer to North Precinct. A PPB officer on the roof was struck by a rock. (*Id.*).

PPB declared a riot due to the projectiles and fires. (*Id.*). After giving announcements of the riot and force warnings, a commercial mortar was thrown onto the roof of North Precinct. (*Id.*). Protesters then lit the awning of the building on fire. (*Id.*). PF&R personnel put the fire out, but projectiles continued to be thrown at officers, including lit flares. (*Id.*). Tear gas was deployed to disperse the group. (*Id.*).

Protesters returned to North Precinct shortly after being dispersed. (*Id.*). They lit another awning of the North Precinct building on fire, and continued to throw rocks and mortars at officers. (*Id.*). PPB made a short push to move protesters away from the North Precinct building. (*Id.*). Protesters returned, continued to throw rocks and bottles, and chanted "Burn the fucking precinct down!" (*Id.*). A car was briefly surrounded by protesters, but was eventually allowed to get through. (*Id.*). PPB did deploy tear gas on August 23, 2020. (*Id.*)

**37.    August 24, 2020**

Plaintiffs assert in their Motion that PPB used tear gas on August 24, 2020. (ECF 252, Mot. at 70).

On August 24, 2020, protesters marched to the PPA building. (Dobson Decl. ¶ 55). PPB received a call from the security company that the power may have been cut. (*Id.*). A neighbor reported people were trying to light the south side of the building on fire. (*Id.*). A couple of protesters also got onto the roof of the PPA building. (*Id.*). As PPB observed what appeared to be the glow of fire on the south side of the building, a large fireball erupted from the west side of the building as well, seemingly enhanced by accelerant. (*Id.*).

With the two fires, PPB declared a riot and the Incident Commander authorized the use of tear gas to disperse the crowd. (*Id.*). PPB pushed the group out of the immediate area, allowing

Page 30 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

PF&R to access the building. (*Id.*). After dispersing, many protesters returned to the building, setting up roadblocks on N Lombard Street and lighting a fire in the street. (*Id.*). Shortly after, a smaller group attempted to light a fire on the north side of the building while others lit the front door awning on fire. (*Id.*). PPB continued to announce a riot and officers returned to move protesters away from the building to get the fire out. (*Id.*). PPB officers did deploy tear gas on August 24, 2020. (*Id.*).

**38.    August 28, 2020**

Mr. Roberts testified that he was subjected to tear gas deployed by PPB near PPB's North Precinct on August 28, 2020. (Ex. 11, Roberts Depo, 108:04-108:11).

Protesters gathered near the lobby of Mayor Wheeler's building in the Pearl District on August 28, 2020. (Dobson Decl. ¶ 56). This group was peaceful, and PPB did not respond. (*Id.*). A group also gathered at Peninsula Park and marched to the PPA building. (*Id.*). Protesters blocked N Lombard Street with cars and dumpsters. (*Id.*). Somebody cut the power to the PPA building, and protesters tagged the building. (*Id.*). Protesters lit some the dumpsters on fire. (*Id.*). PPB observed a burning mattress leaning against the PPA building. (*Id.*). PPB declared a riot. (*Id.*). The group largely fled voluntarily when officers arrived. PPB officers did not deploy tear gas on August 28, 2020. (*Id.*).

**39.    September 5, 2020**

Plaintiffs Johnson and Belden both testified that they were subjected to tear gas on September 5, 2020, near Ventura Park and PPB's Southeast Precinct. (Compl., ¶¶ 60, 71; Ex. 9, Belden Depo, 95:01-15; Ex. 5, Johnson Rog. # 3; Ex. 10, Johnson Depo, 140:19-142:11).

September 5, 2020, was the 100th straight day of protests in Portland. (Dobson Decl. ¶ 57). OSP troopers assisted PPB. In light of extremely dry weather conditions, PF&R informed PPB that they were very concerned about fire danger. (*Id.*). Protesters gathered at Ventura Park. (*Id.*). PPB officers lined up along Stark to prevent protesters from reaching East Precinct. (*Id.*). Protesters began throwing rocks and then threw a Molotov cocktail toward police. (*Id.*). The

Page 31 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
        CLASS CERTIFICATION

Molotov cocktail exploded in front of the police line, igniting a protester's legs on fire. (*Id.*.),
PPB declared a riot in light of the number of projectiles and the danger from the Molotov
cocktail. (*Id.*). Tear gas was authorized to be deployed only on hard surface streets due to the fire
danger. (*Id.*). After the riot declaration, protesters threw two more Molotov cocktails and several
illegal fireworks towards officers. (*Id.*). PPB officers deployed tear gas. (*Id.*).

Protesters continued to throw rocks at officers. (*Id.*). A dumpster was lit on fire. (*Id.*).
Officers pushed protesters past the fire, allowing PF&R to put the fire out. PPB and OSP officers
were injured, including burns and concussions. (*Id.*). PPB did deploy tear gas on September 5,
2020. (*Id.*).

## II.   Portland's policy and practice of using less lethal munitions during crowd control.

Section IV of the Motion outlines Plaintiffs' policy and practice claims against the City.
(ECF 252, Mot. at 30-46). As discussed below, evidence of an alleged policy or practice are
relevant to Plaintiffs' *Monell* claims, but do not create common questions that drive resolution of
the underlying claims. The City briefly addresses these factual allegations, but intends to fully
litigate Plaintiffs' *Monell* claims at the appropriate time; later in this litigation.

## 1.   PPB Directive 1010.00, 635.10, and additional limitations on use of force.

In part A, Plaintiffs allege that the City has an unconstitutional written policy (PPB
Directives 1010.00 and 635.10). (*Id*. at 30-31). These allegations are largely not contained in
their Fourth Amended Complaint. (*See* Compl. at ¶ 99). Moreover, they inaccurately describe
PPB Directives.

PPB Directive 1010.00, at bottom, prohibits all uses of force that are not objectively
reasonable under the totality of the circumstances, consistent with *Graham*. Directive 1010.00
imposes further, additional limitations on specific types of force and specific tools.

Tear gas (2-chlorobenzalmalononitrile "CS gas," Oleoresin Capsicum Pyrotechnic "OC
pyrotechnic," OC vapor, and RBDDs containing OC) and RBDDs are both subject to the
additional limitations on riot control agents or area impact munitions in both PPB Directive

Page 32 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
            CLASS CERTIFICATION

1010.00 and 635.10.[10] If used for the purpose of crowd dispersal, these munitions must be authorized by the Incident Commander, following the declaration of a civil disturbance. Before ordering that a crowd be dispersed, the Incident Commander must consider whether dispersal would unduly endanger the public, police or participants of the crowd. If used to disperse a crowd, time permitting, there must be at least two warnings and a clear path or route of dispersal must be available to the crowd. Only then may tear gas or RBDDs be deployed "to prevent violence, injury or property damage and to avoid a greater application of force."[11] Tear gas and RBDDs cannot be used against protestors engaged in passive resistance that do not impede a lawful objective.

In addition to the restrictions on tear gas and RBDDs imposed by PPB directive, which incorporates constitutional limitations, Police Commissioner, Mayor Ted Wheeler, imposed greater limitations on the use of CS gas on June 6, 2020, directing PPB that "gas should not be used unless there is a serious and immediate threat to life safety, and there is no other viable alternative for dispersal." (ECF 19, Dobson TRO Decl. ¶ 16). Mayor Wheeler instructed that "gas should not be used to disperse crowds of non-violent protestors or for general crowd management purposes. It should only be used in response to violence that threatens life safety." (*Id.*). This Court subsequently issued the temporary restraining order on tear gas on June 6, 2020. (ECF 29).

In September 2020, Mayor Wheeler further restricted the use of CS gas for crowd control, requiring authorization from him or his designee, and limiting its use to instances where there are "facts showing an immediate risk of death or serious physical injury which cannot otherwise be safely addressed without a greater application of force." (Dobson Decl. ¶ 66).

Oregon House Bill 2928, which became effective July 19, 2021, further restricts the use

---

[10] ECF 141-1 are copies of PPB Directives 635.10 and 1010 in their entirety.

[11] There are other more direct uses of tear gas and RBDDs set forth in Directive 1010, but these uses would not be authorized for crowd dispersal, as contemplated by Plaintiffs.

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

of tear gas and RBDDs during crowd control events. HB 2928 effectively prohibits the use of RBDDs; prohibiting the use of a sound device other than announcements. (HB 2928, Section 2(2)(c)). HB 2928 replaced HB 4208, imposing greater limitations on the use of tear gas. HB 2928 limits the use of tear gas to circumstances constituting a riot pursuant to ORS 166.015. (Section 2(a)(A)). And it further limits the use to situations where the officer deploying tear gas reasonably believes that it is necessary to terminate the riot and prevent further riotous behavior. (Section 2(a)(B)). This latter restriction both limits when and the extent of the use. (*Id.*). Practically, particularly in light of the potential criminal liability arising from violations, HB 2928 substantially restricted the use of tear gas for crowd control.

The "targeted weapons" outlined in Plaintiffs' Motion are similarly subject to the constitutional restrictions set forth in *Graham* and additional restrictions in PPB Directives. As relevant to crowd control situations, impact munitions (FN303 and 40mm) can only be used in response to active aggression or to avoid a higher level of force (impact munitions may be utilized in situations where lethal force would be legally permissible). (ECF 141-1, Directive 1010, 6.4.2). The use of impact munitions in crowd control is further limited and should generally not be used without authorization from the Incident Commander. (Dobson Decl. ¶ 67). This authorization is not authorization to use a particular munition in a particular circumstance—that is governed by PPB Directives and *Graham*. Rather, because of the crowd dynamic that is present in crowd control, the Incident Commander may direct officers not to use force, even when such forth may otherwise be permissible, because the use of even reasonable force could have a negative impact on the overall crowd dynamic. (*Id.*).

Aerosol restraints (OC spray) are limited to situations where their use is objectively reasonable under the totality of the circumstances, and further restricted to situations where a person is engaged in physical resistance or indicates an intent to engage in physical resistance. (ECF 141-1, Directive 1010, 6.4.3.1.1). Officers must seek to minimize the exposure from the aerosol restraint against non-targeted individuals. Use of impact munitions and aerosol restraints

Page 34 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
　　　　　　CLASS CERTIFICATION

is further limited for crowd control: "Members shall not deploy specialty impact munitions or aerosol restraints indiscriminately into a crowd." (ECF 141-1, Directive 635.10, 10.2). HB 2928 imposed additional restrictions on the use of aerosol restraints and impact munitions during crowd control. First, aerosol restraints are subject to the same restrictions imposed on tear gas, as set forth above. (Section 2(1)(a)). Impact munitions are prohibited in crowd control except "against an individual engaged in conduct otherwise justifying the use of deadly physical force by a peace officer." (Section 2(2)(b)).

Batons when used as impact weapons, may only be used in response to active aggression (ECF 141-1, Directive 1010.00, 6.4.1.1.1).

## 2.    PPB Training

In part B, Plaintiffs argue that the City failed to properly train PPB members regarding use of force in crowd control. (ECF 252, Mot. at 31-33). Plaintiffs note the City's focus on teaching officers to articulate the totality of the circumstances justifying a use of force. (*Id.*). However, there is nothing unconstitutional about training officers to accurately articulate the reason they deployed force. Plaintiffs also note a slide from a training of RRT Grenadiers which inaccurately cite the district court decision in *Headwaters*, which was overturned. (*Id.*; Moede Decl. ¶ 19, Ex. 17, Deposition of Franz Schoening ("Schoening Depo"), 39:18-45:20). The City acknowledges that this slide cited bad caselaw. The City also recognizes that a slide included in 2018 RRT training materials was offensive and inappropriate. (ECF 252, Mot. at 12; Schoening Depo, 93:16-94:18). The inclusion of the latter slide in the training materials is the subject of a pending Internal Affairs investigation. (Bell Decl. ¶ 3). Plaintiffs must show for their *Monell* claim, however, that such slides were the driving force behind the class members' constitutional deprivations. This must be analyzed with respect to each claim.

## 3.    PPB's force reporting, audit, and review.

Similarly, in part C, Plaintiffs criticize the City for untimely completion of FDCRs and AARs and its failure to correct or retrain officers. (ECF 252, Mot. at 33-42). Plaintiffs rely

Page 35 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
        CLASS CERTIFICATION

largely on the City's own audit and training, conducted in July 2020, which were developed to remedy these very deficiencies. (*Id*.). The City does not dispute that the magnitude of the protests created unprecedented issues regarding force reporting and review. In fact, the City testified to the actions that PPB took, in real time, to rectify and address these issues. (Moede Decl. ¶ 25, Ex. 23, Deposition of Robert Simon, 11:19-13:04; 13:21-14:15:02). The City will further address specific claims regarding FDCRs, AARs or the City's EIS system when addressing the merits of Plaintiffs' *Monell* claims.

### 4.    PPB discipline policies

Finally, in Part D, Plaintiffs argue that [e]ven among American police departments, PPB is infamous in its complete lack of accountability when it comes to disciplining officers who use excessive force." (ECF 252, Mot. at 42-46). This is again an argument that may be relevant to Plaintiffs' *Monell* claims but does not advance the analysis of whether class certification is appropriate. First, Plaintiffs assert that IPR is unable to investigate misconduct. This misconstrues the City's testimony. In fact, the IPR director noted that it initially began a review on tear gas, and will complete that review in connection with the settlement with the United States Department of Justice. (Moede Decl. ¶ 20, Ex. 18, Deposition of Ross Caldwell ("Caldwell Depo"), 27:03-28:16 51:20-52:11).

Plaintiffs also highlight that at this time, no officer has not been disciplined as a result of this Court's contempt finding. (ECF 252, Mot. at 45-46). With respect to the IA investigation of *Incident 9*, the PPB investigator, upon close review of the full video footage, found the individual struck by the FN303 was picking up a canister of smoke, and not an unknown object. (Moede Decl. ¶ 21, Ex. 19, Investigation Memo). Moreover, the investigation concluded that the individual successfully picked-up the smoke canister before being struck. (*Id*.). It was based on these factual conclusions which differed from this Court's findings, and the Court's evaluation of (Incident 8), that PPB did not sustain the force as out of policy. (*Id*.). With regard to Incidents 2 and 3, which this Court found violated the Less Lethal Order, PPB's investigation remains

Page 36 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
         CLASS CERTIFICATION

pending. (Bell Decl. ¶ 4).

Plaintiffs also argue that the City is unconcerned with this finding. (ECF 252, Mot. at 46).

Not so. The City took the Court's contempt ruling seriously and acted quickly to implement the

Court's remedies. At the same time, each person in the disciplinary review process—an

employment review—must review the evidence before them and reach a conclusion, which

occurred with PPB's evaluation of Incident 9 after reviewing the full video footage and

determining that the person picked up a smoke cannister. (Moede Decl. ¶ 22, Ex. 20, Deposition

of Jeffrey Bell ("Ex. 20, Bell Depo"), 161:17-163:10). Finally, while Plaintiffs argue that IA and

IPR are not going to do anything, it is undisputed that PPB has sustained violations of policy

from the protests of 2020, that pending investigations remain open, and that IPR will conduct

additional investigations in connection with the DOJ Settlement. (Bell Decl. ¶ 6; Moede Decl. ¶

23, Ex. 21, Proposed XI – Addendum of Remedies).

## Legal Standard

Federal Rule of Civil Procedure 23 governs motions for class certification. Under that

rule, the party seeking certification "bears the burden of demonstrating that [it] has met each of

the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)." *Zinser v.

Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). To meet that burden, that party

"must affirmatively demonstrate [its] compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*,

564 U.S. 338, 349 (2011). The burden is not a "mere pleading standard"; the proponent of the

class "must be prepared to prove" that it has met the requirements of Rule 23. *Id*. at 350.

Plaintiffs must affirmatively demonstrate the Rule 23(a) prerequisites:

> **Prerequisites.** One or more members of a class may sue or be sued as
> representative parties on behalf of all members only if:
>     (1) the class is so numerous that joinder of all members is impracticable;
>     (2) there are questions of law or fact common to the class;
>     (3) the claims or defenses of the representative parties are typical of the
> claims or defenses of the class; and
>     (4) the representative parties will fairly and adequately protect the interests
> of the class.

Page 37 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
        CLASS CERTIFICATION

Plaintiffs must also satisfy the requirements of at least one of the three subdivisions of Rule 23(b). Here, Plaintiffs propose certification under Rule 23(b)(2), which requires them to affirmatively demonstrate that the City "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Failure to meet "any one of Rule 23's requirements destroys the alleged class action." *Rutledge v. Elec. Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir. 1975).

"Although not expressly required by FRCP 23, a proposed class must be ascertainable, meaning that 'membership must be determinable from objective, rather than subjective, criteria.'" *Ott v. Mortg. Invs. Corp. of Ohio*, 65 F. Supp. 3d 1046, 1064 (D. Or. 2014) (citation and quotation omitted); *see also Rodriguez v. Gates*, 2002 WL 1162675, at *9 (C.D. Cal. May 30, 2002) ("Requiring an objectively ascertainable class is important because without one, it will be unclear who is bound by the judgment and who has standing to enforce any resulting injunction against the defendant.").

### Discussion

Here, Plaintiffs' putative class and subclasses cannot certify. Under the Rule 23, Plaintiffs must affirmatively demonstrate that they have met *each* of the four prerequisites in Rule 23(a) with respect to the class and each subclass. *Zinser*, 253 F.3d at 1186; *see Officers for Justice v. Civil Serv. Comm'n of City and Cty. of San Francisco*, 688 F.2d 615, 630 (9th Cir. 1982) ("[E]ach subclass must independently meet the requirements for the maintenance of a class action."). They cannot.

First, the putative class and subclasses, as defined, do not satisfy commonality. Second, Plaintiffs cannot meet the prerequisite of typicality because the named Plaintiffs do not assert claims that are typical of other members of either the class or subclasses. Third, because of the fact-specific inquiry required for identification in the Targeted Weapons Subclass, plaintiffs cannot show numerosity with respect to this subclass. And fourth, for several reasons, Plaintiffs cannot fairly and adequately represent the interests of absent class members. As a result,

Page 38 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs' class cannot certify.

Even if they met the Rule 23(a) prerequisites, they would need to further demonstrate that they meet the requirements under Rule 23(b)(2). Again, they cannot. The Portland Police Bureau did not act or fail to act in a manner that applies generally to either the putative class or subclasses. This Court should, therefore, deny Plaintiffs' Motion.

Plaintiffs begin their legal argument citing nine cases for the proposition that "[t]he Court is not alone in addressing these issues." (ECF 252, Mot. at 62). However, three of the cases have been dismissed.[12] Four cases did not purport to be class actions.[13] In two of the putative class actions, the courts denied class certification without prejudice. *See Anti-Police-Terror Project, et al. v. City of Oakland*, 2021 WL 4846958 (N.D. Cal. Oct. 18, 2021); *Goyette v. City of Minneapolis*, 2020 WL 3056705 (D. Minn. June 9, 2020). Subsequently, in Oakland, the parties stipulated to a proposed class that is far more limited than the class or subclasses Plaintiffs seek to certify here. *Anti-Police-Terror Project, et al. v. City of Oakland*, 3:20-cv-03866-JCS (ECF 139). The court nonetheless requested supplemental briefing on issues of commonality and typicality. *Id*. (ECF 141). These cases do not offer any particular guidance to address class certification in this case.

## III.    Inadequate Class Definition

### 1.    Plaintiffs cannot broaden the class definition at this time.

As an initial matter, Plaintiffs request that the Court certify a First Amendment Class,

---

[12] *Williams, et al. v. Minneapolis*, No. 0:20-cv-01303-DSD-BRT (D. Minn.) (ECF 25 – stipulation of dismissal); *Ballew v. City of Chicago*, No. 1:20-cv-03422 (N.D. Ill.) (ECF 22 – stipulation of dismissal); *Indy 10 Black Lives Matter, et al. v. Indianapolis*, No. 1:20-cv-01660-JMS-DLP (S.D. Ind.) (ECF 63 – order dismissing case).

[13] *Williams et al v. City of Dallas Texas et al,* No. 3:20-cv-01526-L (N.D. Tex.) (ECF 39 – First Amended Complaint); *Ballew v. City of Chicago*, No. 1:20-cv-03422 (N.D. Ill.) (ECF 11 – Amended Complaint); *Indy 10 Black Lives Matter, et al. v. Indianapolis*, 1:20-cv-01660-JMS-DLP (S.D. Ind.) (ECF 1 - Complaint); *Black Lives Matter Seattle-King County et al v. Seattle*, No. 2:20-cv-00887-RAJ (W.D. Wash.) (ECF 1 – Complaint).

Page 39 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Indiscriminate Weapons Subclass, and Targeted Weapons Subclass which are not described in the Complaint. This is procedurally improper. "When a plaintiff desires to change the definition of the proposed class, the remedy is to seek leave from the court to amend the complaint, not to seek certification of a class different than the one described in the operative pleading." *Crosby v. Cal. Physicians' Service*, 498 F. Supp. 3d 1218, 1225 n.2 (C.D. Cal. 2020). The Plaintiffs must identify the class in their complaint, instead of asking the Court or the defendant to predict what additional groups of people might later be added to the class Plaintiffs seek to certify. *Id.*; *Urena v. Earthgrains Distribution, LLC*, 2017 WL 4786106, *3 n.2 (C.D. Cal. July 19, 2017); *Coughlin v. Sears Holdings Corp.*, 2010 WL 4403089, *2 (C.D. Cal. Oct. 26, 2010).

Here, Plaintiffs broadened their First Amendment Class and Fourth Amendment Subclasses for the first time in their Motion. Primarily the classes are no longer confined to any dates, while the class and subclasses defined in the Fourth Amended Complaint were limited to persons engaged in protests from May 25, 2020 to November 15, 2020. (Compl., ¶ 90). Moreover, the First Amendment Class is no longer confined to people who protested.

Importantly, all these changes come after five iterations of the Complaint and after the close of class discovery. (Moede Decl. ¶ 24, Ex. 22, Contempt Hearing Transcript ("Ex. 22, Contempt Hearing") 453:9-454:13) (noting that it is not fair to the City if the Court is asked to "just go through and find issues that may not have been raised by the parties"). These changes are improperly before this Court and are prejudicial to the City.

> ### 2.   The First Amendment Class is indefinite and impermissibly broad.

Plaintiffs new First Amendment Class definition fails to meet these requirements. First, it injects two subjective elements into the class definition. The class includes persons who "will engage in the future in protest activities" and it includes persons who "would like to engage in such protests but have not due to fear of being subjected to unlawful force by the Portland Police Bureau." (ECF 252, Mot. at 1). Whether a person will engage in future protest activities and whether another person feared a potential response by PPB both require the Court to make a

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

"subjective determination based on an individual's state of mind," to determine if an individual belongs in the class. *C.F. v. Lashway*, 2017 WL 2574010 (W.D. Wash. June 14, 2017) (noting the word "'desire' does not allow the Court to determine, based on objective criteria, who is included in the proposed class"). Such an individualized evaluation exceeds the definite and objective standard the Court must utilize.

Further, Plaintiffs' new First Amendment Class could include innumerable persons that attended "protest activities," of any size and location, but have not been subjected to any of the purported misconduct or sustained any injuries. In fact, it includes persons who have never protested at all.

### 3.    Fourth Amendment Subclasses

"Class members must be identifiable through 'a manageable process that does not require much, if any, individual factual inquiry.'" *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 2019 WL 3410382, at *11 (D. Or. July 29, 2019) (citation omitted). "Class definitions which require the court to determine the merits of every individual's claim to determine if they are within the class generally do not satisfy this requirement." *Rodriguez*, 2002 WL 1162675, at *9; *see also Shuford v. Conway*, 326 F.R.D. 321, 329–30 (N.D. Ga. 2018) (finding a class definition problematic where it "would require the Court to engage in individualized determinations in order to ascertain a person's membership in the class."). A class definition is not appropriate if the court would be required to "resolv[e] the merits of [an] individuals' claim" in order to "determine[] whether a particular individual is a member of the class." *Lyall v. City of Los Angeles*, 2010 WL 11549565, at *2 (C.D. Cal. May 18, 2010). Here, the definition of the Fourth Amendment Class would require an individual evaluation of protester conduct just to determine membership.

Here, both Fourth Amendment Subclasses are limited to "protestors who were engaging in passive resistance to the orders of police at the time force was used, and those that attempted to comply with the orders of the police, but does not include those who were engaging in conduct

Page 41 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

beyond passive resistance at the time force was used." (ECF 252, Mot. at 1-2). Even if there was

a common understanding of what constitutes passive resistance versus conduct beyond passive

resistance—there is not—identifying persons for membership in the class would require

evaluation of their particular conduct at the time they were impacted by force.

This fact-intensive inquiry would largely overlap with the inquiry into whether each

particular use of force was objectively reasonable. Plaintiffs' subclass definitions, which requires

individualized inquiry for membership, are not appropriate for class certification. Plaintiffs "have

impermissibly incorporated the substance of their claims into their class definition." *Lyall*, 2010

WL 11549565, *2; *Xavier v. Philip Morris USA Inc*., 787 F. Supp. 2d 1075, 1089-90 (N.D. Cal.

2011) (even when class definition is technically objective, court rejected definition where

identifying members would require subjective memories of events); *Lucas v. Breg, Inc.*, 212 F.

Supp. 3d 950, 973 (S.D. Cal. 2016) ("[A] class is not ascertainable where a court must

investigate the merits of individual claims to determine class membership, or if membership

depends upon subjective factors such as a prospective member's state of mind.").

The fact-intensive nature of the inquiry into passive resistance is demonstrated by

Plaintiffs' inconsistent responses about what type of conduct constitutes passive resistance.

Named Plaintiffs have wavered about whether persons throwing water bottles are included

within the Fourth Amendment Subclasses. (*See* Ex. 9, Belden Depo, 131:24-132:06 (throwing a

water bottle is passive resistance); Ex. 8, Dreier Depo, 114:17-115:01, 115:13-15 (explaining

that he was always engaged in passive resistance despite throwing a water bottle); Ex. 10,

Johnson Depo, 159:15-160:23 (explaining that what goes beyond passive resistance is not

generally known and would need to be evaluated by the Court); Ex. 11, Roberts Depo, 137:20-

138:20 (discussing how throwing water bottles toward the police can sometimes be passive and

sometimes not, depending on whether its "intended purpose is to cause harm"). The same

uncertainty exists with respect to persons setting fires. (Ex. 11, Roberts Depo, 139:01-19; Ex. 10,

Johnson Depo, 160:13-18; Ex. 12, Wrecksie Depo, 211:11-20); persons kicking smoke or tear

Page 42 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
       CLASS CERTIFICATION

gas canisters at police; (Ex. 8, Dreier Depo, 124:03-124:25); and persons damaging property (Ex.

11, Roberts Depo, 140:23-141:02; Ex. 10, Johnson Depo, 160:19-23).

Given the inability of named Plaintiffs to coalesce around the conduct that excludes

persons from participation in the Fourth Amendment Subclasses, evaluating such conduct with

respect to thousands of protesters would be impossible.

## IV.    Commonality: There are no common questions of law or fact that would drive resolution of the class claims.

A party seeking class certification "must be prepared to prove that there are *in fact* . . .

common questions of law or fact[.]" *Dukes*, 564 U.S. at 350 (emphasis in original). This

requirement "is easy to misread, since any competently crafted class complaint literally raises

common questions." *Id.* (citation and quotation omitted). "What matters to class certification . . .

is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-

wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.*

(citation and quotation omitted; emphasis in original). "Additionally, commonality requires the

plaintiff to demonstrate that the class members have suffered the same injury, which cannot

merely be the suffering of a violation of the same provision of law." *Civil Rights Educ. &

Enforcement Ctr. v. Hosp. Props. Tr.*, 317 F.R.D. 91, 100 (N.D. Cal. 2016) (citation and

quotation omitted).

In short, Plaintiffs' "common contention . . . must be of such a nature that it is capable of

classwide resolution—which means that determination of its truth or falsity *will resolve an issue

that is central to the validity of each one of the claims in one stroke*." *Dukes*, 564 U.S. at 350

(emphasis added). "[I]n the collective action context, what matters is not just *any* similarity

between party plaintiffs, but a legal or factual similarity material to the resolution of the party

plaintiffs' claims, in the sense of having the potential to advance these claims, collectively, to

some resolution." *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1115 (9th Cir. 2018)

(emphasis in original).

Page 43 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
         CLASS CERTIFICATION

Importantly, "[t]o assess whether the putative class members share a common question, the answer to which 'will resolve an issue that is central to the validity of each one of the [class members's] claims,' we must identify the elements of the class members's case-in-chief.'" *Parsons v. Ryan*, 754 F.3d 657, 676 (9th Cir. 2014); *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 968 (9th Cir. 2019) ("[T]o assess whether the putative class members share a common question, the answer to which will resolve an issue that is central to the validity of each one of the class member's claims, [courts] must identify the elements of the class member's case-in-chief."). Notably absent from the Motion is any indication of the elements of Plaintiffs' claims. When considered through the lens of the elements of Plaintiffs' claims, it is clear that their class and subclasses are individuals alleging violations of the same provisions of law based on loosely connected incidents but arising from unique and widely differing circumstances.[14]

1.      **First Amendment Class**

Plaintiffs' First Amendment Class is so broad and indefinite, as discussed above, that it belies the commonality of the class members. Most fundamentally, the First Amendment Class is not limited to persons who engaged in protected activity. (ECF 252, Mot. at 1 ("all people who would like to engage in such protests but have not due to fear of being subjected to unlawful force by the Portland Police Bureau").[15] It is not limited to persons who attended protests where

---

[14] Plaintiffs assert for both the First Amendment Class and the Fourth Amendment Subclasses, that the "truly dispositive common question" is the appropriate remedy, not whether the City is liable. By doing this, Plaintiffs attempt to write commonality out of the requirements for a Rule 23(b)(2) class. Plaintiffs assert that the dispositive question is "if the City of Portland has a practice, policy, or custom of engaging in discrimination against protestors based on the content of their message, what form of injunctive relief is necessary to change that practice, policy, or custom moving forward." (ECF 252, Mot. at 69; *see also* 71 ("here again, however, the truly operative question is whether, if there is a custom practice, or policy that results in violation of the Fourth Amendment against protestors, what injunctive relief is appropriate to remedy that unlawful policy."). Plaintiffs cite no case to support their position that a common remedy alone, without common questions regarding liability, satisfies commonality under Rule 23(a)(2).

[15] It is similarly not limited by geography to persons who protested or wanted to protest in Portland, OR.

Page 44 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
           CLASS CERTIFICATION

PPB officers were present. It is not limited to persons subjected to force by PPB officers. In short, it is not limited by any common experiences of the class members, but rather by a common legal theory. The common legal theory is insufficient to certify the class.

A First Amendment retaliation claim requires that Plaintiffs prove (1) they "engaged in constitutionally protected activity; (2) [the City's] actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the [City's] conduct—i.e., that there was a nexus between the [City's] actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). To succeed with a First Amendment retaliation claim, "plaintiff must allege facts 'ultimately enabling him to prove the elements of retaliatory animus as the cause of injury with causation being understood to be but-for causation.'" *Senn v. Multnomah Cty.*, 527 F. Supp. 3d 1255, 1265 (D. Or. 2021) (quoting *Lacey v. Maricopa Cty.*, 693 F.3d 896, 917 (9th Cir. 2012)).

Even for those members of the First Amendment Class who exercised their constitutionally protected right to protest in Portland, their differing experiences prevent a common answer to their retaliation claims. There have been scores of protests in Portland since May 25, 2020. (Dobson Decl. ¶¶ 59-61). There were protests opposing police violence that PPB did not monitor. (ECF 113, Dobson PI Decl. ¶¶ 16-17; Dobson Decl. ¶ 59). There were protests that PPB monitored, but where PPB officers never engaged with protesters—some of these protests involved marches with thousands of people that shutdown major roads and interstates, but did not involve physical violence or property damage. (ECF 113, Dobson PI Decl. ¶¶ 16-17; Dobson Decl. ¶ 60). There were protests where PPB officers knelt with protesters. (ECF 81, Krantz Decl. ¶6(a)). There were protests where PPB provided warnings and directions to protestors engaging in illegal activity, including throwing items and engaging in property damage, but where PPB did not respond or did not use force. (Dobson Decl. ¶ 61). There were protests where other law enforcement agencies, including federal law enforcement and MCSO

Page 45 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION

used force, but PPB did not. (*Id*. at ¶ 62). And there were protests in which PPB officers used force. (*Id*. at ¶¶ 7, 9, 13, 15, 17, 19, 21, 23-26, 28, 31, 32, 36, 37, 40-50, 52, 54-57). Some named Plaintiffs admit to these varied police responses. (Ex. 8, Dreier Depo, 113:25-114:15; Ex. 10, Johnson Depo, 151:18-152:14; 212:18-213:08 (attended several protests where PPB did not use force); Ex. 11, Roberts Depo, 134:01-16; Ex. 12, Wrecksie Depo, 200:04-201:13, 203:08-204:20 (noting that PPB "reacted differently at different times")).

Even protests requiring PPB response included wide ranging behavior among protesters. There were nights when protesters lit or attempted to light the outside of buildings on fire. (ECF 88, Passadore Decl. ¶¶39-44; Dobson Decl. ¶¶ 34, 41, 42, 54, 55, 56). There were nights that protesters broke into buildings and lit fires inside. (ECF 21, Reese Decl. ¶¶5-9; Dobson Decl. ¶¶ 32, 44). There were nights that protesters drew firearms, and there was even a night where a protester shot and killed another protester. (ECF 73, Dobson PI Decl. ¶ 31; Dobson Decl. 63). There were nights that protesters threw water bottles at police, as Plaintiffs acknowledge, but there were also nights where protesters threw Molotov cocktails, improvised explosives, rocks, cans, lit fireworks, paint, unknown liquids, glass bottles, and bricks. (ECF 21, Reese Decl. ¶¶10; Dobson Decl. ¶¶ 13, 17, 23, 26, 28, 31, 32, 39, 41, 42, 43, 44, 46, 48, 49, 50, 52 57). Named Plaintiffs also witnessed some of these different behaviors among members of the First Amendment Class. (Ex. 9, Belden Depo, 31:10-20; 55:16-24; 93:08-13; 99:09-23; 109:16-110:07; Ex. 8, Dreier Depo, 81:01-16; 82:10-83:21; 98:15-100:14; 115:09-15; Ex. 10, Johnson Depo, 48:23-49:03; 142:12-143:01; 187:07-188:22; 189:25-191:21; Ex. 11, Roberts Depo, 122:13-123:07).

Plaintiffs assert common questions for their First Amendment Class in the Motion.[16] While the questions are common, they cannot produce common answers that would resolve their

---

[16] Plaintiffs' common questions set forth in Plaintiffs' Motion diverge again from the common questions set forth in both their Complaint and interrogatory responses. (Compl., ¶ 94; *see, e.g.,* Ex. 3, Belden Rog. # 5-6).

Page 46 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

claim—that PPB officers retaliated against them in violation of the First Amendment.

Plaintiffs first ask whether the class was engaged in protected speech. (ECF 252, Mot. at 68). However, Plaintiffs point to no case supporting the theory that individuals electing not to engage in protected activity (i.e., those electing not to protest) have a First Amendment retaliation claim. "Absent such a showing of First Amendment protected activity, a complainant cannot sustain a claim of First Amendment retaliation." *Williams v. Town of Greenburgh*, 2006 WL 8461745, *10 (S.D.N.Y. Oct. 11, 2006); *see also Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020) ("A chilling of First Amendment rights can constitute a cognizable injury, so long as the chilling effect is not based on a fear of future injury that itself [is] too speculative to confer standing.") (citation and quotation omitted)).

Plaintiffs also ask whether the City's "aggressive tactics" would chill a person of ordinary firmness. (ECF 252, Mot. at 68). But the relevance of this question is not common to all class members. As discussed above, the First Amendment Class did not all experience the same tactical response by the City.

Next, Plaintiffs ask whether the content of the class's message was a substantial motivating factor in the City's "aggressive tactics." (*Id.*) Again, there is no common answer among the First Amendment Class. Some members of the class, with their message against police violence and white supremacy, never experienced any of Plaintiffs' alleged tactics. For those class members who were affected by PPB force, some threw Molotov cocktails, improvised explosives, fireworks, rocks and bottles at police officers, others lit buildings on fire, broke windows, and engaged in other violent actions. For those class members who engaged in violence and criminal activity, it will be a high bar to show that their speech motivated a particular PPB officer's response. The class also includes persons who protested and were subjected to force by federal law enforcement and other agencies. The federal law enforcement and other agencies are not parties in this case, and the City cannot defend the motivations or reasons for the federal government or other agencies using force against protesters in Portland in

Page 47 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

2020.

Plaintiffs' remaining three First Amendment Class common questions relate to the additional requirements for a *Monell* claim. As discussed below, commonality remains evasive with respect to the *Monell* elements. Moreover, even if some elements of Plaintiffs' *Monell* claim have common answers, such answers would not drive resolution of their First Amendment claims. *See Dukes*, 564 U.S. at 350.

## 2.    Fourth Amendment Subclasses

Plaintiffs demonstrate their misconception of the requirements of their Fourth Amendment claim when they explain that an individualized *Graham* analysis for each use of force is unnecessary. (ECF 252, Mot. at 75). Plaintiffs claim that individualized analysis is not necessary because they will prove that "the true purpose of all the force used was to disperse the crowd." (*Id.*). This inserts a subjective element into the *Graham* analysis that Plaintiffs cannot prove and that is not relevant. *See Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006) ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'" (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)); *Rodriguez v. Cty. of Los Angeles*, 891 F.3d 776, 797 (9th Cir. 2018) (explaining that subjective intent plays no role in Fourth Amendment excessive force analysis); *Graham v. Connor*, 490 U.S. 386, 396 (1989) ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.").

The Fourth Amendment allows police officers to use reasonable force in carrying out law enforcement duties. *See Graham*, 490 U.S. at 396. A claim for excessive force under the Fourth Amendment requires consideration of "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them[.]" *Id.* at 397. Police officers are not "required to use the least intrusive degree of force possible" as long as the force used was reasonable. *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994). And "[t]he

Page 48 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
           CLASS CERTIFICATION

'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396.

Fundamentally, reasonableness involves balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner,* 471 U.S. 1 (1985)). Such an inquiry requires the Court to answer "whether the totality of the circumstances justified" the use of force. *Garner,* 471 U.S. at 8-9. An excessive force claim is analyzed in three steps. *Williamson v. City of National City,* 2022 WL 201071, *3 (9th Cir. Jan. 24, 2022). First, the Court evaluates the severity of the intrusion with reference to "the type and amount of force inflicted." *Id.* Second, the Court identifies the government's interests that were furthered by the use of force. *Id.* In the final step, the Court balances "the gravity of the intrusion on the individual and the government's need for that intrusion" *Id.* (quoting *Rice v. Morehouse,* 989 F.3d 1112, 1121 (9th Cir. 2021)).

"Determining the reasonableness of an officer's actions is a highly fact-intensive task for which there are no *per se* rules." *Torres v. City of Madera,* 648 F.3d 1119, 1124 (9th Cir. 2011). Here, where Plaintiffs ask the Court to evaluate the reasonableness of upwards of 6,000 separate uses of force, "the unmanageable dissimilarity injected by the uncommon would make the quest for a common Fourth Amendment answer quixotic." *Amador v. Baca,* 2014 WL 10044904, *2 (C.D. Cal. Dec. 18, 2014), *partially certified class decertified in Amador v. Baca,* 2016 WL 6804910 (C.D. Cal. July 27, 2016).

### 3.    Indiscriminate Weapons Subclass

Plaintiffs' first two common questions for the Indiscriminate Weapons Subclass do not result in common answers that would drive resolution of the case. Plaintiffs ask whether the use of tear gas constitutes a seizure, and, if so, how much tear gas is necessary to affect a seizure. (ECF 252, Mot. at 70). The City agrees that the use of tear gas to disperse a crowd when the situation has become a riot may not constitute a seizure under the Fourth Amendment. *See*

Page 49 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

*Torres v. Madrid*, 141 S. Ct. 989 (2021) ("A seizure requires the use of force *with intent to restrain*. Accidental force will not qualify. Nor will force intentionally applied for some other purpose satisfy this rule."). But this question, even if answered in the affirmative (as Plaintiffs' claim would require), would not drive resolution of the Indiscriminate Weapons Subclass's Fourth Amendment claims.[17] The answer to both of these questions may answer whether a seizure occurred, but it does not address the fact-intensive inquiry of whether the seizure was reasonable. *Graham*, 490 U.S. at 396 (applying the test for reasonableness "requires careful attention to the facts and circumstances of each particular case").

Plaintiffs' final common question demonstrates the uncommonality of the Indiscriminate Weapons Subclass. Plaintiffs question whether tear gas, deployed on twenty different nights, was justified. (ECF 252, Mot. at 70).[18] This includes nights when PPB did not deploy tear gas and omits nights when named Plaintiffs allege that PPB deployed tear gas. Between the Complaint, interrogatory responses, depositions, and the Motion, Plaintiffs identify 33 instances where PPB allegedly used tear gas. PPB actually deployed tear gas less than half of those nights. The following table illuminates the claims and facts for the 33 days:

---

[17] Conversely, a negative answer—that force not used with the intent to restrain protesters cannot violate the Fourth Amendment—could result in the common termination of the Indiscriminate Weapons Class's Fourth Amendment claims. *See Black Lives Matter D.C. v. Trump*, 2021 WL 2530722, \*20 (D.C.C. June 21, 2021) (noting that there is no clearly established law on "whether the use of tear gas to move members of a crowd can constitute a seizure.").

[18] While Plaintiffs' Indiscriminate Weapons Subclass purports to include persons impacted by RBDDs, Plaintiffs' commonality analysis looks only at tear gas. (ECF 252, Mot. at 1, 70).

Page 50 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
        CLASS CERTIFICATION

| Plaintiffs' Claims for Use of Tear Gas | | | | | |
|---|---|---|---|---|---|
| | Complaint | Interrogatory Responses | Depositions | Identified Generally in Class Motion (Mot., ECF 252, at 15, 70) | Tear Gas Deployed by City |
| 5/29/2020 | | X | X | X | TEAR GAS |
| 5/30/2020 | X | X | X | X | TEAR GAS |
| 5/31/2020 | X | X | | X | TEAR GAS |
| 6/1/2020 | | | | X | NO TEAR GAS |
| 6/2/2020 | X | X | X | X | TEAR GAS |
| 6/5/2020 | X | X | X | X | TEAR GAS |
| 6/6/2020 | X | | | X | TEAR GAS |
| 6/7/2020 | | X | X | | NO TEAR GAS |
| 6/9/2020 | X | | | | NO TEAR GAS |
| 6/10/2020 | | | X | | NO TEAR GAS |
| 6/12/2020 | | X | X | | NO TEAR GAS |
| 6/13/2020 | X | | | X | NO TEAR GAS |
| 6/15/2020 | | X | | | NO TEAR GAS |
| 6/26/2020 | | X | X | X | NO TEAR GAS |
| 6/27/2020 | | | | X | NO TEAR GAS |
| 6/30/2020 | | X | X | X | TEAR GAS |
| 7/3/2020 | | | X | | NO TEAR GAS |
| 7/4/2020 | X | X | X | X | TEAR GAS |
| 7/18/2020 | | | | X | NO TEAR GAS |
| 7/23/2020 | | X | X | | NO TEAR GAS |
| 7/24/2020 | | X | X | | NO TEAR GAS |
| 8/4/2020 | X | X | X | | NO TEAR GAS |
| 8/5/2020 | | | | X | TEAR GAS |
| 8/10/2020 | X | | X | | NO TEAR GAS |
| 8/12/2020 | | | X | X | TEAR GAS |
| 8/15/2020 | | | | | NO TEAR GAS |
| 8/19/2020 | | | | X | TEAR GAS |
| 8/21/2020 | | X | X | | NO TEAR GAS |
| 8/22/2020 | | X | X | X | TEAR GAS |
| 8/23/2020 | | | | X | TEAR GAS |
| 8/24/2020 | | | | X | TEAR GAS |
| 8/28/2020 | | X | | | NO TEAR GAS |
| 9/5/2020 | X | X | X | X | TEAR GAS |

Orange highlight indicates a date when Plaintiffs allege PPB deployed tear gas and PPB did deploy tear gas. Green highlight indicates a date where Plaintiffs identified PPB's use of tear gas in their Motion, but PPB did *not* deploy tear gas. Dates that PPB did *not* use tear gas, but Plaintiffs allege

Page 51 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

PPB used tear gas in the Complaint, interrogatories, or depositions (not identified in the Motion) are not highlighted.

(*See* Compl., ¶¶ 51, 54, 55, 59, 60, 64, 65, 66, 67, 68, 69, 71, 77; Ex. 3, Belden Rog. # 3, 12; Ex. 4, Dreier Rog. # 3, 12; Ex. 5, Johnson Rog. # 3, 12; Ex. 6, Roberts Rog. # 3, 12; Ex. 7, Wrecksie Rog. # 3, 12; Ex. 9, Belden Depo, 24:17-25:20 (6/9); 32:17-33:24; 39:20-40:04 (6/10); 54:03-14 (6/12); 62:20-68:16 (6/2); 89:22-91:22 (8/10); 95:01-11 (9/5); ; Ex. 10, Johnson Depo, 57:20-59:04 (6/5); 109:10-110:09 (7/4); 114:04-23 (8/4); 122:07-19 (8/12); 141:20-142:11 (9/5); Ex. 11, Roberts Depo, 13:15-14:06 (5/29); 20:19-21:06 (5/30); 31:07-32:23 (6/2); 70:11-17 (6/5); 73:02-05 (6/7); 77:01-04 (6/26); 79:01-11 (7/3); 85:06-12 (7/23); 90:10-12 (7/24); 96:24-97:01 (8/21); 103:05-08 (8/22); 108:09-11 (8/28); Ex. 12, Wrecksie Depo, 63:23-64:23 (6/30); ECF 113, Dobson PI Decl. ¶¶ 34-108; Dobson Decl. ¶¶ 7-57).

Further, the times that PPB did utilize tear gas were in response to widely varying circumstances. The facts outlined above demonstrate the varied circumstances. These included deploying gas in response: to protesters lighting buildings on fire (ECF 113, Dobson PI Decl. ¶¶ 21, 36-37; ECF 19; Dobson Decl. ¶¶ 44, 55); protesters throwing Molotov cocktails; (Dobson Decl. ¶ 57); and protesters throwing fireworks, rocks, bricks, hammers, and other projectiles. (*Id*. at ¶¶ 13, 44, 49, 52). In some instance, PPB was the sole agency that deployed tear gas (*Id*. at ¶ 41, 44), and in other instances, other law enforcement agencies deployed tear gas. (*Id*. at ¶ 31). At least one named Plaintiff acknowledged that the situations in which tear gas was deployed were factually different. (Ex. 9, Belden Depo, 129:15-129:22; 133:16-134:04 ("I do recognize that there were nights that active resistance was being used and that things such as Molotov cocktails were being thrown. But there were more nights that were peaceful, and so those don't have any factual similarities in terms of when they were used.")).

Based on these factually different circumstances over many days, Plaintiffs cannot prove a common answer to the question of whether or not the use of tear gas was objectionably reasonable for the entire Indiscriminate Weapons Class. *Dukes*, 564 U.S. at 350; *Chua v. City of Los Angeles*, 2017 WL 10776036, *7-8 (C.D. Cal. May 25, 2017) (finding no commonality between protesters who were kettled on two different nights, even when the reason for the protests were the same because "they occurred on different days, involved different people, as well as different police officers."). Without common answers to questions that would resolve claims in dispute, Plaintiffs have failed to satisfy the commonality requirement of Rule 23(a).

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

4.      **Targeted Weapons Subclass**

Plaintiffs' targeted weapons subclass purports to consist of class members who have been impacted by PPB's use of impact munitions, OC spray, or batons, but were not engaged in conduct beyond passive resistance at the time the force was used. (ECF 252, Mot. at 1). Plaintiffs' common questions for the Targeted Weapons Subclass relate entirely to their alleged *Monell* claim. These questions will not result in common answers that will drive resolution of Plaintiffs' claims.

Plaintiffs do not propose that a single common question would result in a common answer that would drive resolution of the individual Fourth Amendment claims of individuals who were affected by impact munitions, OC spray, or batons. To determine constitutionality, the Court must evaluate the reasonableness of thousands of separate interactions between individual protesters and hundreds of different officers.

Plaintiffs cite to *Headwaters Forest Def. v. Cty. of Humbolt*, 276 F.3d 1125 (9th Cir. 2002), *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012), and *Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1167 (2011) in support of their general contention that PPB's uses of OC spray, batons, and impact munitions were unconstitutional. (ECF 252, Mot. at 25). But these and other Ninth Circuit precedent do not support Plaintiffs' position that an individualized analysis of the reasonableness of each use of force is not required. Quite the opposite. In *Nelson*, the Ninth Circuit carefully analyzed "the lack of serious criminal behavior by Nelson, and the absence of exigency involved in the officers' desire to clear the apartment complex[.]" 685 F.3d at 880. The Court went on to note that officers never saw Nelson, or anyone near him, "throwing bottles or engaging in any other threatening or dangerous behavior." *Id*. Finally, the Court evaluated Nelson's level of resistance, noting that even if he had failed to comply with orders, "this single act of non-compliance, without any attempt to threaten the officers or place them at risk" would not support force under the third *Graham* factor. *Id*. at 882. *See also Young*, 655 F.3d at 1163-67 (court engaged in lengthy comparison of the governmental interest—noting absence of an immediate safety threat, the minor alleged criminal offenses, and the absence of resistance—to

Page 53 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
                    CLASS CERTIFICATION

the nature of the intrusion on Mr. Young's rights); *Headwaters*, 276 F.3d at 1130 (explaining pepper spray was "unnecessary to subdue, remove, or arrest," "officers could safely and quickly remove the protestors" from the protest site, and officers could remove the devices quickly without causing pain or injury).

The conclusion of whether a Fourth Amendment violation occurred, after a full analysis of the reasonableness of force given the totality of the circumstances, is dependent on the specific facts of the case. In *Felarca v. Birgeneau*, 891 F.3d 809 (9th Cir. 2018), the Court distinguished *Headwaters* and *Young*, concluding that specific baton strikes by officers attempting to remove protesters, who refused to leave and allow police to remove their tents, were objectively reasonable under the totality of the circumstances. *Id*. at 818-19. Similarly, in *Williamson*, the court emphasized that it "consider[s] the 'specific factual circumstances' of the case in classifying the force used." 2022 WL 201071, *4-6 . There, the court found that officers did not violate a protester's Fourth Amendment rights when they lifted and dragged her by her arms after she went limp. *Id*. at *2, 4 (plaintiff suffered a sprained wrist, mild swelling, and a torn rotator cuff); *see also Forrester*, 25 F.3d at 807-08 (physical pressure on the limbs of protesters engaged in passive resistance was reasonable to make arrest).

To understand the lack of commonality with respect to different officers' uses of force, the Court's Opinion & Order with respect to Plaintiffs' Amended Motion to Show Cause is instructive. (ECF 204). In its decision, this Court carefully examined nine instances where protesters were impacted by force used by PPB officers. In three of those incidents, the Court found that a single PPB officer's use of an FN303 against protesters violated this Court's Less Lethal Order. (ECF 204 at 16-18). In contrast, the Court found that three uses of impact munitions did not violate the Less Lethal Order because "kicking or throwing smoke canisters constitutes a threat or act of assault." (ECF 204 at 19). The Court also found that deploying a munition against an individual throwing an item at police or an individual lighting a dumpster fire did not violate the Less Lethal Order because both "reasonably constitute a threat or overt act

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

of assault and create a risk of injury to officers or others without intervention." (ECF 204 at 19). Finally, the Court concluded that an individual "grabb[ing] an officer's weapon during a physical altercation" could reasonably be interpreted as more than passive resistance and the use of OC spray did not violate the Less Lethal Order. (ECF 204 at 20).

Under Plaintiffs' theory for class certification, the individual analysis done by this Court with respect to those different uses of force is unnecessary. This is incorrect. An individualized analysis of the totality of the circumstances is necessary to evaluate whether *any* seizure is reasonable. While this is true for both the use of indiscriminate and targeted weapons, the overwhelming number of unique circumstances in which individual officers deployed "targeted weapons" underscores the lack of commonality.

Throughout the Complaint, interrogatory responses, depositions, and declarations, Plaintiffs have cited numerous separate incidents of impact munitions, OC spray, or baton uses, which they appear to contend violated protesters' Fourth Amendment rights. Many of those allegations are so vague, lacking date or location information, that evaluation of the circumstances is not possible. (*See e.g.*, Decl. of Mitchell Green (ECF 263), Decl. of Chase Lingelbach, ECF 266, ¶¶ 4-7, Decl. of Courtney Margolin (ECF 267); Wrecksie Depo, 98:14-100:12). Many others involve descriptions where a person partially witnessed interactions between law enforcement and an unknown individual. (*See, e.g.*, Ex. 11, Roberts Depo, 17:25-18:13; Ex. 10, Johnson Depo, 117:16-118:05; Decl. of Kathleen Mahoney, ECF 281, ¶ 25). It is impossible to evaluate the reasonableness of force based on these limited facts describing interactions between unknown persons and unknown law enforcement personnel. It is not possible here, nor has adequate discovery been completed, to address each of the incidents of force that Plaintiffs cite. However, examination of some of the allegedly unconstitutional force demonstrates that there are no common answers to the fundamental question of whether force was reasonable.

Plaintiffs allege that force occurred on nights when PPB officers did not deploy force or

Page 55 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION

did not deploy force at the location that Plaintiffs allege.[19] Declarant Lingelbach described being subjected to tear gas and being hit with a foam-tipped munition on June 6, 2020, at the PPA building in North Portland. (ECF 266, ¶¶ 8-13). PPB officers deployed downtown on June 6, 2020, and were not deployed near the PPA building at any point during that night. (Dobson Decl. ¶ 16). Declarant Nel provided an account of her experience on July 21, 2020, including being subjected to flash bangs, pepper spray, baton strikes, and less lethal munitions. (ECF 262, ¶¶14-25). But PPB did not deploy on July 21, 2020, or use any munitions. (Dobson Decl. ¶ 34). In short, even if Plaintiffs could prove that these individuals were impacted by force deployed by some law enforcement agency, as described, it would nonetheless not result in a claim against the City.

Other uses of force that Plaintiffs describe were likely deployed by other law-enforcement agencies. Further discovery, and fact-specific analysis, would be required to confirm who deployed the force and whether it was reasonable. For example, on June 19, 2020, Declarant Mahoney asserted that she "repeatedly saw PPB fired less lethal munitions into the crowd from behind the fence that surrounded the Justice Center." (ECF 281, ¶ 9). PPB did not deploy munitions from behind the fence surrounding the Justice Center on June 19, 2020. (Dobson Decl. ¶ 25). MCSO Deputies did deploy impact munitions at individuals that breached the fence. (*Id.*). And Declarant Garlick described being struck by a 40mm impact munition on June 26, 2020, deployed from behind the fence at the Justice Center. (ECF 50, at ¶¶ 12-14). This night, like many of the other nights in mid-June, PPB did not deploy munitions from behind the fence, but MCSO deputies did deploy from that location. (Dobson Decl. ¶ 27).

Even if Plaintiffs' allegedly unlawful uses of force were deployed by PPB officers, each use of force was deployed in response to dissimilar circumstances, just like the differences that this Court explored during the contempt hearing. Named Plaintiffs' own descriptions of the force

---

[19] The City addresses more of these instances, with respect to force allegedly used against named Plaintiffs, when addressing typicality.

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

used against them, without further analysis of the totality of the circumstances, demonstrates the differences. Mr. Roberts described being struck with an FN303 munition once when he reached down to pick up and throw a tear gas canister. (Ex. 11, Roberts Depo, 81:03-12). In contrast, Mr. Dreier described being struck with an impact munition while asking an officer to return his guitar. (Ex. 8, Dreier Depo, 77:16-78:13).

Throughout this case, testimony, responses to discovery, declarations, and videos provide contradictory information. The Court saw these inconsistent accounts during the contempt hearing. There, Mr. Greatwood testified that he slowly approached and bent toward a smoke canister that did not deploy, but was unable to pick up the canister. (Ex. 22, Contempt Hearing, 232:15-21; 248:19-249:19). "However, video of the incident shows Mr. Greatwood walking quickly toward the smoke canister and successfully picking it up." (ECF 204 at 11). Mr. Cleinman described in his declaration being pushed by batons and then pepper sprayed. (ECF 120, ¶ 6). He subsequently testified that he grabbed an officer's baton. (Ex. 22, Contempt Hearing, at 34:17-35:10).

Named Plaintiffs' discovery and testimony in this case have presented additional inconsistencies and variations in testimony. For example, Mr. Wrecksie stated in his interrogatory responses that he "has been struck by munitions that appeared to have been shot from a 40mm weapon in the area around the Justice Center in Portland in early or mid-June 2020." (Ex. 7, Wrecksie Rog. # 14). He subsequently testified that he does not recall being struck by a 40mm munition. (Ex. 12, Wrecksie Depo, 152:13-153:07). Similarly, in Ms. Johnson's interrogatory responses, she indicates that on June 5, 2020, she was subjected to tear gas, was struck by an FN303, was struck by the explosion of a 40MM munition, and may have been struck by an RBDD. (Ex. 3, Johnson Rog. #3). In her deposition, however, Ms. Johnson explained that she was not struck by either an FN303 or a 40mm less lethal munition. (Ex. 10, Johnson Depo, 76:17-25).

These instances demonstrate the fact-specific inquiry required to assess Fourth

Page 57 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Amendment claims, and the dispositive point that there is no common answer that drives the resolution of these claims asserted by Plaintiffs' Targeted Weapons Subclass. Individualized examination is necessary because there is no common answer to the question that drives resolution of these Fourth Amendment Claims—was a particular use of force objectively reasonable under the totality of the circumstances? *Graham*, 490 U.S. at 397.

## 5.  Asserting a *Monell* claim does not create commonality.

Plaintiffs try to get around the extraordinary differences within their First Amendment Class and each of the Fourth Amendment Subclasses by raising the elements of a *Monell* claim as their common questions. (ECF 252, Mot. at 68-71). In doing so they emphasize that the commonality requirement does not require that all questions be common. (*Id.* at 66). However, the cases that Plaintiffs rely upon to analyze whether there was a "single significant question of law or fact" did not ignore that the significant question must "yield a common answer that is 'apt to drive the resolution of the litigation' as required by rule 23(a)(2)." *Abdullah v. U.S. Sec. Associates, Inc.*, 731 F.3d 952, 962 (9th Cir. 2013). First Amendment and Fourth Amendment claims arising from numerous, varied factual circumstances will not have common answers that drive resolution of the claims. This is the case regardless of whether Plaintiffs can successfully demonstrate a policy, practice or custom by the City.

"To establish Monell liability, Plaintiffs must allege that: (1) they were deprived of a constitutional right; (2) the municipality had a policy, custom, or practice; (3) the policy, custom, or practice amounted to deliberate indifference of the plaintiffs' constitutional rights; and (4) the policy, custom, or practice was the "moving force" behind the constitutional violation." *Cantu v. City of Portland*, 2020 WL 2952972, at *3 (D. Or. June 3, 2020).

Here, Plaintiffs cannot achieve a common answer to the first question—whether the individual members of the class possessed a constitutional right of which they were deprived. As discussed above, this is because their First and Fourth Amendment claims arise out of hundreds of different uses of force by PPB. The answer to that question is fundamental to resolution of the

Page 58 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

claims.

The uniquely individual factual analysis necessary for Plaintiffs' claims is not the case with some other civil rights cases. For example, in *Parsons*, the Court analyzed an Eighth Amendment claim. There, plaintiffs did "not allege that the care provided on any particular occasion to any particular inmate (or group of inmates) was insufficient, but rather that the . . . policies and practices of statewide and systemic application expose all inmates in ADC custody to a substantial risk of serious harm." 754 F.3d at 676. This claim was based on the firmly established constitutional law that the Eighth Amendment does not require actual injury to occur. *Id.* at 676-77.

Plaintiffs point to no similar doctrine regarding either the First Amendment or Fourth Amendment. In fact, in *Amador*, the court explained that "Fourth Amendment analyses, which turn on the circumstances of individual searches, will differ when the circumstances of each search are decidedly different." 2014 WL 10044904, at *3. The Court went on to explain that the Eighth Amendment risk-of-harm doctrine applied in *Parsons*, was inapposite to a Fourth Amendment case, and is "the equivalent of trying to put a square peg through a round hole." *Id.* at *4; *see also B.R. v. Cty. of Orange*, 2017 WL 10525878, at *4 (C.D. Cal. Dec. 11, 2017) ("[E]ven if the common question proves the existence of a County policy, custom, or practice, the Court must still conduct an individualized inquiry into whether each member of the class suffered a constitutional violation."). Similarly, Plaintiffs point to no cases where a risk-of-harm doctrine is applied to First Amendment retaliation claims.

As *Dukes* requires, the Court must look to the ultimate question that drives the underlying legal merits of Plaintiffs' claims. *Amador*, 2014 WL 10044904, *5-6. In *Dukes*, the question was, "why was I disfavored," 564 U.S. at 352. For a Fourth Amendment claim, the question is whether the particular force was reasonable. *See e.g.*, *B.R.*, 2017 WL 10525878, at *4 ("Plaintiff's common question, at bottom, asks whether each class member suffered a Fourth Amendment violation. The issue of 'whether a search and seizure is unreasonable within the

Page 59 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
    CLASS CERTIFICATION

meaning of the Fourth Amendment depends upon the facts and circumstances of each case.'").

For a First Amendment retaliation claim, the questions are: was I engaged in protected activity,

was I "subjected to an adverse action by the defendant," and were the government actors

substantially motivated by my speech. *See Senn v. Multnomah Cty.*, 527 F. Supp. 3d 1255, 1265

(D. Or. 2021). Regardless of any alleged policy or practice by the City, these questions cannot

yield common answers where there are hundreds of actions in questions, taken by hundreds of

officers, in response to hundreds of nights, each involving different activity. *See e.g.*, *B.R.*, 2017

WL 10525878, at *5 (common question "does not produce a *common answer* because of the

individualized inquiries required" to assess the individual facts of each class member and

whether a policy caused a particular violation); *Mothersell v. City of Syracuse*, 289 F.R.D. 389,

395 (N.D.N.Y. 2013) ("[L]itigating the questions of whether a blanket policy or practice

regarding all-persons-present warrant clauses existed and, if so, whether it was constitutional,

will not resolve an issue that is 'central to the validity of the claims' of the prospective class

members.")

    "[W]hen named plaintiffs attempt 'to aggregate a plethora of discrete claims . . . into one

super-claim' against a government agency, without demonstrating 'that the class members have

been harmed in essentially the same way,' the proposed Rule 23(b)(2) class is deficient." *Ahmad*,

995 F.3d at 644 (citation omitted). In *Ahmad*, the Court explained that each of the "fact-

intensive" Fourth Amendment and First Amendment claims "requires different proof to establish

the alleged constitutional violation." *Id*. Plaintiffs here ignore the fact-intensive inquiries

necessary to litigate their First Amendment and Fourth Amendment claims. These inquiries drive

resolution of the claims and will certainly yield different answers for different class members.

## V.    Typicality: The class cannot certify because the City's unique defenses against Plaintiff would prejudice absent class members.

    "To determine whether claims and defenses are typical, courts often look to 'whether

other members have the same or similar injury, whether the action is based on conduct which is

Page 60 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
        CLASS CERTIFICATION

not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *McKenzie Law Firms, P.A. v. Ruby Receptionists, Inc.*, 2020 WL 1970812, at \*5 (D. Or. 2020) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). While the named Plaintiffs do not need to have injuries that are identical to those of other class members, they must have similar injuries, and "the injuries [must] result from the same, injurious course of conduct." *Parsons*, 754 F.3d at 685 (quoting *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001)). Here the named Plaintiffs' claims are not typical for largely the same reason that the class lacks commonality—the alleged injuries arise from hundreds or thousands of unique incidents that require individualized evaluation.

1.      **Named Plaintiffs do not experience the same types of alleged injuries as their over-broad First Amendment Class.**

First, since all of the named Plaintiffs have engaged in protests, none of the named Plaintiffs are part of the First Amendment Class of "people who *would like to* engage in such protests *but have not* due to fear of being subjected to unlawful force by the Portland Police Bureau." (ECF 252, Mot. at 1; emphasis added). The First Amendment claim of this other group of people is different than the claim raised by the named Plaintiffs. Similarly, named Plaintiffs only include individuals who were impacted by PPB uses of force; they do not include persons who were not impacted or protested without witnessing PPB intervention at all. They also do not include people who attended protests where only federal officers were present.

2.      **Named Plaintiffs' claims relate to force that PPB did not deploy.**

Many of the named Plaintiff's claims related to force used by federal law enforcement or other agencies, and not PPB. For example, Mr. Roberts testified that his claims include PPB's use of tear gas against him on thirteen nights. (Ex. 11, Roberts Depo, 13:15-14:06 (5/29); 20:19-21:06 (5/30); 31:07-32:23 (6/2); 70:11-17 (6/5); 73:02-05 (6/7); 77:01-04 (6/26); 79:01-11 (7/3); 85:06-12 (7/23); 90:10-12 (7/24); 96:24-97:01 (8/21); 103:05-08 (8/22); 108:09-11 (8/28)). Of those thirteen nights giving rise to Mr. Roberts' tear-gas-related claims against the City, PPB

Page 61 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

deployed tear gas on just six of those nights. (Dobson Decl. ¶¶ 7, 10, 13, 52; ECF 113, Dobson PI Decl. ¶¶ 37, 43, 44, 46, 56, 58, 63-70 (PPB did not use tear gas on June 26, July 3, July 23, July 24, August 21, or August 28)). Similarly, Mx. Belden alleged and testified that their claims against the City arise from six instances where PPB used tear gas. (Ex. 9, Belden Depo, 24:17-25:20 (6/9); 32:17-33:24; 39:20-40:04 (6/10); 54:03-14 (6/12); 62:20-68:16 (6/2); 89:22-91:22 (8/10); 95:01-11 (9/5)). PPB used tear gas on just two of those nights. (Dobson Decl., ¶¶ 10, 18, 19, 21, 46, 57; ECF 113, Dobson PI Decl. ¶¶ 63-70 (PPB did not use tear gas on June 9, 10, 12 or August 10)).

Similarly, Plaintiffs assert in their Motion that Ms. Johnson "was injured or otherwise exposed to indiscriminate violence and use of chemical agents and impact munitions by PPB" on June 28, 2020, (ECF 252, Mot. at 52-53) a night when PPB deployed no force. (Dobson Decl. ¶ 29). Ms. Johnson also indicated in her interrogatory responses that she was impacted by tear gas on June 15, 2020, at the Multnomah County Detention Center, (Ex. 5, Johnson Rog. # 3), but PPB officers did not deploy tear gas on that night. (Dobson Decl. ¶ 24).

Mr. Roberts testified that he was subjected to tear gas, concussion or flash grenades and rubber bullets deployed by PPB on July 3, 2020. (Ex. 11, Roberts Depo, 78:14-84:03). PPB did not deploy or use force on July 3, 2020. (Dobson Decl. ¶ 30). Mr. Roberts also provided a detailed description of being subjected to "tear gas; the pepper balls, or the FN303s . . . and the concussion grenades" on July 23, 2020. (Ex. 11, Roberts Depo, 85:03-88:25). PPB did not deploy or use any munitions on July 23, 2020. (Dobson Decl. ¶ 35). Mr. Roberts described being struck with an FN303 in the afternoon on August 22, 2020. (Ex. 11, Roberts Depo, 116:24-119:13; 161:11-19). Mr. Roberts explained that officers deployed from the Edith Green Federal Building one block south of the Justice Center firing FN303s into the trees and he was struck with a munition in the back of his arm. (*Id.* at 116:24-119:13). PPB did not use force downtown on the afternoon of August 22, 2020. (Dobson Decl. ¶ 51). Federal officers, however, did declare an unlawful assembly in downtown Portland around 2:50 p.m. on August 22, 2020. (*Id.*).

Page 62 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
        CLASS CERTIFICATION

Mr. Wrecksie described having a flash bang explode right by his feet on June 20, 2020, causing him to fall to the ground and be knocked unconscious. He also described being struck by batons while he was on the ground. (Ex. 12, Wrecksie Depo, 106:21-109:09). Upon review of the video of this incident and reports from June 20, 2020, it appears likely that the flash bang Mr. Wrecksie was impacted by was deployed by an MCSO deputy. (Dobson Decl. ¶ 26).

Plaintiffs' claims, many of which relate to force not deployed by PPB officers, are not typical of a class that purports to have been harmed by PPB's use of force.

3.    **Defenses specific to named Plaintiffs' claims.**

Under the typicality prerequisite, "a named plaintiff's motion for class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Named Plaintiffs face unique defenses due to their loss of material, relevant evidence.

Mx. Belden, who became a named plaintiff and putative class representative when this lawsuit was filed on June 5, 2020, carried out all their conversations related to the protest on Signal. (Ex. 9, Belden Depo, 87:07-25). They communicated regarding their experiences at protests on a messaging app that does not store text messages, guaranteeing that such information would be lost and not produced to the City. (Ex. 9, Belden Depo, 146:07-17). Ms. Johnson, who became a named plaintiff and putative class representative on June 24, 2020, similarly used Signal, resulting in all her text messages related to the protests—even those sent after she sued the City—being deleted. (Ex. 10, Johnson Depo, 16:03-20). Named Plaintiffs, after filing suit against the City, engaged in communications regarding the subject of the lawsuit via an application that deleted these relevant communications. This creates potential spoliation defenses unique to the named plaintiffs. *See F.T.C. v. Noland*, 2021 WL 3857413 (D. Ariz. Aug. 30, 2021); *Herzig v. Arkansas Found. for Medical Care, Inc.*, 2019 WL 2870106 (W.D. Ark. July 3, 2019).

Page 63 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
              CLASS CERTIFICATION

Ms. Johnson also took video of most of the protests that she attended. (Ex. 10, Johnson Depo, 28:13-29:20). These livestreamed videos were done through Facebook and Twitch. (*Id*). Despite discovery requests for these videos, and assurances from Plaintiffs' counsel that these videos will be produced, the City has not received downloaded copies of Ms. Johnson's livestreamed videos. (Ex. 13, Discovery Email). The City has been able to access videos from Ms. Johnson's Facebook account. (Moede Decl. ¶ 14). When accessing Ms. Johnson's Twitch account, the City has been unable to access any videos of the 2020 protests. (*Id*. at ¶ 15).

Plaintiffs Wrecksie and Roberts have also lost the journal records that they created recounting the protests of 2020. (Ex. 11, Roberts Depo, 151:11-21; 159:04-09; Ex. 12, Wrecksie Depo, 76:14-77:16). This loss of evidence and the City's related defenses are likely unique to named Plaintiffs, and addressing these issues would distract from the class claims.

**4.    Mr. Dreier admitted to engaging in conduct beyond passive resistance during the protests.**

In the Complaint, Plaintiffs define their Fourth Amendment Subclasses to exclude "those who engaged in conduct beyond passive resistance." (Compl., ¶ 90). As discussed above, Plaintiffs attempt to modify their class definitions to only exclude persons "engaged in conduct beyond passive resistance at the time force was used." Mr. Dreier testified to throwing a water bottle over the fence toward police officers. (Ex. 8, Dreier Depo, 143:25-145:10). If the Court declines to allow Plaintiffs to further modify their class definition at this time, Mr. Dreier is not a member of the Fourth Amendment Subclasses.

**VI.    Numerosity: The Targeted Weapons Subclass does not meet the numerosity requirement.**

"The central question [with regard to numerosity] is whether Plaintiffs have sufficiently identified and demonstrated the existence of the numbers of persons for whom they speak." *Schwartz v. Upper Deck Co*., 183 F.R.D. 672, 680-81 (S.D. Cal. 1999). "While there is no threshold number necessary to meet the numerosity requirement, the requirement cannot be met where the Court is unable to even estimate the number of class members." *In re Paxil Litig*., 212

Page 64 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

F.R.D. 539, 549 (C.D. Cal. 2003) (citation omitted).

Plaintiffs cannot show numerosity for their Targeted Weapons Subclass because the definition, as discussed above, requires an analysis of individual conduct, which cannot be conducted at this stage of litigation. Plaintiffs' reliance on tort claim notices and declarations, without allowing for a complete review of the facts and circumstances of each individual use of force, asks this Court "assume the proposed class into existence." *Sarmiento v. Sealy, Inc.*, 2020 WL 4458915, at *5 (N.D. Cal. May 27, 2020) (citations, brackets, and quotations omitted); *Shields v. Walt Disney Parks & Resorts US, Inc.*, 279 F.R.D. 529, 546 (C.D. Cal. 2011) ("[W]here evidence of numerosity is entirely lacking, the Court cannot substitute its imagination—no matter how commonsensical—in place of facts.").

## VII.   Adequacy: The proposed representative parties would not fairly and adequately protect the interests of the class.

Lastly, Plaintiff cannot meet the fourth Rule 23(a) prerequisite—adequacy. The adequacy prerequisite is crucial to ensuring "due process for absent members of the class." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 959 (9th Cir. 2009). The named Plaintiffs have not established that they are adequate representatives of the class or subclasses. Plaintiffs assert that the class representatives "understand the action, and they do not seek unique or additional benefits from this litigation." (ECF 252, Mot. at 73). In support of this contention, Plaintiffs cite to nearly identical, rote statements included in the named Plaintiffs' declarations. This general assertion of adequacy does not meet Plaintiffs' burden, especially when these assertions are unsupported by discovery.

Named Plaintiffs in this case *do* seek unique and additional benefits from this litigation— they seek money damages against the City that they do not seek for similarly situated class members. As discussed below, named Plaintiffs also show a lack of understanding regarding their claims and how they relate to the classes of persons they would represent. Finally, this case includes claims of an additional named Plaintiff that is neither a representative nor an apparent

Page 65 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

member of either the class or subclasses.

> **1.    Plaintiffs' interest in obtaining money damages for their alleged claims creates a conflict with the relief sought for the remainder class.**

The Supreme Court has explained that Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Dukes*, 564 U.S. at 360–61. Claims for monetary relief cannot be certified under Rule 23(b), "at least where (as here) the monetary relief is not incidental to the injunctive or declaratory relief." *Id*. at 360. Incidental monetary damages may include "statutory or punitive damages that do not turn on the individual circumstances of class members." *Algarin v. Maybelline*, LLC, 300 F.R.D. 444, 459 (S.D. Cal. 2014).

Plaintiffs will likely argue that they do not seek monetary relief for the class, bringing them outside of the purview of the analysis in *Dukes*. But this simply highlights the conflict. Named Plaintiffs each seek monetary damages for their individual claims against the City. (Compl. at 37-38). They also seek injunctive relief on behalf of themselves and the class. But they do not seek monetary relief for the class that allegedly suffered the same harms for which they personally seek monetary relief. In pursuing financial relief that may directly conflict with the interests of the class in obtaining injunctive relief, named Plaintiffs are not adequate class representatives.

> **2.    Plaintiffs do not adequately represent the interests of others who have filed similar lawsuits against the City.**

Plaintiffs' conflict is further evident in the potential risk that their lawsuit creates for class members that have separately pursued their own claims for both injunctive relief and damages against the City. The City currently has four pending lawsuits seeking injunctive relief in connection with alleged First Amendment or Fourth Amendment violations from the 2020 protests. (Moede Decl. ¶ 28). Plaintiffs in these other lawsuits fall squarely within the definition of Plaintiffs' First Amendment Class, and generally allege harms that would qualify them as members of Plaintiffs' Fourth Amendment Subclasses. (*Id*.). Further, the City has 23 open cases

Page 66 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

against individual officers and the City seeking damages in connection with incidents that occurred during protests in 2020. (*Id.* at ¶ 29). Based on Plaintiffs' broad class definitions, the allegations of many of these damages lawsuits would put the plaintiffs in those suits within Plaintiffs' proposed class and subclasses. Plaintiffs fail to address how class certification would impact these plaintiffs with pending litigation.

Other courts have expressed concerns in response to broad Rule 23(b)(2) classes. If Plaintiffs fail to prevail on their claim for injunctive relief, Supreme Court precedent has indicated that individual damages claims, at least in certain instances, may nonetheless proceed. *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984). But that does not resolve the potential conflict. As one court has noted:

> The Court is not concerned with what would happen if the class in this case is certified and *fails to prevail* on its class action for disparate treatment. Under *Cooper,* the class members could then bring individual suits for discrimination. What concerns the Court is the effect of a decision, if a class is certified, in which the class proposed here *prevails.* The Plaintiffs have dropped their claim for monetary damages, but have not dropped their claim for class-wide disparate treatment. If a Court certifies a class in this case and the class prevails on this issue, no one will receive compensatory or punitive damages because the seven Plaintiffs have unilaterally chosen not to seek them. Whether this bars the other class members from later seeking compensatory damages is an issue that greatly concerns the Court.

*Zachery v. Texaco Expl. & Prod., Inc.*, 185 F.R.D. 230, 243 (W.D. Tex. 1999).

District courts in the Ninth Circuit have expressed similar concerns. In *Anderson v. Seaworld Parks & Ent., Inc.*, the court expressed "reasonably heightened" concerns that a class action seeking only injunctive relief that "relies on the same facts as another, already-pending case that requests damages" could result in claim preclusion. 132 F. Supp. 3d 1156, 1167 (N.D. Cal. 2015), on reconsideration in part, 2016 WL 125510 (N.D. Cal. Jan. 12, 2016). In *Cholakyan v. Mercedes-Benz, USA, LLC,* the court noted that in seeking injunctive relief for the class, the class representative had "at a minimum, placed class members' ability to pursue individualized

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

claims for monetary relief in question." 281 F.R.D. 534, 565 (C.D. Cal. 2012)

("While *Cooper* indicates that under some circumstances individual damages claims remain available to class members even after an adverse judgment in a Rule 23(b)(2) class action, the Court clearly stated that a plaintiff could not relitigate the exact question that was adjudicated in the prior litigation."); *see also Montoya v. City of San Diego*, 2021 WL 5746476, at *9-10 (S.D. Cal. Oct. 20, 2021).

Even if there is some risk that a decision in Plaintiffs' favor could waive or bar the claims of other plaintiffs, it is an unnecessary risk given the number of other cases already pending. It is further unnecessary because certification of the class is not required for named Plaintiffs to seek injunctive relief. Another court, considering a similar case, was recently "left wondering about the necessity of pursuing this as a class action if the named Plaintiffs are seeking only injunctive and declaratory relief. . . . The relief sought remains available to the three named plaintiffs without the need to bind putative class members to a proposed settlement or trial result[.]" *Montoya*, 2021 WL 5746476, at *12; *see also Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th Cir. 1996) (explaining that injunctive relief can extend to persons beyond prevailing parties, even without a class action, "*if such breadth is necessary to give prevailing parties the relief to which they are entitled.*" (emphasis in original, citation and quotation omitted)).

### 3.    Named Plaintiffs have insufficient knowledge of their particular claims and the facts giving rise to them.

Class representatives must possess a general understanding of the case, their responsibilities, and the relief they are seeking. *Alberghetti v. Corbis Corp.*, 263 F.R.D. 571, 580 (C.D. Cal. 2010) ("One of this Court's duties is to ensure that the parties are not simply lending their names to a suit controlled entirely by the class attorney.") (citation and quotation omitted); *see also Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 154 (N.D. Cal. 1991) (certifying a class with "an essentially unknowledgeable" class representative would mean

Page 68 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
           CLASS CERTIFICATION

that the counsel would act on behalf of the class, which would "risk a denial of due process to the absent class members."). Additionally, "[t]he honesty and credibility of a class representative is a relevant consideration when performing the adequacy inquiry 'because an untrustworthy plaintiff could reduce the likelihood of prevailing on the class claims.'" *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010).

Many of the incidents giving rise to named Plaintiffs claims did not involve PPB's use of force, as discussed above. Mx. Belden's claims highlight these inconsistencies. They testified to being subject to tear gas on six nights – June 2, June 9, June 10, June 12, August 10, and September 5. (Ex. 9, Belden Depo, 20:17-27:22; 35:13-36:23; 54:3-23; 62:20-68:16; 86:5-18; 95:1-95:11). PPB did not deploy tear gas on June 9, June 10, June 12, or August 10. (Dobson Decl. ¶¶ 18, 19, 21, 46). A full two-thirds of Mx. Belden's allegations are not supported by the evidence. Insufficient understanding of even the facts giving rise to their personal claims shows that named Plaintiffs lack the knowledge necessary to adequately represent the class. *Rolex Emps. Ret. Tr. v. Mentor Graphics Corp.*, 136 F.R.D. 658, 666 (D. Or. 1991) ("[Plaintiff] is unfamiliar with the basic elements of the case, including what the allegations of the complaint are and which allegations of the complaint pertain to which defendants.").

**4.    Named Plaintiffs do not purport to be representatives of both Fourth Amendment Subclasses.**

Plaintiffs Belden, Wrecksie, and Dreier have inconsistently asserted which classes they purport to represent. In the Complaint, Plaintiffs allege that Plaintiffs Roberts, Belden, Johnson, Wrecksie and Dreier are all class representatives for the First Amendment Class, the Indiscriminate Weapons Subclass, and the Targeted Weapons Subclass. (Compl., ¶ 95). Mx. Belden purports to represent the Targeted Weapons Subclass despite having not alleged or asserted at any point that they were impacted by any of the targeted weapons. (Moede Decl. ¶ 26, Ex. 24, Belden Response to Request for Admissions # 4 and 6; Ex. 9, Belden Depo, 95:12-15; 103:10-104:04; 108:05-109:02).

Page 69 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
            CLASS CERTIFICATION

Mr. Dreier indicated in his interrogatory response and testified that he was not a representative of the indiscriminate weapons subclass, even though Plaintiffs' motion seeks to appoint him as a representative for the class and both subclasses. (Ex. 4, Dreier Rog. # 2; Ex. 8, Dreier Depo, 104:18-22). Mr. Wrecksie also only identified himself as a representative of the First Amendment Class and Targeted Weapons Subclass in his interrogatory response, (Ex. 7, Wrecksie Rog. # 2), but in deposition testimony he asserted that he was also a member and representative of the Indiscriminate Weapons Subclass. (Ex. 12, Wrecksie Depo, 205:01-17).

**5.      As a resident of Utah, Mr. Roberts' prospective claims for relief are moot.**

In light of the significant changes in protest activity, PPB responses to protests, and law, all claims for prospective relief are moot.[20] However, without reaching the general issue of mootness, Mr. Roberts, resides in Utah and has no current plans to move back to Portland. (Ex. 11, Roberts Depo, 147:12-149:07). Mr. Roberts does not face any non-hypothetical risk of future harm. *Nelsen v. King Cty.*, 895 F.2d 1248, 1250-51 (9th Cir. 1990).

"A representative whose individual claim becomes moot" while an action is pending may only continue to represent the class "if the class was duly certified *prior* to mootness." *Kennerly v. United States*, 721 F.2d 1252, 1260 (9th Cir. 1983) (emphasis added). Because Plaintiff Roberts' claims for prospective relief are moot, he is an inadequate representative of the class. *See Ellis v. Costco*, 657 F.3d 970, 984-86 (9th Cir. 2011) (addressing standing to seek particular relief as issues of typicality and adequacy).

**6.      Named Plaintiffs fail to define the contours of the classes.**

Each of the named Plaintiffs demonstrate "alarming unfamiliarity," *Stuart v. Radioshack Corp.*, 2009 WL 281941, at *10 (N.D. Cal. Feb. 5, 2009), with respect to the class that they seek to represent. This is perhaps understandable given the ongoing changes to the class definitions. With respect to the First Amendment Class, Mx. Belden explained "[n]ot every single person in

---

[20] The City will separately file a partial motion for summary judgment on the justiciability of Plaintiffs' claims for prospective relief.

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

the crowd is going to be part of the class." (Ex. 9, Belden Depo, 123:04-123:11). Mr. Dreier stated that the First Amendment Class "includes people who have . . . exercised or attempted to exercise their First Amendment rights in Portland in the time you specified and were met with police repression because of that reason." (Ex. 8, Dreier Depo, 108:08-109:14). Mr. Roberts indicated that a person's experience with PPB was not relevant, because they may have witnessed force and been "afraid to use their right to free speech." (Ex. 11, Roberts Depo, 131:24-132:09). Mr. Wrecksie testified that the First Amendment Class included persons protesting Israeli Occupation of Palestine and seeking to abolish ICE. (Ex. 12, Wrecksie Depo, 195:12-197:01; 198:18-198:24). Ms. Johnson stated that she doesn't have the "training, education, or experience to define a class," but it should be defined by the Court. (Ex. 10, Johnson Depo, 148:23-149:05).

As discussed above, *supra* [__], Plaintiffs similarly do not have a common understanding of the contours of their Fourth Amendment Subclasses, as there is no general agreement about what conduct constitutes passive resistance and what conduct is beyond passive resistance. Plaintiffs' inability to generally identify who they represent calls into questions their adequacy as class representatives. *See Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 154 (N.D. Cal. 1991) ("He apparently also is not entirely clear about who he seeks to represent: at various points in his deposition, he stated that the class would be composed of the defendants, purchasers only in Hawaii, or only purchasers located in San Francisco.").

**7.    Don't Shoot Portland is a named Plaintiff that shares a claim with the class, but is neither a representative nor member of the class.**

Plaintiff Don't Shoot Portland moves, with the other named Plaintiffs and a class of similarly situated individuals, for class certification. (ECF 252, Mot. at 1). However, Plaintiff Don't Shoot Portland has indicated in its responses to the City's discovery that it is not a representative of either the class or subclasses. (Moede Decl. ¶ 27, Ex. 25, Don't Shoot Interrogatory Response # 2). Based on the class definition, both previously proposed, and more

Page 71 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
              CLASS CERTIFICATION

recently changed, it does not appear that Don't Shoot Portland is a member of the class or the subclasses. Also, Don't Shoot Portland is not seeking damages for any harms arising from the protests. (Ex. 25, Don't Shoot Rog. # 11). "Implicit in [the adequacy standard] is the requirement that a proposed named plaintiff must herself be a member of the class she seeks to represent." *Blake v. City of Grants Pass*, No. 18-1823, 2019 WL 3717800, at \*5 (D. Or. Aug. 7, 2019). Don't Shoot Portland does not meet this requirement.

## VIII. The City did not act "on grounds that apply generally to the" First Amendment Class or either Fourth Amendment Subclass.

To certify a class under Rule 23(b)(2), Plaintiffs must show that the City "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Dukes*, 564 U.S. at 360 (citation omitted). A Rule 23(b)(2) class is not appropriate if "each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Id*. Here the Court should not certify the proposed class and subclasses because the alleged harm of the class members is not based on an act by the City that applies generally to the class, nor is the potentially appropriate injunctive relief the same for all class members.

Plaintiffs are correct that "[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples" for Rule 23(b)(2) certification. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). But the reason civil rights cases often work as Rule 23(b)(2) classes is because, "[t]he members of a (b)(2) class are generally bound together through preexisting or continuing legal relationships or by some significant common trait such as race or gender." *Ahmad*, 995 F.3d 644 (8th Cir. 2021) (citation omitted). This common characteristic among class members ensures that the defendant's "conduct is such that it can be enjoined or

Page 72 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360.

Here, Plaintiffs seek to broadly create a class and subclass of persons that are not bound by a common trait or legal relationship. In fact, their class consists of thousands of people with widely varied experiences, as discussed above. *See supra* [__]. Therefore, the class should be denied. *Jennings v. Rodriguez*, 138 S. Ct. 830, 851-52 (2018) (directing court of appeals to reconsider whether Rule 23(b)(2) class is appropriate for Due Process Claims, when the appropriate process is highly dependent on the particular situation). Plaintiffs cite to other protest cases where courts certified an injunctive class. However, those classes were more narrowly defined such that the entire class was impacted by a single police action or decision. The differences between this case, and cases upon which Plaintiffs rely demonstrates why certification is not appropriate here. In *Multi-Ethnic Immigrant Workers Org. v. City of Los Angeles*, the court certified an injunctive class for First Amendment and Fourth Amendment claims that arose from Los Angeles' declaration of an unlawful assembly and forceable dispersal at a single-night protest. 246 F.R.D. 621, 624 (C.D. Cal. Dec. 14, 2007). The Court noted that the LAPD command had declared the unlawful assembly, ordered the dispersal of the crowd, and authorized the use of force on the single night in question. *Id*. at 631. This was sufficient to demonstrate that they acted uniformly with respect to the class. *Id*. at 633. The class was also limited to members of specific organizations that had organized the protest. *Id*. at 625.

Three of the cases cited by Plaintiffs were classes of people arrested at a particular protest or for particular crimes at protests. *See Chang v. United States*, 217 F.R.D. 262, 267 (D.D.C. 2003) (class of persons arrested during protest on a particular day); *Washington Mobilization Committee v. Cullinane*, 400 F. Supp. 186, 190 n.2 (D.D.C. 1975) (class of individuals arrested during mass arrests, decided without analysis of class factors, where "defendants tacitly conceded the propriety of having this proceed as a class action"); *Sullivan v. Murphy*, 478 F.2d 938, 943 (D.C. Cir. 1973) (class of persons arrested during one week of protests with specific

Page 73 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION

characteristics). [21] The other cases cited by Plaintiffs similarly relate to a single, identifiable action or policy that applied the same to all members of the class. *See Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998) (considering the legality of a specific set of forms and procedures used by INS in document fraud cases nationwide); *In re Yahoo Mail Litigation*, 308 F.R.D. 577, 599-600 (N.D. Cal. 2015) (looking at single practice of uniformly intercepting, scanning, and disclosing the contents of emails to third parties).

    None of the classes in the cases Plaintiffs cite were defined by hundreds or thousands of different uses of force over scores of nights. Unlike a class arising from a single law enforcement decision—command-level decisions to disperse a crowd on a single night or mass arrest of an entire group engaged in unlawful conduct—Plaintiffs seek to certify a class arising from thousands of decisions made by hundreds of different officers.[22] Here, even though plaintiffs allege that PPB engaged in certain unconstitutional practices, "there is no evidence that every [plaintiff] has experienced the same challenged practice or suffered the same injury" due to the challenged policies or practices. *Willis v. City of Seattle*, 943 F.3d 882, 885–86 (9th Cir. 2019).

    Additionally, Plaintiffs' broad class definitions ensure that the plaintiffs within each class, even if entitled to an injunction, would not be entitled to *the same* injunction. *See Jennings*, 138 S. Ct. at 851-52 (remanding for reconsideration of class certification in light of *Dukes* where class members may not be similarly situated in their right to relief). A person impacted by an RBDD would not be entitled to an injunction limiting the City's use of tear gas. Similarly, a

---

[21] The City is not arguing that these types of cases are not appropriate for class certification. In fact, the City has previously stipulated to class certification of a class of individuals collectively detained based on reasonable suspicion that they had engaged in criminal activity. *Haber, et al v. City of Portland, et al*; No. 3:17-cv-1827 JR (D. Or.).

[22] Also notable, none of protest class certification cases considered the Supreme Court decision in *Dukes*, as they were decided prior to this seminal decision regarding class certification. *See also Northwest Immigrant rights Project v. United States Citizenship and Immigration Services*, 325 F.R.D. 671 n.22 (W.D. Wa. 2016) (noting that *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998) was decided more than a decade before *Dukes* set forth the rigorous analysis requirements for class certification).

Page 74 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
       CLASS CERTIFICATION

person impacted by OC spray, would not be entitled to an injunction related to the City's future use of impact munitions.

Both because Plaintiffs' claims do not arise out of a single action or decision by the City that applied to all of them, and because they would not be entitled to a common injunction, this Court should not certify the proposed class or subclasses.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Motion for Class Certification.

Dated:  February 2, 2022.

Respectfully submitted,

/s/ Naomi Sheffield
NAOMI SHEFFIELD, OSB 170601
Senior Deputy City Attorney
naomi.sheffield@portlandoregon.gov
J. SCOTT MOEDE, OSB 934816
Chief Deputy City Attorney
scott.moede@portlandoregon.gov
ROBERT YAMACHIKA, OSB 065560
Senior Deputy City Attorney
rob.yamachika@portlandoregon.gov
*Of Attorneys for Defendant City of Portland*

Page 75 – DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFFS' MOTION FOR
        CLASS CERTIFICATION