1           IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF OREGON

3                  PORTLAND DIVISION

4

5   DON'T SHOOT PORTLAND, a           )
    nonprofit corporation in its      )
6   individual capacity, et al.,      )
                                      )
7                      Plaintiff,     )   No. 3:20-cv-00917-HZ
                                      )
8               vs.                   )   July 14, 2021
                                      )
9   CITY OF PORTLAND, a municipal     )   Portland, Oregon
    corporation; MULTHOMAH COUNTY,    )
10  a political subdivision of the    )
    State,                            )
11                                    )
                       Defendants.    )
    _____

12

13

14              TRANSCRIPT OF PROCEEDINGS

15               (Telephone Conference)

16

17       BEFORE THE HONORABLE MARCO A. HERNANDEZ

18       UNITED STATES DISTRICT COURT CHIEF JUDGE

19

20

21

22

23  Court Reporter:        Ryan White, RMR, CRR, CSR/CCR
                           United States District Courthouse
24                         1000 SW 3rd Avenue, Room 301
                           Portland, Oregon 97204
25                         (503) 326-8184

Exhibit 1
Decl of Moede

2

```
 1                              APPEARANCES

 2

 3   For the Plaintiff:        OREGON JUSTICE RESOURCE CENTER
                               By:   JUAN C. CHAVEZ (by phone)
 4                             jchavez@orjc.info
                               Post Office Box 5248
 5                             Portland, Oregon 97208
                               (503) 944-2270
 6

 7   For Defendants:           PORTLAND CITY ATTORNEY'S OFFICE
                               By:   NAOMI SHEFFIELD (by phone)
 8                             naomi.sheffield@portlandoregon.gov
                               1221 SW 4th Avenue, Room 430
 9                             Portland, Oregon 97204
                               (503) 823-4047
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 1
Decl of Moede

1       (July 14, 2021; 3:01 p.m.)

2

3       P R O C E E D I N G S

4

5     THE COURT:  Good afternoon.  This is Judge Hernandez.

6 We're here in the matter of Don't Shoot versus City of Portland.

7 It is case number 20-cv-917-HZ.  This matter comes to the Court

8 by way of a discovery conference.

9     Let me take role and find out who is on the call.

10     Is there a court reporter?

11     THE COURT REPORTER:  Yes, Judge.  It's Ryan.

12     THE COURT:  We have a court reporter, and we also have

13 Jennifer, my courtroom deputy, on the call.

14     So let me turn to the plaintiffs and find out who's on

15 the call.

16     MR. CHAVEZ:  Good afternoon.  This is Juan Chavez.

17     THE COURT:  And for defendant?

18     MS. SHEFFIELD:  Hello, Your Honor.  This is Naomi

19 Sheffield for the City of Portland.

20     THE COURT:  Thank you.

21     I understand that our conversation this afternoon is

22 limited to how expansive the request for discovery should be; in

23 particular, how many nights of protests between, I think it was,

24 May and November that the plaintiffs should be entitled to

25 discover.  I read your joint statement on the discovery dispute.

Exhibit 1
Decl of Moede

1        Mr. Chavez, I'll turn to you.  Is there anything else

2   you want to tell me?

3        MR. CHAVEZ:  Only that I think that based on the

4   City's response -- which we put our statements together so we

5   didn't necessarily respond to one another -- I'd say that -- my

6   sense is that the City fundamentally disagrees with what we have

7   pled as our class definition.

8        And they'll have an opportunity to dispute that in

9   their response to our motion for class certification.  As well,

10  they could have filed a Rule 12 motion, but since that isn't the

11  case right now, I think what we're entitled to are the nights

12  that we've asked for and so -- at least based on our

13  submissions.

14        And I'm happy to answer any other further questions

15  the Court might have.  I think we're within our rights for that

16  discovery.

17        THE COURT:  My question is, the nights that are

18  actually at issue in your pleadings, you talked about specific

19  nights and I think there's 10 or 11 of them that are at issue,

20  and my question is, in that 10 or 11 nights, is it your position

21  that you will be able to establish typicality and commonality as

22  well as the other requirements with -- in utilizing those 11

23  nights?

24        MR. CHAVEZ:  Our position is that the *Monell*

25  violations extend between the pled periods between May and

Exhibit 1
Decl of Moede

1   November.

2            So -- and maybe just further kind of grounding this in

3   what the requested relief is, we're trying to certify an

4   injunctive relief class where the motivating predominant factor

5   is the City's pattern and practice that we allege in our

6   complaint.  And if we are providing dates in regards to the

7   plaintiffs who are pled, I think what that goes to is -- is

8   typicality, but also to the adequacy of those plaintiffs as well

9   as their standing.

10           So I think that probably better reflects what it is

11  that -- that's in the dates that we've provided in the

12  complaint; but otherwise, our class definition is meant to cover

13  that entire period.

14           THE COURT:  I recognize that.  And as far as the

15  *Monell* issue goes, it seems to me that if the plaintiffs are

16  able to establish a certain pattern and practice of behavior

17  over the course of 11 nights, then I think you get there.

18           But let me back up a second.  I mean, one of the

19  things that occurs to me is that establishing a class for

20  purposes of showing typicality, commonality, numerosity, and

21  whether or not your named plaintiffs are adequate, that you

22  should be able to do that given the discovery that would be

23  included in the 11 nights that you have alleged.  And then if

24  you are able to establish that you meet the requirements for

25  class certification, at that point all of the other discovery

Exhibit 1
Decl of Moede

1    that you're seeking may well become important.

2              But for purposes of just figuring out whether or not

3    you're able to certify a class or not, it seems to me that you

4    should be able to do that with the stated 11 nights that have

5    been put forth in the pleadings.  Am I wrong about that?

6              MR. CHAVEZ:  We'll certainly endeavor to prove it with

7    the 11 nights if that is what we are presented.

8              But I think also just highlighting where -- or what

9    the patterns and practices are, showing that -- again, that

10   there is inadequate training or inadequate discipline, those are

11   things that we can -- that our class claims would -- would be

12   benefited from and the Court would be -- would have the benefit

13   of reviewing the consistency of those deficiencies from the

14   record.

15             And I should also state that these are documents that

16   do exist, would likely be available through public records

17   requests, although that is probably an untimely way of dealing

18   with this, and these are records that were also provided to the

19   US Department of Justice.  There's reporting and I think

20   probably some prior testimony about that -- that case, and

21   there's letters and documents reflecting that those reports

22   exist and have been compiled and presented to the Department of

23   Justice.

24             THE COURT:  If you are concerned about establishing a

25   pattern and practice, I don't have any trouble with the notion

Exhibit 1
Decl of Moede

1   that, look, we want discovery from an episode that occurred in

2   May and we want one from -- one that occurred in July and

3   perhaps August, and one that occurred in November in order to

4   show that there wasn't any changes during the course of that.  I

5   don't see why something like that wouldn't resolve the issue

6   that you're concerned about, and that is establishing a pattern

7   and practice of bad behavior on the part of the defendants.

8          And if all of your 11 -- because I haven't looked at

9   them carefully -- are all squished together in one time frame, I

10  would be amenable to considering, well, let's get another time

11  frame that's a little bit farther out or a time frame that's a

12  little bit earlier on.  But that's different than saying I want

13  the City to produce in response to your request every single

14  document from every single night over the course of every night

15  where there was a protest between May and November.

16         And by the way, again, I think that ultimately you may

17  be entitled to all of that, but I don't know that all of that is

18  necessary for purposes of class certification.  And after class

19  certification, if you are successful in certifying a class, then

20  I think I agree with you, you may be entitled to all that

21  information, although I don't want to say that for sure, but at

22  least I think you've got a better argument.

23         MR. CHAVEZ:  Very good, Your Honor.  I guess if I

24  could segment now -- or ask by way of clarification, I guess,

25  the scope of the documents that the Court is considering, I

Exhibit 1
Decl of Moede

1   think -- I think we're generally talking about, you know, use of

2   force reports, after-action reports, those kinds of documents

3   that are typically created night after night of protest.  But

4   there are also documents from that time period regarding

5   training and discipline that I think we would likely be entitled

6   to and would probably not necessarily directly correspond to

7   nights that are particularly in the amended complaint.

8           So would the Court likely disallow discovery of those

9   discipline and training records?

10          THE COURT:  Let me hear from the City.  I haven't had

11  a chance -- given them a chance to weigh in yet.

12          Ms. Sheffield, what do you want to tell me?

13          MS. SHEFFIELD:  I guess I'll start with a few

14  additional things that I just wanted to raise kind of outside of

15  the joint statement and also a few of the issues that came up

16  from Mr. Chavez.

17          So I did want to provide a little clarification about

18  those documents.  It is my understanding they have not all been

19  provided to the US DOJ, a sampling has been, because the amount

20  is so voluminous that they agreed to a sampling of certain

21  nights.  And that sampling has also been made publicly

22  available, I believe, of the FCCRs that were provided to the US

23  DOJ.

24          I did want to go specifically kind of to the issue of

25  class certification and the questions of commonality and

Exhibit 1
Decl of Moede

1  typicality that plaintiff suggested all of these documents would

2  address because I think the City's position is that these

3  documents will give plaintiff pieces of thousands of individual

4  stories but won't get us any closer to the question of whether

5  the case is appropriate for class certification.

6        And I know plaintiffs' position is that their *Monell*

7  allegations are enough, the *Monell* allegation that the City has

8  a policy, pattern, or practice of engaging in indiscriminate

9  force.  And what I think is missing from that, though, is that

10  for a *Monell* allegations, there are two key individualized

11  analyses of particular uses of force that are necessary for

12  every *Monell* allegation.  Relating to force, it's going to be,

13  first, whether there was an unlawful -- the underlying use of

14  force was unconstitutional.  So you have to apply *Graham* to

15  every individual use of force in order to evaluate the

16  constitutionality even -- which the City doesn't believe that

17  plaintiffs can prove -- but even if the plaintiffs proved a

18  pattern or practice, any unconstitutional action requires an

19  individual analysis of the particular force.  That's not a

20  class; that's an individual analysis each time.

21        The City didn't act in one instance here.  The City

22  acted through individual police officers on hundreds of

23  different nights in different locations in response to different

24  protester activity and with dozens of different police officers

25  making different decisions.  And so doing that analysis of what

Exhibit 1
Decl of Moede

1    is reasonable under the totality of the circumstances, and that

2    is -- that is fundamental to a Fourth Amendment claim regardless

3    of the whether there's a *Monell* claim as well.

4            And then also on the *Monell* claim, in addition to

5    having to do that underlying constitutional evaluation, the

6    individual analysis of whether the alleged policy, custom, or

7    practice was the moving force or the cause of the constitutional

8    violation.  So even if there's a policy or practice, and even if

9    there's a constitutional violation, it has to have

10   caused -- that policy or practice that is proven has to be the

11   cause of it, and that, again, requires an individualized

12   analysis.

13           And this just gets at the problem that it's -- the

14   *Monell* discovery is not just co-existent with the class

15   discovery on questions of commonality.

16           And on issues of typicality, one issue I wanted to

17   raise that wasn't raised in the joint response is plaintiffs

18   have redefined their class numerous times.  They're at the

19   fourth amended complaint, and in their fourth amended complaint,

20   they define their Fourth Amendment class -- and this kind of

21   gets to the questions of typicality and whether discovery from

22   the City will resolve the issues.  They define their Fourth

23   Amendment class as protesters who engaged in passive resistance

24   but did not engage in conduct beyond passive resistance.

25           In response to the City's request for admissions,

Exhibit 1
Decl of Moede

however, the plaintiff representatives could not admit or deny whether they engaged in conduct beyond passive resistance.  None of them admitted or denied a request for admission on that topic.  Plaintiff Belden and Roberts stated that that is vague, unclear, and confusing, and in particular, it is not clear what conduct is included or excluded by what is "beyond passive resistance."  And similarly, Plaintiff Johnson said that passive resistance is undefined and ambiguous.

So the plaintiffs are seeking discovery from the City to resolve issues of typicality.  The issues of typicality arise because the plaintiffs cannot themselves determine whether they fit within their own class definitions, and therefore, whether their experiences are typical of that of other members of the class.

And the First Amendment class has similar problems. They broadly define their class as everybody who engaged in protest activity for that six-month period, the protest activity relating to police violence and white supremacy, and then they contend they need discovery on all other nights.  But plaintiffs, again, in admissions, admit that they're unaware of what every protest in Portland relating to police violence and white supremacy would include, and they object to answer -- object to admitting whether they attended all of the protests explaining -- their objection is, to the extent that it requires knowledge, awareness, or information about given

Exhibit 1
Decl of Moede

1    protests that may or may not have occurred in the designated

2    span.

3            Again, the City similarly does not know all of the

4    protest activity that occurred within the City during that span.

5    There were thousands of protests.  Many of them, probably the

6    majority, occurred without any police response.  There's no

7    documents that plaintiffs are requesting from the City that

8    would help us or the Court or plaintiff understand who was part

9    of that First Amendment class and whether the plaintiffs'

10   experiences are typical of those class members.

11           So the City's position is that this discovery is broad

12   discovery about everything that happened last summer, but it

13   doesn't address the fundamental issues that make class

14   certification in this case appropriate.

15           The one other thing I did want to note is Mr. Chavez

16   raised the possibility of -- they talked about use of force and

17   then they talked about IPR and IA investigations, disciplinary

18   investigations.  And I did want to note there are -- so just in

19   terms of numbers, there are a hundred -- or sorry -- 1,835,

20   approximately, FDCRs, force data collection reports, over that

21   period that cover over 6,400 applications of force.  There are

22   approximately 309 after-action reviews and there are

23   approximately 126 IPR or internal affairs investigations, and

24   many of them are a thousand pages long or more in those IPR

25   investigations, and the City has produced specific IPR or IA

Exhibit 1
Decl of Moede

1    files when plaintiffs requested them.  It is an objection to

2    this broad request for all documents that the City is objecting

3    to.

4              THE COURT:  Thank you.

5              It's not my intent today to determine whether or not a

6    class should be certified, it's just to determine what the scope

7    of discovery is.

8              Mr. Chavez, is there anything else that you want to

9    tell me?

10             MR. CHAVEZ:  I think the Court just addressed the

11   thing I was going to raise.  This is not necessarily the time

12   for a Rule 12 or response to a class certification motion.  But,

13   yeah, unless the Court has any further questions, I will rest.

14             THE COURT:  I am ordering that the temporal scope of

15   discovery be limited to the 11 nights that were set forth in the

16   pleadings, and if a class gets certified, we can revisit whether

17   or not additional discovery needs to take place.

18             Any questions from plaintiff?

19             MR. CHAVEZ:  Nothing further, Your Honor.

20             THE COURT:  Any questions from defense?

21             MS. SHEFFIELD:  No, Your Honor.

22             THE COURT:  Thank you.

23             That's all for this afternoon.

24

25        (The proceedings concluded at 3:20 p.m.)

Exhibit 1
Decl of Moede

```
 1                    C E R T I F I C A T E

 2

 3           I certify, by signing below, that the foregoing is a

 4    true and correct transcript, to the best of my ability, of the

 5    telephonic oral argument heard via conference call, taken by

 6    stenographic means.  Due to the telephonic connection, parties

 7    appearing via speakerphone or cell phone, speakers overlapping

 8    when speaking, speakers not identifying themselves before they

 9    speak, fast speakers, the speaker's failure to enunciate, and/or

10    other technical difficulties that occur during telephonic

11    proceedings, this certification is limited by the

12    above-mentioned reasons and any technological difficulties of

13    such proceedings occurring over the speakerphone at the United

14    States District Court of Oregon in the above-entitled cause.  A

15    transcript without an original signature, conformed signature,

16    or digitally signed signature is not certified.

17

18           DATED this 21st day of January, 2022.

19

20

21                          // Ryan White
                            _____
22                          RYAN WHITE
                            Registered Merit Reporter
                            Certified Realtime Reporter
23                          Expires 9/30/2022
                            Washington CCR No. 3220
24                          Expires 10/25/2022
                            Oregon CSR No. 10-0419
25                          Expires 12/31/2023
```

Exhibit 1
Decl of Moede

| From: | Sheffield, Naomi |
|---|---|
| To: | Jesse Merrithew; Moede, Scott |
| Cc: | J. Ashlee Albies; Franz Bruggemeier; Viktoria Lo; Juan Chavez |
| Subject: | RE: Class discovery conferral |
| Date: | Thursday, July 15, 2021 10:29:00 AM |

Jesse,

I don't think we fully agree on three of those dates, but we are happy to produce the documents for each of the dates. As well as June 30, which you didn't list, but I believe is the date from Mr. Wrecksie's allegations. I believe we have produced most or all of the May & June dates, but we are following-up with documents from the additional dates. I expect we will have those to you soon.

I'm happy to confer on class discovery closing and class certification deadline. I think the end of September should make sense. As you know, we are still waiting on discovery from plaintiffs, and I expect that we will need to confer on some of the discovery that you have objected to (I have been waiting until we have at least some of the documents to try to consolidate any discussions). We will also plan to notice depositions of the class representatives once we have received all of the written discovery.

Best,
Naomi


**NAOMI SHEFFIELD | Senior Deputy City Attorney** (She/Her)
**PORTLAND OFFICE OF THE CITY ATTORNEY**
1221 SW Fourth Avenue, Room 430
Portland, OR 97204
Voice: 503-823-3122 | Fax: 503-823-3089
naomi.sheffield@portlandoregon.gov


***Equal Access Notice:*** *The City of Portland operates without regard to race, color, national origin, religion, sex, sexual orientation, gender identity, marital status, age or disability* **according to all applicable** *non-discrimination laws, Title VI of the Civil Rights Act, and Title II of the ADA. To help ensure equal access to City services, the City will provide translation and interpretation and will reasonably modify policies or procedures and provide auxiliary aids or services to persons with disabilities. For such requests please click here or call (503) 823-2559, TTY 503-823-6868 or Oregon Relay Service: 711.*
***Portland City Attorney Confidentiality Notice:*** *This message may contain confidential or legally privileged information belonging to the sender. If you have received this message by mistake, please immediately notify the sender, delete the original message, and destroy all copies.*

**From:** Jesse Merrithew <jesse@lmhlegal.com>

Exhibit 2
Decl. of Moede
Page 1 of 2

**Sent:** Wednesday, July 14, 2021 4:41 PM
**To:** Sheffield, Naomi <Naomi.Sheffield@portlandoregon.gov>; Moede, Scott
<Scott.Moede@portlandoregon.gov>
**Cc:** J. Ashlee Albies <ashlee@albiesstark.com>; Franz Bruggemeier <fbruggemeier@ojrc.info>;
Viktoria Lo <viktoria@lmhlegal.com>; Juan Chavez <jchavez@ojrc.info>
**Subject:** Class discovery conferral

Hi Naomi –

We need to confer on a couple issues. Based on Hernandez's order today, we need to get new dates
for class discovery close and deadline for filing the motion for class certification. Looking at
sometime in September?

As we understand it, Hernandez is allowing discovery for each of the dates specifically listed in the
complaint. We have those dates as: 5/29, 5/30, 5/31, 6/1 6/2, 6/5, 6/6, 6/9, 6/10 6/12, 6/13, 6/28,
7/4, 8/4 8/10, 8/13, 8/15-16, 8/16, 8/22, 8/23, and 9/5. Do you agree with that?

If yes, has the city provided all documents that it believes are responsive for these dates or is there
still more stuff coming?

FYI, I will reframe the 30b6 to comply with HZ's order and get that over to you by the end of the
week.

Jesse Merrithew
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland Oregon 97205
971-229-1241

Exhibit 2
Decl. of Moede
Page 2 of 2

**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
**Viktoria Lo**, OSB No. 175487
Email: viktoria@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241

**Juan C. Chavez**, OSB No. 136428
Email: jchavez@ojrc.info
**Brittney Plesser**, OSB No. 154030
Email: bplesser@ojrc.info
**Alex Meggitt**, OSB No. 174131
Email: ameggitt@ojrc.info
**Franz H. Bruggemeier**, OSB No. 163533
Email: fbruggemeier@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503 944-2270

**J. Ashlee Albies**, OSB No. 051846
Email: ashlee@albiesstark.com
**Whitney B. Stark**, OSB No. 090350
Email: whitney@albiesstark.com
**Maya Rinta**, OSB No. 195058
Email: maya@albiesstark.com
Albies & Stark LLC
1 SW Columbia St. Suite 1850
Portland, Oregon 97204
Telephone: (503) 308-4770

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DON'T SHOOT PORTLAND, et al., <br><br> Plaintiffs <br><br> v. <br><br> CITY OF PORTLAND, a municipal corporation, and MULTNOMAH COUNTY, a political subdivision of the State, <br><br> Defendants. | CASE NO. 3:21-cv-00146-YY <br><br> PLAINTIFF MISHA BELDEN'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES |

TO: Defendants City of Portland

PAGE 1 –   PLAINTIFF MISHA BELDEN'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 3
Decl of Moede

## GENERAL OBJECTIONS

1.      Plaintiff objects to Defendant's definitions, instructions, and interrogatories to the extent they seek to expand or alter obligations beyond those required by the Federal Rules of Civil Procedure or to any reference to a definition not contained within the Interrogatory or the preamble. Only terms actually used in the Interrogatory may be defined. LR 33-1(c).

2.      Plaintiff objects to any definition, instruction, or interrogatory that seeks information protected from discovery by the attorney-client privilege, the privilege applicable to work product or trial preparation material, or any other privilege or authority.

3.      Plaintiff makes these responses and objections without prejudice and with a reservation of all of their rights to amend, clarify, or modify their objections and responses as further information becomes available during the course of discovery.

4.      Plaintiff objects to these Interrogatories to the extent it requires Plaintiff to answer on behalf of third parties. Plaintiff also objects on the basis that the information requested is outside the scope of discovery because the request is not proportional to the needs of the case in light of Defendant's relative access to relevant information, its resources, the importance of the discovery in resolving the issues, and because the burden and expense of the proposed discovery outweighs its likely benefit.

5.      Plaintiff also objects to the extent the requests are duplicative, and the information is equally available to Defendant.

6.      Each of these general objections is incorporated into each of Plaintiff's specific responses as if they were set forth in full below.

PAGE 2 –     PLAINTIFF MISHA BELDEN'S RESPONSE TO DEFENDANT CITY OF
PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 3
Decl of Moede

## **INTERROGATORIES**

**REQUEST NO. 1:** The Third Amended Complaint purports to be a class action, with the class defined as "all individuals who currently or who will in the future engage in protest activities that follow the death of George Floyd opposing police violence and white supremacy. This includes protesters who engage in passive resistance to the orders of police, but does not those who engage in conduct beyond passive resistance." (Am. Compl. ¶ 44).  Identify any sub-classes in this class action.

**RESPONSE:  *See* Fourth Amended Complaint, ¶ 90.**

**REQUEST NO. 2:** Identify any class or sub-class for which you are a representative.

**RESPONSE: *See* Fourth Amended Complaint. Plaintiff Belden is a representative for the First Amendment Class and the Indiscriminate Weapons subclass and the Targeted Weapons subclass.**

**REQUEST NO. 3:** Identify, by date, time, and description, the events giving rise to each of your claims against the City.

**RESPONSE: Plaintiff Belden objects as vague, overly broad and unduly burdensome. *See* Fourth Amended Complaint, ¶¶ 54-61.**

**REQUEST NO. 4:** Estimate the number of persons in each class or sub-class for which you are a representative.

**RESPONSE: Plaintiff estimates there are thousands of people in the First Amendment Class, and at least 300 in the weapons subclasses.**

**REQUEST NO. 5:** Identify all common questions of law for each class or sub-class for which you are a representative.

**RESPONSE: See Fourth Amended Complaint, ¶¶ 87-97.**

**REQUEST NO. 6:** Identify all common facts for each class or sub-class for which you are a representative.

PAGE 3 –    PLAINTIFF MISHA BELDEN'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 3
Decl of Moede

**RESPONSE: See Fourth Amended Complaint, and in particular ¶¶ 87-97.**

**REQUEST NO. 7:** Identify all of your claims that you believe are typical of the claims for each class or sub-class for which you are a representative.

**RESPONSE: See Fourth Amended Complaint.**

**REQUEST NO. 8:** For any class or sub-class for which you are not a representative, identify the representative parties for that class or sub-class.

**RESPONSE: Nicholas Roberts, Misha Belden. Alexandra Johnson, Lester Wresckie, and Thomas Dreier.**

**REQUEST NO. 9:** Describe how the City, through PPB, has acted in a manner that applies generally to the members of the class or sub-class that you represent.

**RESPONSE: See Fourth Amended Complaint.**

**REQUEST NO. 10:** Describe any injunctive relief that you seek on behalf of the class or sub-classes that you represent.

**RESPONSE: Plaintiff Belden seeks a permanent injunction prohibiting the City of Portland from using tear gas as a crowd control measure; a permanent injunction prohibiting the City of Portland from using "less lethal" weapons, including but not limited to OC spray or munitions, impact munitions, LRAD, sound cannons, etc., against protestors who are only engaged in passive resistance, including passive resistance to an order to disperse. In any case where PPB uses less lethal weapons, they must insure that no person who is engaged in only passive resistance is impacted or affected by those weapons.**

**REQUEST NO. 11:** To the extent you denied any of Admissions 1-3, identify all economic and non-economic harm for which you seek damages.

**RESPONSE: Plaintiff Belden seeks compensation for the emotional distress and fear caused by PPB's conduct.**

**REQUEST NO. 12:** Identify the date and location of every instance in which you have been

PAGE 4 –     PLAINTIFF MISHA BELDEN'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 3
Decl of Moede

exposed to "tear gas" deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: From approximately May 29, 2020, through approximately October 2020, Plaintiff has been exposed by tear gas deployed by Defendant City at least the majority of times they attended protests.**

**REQUEST NO. 13:** Identify the date and location of every instance in which you have been struck by an FN303 munition deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: From approximately May 29, 2020, through approximately October 2020, Plaintiff has not been struck by an FN303 deployed by Defendant City.**

**REQUEST NO. 14:** Identify the date and location of every instance in which you have been struck by a 40mm munition deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: From approximately May 29, 2020, through approximately October 2020, Plaintiff has not been struck by a 40mm munition deployed by Defendant City.**

**REQUEST NO. 15:** Identify the date and location of every instance in which you have been struck by an RBDD deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: From approximately May 29, 2020, through approximately October 2020, Plaintiff has been exposed to and affected by multiple RBDDs deployed by Defendant City.**

**REQUEST NO. 16:** Identify the date and location of every instance in which you have been

PAGE 5 –    PLAINTIFF MISHA BELDEN'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 3
Decl of Moede

exposed to a Long Range Acoustical Device deployed in any manner other than an announcement, by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: From approximately May 29, 2020, through approximately October 2020, Plaintiff has not been exposed to a Long Range Acoustical Device deployed in any manner other than an announcement by Defendant City.**

**REQUEST NO. 17:** Identify the date and location of every instance in which you have been subject to OC spray (pepper spray) deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: From approximately May 29, 2020, through approximately October 2020, Plaintiff has been exposed to and affected multiple times by OC spray deployed by Defendant City.**

**REQUEST NO. 18:** Identify the date and location of every protest that you have attended in the City from May 25, 2020 to present.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: Plaintiff has attended 2-3 protests per week from May 29, 2020, to October 2020 at the following locations: in and around Downtown Portland; the area in and around SW 3rd Avenue and SW Main Street; the East Side Police Station on E Burnside Street and SE 47th Avenue and the surrounding neighborhood; the area around the Southeast Police Station; in and around Ventura Park; and possibly others.**

      Dated:  June 7, 2021.


                               *s/Franz Bruggemeier*        
                               **J. Ashlee Albies**, OSB No. 051846

PAGE  6 –     PLAINTIFF MISHA BELDEN'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 3
Decl of Moede

**Whitney B. Stark**, OSB No. 090350
**Maya Rinta**, OSB No. 195058
Albies & Stark LLC
**Jesse Merrithew**, OSB No. 074564
**Viktoria Safarian**, OSB No. 175487
Levi Merrithew Horst PC

**Juan C. Chavez**, OSB No. 136428
**Brittney Plesser**, OSB No. 154030
**Alex Meggitt**, OSB No. 174131
**Franz H. Bruggemeier**, OSB No. 163533
Oregon Justice Resource Center
**Attorneys for Plaintiffs**

PAGE  7 –    PLAINTIFF MISHA BELDEN'S RESPONSE TO DEFENDANT CITY OF
PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 3
Decl of Moede

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **PLAINTIFF MISHA BELDEN'S**

**RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF**

**INTERROGATORIES**  via E-mail on the parties listed below.


J. SCOTT MOEDE, OSB 934816
Chief Deputy City Attorney
scott.moede@portlandoregon.gov
NAOMI SHEFFIELD, OSB 170601
Deputy City Attorney
naomi.sheffield@portlandoregon.gov
ROBERT YAMACHIKA, OSB 065560
Senior Deputy City Attorney
rob.yamachika@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430 Portland, OR 97204
Facsimile: (503) 823-3089
*Of Attorneys for Defendant City of Portland*

**DATED** this 7th day of June 2021


*/s/ Franz Bruggemeier*_____

Exhibit 3
Decl of Moede

**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
**Viktoria Lo**, OSB No. 175487
Email: viktoria@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241

**Juan C. Chavez**, OSB No. 136428
Email: jchavez@ojrc.info
**Brittney Plesser**, OSB No. 154030
Email: bplesser@ojrc.info
**Alex Meggitt**, OSB No. 174131
Email: ameggitt@ojrc.info
**Franz H. Bruggemeier**, OSB No. 163533
Email: fbruggemeier@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503 944-2270

**J. Ashlee Albies**, OSB No. 051846
Email: ashlee@albiesstark.com
**Whitney B. Stark**, OSB No. 090350
Email: whitney@albiesstark.com
**Maya Rinta**, OSB No. 195058
Email: maya@albiesstark.com
Albies & Stark LLC
1 SW Columbia St. Suite 1850
Portland, Oregon 97204
Telephone: (503) 308-4770

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DON'T SHOOT PORTLAND, et al., <br><br> Plaintiffs <br><br> v. <br><br> CITY OF PORTLAND, a municipal corporation, and MULTNOMAH COUNTY, a political subdivision of the State, <br><br> Defendants. | CASE NO. 3:21-cv-00146-YY <br><br> PLAINTIFF THOMAS DREIER'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES |

TO:  Defendants City of Portland

PAGE 1 –    PLAINTIFF THOMAS DREIER'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 4
Decl of Moede

**GENERAL OBJECTIONS**

1.    Plaintiff objects to Defendant's definitions, instructions, and interrogatories to the extent they seek to expand or alter obligations beyond those required by the Federal Rules of Civil Procedure or to any reference to a definition not contained within the Interrogatory or the preamble. Only terms actually used in the Interrogatory may be defined. LR 33-1(c).

2.    Plaintiff objects to any definition, instruction, or interrogatory that seeks information protected from discovery by the attorney-client privilege, the privilege applicable to work product or trial preparation material, or any other privilege or authority.

3.    Plaintiff makes these responses and objections without prejudice and with a reservation of all of their rights to amend, clarify, or modify their objections and responses as further information becomes available during the course of discovery.

4.    Plaintiff objects to these Interrogatories to the extent it requires Plaintiff to answer on behalf of third parties. Plaintiff also objects on the basis that the information requested is outside the scope of discovery because the request is not proportional to the needs of the case in light of Defendant's relative access to relevant information, its resources, the importance of the discovery in resolving the issues, and because the burden and expense of the proposed discovery outweighs its likely benefit.

5.    Plaintiff also objects to the extent the requests are duplicative, and the information is equally available to Defendant.

6.    Each of these general objections is incorporated into each of Plaintiff's specific responses as if they were set forth in full below.

PAGE 2 –    PLAINTIFF THOMAS DREIER'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 4
Decl of Moede

## **INTERROGATORIES**

**REQUEST NO. 1:** The Fourth Amended Complaint purports to be a class action, with the class defined as "all individuals who currently or who will in the future engage in protest activities that follow the death of George Floyd opposing police violence and white supremacy. This includes protesters who engage in passive resistance to the orders of police, but does not those who engage in conduct beyond passive resistance." (Am. Compl. ¶ 44).  Identify any sub-classes in this class action.

**RESPONSE:**  *See* **Fourth Amended Complaint, ¶ 90.**

**REQUEST NO. 2:** Identify any class or sub-class for which you are a representative.

**RESPONSE:** *See* **Fourth Amended Complaint. Plaintiff Dreier is a representative for the First Amendment Class and the Targeted Weapons subclass.**

**REQUEST NO. 3:** Identify, by date, time, and description, the events giving rise to each of your claims against the City.

**RESPONSE: Plaintiff Dreier objects as vague, overly broad and unduly burdensome.** *See* **Fourth Amended Complaint, ¶¶ 81-86.**

**REQUEST NO. 4:** Estimate the number of persons in each class or sub-class for which you are a representative.

**RESPONSE: Plaintiff estimates there are thousands of people in the First Amendment Class, and at least 300 in the weapons subclasses.**

**REQUEST NO. 5:** Identify all common questions of law for each class or sub-class for which you are a representative.

**RESPONSE:** *See* **Fourth Amended Complaint, ¶¶ 87-97.**

**REQUEST NO. 6:** Identify all common facts for each class or sub-class for which you are a representative.

**RESPONSE:** *See* **Fourth Amended Complaint, and in particular ¶¶ 87-97.**

PAGE 3 –     PLAINTIFF THOMAS DREIER'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 4
Decl of Moede

**REQUEST NO. 7:** Identify all of your claims that you believe are typical of the claims for each class or sub-class for which you are a representative.

**RESPONSE:** *See* **Fourth Amended Complaint.**

**REQUEST NO. 8:** For any class or sub-class for which you are not a representative, identify the representative parties for that class or sub-class.

**RESPONSE: Nicholas Roberts, Misha Belden. Alexandra Johnson, and Lester Wresckie.**

**REQUEST NO. 9:** Describe how the City, through PPB, has acted in a manner that applies generally to the members of the class or sub-class that you represent.

**RESPONSE:** *See* **Fourth Amended Complaint.**

**REQUEST NO. 10:** Describe any injunctive relief that you seek on behalf of the class or sub-classes that you represent.

**RESPONSE: Plaintiff Dreier seeks a permanent injunction prohibiting the City of Portland from using tear gas as a crowd control measure; a permanent injunction prohibiting the City of Portland from using "less lethal" weapons, including but not limited to OC spray or munitions, impact munitions, LRAD, sound cannons, etc., against protestors who are only engaged in passive resistance, including passive resistance to an order to disperse. In any case where PPB uses less lethal weapons, they must ensure that no person who is engaged in only passive resistance is impacted or affected by those weapons.**

**REQUEST NO. 11:** To the extent you denied any of Admissions 1-3, identify all economic and non-economic harm for which you seek damages.

**RESPONSE: Plaintiff Dreier seeks compensation for the emotional distress and fear caused by PPB's conduct.**

**REQUEST NO. 12:** Identify the date and location of every instance in which you have been exposed to "tear gas" deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome.**

PAGE 4 –    PLAINTIFF THOMAS DREIER'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 4
Decl of Moede

**Notwithstanding these objections and subject to them, Plaintiff responds as follows: From approximately June 2020 to September 2020, Plaintiff Dreier was exposed to teargas deployed by the City on an average of at least once or twice a week, which accounts for both weeks with heavier exposure to tear gas deployed by the City and breaks that Plaintiff Dreier took from participating in protests.  The locations where Plaintiff Dreier was exposed to tear gas may include the following locations and the areas around the locations: Downtown Waterfront, MCSO Penumbra Kelly Building, former Portland Police Association building on N. Lombard, Laurelhurst Park, Pioneer Square, Director Park, the Justice Center, the federal District of Oregon Courthouse, the Park Blocks, PPB North Precinct, while marching in various streets around the city, and Ventura Park.**

**REQUEST NO. 13:** Identify the date and location of every instance in which you have been struck by an FN303 munition deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: Plaintiff has not been struck by an FN303 deployed by Defendant City.**

**REQUEST NO. 14:** Identify the date and location of every instance in which you have been struck by a 40mm munition deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: Plaintiff was shot by PPB with a 40mm munition that hit his guitar on August 6, 2020, in or around Ventura Park. Plaintiff was shot by PPB with a 40mm munition in the upper thighs by PPB on August 15, 2020, across the street from the MCSO Penumbra Kelly Building on East Burnside.**

**REQUEST NO. 15:** Identify the date and location of every instance in which you have been struck by an RBDD deployed by an employee or agent of the City of Portland.

PAGE  5 –    PLAINTIFF THOMAS DREIER'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 4
Decl of Moede

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: From approximately May 29, 2020, through the present, Plaintiff has been exposed to and affected by multiple RBDDs deployed by Defendant City in many locations around Portland. See locations in response to Request 12, above.**

**REQUEST NO. 16:** Identify the date and location of every instance in which you have been exposed to a Long Range Acoustical Device deployed in any manner other than an announcement, by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: From approximately May 29, 2020, through the present, Plaintiff was exposed to a Long Range Acoustical Device deployed in a manner other than an announcement by Defendant City one time when the LRAD was used to produce a car alarm-type sound.**

**REQUEST NO. 17:** Identify the date and location of every instance in which you have been subject to OC spray (pepper spray) deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: Plaintiff Dreier was sprayed with a direct stream of OC spray to his eyes one time in the summer of 2020 near the former PPA building on N. Lombard. In addition, from approximately May 29, 2020, through the present, Plaintiff has been indirectly exposed to and affected multiple times by OC spray deployed by Defendant City against others.**

**REQUEST NO. 18:** Identify the date and location of every protest that you have attended in the City from May 25, 2020 to present.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows:**

PAGE 6 –    PLAINTIFF THOMAS DREIER'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 4
Decl of Moede

Plaintiff attended an average of about 2 to 3 protests per week from June 2020 through September 2020 and attended protests sporadically since September 2020. The locations where Plaintiff Dreier attended protests include the following locations and the areas around the locations: Downtown Waterfront, MCSO Penumbra Kelly Building, former Portland Police Association building on N. Lombard, Laurelhurst Park, Ventura Park, Pioneer Square, Director Park, the Justice Center, the federal District of Oregon Courthouse, the Park Blocks, PPB North Precinct, and marching through various streets around the city.

Dated:  August  28, 2021.

_____s/Franz Bruggemeier_____
**J. Ashlee Albies**, OSB No. 051846
**Whitney B. Stark**, OSB No. 090350
**Maya Rinta**, OSB No. 195058
Albies & Stark LLC
**Jesse Merrithew**, OSB No. 074564
**Viktoria Safarian**, OSB No. 175487
Levi Merrithew Horst PC

**Juan C. Chavez**, OSB No. 136428
**Brittney Plesser**, OSB No. 154030
**Alex Meggitt**, OSB No. 174131
**Franz H. Bruggemeier**, OSB No. 163533
Oregon Justice Resource Center
**Attorneys for Plaintiffs**

PAGE  7 –     PLAINTIFF THOMAS DREIER'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 4
Decl of Moede

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **PLAINTIFF THOMAS DREIER'S**

**RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF**

**INTERROGATORIES**  via E-mail on the parties listed below.


      J. SCOTT MOEDE, OSB 934816
      Chief Deputy City Attorney
      scott.moede@portlandoregon.gov
      NAOMI SHEFFIELD, OSB 170601
      Deputy City Attorney
      naomi.sheffield@portlandoregon.gov
      ROBERT YAMACHIKA, OSB 065560
      Senior Deputy City Attorney
      rob.yamachika@portlandoregon.gov
      Portland City Attorney's Office
      1221 SW 4th Ave., Rm. 430 Portland, OR 97204
      Facsimile: (503) 823-3089
      *Of Attorneys for Defendant City of Portland*

**DATED** this 28th day of August 2021


                */s/ Franz Bruggemeier* _____

Exhibit 4
Decl of Moede

**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
**Viktoria Lo**, OSB No. 175487
Email: viktoria@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241

**Juan C. Chavez**, OSB No. 136428
Email: jchavez@ojrc.info
**Brittney Plesser**, OSB No. 154030
Email: bplesser@ojrc.info
**Alex Meggitt**, OSB No. 174131
Email: ameggitt@ojrc.info
**Franz H. Bruggemeier**, OSB No. 163533
Email: fbruggemeier@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503 944-2270

**J. Ashlee Albies**, OSB No. 051846
Email: ashlee@albiesstark.com
**Whitney B. Stark**, OSB No. 090350
Email: whitney@albiesstark.com
**Maya Rinta**, OSB No. 195058
Email: maya@albiesstark.com
Albies & Stark LLC
1 SW Columbia St. Suite 1850
Portland, Oregon 97204
Telephone: (503) 308-4770

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **DON'T SHOOT PORTLAND**, et al., <br><br> Plaintiffs <br><br> v. <br><br> **CITY OF PORTLAND**, a municipal corporation, <br><br> Defendant. | CASE NO. 3:21-cv-00917-HZ <br><br> **PLAINTIFF ALEXANDRA JOHNSON'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES** |

TO:  Defendants City of Portland

Exhibit 5
Decl of Moede

## PRELIMINARY STATEMENT

Plaintiff Johnson has not, at this time, fully completed her discovery and investigation in this action. All information contained herein is based solely upon such information and evidence as is presently available and known to Plaintiff upon information and belief at this time. Should further discovery, investigation, research and analysis supply additional details or specific information responsive to Defendant's Interrogatories, Plaintiff will amend her Responses. The Responses herein are made in a good faith effort to supply as much information as is presently known to Plaintiff.

## GENERAL OBJECTIONS

1.    Plaintiff objects to Defendant's definitions, instructions, and interrogatories to the extent they seek to expand or alter obligations beyond those required by the Federal Rules of Civil Procedure or to any reference to a definition not contained within the Interrogatory or the preamble. Only terms actually used in the Interrogatory may be defined. LR 33-1(c).

2.    Plaintiff objects to any definition, instruction, or interrogatory that seeks information protected from discovery by the attorney-client privilege, the privilege applicable to work product or trial preparation material, or any other privilege or authority.

3.    Plaintiff makes these responses and objections without prejudice and with a reservation of all of her rights to amend, clarify, or modify her objections and responses as further information becomes available during the course of discovery.

4.    Plaintiff objects to these Interrogatories to the extent it requires Plaintiff to answer on behalf of third parties. Plaintiff also objects on the basis that the information requested is outside the scope of discovery because the request is not proportional to the needs of the case in light of Defendant's relative access to relevant information, its resources, the importance

PAGE 2 – PLAINTIFF ALEXANDRA JOHNSON'S RESPONSE TO DEFENDANT CITY
OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 5
Decl of Moede

of the discovery in resolving the issues, and because the burden and expense of the proposed discovery outweighs its likely benefit.

5.      Plaintiff also objects to the extent the requests are duplicative, and the information is equally available to Defendant.

6.      Each of these general objections is incorporated into each of Plaintiff's specific responses as if they were set forth in full below.


## INTERROGATORIES

**REQUEST NO. 1:** The Third Amended Complaint purports to be a class action, with the class defined as "all individuals who currently or who will in the future engage in protest activities that follow the death of George Floyd opposing police violence and white supremacy. This includes protesters who engage in passive resistance to the orders of police, but does not those who engage in conduct beyond passive resistance." (Am. Compl. ¶ 44).  Identify any sub-classes in this class action.

**RESPONSE:** *See* **Fourth Amended Complaint, ¶ 90.**

**REQUEST NO. 2:** Identify any class or sub-class for which you are a representative.

**RESPONSE:** *See* **Fourth Amended Complaint. Plaintiff Johnson is a representative for the First Amendment Class and the Indiscriminate Weapons subclass and the Targeted Weapons subclass.**

**REQUEST NO. 3:** Identify, by date, time, and description, the events giving rise to each of your claims against the City.

Exhibit 5
Decl of Moede

**RESPONSE: Plaintiff Johnson objects as vague, overly broad and unduly burdensome. Notwithstanding this objection, and with leave to amend if further information or memory is recovered, Plaintiff Johnson responds:**

June 5: **Teargas** at Multnomah County Detention Center; Struck by **FN303** at Multnomah County Detention Center; Struck by explosion of **40MM munition**, upon information and belief a **RBDD**, at Multnomah County Detention Center.

June 12: **Teargas** at Multnomah County Detention Center

June 15:  **Teargas** at Multnomah County Detention Center

June 30: **Teargas** at Northeast Killingsworth Precinct

July 4: **Teargas** at/around SW 2nd Ave. & SW Alder St.

August 4: **Teargas** at Portland Police Association

August 16: Violently thrown to ground and hit with **batons** at or around SE 41st Ave. & SE Ankeny St.

August 22: Violently thrown into bushes, hit with **batons**, head and neck jerked backward to rip off mask at or around SE 41st Ave. & SE Ash St.; **40MM munitions** launched in the middle of SE 41st Ave. & SE Ankeny St.

September: 5: **Teargas** at Ventura Park

**REQUEST NO. 4:** Estimate the number of persons in each class or sub-class for which you are a representative.

**RESPONSE: Plaintiff estimates there are thousands of people in the First Amendment Class, and at least 300 in the weapons subclasses.**

**REQUEST NO. 5:** Identify all common questions of law for each class or sub-class for which you are a representative.

Exhibit 5
Decl of Moede

**RESPONSE: See Fourth Amended Complaint, ¶¶ 87-97.**

**REQUEST NO. 6:** Identify all common facts for each class or sub-class for which you are a representative.

**RESPONSE: See Fourth Amended Complaint, and in particular ¶¶ 87-97.**

**REQUEST NO. 7:** Identify all of your claims that you believe are typical of the claims for each class or sub-class for which you are a representative.

**RESPONSE:** *See* **Fourth Amended Complaint.**

**REQUEST NO. 8:** For any class or sub-class for which you are not a representative, identify the representative parties for that class or sub-class.

**RESPONSE: Nicholas Roberts, Misha Belden, Alexandra Johnson, Lester Wresckie, and Thomas Dreier.**

**REQUEST NO. 9:** Describe how the City, through PPB, has acted in a manner that applies generally to the members of the class or sub-class that you represent.

**RESPONSE:** *See* **Fourth Amended Complaint.**

**REQUEST NO. 10:** Describe any injunctive relief that you seek on behalf of the class or sub-classes that you represent.

**RESPONSE: Plaintiff Johnson seeks a permanent injunction prohibiting the City of Portland from using tear gas as a crowd control measure; a permanent injunction prohibiting the City of Portland from using "less lethal" weapons, including but not limited to OC spray or munitions, impact munitions, LRAD, sound cannons, etc., against protestors who are only engaged in passive resistance, including passive resistance to an order to disperse. In any case where PPB uses less lethal weapons, they must insure that no person who is engaged in only passive resistance is impacted or effected by those weapons.**

PAGE 5 – PLAINTIFF ALEXANDRA JOHNSON'S RESPONSE TO DEFENDANT CITY
OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 5
Decl of Moede

**REQUEST NO. 11:** To the extent you denied any of Admissions 1-3, identify all economic and non-economic harm for which you seek damages.

**RESPONSE: Plaintiff Johnson seeks compensation for the emotional distress and fear caused by PPB's conduct.**

**REQUEST NO. 12:** Identify the date and location of every instance in which you have been exposed to "tear gas" deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff Johnson objects as vague, duplicative of previous requests, overly broad and unduly burdensome. Notwithstanding this objection, and with leave to amend if further information or memory is recovered, see Response to Request No. 3.**

**REQUEST NO. 13:** Identify the date and location of every instance in which you have been struck by an FN303 munition deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff Johnson objects as vague, duplicative of previous requests, overly broad and unduly burdensome. Notwithstanding this objection, and with leave to amend if further information or memory is recovered, see Response to Request No. 3.**

**REQUEST NO. 14:** Identify the date and location of every instance in which you have been struck by a 40mm munition deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff Johnson objects as vague, duplicative of previous requests, overly broad and unduly burdensome. Notwithstanding this objection, and with leave to amend if further information or memory is recovered, see Response to Request No. 3.**

**REQUEST NO. 15:** Identify the date and location of every instance in which you have been struck by an RBDD deployed by an employee or agent of the City of Portland.

PAGE 6 – PLAINTIFF ALEXANDRA JOHNSON'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 5
Decl of Moede

**RESPONSE: Plaintiff Johnson objects as vague, duplicative of previous requests, overly broad and unduly burdensome. Notwithstanding this objection, and with leave to amend if further information or memory is recovered, see Response to Request No. 3.**

**REQUEST NO. 16:** Identify the date and location of every instance in which you have been exposed to a Long Range Acoustical Device deployed in any manner other than an announcement, by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff Johnson objects as vague, duplicative of previous requests, overly broad and unduly burdensome. Notwithstanding this objection, and with leave to amend if further information or memory is recovered, see Response to Request No. 3.**

**REQUEST NO. 17:** Identify the date and location of every instance in which you have been subject to OC spray (pepper spray) deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff Johnson objects as vague, duplicative of previous requests, overly broad and unduly burdensome. Notwithstanding this objection, and with leave to amend if further information or memory is recovered, see Response to Request No. 3.**

**REQUEST NO. 18:** Identify the date and location of every protest that you have attended in the City from May 25, 2020 to present.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Plaintiff Johnson objects as vague, duplicative of previous requests, overly broad and unduly burdensome. Notwithstanding this objection, and with leave to amend if further information or memory is recovered, see Response to Request No. 3. Additionally, Plaintiff attended protests throughout the summer and fall on a weekly basis.**

Dated this 7th day of June 2021

s/Juan Chavez
**J. Ashlee Albies**, OSB No. 051846

PAGE 7 – PLAINTIFF ALEXANDRA JOHNSON'S RESPONSE TO DEFENDANT CITY
OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 5
Decl of Moede

**Whitney B. Stark**, OSB No. 090350
**Maya Rinta**, OSB No. 195058
Albies & Stark LLC

**Jesse Merrithew**, OSB No. 074564
**Viktoria Safarian**, OSB No. 175487
Levi Merrithew Horst PC

**Juan C. Chavez**, OSB No. 136428
**Brittney Plesser**, OSB No. 154030
**Alex Meggitt**, OSB No. 174131
**Franz H. Bruggemeier**, OSB No. 163533
Oregon Justice Resource Center
**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **PLAINTIFF JOHNSON'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES** via E-mail on the parties listed below.

    J. SCOTT MOEDE, OSB 934816
    Chief Deputy City Attorney
    scott.moede@portlandoregon.gov
    NAOMI SHEFFIELD, OSB 170601
    Deputy City Attorney
    naomi.sheffield@portlandoregon.gov
    ROBERT YAMACHIKA, OSB 065560
    Senior Deputy City Attorney
    rob.yamachika@portlandoregon.gov
    Portland City Attorney's Office
    1221 SW 4th Ave., Rm. 430 Portland, OR 97204
    Facsimile: (503) 823-3089
    *Of Attorneys for Defendant City of Portland*

**DATED** this 7th day of June 2021

    s/  Juan Chavez _____

CERTIFICATE OF SERVICE

Exhibit 5
Decl of Moede

**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
**Viktoria Lo**, OSB No. 175487
Email: viktoria@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241

**Juan C. Chavez**, OSB No. 136428
Email: jchavez@ojrc.info
**Brittney Plesser**, OSB No. 154030
Email: bplesser@ojrc.info
**Alex Meggitt**, OSB No. 174131
Email: ameggitt@ojrc.info
**Franz H. Bruggemeier**, OSB No. 163533
Email: fbruggemeier@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503 944-2270

**J. Ashlee Albies**, OSB No. 051846
Email: ashlee@albiesstark.com
**Whitney B. Stark**, OSB No. 090350
Email: whitney@albiesstark.com
**Maya Rinta**, OSB No. 195058
Email: maya@albiesstark.com
Albies & Stark LLC
1 SW Columbia St. Suite 1850
Portland, Oregon 97204
Telephone: (503) 308-4770

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **DON'T SHOOT PORTLAND**, et al., | CASE NO. 3:21-cv-00917-HZ |
| Plaintiffs | |
| v. | **PLAINTIFF NICHOLAS J. ROBERTS' AMENDED RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES** |
| **CITY OF PORTLAND**, a municipal corporation, | |
| Defendant. | |

TO:  Defendants City of Portland

**PRELIMINARY STATEMENT**

PAGE 1 – PLAINTIFF NICHOLAS J. ROBERTS' AMENDED RESPONSE TO
    DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

ALBIES & STARK
ATTORNEYS AT LAW
1 SW COLUMBIA ST, #1850, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

Exhibit 6
Decl of Moede

Plaintiff Roberts has not, at this time, fully completed their discovery and investigation in this action. All information contained herein is based solely upon such information and evidence as is presently available and known to Plaintiff upon information and belief at this time. Should further discovery, investigation, research and analysis supply additional details or specific information responsive to Defendant's Interrogatories, Plaintiff will amend his Responses. The Responses herein are made in a good faith effort to supply as much information as is presently known to Plaintiff.

**<u>GENERAL OBJECTIONS</u>**

1.      Plaintiff objects to Defendant's definitions, instructions, and interrogatories to the extent they seek to expand of alter obligations beyond those required by the Federal Rules of Civil Procedure or to any reference to a definition not contained within the Interrogatory or the preamble. Only terms actually used in the Interrogatory may be defined. LR 33-1(c).

2.      Plaintiff objects to any definition, instruction, or interrogatory that seeks information protected from discovery by the attorney-client privilege, the privilege applicable to work product or trial preparation material, or any other privilege or authority.

3.      Plaintiff makes these responses and objections without prejudice and with a reservation of all of his rights to amend, clarify, or modify his objections and responses as further information becomes available during the course of discovery.

4.      Plaintiff objects to these Interrogatories to the extent it requires Plaintiff to answer on behalf of third parties. Plaintiff also objects on the basis that the information requested is outside the scope of discovery because the request is not proportional to the needs of the case in light of Defendant's relative access to relevant information, its resources, the importance

PAGE 2 – PLAINTIFF NICHOLAS J. ROBERTS' AMENDED RESPONSE TO
        DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

ALBIES & STARK
ATTORNEYS AT LAW
1 SW COLUMBIA ST, #1850, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

Exhibit 6
Decl of Moede

of the discovery in resolving the issues, and because the burden and expense of the proposed discovery outweighs its likely benefit.

5.      Plaintiff also objects to the extent the requests are duplicative, and the information is equally available to Defendant.

6.      Each of these general objections is incorporated into each of Plaintiff's specific responses as if they were set forth in full below.


## **INTERROGATORIES**

**REQUEST NO. 1:** The Third Amended Complaint purports to be a class action, with the class defined as "all individuals who currently or who will in the future engage in protest activities that follow the death of George Floyd opposing police violence and white supremacy. This includes protesters who engage in passive resistance to the orders of police, but does not those who engage in conduct beyond passive resistance." (Am. Compl. ¶ 44).  Identify any sub-classes in this class action.

**RESPONSE:** *See* **Fourth Amended Complaint, ¶ 90.**

**REQUEST NO. 2:** Identify any class or sub-class for which you are a representative.

**RESPONSE:** *See* **Fourth Amended Complaint. Plaintiff Roberts is a representative for the First Amendment Class and the Indiscriminate Weapons subclass and the Targeted Weapons subclass.**

**REQUEST NO. 3:** Identify, by date, time, and description, the events giving rise to each of your claims against the City.

**RESPONSE: Plaintiff Roberts objects as vague, overly broad and unduly burdensome.** *See* **Fourth Amended Complaint, ¶¶ 51-53.**

PAGE 3 – PLAINTIFF NICHOLAS J. ROBERTS' AMENDED RESPONSE TO
        DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

ALBIES & STARK
ATTORNEYS AT LAW
1 SW COLUMBIA ST, #1850, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

Exhibit 6
Decl of Moede

**REQUEST NO. 4:** Estimate the number of persons in each class or sub-class for which you are a representative.

**RESPONSE: Plaintiff estimates there are thousands of people in the First Amendment Class, and at least 300 in the weapons subclasses.**

**REQUEST NO. 5:** Identify all common questions of law for each class or sub-class for which you are a representative.

**RESPONSE:** *See* **Fourth Amended Complaint, ¶¶ 87-97.**

**REQUEST NO. 6:** Identify all common facts for each class or sub-class for which you are a representative.

**RESPONSE:** *See* **Fourth Amended Complaint, and in particular ¶¶ 87-97.**

**REQUEST NO. 7:** Identify all of your claims that you believe are typical of the claims for each class or sub-class for which you are a representative.

**RESPONSE:** *See* **Fourth Amended Complaint.**

**REQUEST NO. 8:** For any class or sub-class for which you are not a representative, identify the representative parties for that class or sub-class.

**RESPONSE: Nicolas Roberts, Misha Belden, Alexandra Johnson, Lester Wresckie, and Thomas Dreier.**

**REQUEST NO. 9:** Describe how the City, through PPB, has acted in a manner that applies generally to the members of the class or sub-class that you represent.

**RESPONSE:** *See* **Fourth Amended Complaint.**

**REQUEST NO. 10:** Describe any injunctive relief that you seek on behalf of the class or sub-classes that you represent.

PAGE 4 – PLAINTIFF NICHOLAS J. ROBERTS' AMENDED RESPONSE TO
        DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

ALBIES & STARK
ATTORNEYS AT LAW
1 SW COLUMBIA ST, #1850, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

Exhibit 6
Decl of Moede

**RESPONSE: Plaintiff Roberts seeks a permanent injunction prohibiting the City of Portland from using tear gas as a crowd control measure; a permanent injunction prohibiting the City of Portland from using "less lethal" weapons, including but not limited to OC spray or munitions, impact munitions, LRAD, sound cannons, etc., against protestors who are only engaged in passive resistance, including passive resistance to an order to disperse. In any case where PPB uses less lethal weapons, they must insure that no person who is engaged in only passive resistance is impacted or effected by those weapons.**

**REQUEST NO. 11:** To the extent you denied any of Admissions 1-3, identify all economic and non-economic harm for which you seek damages.

**RESPONSE: Plaintiff Roberts seeks reimbursement for the costs of COVID-19 tests he had to take due to tear gas exposure, and compensation for the emotional distress and fear caused by PPB's conduct.**

**REQUEST NO. 12:** Identify the date and location of every instance in which you have been exposed to "tear gas" deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: From approximately May 29, 2020 through approximately July or August 2020, Plaintiff has been exposed by tear gas approximately 40 to 60 times, including as deployed by Defendant City, located in the downtown Portland area and in northeast Portland. Plaintiff specifically identifies the following instances of the City of Portland subjecting him to tear gas:**

- **May 29, 2020 around SW 4th Avenue and SW Alder Street, and around Pioneer Square;**

PAGE 5 – PLAINTIFF NICHOLAS J. ROBERTS' AMENDED RESPONSE TO
DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

ALBIES & STARK
ATTORNEYS AT LAW
1 SW COLUMBIA ST, #1850, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

Exhibit 6
Decl of Moede

- **May 30, 2020 around SW 3rd Avenue and SW Main Street, and around SW 5th Avenue and SW Main Street;**

- **May 31, 2020 around Chapman Park, and around Pioneer Square;**

- **June 2, 2020;**

- **June 5, 2020;**

- **June 7, 2020;**

- **June 26, 2020;**

- **July 4, 2020;**

- **July 23, 2020;**

- **July 24, 2020;**

- **August 21, 2020 around PPB's North Precinct on NE Martin Luther King, Jr. Boulevard and NE Emerson, and around NE Emerson Street between NE Mallory Avenue and NE Rodney Avenue;**

- **August 22, 2020 around PPB's North Precinct on NE Martin Luther King, Jr. Boulevard and NE Emerson; and**

- **August 28, 2020.**

**REQUEST NO. 13:** Identify the date and location of every instance in which you have been struck by an FN303 munition deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: From approximately May 29, 2020 through approximately July or August 2020, Defendant City shot Plaintiff with an FN303 munition approximately 10 to 15 times.**

PAGE 6 – PLAINTIFF NICHOLAS J. ROBERTS' AMENDED RESPONSE TO
      DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

ALBIES & STARK
ATTORNEYS AT LAW
1 SW COLUMBIA ST, #1850, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

Exhibit 6
Decl of Moede

**REQUEST NO. 14:** Identify the date and location of every instance in which you have been struck by a 40mm munition deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: From approximately May 29, 2020 through approximately July or August 2020, Defendant City shot Plaintiff with a 40mm munition approximately seven times.**

**REQUEST NO. 15:** Identify the date and location of every instance in which you have been struck by an RBDD deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: From approximately May 29, 2020 through approximately July or August 2020, Defendant City struck Plaintiff with an RBDD approximately four times.**

**REQUEST NO. 16:** Identify the date and location of every instance in which you have been exposed to a Long Range Acoustical Device deployed in any manner other than an announcement, by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: Plaintiff has not been exposed to a Long Range Acoustical Device deployed in any manner other than an announcement by Defendant City.**

**REQUEST NO. 17:** Identify the date and location of every instance in which you have been subject to OC spray (pepper spray) deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: From**

PAGE 7 – PLAINTIFF NICHOLAS J. ROBERTS' AMENDED RESPONSE TO
DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

ALBIES & STARK
ATTORNEYS AT LAW
1 SW COLUMBIA ST, #1850, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

Exhibit 6
Decl of Moede

approximately **May 29, 2020 through approximately July or August 2020, Defendant subjected Plaintiff to OC spray approximately two times, both times at approximately SW 3rd Avenue and SW Main Street in Portland, Oregon.**

**REQUEST NO. 18:** Identify the date and location of every protest that you have attended in the City from May 25, 2020 to present.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: Plaintiff has attended approximately 45 to 60 protests from May 25, 2020 to present at the following locations: downtown Portland at SW 3rd Avenue and SW Main Street; in downtown Portland at Pioneer Courthouse Square; downtown Portland around the Portland State University Campus; in the downtown Portland area in an area bounded approximately by Portland State University to Old Town, and the Willamette River to Goose Hollow neighborhood;  the East Side Police Station on E Burnside Street and SE 47th Avenue and the surrounding neighborhood; Portland Police Bureau's North Precinct on NE Martin Luther King, Jr. Boulevard and NE Killingsworth Street and the surrounding neighborhood; at approximately SE Stark Street and SE 14th Avenue.**

Dated this 3rd day of November 2021

s/Maya Rinta
**J. Ashlee Albies**, OSB No. 051846
**Whitney B. Stark**, OSB No. 090350
**Maya Rinta**, OSB No. 195058
Albies & Stark LLC

**Jesse Merrithew**, OSB No. 074564
**Viktoria Safarian**, OSB No. 175487
Levi Merrithew Horst PC

**Juan C. Chavez**, OSB No. 136428

PAGE 8 – PLAINTIFF NICHOLAS J. ROBERTS' AMENDED RESPONSE TO
DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

ALBIES & STARK
ATTORNEYS AT LAW
1 SW COLUMBIA ST, #1850, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

Exhibit 6
Decl of Moede

**Brittney Plesser**, OSB No. 154030
**Alex Meggitt**, OSB No. 174131
**Franz H. Bruggemeier**, OSB No. 163533
Oregon Justice Resource Center
**Attorneys for Plaintiffs**

PAGE 9 – PLAINTIFF NICHOLAS J. ROBERTS' AMENDED RESPONSE TO
DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 6
Decl of Moede

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **PLAINTIFF NICHOLAS J. ROBERT'S**

**AMENDED RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF**

**INTERROGATORIES**  via E-mail on the parties listed below.

J. SCOTT MOEDE, OSB 934816
Chief Deputy City Attorney
scott.moede@portlandoregon.gov
NAOMI SHEFFIELD, OSB 170601
Deputy City Attorney
naomi.sheffield@portlandoregon.gov
ROBERT YAMACHIKA, OSB 065560
Senior Deputy City Attorney
rob.yamachika@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430 Portland, OR 97204
Facsimile: (503) 823-3089
*Attorneys for Defendant City of Portland*

**DATED** this 3rd day of November 2021

*s/Maya Rinta*
Maya Rinta
maya@albiesstark.com

CERTIFICATE OF SERVICE

ALBIES & STARK
ATTORNEYS AT LAW
1 SW COLUMBIA ST. #1850, PORTLAND, OR 97204
TEL 503.308.4770 | FAX 503.427.9292

Exhibit 6
Decl of Moede

**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
**Viktoria Lo**, OSB No. 175487
Email: viktoria@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241

**Juan C. Chavez**, OSB No. 136428
Email: jchavez@ojrc.info
**Brittney Plesser**, OSB No. 154030
Email: bplesser@ojrc.info
**Alex Meggitt**, OSB No. 174131
Email: ameggitt@ojrc.info
**Franz H. Bruggemeier**, OSB No. 163533
Email: fbruggemeier@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503 944-2270

**J. Ashlee Albies**, OSB No. 051846
Email: ashlee@albiesstark.com
**Whitney B. Stark**, OSB No. 090350
Email: whitney@albiesstark.com
**Maya Rinta**, OSB No. 195058
Email: maya@albiesstark.com
Albies & Stark LLC
1 SW Columbia St. Suite 1850
Portland, Oregon 97204
Telephone: (503) 308-4770

**Attorneys for Plaintiffs**

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| DON'T SHOOT PORTLAND, et al., <br><br> Plaintiffs <br><br> v. <br><br> CITY OF PORTLAND, a municipal corporation, and MULTNOMAH COUNTY, a political subdivision of the State, <br><br> Defendants. | CASE NO. 3:21-cv-00146-YY <br><br> PLAINTIFF LESTER WRECKSIE'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES |

TO:  Defendants City of Portland

PAGE 1 –    PLAINTIFF LESTER WRECKSIE'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 7
Decl of Moede

## **GENERAL OBJECTIONS**

1.      Plaintiff objects to Defendant's definitions, instructions, and interrogatories to the extent they seek to expand or alter obligations beyond those required by the Federal Rules of Civil Procedure or to any reference to a definition not contained within the Interrogatory or the preamble. Only terms actually used in the Interrogatory may be defined. LR 33-1(c).

2.      Plaintiff objects to any definition, instruction, or interrogatory that seeks information protected from discovery by the attorney-client privilege, the privilege applicable to work product or trial preparation material, or any other privilege or authority.

3.      Plaintiff makes these responses and objections without prejudice and with a reservation of all of their rights to amend, clarify, or modify their objections and responses as further information becomes available during the course of discovery.

4.      Plaintiff objects to these Interrogatories to the extent it requires Plaintiff to answer on behalf of third parties. Plaintiff also objects on the basis that the information requested is outside the scope of discovery because the request is not proportional to the needs of the case in light of Defendant's relative access to relevant information, its resources, the importance of the discovery in resolving the issues, and because the burden and expense of the proposed discovery outweighs its likely benefit.

5.      Plaintiff also objects to the extent the requests are duplicative, and the information is equally available to Defendant.

6.      Each of these general objections is incorporated into each of Plaintiff's specific responses as if they were set forth in full below.

PAGE 2 –     PLAINTIFF LESTER WRECKSIE'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 7
Decl of Moede

## **INTERROGATORIES**

**REQUEST NO. 1:** The Fourth Amended Complaint purports to be a class action, with the class defined as "all individuals who currently or who will in the future engage in protest activities that follow the death of George Floyd opposing police violence and white supremacy. This includes protesters who engage in passive resistance to the orders of police, but does not those who engage in conduct beyond passive resistance." (Am. Compl. ¶ 44). Identify any sub-classes in this class action.

**RESPONSE:** *See* **Fourth Amended Complaint, ¶ 90.**

**REQUEST NO. 2:** Identify any class or sub-class for which you are a representative.

**RESPONSE:** *See* **Fourth Amended Complaint. Plaintiff Wrecksie is a representative for the First Amendment Class and the Targeted Weapons subclass.**

**REQUEST NO. 3:** Identify, by date, time, and description, the events giving rise to each of your claims against the City.

**RESPONSE: Plaintiff Wrecksie objects as vague, overly broad and unduly burdensome.** *See* **Fourth Amended Complaint, ¶¶ 73-80.**

**REQUEST NO. 4:** Estimate the number of persons in each class or sub-class for which you are a representative.

**RESPONSE: Plaintiff estimates there are thousands of people in the First Amendment Class, and at least 300 in the weapons subclasses.**

**REQUEST NO. 5:** Identify all common questions of law for each class or sub-class for which you are a representative.

**RESPONSE:** *See* **Fourth Amended Complaint, ¶¶ 87-97.**

**REQUEST NO. 6:** Identify all common facts for each class or sub-class for which you are a representative.

**RESPONSE:** *See* **Fourth Amended Complaint, and in particular ¶¶ 87-97.**

PAGE 3 –     PLAINTIFF LESTER WRECKSIE'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 7
Decl of Moede

**REQUEST NO. 7:** Identify all of your claims that you believe are typical of the claims for each class or sub-class for which you are a representative.

**RESPONSE:** *See* **Fourth Amended Complaint.**

**REQUEST NO. 8:** For any class or sub-class for which you are not a representative, identify the representative parties for that class or sub-class.

**RESPONSE: Nicholas Roberts, Misha Belden. Alexandra Johnson, and Thomas Dreier.**

**REQUEST NO. 9:** Describe how the City, through PPB, has acted in a manner that applies generally to the members of the class or sub-class that you represent.

**RESPONSE:** *See* **Fourth Amended Complaint.**

**REQUEST NO. 10:** Describe any injunctive relief that you seek on behalf of the class or sub-classes that you represent.

**RESPONSE: Plaintiff Wrecksie seeks a permanent injunction prohibiting the City of Portland from using tear gas as a crowd control measure; a permanent injunction prohibiting the City of Portland from using "less lethal" weapons, including but not limited to OC spray or munitions, impact munitions, LRAD, sound cannons, etc., against protestors who are only engaged in passive resistance, including passive resistance to an order to disperse. In any case where PPB uses less lethal weapons, they must ensure that no person who is engaged in only passive resistance is impacted or affected by those weapons.**

**REQUEST NO. 11:** To the extent you denied any of Admissions 1-3, identify all economic and non-economic harm for which you seek damages.

**RESPONSE: Plaintiff Wrecksie seeks compensation for the emotional distress and fear caused by PPB's conduct.**

**REQUEST NO. 12:** Identify the date and location of every instance in which you have been exposed to "tear gas" deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome.**

PAGE 4 –    PLAINTIFF LESTER WRECKSIE'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 7
Decl of Moede

**Notwithstanding these objections and subject to them, Plaintiff responds as follows: From approximately late May 2020 through September 2020, Plaintiff Wrecksie was exposed to tear gas at least once a week while attending protests in various areas of Portland.**

REQUEST NO. 13: Identify the date and location of every instance in which you have been struck by an FN303 munition deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: On June 30, Plaintiff Wrecksie was struck by FN303 munitions deployed by Defendant City in the area near the former Portland Police Association building on N. Lombard.**

REQUEST NO. 14: Identify the date and location of every instance in which you have been struck by a 40mm munition deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: Plaintiff has been struck by munitions that appeared to have been shot from a 40mm weapon in the area around the Justice Center in Portland in early or mid June 2020.**

REQUEST NO. 15: Identify the date and location of every instance in which you have been struck by an RBDD deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: From approximately May 29, 2020, through the present, Plaintiff has been exposed to and affected by multiple RBDDs deployed by Defendant City in many locations around Portland.**

REQUEST NO. 16: Identify the date and location of every instance in which you have been exposed to a Long Range Acoustical Device deployed in any manner other than an announcement, by an employee or agent of the City of Portland.

PAGE  5 –     PLAINTIFF LESTER WRECKSIE'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 7
Decl of Moede

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: In approximately June 2020, Plaintiff was exposed to a Long Range Acoustical Device deployed in a manner other than an announcement by Defendant City one time when Plaintiff heard a repeated clicking sound that he also felt vibrating him throughout his body. Plaintiff left the area immediately because of his fear of what the LRAD would do to him.**

**REQUEST NO. 17:** Identify the date and location of every instance in which you have been subject to OC spray (pepper spray) deployed by an employee or agent of the City of Portland.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: Plaintiff Wrecksie was sprayed with multiple blasts of OC spray from a canister held by a PPB officer against his cheek when he was arrested on June 30, 2020. PPB has also sprayed OC in his direction while officers were hanging onto the outside of riot vans that were driving past him, which happened at least one time in the area around the Justice Center and one time in the area around the former PPA building, likely occurring in early to mid June.**

**REQUEST NO. 18:** Identify the date and location of every protest that you have attended in the City from May 25, 2020 to present.

**RESPONSE: Plaintiff objects as vague, overly broad, and unduly burdensome. Notwithstanding these objections and subject to them, Plaintiff responds as follows: Plaintiff attended five or more protests per week from late may to July 4, 2020. He then attended an average of about 3-4 protests per week from late July 2020 through September 2020 and attended protests sporadically since September 2020. The locations where Plaintiff Wrecksie attended protests include the following locations and the areas around**

PAGE  6 –      PLAINTIFF LESTER WRECKSIE'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 7
Decl of Moede

the locations: Downtown Portland, Salmon Springs, the Justice Center, MCSO Penumbra Kelly Building, former Portland Police Association building on N. Lombard, Ventura Park, a police station in southeast Portland, PPB North Precinct, marching through various streets around the city, and possibly other places.

Dated:  August  28, 2021.

_____*s/Franz Bruggemeier*_____
**J. Ashlee Albies**, OSB No. 051846
**Whitney B. Stark**, OSB No. 090350
**Maya Rinta**, OSB No. 195058
Albies & Stark LLC
**Jesse Merrithew**, OSB No. 074564
**Viktoria Safarian**, OSB No. 175487
Levi Merrithew Horst PC

**Juan C. Chavez**, OSB No. 136428
**Brittney Plesser**, OSB No. 154030
**Alex Meggitt**, OSB No. 174131
**Franz H. Bruggemeier**, OSB No. 163533
Oregon Justice Resource Center
**Attorneys for Plaintiffs**

PAGE  7 –    PLAINTIFF LESTER WRECKSIE'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 7
Decl of Moede

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **PLAINTIFF LESTER WRECKSIE'S**

**RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF**

**INTERROGATORIES** via E-mail on the parties listed below.


      J. SCOTT MOEDE, OSB 934816
      Chief Deputy City Attorney
      scott.moede@portlandoregon.gov
      NAOMI SHEFFIELD, OSB 170601
      Deputy City Attorney
      naomi.sheffield@portlandoregon.gov
      ROBERT YAMACHIKA, OSB 065560
      Senior Deputy City Attorney
      rob.yamachika@portlandoregon.gov
      Portland City Attorney's Office
      1221 SW 4th Ave., Rm. 430 Portland, OR 97204
      Facsimile: (503) 823-3089
      *Of Attorneys for Defendant City of Portland*

**DATED** this 28th day of August 2021


                            */s/ Franz Bruggemeier* _____

Exhibit 7
Decl of Moede

```
 1               UNITED STATES DISTRICT COURT
                     DISTRICT OF OREGON
 2                   PORTLAND DIVISION


 3


 4   DON'T SHOOT PORTLAND, a      ) Case No. 3:20-cv-00917-HZ
     nonprofit corporation, in its )
 5   individual capacity;         )
     NICHOLAS J. ROBERTS, in an   )
 6   individual capacity and on   )
     behalf of themselves and all )
 7   others similarly situated;   )
     MICHELLE "MISHA" BELDEN, in an )
 8   individual capacity and on   )
     behalf of themselves and all )
 9   others similarly situated;   )
     ALEXANDRA JOHNSON, in an     )
10   individual capacity and on   )
     behalf of themselves and all )
11   others similarly situated;   )
     LESTER WRESCKIE, in an       )
12   individual capacity and on   )
     behalf of themselves and all )
13   others similarly situated; and )
     THOMAS DREIER, in an individual)
14   capacity and on behalf of    )
     themselves and all others    )
15   similarly situated,          )
                                  )
16              Plaintiffs,       )
                                  )
17        vs.                     )
                                  )
18   CITY OF PORTLAND, a municipal )
     corporation,                 )
19                                )
                Defendant.        )
20   _____)


21


22       VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
                       THOMAS DREIER
23
              Taken on behalf of Defendant
24
                       *   *   *
25
```

Exhibit 8
Decl of Moede

1    Q    Oh.

2    A    Yeah.  I don't believe we started at Ventura Park.

3    Um, if memory serves, we had walked -- you know, marched

4    to that location from a police station.  And I don't

5    remember the exact name of the police station, but, um,          10:48:49

6    it's, you know, whichever one was within walking distance

7    of Ventura Park, that's -- that's the one that it was.

8    Q    Okay.  And did you attend that protest with anyone

9    else?

10   A    Um, I believe I was alone at that protest.                   10:49:04

11   Q    Okay.  And just describe your best memory of the

12   events of August 6, 2020.

13   A    Hmm.  Um, I remember -- so the part that I remember

14   the most distinctly is when I was shot at.  Um, and so

15   the -- the way that worked out was there was a van full           10:49:35

16   of -- with, um, there was -- I believe it's called

17   their -- whatever it's -- we called it the riot van,

18   that's what we called it, um, that was -- the van the cops

19   would all ride on.

20           It was at Ventura Park.  Um, I believe they               10:49:56

21   had, um, forced us away from the police station to Ventura

22   Park, um, and so people were sort of taking refuge there

23   on the sidewalk.  And some people were standing on the

24   sidewalk and passively just protesting the cops in terms

25   of some people were, um, just standing there and some            10:50:20

Exhibit 8
Decl of Moede

1   people were, um, I think -- if I remember correctly,

2   they -- people were, you know, talking to the cops and

3   stuff, you know, in a protesting kind of manner.

4            Um, I was standing there with my guitar on the

5   sidewalk.  All of a sudden, my guitar was shot, um, with a          10:50:42

6   40 -- well, what I now know to be a 40 millimeter

7   projectile.  Um, it hit the neck of my guitar.  I

8   submitted the video, I'm pretty sure that's in the record.

9   Um, and you can see -- in that video, you can see the

10  immediate aftermath; you can see the green chalk from the           10:51:01

11  40 millimeter marker round is all over the neck of the

12  guitar.

13           I was -- if I remember correctly, I was

14  playing guitar when I was shot, and so I was -- it was

15  just sheer luck that my fingers weren't crushed by the              10:51:25

16  munition, um...

17           Now, another important thing about this was,

18  um, the officer shot me from the riot van.  He was on the

19  riot van, and he shot me as they were leaving or right

20  before they left.                                                   10:51:39

21  Q    Okay.  Do you know about what time it was?

22  A    Um, it was either -- well, I believe it was sometime

23  before midnight, um, so, like, in the -- in the night, it

24  was, like, after -- it was after, like, 8; it was dark.

25  Sometime around then.                                               10:52:08

Exhibit 8
Decl of Moede

1  Q    Okay.  So if police testified that the sound truck

2  was there, do you dispute that?

3  A    No.  I just can't remember if it was there or not,

4  yeah.

5  Q    Okay.  Did you hear warnings given from the sound          11:26:32

6  truck that night?

7  A    I can't remember if I did that night or not.

8  Q    Did you hear any announcements from the sound truck

9  telling the crowd to disperse?

10 A    Um, it's -- it's possible that they were making such        11:26:49

11 announcements, I can't -- I can't specifically remember.

12 Q    Okay.  And, specifically, do you recall any

13 announcements to disperse to the west on Burnside?

14 A    Um, I don't have a specific memory of that.

15 Q    Okay.  All of these things I just described, do you         11:27:13

16 have any recollection of those things happening prior to

17 your getting struck by the 40 millimeter?

18 A    Um, I can't recall right now, no.

19 Q    Okay.  Well, why don't you tell me, what was it that

20 occurred; describe the scene for me immediately before you    11:27:41

21 were struck by the 40 millimeter, take me through that.

22 A    Sure.  Um, I was playing -- I was on the -- standing

23 on the sidewalk across from the -- the MCSO building.  Um,

24 I saw a police officer, um, approach a protester who was

25 standing on the sidewalk about 20, 30 feet in front of me,   11:28:03

Exhibit 8
Decl of Moede

1    and he -- and I'm -- he used his hands to choke the man by

2    the neck, um, against -- and was pushing him against a

3    wall.

4            Um, and so I saw that and I was not -- I

5    wanted to sort of protest it and make clear that that was          11:28:23

6    not okay, so I -- I, um, approached and I played my

7    guitar, I played "All you Fascists Are Bound to Lose" by

8    Woody Guthrie, and I sang it to give a soundtrack to what

9    I was seeing.

10   Q    How close were you to the police officer?                     11:28:46

11   A    Um, probably 6 feet away, or something along those

12   lines.

13   Q    And how close were you to the protester that you

14   described?

15   A    Um, well, they were both next to each other, so               11:29:06

16   something along the -- roughly around the same distance,

17   approximately.

18   Q    Earlier, you used the words that you wanted to

19   confront or you confronted the police officer.  What do

20   you mean by that?                                                  11:29:21

21            MR. MEGGITT:  Object to form.

22   Q    BY MR. MOEDE:  Go ahead and answer.

23   A    Okay.  Um, I didn't want the action that he was

24   conducting to go unaddressed and unprotested.

25   Q    And so when you use the word "confronted", what do            11:29:39

Exhibit 8
Decl of Moede

```
 1   that.

 2   A     Sure.

 3   Q     And so I -- the question was, you know, were you

 4   trying to do that, and the "that" was what you just

 5   described as the de-arrest or unarrest.  And so I'll have     11:33:24

 6   you go ahead and state the answer again, just because

 7   the -- breaking up.

 8   A     I was not -- I was not attempting to de-arrest the

 9   person.

10   Q     Okay.  So I think you said you played your guitar         11:33:43

11   less than a minute.  And then what caused you to leave the

12   immediate presence of the police officer?

13   A     Um, I don't quite -- that question is --

14   Q     Okay.  How about, what happened next?

15   A     Okay, yeah, like -- there we go.  Um, so at that          11:34:09

16   point, I -- I played guitar for a -- about a minute, and

17   then my guitar is ripped out of my hand by the officer,

18   who, um, turned his attention to me.

19   Q     Was that the same officer as the one you described as

20   choking the person?                                            11:34:31

21   A     That's correct.

22   Q     Okay.  And so now that your guitar was --  And did

23   you have a guitar case on your back?

24   A     I did, yes.

25   Q     And was that empty, or was that -- have a --             11:34:42
```

Exhibit 8
Decl of Moede

1   A    Yeah, that's -- well, that was empty.  That was the

2   case for the guitar that I was holding, yeah, so just one

3   guitar and one case.

4   Q    How many guitars do you own?  At that time.

5   A    Um, oh -- I mean, I don't think it's changed.  I          11:34:56

6   don't know, more than -- more than six.  I can count them

7   right now, if you want me to.

8   Q    No, I was just -- just curious.

9              Okay, and so then the police officer ripped

10  the guitar from your hands, I believe those are the words    11:35:12

11  you used.  And then what happened next?

12  A    Um, yeah, he took the guitar out of my hands, and

13  then he just started walking away.

14  Q    Okay.

15  A    Walking into the -- walking into the street, yeah.      11:35:27

16  Q    All right.  And then what happened?

17  A    Um, I -- I asked him for my guitar back, many times.

18  Um, I -- as you can see in the video, I followed him on to

19  the street, I -- asking for my guitar back, um -- um --

20  Do you want me to continue?                                   11:35:51

21  Q    Was there --

22  A    Yeah, go ahead.

23  Q    Was there any kind of tug-of-war over the guitar?  Do

24  you know what I mean by that term?

25  A    I do know what you mean by that, but I was -- it was     11:35:59

Exhibit 8
Decl of Moede

```
1   a one-way tug-of-war, there was no tugging back on my end,
2   it was just -- I really didn't expect it, it was just
3   ripped out of my hands all of a sudden by a man who was
4   much stronger than me.
5   Q     Did you at all swing your arms around during that        11:36:14
6   time?
7   A     No, I did not.
8   Q     And then what happened next?
9   A     Um, the cops -- two other police officers came and
10  ordered me to get onto the sidewalk.  And I -- I did that.   11:36:30
11  I got back on the sidewalk.  And when I got back on the
12  sidewalk, I was shot by another officer who had a 40
13  millimeter launcher and shot me with it.
14  Q     Okay.  And where were you struck?
15  A     I was struck in the thighs, um, up very -- kind of       11:36:55
16  either sides of where my genitals are, so it sort of
17  bounced between my thighs -- well -- yeah, it -- I was
18  left with an impact wound on each thigh, my right and my
19  left thigh.
20  Q     Okay.  And do you believe that you were -- that it       11:37:14
21  was a single shot that hit one thigh and then ricocheted
22  to the other thigh in the front?
23  A     Yeah, that's what I think is most likely.  I'm not a
24  hundred percent certain, but that seems to be the case.
25  Um, the only thing -- it's -- I have two almost exactly --    11:37:31
```

Exhibit 8
Decl of Moede

1   well, I have, you know, from the pictures, you can tell

2   both -- it kind of looks like I was shot in both thighs

3   from the -- from the wound, but I be -- and it kind of

4   felt like that, too, to be honest, but I believe it was

5   one round that just bounced, um, and -- yeah.                 11:37:48

6   Q     Okay.  And, that night, were you struck again at any

7   time by a 40 millimeter?

8   A     No, that was the only time that I was, um, struck

9   in -- yeah, that night.

10  Q     What did you do immediately after you -- you've now    11:38:07

11  been struck in the thighs as you described.  What did you

12  do next?

13  A     Um, I -- I really kind of emotionally -- my heart

14  really sank into my stomach and I started begging them to

15  give me my guitar back.  I didn't -- I didn't get -- I --   11:38:26

16  if I recall correctly, I stayed on the sidewalk and I just

17  sort of, um, collapsed and I, um -- not out of -- not out

18  of pain, so much, I had a lot of adrenaline, um, but just

19  collapsed out of -- just despair at having my guitar being

20  taken from me.                                               11:38:45

21  Q     And after you were struck with the 40 millimeter, how

22  long did you remain at the protest?

23  A     Um, I think probably no longer than, like, 45 minutes

24  or something, at that point, um, maybe an hour longer, I

25  couldn't -- I couldn't tell you exactly, but probably not   11:39:04

Exhibit 8
Decl of Moede

THOMAS DREIER, 12/08/2021                                      Page 81

1                    At any of the protests you attended, did you

2    ever see protesters set fires?

3    A    Yes.

4    Q    Okay.  And where?

5    A    Um, I have -- many times, people would set little    11:53:00

6    fires at the Justice Center, um, in front of that building

7    at the little intersection there, um, by the park blocks,

8    the federal courthouse, and the -- and the Portland Police

9    precinct downtown, there would be fires set there

10   frequently.                                                11:53:23

11   Q    Anyplace else?

12   A    Um, yeah, there were some times people would set,

13   like, dumpster fires.  I remember that happening at the

14   ICE building one time -- or several times, actually.  And

15   I've seen people set dumpster fires around -- around -- at  11:53:41

16   various protests that I went to.

17   Q    Anyplace else that you can recall fires being set?

18   A    Um, I believe there may have been some fires at --

19   there was -- there was a house that we, um, protested at

20   called the Red House, and I believe people may have made    11:54:20

21   some fires, um -- oh, they -- no, I recall that very --

22   they were fires to keep warm, but there were definitely --

23   fires were set there, um, and possibly, like -- I don't

24   know if they ever set like a trash fire or something, that

25   might have -- may have happened.  Um, I -- it's --          11:54:36

Exhibit 8
Decl of Moede

THOMAS DREIER, 12/08/2021

Page 82

1   there -- yeah, I have some memories of people doing that,

2   um, trash -- dumpster fires and --

3   Q    Did you ever see protesters set fires inside of a

4   building?

5   A    No.                                                      11:54:59

6   Q    Okay.

7   A    No --

8   Q    If you did see that, would you try to stop it?

9   A    Hmm, I'm not sure what I would do.

10  Q    Did you ever see any vandalism in the form of           11:55:11

11  graffiti by protesters?

12  A    Yes, I've seen that.

13  Q    How many times?

14  A    Um...

15  Q    Hundreds?                                                11:55:28

16  A    It's hard to put a number on it, but I would say it

17  was a -- it was fairly common to see people doing that, so

18  I don't know if I'd put it in the hundreds, but, you know,

19  many, many, many times.

20  Q    What about, did you ever see protesters break           11:55:42

21  windows?

22  A    Oh, yeah.  Yes.

23  Q    And, also, you know, I went through the whole list of

24  items, but did you ever see protesters throw rocks at

25  police?                                                      11:55:57

Exhibit 8
Decl of Moede

THOMAS DREIER, 12/08/2021                              Page 83

```
 1   A    Um, I've seen people throw stuff.  I haven't

 2   necessarily known what they were throwing in all cases.

 3   Q    How about water bottles?

 4   A    Oh, yeah, I've seen water bottles thrown.

 5   Q    Have you ever seen like a frozen apple or a can of      11:56:14

 6   soda thrown at --

 7   A    I've never heard of any frozen or seen a frozen apple

 8   thrown at anybody, um, no, um -- and then you asked about

 9   cans, um, I don't -- I don't -- that's not something that

10   I've -- I have any memory of having seen, yeah, I don't      11:56:35

11   remember that.

12   Q    Did you ever see protesters shine green lasers into

13   the eyes of police officers, during the protests you

14   attended?

15   A    Um, occasionally, I have seen people shine lasers at    11:56:52

16   the cops.  I don't know what the effect of that was

17   exactly.

18   Q    Have you ever seen protesters fire mortars or

19   fireworks at the police, during the protests you attended?

20   A    Um, no, I don't think I -- I don't -- I don't recall    11:57:13

21   that at this time, no.

22   Q    Okay.  I'm going to go to some of the exhibits

23   regarding that August 15th incident that you mentioned.

24              MR. MOEDE:  And, let's see, I think we are

25   on -- are we on 76, Clair?  Or Kim?                          11:57:35
```

Exhibit 8
Decl of Moede

1  A    Um, I would -- I don't know about that.  It's used

2  for secure communication.

3  Q    Okay.  And what do you mean by "secure

4  communication"?

5  A    Um, I believe that it's encrypted and it's supposed          12:22:23

6  to be more -- um, more private than using a standard text

7  message.

8  Q    So, and because it's encrypted, that means that you

9  can't download that and print it off; correct?  Is that --

10  A    I don't think that's what encryption means.                 12:22:45

11  Q    Okay.  So do you have all of your messaging from

12  Signal during the protests?

13  A    I mean, I haven't deleted the app, it's on my phone

14  still, yeah.

15  Q    Okay.  So this Exhibit Number 83, and it's Bates           12:23:02

16  Number 696.  How did this photograph come to be taken?

17  A    Um, there was an event -- I'm going to just assume

18  that was correct, the caption here, that sounds right, the

19  Multnomah Building.  Um, there was some sort of a protest

20  happening and there were photographers and I was -- I was     12:23:31

21  playing my guitar, and this photo was taken.

22  Q    Okay.  And so the caption says, "Fire at the

23  Multnomah Building in Portland August 19, 2020."  Does

24  that match with your recollection of the date of when this

25  matter occurred?                                               12:24:01

Exhibit 8
Decl of Moede

```
 1   A    Um, yeah, I think so.

 2   Q    Okay.  And would you agree with me, that's just four

 3   days after the incident you described on August 15, 2020;

 4   correct?

 5   A    Um, yes.                                          12:24:19

 6   Q    Okay.  And so, fair to say that that incident on

 7   August 15th didn't stop you from protesting on August 19,

 8   2020; correct?

 9   A    Um, yeah, I think that would be fair to say.

10   Q    Okay.  And you didn't mention that you had seen a   12:24:39

11   fire inside of a building.  Would you agree with me that

12   there is a fire inside of this building being lit by

13   protesters?

14   A    Um, I mean, I can see that from this picture, yes.

15   Q    Okay.  Did you do anything to stop them from lighting 12:24:56

16   that building --

17   A    Um, I -- I don't -- I have --  Oh.

18   Q    Let me just finish the question, I'm sorry.

19        Did you do anything to stop these protesters

20   from lighting that building on fire?                   12:25:10

21           MR. MEGGITT:  Object to form.

22   Q    BY MR. MOEDE:  Go ahead and answer.

23   A    Um, I didn't stop them from, ah, lighting the fire, I

24   didn't -- yeah.

25   Q    And there's also, would you agree with me, graffiti, 12:25:25
```

Exhibit 8
Decl of Moede

1    property damage, broken windows that occurred here?

2         MR. MEGGITT:  Object to form.

3    A    I mean, I see that in the picture, yes.

4    Q    BY MR. MOEDE:  Okay.  And did you do anything to

5    prevent that?                                          12:25:43

6         MR. MEGGITT:  Object to form.

7    A    No.

8    Q    BY MR. MOEDE:  Did you say anything to these

9    protesters, "Hey, you shouldn't light buildings on fire",

10   did you say that specifically?                         12:25:52

11   A    No.

12   Q    Okay.  And why not?

13   A    Um, I don't even remember seeing them doing what

14   they were doing.  I was facing the other direction.

15        (There was an interruption by the reporter.)     12:26:32

16        (A discussion was held off the stenographic

17   record with the reporter.)

18        MR. MOEDE:  So I was asking him if he did

19   anything to prevent the fires or the graffiti or the

20   broken windows, did you get that?                      12:26:37

21        (The record was read by the reporter.)

22        MR. MOEDE:  Okay, I will -- I'll repeat that

23   one.

24   Q    BY MR. MOEDE:  So I asked specifically, did you say

25   to the protesters that were behind you, "Don't light the  12:27:09

Exhibit 8
Decl of Moede

```
1              THE VIDEOGRAPHER:  The time is 1:18 p.m.,
2    and we're now back on the record.
3    Q    BY MR. MOEDE:  Mr. Dreier, so, as you heard, we're
4    back on the record and all of those same admonitions
5    apply.  You understand you're under oath, and all of the        13:19:00
6    various rules that we went over earlier; correct?
7    A    Yes.
8    Q    I'd like to ask you some more questions about the
9    Fourth Amended Complaint.  So my understanding is that you
10   are a member of the First Amendment class and a class          13:19:32
11   representative of that class.  Correct?
12   A    Yes.
13   Q    And my understanding is that you are also a member
14   and repre- -- representative of the targeted weapons
15   subclass for purposes of the Fourth Amendment claim;           13:19:54
16   correct?
17   A    That's -- that's correct, yep.
18   Q    Okay.  It's also my understanding that you are not a
19   member of the indiscriminate weapons subclass for purposes
20   of the Fourth Amendment claim nor a class representative       13:20:10
21   for that subclass.  Is that right?
22   A    That's correct.
23   Q    Okay.  I'll, then, restrict my questions to those --
24   the First Amendment class and then the targeted weapons
25   subclass.                                                      13:20:27
```

Exhibit 8
Decl of Moede

1    you know that is a member of this class, the First

2    Amendment class.

3              MR. MEGGITT:  Object to form.

4    A    Um, no, I don't think I have the information to know

5    whether a person, short of, um -- yeah, I don't -- I don't    13:25:36

6    know -- I don't know if they would fall into the claim of

7    the class or not.

8    Q    BY MR. MOEDE:  Okay.  And now, again, during that

9    same time period, the May 25th, 2020, to November 15,

10   2020, and I want you to think about the total universe of    13:25:55

11   all protests that occurred in Portland, do you know the

12   locations, dates, times of every protest in Portland

13   during that time frame?

14             MR. MEGGITT:  Object to form.

15   A    No, I -- no, I do not.                                   13:26:17

16   Q    BY MR. MOEDE:  How would you begin to identify who

17   all of the people are, you know, in that First Amendment

18   class?

19             MR. MEGGITT:  Object to form.

20   A    Um, so I would say it includes people who have, um,      13:26:40

21   exercised or attempted to exercise their First Amendment

22   rights in Portland in the time you specified and were met

23   with police repression because of that reason.  Um, I

24   would -- I would -- you know, that's sort of a

25   case-by-case basis; I guess one would have to evaluate       13:27:07

Exhibit 8
Decl of Moede

1  whether that was -- a person was a member of that class,

2  um...

3  Q   BY MR. MOEDE:  My question is a little bit more

4  practical, you know, which is, how -- how do you figure

5  out who all those people are?  Is that possible?        13:27:24

6  A   Um --

7            MR. MEGGITT:  Object to form.

8  A   Well, yeah, I think it's like the same process that

9  we're -- I mean, it seems that that's the process I'm

10 going through in my case, is to show that I'm a member of  13:27:38

11 this class.  Short of a lawsuit or something, I'm not

12 sure -- I mean, it's anybody who was, ah, met with police

13 violence.  I don't have a complete list of those people,

14 um...

15 Q   BY MR. MOEDE:  Well, let me -- let me ask it to you  13:28:02

16 this way.  So, you know, imagine we were -- we went to a

17 comedy show or something at Helium Comedy Club and we were

18 trying to have every person that attended one particular

19 show be a member of a particular class action, okay.

20            And so, if I asked you, sir, I want you to     13:28:24

21 think about it this way, which is, okay, how do we -- how

22 are we going to go about identifying who those people

23 were.

24            MR. MEGGITT:  Object to form.

25            MR. MOEDE:  Right.  I haven't asked the        13:28:37

Exhibit 8
Decl of Moede

1    Q   BY MR. MOEDE:  Well, I'm asking you, which is, are

2    they -- well, let me -- I'll ask it in a different way.

3              Are they identical?  Is every protest

4    identical between that time frame?

5                    MR. MEGGITT:  Object to form.                13:33:17

6    A    No.

7    Q   BY MR. MOEDE:  Okay.  And so then, saying again,

8    like, sort of another gradation, right, are they factually

9    similar in every way?

10                   MR. MEGGITT:  Object to form.                13:33:42

11   A    Um, I mean, I'm going to say I don't understand the

12   difference between those two questions.  It sounds like it

13   could be -- I want to give you the same answer and say

14   they are similar.

15             I don't know -- I'm not trying to be             13:33:50

16   difficult.  I don't know what the difference between it

17   being similar and it being factually similar are.  I mean,

18   if -- the facts were similar, I guess, um.  Like, is that

19   what --

20   Q   BY MR. MOEDE:  Let me -- let me break it down for      13:34:05

21   you.

22             Would you agree with me that there are some

23   similarities, but there are some differences?

24                   MR. MEGGITT:  Object to form.

25   Q    BY MR. MOEDE:  When you look at every protest during  13:34:18

Exhibit 8
Decl of Moede

1    that time frame, some have similarities and some have

2    differences.  Do you agree with that?

3    A    I agree with that.

4    Q    And some of the differences might be the location;

5    correct?                                                      13:34:30

6    A    That's correct.

7    Q    And some of them might be the time, the time of day;

8    correct?

9    A    That's correct, yes.

10   Q    And some of them have different behavior by           13:34:38

11   individual protesters; right?

12   A    Yes.

13   Q    And then, similarly, the police response is

14   different, as well; correct?

15   A    That's correct.                                         13:34:52

16            MR. MEGGITT:  Object to form.

17   Q    BY MR. MOEDE:  At any point during the protests, did

18   you engage in conduct beyond passive resistance?

19            MR. MEGGITT:  Object to the form.

20   A    Beyond passive resistance.  No, I don't believe that   13:35:29

21   I did.

22   Q    BY MR. MOEDE:  Okay.  And so it's basically your

23   testimony that, of all those protests you catalogued or we

24   talked about, you were always just passively resisting;

25   correct?                                                     13:35:46

Exhibit 8
Decl of Moede

1    A    Yes.

2              MR. MEGGITT:  Object to form.

3    Q    BY MR. MOEDE:  And how -- how do you define passive

4    resistance when you respond to that question?

5              MR. MEGGITT:  Object to form.                    13:35:57

6    A    Um, so passive means that there isn't a use of -- of,

7    like, force or I should say, really, violence to try to

8    resist a police directive.

9    Q    BY MR. MOEDE:  Okay.  So, for example, at any time

10   during that time frame, the May 25th, 2020, to            13:36:24

11   November 15th, 2020, did you ever throw a single rock?

12   A    No.

13   Q    How about a single water bottle?

14   A    Yes.  I once threw a single water bottle over a

15   fence.                                                     13:36:45

16   Q    Okay.  And that was toward the police?

17   A    No, it wasn't towards anybody specifically.

18   Q    Okay.  Did you ever throw a Molotov cocktail?  Do --

19   you know what that is, don't you?

20   A    I know what it is.  I did not throw one.              13:36:57

21   Q    Okay.  Did you ever light a fire?

22   A    No, sir.

23   Q    What about, did you ever graffiti property?

24   A    No, sir.

25   Q    Did you ever break a window?                          13:37:13

Exhibit 8
Decl of Moede

1 the tear gas, maybe that would be active in some respect,

2 um, ah...

3 Q   BY MR. MOEDE:  So let me give you a couple of other

4 examples.  Let's say you're a protester and a smoke

5 canister is thrown at your feet or launched toward you by        13:52:13

6 the police and you kick it back toward the police.  Is

7 that passive resistance?

8                   MR. MEGGITT:  Object to form.

9 A   I'm not even sure I would -- I'm not sure if that's

10 even resistance.  I mean, if somebody throws something at       13:52:33

11 you, you're going to pick the -- you're going to pick the

12 way to protected yourself.

13            I don't know that just trying to breathe is

14 resistance, is any kind of resistance, um, so that's a

15 response to violence, it's not -- it's not active, it's --      13:52:53

16 the person is acted on, so I don't -- in my own personal

17 belief, that doesn't rise to the level of actively

18 resisting, it's -- yeah.

19 Q   BY MR. MOEDE:  Yeah, and same question -- you know, I

20 used the example of smoke, but let's just say it's some         13:53:18

21 form of tear gas and you kick the tear gas canister back

22 toward the police.  Is that passive resistance?

23                   MR. MEGGITT:  Object to form.

24 A   Hmm.  Um, I'm not sure.  I suppose it -- I'm not

25 sure.                                                            13:54:10

Exhibit 8
Decl of Moede

1   something on Facebook was, um, it would have been years

2   and years ago, so --

3   Q    Do people have handles on Facebook, or is that

4   something different?

5   A    My Facebook is just my name.                          14:22:50

6   Q    Okay.

7   A    Maybe some other people do, but, um, I'm used to them

8   just being names.

9            MR. MOEDE:  All right, let's go off the

10  record and take a break into the -- and then we're going   14:23:05

11  to -- give me ten minutes, and I'm going to see if we can

12  wrap this up soon.

13           MR. MEGGITT:  Sounds good.

14           THE VIDEOGRAPHER:  Time is 2:23 p.m., and

15  we're now off the record.                                  14:23:21

16           (A recess was taken.)

17           THE VIDEOGRAPHER:  The time is 2:38 p.m.,

18  and we're now back on the record.

19  Q    BY MR. MOEDE:  Mr. Dreier, we're back on the record,

20  and you understand, don't you, that you're still under     14:38:54

21  oath; correct?

22  A    Yes, sir.

23  Q    All right.  I just have a few more and then we'll be

24  done, for now, at least.

25           So you mentioned that there was one occasion       14:39:05

Exhibit 8
Decl of Moede

1   that you could recall where you threw a water bottle at a

2   protest between May 25, 2020, and November 15, 2020;

3   correct?

4   A    Yes, that's correct.

5   Q    Okay.  I just want to get some details about that.    14:39:22

6   Where were you?

7   A    I was in front of the federal building in downtown in

8   front of the large fence that they had erected and is

9   still there.

10  Q    And do you remember what day it was?                  14:39:43

11  A    That, I don't -- I couldn't -- I couldn't tell you

12  what day it was, I don't remember that.

13  Q    Do you remember what month?

14  A    Um, here -- just my calendar I'm looking at.  Um,

15  probably sometime from -- in July to September, probably    14:40:08

16  in that range, is my guess.

17  Q    And do you remember what time of day?

18  A    Yeah, it was dark, it was probably -- I guess it got

19  pretty dark -- got dark pretty late then, so it was

20  probably something like 10 at night or later.              14:40:33

21  Q    And can you tell me why you threw the water bottle?

22  A    Yes.  I was -- I was really upset, after, um,

23  having -- it was the -- there was a large protest at the

24  fence at the federal building.  And my recollection was

25  that the cops had just, um, deployed a huge amount of       14:40:53

Exhibit 8
Decl of Moede

1    force against protesters and I was -- I was furious and I

2    didn't know how to voice that, and so I picked up a water

3    bottle that was half empty and I threw it -- threw it over

4    the fence.  I saw it didn't hit anybody.

5            I mean, I underhanded it, to be clear.  It was    14:41:23

6    not really meant to hurt anybody, or it absolutely wasn't

7    meant to hurt anybody, it was -- I was -- I was angry and

8    I essentially wanted to send a message, um, you know, I

9    wanted to disrespect their fence that I didn't think

10   should be there.                                           14:41:40

11   Q    And did you throw -- as the -- as you described it,

12   was that water bottle thrown toward any police officers?

13   A    No, I wasn't specific -- I wasn't trying to do that

14   and I was just throwing it over the fence, and I saw it

15   landed on an empty -- it didn't land near any cops, and it  14:42:01

16   wasn't intended to.

17   Q    And I was going to ask you about that, as well.  You

18   said that, quote, cops deployed a huge amount of force or

19   cops had just deployed a huge amount of force.  When you

20   say "cops", which cops?                                     14:42:19

21   A    Um, I mean, most likely, federal cops in that

22   circumstance.  Um, because it was at the federal building

23   and they were behind the fence, so I think it's reasonable

24   to assume that they were most likely feds; although, I

25   couldn't tell you that for sure, because I have no way of   14:42:40

Exhibit 8
Decl of Moede

1                        CERTIFICATE

2          I, Kim Nerheim, an Oregon Certified Shorthand

3    Reporter and a Washington Certified Court Reporter, hereby

4    certify that said witness appeared before me by

5    videoconference at the time and place set forth in the

6    caption hereof; that at said time and place I reported in

7    stenotype all testimony adduced and other oral proceedings

8    had in the foregoing matter; that thereafter my notes were

9    transcribed through computer-aided transcription, under my

10   direction; and that the foregoing pages constitute a full,

11   true and accurate record of all such testimony adduced and

12   oral proceedings had, and of the whole thereof.

13          I further certify review of the transcript was

14   requested.

15          Witness my hand at Portland, Oregon, this 22nd

16   day of December, 2021.

17

18

19

20   _____

21                       Kim Nerheim

22                       Oregon CSR No. 90-0138

23                       Expires 9/30/2023

24                       Washington CCR No. 0003038

25                       Expires 3/28/2022

Exhibit 8
Decl of Moede

1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF OREGON
2                        PORTLAND DIVISION

3

4   DON'T SHOOT PORTLAND, a          ) Case No. 3:20-cv-00917-HZ
    nonprofit corporation, in its    )
5   individual capacity;             )
    NICHOLAS J. ROBERTS, in an       )
6   individual capacity and on       )
    behalf of themselves and all     )
7   others similarly situated;       )
    MICHELLE "MISHA" BELDEN, in an   )
8   individual capacity and on       )
    behalf of themselves and all     )
9   others similarly situated;       )
    ALEXANDRA JOHNSON, in an         )
10  individual capacity and on       )
    behalf of themselves and all     )
11  others similarly situated;       )
    LESTER WRESCKIE, in an           )
12  individual capacity and on       )
    behalf of themselves and all     )
13  others similarly situated; and   )
    THOMAS DREIER, in an individual  )
14  capacity and on behalf of        )
    themselves and all others        )
15  similarly situated,              )
                                     )
16                Plaintiffs,        )
                                     )
17       vs.                         )
                                     )
18  CITY OF PORTLAND, a municipal    )
    corporation,                     )
19                                   )
                  Defendant.         )
20  _____ )

21

22        VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
                MICHELLE "MISHA" BELDEN

23            Taken on behalf of Defendant

24                    *   *   *

25

Exhibit 9
Decl of Moede

MICHELLE BELDEN, 11/15/2021

Page 20

1   representative.  You're aware of that; correct?

2   A    Yes.

3   Q    And, as such, I need to determine what your

4   recollection is about the events that you've alleged in

5   the Fourth Amended Complaint.  Okay?                    09:26:17

6   A    Okay.

7   Q    And so, if you don't have a recollection of the

8   particular event, the date and the time and what happened,

9   then I need to know that today.  Okay?

10  A    Okay.                                              09:26:37

11  Q    All right.  So do you have any recollection about

12  June 2, 2020?  That would be the night of June 2nd, 2020,

13  and into the morning of June 3rd, 2020.

14  A    Um, let me think.  June 2nd to June 3rd.

15       I believe that -- I remember June 3rd, the         09:27:25

16  evening, but not June 2nd the evening.

17  Q    Okay.  Let's go to June 9th.  And do you recall

18  attending protests on June 9th, 2020?

19  A    Yes.

20  Q    Okay.  And did you attend with any other people?    09:28:26

21  A    Yes.

22  Q    And who are they?

23  A    My roommates.

24  Q    The two that you mentioned?

25  A    Yes.                                               09:28:37

Exhibit 9
Decl of Moede

MICHELLE BELDEN, 11/15/2021

Page 21

1   Q    And could you just remind me of their names again?

2   I'm sorry.

3   A    Michelle Hicks and Madelyn Belden.

4   Q    And were you meeting up with anyone else at the

5   protests on June 9th?                                    09:28:57

6   A    No.

7   Q    And where were you attending that particular protest?

8   A    Downtown.

9   Q    Okay, when you say "downtown", what do you mean?

10  A    Downtown right in front of the Justice Center, so I   09:29:14

11  believe that's Salmonish.

12  Q    Okay.  And were you near the fence at all?

13  A    No.

14  Q    How far away were you from the fence?

15  A    Maybe a few feet back -- maybe a little more, like,   09:29:31

16  10, 15.

17  Q    Okay.

18              THE VIDEOGRAPHER:  Counsel, sorry for the

19  interruption.  We also have a couple more people coming

20  in, a J. Ashlee Albies and a Nick Roberts.              09:29:43

21              MR. MOEDE:  They're good, that's fine.

22              THE VIDEOGRAPHER:  Okay.

23  Q    BY MR. MOEDE:  All right.  I am going to try to show

24  you a map, if I can figure out how to share screen.

25              (Document presented.)                         09:30:22

Exhibit 9
Decl of Moede

1    Q    BY MR. MOEDE:  Can you -- can you see what's in front

2    of you there?

3    A    Kind of, yeah.

4    Q    Okay, it's a map.  Do you see that?

5    A    Yes.                                                      09:30:30

6    Q    Okay.

7              MR. MOEDE:  Can I have the court reporter

8    mark this as Deposition Exhibit 1, Defendant's Deposition

9    Exhibit 1, please.

10             (Deposition Exhibit No. 1 was marked              09:30:46

11        for identification.)

12             MR. MOEDE:  Hey, Juan, what we're going to

13   do is we're just going to start over again with

14   Defendant's exhibits, and so we'll start with Defendant's

15   Exhibit 1, 2, 3, et cetera.                                   09:30:54

16             MR. CHAVEZ:  Very good.

17             MR. MOEDE:  Okay.

18   Q    BY MR. MOEDE:  So I'm showing you here what's been

19   marked as Deposition Exhibit 1.  And can you see that?

20   A    Yes.                                                     09:31:07

21   Q    Okay.  And there's a -- do you see my cursor on the

22   screen?

23   A    Yes.

24   Q    Okay.  And that says "Multnomah County Justice

25   Center"; correct?                                             09:31:18

Exhibit 9
Decl of Moede

1   A     Yes.

2   Q     Okay.  And can you tell me where you were located in

3   terms of cross streets?

4   A     Around 3rd and Main, actually.

5   Q     Okay.  So here's my cursor.  And you see I'm at 3rd          09:31:33

6   and Main?

7   A     Yes.

8   Q     And were you in the intersection?

9   A     No.  We in Chapman Square.

10  Q     Okay.  So you were in this area where my cursor is;          09:31:49

11  is that correct?

12  A     Yes.

13  Q     Okay.  And did you remain there the entire time?

14  A     Not that night, no.

15  Q     Okay.  About what time did you arrive?                       09:32:02

16  A     Around 9 p.m.

17  Q     And did you see the fence that was up that night?

18  A     Yes.

19  Q     And did you hear any announcements to stay back away

20  from the fence?                                                    09:32:25

21  A     Not that night.

22  Q     Okay.  You didn't hear even one single announcement

23  that entire night, is that correct, to stay back from the

24  fence?

25  A     Correct.                                                     09:32:37

Exhibit 9
Decl of Moede

1    Q    Okay.  And how long were you there?

2    A    Until probably 1 a.m.

3    Q    Okay.  So there are four hours where you were in and

4    around Chapman Square and 3rd and Main; is that correct?

5    A    Yes.                                          09:32:53

6    Q    Okay, in the whole four hours, you did not hear any

7    announcements to stay back from the fence; is that right?

8    A    No.

9    Q    So where did you go on the 9th?

10   A    On the 9th, I believe that -- well, on the 9th, I    09:33:09

11   went to Chapman Square and --  Is that what you're asking?

12   Q    Yes.

13   A    Okay.

14   Q    And what I'm wondering is, did you stay just in and

15   around that entire area for the whole entire four hours?   09:33:30

16   A    No.

17   Q    Okay.  And that's what I'm wondering.  Where else did

18   you go?

19   A    Well, we ended up getting chased to around Naito and

20   Salmon.                                          09:33:50

21   Q    Okay, about what time was that?

22   A    Nearing 1 a.m., so maybe midnight, 12:30.

23   Q    Okay.  And so did the Portland Police Bureau

24   undertake some action at that time?

25   A    Yes.                                          09:34:09

Exhibit 9
Decl of Moede

1   Q    Okay.  Why don't you describe what happened.

2   A    So we were at the protest in front of the Justice

3   Center and there was a pretty large crowd and there -- it

4   was mostly peaceful.

5          Now that I am remembering, there were people          09:34:38

6   rattling the fence, and I think that -- like, now that I'm

7   remembering, there was actually an announcement to back

8   away from the fence.

9          And at about midnight, the crowd was dwindling

10  and then -- and so most people -- it was pretty peaceful,   09:35:00

11  at that point.  And then, out of nowhere, PPB started to

12  fire flashbangs and -- I believe they're called OC

13  munitions.

14         And there wasn't any warning about that

15  happening, and so we believed that this would continue,     09:35:31

16  and so -- I think we, um, started running, because of the

17  flashbangs and the tear gas munitions, and that's when we

18  ended up around, um, I believe Naito.  And, you know,

19  the -- they kept firing OC munitions and flashbangs, and

20  so then I left the scene.                                   09:36:24

21  Q    Okay.  And so you can see my cursor; correct?

22  A    Yes.

23  Q    And so where did you -- you say you ended up around

24  Naito.  What was the cross street?

25  A    Um, Salmon.                                            09:36:36

Exhibit 9
Decl of Moede

MICHELLE BELDEN, 11/15/2021                          Page 26

1   Q    Okay, so right where my cursor is?

2   A    Yes.

3   Q    Okay.  I'm going to stop sharing that.

4            So you indicate that the Portland Police

5   Bureau fired flashbangs and OC munitions.  That's your        09:36:52

6   testimony; correct?

7   A    Yes.

8   Q    Okay.  And I think you also indicated that this was

9   without warning.  So are you indicating that there had

10  been no announcements made at that point?                     09:37:10

11  A    Not at that moment before they started firing the

12  munitions.

13  Q    Okay, that makes it seem like they did give some

14  announcement.

15  A    Earlier in the night --                                  09:37:26

16            MR. CHAVEZ:  Object to the form.  Misstating

17  statement witness -- or witness' statement.

18  Q    BY MR. MOEDE:  So you're talking about announcements

19  they made to stay back from the fence earlier in the

20  night; correct?                                               09:37:39

21  A    Yes.

22  Q    Okay.  So it's your testimony when the flashbangs and

23  OC munitions were used that they came without any warning

24  of any kind; correct?

25  A    Correct.                                                  09:37:54

Exhibit 9
Decl of Moede

MICHELLE BELDEN, 11/15/2021

Page 27

1   Q     And how is your memory on that point?

2   A     Very certain on that.

3   Q     Okay.  And what do you mean by "flashbangs"?

4   A     The really bright, loud tool they use, it -- when

5   they throw it at you, it kind of explodes into a very        09:38:15

6   bright light.

7   Q     Okay.  Any other description about what a flashbang

8   is?

9   A     It's very loud.  Sounds like a gunshot.

10  Q     Okay.  Anything else?                                   09:38:29

11  A     It can be painful, if it explodes near you.

12  Q     Okay.  Did it explode near you that day?

13  A     Not me.

14  Q     And what do you mean by "OC munitions"?

15  A     OC munitions, I believe, are -- if I'm classifying      09:38:48

16  them correctly, are tear gas.

17  Q     And so when you -- describe that for me, if you

18  would.

19  A     Tear gas, I feel like, operates at a similar -- in a

20  similar way to flashbangs when there's a loud explosion      09:39:15

21  that goes off before it starts dispersing gas into the

22  air.

23  Q     Okay.  And are there --  How many types of tear gas

24  are there?  Do you know?

25  A     I think two.                                            09:39:34

Exhibit 9
Decl of Moede

MICHELLE BELDEN, 11/15/2021                        Page 28

1    Q    Okay, and what are those two?

2    A    Um, there's -- I know one is aerosolized and one is,

3    like, not -- it, like, explodes and kind of like releases

4    gas into the air, like vaporizes it.

5    Q    So, based on your description of June 9th, which --        09:39:52

6    which one of those tear gas items was it?

7    A    The one that vaporizes into the air and spreads.

8    Q    Okay.  And I think you indicated that it looked or

9    sounded like tear gas?  Is that correct?

10   A    Yes.                                                        09:40:14

11   Q    Okay.  And what did the tear gas look like?  Can you

12   describe it?

13   A    In the air, it looks like fog, really thick fog.  In

14   terms of the vehicle that it comes in, it's like a small,

15   I think, roundish machine-looking thing.                         09:40:32

16   Q    Okay.  Any other description?

17   A    Ah, no.

18   Q    And what did the tear gas sound like?

19   A    Like an explosion, just a smaller one than a

20   flashbang.                                                       09:40:51

21   Q    Okay.  And were you impacted by the OC munitions that

22   you described?

23   A    Yes.

24   Q    How?

25   A    I was caught in the fog of the OC munitions, the tear      09:41:01

Exhibit 9
Decl of Moede

MICHELLE BELDEN, 11/15/2021

1   gas; and there was an instance that one exploded near my

2   legs.

3   Q    Okay.  So let's take both of those.  So you were

4   impacted in two different ways; is that correct?

5   A    Yes.                                              09:41:32

6   Q    Okay.  So tell me again the first one.

7   A    Um, I was caught in the gas that it released.

8   Q    Okay.  And when you say "caught in the gas", is there

9   anything else, any other detail you can provide?

10  A    It was so -- the, like, area in which the gas was    09:41:57

11  covering was very expansive.  And, by "caught", I mean I

12  couldn't find a way to get out of it for a while.

13  Q    And how did it affect you, your person?

14  A    I couldn't see; I couldn't breathe; my eyes were

15  watering; my nose was watering; my face felt like it was  09:42:22

16  on fire and so did any of my exposed skin.

17  Q    Okay, and then there was a second one you said that

18  exploded near you; is that correct?

19  A    Yes.

20  Q    And describe that for me.                           09:42:45

21  A    Well, when we were removing ourselves from the

22  premises, there was tear gas thrown at us, and one of them

23  went off, like, right between my legs, almost, a little

24  bit behind me, but really close.

25  Q    Okay.  And how did that impact you?                 09:43:08

Exhibit 9
Decl of Moede

1   A    Um, I got the brunt of gas, so I got a very, very,

2   um, thick volume of gas surrounding me.

3   Q    Okay.  And so, when you say it --  How did it affect

4   your person?  Did you cough?  Did it affect your eyes?

5   How did it -- how did it affect you?                          09:43:33

6   A    Well, it stung my eyes and caused it to water; I

7   couldn't open them.  And I could barely breathe.  Every

8   time I breathed in, it was extremely painful and I would

9   cough; felt like I was going to throw up, after a certain

10  point.  And my nose was really runny.  And I tried          09:43:53

11  breathing through my mouth, as well, but it just stung my

12  nasal cavity.

13  Q    And how long did that effect last for you?

14  A    For -- the brunt of it was about five minutes, but

15  the lingering effects, maybe about an hour.                  09:44:13

16  Q    Okay.  Any other way that you were impacted by OC

17  munitions the night of June 9th into June 10th, other than

18  what you've just described?

19  A    That was it.

20  Q    Okay, if I told you that the Portland Police Bureau     09:44:33

21  did not use force the night of June 9th to June 10th,

22  would that surprise you?

23          MR. CHAVEZ:  Object to the form.

24  Q    BY MR. MOEDE:  Go ahead and answer.

25  A    Yes.                                                    09:44:50

Exhibit 9
Decl of Moede

1   Q    So I'm going to share with you and have this marked

2   as Defendant's Exhibit 2.

3            Do you know who Sergio Olmos is, O-l-m-o-s?

4   A    Yes.

5   Q    Okay, and who is that person?                          09:45:16

6   A    Like, a local journalist, I believe.

7   Q    Okay.

8            (Deposition Exhibit No. 2 was marked

9        for identification.)

10  Q    BY MR. MOEDE:  I'm going to show you what's been       09:45:24

11  marked as Defendant's Exhibit 2.  And this is June 9th.

12  It says, "Police are out of sight.  Water bottles and

13  fireworks were thrown over the fence.  But the night

14  remained peaceful."  Do you see that?

15  A    Yes.                                                   09:45:45

16  Q    Okay.  Did you see any water bottles and fireworks

17  thrown over the fence?

18  A    Water bottles.

19  Q    Okay.  How many?

20  A    A few.  Maybe no more than ten.                        09:45:59

21  Q    Okay.  Did you see anything else thrown over the

22  fence?

23  A    No.

24  Q    And so Mr. Olmos described the night remaining

25  peaceful.  Do you disagree with that characterization?     09:46:21

Exhibit 9
Decl of Moede

1    A    Absolutely.

2    Q    So the next day would be June 10th; and then the

3    evening of June 10th and into the morning of June 11th;

4    correct?

5    A    Yes.                                                09:47:02

6    Q    Do you have any recollection of attending a protest

7    that day?

8    A    Yes.

9    Q    Okay.  And about what time did you arrive downtown?

10   A    Around the same time as June 9th, 9 p.m.           09:47:17

11   Q    Okay.  And who went with you that night?

12   A    My roommates again.

13   Q    The two roommates that you mentioned; correct?

14   A    Yes.

15   Q    And how long did you stay there?                    09:47:34

16   A    Until about the same time, maybe 1 a.m.

17   Q    And where were you standing during that protest, the

18   night of June 10th?

19   A    At the same location in Chapman Square near 3rd and

20   Main.                                                    09:47:55

21   Q    And why don't you describe what you saw on that

22   evening.

23   A    Um, that night, a part of the fence was taken down

24   from the Justice Center.  Um --

25   Q    And Let me just stop you there.  When you say "part  09:48:19

Exhibit 9
Decl of Moede

1    of the fence was taken down", what do you mean by that?

2    A    Um, it, like, just wasn't there; there, like --

3    because I remember that night, I believe the City of

4    Portland had people put up that fence, and they had --

5    when I arrived, there was a part of it that wasn't there    09:48:37

6    anymore.

7    Q    Okay, it was just gone.

8    A    Yes.

9    Q    Do you have personal knowledge as to who removed that

10   portion of the fence?                                       09:48:50

11   A    No.

12   Q    Okay.  Okay, keep going, sorry to interrupt you.

13   A    It was peaceful, for the most part.  I do remember

14   that there were a couple of people who ran behind the

15   fenced-off area because a part of that fence was missing.   09:49:07

16   One person was clothed and one person was not.

17           And law enforcement then used tear gas again

18   and was saying that they were going to use, like, force, I

19   don't remember exactly the way they worded it, and

20   flashbangs were used again.                                 09:49:41

21           And so I was frustrated at the scene, so --

22   because I felt like law enforcement was really escalating

23   something and I did not want to get gassed again, so I

24   went home and didn't go out protesting the next week.

25   Q    Okay.  What kind of clothing were you wearing that      09:50:08

Exhibit 9
Decl of Moede

1    A    Didn't think it was important.

2    Q    Okay.  Why don't you describe that to me.

3    A    It's a, um -- I would say it's a gas mask.  It has

4    two, um, like, filters that are attached to it that kind

5    of protrude, it's purple on the outside, you stick filters       09:52:12

6    on the inside of it, and it goes over my head.

7    Q    Okay.  Does that protect your eyes, as well?

8    A    No.

9    Q    So does that protect you from tear gas?

10   A    I learned no.                                               09:52:28

11   Q    Okay.  And how did you learn that?

12   A    Because I was gassed when I was wearing it.

13   Q    On the evening of June 10th that we're talking about,

14   did you see any individuals run into a fenced -- the

15   fenced area?                                                     09:52:48

16   A    Yes.

17   Q    Okay.  Can you describe that for me.

18   A    Um, there was a streaker who ran behind the fenced

19   area; and then somebody who followed them and was running

20   behind the fenced area, and they were clothed.                  09:53:03

21   Q    And where were they running toward?

22   A    It didn't look like they had direction, it just

23   looked like they were running behind the fence just to run

24   behind it.

25   Q    Okay.  Were there any warnings given that evening not      09:53:19

Exhibit 9
Decl of Moede

1    to approach the fenced area or to go inside the fenced

2    area?

3    A    Yes.

4    Q    And what were those warnings?

5    A    "Please step away from the fence."                    09:53:37

6    Q    Okay.  And so those two individuals, I take it, did

7    not do that.  Correct?

8    A    Correct.

9    Q    Do you know either of those two individuals?

10   A    No.                                                   09:53:50

11   Q    And I think you mentioned that officers deployed

12   chemical agents at the first person?  Is that right?

13   A    Correct.

14   Q    Okay.  And was that near protesters?

15   A    Yes.                                                  09:54:10

16   Q    And do you know what the chemical agents were?

17   A    Tear gas, the same tear gas that I felt like had been

18   used before, the, like, aerosol -- not the aerosol, the

19   vaporized one that goes up in the air.

20   Q    Okay.  Were you impacted by that deployment of        09:54:28

21   chemical agent?

22   A    Lightly, but I was far enough away that it didn't

23   affect me terribly.

24   Q    Okay.  And what do you mean by that, didn't affect

25   you terribly?                                              09:54:42

Exhibit 9
Decl of Moede

1   A    It wasn't like the previous night, where I was caught

2   up in the gas and was surrounded by gas.  But gas

3   disperses and takes up whatever volume it can, and I was

4   maybe, like, 50 to 70 feet away from the fence.  And so I

5   got, like, a lingering; like, kind of like that, like --          09:55:06

6   as it was traveling around the air around me, I got, like,

7   the lighter amounts of it that kind of just, like, started

8   to come my way.

9   Q    Okay.  And when you saw it coming your way, did you

10  move out of the way?                                              09:55:23

11  A    Yes.

12  Q    Okay.  And did that help?

13  A    Yes.

14  Q    Okay.  So when you indicated that you were impacted

15  lightly, what do you mean?  Like, how did it affect your          09:55:33

16  person?

17  A    My eyes stung and kind of watered, but I wasn't,

18  like, leaking like I was the night before.  And it kind of

19  stung to breathe, but I wasn't coughing.

20  Q    And how long did the effects last?                           09:55:51

21  A    Max, ten minutes.

22  Q    And then there was a second deployment, as I

23  understand, correct, of less-lethal weapons?

24  A    Yes.

25  Q    Okay.  And that included OC blasts and flashbangs, as        09:56:05

Exhibit 9
Decl of Moede

1   I understand the description that you've given.

2   A    Yes.

3   Q    Is that correct?

4   A    Yes.

5   Q    Okay.  And what did the flashbangs sound like?      09:56:17

6   A    Explosions.  Um, like gunshots, kind of.

7   Q    I was going to say, there's all sorts of explosions

8   at various levels.  But you're saying it's like a gunshot.

9   A    Yes.

10  Q    Okay.  And what is an OC blast?  What does that mean   09:56:37

11  to you?

12  A    OC blasts, I believe, are -- I think that they are

13  rubber bullets, from my understanding.

14  Q    Okay, what do you mean "rubber bullets"?

15  A    Bullets that are made of rubber.                      09:56:59

16  Q    Okay.  And what is -- when the Complaint uses the

17  term "OC", what does that mean?

18  A    That, I don't know.

19  Q    Okay.  So remember we were talking about the night

20  before and you described OC munitions?                     09:57:20

21  A    Yes.

22  Q    Okay.  And this is an OC blast.  So what's the

23  difference?

24  A    Um, I -- the blasts were much louder and munitions

25  were not quite as loud, from what I understand.  I         09:57:41

Exhibit 9
Decl of Moede

1  understand layman's terms of these, like, materials, and

2  so, yeah.

3  Q   Yeah, and that's all I'm asking, which is describe it

4  to me to the best of your knowledge.  So when you want to

5  use the term "OC blast" in layperson's terms, what do you          09:58:04

6  mean?

7  A   I believe OC blasts -- I mean, they're like -- okay.

8  So, like, I'm getting munitions and blasts mixed up.  I

9  believe OC blasts are like small grenades, ish, that,

10  like -- like a pepper powder is, like, expelled through          09:58:43

11  them.  And then munitions, I believe, are the rubber

12  bullets.  Yeah.

13  Q   Okay.  So on June 10th, 2020, were you impacted by

14  the OC blast?

15  A   Yes, because the powder also disperses throughout the          09:59:11

16  air.

17  Q   Okay.  And could you distinguish that between the

18  first incident and then the second one?

19  A   Now that I'm clarifying what it is, yes.

20  Q   Okay.  So tell me how you were impacted, your person,          09:59:29

21  with respect to the second OC -- the OC blast.

22  A   By the blast.  Well, from the OC blast, they dispel a

23  powder, again, it moves through the air much like tear

24  gas, but it's just with the wind, and kind of came my

25  direction, as well, when it was deployed.                         09:59:51

Exhibit 9
Decl of Moede

1    Q    And so when were you -- where were you standing when

2    you were impacted by the OC blast?

3    A    Around the same location as I was when the tear gas

4    went off.

5    Q    In Chapman Square?                                10:00:07

6    A    Yes.

7    Q    And how close to the sidewalk?

8    A    The sidewalk?  Oh, pretty close.  I was maybe, like,

9    10 feet away from the sidewalk.

10   Q    Okay.  And did you see the officer or officers who   10:00:20

11   deployed these less-lethal weapons that you've described?

12   A    From a distance.

13   Q    Okay.  Were they wearing a helmet?

14   A    Yes.

15   Q    Can you describe that.                            10:00:38

16   A    It was like -- it looked like kind of like a

17   motorcycle helmet; riot gear looks like -- to me, it looks

18   like a motorcycle helmet and then lots of armor that's on.

19   Q    Okay.  Was there a clear visor in the front?

20   A    Yes.                                              10:01:04

21   Q    And were the visors up or down?

22   A    Down.

23   Q    Did you see the officers that used the less-lethal

24   weapons on both of those occasions, on June 10th?

25   A    Can you repeat the question, please?             10:01:22

Exhibit 9
Decl of Moede

1   Q    And where else?

2   A    Denver.

3   Q    Any other cities where you had attended protests?

4   A    No.

5   Q    And what's the total number of protests that you          10:36:49

6   attended in any city, prior to June 12th and 13th?

7   A    Upwards of 20.

8   Q    And what kind of --  Did you ever protest against the

9   police previously?

10  A    No.                                                        10:37:12

11  Q    Can you describe the location that you went to on

12  June 12th/13th?

13  A    Also Chapman Square.

14  Q    Same spot, I take it.

15  A    Yes.                                                       10:37:38

16  Q    And did you stay in the same location or general

17  vicinity as you described on the other nights?

18  A    For most of the night, yes.

19  Q    Okay.  And so when you say "for most of the night",

20  where else did you go, other than Chapman Square, on that      10:37:51

21  night, that is, June 12th/13th?

22  A    Towards Burnside Bridge, because that's how I get

23  home.

24  Q    Oh, okay.  Was that on your way home that night?

25  A    Burnside Bridge?  Yes.                                     10:38:07

Exhibit 9
Decl of Moede

1   Q     Let me restate the question.

2           So you met up with Jose around 8 p.m. or so,

3   went downtown to Chapman Square.  What time did you

4   arrive, approximately?

5   A   At Chapman Square, I met up with them at 8, so we          10:38:27

6   probably got there around 9:30.

7   Q    Okay.  And what time did you leave that night or --

8   A    Probably --

9   Q    -- the next morning?  I'm sorry.

10  A    Probably 2 or 3 a.m.                                       10:38:42

11  Q    Okay.  Now, that was later than the other nights;

12  correct?

13  A    Yes.

14  Q    And why is that?

15  A    Just so happened to be that way.                          10:38:48

16  Q    And what do you mean by that?

17  A    Not like I'm on a schedule.

18  Q    I'm not suggesting that.  Were there particular

19  speakers that you wanted to listen to at the protest?

20  A    There were no speakers.                                   10:39:04

21  Q    Okay.  Were there -- was there a particular event

22  that night or message that you were trying to convey that

23  night for an extended period of time?

24  A    No.

25  Q    Did you carry any signs with you that night or the       10:39:19

Exhibit 9
Decl of Moede

MICHELLE BELDEN, 11/15/2021

Page 54

1  other nights?

2  A     No.

3  Q     Describe what you observed on the night of June 12th

4  and the 13th.

5  A     It was similar to most other nights that I had been     10:39:44

6  out, up until that point.  People gathered around the

7  Justice Center.  There was predominantly peaceful

8  protesters and a few people who were up at the fence

9  rattling it.

10         And, um, PPB -- I believe PPB would make     10:40:03

11  announcements on the LRAD to back away from the fence.

12  And as the night progressed and people were still within

13  the vicinity of the fence, at some point, they decided to

14  deploy tear gas and less-lethal munitions.

15  Q     And like I asked you on the other nights, were you     10:40:29

16  impacted at all by -- let's first take the less-lethal

17  munitions.

18  A     Less-lethal munitions, no, if we're talking about

19  rubber bullets.

20  Q     Okay.  I'm just trying to use your words, right, as     10:40:49

21  opposed to mine.

22         So were you impacted by tear gas that night?

23  A     Yes.

24  Q     Okay.  And can you describe that for me.

25  A     Again, similar to other nights.  I was, once again, a     10:41:09

Exhibit 9
Decl of Moede

MICHELLE BELDEN, 11/15/2021                                    Page 55

1  little bit farther away from the fence, and -- because I

2  figured that the police had a pattern of eventually

3  deploying tear gas, regardless of the way the crowd was

4  conducting themselves, so I kept my distance from the

5  fence, just in case that would happen.  When they deployed      10:41:33

6  gas, that is, again, when I took my leave.

7  Q    And that was about 2 or 3 in the morning; is that

8  correct?

9  A    About, yes.

10 Q    Okay.  And you indicated that you did see protesters      10:41:46

11 throwing things at the police, is that correct, for that

12 night?

13 A    I didn't say that.

14 Q    And that's right, I'm -- poorly phrased on my part.

15 I'll restate it.                                               10:42:04

16         Did you see protesters, on that evening,

17 throwing anything at the police?

18 A    Yes.

19 Q    And can you describe what you saw.

20 A    Water bottles.                                            10:42:17

21 Q    And were those water bottles full?

22 A    Some were more full than others.

23 Q    And how many would you say were thrown at the police?

24 A    That night, maybe five or six.

25 Q    Okay.                                                     10:42:34

Exhibit 9
Decl of Moede

1          MR. MOEDE:  I'm just going to ask, the

2   person with the phone -- Nick Roberts, can you mute,

3   please; and then, also, the person with the phone number

4   352-256-8323, can you mute, as well.  Mr. Roberts, hello,

5   can you mute your --                                    10:42:58

6          THE VIDEOGRAPHER:  I can mute it on my end,

7   if you'd like.

8          MR. MOEDE:  Yeah, that would be helpful for

9   those two, please.

10  Q    BY MR. MOEDE:  So we were talking about -- I think my  10:43:12

11  question was how many water bottles did you see thrown at

12  the police that evening, that is, the June 12th/13th?

13  A    About five or six.

14  Q    All right.  So my understanding, again, is that you

15  have an independent recollection about June 3rd, June 9th,  10:43:43

16  June 12th and 13th.  And we've gone over all of those;

17  correct?

18  A    We haven't gone over June 3rd.

19  Q    That was --  Oh, I'm sorry.  I thought that was the

20  first one that we did.                                   10:43:58

21  A    You had mentioned it, but I didn't go into detail

22  about it.

23  Q    Okay.  I will go back, then, and ask you about

24  June 3rd, I'm sorry.

25          All right, so let's go to June 3rd.  So when I  10:44:43

Exhibit 9
Decl of Moede

1   say "June 3rd", we're talking about the evening of

2   June 3rd and then into the morning of June 4th; correct?

3   A    After thinking about it, I recall that it was

4   actually early morning that day, because of the time that

5   I had gotten home.                                        10:45:05

6   Q    Okay.  And so what do you mean by that?

7   A    So it means that it would have been the evening of

8   June 2nd/morning of June 3rd, because I recall getting

9   home around, like, 3 a.m.

10  Q    Okay.  So your testimony now, after the break --    10:45:21

11  initially, you believed it was June 3rd, but now you're

12  remembering that it was June 2nd; is that correct?

13  A    Yeah.  It's within a day, so it feels reasonable.

14  Q    Close enough?

15  A    Yeah.                                                10:45:45

16  Q    Okay.  And you understand the importance of being

17  precise in this lawsuit?

18  A    Why, yes, I do.

19  Q    Okay.  Because, again, you're making allegation --

20  specific allegations about things that occurred on a      10:45:58

21  particular day at a particular time; correct?

22  A    Yes.  And as I continue to speak about my

23  experiences, things are coming back to me, just as like a

24  lot of people happen like that.

25  Q    Okay.  So let's go to what you now understand -- what  10:46:15

Exhibit 9
Decl of Moede

MICHELLE BELDEN, 11/15/2021

Page 62

1  you receive any emails or text messages or instant message

2  reminding you of this?

3  A    No.  I mean, I'm remembering it right now.

4  Q    Okay.  You're not looking at the Fourth Amended

5  Complaint again?                                              10:52:11

6  A    No.

7  Q    You're not looking at anything in particular?  You're

8  just remembering?

9           MR. CHAVEZ:  Object to the form.  Asked and

10  answered.  I'm going to direct her not to go down this       10:52:19

11  path.

12  Q    BY MR. MOEDE:  All right.  I do want to emphasize to

13  you, right, truthfully, accurately, completely.  And

14  remember when I mentioned that if your testimony doesn't

15  match prior testimony, then I'm going to use that to         10:52:36

16  cross-examine you and to try to discredit you.  Do you

17  understand that?

18  A    I recognize that, Scott.

19  Q    Okay, good.  So let's start again.

20           All right.  So June 2nd.  You leave your            10:52:53

21  duplex.  Where do you go?

22  A    I go downtown.

23  Q    Okay.  And where do you go downtown?

24  A    Somewhere close to the building, the Justice Center.

25  I can't --                                                   10:53:11

Exhibit 9
Decl of Moede

MICHELLE BELDEN, 11/15/2021

Page 63

1    Q    Well, you just told me -- maybe my question isn't
2    good.  You just told me you went on a march.
3    A    Yeah.  And I'm saying I was somewhere downtown.
4    Q    Okay.  Right.  And so where was the march started?
5    A    I can't remember that.  But I did march to 3rd and          10:53:26
6    Salmon.
7    Q    Okay.  Right.  That's what I'm trying to get at, is
8    what was the march route?  Maybe I need to ask a better
9    question.
10           What was the route of the march?  Where          10:53:39
11   did --
12   A    Somewhere --
13   Q    Where did -- I'm sorry.
14           Where did it start and where did it end?
15   A    Like I said, somewhere in downtown and ended at          10:53:48
16   Southwest 3rd and Salmon.
17   Q    Okay.  But you don't know where it started --  How
18   did you -- did you go to a starting point?  You know,
19   sometimes marches say, "Hey, everybody gather at X
20   location" and then you start marching from that point.          10:54:04
21   You know what I mean?
22           MR. CHAVEZ:  Object to the form.  Compound
23   question.  Go ahead.
24           MR. MOEDE:  Yeah, I understand.  That was a
25   compound question.          10:54:14

Exhibit 9
Decl of Moede

MICHELLE BELDEN, 11/15/2021

Page 64

1    Q    BY MR. MOEDE:  I'm just trying to -- just give me

2    your best recollection of where you joined the march, how

3    about that.

4    A    Okay.  It was probably somewhere -- okay, if I'm

5    remembering where west -- somewhere northish of the          10:54:26

6    Justice Center, um, we were still near downtown.

7    Q    Would a map help you at all?

8    A    Probably.

9    Q    Okay.  I'm going to try to share my screen with you

10   here.                                                         10:54:51

11                    (Document presented.)

12   Q    And can you see that map now?

13   A    Yes.

14   Q    Okay.  And you see my cursor?

15   A    Yes.                                                     10:55:01

16   Q    And this is Southwest 3rd and Salmon, where my cursor

17   is.  You see that?

18   A    Yes.

19   Q    Okay.  So if you take a moment to orient yourself and

20   then -- and then tell me where you think you joined that     10:55:16

21   march that you talked about.

22   A    I remember Nordstrom Rack.  So Morrisonish and

23   3rdish.

24   Q    Okay.  And you see my cursor there?

25   A    Yes.                                                     10:55:33

Exhibit 9
Decl of Moede

1    Q    And it's on that -- it says "Nordstrom Rack" right on

2    there, doesn't it?

3    A    Yes.

4    Q    Okay.  And so that is -- 3rd and Morrison would be

5    right where the cursor is now; is that right?          10:55:47

6    A    Yes.

7    Q    Okay.  So to the best of your recollection, that's

8    where you joined the march; right?

9    A    Yes.

10   Q    Okay.  And then describe for me where you went from   10:55:59

11   3rd and Morrison to get to 3rd and Salmon.

12   A    We walked basically in that -- off 3rd, because we

13   arrived, like, right in front of the Justice Center.

14   Q    And you see my cursor is going right down 3rd Avenue

15   there?                                                    10:56:22

16   A    Yes.

17   Q    And then I just stopped at Salmon; correct?

18   A    Yes.

19   Q    Okay.

20            MR. MOEDE:  And, Court Reporter, can we mark       10:56:29

21   this as -- I think we're on Exhibit 3, is that correct,

22   Defendant's Exhibit 3?

23            THE REPORTER:  Yes, that's correct.

24            (Deposition Exhibit No. 3 was marked

25      for identification.)                                    10:56:39

Exhibit 9
Decl of Moede

1  Q    BY MR. MOEDE:  All right.  Do you know what your

2  intention was?  Was your intention to go to Southwest 3rd

3  and Salmon, or to another location?

4  A    Um, my intention was to go to the Justice Center.

5  Q    Okay.  Did you have any intention to go to Pioneer          10:57:06

6  Square at all?

7  A    Pioneer Square.  If there were speakers that night,

8  yes.

9  Q    Okay, do you have an independent recollection of

10 that?                                                            10:57:29

11 A    Um, it's fuzzy.

12 Q    Okay.  So, at some point, you arrive at Southwest 3rd

13 and Salmon.  And what did you observe?

14 A    That night, it was a pretty large crowd, bigger than

15 nights I've spoken about before.  This one was definitely        10:57:50

16 one of the more docile groups that I've been a part of.

17 You know, there wasn't any, like, confrontation with the

18 police.

19        There was people that were, like, on the

20 fence, like kind of like clinging to it, but it wasn't           10:58:14

21 like other nights where they were rattling it or something

22 like that.  And I was nearer the fence than other nights,

23 um, and, um -- yeah, that's what I can remember.  Maybe --

24 no, yeah, there was, at some point, an announcement saying

25 to clear the fence.                                              10:58:49

Exhibit 9
Decl of Moede

1   Q     And about what time was that?

2   A     Later in the night, so maybe 10ish, 11ish.

3   Q     Okay.  And, after that, what was the -- do you

4   remember the words of the announcement?

5   A     Um, it was something along the lines of "Please clear    10:59:14

6   the fence, or else this will be declared an unlawful

7   assembly."

8   Q     Okay.  And did you hear any other words of the

9   announcement?

10  A     No.                                                       10:59:29

11  Q     And what happened next?

12        Well, first of all, did -- did the protesters

13  clear the fence?

14  A     No.

15  Q     And then what happened next?                             10:59:40

16  A     Well, there were no further announcements, but when

17  people weren't clearing the fence, all of a sudden there

18  were loud noises.  And this was new to me, at this point,

19  because this was earlier on in the protests.  I wasn't

20  certain what to expect, didn't know what the loud noises    11:00:06

21  were, until the air started clouding with gas, so then I

22  figured that was a tear gas canister.

23        And so many started going off, and so me and

24  my roommates who I was with start running away and were

25  going down probably what is Main, Main Street, and we are    11:00:37

Exhibit 9
Decl of Moede

1  getting chased by police.

2          And, um, we come across another crowd that is,

3  like, chanting, I would say near, like, 1st or Naito.  And

4  then police are still enclosing on us, still throwing tear

5  gas.  I can't see, I'm just trying to run.  I'm running          11:01:09

6  into bodies; I'm running into people.

7          That second crowd began to disperse, as well.

8  And we are kind of getting kettled and which is when

9  police are, like, kind of surrounding you on all sides,

10  kind of trying to herd you like a cattle.  And they          11:01:28

11  continued to deploy tear gas indiscriminately, in my

12  perspective.

13          And so I get separated from the people that I

14  was with and I run towards Naito and, I believe, Harvey

15  Milk, because there's where there wasn't any gas in the          11:01:51

16  air, and I take a minute there to try to compose myself.

17  Q    Okay.  And for -- during the time of what you just

18  described when -- I think you said that you figured it was

19  tear gas, were you wearing that respirator that you

20  described?          11:02:11

21  A    No -- um, yes.  That night, yes.

22  Q    And how about the goggles that you described?

23  A    M-hm.

24  Q    Is that a "yes"?

25  A    Oh, yes.          11:02:20

Exhibit 9
Decl of Moede

```
 1              THE VIDEOGRAPHER:  Back on the record, the
 2   time is 11:24.
 3   Q   BY MR. MOEDE:  All right, so my power flickered and
 4   now we're back.  And so we were talking about the person
 5   with the leg injury from your declaration.  You recall       11:24:26
 6   that, don't you?
 7   A   Yes.
 8   Q   Okay.  And I think I was asking or I was in the
 9   middle of a question saying, do you know that person's
10   name?                                                        11:24:37
11   A   No.
12   Q   And have you seen that person, either before or since
13   that day that -- seeing that person's leg?
14   A   No.
15   Q   Okay.  At the time, did you notice that there were      11:24:50
16   any flashbangs, or was it just tear gas?
17   A   Can you specify the time that you're --
18   Q   Yeah, on the evening -- at any time on June 2nd to
19   June 3rd.
20   A   Yes, they were used near the beginning of what I had    11:25:25
21   described when they started to close in on us.
22   Q   And when you say "they" were used, do you mean
23   flashbangs?
24   A   Yes.
25   Q   Okay, do you know what time the flashbangs started?     11:25:39
```

Exhibit 9
Decl of Moede

1  A    I can't give you exact days, but I do know, um --

2  well, okay, so I do remember August 10th, I believe, and

3  September 5th and some other time in August, but I can't

4  remember the exact date of that.

5  Q    Okay, let's talk about August 10th.                    11:42:46

6  A    Okay.

7  Q    In Paragraph 59 of the Fourth Amended Complaint, you

8  allege that you attended protests in or around North

9  Precinct on August 10, 2020, where the Portland Police

10 Bureau used indiscriminate force against all protesters.    11:43:08

11 Is that your recollection?

12 A    Yes.

13 Q    Okay.  What -- tell me what force was used.

14 A    Tear gas, again, and that is all I remember.

15 Q    Okay.  So on August 10th, the only thing you remember  11:43:29

16 is tear gas.  And what time was tear gas used on

17 August 10th?

18 A    Around midnight.

19 Q    And why do you believe it was around midnight?

20 A    Because I had arrived around 10:30/11, and it          11:43:42

21 happened pretty soon after.

22 Q    And who were you there with on that evening?

23 A    Um, four friends.

24 Q    And tell me the names of those friends, if you would.

25 A    I only know their first names, because I had met them  11:44:08

Exhibit 9
Decl of Moede

MICHELLE BELDEN, 11/15/2021

Page 87

1    only a couple of nights before and we have not stayed in

2    contact.  But I remember Jill, Camilla, Tad; and the

3    fourth person, I did not know.

4    Q    And so your roommates didn't join you on that

5    evening?                                                    11:44:36

6    A    Not that night, no.

7    Q    Okay.  How do you get in touch with these folks that

8    you met up with at the protest?

9    A    Through a messaging app.

10   Q    So does that mean you have their telephone numbers or   11:44:51

11   their email addresses?  Which one?

12   A    I have their address that is on the messaging app

13   that uses its own address.

14   Q    Okay.  And is that through a particular app?

15   A    Yes.                                                   11:45:08

16   Q    Which one?

17   A    Signal.

18   Q    And why are you using Signal?

19   A    Because it's secure and that's what most people were

20   using at the time.                                         11:45:21

21   Q    To attend protests; is that correct?

22   A    Um, I've used it for other things besides protests.

23   Q    Okay.  But was it being used specifically for

24   protests?

25   A    Yes.                                                   11:45:36

Exhibit 9
Decl of Moede

1    Q    Do you know --  So you indicated that the only force

2    used was tear gas.  What time was the tear gas used?

3    A    I believe I said around 11:30.

4    Q    Okay.  My fault.  I think I wrote down midnight.

5              All right, I'm going to try to show you a map.      11:46:01

6              (Document presented.)

7              MR. MOEDE:  All right, I'm going to have the

8    court reporter mark this as Defendant's Deposition Exhibit

9    Number 5.  Is that the number we're on?

10             THE REPORTER:  Yes.                                 11:46:31

11             MR. MOEDE:  Thank you.

12             (Deposition Exhibit No. 5 was marked

13        for identification.)

14   Q    BY MR. MOEDE:  So I'm showing you what's been marked

15   as Deposition Exhibit Number 5.  And that's the area          11:46:36

16   around North Precinct, do you see that?

17   A    Yes.

18   Q    Okay.  Is this going to -- I'm going to ask you that

19   same series of questions that we've been doing.  Is this

20   map going to work for you?                                    11:46:55

21   A    Yes.

22   Q    Okay.  So when you arrived on August 10th, what --

23   what's the nearest cross street you were at?

24   A    I was in Mallory Park.

25   Q    Okay.  And so my cursor right here on the left side      11:47:05

Exhibit 9
Decl of Moede

MICHELLE BELDEN, 11/15/2021

Page 89

1  of the screen is on Mallory Park; is that correct?

2  A    Correct.

3  Q    Okay, so this is where you -- you were in the park

4  here when you first arrived; right?

5  A    Yes.                                        11:47:19

6  Q    Okay.  And about what time was that, again?

7  A    Around 10ish.

8  Q    Okay.  And then what time did you leave the park?

9  A    Um, around 10:30.

10 Q    And where did you go?                        11:47:32

11 A    I walked towards Emerson Street and Northeast

12 Garfield.  And I was trying to stay away from the center

13 of the action, I just wanted to be available, because I

14 had my medic gear.

15 Q    And where was the center of the action that night?  11:47:51

16 A    Off of Killingsworth, right in front of the Portland

17 Police Bureau North Precinct.

18 Q    Okay.  So you see where my cursor is, it's at the

19 intersections of Northeast Emerson and then Northeast

20 Mallory Ave and Garfield Avenue, do you see that?        11:48:09

21 A    Yeah.  I was at Emerson and Garfield proper.

22 Q    Okay.  Right here where my cursor is now; is that

23 right?

24 A    Yes.

25 Q    And the action, if you will, was up here at        11:48:22

Exhibit 9
Decl of Moede

MICHELLE BELDEN, 11/15/2021

Page 90

1   Killingsworth.  And what was the -- what's the cross

2   street there?

3   A    Um, I don't know that cross street.  It's a little

4   bit closer to the Mid-K Beauty Supply, though.

5   Q    Okay, down this direction?  Do you see where my       11:48:42

6   cursor is?

7   A    Yeah.

8   Q    Right.  And there's -- on that map, it says, as you

9   indicated, "Mid-K Beauty Supply #1"; correct?

10  A    Correct.                                               11:48:55

11  Q    And so that's where the action was happening?

12  A    Yes.

13  Q    And so we've established the time and that it was

14  just tear gas.  What was the location of the tear gas that

15  night?                                                     11:49:08

16  A    Off of Killingsworth.

17  Q    Okay, do you have a -- can you pinpoint an area or

18  give me a general area where the tear gas was deployed?

19  A    Um, a little bit towards Mallory Park but -- so

20  Martin Luther King Junior Boulevard is right there, so     11:49:24

21  maybe, like, just a little bit towards -- on this map, it

22  would be towards the left, so maybe where your cursor is.

23  Q    Okay.  So right where it says "wireless", do you see

24  that?

25  A    Yes.                                                  11:49:41

Exhibit 9
Decl of Moede

MICHELLE BELDEN, 11/15/2021

Page 91

1  Q    Yeah, and I've got the cursor there on Killingsworth.

2          So could you see that location from where you

3  were on Emerson?

4  A    No.  I didn't need to see it, I just was standing

5  somewhere where I could hear if any tear gas was deployed.  11:49:53

6  Q    Okay.  And so you -- I take it you heard the tear gas

7  being deployed.  Is that right?

8  A    Yes.

9  Q    Okay.  Were you impacted personally by that tear gas

10 on that night?  11:50:10

11 A    That particular night, a lot of it was used, and so

12 it started permeating pretty far into the neighborhood.

13 And so I had smelled a little bit of it, it stung my nose

14 a bit, but it wasn't anything too serious.

15 Q    Is it possible that there was no tear gas deployed  11:50:32

16 that night and it was only smoke?

17 A    At that point, I recognized what tear gas kind of

18 smells like.

19 Q    Okay.  And so on a scale of a hundred percent versus

20 zero percent, how certain are you that tear gas was  11:50:47

21 deployed the night of August 10th?

22 A    A hundred percent.

23 Q    And how many canisters of tear gas was deployed?

24 A    All I heard was consecutive and overlapping

25 explosions, so it was hard to keep count, but definitely  11:51:09

Exhibit 9
Decl of Moede

1  A    There's always discussions being had.

2  Q    Okay.  Well, what sort of activities are the

3  protesters engaged in at 11:30 p.m.?

4  A    Protesting.  Standing.

5  Q    How --  I'm sorry, go ahead.                    11:53:10

6  A    Just showing up and being there, you know, chanting

7  and, yeah.

8  Q    Are they throwing anything?

9  A    Yes.

10 Q    Like what?                                       11:53:29

11 A    Water bottles again.

12 Q    Anything more dangerous than water bottles?

13 A    Not that I saw.

14 Q    So where were you located -- I can pull up another

15 map for you, if that's helpful.                      11:53:48

16         MR. MOEDE:  All right, I'd like to have the

17 court reporter mark this as Defendant's Deposition Exhibit

18 Number 6, please.

19         (Deposition Exhibit No. 6 was marked

20    for identification.)                              11:54:10

21 Q    BY MR. MOEDE:  And you see my cursor on the screen?

22 A    Yes.

23 Q    And that's Ventura Park; correct?

24 A    Yes.

25 Q    Okay.  And I'm just -- just to orient you a bit, you  11:54:20

Exhibit 9
Decl of Moede

1    Q    All right.  And did you ever hear a declaration of an

2    unlawful assembly on September 5, 2020?

3    A    No.

4    Q    Did you hear any announcements from the police on

5    September 5th, 2020?                                          11:56:27

6    A    No.  I believe I was too far away to hear anything,

7    if anything was said.

8    Q    What type of force did you see used by the police?

9    A    Tear gas.

10   Q    Anything else, other than tear gas?                      11:56:44

11   A    Not from my recollection.

12   Q    Okay.  And so fair to say you would not have been

13   subjected personally to any other less-lethal munitions;

14   correct?

15   A    Correct.                                                  11:57:01

16   Q    And so were you impacted by tear gas that night?

17   A    It was similar to August 10th, where I was far enough

18   away that I wasn't severely impacted, but it was enough to

19   cause a little bit of burning and tingling.

20   Q    And how long did that burning and tingling last?         11:57:17

21   A    Maybe another ten minutes.

22   Q    Okay.  And I don't think I asked you this question

23   about the gas impact, how long it lasted from -- let's

24   see, if I -- I've got to get my dates here.

25           On August 10th, how long were you impacted by         11:57:45

Exhibit 9
Decl of Moede

1  it.

2  A    Okay.

3               (Video playback.)

4               MR. CHAVEZ:  I'm going to object to the

5  relevance of this exhibit and -- to the extent that the          12:04:55

6  quality is not presenting the authentic video.

7               MR. MOEDE:  Well, I'll ask the deponent

8  questions about it.

9  Q    BY MR. MOEDE:  Mx. Belden, did you -- were you able

10 to see that video on your screen?                                 12:05:11

11 A    Yes.

12 Q    And did it depict a Molotov cocktail being thrown and

13 one of the protesters being lit on fire?

14 A    Yes.

15 Q    Okay, and you saw that, didn't you?                          12:05:21

16 A    I did.

17 Q    Okay.  And did that seem dangerous to you?

18 A    Yes.

19 Q    Okay.  And were you concerned for that protester's

20 safety when they were on fire?                                    12:05:32

21 A    Yes.

22 Q    They could have been seriously burned?

23 A    Yes.

24 Q    And it was after that that you then heard the tear

25 gas going off; correct?                                           12:05:44

Exhibit 9
Decl of Moede

1   Q    Okay.  And same for the next question.  Can you

2   identify each instance when you witnessed the Portland

3   Police Bureau use aerial distraction devices?

4   A    No.

5   Q    Can you identify each instance, again, other than          12:10:33

6   what you've testified to, when you witnessed the Portland

7   Police Bureau use rubber ball distraction devices?

8   A    Again, I can't give you specific dates.  I was out

9   weekly.

10  Q    Can you identify each instance, other than what          12:10:51

11  you've testified to already, when you witnessed the

12  Portland Police Bureau use smoke?

13  A    Again, can't give you exact dates.

14  Q    Okay.  I just have a few more of these.

15          Can you identify each instance, other than          12:11:08

16  what you testified to, when you witnessed the Portland

17  Police Bureau use FN 303?

18  A    No.

19  Q    Can you identify each instance when you witnessed

20  Portland Police Bureau use 40 millimeter?          12:11:23

21  A    No.

22  Q    Can you identify, other than what you've testified

23  to, when you witnessed the Portland Police Bureau use a

24  baton, specific dates?

25  A    No.          12:11:38

Exhibit 9
Decl of Moede

1   Q    Can you identify each instance when you witnessed the

2   Portland Police Bureau use an aerosol restraint, other

3   than what you've testified to?

4   A    No.

5   Q    I think you -- you mentioned that you live near the          12:12:01

6   Penumbra Building, in Paragraph 57 of the Fourth Amended

7   Complaint; is that correct?

8   A    Yes.

9   Q    While at home, were you ever affected by tear gas,

10  between May 29th and November 15th, 2020?                          12:12:23

11  A    Um, there were nights -- not many, but there were

12  nights where I would go outside and I would either hear

13  what was going on, um, or, you know, tear gas might have,

14  like, gone up the street a little bit, um, but it wasn't

15  anything severe.                                                   12:12:46

16  Q    Did you ever see it being deployed?

17  A    Ah, no.

18  Q    In Paragraph 58, you allege that you attended

19  protests at or around the Penumbra Building and were

20  subjected to less-lethal weapons, despite doing no more           12:13:10

21  than passively resisting.

22  A    (Nodded head.)

23  Q    Can you tell me what days you were subject to

24  less-lethal weapons while doing no more than passively

25  resisting?                                                         12:13:29

Exhibit 9
Decl of Moede

1              MR. CHAVEZ:  Object to the form.

2    Q    BY MR. MOEDE:  Go ahead and answer.

3    A    Um, if I'm understanding that, it's like a bleeding

4    disorder, yeah.

5    Q    Do you know what an FN 303 is?                    12:18:43

6    A    I know it's a munition used by the cops.

7    Q    Can you describe it?

8    A    No.

9    Q    Do you know what a 40 millimeter is?

10   A    I believe those are the rubber bullets.          12:19:06

11   Q    Okay, when you say "rubber bullets", what do you

12   mean?

13   A    Bullets made of rubber.

14   Q    Okay.  Fair, fair response.  How about a more

15   detailed description of the rubber bullet itself.  How big   12:19:20

16   is it?

17   A    40 millimeters.

18   Q    Okay.  And any other description that you can provide

19   in terms of color that it might be?

20   A    I believe they're black.                         12:19:36

21   Q    Okay.  And do you know whether or not a 40 millimeter

22   leaves any color on a person's clothing if you're struck

23   by it?

24   A    No, but it does leave, like, physical harm.

25   Q    Okay.  And you don't allege that you were impacted by   12:19:57

Exhibit 9
Decl of Moede

1  batons; correct?

2  A    Correct.

3  Q    You indicate that you have, quote, been exposed to

4  and affected multiple times by OC spray deployed by

5  Defendant City, end quote.  Okay?                         12:20:28

6              Are you able to identify which nights you were

7  affected by OC spray deployed by Defendant City?

8  A    I know that June 2nd is one of those dates.

9  Q    Any other date?

10 A    No.                                                   12:20:51

11 Q    Okay, at any point during the protests that you've

12 testified about, did you see rocks thrown at the police?

13 A    No.

14 Q    Not one time.

15 A    No.                                                   12:21:09

16 Q    Did you ever see water bottles?

17 A    Yes.

18 Q    How many times?  Hundreds?

19 A    No.

20 Q    Thousands?                                            12:21:21

21 A    No.

22 Q    Lower than a hundred?

23 A    Lower than 20.

24 Q    Okay.  So your testimony is that, in all the protests

25 you attended, you only saw protesters throw water bottles  12:21:31

Exhibit 9
Decl of Moede

1  toward the police less than 20 times; correct?

2          MR. CHAVEZ:  Asked and answered.

3  Q   BY MR. MOEDE:  Go ahead and answer.

4  A   I believe I misunderstood the question.  So in, like,

5  the entire span of when I was going, maybe 30 to 50.  But,   12:21:51

6  you know, within, like, the four to five days, six days

7  that I've testified about, 20.

8  Q   At any point, did you see -- during all the protests

9  that you've seen, did you ever see glass bottles thrown at

10 the police?                                                   12:22:16

11 A   No.

12 Q   At any time during the protests, did you ever see

13 Molotov cocktails thrown toward the police?

14 A   No.

15 Q   At any time, did you see any Molotov cocktails, at      12:22:31

16 any time during the protests when you attended?

17 A   I've never directly seen a Molotov cocktail.

18          MR. MOEDE:  It is really getting stormy

19 here, by the way.  So if my Internet goes out, we could

20 just take our lunch break, okay?  I just want to try to      12:22:52

21 keep going here.

22 Q   BY MR. MOEDE:  Did you ever see -- again, during all

23 the nights that you attended protests, did you ever see

24 protesters light any fires?

25 A   No.                                                      12:23:07

Exhibit 9
Decl of Moede

1  admissions, you say that you're unaware of what every

2  protest in Portland opposing police violence and white

3  supremacy would include, so we've established that.

4              So the question is, how do you define who the

5  class is that protested opposing police violence and white    13:46:53

6  supremacy, if you, right, aren't aware of every protest?

7  Do you see what I'm asking?

8              MR. CHAVEZ:  Vague.  Same objection.

9  Q    BY MR. MOEDE:  Go ahead and answer that, please.

10 A    Not every single person in the crowd is going to be      13:47:14

11 part of the class, and that's what I meant by I don't know

12 every single, like, person's, like -- um, like the -- how

13 did you word that?  You said, like, the reasons for people

14 being there, or something like that?  I'm not going to

15 know every single person who shows up, what their            13:47:34

16 intentions are.

17              But the overarching demands that were, like,

18 what people -- what most people were gathering for was,

19 like, redistributing resources and making systemic changes

20 that protect black folks, that protect communities of        13:47:51

21 color.

22 Q    Why wouldn't every person, to use your words, be part

23 of the class, the First Amendment class?

24 A    That's because not everybody is going to be aligned

25 in a group of thousands.                                      13:48:06

Exhibit 9
Decl of Moede

1   are still within legal means, so, yeah.

2   Q     BY MR. MOEDE:  At any point during the protests, did

3   you engage in conduct beyond passive resistance, as you

4   just described it?

5   A     No.                                                13:56:54

6   Q     Is it your understanding that the factual situations

7   during each instance when PPB officers deployed tear gas

8   were similar?  Or were they different?

9   A     Were similar to passive resistance?

10  Q     No, just generally.  So, in other words -- let me      13:57:20

11  phrase the question this way.

12           So you testified about the deployment of tear

13  gas on various occasions; correct?

14  A     Yes.

15  Q     Okay.  And so my question to you is, are the factual   13:57:34

16  situations during each instance when tear gas was deployed

17  similar or different?

18  A     Different.

19  Q     Okay, and how so?

20  A     There were nights where there was passive resistance,  13:57:55

21  and then there were nights where there was resistance that

22  could be classified as going against legal means.

23  Q     And that -- was that during times when you

24  experienced that?

25  A     What do you mean?  What times?                         13:58:14

Exhibit 9
Decl of Moede

1  A    Same things, real policy changes that help protect

2  protesters and people who -- of color and black folks.

3  Q    And so, for example, with respect to the FN 303

4  launcher and the 40 millimeter launcher, what specific

5  policy changes would you like determined as a class          14:00:38

6  representative?

7  A    I would like to see, personally, the ban of it --

8  like, ban of its presence at peaceful protests.

9  Q    And when you say "personally", I'm asking you as a

10 class representative.  How would you respond?               14:01:00

11 A    A ban of the use of those weapons at peaceful

12 protests.

13 Q    So how would you define a peaceful protest?

14 A    A peaceful protest is predominantly passive

15 resistance.                                                  14:01:28

16 Q    Is a protest peaceful if protesters throw Molotov

17 cocktails?

18 A    No.

19 Q    Is a protest peaceful if protesters throw rocks at

20 the police?                                                  14:01:40

21 A    No.

22         MR. CHAVEZ:  Objection.  Assuming facts not

23 in the record.  Thank you.

24 Q    BY MR. MOEDE:  Is a protest peaceful if protesters

25 are throwing water bottles at the police?                    14:01:55

Exhibit 9
Decl of Moede

1   A     I don't see how a water bottle can harm somebody, so

2   yeah.

3   Q     Okay.  So it's okay to throw a water bottle -- how

4   about a full water bottle?

5   A     By common sense, as long as it's not going to harm        14:02:12

6   somebody, I don't see how it's not peaceful.

7   Q     Okay.  How about a frozen -- full water bottle that's

8   frozen?  Is it --

9                   MR. CHAVEZ:  Objection --  Go ahead.

10                  MR. MOEDE:  Let me just get it out.             14:02:28

11  Q     BY MR. MOEDE:  Okay, so the scenario is a fall water

12  bottle that's frozen, okay, that's thrown from protesters

13  at the police, okay.  Is that a peaceful protest?

14                  MR. CHAVEZ:  Assuming facts not in the

15  record.  Go ahead.                                            14:02:42

16  A     Probably not.

17  Q     BY MR. MOEDE:  What kind of specific policy change,

18  as a class representative, are you looking for with

19  respect to batons and aerosol restraints?

20  A     In terms of batons and aerosol restraints, I would      14:03:09

21  like to see policy that, again, bans the use of these at

22  peaceful protests.

23                  And I recognize that, you know, I didn't say

24  this explicitly, but a peaceful protest also means, like,

25  there is no threat of active harm toward anybody who is,      14:03:28

Exhibit 9
Decl of Moede

1    like, at the protest.

2              And, also, there needs to be reasonable

3    training done by police, to be able to gauge a situation

4    and its direness and its danger levels, and so I don't see

5    how a frozen water bottle warrants use of batons and          14:03:51

6    FN 303 launchers.

7    Q    Do the LRAD, which is the long range acoustical

8    device, or sound cannons relate to this class?

9    A    Like, the class that I'm actively representing?

10   Q    Yes.                                                       14:04:22

11   A    Um, I don't believe that's one I'm representing, no.

12   Q    And the same questions I asked you during the last

13   round of questions.  So you'll recall I asked you about

14   the indiscriminate weapons subclass, and this is the

15   targeted weapons subclass.                                      14:05:03

16              And the question is, are the factual

17   situations during each instance when PPB officers deployed

18   these types of weapons similar or different?

19   A    I mean, it depends on what nights you're looking at.

20   Q    Okay.  Well, what do you mean by that?                     14:05:32

21   A    I do recognize that there were nights that active

22   resistance was being used and that things such as Molotov

23   cocktails were being thrown.  But there were more nights

24   that were peaceful, and so those don't have any factual

25   similarities in terms of when they were used.                  14:05:51

Exhibit 9
Decl of Moede

1         But they -- but tear gas and targeted weapons

2    and -- targeted weapons and indiscriminate weapons were

3    used at both types of protests, so there was a similarity

4    in those situations.

5              MR. CHAVEZ:  Can we go off the record for a          14:06:10

6    sec?

7              MR. MOEDE:  Sure.

8              THE VIDEOGRAPHER:  Off the record at 2:06.

9              (A discussion was held off the record.)

10             THE VIDEOGRAPHER:  Back on the record, the          14:15:17

11   time is 2:15.

12   Q    BY MR. MOEDE:  Mx. Belden, there are some references

13   in the Fourth Amended Complaint to COVID, so I wanted to

14   ask you some questions about that.

15   A    Yeah.                                                    14:15:31

16   Q    Did you have any concerns related to COVID while you

17   participated in the protests?

18   A    Yes.

19   Q    And tell me about what your concerns were.

20   A    Once the use of tear gas was deployed, I was          14:15:44

21   concerned that -- for people's health and safety, during a

22   pandemic that affects your respiratory system.

23   Q    At some point, there hasn't been any further use of

24   tear gas.  Correct?

25   A    At which point?  Can you clarify?                        14:16:08

Exhibit 9
Decl of Moede

MICHELLE BELDEN, 11/15/2021

Page 146

```
 1              THE VIDEOGRAPHER:  Off the record at 2:34.

 2              (A recess was taken.)

 3              THE VIDEOGRAPHER:  Back on the record, the

 4    time is 2:46.

 5    Q    BY MR. MOEDE:  Mx. Belden, I just have a couple of        14:46:52

 6    follow-ups.

 7              So I think I asked you whether or not you had

 8    provided any texts in response to Request for Production

 9    and you said no; and I was asking, on other questions,

10    whether you had deleted anything, but I don't think I        14:47:13

11    covered it regarding texts.  So have you deleted any texts

12    regarding the protests between May 25, 2020, and

13    November 15, 2020?

14    A    The app that I use for messaging doesn't store text

15    messages.                                                    14:47:35

16    Q    And that's Signal; correct?

17    A    Correct.

18    Q    Okay.  Similarly, another follow-up is I asked you do

19    you have any current plans to attend a protest in

20    Portland; I think you said no.  So here's my follow-up       14:47:53

21    question.  Are you aware of any currently scheduled

22    protests in Portland opposing police violence or white

23    supremacy?

24    A    No.

25              MR. MOEDE:  That's all the questions I have.       14:48:13
```

Exhibit 9
Decl of Moede

1                        CERTIFICATE

2          I, Kim Nerheim, an Oregon Certified Shorthand

3    Reporter and a Washington Certified Court Reporter, hereby

4    certify that said witness appeared before me by

5    videoconference at the time and place set forth in the

6    caption hereof; that at said time and place I reported in

7    stenotype all testimony adduced and other oral proceedings

8    had in the foregoing matter; that thereafter my notes were

9    transcribed through computer-aided transcription, under my

10   direction; and that the foregoing pages constitute a full,

11   true and accurate record of all such testimony adduced and

12   oral proceedings had, and of the whole thereof.

13          I further certify review of the transcript was

14   requested.

15          Witness my hand at Portland, Oregon, this 23rd

16   day of November, 2021.

17

18

19

20          _____

21          Kim Nerheim

22          Oregon CSR No. 90-0138

23          Expires 9/30/2023

24          Washington CCR No. 0003038

25          Expires 3/28/2022

Exhibit 9
Decl of Moede

1                UNITED STATES DISTRICT COURT
                     DISTRICT OF OREGON
2                     PORTLAND DIVISION

3

4   DON'T SHOOT PORTLAND, a        ) Case No. 3:20-cv-00917-HZ
    nonprofit corporation, in its )
5   individual capacity;          )
    NICHOLAS J. ROBERTS, in an    )
6   individual capacity and on    )
    behalf of themselves and all  )
7   others similarly situated;    )
    MICHELLE "MISHA" BELDEN, in an )
8   individual capacity and on    )
    behalf of themselves and all  )
9   others similarly situated;    )
    ALEXANDRA JOHNSON, in an       )
10  individual capacity and on    )
    behalf of themselves and all  )
11  others similarly situated;    )
    LESTER WRESCKIE, in an        )
12  individual capacity and on    )
    behalf of themselves and all  )
13  others similarly situated; and )
    THOMAS DREIER, in an individual)
14  capacity and on behalf of     )
    themselves and all others     )
15  similarly situated,           )
                                   )
16               Plaintiffs,       )
                                   )
17       vs.                       )
                                   )
18  CITY OF PORTLAND, a municipal  )
    corporation,                   )
19                                 )
                 Defendant.        )
20  _____)

21

22       VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
                   ALEXANDRA JOHNSON
23
                 Taken on behalf of Defendant
24
                       *   *   *
25

Exhibit 10
Decl of Moede

ALEXANDRA JOHNSON, 12/03/2021                                    Page 16

1    to re-cover or correct, or anything like that?

2    A     No, appreciate that, thank you.

3    Q     Okay.  So I think you were mentioning that you use

4    Signal for your text messages.  Did you produce all the

5    texts with respect to the protests this summer to the          09:21:34

6    City?

7    A     Um, my Signal has a default setting to delete the

8    text messages, so, unfortunately, I did not have any of

9    the texts from the summer.

10   Q     Okay.  And is that like an intentional thing with        09:21:49

11   Signal, is to not retain texts?

12   A     I believe it -- I think it's a default setting, yes.

13   I didn't realize that it was an automatic thing.

14   Q     Okay.  And so did you mean to -- I don't know if

15   destroy is the right word, but not retain the texts that       09:22:07

16   you were sending for the protests?

17   A     Ah, no, it would just delete them after 30 days.  And

18   I was only seeing the most recent texts in the message

19   scroll, so I didn't even realize that the messages from 30

20   days ago were being deleted.                                   09:22:24

21   Q     You mentioned that you reviewed some videos that were

22   publicly available.  Whose videos did you view?

23   A     My own.

24   Q     Okay.  I thought you had said that you had reviewed

25   some publicly available videos.  But they were just your       09:22:47

Exhibit 10
Decl of Moede

1   friends, um, while I was at a protest.

2   Q    Okay.  What about any alcohol?

3   A    Ah, yes, I would have a White Claw hard seltzer while

4   I was with friends down there.

5   Q    Did you ever feel like that you were, like, buzzed,          09:40:20

6   drunk, or high, when you attended these protests, from the

7   marijuana joint or the White Claw that you consumed?

8   A    No.

9   Q    Do you feel like that you have a clear and accurate

10  memory of the events when you attended protests, even if        09:40:34

11  you had a couple drinks and smoked a joint or two?

12  A    Yes.

13  Q    Okay.  All right, fair to say that you live-streamed,

14  as well, when you protested?

15  A    Correct.                                                    09:40:51

16  Q    And what did you live-stream on?  Was it mostly

17  Twitch?

18  A    Ah, during the month of June and the beginning of

19  July, I streamed solely to Facebook.  Um, for a portion of

20  July, I was unable to stream, um, which is where a              09:41:10

21  majority of my local footage came from on my phone, that

22  was stored on my phone, um -- which I turned over to you,

23  as well.

24  Q    Okay.

25  A    And then, at the end of July, I created my Twitch           09:41:29

Exhibit 10
Decl of Moede

1   account and started streaming solely to Twitch.

2            Oh, ah, I apologize.  I believe that there was

3   a brief couple days in July where I tried to stream to

4   Instagram and/or Twitter but was frustrated with the

5   quality and/or settings and immediately threw it away.    09:41:50

6   Q    Okay, so that's helpful.  So footage June/July is

7   mostly on Facebook and then, at the end of July, you

8   switched to Twitch.  Is that accurate?

9   A    Correct.

10  Q    Okay.  And so the footage that you produced in this   09:42:09

11  case, the video footage, is that, would you say, mostly

12  from Facebook or mostly from Twitch?

13  A    Ah, the video footage that I produced is -- was all

14  locally stored on my phone.  Um, the videos from Twitch

15  and Facebook are all publicly available and I did not have  09:42:29

16  the storage capacity and/or capability, at the time, to

17  download any of those videos, nor do I have that

18  capability now, um, so that's why they stay on the cloud

19  and can be downloaded -- or the enter -- they're hosted by

20  Facebook and Twitch and can be downloaded from there.      09:42:54

21  Q    Okay, so I think I understand what you're saying.  So

22  the exhibits I got through your response to our Request

23  for Production were the ones that you had stored locally

24  on your phone.

25  A    Correct.                                              09:43:03

Exhibit 10
Decl of Moede

1    Q    But we might not have all your Facebook and Twitch

2    posts.  Is that correct?

3    A    Correct.

4    Q    Okay.

5                MR. YAMACHIKA:  So, Franz, I'm going to ask          09:43:15

6    for those, as well.  I mean, I think that was covered by

7    our RFP.

8                MR. BRUGGEMEIER:  You want us to download

9    those and then send those to you?

10                MR. YAMACHIKA:  I mean, I think --                    09:43:31

11                MR. BRUGGEMEIER:  Or do you want us to just

12    provide links to them?  Right?

13                MR. YAMACHIKA:  Yeah, I think -- we'll

14    talk -- I guess we can talk about it off the record.

15                MR. BRUGGEMEIER:  Okay, sounds good.                  09:43:38

16                MR. YAMACHIKA:  Okay.

17    Q    BY MR. YAMACHIKA:  All right.  Ms. Johnson, do you

18    consider yourself a member of the press?

19    A    No.

20    Q    Did you --                                                  09:43:51

21    A    Not -- I mean, no.  I consider myself a protester

22    first that was doing media things occasionally.  But I was

23    always a protester.

24    Q    Okay.  So protester first, media second?

25    A    Ah, yes, I would document what was down there,             09:44:10

Exhibit 10
Decl of Moede

1   Q    Okay.  And so let me -- the Third Amended Complaint

2   was filed in October of 2020, which, by that time, all of

3   these events had happened.  Had you forgotten about these

4   events when you filed the Second and Third Amended

5   Complaints?                                              10:22:49

6   A    Ah, no.  They just weren't as relevant in my memory.

7   Q    Okay.  And then you just -- and then you remember

8   them -- but would you agree with me that the incidents

9   that we're going to talk about here coming up, beginning

10  on June 5th, 2020, those were all closer in time when you  10:23:12

11  made the allegations in your Second and Third Amended

12  Complaint than when you filed the Fourth Amended

13  Complaint.  Would you agree with that?

14  A    Yes.

15  Q    Okay.  Can you explain to me why you waited over a   10:23:27

16  year to add those allegations?

17            MR. BRUGGEMEIER:  Object.  This calls for

18  her to talk about privileged communications with her

19  attorneys.

20  Q    BY MR. YAMACHIKA:  Can you answer that without       10:23:42

21  revealing anything that you've talked about with your

22  attorneys?

23  A    Ah, no, I don't believe so.

24  Q    Okay.  All right, so I want to make sure that there

25  are going to be any -- talking about all the dates that   10:23:58

Exhibit 10
Decl of Moede

ALEXANDRA JOHNSON, 12/03/2021                          Page 45

1   force was used against you or that give rise to the claim

2   against the City.  So that's June 5th, June 13th,

3   June 20th, July 4th, August 4th, August 13th and 16th,

4   August 22nd or 23rd, and September 5th.  Those are the

5   only dates that you have allegations that give rise to          10:24:20

6   claims against the City; is that right?

7   A    Um, upon reviewing for my deposition, I have found

8   more dates that I would like to add to the allegation.

9   Q    Okay, what dates are those?

10  A    That would be June 6th, June 10th, June --           10:24:37

11  Q    Slow down a bit, because I'm writing.  June 6th.

12  Sorry, go ahead.

13  A    June 10th, June 27th, August 1st, August 5th -- I

14  think -- actually, I think August 5th may be in there,

15  give me just a moment.  Um, yes, August 5th, August 7th,        10:25:09

16  August 8th, August 9th.  Um, I would like to amend

17  Paragraph 69 to reference August 12th and --

18  Q    Let me ask a clarification on that.  You talk about

19  69 to amend to the 12th?

20  A    Ah, yes, to be amended to August 12th and            10:25:44

21  August 15th.

22  Q    And not 13th and 16th?

23  A    Correct.

24  Q    Okay, so let -- maybe I confused things when I kind

25  of defined -- and I might have got it backwards.  What         10:25:58

Exhibit 10
Decl of Moede

1   Portland for many days since May 31st, 2020, because Black

2   Lives Matter and she wants to make her community safer and

3   more equitable.  Ms. Johnson has not witnessed any rioting

4   or looting."

5           So I want to ask you, what do you consider the          10:41:06

6   word "rioting" to mean?

7                MR. BRUGGEMEIER:  Objection.  Calls for a

8   legal conclusion.

9   Q   BY MR. YAMACHIKA:  Go ahead and answer --

10               MR. BRUGGEMEIER:  You can answer, Alex, if          10:41:18

11  you can.

12  A    I don't think that I have the training, education, or

13  experience to really define that term legally, so...

14  Q   BY MR. YAMACHIKA:  Yeah, so what do you -- like, if

15  you say, "I" -- "Ms. Johnson has not witnessed any            10:41:34

16  rioting", what is -- what is that -- like, what does that

17  mean to you; like, "I haven't witnessed any rioting", as

18  that's from a -- from a layperson's standpoint?

19  A    I didn't witness anybody burning any cars and jumping

20  on top of them or, um, I didn't see any buildings burn        10:41:50

21  down, um, I didn't see anybody break out in huge brawls

22  among crowds.

23  Q    So when you said you didn't see any buildings burn

24  down, did you see buildings lit on fire?

25  A    Upon reviewing my video for my deposition, I believe      10:42:15

Exhibit 10
Decl of Moede

ALEXANDRA JOHNSON, 12/03/2021                    Page 49

1  that I caught some video of a building being lit on fire,

2  but, at the time that I was filming, I didn't recognize or

3  see it.

4  Q    So I want to also expand, I'm not just talking about

5  what you filmed.  Like, you obviously saw a lot of things     10:42:40

6  that you might not have captured on film; right?

7  A    Yes, of course.  Um, no, otherwise, no, I didn't.

8  Q    And then you said you didn't see any burning cars or

9  people jumping on cars; is that right?

10 A    Correct.                                                 10:42:58

11 Q    Okay.  Did you see people smashing out windows?

12 A    No, I didn't witness any smashing of windows.

13 Q    Okay.  And then, similarly, you say that you didn't

14 witness any looting.  What does the word "looting" mean to

15 you?                                                          10:43:14

16 A    I didn't witness anybody breaking into any stores and

17 stealing items that they didn't pay for.

18 Q    Okay.  And so May 31st, 2020, was the first day that

19 you attended a protest in downtown Portland.  Can you give

20 me a date that you stopped protesting in the summer or        10:43:34

21 fall of 2020?

22 A    I apologize, did you say May 21st?

23 Q    I meant 31st, if I said 21st.  I meant May 31st,

24 2020, was the first day that you started protesting in the

25 summer of 2020.  What I'm asking is when did you stop         10:43:50

Exhibit 10
Decl of Moede

1    A    Correct.

2    Q    And where did you attend the protest on June 5th,

3    2020?

4    A    I attended the protest at the Multnomah County

5    Detention Center in downtown Portland.                    10:55:39

6    Q    Is that also sometimes referred to as the "Justice

7    Center" and also the "injustice center"?

8    A    Correct.

9    Q    Okay.  I just wanted to make sure we're talking about

10   the same thing.                                           10:55:54

11          Where did you come from, before you showed up

12   at the Multnomah County Detention Center?

13   A    That night, my friend Lacey and I had decided to

14   bring coffee to the protesters that were downtown.  Ah, we

15   came from Lacey's place of work where we picked up the     10:56:12

16   coffee and then went to downtown, where we parked on --

17   um, I want to say it was 4th and Madison.

18   Q    Did you drive there in your own vehicle?

19   A    No, I did not.  We drove in Lacey's vehicle.

20   Q    What time did you get there on June 5th, 2020?        10:56:50

21   A    Approximately 11 p.m.

22   Q    You said you went there with Lacey at this event.

23   Was that the only person that you attended with, or was it

24   the group of people that you previously mentioned?

25   A    Um, that was a -- an instance where I arrived with     10:57:05

Exhibit 10
Decl of Moede

1   Lacey and met up with other people at the protest.

2   Q    And were you dressed similarly to the photos that we

3   just went through with the selfies that we just went

4   through, Exhibit --

5   A    Yes.                                              10:57:22

6   Q    Okay.  So --

7   A    And with the -- with the addition of the snapback.

8   Q    Okay, thank you.

9            All right, so tell me what happened when --

10  from when you arrived around 11 p.m. at the Multnomah    10:57:35

11  County Detention Center and to when the tear gas was

12  deployed.

13  A    Um, Lacey and I arrived at around 11 p.m.  Um, as

14  soon as we exited the car, there was an LRAD announcement

15  that declared -- that said it was PPB and that they were  10:57:55

16  declaring an unlawful assembly.

17           Um, at that point, Lacey and I decided that it

18  wouldn't be a good idea to hand out coffee, um, and so we

19  went to go meet up with our friends who were down on, um,

20  3rd and Main.  Ah, the friends that we met up with were   10:58:16

21  Michael Arnold, Taylor Arnold, ah, Candace Olson, Justin

22  Christianson, um, another gentleman named Justin, um,

23  Jean-Luc Neighbors, and Brandon Peterson, I believe.

24           Um, we spent about ten minutes talking around

25  3rd and Main, ah, when the police fired approximately     10:58:40

Exhibit 10
Decl of Moede

1   eight tear gas canisters.  And when I say "police", I mean

2   PPB fired eight tear gas canisters into the area of 3rd

3   and Main, blanketing most of Chapman Square in, um, tear

4   gas.

5             At that point, um, me, as well as a majority          10:59:02

6   of all of the other protesters, ah, moved north on 3rd

7   where, um, 3rd and Taylor, I believe it is --

8             Actually, do you mind if I -- would it be

9   possible if I could bring up a map of downtown?

10  Q    Yeah, sure.                                                 10:59:29

11  A    Is it okay if I -- do you want to bring that up,

12  or -- I know that there's an exhibit for it, but...

13  Q    Yeah.  If you want to look at a prior exhibit that

14  was used -- the court reporter --

15  A    Otherwise, I can just bring it up on Google Maps, I        10:59:44

16  don't have a problem with that.

17  Q    Well, let's try to use an exhibit that works for you.

18  Which -- do you have a list of exhibits that have been

19  used so far?

20  A    Um, I don't have a list of exhibits, but, if I             10:59:56

21  remember correctly, it's probably Exhibit 1 or 2.

22  Q    Okay.  Trying to figure out the best way to do this.

23  I don't have access to...

24             MS. WARNOCK:  I'll pull Exhibit 1 into your

25  folder, Rob.                                                    11:00:19

Exhibit 10
Decl of Moede

1  Street.  Um, people were screaming.  There was, ah, chaos.

2  It was a lot of people's first times ever being, um,

3  tear-gassed and nobody had any, um, idea how to handle

4  that kind of pain.

5          Um, it was hard to breathe and see, so it          11:02:40

6  caused panic in everyone around you, because you didn't

7  know which way to exit or which way safety was.  Um,

8  thankfully, I had that neutralizing spray with me, and so

9  I was able to help myself, as well as other people who had

10 gathered around, um, Southwest 3rd and Salmon.          11:03:07

11         And at that point, um, the protesters moved

12 back to, ah, Southwest 3rd and Main, ah, where they stood

13 chanting and singing for approximately ten minutes, before

14 PPB decided to fire off another six or seven tear gas

15 canisters.  Um, and, ah, they had moved the protesters up   11:03:24

16 to 4th Avenue and were moving them towards, um, Pioneer

17 Square.

18         Again, the tear gas caused immense pain to

19 everybody that was around.  They were -- there was crying

20 and screaming, which invoked panic in other people.  Um,   11:03:48

21 it burned everyone's eyes.  It stuck with you for at least

22 15 to 20 minutes, if you didn't have any kind of water or

23 help with you.

24         Um, at that point, ah, the protesters again

25 treated each other's wounds and, um, helped each other to   11:04:10

Exhibit 10
Decl of Moede

1  recover from the tear gas.  Ah, we migrated south back on

2  4th Avenue, um, and there was another group of protesters

3  that was on the south end of 4th Avenue.

4           There was a police riot van -- a PPB riot van

5  that was located on the, ah, west side of 4th Avenue, um,     11:04:31

6  with a couple PPB officers there.  Ah, as I was walking

7  up, um, 4th to come back to the park, ah, PPB officers

8  unloaded another tear gas canister off of the truck and

9  left.  Um, there was no protesters around them, ah,

10  there -- all of the protesters were at least 20 to 30       11:04:56

11  yards away from them.

12           Um, at that point, I knew it was tear gas,

13  because I walked into the cloud and felt it.  Again, the

14  pain, um, I had to retreat and, um, spray myself with the

15  neutralizing spray again.  Um --                             11:05:18

16  Q    Let me just stop you there.

17  A    Yeah.

18  Q    It's a lot.

19           One question I've got for you; I appreciate

20  the detailed response.  Are you reading off of some notes   11:05:28

21  of --

22  A    No.

23  Q    Okay.  This is just based on your memory?

24  A    Yes.

25  Q    Okay.  Let me -- let me just kind of drill down a bit   11:05:37

Exhibit 10
Decl of Moede

1   A    Um, yes, I believe that there was one that landed

2   within approximately, ah, 5 to 10 feet of me.

3   Q    Okay.  And then you mentioned that there was another

4   six or seven cans?

5   A    Ah, technically, there was approximately 54 canisters        11:15:02

6   launched that night.

7   Q    How do you know there was 54 canisters launched that

8   night?

9   A    Um, from prepping for my deposition and from my

10  memory.                                                           11:15:16

11  Q    Okay.  Were you counting the number of canisters

12  being deployed?

13  A    Yes.

14  Q    And did you write down notes on the amount of

15  canisters deployed each night that you attended a protest?        11:15:31

16  A    Ah, no, I did not write it down during the protests.

17  Q    Okay.  So which is the one that exploded underneath

18  your feet?  Because that's what is in your Complaint.

19  A    Um, actually, what is in my Complaint is that it was

20  shot at me and, technically, hit me in the chest and then         11:15:59

21  exploded under my feet.

22           Um, in continuation with my story, after PPB

23  had left off of 4th Avenue, the protesters then went down

24  to, I believe, the center of -- ah, between 3rd and 4th on

25  Madison, ah, where, um, they had stayed there probably for        11:16:15

Exhibit 10
Decl of Moede

1  ten minutes just chanting there, lined up in a group on

2  Madison.

3           Um, PPB then threw smoke bombs -- or tear gas

4  flashbangs into the center of the group.  Um, and then, as

5  I was filming, walking back, ah, a tear gas canister came          11:16:42

6  through the crowd, hit me in the chest, and then exploded

7  underneath my feet.

8  Q    Okay.

9  A    And I believe it was a launch, based on the force

10 that it hit me with.                                               11:16:55

11 Q    Okay, so was this, before we -- when you first

12 answered my question, you give a fairly detailed account

13 and you said that there was a group of PPB officers that

14 were by a van and then they -- and tossed a canister.

15          What you're talking about happened after that;          11:17:20

16 is that right?

17 A    Correct.

18 Q    Okay.  And so, I want to focus on when this canister

19 hit you in the chest.

20          MR. BRUGGEMEIER:  Rob?                                   11:17:36

21          MR. YAMACHIKA:  Yes.

22          MR. BRUGGEMEIER:  Can we take, like, five

23 minutes, so that we can get to lunchtime after this?

24          MR. YAMACHIKA:  Yeah.

25          MR. BRUGGEMEIER:  Okay.  I just -- I've got       11:17:43

Exhibit 10
Decl of Moede

1   Q    And were you dispersing?

2   A    I was not.

3   Q    You were not.

4   A    I was not.

5   Q    Okay.  Were you standing in the street on 3rd and          11:37:04

6   Main?

7   A    Yes, I was.

8   Q    Not on the sidewalk.

9   A    No.

10  Q    Okay.  Okay, besides the RBDD and the tear gas, any         11:37:16

11  other force used on you on June 5th, 2020?

12  A    Ah, not that I can remember at this time.

13  Q    Okay.  I'm going to ask you real quick, in your

14  interrogatory response -- do you have that still in front

15  of you?  It's on Page 4.                                          11:37:47

16  A    Yes.

17  Q    In that, you say, on June 5th, there was -- you were

18  struck by an FN 303 at MCDC, struck by explosion of 40

19  millimeter.

20       What are you talking about there?  Are                       11:38:03

21  those -- is that incorrect?

22  A    Um, I -- at this time, I -- I can't remember quite

23  what the FN 303 instance is, um.  Ah, the 40 millimeter

24  munition is what struck me in the chest, and the RBDD is

25  what exploded earlier at my feet.                                 11:38:22

Exhibit 10
Decl of Moede

1  later the next morning?

2  A    No.  We had stayed in the hotel for approximately 30

3  minutes or so and called a friend to come pick us up from

4  the hotel.

5  Q    Okay, I understand.  So you went into the hotel, but          11:41:25

6  didn't, like, check in and spend the --

7  A    (Nodded head.)

8  Q    Yeah, okay, got it.  All right.

9         And you already said that you don't have any

10  photographs of any injuries that you sustained, but there        11:41:35

11  is this video on Facebook that's been posted.

12  A    Correct.

13  Q    Okay.  All right, let's move on to June 12th; the

14  night of June 12th and the morning of June 13th, is how

15  we've defined it.  You attended -- this is Paragraph 65          11:41:52

16  now in Fourth Amended Complaint.  You attended protests in

17  Portland on June -- on the evening of June 12th and the

18  morning of June 13th; correct?

19  A    Correct.

20  Q    And where did you attend the protest on June 13th?         11:42:14

21  A    The Multnomah County Detention Center, on the night

22  of June 12th.

23  Q    Yeah, I'll call it June 13th with -- we're capturing

24  the night of the 12th and the morning of the 13th.

25  A    I apologize, but wasn't that an error that we             11:42:33

Exhibit 10
Decl of Moede

1   corrected earlier?

2   Q    Yeah, I can -- I can say the night of the 12th and

3   the morning of the 13th, that's fine; just avoid that

4   confusion.

5           So where did you come from, before you got to     11:42:45

6   the Multnomah County Detention Center?

7   A    Um, I think I came from my home.

8   Q    And it's the -- is it Woodward or Woodard?

9   A    Woodward.

10  Q    Yeah, okay, Woodward address.                         11:42:58

11          And did you come alone, or did you go -- come

12  with someone else?

13  A    Um, I believe, that night, I also came with my friend

14  Lacey.

15  Q    Okay.  Did you take her car again, or did you drive   11:43:12

16  this time?

17  A    Um, that night, I drove my car.

18  Q    Okay.  Where did you park?

19  A    Um, I believe I parked on, ah -- I think it was on

20  the street just south of Madison and around 5th.          11:43:34

21  Q    Okay.  So south of Madison is Jefferson.  Does that

22  sound right?

23  A    Yes.

24  Q    What time did you get there on the night of

25  June 12th?                                                 11:43:57

Exhibit 10
Decl of Moede

1    except to say where you were.

2    Q    Okay.  Would you and your friends use these shields

3    together?

4    A    Ah, we would pass the shield to one another.  So it

5    wasn't just me who was using the shield throughout the    11:47:00

6    night.

7    Q    Okay.  Did your friends have their own shields?

8    A    Some did and some did not.

9    Q    Okay.  So what I was asking is -- have you ever seen

10   these, like, Roman movies, like Gladiator or something,    11:47:13

11   where they've got like a legion of Roman soldiers and they

12   have their shields in a formation?  Do you know what I'm

13   talking about?

14   A    Yes, I'm familiar.

15   Q    Did you guys use shields in that fashion?    11:47:26

16   A    No.

17   Q    Okay.  Okay.  So tell me what happens when you -- or

18   you arrive at between 10 and 10:30 and then you make your

19   way to the Justice Center.  Because I think, in this -- in

20   Paragraph 65, it says, "On or about June 13th, Ms. Johnson    11:47:56

21   was hit with batons by PPB around Southwest 5th Avenue in

22   downtown Portland.  She had not engaged in active

23   aggression."

24         So tell me, up until you were hit with batons,

25   what occurred.    11:48:11

Exhibit 10
Decl of Moede

1  A    Um, I was standing in 3rd and Main for a considerable

2  amount of time, probably until midnight, with other

3  protesters, um, chanting, singing, drumming, yelling

4  grievances.  Um, I want to say around 11:55 is when PPB

5  started deploying flashbangs into the crowd, um, which --    11:48:36

6  Q    Let me stop you there.  What are -- when you say

7  "flashbangs", what do you mean?

8  A    Um, I mean, ah -- I guess they could also be referred

9  to as an aerial distraction device, depending on when they

10 explode.  Um, if they explode in the air, I imagine it's    11:49:01

11 an aerial distraction device; if it explodes on the

12 ground, I imagine it's still an aerial distraction device

13 that exploded late.

14       But it is a loud -- um, very loud,

15 bone-rattling explosion, um, that is disorienting, ah,    11:49:11

16 causes, ah, minor hearing loss, temporarily, um, and has a

17 very bright, bright flash.

18 Q    Okay.  So let me make sure -- let's unpack that,

19 because those are sometimes confused.

20       Do you consider an RBDD to be a flashbang?    11:49:31

21 A    Um, I -- it can sometimes display some of the same

22 properties, yes.

23 Q    Yeah, so that's why I want to make sure, because --

24 it sounds like you know what an RBDD is, and I'm trying to

25 figure out if you know what a flashbang is -- or at least    11:49:44

Exhibit 10
Decl of Moede

1    what you mean by "flashbang".

2           So you've identified an aerial distraction

3    device, which I will agree with you is intended to deploy

4    in the air and make a large flash of light and make a loud

5    boom.  Is that what you're talking about when you said          11:50:03

6    flashbangs were deployed --

7    A    Correct.

8    Q    -- on June 13th, 2020?

9    A    Correct.

10   Q    Okay.  And then you said sometimes they would land on     11:50:13

11   the ground and then explode?

12   A    Correct.

13   Q    Okay.  Are you sure that these weren't hand-tossed

14   flashbangs, for lack of a better term?

15   A    Ah, I'm unsure.                                            11:50:29

16   Q    Okay.

17   A    Ah, I know that there are occasions that I've seen,

18   um, flashbangs shot out of a 40 millimeter launcher that

19   did not explode in the air that exploded on the ground.

20   Q    Okay.  And did those munitions that you say were          11:50:45

21   launched, did those -- were those a single canister, or

22   did they break up into different canisters?

23   A    I believe those were just single canisters.

24   Q    Okay.  All right, go ahead.  You said around 10:55

25   PPB deployed flashbangs, which you've identified as aerial      11:51:07

Exhibit 10
Decl of Moede

1   distraction devices.

2   A    Yes, I apologize, I meant around 11:55.

3   Q    I'm sorry.  Yeah, I thought I said 11:55, sorry if I

4   misspoke.

5   A    No worries.                                          11:51:19

6            Um, they had pushed protesters, um, towards

7   4th avenue, um, which, after reviewing in preparation, I

8   believe that, um, for clarification, it actually happened

9   on 4th Avenue.  Um, they had started pushing people down,

10  ah, 4th Avenue towards Pioneer Square.  Um, they were     11:51:40

11  deploying flashbangs down the street, ah --

12  Q    So when you -- so can we use the same terminology,

13  like just the same -- like ADDs?  Unless it's something

14  different.

15  A    No, yeah, I -- I can -- I can try to use that        11:51:59

16  terminology.  When I say -- how about -- I'm sorry.  Is it

17  okay if I refer to those as flashbangs and I can refer to

18  RBDDs specifically?

19  Q    Yeah, if there's a -- if you can distinguish between

20  an aerial distraction device and an RBDD, without lumping  11:52:16

21  them together as a flashbang, that would be helpful,

22  because -- yeah.

23  A    Yeah.  Um, when I'm able to when I -- everything that

24  I'm referring to is probably going to be a flashbang,

25  unless I specifically, um, know that I was struck with an   11:52:34

Exhibit 10
Decl of Moede

1    RBDD.  Is that helpful?

2    Q    I think -- so you're saying every -- it's an ADD,

3    unless you tell me it's an RBDD.

4    A    Correct.

5    Q    Okay.                                              11:52:52

6    A    Correct.

7              Um, I apologize, where was I?

8    Q    I think you were telling me that you were moving down

9    on 4th Avenue --

10   A    Oh.                                                11:53:01

11   Q    -- that you corrected that it wasn't 5th.

12   A    Yes.  Um, we were moving on 4th, um, ah, when PPB was

13   lining up and essentially pushing protesters block by

14   block.  I had, um, stayed closest to the police line, in

15   order to keep filming.  Um, I had my camera in my one hand  11:53:21

16   and I was carrying the shield in my other hand.  Um, there

17   were -- the group of police officers had yelled this deep

18   baritone "Move", which I assumed was also for me, um, and

19   told -- pushed the protesters down another block.

20             Um, they did the same thing again a block      11:53:49

21   later, yelled "Move".  Again, I thought that that was a

22   direction for me, so I turned to move the direction that

23   they were moving, um, when I was tackled by PPB officers

24   and thrown to the ground, um, and I was struck in the --

25   my back -- the back of my legs with a baton and told to    11:54:11

Exhibit 10
Decl of Moede

1  stop resisting as they were trying to wrench the shield

2  off of my arm and, um, pull all of my things off of me.

3          Um, there was no way for me to physically move

4  my hands behind my back, because of the position that they

5  had me in, um, and, therefore, ah, they, um, wrenched my        11:54:34

6  shoulders back and forth, in order to make them move a way

7  that they were not supposed to.

8  Q    Okay.  When you say the officers pushed you down the

9  block, what do you mean by that?

10 A    Um, by -- essentially, herd, um, but in a much more         11:54:58

11 violent forceful way.  They would line up at one block and

12 either walk, jog, or sprint down the block towards the

13 protesters.

14 Q    So you said herd -- like, herd, like h-e-r-d, like

15 herd of animals?                                                 11:55:20

16 A    Correct.  They looked like a -- yes, like a herd dog

17 herds cattle.

18 Q    And so let me ask you.  It sounds like the officers

19 were in, like, a line formation, for lack of a better

20 term?                                                            11:55:38

21 A    Um, as best as they could do, yes.

22 Q    Okay.  And so it wasn't one individual officer, it

23 was multiple officers; correct?

24 A    Correct.

25 Q    How many officers do you think were in this line?          11:55:51

Exhibit 10
Decl of Moede

1    tan.

2    Q    Is it a star versus, like, a badge?

3    A    Um, I believe that Portland Police also have -- some

4    of them do have a star-type emblem that they can use.  Um,

5    but, yes, Multnomah County sheriffs usually are more          12:00:40

6    commonly with a star.

7    Q    And can you tell the difference between a Portland

8    Police Bureau star badge and a Multnomah County sheriffs

9    star badge?

10   A    Ah, relatively, I think so.                             12:00:54

11   Q    Okay.  Okay, let's talk about when -- you said the

12   officer tackled you and -- I think you said tackled you

13   and you were taken down to the ground.

14   A    Correct.

15   Q    So tell me, one, how many officers -- tell me about    12:01:16

16   that -- we're at this point, now, they've made contact

17   with you.

18   A    Yes.  So they have tackled me to the ground.  Um, my

19   shield is preventing my arm from being put behind my back,

20   so they are wrenching on my shoulder.  Um, another officer   12:01:39

21   is hitting me in my legs, to get me to comply with the

22   baton -- or, they're hitting me with the baton to get me

23   to comply, apologies for that sentence structure, um, and,

24   ah, they're yelling at me "Don't resist."

25           Unfortunately, because of my body position,          12:02:02

Exhibit 10
Decl of Moede

1   it's -- I am unable to fully comply with their orders,

2   until they wrench my body around to a position it wasn't

3   supposed to be in.

4   Q    Okay, so when the officer --  Was it a male or

5   female?  Could you tell?                              12:02:21

6   A    There was one female and one male.

7   Q    Okay.  Which -- which officer --  So let me ask you

8   this.  So is it only two officers that made contact with

9   you?

10  A    Ah, that I can remember at this time, yes.        12:02:42

11  Q    Okay.  And so what is -- who -- how were they holding

12  the baton, when they made contact with you?

13  A    Um, the officer that tackled me was holding it across

14  their chest horizontally, a baton end in each hand.

15  Q    Okay.  So horizontally, using a pen, like this      12:03:05

16  (indicated)?

17  A    (Nodded head.)

18  Q    Okay.

19  A    Correct.

20  Q    Was that the male or the female officer?            12:03:11

21  A    I'm unsure.  They were far enough away that I

22  couldn't determine gender, at that time.  I could only

23  determine gender after they had, um, tackled me, and I

24  assumed gender based on their voices.

25  Q    So okay, so they were -- at the point where you were  12:03:30

Exhibit 10
Decl of Moede

1    A     Correct.

2    Q     And then is it true that you posted a tweet around

3    June 14th saying something to the effect of, "I said I

4    would post the time line on my arrest.  I've finally

5    written down a minute-by-minute account of what", and then          13:10:59

6    it stops.

7              So did you do that?

8    A     Um, I believe it might have been a Facebook post that

9    I wrote that on, um, but, yes, I do remember writing

10   something to that effect.                                           13:11:13

11   Q     And is that written minute-by-minute account what was

12   just sent to me at -- over the lunch hour?

13   A     Correct.  The minute-by-minute account is accounted

14   for after I stopped filming from the time of my arrest

15   until I was released the next morning.                              13:11:28

16   Q     All right, let's move on to the next date, which is

17   on or about June 28th, 2020; this is Paragraph 66 in your

18   Fourth Amended Complaint.  Did you attend a protest on the

19   evening of June 28th and -- we'll say into the morning of

20   June 29th, 2020?                                                    13:11:55

21   A     Um, I did; however, the Complaint is referencing the

22   evening of the 27th into the morning of the 28th.

23   Q     Okay.  Where did you attend the protest on the 27th

24   and 8th?

25   A     Ah, it was at the Multnomah County Detention Center.         13:12:15

Exhibit 10
Decl of Moede

1   Q    And did you arrive by yourself or with Lacey or

2   somebody else?

3   A    Um, I believe that I arrived with other people, but I

4   can't quite remember who was with me that night.

5   Q    Okay.  And you were dressed similarly to the exhibit     13:12:42

6   photos that we went over earlier?

7   A    Correct.

8   Q    All right, in your Complaint, you allege that -- in

9   Paragraph 66 that, "On or about June 28th, 2020, in and

10  around Southwest Main and Southwest 6th Avenue, PPB struck   13:13:05

11  Ms. Johnson with a projectile consistent with munitions

12  fired from an FN 303, despite being, at most, passively

13  resistant."  Do you see where I'm talking about there?

14  A    Correct.

15  Q    All right, so where were you at 6th -- or at 6th and     13:13:32

16  Main, when you were struck by the FN 303; like, where --

17  where on the intersection?

18  A    Um, after further review, I think I may have been,

19  ah, further north a couple blocks, um, but, again, around

20  6th, um, and I was in the -- I was towards the west end of   13:13:55

21  the block.  So more towards Broadway.

22  Q    So I -- 6th and Main, is that that McDonald's and

23  there's like a Melting Pot entrance and then --

24  A    Ah, yes, I believe that that is the 6th and Main, and

25  that is what -- after preparing for my deposition, I -- I    13:14:22

Exhibit 10
Decl of Moede

1    A    No.   The night that this photo was taken is when I

2    picked up the munition.

3    Q    I understand, yeah.  So that would be helpful, if

4    that could be provided to us by your counsel at some

5    point.                                                        13:20:59

6              Okay, let me see.  I'm going to try to show

7    you 232.

8              Is this the same round taken the same -- you

9    took this photo the same night as the previous photo?

10   A    Ah, correct.                                             13:21:15

11   Q    And this is the left hand that was previously struck

12   by an FN 303 by -- by the County, I believe, on June 15th.

13   Is that right?

14   A    Ah, I'm unsure who fired it.  But, yes, that is what

15   I believe I was struck with on the 15th.                     13:21:30

16   Q    Okay.  Are you -- sorry.

17   A    Good idea.

18   Q    Yeah, thanks.

19              So you're aware that the FN 303 round that we

20   just looked at in Exhibit 49, that it typically breaks up.   13:22:09

21   That's not how it looks when it hits you; is that right?

22   A    Correct.

23   Q    Okay.  Okay, other than being struck by an FN 303 in

24   your left thigh on June 28th, were any other uses of force

25   used against you on June 28th, 2020?                         13:22:33

Exhibit 10
Decl of Moede

1  A    Um, I was also -- I also felt the ricochet of FN 303s

2  that were used against other protesters, um, as well as

3  witnessed protesters be batoned in the face just feet in

4  front of me, and I also witnessed, um, two protesters that

5  were, um, maced just feet in front of me, as well.          13:23:04

6  Q    Okay, those -- but those uses of force weren't used

7  against you; is that right?

8  A    Ah, no.  Um, there were also a number of flashbangs

9  that were detonated that night that were -- any number of

10 them were within my vicinity.                               13:23:23

11 Q    When you say you felt the ricochet, what are you

12 talking about?

13 A    I was close enough to feel the bismuth sand that

14 exploded from the FN 303 hit me in the face.

15 Q    Do you know where the munitions struck before it       13:23:44

16 ricocheted?

17 A    It struck a protester that was next to me.

18 Q    Did you have any video of the incident that we've

19 described with the FN 303 on June 28th, 2020?

20 A    Yes.  It's locally -- or, it's stored on Facebook.     13:24:06

21 Q    All right.

22        MR. YAMACHIKA:  We'd ask that to be

23 produced, as well, just for the record.

24        MR. BRUGGEMEIER:  Rob, are you saying that

25 you want us to produce something that is equally available  13:24:18

Exhibit 10
Decl of Moede

ALEXANDRA JOHNSON, 12/03/2021                                    Page 108

1   evening of June 27th into the morning of June 28th, so --

2   Q    Okay.

3   A    -- I'm not sure what you're referring to.

4   Q    So let me rephrase that.  So If I told you that PPB

5   did not respond to any protest event on the evening of          13:25:55

6   June 27th and the morning of June 28th, would that

7   surprise you?

8   A    Yes, it would.

9   Q    Okay.  I'm going to move on to the next date in your

10  Complaint, which is...                                          13:26:10

11            Let me actually back up.  I'm going to ask you

12  about a date that's listed in your interrogatory response,

13  which is June 30th.  And you say in that that tear gas was

14  used at Northeast Killingsworth precinct.

15            Did you attend a protest event on the evening         13:26:52

16  of June 30th and the morning of June 31st, 2020?

17  A    Um, I believe June only has 30 days, which, yes, I

18  did attend the protest on June 30 at the, um, Northeast

19  Killingsworth precinct, yes.

20  Q    So the evening of June 30th and possibly the morning       13:27:14

21  of July 1st.

22  A    Correct.

23  Q    Okay.  What force were you exposed to on the protest

24  of the evening of June 30th and the morning of July 1st?

25  A    Um, after further review in preparing for my               13:27:36

Exhibit 10
Decl of Moede

1   deposition, I think I was mistaken in naming that date as

2   a use-of-force date.

3   Q     Okay.  So we'll skip that one.

4         So let's move on to July 4th, which is in

5   Paragraph 67 of your Fourth Amended Complaint.  That one,     13:27:55

6   it says, "On or about July 4th, in or around and between

7   Southwest Main Street and West Burnside Street, PPB again

8   teargassed Ms. Johnson, despite being, at most, passively

9   resistant."

10        Did you attend a protest on the evening of             13:28:21

11  July 4th and into the morning of July 5th, 2020?

12  A     Yes.

13  Q     And where did you attend a protest?

14  A     The Multnomah County Detention Center.

15  Q     So let me ask you, that's right next to the federal     13:28:52

16  courthouse; I wrote down federal courthouse for some

17  reason.  Were you at the Multnomah County Detention Center

18  as well as the courthouse, or just the Multnomah County

19  Detention Center, on July 4th?

20  A     I was mainly at the Multnomah County Detention          13:29:07

21  Center, until about, ah, ten minute -- or not even ten

22  minutes, until about five minutes before PPB had started

23  releasing tear gas -- I apolo- -- actually, I apologize,

24  let me clarify -- until tear gas was released into Chapman

25  Square and Lownsdale, at which point PPB had put -- had      13:29:30

Exhibit 10
Decl of Moede

1   pushed or herded protesters up to 6th, which is when I

2   started seeing PPB release tear gas.

3   Q    So the tear gas that was released into Chapman and

4   Lownsdale Park, was that released by somebody else besides

5   PPB?                                                    13:29:50

6   A    I'm unsure who released that tear gas.

7   Q    Okay.  But you're sure that PPB released tear gas at

8   6th?

9   A    Yes.

10  Q    What time did you arrive?                          13:30:05

11  A    I think I arrived around 8:30.

12  Q    Okay.  So where were you when PPB deployed the tear

13  gas and where was PPB in relation to you?

14  A    Um, I believe that the first couple times was up on,

15  um, 6th Avenue, when, ah, they were chasing protesters    13:30:33

16  north.  And then they had chased the protesters several

17  blocks -- several blocks north and east towards the

18  waterfront, um, where, um, around 2nd Avenue, they

19  released more canisters of tear gas.

20  Q    Did you hear any warnings before PPB deployed tear   13:31:04

21  gas?

22  A    Ah, yes.

23  Q    Did you understand those warnings?

24  A    Yes.

25  Q    What did you do when you heard them?                 13:31:15

Exhibit 10
Decl of Moede

ALEXANDRA JOHNSON, 12/03/2021                                          Page 114

1    August 4th.  There were so many dates and times and places

2    that I just, unfortunately, can't remember August 4th at

3    this time.

4    Q    Okay, so are you not prepared to testify as to what

5    happened on August 4th as alleged in your Complaint in          13:36:59

6    Paragraph 68?

7    A    Um, I'm not as prepared as I would like to be,

8    correct.

9    Q    Yeah.  And so what do you remember -- I mean, I

10   guess, what do you remember about this allegation?              13:37:14

11   A    Um, I remember being at the Portland Police

12   Association.  Um, I remember that a friend of mine had

13   been maced in the face, his name was Ian Kennedy.  I

14   remember that protesters were standing around in the

15   streets, um, as well as chanting.                               13:37:42

16            Um, and I believe that this was the night that

17   the Portland Police had chased us, ah, north from Lombard

18   into the neighborhoods of, ah -- of north Portland there,

19   and I believe that that -- that they had unleashed the

20   tear gas -- I apol- -- now that I'm saying it out loud, it      13:38:11

21   is coming back to me a little bit better.  Um, they

22   unleashed the tear gas as we were entering the

23   neighborhoods into the north side of Lombard.

24   Q    Okay.  And that's for August -- it's -- I'm a bit

25   confused if that's on August 4th or you're saying it could      13:38:33

Exhibit 10
Decl of Moede

ALEXANDRA JOHNSON, 12/03/2021                    Page 115

1   possibly be August 12th.

2   A    Ah, no.  August 12th, I have a much more clear memory

3   of.  I -- I'm looking at my Complaint right now, I

4   apologize.  When I was looking at the, um, 4th, I was

5   thinking of the 12th, which I also experienced tear gas on    13:38:56

6   that night, um, it's just there are -- like I said, there

7   are so many dates that it is sometimes hard to keep

8   straight as to which day the terrible thing happened.

9   Q    Yeah, I understand that, and --

10  A    I am trying to be as accurate as I can with all my       13:39:17

11  previous dates, so, I appreciate the...

12  Q    Yeah, I think we're just all trying to get

13  information on particular dates and, like I said, it's

14  hard to keep them all straight and then we keep adding

15  dates, it seems, so...  All right.                            13:39:37

16            So do you have any specific recollections of

17  how much tear gas was launched on August 4th?

18  A    It was enough to seep into homes of the neighborhood,

19  so -- but I'm unsure of the number of canisters.

20  Q    Okay, so when you say enough to seep into the homes      13:40:02

21  of -- in the neighborhood, like, how do you know that?

22  A    Ah, based on media coverage that I had read during

23  the time.

24  Q    Okay.  But you don't know a specific amount of

25  canisters that was launched on that evening; is that          13:40:17

Exhibit 10
Decl of Moede

1   right?

2   A    Correct.

3   Q    Okay, let's move on to -- let me ask you that.

4   Besides the tear gas that we've talked about August 4th,

5   was any other force used on you in that evening and          13:40:32

6   morning by PPB?

7   A    Not that I can remember at this time.

8   Q    Okay.  And if I told you that PPB did not deploy any

9   tear gas on the evening of August 4th and the morning of

10  August 5th, would that surprise you?                         13:40:48

11  A    Ah, like I said, that date is less clear with me, so

12  it wouldn't be as surprising.

13  Q    Let's move on to Paragraph 69.  "On or about the

14  dates of August 13th and 16th, 2020, PPB used

15  indiscriminate force such as aerosol chemical irritants,     13:41:14

16  flashbangs, and, upon information and belief, tear gas on

17  protesters engaged in, at most, passive resistance."

18          Did you attend the protest on the evening of

19  August 13th and the morning of August 14th of 2020?

20  A    Ah, no, I attended a protest on the evening of          13:41:48

21  August 12th into the morning of August 13th.

22  Q    Okay.  And then is -- are the allegations in

23  Paragraph 69, which are with respect to indiscriminate

24  force such as aerosol chemical irritants, flashbangs, and

25  tear gas, accurate?                                          13:42:05

Exhibit 10
Decl of Moede

1    A    Correct.

2    Q    Okay.  Let's unpack a bit of that.

3         Where was this protest on the evening of the

4    12th and 13th?

5    A    It was at the Multnomah County Jus- -- or the          13:42:19

6    Multnomah County Detention Center.

7    Q    And what time did you arrive?

8    A    Um, I believe that I arrived between 9 and 10.

9    Q    And --

10   A    Oh, actually, ah, it was still light out, so it may     13:42:34

11   have been between 8 and 9.

12   Q    Okay.  And then did you attend -- did you come with

13   somebody else, or just by yourself?

14   A    Ah, I believe that I came with people that night, but

15   I'm unsure who I attended with.                              13:42:53

16   Q    Okay.  And so when you allege that PPB used

17   indiscriminate force such as aerosol chemical irritants,

18   what are you talking about there?

19   A    Um, I witnessed Number 12, Brent Taylor, mace someone

20   after he had -- after they had been tackled to the ground.   13:43:15

21         Um, I also witnessed Number 44, Ariel

22   Livingston, um, mace someone who was already on the ground

23   after an officer had punched them in the face for that

24   protester calling them a "short shit".  Um, the officer

25   threw a punch at that protester.  Another officer came in     13:43:41

Exhibit 10
Decl of Moede

1   and started throwing punches indiscriminately and knocked

2   down several protesters, and that's when Ariel Livingston

3   maced the protester that was on the ground, um, mace

4   was -- another protester named Morgan McKniff was affected

5   by that mace spray, as well.                          13:44:04

6   Q    Okay.  So the allegations in Paragraph 69 that we're

7   talking about for August 12th and 13th is with respect to

8   aerosolized chemical irritants, those are not -- which is,

9   basically, OC spray or pepper spray, it sounds like?

10  A    Correct.                                          13:44:24

11  Q    You said "mace", but it's coming out of a handheld

12  canister?

13  A    Yes.  I believe "Mace" is a brand that is generally

14  referred to as the pepper spray or OC spray.

15  Q    And so was this the smaller canisters that officers   13:44:36

16  carry, or was it a larger canister?

17  A    It was a large red canister.

18  Q    I think they're both red.  So when you say "large",

19  do you mean -- how big are we talking about?

20  A    Um, like, the length of your forearm.            13:44:52

21  Q    Okay, so a bigger -- bigger one than like a 1-1/2 or

22  2 ounce one that would be in your vest or that you could

23  carry in your purse, for instance.

24  A    Correct.

25  Q    Okay.  And to be clear, the pepper spray wasn't used   13:45:05

Exhibit 10
Decl of Moede

1    on yourself, right, you just witnessed it being used on

2    others?

3    A    Correct.

4    Q    Let's talk about the flashbangs.  What are you

5    referring to there?                                          13:45:18

6    A    Um, I am referring to, ah, very loud explosions, um,

7    from small canisters that were either tossed or fired from

8    a, um, 40 millimeter grenade launcher.  They had very

9    bright flashes, were disorienting and bone-rattling.

10   Q    The flashes that you're describing, were those        13:45:47

11   detonating in the air, like the ADD would?

12   A    Some would detonate in the air, some would detonate

13   on the ground.

14   Q    Okay.

15   A    Some of them were detonated within just a few feet of  13:45:57

16   other officers.

17   Q    And so are you saying that flashbangs were going off

18   near officers?

19   A    Ah, yes, other officers threw flashbangs near other

20   officers.                                                    13:46:10

21   Q    Okay.  This is somewhat of a more general question,

22   but also for this night.  Did you ever witness protesters

23   throwing fireworks or mortars?

24   A    Yes.  Well, I mean, I -- I witnessed fireworks going

25   off.  I never saw who threw them.                            13:46:28

Exhibit 10
Decl of Moede

```
 1   or hand tossed.

 2   Q    Okay.  And so the flashbangs that you're describing

 3   on August 13th are different from this; is that what

 4   you're saying?

 5   A    I think so, yes.                              13:49:25

 6   Q    Okay.  Thank you.

 7             All right, what else do we have in

 8   Paragraph 69?  Tear gas.  Let me ask you about that.

 9   Where were you on August 12th and 13th when tear gas was

10   deployed?                                          13:49:51

11   A    Um, I was, ah, near -- oh, I was, um, near -- or I

12   was in Chapman, I was on 3rd and Main.

13   Q    Where were --  Was it PPB that launched the tear

14   gas --

15   A    Correct.                                      13:50:10

16   Q    -- or somebody else?

17             Okay, where was PPB?

18   A    They were on the east end of Main, ah, near -- on

19   2nd.

20   Q    Okay.  And how were the -- how was the tear gas      13:50:25

21   launched?

22   A    Um, the tear gas was launched with a, ah, launcher.

23   Q    40 millimeter launcher?

24   A    (Nodded head.)

25   Q    And not hand tossed?                          13:50:37
```

Exhibit 10
Decl of Moede

1        All right, so what time did you arrive, on

2   August 15th into the morning of the 16th?

3   A    Um, I'm unclear of the time that I arrived, but it

4   was after dark.

5   Q    Did you come by yourself or with others?        13:55:15

6   A    Um, I -- I'm unsure that night.  Um, I know that, by

7   that time, I had created friends among the protesters, so,

8   um, I felt comfortable going by myself and knowing that I

9   would know people who were there.

10  Q    Okay.  Did you communicate with these people and know    13:55:38

11  that they were going to be there, or how did that work?

12  Did you, like --

13  A    No, I just assumed that they were going to be there.

14  Q    Okay.  What were you wearing on August 15th and 16th?

15  A    Um, the same thing that I usually do, um, pants,        13:56:01

16  clean shirt, um, bright red backpack, and a snapback.

17  Q    And then possibly not a jacket, this time, it sounds

18  like, because it's August?

19  A    Yeah, possible -- I probably had the jacket with me,

20  in case I got cold.                                        13:56:13

21  Q    All right, so same questions.  Aerosolized chemical

22  irritants, OC spray.  Describe for me what occurred on the

23  15th and 16th of August.

24  A    Um, on the 15th, yes, I was, um -- I was outside of

25  the, um, Penumbra Kelly Building when there were these     13:56:38

Exhibit 10
Decl of Moede

ALEXANDRA JOHNSON, 12/03/2021

Page 127

1  huge plumes of smoke and flashbangs that were set off at

2  the, um, west entrance -- sorry, I'm trying to think of

3  cardinal directions in my head related to the map -- um,

4  that were set off along the west entrance, um, at which

5  the, ah, Portland Police ran through the smoke and                    13:57:04

6  literally jumped on and tackled any protesters that were

7  on the other side of the smoke.

8            Um, at that time, ah, there were several

9  arrests that were made; there were several arrests that

10  weren't made, um, of people who were just knocked down and   13:57:25

11  beat around and then pushed away.  Um, they pushed us down

12  to, ah, 41st, I believe it was, where we turned south, um,

13  and the police were, um -- they were throwing flashbangs

14  all the while, while chasing us down to 41st and turning

15  on to there.                                                          13:57:58

16            Um, I was, ah -- I was walking along 41st and

17  turning up Ankeny to follow the rest of the crowd.  Um,

18  everyone was moving at a really brisk pace, if not

19  jogging, and, um, I felt this officer come up behind me --

20  or, I felt someone come up behind me and grab me by my                13:58:23

21  backpack and throw me to the ground, at which point I

22  realized it was a Portland police officer who then, like,

23  stabbed me with the end of his baton while I was on the

24  ground and told me, "Don't get up, stay there, don't

25  follow officers," or something along those lines.                     13:58:43

Exhibit 10
Decl of Moede

```
 1  like you did earlier, or are these -- or is this more

 2  generalized?

 3  A    Um, I can't identify the officer that used pepper

 4  spray against me.  I did witness Officer John Oliphant use

 5  pepper spray against another protester.  Um, I witnessed a    14:19:43

 6  different PPB officer use the, um, pepper spray against a

 7  different protester, as well, but I am unaware of who that

 8  officer was.

 9  Q    Okay.  Let me -- let's talk about the baton first.

10  Were you struck by a baton?                                   14:20:03

11  A    Um, I believe so, I was, ah -- I was struck in the

12  manner of they used their baton across their chest and

13  struck me forward this way.

14  Q    Okay.  And so it sounds like they had their baton in

15  the horizontal position and extended out, so I want to ask    14:20:28

16  you to break that down.

17          So if -- would you agree with me that if I

18  placed the baton against your body and then pushed, that's

19  me using the baton to push you, versus, if you're standing

20  arm's length away from me and I extend it and hit you with    14:20:46

21  it, that's a different use of force?  Do you understand

22  the distinction that I'm making?

23  A    I do understand the distinction.

24  Q    So which is it in this case?  Were you put -- was the

25  baton placed on you and then you were pushed away, or        14:21:04
```

Exhibit 10
Decl of Moede

1  was -- or were you actually, like, hit with it?

2  A    Ah, I -- it was behind me and I felt a hit against my

3  back, which then sent me forward into another officer, um,

4  who then pushed me to the side into a bush, ah, where

5  they -- um, I dropped my belongings.                    14:21:25

6           That officer then grabbed me by the -- grabbed

7  me around the top of my head and by the goggles that I was

8  wearing and wrenched my head back by the goggles, trying

9  to peel them off, ah, while simultaneously spraying mace

10 in his other hand.                                      14:21:47

11 Q    Okay.  So let me ask you about that.  So you're not

12 wearing the gas mask on August 22nd or 23rd; is that

13 right?

14 A    Correct.

15 Q    And so is this the -- is this a night where you're     14:21:59

16 wearing a painter's mask and then I think you said

17 woodworking goggles, before?

18 A    No, I was just wearing goggles.

19 Q    Okay.  And were those -- did you say woodworking

20 goggles before, or did I miss --                        14:22:13

21 A    Correct, that's what I had said previously.

22 Q    Okay.

23 A    And that's what I was wearing.

24 Q    So I'm trying to think, are those the ones where

25 they're, like, plastic and then they're kind of enclosed    14:22:23

Exhibit 10
Decl of Moede

1    into the street and away from the officers.

2    Q     Okay.  So other than the baton push and the pepper

3    spray deployment that we've talked about, was any other

4    force used on you on August 22nd or August 23rd?

5    A     Um, besides being there for several flashbangs, no.        14:29:50

6    Q     All right, we're going to move on to --

7    A     Ah, not that I can remember at this time.  I

8    apologize.

9    Q     We're going to move on to Paragraph 71, which

10   concerns September 5th.  So in this paragraph, it says,      14:30:09

11   "On or around September 5th, 2020, Ms. Johnson attended a

12   rally and protest in Ventura Park in east Portland.

13   Ventura Park is located nearby PPB's East Precinct.  Not

14   long after the rally concluded, PPB preemptively declared

15   the rally an unlawful assembly.  Mx. Johnson did not           14:30:38

16   engage in unlawful conduct, but she, along with several

17   homes in the neighborhood, were blanketed in tear gas

18   deployed by PPB."

19            All right, so did you attend the protest on or

20   around September 5th -- the evening of September 5th and      14:30:56

21   the morning of September 6th, 2020?

22   A     I did, correct.

23   Q     And it was by Ventura Park in east Portland?

24   A     Correct.

25   Q     All right.  What do you mean by "preemptively           14:31:15

Exhibit 10
Decl of Moede

ALEXANDRA JOHNSON, 12/03/2021

Page 141

1  declared the rally an unlawful assembly"?

2  A    Um, I think that I arrived there around between,

3  like, 6 and 7.  Um, it was Day 100 of the protests, so

4  there were large speeches with a -- or speeches with a

5  large sound system that were happening in the park, as          14:31:34

6  well as food and, um, ah, dancing, singing, mutual aid,

7  things along those lines.

8          Um, the -- after the speeches had concluded,

9  the protesters had walked up to, ah -- I believe that's

10 Stark, it turns into Stark there.  Um, I was still down in     14:31:55

11 the -- there's an embankment that leads up to Stark, so

12 you can't really see the street.  Um, and I saw -- I was

13 still down in the park and saw the protesters up there and

14 had heard, as they arrived to the street, that the

15 Portland Police had declared an unlawful assembly.             14:32:18

16 Q    Okay.  And prior to the -- hearing the declaration of

17 an unlawful assembly, had you seen any violence or things

18 being thrown at officers?

19 A    No.

20 Q    And so the tear gas deployment on September 5th by        14:32:42

21 Ventura Park, can you describe for me the tear gas

22 deployment, like number of canisters, that type of thing?

23 A    Um, the number of canisters was vast, I don't -- I

24 don't think that I would -- that would be one that I

25 could, ah, determine, it was probably between 20 and 30       14:33:10

Exhibit 10
Decl of Moede

ALEXANDRA JOHNSON, 12/03/2021                              Page 142

1    canisters.  Um, the deployment happened, um, right as I

2    was, ah, arriving to --

3              Oh, am I still --

4    Q    Yeah, you're still there.

5    A    Okay.  Apologies.                          14:33:22

6              Um, the tear gas deployment right as I --

7    happened right as I had walked up to the, um, street at

8    the top of the embankment.  I was recording a video and

9    saw a, ah, firework go off and, um, the tear gas was

10   deployed shortly after that.  Or, like, immediately after    14:33:42

11   that.

12   Q    So when the firework went off, besides seeing the

13   firework, did you see any protesters throwing anything at

14   officers?

15   A    No, I did not.                             14:34:08

16   Q    Like rocks, bottles, glass bottles, plastic bottles,

17   anything like that?

18   A    No, I did not.

19   Q    Did you see any protesters throw a Molotov cocktail

20   that ended up lighting another protester on fire?          14:34:24

21   A    No, I did not.  I hadn't -- I had no idea that a

22   Molotov cocktail had been thrown, until days later.

23   Q    So you -- have you seen the video of the protester

24   getting lit on fire by a Molotov cocktail?

25   A    Ah, yes, I believe I saw it played in another         14:34:42

Exhibit 10
Decl of Moede

1  Ms. Johnson?

2  A    No, I don't.  I apologize.

3  Q    Yeah, sure.  I'm asking you if you know whether or

4  not PPB officers were present at each of the protests that

5  are identified in Paragraph 90 between May 25th and          14:43:09

6  November 15th of 2020.

7              MR. BRUGGEMEIER:  Object to form.

8  A    Ah, no, I don't think that it would be possible for

9  me to know that.

10 Q    BY MR. YAMACHIKA:  And do you know if Portland police  14:43:25

11 officers used force against any of the protesters at each

12 of these protests during that time period?

13 A    No, I don't think it would be possible for me to know

14 that.

15 Q    All right.  So are you a -- are you going to be a      14:43:40

16 class representative for protests that you did not attend?

17              MR. BRUGGEMEIER:  Objection.  Misstates the

18 Complaint.

19 A    Um, I believe that the Complaint is for all protest

20 activities between May 25th and, ah, November 15th.  So if  14:44:06

21 the class is certified, then I believe that I would be a

22 representative for all of those dates, yes.

23 Q    BY MR. YAMACHIKA:  And how can -- how do you define

24 who the class is that protested opposing police violence

25 and white supremacy in Portland?                            14:44:30

Exhibit 10
Decl of Moede

1          MR. BRUGGEMEIER:  Objection.  Calls for a

2   legal conclusion.

3   A    Um, I don't believe that I have the training,

4   education, or experience to define a class, and I believe

5   that that would be defined by the judge.                14:44:42

6   Q    BY MR. YAMACHIKA:  All right.  So are you saying

7   you're not sure if you're an adequate class

8   representative?

9          MR. BRUGGEMEIER:  Objection.

10  Mischaracterizes prior testimony.                       14:44:53

11  A    Ah, no, I don't believe that that's what I said.  Um,

12  I believe that the judge determines who is part of the

13  class and who becomes a class representative, so that is

14  not up to me.

15  Q    BY MR. YAMACHIKA:  Okay.  Is it your understanding   14:45:11

16  that all the people who engaged in protest activities that

17  followed the death of George Floyd opposing police

18  violence and white supremacy between May 25th and

19  November 15th of 2020 were impacted by police force?

20  A    Ah, potentially.                                    14:45:38

21  Q    Okay.  And so, potentially, there are some that

22  weren't; right?

23  A    Um, can you --

24          MR. BRUGGEMEIER:  Object to the form.  Calls

25  for speculation.                                         14:45:53

Exhibit 10
Decl of Moede

1          MR. BRUGGEMEIER:  Objection.

2   Mischaracterizes prior testimony.

3   Q    BY MR. YAMACHIKA:  So other than --

4   A    Um --

5   Q    Sorry.  Other than June 5th, Mr. Graf didn't attend        14:47:31

6   any protests, so he wouldn't be covered by any --

7   basically, he wouldn't have experienced any force on any

8   other night in that date range; is that right?

9   A    Ah, not physically, no.  He carried the trauma from

10  June 5th with him throughout the protests.                      14:47:51

11  Q    Is it your understanding that all the protests in

12  Portland that opposed police violence or white supremacy

13  between May 25th and November 15th of 2020 were factually

14  similar?

15          MR. BRUGGEMEIER:  Object to form.  Calls for            14:48:17

16  speculation.

17  A    Um, what do you mean by "factually similar"?

18  Q    BY MR. YAMACHIKA:  Like, the same, essentially.  I

19  mean, would you agree with me that the protests were

20  different on each night?                                        14:48:32

21  A    Um, I -- I don't think that any two protests or any

22  one protest was the same as another, so they all had

23  different elements to them, yes.

24  Q    Okay.  And so would it then follow that if protests

25  had different elements to them that police responses would      14:48:52

Exhibit 10
Decl of Moede

1    be different, as well?

2    A    I --

3              MR. BRUGGEMEIER:  Object to form.

4    A    -- yes, think it's -- I could see that happening,

5    yes.                                              14:49:06

6    Q    BY MR. YAMACHIKA:  And some of the differences would

7    be the location?

8    A    Correct.

9    Q    And some of the differences would be the behaviors of

10   individual protesters?                            14:49:18

11   A    Correct.

12   Q    Some of the differences would be the timing and the

13   police response; is that right?

14   A    Correct.

15   Q    All right.  And so -- okay, let's move on to the    14:49:30

16   indiscriminate weapons class, which is defined in

17   Paragraph 90B.  It says, "Indiscriminate Weapons subclass

18   for purposes of the Fourth Amendment claim:  This subclass

19   of the First Amendment" -- "This is a subclass of the

20   First Amendment class that consists of protesters who were  14:49:55

21   subjected to tear gas, flashbang grenades, aerial

22   distraction devices, rubber ball distraction devices,

23   smoke grenades, and other similar uses of force by PPB

24   from May 25th, 2020, to November 15th, 2020.  This

25   subclass includes protesters who engaged in passive    14:50:14

1  to this request."

2           Is there any --

3  A    Right.

4  Q    Okay.  So my question, then, is, if you're going to

5  be the class representative for class members for          15:00:18

6  indiscriminate weapons subclass -- actually, as well as

7  what we're going to get to next, is the targeted weapons

8  subclass, and you -- and you can't tell me what passive

9  resistance is, how do we know which people are in that

10  class or not?                                             15:00:40

11           MR. BRUGGEMEIER:  Object to the form.  Calls

12  for a legal conclusion.

13  A    I believe the judge would determine who is in that

14  class.

15  Q    BY MR. YAMACHIKA:  All right.  And so would you agree  15:00:53

16  with me that conduct that would be beyond passive

17  resistance would include some of the following: throwing

18  rocks?

19           MR. BRUGGEMEIER:  Object to the form.  Calls

20  for a legal conclusion.                                   15:01:07

21  A    Ah, just throwing a rock?

22  Q    BY MR. YAMACHIKA:  Well, it's being more -- sure.

23  Throwing rocks at people or officers.

24  A    Um, I think that that would need to be --

25           MR. BRUGGEMEIER:  Same objections.             15:01:23

Exhibit 10
Decl of Moede

1    A    -- decided by a judge.

2    Q    BY MR. YAMACHIKA:  Okay, what about throwing Molotov

3    cocktails at police officers?  Is that going --

4              MR. BRUGGEMEIER:  Same objections.

5    Q    BY MR. YAMACHIKA:  -- beyond passive resistance?     15:01:29

6    A    I, again, think that that would need to be determined

7    by a judge.

8    Q    Would you agree that throwing water bottles at

9    officers is beyond passive resistance?

10             MR. BRUGGEMEIER:  Same objections.              15:01:45

11   A    Ah, again, I think that that would need to be

12   determined by a judge.

13   Q    BY MR. YAMACHIKA:  What about lighting fires, like

14   dumpsters and buildings?

15             MR. BRUGGEMEIER:  Object to the form.  Calls    15:01:55

16   for a legal conclusion.

17   A    Again, I think that that would need to be determined

18   by a judge.

19   Q    BY MR. YAMACHIKA:  What about destroying property?

20   Does that go beyond passive resistance?                   15:02:04

21             MR. BRUGGEMEIER:  Same objections.

22   A    Again, I think that that would need to be determined

23   by a judge.

24   Q    BY MR. YAMACHIKA:  Okay.  So with respect to

25   indiscriminate weapons that were used between May 29th -- 15:02:17

Exhibit 10
Decl of Moede

1    what affect the flashbang had on this woman; correct?

2    A    Ah, correct.  I mean, it was pretty apparent that it

3    was directly after the explosion that it happened.

4    Q    Was any -- any -- was there any use of force used

5    against you on June 6, 2020?                          15:32:41

6    A    Not that I can remember at this time.

7    Q    Okay.  So let me ask, then, I think the next date

8    that I wrote down was June 10th, 2020.  Can you tell me

9    what incident you're alleging is giving rise to a claim

10   against the City that occurred on June 10th, 2020.     15:33:15

11   A    Ah, yes.  I witnessed, um, PPB shooting FN 303s at

12   protesters through a fence, um, one of which exploded

13   against a protester and I felt the ricochet of.  Um, I

14   also experienced several flashbangs that night.

15   Q    Where was the location of this deployment of the    15:34:09

16   FN 303 that went through a fence?

17   A    Ah, it was at 3rd and Main.

18   Q    And is this fence -- was this fence in front of the

19   federal courthouse or in front of the Multnomah County

20   Detention Center?                                       15:34:31

21   A    It was in front of the Multnomah County Detention

22   Center.

23   Q    Okay.

24   A    I don't believe that there was a fence in front of

25   the federal courthouse on that date.                    15:34:40

Exhibit 10
Decl of Moede

1    you?

2    A    Correct.

3    Q    Okay.  Besides the FN 303 deployment that you felt

4    the ricochet of in -- on June 10th, 2020, was there any

5    other use of force that was used against you by the PPB?    15:38:20

6              MR. BRUGGEMEIER:  Object to form.

7    Mischaracterizes testimony.

8    A    Ah, I witnessed flashbangs being used that night, as

9    well.

10   Q    BY MR. YAMACHIKA:  Okay.  Anything besides flashbangs    15:38:36

11   and FN 303s?

12   A    Ah, not that I can remember at this time.

13   Q    The next date that I wrote down was June 27th of

14   2020.  Can you describe for me what incident gives rise to

15   claims against the City that occurred on June 27th, 2020.    15:39:00

16   A    Ah, yes.  Around, um, 3rd and Main, again, um, PPB

17   had advanced on protesters from the north on 3rd.  Um, the

18   protesters were just standing in the street, not moving.

19              PPB then came up to the line, ah, wrenched a

20   protester away from the line and sprayed them in the face    15:39:35

21   with mace, directly in the face, like a foot away, um, and

22   tackled them to the ground.  Um, at that point, shortly

23   after that, a flashbang was detonated in the middle of the

24   crowd underneath my feet.

25              Um, the PP -- PPB officers then began to push    15:39:57

Exhibit 10
Decl of Moede

1  understand to be force that may have been used against

2  yourself.

3         It sounded like there was the flashbang that

4  went off "under my feet", is the one that I wrote down.

5  Is that correct?                                    15:42:27

6  A   Um, I believe that your question was what did I

7  witness that give rise to claims against the City.

8  Q   Yeah.

9  A   So that's why I described the things that I

10 witnessed.                                          15:42:38

11 Q   Okay.  Is it fair to say that you did not have OC

12 spray used against yourself on June 27th, 2020?

13 A   Correct.

14 Q   And, similarly, you didn't have an FN 303 used

15 against you on June 27th, 2020?                      15:42:59

16 A   Ah, I did not have it used against me.  I saw it

17 fired, probably hundreds of times that night, into

18 protesters.

19 Q   Okay.  You didn't have a baton used against yourself

20 on June 27th, 2020?                                 15:43:16

21 A   No.  I saw PPB officers strike multiple people across

22 the face with their batons.

23 Q   I think I understand your testimony with respect to

24 June 27th.  Let's go on to August 1st.

25         Can you describe for me the incident that took  15:43:49

Exhibit 10
Decl of Moede

ALEXANDRA JOHNSON, 12/03/2021                          Page 177

1   place on August 1st of 2020 that you allege gives rise to

2   a claim against the City of Portland.

3   A    Yes.   Um, we were protesting at the Penumbra Kelly

4   Building, when the police had pushed us, um, down to

5   either 41st or 44th.   And when I say "push", I mean          15:44:13

6   herded.

7          Um, when we turned on to either of those

8   streets, um, the police were walking probably 30 feet

9   behind the -- where the protest -- group of protesters had

10  started.   Um, when I turned around -- or, when I -- I was   15:44:33

11  watching the police, and an officer sprinted out of the

12  group, came up, grabbed a protester, turned them around,

13  because the protester was walking the direction that they

14  were being told to and not interacting with the police,

15  but he turned them around, sprayed them directly in the      15:44:55

16  face, and then threw them to the ground without arresting

17  them.

18          At this point, I went over to try to help this

19  person, because they had obviously been injured, um, at

20  which time I was also shoved to the ground.                  15:45:13

21  Q    Okay.   So were you -- you were shoved to the ground

22  when you -- I'm sorry, when you came to assist the person

23  that had been sprayed in the face?

24  A    Correct.

25  Q    And who shoved you?                                     15:45:35

Exhibit 10
Decl of Moede

1   A    I believe it was a PPB officer.

2   Q    Other than the shove by the Portland Police Bureau

3   officer that you've described, was any other force used

4   against yourself by the PPB on August 1st, 2020?

5   A    Not against me, that I can remember at this time.    15:45:59

6   Q    Okay.  Let's go to August 5th of 2020.  Can you tell

7   me what happened on August 5th of 2020 that gives rise to

8   the claim that you're making against the City.

9   A    Ah, yes.  I believe that we were at the, ah, East

10  Precinct located on 106th.  Um, and the police had thrown   15:46:30

11  some flashbangs on 106th, um, pushing the protesters up

12  to -- it's, ah -- it's technically Washington, but it very

13  quickly turns into Stark.

14            Um, and, ah, at this corner of Washington and

15  106th, a PPB officer ran forward and again, in that rowing   15:46:57

16  motion, um, with his -- with their baton, I'm unsure of

17  the gender of the officer, um, tackled the protester with

18  all of their body weight, using so much force that they

19  also fell to the ground.

20  Q    Okay.  And so did they clear the -- the PPB officer   15:47:21

21  didn't use a baton against yourself, correct, on

22  August 5th of 2020?

23  A    Correct.

24  Q    And other -- any use of force against yourself on

25  August 5th, 2020?    15:47:37

Exhibit 10
Decl of Moede

1    A    Not that I can remember at this time.

2    Q    Okay.  And I forgot to ask you a question that I

3    asked on the other dates.  So with respect to what we've

4    discussed so far, I think you said there was a Facebook

5    post on June 6th, June 27th.  Did you post to the social    15:47:59

6    media for the incidents that you've described on

7    August 1st?

8                    MR. BRUGGEMEIER:  Object to the form.

9    A    August 1st, no, I don't believe that there is any,

10   ah, posted video.                                           15:48:17

11   Q    BY MR. YAMACHIKA:  Okay.

12   A    And/or local video, I don't believe that there's any

13   video at all.

14   Q    Okay.  And what about August 5th?  Did you have --

15   were you recording for that event?                          15:48:27

16   A    Yes, I was.

17   Q    And is that posted on one of your -- the social media

18   sites?

19   A    Yes.  It's on Twitch.

20   Q    Let's move on to August 7th of 2020.  Can you          15:48:44

21   describe for me the incident that gives rise to the claim

22   against the City for August 7th, 2020.

23   A    Ah, yes.  Again, we were at the Penumbra Kelly

24   Building.  Um, this time, I believe that police had herded

25   or pushed protesters, um, east towards 50th, um, where, on  15:49:09

Exhibit 10
Decl of Moede

1    50th, we turned south.

2          Um, at this time, there was a ton of commotion

3    that was happening on the sidewalk where I was trying to

4    remain and walk the direction.

5          Um, there were also officers who were shoving       15:49:30

6    protesters around on the sidewalk, um, when a protester

7    was grabbed from right next to me and dragged out into the

8    street and sprayed directly in the face with mace for --

9    it seems like forever, I would say five seconds or more.

10         Um, ah, and then I -- ah, eventually, I             15:49:54

11   started moving forward again.

12   Q    Okay.  Fair to say that the officer didn't use pepper

13   spray on yourself on August 7th, 2020?

14   A    Correct.

15   Q    Did any PPB officer use force on you on August 7th,   15:50:17

16   2020?

17   A    Not that I can remember at this time.

18   Q    All right.  Let's go to August 8th of 2020.  Can you

19   describe for me what incident took place on August 8th of

20   2020 that gives rise to the claim against the City.        15:50:40

21   A    Ah, yes.  I believe that I had, um, met with

22   protesters at Kenton Park in north Portland.  Um, it was

23   after dark and we were getting ready to march to the PPA

24   building, when, um, PPB officers arrived at Kenton Park to

25   preemptively warn everybody.                               15:51:07

Exhibit 10
Decl of Moede

1        Um, as they were leaving, officers threw out

2   several flashbangs from their van, which the van was in

3   the street and I was on the edge of the park, um, so I was

4   probably only 20 feet from the officers.  Ah, when they

5   threw out this flashbang, it rolled over and exploded      15:51:29

6   underneath my feet.

7   Q    Okay.  So on August 8th, it sounds like PPB deployed

8   a flashbang that landed near your feet; correct?

9   A    Correct.

10  Q    Other than the flashbang that was used on August 8th   15:51:46

11  of 2020, did the Portland Police Bureau use any force

12  against you?

13            MR. BRUGGEMEIER:  Object to form.

14  A    Not that I can --

15            MR. BRUGGEMEIER:  Mischaracterizes prior           15:52:00

16  testimony.

17  A    Not that I can remember at this time.

18  Q    BY MR. YAMACHIKA:  Okay.  Let's go to August 9th of

19  2020.  Can you describe for me the incident that took

20  place on August 9th of 2020 that gives rise to the claim    15:52:20

21  against the City.

22  A    Um, yes.  I believe it was, ah, several flashbangs

23  that were deployed, um, beneath my feet, um, at the, ah,

24  Portland Police Association.

25  Q    Okay.  I forgot to ask you about video on at least     15:52:51

Exhibit 10
Decl of Moede

ALEXANDRA JOHNSON, 12/03/2021                          Page 187

1  batons.

2  Q    Besides the ones we already talked about, can you

3  identify instances when you witnessed the use of -- PPB's

4  use of an aerosol restraint.

5  A    Um, again, that was, ah, great in number.  Um, I          16:21:52

6  can't remember any other times at this time.

7  Q    Okay.  So for this time frame -- or for this

8  question, I want to ask you to think about the time frame

9  of when you first started protesting to when you stopped

10  protesting; you've estimated 55, plus or minus ten,          16:22:12

11  protests.  At any point in participating in the protests,

12  did you see objects thrown by protesters at officers or

13  others?

14  A    Um, I saw objects, ah, sailing through the air.  I'm

15  unsure who they were thrown by.                              16:22:36

16  Q    Okay.  Did you see rocks thrown by protesters at

17  officers?

18  A    Ah, I couldn't identify any rocks, no.

19  Q    And so when I mean rocks, I mean, you know, what you

20  think about as a rock, versus like chunks of concrete,       16:22:56

21  bricks, you know, any type of -- of that style object.

22  Does that change your answer at all?

23  A    No, it doesn't --

24           MR. BRUGGEMEIER:  Object to form.

25  A    It doesn't change my answer.  I didn't recognize any    16:23:12

Exhibit 10
Decl of Moede

1   large concrete pieces or small rocks.

2   Q     BY MR. YAMACHIKA:  What about water bottles, plastic

3   water bottles?

4   A     I did see water bottles sailing through the air.

5   Q     Did you see both empty water bottles sailing through      16:23:25

6   the air?

7   A     Yes, I saw empty water bottles.

8   Q     Did you see partially full water bottles sailing

9   through the air?

10  A     Ah, it was hard to tell, but I imagine.                   16:23:40

11  Q     What about full water bottles being thrown at

12  officers?  Did you see that?

13  A     Um, again, it's hard to tell how full it was, but

14  I -- I'm unsure.

15  Q     Did you see frozen water bottles thrown at officers?      16:23:55

16  A     Ah, no, not that I can -- not that I could tell that

17  anything was frozen, no.

18  Q     Okay.  What about any glass bottles?  Did you see any

19  glass bottles being thrown from protesters at officers?

20  A     Um, I did hear glass bottles break.  I don't know         16:24:15

21  where they were thrown from or if they were intended to be

22  thrown at the officers.

23  Q     So do you think officers were throwing bottles?  I

24  just want to clarify, because that -- I mean, if it wasn't

25  protesters, who was it?                                          16:24:31

Exhibit 10
Decl of Moede

1   A     Ah, I don't know if the bottles were thrown; I don't

2   know if it was knocked out of someone's hand; I don't know

3   if it was an accident from somebody; I don't know where

4   the water -- or where the glass bottle came from.  I did

5   see it shatter in front of officers.                      16:24:49

6   Q     And you're saying that could have been on accident,

7   versus it being intentionally thrown or launched at them?

8   A     Again, I don't know.

9   Q     Okay.  Did you see any Molotov cocktails being thrown

10  at officers?                                              16:25:06

11  A     No, I did not.

12  Q     I think I previously asked you about the Molotov

13  cocktail, I think it was September 5th.  Do you -- when

14  you said you didn't see it on the night and you saw video

15  a few days later, did you have a -- did you know a Molotov  16:25:24

16  cocktail was thrown on September 5th, while you were at

17  the protest?

18  A     No.

19              MR. BRUGGEMEIER:  Objection.  Asked and

20  answered.                                                 16:25:37

21  Q     BY MR. YAMACHIKA:  At any point during these

22  protests, did you, yourself, throw any objects at the

23  police?

24  A     No, I did not.

25  Q     Did you see any protesters light things on fire, to   16:25:51

Exhibit 10
Decl of Moede

ALEXANDRA JOHNSON, 12/03/2021                          Page 190

1   include dumpsters, trash cans, buildings, windows, that

2   type of stuff?

3   A    Not that I can remember.  I saw fires lit, but I

4   don't remember see -- seeing who lit them.

5   Q    Okay, so it's your testimony you never saw a          16:26:16

6   protester light any of those objects on fire.

7   A    Ah, no, I said that I don't remember seeing

8   protesters light them on fire, just that they were lit.

9   Q    Okay, so you have no recollection, as you sit here

10  today, of any protester actually engaged in the act of     16:26:30

11  lighting something on fire.  Is that correct?

12  A    Correct.

13  Q    Okay.  Did you, yourself, ever light any fires during

14  your protest activities?

15  A    No, I did not.                                         16:26:47

16  Q    And did you see any protesters destroy property?

17  A    Ah, no --

18          MR. BRUGGEMEIER:  Object to form.

19  A    -- I saw destroyed property, but I did not see the

20  act of destroying it.                                      16:27:00

21  Q    BY MR. YAMACHIKA:  And I -- so I would also include,

22  when I -- I don't mean like complete destruction, I'm

23  saying damage property, as well.

24  A    Correct.

25  Q    Did you ever -- yeah, did you ever see any protesters  16:27:09

Exhibit 10
Decl of Moede

ALEXANDRA JOHNSON, 12/03/2021                    Page 191

1  damage property?

2  A    Um, can you be more specific?

3  Q    So, for instance, did you see protesters breaking

4  windows at various establishments throughout Portland

5  during the protests?                                    16:27:27

6  A    No, not that I can remember.

7  Q    Of the 55 plus or minus ten nights, you never saw a

8  single protester break out a window?

9  A    No, I did not.  I saw broken windows, but I did not

10  see them get broken.                                    16:27:42

11  Q    Okay.  What about graffitiing businesses?  Did you

12  see any protesters spray paint graffiti on properties?

13  A    Yes, I did.

14  Q    Okay.  Did you, yourself, ever graffiti any property?

15  A    No, not that I can remember.                        16:28:04

16  Q    Did you see any protesters shine laser devices

17  towards officers?

18  A    Ah, I saw lasers being shined.  I -- I don't know if

19  they -- who was shining them.

20  Q    In which direction were the lasers being shined at?   16:28:18

21  A    Towards the officers.

22  Q    All right, so I'm going to try to run through some

23  photographs.  I'm going to go back and actually make these

24  exhibits.  So I think we're on Exhibit 49, if I'm --

25            THE REPORTER:  49's been marked.                16:28:43

Exhibit 10
Decl of Moede

1    A    Ah, FN 303s were used a majority of the nights that I

2    attended protests.

3    Q    So not every night, but now it's a majority of

4    nights?

5    A    Ah --                                                    17:09:17

6               MR. BRUGGEMEIER:  Objection.

7    A    Yes, I believe it was a majority.  Like I said, it

8    was so often that it's -- that it would -- it's hard to

9    pinpoint all of the dates that an FN 303 was used on

10   protesters.                                                   17:09:35

11   Q    BY MR. YAMACHIKA:  So using our -- the 55 plus or

12   minus ten protests that you attended, can you estimate for

13   me how many of those protests an FN 303 was used?

14   A    Probably between 30 and 40.

15   Q    Okay.  And then you said flashbangs were used very      17:09:56

16   often.  Can you give me the similar estimate?

17   A    Ah, probably between 20 and 30.

18   Q    Did you ever attend a protest where the PPB did not

19   use any force?

20   A    Ah, yes.                                                 17:10:15

21   Q    Which protests were those?

22   A    Um, I attended a protest at -- or several protests,

23   at the beginning of June, that marched from Revolution

24   Hall to Pioneer Square that, um, I didn't witness force.

25   I attended a protest on June 19th, um, in north              17:10:34

Exhibit 10
Decl of Moede

1    Portland -- or, I'm -- yeah, June 19th in north Portland

2    that didn't have any force.

3           Um, I attended, ah, protests that -- there

4    were several dates in the -- in June, I believe, that I

5    can't remember force being used but I can't remember the          17:10:58

6    specific dates.

7           So, yes, I did attend protests where force

8    weren't used.

9    Q    Okay.  So just so I understand what you're saying,

10   they used the weapons the same way, do you mean like the          17:11:18

11   mechanics of shooting an FN 303, like they aimed it,

12   pulled the trigger, shot a projectile, or are you saying

13   that they used it against the -- against the same

14   individuals that were displaying the same behavior and

15   then they applied that less-lethal munition in the same          17:11:39

16   manner?

17   A    Um, no, I don't think it was the same individuals.

18   Ah, it seemed that, um, their actions were pretty

19   predictable and they came out to, ah, disperse a crowd;

20   they would throw a bunch of flashbangs, shoot at people          17:12:00

21   through the flashbangs, and then shoot at people that were

22   dispersing.

23   Q    And when you said that the FN 303 was their favorite

24   and they used that indiscriminately, like how do you

25   mean -- did they ever, like, spray from left to right,          17:12:17

Exhibit 10
Decl of Moede

1                        CERTIFICATE

2              I, Kim Nerheim, an Oregon Certified Shorthand

3    Reporter and a Washington Certified Court Reporter, hereby

4    certify that said witness appeared before me by

5    videoconference at the time and place set forth in the

6    caption hereof; that at said time and place I reported in

7    stenotype all testimony adduced and other oral proceedings

8    had in the foregoing matter; that thereafter my notes were

9    transcribed through computer-aided transcription, under my

10   direction; and that the foregoing pages constitute a full,

11   true and accurate record of all such testimony adduced and

12   oral proceedings had, and of the whole thereof.

13             I further certify review of the transcript was

14   requested.

15             Witness my hand at Portland, Oregon, this 15th

16   day of December, 2021.

17

18

19

20             _____

21             Kim Nerheim

22             Oregon CSR No. 90-0138

23             Expires 9/30/2023

24             Washington CCR No. 0003038

25             Expires 3/28/2022

Exhibit 10
Decl of Moede

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF OREGON
 2                 PORTLAND DIVISION


 3


 4   DON'T SHOOT PORTLAND, a     ) Case No. 3:20-cv-00917-HZ
     nonprofit corporation, in its )
 5   individual capacity;        )
     NICHOLAS J. ROBERTS, in an  )
 6   individual capacity and on  )
     behalf of themselves and all )
 7   others similarly situated;  )
     MICHELLE "MISHA" BELDEN, in an )
 8   individual capacity and on  )
     behalf of themselves and all )
 9   others similarly situated;  )
     ALEXANDRA JOHNSON, in an    )
10   individual capacity and on  )
     behalf of themselves and all )
11   others similarly situated;  )
     LESTER WRESCKIE, in an      )
12   individual capacity and on  )
     behalf of themselves and all )
13   others similarly situated; and )
     THOMAS DREIER, in an individual)
14   capacity and on behalf of   )
     themselves and all others   )
15   similarly situated,         )
                                 )
16             Plaintiffs,       )
                                 )
17       vs.                     )
                                 )
18   CITY OF PORTLAND, a municipal )
     corporation,                )
19                               )
               Defendant.        )
20   _____)


21


22      VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
               NICHOLAS J. ROBERTS
23
             Taken on behalf of Defendant
24
                    *   *   *
25
```

Exhibit 11
Decl of Moede

1          MS. SHEFFIELD:  Okay, thank you.

2    Q    BY MS. SHEFFIELD:  Okay, so we'll just start with,

3    can you give me some of the dates that you do remember off

4    the top of your head.

5    A    Yeah.  May 28th, May 29th, June 2nd -- most of June.    10:47:37

6    I was going pretty consistently during the month of June.

7    Q    And during the nights that you attended the protests,

8    did you consume any alcohol?

9    A    No.

10   Q    And did you consume any recreational drugs?           10:48:07

11   A    No.

12   Q    And any prescription drugs that would have impacted

13   your memory or your recollection of those nights?

14   A    No.

15   Q    Okay, so I'll start with May 28th.  Can you describe   10:48:24

16   what you recall from attending the protest on May 28th.

17   A    Yeah, definitely.  May 28th, I didn't attend the

18   protest until later in the evening.  I had just moved into

19   an apartment, so I wasn't really even aware what was

20   happening.  I knew that the -- that protests were based     10:48:45

21   around police brutality and they -- I went -- I was

22   already living downtown, so I just walked towards Pioneer

23   Square.

24          It was pretty chaotic.  There were a lot of

25   police cars driving up and down the city streets.          10:49:14

Exhibit 11
Decl of Moede

1          I ended up joining a group of protesters where

2     we were standing in front of a line of police officers

3     with our hands up, protesting peacefully.

4          As time went on, the police began to escalate

5     and they dispersed tear gas canisters onto the street we          10:49:54

6     were on.

7          That was my first time ever experiencing tear

8     gas and it was terrifying.  I had to, like, run through a

9     crowd of -- or a cloud of it to -- because I was trapped

10    between the officers and the only way out of the street.          10:50:15

11    And I just remember it being completely debilitating and

12    coughing and, you know, vision was blurried and being in

13    pain and just, like, crouching on the side of the street

14    trying to clear my eyes out.

15         I think the, like, most debilitating symptoms          10:50:50

16    from the tear gas subsided after about ten minutes -- or,

17    I know in those sort of traumatic experiences, I think

18    time can be a little funny in our memory, so ten minutes

19    may have not been really ten minutes, but...

20         I regrouped with the rest of the protesters.          10:51:11

21    I remember seeing an officer shooting one of the

22    protesters, his back -- the protester's back was to them,

23    and they were firing at them with either the rubber

24    bullets -- or I don't think it was the 40 millimeters,

25    because those are pretty significant, but they were firing          10:51:31

Exhibit 11
Decl of Moede

1  at them, they hit them a number of times in the back.

2         Tear gas was used to disperse that crowd

3  again.  And, at this point, it was probably between 1 and

4  2 a.m.  I was certainly in shock, and I walked home and

5  left the protest at that point.                          10:52:15

6  Q    Okay.  And you talked about already living downtown.

7  Where did you live at the time, on May 28th, when you left

8  your apartment?

9  A    Yeah, it was Northwest Couch Street -- I'm trying to

10 remember the cross streets -- and 18th, I believe.        10:52:31

11 Q    And approximately what time did you leave your house

12 on May 28th?

13 A    It was around midnight.

14 Q    So midnight of May 28th going into May 29th?

15 A    Correct.  Yeah.                                       10:52:50

16 Q    And you said you walked toward Pioneer Square and

17 there was a line of police -- or there was a group of

18 people that you joined with their hands up.  Approximately

19 where was that group of people that you joined up with?

20 A    The group of people that I joined up with -- it       10:53:12

21 wasn't in Pioneer Square, I believe it was, like, two

22 blocks south, um...

23 Q    Okay.  And you said that you were dispersed with tear

24 gas.  Did you hear any instructions, prior to the tear gas

25 being used by police?                                     10:53:36

Exhibit 11
Decl of Moede

1   was a Starbucks on one of the cross streets, but around

2   where your cursor is at is where I remember it happening.

3   Q    And then let me -- I'll try one other.

4                (Deposition Exhibit No. 1 was presented.)

5   Q    This was previously marked as Exhibit 1.  So this          10:55:56

6   is -- now, in this one, Pioneer Square is that way.  This

7   is Taylor and 2nd, 1st.  Were you around this area, or

8   were you closer to Pioneer Square?

9   A    Um, I believe I was around this area.  I -- like I

10  mentioned, it was a couple blocks away from Pioneer           10:56:28

11  Square.

12  Q    Okay.  And when you ran south, where did you end up?

13  A    This area that we're trying to determine is where

14  I -- where I ran to.

15  Q    Okay, so you ended up --                                  10:56:46

16  A    Oh, I'm sorry, from the cloud of tear gas?

17  Q    Yeah, you said you ran due south from the cloud of

18  tear gas.

19  A    Hmm, right.  So I just made it, like, a block away.

20  Running was pretty difficult, so the location didn't          10:56:59

21  change very much.

22  Q    And then you were sitting there for about ten minutes

23  trying to clear your eyes; is that correct?

24  A    Correct, yeah.

25  Q    And was it at that point, when you were sitting          10:57:11

Exhibit 11
Decl of Moede

1  there, that you saw the officer shoot somebody with -- I

2  think you described it as a rubber bullet.

3  A    Yeah.  At that point, I had -- I was able to stand,

4  at that point, but I was still trying to overcome the

5  symptoms of the tear gas.                        10:57:29

6  Q    And did you know the individual who was struck by the

7  rubber bullet?

8  A    No, I didn't.

9  Q    Did you speak to that person at all?

10 A    No, I didn't.                                10:57:41

11 Q    Did you see them at all before they were struck with

12 the rubber bullet?

13 A    No, I didn't.

14 Q    And then you said that tear gas was used again.  Was

15 that while you were sitting a block further south?  10:57:56

16 A    Correct.

17 Q    And where was it deployed from?  What direction?  Was

18 it north of you?  South of you?

19 A    Correct, it would have been north, as the officers

20 were north and were just going south towards the group of  10:58:20

21 people.

22 Q    And when you experienced that tear gas, you said you

23 went home.  Do you have a sense of the route that you took

24 home from there?

25 A    I don't recall the route I took that night.  I'm sure  10:58:55

Exhibit 11
Decl of Moede

1    A    Yeah, I was texting with my brother.  I had texted

2    him to let him know that I was home safely.

3    Q    Did you text with anyone else?

4    A    No.

5    Q    Did you video anything -- use your phone to videotape    11:01:25

6    anything during the night of the 28th?

7    A    On that first night, I don't believe I did.

8    Q    Do you know if you took any pictures?

9    A    No.

10    Q    And besides witnessing the tear gas -- or    11:01:48

11    experiencing the tear gas and witnessing the individual

12    struck by some type of impact munition, did you witness

13    any other use of force on May 28th into the morning of

14    May 29th?

15    A    No, I did not.    11:02:08

16    Q    And did you experience any other use of force,

17    besides the tear gas, on that night of the 28th?

18    A    No, I did not.

19    Q    The next night that you said you remembered is

20    May 29th.  Can you describe your experience attending the    11:02:35

21    protest on May 29th?

22    A    It was very similar to the night before.  It started

23    earlier in the evening.  I remember it was around the

24    Justice Center and Chapman Square.  I remember there were

25    speakers there who were speaking on police brutality in    11:03:14

Exhibit 11
Decl of Moede

1  America.  And I remember there was a large police

2  presence.

3            Yeah, I remember peacefully protesting with

4  quite a large crowd in the Chapman Square area and being

5  met with the volleys of tear gas and being chased around        11:03:45

6  the city by Portland Police.

7  Q    When you said it began earlier on the night of

8  May 29th, approximately what time did you go out to

9  protest on May 29th?

10 A    Approximately maybe 7, 7 p.m.                               11:04:06

11 Q    And you went right from your house to Chapman Square?

12 A    Correct.

13 Q    And approximately how long were you in Chapman Square

14 before you described that you were hit with tear gas?

15 A    I would say an hour or two.  I remember it was still     11:04:33

16 light outside, on that day, when they used tear gas.

17 Q    And before -- before they used tear gas, did you hear

18 any announcements on that day by -- from the Portland

19 Police?

20 A    Not that I can recall at the moment.                       11:04:59

21 Q    And do you know where in Chapman Square you were

22 standing?  You can see the map is still up.  I think you

23 said you were near the Justice Center.  So were you on the

24 3rd Avenue side of Chapman Square?

25 A    Yeah, so I believe I was on the corner of Main and        11:05:31

Exhibit 11
Decl of Moede

1    3rd Ave.

2    Q    And what -- what did you do when tear gas was

3    deployed into the crowd of people in Chapman Square?

4    A    I went -- you know, the majority of people were just

5    trying to escape the tear gas, and then we moved -- it          11:05:59

6    would have been up Main Street out of the park.

7    Q    And when you say "up Main Street", do you mean west

8    on Main Street towards 4th or 5th, or do you mean east

9    towards 2nd or 1st?

10   A    Correct, I mean west towards 4th and 5th.                   11:06:15

11   Q    And prior to the use of tear gas on May 29th in

12   Chapman Square, did you witness or experience PPB use any

13   other force?

14   A    Not that I can recall.

15   Q    And after you moved west on Main on May 29th, what         11:06:47

16   happened next?

17   A    After getting out of the park area, I looked back to

18   see, you know, if there was anybody I could help.  After

19   experiencing the tear gas the night before, I was aware of

20   how debilitating it could be.  I remember there seemed to       11:07:18

21   be police around Southwest 5th and Salmon, at that point.

22           After looking back in the park, I saw

23   somebody -- a protester dragging another person out of the

24   park, and so I went over there to do my best to assist

25   them.  And the person we were trying to carry out of the        11:07:48

Exhibit 11
Decl of Moede

1  park was coughing and screaming and saying they couldn't

2  feel their legs, and their legs were just dragging under

3  them as we were moving them out of the tear gas.

4  Q    And where did you bring the individual?

5  A    We were just trying to continue moving west.  I think          11:08:16

6  we were probably between 5th and 4th.  There was a group

7  of protesters, I think, on 5th, kind of on the corner of

8  Main.  And police again began to use tear gas, so we were

9  just feeling trapped between 5th and 4th.

10 Q    So you saw tear gas at 5th and Main and so you didn't          11:08:57

11 continue to move west, is that what you're saying?

12 A    Correct.

13 Q    And were you impacted by that tear gas at 5th and

14 Main?

15 A    I was.                                                         11:09:10

16 Q    And so where -- where did you go from -- from that --

17 at that time you were between 4th and 5th and Main, how

18 long did you remain there?

19 A    I remained there until the tear gas started to

20 dissipate closer to Chapman Square.  I seem to remember          11:09:41

21 going back towards Chapman Square and then heading south

22 on 4th to just -- to get away from the police that were

23 forming on 5th.

24 Q    So you went south on 4th.  Did you continue to go --

25 How far south did you go on 4th?                                 11:10:13

Exhibit 11
Decl of Moede

1   with people in the street west of Chapman Square on

2   May 29th?

3   A    I don't recall, no.

4   Q    And you said you may have gone back to Chapman

5   Square, but you don't recall if that's where you went?        11:12:33

6   A    Correct.

7   Q    Do you remember anything else from that evening of

8   May 29th?

9   A    Not at this time, no, I don't.

10  Q    Do you know approximately what time you returned home    11:12:56

11  on May 29th or the early morning of May 30th?

12  A    I don't.

13  Q    Did you witness any force, besides tear gas, on that

14  night of May 29th into the early morning of May 30th?

15  A    I believe the flash grenades were also being used.       11:13:20

16  It was at the point where they initial -- the protesters

17  initially moved west out of the park, and so that would

18  have happened on 5th.

19  Q    Sorry, you said you believe that flash grenades were

20  used on 5th?  Is that what you said?                          11:13:42

21  A    Correct, yeah.

22  Q    And you never made it up to 5th; is that correct?

23  A    Correct.  I did not feel safe going all the way on to

24  5th.

25  Q    Were you impacted by a flash grenade on May 29th?        11:14:02

Exhibit 11
Decl of Moede

1   A    Um, the flash grenades are incredibly loud, and I

2   remember going towards 5th and, yeah, hearing them go off.

3   Q    So you heard the noise from the flash grenades?

4   A    Correct, yeah.

5   Q    Were you impacted in any other way?                11:14:30

6   A    No.

7   Q    And just so we have the same terminology, what do you

8   mean when you say "flash grenade"?

9   A    When I mean flash grenade, I don't know if it's

10  called the concussion grenade, the little metal cans that   11:14:50

11  create that, like, concussive boom sound and usually then

12  a bright light, as well.

13  Q    And how do you know they're little metal cans?

14  A    I saw them when the officers were throwing them at my

15  feet.                                                  11:15:15

16  Q    On May 29th, or on a different night?

17  A    On a different night.

18  Q    Okay.  And you said that they're -- they create a

19  bright light and a loud boom.  Is that -- is that

20  everything that they do or that you've experienced them   11:15:29

21  doing?

22  A    I mean, when we say "loud boom", it's more than just

23  a noise, there's like a -- it's a physical sensation you

24  can feel in your body, like -- it's really rattling, I

25  wouldn't say it's just a noise.  But, yeah, that's --   11:15:48

Exhibit 11
Decl of Moede

1    I think we were discussing May 28th and May 29th.

2    A    Yeah, thank you, yeah, I'd love to clarify.  What we

3    were referring to as May 29th was -- or, I'm sorry,

4    May 28th was actually May 29th.  Um, I had those dates

5    mixed up.                                          11:30:49

6    Q    Okay.  And so what we were referring to as May 29th

7    was -- what date was that?

8    A    June 1st or May 30.  Is there a 30th of May?

9    Q    There's even a 31st.  But I think it was May 30th.

10   A    Yeah.                                         11:31:04

11   Q    Okay.

12   A    Correct.

13   Q    Okay, so we discussed -- when we were discussing what

14   happened on May 28th, your testimony is that that entire

15   discussion was the night of May 29th into the           11:31:16

16   early-morning hours of May 30th; correct?

17   A    Correct.

18   Q    And we were just discussing May 29th.  And what

19   you're telling me is that discussion of May 29th from

20   earlier was May 30 into the early-morning hours,          11:31:27

21   potentially, of May 31st; is that correct?

22   A    Correct.

23   Q    Okay.  So I'm going to stay on May 30th to May 31st

24   just a little bit longer.  I think, when we stopped, you

25   were describing what you were wearing on -- on May 30th.  11:31:42

Exhibit 11
Decl of Moede

1  May 30th, besides the tear gas and the flash grenades?

2  A    Not that I can recall right now.

3  Q    Okay, so I'm going to move to the other night that

4  you indicated that you remember, and that was June 2nd.

5  Correct?                                           11:33:52

6  A    Correct.

7  Q    Okay.  And can you describe what you recall about

8  your experience on June 2nd.

9  A    Yeah, June 2nd, you know, after experiencing those

10  pretty terrifying events around the courthouse, I decided  11:34:15

11  to join a march or a rally that was starting around

12  Revolution Hall.  And we marched through the city -- am

13  I -- I believe, yes, the 2nd -- marched through the city

14  to downtown.  I think the end point was Pioneer Square,

15  where we heard -- again, there were speakers.         11:34:54

16          And there was a very large crowd, there was a

17  lot of -- a lot of people.  The Pioneer Square was

18  completely full.  I think, at some point during someone's

19  speech during -- like, while we were at Pioneer Square, I

20  remember -- you know, it's not that far from the Chapman  11:35:19

21  Square and Justice Center, I remember seeing people

22  running away from that direction, but the majority of the

23  crowd were just in Pioneer Square.

24          And then we marched back across the river to

25  Revolution Hall where, again, speakers addressed the      11:35:40

Exhibit 11
Decl of Moede

1    group.  And then I was -- the crowd dispersed.  I walked

2    home from Revolution Hall back to the northwest.

3              And while I was on the bridge walking across,

4    police cars were -- the lights and sirens had been by.

5    And when I got back into downtown before getting to the          11:36:07

6    northwest, there were just lots of, you know, the similar

7    sounds I had experienced before: people screaming,

8    yelling, the police sirens, loud bangs that I would not be

9    able to identify.  And I just remember going toward the

10   noise, seeing if there's anybody I could help or -- yeah.        11:36:43

11             I think I ended up in Pioneer Square.  There

12   was quite a few people there.

13             So I'm trying to do my -- I'm just nervous

14   that this is actually the 2nd or not, but I'm pretty sure,

15   in the declaration, it says more specifically the dates,        11:37:14

16   but I think I have the right day here.  This is where I

17   experienced some baton force, some use of force from the

18   police in Pioneer Square.

19             Yeah, they used tear gas again to disperse the

20   crowd in Pioneer Square, which worked.  There were a            11:37:35

21   couple people that stayed in the square, and I -- there

22   was a man who was kneeling in front of the line of riot

23   officers, and so I joined him and put my hands up.

24             And it was a pretty disturbing scene.  This

25   man was exclaiming how he would die for his skin and that        11:38:15

Exhibit 11
Decl of Moede

1   they were going to have to kill him, to which the police

2   responded with force and they started -- you know, I had

3   my hands up above my head, kind of doing my best to stand

4   between that man and the police, and they were using the

5   batons and, you know, hitting me in the ribs, pushing us          11:38:37

6   back out of the square.

7             I remember just looking at the police officers

8   in their eyes and saying, "That hurts me, that hurts; can

9   you feel my ribs," and they just responded by continuing

10  to hit me.                                                        11:39:01

11            I believe there was some sort of dispersement

12  thing -- I remember being hit by maybe little rubber balls

13  or the concussion grenades, I can't recall specifically

14  which ones, but they were instructing us to leave the

15  square.  We were surrounded by police officers, so we were       11:39:31

16  unable to leave the square.

17            At some point, one of the officers just

18  grabbed me by the backpack straps and, like, pulled me

19  through the line and threw me onto the staircase leading

20  out of the square.  And I hung back to make sure the other       11:39:47

21  man made it out and he did, and we ended up back on the

22  street, I think to the west of Pioneer Square.

23            At that point, you know, protesters had

24  started to -- to gather again.  I wasn't -- I don't really

25  recall being a part of a larger group, I was pretty shaken       11:40:17

Exhibit 11
Decl of Moede

```
 1  didn't want to have to be navigating the march with the
 2  bicycle, so I left it kind of on my way home.
 3  Q    Do you know approximately what time you got to
 4  Revolution Hall?
 5  A    I can't recall the time exactly.  I think it was --     11:42:31
 6  it was still light out, at that point.
 7  Q    And you marched from Revolution Hall to Pioneer
 8  Square.  Do you know approximately what time you got to
 9  Pioneer Square?
10  A    I don't, no.                                            11:42:50
11  Q    And the first time when you were in Pioneer Square,
12  you said you -- you saw people running and some yelling
13  from Chapman Square; is that correct?
14  A    I believe so.  There were a lot of people there, but
15  it looked like what I'd experienced on other nights, so...   11:43:11
16  Q    And the first time when you were in Pioneer Square
17  with a lot of people, were there police at Pioneer Square
18  during that time?
19  A    There was not.
20  Q    And so you didn't have any interaction with the         11:43:24
21  police during this first period of time on June 2nd at
22  Pioneer Square; correct?
23  A    Correct.
24  Q    And then you marched back to Revolution Hall;
25  correct?                                                     11:43:38
```

Exhibit 11
Decl of Moede

1    A    Correct.

2    Q    And you didn't have any interaction with the police

3    during that period in time; is that correct?

4    A    Correct.  Marching back to Revolution Hall, there was

5    no police presence.                                    11:43:48

6    Q    And then you said you were crossing the bridge back

7    towards northwest.  Do you know what bridge you were

8    crossing?

9    A    I don't.  It was probably Burnside, but I -- I can't

10   remember specifically.                                 11:44:05

11   Q    And after crossing the bridge, though, you heard

12   noises and sounds towards Pioneer Square; is that correct?

13   A    Correct.

14   Q    And do you know about what time that was?

15   A    Um, I don't.  It was definitely much later in the     11:44:24

16   evening, because the march had already happened, it was

17   dark, but I can't recall what time that took place.

18   Q    You said when you got to Pioneer Square tear gas was

19   deployed.  Did you see where it was deployed from?  Where

20   the officers were standing.                            11:44:47

21   A    M-hm.  Yes, I believe they were -- so it would have

22   been the -- they were kind of standing on the corner where

23   the MAX line is, going towards the airport, not towards

24   Beaverton.  I can't recall the cross streets at this -- at

25   this time, but...                                      11:45:14

Exhibit 11
Decl of Moede

1    physically no way to leave.  And I believe, in these next

2    couple of seconds, is when I was grabbed and pulled over

3    and then thrown onto the staircase.

4    Q    So that was at 4:34.

5    A    That's correct.                                    12:11:08

6              (Video playback.)

7    A    Pause.

8    Q    (Complied.)

9    A    I'm sorry, do you want me to say every time I hear

10   the concussion grenades going off?                       12:11:21

11   Q    If you can, that would be helpful, thank you.

12   A    Okay.  So at 4 -- I believe at 4 minutes and 42

13   seconds there was another one.

14              (Video playback.)

15   A    Pause.                                              12:12:08

16   Q    (Complied.)

17   A    Another indiscriminate weapon went off there at 5:15.

18              (Video playback.)

19   A    Pause.

20   Q    (Complied.)                                         12:13:04

21   A    So that was, I believe, they had fired the rubber

22   pellets or something.  You can hear it at, like, 6:59 and

23   then the person I was standing with screamed out in pain.

24   You can kind of --

25   Q    At 5:59, there was a noise, and you're saying that   12:13:23

Exhibit 11
Decl of Moede

1  was -- you said rubber pellets.  Can you explain what you

2  mean by that?

3  A    Yeah, so I'm just recalling, you know, rubber

4  bullets.  Rubber bullets is just the general term.  They

5  pointed some sort of gun at him and shot him with it.  I      12:13:43

6  think you can hear the "pop pop" and then them scream.

7  Q    Do you know who was hit?  Did you know the person who

8  was hit?

9  A    I don't know them personally, but that is -- I

10  believe that was the person I had been referring to that I   12:14:02

11  was sort of standing in front of and you can hear them, I

12  believe, throughout the video is the person saying that

13  they would die for their skin.

14  Q    Is that the individual who was kneeling?

15  A    Correct.                                                12:14:19

16         At this point in the video, I think -- I don't

17  think we're -- I'm not sure where we're standing.  We had

18  already been kind of pinned up against the wall, from what

19  I had heard, so we're either on the staircase or at the

20  top of Pioneer Square, like on the west side of the --       12:14:38

21  yeah, on the west side of Pioneer Square.

22  Q    And so, just to clarify, the noise we heard at around

23  5:59, you said, was some type of rubber bullet fired at

24  the individual who had been kneeling.  Is that the same --

25  A    Correct --  Sorry.                                      12:15:06

Exhibit 11
Decl of Moede

1    A    M-hm.  Um, yeah, I believe the next date, then, in

2    order, would be June 4th, but, if we just scrolled back up

3    to that list, it would show us there.

4    Q    (Complied.)

5    A    June 5th.                                          13:54:42

6    Q    Okay, and before we go to June 5th, you indicate

7    May 31st on this list, but you haven't described anything

8    from May 31st.  Do you have any recollection of force

9    being used on May 31st?

10    A    Not at this time.  It -- it was probably similar to    13:55:11

11    the nights we have already described.  Looks like it was

12    in Chapman Park, and we experienced a lot of tear gas in

13    that area.

14    Q    But do you have any specific memory of the tear gas

15    on May 31st?                                           13:55:32

16    A    Not at this moment, no.

17    Q    Okay, so the next date you indicated was June 5th;

18    correct?

19    A    M-hm, correct.

20    Q    And can you tell me what force you recall PPB using    13:55:51

21    on June 5th.

22    A    Yeah.  I recall PPB using the tear gas.

23    Q    And where did you go to protest on June 5th?

24    A    It was the Chapman Square in front of the Justice

25    Center.                                                13:56:24

Exhibit 11
Decl of Moede

1    taking care of my own physical body and trying to overcome

2    the tear gas.

3    Q    And what did you do next?

4    A    Went back into Chapman Park to continue protesting

5    peacefully.                                              14:01:55

6    Q    Do you know approximately what time this was?

7    A    I'm sorry, I don't.

8    Q    After you returned to Chapman Square, what -- what

9    happened?

10   A    I don't recall what else happened that night.       14:02:19

11   Q    Okay.  Do you recall any additional tear gas being

12   used that night?

13   A    I want to say yes, because that is how they would

14   disperse folks from peacefully protesting and usually I

15   would continue protesting -- protesting until I was, like,  14:02:46

16   physically unable to, but, no, I can't recall it happening

17   again that night.

18   Q    Okay, so you don't recall additional tear gas.  Do

19   you recall if any other force was used by PPB that night?

20   A    No, I don't.                                        14:03:08

21           MS. ALBIES:  Object to the form of the

22   question.  Are you asking whether he was on the receiving

23   end, or whether he saw any other force?

24           MS. SHEFFIELD:  That's a good --

25   Q    BY MS. SHEFFIELD:  Were you impacted by any other   14:03:18

1   are you just lumping it all together and saying --

2                   MS. SHEFFIELD:  I'm asking for any of them.

3   So you don't have any dates for --

4                   Do we want to go off the record for a second?

5                   MS. ALBIES:  Sure.                          14:05:04

6                   MS. SHEFFIELD:  Okay.

7                   THE VIDEOGRAPHER:  We are off the record at

8   2:05.

9                   (A discussion was held off the record.)

10                  THE VIDEOGRAPHER:  We are on the record at   14:07:41

11  4 -- I'm sorry, 2:07.

12                  MS. SHEFFIELD:  Thank you.

13  Q    BY MS. SHEFFIELD:  Mr. Roberts, we were on --

14  discussing June 5th and you had talked about the use of

15  tear gas.  And I wanted to confirm whether you recall if   14:07:56

16  any other force was used that you witnessed used by PPB

17  officers on June 5th.

18  A    No, I don't recall.

19  Q    Okay, what is -- what is the next date that you

20  recall force used by PPB, either against you or having     14:08:19

21  witnessed it, during the summer of 2020?

22  A    June 7th, 2020.

23  Q    Okay.  And can you recall where you were protesting

24  on June 7th, 2020?

25  A    I was in Chapman Park in downtown in front of the     14:08:36

Exhibit 11
Decl of Moede

1    Justice Center.

2    Q    And what do you recall -- what force do you recall

3    being used on June 7th, 2020?

4    A    I recall the use of tear gas and the use of the flash

5    or concussion grenades.                                    14:09:03

6    Q    And approximately what time did you go to Chapman

7    Square that night, on June 7th?

8    A    Approximately between 6 and 9 p.m.

9    Q    And what time do you recall tear gas being used?

10   A    I don't recall specifically what time it was, but I   14:09:31

11   believe it was after dark.

12   Q    Do you remember if announcements were made before

13   tear gas was used?

14   A    I don't remember, no.

15   Q    Do you remember where the tear gas was deployed from? 14:09:52

16   A    I believe, again, it was from the street or from the

17   steps of the Justice Center.  I believe, on that night,

18   they had moved sort of around the park, as well, so it may

19   have been coming from the side streets, as well.

20   Q    And you were in Chapman Square the whole time?       14:10:19

21   A    Until being dispersed by the tear gas.

22   Q    And where did you go when you were dispersed?

23   A    One to two blocks west into a safer space outside of

24   the tear gas.

25   Q    And what did you do once you moved one to two blocks  14:10:37

Exhibit 11
Decl of Moede

1  with in the park.

2  Q    BY MS. SHEFFIELD:  Okay, and I'm just trying to

3  understand, because you talked about the peaceful

4  protesters in the park and then returning and regrouping

5  with the peaceful protesters.                              14:14:41

6            Did you witness anything else, besides the

7  water bottle being thrown at the police on June 7th?

8  A    No.

9  Q    Okay.  And what is the next date when you were either

10  impacted by or witnessed PPB use force during the summer   14:15:01

11  of 2020?

12  A    June 26.

13  Q    And where did you protest on June 26th?

14  A    Chapman Park, outside of the Justice Center.

15  Q    And what time did you arrive on June 26th?            14:15:26

16  A    Approximately between 6 and 9 p.m.

17            MS. SHEFFIELD:  I think I froze.

18            THE REPORTER:  I can hear you.

19            MS. SHEFFIELD:  You can hear me?

20            THE REPORTER:  Yeah.                             14:16:07

21            MS. SHEFFIELD:  Okay.  Is Ashlee still

22  there?

23            MS. ALBIES:  Yes.

24            MS. SHEFFIELD:  Okay.  For some reason, my

25  computer is a little bit freezing, I apologize.           14:16:15

Exhibit 11
Decl of Moede

1    Q    BY MS. SHEFFIELD:  So on June 26th, you arrived at

2    Chapman between 6 and 9 p.m.  And what force did you

3    witness PPB use on June 26th?

4    A    Tear gas.

5    Q    At approximately what time did PPB use tear gas on          14:16:36

6    June 26th?

7    A    I don't recall the time that they used it.

8    Q    Did you hear any announcements before tear gas was

9    used?

10   A    I believe so, a dispersal order.                            14:16:57

11   Q    And prior to PPB deploying tear gas, did you witness

12   anything thrown at officers?

13   A    No, I didn't.

14   Q    And where was the tear gas deployed from?

15   A    Um, from the Justice Center area, um, you know, I          14:17:38

16   think 3rd.

17   Q    And so 3rd Avenue?

18   A    Correct, yeah.

19   Q    And what did you do after the tear gas was deployed?

20   A    Um, I believe I left.                                       14:18:03

21   Q    So you believe you went home that night?

22   A    Yeah.  Yes.

23   Q    And do you know approximately what time you got home?

24   A    I don't recall what time I got home.

25   Q    And besides witnessing tear gas on June 26th, did          14:18:28

Exhibit 11
Decl of Moede

1   you -- were you impacted by any other use of force by PPB

2   on June 26th?

3   A    I think I was also impacted by -- excuse me -- the

4   concussion or flash grenades, also deployed from where

5   they were and into the park.                              14:19:03

6   Q    So they were also deployed from 3rd Avenue?

7   A    I believe so.

8   Q    And besides the flash grenades and the tear gas on

9   June 26th, were you impacted by any other force by PPB?

10  A    Not that I can recall.                               14:19:23

11  Q    And did you witness any other use of force by PPB on

12  June 26th?

13  A    Not that I can recall.

14  Q    What is the next night that you can recall force

15  being used by PPB during the summer of 2020 after         14:19:48

16  June 26th?

17  A    It would have been -- I think the list here says

18  July 4th, but I think it was actually July 3rd, and that

19  might have been a confusion with the night going into the

20  day situation.                                            14:20:10

21  Q    Okay.  And what -- where were you protesting on

22  July 3rd?

23  A    In Chapman Park.

24  Q    And what time did you arrive in Chapman Park on

25  July 3rd?                                                 14:20:32

Exhibit 11
Decl of Moede

NICHOLAS ROBERTS, 11/17/2021

Page 79

1   A     It was between 6 and 8 p.m.

2   Q     And what force did you experience PPB use on

3   July 3rd?

4   A     It was tear gas and concussion or flash grenades and

5   then the rubber bullets.                                   14:21:03

6   Q     And approximately what time did you experience PPB

7   deploy tear gas?

8   A     Approximately between 9 and 11 p.m.

9   Q     And where did PPB deploy tear gas from on July 3rd?

10  A     It was in Chapman Park and then again later, as they   14:21:39

11  chased and moved us through the city.

12  Q     So in Chapman Park.

13  A     Correct.

14  Q     And then you said they had -- later as they chased

15  and moved you through the city.  Can you describe the       14:21:59

16  route that you went through the city on July 3rd?

17  A     Yeah, I will do my best with names of streets and

18  things like that, but I do recall the directions pretty

19  well.  So after they used tear gas in Chapman Park and

20  moved west a couple of blocks towards 5th.                  14:22:23

21  Q     Okay.

22  A     And, at that point, they had made like a couple of

23  lines, lines of officers in the streets that we were

24  facing.  I think they, at that point, just used the

25  smoke -- smoke grenades, it wasn't actually the tear gas.   14:22:49

Exhibit 11
Decl of Moede

1        After that standoff ended, we -- I moved,

2   would have been north towards Pioneer Square or the Apple

3   Store.  And while moving that direction, there was another

4   line of the riot police.

5        And, at some point -- it was on the same          14:23:24

6   street as the -- the streetcar downtown, because I

7   remember getting pushed into the streetcar, there was a

8   line of officers and they had, like, charged the crowd.  A

9   couple of people had been knocked over.  So I kind of ran

10  through the line to go back to --                       14:23:55

11        There was two people on the ground.  I think

12  one of them had fallen and been pretty seriously hurt, and

13  I was just kind of standing over them.  I tapped them on

14  the shoulder and let them know they were okay and I, like,

15  reached down with my hand, to help them get up.         14:24:14

16        At that point, one of the officers shot me

17  with the rubber bullets twice in the leg from maybe 10

18  feet away.  I experienced a lot of pain and my leg became

19  pretty stiff.  I helped those two people get up off of the

20  street, and then we moved north, towards the group of the 14:24:46

21  other protesters.

22        As we were moving back towards that group, an

23  officer threw a concussion or flash grenade at me and

24  hit -- it bounced right at my feet and exploded just a few

25  feet away from me, and I experienced that terrible       14:25:12

Exhibit 11
Decl of Moede

1  sensation that kind of rattles your chest, like your head

2  is splitting apart.

3          We moved -- at some point, began moving east

4  towards the river.  I'm sorry, I can't remember the cross

5  street, but we were about a block -- block west of the          14:25:42

6  riverfront and maybe -- maybe two or three blocks from the

7  fire department that's on Naito.

8          At that point, the officers were firing

9  tear-gas canisters in the street at the protesters.  One

10 landed at my feet.  I attempted to reach down and throw it     14:26:14

11 out of the street, away from the protesters, and was shot

12 again by the rubber bullets in my hand.

13         Um, I experienced a lot of pain; I thought my

14 hand might have been broken.  So I moved through the

15 crowd.  And then in a parking lot on that same block,          14:26:49

16 there was some dumpsters.  I then crouched down behind the

17 dumpsters and tried to assess my hand.

18         At that point, I was experiencing a lot of

19 pain and unable to use my hand and decided that I would

20 not be of assistance to anybody or myself out there, if       14:27:15

21 they needed any sort of aid, so I walked home from there.

22 I don't recall the time that I went home.

23 Q   Okay.  So I'm going to go in reverse and ask a couple

24 of questions.

25         You said you reached out to pick up a canister      14:27:39

Exhibit 11
Decl of Moede

1    of tear gas and that's when you were shot in the hand

2    by -- the second time you were shot with the rubber

3    bullets?

4    A    Correct.

5    Q    And was it the hand that reached down to pick up the          14:27:51

6    canister of tear gas that was shot?

7    A    Correct.

8    Q    And that was around 1st Avenue, a couple blocks away

9    from -- a couple blocks south of the fire station on

10   Naito?                                                              14:28:30

11   A    Correct.

12   Q    And when you were struck in the leg with the rubber

13   bullet, was that still up on 5th Avenue?

14   A    Correct.  It was the -- it was, um -- I'm sorry, I'm

15   failing to remember the street that the streetcar runs            14:28:43

16   along.

17   Q    Okay, I think it -- yeah, it might be that being

18   north, but, okay -- or more west, but that makes sense.

19   A    Okay.

20   Q    Okay.  And then you don't know what time you got            14:28:59

21   home, but it was sometime in the early morning on the 4th

22   of July, or was it still the 3rd of July?

23   A    I'm uncertain about the time I arrived home.

24   Q    And on July 3rd, did you only witness PPB officers,

25   or were there federal law enforcement officers there, as        14:29:32

Exhibit 11
Decl of Moede

1    well?

2    A    As far as I could tell, it was just the PPB.  They

3    announced themselves over the loudspeakers and the

4    vehicles that they would move in were all labeled as such.

5    Q    And what were the vehicles that they were moving in?        14:29:54

6    A    It was the SUVs, just the normal police officer

7    vehicles.  I don't recall if they were on the -- the vans.

8    They would all stand along the side of the vans.

9    Q    And you said that on July 3rd tear gas was first used

10   sometime between 9 and 11 p.m.  Prior to tear gas being          14:30:23

11   used, had you witnessed protesters throw anything at the

12   police?

13   A    No, I did not.

14   Q    Had you witnessed protesters engage in any violent

15   activity prior to the tear gas being deployed?                   14:30:49

16             MS. ALBIES:  Object to the form of the

17   question.

18             You can still answer it.

19   A    On July 3rd?

20   Q    BY MS. SHEFFIELD:  Yes.                                      14:31:00

21   A    Not that I can recall -- or, I'm -- not for July 3rd,

22   not that I can recall.

23   Q    And prior to the tear gas being deployed, did you

24   witness any protesters engage in any criminal activity?

25             MS. ALBIES:  Object to the form of the                 14:31:27

Exhibit 11
Decl of Moede

1    question.

2              You can answer.

3    A    Not that I can recall, no.

4    Q    BY MS. SHEFFIELD:  Okay.  And we'll move from

5    July 3rd to the next date in the summer of 2020 that you          14:31:40

6    recall force being used against you.  Can you recall what

7    the next date is?

8    A    It would be July 23rd.

9    Q    Okay.  And just to clarify, then, July 4th, you don't

10   recall witnessing PPB use force; is that correct?                 14:32:00

11   A    Um, no, I -- what I do recall is July 3rd.  I think

12   that date, July 4th, is a -- should be July 3rd and not

13   the 4th.  Is that what you were asking?

14   Q    Yes, that was what I was asking.  Thank you.

15   A    All right.                                                    14:32:39

16   Q    And did you text anyone, actually on July 3rd,

17   relating to the protests that occurred on July 3rd?

18   A    Um, not that I recall.  I did provide all of the text

19   messages that I shared with people.

20   Q    Okay, and we'll go into those later.                         14:33:00

21              Did you -- you said you were worried your hand

22   was broken.  Did you seek any medical attention, following

23   July 3rd, related to the injuries that you described?

24   A    I did not, no.  I didn't feel safe going to a

25   hospital, at that time.                                           14:33:23

Exhibit 11
Decl of Moede

NICHOLAS ROBERTS, 11/17/2021                    Page 85

1  Q    And did you take any video on your phone on July 3rd?

2  A    No, I didn't.

3  Q    We can discuss July 23rd now.   That was the next date

4  you had indicated; correct?

5  A    Correct.                                          14:33:56

6  Q    Where were you protesting on July 23rd?

7  A    Chapman Park.

8  Q    And what time did you arrive at Chapman on July 23rd?

9  A    Sometime between 7 and 9 p.m.

10  Q    And what force did you experience on July 23rd?    14:34:17

11  A    It was tear gas; the pepper balls, or the FN 303s, I

12  think they're called; and the concussion grenades.

13  Q    Okay, and when did you -- when did you witness PPB

14  deploy tear gas on July 23rd?

15  A    I'm unsure of the time, but it was approximately    14:35:00

16  between 9 and 12 p.m.

17  Q    And where was the tear gas deployed from?

18  A    3rd Ave.  I believe this is at the point where that

19  fence was put up, and there were officers behind the fence

20  and also along the street on 3rd and -- or, I'm sorry, on   14:35:27

21  3rd and -- I can't recall the name of the street, I'm

22  sorry.

23  Q    Would it be helpful if I pulled the map back up?

24  A    Sure, yeah.

25  Q    Okay, I'm going to stop sharing this.              14:35:47

Exhibit 11
Decl of Moede

1          Not the right map.

2          Okay, this map is Exhibit 1.  So you said they

3  put the fence -- you said on July 23rd was around the time

4  they put the fence up.  What fence are you referring to?

5  A    The fence around the District Court.  I believe it          14:36:31

6  was also around Multnomah County Justice Center.

7  Q    And so you were trying to describe -- I asked where

8  the tear gas was deployed from.  Can you help me -- I can

9  move the cursor.  This is 3rd Avenue here.  Can you help

10 me understand?                                                    14:37:04

11 A    Yes.  I believe, like I mentioned, from behind the

12 fence and then also on 3rd Ave. and Madison, right where

13 your cursor is; and then also on 3rd and Salmon.

14 Q    And you said from behind the fence, and I'm trying to

15 understand, because you talked about a fence around the           14:37:23

16 District Courthouse and you talked about a fence around

17 the Multnomah County Justice Center.  So when you say they

18 deployed tear gas from behind the fence, which fence are

19 you referring to?

20 A    I'm referring to the one around the District            14:37:40

21 Courthouse.

22 Q    And did you hear announcements, prior to the tear gas

23 being deployed on June 23rd -- or, sorry, July 23rd?

24 A    Not that I can recall.

25 Q    And what did you do after the tear gas was deployed        14:38:12

Exhibit 11
Decl of Moede

1   on July 23rd?

2   A    I moved west towards 5th Avenue.

3   Q    On which street were you moving west?

4   A    I believe I was on Main.

5   Q    And where did you go after moving west on 5th?    14:38:34

6   A    I believe I left at this point.

7   Q    So after the tear gas was deployed, you moved west on

8   Main and then left to go home?

9   A    Right.  Well, I'm sorry, I guess I should -- as we

10  were moving west, officers were -- that was also when I    14:39:13

11  was struck with the FN 303s and the concussion grenades.

12  Q    So where were you struck -- where on the map were you

13  struck by the FN 303?

14  A    So on 3rd Avenue between, ah -- I'm sorry, on Main,

15  on Main between -- between 3rd and 5th Avenue.    14:39:42

16  Q    And where were -- where were you struck on your body

17  by the FN 303?

18  A    I was struck on my chest and my head.

19  Q    Were you wearing a helmet?

20  A    I was.    14:40:27

21  Q    Did the FN 303 leave a mark on your helmet?

22  A    It did.

23  Q    What did the mark look like?

24  A    It was like a little white splatter.  I guess I --

25  more specifically was, I think -- because a splatter kind    14:40:39

Exhibit 11
Decl of Moede

1   of refers to a liquid.  It was like -- like a chalky

2   diameter that was where I was struck.

3   Q    And where were you when you were struck by the

4   concussion grenade?

5   A    In that same area.                              14:41:18

6   Q    Did you see the officer that deployed the FN 303?

7   A    I did not.

8   Q    And what were you doing immediately prior to the

9   officer deploying the FN 303?

10  A    I was moving out of the parks area moving west.  14:41:32

11  Q    And were you walking backward moving west?

12  A    I'm sorry, would you repeat the question?  Was I --

13  Q    Sure.  Where was the -- where was the officer who

14  deployed the FN 303?

15  A    Oh, I -- I didn't see them, but I -- they were -- a  14:41:57

16  group of officers were on Main.

17  Q    And the officers were to the east of you?

18  A    Correct.

19  Q    Did you see the officer who deployed the concussion

20  grenade?                                             14:42:33

21  A    No, I did not.

22  Q    But that officer -- do you know where that officer

23  was located?

24  A    I believe they were on the same line as officers who

25  were moving west along Main.                         14:42:44

Exhibit 11
Decl of Moede

1   Q    And did you see the uniforms that these officers were

2   wearing?

3   A    I believe they were wearing black.

4   Q    Were there any markings on their uniforms?

5   A    Not that I can recall.  I think they had -- you know,    14:43:16

6   they have patches and things like that, but not that I can

7   recall specifically detail.

8   Q    And did you take any photographs -- or, sorry.

9            Did the FN 303 leave any marks, the one that

10  struck you in the chest?                                      14:43:47

11  A    No, it didn't.

12  Q    Were you wearing padding on your chest?

13  A    No.  Um, I guess I should also say, if it's

14  appropriate, I have a pretty hairy chest, so any visual

15  bruising would have been difficult to see.  It definitely,    14:44:22

16  you know, was sensitive to touch, but I didn't take any

17  pictures of it.

18  Q    Okay.  And you don't recall seeing any bruising.

19  A    No.

20  Q    I'm going to switch back, unless you can recall -- I     14:44:45

21  wanted to ask about the next night that you recall force

22  being used during the summer.  Do you want -- do you need

23  to switch back to the other document, or do you recall?

24  A    I believe it was just the next day, so the 24th.

25  Q    Okay.  And can you describe where you were protesting    14:45:03

Exhibit 11
Decl of Moede

1    on July 24th?

2    A    Yeah, I was, again, out in front of the -- or in the

3    park in front of the courthouse and the -- the District

4    Court.

5    Q    So you were in Chapman Square and Lownsdale Square?    14:45:29

6    A    Correct.

7    Q    And what time did you arrive at Chapman Square and

8    Lownsdale Square on the 24th?

9    A    Sometime between 6 and 8 p.m.

10   Q    And what type of force did you experience on    14:45:48

11   July 24th, 2020?

12   A    The tear gas -- yeah, I believe it was just tear gas.

13   Q    And what time was tear gas deployed on July 24th?

14   A    I'm uncertain of the time it was deployed.

15   Q    And where was it deployed from?    14:46:19

16   A    It was deployed from behind the fence of the District

17   Court, the corner of 3rd and Madison and the corner of 3rd

18   and Salmon.

19   Q    And what did you do when the tear gas was deployed on

20   July 24th?    14:47:00

21   A    After the first deployment -- at this point, I had a

22   full-face respirator, so I was able to spend a little bit

23   more time in the gas without suffering from the symptoms,

24   so I stayed in the park and waited for the other

25   protesters to collect themselves and wait for the tear gas    14:47:35

Exhibit 11
Decl of Moede

1   Q    Okay.  And I'm going to move back.  So we had --

2   right before we took the break, we had just been speaking

3   about July 24th.  And I wanted to ask if you recall the

4   next time, during the summer of 2020, when you were

5   impacted by force used by PPB.                          15:10:54

6   A    Yeah, if we could refer to the Complaint we were

7   looking at earlier.

8   Q    I think the interrogatory responses?

9   A    That one, yes, thank you.

10  Q    (Complied.)                                         15:11:16

11  A    I think it was later -- yeah, quite a bit later.

12  August 21st.

13  Q    So August 21st.  Can you describe to me where you

14  were protesting on August 21st.

15  A    Yeah, I was on MLK outside of the -- the PPB's North   15:11:30

16  Precinct.

17  Q    Okay.  And what time did you arrive there?

18  A    Um, I arrived at -- at Irving Park around -- at

19  approximately between 6 and 8 p.m.  And then there were

20  some speakers there who addressed the protesters and then  15:12:08

21  we marched up to the North Precinct.  I'm not sure what

22  time we arrived at the North Precinct, but I believe it

23  was probably between 9 and -- or between 8 and 10 p.m.

24  Q    And you said you were impacted by force on

25  August 21st.  What type of force were you impacted by?     15:12:35

Exhibit 11
Decl of Moede

1    A    Um, tear gas.

2    Q    And what time was tear gas deployed?

3    A    I'm not certain.  Approximately between 10 and -- and

4    1 p -- 1 a.m.

5    Q    And do you recall hearing announcements before tear          15:13:07

6    gas was deployed on August 21st?

7    A    I believe there was a dispersal announcement.

8    Q    And after the dispersal, did you remain in the area

9    around North Precinct?

10   A    I did.                                                        15:13:36

11   Q    I'm going to pull up a map of the North Precinct.

12   And we can -- one second.

13           So on this -- can you see the map?

14             MS. SHEFFIELD:  We can mark this as

15   Defendant's Exhibit 13?                                           15:14:18

16             THE REPORTER:  That's the next one.

17             MS. SHEFFIELD:  Thanks.

18             (Deposition Exhibit No. 13 was marked

19      for identification.)

20   Q    BY MS. SHEFFIELD:  And you can see right here, it            15:14:28

21   says "Portland Police Bureau North Precinct", and it's

22   between Killingsworth and MLK.  Can you describe where you

23   were at North Precinct on August 21st?

24   A    I'm having a little trouble just reading the map.

25   Would you be able to point out where -- oh, thank you.           15:14:49

Exhibit 11
Decl of Moede

1   A    By the officers, yeah.  I was at the back of the line

2   walking with the people who were unable to run.

3   Q    Okay.  And you didn't see -- you didn't see the

4   officer who pushed you.

5   A    I wasn't looking at the officer when he pushed me,                15:23:15

6   no.

7   Q    And I just want to clarify.  So you couldn't tell

8   whether it was a baton or something else that pushed you?

9   A    Yeah, correct, I wasn't -- I wouldn't be able to tell

10  if it was -- the officer was holding a baton or if they               15:23:35

11  pushed me with their hands.

12  Q    Okay.  And was there any other force that you

13  witnessed on August 21st, besides the shoving and the

14  rushing and the tear gas that you've described?

15  A    No, not that I can recall.                                        15:23:57

16  Q    And what was the next date that you recall force

17  being used by PPB during the summer of 2020?

18  A    I believe it was the following evening in August.  If

19  we refer back to that sheet, I think it's the 20 --

20  Q    I'll go back to that sheet, sorry, one second.                    15:24:20

21  A    Yeah, thank you.

22          August 22nd.

23  Q    Okay.  And on August 22nd, where were you protesting?

24  A    Again, in front of the North Precinct on the corner

25  of Northeast -- excuse me -- Martin Luther King and                    15:24:58

Exhibit 11
Decl of Moede

1    Emerson.

2    Q    And approximately what time did you arrive on

3    August 22nd?

4    A    Approximately between 7 and 9 p.m.

5    Q    And what force did you experience on August 22nd?    15:25:33

6    A    Tear gas and, um, I don't know how I should describe

7    it, their shields or their -- I believe their batons, but

8    also another physical interaction with the police.

9    Q    Did you say shields, not batons?  I'm sorry.

10   A    Um, I'm -- I don't recall if -- I believe they were    15:25:59

11   carrying -- they were using the shields that night.  And

12   when they'd bull-rush us, they were hitting people with

13   the shields.

14   Q    Okay.  And it happened -- did the tear gas happen

15   prior to the bull-rushing and the shields?                15:26:27

16   A    Correct, yeah.  So it was deployment of tear gas and

17   then the rushing of officers, just moments later, while

18   people were scrambling from the gas.

19   Q    Okay.  And what happened -- what was going on prior

20   to the deployment of tear gas?                            15:26:45

21   A    Protesters were standing on the corner of Northeast

22   Emerson and MLK.

23   Q    And did you hear any announcements before the tear

24   gas was deployed?

25   A    I can't recall, at this time.                        15:27:22

Exhibit 11
Decl of Moede

NICHOLAS ROBERTS, 11/17/2021

Page 104

1    Q    And from what direction was the tear gas deployed?

2    A    From -- from farther east on Northeast Emerson.

3    Q    And what did you do, once the tear gas was deployed?

4    A    I moved across MLK kind of towards that route we had

5    taken the night before across the street on Northeast          15:27:54

6    Emerson, um -- yeah, and that's what I did.

7    Q    And you talked about the police rushing you with

8    shields.  Were you impacted by those shields?

9    A    Right.  So they -- they deployed the tear gas, rushed

10   out with the shields, and it was, like, as myself and          15:28:22

11   others were moving out of the area, not really sure why

12   they -- I mean, they -- tear gas, which they hadn't

13   really -- I feel like they hadn't really done before, so

14   it was pretty startling to be attacked while in a cloud of

15   gas.                                                           15:28:50

16   Q    Okay, and on August 22nd, you said you were attacked

17   in the cloud of gas.  So were you pushed or hit by a PPB

18   officer carrying a shield on August 22nd?

19   A    Correct.

20   Q    And that was on Emerson?                                  15:29:14

21   A    It was on the corner, I think, tech -- like,

22   technically, we're standing on MLK still, but I was moving

23   towards the west side of Emerson.

24   Q    And did you see the officer who pushed you?

25   A    Yes.                                                      15:29:41

Exhibit 11
Decl of Moede

1  Q    And approximately what time did you arrive on

2  August 28th?

3  A    I believe it was between 7 and 9 p.m.

4  Q    And do you remember anything about the protest --

5  specifically about the protest on August 28th before force    15:35:46

6  was used?

7  A    Um, no, I don't.  Like I said, I was standing a block

8  or two away, with the majority of people.

9  Q    Okay.  And approximately -- or, sorry, what force was

10 used on August 28th?                                           15:36:10

11 A    Tear gas was used.

12 Q    And what time was tear gas used?

13 A    Oh, I'm uncertain of the time it was used.

14 Q    And do you know where it was used, where it was --

15 A    I --                                                      15:36:34

16 Q    -- deployed?

17 A    Sorry, I didn't mean to cut you off there.

18 Q    Sorry.

19 A    I believe it was, again, that corner of Northeast

20 Emerson and MLK.  But, you know, the gas -- I was still       15:36:41

21 affected by the gas, even on -- you know, a block away on

22 Garfield.  And as folks are running away and dispersing, I

23 was handing out water and, ah, yeah.

24 Q    And after people began dispersing and you handed out

25 water, what happened next?                                     15:37:12

Exhibit 11
Decl of Moede

1    A    Not that I can recall, no.

2    Q    And are there any other dates that you witnessed PPB

3    use force during the summer of 2020?

4    A    Not that I can recall, no.

5    Q    Okay.  I'm going to show just one more thing so I      15:41:22

6    make sure we've covered everything that you might recall.

7    I'm just going to pull up the Fourth Amended Complaint.

8              This is the Fourth -- Plaintiffs' Fourth

9    Amended Complaint.  Do you recognize -- we're on the

10   section that's Nicholas Roberts.  Do you recognize this     15:41:54

11   document?  I can bring it up to the top, if that would be

12   helpful.

13   A    Yes, please.

14   Q    (Complied.)

15   A    I do recognize this document, yes.                     15:42:07

16   Q    So in Paragraph 51, this is talking about you,

17   correct, Nicholas Roberts?

18   A    Correct.

19   Q    And you talk about attending protests from May 29th,

20   2020, to approximately July or August 2020, too; and you    15:42:32

21   said including May 29th, 30th, 31st, June 1st, 2nd, 6th,

22   10th, 12th, and 13th.

23              And then it says that you witnessed and

24   experienced PPB launching tear gas into crowds protesting

25   police violence in front of the Justice Center and          15:42:56

Exhibit 11
Decl of Moede

1   impacting people like yourself.  And then you say, for

2   example, you attended protests on May 30th, 31st, and

3   June 2nd, 6th, and 13th and had a similar experience.

4           So I just wanted to check whether any of the

5   dates that we -- that are listed here in Paragraph 51 that    15:43:12

6   we did not cover, so that would include the 1st, June 1st,

7   June 6th, June 10th, and June 12th and June 13th, I just

8   want to confirm that you don't recall PPB using force on

9   any of those nights.

10  A    I know you don't want me speaking about generals,    15:43:52

11  but, you know, I was experiencing a lot of trauma and

12  sleeping very little, and so, I apologize, some of the

13  dates are a little confusing and my memory is not the

14  best, but I believe what we've gone over is correct.

15  Q    Okay.  So the ones -- the ones we've covered today    15:44:08

16  are the dates that you recall either experiencing or

17  witnessing PPB use force.

18  A    Correct.

19  Q    Okay.  And so, in your response to your

20  interrogatories, you said that you were exposed to tear    15:44:43

21  gas 40 to 60 times.  Was this 40 to 60 times on 40 to 60

22  different nights, or multiple times on particular nights?

23  A    Correct, so that's multiple times in the nights.

24  Q    And so it seems, from our discussion today, that you

25  recall experiencing exposure to tear gas by PPB on 13    15:45:28

Exhibit 11
Decl of Moede

1    A    No.

2    Q    And besides what we discussed today, were there any

3    other instances when you witnessed PPB use a 40 millimeter

4    less-lethal munition?

5    A    No.                                                    15:50:25

6    Q    Besides what we've discussed today, were there any

7    other instances when PPB used a baton or impacted you with

8    a baton?

9    A    No.

10   Q    And besides what we've discussed today, were there    15:50:43

11   any other instances when you witnessed PPB use a baton on

12   others?

13   A    No.

14   Q    And besides what we've discussed today, were there

15   any instances when PPB used an aerosol restraint, so a      15:50:58

16   handheld pepper spray, against you?

17   A    No.

18   Q    And besides what we discussed today, did you witness

19   PPB use an aerosol restraint or handheld pepper spray

20   against anyone?                                             15:51:19

21   A    No, but, as I'm recalling, I believe there was

22   another incidence of using the FN 303 that I would like to

23   discuss, if possible.

24   Q    Of course.  So what date was the incident when you

25   recall an FN 303 being used?                                15:51:54

Exhibit 11
Decl of Moede

1    A    Yeah, I apologize, I don't exactly remember the date,

2    but it was when there was a counterprotest held by Proud

3    Boys and other factions of people like that.  And on that

4    day, the Portland Police used the FN 303s on people

5    protesting on "Black Lives Matter" and police brutality.    15:52:28

6    Q    Do you recall a range of when that date was?

7    A    I do.  I believe it was in August, maybe mid-August.

8    It was -- it was the day that one of the Proud Boys, like,

9    fired rounds, like live munition, at -- at the crowd.  I'm

10   struggling to remember the day.  I don't know if we -- if    15:52:52

11   anybody else remembers the day that happened, but, yeah.

12   Q    And did you witness PPB deploy the FN 303s?

13   A    I did.

14   Q    Okay.  And where were you located?

15   A    I was in -- I think it was not Chapman, but Lownsdale   15:53:12

16   Park.

17   Q    And what was happening when -- immediately before PPB

18   deployed the FN 303?

19   A    Yeah, so they weren't doing anything while the

20   counterprotesters were aiming guns and things at us, they    15:53:33

21   were standing at the by.  After the counterprotesters

22   left, the remaining protesters who were protesting against

23   police brutality were standing in the park and there was

24   chanting and -- and things like that, and the police moved

25   us out of the park.                                          15:53:58

Exhibit 11
Decl of Moede

1          As they were retreating back into -- I can't

2    remember the -- recall the name of the building, it's the

3    one to the south of the Justice Center, the big glass one.

4    As they were going -- as the police were going back into

5    that building, they were firing the FN 303s in the trees     15:54:21

6    above us so that it would -- it was raining down the tear

7    gas or the -- whatever's inside the pepper balls, on the

8    people.

9    Q    I'm going to quickly show you the map again, to try

10   to understand what building you were saying that the         15:54:36

11   police were going into.

12   A    Yeah.

13   Q    Okay, so the --  Can you see the map?

14   A    Would you be able to zoom in a bit, like on --

15   Q    (Complied.)                                              15:54:56

16   A    Yeah, great.

17   Q    So the Justice Center is right here in kind of

18   yellow.  Are you talking about the Internal Revenue

19   Service Taxpayer/U.S. Navy Acquisition Group, this

20   building?                                                     15:55:08

21   A    Correct.

22   Q    Okay, so the one just east of Terry Schrunk Plaza?

23   A    Correct.

24   Q    Okay.  And they were shooting FN 303s with some type

25   of powder in them above the heads of protesters?             15:55:20

Exhibit 11
Decl of Moede

1  A    Correct, like, into the trees above us, and they were

2  breaking and dispersing the powder, like, on top of our

3  heads.

4  Q    And were you impacted by the -- were you directly

5  impacted by any FN 303s on that day?                    15:55:39

6  A    I was, yeah.

7  Q    And was that from the powder falling down, or from

8  the munition hitting you?

9  A    Correct, from the powder.

10 Q    And not from the munition?                          15:55:55

11 A    When that -- in the picture where I'm hit on the

12 back of the -- the bruise on the back of my arm, I believe

13 that was the same day that had occurred.

14 Q    I'll show those exhibits.

15        MS. SHEFFIELD:  Are we on Exhibit 13?             15:56:18

16        THE REPORTER:  No, the next one would be 14.

17        MS. SHEFFIELD:  I'm doing a bad job of

18 keeping track.  Thank you.

19        MS. WARNOCK:  Naomi?

20        MS. SHEFFIELD:  Yes.                              15:56:42

21        MS. WARNOCK:  What you tried to mark as

22 Exhibit 13 was Exhibit 5 already.  So I don't know if you

23 want to just re-mark it again and move on?

24        MS. SHEFFIELD:  I think we just leave it and

25 we'll end up with two of the same.  Thank you, Clair.     15:56:42

Exhibit 11
Decl of Moede

1              (Deposition Exhibit No. 14 was marked

2         for identification.)

3    Q    BY MS. SHEFFIELD:  Okay, so I'm showing you, right

4    now, Mr. Roberts, what's marked as -- what will be marked

5    as Defendant's Exhibit 14.  And I think this is taken on          15:56:48

6    8/27, according to your attorneys.  Does that sound

7    correct?

8    A    That does sound correct.

9    Q    And what's that a picture of?

10   A    That is a picture of the back of my arm and on my          15:57:03

11   right arm, where I was struck by some sort of munition.

12   Q    And you believe that this is when you were struck by

13   a munition on the night when the counterprotest was

14   occurring?

15   A    Correct.  It was in the afternoon, but yes.               15:57:27

16   Q    And this -- sorry, I'm going to quickly go back on

17   the map.  And did this occur on Madison?  Do you know

18   where you were standing when you were impacted by the

19   munition?

20   A    Yeah, so kind of on the corner of 3rd and Madison.        15:57:50

21   Q    Okay.  And then also I'm going to show you what will

22   be marked as Defendant's Exhibit 15, if we can mark this

23   one.

24              (Deposition Exhibit No. 15 was marked

25         for identification.)                                      15:58:08

Exhibit 11
Decl of Moede

1    four days off.  Um, I didn't really have a schedule, it

2    was just when I felt up to it and was physically capable

3    of going out.

4    Q    And --  Sorry.  Did you have more to say?

5    A    No, I didn't.  I was just concluding the thought.    16:00:11

6    Q    And when you began to attend protests less, how often

7    were you attending protests?

8    A    That was, like, towards the end of August, and it was

9    maybe once or twice a week.  I just did not feel like my

10   body was capable of taking any more abuse.  And, at this    16:00:35

11   point, more counterprotesters were engaging with us, and I

12   feared that I would be injured by them, as well.

13   Q    Okay.  And at any point during the protests in 2020,

14   did you see objects thrown by protesters at officers or

15   others?  I know you indicated one water bottle on one    16:01:05

16   night.  At any other point, did you see objects thrown at

17   either officers or other people by protesters?

18   A    Um, yes, I saw other objects thrown at -- I don't

19   know if I would say at officers.  A lot of times, it was

20   with the fence, just water bottles going over the fence,    16:01:27

21   um, yeah.

22   Q    So did you see, at any point during the protests,

23   rocks being thrown?

24   A    I did not.

25   Q    You said that you did see some water bottles being    16:01:44

Exhibit 11
Decl of Moede

1   thrown.

2   A    Correct.

3   Q    How often did you see water bottles being thrown

4   during the protests?

5   A    Very sporadically.  I can't recall specifically how    16:02:10

6   often.  Maybe, in a given night, no less than -- no more

7   than, like, three or four water bottles.

8   Q    Did you ever see any glass bottles thrown at police?

9   A    No, I did not.

10  Q    Did you ever see Molotov cocktails thrown at police?   16:02:37

11  A    No, I did not.

12  Q    Did you ever throw anything at police?

13  A    No, I did not.

14  Q    Do you recall ever seeing anything else thrown at

15  police?                                                     16:02:56

16  A    No, I did not.

17  Q    Did you see protesters light any fires during the

18  protests?

19  A    I'm sorry, see any protesters --

20  Q    -- light fires during the protests.                    16:03:08

21  A    Oh, light fires.  There was a fire that was lit

22  around the elk statue that was kind of like a place for

23  protesters to appreciate each other, I would say.  And

24  when I think of lighting a fire, I think of lighting a

25  building on fire.  But, no, I did not see that.             16:03:31

Exhibit 11
Decl of Moede

1  right to exercise free speech was chilled?

2  A    Yes.

3  Q    And how did PPB -- excuse me.  How did PPB chill

4  their right to free speech?

5  A    I believe they chilled the right to free speech by      16:33:22

6  using direct force to disperse people protesting and using

7  their voice and also by using violence and fear to -- to

8  limit people's feeling of safety to be able to express

9  themselves.

10  Q    And if a person protested during the summer of 2020     16:33:48

11  and was not impacted by force, are they still a part of

12  the First Amendment class?

13              MS. ALBIES:  Objection.  Calls for a legal

14  conclusion.  Calls for speculation.

15  Q    BY MS. SHEFFIELD:  You can still answer.                16:34:04

16              MS. ALBIES:  Well, I'm not sure about that.

17  Hold on.

18              And false premise.

19              So with those objections, you can answer, if

20  you can.                                                    16:34:16

21  A    I'm sorry, would you repeat the question for me?

22              THE WITNESS:  And if that means you have to

23  object again, sorry.

24  Q    BY MS. SHEFFIELD:  If an individual protested police

25  violence and white supremacy between May 25th and          16:34:29

Exhibit 11
Decl of Moede

1   November 15th, 2020, in Portland but was not impacted by

2   force by PPB, are they a member of your First Amendment

3   class?

4            MS. ALBIES:  Object.  Same objections.

5   A    I would answer yes, again, based on witnessing -- you      16:34:48

6   know, this didn't happen in a bubble.  If they didn't

7   experience force, they -- they witnessed it somewhere and

8   they hold that fear and are, I'm sure, afraid to use their

9   right to free speech.

10  Q    BY MS. SHEFFIELD:  Is it your understanding that all       16:35:16

11  of the protests that occurred in Portland between May 25th

12  and November 15th, 2020, opposing police violence were

13  factually similar, the circumstances were similar?

14            MS. ALBIES:  Object to the form of the

15  question.  Vague.  Unclear.                                     16:35:34

16            You can answer.

17  A    Yes, I believe they -- we experienced similar things

18  throughout those protests.

19  Q    BY MS. SHEFFIELD:  Okay, and can you tell me what

20  those similarities were, in your experience?                    16:35:48

21  A    Yeah, in my experience, the similarities would be

22  gathering peacefully protesting, being met with brutality

23  and agents of fear to -- to stop people from protesting.

24  Q    And were there any differences in the protests from

25  May 25th, 2020, to November 15th, 2020?                         16:36:21

Exhibit 11
Decl of Moede

1  Q    And so I'm just wondering whether the police response

2  to all of those different protests was different or the

3  same every time.

4  A    I think they were similar as meeting protesters with

5  force and violence.                                          16:38:24

6  Q    And I guess, looking at your declaration, it says

7  that you attended a protest on June 1st and you were not

8  tear-gassed and so, then, "did not observe any protester

9  behavior on Monday night, June 1st, than was less peaceful

10 than the protests I had participated in the previous         16:38:51

11 nights."

12          Would you say, on June 1st, the police

13 response was different than on the other nights that you

14 protested?

15 A    From what I witnessed, it was.  And I don't know why    16:39:04

16 they didn't engage with us like they had on other nights.

17 Q    And you're a representative of the indiscriminate

18 weapons class, as well; correct?

19 A    Correct, yes.

20 Q    Can you describe what that class entails?               16:39:20

21 A    Yes.  So the indiscriminate weapons class is

22 specifically tear gas, but any sort of weapon that doesn't

23 have a singular target that affects a variety of people

24 within a space and is -- is uncontrollable, basically,

25 once it's released or deployed.                              16:39:48

Exhibit 11
Decl of Moede

1   were using to make announcements, but I never experienced

2   when they weaponized it.

3   Q    Okay.  And are you seeking relief related to PPB's

4   use of the long range acoustical device or sound cannon?

5               MS. ALBIES:  Same objection.                    16:43:52

6   A    Um, yeah, I think I may be getting confused by the

7   legality of -- and the terminology here, but I don't

8   believe I'm in that subclass, if it -- just based on that

9   I did not experience that specifically.

10  Q    BY MS. SHEFFIELD:  Okay.  Thank you.               16:44:10

11              So the indiscriminate weapons class does not

12  include individuals who engaged in conduct beyond passive

13  resistance.  Can you explain what that means?

14  A    Yeah, so passive resistance, to me, is, you know,

15  maybe disobeying a dispersal order, but protesting without  16:44:47

16  enacting violence.

17  Q    And did you ever engage in conduct beyond passive

18  resistance?

19  A    No.

20  Q    And would throwing items constitute conduct beyond   16:45:07

21  passive resistance?

22              MS. ALBIES:  Object to the form of the

23  question.

24  A    Um, no, I don't think throwing things makes you less

25  passive.  I mean, you could throw -- I can throw a water  16:45:25

Exhibit 11
Decl of Moede

1   bottle behind my head.  I don't -- I don't think that's

2   violent.

3   Q   BY MS. SHEFFIELD:   Okay.  So a protester throwing a

4   water bottle is still engaged in passive resistance.

5                MS. ALBIES:  Object to the form of the          16:45:43

6   question.

7   Q   BY MS. SHEFFIELD:  Is that correct?

8   A   When I would see water bottles thrown, I never saw

9   them hit anybody.  I know that was used as, like, "this

10  has just become violent," but, oftentimes, I would just    16:46:00

11  see water bottles volleyed over fences.  You know, it may

12  be in the direction of the police, but I never saw a

13  impact of a water bottle with a police officer.

14  Q   Okay.  So when does throwing a water bottle change

15  from passive resistance to conduct beyond passive          16:46:26

16  resistance?

17                MS. ALBIES:  Object to the form of the

18  question.

19  A   Um, when that is a violent act, when it is --

20  intended purpose is to cause harm.                          16:46:46

21  Q   BY MS. SHEFFIELD:   Is throwing a rock passive

22  resistance?

23                MS. ALBIES:  Object to the form of the

24  question.

25  A   No.                                                     16:47:07

Exhibit 11
Decl of Moede

1   Q    BY MS. SHEFFIELD:  Is lighting fires passive

2   resistance?

3                    MS. ALBIES:  Same objection.

4   A    I think it can be.

5   Q    BY MS. SHEFFIELD:  Okay, can you explain to me when     16:47:15

6   lighting a fire is passive resistance and when lighting a

7   fire is conduct beyond passive resistance, as your

8   Complaint explains?

9   A    Sure.  Like I mentioned before, there was a fire that

10  was kept burning around the elk statue in downtown          16:47:30

11  Portland.  I would say that is passive resistance.  And I

12  would say that the burning of a building or destruction,

13  which is not something I witnessed, would be outside of

14  passive resistance.

15  Q    Okay.  So if a fire destroys property, it would be     16:48:00

16  outside of passive resistance?

17                    MS. ALBIES:  Object to the form of the

18  question.

19  A    Ah, I don't know.  I don't know.

20  Q    BY MS. SHEFFIELD:  Okay.  I just -- the elk statue is   16:48:24

21  no longer standing in between Chapman and Lownsdale

22  Square; correct?

23  A    As far as I know, no.

24  Q    And that was as a result of damage from the protests.

25  Is that your understanding?                                 16:48:40

Exhibit 11
Decl of Moede

1          MS. ALBIES:  Object to the form of the

2    question.

3    A    My understanding is that it was removed by the City.

4    Q    BY MS. SHEFFIELD:  Is destroying property passive

5    resistance, or conduct beyond passive resistance?          16:48:58

6          MS. ALBIES:  Object to the form of the

7    question.  Vague.

8    A    Yeah, I don't feel -- I feel like that's too vague to

9    really answer.

10   Q    BY MS. SHEFFIELD:  Is breaking a window passive       16:49:11

11   resistance, or conduct beyond passive resistance?

12          MS. ALBIES:  You mean by protesters, not the

13   police?

14          MS. SHEFFIELD:  I just have the question I

15   have.                                                      16:49:40

16   Q    BY MS. SHEFFIELD:  Is breaking a window passive

17   resistance, or conduct beyond passive resistance?

18   A    No.

19   Q    Sorry, which -- is it passive resistance, or conduct

20   beyond passive resistance?                                 16:49:55

21   A    Oh, I'm sorry.  Again, it feels like a vague

22   question, but I would say it's past passive resistance.

23   Q    Is graffitiing a building that you don't own passive

24   resistance, or conduct beyond passive resistance?

25          MS. ALBIES:  Object to the form of the              16:50:21

Exhibit 11
Decl of Moede

1   question.

2   A       Passive resistance.

3   Q    BY MS. SHEFFIELD:  Is running toward the police

4   passive resistance, or conduct beyond passive resistance?

5           MS. ALBIES:  Object to the form of the          16:50:34

6   question.

7   A    Sorry, running towards the police?

8   Q    BY MS. SHEFFIELD:  Yes, running towards a police

9   line.  Passive resistance, or conduct beyond passive

10  resistance?                                              16:50:46

11          MS. ALBIES:  Object to the form of the

12  question.  So on circumstances within, you mean without

13  more?

14  Q    BY MS. SHEFFIELD:  Without more.

15  A    Again, it seems like a vague question, but I would  16:50:59

16  say it's passive.

17  Q    And is running away from the police, after you've

18  been instructed to stay, passive resistance, or conduct

19  beyond passive resistance?

20  A    Instructed to stay?  Sorry?                          16:51:21

21  Q    Yes.  If you've been instructed to stay, you've been

22  instructed that "you're under arrest, please stay,"

23  something along those lines, and you run away, is that

24  passive resistance, or conduct beyond passive resistance?

25          MS. ALBIES:  Object to the form of the           16:51:36

Exhibit 11
Decl of Moede

1  the protests?

2  A    When possible, I did.

3  Q    And are you aware of any evidence that tear gas

4  resulted in an increased spread of COVID during the summer

5  of 2020?                                                    17:00:09

6  A    Not that I'm aware of.  There was a report I remember

7  reading, but I can't recall it at this time.

8  Q    And did you ever hear any anecdotal evidence from

9  anybody who contracted COVID who traced it back to

10 attending the protests in Portland in 2020?                17:00:33

11 A    Not that I can recall, no.

12 Q    Have you engaged in any protests in Portland since

13 November 15th, 2020?

14 A    No, I have not.

15 Q    And I know you're living in Park City now.  When did  17:00:55

16 you move away from Portland?

17 A    So I do seasonal work.  So when I just most recently

18 moved, it was October 31st of 2021.

19 Q    And do you still have a residence in Portland, as

20 well?                                                       17:01:19

21 A    Um, I don't.  I often just use my parents' address.

22 I travel, often, for work, so...

23 Q    And do your parents live in Portland?

24 A    They live in Beaverton.

25 Q    And you said the job you're in Park City for, you     17:01:42

Exhibit 11
Decl of Moede

NICHOLAS ROBERTS, 11/17/2021                    Page 148

1   lined up through March.  Do you have employment lined up

2   after March?

3   A    Um, I have some propositions, but I don't have

4   anything in line concretely, no.

5   Q    Do you plan to return to Portland after March, after          17:02:06

6   you're done with your job in March?

7   A    I do, I typically come back and see my family, but

8   maybe leaving again for work.

9   Q    So you plan to come back to visit family?

10  A    Correct.                                                      17:02:22

11  Q    But you don't have any plans to return to Portland to

12  work?

13  A    My plans are not solid at this time.  My may -- my

14  work may take me back to Portland for a longer extended

15  period of time, yes.                                              17:02:36

16  Q    You don't have -- it may take you back to Portland;

17  you don't have plans on where you're going to live,

18  though, after March of this year -- or, sorry, of 2022?

19  A    Correct, yeah.

20  Q    Are you aware of whether any other class members that         17:02:59

21  you represent have engaged in protests in Portland since

22  November 15th, 2020?

23          MS. ALBIES:  Object to the form of the

24  question.  Outside the scope.  So, not relevant.

25  A    I don't know.  Yeah, I don't know.                           17:03:17

Exhibit 11
Decl of Moede

1   Q   BY MS. SHEFFIELD:  Okay.  And do you have any current

2   plans to attend protests opposing police violence or white

3   supremacy in Portland?

4   A   No, I don't.

5   Q   And are you aware of any currently planned protests          17:03:36

6   opposing police violence or white supremacy in Portland?

7   A   No, I'm not.

8   Q   Let me go through just a couple of more documents you

9   produced, make sure I understand them.

10          MS. SHEFFIELD:  Are we on Exhibit 16?               17:04:19

11          THE REPORTER:  Yes.

12          MS. SHEFFIELD:  Okay.  This will be marked

13  as Defendant's Exhibit 16.

14          (Deposition Exhibit No. 16 was marked

15     for identification.)                                    17:04:26

16  Q   BY MS. SHEFFIELD:  This is a text between you and

17  someone named Danny on July 6, 2020; correct?

18  A   Correct.

19  Q   And who is Danny?

20  A   Danny is my brother.                                   17:04:36

21  Q   And do you know which ones -- which of the text

22  bubbles are you and which of the text bubbles are Danny?

23  A   Yes.  So I am the blue bubbles and Danny are -- Danny

24  is the gray bubbles.

25          MS. SHEFFIELD:  I'll mark this as               17:05:10

Exhibit 11
Decl of Moede

1    A    I have produced all of those text messages.  Often,

2    they were on an app, Signal, that does not store text

3    messages.

4              MS. SHEFFIELD:  Okay, I'm just going to

5    reiterate that -- Counsel, that if there are any other      17:07:25

6    text messages related to the protest activity during that

7    time period, I think they're within the scope of the

8    City's Request for Production.

9    Q    BY MS. SHEFFIELD:  Do you keep a diary at all?

10   A    I journal occasionally, yes.                           17:07:38

11   Q    Did you journal at all about the protests from

12   May 25th to November 15th, 2020?

13   A    I did.

14   Q    Did you provide copies of those in response to the

15   City's Request for Production?                              17:07:54

16              MS. ALBIES:  I'm going to object, to the

17   extent anything was journaled at the direction of counsel.

18   That would be subject to privilege.  But outside of that

19   scope, you can answer.

20   A    Unfortunately, my truck was stolen with most of my     17:08:11

21   belongings, and my journal was lost.

22   Q    BY MS. SHEFFIELD:  Did -- did you tweet at all during

23   the protests from May 25th to November 15th, 2020?

24   A    Um, no.  I've never had a Twitter account.

25   Q    Did you post on Instagram, Facebook, any -- Snapchat,  17:08:41

Exhibit 11
Decl of Moede

1    other than your attorneys, that assisted you in recalling

2    the specific dates where tear gas was used?

3    A    No, I did not.

4    Q    You said that you kept a journal during the protests.

5    And that journal was kept in a truck that was stolen;        17:29:16

6    correct?

7    A    Ah, correct, it was right after I had moved, so --

8    not that I kept it in there, but it was in there when it

9    was stolen.

10   Q    And where was your truck when it was stolen?          17:29:30

11   A    Parked outside of my house on -- on the cross streets

12   of Southeast 20th and Division -- or sorry, 20th and Ash.

13   Q    And when was your truck stolen?

14   A    It was the spring of '21; the end of February or the

15   beginning of March.                                        17:29:57

16   Q    And did you file any police reports --

17   A    I did.

18   Q    -- related to...

19          And did you submit an insurance claim related

20   to the truck?                                              17:30:14

21   A    I did, yes.

22          MS. SHEFFIELD:  Okay, I'm just going to go

23   back, then, to the interrogatory changes.  I think we can

24   leave the deposition open to address this, if we want to

25   have a discussion outside about -- about this, but if we   17:30:45

Exhibit 11
Decl of Moede

1  described in that declaration in this deposition here

2  today with the City attorney; correct?

3  A    Correct.

4  Q    So to the extent there might be any differences in

5  date or time frame, fair to say that the declaration is          17:31:55

6  closer in time to these incidents than sitting here today?

7  A    Yes, I think that's fair to say.

8  Q    Okay, so, more likely accurate, if there's any

9  discrepancies?

10  A    Correct, yeah.                                              17:32:11

11  Q    And then, you described being impacted by -- I think

12  it was FN 303s in mid-August during a Proud Boys -- or

13  subsequent to a Proud Boys or right-wing protest in

14  downtown Portland, I believe it was.

15        Does August 22nd sound like the date?  You            17:32:29

16  were unclear about the date, you said mid-August, but I'm

17  just trying to figure out whether August 22nd sounds like

18  the date that that occurred.

19  A    Correct, I do think it was August 22nd.

20  Q    Okay.                                                      17:32:43

21        MS. ALBIES:  That's all I have.

22

23                   FURTHER EXAMINATION

24  BY MS. SHEFFIELD:

25  Q    And I just have one additional follow-up on that          17:32:44

Exhibit 11
Decl of Moede

1                        CERTIFICATE

2          I, Kim Nerheim, an Oregon Certified Shorthand

3    Reporter and a Washington Certified Court Reporter, hereby

4    certify that said witness appeared before me by

5    videoconference at the time and place set forth in the

6    caption hereof; that at said time and place I reported in

7    stenotype all testimony adduced and other oral proceedings

8    had in the foregoing matter; that thereafter my notes were

9    transcribed through computer-aided transcription, under my

10   direction; and that the foregoing pages constitute a full,

11   true and accurate record of all such testimony adduced and

12   oral proceedings had, and of the whole thereof.

13          I further certify review of the transcript was

14   requested.

15          Witness my hand at Portland, Oregon, this 29th

16   day of November, 2021.

17

18

19

20   _____

21   Kim Nerheim

22   Oregon CSR No. 90-0138

23   Expires 9/30/2023

24   Washington CCR No. 0003038

25   Expires 3/28/2022

Exhibit 11
Decl of Moede

```
 1                UNITED STATES DISTRICT COURT
                     DISTRICT OF OREGON
 2                   PORTLAND DIVISION


 3


 4   DON'T SHOOT PORTLAND, a      ) Case No. 3:20-cv-00917-HZ
     nonprofit corporation, in its )
 5   individual capacity;         )
     NICHOLAS J. ROBERTS, in an   )
 6   individual capacity and on   )
     behalf of themselves and all )
 7   others similarly situated;   )
     MICHELLE "MISHA" BELDEN, in an )
 8   individual capacity and on   )
     behalf of themselves and all )
 9   others similarly situated;   )
     ALEXANDRA JOHNSON, in an      )
10   individual capacity and on   )
     behalf of themselves and all )
11   others similarly situated;   )
     LESTER WRESCKIE, in an       )
12   individual capacity and on   )
     behalf of themselves and all )
13   others similarly situated; and )
     THOMAS DREIER, in an individual)
14   capacity and on behalf of    )
     themselves and all others    )
15   similarly situated,          )
                                  )
16                Plaintiffs,     )
                                  )
17        vs.                     )
                                  )
18   CITY OF PORTLAND, a municipal )
     corporation,                 )
19                                )
                  Defendant.      )
20   _____)


21


22        VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
                     LESTER WRECKSIE
23
               Taken on behalf of Defendant
24
                       *   *   *
25
```

Exhibit 12
Decl of Moede

1   was pretty much the substance of our conversation, I

2   guess.

3   Q    Did you talk to him at all about what had happened on

4   June 30th?

5   A    Um, just in that it was crazy and here we are.  But          10:54:02

6   none of it made sense.  I was pretty sure -- I think we

7   both just commented that we were pretty sure this was all

8   illegal.  That -- that was pretty much it.

9              And then we both advocated for ourselves for,

10  like, COVID safety, basically, because, when the officers      10:54:30

11  did get in the car to drive us downtown, at first, they

12  shut all the windows, and then we asked them to please

13  open the windows, when we were on the highway and away

14  from, like, the tear gas and everything.

15             And then I remember Cory was -- his hands --          10:54:50

16  his zip ties were really uncomfortable, he was, like,

17  having a hard time with -- his hand was going to sleep, so

18  he was asking repeatedly for them to fix that and adjust

19  it, and they finally -- I believe they pulled over and

20  fixed it for him.                                               10:55:09

21             And then we drove -- drove in down to the

22  injustice center downtown, where they took us in to book.

23  Q    On -- you said you experienced -- you had smelled

24  what you recognized as tear gas while you were in the

25  police car; correct?                                            10:55:29

Exhibit 12
Decl of Moede

1    A      Correct.

2    Q      Did you see police deploy tear gas on June 30th?

3    A      Um, I didn't specifically see the tear gas.  I

4    believe I got arrested, like, around or before -- I feel

5    like it was just starting to get crazy and I hadn't -- I          10:55:49

6    don't specifically remember the tear gas before I got

7    arrested, but a lot of that is kind of a blur, too.

8              I remember there was a lot of smoke in the air

9    from other types of canisters that they deployed with,

10   like, the smoke -- because the smoke has a certain weird        10:56:05

11   terrible smell and then the gas has a burning smell, and I

12   remember smelling a lot of the awful gas that night, like

13   the smoke and stuff.

14             And then, like, things were escalating and

15   there was a lot of explosions, around the time that I was       10:56:25

16   arrested, but I don't remember getting affected by tear

17   gas until after I was in the car.  But tear gas was --

18   tear gas was used out there.

19             And then I was affected by tear gas later,

20   while I was in holding, because there was another              10:56:41

21   gentleman that was, like, covered in tear gas and it was

22   just even hard to be in the same room with him.  I can't

23   imagine what he was going through, but, um, yeah.

24   Q    Okay.  So you were arrested either before officers

25   deployed tear gas or before you realized --                    10:57:06

Exhibit 12
Decl of Moede

1          MS. SHEFFIELD:  This will be marked as

2    Defendant's Exhibit Number 39.

3              (Deposition Exhibit No. 39 was marked

4       for identification.)

5    Q    BY MS. SHEFFIELD:  Do you recognize this tweet?      11:24:20

6    A    Yeah, I -- is this a tweet or a Face -- I think it's

7    a Facebook post, because it's long.  Maybe it's a tweet.

8    Q    Maybe it is a Facebook post.  I'm shot sure -- there

9    was no indication.

10   A    Yeah.  I feel like it might be a Facebook post,      11:24:38

11   because it's longer.

12   Q    Okay.  And this was from July 2nd, 2020?

13   A    Yeah.  I have the date right on it, so that's handy.

14   Q    M-hm.  And you indicate in that post that you'll "be

15   writing a thorough recount of my experience for NLG."     11:25:02

16   A    Yeah.

17   Q    Did you do that?

18   A    You know, I sure did, but I never did get that to

19   them.  I had started -- at this point in the protests,

20   like, I had started taking notes for myself on my personal  11:25:19

21   laptop.

22              After my bike got stolen on the 20th or taken

23   from me by the police, I realized that I needed to start

24   taking notes so I could try to remember what had been

25   happening to me, because I knew it was going to be         11:25:36

Exhibit 12
Decl of Moede

1  probably important later for me, because it -- we were

2  just all getting our rights violated left and right and I

3  wanted to have a decent idea later of what had happened to

4  me.

5           So I had been taking notes in a personal          11:25:55

6  laptop that I used to have, but I lost those notes and

7  that laptop in the police raid on the Red House, I was

8  part of the eviction defense there and had lived on the

9  prop -- stayed there for those six months.  And so when

10 they came and did the raid, my lap -- my personal laptop   11:26:19

11 and my work laptop were both in my tents, and they took

12 all of those possessions and we were never able to get

13 them back and no one was ever able to tell us where they

14 went or anything.

15           So I lost a majority of the notes that I had      11:26:34

16 taken for myself, when that happened.

17 Q    And what application were you taking the notes in?

18 A    It was just like a Word document on my laptop.  And I

19 didn't save it to the cloud or anything, I'd just been

20 saving it to my laptop, at that time.                       11:26:55

21 Q    And when -- when were you arrested relating to the

22 Red House?

23 A    Oh, was that December 6th, I think, or 7th.  It was

24 at, like, 5 in the morning.  I'm not sure what date to put

25 on it.  I think it was the 7th.  But that should be         11:27:27

Exhibit 12
Decl of Moede

1  June 20th.  Can I try to get from the early date in June

2  to June 20th and see if we have any other dates, and then

3  we can take a break before June 20th?  Does that work for

4  you?

5           MR. BRUGGEMEIER:  Oh, just get a bunch of                11:59:18

6  dates and then talk about them after break?

7           MS. SHEFFIELD:  If that works.

8           MR. BRUGGEMEIER:  That -- I think that's

9  okay for me.

10          Mr. Wrecksie?                                            11:59:26

11          THE WITNESS:  Sure.

12          MS. SHEFFIELD:  Thank you, Mr. Wrecksie.

13 I'll be brief so we can all get some food.

14 Q    BY MS. SHEFFIELD:  So the early date in June; then

15 you mentioned June 20th specifically is the next date you    11:59:35

16 mentioned, in the last statement you made.

17          Do you remember any dates, between -- between

18 the early date in June and June 20th, when force was used

19 by PPB against you?

20 A    Well, there was multiple instances of just being in       11:59:54

21 the crowd.  There was different marches that would go

22 around downtown to the injustice center and then, like,

23 there was some times that I would just show up at the

24 injustice center at the end of the evening and there would

25 be lots of munitions coming out of the buildings.            12:00:22

Exhibit 12
Decl of Moede

1          I remember there was a night -- because I -- I

2    would skate or bike down there.  And there was nights that

3    I would skate down there -- before the fence was up around

4    the Hatfield, I used to skate in that rotunda area in the

5    front, because it's really nice concrete, the sidewalk is          12:00:50

6    beautiful.  It's really nice to skate.

7          So I would go to the protests on my roller

8    skates and I'd skate around the building, and then there

9    would be a lot of times that I would -- we would be down

10   there for, like, hours and, like, a lot of the time, we          12:01:08

11   were just sitting, standing in the street, whatever.  And

12   so I had a habit, I would skate down to the food carts and

13   get something to eat and come back and sit in front of the

14   Hatfield and I'd play music and I'd skate over there.

15          And there was a couple of times that I would          12:01:26

16   be over there skating and then I would see, like, the

17   officers in the injustice center, like they had, like --

18   kind of, it barricaded a little bit, and you'd see them,

19   like -- on, like -- I don't know how to describe it.  It's

20   not a balcony, it's not a porch, it's like there's the          12:01:43

21   steps that go up to the door, like the little landing

22   there, and they'd be up in there.

23          And, like, there was a couple of occasions

24   that I would hear the shooting and see stuff hit the

25   sidewalk by, like, where I'd just been.  And, like, it was          12:01:56

Exhibit 12
Decl of Moede

1   like I was under the impression they were shooting at me

2   for just skating around, like, on the next block, but,

3   like, I don't -- I don't have any specific dates for that

4   happening.

5          It happened to me on multiple occasions, like,   12:02:12

6   because I did go and skate there -- until they put the

7   fence around the Hatfield, I would skate in front of the

8   Hatfield a lot at night while we were protesting.

9   Q    Okay, so you don't have any -- you don't recall any

10  specific dates between early June and June 20th.         12:02:27

11  A    No, I can't really give you any specifics, um, like

12  I --

13  Q    Okay.

14  A    Yeah.  I was down there, I was affected by tear gas

15  on multiple occasions, I had munitions fly over my head   12:02:39

16  and explode in front of me.  It was just kind of common, I

17  guess, is how I would put it.  Like, being down there and

18  having things fly past your head and, like, explode in

19  front of you or seeing them shoot people that were just on

20  the other side of the fence became very normal.          12:02:59

21  Q    I'm just going to ask, again, just on dates, and

22  we'll go into more of the detail what you witnessed or

23  experienced, even without specific dates.

24          So we have the early date in June that you

25  don't recall the specific date, June 20th, June 30th.  On  12:03:18

Exhibit 12
Decl of Moede

1   A    Yeah.  And that was -- I believe those were from, um,

2   after the 20th, so like the 21st, I think, or the 22nd,

3   like that.

4   Q    Okay.  And I still think, after this, if we can -- we

5   can work out just kind of getting the metadata to make        13:20:51

6   sure, but that is helpful.

7             Was there anything else that you'd like to

8   clarify, Mr. Wrecksie?

9   A    I wasn't sure if we were going to talk more about the

10  other experiences I had out there or if we were just going    13:21:09

11  to go to the 20th.

12  Q    So I'm going to go to the 20th right now and ask some

13  quick questions, because that was the other date I believe

14  you said, besides June 30th and the early date in June,

15  that you specifically remember the events --                  13:21:24

16  A    M-hm.

17  Q    -- that occurred, so...

18  A    Okay.

19  Q    So where were you protesting on June 20th?

20  A    It was at the injustice center.                          13:21:36

21  Q    And what time did you show up at the Justice Center

22  on June 20th?

23  A    Um, I'm not certain what exact time I got down there.

24  I remember that it was after dark, um, and I believe that

25  it was, like, later in the evening, not like late-late,       13:22:02

Exhibit 12
Decl of Moede

1   but -- if I had to guess, I'd say about, like, 7 or 8, I'm

2   thinking it was something like that, maybe it was later.

3   It's hard to remember, for sure, what time it was.  I

4   remember it was dark.

5   Q   Okay.  And what happened once you arrived at the                13:22:25

6   Justice Center?

7   A   Um, well, what I remember from that night is that we

8   were sitting in the street in front of the injustice

9   center and we were just like -- a lot of us were just,

10  like, sitting and standing in the street.  And then there        13:22:44

11  was an announcement to leave the area -- I think they

12  said, like, downtown was closed.

13           And then a bunch of, like, uniformed officers

14  came around -- like, if you're facing the injustice

15  center, they would have been coming up the right side of         13:23:07

16  the building on the street and came around that corner.

17           And as they were coming down the street, like,

18  I had my bicycle with me and I kind of like walked to the

19  side of the group and took up, like, the back corner and

20  was just, like, walking with everyone forward, and the          13:23:28

21  cops were coming from behind us.  And I did let the

22  majority of the crowd get ahead of me.

23           And I saw one gentleman that was still -- a

24  black man that was still sitting on the ground.  And I had

25  my bicycle.  And I remember I leaned over, because it was        13:23:46

Exhibit 12
Decl of Moede

1   really loud, and I asked him if he wanted anybody to stay

2   with him, and he said he did not.  And I said that I was

3   very concerned for his safety.

4              And, like, somewhere in that, like, short

5   conversation, I felt something hit the back of my foot and          13:24:03

6   then there was an explosion.  And, like, I just remember

7   feeling like -- I just -- it was like my foot and, like,

8   lower leg were just, like, I don't know, vibrating.  It

9   was, like, very painful and I just, like --

10             I don't -- it's really hard to describe what        13:24:29

11  happened in that moment, because it was like that bang and

12  I was trying to hold on to my bike, and then I vaguely

13  remember falling down and then there was another bang near

14  my head, and then I don't have -- like, I don't know what

15  happened, but I was --                                            13:24:47

16             When that happened, I was, like, in front of

17  the injustice center, like in the middleish of the block,

18  at that point, and I had been further to the right and

19  moved to about that area when I checked on the other

20  gentleman, and then that happened.                                 13:25:00

21             And, like, the next thing I know is I'm at the

22  end of the next block past the Hatfield, like, in that

23  corner, and there's somebody holding me around the chest

24  and under the arms and, like, pulling me back.  And, like,

25  I just -- I have this memory of, like, just, like, coming         13:25:18

Exhibit 12
Decl of Moede

LESTER WRECKSIE, 11/18/2021

1   to and I'm holding on to my bike and there's an officer

2   that yanks my bicycle out of my hands.

3            And I just remember being very confused,

4   because, like, that's happening; somebody's holding me

5   here telling me I'm okay, dragging me.  I'm not on my          13:25:33

6   feet, my feet are like -- I'm not on my feet, I'm like --

7   they're, like, dragging on the ground, basically, and

8   I'm -- start to try to get my feet under me and, like,

9   there's officers hitting me with batons.

10           And, like, there's a group of us there; like,          13:25:49

11   it was me and at least a couple of medics and there was

12   other people, like, in the area getting hit and pushed, as

13   they were coming.  And it was hard to know what was

14   happening, because I came to in the middle of it all, but

15   we were being -- they were just yelling, "Move, move,          13:26:02

16   move" and hitting pretty indiscriminately.

17           And they -- I finally got my feet under me and

18   then, together, we just kind of ran up the block to the

19   next street.

20           And I remember, when I got up to that street,          13:26:18

21   um, I became very combative with the people that were

22   trying to help me.  And I still feel really terrible about

23   that and I wish I knew who those people were so I could

24   apologize to them, because they were trying to get me to,

25   like, get help and, like, stay with them, because they         13:26:36

Exhibit 12
Decl of Moede

1   were worried about my welfare because I had been knocked

2   unconscious, and I did not take care of myself in that

3   moment at all and adamantly -- was very adamant that I

4   needed to go back to get my bicycle, which is what I

5   attempted to do.                                                13:26:52

6           So I went, like, back towards the police who

7   were -- they were just, you know, firing the -- the

8   FN 303s, "dut dut dut dut dut" things in the street, at

9   every -- like, anybody that was there in the area.

10          And I was trying to get to the police line to      13:27:12

11  talk to somebody and, like, I could not get anyone -- they

12  were just screaming at you to go away, right.  And I'm,

13  like, just literally trying to retrieve my bicycle from

14  them and can't understand why they have it and why -- and

15  I wasn't really probably doing super logical things --     13:27:41

16          (There was an interruption by the reporter.)

17          MR. BRUGGEMEIER:  Can I just jump in?  I

18  think -- I think my Internet is in and out a couple times,

19  so if you see me just go black, it's me trying to get the

20  audio at least back and then I'll just join back on video.  13:27:52

21  We'll see if that works.  Does that sound okay?

22          MS. SHEFFIELD:  It does, thank you.

23  A    Yeah, I couldn't understand why they would have taken

24  it from me in that moment or, like, where it went or how I

25  was going to get it back.                                   13:28:25

Exhibit 12
Decl of Moede

1   center and where they would be, like, chasing the group

2   around blocks, um, and they would just be just shooting at

3   anyone that was with the group still marching; where we

4   would just be, like, marching around not really doing

5   anything but not leaving the entire downtown area.      14:53:47

6   Q    So they were just shooting at the group.  But you

7   were never impacted specifically during one of those

8   instances.

9   A    Not specifically.  Like, there was times when I

10  would, like, get impacts around, like, my boots and things   14:53:56

11  or I would hear stuff hit concrete around me.  Um, yeah,

12  nothing -- nothing specific.

13  Q    And do you -- are there any instances where you

14  specifically remember being impacted by a 40 millimeter

15  less-lethal weapon deployed by PPB?                     14:54:21

16  A    The 40 mill -- like the big rubber bullet that --

17            THE WITNESS:  Is Franz still here?

18            Are you -- oh, sorry, you froze.

19            MS. SHEFFIELD:  He's still here.

20            THE WITNESS:  Sorry, he was caught like he    14:54:34

21  was frozen, I wanted to make sure that he didn't drop out.

22  A    Um, okay, the 40 millimeter, is that what you said?

23  Q    BY MS. SHEFFIELD:  Yes.

24  A    And I'm pretty sure that's the big rubber bullet.  Is

25  that what you're referring to?                          14:54:51

Exhibit 12
Decl of Moede

1   Q    It is the larger of the two less-lethal munitions

2   described in your -- impact munitions described in your

3   Complaint.

4   A    Yeah.  I don't believe I was impacted by one of

5   those.  It's hard to know for sure, because it's, like,          14:55:07

6   you know -- I don't really know what hit me, a lot of

7   times, but I don't believe I was.

8   Q    And do you recall witnessing anybody impacted by a

9   40 millimeter less-lethal weapon?

10  A    I mean, I saw a guy at a protest once that was              14:55:25

11  standing on the side of the protest as we walked by

12  showing his leg bruise that he got from one of those.  And

13  it was gnarly.

14  Q    You didn't witness him being impacted by it; correct?

15  A    No.                                                         14:55:43

16  Q    So, besides seeing that individual's bruise on his

17  leg, haven't witnessed anybody impacted by PPB's

18  deployment of a 40 millimeter less-lethal weapon?

19  A    I saw people get hit, but I didn't see them

20  specifically get hit, because it would be people getting        14:56:01

21  hit that were huddled together all wearing black clothing

22  at the front of the group taking those impacts for the

23  rest of us.

24  Q    And any specific memories, so just people in black

25  clothing huddled together?                                      14:56:22

Exhibit 12
Decl of Moede

1    Q    BY MS. SHEFFIELD:  Okay.  So you said that the vast

2    majority of people were impacted by force.

3    A    Yes.

4    Q    Correct?

5    A    Yes.                                                    16:27:18

6    Q    But some people left protests without being impacted

7    by police force.

8    A    Sure.  Obviously, people are going to have different

9    experiences.

10            MS. SHEFFIELD:  I'm going to -- that's my           16:27:35

11   dog barking.  Apologies.

12   Q    BY MS. SHEFFIELD:  And so those people who left the

13   protest and were not impacted by force, are they members

14   of the First Amendment class?

15   A    Um, they --                                             16:27:47

16            MR. BRUGGEMEIER:  Objection.  Calls for a

17   legal conclusion.

18   A    And I'm going to say that they could actually have

19   been affected, because they may have left because they

20   knew what was happening later.                              16:27:56

21            So there's no way to know how people were

22   affected, because you -- I guess what I'm trying to say is

23   that you could be affected by the fact that these

24   munitions were happening, even if you weren't directly

25   affected, by how you attended protests that you would have  16:28:14

Exhibit 12
Decl of Moede

1   normally attended without question.

2   Q    BY MS. SHEFFIELD:  So it's not relevant whether an

3   individual was impacted by force or not impacted by force.

4                MR. BRUGGEMEIER:  Objection.  Calls for a

5   legal conclusion.                                    16:28:41

6   A    Yeah, I would say that they -- a person wouldn't have

7   to be directly impacted themselves in a way that they

8   would feel that they had to say they were directly

9   impacted in order to be impacted.

10            Like, if you're meaning impacted as meaning a   16:28:56

11   physical impact; whereas, I'm bringing into account that

12   there is an impact that comes on your intellectual side

13   just because you know these things are happening.

14   Q    BY MS. SHEFFIELD:  Okay.  And I was saying physically

15   impacted.  So you're saying somebody who's not physically  16:29:12

16   impacted is still a part of the First Amendment class, if

17   they engaged in protest activity opposing police violence

18   and white supremacy.

19   A    Yes, that's what I'm saying.

20   Q    And are the protests that occurred at ICE, the   16:29:26

21   abolish ICE protests, are people who participated in those

22   protests part of the First Amendment class?

23   A    Yes.

24   Q    Is it your understanding that those are protests

25   opposing police violence and white supremacy?   16:29:45

Exhibit 12
Decl of Moede

1   A    Yes.

2   Q    Can you help me understand what it means -- what a

3   protest opposing police violence and white supremacy, can

4   you help define what that -- I mean, I think I understand

5   the "Black Lives Matter" protests, so we don't have to go          16:30:03

6   into those.  But how broad is -- how broad is that

7   description?

8                   MR. BRUGGEMEIER:  Objection.  Calls for

9   speculation.

10  A    Yeah, it is kind of speculative to assume what other          16:30:11

11  people -- how they feel about "Black Lives Matter".  But,

12  for me, the "Black Lives Matter" and police abolition and

13  protesting police violence all go hand-in-hand, um...

14  Q    BY MS. SHEFFIELD:  So the police abolition as well as

15  the ICE abolition are the same?                                    16:30:37

16  A    Yeah, they're the same, because ICE is another form

17  of police, um, and it -- it's a -- against white

18  supremacy, which is perpetuated through our incarceral

19  system, which is led by the police, which were formed out

20  of the original, um, slave trackers and of that nature, is         16:31:01

21  where the police force was formed from.  And those kind of

22  modes have perpetuated through time without really any

23  change to their base function or how they do things.

24                   So, to me, like these protests, "Black Lives

25  Matter", it is against police, it's against incarceration,         16:31:22

Exhibit 12
Decl of Moede

1    policing in general, the way police act towards people of

2    color, um, yeah.  I mean, I could go on and on about it,

3    if you want me to talk about it more.  I don't know how

4    much of a description you want, but...

5    Q    No, that's fine.  I'm just going to ask one follow-up          16:31:43

6    question.  I'm trying to understand the scope of the First

7    Amendment class.

8    A    M-hm.

9    Q    And you, I think -- I've lost the notes on it, but

10   you had signs that were -- were they "Free" -- I think          16:31:53

11   it's a -- "Free Palestine"?  Were those the signs?

12   A    I have a "Free Palestine" sign, yes.

13   Q    Okay.  And "End Apartheid", that was --

14   A    Yeah, "End Apartheid", yep.

15   Q    And there was --                                            16:32:12

16   A    Other forms of incarceral systems that are, you know,

17   enslaving people and taking away people's freedoms.

18   Q    Okay.  I just wanted to ask.  And so those are within

19   the First Amendment class; if you were protesting

20   Palestinian occupa- -- or Israeli occupation of Palestine,      16:32:26

21   that's part of the scope of this First Amendment class?

22          MR. BRUGGEMEIER:  Objection.  Calls for a

23   legal conclusion.

24   A    Yeah, and, in my opinion, they're related.

25   Q    BY MS. SHEFFIELD:  Okay.  And you attended many            16:32:40

Exhibit 12
Decl of Moede

1   voices heard.  And so, in that way, I would say that they

2   were similar, because it's a protest.  Um, not really sure

3   what you're asking for there.

4   Q    BY MS. SHEFFIELD:  Okay.  So, in that way, they were

5   all showing up to protest, and that was similar?                16:34:34

6   A    Yes.

7   Q    Were there any ways in which the behavior of

8   individuals at the protests differed?

9            MR. BRUGGEMEIER:  Object to form.  Object,

10   calls for speculation.                                          16:34:44

11   A    Yeah, I mean, there's no way for me to know what

12   everybody at the protest was doing or at any protest was

13   doing, because there was a varying number of humans at

14   every one.  And I can just speak for, like, my experience

15   going through.  A majority of the time, like, most of us     16:34:58

16   are, like, walking as a group; we might be chanting, ah...

17   Q    BY MS. SHEFFIELD:  And you saw protesters throw water

18   bottles at some protests; correct?

19   A    Correct.

20   Q    And you never threw water bottles; correct?               16:35:15

21   A    Correct.

22   Q    And you saw a protester throw a Molotov cocktail at a

23   protest; correct?

24   A    I didn't specifically see somebody -- who threw it, I

25   saw one go in the air.                                          16:35:29

Exhibit 12
Decl of Moede

1    Q    And was it thrown from the area of protesters, or

2    from the area where the police were standing?

3    A    There was no way for me to tell, from where I was at.

4    Q    But you never threw a Molotov cocktail during a

5    protest.                                                  16:35:41

6    A    God, no.  No.

7    Q    And was the -- were there differences in the police

8    response to the hundreds of different protests that

9    occurred between May 25th and November 15th?

10                   MR. BRUGGEMEIER:  Objection.  Calls for    16:35:58

11   speculation.

12   A    Yeah, there was different -- they reacted differently

13   at different times, yes.

14   Q    BY MS. SHEFFIELD:  And how -- can you explain what

15   those differences were?                                   16:36:08

16   A    Well, um, there was times -- well, there was, like,

17   I -- when I went to -- I went to Delta Park for a protest

18   and there was Proud Boys in the area and they had their

19   own thing going on.  We had gathered to talk about what

20   had actually happened at Delta Park, since they were      16:36:39

21   having an event down there to oppose "Black Lives Matter".

22                   And the police just let them gather and

23   continually harassed us to leave the area and made it hard

24   to park, um, and, yeah, we just ended up gathering in a

25   separate area of the park away from them and having a     16:37:06

Exhibit 12
Decl of Moede

1          So, and these are your interrogatory responses

2    to the City's questions.  And in Interrogatory Request

3    Number 2, we ask that you identify any class or subclass

4    for which you are a representative.  You indicated that

5    you are a representative for the First Amendment class and    16:42:28

6    the targeted weapons subclass.

7          Are those the only two classes that you are a

8    class representative for?

9               MR. BRUGGEMEIER:  Object to form.

10   A    Ah, I mean, I be -- I guess so, I -- yeah.  I don't    16:42:42

11   know.

12   Q    BY MS. SHEFFIELD:  Are you --  There is another

13   subclass of the indiscriminate weapons class.  Are you a

14   class representative for that class?

15   A    I mean, I think so.  I'm under -- I mean, I got hit    16:43:03

16   by indiscriminate weapons, it seems, because tear gas is

17   an indiscriminate weapon.  Correct?

18   Q    It is within the definition of the indiscriminate

19   weapon subclass.

20          Okay, I just wanted to confirm, because it         16:43:19

21   wasn't indicated in your interrogatory responses.

22          What is the -- what is your understanding of

23   the definition of the indiscriminate weapons subclass?

24   A    That indiscriminate weapons would be, like, tear gas;

25   like the RBDDs; the concussion grenades or the balls, ah,    16:43:43

Exhibit 12
Decl of Moede

1   for a legal conclusion.

2   A     Yeah, I -- yeah, throwing a -- throwing a water

3   bottle isn't passive.

4   Q     BY MS. SHEFFIELD:  Is lighting a fire conduct beyond

5   passive resistance?                                    16:51:00

6              MR. BRUGGEMEIER:  Same objections.  Form.

7   Calls for a legal conclusion.

8   A     You say lighting a fire?  I mean, are you lighting a

9   candle?  Are you starting a fire for warmth?  Am I

10  lighting a joint?  What am I doing?                     16:51:15

11  Q     BY MS. SHEFFIELD:  If you're lighting a dumpster on

12  fire, is that conduct beyond passive resistance?

13             MR. BRUGGEMEIER:  Same objections.

14  A     Lighting a dumpster on fire is not passive.

15  Q     BY MS. SHEFFIELD:  And so, if you're lighting a      16:51:33

16  building on fire, that's also conduct beyond passive

17  resistance?

18             MR. BRUGGEMEIER:  Same objections.

19  A     Lighting a -- lighting anything on fire is not

20  passive.                                                16:51:44

21  Q     BY MS. SHEFFIELD:  If you're damaging property, is

22  that conduct beyond passive resistance?

23             MR. BRUGGEMEIER:  Same objections.

24  A     Can you just say that question again?

25  Q     BY MS. SHEFFIELD:  If you're damaging property, is   16:52:04

Exhibit 12
Decl of Moede

```
 1                    CERTIFICATE

 2           I, Kim Nerheim, an Oregon Certified Shorthand

 3   Reporter and a Washington Certified Court Reporter, hereby

 4   certify that said witness appeared before me by

 5   videoconference at the time and place set forth in the

 6   caption hereof; that at said time and place I reported in

 7   stenotype all testimony adduced and other oral proceedings

 8   had in the foregoing matter; that thereafter my notes were

 9   transcribed through computer-aided transcription, under my

10   direction; and that the foregoing pages constitute a full,

11   true and accurate record of all such testimony adduced and

12   oral proceedings had, and of the whole thereof.

13           I further certify review of the transcript was

14   requested.

15           Witness my hand at Portland, Oregon, this 5th

16   day of December, 2021.

17

18

19

20                    _____

21                    Kim Nerheim

22                    Oregon CSR No. 90-0138

23                    Expires 9/30/2023

24                    Washington CCR No. 0003038

25                    Expires 3/28/2022
```

Exhibit 12
Decl of Moede

| | |
|---|---|
| **From:** | Juan Chavez |
| **To:** | Sheffield, Naomi; Franz Bruggemeier; J. Ashlee Albies; Jesse Merrithew; Alex Meggitt |
| **Cc:** | Moede, Scott; Warnock, Clair; Yamachika, Rob |
| **Subject:** | Re: DSP Discovery |
| **Date:** | Friday, December 17, 2021 3:37:26 PM |

No problem. Hope you have a good weekend too!

--

Juan C. Chavez

Tel: 503-944-2270 ext. 212

Pronouns: he/him

---

**From:** Sheffield, Naomi <Naomi.Sheffield@portlandoregon.gov>
**Date:** Friday, December 17, 2021 at 3:36 PM
**To:** Juan Chavez <jchavez@ojrc.info>, Franz Bruggemeier <fbruggemeier@ojrc.info>, J. Ashlee Albies <ashlee@albiesstark.com>, Jesse Merrithew <jesse@lmhlegal.com>, Alex Meggitt <ameggitt@ojrc.info>
**Cc:** Moede, Scott <Scott.Moede@portlandoregon.gov>, Warnock, Clair <Clair.Warnock@portlandoregon.gov>, Yamachika, Rob <Rob.Yamachika@portlandoregon.gov>
**Subject:** RE: DSP Discovery

Thank you for confirming, Juan. Have a nice weekend.

---

**From:** Juan Chavez <jchavez@ojrc.info>
**Sent:** Friday, December 17, 2021 3:30 PM
**To:** Sheffield, Naomi <Naomi.Sheffield@portlandoregon.gov>; Franz Bruggemeier <fbruggemeier@ojrc.info>; J. Ashlee Albies <ashlee@albiesstark.com>; Jesse Merrithew <jesse@lmhlegal.com>; Alex Meggitt <ameggitt@ojrc.info>
**Cc:** Moede, Scott <Scott.Moede@portlandoregon.gov>; Warnock, Clair <Clair.Warnock@portlandoregon.gov>; Yamachika, Rob <Rob.Yamachika@portlandoregon.gov>
**Subject:** Re: DSP Discovery

Hi Naomi,

Our clients are working on getting those videos now, and we will produce soon as we can as part of our continuing obligation to do so.

-Juan

--

Juan C. Chavez

Tel: 503-944-2270 ext. 212

Exhibit 13
Decl. of Moede
Page 1 of 5

Pronouns: he/him

---

**From:** Sheffield, Naomi <Naomi.Sheffield@portlandoregon.gov>
**Date:** Friday, December 17, 2021 at 3:05 PM
**To:** Juan Chavez <jchavez@ojrc.info>, Franz Bruggemeier <fbruggemeier@ojrc.info>, J. Ashlee Albies <ashlee@albiesstark.com>, Jesse Merrithew <jesse@lmhlegal.com>, Alex Meggitt <ameggitt@ojrc.info>
**Cc:** Moede, Scott <Scott.Moede@portlandoregon.gov>, Warnock, Clair <Clair.Warnock@portlandoregon.gov>, Yamachika, Rob <Rob.Yamachika@portlandoregon.gov>
**Subject:** RE: DSP Discovery

Juan,

We disagree regarding point 1. At this point, based on the information the City has received from Plaintiffs, we are unsure whether there the disagreement is material. We have not been provided any discovery regarding additional dates, despite it being requested. In fact, the City has not been provided the additional video identified in point 2. Although today is the end of class discovery, am I to assume that Plaintiffs still intend to produce those videos outside of the deadline? If not please confirm asap, and we will contact Judge Hernandez.

The City will address the issue related to which dates are at issue/dates not previously identified by Plaintiffs, if necessary, during the motion for class certification.

Best,
Naomi

---

**From:** Juan Chavez <jchavez@ojrc.info>
**Sent:** Friday, December 17, 2021 2:30 PM
**To:** Sheffield, Naomi <Naomi.Sheffield@portlandoregon.gov>; Franz Bruggemeier <fbruggemeier@ojrc.info>; J. Ashlee Albies <ashlee@albiesstark.com>; Jesse Merrithew <jesse@lmhlegal.com>; Alex Meggitt <ameggitt@ojrc.info>
**Cc:** Moede, Scott <Scott.Moede@portlandoregon.gov>; Warnock, Clair <Clair.Warnock@portlandoregon.gov>; Yamachika, Rob <Rob.Yamachika@portlandoregon.gov>
**Subject:** Re: DSP Discovery

Hi Naomi and all,

Sorry I didn't get to this sooner. I mainly want to address the first point:

I don't think the Plaintiffs have stated that they would only address certain dates in the class certification motion. As I believe I said during our meeting, the Complaint is pretty clear that members of the proposed class and the named Plaintiffs have experienced unconstitutional force

Exhibit 13
Decl. of Moede
Page 2 of 5

from PPB throughout the proposed class period and not only on the dates specified in the complaint or in interrogatories. That's how we define the class that we're seeking certification on.

On July 14, Judge Hernandez was asked to make a decision on whether Plaintiffs were entitled to class discovery from the City on dates other than those in the Xomplaint. Judge Hernandez said that he expects that Plaintiffs can move for class certification without discovery on other days and ruled against Plaintiffs' request for discovery from the City on more than those dates. I don't have the transcript in front of me, but I don't recall the Judge limiting us to not discuss or provide examples of PPB violating the rights of proposed class members at any time during the proposed class period. That question was not before the court. And Plaintiffs have not agreed to limit their argument for class certification to specific dates.

Here's the Minutes from the discovery order:

MINUTES of Proceedings: Telephone Conference regarding the parties' discovery dispute held. The Court ordered limited discovery, as more specifically stated on the record. Juan C. Chavez on behalf of all Plaintiffs. Naomi Sheffield on behalf of all Defendants. Court Reporter: Ryan White. Judge Marco A. Hernandez presiding. (jp)

The last two points we agree that that's what we discussed.

--
Juan C. Chavez
Tel: 503-944-2270 ext. 212
Pronouns: he/him

---

**From:** Sheffield, Naomi <Naomi.Sheffield@portlandoregon.gov>
**Date:** Tuesday, December 14, 2021 at 10:34 AM
**To:** Juan Chavez <jchavez@ojrc.info>, Franz Bruggemeier <fbruggemeier@ojrc.info>, J. Ashlee Albies <ashlee@albiesstark.com>, Jesse Merrithew <jesse@lmhlegal.com>, Alex Meggitt <ameggitt@ojrc.info>
**Cc:** Moede, Scott <Scott.Moede@portlandoregon.gov>, Warnock, Clair <Clair.Warnock@portlandoregon.gov>, Yamachika, Rob <Rob.Yamachika@portlandoregon.gov>
**Subject:** DSP Discovery

Juan, Franz & Team,

Below is my understanding based on our conversation on Friday. If Plaintiffs agree to this approach, as I mentioned Friday, I do not think that there is any need to go to Judge Hernandez to address the discovery issues. Please confirm.

1. For the purpose of class certification, Plaintiffs will not be relying on actions taken by PPB on th

Exhibit 13
Decl. of Moede
Page 3 of 5

dates that are not expressly set forth in the 4   Amended Complaint or interrogatory responses. Those dates are as follows (all dates indicate the start of the protest and include the protest beginning on the evening that day going into the early morning hours of the following day):

    a. Belden
- i. June 2, 9, 10,
- ii. August 10
- iii. September 5

    b. Roberts
- i. May 29, 30, 31
- ii. June 1, 2, 5, 6, 7, 10, 12, 13, 26
- iii. July 4, 23, 24
- iv. August 21, 22, 28

    c. Wrecksie
- i. June 30

    d. Johnson
- i. June 5, 12, 13, 15, 28, 30
- ii. July 4
- iii. August 4, 13, 16, 22, 23
- iv. September 5

    e. Dreier
- i. August 6, 15

2. Plaintiffs will provide the City with any video not previously provided that is either taken by plaintiffs or that plaintiffs' have in their possession and control in connection with the above identified dates.
   a. To the extent that an individual plaintiff video recorded a protest on one of the above specified dates, but cannot now obtain that video for production, Plaintiff will indicate as much in response to the City's RFPs.

3. The City expressed its concerns regarding plaintiffs, as parties to ongoing litigation communicating about the protests (which were the subject of the litigation) via signal and therefore allowing these communications to be destroyed. The City has the same concerns to the extent videos were livestreamed via twitch and allowed to be destroyed.

Please let me know if you think this mischaracterizes our conversation or if an additional conversation this week would be helpful.

Best,
Naomi

**NAOMI SHEFFIELD | Senior Deputy City Attorney** (She/Her)
**PORTLAND OFFICE OF THE CITY ATTORNEY**
1221 SW Fourth Avenue, Room 430
Portland, OR 97204
Voice: 503-823-3122 | Fax: 503-823-3089

Exhibit 13
Decl. of Moede
Page 4 of 5

naomi.sheffield@portlandoregon.gov

**Equal Access Notice:** *The City of Portland operates without regard to race, color, national origin, religion, sex, sexual orientation, gender identity, marital status, age or disability* **according to all applicable** *non-discrimination laws, Title VI of the Civil Rights Act, and Title II of the ADA. To help ensure equal access to City services, the City will provide translation and interpretation and will reasonably modify policies or procedures and provide auxiliary aids or services to persons with disabilities. For such requests please click here or call (503) 823-2559, TTY 503-823-6868 or Oregon Relay Service: 711.*

**Portland City Attorney Confidentiality Notice:** *This message may contain confidential or legally privileged information belonging to the sender. If you have received this message by mistake, please immediately notify the sender, delete the original message, and destroy all copies.*

Exhibit 13
Decl. of Moede
Page 5 of 5

**EXHIBIT 15**

Video Place Holder


06.27.2020 – Johnson Facebook Video Clip (1:17:00-01:20:05)

Exhibit 15
Decl. of Moede
Page 1 of 1

**EXHIBIT 16**

Video Place Holder

06.27.2020 – FED Video (20-ED-36261)

Exhibit 16
Decl. of Moede
Page 1 of 1



# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON PORTLAND DIVISION



DON'T SHOOT PORTLAND, et al.,

     Plaintiffs,

vs.                  Case No. 3:20-cv-00917-HZ

CITY OF PORTLAND, a municipal
Corporation,

     Defendant.
_____

**REMOTE DEPOSITION BY VIDEO CONFERENCE OF**

**LIEUTENANT FRANZ SCHOENING**

**TAKEN ON**
**THURSDAY, SEPTEMBER 23, 2021**
**9:05 A.M.**

**111 SOUTHWEST SECOND AVENUE**
**PORTLAND, OREGON 97204**

Exhibit 17
Decl of Moede

1 **instruction during this three days on that topic?**

2     A.   You know, the schedule is built out to try

3 and structure the training.  It doesn't mean the

4 conversations around those topics are exclusive to

5 those time slots.  That topic may come up again

6 during other time slots, because a question was

7 asked or training goes in that direction and a

8 member -- an instructor decides that a refresher of

9 that material or a reminder may be appropriate based

10 on what they're observing.

11          So I can't answer and say it's exactly

12 this amount of time.  And again, a lot of that

13 direction and training is, remember this is what

14 Directive 1010 says.  This is the training you've

15 already received on the use of force or the Graham

16 Standard and this is how it may interplay with the

17 use of this tool in these circumstances.

18     **Q.   Would you look at the -- the slide that's**

19 **on 110 982 that is headlined, "Legal 9th Circuit**

20 **Court"?**

21     **A.   Yes.**

22     **Q.   Okay.  So that looks like it starts about**

23 **three pages specifically discussing cases where**

24 **courts have interpreted whether or not a specific**

25 **use of force was within the Graham Standard or not.**

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Exhibit 17
Decl of Moede

1    Is that what you're looking at as well?

2         A.    Yes.

3         Q.    On the second page, the second bullet

4    point reads, "Use of pepper spray to compel

5    compliance by anti-logging protestors was a

6    reasonable use of force.  Federal trial judge rules

7    that no reasonable jury could view its use in these

8    circumstances as excessive force," and it gives a

9    cite to this Headwaters Forest Defense case; do you

10   see that?

11        A.    Yes, I do.

12        Q.    So is that part of what the new grenadiers

13   in January of 2019 and the new supervisors in

14   January 2019 were trained was the law that they had

15   to apply?

16        A.    So this series of slides is really

17   designed to, you know, make grenadiers and

18   supervisors aware that some of the tools and weapons

19   that are used during crowd control have been

20   evaluated by courts.

21             It is not meant to be an extensive or

22   comprehensive training on current case law that's

23   delivered by generally our city attorney's office

24   during bureau training and in-service or legal

25   updates.  It's more of an awareness-level training

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Exhibit 17
Decl of Moede

1  that there is -- there are times where these tools

2  are examined by the court as to the reasonableness

3  --

4       Q.    In this presentation, these officers were

5  told that the use of pepper spray to compel

6  compliance by these protestors was a reasonable use

7  of force, that a court had held that; right?

8       A.    Yes.

9       Q.    Is the City aware that this District Court

10  opinion was overturned by the 9th Circuit?

11       A.    I have become aware of that, yes.

12       Q.    Okay.  Since becoming aware of it, has the

13  city done anything to correct any misapprehension

14  that existed among its members as a result of this

15  training?

16       A.    I became aware of it yesterday, so no.

17  Other than to say that the Rapid Response Team

18  currently no longer exists and any reconstitution of

19  the Rapid Response Team and any training associated

20  with that will go through a new vetting process to

21  make sure it is in compliance with current case law

22  and directives.

23       Q.    What vetting process did -- did this

24  presentation go through?

25       A.    It was put together by our instructors and

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM
Exhibit 17
Decl of Moede

1   that was it.

2        Q.    Okay.  So in terms of training officers on

3   what the law is, I assume, but maybe I shouldn't,

4   that the instructors are not practicing lawyers; is

5   that correct?

6        A.    That is correct.

7        Q.    So how do the instructors go about trying

8   to understand in order to convey the information

9   what the state of the law is with respect to the

10  Graham Standard?

11       A.    So again, we generally rely on the

12  bureau's training division to deliver current case

13  law and we rely on the bureau to incorporate that

14  current case law into policy and procedure in

15  regards to the use of force, and that includes case

16  law on the Graham Standard.

17            This training is meant to be supplemental

18  to that, and not a replacement of that.  All bureau

19  members, it is made clear to them that their uses of

20  force must comply with Directive 1010, which does

21  incorporate current case law and general community

22  input.

23       Q.    So let me try and understand that a little

24  better.  Generally speaking, when an officer in the

25  field is applying 1010 and therefore applying the

NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

Exhibit 17
Decl of Moede

1    Graham Standard, trying to make sure that his uses

2    of force are reasonable with respect to the totality

3    of the circumstances in front of him, he's looking

4    at or she's looking at the actions of the person who

5    they're considering using force against, you know,

6    whether the person has committed a crime, whether

7    they have probably cause to believe the person's

8    committed a crime, or the person's fleeing, whether

9    the person is acting as though they might harm

10   somebody or has harmed somebody, whether they're

11   resisting arrest, those types of thing.

12              How does the bureau train its RRT members

13   to incorporate or not the actions of a crowd when

14   it's looking at the actions of an individual within

15   the crowd?

16       A.    So we discuss Graham Standard factors you

17   mentioned, but I think that my understanding is that

18   that list is not exhaustive.  There are other

19   factors that were not specifically enumerated or

20   listed in that case decision.

21              So we talk about the totality of the

22   circumstances and how, you know, operating in a

23   crowd environment, there are circumstances that are

24   unique to that, that should go into their decision-

25   making process on when and how to use force.

Exhibit 17
Decl of Moede

1    It does not mean that you can use force

2  that would not otherwise be authorized, but the

3  overall reasonableness of that decision has

4  different factors.

5    Q.    **And what specific factors do you train new**

6  **RRT members to consider when they're considering a**

7  **particular use of force?**

8    A.    So again, we don't -- there is no way to

9  capture every, single factor that they should

10  consider.  That's -- what we train them to do is to

11  understand the nuances and the differences of

12  operating in a crowd environment and to be able to

13  articulate those factors or what their

14  considerations are.

15    Some common factors that we see are, you

16  know, limited resources.  So on your typical patrol

17  operations call for service, you're likely to have

18  two or three or potentially, you know, a dozen

19  police officers dealing with one or two subjects who

20  are, you know, who are being arrested, who force may

21  have to be used on.  That allows for different

22  tactics in different ways of resolving that

23  situation or de-escalating it.

24    Compared to a crowd setting where you may

25  have 12 or 15 officers dealing with a crowd of

1    several hundred.  That's just a different dynamic

2    and ultimately the force that they apply to each

3    person must be authorized and Constitutional, but

4    their ability to deploy alternative tactics and de-

5    escalate or disengage in different ways may be

6    different.

7              Things like governmental interest.  You

8    know, the necessity to defend a piece of critical

9    infrastructure or something like that may be

10   different in a crowd setting if we believe that

11   people in that crowd want to damage critical

12   infrastructure.  It may be a different

13   prioritization than, you know, vandalism to an

14   individual business.  So there's different

15   considerations, but we can't -- we can't capture all

16   of the different Graham factors that may be present

17   in someone's decision-making process.  We just try

18   to help them understand the need to consider those

19   things and articulate them when justifying their use

20   of force.

21        Q.    The members that you -- that get selected

22   for RRT, are they likely to have deployed in some

23   sort of protest crowd control setting prior to

24   joining RRT?

25        A.    Not necessarily.

Exhibit 17
Decl of Moede

1    It's not listed on the presentation.  I -- I think

2    it was produced in a batch later on which were

3    represented to be 2017 or '18.  Let me see if I can

4    figure it out.

5            MS. SHEFFIELD:  It's going to be in 2018,

6    so say the number one more time, Jesse?

7            MR. MERRITHEW:  Yeah, 128 521.

8    BY MR. MERRITHEW:

9        Q.    The first slide is, "Protests and Riots."

10           MR. MOEDE:  It's 2018.  It's Scott Moede

11   for the City of Portland.

12           MS. SHEFFIELD:  Yeah, it's going to be in

13   the state basic.

14   BY MR. MERRITHEW:

15       A.    Yeah, I see a slide.

16       Q.    This looks to be a part of the effort that

17   you're describing in order to help members

18   understand these theories of crowd behavior; is that

19   accurate?

20       A.    Part of it, yes.

21       Q.    When and to whom was this presentation

22   given?

23       A.    This appears to be part of the material

24   provided at the state basic RRT MRT Course.

25       Q.    Okay.  I want to ask you about the very

Exhibit 17
Decl of Moede

 1   last slide in this presentation, which is at 128

 2   630?

 3       A.    Yes.

 4       Q.    Could you explain how that slide is

 5   consistent with the theories of crowd management

 6   that the rest of the presentation was meant to

 7   address?

 8       A.    It is inconsistent and it's unacceptable.

 9       Q.    Okay.  Do you -- was it a -- do you know

10   how this slide is -- came to be in this

11   presentation?

12       A.    I do not.

13       Q.    Would you agree that this slide undermines

14   a lot of what you just described the city trying to

15   teach members about crowd dynamics and in-crowd out-

16   crowd and building rapport in order to avoid the use

17   of force?

18       A.    Yes, absolutely.

19       Q.    In terms of the training with respect to

20   documentation of uses of force, does the city train

21   that each use of force that a member uses must be

22   documented in a -- I forget what their form is

23   called now.  But some sort of documentation of the

24   use of force -- force data collection report.

25   Sorry.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Exhibit 17
Decl of Moede

Exhibit 17
Decl of Moede

CERTIFICATE

I, the undersigned, Vincent Guerrera, am a
videographer on behalf of NAEGELI Deposition & Trial. I
do hereby certify that I have accurately made the video
recording of the deposition of Franz Schoening, in the
above captioned matter on the 23rd day of September,
2021, taken at the location of 1111 SW 2nd Ave, Portland,
Oregon 97204.

No alterations, additions, or deletions were made
thereto.

I further certify that I am not related to any of
these parties in the matter and I have no financial
interest in the outcome of this matter.

_____

Vincent Guerrera

CERTIFICATE

    I, Rachael McCarrel, do hereby certify that I
reported all proceedings adduced in the foregoing
matter and that the foregoing transcript pages
constitutes a full, true and accurate record of said
proceedings to the best of my ability.

    I further certify that I am neither related
to counsel or any party to the proceedings nor have any
interest in the outcome of the proceedings.

    IN WITNESS HEREOF, I have hereunto set my hand this
22nd day of October, 2021.


_____

                        Rachael McCarrel

Exhibit 17
Decl of Moede

1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


DON'T SHOOT PORTLAND, et al. ) Case No. 3:20-cv-00917-HZ
                             )
      Plaintiffs,            )
                             )
      v.                     )
                             )
CITY OF PORTLAND, a municipal)
corporation,                 )
                             )
      Defendant.             )
-----------------------------


DEPOSITION OF ROSS CALDWELL

Taken on behalf of the Plaintiffs

December 7, 2021


BE IT REMEMBERED THAT, pursuant to the
Federal Rules of Civil Procedure, the deposition of ROSS
CALDWELL via Zoom was taken before Julie Purcell, a
Certified Shorthand Reporter, on Tuesday, December 7,
2021, commencing at the hour of 1:00 p.m.

Exhibit 18
Decl of Moede

DON'T SHOOT PORTLAND, et al. v. CITY OF PORTLAND          3:20-cv-00917-HZ
ROSS CALDWELL                                            12/7/2021

27

1   community repeatedly and it seems to be an issue and it

2   is potentially an issue of building community trust."

3        Q.   So did IPR initiate or conduct any policy

4   reviews related to the protests last summer?

5        A.   We started one and we no longer have the

6   person who works on policy reviews any longer and so

7   that has been put on hold.  We are also going to be, I

8   expect, conducting an investigation based on paragraph

9   192 in the DOJ Settlement Agreement, which is one of the

10  nine proposed remedies that the City and DOJ are still

11  negotiating.  And I think that that -- the goal of that

12  will be to deal with a lot of the trends that we saw in

13  complaints, tear gas and just kind of general force

14  response to the Police Bureau -- or to the -- to the

15  protests by the Police Bureau.

16       Q.   What was the policy review that IPR started

17  but didn't complete?

18       A.   It was initially regarding use of tear gas in

19  a neighborhood in North Portland on June 30th.  We were

20  looking at directive 635.10 and that it doesn't really

21  give a lot of direction on when to use tear gas and when

22  not to use tear gas and it puts an accountability system

23  in a difficult situation, because that's a pretty hard

24  thing to successfully investigate.  And the directives I

25  don't think make it very possible for us to hold

Exhibit 18
Decl of Moede

DON'T SHOOT PORTLAND, et al. v. CITY OF PORTLAND          3:20-cv-00917-HZ
ROSS CALDWELL                                                      12/7/2021

28

1    individual people accountable, and so we started a

2    policy review on that.

3              And the protests, you know -- it's important

4    to go back and remember that when the protests first

5    started, we didn't know that they would go on for the

6    amount of time that they did.  And so I think we were

7    all trying to learn and adjust and maximize our capacity

8    as best we could to try to sort of frantically keep up

9    as they continued to happen, and so there continued to

10   be more kind of issues that piled up, I think, from the

11   protests that we wanted to -- that we wanted to do a

12   review of.  At the same time we were -- we had less

13   employees as we went along.  So that created a

14   challenging situation for us.  And I think that a lot of

15   those issues, well, we will attempt to address those in

16   that paragraph 192 investigation that's going.

17        Q.   So, other than that, the policy review you

18   just described that started but is not completed and the

19   one that has not yet started pursuant to the DOJ

20   Settlement Agreement, any other policy reviews that IPR

21   has undertaken with regard to the protests of last

22   summer?

23        A.   No.  We've been spending all our capacity

24   trying to get our investigations completed.

25        Q.   So, I do want to go through some of the

Exhibit 18
Decl of Moede

51

1    requests, we were doing redundant requests again and

2    again and again to make sure we had all those reports.

3            And the reports that we get for protest cases

4    could easily be 500 pages.  Sometimes they were over a

5    thousand pages.  A pretty trim night would be at least

6    200 pages.  And so our investigators are going through

7    hundreds of pages of reports trying to figure out if

8    they can find an incident reported by police that

9    matches up with, you know, something we have a complaint

10   about, something we found a video about, something we

11   read about in a tort claim notice, any of those things.

12   At the same time we're also looking through tons and

13   tons of videos.  Yeah, the indirect access thing is a

14   big issue for IPR and for whoever will be doing, you

15   know, police oversight in the future at Portland.

16       Q.   Okay.  So, the IPR Investigator notes that

17   "PPB is not allowed to indiscriminately deploy CS gas on

18   a peaceful protest."

19       A.   Mm-hm.

20       Q.   "The rules of engagement provided by the

21   Incident Command would not allow this to be a part of

22   their response to a peaceful protest."

23            So, this allegation is that young children

24   were impacted by the use of tear gas.  And Miss

25   Leslie -- I believe IPR repeatedly contacted this

Exhibit 18
Decl of Moede

DON'T SHOOT PORTLAND, et al. v. CITY OF PORTLAND                    3:20-cv-00917-HZ
ROSS CALDWELL                                                       12/7/2021

52

1   complainant, but did not receive a response.

2           When closing this, this one was categorized as

3   complainant unavailable, but that does not mean that the

4   conduct alleged was consistent -- or that there was no

5   violations of policy according to this complaint,

6   correct?

7       A.   Correct.  And this is a good example of

8   something that will be taken up in that paragraph 192

9   investigation once we are able to get that -- once the

10  City and DOJ has kind of finished negotiating that out

11  and we're able to start doing that.  Because the

12  directive 635.10, as well as 1010, says that the CMIC

13  and the Incident Commander are responsible for making

14  the determination to use -- to use tear gas.  And I

15  don't -- I think that the way 635.10 is written, there's

16  some real challenges to finding someone out of policy if

17  they have -- you know.  I think 635.10 says that if

18  there's a civil disturbance, you can use riot control

19  agents to disperse the crowd.  And in other sections it

20  talks about if an officer, you know, is in danger, you

21  can use riot control agents, but you need to be careful,

22  but it's -- you know, it's not likely to affect other

23  people in the crowd.

24          In the section where it talks specifically

25  about using it to disperse -- to disperse a crowd if a

Exhibit 18
Decl of Moede

1                        CERTIFICATE

2

3

4          I, Julie Purcell, a Registered Professional

5     Reporter and Certified Shorthand Reporter, hereby

6     certify that said witness appeared remotely via Zoom

7     before me at the time and place set forth in the caption

8     hereof; that at said time and place I reported in

9     stenotype all testimony adduced and other oral

10    proceedings had in the foregoing matter; that thereafter

11    my notes were transcribed through computer-aided

12    transcription by me; and that the foregoing pages

13    constitute a full, true and accurate record of all such

14    testimony adduced and oral proceedings had, and of the

15    whole thereof.

16         Witness my hand this 13th day of December, 2021.

17

18

19

20    _____

21    Julie Purcell
      CSR No. 21-0011

22    Expires:  6/30/2024

23

24

25

Exhibit 18
Decl of Moede



**Bureau of Police**

Portland, Oregon

**INTER-OFFICE  MEMORANDUM**

**DATE:** October 21, 2021

**TO:** Commander Jeff Bell
Professional Standards Division

**FROM:** Internal Affairs Investigator Jon Rhodes

**SUBJ:** Clarification Memo Regarding Internal Affairs Case 2020-C-0335

On October 21, 2021 I received a request for a memo clarifying information contained in the Internal Affairs (IA) Investigation Report for IA case 2020-C-0335, which I authored, and completed on August 4, 2021. The request came from the City Attorney's Office, when in preparation for further proceedings in Federal Court Case 3:20-CV-00917-HZ, Don't Shoot Portland v. City of Portland, the City Attorneys assigned to that case reviewed my investigation and providing clarifying information for the underlying temporary restraining order hearing.

The IA investigation for that case 2020-C-0335 was conducted as a result of the Federal Court Opinion and Order findings in the above referenced Federal Court case, that the actions of Officer Brent Taylor in the deployment of an FN303 against an individual who bent down to pick up an unknown object between the protest line and the police line (Incident 9) violated the court-issued temporary restraining order in that case.

For my August 4th Investigation Report, I repeatedly viewed and relied upon a video, referred to as file 20-ED-36367 20-680932 063020 Stoner (15), to conclude that the "unknown object" referred to in the court findings was in fact, more likely than not, a spent gas/smoke metal canister which was rolled into the street by a Rapid Response Team member, and subsequently retrieved by the civilian, as seen in the video of Incident 9. Video 20-ED-36367 20-680932 063020 Stoner (15) is approximately 10 minutes in length.

At the time the investigation was initiated and assigned to me, I was provided with an abbreviated video approximately 7 seconds in length. I presumed and mistakenly stated in my investigative report that the video of Incident 9 which was presented during the Federal Court Evidentiary Hearing was the shorter video. I subsequently learned that, in fact, the video which was made available to the Court of events leading up to Incident 9, is the longer version and was marked exhibit L in the hearing. The City Attorney's Office is the custodian of records of that video file, which is how I viewed the file for my investigation, and I learned the Federal Court was presented with and retained a copy from the hearings.

This memo serves to correctly document the fact that the entire video was made available to the Federal Court. Notwithstanding this correction, the findings I recommended for both allegations in IA case 2020-C-0335 remain "Not Sustained," as the video demonstrates the "unknown object" was a spent gas/smoke metal canister, and the civilian retrieved the canister. Please refer to my Investigation Report for additional information.

Respectfully;
Internal Affairs Investigator Jon Rhodes, DPSST #16753

Page **1** of 1

CONFIDENTIAL - Subject to Protective Order



**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON PORTLAND DIVISION**

DON'T SHOOT PORTLAND, et al.,

      Plaintiffs,

vs.                              Case No. 3:20-cv-00917-HZ

CITY OF PORTLAND, a municipal
Corporation,

      Defendant.
_____



**REMOTE DEPOSITION BY VIDEO CONFERENCE OF**

**COMMANDER JEFFREY BELL**

**TAKEN ON**
**FRIDAY, OCTOBER 29, 2021**
**9:08 A.M.**

**TIGARD, OREGON  97223**

Exhibit 20
Decl of Moede

1      Q.    And if the information in that force data

2  collection report is in accurate or incomplete, that

3  can impact that officer's ability to give an

4  accurate statement about what happened or what they

5  were thinking at the time of the incident; correct?

6      A.    Yes.

7      Q.    And then that, in turn, can impact

8  efficacy of the administrative investigation; would

9  you agree?

10     A.    Yes.

11     Q.    Okay.

12         MS. ALBIES:  No further questions.

13         MR. MOEDE:  I do have a couple of follow

14  ups.

15  EXAMINATION

16  BY MR. MOEDE:

17     Q.    Cmdr. Bell, counsel asked you a question

18  about 335 and 334, I believe and whether or not the

19  City had any concerns about disagreement with a

20  federal judge.  And I think your response no, as it

21  pertained to those two files in particular; correct?

22     A.    Yes.

23     Q.    Okay.  And so could you clarify what you

24  meant by no concerns?

25     A.    So I -- I obviously gave a yes or no

NAEGELI
DEPOSITION AND TRIAL

(800)528-3335
NAEGELIUSA.COM

Exhibit 20
Decl of Moede

1  answer to a question that probably deserved a little

2  bit more of a response, so in terms of the

3  investigations themselves, I think each -- because

4  this is an employment action, we are investigating a

5  member for potential discipline.  Each person who

6  renders findings, whether that's the investigator

7  who puts forward  recommended findings or the RU

8  Manager who does proposed findings, or the other

9  reviewers who had the ability to controvert those

10 findings, they have to very strictly rely on the

11 evidence that's in the record of the investigation.

12         They have to interpret the directives and

13 apply them themselves, and  so I think the concern

14 about whether or not a federal judge had decided

15 differently, although that piece of evidence was in

16 the record, each person has to make that decision on

17 their own.

18         And in the way that they might controvert

19 a -- controvert or agree with someone else's

20 opinion, they might agree with or not agree with the

21 judge's consideration, the judge's opinion, but they

22 still have to base that on their reading of the

23 evidence and their own interpretation of the facts.

24         So I think there is -- there is concern in

25 terms of the fact that there's disparity there.

NAEGELI
DEPOSITION AND TRIAL

(800)528-3335
NAEGELIUSA.COM

Exhibit 20
Decl of Moede

1  However, we've had a number of people look at these

2  cases, again, people from the bureau, people from

3  IPR and at least in those cases, they've concluded

4  that based on the evidence, again, not necessarily

5  the evidence that the judge can serve but the

6  evidence that was in the record of the IA

7  investigation, and they have made the conclusion

8  that there is not a preponderance of evidence that

9  the officer violated policy.

10         Does that kind of explain it?

11     Q.   Yes, thank you.  So I have another area

12  that I want to ask you about, and this also

13  concerned the File Number 335, which is Incident 9.

14         And I believe counsel asked you a question

15  to the effect of, under Directive 1010, would the

16  decision be the same today as it was as at the time

17  the decision was made?

18         So what I'm curious about is, do you want

19  to clarify at all your response  regarding it would

20  be the same?

21     A.   So the way the question was asked and I

22  may have made an assumption, I was assuming that the

23  analysis of whether or not that policy or those

24  actions would be solely under the Directive of 1010

25  and that's why I answered, yes.  I believe the

Exhibit 20
Decl of Moede

Exhibit 20
Decl of Moede

1          CERTIFICATE

2

3          I, the undersigned, Vincent Guerrera, am a

4  videographer on behalf of NAEGELI Deposition & Trial. I

5  do hereby certify that I have accurately made the video

6  recording of the deposition of Commander Jeffrey Bell, in

7  the above captioned matter on the 29th day of October,

8  2021, taken via remote videoconference.

9

10  No alterations, additions, or deletions were made

11  thereto.

12

13          I further certify that I am not related to any of

14  these parties in the matter and I have no financial

15  interest in the outcome of this matter.

16

17

18  _____

19                          Vincent Guerrera

20

21

22

23

24

25

1                           CERTIFICATE

2

3          I, Jennifer Kallmeyer, do hereby certify that I

4    reported all proceedings adduced in the foregoing

5    matter and that the foregoing transcript pages

6    constitutes a full, true and accurate record of said

7    proceedings to the best of my ability.

8

9          I further certify that I am neither related

10   to counsel or any party to the proceedings nor have any

11   interest in the outcome of the proceedings.

12

13         IN WITNESS HEREOF, I have hereunto set my hand this

14   12th day of November, 2021.

15

16

17

18   _____

19                             Jennifer Kallmeyer

20

21

22

23

24

25

# XI.   ADDENDUM OF ADDITIONAL REMEDIES

On April 2, 2021, the United States issued a notice of noncompliance pursuant to Paragraph 178. The purpose of this Addendum is to ensure that the City, by and through its officials, agents, employees, and bureaus, takes actions to resolve the concerns expressed by the United States in the noncompliance notice. Specifically, the United States found that the City failed to implement the following provisions of this Agreement: Section III – Use of Force, Paragraphs 66, 67, 69, 70, and 73; Section IV – Training, Paragraphs 78 and 84; Section VIII – Officer Accountability, Paragraphs 121, 123, and 169; and Section IX – Community Engagement and Creation of Portland Committee on Community Engaged Policing, Paragraph 150. The City does not admit that the allegations of noncompliance are true.

188.    The City shall revise Force Data Collection Report (FDCR) and After Action Report forms to capture when the forms are edited and completed as part of PPB's implementation of Office365, which is ongoing. In the interim, pursuant to a process approved by the United States, PPB shall capture in the existing FDCR and After Action Report forms the author's name and the time and date of initial submission and any subsequent edits, as well as the name, time, and date of each level of review.

189.    Before November 25, 2021, the City shall provide funding for a qualified outside entity to critically assess the City's response to crowd control events in 2020 in a public-facing report and prepare a follow-on review of the City's response to the report. The City will use the report to prepare a training needs assessment. The report, training needs assessment, and follow-on review will be completed consistent with a Scope of Work and deadlines agreed upon by the City and the United States, and such agreement shall not be unreasonably withheld by either Party. If the City demonstrates to the United States that significant progress is being made toward meeting the obligations under the agreed upon Scope of Work and deadlines, the City may request a reasonable

PROPOSED SECTION XI

Exhibit 21
Decl. of Moede
Page 1 of 8

modification of the Scope of Work or extension of deadlines, which the United States shall not unreasonably decline.

190.    Before November 25, 2021, the City shall provide in the budget a separate line item for overtime costs to conduct necessary training for PPB officers.  The City shall include a similar line item in subsequent budgets for the duration of this Agreement.

191.    Before November 25, 2021, the City shall budget for a qualified civilian in PPB to direct all educational aspects of PPB's Training Division alongside the Captain of the Training Division, who will direct administrative aspects of PPB's Training Division.  The respective roles and responsibilities of the civilian and the Captain are outlined in Attachment 1 appended to this Agreement, provided that the Parties may agree to modify those roles and will not unreasonably withhold such agreement.  Once funding is provided, the City shall post the position within 90 days. Once the position is posted, the City shall make a job offer to a suitable candidate and complete any required background screenings within 150 days.  If the City demonstrates to the United States that no suitable candidate applied for or accepted the position, or that the City is otherwise making significant progress toward meeting the deadlines in this Paragraph, the City may request a reasonable extension of time to fill the position, which the United States shall not unreasonably withhold.

192.    Within 60 days of the date this paragraph is entered as an order of the Court, the City shall initiate an appropriate investigation through IPR to identify: (a) the PPB Lieutenant(s) and above who trained Rapid Response Team members to believe that they could use force against individuals during crowd control events without meeting the requirements of PPB Directive 1010.00; (b) the PPB incident commander(s) and designee(s) with the rank of Lieutenant or above who directed or authorized any officer to use force in violation of PPB Directive 1010.00, or who failed to ensure that FDCRs and After Action Reports arising from the crowd control events

PROPOSED SECTION XI

Exhibit 21
Decl. of Moede
Page 2 of 8

starting on May 29, 2020, and ending on November 16, 2020, were completed as required by Section 13.1 of PPB Directive 635.10; and (c) the PPB Commanders and above who failed to timely and adequately clarify misunderstandings and misapplications of PPB policy (including this Agreement) governing the use, reporting, and review of force during the crowd control events starting on May 29, 2020, and ending on November 16, 2020.  Once the IPR investigation is complete, the Police Commissioner and/or the Chief of Police, as required by this Agreement, shall hold accountable those investigated members of the rank of Lieutenant and above who are determined to have violated PPB policies (including this Agreement) as outlined in this paragraph.  The parties affirm the obligation in this Agreement and Directive 330 for IPR and PPB to investigate any sworn member if, during the investigations of Lieutenants and above required by this paragraph, information is discovered suggesting that any sworn member may have violated PPB policy or this Agreement.

193.     In addition to the requirements of paragraph 150 of this Agreement, PPB shall release its Annual Report and hold the required precinct meetings no later than September 20 of each year for the duration of this Agreement.

194.     Within 210 days of the date this paragraph is entered as an order of the Court, the City shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement; provided, however, if the City is making substantial progress this deadline may be extended by agreement of the United States, which shall not be unreasonably withheld.

a.     The City will comply with any collective bargaining obligations it may have related to BWCs, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

PROPOSED SECTION XI

Exhibit 21
Decl. of Moede
Page 3 of 8

b.      Within 60 days of the date this paragraph is entered as an order of the Court, the Compliance Officer shall gather public input on the use of BWCs and provide this information and any technical assistance to the public and the Parties to inform the drafting of a policy.  The United States reserves its policy review rights related to the BWC program under the terms of this Agreement.

c.      If the City has not finally discharged its collective bargaining obligations as to BWCs within 120 days of the date this paragraph is entered as an order of the Court, the Parties stipulate that the Court may thereafter hold periodic status conferences every 60 days to receive an update on the procedural status of the collective bargaining process related to BWCs.  The City will provide a final procedural status update upon the completion of the collective bargaining process.

d.      The United States reserves its enforcement rights related to the BWC program under the terms of this Agreement.  If collective bargaining or any related arbitration or appeal results in a BWC program that the United States determines, in its sole and absolute discretion, will not adequately resolve the compliance concerns identified in the April 2, 2021 notice of noncompliance, the Parties agree that the United States can seek court enforcement pursuant to paragraph 183, without having to repeat the steps laid out in paragraphs 178 to 182.

195.      In 2020, the City referred to voters a ballot measure that would overhaul the police accountability system incorporated into this Agreement by establishing a new Community Police Oversight Board to replace IPR for investigations of certain complaints of police misconduct and to

PROPOSED SECTION XI

Exhibit 21
Decl. of Moede
Page 4 of 8

replace the Chief of Police for imposition of discipline. City voters approved the ballot measure. The City has since empowered a 20-member civilian Commission to define the duties and authority of the Oversight Board and submit a proposal to City Council for final approval.

a.    Before January 1, 2022, the City Council and Auditor shall each present a plan to the United States for an orderly transition to the Community Police Oversight Board by ensuring the continuity of IPR operations while the Commission develops the Oversight Board for City Council's approval. The United States shall determine whether either of these two plans is acceptable. City Council will then adopt a plan that the United States has determined is acceptable. The Parties agree that the adopted plan shall be appended to this Agreement and will become part of this Order, provided that the Parties may agree to modify the plan if warranted by the circumstances. Until the Oversight Board becomes operational, the City shall ensure that administrative investigations are completed as required by Section VIII – Officer Accountability and that officers are held accountable for violating PPB policy and procedure as required by Paragraph 169.

b.    Within 18 months of the date this paragraph is entered as an order of the Court, the Commission shall propose to City Council changes to City Code to create a new police oversight system as reflected in the City of Portland Charter amendment establishing a Community Police Oversight Board. Within 60 days of receiving the Commission's proposal, the City will propose amendments to City Code to address the Commission's proposal, and corresponding amendments to this Agreement, subject to the United States' and the Court's approval, to ensure full implementation of the Oversight

PROPOSED SECTION XI

Exhibit 21
Decl. of Moede
Page 5 of 8

Board and effective police accountability, consistent with the requirements of this Agreement.  Within 21 days of the approval of the amendments to the Agreement by the United States and the Court, the City Council shall consider and vote on the conforming City Code provisions creating the Oversight Board.  Within 12 months of the Council's adoption of the City Code provisions, the new Oversight Board shall be staffed and operational, and IPR shall then cease taking on new work and complete any pending work.  For good cause shown, the deadlines imposed by this subparagraph (b) may be reasonably extended provided that the City is in substantial compliance with subparagraph (a).

c.      The City will comply with any collective bargaining obligations it may have related to the Oversight Board, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

PROPOSED SECTION XI

Exhibit 21
Decl. of Moede
Page 6 of 8

DATED: November ___, 2021.

Respectfully submitted,

| FOR THE UNITED STATES: | |
|---|---|
| SCOTT ERIK ASPHAUG<br>Acting United States Attorney<br>District of Oregon | KRISTEN CLARKE<br>Assistant Attorney General<br>Civil Rights Division |
| RENATA A. GOWIE<br>Civil Division Chief | STEVEN H. ROSENBAUM<br>Special Litigation Section Chief |
| */s/ Jared D. Hager*<br>JARED D. HAGER<br>Assistant U.S. Attorney | */s/ Laura L. Cowall*<br>LAURA L. COWALL<br>Deputy Chief |
| | */s/ R. Jonas Geissler*<br>R. JONAS GEISSLER<br>Trial Attorney |

| FOR THE CITY OF PORTLAND: | |
|---|---|
| */s/ Robert Taylor*<br>ROBERT TAYLOR<br>City Attorney | */s/ Heidi Brown*<br>HEIDI BROWN<br>Chief Deputy City Attorney |

PROPOSED SECTION XI

Exhibit 21<br>Decl. of Moede<br>Page 7 of 8

Here is the list of Training Division duties:

YELLOW = Academic Director
BLUE = Captain
GREEN = Both

| Academic Director | SHARED | Captain |
|---|---|---|
| <ul><li>Lesson plan final approval</li><li>Forecasting/scheduling of the yearly training calendar</li><li>Needs assessment and surveys (analyst supervision)</li><li>Instructor development/training</li><li>FTEP and recruit officers training</li><li>Ensure training adheres to policy</li><li>Procedural Justice program</li><li>Patrol Procedures Patrol Vehicle, Operations, Control Tactics, Firearms program training</li><li>Community academy training</li><li>Advanced academy</li><li>Supervisor in-service</li><li>Inservice</li><li>Outside training approval</li><li>Learning Management System</li><li>Video Production unit</li><li>PS3 training</li><li>Able Program</li><li>CIT/ECIT training</li><li>Satellite instructor schools training</li><li>Return to work training for members who have been on extended leave</li></ul> | <ul><li>Instructor Selection</li><li>DPSST coordination</li><li>FTEP and recruit officers</li><li>Budget</li><li>Wellness programs</li><li>Patrol Procedures Patrol Vehicle, Operations, Control Tactics, Firearms program</li><li>Sworn and non-sworn performance evaluations</li><li>Community academy</li><li>Leadership program</li><li>Officer involved shooting reviews</li><li>Satellite instructor schools</li><li>Training Advisory Council (TAC)</li><li>PRB advisory member</li></ul> | <ul><li>FTEP and recruit officer assignments</li><li>EAP</li><li>Armory and equipment management</li><li>Facility use management (internal and external users)</li><li>Patrol Procedures Patrol Vehicle, Operations, Control Tactics, Firearms program assignments</li><li>Community academy assignments</li><li>Cadet program coordination</li><li>Satellite instructor school assignments</li></ul> |

Exhibit 21
Decl. of Moede
Page 8 of 8

1                IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF OREGON

3   DON'T SHOOT PORTLAND, a          )
    nonprofit corporation in its     )
4   individual capacity, et al.,     )
                                     )
5            Plaintiffs,             ) No. 3:20-cv-00917-HZ
                                     )
6        vs.                         ) October 21, 2020
                                     )
7   CITY OF PORTLAND, a municipal    ) Portland, Oregon
    corporation; MULTNOMAH COUNTY,   )
8   a political subdivision of the   )
    State,                           )
9                                    )
             Defendants.             )
10  ---------------------------------

11

12

13

14

15

16                   **EVIDENTIARY HEARING**

17                        **DAY 1**

18              TRANSCRIPT OF PROCEEDINGS

19       BEFORE THE HONORABLE MARCO A. HERNANDEZ

20          UNITED STATES DISTRICT COURT JUDGE

21

22

23

24

25

Exhibit 22
Decl of Moede

Cleinman - D

1   whole lot of pain from -- from pepper spray.

2   Q.  Mr. Cleinman, had you pushed back at the officer or

3   engaged in any fighting with the officers as this was

4   happening?

5   A.  No, I did not engage in fighting the officers.

6         MS. SAFARIAN:  At this point, Mr. Chavez, please play

7   Cleinman Exhibit 1.

8             (A video is then played.)

9   BY MS. SAFARIAN:  (continuing)

10  Q.  Mr. Cleinman, does that accurately depict your testimony

11  about the shove and the pepper spray?

12  A.  Yes, it does.

13         MS. SAFARIAN:  Mr. Chavez, can you rewind back and

14  play that again.

15             (A video is then played.)

16  BY MS. SAFARIAN:  (continuing)

17  Q.  Mr. Cleinman, as the officer -- the first push that you

18  experienced, can you please explain to us, what were you doing

19  with your arms and your hands?

20  A.  Definitely.

21         So I had two pushes from that first officer.  As I

22  described, the second push was in a downward motion and it

23  struck me off balance, and I was falling.  And I, without

24  thinking about it -- when people are falling, they

25  instinctually try to stop that fall however they can.  And I

Exhibit 22
Decl of Moede

1    have a distinct memory of, like, falling and then realizing I

2    had stopped falling and looking and seeing my hand around the

3    officer's baton, because I had prudently, instinctually

4    grabbed the only thing in front of me.

5            I remember as soon as I noted -- consciously

6    perceived that I stopped myself from falling by grabbing his

7    baton, I released the baton immediately, because my intent

8    wasn't to do anything to this officer.  And I also remember

9    that the officer didn't seem bothered or struck off balance by

10   that momentary hold.

11   Q.  And do you remember, out of the officers that were lined

12   up directly in front of you, could you tell by their uniforms

13   if they were OSP officers or Portland police?

14   A.  I could.  They were Portland police officers.

15   Q.  And how could you tell?

16   A.  Several ways, but most notably the badge on the side

17   of -- on the shoulder of their uniform saying "Portland Police

18   Bureau."

19   Q.  Mr. Cleinman, can you describe the sensation you felt as

20   you are -- you described feeling disoriented, and we assume in

21   the video that corresponds with the pepper spray.  What did

22   you feel as you were sprayed in the face?

23   A.   It's similar, probably, to being in a car collision, if

24   anybody has been in that, where there is a sort of moment

25   where everything just goes blank.  And then it's almost like

Exhibit 22
Decl of Moede

Greatwood - D

1  into three pieces.  Are you familiar with the term

2  "Triple-Chaser"?

3  A.  I am not familiar with that term.

4  Q.  Okay.  So they split into three pieces, and usually each

5  of those pieces starts smoking; is that right?

6  A.  Uh-huh.

7  Q.  And when it rolls towards you, it's not smoking, right?

8  A.  Not at all.  It's just completely -- nothing -- it's just

9  solid.

10  Q.  So you thought, "This is my chance to look at this"?

11  A.  Yeah.  I've never seen one up close.

12  Q.  Okay.  And so where -- what position is your body in when

13  you're shot?

14  A.  Facing the police.

15  Q.  Okay.  And are you -- are you standing upright?  You're

16  bending down?  Have you touched the canister yet?

17  A.  I actually saw -- I have my camera pole in my left hand.

18  And the cables on it, going to the camera on my backpack,

19  actually are really tight, so I have to really slowly bend

20  down to pick it up.  And I didn't even make it to where I

21  could touch it before I was hit.

22  Q.  So you don't even touch it yet, and you're shot.  What

23  does that feel like?

24  A.  The only pain that I can even say comes close is,

25  actually, I had sciatica of my right leg and my lower spine

Exhibit 22
Decl of Moede

1   A.   So, yeah, it has three sections in it.  I couldn't

2   analyze, when they threw it, what it was.

3   Q.   Did you observe people throwing objects at the police

4   before you were shot by the impact round?

5   A.   I noticed a couple water bottles; in what condition, I

6   don't know.  I saw them spraying water, but just literally

7   maybe two.

8   Q.   You just saw two water bottles being thrown?

9   A.   Maybe, maybe two.

10  Q.   You didn't see rocks?

11  A.   No.

12  Q.   Cans?

13  A.   No.

14  Q.   Bottles?

15  A.   No.

16  Q.   You said that somebody picked up the Triple-Chaser after

17  you were shot?

18  A.   Uh-huh.

19  Q.   Do you -- I think you testified you had the camera pole in

20  your left hand, you slowly bent down because there was, like,

21  cables connecting your camera or something?

22  A.   Yes.

23  Q.   So you were reaching with your right to pick up the

24  Triple-Chaser canister?

25  A.   Yeah, I must have -- I usually -- at that night, I had my

Exhibit 22
Decl of Moede

Greatwood - X

1    pole in my left hand and my phone in my right hand, which

2    allowed me to see what the camera was seeing.  And so I must

3    have put my phone in my pocket and went to lunge to get it

4    very slowly, because my rig is super tight.  It was -- it's

5    MacGyver'd, so it's not a professional rig or anything.  Yeah,

6    I went to --

7    Q.   When you say -- to me, when you say "lunge" and "slowly

8    bend," those are two different things.

9    A.   Okay.  It's in between a lunge and a bend, because I have

10   a 20-foot pole, so it's a very awkward way to get down, like,

11   to pick something off the ground, I promise.

12   Q.   So was it like a quick movement to pick it up or a slow

13   movement?

14   A.   I only could have moved in a slow movement.  I had too

15   much heavy stuff on me.

16   Q.   And did you actually touch the object, the Triple-Chaser

17   canister, or did you never get to touch it?

18   A.   I didn't get to touch it before I was hit.  I only have it

19   because somebody else picked it up.

20           MR. YAMACHIKA:  No further questions.  Thank you.

21           THE COURT:  Redirect.

22           MR. BRUGGEMEIER:  Thank you, Your Honor.

23

24

25

Exhibit 22
Decl of Moede

1                                --oOo--

2

3            I certify, by signing below, that the

4        foregoing is a correct transcript of the record

5        of proceedings in the above-titled cause.  A

6        transcript without an original signature,

7        conformed signature or digitally signed signature

8        is not certified.

9

10

11

        /s/ Nancy M. Walker                12-16-20
12     _____   _____
       NANCY M. WALKER, CSR, RMR, CRR          DATE
13     Official Court Reporter
       Oregon CSR No. 90-0091
14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 22
Decl of Moede

1           IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF OREGON

3  DON'T SHOOT PORTLAND, a          )
   nonprofit corporation in its     )
4  individual capacity, et al.,     )
                                    )
5           Plaintiffs,             ) No. 3:20-cv-00917-HZ
                                    )
6       vs.                         ) October 22, 2020
                                    )
7  CITY OF PORTLAND, a municipal    ) Portland, Oregon
   corporation; MULTNOMAH COUNTY,   )
8  a political subdivision of the   )
   State,                           )
9                                   )
           Defendants.              )
10 --------------------------------

11

12

13

14

15

16                  **EVIDENTIARY HEARING**

17                       **DAY 2**

18              TRANSCRIPT OF PROCEEDINGS

19       BEFORE THE HONORABLE MARCO A. HERNANDEZ

20          UNITED STATES DISTRICT COURT JUDGE

21

22

23

24

25

Exhibit 22
Decl of Moede

Closing Argument - Plaintiffs

1   anticipated and contemplated that all declarations and videos

2   submitted as part of the amended motion for contempt are part

3   of the record that we want the Court to consider.

4            The purpose of the evidentiary hearing today was to

5   highlight some of those videos, some of those declarants.  But

6   we had anticipated the Court would consider all of the

7   declarations and evidence that plaintiffs had submitted in

8   conjunction with the amended motion for contempt.

9            MR. BRUGGEMEIER:  For example, the declaration videos

10  of Mr. Dicks, I believe there are -- I could be wrong -- maybe

11  13 of them.  I think that we've only seen and shown three

12  during this hearing.

13           And, as Ms. Albies was saying, you know, the

14  violations that we have highlighted in the last two days are

15  not the only violations that this Court can find.  Anything

16  that the witnesses have said and described that the Court

17  believes is clear and convincing evidence can also work.

18           THE COURT:  But to be really clear, I am not going to

19  hunt through this record in order to find whether or not there

20  was a violation.  That's not --

21           MR. BRUGGEMEIER:  And I'm not asking you to, Your

22  Honor.

23           THE COURT:  That's not my job, and it's not fair

24  to --

25           MR. BRUGGEMEIER:  I agree.  I'm just saying --

Exhibit 22
Decl of Moede

Closing Argument - Plaintiffs

1      THE COURT:  Wait a minute.  Wait a minute.  There are
2  some rules.  One of the rules is I get to interrupt whoever I
3  want in my courtroom --
4      MR. BRUGGEMEIER:  That is fair.
5      THE COURT:  -- and nobody gets to interrupt me.
6      MR. BRUGGEMEIER:  I didn't intend to.  I'm sorry,
7  Your Honor.
8      THE COURT:  So what I was saying is it's not fair to
9  the other side, the suggestion that I just go through and find
10  issues that may not have been raised by the parties.
11      I will only consider those events that were raised by
12  the parties and pointed out to the Court in your opening
13  statements.  I'm not going anywhere else.
14      MR. BRUGGEMEIER:  Fair enough.
15      THE COURT:  Understood?
16      MR. BRUGGEMEIER:  Yes, Your Honor.
17      THE COURT:  Okay.  Go ahead.
18      MR. BRUGGEMEIER:  Just as an initial note, before I
19  briefly go through what we've seen, what the Court has seen as
20  the violations, I'll note that Mr. Passadore testified
21  multiple times about how the safety gear that PPB wears,
22  especially the RRT, is built to allow the officers to have
23  protection from a lot of things.  And I note that especially
24  when we're talking about canisters of smoke being kicked.
25      From the first minute of the first push, we see a

Exhibit 22
Decl of Moede

1                              --oOo--

2

3         I certify, by signing below, that the

4     foregoing is a correct transcript of the record

5     of proceedings in the above-titled cause.  A

6     transcript without an original signature,

7     conformed signature or digitally signed signature

8     is not certified.

9

10

11
      /s/ Nancy M. Walker                12-16-20
12    _____    _____
      NANCY M. WALKER, CSR, RMR, CRR         DATE
13    Official Court Reporter
      Oregon CSR No. 90-0091
14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 22
Decl of Moede

1

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

DON'T SHOOT PORTLAND, et al.,     )
                                  )
                Plaintiffs,       )
                                  )
   v.                             )   Case Number
                                  )   3:20-cv-00917-HZ
CITY OF PORTLAND, a municipal     )
corporation,                      )
                                  )
                Defendant.        )


DEPOSITION OF CAPTAIN ROBERT SIMON

Taken in behalf of the Plaintiff

Pursuant to FRCP 30(b)(6)

December 10, 2021

***TAKEN VIA VIDEOCONFERENCE***

Exhibit 23
Decl of Moede

11

1      is of that member -- that person making the

2      complaint.  I went to a lot of meetings with her.  I

3      was basically her -- her facilitator for a lot of

4      stuff.

5  Q.  Now, did you receive any additional training to

6      become the force inspector on -- on or around

7      June 25th?

8  A.  Other than meeting with Lieutenant Niiya several

9      times and talking to him about it.

10 Q.  Okay.  Previous trainings prior to July 9th, who

11     developed those --

12 A.  Those would be --

13 Q.  -- as they relate to FDCRs and AARs?

14 A.  That would -- most of that had come through the

15     Office of Inspector General's office, Mary Claire

16     Buckley's team, Lieutenant Niiya, and prior to that

17     it was then Lieutenant Dobson, now Commander Craig

18     Dobson.

19 Q.  Okay.  So let me talk to you, then, about the

20     development of that July 9th training.  What spurred

21     on the bureau to put on this training?

22 A.  The influx of reports that we were receiving in the

23     inspector's office, the event that was happening in

24     the streets, sort of the back end of it was the

25     massive amounts of data that was coming in as far as

Exhibit 23
Decl of Moede

DON'T SHOOT PORTLAND, et al. v. CITY OF PORTLAND
CAPTAIN ROBERT SIMON

3:20-cv-00917-HZ
12/10/2021

12

1    reports and trying to be -- organizing and trying

2    to -- making sure they're accurate and detailed is

3    what spurred that on.

4  Q.  And how did you learn that this training was going

5    to be happening?

6  A.  I had -- I went to the chief's office.  I had talked

7    to Lieutenant Niiya about it.  For the first few

8    days, I went talked to Mary Claire Buckley about it,

9    as well as some of the issues that we were seeing in

10    the reports, and then ultimately went and talked to

11    Chief Resch about it and asked what the direction

12    was going to be for the police bureau in the

13    reporting.

14  Q.  Now, you had identified some issues involving kind

15    of the large amount of data coming in, I presume

16    during June 2020.  Is that correct?

17  A.  It would have been the end of May, early May, June,

18    July -- or May and June, sorry.

19  Q.  Okay.  And were you seeing any problems with the

20    documents that were coming in, the FDCRs and AARs?

21        MR. YAMACHIKA:  Object to the form.

22        Go ahead.

23  BY MR. CHAVEZ:

24  Q.  You can go ahead.

25  A.  Yeah, I mean, there was reports that were coming in

Exhibit 23
Decl of Moede

DON'T SHOOT PORTLAND, et al. v. CITY OF PORTLAND
CAPTAIN ROBERT SIMON

3:20-cv-00917-HZ
12/10/2021

13

1    that had insufficient data in them, the reports.

2    There was case number issues, there was some

3    tracking issues, trying to make sure that the FDCRs

4    matched the after actions.  Our routing process for

5    information was never really designed for that

6    amount of data to come through, and it became a

7    little chaotic, in my opinion.

8  Q.  Did anybody else share your opinion that it was --

9      that those problems were present with the documents?

10         MR. YAMACHIKA:  Objection.  Calls for

11     speculation.

12         Go ahead.

13  A.  When I brought it to the attention of Chief Resch,

14      she shared my concern.

15  BY MR. CHAVEZ:

16  Q.  And --

17  A.  I apologize.  She was then the assistant chief.  I

18      call her Chief Resch, but she was the assistant

19      chief of the investigations branch at the time,

20      so...

21  Q.  And what were some of the solutions identified,

22      then, to the issues that you had identified?

23  A.  Out of that discussion, we just talked about having

24      a -- a training for RRT members and RRT supervisors

25      on the necessity to clean up the reports.

Exhibit 23
Decl of Moede

DON'T SHOOT PORTLAND, et al. v. CITY OF PORTLAND
CAPTAIN ROBERT SIMON

3:20-cv-00917-HZ
12/10/2021

14

1  Q.  It's also my understanding that additional sergeants

2      were tasked with reviewing the backlog.  Is that

3      correct?

4  A.  Yeah.  And part of that -- the backlog piece was I

5      had asked what we wanted to do for the reports that

6      I had already -- that already had come in before I

7      was assigned there, because there was an influx of

8      reports for the entire month of June -- I got there

9      the end of June -- that were problematic, did we

10     want to go back and try to fix all those, or what

11     did we want to do?  Did we want to try to correct

12     some of the issues in those reports, or did we just

13     want to move on from when I got there going forward?

14         Out of that discussion came the idea that we

15     would go back and fix those as good as we can, put

16     this training on in July, and have a better

17     understanding of what the expectations of the

18     officers in the street were after that training.

19  Q.  Okay.  And those new officers -- or those new

20     sergeants who had been brought on to review the

21     backlog, did they also attend this training?

22  A.  Yes, I -- I believe so.  I can't remember if all of

23     them were there, because it was -- Sergeant Julian

24     Carroll and Sergeant Eric Copane (ph) were involved

25     in the field in reports, and then part of my team

Exhibit 23
Decl of Moede

15

1      that I brought up with me was -- Sergeant John

2      Sapper was part of that.

3  Q.  Okay.  Now, let me just ask this question before I

4      forget.  Who attended this training on July 9th,

5      2020?

6  A.  I don't have a roster for it.  I don't know if a

7      roster was taken.  I reached out to the training

8      division to try to see if there was an actual roster

9      written down.  I have a list of people who accepted

10     the invite, and I remember a handful of people that

11     were there.  Some were there in person, some were

12     there by Zoom, but I don't have an accurate exact

13     head count of who was there and who wasn't there.

14 Q.  And this training was aimed at sergeant-level squad

15     leads, or who was this aimed at?

16 A.  The training was aimed at sergeants and above that

17     were out in the field assigned to RRT.

18 Q.  Okay.  Now, what did you review in developing the

19     training materials for July 9th, 2020?

20 A.  Some directives, obviously 1010, as well as the

21     reports that were coming in, and then having

22     conversations with the audit team members about

23     stuff they were seeing, because they were the ones

24     actually going through the reports line by line,

25     finding the deficiencies or discrepancies and

Exhibit 23
Decl of Moede

45

1                    C E R T I F I C A T E

2

3          I, Tamara Aufdermauer Pearce, Oregon CSR

4     Number 90-0199, Washington CCR Number 2141, do

5     hereby certify that CAPTAIN ROBERT SIMON via

6     videoconference appeared before me at the time and

7     place mentioned in the caption herein; that the

8     witness was by me first duly sworn on oath and

9     examined upon oral interrogatories propounded by

10    counsel; that said examination, together with the

11    testimony of said witness, was taken down by me in

12    stenotype and thereafter reduced to typewriting; and

13    that the foregoing transcript, pages 1 to 44,

14    inclusive, constitutes a full, true and accurate

15    record of said examination of and testimony given by

16    said witness, and of all other proceedings had

17    during the taking of said deposition and of the

18    whole thereof, to the best of my ability.

19          Witness my hand at Portland, Oregon, this 22nd

20    day of December, 2021.

21

22    _____

23    TAMARA AUFDERMAUER PEARCE

24    OCSR Number 90-0199    Expires:  12/31/2023

25    WCCR Number 2141       Expires:  12/01/2022

Exhibit 23
Decl of Moede

**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
**Viktoria Lo**, OSB No. 175487
Email: viktoria@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241

**Juan C. Chavez**, OSB No. 136428
Email: jchavez@ojrc.info
**Brittney Plesser**, OSB No. 154030
Email: bplesser@ojrc.info
**Alex Meggitt**, OSB No. 174131
Email: ameggitt@ojrc.info
**Franz H. Bruggemeier**, OSB No. 163533
Email: fbruggemeier@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503 944-2270

**J. Ashlee Albies**, OSB No. 051846
Email: ashlee@albiesstark.com
**Whitney B. Stark**, OSB No. 090350
Email: whitney@albiesstark.com
**Maya Rinta**, OSB No. 195058
Email: maya@albiesstark.com
Albies & Stark LLC
1 SW Columbia St. Suite 1850
Portland, Oregon 97204
Telephone: (503) 308-4770

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **DON'T SHOOT PORTLAND**, et al.,<br><br>Plaintiffs<br><br>v.<br><br>**CITY OF PORTLAND**, a municipal corporation,<br><br>Defendant. | **CASE NO. 3:20-CV-00917-HZ**<br><br>**PLAINTIFF MISHA BELDEN'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST REQUEST FOR ADMISSIONS** |

TO:  Defendants City of Portland

Exhibit 24
Decl of Moede

## GENERAL RESPONSES AND OBJECTIONS

Plaintiff Belden makes these responses and objections without prejudice and with a reservation of all of their rights to amend, clarify, or modify their objections and responses as further information becomes available during the course of discovery.

Plaintiff Belden objects to these Admissions to the extent it requires Plaintiff to answer on behalf of third parties. Plaintiff also objects on the basis that the information requested is outside the scope of discovery because the request is not proportional to the needs of the case in light of Defendant's relative access to relevant information, its resources, the importance of the discovery in resolving the issues, and because the burden and expense of the proposed discovery outweighs its likely benefit.

Plaintiff also objects to the extent the requests are duplicative and the information is equally available to Defendant.

## RESPONSES TO REQUESTS FOR ADMISSIONS

**REQUEST NO. 1:** Admit that you are not seeking monetary damages pertaining to the allegations in the Third Amended Complaint.

**RESPONSE: Deny. Plaintiff Belden seeks compensation for the harm the City caused them.**

**REQUEST NO. 2:** Admit that you do not seek economic damages pertaining to the allegations in the Third Amended Complaint.

**RESPONSE: Admit.**

**REQUEST NO. 3:** Admit that you do not seek noneconomic damages pertaining to the allegations in the Third Amended Complaint.

**RESPONSE: Deny. Plaintiff Belden seeks compensation for the harm the City caused them.**

Exhibit 24
Decl of Moede

**REQUEST NO. 4:**  Admit that you have not been struck by a FN303 munition in connection with the events alleged in the Third Amended Complaint.

**RESPONSE: Admit.**

**REQUEST NO. 5:**  Admit that you have not been struck by a rubber ball distraction device munition in connection with the events alleged in the Third Amended Complaint.

**RESPONSE: Deny. Plaintiff has been struck by the effects of, exposed to, and affected by Portland Police weapons, including rubber ball distraction devices, in connection with the events alleged in the Fourth Amended Complaint.**

**REQUEST NO. 6:**  Admit that you have not been struck by a 40mm munition in connection with the events alleged in the Third Amended Complaint.

**RESPONSE: Admit.**

**REQUEST NO. 7:**  Admit that you have not been physically affected by any form of tear gas in connection with the events alleged in the Third Amended Complaint.

**RESPONSE: Deny. Plaintiff has been physically affected by tear gas in connection with the events alleged in the Third Amended Complaint and Fourth Amended Complaint**.

**REQUEST NO. 8:**  Admit that have not been physically affected by a Long Range Acoustical Device in connection with the events alleged in the Third Amended Complaint.

**RESPONSE: Deny, as Plaintiff has been physically affected by a Long Range Acoustical Device in connection with the events alleged, primarily through their auditory senses, but Plaintiff does not allege they have been physically harmed by a Long Range Acoustical Device in connection with the events alleged.**

**REQUEST NO. 9:**  Admit that you have engaged in conduct beyond passive resistance at protests since May 25, 2020.

PAGE 3 – PLAINTIFF MISHA BELDEN'S RESPONSE TO DEFENDANT CITY OF
     PORTLAND'S FIRST REQUEST FOR ADMISSIONS

Exhibit 24
Decl of Moede

**RESPONSE:  Plaintiff objects as vague, unclear, and confusing, including the meaning of "beyond passive resistance" and all conduct included and excluded by that definition.**

**REQUEST NO. 10:**  Admit that you have not attended any protests since June 13, 2020.

**RESPONSE: Deny. Plaintiff attended protests since June 13, 2020, attending protests until approximately October 2020.**

**REQUEST NO. 11:**  Admit that you have not attended every protest in the City of Portland since May 25, 2020 in Portland, Oregon opposing police violence and white supremacy.

**RESPONSE: Plaintiff admits that they have not attended every protest in the City of Portland since May 25, 2020, opposing police violence and white supremacy, and also is unaware of what "every protest" in Portland, Oregon, opposing police violence and white supremacy would include.**

**REQUEST NO. 12:**  Admit that the class defined in the Third Amended Complaint does not apply to Multnomah County.

**RESPONSE: Admit.**

**REQUEST NO. 13:**  Admit that the class defined in the Third Amended Complaint does not apply to the Oregon State Police.

**RESPONSE: Admit.**

**REQUEST NO. 14:**  Admit that the class defined in the Third Amended Complaint does not apply to Department of Homeland Security.

**RESPONSE: Admit.**

**REQUEST NO. 15:**  Admit that any subclasses defined in the Third Amended Complaint do not apply to Multnomah County, Oregon State Police and/or Department of Homeland Security.

PAGE 4 – PLAINTIFF MISHA BELDEN'S RESPONSE TO DEFENDANT CITY OF
PORTLAND'S FIRST REQUEST FOR ADMISSIONS

Exhibit 24
Decl of Moede

**RESPONSE: Plaintiff objects as compound and confusing. Notwithstanding and subject to them, Admit.**

Dated this 7th day of June, 2021.

*s/Franz Bruggemeier*

**J. Ashlee Albies**, OSB No. 051846
**Whitney B. Stark**, OSB No. 090350
**Maya Rinta**, OSB No. 195058
Albies & Stark LLC

**Jesse Merrithew**, OSB No. 074564
**Viktoria Safarian**, OSB No. 175487
Levi Merrithew Horst PC

**Juan C. Chavez**, OSB No. 136428
**Brittney Plesser**, OSB No. 154030
**Alex Meggitt**, OSB No. 174131
**Franz H. Bruggemeier**, OSB No. 163533
Oregon Justice Resource Center
**Attorneys for Plaintiffs**

Exhibit 24
Decl of Moede

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **PLAINTIFF NICHOLAS J. ROBERTS'**

**RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST REQUEST FOR**

**ADMISSIONS**  via E-mail on the parties listed below.

      J. SCOTT MOEDE, OSB 934816
      Chief Deputy City Attorney
      scott.moede@portlandoregon.gov
      NAOMI SHEFFIELD, OSB 170601
      Deputy City Attorney
      naomi.sheffield@portlandoregon.gov
      ROBERT YAMACHIKA, OSB 065560
      Senior Deputy City Attorney
      rob.yamachika@portlandoregon.gov
      Portland City Attorney's Office
      1221 SW 4th Ave., Rm. 430 Portland, OR 97204
      Facsimile: (503) 823-3089
      *Of Attorneys for Defendant City of Portland*

**DATED** this 7th day of June 2021

        s/  Franz Bruggemeier

CERTIFICATE OF SERVICE

Exhibit 24
Decl of Moede

**Jesse Merrithew**, OSB No. 074564
Email: jesse@lmhlegal.com
**Viktoria Lo**, OSB No. 175487
Email: viktoria@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241

**Juan C. Chavez**, OSB No. 136428
Email: jchavez@ojrc.info
**Alex Meggitt**, OSB No. 174131
Email: ameggitt@ojrc.info
**Franz H. Bruggemeier**, OSB No. 163533
Email: fbruggemeier@ojrc.info
PO Box 5248
Portland, OR 97208
Telephone: 503 944-2270
Oregon Justice Resource Center

**J. Ashlee Albies**, OSB No. 051846
Email: ashlee@albiesstark.com
**Whitney B. Stark**, OSB No. 090350
Email: whitney@albiesstark.com
**Maya Rinta**, OSB No. 195058
Email: maya@albiesstark.com
Albies & Stark LLC
1 SW Columbia St. Suite 1850
Portland, Oregon 97204
Telephone: (503) 308-4770

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **DON'T SHOOT PORTLAND**, et al., | **CASE NO. 3:20-CV-00917-HZ** |
| Plaintiffs | |
| v. | **PLAINTIFF DON'T SHOOT PORTLAND'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES** |
| **CITY OF PORTLAND**, a municipal corporation, | |
| Defendant. | |

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff Don't Shoot Portland by and through its attorneys, serves its responses to Defendant City of Portland's First Set of Interrogatories to Plaintiff Don't Shoot Portland.

Page 1 – PLAINTIFF DON'T SHOOT PORTLAND'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 25
Decl of Moede

**GENERAL OBJECTIONS**

1.  Plaintiff objects to Defendant's definitions, instructions, and interrogatories to the extent they seek to expand of alter obligations beyond those required by the Federal Rules of Civil Procedure or to any reference to a definition not contained within the Interrogatory or the preamble. Only terms actually used in the Interrogatory may be defined. LR 33-1(c).

2.  Plaintiff objects to any definition, instruction, or interrogatory that seeks information protected from discovery by the attorney-client privilege, the privilege applicable to work product or trial preparation material, or any other privilege or authority.

3.  Plaintiff makes these responses and objections without prejudice and with a reservation of all of its rights to amend, clarify, or modify their objections and responses as further information becomes available during the course of discovery.

4.  Plaintiff objects to these Interrogatories to the extent it requires Plaintiff to answer on behalf of third parties. Plaintiff also objects on the basis that the information requested is outside the scope of discovery because the request is not proportional to the needs of the case in light of Defendant's relative access to relevant information, its resources, the importance of the discovery in resolving the issues, and because the burden and expense of the proposed discovery outweighs its likely benefit.

5.  Plaintiff also objects to the extent the requests are duplicative, and the information is equally available to Defendant.

6.  Each of these general objections is incorporated into each of Plaintiff's specific responses as if they were set forth in full below.

Exhibit 25
Decl of Moede

## INTERROGATORY RESPONSES

**REQUEST NO. 1:** The Third Amended Complaint purports to be a class action, with the class defined as "all individuals who currently or who will in the future engage in protest activities that follow the death of George Floyd opposing police violence and white supremacy. This includes protesters who engage in passive resistance to the orders of police, but does not those who engage in conduct beyond passive resistance." (Am. Compl. ¶ 44).  Identify any sub-classes in this class action.

**RESPONSE:** *See* **Fourth Amended Complaint.**

**REQUEST NO. 2:** Identify any class or sub-class for which you are a representative.

**RESPONSE: Don't Shoot Portland is not a class representative.**

**REQUEST NO. 3:** Identify, by date, time, and description, the events giving rise to each of your claims against the City.

**RESPONSE: Objection, overly broad and unduly burdensome, given the 100 plus nights of protests in Portland in 2020. In general, see Fourth Amended Complaint, and Plaintiff Don't Shoot Portland responds that the PPB's increasing and excessive use of force on protestors engaged in passive resistance, including PPB deployment of tear gas, pepper spray, and impact weapons, from May 25, 2020 to November 15, 2020 in downtown Portland and in North Portland are the basis for Plaintiff's claims against the City.**

**REQUEST NO. 4:** Estimate the number of persons in each class or sub-class for which you are a representative.

**RESPONSE: Plaintiff Don't Shoot Portland is not a class representative.**

**REQUEST NO. 5:** Identify all common questions of law for each class or sub-class for which you are a representative.

**RESPONSE: Plaintiff Don't Shoot Portland is not a class representative.**

**REQUEST NO. 6:** Identify all common facts for each class or sub-class for which you

Exhibit 25
Decl of Moede

are a representative.

     **RESPONSE: Plaintiff Don't Shoot Portland is not a class representative.**

     **REQUEST NO. 7:** Identify all of your claims that you believe are typical of the claims for each class or sub-class for which you are a representative.

     **RESPONSE: Plaintiff Don't Shoot Portland is not a class representative.**

     **REQUEST NO. 8:** For any class or sub-class for which you are not a representative, identify the representative parties for that class or sub-class.

     **RESPONSE: Plaintiff Don't Shoot Portland is not a class representative.**

     **REQUEST NO. 9:** Describe how the City, through PPB, has acted in a manner that applies generally to the members of the class or sub-class that you represent.

     **RESPONSE: Plaintiff Don't Shoot Portland is not a class representative. Notwithstanding this objection, PPB's use of force and intimidation tactics physically harmed and interfered with the  First Amendment rights of all class and subclasses members involved.**

     **REQUEST NO. 10:** Describe any injunctive relief that you seek on behalf of the class or sub-classes that you represent.

     **RESPONSE: Plaintiff Don't Shoot Portland is not a class representative.**

     **REQUEST NO. 11:** To the extent you denied any of Admissions 1-3, identify and describe all economic and non-economic harm for which you seek damages.

     **RESPONSE: Plaintiff Don't Shoot Portland does not seek economic and non-economic damages for the extensive harm the City has caused it and other community members at this time, but does not waive its right to do so in the future.**

     **REQUEST NO. 12:** Identify the date and location of every instance in which you have been harmed, including harm to plaintiff's property, by "tear gas" deployed by an employee or agent of the City of Portland.

Exhibit 25
Decl of Moede

**RESPONSE: Don't Shoot Portland objects as vague, overly broad, unduly burdensome. Notwithstanding these objections and subject to them, Don't Shoot Portland responds as follows: Plaintiff Don't Shoot Portland's board members and volunteers provided PPE equipment and medical support to demonstrators during the 2020 summer protests including but not limited to May 31, June, 1, June 2, June 3, in downtown Portland in front of the Justice Center.**

**REQUEST NO. 13:** Identify the date and location of every instance in which you have been harmed, including harm to plaintiff's property, by an FN303 munition deployed by an employee or agent of the City of Portland.

**RESPONSE: Don't Shoot Portland objects as vague, overly broad, unduly burdensome. Notwithstanding these objections and subject to them, Don't Shoot Portland responds that Don't Shoot Portland's volunteers and board members witnessed PPB use FN303 munitions often from May 31 to November of 2020 in downtown Portland.**

**REQUEST NO. 14:** Identify the date and location of every instance in which you have been harmed, including harm to plaintiff's property, by a 40mm munition deployed by an employee or agent of the City of Portland.

**RESPONSE: Don't Shoot Portland objects as vague, overly broad, unduly burdensome. Notwithstanding these objections and subject to them, Don't Shoot Portland responds that Don't Shoot Portland's volunteers and board members witnessed PPB use 40mm munitions often from May 31 to November of 2020 in downtown Portland.**

**REQUEST NO. 15:** Identify the date and location of every instance in which you have been harmed, including harm to plaintiff's property, by an RBDD deployed by an employee or agent of the City of Portland.

**RESPONSE: Don't Shoot Portland objects as vague, overly broad, unduly burdensome. Notwithstanding these objections and subject to them, Don't Shoot Portland**

Page  5  –  PLAINTIFF DON'T SHOOT PORTLAND'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF INTERROGATORIES

Exhibit 25
Decl of Moede

**responds that Don't Shoot Portland's volunteers and board members witnessed PPB use RBDD munitions several times from May 31 to November of 2020 in downtown Portland.**

REQUEST NO. 16: Identify the date and location of every instance in which you have been harmed, including harm to plaintiff's property, by a Long Range Acoustical Device deployed by an employee or agent of the City of Portland.

**RESPONSE: Don't Shoot Portland objects as vague, overly broad, unduly burdensome. Notwithstanding these objections and subject to them, Don't Shoot Portland responds that Don't Shoot Portland's volunteers and board members witnessed PPB use a Long Range Acoustical Device often from May 31 to November of 2020 in downtown Portland.**

**REQUEST NO. 17:** Identify the date and location of every instance in which you have been harmed, including harm to plaintiff's property, by OC spray (pepper spray) deployed by an employee or agent of the City of Portland.

**RESPONSE: Don't Shoot Portland objects as vague, overly broad, unduly burdensome. Notwithstanding these objections and subject to them, Don't Shoot Portland responds as follows: Plaintiff Don't Shoot Portland's board members and volunteers provided PPE equipment and medical support to demonstrators during the 2020 summer protests including but not limited to May 31, all though June, July, and August of 2020 in downtown Portland in front of the Justice Center.**

REQUEST NO. 17: Identify the date and location of every protest that you or your board members, officers, members or volunteers, have attended in the City from May 25, 2020 to present.

**RESPONSE: Don't Shoot Portland objects as overly broad, unduly burdensome. Notwithstanding these objections and subject to them, Don't Shoot Portland responds as follows: Don't Shoot Portland's volunteers and Board members attended protests from the**

Exhibit 25
Decl of Moede

**end of May to August 2020.**


       Dated: June 7, 2021.

                    *s/J. Ashlee Albies*
                    **J. Ashlee Albies**, OSB No. 051846
                    **Whitney B. Stark**, OSB No. 090350
                    **Maya Rinta**, OSB No. 195058
                    Albies & Stark LLC

                    **Jesse Merrithew**, OSB No. 074564
                    **Viktoria Safarian**, OSB No. 175487
                    Levi Merrithew Horst PC

                    **Juan C. Chavez**, OSB No. 136428
                    **Brittney Plesser**, OSB No. 154030
                    **Alex Meggitt**, OSB No. 174131
                    **Franz H. Bruggemeier**, OSB No. 163533
                    Oregon Justice Resource Center
                    **Attorneys for Plaintiffs**

Exhibit 25
Decl of Moede

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **PLAINTIFF DON'T SHOOT**

**PORTLAND'S RESPONSE TO DEFENDANT CITY OF PORTLAND'S FIRST SET OF**

**INTERROGATORIES**  via E-mail on the parties listed below.

      J. SCOTT MOEDE, OSB 934816
      Chief Deputy City Attorney
      scott.moede@portlandoregon.gov
      NAOMI SHEFFIELD, OSB 170601
      Deputy City Attorney
      naomi.sheffield@portlandoregon.gov
      ROBERT YAMACHIKA, OSB 065560
      Senior Deputy City Attorney
      rob.yamachika@portlandoregon.gov
      Portland City Attorney's Office
      1221 SW 4th Ave., Rm. 430 Portland, OR 97204
      Facsimile: (503) 823-3089
      *Of Attorneys for Defendant City of Portland*

**DATED** this 7th day of June 2021

s/__ J. Ashlee Albies_____

CERTIFICATE OF SERVICE

Exhibit 25
Decl of Moede