IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DON'T SHOOT PORTLAND, a nonprofit
corporation, in its individual capacity;
NICHOLAS J. ROBERTS, in an individual
capacity and on behalf of themselves and all
others similarly situated; MICHELLE
"MISHA" BELDEN, in an individual capacity
and on behalf of themselves and all others
similarly situated; ALEXANDRA
JOHNSON, in an individual capacity and on
behalf of themselves and all others similarly
situated; THOMAS DREIER, in an individual
capacity and on behalf of themselves and
all other similarly situated; and LESTER
WRECKSIE, in an individual capacity and on
behalf of themselves and all others similarly
situated,

No. 3:20-cv-00917-HZ

OPINION & ORDER

                         Plaintiffs,

    v.

CITY OF PORTLAND, a municipal
corporation,

                         Defendant.

Jesse Merrithew
Viktoria Lo
LEVI MERRITHEW HORST PC
610 SW Alder Street, Suite 415
Portland, OR 97205

Juan Chavez
Brittney Plesser
Alexander Meggitt
Franz H. Bruggemeier
OREGON JUSTICE RESOURCE CENTER
PO Box 5248
Portland, OR 97208

J. Ashlee Albies
Whitney B. Stark
Maya Rinta
ALBIES & STARK LLC
1 SW Columbia Street, Suite 1850
Portland, OR 97204

      Attorneys for Plaintiffs

J. Scott Moede
Naomi Sheffield
Robert T. Yamachika
PORTLAND CITY ATTORNEY'S OFFICE
1221 SW Fourth Avenue, Room 430
Portland, OR 97204

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      Plaintiffs Don't Shoot Portland, Nicholas Roberts, Michelle "Misha" Belden, Alexandra Johnson, Lester Wrecksie, and Thomas Drier, on behalf of themselves and all others similarly situated, bring this case against Defendant City of Portland. Compl., ECF 1; Fourth Am. Compl. ("FAC"), ECF 186. Plaintiffs allege that Defendant violated the First and Fourth Amendments through the Portland Police Bureau's use of less lethal force during the 2020 Portland protests.

      On June 9, 2020, the Court issued a Temporary Restraining Order barring the use of tear gas by Defendant City of Portland except in situations in which the lives or safety of the public or the police are at risk. TRO, ECF 29. Based on the stipulation of the parties, the Court further restrained Defendant City of Portland's use of less lethal munitions on June 26, 2020. Stip.

Add'tl TRO, ECF 43. On November 27, 2020, the Court found Defendant in contempt of the parties' Stipulated Additional Temporary Restraining Order, and on March 16, 2021, ordered sanctions to achieve compliance with the Order.

Now, after conducting limited class discovery over the past year, Plaintiffs move for class certification. For the reasons that follow, the Court denies Plaintiffs' motion.

## BACKGROUND

### I.    Factual Background

After the murder of George Floyd by a Minneapolis police officer, thousands of people took to the streets across the United States to protest police brutality and call for reform. Protests began in Portland on May 29, 2020, and continued almost daily through November 15, 2020. Portlanders gathered in parks and in front of courthouses and police buildings. They marched throughout the city.

From the beginning of the protests, Defendant's response frequently involved the use of force. Portland Police Bureau ("PPB") Rapid Response Team ("RRT") officers physically pushed protestors with batons and used targeted less lethal weapons, including OC spray, FN303s, and 40mm less lethal launchers against individuals. PPB authorized the use of indiscriminate force, including CS gas, rubber ball distraction devices ("RBDDs"), and flash bangs.[1] The U.S. Department of Justice has estimated that force was used over 6,000 times during Portland protests. Albies Decl. Ex. 70 at 5, ECF 255.

---

[1] These less lethal weapons have a variety of names. For example, CS gas is commonly referred to as tear gas and OC spray as pepper spray. Rubber bullets are used in 40mm launchers, and rounds called "40mm bullets" are 40mm less lethal rounds in this context. The Court uses these terms interchangeably throughout this Opinion.

On May 29, 2020—the first evening of protests in Portland—individuals gathered at Peninsula Park in Northeast Portland and outside of the Pioneer Courthouse and the Justice Center in downtown Portland. Protests began peacefully. Dobson PI Decl. ¶ 34, ECF 105. But in the evening, protests became chaotic, and some individuals in the protests engaged in dangerous activity. *See* Roberts Decl. ¶ 12, ECF 277 ("It was a chaotic scene, and I joined a group of protestors in front of a line of police officers with their hands up, peacefully protesting."); Dobson PI Decl. ¶¶ 34–35 (individuals engaged in acts of vandalism during the protest and a gun was fired after an individual drove his car into a march). Flares were thrown into the Justice Center after the protest was declared an unlawful assembly, starting a fire in the building that houses the Multnomah County Detention Center. Dobson PI Decl. ¶ 36. PPB deployed tear gas. *Id.* ¶ 37.

On May 30, 2020, protestors again gathered near the Justice Center. Plaintiff Roberts describes listening to speakers taking a stand against police brutality and peacefully protesting with a large crowd when he was tear gassed and hit with RBDDs. Roberts Decl. ¶ 13. PPB officers describe using tear gas and other less lethal weapons after protestors began throwing objects and attempting to scale a newly erected fence around the Justice Center. Dobson PI Decl. ¶¶ 40–43. In Force Data Collection Reports ("FDCRs"), officers also described deploying CS gas and smoke to the rear of the crowd to prevent them from pushing back towards officers. Albies Decl. Ex. 29 at 3. Another officer describes using RBDDs on a crowd of individuals running away in order to disperse them. *Id.* at Ex. 30 at 3.

On May 31, 2020, protests were held in different locations throughout the city, again with varying police response. Earlier in the day, PPB facilitated a large march that began at Laurelhurst Park on Portland's east side and remained peaceful. Dobson PI Decl. ¶¶ 48–50. Later

that day, after protestors began throwing objects at the police, PPB used tear gas against the crowd. *Id.* ¶¶ 48, 51; Albies Decl. Ex. 31 at 4.

On June 1, 2020, thousands of people marched and protested. Dobson Decl. ¶ 9, ECF 292. PPB monitored the protests, and for most of the day protests remained peaceful. *Id.* Later in the evening, however, individuals threw projectiles at officers, and PPB arrested individuals engaged in unlawful conduct. *Id.* PPB also deployed less lethal force and smoke that evening. *Id.*

On June 2, 2020, a group of protestors peacefully marched downtown from Revolution Hall, stopping on the Burnside Bridge to lie down. Dobson PI Decl. ¶ 63. Later that evening, protestors also gathered in front of the Justice Center. Protestors recall being subjected to tear gas, pushed with batons, and targeted with RBDDs that evening. Moede Decl. Ex. 11 (Roberts Dep.) 32:01–33:16, ECF 291; Moede Decl. Ex. 9 (Belden Dep.) 67:15–68:16. Plaintiffs described peacefully protesting before being subjected to force. *See* Belden Decl. ¶ 2, ECF 283; Roberts Decl. ¶ 14. But according to police, protestors attempted to breach the fence around the Justice Center and threw items like fireworks, glass bottles, and baseball bats. Dobson PI Decl. ¶¶ 64–65. One officer stated that the plan had been to move the protestors away from the peaceful protest at nearby Pioneer Square so that it could continue without officer intervention. Albies Decl. Ex. 28 at 14. A sound truck warned the crowd to move, but the announcement led to an increase in the number of objects thrown at the police. *Id.* Officers ultimately used many canisters of tear gas and smoke as they advanced toward the crowd to move protestors west. *Id.*; Bruggemeier Decl. ¶ 4, Ex. A, ECF 257.

In the months that followed, protests continued. Some protests proceeded without police intervention. *See, e.g.*, Dobson Decl. ¶¶ 11, 32, 41, 56, 59–60. But confrontations between protestors and police were frequent, and the parties' evidence reveals night after night of chaos.

PPB details the use of force against protestors throwing objects, shining lasers into officers' eyes, barricading doors, setting fires, and tearing down fences. *See* Dobson Decl. But Plaintiffs provide evidence of the use of force against protestors complying with police commands or engaged in passive resistance. *See, e.g.* Bezdek Decl. ¶¶ 10, 11 (tear gas used against protestors who were not engaged in conduct beyond passive resistance), ECF 4; Winders Decl. ¶ 13 (tear gas used against protestor complying with police instructions to disperse), ECF 13; Wilbanks Decl. ¶¶ 9, 14 (RBDD and tear gas used against protestor complying with police instructions), ECF 12; Garlick Decl. ¶¶ 13–14 (40mm impact munition used against crowd), ECF 50; O'Connell Decl. ¶ 9 (subjected to batons while in retreat), ECF 69; Tupper Decl. ¶¶ 6–10 (pepper sprayed in the face while trying to leave protest), ECF 260; Margolin Decl. ¶ 11 (FN303s used indiscriminately), ECF 267. Significant injuries were caused by these munitions. *See, e.g.*, Khalsa Decl. ¶¶ 6, 16–20, ECF 7; Ficklin ¶¶ 3–10, ECF 258; Drier Decl. ¶ 16, ECF 284.

## II.    PPB Use of Force Policies

PPB Directives 1010 and 635.10 govern the use of force. *See* Am. Sheffield Decl. Exs. 20–21 (PPB Directives 1010 and 635.10), ECF 141-1. Directive 1010 requires that "members shall only use force that is objectively reasonable under the totality of the circumstances[,] . . . balanc[ing] the individuals' Fourth Amendment rights against the government interest." Am. Sheffield Decl. Ex. 21 ("PPB Dir. 1010") ¶ 5.1. "Members must individually justify each independent application of force." *Id.* ¶ 5.4.1. Directive 1010 generally prohibits the use of force "against people who engage in passive resistance that does not impede a lawful objective" and clarifies that "[p]hysically moving a subject engaged in passive resistance is permitted when it is necessary and objectively reasonable." *Id.* ¶ 4.1.

Directive 1010 allows the use of "less lethal force" under certain circumstances. *Id.* ¶ 6. Impact weapons—like batons—can be used in response to active aggression on certain parts of the body. *Id.* ¶ 6.4.1.1.1. Impact munitions like FN303s, by comparison, can be used:

> 6.4.2.1.1. In response to active aggression;
>
> 6.4.2.1.2. To prevent suicide or immediate physical harm when reasonable in light of available options;
>
> 6.4.2.1.3. To avoid the use of a higher level of force; or,
>
> 6.4.2.1.4. To effect the capture or prevent the escape of a subject when the member reasonable believes the subject presents an immediate risk of physical injury to the public, members or themselves, or the escape of the subject presents a significant danger to the public, members or themselves. Mere flight from an officer is not sufficient cause for the use of impact munitions.

*Id.* ¶ 6.4.2.1. Aerosol restraints such as OC spray are permitted when a person "engages in physical resistance or indicates the intent to engage in physical resistance."[2] *Id.* ¶ 6.4.3.2.1.

Riot control agents or area impact munitions—which include CS gas and RBDDs—are permitted for use in crowd control under the direction of a Crowd Management Incident Commander when the event is declared a civil disturbance under Directive 635.10. *Id.* ¶ 6.4.6.1.1. These munitions may also be used to stop or disrupt a group of individuals "committing a crime or about to commit a crime, when other more discriminate methods are not feasible or reasonable, and uninvolved parties are unlikely to be subjected to the use of force;" when a person "engages in physical resistance or indicates the intent to engage in physical

---

[2] Directive 1010 defines "physical resistance" as "[a] person's physical attempt to evade a member's control that does not rise to the level of active aggression." "Passive Resistance" is defined as "[a] person's non-cooperation with a member that does not involve violence or other active conduct by the individual." And "active aggression" is defined as "[a] threat or overt act of an assault (through physical or verbal means), coupled with the present ability to carry out the threat or assault, which reasonably indicates that an assault or injury to any person is about to happen, unless intervention occurs." *See* PPB Dir. 1010 (Definitions).

resistance;" and "[i]n exigent circumstances to defend the member or others from physical injury when other, more discriminate methods of applying force are not feasible and uninvolved parties are unlikely to be subjected to the use of force." *Id.* ¶ 6.4.6.1. A "civil disturbance" is "[a]n unlawful assembly that constitutes a clear and present danger of riot, disorder, interference with traffic upon the public streets, or when another immediate threat to public safety, peace or order appears." Am. Sheffield Decl. Ex. 20 ("PPB Directive 635.10") (Definitions). Prior to taking any police action to disperse the crowd, PPB must issue at least "two warnings at reasonable intervals to allow the crowd to comply." *Id.* ¶ 9.1.2. If the crowd does not heed the warnings and there are no reasonable alternatives, "riot control agents (RCAs) and/or special impact munitions may be deployed to prevent violence, injury or property damage and to avoid greater applications of force." *Id.* ¶ 9.2. After incident command authorizes their use, individual officers are required to conduct their own *Graham* analysis before deployment of riot control agents. PPB Dir. 1010 ¶¶ 5, 6.4.6.1; Merrithew Decl. Ex. 4 ("Schoening Dep.") 66:16–68:15, ECF 253; Merrithew Decl. Ex. 3 ("Dobson Dep.") 62:15–63:19.

Two additional city policies governing the use of tear gas during protests were issued during the pendency of this litigation. In June 2020, Portland Mayor Ted Wheeler—who also serves as the City's police commissioner—issued a directive barring the use of tear gas "unless there is a serious and immediate threat to life safety, and there is no other viable alternative for dispersal." Dobson TRO Decl. ¶ 13, ECF 19. Tear gas could not be used to "disperse crowds of non-violent protestors or for general crowd management purposes." *Id.* In September 2020, Mayor Wheeler further restricted the use of tear gas, requiring authorization from him or his designee before use and limiting its use to instances where there is "an immediate risk of death

or serious physical injury which cannot otherwise be safely addressed without greater application of force." Dobson Decl. ¶ 66.

This Court has also limited PPB's use of tear gas and less lethal munitions. In its June 9, 2020 Temporary Restraining Order, the Court limited PPB's use of tear gas to situations "in which the lives or safety of the public or the police is at risk" and restricted PPB from using tear gas "to disperse crowds where there is no or little risk of injury." TRO 8–9. In the June 26, 2020 Stipulated Additional Temporary Restraining Order, the Court limited PPB's use of FN303s and 40mm less lethal launchers "as outlined in PPB Use of Force Directive 1010" and prohibited its use "where people engaged in passive resistance are likely to be subjected to force." Stip. TRO 2. RBDDs were limited to "situations in which the lives or safety of the public or the police are at risk" and were not to be "used to disperse crowds where there is no or little risk of injury." *Id.* Finally, the Court restricted the use of aerosol restraints like OC spray, prohibiting its use against persons engaged in passive resistance and requiring that members minimize exposure to non-targeted persons. *Id.* Passive resistance was defined as "a person's non-cooperation with a member that does not involve violence or other active conduct by the individual." *Id.*

### III.    Training, Incident Review & Discipline

Following any use of force, PPB officers must file a Force Data Collection Report ("FDCR") before the end of their shift. Merrithew Decl. Ex. 1 ("Resch Dep.") 20:2–16. The FDCR must detail the time, location, type of force used, and legal justification for the use of force. *Id.* at 20:17–21:03. Officers also report their use of force to a supervisor so that they can initiate an investigation. *Id.* at 22:23–23:06. The supervisor then writes an After Action Report ("AAR") within 72 hours of the use of force, which is reviewed to determine if the AAR filer followed Directive 1010. PPB Dir. 1010 ¶ 13. These requirements apply even in the crowd-

control setting. Resch Dep. 24:7–15. According to Defendant, accurate and timely FDCRs and AARs are essential to determining whether force was compliant with City policy and training because without accurate data the City may not be able to address training and discipline problems. *Id.* at 49:14–20, 54:24–55:17; Merrithew Decl. Ex. 5 ("Bell Dep.") 161:1–20.

During June and July 2020, the City had a backlog of FDCRs and AARs, allegedly because completing the FDCR and AAR process was difficult given the amount of force used by PPB during this time and the fatigue experienced by officers in responding to daily protests. Merrithew Decl. Ex. 2 ("Simon Dep.") 11:19–13:7; Resch Dep. 31:2–10; Albies Decl. Ex. 73 at 15. As a result, supervisors were not able to catch errors and cross reference uses of force in FDCRs. Resch Dep. 32:1–10; Albies Decl. Ex. 73 at 15. Further, many FDCRs and AARs that were submitted contained "insufficient data," Simon Dep. 12:19–14:13, and missing FDCR's posed the "most important issue" in May and June of 2020, *id.* at 21:01–07; Albies Ex. 74.

PPB's Employee Information System ("EIS") also "compiles information from different sources so that PPB can review an officer's work performance." Merrithew Decl. Ex. 7 ("Snider Dep.") 18:17–19:25. It can track the amount of force used by a particular officer in numbers, in comparison to arrests, and compared to other members, allowing the system to trigger an alert when an officer reaches a certain threshold in their use of force. *Id.* at 33:12–24, 39:18–40:04, 40:23–41:10. Before July 2020, however, EIS only counted each FDCR as one use of force regardless of how many times force was used on a particular night. *Id.* at 110:01–07, 37:20–38:18.

Two different entities are responsible for discipline and oversight of PPB officers. The Independent Police Review ("IPR") is the City's oversight agency housed in the Auditor's Office. Bell Dep. 32:23–33:05. Internal Affairs ("IA") is the administrative investigatory

department of PPB. *Id.* Investigations are initiated in various ways, including referrals by bureau members, complaints from community members, news stories, tort claims, and legal actions. *Id*. at 27:00–14. IPR decides whether to send the case to IA for investigation or conduct the investigation internally. *Id*. at 40:03–15. After the investigation is complete, the investigator makes a recommendation, which is reviewed by the IPR chain of command, the reporting unit manager, and then the IA captain to make proposed findings. *Id*. at 50:04–51:20. Findings of investigations include "unfounded," "exonerated," "not sustained," or "sustained." *Id.* at 51:16–20. Cases can also be administratively closed when IPR cannot make a finding based on the initial information it has. Merrithew Decl. Ex. 6 ("Caldwell Dep.") 29:11–24, 29:12–22. For example, a case may be administratively closed when they are unable to identify an involved officer. *Id.*

During the 2020 protests, the City's IPR received 107 complaints about the use of force. Bell Dep. 61:01–62:01; Albies Decl. Ex. 75. The City's response to these complaints has been opaque. Thirty-three cases involving the use of force during protests were administratively closed, Caldwell Dep. 17:16–18:01, largely because IPR could not identify the officer in question, *id*. at 22:15–18. Ten of these cases were dismissed for no misconduct (i.e. there was no violation even if the allegations were true), nine lacked merit, six lacked an available complainant, five did not involve PPB officers, one was an unidentified employee, one involved "other judicial remedy," and one had a third-party complaint. Albies Decl. Ex. 75. Defendant submits evidence that at least a handful of 2020 investigations ended with "sustained findings for force allegations" and that there are other claims that remain open, including one investigation involving the incidents in which this Court found the City in contempt. Bell Decl. ¶¶ 2–6, ECF 293. But, notably, for two of the three incidents for which this Court found Plaintiffs had

demonstrated by clear and convincing evidence Defendant had violated this Court's Order—which incorporates the City's use of force directives—the City has determined that there was no violation. *See* Bell Dep. 72:05–17, 19:23–98:21, 99:1–103:8, 111:19–112:13, 124:4–130:9; Bell Decl. ¶ 4.

An officer's ability to articulate their use of force was a key component of officer training. *See, e.g.*, Schoening Dep. 44:0–45:20, 54:02–55:02, 82:12–83:11. However, RRT grenadiers were given incorrect training on the constitutional standard for the use of force against passively resisting protestors. *Id.* at 38:11–41:22; Albies Ex. 72. In addition, 2018 training materials for new RRT members ended with a slide glorifying violence against left wing protestors. Schoening Dep. 92:21–94:18; Albies Decl. Ex. 27.

## IV.    Class Representatives

Plaintiff proposes five class representatives: Nicholas Roberts, Michelle "Misha" Belden, Alexandra Johnson, Lester Wrecksie, and Thomas Dreier.

### A.    Nicholas Roberts

Plaintiff Nicholas Roberts attended protests in Portland from May through August 2020. Roberts Decl. ¶¶ 5. He claims he did not engage in anything beyond passive resistance but was subject to indiscriminate and less lethal munitions. *Id.* ¶ 10. His experiences at the protests were terrifying and have made him fearful of protesting and gathering in large crowds. *Id.* ¶ 23.

On May 29, Roberts joined a protest at the Justice Center, standing in front of a line of police officers with his hands up. *Id.* ¶ 12. PPB used tear gas against the crowd, causing him debilitating pain, blurred vision, and coughing while he was trapped between officers and the tear gas, unable to find a way out. *Id.* He also witnessed police shoot 40mm weapons at protestors running away, hitting people in the back. *Id.*

The next evening, Roberts attended a protest at Chapman Square. *Id*. ¶ 13. He peacefully protesting when PPB deployed tear gas against the crowd. *Id.* He also believes PPB threw RBDDs at protestors' feet because he could feel a booming and rattling physical sensation in his entire body. *Id.*

On June 2, Roberts attended a protest at Revolution Hall in Southeast Portland. While walking home that night over the Burnside Bridge, he heard loud bangs and police sirens from Pioneer Square in downtown. *Id*. ¶ 14. He went to see if he could help and joined a Black man peacefully protesting in front of a line of police. *Id.* Police began to push Roberts and others out of the square with their batons, and they deployed tear gas and RBDDs to clear the area. *Id.* Roberts was likely subjected to an RBDD when he was hit with what felt like shrapnel. *Id.*

On June 5, Roberts attended another protest in Chapman Square. *Id*. ¶ 15. After the crowd was given a dispersal order, Roberts remained in the square, passively resisting the orders of police. *Id.* PPB deployed tear gas. *Id.*

Roberts was similarly met with tear gas and RBDDs on June 7 and 26 while engaging in similar behavior. *Id.* And on July 3 in Chapman Square, Roberts was peacefully protesting when PPB deployed tear gas, RBDDs, rubber bullets, and smoke grenades. *Id*. ¶ 16. That evening, he was also pushed by police into a streetcar near Pioneer Square when officers charged the crowd, and he was shot in the leg with a rubber bullet when he tried to help two people up off the ground. *Id.* He continued to try to help people get out of the street when PPB deployed a flash grenade that rattled his chest and caused excruciating head pain. *Id.* And when Roberts moved to throw a tear gas canister away from protestors and police, PPB shot him in the hand with rubber bullets. *Id.*

In August, Roberts attended three protests. On August 21, police deployed tear gas and bull rushed the crowd with shoves and batons. *Id.* ¶ 18. On August 22, as protestors were going to the Justice Center after engaging in a counterprotest, PPB fired FN303s above the crowd of protestors, causing pepper balls to rain down on people. *Id.* ¶ 19. Roberts was struck on the arm by a munition. *Id.* He also protested in Northeast Portland that evening, where PPB deployed tear gas and again bull rushed the crowd with baton and shield shoves. *Id.* On August 28, he was also impacted by tear gas even though he hung further back in the crowd to help others. *Id.* ¶ 20. Over the course of the summer, Roberts "attended several other protests, with largely the same experience of tear gas, RBDDs, and impact munitions." *Id.* ¶ 21.

B.    Mischa Belden

Plaintiff Mischa Belden attended their first protest on May 29, 2020, and continued to occasionally attend protests through September 5, 2020. Belden Decl. ¶¶ 5, 10. During these protests, Belden was tear gassed most evenings they protested even though their conduct never rose above "passive resistance." *Id.* ¶¶ 11–12. These experiences made them fearful of attending future protests. *Id.* ¶¶ 13–14.

On June 2, for example, Belden was protesting with a peaceful crowd near a fence by the Hatfield Federal Courthouse in downtown Portland. *Id.* ¶ 15. Police—without warning—launched tear gas and explosives into the crowd, one of which went off right next to Belden. *Id.* Tear gas was used against the crowd as they tried to get away. *Id.* Similarly, on June 9, 10, and 12, Belden witnessed PPB firing flashbangs and tear gas into a peaceful crowd. *Id.* ¶¶ 16–18. And on August 10, in Northeast Portland, PPB deployed chemical munitions against protestors. *Id.* ¶ 19.

///

C.     Alexandra Johnson

Plaintiff Alexandra Johnson attended between 45 and 65 protests in 2020. Johnson Decl.

¶ 5, ECF 276. She attended her first protest on May 31, 2020, *id.* ¶ 5, but the first incident where

she was exposed to tear gas by PPB was on June 5 outside of the Justice Center in downtown

Portland, *id.* ¶ 14. That evening, she was exposed to tear gas when PPB fired canisters into a

crowd at Chapman Square, at the intersection of Third and Main, and on Madison between Third

and Fourth Avenues. *Id.* ¶¶ 14–16. One of the canisters hit her in the chest and exploded at her

feet. *Id.* ¶ 16.

On June 6, 10, 12, and 27, and July 4, Johnson attended protests outside the Justice

Center. On June 6, she witnessed a flashbang explode just underneath a protestor's feet,

triggering a panic attack. *Id.* ¶ 18. On June 10, she witnessed officers shooting FN303s at

protestors on the other side of a fence, including one that exploded against a protestor near her—

its fragments hitting Johnson's face. *Id.* ¶ 19. She was also exposed to several flashbangs. *Id.* On

June 12, she was tackled by officers and hit in the back of her legs with a baton when she was

moving away from officers, pursuant to their orders. *Id.* ¶ 20. On June 27, she was hit with an

FN303 projectile and felt ricochets from other FN303 projectiles used against other protestors.

*Id.* ¶ 21. She also witnessed force used against other protestors. *Id.* ¶¶ 21–23. On July 4, Johnson

attended another Justice Center protest where PPB used tear gas. *Id.* ¶ 24.

On August 1, Johnson attended a protest at the Penumbra Kelly Building. She witnessed

force being used against protestors, and she was shoved to the ground when she tried to help

another protestor. *Id.* ¶ 25. She attended many other protests in August, where she says she

witnessed additional incidents of indiscriminate force. *Id.* ¶¶ 25–31.

On September 5, Johnson went to a protest near Ventura Park in East Portland, which included a march to a nearby police precinct that was quickly declared an unlawful assembly. *Id.* ¶ 32. She had not seen any violence or objects thrown at officers, but PPB deployed 20 to 30 tear gas canisters into the crowd of protestors shortly after their announcement. *Id.*

D.    Lester Wrecksie

Plaintiff Lester Wrecksie attended multiple protests after the killing of George Floyd. Wrecksie Decl. ¶¶ 6, 12, ECF 282. Wrecksie attended most of the nightly protests in June 2020, occasionally carrying protest signs or an umbrella with messages like "Black Lives Matter," "Free Palestine/End Apartheid," "Fuck 12," "Melt ICE," and "ACAB." *Id.* ¶ 13. He never threw anything at police, lit any fires, engaged in any property destruction, or engaged in any acts beyond passive resistance. *Id.* ¶ 14. Because of his experiences, he is wary of attending another demonstration. *Id.* ¶ 37.

On June 20, Wrecksie attended a protest at the Justice Center. *Id.* ¶ 15. After PPB ordered demonstrators to move, he walked his bike down Third Avenue as instructed by police. *Id.* ¶ 16. He stopped to talk with a Black man who was seated on the ground in the middle of the street when the police deployed a flashbang grenade that hit Wrecksie and then exploded on or near him. *Id.* Wrecksie suffered a concussion and fell unconscious as a police officer took his bicycle out of his hands. *Id.* When he regained consciousness, he was being dragged by other protestors away from the police. *Id.* ¶ 18. Officers subjected Wrecksie to baton strikes, hitting him and others while yelling "move, move, move" even as the crowd was already moving. *Id.*

On June 30, Wrecksie marched—on roller skates—from Peninsula Park to the Portland Police Association. *Id.* ¶¶ 20–21. Soon after protestors arrived at the Portland Police Association building, PPB announced that the event was unlawful and ordered protestors to disperse. *Id.* ¶ 22.

Wrecksie ultimately retreated with the crowd, moving east as police advanced and pushed the crowd in that direction. *Id.* Wrecksie helped a group of individuals carry a banner as they moved, and at some point PPB yanked Wrecksie's backpack and he felt a stinging sensation in his face and eyes. *Id.* He fell, and a PPB officer shot him multiple times with FN303 munitions. *Id.* That night, Wrecksie was also subjected to PPB's use of flashbang grenades and tear gas. *Id.* ¶ 28. And on at least two other occasions in June, Wrecksie was subjected to other flashbang grenades. *Id.* ¶ 29. One hit his ankle and exploded while he was running away in compliance with police instructions. *Id.* Another flashbang bounced off his helmet. *Id.*

Wrecksie also recalls being subjected to baton strikes. *Id.* ¶ 31. Once, near the Portland Police Association building, police shoved him and others with batons to forcefully move them down a block while he and other protestors were complying with instructions to move to the sidewalk. *Id.* He experienced similar incidents at other protests, where the police hit him with batons to get him to move despite his compliance with police orders. *Id.*

Wrecksie states that he was also subjected to tear gas on other occasions in June and July 2020. *Id.* ¶ 33.

E.    Thomas Drier

Plaintiff Thomas Drier attended between 15 and 48 protests between May 25, 2020, and November 15, 2020. Drier Decl. ¶ 5, ECF 284. He did not begin protesting until a month or two after George Floyd's death. *Id.* He never threw any objects, lit fires, or graffitied property during any protest except for once "under handing" a water bottle over a fence in front of the federal courthouse. *Id.* ¶ 10.

On August 6, Drier attended a protest that ended at Ventura Park in Southeast Portland. *Id.* ¶ 11. Drier was standing on the sidewalk playing his guitar when a riot van shot a 40mm

round at him, hitting the neck of this guitar. *Id.* On August 15 and 16, 2020, Drier attended a protest that began at Laurelhurst Park and ended at the Penumbra Kelly Building. *Id.* ¶ 13. He does not recall any protestors throwing objects or any orders being issued to protestors, but officers fired a 40mm round at him. *Id.* Later that night, Drier witnessed an officer choking and shoving a protestor against the wall. *Id.* ¶ 14; Bruggemeir Decl. ¶ 22, Ex. U. Drier walked by the officer and, in protest, began playing "All You Fascists Bound to Lose" by Woody Guthrie. Drier Decl. ¶ 14. The officer then turned to Drier, ripped the guitar from his hands, and walked away with the guitar. *Id.* Dreier followed, asking for the guitar back. *Id.* Two officers ordered Drier back onto the sidewalk. He complied, but a PPB officer shot him in the thigh with a 40mm round. *Id.* Drier collapsed onto the ground. *Id.* ¶ 14.  PPB's use of force against him has impacted his mental health and caused him to miss days of protesting to recover. *Id.* ¶ 19.

## STANDARDS

Under Federal Rule of Civil Procedure 23, a suit may proceed as a class action if:

(1) [T]he class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition to satisfying the four Rule 23(a) criteria, a class action may proceed only if one of the Rule 23(b) criteria is met. Fed. R. Civ. P. 23(b). To proceed under Rule 23(b)(2), a court must find "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

A plaintiff has the burden to establish compliance with Rule 23. *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th Cir. 2014). A class may therefore be certified only if the court is "satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been

satisfied." *Hanon v. Dataproducts Corp*., 976 F.2d 497, 509 (9th Cir. 1992) (quoting *General Tel. Co. Southwest v. Falcon*, 457 U.S. 147, 161 (1982)). In determining whether these prerequisites have been satisfied, the court takes "the substantive allegations of the complaint as true." *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig*., 691 F.2d 1335, 1342 (9th Cir. 1982). However, the court must also "consider the nature and range of proof necessary to establish those allegations." *Id*. Ultimately, the decision to grant or to deny class certification is within the trial court's discretion. *Bateman v. Am. Multi–Cinema, Inc*., 623 F.3d 708, 712 (9th Cir. 2010).

## DISCUSSION

In moving for class certification, Plaintiffs have documented significant abuses by the Portland Police Bureau, described a disciplinary and oversight system unable to handle the pressure of the 2020 protests, and uncovered extreme bias and misinformation in PPB's training. These facts and the events described by protestors are deeply troubling. But the question presently before the Court is not whether Plaintiffs will succeed on the merits of their First and Fourth Amendment claims. The question is whether certification of Plaintiffs' proposed class and subclasses is appropriate in this case. The Court finds that it is not.[3]

Plaintiffs move for certification of one First Amendment class and two Fourth Amendment subclasses:[4]

> A. First Amendment Class: all people who engaged in protest activities that follow[ed] the death of George Floyd opposing police violence and white supremacy between May 25, 2020 and November 15, 2020.

---

[3] Defendant also makes various evidentiary objections in its response to Plaintiffs' motion. Because resolution of these issues is not essential to the Court's decision, the Court declines to address them.

[4] Plaintiffs' definitions are different in their motion. In their reply brief, Plaintiffs clarify that this was a "drafting error" and "direct the Court to the class definition in their Fourth Amended Complaint." Pl. Reply 8, ECF 295.

B. Indiscriminate Weapons Subclass for purposes of the Fourth Amendment claim: This is a subclass of the First Amendment Class that consists of protestors who were subjected to tear gas, "flash bang" grenades, aerial distraction devices, rubber ball distraction devices, smoke grenades, and other similar uses of force by the PPB from May 25, 2020 to November 15, 2020. This subclass includes protestors who engaged in passive resistance to the orders of police and those that attempted to comply with orders of the police, but does not include those who engaged in conduct beyond passive resistance.

C. Targeted Weapons Subclass for the purposes of the Fourth Amendment claim: This is a subclass of the First Amendment class that consists of protestors who were subjected to "less lethal weapons" (FN303 launchers, 40mm launchers, batons, aerosol restraints) while engaged in protest activities from May 25, 2020 to November 15, 2020. This subclass includes protestors who engaged in passive resistance to the orders of police and those that attempted to comply with the orders of the police, but does not include those who engaged in conduct beyond passive resistance.

FAC ¶ 90.

The crux of Plaintiffs' First and Fourth Amendment claims is Plaintiffs' allegation that Defendant has a pattern, practice, and custom of retaliating against protestors because of the content of their speech by using force against crowds indiscriminately, without individualized justification, and when a number of protestors in the crowd were engaged in only passive resistance. *See* Pl. Mot. Class Cert. 67, ECF 252. Regarding Plaintiffs' Fourth Amendment claim, Plaintiffs allege that Defendant deployed tear gas and other "less lethal" weapons indiscriminately on large crowds of passively resisting protestors and protestors who were complying with police instructions. FAC ¶ 100. Plaintiffs' First Amendment claim is broader, challenging every use of less lethal force against all protestors during the summer and fall of 2020. FAC ¶¶ 104–107; *see also* Pl. Mot. Class Cert. 67 ("The core of all of Plaintiffs' claims is that the PPB has a pattern, practice, and custom of using tactics that chill protected speech because of the content of that speech—criticisms of police generally and the PPB in particular.").

Considering Plaintiffs' claims and proposed class and subclasses, the Court finds that class certification is not appropriate in this case. Plaintiffs' classes lack commonality.[5] The analyses for both the First and Fourth Amendment claims are highly fact intensive. Plaintiffs' proposed classes include thousands of protestors engaged in a range of behaviors who have been subject to both indiscriminate and targeted force by different individuals over more than 100 nights of protests. The proposed classwide proceeding will not generate common answers apt to drive the resolution of the litigation.

Rule 23(a)(2) requires "questions of law or fact common to the class." As the Supreme Court has observed, Rule 23(a)(2) is "easy to misread, since any competently crafted class complaint literally raises common questions." *Wal-Mart v. Dukes*, 564 U.S. 338, 349 (2011) (brackets and citation omitted). Rather, this provision requires the plaintiff to "'demonstrate that the class members have suffered the same injury,' not merely violations of 'the same provision

---

[5] Because the Court finds that Plaintiffs' classes lack commonality, it declines to address the additional Rule 23 factors. The Court, however, notes that ascertainability does not appear to be a factor that courts consider in evaluating Rule 23(b)(2) classes in the Ninth Circuit, contrary to Defendants' argument. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1133 (9th Cir. 2017) ("[T]he language of Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification[.]"); *Anti Police-Terror Project v. City of Oakland*, No. 20-CV-03866-JCS, 2021 WL 4846958, at *4 (N.D. Cal. Oct. 18, 2021) ("While the Ninth Circuit has not specifically addressed ascertainability in the context of a Rule 23(b)(2) class, district courts in the Ninth Circuit that have addressed the question have found that there is no ascertainability requirement in that context."). It would, however, be difficult to determine who falls within the class definition as it encompasses only protestors who are engaged in at most passive resistance, and this term has been a point of contention throughout the litigation. For example, Plaintiff Roberts declares that he was never engaged in more than passive resistance. Roberts Decl. ¶ 10 ("During these protests, I never threw anything at police, I did not light any fires, I did not destroy or damage any property. I did not engage in anything beyond passive resistance."). He then admits to having reached for a tear gas canister at a protest with the intent to throw it. *Id.* ¶ 16 ("As I was reaching down towards a tear gas canister to throw it away from protestors and away from the police, PPB shot me in the hand with rubber bullets."). This is an action which this Court has already determined may go beyond passive resistance. *See* Opinion & Order 18–19 (concluding that picking up a smoke canister constituted a threat of assault), ECF 204.

of law.'" *Parsons v. Ryan*, 754 F.3d 657, 674–75 (9th Cir. 2014) (quoting *Wal-Mart*, 564 U.S. at

350). As a result, the plaintiff's claims "must depend upon a common contention such that

determination of their truth or falsity will resolve an issue that is central to the validity of each

one of the claims in one stroke." *Id.* (quotations and brackets omitted). "What matters to class

certification . . . is not the raising of common questions—even in droves—but, rather, the

capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of

the litigation." *Wal-Mart*, 564 U.S. at 350.

 A plaintiff "need not show . . . that 'every question in the case, or even a preponderance

of questions, is capable of class wide resolution.'" *Parsons*, 754 F.3d at 675 (quoting *Wang v.*

*Chinese Daily News*, 737 F.3d 538, 544 (9th Cir. 2013)). "[C]ommonality only requires a single

significant question of law or fact." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th

Cir. 2012), *overruled on other grounds by Olean Wholesale Grocery Coop., Inc. v. Bumble Bee*

*Foods, LLC*, 31 F.4th 651 (9th Cir. 2022).

"Commonality cannot be determined without a precise understanding of the nature of the

underlying claims." *Parsons*, 754 F.3d at 676 (citing *Amgen Inc. v. Connecticut Ret. Plans &*

*Trust Funds*, 568 U.S. 455, 465–66 (2013)). Thus, to determine "'whether the putative class

members share a common question, the answer to which will resolve an issue that is central to

the validity of each one of the [class members's] claims, we must identify the elements of the

class members's case in chief.'" *Id.* (quoting *Stockwell v. City & Cnty. of San Francisco*, 749

F.3d 1107, 1114 (2014)).

Plaintiffs propose several questions relevant to each class and subclass that they argue

demonstrate commonality. Plaintiffs, however, fail to tether their analysis to the elements of their

claims. Nor do Plaintiffs adequately demonstrate that, given their claims and the facts described,

their proposed questions would generate common answers apt to drive the resolution of the litigation. This case involves the dilemma of what type and amount of force can be used by police against protestors, particularly in situations where protestors have within their ranks individuals that threaten the safety of police officers and others. It may be difficult to resolve this issue based on the events of a single night, much less over the course of 100 nights of protest, because each night involved a variety of different protests, in different locations, and with different circumstances. When undertaking the analysis in light of the claims at issue here and the significant scope of the classes proposed, it becomes evident that class certification is improper in this case.

## I.    First Amendment Class

Plaintiffs state that "[t]he core of all of [their] claims is that the PPB has a pattern, practice, and custom of using tactics that chill protected speech because of the content of that speech" including "the use of unconstitutional force at civil rights protests since the murder of George Floyd." Pl. Mot. Class Cert. 67. Plaintiffs further assert that the PPB's "failure to train and/or discipline officers for violating the constitution, and to cease this pattern, practice, and custom, has had the effect of condoning or acquiescing to these unconstitutional practices." *Id.*; FAC ¶¶ 108–111.

The First Amendment provides that all citizens have a right to hold and express their personal political beliefs. *See Cohen v. California*, 403 U.S. 15, 23–24 (1971). Organized political protest is a form of "classically political speech." *Boos v. Barry*, 485 U.S. 312, 318 (1988). "Activities such as demonstrations, protest marches, and picketing are clearly protected by the First Amendment." *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996). However, "[i]n order to demonstrate a First Amendment violation, a plaintiff must provide evidence

showing that 'by his actions [the defendant] deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct.'" *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (alterations in the original) (quoting *Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th Cir. 1994)).

A plaintiff must allege facts "ultimately enabling him to prove the elements of retaliatory animus as the cause of injury with causation being understood to be but-for causation." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) (internal quotation marks and citation omitted). "It may be dishonorable to act with an unconstitutional motive and perhaps in some instances be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." *Hartman v. Moore*, 547 U.S. 250, 160 (2006); *see also Barney v. City of Eugene*, 20 F.App'x 683, 685 (9th Cir. Sept. 26, 2001) (affirming the district court's decision granting summary judgment for the defendant on the plaintiff's First Amendment retaliation claim where the plaintiff was a peaceful protestor and tear gas was deployed in response to the violence of a small group of protestors in a larger crowd after protestors were warned to clear the area; the court concluded the plaintiff's "exposure to tear gas and any effect on her First Amendment activities were . . . the unintended consequence of an otherwise constitutional use of force under the circumstances").

Plaintiffs' First Amendment class lacks commonality. The First Amendment class includes "all people who engaged in protest activities that follow[ed] the death of George Floyd opposing police violence and white supremacy between May 25, 2020, and November 15, 2020." FAC ¶ 90(A). It includes *all* protestors, regardless of whether those individuals were engaged in active aggression, *see* Dobson Decl. ¶ 41 (deploying CS gas and using less lethal force to clear the crowd after protestors blocked the exits to East Precinct and started a fire in a

garbage can placed against the building), or passively resisting, *see* Wrecksie Decl. ¶¶ 23–25
(describing being shot with an FN303 after falling on the ground while moving east in
compliance with PPB's instructions). Plaintiffs' class definition also lacks any reference to the
actions of Defendant or PPB officers. In other words, the class includes individuals who may
have been subjected to force by PPB, individuals who interacted with other law enforcement
agencies, individuals who engaged with but were not subjected to force by PPB, and others who
may not have interacted with police at all. *See, e.g.,* Dobson PI Decl. ¶¶ 48–50 (noting police
facilitation of march but without any use of force), ¶¶ 40–43 (noting less lethal weapons and tear
gas deployed after protestors scaled fence outside of Justice Center, threw objects at the police,
and a fight broke out in the protest). Given the breadth of this definition and the dissimilarities
within the proposed class, examination of all the class members' First Amendment claims will
not produce a common answer to the crucial questions of whether Defendant's actions—via PPB
officers—chilled the class members' speech and whether the Defendant's actions were
substantially motivated by the speech.

  Plaintiff's proposed common questions illustrate the problem. For example, Plaintiffs ask
whether Defendant's "aggressive tactics in policing of protests in support of Black Lives Matter
and against police violence would chill a person of ordinary firmness from continuing to engage
in the protected activity." Pl. Mot. Class Cert. 68. But the answer to this question cannot be
common to the class when the members of the class have been subjected to different police
tactics in different situations over different nights, including some who were not subjected to
police action at all. Similarly, whether the content of the class's message was a motivating factor
in Defendant's conduct cannot be answered on a classwide basis, as Plaintiffs have proposed.
Despite the troubling evidence of police bias in the record, the First Amendment retaliation

inquiry requires a determination of whether the action would have been taken despite the alleged bias.  In this case, force may have been used against some individuals in the class engaged in active aggression. *See, e.g,* Dobson Decl. ¶ 32 (deploying less lethal munitions where protestors entered the Portland Police Association building, lit a fire, and threw rocks, paint, and fireworks at officers). Some nights, lawful force was used to prevent risk to human life. *See, e.g.*, Dobson PI Decl. ¶¶ 36–37 (tear gas used after fire started in Justice Center). And still on other evenings, force may have been used without justification and with an unlawful motive under the First Amendment. *See* Drier Decl. ¶ 14 (protestor shot in thigh with 40mm round after playing Woody Guthrie's "All You Fascists Bound to Lose" near police officer). In other words, these common questions cannot generate common answers that drive the resolution of Plaintiffs' First Amendment retaliation claim for all members of this broad class. Given its lack of commonality, the Court denies certification of Plaintiffs' First Amendment class.[6]

## II.    Fourth Amendment Subclasses

Plaintiff alleges that PPB has a pattern, practice, and custom of using "unconstitutional force at civil rights protests since the murder of George Floyd—specifically the use of indiscriminate force against, at best, passively resistant protestors."  Pl. Mot. Class Cert. 67; FAC ¶¶ 99–100. "The Fourth Amendment protects against unreasonable seizures." *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1151 (9th Cir. 2022) (citing *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021)). Excessive force claims are analyzed under the objective reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The Fourth Amendment

---

[6] The Court also notes that all of the named Plaintiffs claim to have engaged in no more than passive resistance and all were subjected to some degree of force by PPB officers. But the class includes individuals who have engaged in more aggressive behaviors as well as protestors who may not have been subjected to any force.

requires inquiry into the factual circumstances of every case. *Id.* at 396–97. To determine whether an officer's actions were objectively reasonable, the Court looks to: "(1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021) (quoting *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017)). The reasonableness of an officer's conduct must be assessed "from the perspective of a reasonable officer on the scene," recognizing that the officer may be "forced to make split-second judgments" under stressful and dangerous conditions. *Graham*, 490 U.S. at 396–97.

"The Ninth Circuit has held that it is unreasonable to use pepper spray, projectile bean bags, and pepper ball projectiles against individuals 'who were suspected of only minor criminal activity, offered only passive resistance, and posed little to no threat of harm to others.'" *Black Lives Matter Seattle-King Cnty. v. City of Seattle,* 466 F. Supp. 3d 1206, 1214 (W.D. Wash. 2020) (quoting *Nelson v. City of Davis*, 685 F.3d 867, 885 (9th Cir. 2012)). While the Court must be "careful not to attribute other protestors' actions to those plaintiffs who do not admit physically provoking police," the Ninth Circuit has also indicated that "'the context of the officers' actions must be considered.'" *Felarca v. Birgeneau,* 891 F.3d 809, 818 (9th Cir. 2018) (quoting *Nelson*, 685 F.3d at 886)).

In light of the fact-intensive nature of Fourth Amendment analyses and the scope of Plaintiffs' classes and claims, the Court finds that the Fourth Amendment subclasses also lack commonality. The Fourth Amendment excessive force analysis turns on the specific circumstances of each use of force. Indeed, the excessive force cases cited by Plaintiffs highlight

how fact intensive the analysis of each use of force is here. In *Nelson v. City of Davis*, for example, the Ninth Circuit concluded that the firing of pepper spray pellets at a student and his friends—who became trapped in a breezeway by police while they were attempting to leave a party pursuant to police instructions—was unconstitutional. 685 F.3d 867 (9th Cir. 2012). In doing so, the court discussed at length the circumstances surrounding the use of force. It emphasized the significant nature of the force used, the risk of harm to and harm experienced by the plaintiff, the limited government interest in clearing the complex of partygoers, the fact that neither the plaintiff nor his friends had committed a chargeable offense, the lack of exigency or threat, and the failure to give sufficient warnings. *Id.* at 878–83. It then weighed the factors justifying the use of force against the degree of intrusion posed by the force used to conclude that the officers' use of force was not reasonable. *Id.* at 883. *Headwaters* and *Young* involve similar analyses. *See Headwaters v. Cnty. of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002) (finding the use of pepper spray against protestors sitting peacefully who were easily moved by police without any threat or harm to the officers violated the Fourth Amendment); *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1161–67 (9th Cir. 2011) (finding force excessive where the plaintiff was pepper sprayed and hit with a baton twice but did not pose any threat to officers or the public and was sitting on the curb, refusing to comply with police orders, and had only committed non-violent misdemeanors). These cases demonstrate that there are additional factors—including but not limited to the behavior of nearby protestors, the exigency of the situation, any threatening behavior, and whether the police gave sufficient warnings—that drive the Fourth Amendment analysis. *See Felarca v. Birgeneau,* 891 F.3d 809, 817–19 (9th Cir. 2018) (finding that the plaintiffs' Fourth Amendment rights were not violated where officers—who were outnumbered and both verbally and physically provoked—used batons against the plaintiffs who had been

ordered to disperse, had ignored those orders, and interfered with the officers' attempt to enforce university policy).

Turning first to the indiscriminate weapons subclass—which includes protestors engaged in no more than passive resistance who were subjected to indiscriminate weapons—any common question would not generate common answers for all members of this subclass. As with the First Amendment class, Plaintiffs' proposed common questions demonstrate the lack of commonality in this broad subclass. For example, Plaintiffs ask: "Whether the circumstances that existed on May 29, 30, 31, June 1, 2, 5, 6, 13, 26, 27, 30, July 4, 18, August 5, 12, 19, 22, 23, 25, and September 5 justify the seizure of all the individuals who were seized by the use of the gas." Pl. Mot. Class Cert. 70. The parties' evidence and briefing reveal different narratives regarding the use of indiscriminate weapons on each of the nights in question. For example, Plaintiff Roberts declares that tear gas was used on a crowd that was peaceful on May 29. Roberts Decl. ¶ 12. But Defendant's evidence shows that tear gas was used after a fire was started in the Justice Center, which houses the downtown jail. Dobson PI Decl. ¶ 36. Similarly, Defendant's evidence shows that on August 5, protestors barricaded the doors of the East Police Precinct—effectively locking personnel inside—and started a fire against the front of the building. Dobson Decl. ¶ 41. Officers deployed tear gas to disperse the crowd. *Id.* On June 2, tear gas was deployed after a crowd—in which some individuals had been attempting to breach the fence and throwing projectiles—did not disperse. Dobson PI Decl. ¶¶ 63–66. Again, evidence from the named Plaintiffs suggests that force was used against peaceful protestors that evening. Roberts Decl. ¶ 14 (pushed with batons and subject to tear gas after joining a Black man in peaceful protest, with his hands up in front of a line of police); Belden Decl. ¶ 15 (tear gas deployed on crowd that was peaceful). Each of these incidents will require the Court to sift through the evidence and render an individual

determination of whether each use of force was reasonable against each individual. *Olean*, 31 F.4th at 663 ("[A]n individual question is one where members of a proposed class will need to present evidence that varies from member to member.").

Even limiting the proposed class members to individuals engaged in no more than passive resistance—as Plaintiffs have done here—fails to remedy this problem. The individual protestor's behavior is just one piece of the analysis. As illustrated above, the specific course of events confronting the officers in each situation varied. *Young*, 655 F.3d at 1163 (The "ultimate inquiry addresses whether the totality of the circumstances justifies a particular sort of seizure."). On each night and for each use of force, the Court must consider additional circumstances, including but not limited to whether PPB's warnings were adequate or the exigencies of the situation were significant enough to justify crowd dispersal. *See Graham,* 490 U.S. at 396; *Nelson*, 685 F.3d at 878–83. Essentially, Plaintiffs in this case suggest their question can be answered by a *per se* rule that the use of indiscriminate weapons against a group of protestors comprised of at least some individuals that are engaged in no more passive resistance always violates the Fourth Amendment regardless of the any other circumstances. But such a rule is at odds with the nature of excessive force claims.

The targeted weapons subclass—which includes protestors engaged in no more than passive resistance who were subjected to FN303s, 40mm launchers, batons, and aerosol restraints such as OC spray—suffers from the same problem. The circumstances of each use of force requires its own Fourth Amendment inquiry. For example, a protestor—acting as a medic one evening and standing away from the main crowd of protestors—describes being kettled against a building and hit with batons on his head and shoulders by six or seven police officers. Rushton Decl. ¶¶ 13–14, ECF 268. On a different night, a protestor describes being hit with a

rubber bullet as nearby protestors pulled down the fence outside of the justice center. Simon

Decl. ¶¶ 9–11. On July 30, an investigator for Plaintiffs:

> [O]bserved that a very small group of people lit an office chair on fire on the south sidewalk. There were no buildings, trees, or structures surrounding this small fire. Most of the crowd was not participating in the lighting of the fire. PPB used force to push passive protestors back.

Brownell Decl. ¶ 13, ECF 279. And Plaintiff Drier recalls being shot in the upper thigh with a

40mm round on the evening of August 15, 2022, after asking officers to return his guitar, on

which he had been playing "All You Fascists Bound to Lose" by Woody Guthrie as an officer

choked and pushed another protestor. Drier Decl. ¶¶ 14–16; Bruggemeier Decl. Ex U. There are

dozens—if not hundreds—of additional incidents documented by Plaintiffs in the class

certification record alone. All these incidents contain class members, and each could result in a

finding of excessive force by PPB. But the excessive force analysis for each incident is distinct.

The cases cited by Plaintiffs as support for certification of a civil rights class are

distinguishable.[7] For example, in *Multi-Ethnic Immigrant Workers Organizing Network v. City of

Los Angeles*, the plaintiffs brought class claims for injunctive relief related to violations of the

First, Fourth, and Fourteenth Amendments. 246 F.R.D. 621, 625 (C.D. Cal. Dec. 14, 2007). The

plaintiffs alleged that their rights were violated when force was used to disperse a crowd at a

May Day rally. *Id.* at 624. Officers in the crowd reported that they were taking rocks and bottles.

*Id.* A decision was made to disperse the crowd, but before a dispersal order was given officers

formed a skirmish line and—using pushes, strikes, and less lethal munitions—moved the crowd.

*Id.* All told, officers had "driven thousands of people from the park, knocked over and struck

some individuals—including media and non-media, peaceful or not—and deployed a total of 146

---

[7] The Court also notes that Plaintiffs' cited cases predate *Dukes*. *See* Pl. Mot. Class Cert. 64.

less lethal impact munitions and over 100 uses of the baton" on a single night of protest. *Id.* at 624.

Ultimately, the court concluded that "[t]he LAPD's command decisions to declare an unlawful assembly, disperse the crowd, and authorize the use of force constitute[d] the 'common core of salient facts' that support commonality." *Id.* at 631. Other cases certifying Fourth and First Amendment classes arising out of protests similarly involve challenges to command decisions to use force over a shorter period of time. *See, e.g.*, *Chang v. United States*, 217 F.R.D. 262, 267  (D.D.C. 2003) (certifying a class of 400 persons subjected to mass arrest in Pershing Park on September 27, 2002); *Chua v. City of Los Angeles*, No. LACV1600237JAKGJSX, 2017 WL 10776036, at *4 (C.D. Cal. May 25, 2017) (certifying two subclasses of individuals who were allegedly kettled by the LAPD during two protests on two evenings in November 2014); *MacNamara v. City of New York*, 275 F.R.D. 125, 133, 143 (S.D.N.Y. 2011) (certifying mass arrest subclasses, each of which was defined by location and date of the mass arrest); *Aichele v. City of Los Angeles*, 314 F.R.D. 478, 490 (C.D. Cal. 2013) (finding commonality on a Fourth Amendment claim where the plaintiffs challenged generalized conditions of confinement resulting from blanket policies and class members were held with others in one of several locations). Here, by comparison, Plaintiffs are not challenging a couple command decisions or a blanket policy at a few discrete protests over a short period of time. Rather, Plaintiffs are challenging dozens of command decisions *and* decisions by individual officers over the course of more than 100 nights in several locations throughout Portland.

Plaintiffs also note that the Northern District of California, after initially denying certification, granted class certification to the plaintiffs in another 2020 protest case. *See Anti Police-Terror Project v. City of Oakland*, No. 20-cv-03866-JCS, 2021 WL 4846958 (N.D. Cal.

Oct. 18, 2021); *Anti Police-Terror Project v. City of Oakland*, No. 149, Case No. 20-cv-03866-JCS (N.D. Cal. Jan. 6, 2022) (Stipulated Class Certification Order). In *Anti Police-Terror Project* ("*APTP*"), the district court initially denied class certification because of the breadth of the plaintiffs' proposed class definition, "which include[d] protestors who were injured by tear gas regardless of where and when it was used and even if it was used by OPD or mutual aid partners." 2021 WL 4846958, *5. It questioned "whether the class proposed by [the plaintiffs] satisfie[d] the commonality requirement" because the defendant's liability might depend on different policies depending on which entity deployed tear gas. *Id.* at *5. The court further noted that "the class [was] so broad it include[d] even individuals who may not have been demonstrating peacefully" and "[a]s to those individuals, the question of whether the [defendant] used excessive force or chilled their right to protest is likely to give rise to different answers than those who were protesting peacefully." *Id.*

While Plaintiffs in the present case may have remedied at least one of the issues identified in *APTP* by limiting their Fourth Amendment subclasses to protestors who were protesting peacefully, the scope of the proposed classes still presents the same concerns identified by the court in *APTP*. *Id.* ("Given the breadth of Plaintiffs' amended proposed class definition, which includes protestors who were injured by tear gas regardless of where and when it was used and even if it was used by OPD or mutual aid partners, the Court questions whether the class proposed by Plaintiffs satisfies the commonality requirement."). And the claims in *APTP*—like the claims in the cases cited above—are even narrower than the claims at issue in this case. In *APTP*, the plaintiffs challenge only the use of tear gas at protests on four different nights. Here, by contrast, Plaintiffs are challenging the use of many different types of less lethal

targeted and indiscriminate weapons, over the course of over 100 nights of protests, at protests all over Portland.

There were over 6,000 deployments of different types of force over more than 100 nights of protest, each of which requires its own individualized inquiry to determine whether force was excessive. *See Ahmad v. City of St Louis*, 995 F.3d 635, 645 (8th Cir. 2021) ("[C]lass certification [of First and Fourth Amendment claims] was granted prematurely. Given the individualized inquiries plaintiffs' disparate claims require, "the massive class action certified neither promotes the efficiency and economy underlying class actions nor pays sufficient heed to the federalism and separation of powers principles[.]"); *Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1557–58 (11th Cir. 1989) (finding excessive force determinations "cannot be made *en masse,* and such suits therefore are especially unsuited to class disposition"). This is the heart of a Fourth Amendment excessive force claim. Given the breadth of the proposed classes and the nature of this claim, the examination of all the class members' claims will not produce common answers crucial to the Fourth Amendment excessive force inquiry.[8]

## III.    *Monell* Liability

Plaintiff proposes additional common questions grounded in *Monell* liability. *See* Pl. Mot. Class Cert. 68–70. Again, Plaintiffs argue that "the core of all of [their] claims is that PPB has a pattern, practice, and custom of using tactics that chill protected speech" and using

---

[8] The Court also notes that the Fourth Amendment subclasses include individuals who were subjected to force that is beyond the scope of Plaintiffs' claims. Plaintiffs' claims focus on the use of indiscriminate force to disperse crowds, FAC ¶¶ 99–103, 88 ("Defendant has a pattern, policy, or practice of using force without individualized justification to disperse protestors."), but neither subclass contains such a limitation. Rather, they include all passive protestors subjected to force, *see* FAC ¶ 90, which would include individuals who may have been specifically targeted by police for reasons other than crowd dispersal. Thus, the resolution of Plaintiffs Fourth Amendment claims will not determine whether the use of force in these incidents violated those class members' constitutional rights.

indiscriminate force against passively resisting protestors. *Id*. at 67. Plaintiffs further claim that Defendant's "failure to train and/or discipline officers for violating the constitution, and to cease this pattern, practice, and custom has had the effect of condoning or acquiescing to these unconstitutional practices." *Id.* In support of their claim, Plaintiffs submit evidence of an ineffective oversight and disciplinary system along with incorrect and biased training materials.

To prevail on a municipal liability claim under § 1983, Plaintiffs must show that a municipal custom or policy caused the violation of their constitutional rights. *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 690 (1978) (holding that a municipality is a "person" subject to liability under § 1983 when it causes a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers"). The municipality itself must cause the constitutional deprivation, and a city may not be held vicariously liable for the unconstitutional acts of its employees under the theory of *respondeat superior*. *Id*. at 691; *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (requiring "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation"). Rather, a plaintiff must demonstrate that the constitutional violation was the result of (1) an employee acting under an expressly adopted official policy; (2) an employee acting pursuant to a longstanding practice or custom; or (3) an employee acting as a final policymaker. *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003).

To establish *Monell* liability, the plaintiff must show that (1) the plaintiff was deprived of a constitutional right; (2) the municipality had a policy, longstanding practice, or custom; (3) the policy, practice, or custom amounted to "deliberate indifference to the plaintiff's constitutional right;" and (4) the policy, practice, or custom was "the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (internal quotations

omitted). *Monell* liability can arise from a failure to train, supervise, or discipline that amounts to an official policy of deliberate indifference to an individual's constitutional rights. *Horton ex rel. Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019). A defendant may be liable on a failure to train or supervise theory when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can be said to have been deliberately indifferent to the need." *Harris*, 489 U.S. at 388–89.

Plaintiff is correct that generally "commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." Pl. Mot. Class Cert. 67 (citing *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014)). But cases that challenge a system-wide practice or policy are distinguishable from the *Monell* claims at issue here.

*Parsons v. Ryan*, for example, involved an alleged violation of the Eighth Amendment by senior officials of the Arizona Department of Corrections ("ADC") in numerous statewide policies and practices governing medical care, which subjected the plaintiffs to harm or a serious risk of harm and to which the defendants were deliberately indifferent. 754 F.3d at 662. Specifically, the plaintiffs referred to nearly a dozen constitutionally defective policies, practices, and conditions of confinement that the ADC was aware of and deliberately ignored. *Id.* at 663. The Ninth Circuit found that class certification was appropriate. Emphasizing that "commonality cannot be determined without a precise understanding of the nature of the underlying claims," the court noted that the plaintiffs had alleged that the prison system's "policies and practices of statewide and systemic application expose all inmates in ADC custody to a substantial risk of serious harm" under the Eighth Amendment. *Id.* at 676–77 (distinguishing claims of systemic future-orientated harm versus past instances of mistreatment). The court further explained that

"all members of the putative class and subclass have in common . . . their alleged exposure, as a result of specified statewide ADC policies and practices that govern the overall conditions of health care services and confinement, to a substantial risk of serious future harm to which the defendants are allegedly deliberately indifferent." *Id.* at 678. "Although a presently existing risk may ultimately result in different future harm for different inmates—ranging from no harm at all to death—every inmate suffers exactly the same constitutional injury when he is exposed to a single statewide ADC policy or practice that creates a substantial risk of serious harm." *Id.*

Plaintiffs in this case, by contrast, bring *Monell* claims against Defendant for First and Fourth Amendment violations by PPB. Unlike the Eighth Amendment claims in *Parsons*, each class member has not suffered the same constitutional injury merely because they are exposed to Defendant's practices. Put another way, even assuming that Defendant's practices or customs are defective, the underlying constitutional injuries alleged here cannot be sustained merely because an individual is exposed to a risk of harm. *See Amador v. Baca,* No. CV-10-1649 SVW, 2014 WL 10044904, at *4 (C.D. Cal. Dec. 18, 2014) (noting that the "risk-of-harm theory" has "no place . . . in a Fourth Amendment analysis" involving unconstitutional strip searches and distinguishing the claims from the Eighth Amendment claim in *Parsons*). In *Parsons*, all the class members' claims could be determined by answering the same question: "whether the specified statewide policies and practices to which they are all subjected to by ADC expose them to a substantial risk of harm." 754 F.3d at 678. Here, by contrast, a similar question cannot be answered on a classwide basis: "Whether the specified policies and practices caused violations of the class members' First and Fourth Amendment rights."[9] To find liability under *Monell,* each

---

[9] It is also unclear the extent to which Plaintiffs are challenging as unconstitutional PPB Directives 1010 and 635.10. While their Fourth Amended Complaint alleges that Defendant's "official policy" of using "riot control" and "less lethal" weapons violates the Fourth

class member must have suffered the underlying constitutional injury in question. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."). And it is not possible to make that determination on a classwide basis, as illustrated above. *Cf. Parsons*, 754 F.3d at 678 ("These policies and practices are the 'glue' that holds together the putative class and the putative subclass; either each of the policies and practices is unlawful as to every inmate or it is not."); *B.K. v. Snyder*, 922 F.3d 957, 975–76 (9th Cir. 2019) (distinguishing an Eighth Amendment claim from a claim under the Medicaid Act and noting that "being at risk of not receiving Medicaid services [was not] a Medicaid violation.").

In addition, even if Plaintiffs can demonstrate a deficient practice or training, this is not the "glue" that holds the class together because it is still unclear whether the deficient practice was the cause of any underlying violation. In *Gonzalez v. U.S. Immigration & Customs Enforcement*, for example, the Ninth Circuit found that commonality existed where a class was defined as "those individuals against whom ICE issued a detainer based solely on searches of electronic databases." 975 F.3d 788, 808 (9th Cir. 2020). The court explained that "ICE's policy

---

Amendment, FAC ¶ 99, Plaintiffs' brief and complaint largely focus on pattern and practice allegations, FAC ¶¶ 99–111; Pl. Mot. Class Cert. 14 n.14 (noting in a footnote that Defendant's "written policy is facially unconstitutional when it comes to tear gas" without further discussion). In addition, even if Plaintiffs were challenging the City's policies—at least as they relate to the use of tear gas—certification of the proposed class and subclasses may not be appropriate as the policies applicable to the proposed class varied during the course of the class period. *See Amador v. Baca*, No. 210CV01649SVWJEM, 2016 WL 6804910, at *4 (C.D. Cal. July 27, 2016) (decertifying a class where it became evident that the challenged policies and procedures changed during the class period such that members of the same class were subject to different circumstances. For example, only the PPB Directives were applicable to protests prior to June 6. But on June 6, and then again on September 21, Mayor Ted Wheeler issued additional orders pertaining to the use of tear gas. The Court's June 2020 Orders also changed the circumstances under which PPB could use less lethal force.

of making probable cause determinations based solely on such searches was the 'glue' that holds

the class together." *Id.*  In reaching this conclusion, the court also recognized that "the

constitutional validity of a warrantless search is pre-eminently the sort of question which can

only be decided in the concrete factual context of an individual case," but it ultimately concluded

that this question was "quite different from the question of the adequacy of the procedures on

which the government relies to make arrests and detain individuals." *Id*. at 809 (internal

citations, quotations, brackets omitted).  In other words, the challenged ICE behavior did not

depend on dynamic factors.

Unlike the class members in *Gonzalez*—who each faced the same set of circumstances

because the class was limited to individuals challenging the exact same procedures used to detain

and arrest individuals—the circumstances facing each class member vary in Plaintiffs' proposed

classes. For example, some individuals may have been subjected to indiscriminate force, perhaps

as the result of the deficient training or discipline as Plaintiffs allege. But other members of the

class may have been subjected to unconstitutional force that was not the result of the challenged

practice or the result of an entirely different problem with Defendant's training or discipline. *See*

*Green v. Borg-Warner Protective Servs. Corp.,* No. 95 CIV. 10419 (RPP), 1998 WL 17719, at

*4 (S.D.N.Y. Jan. 16, 1998) ("Even if improper training were responsible for one of the incidents

involved, it might not have been the cause of the other alleged incidents, and therefore it is not

possible to conclude that, based on the existence of the incidents alleged, there exist common

questions of law or fact."). Based on Plaintiffs' motion and the record before the Court, it is not

possible to conclude that the *Monell* claims—specifically, the alleged deficiencies with

Defendant's training and discipline—create commonality.

In sum, dissimilarities within the proposed class and the need for individualized determinations permeate the class members' First and Fourth Amendment claims, and allegations of *Monell* liability do not, on their own, create commonality where there is none. Because the proposed classwide proceeding is not apt to produce common answers that drive the resolution of Plaintiffs' claims, class certification is denied.

## CONCLUSION

The Court DENIES Plaintiffs' Motion for Class Certification [252]. The parties shall file a joint status report and proposed case schedule 30 days from the date of this Opinion & Order.

IT IS SO ORDERED.

DATED:       July 12, 2022       .


MARCO A. HERNÁNDEZ
United States District Judge