J. SCOTT MOEDE, OSB 934816
Chief Deputy City Attorney
scott.moede@portlandoregon.gov
NAOMI SHEFFIELD, OSB 170601
Senior Deputy City Attorney
naomi.sheffield@portlandoregon.gov
ROBERT YAMACHIKA, OSB 065560
Senior Deputy City Attorney
rob.yamachika@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR  97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendant City of Portland*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| DON'T SHOOT PORTLAND, a nonprofit corporation, in its individual capacity, NICHOLAS J. ROBERTS, in an individual capacity on behalf of themselves and all others similarly situated, MICHELLE "MISHA" BELDEN, in an individual capacity and on behalf of themselves and all others similarly situated, ALEXANDRA JOHNSON, in an individual capacity and on behalf of themselves and all others similarly situated, LESTER WRESCKIE, in an individual capacity and on behalf of themselves and all others similarly situated, and THOMAS DREIER,  in an individual capacity and on behalf of themselves and all others similarly situated, | **3:20-cv-00917-HZ**<br><br>**DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

              **PLAINTIFFS,**

      v.

CITY OF PORTLAND, a municipal corporation**,**

              **DEFENDANT.**

Page i  –   DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY
JUDGMENT

# TABLE OF CONTENTS

MOTION ............................................................................................................. 1

MEMORANDUM OF LAW ................................................................................. 1

    I.    **This Court should grant the City's motion because Plaintiffs' claims for prospective relief are moot.** ................................................................ 3

    A.  **Nightly protest activity in Portland stopped almost two years ago.** ................. 6

        1.  **May 2020 to November 2020** ........................................................ 7

        2.  **November 2020 and Beyond** ....................................................... 10

    B.  **Changes to Oregon law modified the tools available to PPB when responding to protests.** ................................................................. 12

    C.  **PPB has undergone significant changes since the events that gave rise to Plaintiffs' claims due to legally binding requirements.** .................................. 14

        1.  **Additional changes to Oregon law have required PPB to alter its response to large protest events.** ................................................ 14

        2.  **The City completed the contempt remedies required by this Court, and continues to be guided by this Court's orders in training officers and evaluating officer conduct.** ........................................ 16

        3.  **The City will be engaging in further disciplinary review, critical assessment, changes to training, and implementation of body worn cameras in connection with a separate legal proceeding.** ..................... 19

    D.  **The drastically changed circumstances demonstrate that Plaintiffs cannot establish any real, non-speculative, threat of future harm.** ....................... 21

    II.  **This Court should grant the City's motion for summary judgment with respect to Don't Shoot Portland, because it has neither alleged, nor does it have evidence that the City violated its First or Fourth Amendment rights.** ................................................................................................ 24

    A.  **Don't Shoot Portland has no plausible Fourth Amendment claim against the City.** ........................................................................................... 27

    B.  **Don't Shoot Portland's First Amendment Claim fails for similar reasons.** .. 29

    C.  **Don't Shoot Portland lacks standing to assert its First Amendment or Fourth Amendment claims against the City.** ....................................... 30

    CONCLUSION ............................................................................................. 35

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

# TABLE OF AUTHORITIES

<u>**Federal Cases**</u>

*Alderman v. United States*,
  394 U.S. 165 (1969)......................................................................................... 27

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013).............................................................................................. 3

*Ariz. Student's Ass'n v. Ariz. Bd. of Regents*,
  824 F.3d 858 (9th Cir. 2016) ......................................................................... 29

*Arizona Christian Sch. Tuition Org. v. Winn*,
  563 U.S. 125 (2011)................................................................................... 30, 31

*Bayer v. Neiman Marcus Grp., Inc.*,
  861 F.3d 853 (9th Cir. 2017) ................................................................... passim

*Bilbrey by Bilbrey v. Brown*,
  738 F.2d 1462 (9th Cir. 1984) ......................................................................... 5

*Black Lives Matter Seattle-King Cty. v. City of Seattle, Seattle Police Dep't*,
  No. 2:20-CV-00887-RAJ, 2020 WL 3128299 (W.D. Wash. June 12, 2020).......................... 29

*Blankenhorn v. City of Orange*,
  485 F.3d 463 (9th Cir. 2007) ......................................................................... 28

*Blunt v. Lower Merion Sch. Dist.*,
  262 F.R.D. 481 (E.D. Pa. 2009) ..................................................................... 31

*Burke v. Barnes*,
  479 U.S. 361 (1987).......................................................................................... 4

*City of Canton v. Harris*,
  489 U.S. 378 (1989)........................................................................................ 26

*City of Los Angeles v. Heller*,
  475 U.S. 796 (1986)........................................................................................ 27

*Cook v. Brown*,
  364 F. Supp. 3d 1184 (D. Or. 2019) ............................................................... 5

*Ctr. for Biological Diversity v. Bernhardt*,
  No. 19-CV-05206-JST, 2020 WL 4188091 (N.D. Cal. May 18, 2020) ................................ 34

*Davis v. Fed. Election Comm'n*,
  554 U.S. 724 (2008)........................................................................................ 30

*Dougherty v. City of Covina*,
  654 F.3d 892 (9th Cir. 2011) ......................................................................... 27

*Eggar v. City of Livingston*,
  40 F.3d 312 (9th Cir. 1994) ........................................................................... 21

*Espinosa v. City & Cty. of San Francisco*,
  598 F.3d 528 (9th Cir. 2010) ......................................................................... 28

*Gleason v. Bundage*,
  No. 6:17-cv-01415-AA, 2018 WL 2305690 (D. Or. May 18, 2018)........................ 4

*Glenn v. Washington Cty.*,
  673 F.3d 864 (9th Cir. 2011) ......................................................................... 28

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

*Graham v. Connor*,
   490 U.S. 386 (1989)..................................................................................... 27, 28

*Green v. Mansour*,
   474 U.S. 64 (1985).............................................................................................. 22

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)...................................................................................... 32, 34

*Horton v. City of Santa Maria*,
   915 F.3d 592 (9th Cir. 2019) ........................................................................ 27, 34

*Idaho v. Coeur d'Alene Tribe of Idaho*,
   521 U.S. 261 (1997).......................................................................................... 22

*In defense of Animals v. Sanderson Farms, Inc.*,
   No. 20-cv-05293-RS, 2021 WL 4243391 (N.D. Cal. Sept. 17, 2021)...................................... 34

*Index Newspapers LLC v. City of Portland*,
   No. 3:20-CV-1035-SI, 2022 WL 4466881 (D. Or. Sept. 26, 2022) ................................. 1, 6, 23

*L.A. Police Dep't v. United Reporting Publ'g Corp.*,
   528 U.S. 32 (1999)............................................................................................ 34

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
   624 F.3d 1083 (9th Cir. 2010) .................................................................. 31, 32, 33, 34

*Lewis v. Continental Bank Corp.*,
   494 U.S. 472 (1990)......................................................................................... 3, 4

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)........................................................................................... 31

*MacNamara v. City of New York*,
   275 F.R.D. 125 (S.D.N.Y. 2011) ............................................................................. 22

*Maya v. Centex Corp.*,
   658 F.3d 1060 (9th Cir. 2011) ............................................................................... 30

*Mendocino Envtl. Ctr. v. Mendocino Cty.*,
   192 F.3d 1283 (9th Cir. 1999) ............................................................................... 29

*Mihailovici v. Snyder*
   No. 3:15-CV-01675-KI, 2016 WL 447842 (D. Or. Feb. 4, 2016).............................................. 27

*Miller v. Clark Cty.*,
   340 F.3d 959 (9th Cir. 2003) ................................................................................. 28

*Murphy v. Kenops*,
   99 F. Supp. 2d 1255 (D. Or. 1999) ............................................................................ 21

*National Audubon Soc'y, Inc. v. Davis*,
   307 F.3d 835 (9th Cir. 2002) ................................................................................. 22

*Nelsen v. King Cty.*,
   895 F.2d 1248 (9th Cir. 1990) ................................................................................. 4

*People for the Ethical Treatment of Animals v. Rasmussen*,
   298 F.3d 1198 (10th Cir. 2002) ............................................................................... 22

*People for the Ethical Treatment of Animals, Inc. v. United States Fish & Wildlife Serv.*,
   No. CV-12-04435 DMG (MANx), 2014 WL 12580234 (C.D. Cal. Jan. 31, 2014)................................ 34

*Rodriguez v. San Jose*,
   930 F.3d 1123 (9th Cir. 2019) ............................................................................... 34

Page  iv  – TABLE OF AUTHORITIES

*S. Cal. Painters & Allied Trades, Dist. Council No. 36 v. Rodin & Co.*,
  558 F.3d 1028 (9th Cir. 2009) ................................................................................ 4
*Sample v. Johnson*,
  771 F.2d 1335 (9th Cir. 1985) ................................................................................ 4
*Sanchez v. Marion Cty.*,
  No. 6:14-CV-724-AA, 2016 WL 680814 (D. Or. Feb. 16, 2016) ............................ 28
*Santos v. Gates*,
  287 F.3d 846 (9th Cir. 2002) ................................................................................ 28
*Schlesinger v. Reservists Committee to Stop the War*,
  418 U.S. 208 (1974) .............................................................................................. 34
*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ......................................................................................... 31, 32
*Sloman v. Tadlock*,
  21 F.3d 1462 (9th Cir. 1994) ................................................................................ 29
*Spencer v. Kemna*,
  523 U.S. 1 (1998) ................................................................................................... 5
*The Equal Rts. Ctr. v. AvalonBay Communities, Inc.*,
  No. CIV.A.AW-0502626, 2009 WL 1153397 (D. Md. Mar. 23, 2009) ................... 31
*United Food Workers Union Local 751 v. Brown Grp., Inc.*,
  517 U.S. 544 (1996) .............................................................................................. 31
*United States Parole Comm'n v. Geraghty*,
  445 U.S. 388 (1980) ................................................................................................ 4
*Wise v. City of Portland*,
  539 F. Supp. 3d 1132 (D. Or. 2021) ............................................................. 6, 7, 24
*Wolfe v. City of Portland*,
  566 F. Supp. 3d 1069 (D. Or. 2021) ............................................................... 6, 23

## Federal Statutes

42 U.S.C. § 1983 .................................................................................................... 27
42 U.S.C. § 3602(i) ................................................................................................. 32
Article III of the U.S. Constitution ................................................................... 3, 30

## State Statutes

ORS 131.675 ...................................................................................................... 14, 15
ORS 161.195 to 161.275 ......................................................................................... 13
ORS 162.247 ........................................................................................................... 15
ORS 181A.708 .............................................................................................. 12, 13, 14

## Federal Rules

F.R.C.P. 56 ............................................................................................................... 1
L.R. 7 ....................................................................................................................... 1

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

**<u>Other Authorities</u>**

HB 2928 ................................................................................................................ 13

HB 4008 ................................................................................................................ 13

HB 4208 ................................................................................................................ 13

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

**Local Rule 7-1 Certificate**

In accordance with L.R. 7(a)(1)(A), Defendant City of Portland ("City"), through its counsel, made a good faith attempt through a telephone conversation on November 2, 2022, with Plaintiffs' attorney, Ashlee Albies, to resolve the disputes subject to the City's motion, but was unable to do so.

**MOTION**

The City hereby moves for partial summary judgment, pursuant to Federal Rule of Civil Procedure 56 as follows:

- On Plaintiffs' claims for prospective injunctive and declaratory relief because those claims are moot, and this Court lacks subject-matter jurisdiction over them.

- On all claims by Plaintiff Don't Shoot Portland ("DSP") because the undisputed facts show that the City's actions have not violated DSP's Fourth Amendment or First Amendment rights, and DSP otherwise lacks standing to seek relief.

**MEMORANDUM OF LAW**

Plaintiffs filed their original complaint in this case and sought preliminary relief at the height of nightly protests in Portland that followed the murder of George Floyd, a Black man, by police in Minneapolis, Minnesota. Since then, however, "the situation has changed," and any remaining demonstrations in Portland are "sporadic" and "have shrunk in number, size, and scope." *Index Newspapers LLC v. City of Portland*, No. 3:20-CV-1035-SI, 2022 WL 4466881, at *4 (D. Or. Sept. 26, 2022). Indeed, the Portland Police Bureau ("PPB") has not used force at a protest in nearly a year and a half. Furthermore, intervening changes in Oregon law, policy, and other requirements have materially altered how PPB could respond to any future, hypothetical

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

protests. In short, the reality is now far different than it was two and a half years ago when this case was first filed.

Notwithstanding these significant changes, Plaintiffs' Fourth Amended Complaint ("Complaint") continues to seek the following prospective relief against the City:

> 3. A permanent injunction, prohibiting the City of Portland from using tear gas as a crowd control measure;

> 4. A permanent injunction, prohibiting the City of Portland from using "less lethal" weapons, including but not limited to OC spray or munitions, impact munitions, LRAD, sound cannons, etc., against protestors who are only engaged in passive resistance, including passive resistance to an order to disperse. In any case where PPB uses less lethal weapons, they must insure [sic] that no person who is engaged in only passive resistance is impacted or effected by those weapons;

> 5. A declaration that Portland Police Bureau's Crowd Control Directive, 0635.10, as written and/or as applied violates the Fourth Amendment to the United States Constitution.

(ECF 233, Plaintiffs' Fourth Amended Complaint ("Compl.") at 38). These requests for prospective relief are moot. Therefore, the Court should grant the City's motion and dismiss Plaintiff's request for declaratory and injunctive relief.

Additionally, the Court should grant the City's motion with respect to DSP's claims. As a preliminary matter, DSP's claims are not justiciable because it, as an organization, lacks standing.[1] Moreover, there is no evidence that the City, through the actions of PPB, violated

---

[1] Additionally, DSP seeks only prospective relief. (Declaration of Robert Yamachika ("Yamachika Decl."), ¶ 9, Ex. 2, DSP Response to City's Request for Admissions ("DSP Admissions"), Nos. 1-3). To the extent the Court agrees that Plaintiffs' request for prospective relief is moot, DSP should be dismissed from the lawsuit.

Page  2 –    DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

DSP's Fourth or First Amendment rights. For each of these independent reasons, the Court should grant the City's motion and dismiss DSP's claims with prejudice.

### I. This Court should grant the City's motion because Plaintiffs' claims for prospective relief are moot.

Even assuming Plaintiffs were able to prove their claims against the City, based on actions by PPB officers over two years ago, their request for prospective relief is nonetheless moot. From the summer of 2020 to today, there has been a dramatic change in circumstances. Quite simply, and most obviously, protests in Portland are not occurring nightly or even regularly. This is the case despite events throughout the country that have ignited outrage. In fact, protests are occurring sporadically, and generally require little or no police response. In addition to the complete change in protest activity, changes to Oregon law and other legal requirements imposed on the City, have resulted in material changes to how PPB responds to the few protests that continue to occur. Given this changed activity, demonstrated by evidence from both Plaintiffs and PPB, there is no longer any "present harm left to enjoin." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 864 (9th Cir. 2017).

The Article III "case-or-controversy requirement subsists through all stages of federal judicial proceedings[.]" *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III— when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citations and internal quotation marks omitted).

///

Page 3 –   DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY
JUDGMENT

Mootness and standing are two sides of the same coin. It is not sufficient "that a dispute was very much alive when suit was filed[.]" *Lewis*, 494 U.S. at 477. Rather, "the interest required of a litigant to attain standing is essentially the same as the interest required to maintain a claim under the mootness doctrine." *Nelsen v. King Cty.*, 895 F.2d 1248, 1250 (9th Cir. 1990); *see also Burke v. Barnes*, 479 U.S. 361, 363 (1987) ("We therefore analyze this case as if respondents had originally sought to litigate the validity of a statute which by its terms had already expired"). In short, "[t]he requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980).

The requirement of a continued case or controversy is particularly important when plaintiffs seek prospective relief. The analysis for justiciability for both declaratory relief and injunctive relief is similar. "[P]laintiffs must demonstrate that a 'credible threat' exists that they will again be subject to the specific injury for which they seek injunctive or declaratory relief." *Sample v. Johnson*, 771 F.2d 1335, 1340 (9th Cir. 1985). "In evaluating whether such a credible threat of future harm exists, 'past exposure to harm is largely irrelevant.'" *Gleason v. Bundage*, No. 6:17-cv-01415-AA, 2018 WL 2305690, at *2 (D. Or. May 18, 2018) (quoting *Nelsen*, 895 F.2d at 1251). And "no matter how important the issue or how likely that a similar action will be brought, a court is without jurisdiction if there is not a sufficient likelihood of recurrence with respect to the party now before it." *Nelsen*, 895 F.2d at 1251.

In the context of declaratory relief, "the central question [for mootness] is whether changes in the circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief." *S. Cal. Painters & Allied Trades, Dist. Council No. 36 v. Rodin*

Page 4 –   DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

*& Co.*, 558 F.3d 1028, 1035 (9th Cir. 2009). Two criteria must be met for declaratory relief to be appropriate: "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Bilbrey by Bilbrey v. Brown*, 738 F.2d 1462, 1470 (9th Cir. 1984) (citation omitted). Federal courts, "are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong." *Spencer v. Kemna*, 523 U.S. 1, 18 (1998). In short, "[a] declaratory judgment merely adjudicating past violations of federal law—as opposed to continuing or future violations of federal law—is not an appropriate exercise of federal jurisdiction." *Bayer*, 861 F.3d at 868; *Cook v. Brown*, 364 F. Supp. 3d 1184, 1189 (D. Or. 2019) ("The test for mootness in the declaratory judgment context is whether there is a substantial controversy between parties with adverse legal interests that are sufficiently immediate to warrant declaratory relief.").

Here, Plaintiffs' claims for declaratory and injunctive relief are moot. It has been about two years since the racial justice protests giving rise to this lawsuit ended. And it has been well over two years since this Court issued temporary injunctions in connection with PPB's response to those protests. During this period, Plaintiffs sought contempt regarding the City's compliance with the injunctions once, over two years ago.

In the two years that have passed since any actions of PPB have been substantively evaluated, the circumstances have so significantly changed that they are not recognizable. Most notably, there has not been regular protest activity in Portland for well-over a year and a half. The law in Oregon has changed, impacting the way in which PPB has responded to protests and will continue to respond going forward. PPB has taken important, legally-required steps to

Page 5 –   DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY
                JUDGMENT

retrain officers regarding obligations and responsibilities when policing protests. Importantly, and as a result of many of these changes, PPB has not responded directly to protest activity in months, and PPB has not used any force at a protest since June 2021. (Declaration of Craig Dobson ("Dobson Decl."), ¶¶ 27-30).

A. **Nightly protest activity in Portland stopped almost two years ago.**

As previously recognized by numerous courts, the absence of nightly protests in Portland for almost two years has obviated the need for ongoing equitable relief. *See Wise v. City of Portland*, 539 F. Supp. 3d 1132, 1147 (D. Or. 2021) ("The frequent protests on which Plaintiffs' equitable claims rely have also abated, further suggesting Plaintiffs' need for equitable relief has waned."); *Wolfe v. City of Portland*, 566 F. Supp. 3d 1069, 1085 (D. Or. 2021) ("Under the specific facts of this case, considering the significantly reduced number of protests, protest crowd size, police response to protests, and deployment of less lethal munitions and aerosol restraints, the Court finds that Plaintiffs' alleged future injury is now too speculative and conjectural to provide Plaintiffs with the legally cognizable interest necessary to support ongoing claims for future injunctive relief."); *Index Newspapers LLC*, 2022 WL 4466881, at *6 (dismissing claims against federal defendants as moot because "[t]he current situation in Portland is that there are only intermittent protests and they are of significantly reduced size and scope," no "declared unlawful assemblies" had occurred "in the last 17 months," and any threat of future injury to plaintiffs was therefore "unduly conjectural and speculative.").

Plaintiffs, by their own admission and consistent with PPB's observations, are not engaging in protest activity of either the kind or the frequency that they did during the summer of 2020. Plaintiffs have also not been impacted by force used by PPB for over two years. To the

Page 6 –   DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY
             JUDGMENT

extent that Plaintiffs assert that racial justice protests or other significant protests will begin again in earnest at another time prompting police intervention, such assertion is mere speculation. "Plaintiffs must have 'a reasonably certain basis' for needing the prospective relief they seek for such claims to remain live." *Wise*, 539 F. Supp. 3d 1132, 1147. Because there is no ongoing protest activity in Portland, nor have Plaintiffs been participating in any regular, ongoing protest activity, any concern or risk of harm is speculative.

### 1. May 2020 to November 2020

On May 25, 2020, George Floyd was murdered in Minneapolis, Minnesota by a Minneapolis police officer. Following George Floyd's death, millions of people across the country gathered to protest police brutality and racism.  Protests in Portland began on May 28, 2020. (Dobson Decl., ¶ 5).

From late May through June, thousands of individuals in Portland marched, at times blocking City streets and freeways, but generally engaging in peaceful, lawful exercise of their First Amendment Right. (*See, e.g.*, ECF 112, ¶ 4; ECF 113, ¶¶ 16-17). During that same time, other individuals engaged in significant and widespread property damage and violence. (*See, e.g.*, ECF 112, ¶¶ 5-6; ECF 113, ¶¶ 20-33). This included breaking into and lighting the Justice Center on fire, lighting hundreds of additional fires, breaking the windows of storefronts and government buildings, stealing property, graffitiing and otherwise destroying property, as well as other criminal activity. (*See, e.g.*, ECF 112, ¶¶ 5-6; ECF 113, ¶¶ 20-33; ECF 21, ¶¶ 5-10; ECF 109).

Page  7  –   DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Between May 28, 2020 and June 9, 2020, PPB officers deployed tear gas[2] on six nights in order to disperse protesters. (Dobson Decl., ¶ 8). In response to PPB's deployments of tear gas, Plaintiffs filed their first complaint and a motion for a temporary restraining order on June 5, 2020. (ECF 1, 2). On June 6, 2020, Mayor Ted Wheeler issued an order prohibiting PPB officers from using CS gas (one of two types of tear gas used by PPB) "unless there is a serious and immediate threat to life safety, and there is no other viable alternative for dispersal." (ECF 19, ¶ 13). PPB officers did not use CS gas between June 6, 2020 and this Court's order on June 9, 2020. (Dobson Decl., ¶ 8).

On June 9, 2020, this Court entered an injunction restricting PPB's use of tear gas "except as provided by its own rules generally" and additionally limiting its use "to situations in which the lives or safety of the public or the police are at risk." (ECF 29 ("Tear Gas TRO")). The Court also prohibited the use of tear gas to "disperse crowds where there is no or little risk of injury." (*Id.*). Following the issuance of the Tear Gas TRO, PPB Officers did not use tear gas until June 25, 2020, when protesters blockaded the doors of PPB's North Precinct, an occupied building, disabled the outside security cameras, and lit the awnings on the outside of the building on fire. (ECF 111, ¶¶ 25-48; Dobson Decl. ¶ 8). Subsequently, PPB Officers used tear gas additional times during the 2020 protests in response to situations where the lives and safety of officers were at risk, often due to protesters lighting buildings on fire, or throwing dangerous objects, including rocks, bricks, fireworks, mortars, and Molotov cocktails at officers. (Dobson Decl., ¶ 9; *see, e.g.,*

---

[2] References to tear gas in this Motion include aerosolized oleoresin capsicum ("OC") and orthochlorobenzalmalonitrile ("CS"), consistent with this Court's temporary restraining order. (ECF 29). The City does not refer to hand-held OC spray as tear gas.

Page 8 –   DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

ECF 292, ¶¶ 31 44, 49, 54, 57). PPB Officers have not deployed CS gas in connection with crowd control since September 5, 2020. (Dobson Decl., ¶ 10). PPB Officers have not deployed any type of tear gas in connection with crowd control since September 28, 2020. (*Id*. at ¶ 11).

On June 26, 2020, Plaintiffs and the City stipulated to a temporary restraining order regarding PPB Officers' use of FN303s, 40mm Less Lethal munitions, Rubber Ball Distraction Devices ("RBDDs"), hand-held OC spray, and the Long Range Acoustical Device ("LRAD"). (ECF 43 ("Less Lethal TRO")).

On August 12, 2020, Plaintiffs filed a motion for contempt, asserting that the City violated the Less Lethal TRO on nine occasions on June 30, 2020. This is the only contempt motion that Plaintiffs have pursued related to either the Tear Gas TRO or Less Lethal TRO.[3] On November 27, 2020, the Court found the City in contempt for three uses of force by a single officer deploying an FN303 on June 30, 2020. (ECF 204). Plaintiffs never sought relief from this Court for any alleged violations of the Tear Gas TRO. Plaintiffs never sought relief for any other alleged violations of the Less Lethal TRO. Nightly protests continued in Portland every night through September 6, 2020. (Dobson Decl., ¶ 5). Less frequent protests continued through early November 2020. (*Id*. at ¶ 6). The absence of any additional request for relief from this Court is informative, as the injunctive relief was in place for most of the nightly protests in 2020, and for the following two years.

---

[3] On June 30, 2020, Plaintiffs filed an initial motion for contempt relating to uses of force on June 25, 26, and 27, 2020. (ECF 55). The City responded to that motion on July 14, 2020 (ECF 131). However, Plaintiffs elected to amend their motion on August 12, 2020, eliminating the allegations in the initial motion and instead addressing only force on June 30, 2020. (ECF 145).

Page 9 – DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## 2. November 2020 and Beyond

The protest situation in Portland changed again around mid-November 2020. The number of protests drastically reduced, as did the number of people in attendance at any particular protest. (Dobson Decl., ¶¶ 12-26). The current situation of sporadic, typically small, protests without any police response stands in contrast to the summer of 2020, when protests occurred on a nightly basis.

While some protest activity continued in Portland from mid-November of 2020 through March of 2021, it was infrequent and there was a significant reduction in the number of individuals participating in protests. (Dobson Decl., ¶¶ 12-17). From April 2021 through June of 2021, PPB responded to more protests, but they did not occur at nearly the frequency or size as the protests in the summer of 2020. (Dobson Decl. ¶¶ 18-19). During the protests in these three months, PPB officers used force at just eight of these events. (*Id*. at ¶ 19).

Since July 2021, protest activity has declined even more precipitously. Correspondingly, PPB has responded to almost no protests during this period. From July of 2021 to today, while over one hundred protests have occurred in Portland, PPB deployed a crowd management response on just one occasion. (Dobson Decl., ¶¶ 20, 25). PPB has monitored these events, and has made targeted arrests, but has not used any force at a protest during this time.[4]

Plaintiffs have confirmed this sharp decline in both protest activity and PPB use of force.

_____

[4] PPB has not deployed CS gas since September 5, 2020. (Dobson Decl., ¶ 27). PPB has not deployed any tear gas since September 28, 2020. (*Id*.). PPB has not deployed RBDDs since May 2021. (*Id*. at ¶ 30). PPB has not deployed impact munitions, hand-held OC spray, batons, or any other force at a protest since June 2021. (*Id*. at ¶¶ 20, 28-29).

Page 10 – DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs Belden and Roberts have not attended a protest in Portland since November 15, 2020. (Declaration of Robert Yamachika ("Yamachika Decl."), ¶ 16, Ex. 9, Plaintiff Belden's Response to Request for Admission ("Belden Admissions"), No. 16; ¶ 15, Ex. 8, Plaintiff Roberts' Response to Request for Admission ("Roberts Admissions"), No. 16). And Plaintiffs Wrecksie, Johnson and Dreier attended far fewer protests in the last two years than the well-over 100 nights of protests in 2020. (Yamachika Decl., ¶ 11, Ex. 5, Plaintiff Dreier's Response to Interrogatories ("Dreier Interrogatories"), No. 19; ¶ 18, Ex. 11, Plaintiff Wrecksie's Response to Interrogatories ("Wrecksie Interrogatories"), No. 19; ¶ 14, Ex. 7, Plaintiff Johnson's Response to Interrogatories ("Johnson Interrogatories"), No. 19.). Plaintiff Wrecksie was only able to generally explain that "[t]hroughout most of 2021 [he] believes that he attended an average of one protest event per week in various areas and neighborhoods in Portland and periodic protests throughout the city during 2022." (Ex. 11, Wrecksie Interrogatories, No. 19). Plaintiff Dreier attended thirty-four protests and Plaintiff Johnson attended eleven protests during this approximately two-year period. (Ex. 5, Dreier Interrogatories, No 19; Ex. 7, Johnson Interrogatories, No. 19). Ultimately, Plaintiffs and the City agree that the frequency of protests in the last two years is not even comparable to the protests of 2020.

Most notably, all of the Plaintiffs have confirmed that they have not been subject to any force at a protest in Portland since prior to November 2020. (Ex. 9, Belden Admissions, No. 17; Ex. 8, Roberts Admission, No. 17; Yamachika Decl., ¶ 11, Ex. 4, Dreier Admission, No. 17; ¶ 13, Ex. 6, Johnson Admission, No. 17; ¶17, Ex. 10, Wrecksie Admission, No. 17). This is again unsurprising. It is wholly consistent with the reported data from PPB that very little force has been used during protests in the last two years.

Page  11  –  DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY
                JUDGMENT

Not only has there been a decline in protest activity over the last two years, but there is also no evidence of that changing in the foreseeable future. When deposed, while some of the Plaintiffs anticipated potentially protesting in Portland again, at some time, none were able to identify any specific plans to do so. (Yamachika Decl., ¶ 21, Ex. 14, Deposition Transcript of Alexandra Johnson, 169:7-10; ¶19, Ex. 12, Deposition Transcript of Michelle Belden, 138:22-139:5; ¶ 22, Ex. 15, Deposition Transcript of Nicholas Roberts 149:1-7; ¶ 20, Ex. 13, Deposition Transcript of Thomas Dreier, 140:6-20; ¶ 23, Ex. 16, Deposition Transcript of Lester Wrecksie, 226:10-15). And if Plaintiffs do choose to attend a protest in the future, as discussed below, Oregon law has significantly changed. Any police response to future protests will be different than the response during the summer of 2020. The present circumstances in Portland, demonstrated by Plaintiffs' own experiences, are such that any likelihood of future injury is based on speculation rather than concrete facts.

**B. Changes to Oregon law modified the tools available to PPB when responding to protests.**

In addition to the significant change in circumstances since the summer and fall of 2020, there have also been fundamental changes in Oregon law. These changes materially alter how the City can respond to future protests, should such protests to occur. Indeed, taken together, the statutory changes represent significant reform to the way that police can respond to riots or unlawful assemblies, to disperse or arrest persons participating in such assemblies, and to use tear gas and other less lethal munitions in response to unlawful protest activity.

Most directly related to Plaintiffs' claims in this lawsuit, on March 23, 2022, the Governor signed into law HB 4008, which became effective immediately upon passage. ORS

Page 12 – DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY
                    JUDGMENT

181A.708.[5] In relevant part, HB 4008 amended ORS 181A.708, relating to the use of tear gas, hand-held OC spray, kinetic impact projectiles, and sound devices.

ORS 181A.708 restricts when and how force can legally be used by law enforcement at protests. The limitations apply to most of the types of force complained of by Plaintiffs. Notably, the law specifically prohibits PPB officers from using any handheld chemical incapacitant or kinetic impact projectile for crowd management.[6] Crowd management is broadly defined to mean "a public security practice in which crowds are managed to prevent the outbreak of crowd crushes, affrays, fights or rights, or in which an assembly protest or demonstration is dispersed." ORS 181A.708(1)(a).

The use of tear gas is similarly limited in a manner comparable to that provided for by this Court in its Tear Gas TRO. *See* ORS 181A.708(3). The use of tear gas must be objectively reasonable to either defend against a threat to life or serious bodily injury to an individual or to bring an objectively dangerous and unlawful situation safely and effectively under control. *Id.* In addition to these overarching limitations on the use of tear gas, there are procedural limitations that provide further protections to future protesters, including Plaintiffs. *Id.*

Finally, like this Court's previous injunctions, the changes in Oregon law require officers to minimize incidental impact of any uses of force on bystanders and other unintended targets.

---

[5] Notably, this law amended HB 2928 from 2021 (which repealed HB 4208 from 2020), which also restricted the use of certain types of force in connection with protest events. *See* 2021 Or. Laws Ch. 54; 2020 Or. Laws Ch. 8 (first special session).

[6] This prohibition does not otherwise prohibit a PPB officer "from using a handheld chemical incapacitant or kinetic impact projectile against an individual engaged in conduct otherwise justifying the use of physical force under ORS 161.195 to 161.275." ORS 181A.708(5).

Page  13  –  DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY
JUDGMENT

ORS 181A.708(6). These changes in Oregon law provide Plaintiffs with nearly everything that they ask of this Court. Oregon law now provides limitations and requirements around the use of force at protests that go beyond the limitations of the Fourth Amendment. Significantly, the changes to Oregon law very nearly eliminate the risk that Plaintiffs will be subject to similar harm to what they allege in the Complaint. At this point, finding a likelihood of future injury to Plaintiffs would require stacking of hypothetical upon hypothetical.

### C. PPB has undergone significant changes since the events that gave rise to Plaintiffs' claims due to legally binding requirements.

Not only have the legal requirements on force and the factual reality regarding protests in Portland changed over the last two years, the City's response to protests has also changed as a result of changes to law, retraining, and other lawsuits. These fundamental changes in the way PPB responds to large protests make the risk of Plaintiffs experiencing future harm almost non-existent. And these changes are not merely a voluntary cessation of PPB's prior practices. Rather, they are driven by legal obligations that are, at bottom, beyond the City's control.

#### 1. Additional changes to Oregon law have required PPB to alter its response to large protest events.

The changes in Oregon law regarding use of force at protest, discussed above, coupled with changes to laws regarding unlawful assembles and the crime of interfering with a peace officer, have fundamentally altered the manner in which PPB responds to protests.

First, and most directly related to Plaintiff's claims, PPB has stopped the use of RBDDs and is currently eliminating the remaining inventory of these devices. (Dobson Decl., ¶ 33(a)). Additional changes to Oregon law, not directly related to use of force, have also required PPB to modify its response to protest activities. Effective January 1, 2022, the legislature amended ORS

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

131.675, the state unlawful assembly statute, as follows:

> When any five or more persons, ~~whether armed or not~~, are unlawfully ~~or riotously~~ assembled in any county, city, town or village, the sheriff of the county and the deputies of the sheriff, the mayor of the city, town or village, or chief executive officer or officers thereof, ~~and the justice of the peace of the district where the assemblage takes place, or such of them as can forthwith be collected, shall~~ may go among the persons assembled, or as near to them as they can with safety, and command them in the name of the State of Oregon to disperse. If, so commanded, they do not immediately disperse, the officer ~~must~~ may arrest them or cause them to be arrested~~; and they may be punished according to law~~ for any unlawful activity constituting an offense.

*See* 2021 Or. Laws Ch. 250 (new language underlined in blue, stricken language in red).

The legislature also amended ORS 162.247, which defines the crime of interfering with a peace officer. The amendment eliminated from the scope of violations a person's "refus[al] to obey a lawful order by the peace officer or parole and probation officer." *See* 2021 Or. Laws Ch. 254. This amendment became effective on June 11, 2021. *Id*.

Together, these changes to Oregon law modify the authority of law enforcement to declare an unlawful assembly and respond to individuals who remain in the area of an unlawful assembly following an instruction to disperse. In order to adapt to changes in Oregon law, PPB has adjusted how it responds to protests. Instead of attempting to manage and respond to a large group of protesters, PPB has changed tactics to specifically focus on identifying and addressing individuals at protests who are engaged in crime. (Dobson Decl., ¶¶ 33-34).

This changed approach has both reduced the interactions between PPB and protesters and has eliminated the use of force by PPB for over a year. (*Id*.). PPB has monitored protests to identify, investigate, and seek prosecution of specific individuals within crowds that are

Page 15 – DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

engaging in violent criminal activity. (*Id*.). In fact, Plaintiffs' counsel in this case has recognized

this new approach of using informants and including reference to their presence in charging

documents as "partially a psychological warfare tactic."[7] While the City does not agree with

Plaintiffs' counsel's hyperbolic description of PPB's attempt to target and arrest persons engaged

in criminal activity, there can be no dispute that this approach is materially different than the

approach that gave rise to Plaintiffs' claims.

> **2. The City completed the contempt remedies required by this Court, and continues to be guided by this Court's orders in training officers and evaluating officer conduct.**

This Court's requirements to remedy the City's contempt have further ensured that the

risk of additional harm to Plaintiffs is low. In connection with this Court's finding of Contempt,

City Attorneys participated in a day-long retraining of PPB's Rapid Response Team grenadiers

on December 5, 2020 to ensure that they immediately understood the implication of this Court's

decision. (Yamachika Decl., ¶ 1). This training was provided without any order from the Court in

order to ensure that officers were prepared to comply with PPB policy and the Less Lethal Order,

as clarified by this Court's decision. (*Id*. at ¶ 3).

Further, the City has fully complied with the Court's remedies. In complying, the City

conducted a 2.5-hour training with RRT grenadiers regarding the contours of this Court's

decision. (*See* ECF 220 ("Remedies Order"); ECF 222). The City voluntarily conducted this

training with all PPB officers who were certified to carry a 40mm less lethal launcher, and

---

[7] *See* https://www.wweek.com/news/courts/2021/06/02/portland-cops-are-mining-intel-from-informants-who-infiltrate-masked-black-bloc-marches/.

Page 16 – DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

stipulated to an amendment of the Remedies Order to include these officers.[8] (ECF 229, ECF 230; Yamachika Decl., ¶ 5). The City also provided this training to all supervisors to ensure that persons supervising and evaluating PPB officers understood the parameters of this Court's ruling. (Yamachika Decl., ¶ 7). In total, the City Attorney's Office conducted eleven, 2.5 to 3-hour trainings; including a knowledge test, for 247 PPB members, including officers, sergeants, lieutenants, command staff, and internal affairs investigators. (*Id*. at ¶ 8).

Also, in compliance with the Remedies Order, PPB conducted a 3-hour training for every PPB officer in the fall of 2021 to address lessons learned from the 2020 protests. (Declaration of Michael Porter ("Porter Decl."), ¶¶ 3-7). This included a 2-hour training session by City Attorneys specifically addressing legal issues related to the protest response both in Portland and protest responses around the country. (*Id.* at ¶ 5). Ultimately, PPB and the City Attorney's Office conducted over thirty, 5.5-hour trainings for PPB members. (*Id*. at ¶ 7).[9]

This training and retraining of PPB officers on responding to protests and other large crowd management events remains ongoing. PPB in-service training for all sworn officers, scheduled for January 2023, will include a two-day training on crowd control. (*Id.* at ¶ 10). This

---

[8] Importantly, the City adjusted its approach to the training in response to critiques, including the use of at least two City Attorneys as instructors and requiring all officers to appear on camera during the training to ensure that participants were not multitasking and paying attention to the presentation. Changes also included engaging in discussion following the knowledge test to address and reinforce the correct answer for questions answered incorrectly. (Yamachika Decl. ¶ 6).
[9] PPB also recirculated this Court's Contempt Order through the learning management system on March 24, 2021, and required that all sworn PPB officers to certify that they had read and understood the order. (Porter Decl., ¶ 8). PPB members were invited to contact the City Attorney's Office to ask questions. (*Id*.).

Page  17  –  DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY
            JUDGMENT

training will again address reasonable and unreasonable use of force. (*Id.*). It will also include training on the tactical changes in PPB's approach to crowd management. (*Id.*).

In addition to completing the required training elements of the Remedies Order, the City has also completed the investigations into the uses of force. Ultimately, PPB sustained allegations that Officer Taylor's use of the FN303 at an individual holding a banner and individuals pulling Plaintiff Wrecksie on June 30, 2020 (Incidents 2 and 3) violated PPB Directives 1010.00 and 315.00. (Declaration of Jeffrey Bell ("Bell Decl."), ¶ 5).

PPB also conducted a complete investigation of Incident 9, where the Court described Officer Taylor's use of an FN303 at an individual who "walked out from the crowd of protestors toward an unknown object," "leaned down to grab the item," and "was struck by a munition before they even had the object in their hands." (ECF 204, at 18). Ultimately, the allegation that Officer Taylor violated PPB Directive 1010.00 and 315.00 for this use of force were not sustained by PPB. Through the investigator's review of video evidence and the testimony from the contempt hearing, it was determined that the "unknown item" was a previously deployed smoke canister. It was also determined that the individual did successfully pick up the smoke canister. (Bell Decl., ¶ 6). In reaching a different factual conclusion than the Court, PPB determined that the incident was factually more similar to Incident 8, than the Court's description of Incident 9. PPB, therefore, determined that it was reasonable for Officer Taylor to conclude that the individual who successfully picked up a deployed smoke canister was engaged in active aggression. (*Id.*).

Page 18 – DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**3. The City will be engaging in further disciplinary review, critical assessment, changes to training, and implementation of body worn cameras in connection with a separate legal proceeding.**

Finally, in connection with legal requirements in *United States v. City of Portland*, No. 3:12-cv-02265-SI, the City will also be conducting further review and providing additional training related to crowd management and crowd control responses. The City and the United States Department of Justice have agreed to amend the settlement agreement in that case to add additional remedies in response to the United States' notice of noncompliance relating to PPB's response to the 2020 protests. The Court entered an order adopting these amendments on April 29, 2022. (*United States v. City of Portland*, No. 3:12-cv-02265-SI, ECF 276, 290). The majority of the amendments amount to legally binding obligations that PPB is undertaking to learn from the 2020 protests and make improvements. These amendments include:

- Revising Force Data Collection Report and After Action Report forms to capture when and by whom the forms are edited.

- Hiring a qualified outside entity to conduct a critical assessment of the City's response to the 2020 protests and produce a public-facing report. The City will use the report to conduct a training needs assessment. The outside entity is also required to prepare a follow-on review of the City's response to its report.

- Creating a civilian position in PPB to direct all educational aspects of PPB's Training Division.

- Investigating to identify "(a) the PPB Lieutenant(s) and above who trained Rapid Response Team members to believe that they could use force against individuals during crowd control events without meeting the requirements of PPB Directive

Page 19 – DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1010.00; (b) the PPB incident commander(s) and designee(s) with the rank of Lieutenant or above who directed or authorized any officer to use force in violation of PPB Directive 1010.00, or who failed to ensure that FDCRs and After Action Reports arising from the crowd control events starting on May 29, 2020, and ending on November 16, 2020, were completed as required by Section 13.1 of PPB Directive 635.10; and (c) the PPB Commanders and above who failed to timely and adequately clarify misunderstandings and misapplications of PPB policy (including this Agreement) governing the use, reporting, and review of force during the crowd control events starting on May 29, 2020 and ending on November 16, 2020." In addition to this investigation, PPB is required to hold accountable members at the rank of Lieutenant and above who are determined to have violated PPB directives.

- Implementing the use of body-worn cameras.

(*Id.*, ECF 276-1, ¶¶ 188-194).

These requirements, dictated by the legal obligations of the amended settlement agreement, like many of the requirements stemming from this Court's Remedies Order, are designed to improve PPB's training around crowd management and ensure greater accountability when officers engage in conduct that violates policy or law. These changes, coupled with the retraining and other changes addressed above, significantly reduce the risk that any Plaintiff faces a realistic threat of future harm arising from PPB's response to protests.

Page  20  –  DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**D.  The drastically changed circumstances demonstrate that Plaintiffs cannot establish any real, non-speculative, threat of future harm.**

"A request for injunctive relief remains live only so long as there is some present harm left to enjoin." *Bayer*, 861 F.3d at 864 (citation omitted). The facts and circumstances that gave rise to Plaintiffs' alleged harm have changed so markedly over the last two years that there is no real, present threat of harm. In fact, the changes make it most unlikely that Plaintiffs will ever face a similar threat of harm in the future.

Large, regular protests are no longer occurring in Portland. Oregon law has changed, placing greater restrictions on how PPB officers can use force at protests. Changes in other areas of Oregon law have required tactical changes in the way that PPB engages with protesters. And this Court's orders and other binding legal obligations have resulted in re-evaluation of PPB's response in 2020, retraining of PPB officers to change and improve outcomes going forward, and mandated review and investigation of specific uses of force from 2020. These efforts have shown results. As Plaintiffs concede, they are protesting much more sporadically than in the summer and fall of 2020. And none of them have been subjected to harms like those alleged in the Complaint since prior to November 2020.

For harm to Plaintiffs to recur: (a) large protests would have to start again in Portland; (b) Plaintiffs would need to attend the protests; (c) PPB would have to declare a riot or unlawful assembly under the new constraints of state law; and (d) PPB would need to use unlawful force against Plaintiffs. With all of the changes outlined above, "[t]his chain of events is too speculative," so Plaintiffs' requests for prospective relief are moot. *Murphy v. Kenops*, 99 F. Supp. 2d 1255, 1260 (D. Or. 1999); *Eggar v. City of Livingston*, 40 F.3d 312, 317 (9th Cir. 1994)

Page  21  –  DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

("A 'chain of speculative contingencies' rules out standing in this case."); *MacNamara v. City of New York*, 275 F.R.D. 125, 141 (S.D.N.Y. 2011) ("That some Plaintiffs may participate in future demonstrations of unspecified date, duration, or scope does not translate into a real and immediate threat of future injury." (quotation marks omitted)).

Plaintiffs cannot "show the conduct complained of in this action presently affects [them] or can reasonably be expected to affect [them] in the future," and therefore their claims for prospective relief, even declaratory relief, are not justiciable. *Bayer*, 861 F.3d at 868. Declaratory relief is "retrospective to the extent that it is intertwined with a claim for monetary damages that requires [courts] to declare whether a past constitutional violation occurred. In such a situation, however, declaratory relief is superfluous in light of the damages claim.'" *National Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 847 n.5 (9th Cir. 2002) (quoting *People for the Ethical Treatment of Animals v. Rasmussen*, 298 F.3d 1198, 1202 n.2 (10th Cir. 2002)). Retrospective declaratory relief is not appropriate when it "would have much the same effect as a full-fledged award of damages." *Green v. Mansour*, 474 U.S. 64, 73 (1985). *See also Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 288 (1997) (stating "[a] federal court cannot award retrospective [declaratory] relief, designed to remedy past violations of federal law") (internal citations omitted).

Here, Plaintiffs claim for injunctive relief has become moot because "subsequent events have made clear the conduct alleged as the basis for the requested relief 'could not reasonably be expected to recur.'" *Bayer*, 861 F.3d at 864. In applying this standard to the potential risk of harm from future protests in Portland, other courts in this district have similarly concluded that such harm is too speculative:

Page  22  –  DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY
               JUDGMENT

> Plaintiffs desire to attend any social justice protests that might
> occur in Portland in the future. For their alleged *injury* to occur,
> however, requires "attempting to anticipate whether and when
> these" Plaintiffs might attend a social justice protest that is then
> declared an unlawful assembly. *See O'Shea*[ *v. Littleton*], 414 U.S.
> [488,] 497[ (1974)]. Then if such a protest is declared an unlawful
> assembly, it must result in a law enforcement response that
> includes the alleged excessive force, failure to accommodate, or
> other misconduct. Finally, the Plaintiffs must be harmed by that
> alleged misconduct. All of these steps must occur despite the
> currently reduced crowd size and protest circumstances in
> Portland. This "takes us into the area of speculation and
> conjecture." *Id.* For Plaintiffs' alleged injury to occur requires too
> speculative of a chain of possibilities. *See Clapper*[ *v. Amnesty
> Int'l*], 568 U.S. [398,] 410 [(2013)].

*Wolfe*, 2021 WL 4713237, at *10.

As discussed above, the relevant circumstances that prompted PPB's response to the

2020 protests no longer exist. Protests in Portland continue sporadically, rarely resulting in a

police response. Police response has adapted to ensure compliance with changes in state law.

Consistently, Plaintiffs concede they have only sporadically attended protests and have not been

subjected to use of force by PPB officers since before November 15, 2020. *Cf. Index Newspapers

LLC*, 2022 WL 4466881, at *5 (finding plaintiff's claims for prospective relief against federal

government moot when "[t]he most recent alleged improper conduct by federal officers against

journalists or legal observers is from June 3, 2021.").

The City does not dismiss the possibility that sometime in the future some large protest

may occur that necessitates a crowd management response. While it is possible that a PPB

officer will use force in connection with some theoretical future protest, "[t]he mere fact that

some protests are likely to occur does not mean that the harm alleged by Plaintiffs' is reasonably

likely to occur." *Id*. The proper way to address any future harm is through judicial action at that

Page  23  –  DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY
                 JUDGMENT

time. *Id.* (noting that deciding Plaintiffs' claims are moot does not mean "that any future claims that might arise under similar circumstances as happened in this case would not be subject to judicial review."). If such similar harm, although unlikely, were to happen in the future, Plaintiffs could seek retrospective relief or seek prompt equitable relief, just as was done in this case. *Id.* ("If there were a similar future case, there is no reason why Plaintiffs could not also obtain similar preliminary injunctive relief and more expeditiously seek a trial on the merits to request permanent injunctive relief."). But the mere possibility that some harm could come to these Plaintiffs, harm which has not occurred in over two years, does not justify a sweeping, permanent injunction and indefinite oversight by this Court. "Plaintiffs cannot rely on the general assumption that protests of some kind will continue to occur in Portland to save their own claims from mootness." *Wise*, 539 F. Supp. 3d at 1148.

## II.    This Court should grant the City's motion for summary judgment with respect to Don't Shoot Portland, because it has neither alleged, nor does it have evidence that the City violated its First or Fourth Amendment rights.

Plaintiffs' claims arise from allegations that PPB officers used excessive force against them and that such force was used to retaliate against the exercise of their First Amendment Rights. DSP's claims against the City necessarily fail because they do not allege, nor is there any evidence, that any PPB officer used excessive force against DSP. Because there is no basis to conclude that the City violated DSP's Fourth or First Amendment rights as a result of its use of force during the 2020 protests, the Court should enter judgment for the City with respect to DSP's claims.

In the Complaint, DSP alleges that: it strongly opposes the use of force against protesters; (ECF 233, Compl. ¶ 48); it provides mutual aid to protesters. (*id*.); it had to divert resources to

Page  24  –  DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY
               JUDGMENT

distribute supplies to protesters (*id.*); and its board members and volunteers participated in the 2020 protests and have been subjected to force. (*Id.*). DSP also alleges that it has facilitated scientific research related to the tear gas and COVID-19. (*Id.* at ¶ 49). Finally, DSP alleges that its supplies have been destroyed by tear gas and other physical destruction and PPB's response to the 2020 protests made it more difficult for DSP to organize protests in support of Black Lives because people are fearful of engaging in such activities. (*Id.* at ¶ 50). Nowhere does DSP allege that PPB officers used tear gas or other less lethal munitions against it.

In discovery, when asked to "identify, by date, time, and description, the events giving rise to each of [its] claims against the City," DSP responded:

> Objection, overly broad and unduly burdensome, given the 100 plus nights of protests in Portland in 2020. In general, see Fourth Amended Complaint, and Plaintiff Don't Shoot Portland responds that the PPB's increasing and excessive use of force on protestors engaged in passive resistance, including PPB deployment of tear gas, pepper spray, and impact weapons, from May 25, 2020 to November 15, 2020 in downtown Portland and in North Portland are the basis for Plaintiff's claims against the City.

(Yamachika Decl., ¶ 10, Ex. 3, Interrogatory Responses of Don't Shoot Portland ("DSP Interrogatories"), No. 3)

DSP's claims against the City relate to unspecified uses of force against unidentified individuals, regardless of their relationship to DSP, over a five-month period. With respect to specific types of munitions for which DSP seeks relief, it similarly was unable to identify any specific dates or locations at which it or its property were harmed:

- Tear Gas: Plaintiff DSP's board members and volunteers provided PPE equipment and medical support to demonstrators.

Page  25  –  DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY
         JUDGMENT

- FN303: DSP's volunteers and board members witnessed PPB use FN303 munitions often.

- 40MM: DSP's volunteers and board members witnessed PPB use 40mm munitions often.

- RBDD: DSP's volunteers and board members witnessed PPB use RBDD munitions several times.

- LRAD: DSP's volunteers and board members witnessed PPB use a Long Range Acoustical Device.

- Pepper Spray: DSP's board members and volunteers provided PPE equipment and medical support to demonstrators during the 2020 summer protests.

(*Id.* at Nos. 12-16).

When asked to admit that it had not been harmed by FN303s, RBDDs, or 40mm munitions, DSP denied, explaining "because Don't Shoot Portland volunteers and committee members have been injured by Portland Police weapons." (Yamachika Decl., ¶ 9, Ex. 2, Admissions of Don't Shoot Portland ("DSP Admissions"), Nos. 7-9). Moreover, when asked to admit that it, as an entity, has not been harmed in connection with the events alleged in the Complaint, DSP denied, explaining "Don't Shoot Portland has been targeted and harassed by White Supremacists, and had their buildings targeted and vandalized." (*Id*. at No. 11). The City certainly agrees that acts of violence by white supremacists is abhorrent. However, DSP's identified harms were either harm to third parties (volunteers and committee members) or expressly caused by third parties, not the City.

To state a *Monell* claim, a plaintiff must show as an initial and dispositive matter that the plaintiff possessed a constitutional right of which it was deprived. *City of Canton v. Harris*, 489

Page 26 – DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

U.S. 378, 380 (1989); *Horton v. City of Santa Maria*, 915 F.3d 592, 602–603 (9th Cir. 2019); *Dougherty v. City of Covina*, 654 F.3d 892 (9th Cir. 2011). DSP cannot do so. Therefore, the Court should grant the City's motion for summary judgment against DSP. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.").

**A. Don't Shoot Portland has no plausible Fourth Amendment claim against the City.**

DSP's First Claim for Relief alleges municipal liability based on an unlawful policy or practice of allowing indiscriminate force for crowd dispersal, an official action of policymaking officials, or ratification. (ECF 233, Compl. ¶¶ 99-103). DSP alleges that "[t]he City, acting pursuant to this policy, custom, or practice, unlawfully used force against plaintiffs as alleged above." (*Id*. at ¶ 100). But DSP never alleges that any PPB officers used force against it—nor could it.

Generally, "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969). To state an excessive force claim, plaintiff must allege facts showing that an officer's conduct was "objectively [un]reasonable in light of the facts and circumstances confronting them[.]" *Mihailovici v. Snyder*, No. 3:15-CV-01675-KI, 2016 WL 447842, at *4 (D. Or. Feb. 4, 2016) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Where a plaintiff brings a claim under 42 U.S.C. § 1983, asserting that defendants used excessive force against them in violation of their Fourth Amendment right to be secure against unreasonable seizures, the critical question "is whether the use of force was 'objectively reasonable in light of the facts and

Page  27  –  DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY
                JUDGMENT

circumstances confronting' the ... officer[ ]." *Sanchez v. Marion Cty.*, No. 6:14-CV-724-AA, 2016 WL 680814, at *2 (D. Or. Feb. 16, 2016) (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007)).

The Ninth Circuit has articulated the Fourth Amendment analysis stating: "[o]ur analysis involves three steps. First, we must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted." *Glenn v. Washington Cty.*, 673 F.3d 864, 871 (9th Cir. 2011) (quoting *Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010)). "[E]ven where some force is justified, the amount actually used may be excessive." *Glenn*, 673 F.3d at 871 (quoting *Santos v. Gates,* 287 F.3d 846, 853 (9th Cir. 2002)). Second, we evaluate the government's interest in the use of force. *Graham,* 490 U.S. at 396. Finally, "we balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Miller v. Clark Cty.,* 340 F.3d 959, 964 (9th Cir. 2003).

In this case, evaluating the type and amount of force allegedly inflicted against DSP is impossible because there was none. DSP acknowledges as much. When asked to identify the dates and locations when it was harmed by the force used by PPB, DSP responded only that its board members and volunteers provided support to demonstrators, and that DSP volunteers and board members witnessed force. (Ex. 3, DSP Interrogatories, Nos. 12-17). DSP has failed to identify a single incident when it was subjected to force. Regardless of the alleged basis for the *Monell* claim, the *Graham* reasonable force standard still applies for excessive force claims. Unlike the individual Plaintiffs, DSP has not pled and there is no evidence to support the conclusion that PPB engaged in any type or level of force against the nonprofit corporation whatsoever.

Page  28  –  DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

There is no evidence that the PPB officers have engaged in any force, let alone excessive force, against DSP. Accordingly, the Court should dismiss DSP's Fourth Amendment claim.

**B. Don't Shoot Portland's First Amendment Claim fails for similar reasons.**

For the same reason that DSP's Fourth Amendment claim fails, its First Amendment claim also fails—there is simply no evidence that that the City took any action against DSP. There is no evidence that DSP's general participation and support of the 2020 protests was the motivating factor in an unpled and unknown action that the City took against it.

"To bring a First Amendment retaliation claim, the plaintiff must allege that (1) it engaged in constitutionally protected activity; (2) the defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech." *Ariz. Student's Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016).

DSP states that it has "been participating [in] the local demonstrations and providing assistance and support to protesters." (ECF 233, Compl. ¶ 48). It is undisputed that participating in organized political protest is protected activity. *See Black Lives Matter Seattle-King Cty. v. City of Seattle*, *Seattle Police Dep't,* No. 2:20-CV-00887-RAJ, 2020 WL 3128299, at *4 (W.D. Wash. June 12, 2020). However, "[i]n order to demonstrate a First Amendment violation, a plaintiff must provide evidence showing that 'by his actions [the City] deterred or chilled [DSP's] political speech and such deterrence was a substantial or motivating factor in [the City's] conduct.'" *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (alterations in the original) (quoting *Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th Cir.

Page  29  –  DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY
                JUDGMENT

1994)). Once again, DSP's retaliation claim fails because there is no evidence that the City took any action against it.

All of the actions alleged in the Complaint relate to PPB's use of force. Specifically, Plaintiffs allege that "PPB's use of force against Plaintiffs for engaging in First Amendment protected activity and, in an effort, to deter future similar activity, evidences a pattern and practice of unconstitutional conduct that is certain to continue absent any relief." (ECF 233, Compl. ¶ 106). But, as discussed above, there are no allegations, and there is no evidence, that PPB used force against DSP. Because PPB's use of force is what Plaintiffs allege would chill a reasonable person, the Court should dismiss DSP's First Amendment claim against the City.

C. **Don't Shoot Portland lacks standing to assert its First Amendment or Fourth Amendment claims against the City.**

Pursuant to Article III of the U.S. Constitution, federal courts may only hear cases if the plaintiffs can establish they have standing. *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011). "A plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). Otherwise, the court must dismiss the claims for lack of subject matter jurisdiction. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). To establish Article III standing, a plaintiff must establish three elements:

> (1) it has suffered an "injury in fact' that is
>
> (a) concrete and particularized and
>
> (b) actual or imminent, not conjectural or hypothetical;
>
> (2) the injury is fairly traceable to the challenged action of the defendant; and

Page 30 – DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

(3) it is likely, as opposed to merely speculative, that the
injury will be redressed by a favorable decision.

*Arizona Christian Sch.*, 563 U.S. at 134 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

560–61 (1992)). An organization may have standing to sue either on behalf of its members or in

its own right. It may sue on behalf of its members when "its members would otherwise have

standing to sue in their own right[,]" and "the interests it seeks to protect are germane to the

organization's purpose[.]"  *United Food Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S.

544, 553 (1996). An organization may have standing to sue on its own behalf "when it suffered

both a diversion of its resources and a frustration of its mission." *La Asociacion de Trabajadores*

*de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)). The organization is

required to "show that it would have suffered some other injury if it had not diverted resources to

counteracting the problem." *Id*. Here, DSP does not allege nor is there evidence that it is suing on

behalf of its members. In fact, it has confirmed that it is not a member organization. (Ex. 2, DSP

Admissions, No. 16; ECF 233, Compl. ¶¶ 47-50, 111).[10]

For an organization to establish injury-in-fact, and thus have standing in its own right, it

must suffer a "concrete" and "demonstrable" injury to the organization's activities— "with the

consequent drain on the organization's resources - constitu[ting] far more than simply a setback

---

[10] Because DSP is not a member organization, it does not and cannot bring this action on behalf
of its members. *See e.g., The Equal Rts. Ctr. v. AvalonBay Communities, Inc.*, No. CIV.A.AW-
0502626, 2009 WL 1153397, at *4 (D. Md. Mar. 23, 2009) ("When an organization
has no members and is suing on its own behalf, it must have organizational standing to bring the
cause of action."); *Blunt v. Lower Merion Sch. Dist.*, 262 F.R.D. 481, 487 (E.D. Pa. 2009), aff'd
on other grounds, 767 F.3d 247 (3d Cir. 2014) ("[W]e find that it does not have standing to bring
suit on behalf of its members because it has none.").

Page  31  –  DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY
                JUDGMENT

to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, (1982) (citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)).  In *Havens*, the nonprofit HOME sued a residential development company, Havens Realty Corp. (Havens), under the Fair Housing Act, claiming that Havens had engaged in unlawful racial steering. HOME described itself as a nonprofit that pursued the goal of equal opportunity housing. The Supreme Court found that HOME had organizational standing in its own right because: 1) the Fair Housing Act created a broad private right of action for an "aggrieved person," who is "injured by a discriminatory housing practice (42 U.S.C. § 3602(i); 3613(a)); and 2) the unlawful racial steering practices had "perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers," and thus, "there can be no question that the organization has suffered injury in fact." *Id*.

In contrast, the Supreme Court in *Sierra Club v. Morton*, held that Sierra Club, an organization suing in its own right, did not have standing because: 1) there was no specific statute "authorizing invocation of the judicial process" and 2) the Sierra Club did not suffer any concrete injury, but instead had a "special interest" in the dispute. 405 U.S. at 732, 735; *see also La Asociacion de Trabajadores de Lake Forest*, 624 F.3d at 1088 (explaining that in failing to assert sufficient factual allegations regarding organizational standing in its complaint, an organization cannot establish standing "by . . . simply choosing to spend money fixing a problem that otherwise would not affect the organization at all.").

Sierra Club sued to stop construction of a proposed ski resort and recreation area in a national game refuge and forest that allegedly contravened federal laws. The Sierra Club claimed that the development "would destroy or otherwise adversely affect the scenery, natural and

Page  32  –  DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

historic objects and wildlife of the park and would impair the enjoyment of the park for future generations." 405 U.S. at 734. In claiming that it would be "vitally affected" and "aggrieved" by defendant's acts, Sierra Club stated that "[o]ne of the principal purposes of the Sierra Club is to protect and conserve the national resources of the Sierra Nevada Mountains" and its activities and conduct were focused on the "conservation and the sound maintenance of the national parks, game refuges and forests of the country." *Id*. In holding that the Sierra Club did not have standing, the Supreme Court noted:

> [I]f a 'special interest' in this subject were enough to entitle the Sierra Club to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide 'special interest' organization however small or short-lived. And if any group with a bona fide 'special interest' could initiate such litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so.

*Id*. at 636.

Both the factual allegations and evidence demonstrate that DSP cannot establish injury-in-fact. As in *Sierra Club v. Morton* and *La Asociacion de Trabajadores de Lake Forest*, DSP has not suffered an organizational injury in connection with PPB's alleged uses of force. Instead, the facts show that DSP may have had a special interest in the 2020 protests. DSP describes its mission as "advocating and educating on the issue of police violence and accountability." (ECF 233, Compl. ¶ 47). In another lawsuit, it explained that its "core organization mission is to support activists, protesters, and organizers exercising their First Amendment rights toward eradicating gross inequalities in society through 'mutual aid.'" (1:20-cv-02040-CRC, ECF 26 at 14).

For organizational standing in its own right, it is not enough that DSP simply chose to use resources in support of the 2020 protests. It "must be 'forced' into acting because the defendant

Page  33  –  DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY JUDGMENT

affected its operations." *In defense of Animals v. Sanderson Farms, Inc.*, No. 20-cv-05293-RS, 2021 WL 4243391, * 4 (N.D. Cal. Sept. 17, 2021) (citing *Rodriguez v. San Jose*, 930 F.3d 1123, 1136 (9th Cir. 2019)); *La Asociacion de Trabajadores de Lake Forest*, 624 F.3d at 1088 n.4; *Ctr. for Biological Diversity v. Bernhardt*, No. 19-CV-05206-JST, 2020 WL 4188091, at *4-5 (N.D. Cal. May 18, 2020). In short, "[t]he conduct must force the organization to divert resources *or* suffer injury." 2021 WL 4243391, at * 4. Here, DSP elected to participate in the 2020 protests. In fact, "The protests further exposed Don't Shoot Portland's national grassroots organizing and inspired many calls of action to support the work of Don't Shoot Portland." (Ex. 2, DSP Admissions, No. 5). There is no evidence that the City's particular uses of force at the protests caused DSP to either divert resources away from its mission or suffer some unknown other injury. Quite the opposite, the protests, appear to have brought attention to and garnered support for DSP's mission. The evidence shows that DSP used resources to support the 2020 protests. But choosing to use its resources to support protests consistent with its mission does not suffice for injury-in-fact. *See People for the Ethical Treatment of Animals, Inc. v. United States Fish & Wildlife Serv.*, No. CV-12-04435 DMG (MANx), 2014 WL 12580234, at *5 (C.D. Cal. Jan. 31, 2014) ("An organization, however, 'cannot convert its ordinary program costs into an injury in fact.'").

Additionally, and importantly, unlike in *Horton*, there is no statute granting a private right of action for DSP's claims. Quite the opposite. "[A] cardinal principle [] of our constitutional order [is] the *personal* nature of constitutional rights . . ." *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999). And there is no evidence that DSP "suffered a particular injury caused by the action challenged as unlawful." *Schlesinger v.*

Page  34  –  DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY
              JUDGMENT

*Reservists Committee to Stop the War*, 418 U.S. 208, 221 (1974). As discussed above, there is no evidence that DSP has suffered a constitutional injury as a result of any PPB officer's use of force. Because DSP was never impacted by the excessive force that Plaintiffs allege, nor does it seek to assert rights on behalf of its members, the Court should dismiss DSP's claims because it lacks standing to bring them against the City.

## CONCLUSION

For the foregoing reasons, this Court should grant the City's motion and dismiss with prejudice Plaintiffs' requests for declaratory and injunctive relief. In addition, the Court should grant the City's motion against Don't Shoot Portland, as its claims are not justiciable and the evidence does not support its claims that any PPB officer violated its Fourth or First Amendment rights.

Dated:  November 8, 2022.


Respectfully submitted,


*/s/ Naomi Sheffield*
NAOMI SHEFFIELD, OSB 170601
Senior Deputy City Attorney
naomi.sheffield@portlandoregon.gov
J. SCOTT MOEDE, OSB 934816
Chief Deputy City Attorney
scott.moede@portlandoregon.gov
ROBERT YAMACHIKA, OSB 065560
Senior Deputy City Attorney
rob.yamachika@portlandoregon.gov
*Of Attorneys for Defendant City of Portland*

Page  35  –  DEFENDANT CITY OF PORTLAND'S MOTION FOR PARTIAL SUMMARY
JUDGMENT